IMMIGRANT DEFENDERS LAW CENTER
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org

JUSTICE ACTION CENTER
Esther H. Sung (CA Bar No. 255962)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)*
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

AMICA CENTER FOR IMMIGRANT RIGHTS
Adina Appelbaum (D.C. Bar No. 1026331)*
Samantha Hsieh (V.A. Bar No. 90800)*
Peter Alfredson (D.C. Bar No. 1780258)*
Evan Benz (N.C. Bar No. 49077)*
Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*pro hac vice forthcoming

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO,<br>1861 Bay Road<br>East Palo Alto, CA 94303;<br><br>SOCIAL JUSTICE COLLABORATIVE,<br>1832 Second Street<br>Berkeley, CA 94710;<br><br>AMICA CENTER FOR IMMIGRANT RIGHTS,<br>1025 Connecticut Avenue NW, Suite 701<br>Washington, DC 20036;<br><br>ESTRELLA DEL PASO,<br>2400A E. Yandell Drive<br>El Paso, TX 79903;<br><br>FLORENCE IMMIGRANT AND REFUGEE RIGHTS PROJECT, | CASE NO. 3:25-cv-2847<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

PO Box 654
Florence, AZ 85132;

GALVESTON-HOUSTON IMMIGRANT
REPRESENTATION PROJECT,
6001 Savoy Drive, Ste. 400
Houston, TX 77036;

IMMIGRANT DEFENDERS LAW CENTER,
634 South Spring Street, 10th Floor
Los Angeles, CA 90014;

NATIONAL IMMIGRANT JUSTICE CENTER,
111 W. Jackson Boulevard, Suite 800
Chicago, IL 60604;

NORTHWEST IMMIGRANT RIGHTS
PROJECT,
615 Second Avenue, Suite 400
Seattle, WA 98104;

ROCKY MOUNTAIN IMMIGRANT
ADVOCACY NETWORK,
7301 Federal Boulevard, Suite 300
Westminster, CO 80030;

VERMONT ASYLUM ASSISTANCE
PROJECT,
P.O. Box 814 Elmwood Avenue
Burlington, VT 05402,

                    Plaintiffs,

          v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
200 Independence Avenue, S.W.
Washington, DC 20201;

OFFICE OF REFUGEE RESETTLEMENT,
Administration for Children and Families
Mary E. Switzer Building
330 C Street, Room 5123
Washington, DC 20201;

DEPARTMENT OF THE INTERIOR,
1849 C Street N.W.
Washington, DC 20240,

Defendants.

**INTRODUCTION**

1.      Every day, in immigration courts across the country, unaccompanied children stand (or sit, with legs dangling over chairs, or are held in caretakers' arms) in front of federal immigration judges, across from Department of Homeland Security lawyers, in adversarial removal proceedings. Thousands of other unaccompanied children are not in removal proceedings—but nonetheless must navigate the country's complex immigration laws as they attempt to complete complicated and lengthy applications allowing them to seek lawful status in the United States.  These children, including babies and toddlers, arrived in the United States without a parent or legal guardian.  The vast majority do not speak English; the babies do not speak at all.  Most do not have the means to hire a lawyer.

2.      In one case, a one-year-old named Johan appeared in the Phoenix Immigration Court in 2018 with a bottle of milk and a purple ball—but without a parent or legal guardian.  The judge in Johan's case was "embarrassed to ask" if Johan understood the proceedings.  Turning to Johan's attorney, the judge addressed the absurdity of the legal theater playing out in his courtroom:  "I don't know who you would explain it to, unless you think that a 1-year-old could learn immigration law." Sasha Ingber, *1-Year-Old Shows Up In Immigration Court*, NPR (July 8, 2018), https://perma.cc/ALU7-RM6V.  Johan's story is not unusual, and demonstrates that the *only* way that many unaccompanied children can navigate the immigration legal system is with the help of a lawyer.

3.      Each unaccompanied child has their own individual story, but there are common themes. While many unaccompanied children are from Central America and the "Northern Triangle" countries of Guatemala, Honduras, and El Salvador, unaccompanied children come from all over the world. Most speak Spanish; some only speak indigenous Central American languages.  Few speak much English.  Many fled their home countries for their personal safety, escaping from gang violence, sexual violence, political violence, extreme poverty, and other dangers, only to experience further violence

and even trafficking during their long and dangerous journeys north to the United States.  No matter their country of origin or spoken language, all are incredibly vulnerable.

4.    Recognizing the needs of these children who are attempting to navigate the complex immigration system on their own, Congress enacted laws to provide special protections for unaccompanied children in that system.  These include the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), which requires that the government "shall ensure, to the greatest extent practicable," that all unaccompanied children receive legal counsel to represent them in "legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking." Pub. L. No. 110-457, § 235(c)(5), 122 Stat. 5044, 5079.

5.    More recently, the Department of Health and Human Services' ("HHS") Office of Refugee Resettlement ("ORR") issued a Foundational Rule, published in 2024, meant, in part, to carry out the agency's obligations under the TVPRA as well as the earlier 1997 settlement in *Flores v. Reno* (which dictates certain government obligations to unaccompanied children).  Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384 (Apr. 30, 2024) (codified at 45 C.F.R. pt. 410 (the "Foundational Rule")).   The Foundational Rule requires the government to "fund legal service providers to provide direct immigration legal representation" to unaccompanied children if there are "available appropriations" and to ensure children receive a legal orientation, consultation with a lawyer, and ongoing access to lawyers.  45 C.F.R. § 410.1309(a) (2024).

6.    Congress has appropriated funds to ensure as many unaccompanied children as possible are represented by lawyers.  For fiscal year 2024, for example, Congress appropriated more than $5 billion for Defendants to deliver services to unaccompanied children under various statutory obligations, which includes funding to provide legal representation for unaccompanied children under the TVPRA "to the greatest extent practicable."   This appropriation is now available to fund legal representations through September 30, 2027.

7. For more than a decade, until March 21, 2025—under different presidential administrations and changing immigration policies—the government fulfilled its obligations under the TVPRA and ongoing congressional appropriations to fund legal representation for unaccompanied children. Through this funding, every unaccompanied child in government custody (at shelters run by ORR, under the authority of HHS) had the opportunity to receive a group "know your rights" session and an individual legal screening, and many children received direct legal representation from legal service providers. These representations helped bridge the significant gap in legal access for unaccompanied children, only a small number of whom can afford paid representation or are able to independently retain a pro bono attorney. They also helped immigration courts function efficiently and avoided forcing immigration judges and government lawyers to engage directly with children in responding to immigration charges and related questions around relief from removal.

8. Plaintiffs are legal service providers that, until March 21, 2025, provided representation and related services to unaccompanied children with funding from Defendants. Plaintiffs furthered the TVPRA's goals and the requirements in the TVPRA and the Foundational Rule by providing basic legal services to unaccompanied children and by representing unaccompanied children in immigration court, affirmative immigration proceedings, and related state court proceedings.

9. Now, Plaintiffs have largely had to stop taking on new clients and face the real threat of not being able to continue their ongoing representations. For example, without funding from Defendants, Plaintiff Community Legal Service in East Palo Alto has had to stop taking on new unaccompanied children clients—even if the children face upcoming court dates without a lawyer—and if it cannot find other funding sources, its ability to represent existing clients (taken on in reliance on continued funding from Defendants) will be in jeopardy. Plaintiffs' inability to serve new clients or provide certainty for existing clients is an enormous harm to their mission to serve as many unaccompanied children as possible.

10.     Plaintiffs' clients range in age from infants to teenagers, all of whom depend on Plaintiffs for critical legal counsel.  For example, Plaintiff Immigrant Defenders Law Center represents a 16-year-old girl and her one-year-old son in cases that were funded by Defendants until March 21, 2025.  Beginning at the age of six years old, the girl was sex trafficked by her family in Mexico.  After giving birth to her son, she fled to the U.S. to save him from the same fate.

