IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, <br> 1861 Bay Road <br> East Palo Alto, CA 94303, *et al.*, <br><br>         Plaintiffs, <br><br>    v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br> 200 Independence Avenue, S.W. <br> Washington, DC 20201, *et al.*, <br><br>         Defendants. | Case No. 3:25-cv-2847 <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:      TBD <br> Time:      TBD <br> Dept:      TBD <br> Judge:     TBD <br> Trial Date:  TBD <br> Date Action Filed:  March 27, 2025 |

## NOTICE OF MOTION AND MOTION FOR A TEMPORARY RESTRAINING ORDER

PLEASE TAKE NOTICE as soon as it may be heard in the United States District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, CA 94102 that Plaintiffs Community Legal Services in East Palo Alto, Social Justice Collaborative, Amica Center for Immigrant Rights, Estrella del Paso, Florence Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project, Immigrant Defenders Law Center, National Immigrant Justice Center, Northwest Immigrant Rights Project, Rocky Mountain Immigrant Advocacy Network, and Vermont Asylum Assistance Project, will, and hereby do, move this Court for a temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b) or, in the alternative, for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a).

As long as congressional appropriations are available, Defendants United States Department of Health and Human Services, Office of Refugee Resettlement, and Department of the Interior are required to provide funding to legal services providers to provide direct legal representation to unaccompanied immigrant children under 8 U.S.C. § 1232(c)(5) and 45 C.F.R. § 410.1309(a)(4).  But on March 21, 2025, Defendants abruptly terminated this long-standing funding for direct legal representation for these unaccompanied children.  Accordingly, Plaintiffs seek a temporary restraining order preventing Defendants from violating the Administrative Procedure Act ("APA") by illegally ceasing funding for direct legal representation services for unaccompanied immigrant children in violation of 8 U.S.C. § 1232(c)(5) and 45 C.F.R. § 410.1309(a)(4).

Plaintiffs request that this motion be heard on an expedited basis.  The motion is based upon this notice of motion; the memorandum of points and authorities in support thereof that follows; the declarations of Jill Martin Diaz, Laura Nally, Martha Ruch, Melissa Mari Lopez,

2

Roxana Avila-Cimpeanu, Elizabeth Sanchez Kennedy, Marion Donovan-Kaloust, Lisa Koop, Vanessa Gutierrez, Ashley T. Harrington, Joel Frost-Tift, Ana Raquel Devereaux, Wendy Young, Gautam Jagannath, Miguel Angel Mexicano Furmanska, and Daniela Hernández Chong Cuy filed concurrently herewith; the proposed order filed concurrently herewith; the pleadings, records, and papers on file in this action; oral argument of counsel; and any other matters properly before the Court.

DATED: March 27, 2025                    Respectfully submitted,


By: /s/ Alvaro M. Huerta                    /s/ Samantha Hsieh


IMMIGRANT DEFENDERS LAW CENTER
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org

AMICA CENTER FOR IMMIGRANT RIGHTS
Adina Appelbaum (D.C. Bar No. 1026331)*
Samantha Hsieh (V.A. Bar No. 90800)*
Peter Alfredson (D.C. Bar No. 1780258)*
Evan Benz (N.C. Bar No. 49077)*
Amica Center for Immigrant Rights
1025 Connecticut Ave., NW, Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org


/s/ Karen C. Tumlin                    *pro hac vice forthcoming
                                       Attorneys for Plaintiffs

JUSTICE ACTION CENTER
Esther H. Sung (CA Bar No. 255962)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)*
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

## TABLE OF CONTENTS

**INTRODUCTION**...................................................................................................................1

**BACKGROUND** ...................................................................................................................2

    A.   Thousands of Unaccompanied Children Rely on Legal Representation Every Year to Exercise Their Legal Rights..............................................................................2

    B.   Congress Has Directed HHS to Ensure Unaccompanied Children Have Legal Counsel .............................................................................................................................3

    C.   ORR's Own 2024 Regulations Require Funding for Legal Services for Unaccompanied Children Consistent with Available Appropriations......................4

    D.   Defendants Terminate Funding for Direct Legal Representation for Unaccompanied Children. ....................................................................................................6

**STANDARD OF REVIEW** ..................................................................................................8

**ARGUMENT** .........................................................................................................................8

    I. .........PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...........................................8

    A.   The Cancellation Order Determines Plaintiffs' Legal Rights and Obligations and is Final Agency Action Reviewable Under the APA...........................................9

    B.   Termination of the Legal Representation Programs Violates the TVPRA..............11

    C.   Terminating the Legal Representation Programs Violates the ORR Foundational Rule. ..............................................................................................................13

    II. ........PLAINTIFFS SATISFY THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF ......16

    A.   Plaintiffs Face Irreparable Harm..........................................................................16

    B.   The Balance of Equities ........................................................................................19

    III. ......A NATIONWIDE INJUNCTION IS APPROPRIATE............................................................21

    IV. ......PLAINTIFFS SEEK EXPEDITIOUS RESOLUTION OF THEIR CLAIMS ................................23

**CONCLUSION** ....................................................................................................................24

## TABLE OF AUTHORITIES
### Cases

*Abbott Lab'ies v. Gardner*,
   387 U.S. 136 (1967) ................................................................................11

*United States ex rel. Accardi v. Shaughnessy*,
   347 U.S. 260 (1954), *superseded by statute on other grounds* ...............13

*AIG Annuity Ins. Co. v. Law Offs. of Theodore Coates*, *P.C.*,
   2008 WL 4543422 (D. Colo. Oct. 10, 2008) .........................................23

*Al Otro Lado, Inc. v. Mayorkas*,
   2024 WL 4370577 (S.D. Cal. Sept. 30, 2024) .......................................14

*Alcaraz v. I.N.S.*,
   384 F.3d 1150 (9th Cir. 2004) ...............................................................13

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) .................................................................8

*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ...............................................................16

*Bennett v. Spear*,
   520 U.S. 154 (1997) ............................................................................9, 10

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) ...............................................................................11

*Bowen v. Mich. Acad. of Fam. Physicians*,
   476 U.S. 667 (1986) ...............................................................................11

*Bresgal v. Brock*,
   843 F.2d 1163 (9th Cir. 1987) ...............................................................21

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ...............................................................................21

*Caribbean Marine Servs. Co. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988) .................................................................16

*Carnation Co. v. Sec'y of Lab.*,
   641 F.2d 801 (9th Cir. 1981) .................................................................14

*Chang v. United States*,
   327 F.3d 911 (9th Cir. 2003) .................................................................11

*Darby v. Cisneros*,
   509 U.S. 137 (1993) ...............................................................................11

*Disney Enters., Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017) .................................................................19