11.     On March 21, 2025, without warning, Defendant the U.S. Department of the Interior ("DOI") sent a notice terminating the contract line items through which Defendants HHS and ORR had provided funding for counsel for unaccompanied children and ordering Plaintiffs to "immediately stop work" on their ongoing funded representations (the "Cancellation Order").  Defendants issued this order despite the TVPRA's mandate that the government provide unaccompanied children with legal counsel to the greatest extent practicable and despite the existence of congressionally appropriated funds to pay for precisely these services through at least September 30, 2027.  As a result, many of the approximately 26,000 unaccompanied children around the country represented by attorneys through now-terminated funding from Defendants—including children with immigration court hearings scheduled for the following business day—were placed at imminent risk of being cut off from their lawyers.  The children subject to this risk include many children now facing imminent removal from the United States despite being prima facie eligible for immigration relief.

12.     The Cancellation Order flies in the face of the TVPRA and the Foundational Rule.  In addition to interrupting and obstructing attorney-client relationships, contrary to the mandate to provide legal counsel to unaccompanied children, it also defeats the broader purpose of both the TVPRA and the Foundational Rule.  Through the funded representations, Plaintiffs play a key role in identifying and helping child trafficking victims, fulfilling one of Congress's primary objectives in the TVPRA (to "protect [unaccompanied children] from mistreatment, exploitation and trafficking").  *See* TVPRA, Pub. L. No. 110-457, § 235(c)(5), 122 Stat. 5044, 5079 (2008).  By subverting Congress's funding of

counsel for unaccompanied children, Defendants ensure more children will remain separated from their families, fewer trafficking victims will be identified and protected, and more children will be at risk of being trafficked in the future.

13.     Defendants' actions will also cause chaos throughout the immigration legal system and are particularly harmful because they come at a time when the government is reinstating expedited docketing for removal cases for unaccompanied children.  Unaccompanied children across the country have immigration court dates this week, at which some will now appear without an attorney.  Other children have impending deadlines to apply for immigration relief for which they are eligible, but will need an attorney's assistance to submit their application.

14.     As a consequence of Defendants ordering Plaintiffs to stop providing direct legal services, many unaccompanied children will never speak to a lawyer, will never apply for immigration relief for which they are eligible, will remain in tenuous status for longer, and will not understand what is happening as they are rushed through adversarial removal proceedings.  Immigration judges will be left to carry the burden, on their own, to expend limited government resources to educate child respondents (some only a few months old) on arcane immigration law and apply the law to their cases, without a full understanding of the reasons the children left their countries or the realities facing their removal.  This will cause immigration judges to spend more time on cases for unaccompanied children at a time when the immigration court backlog is already at an all-time high.

15.     Plaintiffs seek to enjoin Defendants from ceasing funding for legal representation of unaccompanied children, an action contrary to Congress's TVPRA mandate and subsequent congressional funding, contrary to Defendant ORR's own Foundational Rule on funding for counsel for unaccompanied children, and in violation of the Administrative Procedure Act ("APA").

16.     Plaintiffs respectfully ask this Court to grant declaratory and injunctive relief, declaring that Defendants are violating the law and requiring them to continue funding legal representation

consistent with the TVPRA and the Foundational Rule.  Plaintiffs ask this Court to enjoin Defendants nationwide from refusing to fund counsel for unaccompanied children in violation of the TVPRA and the Foundational Rule.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over the claims alleged in this Complaint under 28 U.S.C. § 1331, as they arise under federal law, including the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232, and the 2024 Unaccompanied Children Program Foundational Rule (the "Foundational Rule"), 89 Fed. Reg. 34384.

18.    The APA waives the U.S. government's sovereign immunity where, as here, federal agencies have acted in a manner that is arbitrary and capricious, an abuse of discretion, or otherwise in violation of the law.  5 U.S.C. § 706(2)(A).

19.    The Court has authority to issue a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

20.    The Court has authority to grant injunctive relief under 5 U.S.C. §§ 702 and 706, and Rule 65 of the Federal Rules of Civil Procedure.

21.    Venue properly lies in the Northern District of California under 28 U.S.C. § 1391(e)(1)(C) because Defendants are "officer[s]," "employee[s]," and "agenc[ies]," of the United States acting in their official capacities, and because Plaintiffs Community Legal Services in East Palo Alto and Social Justice Collaborative are California non-profit organizations headquartered in and providing services in the Northern District.  No real property is involved in this action.

22.    Venue is proper in the San Francisco Division because "a substantial part of the events or omissions giving rise to the claim occurred" in this Division.  28 U.S.C. § 1391(b)(2).  Plaintiff Community Legal Services in East Palo Alto is headquartered in San Mateo County, in this Division,

Plaintiffs Community Legal Services in East Palo Alto and Social Justice Collaborative both conduct substantial business in this Division including by serving unaccompanied children living in the San Francisco Division and in San Francisco Immigration Court, and Defendants' conduct has caused harm to these Plaintiffs in this Division by harming their ability to represent and serve unaccompanied children in the San Francisco Division.

## PARTIES

### A.    Plaintiffs

23.    Plaintiffs are nonprofit organizations that have received funding from Defendants HHS and ORR to provide legal representation and other legal services to unaccompanied children.  Plaintiffs share a mission to expand access to legal information and services for unaccompanied children, and to ensure that as many unaccompanied children as possible are represented by a lawyer.

24.    Plaintiff Community Legal Services in East Palo Alto ("CLSEPA") is a nonprofit organization in East Palo Alto, California.  CLSEPA serves unaccompanied children in San Mateo County and Santa Clara County.  Through funding from Defendants, CLSEPA provided legal representation for non-detained unaccompanied children.  CLSEPA currently represents 23 unaccompanied children in cases formerly funded by Defendants.

25.    Plaintiff Social Justice Collaborative ("SJC") is a nonprofit organization in Berkeley, California, operating across the Bay Area and in California's central valley—including in areas where it is one of the only organizations offering legal services to immigrants.  It serves unaccompanied children in San Francisco Immigration Court, Concord Immigration Court, and Sacramento Immigration Court.  Through funding from Defendants, SJC provided legal representation to about 45 non-detained unaccompanied children per year and hosted Immigrant Justice Corps fellows.

26.    Plaintiff Amica Center for Immigrant Rights ("Amica Center"), formerly Capital Area Immigrants' Rights ("CAIR") Coalition, is a nonprofit organization in Washington, D.C.  It serves

unaccompanied children in the greater Washington, D.C. and Baltimore areas, appearing before the Baltimore, Hyattsville, Sterling, and Annandale Immigration Courts. Through funding from Defendants, Amica Center provided legal orientations for children in ORR custody, legal representation for children in ORR custody and released from ORR custody, and hosted an Immigration Justice Corps fellow. Amica Center currently represents more than 850 unaccompanied children in cases formerly funded by Defendants.

27. Plaintiff Estrella del Paso ("Estrella") is a nonprofit organization based in Texas and the largest provider of free immigration legal services in West Texas and New Mexico. It serves unaccompanied children appearing before the El Paso Immigration Court and has provided legal services for unaccompanied children in El Paso since 2007. Through funding from Defendants, Estrella provided legal services to indigent, unaccompanied immigrant children who are not in detention, as well as those in ORR custody in El Paso County, and conducted "know your rights" presentations and individual consultations. Estrella currently represents 324 unaccompanied children in cases formerly funded by Defendants.

28. Plaintiff Florence Immigrant and Refugee Rights Project ("Florence Project") is a nonprofit organization in Arizona. The Florence Project has provided legal services for unaccompanied children in Arizona since 2000. It serves unaccompanied children in Tucson Immigration Court and Phoenix Immigration Court, and in 24 ORR shelters. Through funding from Defendants, the Florence Project provided legal orientations, legal representation for detained and non-detained unaccompanied children, Spanish-language tutoring, and hosting for Immigrant Justice Corps fellows. The Florence Project is the only non-profit organization that provides free legal services to unaccompanied children in Arizona and currently represents more than 800 unaccompanied children in cases formerly funded by Defendants.