*Doe #1 v. Trump*,
   957 F.3d 1050 (9th Cir. 2020) ......................................................................................21

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 .....................................................................................................21, 22

*E. Bay Sanctuary Covenant v. Trump*,
   932 F.3d 742 (9th Cir. 2018) ......................................................................................16

*FDA. v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ....................................................................................................16

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ......................................................................................................9

*Freedom Commc'ns Inc. v. F.D.I.C.*,
   157 F.R.D. 485 (C.D. Cal. 1994) ................................................................................23

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ....................................................................................................16

*HIAS, Inc. v. Trump*,
   985 F.3d 309 (4th Cir. 2021) ......................................................................................22

*Immigrant Defenders Law Center v. U.S. Department of Homeland Security*,
   No. 2:21-cv-00395, Dkt. 304 (C.D. Cal. Mar. 14, 2025) .............................................9

*League of Women Voters of N.C. v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ......................................................................................17

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ..................................................................................17, 19

*Morton v. Ruiz*,
   415 U.S. 199 (1974) ....................................................................................................13

*Nat'l Council of Nonprofits v. OMB*,
   2025 WL 368852 (D.D.C. Feb. 3, 2025) ..................................................................9, 10

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................................8, 19

*Pacesetter, Inc. v. Aortech Intl. PLC*,
   2012 WL 12894007 (C.D. Cal. Nov. 1, 2012) ............................................................23

*Pacito v. Trump*,
   2025 WL 655075 (W.D. Wash. Feb. 28, 2025) ..........................................................12

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) ....................................................................................19

*State v. Azar*,
  385 F. Supp. 3d 960 (N.D. Cal. 2019), *vacated on other grounds and
  remanded sub nom. California ex rel. Becerra v. Azar*, 950 F.3d 1067 (9th
  Cir. 2020) ...........................................................................................................19

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
  240 F.3d 832 (9th Cir. 2001) .............................................................................8

*Torres v. U.S. Dep't of Homeland Sec.*,
  411 F. Supp. 3d 1036 (C.D. Cal. 2019) ............................................................15

*Trump v. Int'l. Refugee Assistance Project*,
  582 U.S. 571 (2017)...........................................................................................21

*United States v. 1996 Freightliner Fld Tractor VIN1FUYDXYB-TP822291*,
  634 F.3d 1113 (9th Cir. 2011) ...........................................................................13

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ...........................................................................16

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) ...........................................................................22

*Winter v. Nat'l Res. Def. Council*,
  555 U.S. 7 (2008)...........................................................................................8, 19

*Zepeda v. I.N.S.*,
  753 F.2d 719 (9th Cir. 1983) .............................................................................19

**Statutes**

5 U.S.C. § 551(13) ......................................................................................................9

5 U.S.C. § 701(a) ........................................................................................................9

5 U.S.C. § 701(b)(2) ...................................................................................................9

5 U.S.C. § 702 .............................................................................................................9

5 U.S.C. § 704 .............................................................................................................9

5 U.S.C. § 706(a)(2)(A) ............................................................................................12

6 U.S.C. § 279(a)(2)(i)(A) ..........................................................................................5

6 U.S.C. § 279(b)(1)(*I*) ..............................................................................................5

6 U.S.C. § 279(b)(1)(A) ..............................................................................................3

6 U.S.C. § 279(g)(2) ...................................................................................................3

8 U.S.C. § 1101(a)(27)(j) ...........................................................................................3

8 U.S.C. § 1158(b)(3)(C) ............................................................................................3

8 U.S.C. § 1232(a)(5)(D) ........................................................................................3

8 U.S.C. § 1232(c)(5) ...................................................................................1, 4, 11

28 U.S.C. § 1657(a) ..........................................................................................23, 24

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4,
    Div. A Tit. I § 1101(8) (2025) ................................................................6, 15

Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138
    Stat. 460, 665-666 (2024) ................................................................................15

Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, § 4, 130 Stat.
    460, 461........................................................................................................12

Pub. L. 118-47 138 Stat. 460, 664 (2024) .............................................................5

## Other Authorities

170 Congressional Record H1501-01 ....................................................................13

DHHS: Administration for Children & Families, *Justification of Estimates for
    Appropriations Committees* (2024), https://shorturl.at/4VDSL; ....................14

H. Rep. No. 985, 98th Cong., 2d Sess. (1984), reprinted in 1984 U.S.C.C.A.N.
    5708, U.S.C.C.A.N. 5782 ..............................................................................23

https://1.next.westlaw.com/Document/Ib5f6578989d511d9ac45f46c5ea084a3/Vie
    w/FullText.html?transitionType=Default&contextData=(oc.Default)&docume
    ntSection=co_pp_sp_506_923..........................................................................11

Olga Byrne & Elise Miller, *The Flow of Unaccompanied Children Through the
    Immigration System* (March 2012), https://shorturl.at/KI3Jt ...........................4

ORR, Unaccompanied Alien Children Bureau Fact Sheet (March 7, 2025),
    https://acf.gov/orr/fact-sheet/programs/uc/fact-sheet .......................................2

S. Rep. 118-84 (2023) ...............................................................................5, 13, 15

Senate Report No. 118-84 .....................................................................................13

Senator Mazie K. Hirono, Letter to HHS and Interior on Legal Services for
    Children in Immigration System (March 3, 2025), https://shorturl.at/RcUr3 .........7

William A. Kandel, *et al.*, CRS Report R43628, *Unaccompanied Alien Children:
    Potential Factors Contributing to Recent Immigration* (2014) .................................2

## Rules

9th Cir. Rule 27–12................................................................................................23

## Regulations

45 C.F.R. § 410.1309(a)(4)..............................................................................1, 5, 15

45 C.F.R. § 410.1309(d) ....................................................................................................5

89 Fed. Reg. 34384 ......................................................................................................3, 4

89 Fed. Reg. 34386 .........................................................................................................4

89 Fed. Reg. 34526 ....................................................................................................5, 14

89 Fed. Reg. 34529 ................................................................................3, 4, 14, 15, 20

## INTRODUCTION

Each year, tens of thousands of unaccompanied immigrant children ("UCs") are referred to the Office of Refugee Resettlement ("ORR") when they are encountered in the United States without an available parent or legal guardian.  Absent intervention from legal services providers, they are forced to navigate our country's complicated immigration processes alone.  Plaintiffs are a group of legal services providers who provide congressionally mandated legal representation and services to UCs in a variety of immigration proceedings.  Recognizing the importance of this representation, Congress has appropriated funding for them since 2012, and continuing through September 2027.  Nonetheless, on March 21, 2025, Defendants abruptly cancelled direct legal representation for UCs under the contract effectuating Congress's mandate.  Without these congressionally mandated funds, Plaintiffs face the impossible choice of continuing to represent their UC clients in violation of Defendants' order and without compensation, or abandoning their core functions.