29.     Plaintiff Galveston-Houston Immigrant Representation Project ("GHIRP") is a nonprofit organization in the Galveston-Houston area of Texas.  It serves unaccompanied children in the Galveston-Houston area and Houston Immigration Court.  Through funding from Defendants, GHIRP provided legal orientations, legal representation for detained and non-detained unaccompanied children, and hosting for Immigrant Justice Corps fellows.   GHIRP currently represents 292 unaccompanied children in cases formerly funded by Defendants.

30.     Plaintiff Immigrant Defenders Law Center ("ImmDef") is a nonprofit organization in Los Angeles, California.  It serves unaccompanied children in three Immigration Courts:  Van Nuys, West Los Angeles, and Santa Ana.  ImmDef provided legal orientations and direct legal representation through funding from Defendants for nearly 2,000 detained and non-detained unaccompanied children, along with Spanish-language tutoring for attorneys, and hosting for Immigrant Justice Corps fellows.  ImmDef currently represents nearly 2,000 unaccompanied children in cases formerly funded by Defendants.

31.     Plaintiff National Immigrant Justice Center ("NIJC") is a nonprofit organization headquartered in Chicago, Illinois and has provided services to unaccompanied children for more than 40 years.  It serves unaccompanied children in Chicago Immigration Court.  Through funding from Defendants, NIJC provided legal orientations and individual consultations as well as representation to unaccompanied children in immigration proceedings both in and out of ORR custody.  NIJC currently represents approximately 500 unaccompanied children in cases formerly funded by Defendants.

32.     Plaintiff Northwest Immigrant Rights Project ("NWIRP") is a nonprofit organization located in Washington State.  It serves unaccompanied children in Seattle Immigration Court (and occasionally Portland Immigration Court), and has provided free immigration legal services for over 40 years.  Through funding from Defendants, NWIRP provided legal services to unaccompanied immigrant children and youth who have been released from ORR custody throughout Washington

State. NWIRP currently represents approximately 500 unaccompanied children in cases formerly funded by Defendants.

33. Plaintiff Rocky Mountain Immigrant Advocacy Network ("RMIAN") is a nonprofit organization in Colorado. It serves unaccompanied children in Denver Immigration Court. Through funding from Defendants, RMIAN provided legal representation for non-detained unaccompanied children and Spanish-language tutoring for staff. RMIAN is the primary organization providing free legal services to unaccompanied children in Colorado. RMIAN currently represents 160 unaccompanied children in cases formerly funded by Defendants.

34. Plaintiff Vermont Asylum Assistance Project ("VAAP") is a non-profit organization in Vermont. It serves unaccompanied children in Chelmsford Immigration Court and Boston Immigration Court. Through funding from Defendants, VAAP provided legal representation for detained and non-detained unaccompanied children, and hosting for two Immigrant Justice Corps fellows. VAAP provides legal services to about 135 unaccompanied children annually, with 35-40 full scope direct representations each year. Serving unaccompanied children in Vermont is particularly urgent because unaccompanied children in Vermont are often unable to access removal proceedings in far-away Boston and Chelmsford without legal assistance—and VAAP is the only legal services provider for unaccompanied children in Vermont.

35. For years, Plaintiffs heeded Congress's call to provide critical legal services to unaccompanied children. Plaintiffs collectively represent thousands of unaccompanied children, including children in removal proceedings and children applying for affirmative forms of immigration relief, and their organizational missions and ethical obligations compel them to represent these clients to the best of their abilities. Defendants' Cancellation Order severely limits Plaintiffs in performing their respective missions to provide legal representation the law requires be made available to unaccompanied children. To pay for existing representations, Plaintiffs face the need to use up any

discretionary or reserve funding, and to lay off employees.  If Plaintiffs are unable to maintain staffing levels necessary to handle their current caseloads, they will have to assess their ability to meet ongoing ethical and court-required obligations to their clients and may be forced to withdraw from ongoing cases.

36.     For many Plaintiffs, these consequences are imminent or already occurring.  For example, ImmDef has already been forced to give layoff notices to 27 staff to try to stay financially viable and able to serve unaccompanied children for as long as possible.  SJC will have to lay off its three Immigrant Justice Corps fellows if it cannot find other funding.  To maintain its representations, Estrella has had to furlough 18 of the 28 employees in its unaccompanied children program.  VAAP has had to not renew the contract of one of its four employees and may have to furlough another two employees—leaving it with only a single remaining employee.  In four weeks, GHIRP will have to lay off most of its 19 employees who provide services to unaccompanied children.

**B.     Defendants**

37.     Defendant HHS is the department of the federal government that receives appropriations from Congress to fulfill its statutory obligations under the TVPRA to aid and provide legal representation to unaccompanied children to the greatest extent practicable.  HHS most recently received an appropriation for services (including provision of counsel) required under the TVPRA for unaccompanied children on March 23, 2024, in the 2024 Further Consolidated Appropriations Act. *See* Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D, tit. II, 138 Stat. 460, 664– 65 (2024) (funding continued through September 30, 2025, by the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, tit. I, § 1101(8) (2025)).  This appropriation extends funding for services under the TVPRA through September 30, 2027.  *See id.*

38.     Defendant ORR is the office of HHS (situated within HHS's Administration for Children and Families Division) that oversees services for unaccompanied children under the TVPRA

and is the agency that passed the Foundational Rule in 2024 through notice-and-comment rulemaking. Defendant ORR's Unaccompanied Alien Children Bureau is the government body that interacts most directly with unaccompanied children.

39.    Defendant DOI is the department of the federal government primary contractor listed for the contract through which Defendants HHS and ORR provided the required funding for counsel for unaccompanied children.  DOI issued the Cancellation Order on March 21, 2025.

## STATEMENT OF FACTS

**A.    HHS And ORR Are Required By Law To Care For Unaccompanied Children.**

40.    "Unaccompanied child" is defined by statute as any individual younger than 18 and without lawful immigration status, who has no parent or legal guardian who is in the United States able to provide care and physical custody.  *See* 6 U.S.C. § 279(g)(2).  Once a child is identified as unaccompanied under this definition, they are treated as unaccompanied even if they are later released to a sponsor—the "unaccompanied" designation applies throughout their time navigating U.S. immigration law.

41.    In the 2024 fiscal year, nearly 100,000 children, toddlers, and babies were identified by federal authorities as being unaccompanied children.  These children entered the United States without their parents for many reasons, most commonly because they were separated from their parents on their way to the United States, because they were trafficked to the United States, because they were separated from their families by immigration authorities after entering the United States, or because they fled their home countries without their parents.  A large majority of the children are from Central America and arrived in the United States after a long and dangerous journey north to the U.S.-Mexico border. Many fled unspeakable violence in their home countries and arrived in the United States only to face detention and deportation on their own.

42.     The United States has long struggled to care for unaccompanied children.  Change has come as Congress has recognized that unaccompanied children are uniquely vulnerable to trafficking, abuse in government custody, and injustices in the immigration legal system.

43.     Until 2002, the former Immigration and Naturalization Services detained unaccompanied children, treating them similarly to detained noncitizen adults.

44.     The Homeland Security Act of 2002 changed this model, giving Defendants HHS and ORR legal custody of unaccompanied children, with the mandate to care for these children.  *See* 6 U.S.C. § 279(a).

45.     In 2008, the TVPRA imposed further responsibilities on HHS and ORR's custody of unaccompanied children, including that HHS and ORR "shall ensure, to the greatest extent practicable . . . that all unaccompanied alien children . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking."  8 U.S.C. § 1232(c)(5).