Recognizing that children navigating complicated legal proceedings need counsel, in 2008, Congress directed the Secretary of Health and Human Services ("HHS") to "ensure, to the greatest extent practicable . . . , that all unaccompanied alien children . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5).  In keeping with that mandate, Congress has funded direct legal representation for UCs since 2012.  In 2024, acknowledging its responsibility to provide these congressionally mandated legal services, ORR issued its Unaccompanied Children Program Foundational Rule ("Foundational Rule") and bound itself to funding legal services providers, so long as congressional appropriations were available.  45 C.F.R. § 410.1309(a)(4).

On March 21, 2025, Defendants ordered an immediate stop to the representation work in clear violation of the Administrative Procedure Act ("APA").  Defendants have provided no

information as to how or if they will now comply with their statutory and regulatory obligations. Defendants have also provided no information to Plaintiffs about how they should deal with their ongoing commitments to represent UCs (including UCs with immigration court dates as soon as this week).  As a result, Plaintiffs must choose between several intolerable options:  continuing to represent their clients without compensation, drawing down precious or scarce discretionary or reserve funding, cutting other organizational services, laying off or terminating experienced staff, or seeking to withdraw from representation, thereby abandoning their child clients in the middle of legally complex immigration proceedings they likely cannot navigate alone.  Defendants' actions are contrary to congressional and regulatory mandate and are arbitrary and capricious because they violate their own regulatory obligations.  To prevent irreparable harm to Plaintiffs, to say nothing of irreparable harm to their UC clients, this Court should enjoin Defendants' attempt to terminate direct legal representation for UCs under the APA.

This Court should expedite consideration of this motion under 28 U.S.C. § 1657(a) and grant immediate provisional relief enjoining Defendants' illegal action, which is creating ongoing and irreparable harm to Plaintiffs and their clients.

## BACKGROUND

### A.  Thousands of Unaccompanied Children Rely on Legal Representation Every Year to Exercise Their Legal Rights

In the 2024 fiscal year alone, nearly 100,000 new children were identified by federal authorities as UCs and referred to ORR.  ORR, *Unaccompanied Alien Children Bureau Fact Sheet* (March 7, 2025), https://acf.gov/orr/fact-sheet/programs/uc/fact-sheet.  These children's journeys to the United States may differ, but all of them are now in the United States without their parents or guardians.  William A. Kandel, *et al.*, CRS Report R43628, *Unaccompanied Alien Children: Potential Factors Contributing to Recent Immigration*, at 3, 10 (2014).  Of the UCs who moved

through ORR custody in 2024, nearly a quarter were 12 years old or younger.  ORR, Fact Sheets and Data, *supra*.

Given their inherent vulnerabilities, UCs have special legal rights, *see, e.g.*, 8 U.S.C. § 1232(a)(5)(D), including the right to apply for asylum, withholding of removal, relief under the Convention Against Torture and voluntary departure.  Many UCs also have the right to apply for Special Immigrant Juvenile Status ("SIJS"), which offers a path to lawful permanent resident status but requires state court proceedings that require counsel.  *See* 8 U.S.C. § 1101(a)(27)(j).  UCs may also pursue asylum before U.S. Citizenship and Immigration Services in a non-adversarial process without being subject to the one-year filing deadline applicable to adults.  *See* 8 U.S.C. § 1158(b)(3)(C).  But these rights are meaningless unless children are educated about their rights and equipped with the tools to exercise them, including legal counsel.  89 Fed. Reg. 34384, 34529 (Apr. 30, 2024).  Unaccompanied children primarily learn about and exercise their rights through either full legal representation or limited-scope assistance from a lawyer—often, until March 21, 2025, an attorney funded by Defendants, and provided by Plaintiffs.

**B.  Congress Has Directed HHS to Ensure Unaccompanied Children Have Legal Counsel**

Congress has recognized that UCs are uniquely vulnerable to trafficking, abuse in government custody, and injustices in the immigration legal system.  Through the Homeland Security Act of 2002, Congress gave Defendants Department of Health and Human Services ("HHS") and ORR legal custody of UCs, with the mandate to care for the children.  *See* 6 U.S.C. § 279(g)(2).  Congress also commanded Defendants HHS and ORR to "develop[] a plan to be submitted to Congress on how to ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such [unaccompanied] child."  6 U.S.C. § 279(b)(1)(A).  Acting on this congressional command, in 2005, ORR developed a three-year pilot program to meet the legal needs of UCs through provision of pro bono legal services.  At the end of the pilot

program in 2008, a summary report detailed that volunteer attorneys alone were not sufficient to meet the representation needs of UCs. *See* Olga Byrne & Elise Miller, *The Flow of Unaccompanied Children Through the Immigration System*, at 22–23 (March 2012), https://shorturl.at/KI3Jt. The report concluded that paid attorneys would be required to cover a significant percentage of the representation that UCs needed, spurring Congress to impose additional representation-related requirements on ORR and HHS through the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044 ("TVPRA").

The TVPRA, which Congress passed in 2008 and has regularly reauthorized since then (most recently in 2023), mandates that HHS must provide counsel for UCs: "The Secretary of Health and Human Services *shall ensure*, to the greatest extent practicable . . . that all unaccompanied alien children who are or have been in the custody of the Secretary or the Secretary of Homeland Security . . . have counsel to represent them in legal proceedings or matters." 8 U.S.C. §1232(c)(5) (emphasis added). Defendants have violated this mandate.

## C.  ORR's Own 2024 Regulations Require Funding for Legal Services for Unaccompanied Children Consistent with Available Appropriations.

ORR has recognized "that most unaccompanied children need legal services to resolve their immigration status and that representation appears to have a significant impact on both the court appearance rate and the outcome of cases for unaccompanied children." Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384, 34529 (April 30, 2024). On April 30, 2024, ORR issued the final "Foundational Rule," which codified in part HHS's 1997 *Flores* settlement.[1] *Id.* Section 410.1309 of the final rule, titled "Legal Services," affirms ORR's position

---

[1] The *Flores* settlement, entered into by the federal government and four noncitizen children in 1997, sets forth requirements regarding the care of UCs while in ORR custody. 89 Fed. Reg. at 34386.

that "legal services providers who represent unaccompanied children undertake an important function" and explains ORR's goal of "100 percent legal representation of unaccompanied children." *Id.* at 34526.