**B. Unaccompanied Children Have Special Legal Rights.**

46.     Unaccompanied children have special legal rights, including the right to go through full removal proceedings before an immigration judge, unlike other individuals who may be put through expedited removal proceedings.  *See* 8 U.S.C. § 1232(a)(5)(D).  If an unaccompanied child applies for asylum, they are entitled to go through the non-adversarial process of an asylum determination through DHS's Asylum Office—instead of in immigration court, where an immigration judge would preside over an adversarial hearing between a DHS lawyer and the unaccompanied child.  *See* 8 U.S.C. § 1158(b)(3)(C).  Unaccompanied children also have the right to apply for other forms of immigration relief, like Special Immigrant Juvenile Status, Withholding of Removal, relief under the Convention Against Torture, and U or T visas.

47.     Although U.S. law guarantees unaccompanied children these rights, the children are not able to avail themselves of these rights unless the children understand their rights, are equipped with

16

the tools to exercise them, and are given legal counsel.  For this reason, Congress and ORR have both recognized the importance of providing unaccompanied children with legal representation—and taken steps to maximize the number of unaccompanied children represented by attorneys.  The TVPRA requires Defendants to provide legal representation to unaccompanied children to the greatest extent practicable, and Congress has consistently appropriated funds annually to pay for that representation.

48.    And all children (unaccompanied or otherwise) are protected by regulations that prevent immigration judges from accepting an admission of removability from respondents under the age of 18—unless the respondent is represented by an attorney or other designated individual.  *See* 8 C.F.R. 1240.10(c).

49.    ORR, recognizing its obligations under the TVPRA, committed to providing legal representation to children unable to secure counsel, subject to ORR's discretion to the extent it determines appropriations are available.  ORR "strives for 100 percent legal representation of unaccompanied children."  89 Fed. Reg. 34384, 34526 (Apr. 30, 2024).

## C.    The TVPRA Requires Defendants to Provide Legal Services to Unaccompanied Children.

50.    Congress, through the Homeland Security Act of 2002, commanded Defendants HHS and ORR to "develop[] a plan to be submitted to Congress on how to ensure that qualified and independent legal counsel is timely appointed to represent the interests of *each* such [unaccompanied] child."  6 U.S.C. § 279(b)(1)(A) (emphasis added).

51.    Acting on this congressional command, ORR contracted with the Vera Institute for Justice in 2005 to administer what was then called the "Unaccompanied Children Pro Bono Project" (the "Project").  The Project was a three-year pilot to develop and test ways to meet the legal needs of unaccompanied children through pro bono legal services.

52.    Through the Project, ORR and Vera collaborated to design a program of subcontracting with nonprofit legal service organizations to provide basic legal orientation to unaccompanied children,

to screen their cases to identify those with potential claims for relief from removal, and to recruit and train volunteer lawyers to represent children in immigration court.  Initially, the nonprofit legal service providers were not permitted to use government funding to provide direct representation.

53.    At the end of the pilot period in 2008, Vera issued a report to ORR, explaining that volunteer attorneys alone could not represent all unaccompanied children in ORR custody.  Accordingly, the government could not meet its goal of ensuring that a significant percentage of unaccompanied children were represented unless it funded attorneys to represent them.

54.    On the heels of this pilot program, Congress imposed additional mandates on ORR and HHS in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA").  The TVPRA mandates HHS to provide counsel for unaccompanied children:

> **The Secretary of Health and Human Services shall ensure**, **to the greatest extent practicable** and consistent with section 292 of the Immigration and Nationality Act (8 U.S.C. 1362), **that all unaccompanied alien children who are or have been in the custody of the Secretary or the Secretary of Homeland Security**, and who are not described in subsection (a)(2)(A), **have counsel to represent them in legal proceedings or matters** and protect them from mistreatment, exploitation, and trafficking. To the greatest extent practicable, the Secretary of Health and Human Services shall make every effort to utilize the services of pro bono counsel who agree to provide representation to such children without charge.

8 U.S.C. § 1232(c)(5) (emphasis added).

55.    In other words, the TVPRA directs that Defendants "shall ensure, to the greatest extent practicable . . ." that unaccompanied children have counsel to represent them in legal proceedings.  If Defendants have funding they can spend to provide counsel for unaccompanied children, they must spend that funding to provide such counsel.

**D.    Defendants Satisfied Their Congressional Mandate To Provide Legal Services To Unaccompanied Children By Paying Plaintiffs With Funding Appropriated By Congress.**

56.    Since passing the TVPRA, Congress has specifically appropriated funds for Defendant HHS to effectuate section 235 of the TVPRA's requirement that HHS and ORR provide certain services to unaccompanied children, including funding legal representations for unaccompanied children "to

the greatest extent practicable." *See* Supplemental Appropriations Act, 2009, Pub L. 111-32, tit. VIII, 123 Stat. 1859, 1884 (2009); Consolidated Appropriations Act, 2010, Pub. L. 111-117, div. D tit. II, 123 Stat. 3034, 3249–3250 (2009); Consolidated Appropriations Act, 2012, Pub. L. 112-74, div. F tit. II, 125 Stat. 786, 1077 (2011); Consolidated Appropriations Act, 2014, Pub. L. 113-76, div. H tit. II, 128 Stat. 5, 376 (2014); Consolidated and Further Continuing Appropriations Act, 2015, div. G tit. II, Pub. L. 113-235, 128 Stat. 2130, 2479 (2014); Consolidated Appropriations Act, 2016, Pub. L. 114-113, div. H tit. II, 129 Stat. 2242, 2612 (2015); Further Continuing and Security Assistance Appropriations Act, 2017, Pub. L. 114-254, 130 Stat. 1005, 1011 (2016); Consolidated Appropriations Act, 2017, Pub. L. 115-31, div. H tit. II, 131 Stat. 135, 531 (2017); Consolidated Appropriations Act, 2018, Pub. L. 115-141, div. H tit. II, 132 Stat. 348, 728 (2018); Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. 115-245, div. B tit. II, 132 Stat. 2981, 3082 (2018); Consolidated Appropriations Act, 2021, Pub. L. 116-260, div. H tit. II, 134 Stat. 1183, 1582 (2020); Consolidated Appropriations Act, 2022, Pub. L. 117-103, div. H tit. II, 136 Stat. 49, 458 (2022); Consolidated Appropriations Act, 2023, Pub. L. 117-328, div. H tit. II, 136 Stat. 4459, 4870 (2022); Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023, Pub. L. 117-180, div. A sec. 147, 136 Stat. 2114, 2124 (2022); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D tit. I, 138 Stat. 460, 664-665 (2024) (funding continued through September 30, 2025, by the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A tit. I Sec. 1101(8) (2025)).

57.    Until 2012, funds for legal representation were used only to match unrepresented unaccompanied children with available pro bono counsel.  In 2009, the House Appropriations Committee—following the passage of the TVPRA—explained that "legal representation is absolutely critical to ensure that children understand their rights as they navigate the legal process to determine their status in the United States."  H. Rep. 111-220, at 165.  The Committee commended the earlier

pilot program for legal representation for unaccompanied children and included funding "to continue and expand this initiative" "to work towards ensuring that all unaccompanied alien children understand their legal rights and have access to pro bono representation." *Id.* at 165-66. But success of this program to match unaccompanied children with volunteer attorneys was highly dependent on local circumstances, and it was clear pro bono representation alone could not meet the representational needs of unaccompanied children.

58.     Beginning in 2012, funding became available to pay lawyers dedicated to representing unaccompanied children, in addition to referring them to pro bono counsel.

59.     Over time, ORR and Congress have directed that funded representation be expanded again and again. In reports accompanying appropriations bills, Congress has built on its mandates for funded legal representation for unaccompanied children over the years. For example, in 2018 the Senate Appropriations Committee noted "that services provided by qualified and independent legal counsel to [unaccompanied children] can increase the efficiency and effectiveness of immigration proceedings and significantly reduce the failure-to-appear rate of children who are released from HHS custody. The Committee recommendation directs ORR to continue the scope and funding of these legal services at no less than fiscal year 2017 levels." S. Rep. 115-289, at 150.