The Foundational Rule requires that ORR must—if it has available appropriations—"fund legal service providers to provide direct immigration legal representation for certain unaccompanied children."[2] 45 C.F.R. § 410.1309(a)(4).  To comply with the TVPRA and the Immigration and Nationality Act ("INA"), the rule recognizes ORR must "ensure that all unaccompanied children who are or have been in ORR care have access to counsel" and provides, that "[t]o the extent ORR determines that appropriations are available, and insofar as it is not practicable for ORR to secure pro bono counsel, ORR shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children, subject to ORR's discretion and available appropriations."  45 C.F.R. § 410.1309(a)(4), (d).

Funds are, in fact, available, through at least September 30, 2027.  On March 23, 2024, Congress passed H.R. 2882, the Further Consolidated Appropriations Act of 2024, which specifically appropriated funds through September 30, 2027, "for carrying out" section 235 of the TVPRA. Pub. L. 118-47 138 Stat. 460, 664 (2024).  The Senate Appropriations Committee Report confirms there should be "$5,506,258,000 for the Unaccompanied Children program."  S. Rep. 118-84, at 169.  The Committee also directed that its "recommendation includes no less than the fiscal year 2023 funding level for post-release services; legal services and access to counsel; and child advocates" and that it "expects HHS will continue to expand child-welfare focused post-

---

[2] Congress has also required ORR to compile and provide lists of legal services providers "qualified to provide guardian and attorney representation services" for UCs.  6 U.S.C. § 279(b)(1)(*I*).  The Foundational Rule also binds ORR to working with qualified legal services providers to provide orientations and consultations for UCs.  (a)(2)(i)(A).

release services . . . including . . . access to legal services." *Id.* at 168.  Finally, the Senate Report expressed its understanding that the TVPRA requires ORR to fund counsel for UCs:  "The Committee also expects these funds will be used to provide access to counsel, consistent with the goals of the [TVPRA] of 2008 for all children to have access to counsel in their immigration proceedings." *Id.* at 169.  On March 15, 2025, Congress continued funding at the same levels for UC legal representation.  Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, tit. I, § 1101(8) (2025)).  From December 2023 until March 21, 2025, Defendants satisfied this obligation through contracting with Acacia Center for Justice, who contracted with organizations like Plaintiffs to provide direct legal representation for unaccompanied children.

**D.  Defendants Terminate Funding for Direct Legal Representation for Unaccompanied Children.**

Despite Congress's consistent funding of legal representation for UCs as mandated by the TVPRA, Defendants' actions undermine congressional appropriations, the TVPRA's mandate, and ORR's Foundational Rule.  On March 21, 2025, Defendant DOI sent a letter titled "Notice of Partial Termination for the Government's Convenience" (the "Cancellation Order") to the Acacia Center for Justice, the prime contractor on this contract, who then notified Plaintiffs of the termination.  The letter announced that Defendants were terminating funding for direct legal representation for UCs—both in and out of ORR's custody—as of close of business that day, ignoring the requirement to fund these programs under the TVPRA and the Foundational Rule. The letter further commanded the Plaintiffs to "immediately stop work" on any of the active representations of UCs and to stop taking on new engagements.  NWIRP Decl. ¶ 10; VAAP Decl. ¶ 13.  Up until the March 21 letter, Defendants enabled legal services providers, including Plaintiffs, consistently to provide direct and ongoing representations to tens of thousands of UCs in proceedings, including removal and SIJS proceedings.  The letter provided no explanation for

the termination nor guidance on how to handle existing representations, including those with imminent court hearings. Defendants were silent as to whether providers could continue existing representations (unfunded), despite the stop-work direction, or must withdraw immediately and (if granted) be forced to leave their clients in the lurch. *See* NWIRP Decl. ¶¶ 9, 11; VAAP Decl. ¶¶ 12, 13, 21; Estrella Decl. ¶¶ 13, 16; RMIAN Decl. ¶ 19.

This is not the first time that Defendants have acted to halt the legal representation of unaccompanied children. About a month earlier, on February 18, 2025, Defendant Department of the Interior ("DOI") and Defendant HHS issued an "Immediate Stop Work Order," ordering legal services providers—including Plaintiffs—to indefinitely "cease all services" and "stop all work" for active legal services. NWIRP Decl. ¶ 9; VAAP Decl. ¶ 12; MIRC Decl. ¶ 21; Public Counsel Decl. ¶ 10; Estrella Decl. ¶ 10; RMIAN Decl. ¶ 11. Although Defendants rescinded the stop work order three days later, Defendants' drastic actions spurred 32 Senators to sign a letter expressing "strong opposition" to the stop work order and noting its violation of the TVPRA. NWIRP Decl. ¶ 9; VAAP Decl. ¶ 12; Estrella Decl. ¶ 10; RMIAN Decl. ¶ 11; *see* Senator Mazie K. Hirono, Letter to HHS and Interior on Legal Services for Children in Immigration System (March 3, 2025), https://shorturl.at/RcUr3.

Despite this strong opposition and TVPRA's mandate, Defendants terminated funding on March 21, 2025, and have further provided no information about whether or how they intend to replace these critical legal services for UCs. Terminating funding for these legal services has devastating and irreparable effects on Plaintiffs, which are all the more devastating for the harm they will do to UCs. Estrella Decl. ¶ 7. For example, VAAP previously furloughed two of its three direct legal service practitioners on staff after the February stop work order, leaving the remaining practitioner to bear two additional full caseloads at a time. VAAP Decl. ¶¶ 15, 19. Even

if Defendants reinstate funding for counsel for UCs at some unknown future time, the providers'
funded children's legal programs and the UCs that depend on their vital counsel will have already
been dealt a fatal blow via mass layoffs of staff for the nonprofits and private providers, *see, e.g.*,
VAAP Decl. ¶¶ 15, 19, and prolonged government custody or deportations for the children—
including children who could have raised valid claims to lawful immigration status.

## STANDARD OF REVIEW

Motions for temporary restraining orders are governed by the same standards as motions
for preliminary injunctions. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240
F.3d 832, 839 n.7 (9th Cir. 2001) (explaining the analysis for a TRO and preliminary injunction
are "substantially identical"). A temporary restraining order is warranted where the plaintiffs
establish: (1) their likelihood of success on the merits; (2) irreparable harm; (3) the balance of
equities tips in their favor; and (4) that an injunction is in the public interest. *All. for the Wild
Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter v. Nat'l Res. Def. Council*,
555 U.S. 7, 20 (2008)); *see also Stuhlbarg*, 240 F.3d at 839 n.7 (applying preliminary injunction
standard to a temporary restraining order). Where the government is the defendant, the last two
factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

## I.    Plaintiffs are Likely to Succeed on the Merits

Agency action cannot stand if it is contrary to law. Because Defendants' termination of
direct legal representation services is contrary to the TVPRA and ORR's own regulations,
Plaintiffs are likely to succeed on the merits.