60.     In 2019, the House Appropriations Committee directed funding specifically for "qualified and independent legal services for unaccompanied children, including but not limited to know-your- rights orientations, legal screenings, court preparation and assistance, **representation**, and pro bono referrals" and recommended expanding funded representations. H. Rep. 116-62 at 145 (emphasis added).

61.     In 2020, the House Appropriations Committee recommended "no less than $30,000,000 to be spent in fiscal year 2021 for **direct representation** services to children" and encouraged "ORR

to work with legal service providers to develop a strategy to minimize the risks of any child having to go to immigration court without independent legal counsel." H. Rep. 116-450 at 180 (emphasis added).

62.     In 2021, the House Appropriations Committee again supported funded representations, instructing that there should be even more funded representation for unaccompanied children released from ORR custody and that such direct representation "shall be made available to children **up to the funded capacity**." H. Rep. 117-96, at 211 (emphasis added).

63.     In 2022, the House Appropriations Committee again supported "the continued expansion of independent legal services for unaccompanied children" and directed that funded representations should "be made available to children **up to funded capacity**." H. Rep. 117-403, at 200 (emphasis added).

64.     Until March 21, 2025, the Acacia Center for Justice ("Acacia") managed a network of 89 legal services organizations (including Plaintiffs) in 159 offices across the country providing representation to unaccompanied children through funding from HHS and ORR, under a contract between Acacia and DOI (contracting on behalf of HHS and ORR).

65.     This contract had four funded line items:

1.  Work in ORR shelter facilities, including "know your rights" presentations, intakes to connect detained children with attorneys, and initial screenings with detained children;

2.  Full legal representation for children in and out of ORR custody, as well as other non-representation services such as "friend of court" services in hearings for unaccompanied children appearing in immigration court or preparing forms without attorneys;

3.  Immigrant Justice Corps fellows who represent unaccompanied children not covered by the second line item;

4.  Spanish language tutoring for organizational staff who work with unaccompanied children.

66.    As of March 21, 2025, Plaintiffs and other attorneys across the country represented approximately 26,000 children, toddlers, and babies—who arrived in the U.S. without parents or other caregivers—through funding appropriated by Congress and delivered under this contract.

**E.    Past Government Statements Acknowledge The Benefits Of Funding Counsel For Unaccompanied Children and Babies**

67.    The importance of legal representation for unaccompanied children is borne out in immigration court statistics.  Increasing representation for unaccompanied children makes immigration courts run more efficiently, leads to more unaccompanied children who qualify for immigration relief receiving that relief, and leads to more unaccompanied children without a case for relief requesting voluntary departure instead of unnecessary proceedings.

68.    Unrepresented children effectively never receive relief from removal.  A 2024 Congressional Research Service report explained that from 2005 to 2017, 90% of unaccompanied children in removal proceedings without a lawyer were removed and *less than 1% received some form of immigration relief* (only 308 children out of nearly 90,000).  *See* "Unaccompanied Alien Children: An Overview," CONGRESSIONAL RESEARCH SERVICE (Sept. 5, 2024), https://www.congress.gov/crs-product/R43599.  On the other hand, only 21% of represented unaccompanied children received a removal order over the same time period, and 73% attain some form of relief, including asylum and other paths to lawful permanent resident status.  Moreover, a greater percentage of unaccompanied children with attorneys chose to depart the country voluntarily than those without lawyers, showing the role attorneys play in helping children understand both their options and—in some circumstances—their lack of options.

69.    Represented children are also more likely to attend their hearings than unrepresented children, and more likely to understand what happens in their cases, easing the burden on immigration judges to explain proceedings.  From 2005 to 2017, 76% of all unaccompanied children continued to appear as scheduled for their cases—but for represented unaccompanied children, that rate was a near-

perfect 97%. *See* Alyssa Snider and Rebecca DiBennardo, "Representation Matters: No Child Should Appear in Immigration Proceedings Alone," VERA INSTITUTE OF JUSTICE (Dec. 2021), https://vera-institute.files.svdcdn.com/production/downloads/publications/representation-matters.pdf.

70.     ORR has acknowledged "that most unaccompanied children need legal services to resolve their immigration status and that representation appears to have a significant impact on both the court appearance rate and the outcome of cases for unaccompanied children." Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384, 34529 (April 30, 2024) (to be codified at 4 C.F.R. pt. 410).

**F.     Immigration Judges And Other Government Officials Regularly Praise Plaintiffs' Work, Which Makes Their Jobs Easier**

71.     In the past weeks, immigration judges have expressed their concern that Plaintiffs might no longer be working in their courtrooms and helping courts function smoothly. Plaintiff Community Legal Services in East Palo Alto prioritizes positive interactions with immigration judges and adopts a proactive approach to advocacy, working with ICE counsel to ensure that their clients can advance their cases without missing school—a benefit to everyone involved.

72.     A judge in Chicago Immigration Court specifically expressed her concern that NIJC might not be available anymore to represent unaccompanied children appearing before her. Judges praise NIJC's work as allowing the court to operate efficiently and with confidence that unaccompanied children are making informed decisions and have been screened for relief and other needs.

73.     Plaintiff the Florence Project was created after a call to action by an immigration judge. The Florence Project works with the court and individual judges to coordinate the specialized docket for unaccompanied children, serving as friend of the court frequently. Judges show their appreciation for the Florence Project's work by giving its staff space in courtrooms to conduct pre-hearing orientations for children and even by swearing in Florence Project staff who have just been admitted

to the Arizona Bar. In stakeholder meetings with the government, government partners routinely thank the Florence Project for its work and emphasize the value of the services it provides.

74. Immigration judges and other stakeholders rely on Amica Center's services. Immigration judges rely on Amica Center's friend of court services and ask Amica Center to enter appearances in cases where the judge doubts the child understands their legal options or is competent to appear in court. ORR shelter staff lean on Amica Center to answer questions about court appearances for the children they house.

75. Immigration judges overseeing dedicated dockets for unaccompanied children in El Paso express gratitude for the work Estrella does both in its representations and its friend of court services. Judges appreciate that Estrella helps them reduce their docket loads. ORR shelter staff appreciate Estrella's help and training in caring for unaccompanied children.

76. Immigration judges and government attorneys regularly thank RMIAN for its work, and RMIAN and government employees work together to improve immigration court efficiency in Denver. RMIAN saves the court and the government unnecessary time and effort by obtaining dismissal in cases where dismissal is proper and by avoiding unnecessary status hearings. The Denver Immigration Court regularly asks RMIAN to provide friend of court services to assist unaccompanied children with anything from a change of address form to a screening for potential human trafficking.

77. Judges, clerks, and other immigration court staff, and DHS field office staff praise VAAP's work as making the immigration legal system more fair and efficient. VAAP's services help immigration courts avoid unnecessary proceedings and help unaccompanied children efficiently appear in court remotely.

**G.    In 2024, ORR Issued A Foundational Rule On Funding For Legal Services For Unaccompanied Children**

78. On April 30, 2024, ORR issued a final rule following full notice-and-comment rulemaking: the "Unaccompanied Children Program Foundational Rule," which took effect July 1,

2024.  Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384, 34529 (April 30, 2024) (to be codified at 4 C.F.R. pt. 410).  The rule is meant to codify regulations "consistent with ORR's statutory duties" and "responsibilities for coordinating and implement the care and placement of unaccompanied children . . . under the Homeland Security Act of 2002 (HSA) and the [TVPRA]." *Id.*, 89 CFR 34384.

79.  Section 410.1309 of the Foundational Rule is titled "Legal Services."  *Id.*, 89 Fed. Reg. 34526.  This section of the Foundational Rule affirms ORR's belief that "legal services providers who represent unaccompanied children undertake an important function" and stated, "ORR strives for 100 percent legal representation of unaccompanied children and will continue to work towards that goal to the extent possible."  *Id.*

80.  The Foundational Rule requires that unaccompanied children in ORR custody *must* receive a legal orientation from "an independent legal service provider" and a "confidential legal consultation with a qualified attorney."  *Id.*, 89 CFR 34603.