**A.  The Cancellation Order Determines Plaintiffs' Legal Rights and Obligations and is Final Agency Action Reviewable Under the APA.**

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  Persons or organizations, like Plaintiffs here, who are "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, [are] entitled to judicial review thereof." 5 U.S.C. § 702.  "[A]gency action" includes not only agencies' affirmative acts, but also their omissions and failures to act. *Id.*; 5 U.S.C. § 551(13).

Under the APA, this Court may set aside and enjoin unlawful agency action, and compel agency action unlawfully withheld, if it is a (1) "final agency action," (2) "for which there is no other adequate remedy in a court," so long as (3) there are no "statutes [that] preclude judicial review" and "agency action is [not] committed to agency discretion by law."  5 U.S.C. §§ 701(a), 704.  Plaintiffs satisfy each of these criteria here, and APA relief is therefore proper.

*Final Agency Action*.  Under the APA, "agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13); 5 U.S.C. § 701(b)(2).  An agency action is final where two conditions are satisfied: (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks and citations omitted).

Defendants' refusal to fund or otherwise provide direct legal representation for UCs is a final agency action.  *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025) (attempt to "pause" funding and disbursements constituted final agency action).  *Immigrant Defenders Law Center v. U.S. Department of Homeland Security*, No. 2:21-

9

cv-00395, Dkt. 304 (C.D. Cal. Mar. 14, 2025), is instructive. In that case, plaintiffs alleged that the Department of Homeland Security unlawfully denied the rights guaranteed by the TVPRA from unaccompanied children who had previously been processed under the Department of Homeland Security's Migrant Protection Protocols Policy ("MPP"), despite having entered and been designated as UCs. *Id.* at \*21–22. The court held that plaintiffs met the first requirement because "nothing in the record indicates that the Policy is tentative or that decisionmaking is ongoing." *Id.* at \*18. As to the second, the court found the policy at issue was final because it was "an agency action 'from which legal consequences will flow.'" *Id.* at \*19 (quoting *Bennett*, 520 U.S. at 178).

Here, Defendants clearly ceased funding direct legal representation to UCs in violation of an express statutory mandate and their own regulatory frameworks. The Cancellation Order directed Plaintiffs to stop all work providing direct legal representation to UCs, including existing clients whom Plaintiffs undertook to represent before the Cancellation Order. This notification is final: it terminates all funding for and orders a halt to all direct legal representation, leaving only funding for certain Know Your Rights ("KYR") presentations and confidential legal consultations. VAAP Decl. ¶ 13; NWIRP Decl. ¶ 10; RMIAN Decl. ¶ 12; Estrella Decl. ¶ 11. That order went into effect immediately on March 21, 2025.

As a result, Plaintiffs are forced to choose between continuing to provide unfunded legal representation in the face of extremely limited resources; cutting other vital organizational programs, laying off, furloughing, or terminating staff; or seeking to withdraw from their ongoing representation duties for court hearings, client meetings, and other important preparations for legal proceedings as soon as this week. VAAP Decl. ¶ 21. The longer Plaintiffs go without this funding or clarity regarding how to handle their current clients, the fewer services they can provide as they

are forced to withdraw from ongoing representations, cut other core programs, and/or lay off or reassign staff.  VAAP Decl. ¶ 20–22; NWIRP Decl. ¶ 14.  Institutional knowledge will be permanently lost if significant numbers of experienced staff are laid off, irreparably damaging the Plaintiffs' capabilities, regardless of whether funding is ever reinstated.  Thus, this termination undeniably has an immediate effect on parties' rights or obligations.

_No Other Adequate Remedy_.  Plaintiffs do not have any other adequate remedy for their claims.  The Supreme Court narrowly interprets the "other adequate remedy" limitation, stressing that it "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action."  *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988); *see also Chang v. United States*, 327 F.3d 911, 923 (9th Cir. 2003) ("generous" APA review provisions must be given "hospitable" interpretation (citing *Abbott Labs v. Gardner*, 387 U.S. 136, 140, 141 (1967))).  Instead, "Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions."  *Darby v. Cisneros*, 509 U.S. 137, 146 (1993).  Here, no such special procedures have been established.

_No Statutory Bar to Review_.  Finally, no statute bars review of Plaintiffs' claims here, and Congress has done nothing to override "the strong presumption that Congress intends judicial review" of the administrative actions Plaintiffs challenge.  *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670–71 (1986).

**B.  Termination of the Legal Representation Programs Violates the TVPRA.**

Under the TVPRA, Congress requires that the government "shall ensure, to the greatest extent practicable," that *all* UCs receive legal "counsel to represent them in legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking."  8 U.S.C. § 1232(c)(5).  Canceling funding for and ordering stoppage of direct legal representation services to UCs violates

an express congressional mandate. The Cancellation Order should be held unlawful and set aside. 5 U.S.C. § 706(a)(2)(A).

The TVPRA, requiring Defendants to "ensure [UC legal representation] to the greatest extent practicable," precludes them from terminating the legal representation program and nullifying its congressionally appropriated funding under circumstances here. *See, e.g.*, *Pacito v. Trump*, 2025 WL 655075, at *18 (W.D. Wash. Feb. 28, 2025) (government agencies violated the APA when they withheld appropriated funds when agencies were "required, 'to the extent of available appropriations,' to ensure provision of support services for resettled refugees"). Defendants terminated this funding and ordered Plaintiffs to cease UC client representation without providing any other avenues of legal services for UCs—failing to "ensure, to the greatest extent practicable," that UCs have legal counsel in their immigration proceedings. Defendants' Cancellation Order effectively ends meaningful legal representation for UCs by Plaintiffs and forecloses other providers from providing similar legal representation. VAAP Decl. ¶¶ 20–21.

Although the TVPRA grants Defendants some discretion in *how* to allocate appropriated funds for legal access, Defendants cannot simply cease funding for direct legal representation in its entirety. *See Pacito*, 2025 WL 655075, at *18. That is precisely what happened here: Defendants cut off funding for direct legal representation services without providing any guidance or explanation to Plaintiffs regarding how they should deal with their ongoing representations and without any alternative plan for implementing their duties under the statute. Amica Decl. Ex. 3.

Ultimately, canceling the programs defies express congressional mandates in both the TVPRA and appropriations bills. *See* Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, § 4, 130 Stat. 460, 461 (incorporating the explanatory statement published at 170 Congressional Record H1501-01, which in turn incorporates Senate Report No. 118-84). Out of

the $5,506,258,000 the Senate Report specified for the UCP, the Report recommended "no less than the fiscal year 2023 funding level for post-release services; *legal services and access to counsel*; and child advocates," and that such "funds will be used to provide access to counsel, consistent with the goals of the [TVPRA]."  S. Rep. 118-84 at 167–70 (2023) (emphases added).