81.  The rule also provides that ORR must—if it has available appropriations—"fund legal service providers to provide direct immigration legal representation for certain unaccompanied children."  *Id*.

82.  To comply with the TVPRA and INA, the rule recognizes ORR must "ensure that all unaccompanied children who are or have been in ORR care have access to counsel" and provides, "ORR may make grants, in its discretion and subject to available resources . . . or contracts under this section . . . for the purpose of providing immigration legal representation, assistance and related services to unaccompanied children."  *Id*.

## H.    In 2024, Congress Reauthorized Funding For The Services, And That Funding Is Available Today

83.  On March 23, 2024, Congress passed H.R. 2882, the Further Consolidated Appropriations Act of 2024, which appropriated funding for many federal departments and programs,

including Defendants HHS and ORR. Congress specifically appropriated funds "for carrying out . . . section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008," the TVPRA. Pub. L. 118-47 138 Stat. 460, 664. Section 235 of the TVPRA includes the requirement to provide funding for counsel for unaccompanied children "to the greatest extent practicable"—so the appropriation was, in part, meant to pay for this representation. 8 U.S.C. § 1232(c)(5).

84. The Senate Report accompanying the 2024 appropriations bill commanded Defendant HHS to fund the Services. The Senate Committee on Appropriations specified there should be "$5,506,258,000 for the Unaccompanied Children [UC] program." S. Rep. 118-84, at 167. It went on to direct, "The Committee recommendation includes no less than the fiscal year 2023 funding level for post-release services; legal services and access to counsel; and child advocates. The Committee expects HHS will continue to expand child-welfare focused post-release services . . . including . . . access to legal services." *Id.* at 168.

85. The Senate Report expressed its understanding that the TVPRA requires ORR to fund counsel for unaccompanied children: "The Committee also expects these funds will be used to provide access to counsel, consistent with the goals of the Trafficking Victims Protection Reauthorization Act of 2008 **for all children to have access to counsel in their immigration proceedings.**" *Id.* at 169 (emphasis added).

86. On March 15, 2025, Congress continued funding at the levels set in the Further Consolidated Appropriations Act. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A tit. I sec. 1101(8) (2025).

87. This appropriated funding for counsel for unaccompanied children is now available to Defendants through September 30, 2027. The initial 2024 appropriation extended for two years, through September 30, 2026, Pub. L. 118-47 138 Stat. 460, 664, and the Full-Year Continuing Appropriations and Extensions Act of 2025 further extended the appropriation by another year, Pub.

L. 119-4, div. A tit. I sec. 1103 ("Appropriations provided by this division that, in the applicable appropriations Act for fiscal year 2024, carried a multiple-year or no-year period of availability shall retain a comparable period of availability").

**I.    Defendants Abruptly Shut Down And Later Resumed Funding For Counsel For Unaccompanied Children Without Explanation**

88.    Despite Congress's consistent funding of legal representation for unaccompanied children, consistent with the TVPRA, Defendants seek to undermine congressional appropriations and the TVPRA's mandate.  On Tuesday, February 18, 2025, without warning, Defendant DOI and Defendant HHS issued a "Stop Work Order" to Acacia, ordering service providers—including Plaintiffs—to "cease all services" and "stop all work" for those services under the contract between Acacia and DOI.  The order included no end date; it indefinitely suspended the services.  The stop work order gave no explanation, but said it had nothing to do with how the legal services were being run: "The stop work order is being implemented due to causes outside of [Acacia's] control and should not be misconstrued as an indication of poor performance by [Acacia]."  Nevertheless, the order explained, the stop work order could lead Defendants to "terminate the contract."

89.    Three days later, and after significant backlash, on Friday, February 21, 2025, Defendants voluntarily rescinded the stop work order without explanation.

**J.    On March 3, 2025, 32 Senators Reminded Defendants That Ending Funding For Counsel For Unaccompanied Children Violates the TVPRA**

90.    On March 3, 2025, 32 Senators wrote to HHS Secretary Robert F. Kennedy, Jr. and DOI Secretary Doug Burgum to express their "strong opposition" to the now-rescinded stop work order and to note their "concern[] about the chaos and confusion it caused for legal services providers and the children they serve."  Sens. Ossoff, Hirono, et al, *Letter to Secretary Robert F. Kennedy, Jr. and Secretary Doug Burgum* (Mar. 3, 2025), accessible at https://www.hirono.senate.gov/imo/media/doc/250305lettertohhsandinteri101legalservicesforchildreninimmigrationsystem.pdf.

91.     The Senators explained that the stop work order—and any other attempt to stop funding counsel for unaccompanied children—is a violation of the TVPRA: "**Pausing or terminating the provision of legal services to unaccompanied children under this contract runs directly counter to the requirements of the Trafficking Victims Protection Reauthorization Act** (TVPRA) and places 26,000 unaccompanied children at increased risk of trafficking, exploitation, and other harm. The TVPRA, passed by Congress in 2008 on a bipartisan basis, requires the Department of Health and Human Services (HHS) to ensure, to the greatest extent practicable, that all unaccompanied children have counsel to represent them in legal proceedings and protect them from mistreatment, exploitation, and trafficking. Shirking this statutory mandate heightens the risk of harm for these uniquely vulnerable children." *Id.* (emphasis added).

92.     The Senators went on to explain that representation makes it more likely that unaccompanied children will appear at their hearings, less likely that the government will lose track of unaccompanied children, and less likely that the unaccompanied children will be trafficked. *Id.* at 2.

93.     The Senators requested a briefing from Defendants about why the stop work order was issued and Defendants' "plan for compliance with your statutory mandate to ensure that children have counsel in immigration proceedings." *Id.*

94.     Plaintiffs are not aware of any response from Defendants to the Senators.

**K.     On March 21, 2025, Defendants Again Stopped Funding Counsel for Unaccompanied Children**

95.     Although Defendants rescinded their February 18, 2025 stop work order, they apparently continued to look for ways to avoid the TVPRA's and Foundational Rule's requirement that they fund legal representation for unaccompanied children.  On March 21, 2025, Defendant DOI sent a letter titled "Notice of Partial Termination for the Government's Convenience" to Acacia (the "Cancellation Order").  The letter announced that Defendants were terminating funding for contract line items two through four:  legal representation for unaccompanied children—both in and out of

detention—and other legal services like "friend of court" assistance in *pro se* matters, Immigrant Justice Corps fellows, and Spanish-language tutoring.  The letter further commanded Acacia and Plaintiffs to "immediately stop work" on these representations.

96.    On information and belief, Defendants have no plans to fund any legal representation for unaccompanied children—whether by reinstating the cancelled contract line items or by finding alternative ways to pay lawyers to represent unaccompanied children.

97.    The Cancellation Order took effect at close of business on Friday, March 21, 2025, and Plaintiffs represent clients with immigration court hearings that were scheduled for Monday March 24, 2025—the very next business day.  Yet Plaintiffs received no guidance from Defendants regarding how those representations should continue—forcing them to choose between seeking to withdraw from their representations or attempting to continue representing their clients unfunded.  Their clients are at risk of losing access to the legal counsel provided by the TVPRA and Foundational Rule.

**L.    Defendants' Termination Of Funding To Represent Unaccompanied Children Frustrates Plaintiffs' Missions, Causes Plaintiffs Irreparable Harm, and Serves No Legitimate Purpose.**

98.    Terminating funding for attorneys to represent unaccompanied children has devastating and irreparable effects, even more so for the harm it does to unaccompanied children.  Even if Defendants reinstate funding for counsel for unaccompanied children at some unknown future time (an unlikely supposition), the funded representations, the non-profits and attorneys that administer them, and the unaccompanied children that receive vital counsel from them already will have been dealt an irreparable blow.