After mandating in the TVPRA that Defendants provide legal representation to UCs "to the greatest extent practicable," Congress facilitated the provision of legal representation by appropriating billions of dollars to the UCP program, which includes (among other services) direct legal representation to UCs.  By consistently appropriating funds for this program for more than a decade, Congress not only ensured that it *would* be practicable to provide legal representation to UCs, but also expressly intended to ensure this outcome.  Given that appropriations are available to fund access to direct legal representation, Defendants cannot, consistent with their TVPRA obligations, simply refuse to fund such representation.

**C.  Terminating the Legal Representation Programs Violates the ORR Foundational Rule.**

The government also is "bound by the regulations it imposes upon itself."  *See United States v. 1996 Freightliner Fld Tractor VIN1FUYDXYB-TP822291*, 634 F.3d 1113, 1116 (9th Cir. 2011).  "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974).  Under the *Accardi* doctrine, parties may bring claims under the APA asserting that an agency has failed to follow its own rules and internal policies.  *See, e.g.*, *Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004).  *Accardi* concerned the failure by the Board of Immigration Appeals to exercise its independent discretion in deciding an appeal as required by the agency's own regulations.  *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954), *superseded by statute on other grounds*.

To establish an *Accardi* claim, Plaintiffs must show (1) that the government has violated its own regulations; and (2) that Plaintiffs are substantially prejudiced by that violation.  *See Al*

*Otro Lado, Inc. v. Mayorkas*, 2024 WL 4370577, at \*8–9 (S.D. Cal. Sept. 30, 2024) (plaintiffs sufficiently alleged a policy violation based on a rule preamble and alleged substantial hardship based on border turnback policy); *see also Carnation Co. v. Sec'y of Lab.*, 641 F.2d 801, 804 n.4 (9th Cir. 1981) (the standard for an *Accardi* violation is "whether violation of the regulation prejudiced the party involved"). Here, Defendants' actions violate their express commitment in the Foundational Rule, a binding regulation, to fund legal services providers to provide UC legal representation as long as appropriations are available. Plaintiffs are substantially prejudiced because they rely on that funding to provide critical legal services to UCs and will, in some cases, be forced to stop providing that representation to their UC clients. Plaintiffs will have to choose between financial survival and adhering to binding ethical obligations as to existing clients if Defendants' actions are not enjoined. RMIAN Decl. ¶ 14; Estrella Decl. ¶ 15; *see also infra* Section II.A.

ORR has "recognize[d] that most unaccompanied children need legal services to resolve their immigration status and that representation appears to have a significant impact on both the court appearance rate and the outcome of cases for unaccompanied children." 89 Fed. Reg. at 34529; *see also Al Otro Lado*, 2024 WL 4370577, at \*9 (preambles may sufficiently bind agencies under *Accardi*). Accordingly, ORR just last year stated its intention to provide "universal legal representation for unaccompanied children by FY 2027." HHS: Administration for Children & Families, *Justification of Estimates for Appropriations Committees*, at 78 (2024), https://shorturl.at/4VDSL; *see also* 89 Fed. Reg. at 34526 ("ORR strives for 100 percent legal representation of unaccompanied children and will continue to work towards that goal to the extent possible."). Thus, in 2024, ORR adopted the Foundational Rule, which states in relevant part:

> To the extent ORR determines that appropriations are available, and insofar as it is
> not practicable for ORR to secure pro bono counsel, ORR *shall fund legal service*

> *providers* to provide direct immigration legal representation for certain
> unaccompanied children, subject to ORR's discretion and available appropriations.

45 C.F.R. § 410.1309(a)(4) (emphasis added).  ORR explicitly noted that "in some cases it is impracticable for ORR to secure pro bono legal services for unaccompanied children," and provided that ORR would fund legal services with available congressional appropriations for those cases.  89 Fed. Reg. at 34529.  The Foundational Rule thus explicitly obligates ORR to fund legal services providers to provide direct immigration legal representation, so long as congressional appropriations are available and pro bono counsel is not practicable.  *See id.* at 34529 ("ORR has determined that its approach to providing legal services to unaccompanied children by enabling them to access pro bono counsel 'to the greatest extent practicable' and funding legal services for additional unaccompanied children, as resources allow, is consistent with ORR's statutory obligations.").

Defendants' actions on March 21, 2025, subvert these ORR commitments and regulations, violate the *Accardi* doctrine, and are both contrary to law and arbitrary and capricious under the APA.  *See Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1068–69 (C.D. Cal. 2019).  Congressional appropriations are readily available until September 2027 to fund these legal services, including funds appropriated as recently as March 15, 2025.  *See, e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, Div. A Tit. I Sec. 1101(8) (2025); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 665-666 (2024); S. Rep. 118-84, at 169.  Nonetheless, without explanation and without a plan to replace these critical legal services, the Cancellation Order violates Defendants' obligations and has caused and will continue to cause Plaintiffs substantial hardship, as described below.  *See also infra* Section II.A.  Because Defendants' actions violate their own stated policies and substantially prejudice Plaintiffs, the termination order should be enjoined.

## II.  Plaintiffs Satisfy the Remaining Requirements for Injunctive Relief

### A.  Plaintiffs Face Irreparable Harm

A temporary restraining order is appropriate where, as here, the moving party shows that it faces irreparable harm—harm which is (1) "immediate", *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988), and (2) "for which there is no adequate legal remedy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

Organizations have standing when a defendant's actions interfere with their "core business activities." *FDA. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (organizational standing analysis applies to irreparable harm factor).  When a defendant's actions "have perceptibly impaired" an organizational plaintiff's programs, "there can be no question that the organization has suffered injury in fact." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 765 (9th Cir. 2018) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (quotation marks removed)).  An organization also meets this burden by establishing defendant's actions have "frustrated [the organization's] mission." *Id.* at 766.

Here, immediate injunctive relief is necessary to protect Plaintiffs from suffering severe and irreparable harm.  Defendants' abrupt termination of funding for direct legal representation directly interferes with Plaintiffs' missions, immediately impeding their ability to provide critical legal representation that is at the heart of Plaintiffs' core activities.  RMIAN Decl. ¶ 22; VAAP Decl. ¶¶ 21–22; NWIRP ¶¶ 13–15.  There is no question that ceasing funding for legal representation services for UCs and terminating the existing services will cause imminent harm that cannot be later remediated.  MIRC Decl. ¶ 32–33; FIRRP Decl. ¶ 37.  The Cancellation Order prevents Plaintiffs from providing thousands of unaccompanied children with the direct legal representation required under the TVPRA and the Foundational Rule, frustrating Plaintiffs'

primary mission of representing these children as contemplated by Congress and the TVPRA.  *See, e.g.*, ImmDef Decl. ¶ 2.  If this occurs, "'there can be no do over and no redress.'"  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).