99.    **Defendants' actions will cause Plaintiffs to lay off employees and lose huge percentages of their overall funding.**  For Plaintiffs, the funding Congress has consistently appropriated to provide services under the TVPRA is existentially important.

100.    For example, funding for the services Defendants have illegally cancelled makes up approximately 55% of ImmDef's budget and pays for 113 of ImmDef's approximately 200 employees. The cancelled funding made up nearly half of VAAP's and GHIRP's operating budgets, 30% of Amica Center's budget, over 25% of NIJC's budget, 15% of RMIAN's budget, and 10% of NWIRP's budget. The Florence Project received about $12 million a year from the now-cancelled funding, which supported more than 100 employees.

101.    Many organizations will have to lay off staff.  SJC will soon have to lay off its three Immigrant Justice Corps fellows unless it can find another source of funding for their salaries, ImmDef has already been forced to give layoff notices to 27 staff, Estrella has had to furlough 18 of the 28 employees in its unaccompanied children program, GHIRP will have to lay off most of its 19 children's program staff in four weeks, and VAAP has had to not renew the contract of one of its four employees, and may have to furlough another two employees—leaving it with only a single remaining employee.

102.    **Because Plaintiffs' mission is to serve unaccompanied children, they will incur huge losses to keep doing so.**  Plaintiffs' ethical responsibilities to their clients and commitment to their mission of serving as many unaccompanied children as possible mean that Plaintiffs cannot simply cut off services and representations for unaccompanied children.  The organizations will hold on for as long as they can without funding from Defendants, but the impacts will be harsh whether they are immediate or sightly delayed.

103.    For example, CLSEPA has had to stop taking on new clients, even if they are unaccompanied children in removal proceedings without an attorney.  CLSEPA is seeking new funding to continue existing representations of unaccompanied children, but is faced with the risk of having to withdraw from ongoing representations—which is entirely antithetical to CLSEPA's mission to serve immigrants in Santa Clara and San Mateo counties.

104.    SJC is facing the prospect of having to lay off three Immigrant Justice Corps fellows who represent unaccompanied children and may be forced to try to find other organizations that can take on their clients.

105.    Estrella faces a budget deficit of more than $200,000 per month to maintain its services for unaccompanied children without funding from Defendants.  To continue representing the 324 unaccompanied children clients it took on in reliance on funding from Defendants, Estrella will have to operate at this significant deficit, threatening Estrella's other programming.  Once Estrella's reserves are depleted, it will likely not be able to offer free legal representation in many circumstances.

106.    The Florence Project is drawing on general funds to sustain its services for unaccompanied children but will likely have to conduct significant layoffs of its team of more than 100 employees who are dedicated to serving unaccompanied children.  Still, the Florence Project is determined to continue its representations of more than 800 unaccompanied children—even without the funding it relied on when it entered into the representations—though it will cost the organization significantly to continue this work.

107.    To support their existing Immigrant Children and Youth staff, GHIRP will have to rely on unrestricted funds and savings, destabilizing the organization as a whole. This will divert unrestricted funds away from other services, as these resources typically cover gaps in funding between contract cycles on other grants, underfunded programs, or new initiatives that are responsive to emerging needs in their community.

108.    ImmDef has 1,900 cases that were funded by Defendants.  ImmDef estimates its reserve funding will be exhausted within 6 months, and to hang on that long it will have to dramatically cut its staffing.  Just to position itself to survive in the short-term, ImmDef has had to lay off 27 staff.  Once ImmDef's reserves run out, it will have to terminate all 113 staff formerly funded by money appropriated by Congress to provide services under the TVPRA.  As ImmDef has to cut staff, it will

be unable to reallocate its 1,900 formerly funded cases to other attorneys—so it will be unable to competently represent existing unaccompanied child clients.

109.    NWIRP will have to spend at least $200,000 per month to sustain its services for unaccompanied children that were previously funded by Defendants.

110.    NIJC is transferring employees away from its children's services to try to make it feasible to maintain a limited staff to attempt to sustain existing representations.

111.    RMIAN will have to draw from its financial reserves and the limited funding it receives that is not pre-allocated for restricted purposes to delay layoffs, and it cannot provide long-term assurances to its clients that they will not be left without lawyers if RMIAN cannot afford to keep its unaccompanied children staff employed.

112.    VAAP's remaining staff of three are stretched as they try to continue to support their clients.  Two of those three may soon need to be furloughed, leaving only one attorney for all of VAAP's clients.

113.    **Every harm to their clients is a severe harm to Plaintiffs' mission to help their clients.**  Plaintiffs' clients are significantly harmed by the uncertainty they now face, as Plaintiffs may be forced to withdraw from ongoing representations.  The cases Plaintiffs took on in reliance on funding from Defendants are complex and often take years to resolve, and clients will be harmed if they are no longer represented by Plaintiffs.

114.    For example, ImmDef took on a client from West Africa with funding from Defendants and filed an asylum application with USCIS on his behalf in February 2025.  He is waiting for his asylum interview to be scheduled, and that interview will be complicated—he speaks a language from the Niger-Congo language family, so his case requires specialized translation and in-depth presentation of uncommon country conditions.  This client now has no guarantee that ImmDef will have enough

attorneys remaining on staff to represent him at his interview when it is scheduled, and ImmDef is helpless to provide him any assurances.

115.    In representations formerly funded by Defendants, SJC represents—for example—three individuals not in active removal proceedings, with strong cases for affirmative immigration relief that would allow them to stay in the country.  None of these clients could afford to hire a lawyer, but with free representation from SJC each has a clear path to relief.  If SJC cannot continue to represent them, they will be unlikely to secure the relief they qualify for.

116.    The Amica Center represents a four-year-old boy from Haiti in a case formerly funded by Defendants.  The four-year-old has a hearing in the process of obtaining SIJS relief on April 2, 2025. He also has an immigration court hearing in early June.  Without an attorney, the four-year-old could not engage in these proceedings or obtain any of the immigration relief for which he is eligible.  The Amica Center is continuing to represent him and its other unaccompanied child clients, though continuing its now-unfunded representations is very costly to the organization.

117.    The Florence Project currently represents a set of three siblings who fled their home country after their mother died and their sister was murdered.  All three siblings have pending asylum applications and are in the process of obtaining SIJS relief.  Both the asylum and SIJS processes require complex legal work, and the siblings would have little hope of obtaining relief without an attorney. Were the three to lose their Florence Project lawyer—previously funded by Defendants—they would be severely harmed, a result antithetical to the Florence Project's mission.

118.    **Defendants' illegal actions prevent Plaintiffs pursuing their missions.**  Because Plaintiffs' missions are founded on the belief that no child should face a trained government prosecutor alone, Plaintiffs also suffer significant harms to their missions because without funding from Defendants, they cannot take on new clients.  Every unaccompanied child in ORR custody who needs but does not receive representation because Defendants have ceased funding legal representation under

the TVPRA is a harm to Plaintiffs, as organizations that exist to serve these children and to ensure as few as possible go without a lawyer.  Unrepresented children will be unable to apply for voluntary departure to return home, children who have been trafficked will be unable to access the protections afforded to them by U.S. law, and children with strong cases for asylum who fled persecution in their home countries will be unable to apply for asylum.  These impacts are unacceptable for Plaintiffs.

119.    If Plaintiffs are forced to shut down or stop providing services to unaccompanied children entirely, these mission harms will be even more acute because entire populations will be left unserved.  For example, SJC serves remote areas of California's central valley where there are few other resources for unaccompanied children, VAAP is the only legal service provider for unaccompanied children in Vermont, RMIAN is the primary free legal service provider for unaccompanied children in Colorado, and for the majority of unaccompanied children in ORR custody in Arizona, the Florence Project represents their only access to counsel and only opportunity to receive free legal representation.