Plaintiffs have relied on Congress's and Defendants' assurances that funding for these critical resources will continue to be available.  Amica Decl. ¶ 11; RMIAN Decl. ¶ 18.  Cutting off this vital resource threatens immediate and irreparable harm.  *See, e.g.*, CLSEPA Decl. ¶ 13; VAAP Decl. ¶¶ 22–24; KIND Decl. ¶¶ 16–19.  For example, Immigrant Defenders Law Center has already had to provide 27 staff with layoff notices in response to the Cancellation Order and anticipates additional cuts would be necessary if funding is not restored; these staff losses threaten its ability to continue representing the 1900 UCs it currently represents.  ImmDef Decl. ¶¶ 20–22. In Texas, Estrella del Paso currently manages 324 pending cases and predicts the loss of funding will require staff layoffs and increase caseloads for existing staff.  Estrella Decl. ¶ 6.  The Galveston-Houston Immigration Representation Project expects to lay off most of their Immigrant Children and Youth staff within four weeks.  GHIRP Decl. ¶ 21.  Sustaining these services without this funding will cost the Northwest Immigrant Rights Project $200,000 a month.  NWIRP Decl. ¶ 13.  Private providers predict devastating financial consequences, including the potential for bankruptcy.  DHCC Decl. ¶ 19; MM Decl. ¶ 18.  And these losses do not even account for the organizational knowledge at risk of being lost.  Estrella Decl. ¶ 6; FIRRP Decl. ¶ 38; Amica Decl. ¶ 25; ImmDef Decl. ¶ 21.

These harms cannot be remediated or redressed, even if Defendants later provide alternative routes for providing direct legal representation for UCs.  The harm to Plaintiffs and their clients is imminent and irreparable.  The termination of services took effect immediately upon

17

receipt of Defendants' letter on March 21, 2025, which provided no guidance as to what Plaintiffs should do with their existing obligations, including immigration court hearings scheduled for this week. DHCC Decl. ¶ 15; Amica Decl. ¶ 20; ImmDef Decl. ¶ 24. Plaintiffs have ethical obligations to their clients and cannot simply immediately withdraw from representation; indeed, most attorneys will require court permission to withdraw. FIRRP ¶ 34. Plaintiffs and their clients are already experiencing irreparable harm far exceeding the mere loss of funding, including because they have to furlough or layoff staff and increase the caseloads of staff who can stay on. After limited reserves run out, Immdef will be forced "to take drastic action to terminate staff across all positions funded under this contract." Immdef Decl. ¶ 21. Similarly, KIND "anticipate[s] significant layoffs, starting within days" after the termination of funding. KIND ¶ 16. Children's immigration cases "are complex, often take years to complete, and require highly skilled attorneys to competently handle them." *Id.* at ¶ 23. Impacted attorneys and staff have years of individualized experience and wisdom with clients, making rehiring after layoffs impracticable.

The imminent potential harms to children are immediate and severe. For example, "if a child at one of the ORR-subcontracted facilities we serve is identified as having an urgent legal need such as an outstanding removal order, Amica Center—the only legal provider with access to the ORR-subcontracted facility—would not be funded to provide the necessary legal service to protect the child from imminent removal." Amica Decl. ¶ 21. Further, "[a]t this very moment, there are children in ORR custody who need our representation who are not receiving it. This means that children who want voluntary departure will have their return home unacceptably delayed, victims of trafficking will not be able to access the protections they deserve, and children fleeing persecution will not be able to have their day in court." ImmDef Decl. ¶ 25. The Court

cannot later reset the clock.  Absent a temporary restraining order Plaintiffs will suffer harm that cannot later be fixed.

## B.  The Balance of Equities

Finally, in considering whether to grant a temporary restraining order, the Court should "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  Where an injunction will not "substantially injure the other [interested] parties," the balance of equities tips in plaintiffs' favor.  *Nken*, 556 U.S. at 434.

Here, there will be no harm to Defendants if this Court issues a temporary restraining order: the Government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *cf. Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983).  Instead, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *State v. Azar*, 385 F. Supp. 3d 960, 985 (N.D. Cal. 2019), *vacated on other grounds and remanded sub nom. California ex rel. Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (quoting *Newby*, 838 F.3d at 12) (cleaned up).

Terminating funding for direct legal representation for UCs, without any plan to ensure that current representations are not interrupted, violates Congress's express directive in the TVRPA and ORR's own commitments in the Foundational Rule.  Enjoining Defendants from effectively terminating these services merely prevents Defendants from defying these mandates and shirking their own voluntarily undertaken obligations.  Paying out funds already appropriated for these services cannot harm Defendants in any meaningful way compared to the harms that Plaintiffs and their clients will suffer if this Court does not issue a temporary restraining order.

Maintaining funding for these direct legal representation services furthers critical public interests: ensuring children have access to legal representation and protection from trafficking, as well as promoting efficiency and fairness within the immigration system for thousands of children who have viable claims for immigration relief in the United States.  *See* 89 Fed. Reg. at 34529 (recognizing benefit of UC representation to the immigration system generally).  Plaintiffs' work with UCs is widely recognized and commended by the legal community writ large, including by Immigration Judges, clerks, and the Department of Homeland Security's field office staff.  VAAP Decl. ¶ 11; MIRC Decl. ¶ 19; ImmDef Decl. ¶ 13. The programs promote judicial economy by preventing immigration courts from bearing expenses such as unnecessary status conferences, VAAP Decl. ¶ 11, terminating proceedings for children where jurisdiction is improper, VAAP Decl. ¶ 9; RMIAN Decl. ¶ 10, and efficiently funneling contact with the courts through a single point of contact rather than having 50 or more representatives reaching out individually, MIRC Decl. ¶ 19.  Plaintiffs play a key role in ensuring that children's needs are being met while in ORR custody.  ImmDef Decl. ¶ 8.  For example, Plaintiffs make referrals to Child Advocates, advocate directly with ORR to avoid unnecessary "step ups" for children at risk of being placed in more restrictive detention settings, and request Trafficking Victim designations from the Office of Trafficking in Persons.  *Id.*  Because Plaintiffs are independent, non-governmental organizations, children often share concerns with Plaintiffs they do not feel comfortable sharing with ORR-subcontracted staff or other stakeholders.  *Id.*  A temporary restraining order enjoining the Cancellation Order is in the public interest.

If the Court does not issue a temporary restraining order, Plaintiffs and the thousands of UCs they represent will face clear, immediate, and irreparable harms.  Defendants themselves, meanwhile, do not face any injury from the issuance of a temporary restraining order to stop their

illegal action.  Given these considerations, the balance of equities weighs heavily in favor of issuing a temporary restraining order here.