**120.    Defendants' illegal actions are also causing collateral harm to other parts of Plaintiffs' missions.**  While work serving unaccompanied children is a large portion of what most Plaintiffs do, many Plaintiffs also serve other immigrant populations—but Defendants' illegal refusal to fund legal representation has knock-on effects that harm all of Plaintiffs' efforts and other missions.

121.    The Florence Project has had to institute a hiring freeze and cannot fill twenty open positions that would be dedicated to serving unaccompanied children.  Because the Florence Project is having to use general funding to maintain its representations of unaccompanied children, it has also had to freeze hirings in all non-unaccompanied-children service areas across the organization, limiting its ability to carry out other elements of its mission to provide legal services to immigrants.

122.    As GHIRP draws down its savings to continue serving its unaccompanied child clients, the financial strain threatens its other programming, which also relies on GHIRP maintaining funds to cover gaps in funding for those other programs.

123.    For ImmDef, transferring funds from other efforts to try to sustain legal representations of unaccompanied children for as long as possible will mean cutting back on other services it planned to provide for immigrants, including pro se clinics.  ImmDef has also had to stop providing any non-essential support for its clients (like paying for medical exams required for certain adjustment of status applications), though its mission is to support its clients as much as possible.  And ImmDef has had to freeze all hiring across its organization, hampering its ability to fulfill its overall mission of providing legal services to immigrants.

124.    NWIRP is being forced to draw from its reserves, at the expense of using that money for the other services it provides immigrants in Washington state.

125.    RMIAN will be forced to dedicate its already-limited staff time to fundraise to try to cover the gap left by the cancelled funding.  RMIAN is concerned that its staff might take other jobs with organizations that are more securely funded.

126.    Because VAAP is a small organization, its remaining staff of three has struggled to keep up its legal work and field client questions, and has been unable to engage in basic administrative work to keep the organization running.

### FIRST CLAIM FOR RELIEF
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Not in Accordance with Law

127.    Plaintiffs incorporate herein by reference paragraphs 1 through 126 as if fully rewritten herein.

128.    The Administrative Procedure Act ("APA") authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5

U.S.C. § 706(2)(A).  Defendants' cancellation of funding for counsel to represent unaccompanied children violates the TVPRA.

129.    The TVPRA requires Defendants HHS and ORR to "ensure, to the greatest extent practicable . . . that all unaccompanied . . . children who are or have been in the custody of [Defendants HHS and ORR] . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking."  8 U.S.C. § 1232(c)(5).  This language in the TVPRA is and has been understood to require Defendants HHS and ORR to fund attorneys to represent unaccompanied children.

130.    Congress has consistently and specifically appropriated funds to Defendants HHS and ORR to provide services required by the TVPRA, including funding legal representation.  These congressionally appropriated funds remain available to Defendants to pay for legal representation through September 30, 2027.

131.    On March 21, 2025, Defendants terminated the contract line items that funded legal representation under the TVPRA.  On information and belief, Defendants are not funding the required legal representations for unaccompanied children in any other way.  Instead, the Cancellation Order ends government-funded legal representation for unaccompanied children despite the availability of appropriated funding for such representations through at least September 30, 2027—two-and-a-half years from now.

132.    By ending funding for legal representation of unaccompanied children despite the availability of appropriated funds for this purpose, Defendants violate the TVPRA's mandate to provide counsel for unaccompanied children "to the greatest extent practicable."  Funds remain available for this purpose, and Defendants are subverting congressional appropriations and the TVPRA by failing to fund legal representation for unaccompanied children.

133.    Because Defendants' termination of funding for counsel for unaccompanied children is not in accordance with the TVPRA, it is "not in accordance with law" within the meaning of the APA and should be set aside.

### SECOND CLAIM FOR RELIEF
#### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
#### *Accardi* Doctrine

134.    Plaintiffs incorporate herein by reference paragraphs 1 through 126 as if fully rewritten herein.

135.    The APA authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Defendants' cancellation of funding for counsel to represent unaccompanied children violates the APA under the *Accardi* Doctrine because it violates ORR's own policies and regulations.

136.    Longstanding Supreme Court caselaw mandates that agencies must adhere to their own policies and regulations, and that failure to do so violates the APA.  *See U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954), *superseded by statute on other grounds*; *see also Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004) ("The legal proposition that agencies may be required to abide by certain internal policies is well-established.").

137.    The 2024 Unaccompanied Children Program Foundational Rule requires the government to "fund legal service providers to provide direct immigration legal representation" to unaccompanied children if there are "available appropriations" and to ensure children receive a legal orientation, consultation with a lawyer, and ongoing access to lawyers.  89 CFR 34604.

138.    The ORR Unaccompanied Alien Children Bureau Policy Guide expressly states that "ORR funds legal service providers (LSPs) to provide direct immigration legal representation or representation in non-immigration related matters to the extent of available appropriations, and insofar as it is not practicable for ORR to secure pro bono counsel."  *See* "ORR Unaccompanied Alien Children

Bureau Policy Guide: Section 3.7.2 Direct Legal Representation," OFFICE OF REFUGEE RESETTLEMENT (revised Aug. 1, 2024), https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-3#3.7.2.

139.    By ending funding for legal representation of unaccompanied children despite the availability of appropriated funds for this purpose through at least September 30, 2027, Defendants violate the Foundational Rule's mandate to provide counsel for unaccompanied children to the extent there are appropriated funds available to do so and violate ORR's policy of funding legal service providers "to the extent of available appropriations."  Defendants' violations of ORR's own rule and policy violate the APA.

140.    Because Defendants' termination of funding for counsel for unaccompanied children violates the Foundational Rule and ORR's own Policy Guide, it violates the APA and should be set aside under the *Accardi* Doctrine as "arbitrary, capricious, an abuse of discretion [and] otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

141.    Plaintiffs incorporate herein by reference paragraphs 1 through 126 as if fully rewritten herein.

142.    The APA authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

143.    Defendants have given no reasoned justification for their abrupt cancellation of mandated and appropriated funding for legal representations for unaccompanied children.  The Cancellation Order gives no reasoning at all.  And the February stop work order expressly disclaimed that it was issued for any "poor performance" of the legal representations.

144.    There is significant evidence that providing legal representation improves efficiency in immigration court and conserves immigration court time and resources.  Cancelling funding for legal representation will only make immigration courts operate less efficiently.

145.    In addition, Defendants' unlawful cancellation of funding for legal representations directly undermines Plaintiff organizations' missions to provide representation for as many unaccompanied children as possible.  Defendants have "entirely failed to consider an important aspect of the problem" by failing to consider the impact to Plaintiffs and their clients.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

146.    Because Defendants' termination of the Programs is arbitrary and capricious, Plaintiffs ask that the Court set aside Defendants' actions as violative of the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.    Declare that Defendants' actions violate the APA because they are "arbitrary, capricious, an abuse of discretion, or otherwise in violation of the law."

2.    Declare that Defendants are required to continue funding legal representation to unaccompanied children, consistent with the TVPRA and ORR's Foundational Rule.

3.    Set aside Defendants' actions that violate the APA.

4.    Enjoin Defendants nationwide from ceasing to fund counsel to represent unaccompanied children in violation of the TVPRA and the Foundational Rule.

5.    Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

6.    Award such other relief as this Court may deem just and proper.

Respectfully submitted,

March 26, 2025

s/ *Alvaro M. Huerta*
IMMIGRANT DEFENDERS LAW CENTER

Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org

s/ *Samantha Hsieh*
AMICA CENTER FOR IMMIGRANT
RIGHTS

Adina Appelbaum (D.C. Bar No. 1026331)*
Samantha Hsieh (V.A. Bar No. 90800)*
Peter Alfredson (D.C. Bar No. 1780258)*
Evan Benz (N.C. Bar No. 49077)*
Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*pro hac vice* forthcoming

s/ *Karen C. Tumlin*
JUSTICE ACTION CENTER

Esther H. Sung
Karen C. Tumlin
Laura Flores-Perilla
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org