### III.A Nationwide Injunction is Appropriate

While injunctive relief must be tailored to the scope of the case, "there is no bar against . . . nationwide relief in federal district or circuit court when it is appropriate." *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987).  Moreover, "an injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Id.* at 1170–71.  Accordingly, "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640,681 (9th Cir. 2021) (cleaned up).  The appropriate injunctive relief "often depend[s] as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l. Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017).

Here, because "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff," a nationwide injunction is necessary to provide Plaintiffs complete relief.  *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020) (nationwide scope of injunction proper to provide complete relief).  Defendants' decision to terminate direct legal representation directly violates the TVPRA and the Foundational Rule as to every legal services provider and will cause irreparable harm if allowed to proceed.  A nationwide injunction is the only way to effectively grant Plaintiffs the relief they seek: the preservation of their mission to provide critical legal services for UCs across the country who would otherwise be left to navigate the immigration system alone.  It is also the only way to ensure that Defendants comply with the congressional mandate and their own

21

regulatory obligations to provide legal representation to UCs to the greatest extent practicable

Without a nationwide injunction, Defendants may continue to deny funding to other nonprofit

organizations providing similar services, preventing thousands of UCs from receiving legal

representation and assistance, and forcing Plaintiffs to make an impossible choice between serving

their mission unfunded or turning their backs on vulnerable clients.  Plaintiffs, whose primary

mission and core organizational activities include critical direct legal representation for these

children, will be forced to either deplete their reserves by continuing to provide as much direct

legal representation services as possible or turn their backs on vulnerable clients.  Notably,

Defendants—who, consistent with congressional appropriations, already allocated funding for

direct legal representation—will not face any harm from a nationwide injunction requiring them

to continue funding legal representation as planned.  Thus, the balance of equities weighs heavily

in favor of a nationwide injunction.

Courts have recognized that "a fragmented immigration policy would run afoul of the

constitutional and statutory requirement for uniform immigration law and policy." *Washington v.

Trump*, 847 F.3d 1151, 1166–67 (9th Cir. 2017).  "For these reasons, in immigration cases, [this

Court] consistently recognize[s] the authority of district courts to enjoin unlawful policies on a

universal basis." *E. Bay Sanctuary*, 993 F.3d at 681 (quotation marks and citations omitted).

Moreover, plaintiffs are located throughout the country, and "[d]ifferent interpretations of

executive policy across circuit or state lines will needlessly complicate agency and individual

action," *see E. Bay Sanctuary*, 993 F.3d at 681, and piecemeal injunctive relief for the more than

80 providers nationwide would be impractical and difficult to administer.  *See HIAS, Inc. v. Trump*,

985 F.3d 309, 326–27 (4th Cir. 2021).  Accordingly, a nationwide injunction is appropriate in this

case.

## IV. Plaintiffs Seek Expeditious Resolution of their Claims

Under 28 U.S.C. § 1657(a), courts "shall expedite the consideration of any action . . . if good cause therefor is shown." Actions for preliminary or temporary injunctive relief "are named the highest priority civil actions," and "special consideration" should be given to "actions asserting federal rights." *Freedom Commc'ns Inc. v. F.D.I.C.*, 157 F.R.D. 485, 486 (C.D. Cal. 1994). Further, "[l]itigants who can persuasively assert that there is a special public or private interest in expeditious treatment of their case will be able to use the general expedition provision." H. Rep. No. 985, 98th Cong., 2d Sess. (1984), reprinted in 1984 U.S.C.C.A.N. 5708, 1984 U.S.C.C.A.N. 5782.

Courts have found that "good cause" is shown where the effective relief hinges on appropriate timing. *See, e.g.*, *Pacesetter, Inc. v. Aortech Intl. PLC*, 2012 WL 12894007, at \*1 (C.D. Cal. Nov. 1, 2012) (expediting when a regularly scheduled motion would exceed the time allotted in defendant's Rectification Notice); *see also* 9th Cir. Rule 27-12 (allowing for expedited briefing and hearing "upon showing of good cause"). Actions also may be expedited where one party's income stream is dependent on the outcome of the case. *See, e.g.*, *AIG Annuity Ins. Co. v. Law Offs. of Theodore Coates*, *P.C.*, 2008 WL 4543422, at \*3 (D. Colo. Oct. 10, 2008).

Here, funding for the direct legal representation that Plaintiffs provide to UCs has already abruptly been rescinded. Plaintiffs have been ordered to stop work and no longer receive funding, effective March 21, 2025. NWIRP Decl. ¶ 10; VAAP Decl. ¶ 13. Not only will Plaintiffs be irreparably injured, *see supra* Section II.A, but the thousands of children whom Plaintiffs and other service providers assist will also be harmed if these services are not restored. VAAP Decl. ¶ 21; NWIRP Decl. ¶¶ 14–15; Estrella Decl. ¶ 16; RMIAN Decl. ¶ 21. With every passing day that funding is blocked for these services, more children will appear in court proceedings across the country without any guidance or assistance to help them navigate these complex proceedings even

as provider organizations stretch their resources to fulfill their missions.  Estrella Decl. ¶ 7; VAAP Decl. ¶ 9.  In addition to the harm to these children's due process rights, the loss of representation will cause dysfunction and confusion in the immigration system, including the immigration courts. VAAP Decl. ¶¶ 9, 11; RMIAN Decl. ¶ 10; MIRC Decl. ¶ 19.  Accordingly, there is sufficient "good cause" to expedite the consideration of this motion under 28 U.S.C. § 1657(a).

## CONCLUSION

Defendants' actions violate the APA.  Because this conduct will immediately cause Plaintiffs irreparable harm, this Court should grant immediate provisional and nationwide relief enjoining Defendants' illegal actions and preserving the status quo pending a final judgment.

Respectfully submitted,

March 27, 2025

/s/ Alvaro M. Huerta

IMMIGRANT DEFENDERS LAW CENTER
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org

/s/ Karen C. Tumlin

JUSTICE ACTION CENTER
Esther H. Sung (CA Bar No. 255962)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)*
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

/s/ Samantha Hsieh

AMICA CENTER FOR IMMIGRANT RIGHTS
Adina Appelbaum (D.C. Bar No. 1026331)*
Samantha Hsieh (V.A. Bar No. 90800)*
Peter Alfredson (D.C. Bar No. 1780258)*
Evan Benz (N.C. Bar No. 49077)*
Amica Center for Immigrant Rights
1025 Connecticut Ave., N.W., Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*pro hac vice forthcoming
Attorneys for Plaintiffs

25