IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | Case No. 3:25-cv-2847 <br><br> **DECLARATION OF ROXANA AVILA-CIMPEANU (FIRRP) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

# DECLARATION OF ROXANA AVILA-CIMPEANU FOR THE FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT

I, Roxana Avila-Cimpeanu, make the following statement on behalf of the Florence Immigrant & Refugee Rights Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1. My name is Roxana Avila-Cimpeanu. I am a licensed attorney and a member in good standing in the State Bar of Arizona. I am currently employed as Deputy Director of the Florence Immigrant & Refugee Rights Project ("Florence Project" or "FIRRP"). I joined the Florence Project on September 6, 2016, and have served in my current role since September 2024. Before I assumed my current position, I previously served as Children's Legal Program Manager, Managing Attorney for the Children's Pro Bono Program, Pro Bono Mentor, Staff Attorney, and Law Graduate with the Florence Project's Children's Legal Program serving unaccompanied immigrant children in Arizona. During my time at the Florence Project, I have personally provided free legal services, including friend of court services, direct representation, legal orientation and education, and *pro bono* mentorship, to at least 140 children. Additionally, as Children's Legal Program Manager and Deputy Director I have supervised attorneys, pro bono volunteer attorneys, law graduates, accredited representatives, legal assistants, intake specialists, and social workers who have provided free legal services, both direct representation and pro se services, to thousands of individuals detained in Office of Refugee Resettlement "ORR" and ICE custody in Arizona.

## Florence Project's Mission and Scope

2. Founded in 1989, the Florence Project is a 501(c)(3) non-profit legal services organization with offices in Tucson, Phoenix, and Florence, Arizona. The Florence Project's mission is to provide free legal and social services to detained adults and children facing immigration removal proceedings in Arizona. On any given day, there are thousands of people detained and facing deportation proceedings in Arizona, including adults in rural detention centers in Eloy and Florence, Arizona and unaccompanied children who are or were previously in the custody of the Office of Refugee Resettlement ("ORR") in shelters in the Phoenix and Tucson metropolitan areas. With no public defender structure in immigration removal proceedings, the vast majority of people facing removal are forced to go unrepresented in immigration court due to poverty or lack of access to counsel, this includes unaccompanied children who are in the country without a parent or legal guardian. The Florence Project's vision is to ensure that all immigrants facing removal have access to counsel, understand their rights under the law, and are treated fairly and humanely.

3. The Florence Project is the sole 501(c)(3) non-profit organization dedicated to providing free immigrant legal services to unaccompanied children in Arizona. Through our attorneys, accredited representatives, law graduates, intake specialists, legal assistants, social workers, and network of pro bono attorneys, the Florence Project provides free

legal education and free representation and social services to thousands of unaccompanied children who are facing deportation proceedings in Arizona.

### **Florence Project's Services Under the Unaccompanied Children's Program**

4. The Florence Project began providing legal services to unaccompanied children who were detained and facing deportation proceedings in Arizona in 2000. At the time, unaccompanied children were detained in the custody of the former Immigration and Naturalization Service, ("INS"), the same agency that managed adult immigration detention and removal, in jail-like facilities in Central Arizona. Those facilities were ill-equipped to manage the special needs of children and children regularly suffered harmful treatment–for example, routine strip searches before attorney visits, prolonged detention, placement in solitary confinement, and other restraints. In 2002 as part of the general restructuring of immigration enforcement under the Homeland Security Act, and in recognition of the special needs of children, Congress moved away from the adult detention model and transferred the care and custody of unaccompanied immigrant children to the Office of Refugee Resettlement "ORR". At or about that same time, children began to be detained in shelter facilities in the Phoenix area. The Florence Project subsequently opened an office in Phoenix to better facilitate serving these unaccompanied child clients. In 2014, ORR opened additional shelters in the Tucson area and, again, the Florence Project opened a Tucson office to serve those clients. The Florence Project has continuously served unaccompanied children detained in Arizona since 2000.

5. As it pertains to unaccompanied children, in order to carry out our mission of providing free legal and social services to unaccompanied children facing removal proceedings in Arizona, the Florence Project's Children's Legal Program and Children's Social Services Team has a number of main work components that involve providing unaccompanied children with legal education and know your rights presentations, legal screenings, legal advocacy, friend of court assistance, and direct representation both from Florence Project attorneys and through pro bono placements. Each of these facets of Florence Project's work is addressed in more detail below.

6. First, the foundational level of our services to unaccompanied children are based on providing age-appropriate legal education services and "know your rights" presentations and conducting individual legal screenings(intakes) with all unrepresented children in ORR custody in Arizona. Under the UCP, Florence Project staff ensure that every unaccompanied child who is detained in ORR custody in Arizona receives age-appropriate, basic "know your rights" information and an intake in a language they understand within 10 business days of their arrival in an Arizona ORR shelter facility, where possible, in keeping with 45 CFR 410.1309(a)(2)(i)(B). For children who are reunified to a sponsor before Florence Project staff are able to meet with them, staff call the child and provide a know your rights presentation and intake over the phone. Every year, Florence Project staff provide these educational services to tens of thousands of children in Arizona; in 2023 alone, Florence Project staff provided 17,514

unaccompanied children with a "know your rights" presentation. These are critical services because unaccompanied children almost universally lack resources to afford legal representation and, without the Florence Project, would not have meaningful access to accurate and age-appropriate resources to help them understand their rights, responsibilities, or legal options.

7. Second, Florence Project attorneys also attend every detained Unaccompanied Minor children's docket in the Phoenix and Tucson Immigration Courts and, where allowed by the judge and appropriate, serve as Friend of Court for any cases in which the child is still seeking and likely to attain reunification with a sponsor or family member, and the Court requires additional information to assess next steps. Because the Trafficking Victims Protection Reauthorization Act ("TVPRA") requires that unaccompanied children "be promptly placed in the least restrictive setting that is in the best interest of the child," many of the children to whom we provide educational "know your rights" services eventually reunify with sponsors elsewhere in the United States. As a result, Florence Project staff do not immediately enter as counsel on every child's case in Arizona, but we do ensure that no child is alone in court by being present and to help provide critical information to the Court regarding the status of the reunification process, best language, special vulnerabilities and other critical information, where appropriate and allowed by the Court.

8. Third, the Florence Project provides non-representational legal advocacy for non-represented children in ORR custody. This includes advocating with ORR shelters for things like communication in the proper language, access to medical care, religious accommodations, access to education, access to proper food, access to communication with family and sponsors, and access to counsel. Through this type of non-representational advocacy, the Florence Project works to ensure that children in ORR care are being treated with dignity, respect, and are not subject to discrimination or mistreatment, and that the shelters are abiding by laws surrounding the treatment of children.

9. Fourth, every year Florence Project attorneys provide direct representation to hundreds of unaccompanied children in Arizona; in 2023 alone Florence Project attorneys represented 1,091 unaccompanied children in Arizona. Excepting cases of ethical conflict, Florence Project attorneys represent all unaccompanied children who are placed into Long-Term Foster Care ("LTFC") facilities in Arizona, as well as other unaccompanied children who remain in ORR custody during their removal proceedings or as they approach "aging-out" of the age of minority by turning 18. Additionally, Florence Project attorneys represent unaccompanied children who have passed through ORR custody and reunified with family members or sponsors here in Arizona, or have been placed in the Unaccompanied Refugee Minor Program in Phoenix, AZ. In all these cases, Florence Project's representation of these unaccompanied children can include representation before the Immigration Courts and the United States Citizenship and Immigration Services ("USCIS"), as well as representation in Arizona State Court juvenile or probate proceedings where necessary and appropriate for children who have been abandoned, abused, or neglected.

10. Fifth, Florence Project also has two specialized direct representation teams, which are partially funded by UCP. The first is the Children's Trafficking Response Team, which works to educate and guide staff and community stakeholders and partners on how to identify and support child survivors or trafficking, or children at risk of trafficking. This team is partially funded by UCP and works directly with unaccompanied minors who are at risk of or have survived trafficking, whether in the U.S., their country of origin, or on their journey to the U.S. The second in the Released Representation team which focuses on providing direct legal and social services to children who were formerly detained by ORR and living in the Phoenix metropolitan area.

11. The Sixth and final major component of the Florence Project's Children's Legal Program is our Children's Pro Bono Team, who receive pro bono case referrals from Children's Program staff and then connect unrepresented unaccompanied children with pro bono counsel from law firms or pro bono private immigration practitioners. Each year, our pro bono team places dozens of cases with volunteer attorneys before the immigration court, USCIS, Arizona state courts, and Board of Immigration Appeals and provides full-service mentorship, ongoing training, and technical support on those cases. Pro bono screening and mentorship in cases before the agency also are funded and conducted, through the UCP contract.

12. As of February 28, 2025,[1] the Florence Project provided free legal services to unaccompanied children at 24 shelters located in the State of Arizona, primarily in the Phoenix and Tucson metropolitan areas. These shelters have a combined capacity to detain over 2,000 children on any given day. Of these, 18 facilities are located in Maricopa County and 6 are located in Pima or Pinal counties. These shelters include 3 LTFC facilities as well as 3 transitional foster care facilities that serve particularly vulnerable or special needs populations such as children under the age of 13, siblings detained together, teens who are parenting or pregnant, and children with special needs. Unaccompanied children in Arizona with active immigration court cases generally are docketed on either the Phoenix or Tucson immigration court dockets and, as noted above, Florence Project staff ensure that no detained unaccompanied child in Arizona stands alone in immigration court, either by representing children or being present to provide Friend of the Court services as deemed appropriate and approved by the Court.

13. The Florence Project currently employs 114 full time staff who are dedicated to directly providing services under the UCP and whose positions are largely funded through U.S. Department of Health and Human Services ("HHS") funding. Specifically, Florence Project employs 1 Program Manager and 1 Associate Program Manager as well as 9 managing attorneys, 9 managing legal assistants, and 1 managing social worker who directly oversee and train staff providing UCP legal services, help manage legal and contractual compliance, and directly provide legal services under the UCP themselves.

---

[1] On February 28, 2025, Florence Project staff began to learn of "stop placement orders" and an accompanying depopulation of various shelters we have historically served. The reason, scope, and anticipated duration of the stop placement order and accompanying depopulation remain unclear at this time as do any possible plans for opening potential replacement shelter services in our region.

Additionally, Florence Project employs 21 staff attorneys and law graduates, and 4 accredited representatives who provide direct representation, legal consultation, and legal education and screenings under the UCP; 1 pro bono Managing Attorney who oversees the Pro Bono Program, screens volunteer attorneys, places cases, and supervises the Pro Bono team, and 2 pro bono mentors who provide technical support to pro bono attorneys; 49 legal assistants and intake specialists who help provide know your rights presentations and legal screenings under attorney supervision; 9 social workers; and 3 legal administrative assistants who support the team with UCP related data entry and billing requirements. Due to staff turnover, internal transitions, and promotions, the Florence Project also has 20 open positions that are contemplated under the Florence Project's UCP that we have yet to backfill. In addition to our regular full-time employees noted above, the Florence Project also currently hosts 3 Immigrant Justice Corps ("IJC") fellows and one Equal Justice Works ("EJW") Fellow who work in conjunction with our general staff to represent unaccompanied children in removal proceedings.

14. Staff providing representation and "know your rights" presentations to children in ORR facilities routinely travel to each of the 24 shelter facilities in person to conduct client interviews and screenings, prepare clients for hearings, as well as provide legal education, legal screenings, and other legal support to detained children. Florence Project staff are typically present in shelters anywhere from 3-5 days a week. The Florence Project represents unaccompanied children in removal proceedings in immigration court, affirmative relief such as seeking asylum before USCIS, U-visas and T-visas, Special Immigrant Juvenile Status ("SIJS") applications both before the agency and in state courts for necessary predicate orders, BIA appeals, and petitions for review to the Ninth Circuit Court of Appeals.

15. For every child that passes through ORR in Arizona, the Florence Project monitors to make sure that the child is on track for reunification with a sponsor. If the shelter indicates that a child does not have a sponsor, or if the child has been detained for an extended period of time, or if the child's case merits entering of representation, the Florence Project will place the case with an in-house attorney or accredited Representative, or with a volunteer pro-bono attorney from the community.

16. The Florence Project currently directly represents over 800 children under the UCP contract. Some are children still in detention, and many are children who have been released from ORR and are living in Arizona, and have been waiting for their cases to be resolved for years due to government backlogs. Some cases take up to 6 years to conclude at the Legal Permanent Resident stage, and the presence of an attorney is critical during that long time span since Immigration Law changes at a rapid rate.

17. These various services provided under the UCP, from education through full representation are a critical safety net for unaccompanied children who are or have been in ORR custody. The children the Florence Project serves are often extremely vulnerable – they have often experienced significant trauma, have been abused, abandoned, or neglected. Many have experienced discrimination, trafficking, or harm in their country of origin or en route to the United States. We routinely work with children who identify as

LGBTQ. We also regularly work with children who are experiencing symptoms of significant disabilities including mental health conditions as well as medical disabilities that can directly impact their ability to participate in proceedings, for example vision or hearing impairment. Moreover, some of our child clients are very young such that their age presents unique barriers to their ability to participate in their legal cases. The Florence Project also serves facilities that specialize in young or "tender aged" children under the age of 13, where the children we at times encounter children who are so young that they do not know even their parent's names (aside from "mom" or "dad"). Florence Project staff have even represented children who were pre-verbal, with at least one client who was only six-months old. For such individuals, the UCP is a critical safety net since, without the UCP, the vast majority of these particularly vulnerable children would be left without any information and most likely would face significant barriers to adequately and efficiently preparing their cases without counsel, nor would a child be well-positioned to pay the thousands of dollars required to retain counsel. Indeed, almost universally, unaccompanied children lack sufficient resources and knowledge to obtain private counsel and the Florence Project is the only non-profit organization that provides free legal services to unaccompanied children who are detained by ORR in Arizona. Without the services the Florence Project provides under the UCP, unaccompanied children in Arizona would be forced to go through their legal process entirely alone, without a lawyer. However, immigration law is famously complex and given the educational/literacy barriers, language barriers, developmental stage barriers, age barriers, and emotional and mental hurdles caused by past discrimination, trauma, and harm, the vast majority of our child clients would be simply incapable of navigating their legal proceedings without assistance from trusted, independent legal and social service providers like the Florence Project. Additionally, a significant number of the children we work with are eligible for Special Immigrant Juvenile Status ("SIJS"), which requires proceedings and findings before state juvenile courts, which children simply cannot obtain without the assistance of counsel.

18. Looking at SIJS in particular is useful to understanding how complicated and specialized the work the Florence Project does with unaccompanied minors is. SIJS requires attorneys to be well-versed and competent to represent clients in not one, but two complicated areas of law: immigration removal defense and state court child welfare processes, which vary from state to state. In Florence Project's experience, not only do our advocates need to be completely fluent in both areas to advocate in individual client's cases, but historically we have had to do a great deal of education for both the state courts and the immigration courts about what the other side of the coin looks like and how the other court system operates. This requires regular stakeholder outreach, developing strong relationships with courts, and participating in opportunities to educate judges and court staff, extending even to formal trainings where courts have requested such support, to ensure cases that involve both systems are able to move forward effectively and efficiently.

19. In addition to representing clients in their immigration proceedings, Florence Project represents clients in various forms of advocacy that arise incident to their custody. In this context, Florence Project staff play a critical role in building trust with clients and being a

constant, dependable point of contact who is independent and not part of the United States government, which allows these vulnerable youth to share information regarding abuse or mistreatment these children have experienced both before, during, and after their custody by the U.S. government. Because we build this trusting connection with the children we serve, Florence Project clients have not only felt comfortable sharing examples of abuse and violence they experienced in their countries of origin and during their journeys to the United States that are critical to developing their legal cases for relief here in the United States, but also regularly share information about abuses they experienced while in the custody of the United States government.

20. Examples of the types of abuses our unaccompanied children clients have reported to us, and about which the Florence Project has engaged in advocacy on our clients' behalf, include lack of access to proper food, religious services, regular communication with parents or potential sponsors, clothing, hygiene items, parenting ability, and appropriate medical care in both Customs and Border Patrol ("CBP") and ORR custody; verbal and physical assaults in CBP custody; physical abuse and sexual assaults in ORR custody; and attempted trafficking and/or grooming by ORR staff. Because we begin working with these children within days of their arrival into ORR custody, Florence Project staff often are the first to learn about harmful government policies – things like widespread family separations in 2017-2018 and the unlawful use of dental imaging as the sole basis to redetermine a child's age as a justification for moving a minor into adult ICE custody. Because we are independent legal service providers, we have the unique ability to advocate on our clients' behalf to raise awareness and push back against such harmful policies.

21. For example, Florence Project staff screen each child for abuse or mistreatment at CBP facilities prior to their arrival in ORR through questions designed to ensure that children's legal rights are respected and that children are treated humanely by CBP. Many children the Florence Project encounters report being held for extended periods of time beyond that allowed by the TVPRA, lacking proper food, being held in ice-cold facilities or cages, having possessions, including religious items and medical items removed, and being verbally and physically abused by CBP officers. We have heard stories of young mothers not being provided with blankets or diapers for their babies. In fact, over the last year alone, the Florence Project has documented over 150 complaints on behalf of children and filed at least 30 formal complaints with the Office of Civil Rights and Civil Liberties to seek official review and redress over abusive treatment or conditions children face while in CBP custody.[2] For many children, it can take some time before they feel willing to open up regarding abuse or harm they have experienced. Limiting funding for legal service providers like the Florence Project to exclusively know your rights presentations and intakes, will limit opportunities for Florence Project staff to build the type of trusting relationship with these children that enables children to feel

---

[2] It is worth noting that, because our clients are minors who often have experienced serious abuse and trauma, often at the hands of adults who hold positions of authority or trust, many of our clients who report abusive conditions or treatment do not ultimately want to file formal complaints out of fear of retaliation. Thus, there is a disparity on instances of abuse reported and documented as opposed to formal complaints filed.

sufficiently safe to disclose abuse experienced, particularly abuse experienced at the hands of U.S. Government officials. This will create circumstances that put children in increased danger of abuse and harm by government officials and allow abusive CBP officials to continue to act with increasing impunity, emboldened by the knowledge that children will have few, if any, opportunity to report harm or resources necessary to do so in a way that would potentially result in any accountability. This directly undermines the Florence Project's mission to ensure that all people facing deportation are treated fairly and humanely. Florence Project's ability to build meaningful trusting relationships with unaccompanied children under the UCP helps our staff identify disturbing patterns and trends in the types of abuses our children clients report. The role of possible representation is particularly crucial in cases where serious trends of harm appear, as was the case, for example, when Florence Project staff were some of the first to note and blow the whistle on how the Trump administration's "Zero Tolerance" border prosecution policy resulted in widespread separations of minor children from their parents at the border. The type of public advocacy and media that eventually brought a halt to that egregious family separation policy is only possible under portions of the UCP that allow for additional legal services and representation, a fact that is surely not lost on this second Trump administration in this decision to eliminate all portions of funding that allowed the Florence Project to advocate for our children clients in this way.

22. Beyond advocating for our clients when they have experienced more extreme abuses and harm while in ORR or CBP custody, Florence Project staff also routinely support clients with other types of advocacy which are equally necessary to ensure the rights of vulnerable children are properly respected. This type of advocacy can include advocating for less restrictive or more appropriate placements in custody as well as the least restrictive placement when a child turns 18. It also includes advocating for access to proper medical care and treatment in custody – from everything for advocating that a client with vision impairment be given glasses so they could see, to advocating that a client with serious medical condition such as a coma is placed in a facility that is equipped to care for their needs. We help our clients file complaints with oversight agencies to document and resolve myriad of issues that arise as a result of our clients' custody and vulnerable status.

23. Many of our child clients also speak languages other than English or Spanish and our staff not only provide them with legal services and education in a language they understand, as required by the Foundational Rule, but also advocate that they have appropriate language access in immigration court as well as other spaces, including ORR communications and medical appointments. For example, our child clients frequently report to Florence Project staff that ORR staff insist on communicating with them in Spanish, despite that fact the child does not speak Spanish or prefers another language. Children also report to Florence Project staff being discriminated against by shelter staff for speaking indigenous language, or African languages. Many indigenous children or children who are part of a minority have experienced discrimination at home due to their ethnicity, race, or national origin, and it can be difficult for them to advocate for themselves for access to communication in their best language, especially if the shelter staff are displaying prejudice or discrimination against them. Ensuring that

communication takes place in the appropriate language that a child understands is critical and this is even more true when shelters or judges are attempting to share important information with the child. Florence Project staff not only regularly advocates that important government communications be conducted in the child's best language, but also meet with children in detention, build trust with our clients, and empower them to assert their language rights themselves.

24. Florence Project staff also often advocate for the medical needs of children. Florence Project staff have seen countless examples of ORR not taking adequate measures to protect the health of children. Attorneys have advocated for visits to medical professionals who were able to diagnose conditions requiring surgery or medication, including for broken arms and necessary blood transfusions. Staff have learned of special medical needs from children that the shelter did not know about, which resulted in children receiving life-saving treatment. Staff have advocated for proper dental care for children who had a difficult time eating due to mouth pain. Children have also reported ORR staff misrepresenting the purpose of medical visits, children being told they are going to routine dental appointments only to later learn that the dental exams were actually completed for the purposes of age redetermination to facilitate transferring minors into adult ICE custody. Staff have also pushed back in cases where ORR was attempting to pressure minors to return to home country before proper medical care could be assured for things like traumatic brain injuries, or other conditions.

25. The Florence Project also regularly advocates for First Amendment protections, particularly access to religious activities, including ensuring that children are taken to services, are given the proper diet, and are provided with adequate space and time to complete religious rites. Children who observe fasting have been denied food after breaking fast, have had nighttime prayers interrupted, and have faced discrimination at the hand of ORR staff for their religious observances. In such cases, the Florence Project plays a critical role as an independent third party able to both identify potential first amendment and civil rights violations and empower our child clients to assert their rights as well.

26. Florence Project staff also frequently work with ORR and shelter staff to ensure that shelter staff refrain from the unauthorized practice of law. ORR staff are not legally trained and are not lawyers with the associated privilege and confidentiality – they are not able to advise children as to their legal rights or counsel them on their legal options. Despite these known facts and rules against unauthorized practice of law, in many cases ORR staff have provided legal advice to children, which more often than not has been incorrect, harmful, or contrary to the child's wishes.  Florence Project attorneys regularly correct mistakes by ORR staff, for example, when ORR staff submit case assistance requests through the Office of Trafficking in Persons ("OTIP"). The Florence Project has observed countless cases where ORR staff's submission was denied due to a lack of understanding of the requirements of an OTIP request for assistance, the child's life, the legal definitions of trafficking, or a combination thereof. In such cases, Florence Project attorneys have re-submitted requests and received OTIP approvals for case assistance for children who have rightly been determined to be survivors of severe forms of trafficking.

27. The Florence Project has long enjoyed a cooperative stakeholder relationship with our Arizona immigration courts. Beginning from the initial call to action by an Immigration Judge that led to the creation of the Florence Project, Immigration Judges in Arizona have consistently engaged with and welcomed the Florence Project's legal education services. In the context of unaccompanied children, both the Phoenix and Tucson Immigration Courts have a long history of working collaboratively with the Florence Project. For example, in both courts this cooperative stakeholder relationship has allowed for the coordination of specialized dockets for unaccompanied children. The Florence Project has worked with the court and individual judges to ensure the children's docket are as child-friendly as possible, with one judge even electing to wear a more informal Hawaiian shirt instead of the traditional black robes. For decades, the vast majority of judges on the children's docket have welcome Florence Project attorneys to serve as friend of court to assist the court by sharing important information, such as updates regarding likelihood and timeline of reunification, the child's best language, and other information necessary to properly and efficiently adjudicate children's cases. This cooperation has included everything from willingness to provide Florence Project staff space in the physical courtrooms to conduct pre-court orientations to children before their hearings, to smaller acts of appreciation, including swearing in Florence Project law graduates into the bar. Judges in Phoenix and Tucson have long relied on the Florence Project as a resource to which they may refer respondents who are confused or unclear about the next step in their immigration court process. Judges in Phoenix have also allowed the Florence Project to serve as friend of court over the Government's objection, in acknowledgement of the critical information provided for children's cases. In both EOIR and ICE stakeholder meetings, government partners routinely express thanks and emphasize the value of the services the Florence Project provides.

## **UCP Stop Work Order, Stop Work Recission, and Subsequent Termination of all but CLIN 1 Funding Under UCP Contract**

28. On February 18, 2025, with no warning, HHS, through the Department of the Interior issued a national stop work order on the for Legal Services for Unaccompanied Children, effective immediately. This stop work order, citing only FAR 42.1303 as the basis for the order, extended to all Contract Line Numbers ("CLINs"): (1) KYR presentations and legal services for unrepresented children in ORR facilities; (2) Legal representation for unaccompanied children both in ORR custody and who were formerly in ORR custody, courtroom assistance and friend of court services for unrepresented unaccompanied children, pro bono program services, other legal assistance including shelter and conditions advocacy, data reporting, and program management and emergency site support; (3) Attorney recruitment project and Immigrant Justice Corps ("IJC") fellows; and (4) Spanish language instruction and interpretation for organizational staff who work with children. The Florence Project learned about the stop work order through an email notification from the government prime contractor on the UCP program, the Acacia Center for Justice, at approximately 11:40 a.m. Arizona time. Without further elaboration on the duration or the rational for the order, the stop work order states that it "shall

remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication of poor performance."

29. On February 18, 2025, shortly after receiving the stop work notice, Florence Project leadership promptly notified all staff regarding receipt of the UCP stop work order and provided additional specific instruction to staff who provided services under the UCP clarifying how they would need to change aspects of their work to follow that order. However, because the Florence Project's mission is to provide free legal and social services to unaccompanied children in Arizona, we also immediately began to discuss how we could potentially transition the critical services that had been conducted under the UCP to other legal access mechanisms, specifically legal access as envisioned by provisions of the TVPRA mandating that "to the greatest extent practicable...that all unaccompanied alien children who are or have been in the custody of [HHS or DHS] have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." As such, we also provided instruction to staff on how we envisioned ensuring continuity of legal and social services for children in ORR shelters served by the organization without government funding, at least for the short term.

30. Just three days after it was abruptly issued, the UCP stop work order was just as abruptly rescinded on February 21, 2025. Like the original stop work order, the cancellation of said order came via email notification from the UCP prime contractor and the actual recission order from the government contracting office provided little to no information as to why the stop work order had been issued originally or why that decision had now been reversed. It simply stated that the stop work order had been cancelled and that all activities under the contract could be resumed.

31. In the three-day window in which the UCP stop work order was in effect, Florence Project staff were consistently allowed to continue to access our child clients in ORR custody without interruption from shelter or ORR staff using our own funds to support this work. As of this date, it is not clear what, if any, reimbursement for those services Florence Project will receive.

32. On March 21, 2025, again without warning, the Florence Project learned that HHS through the U.S. Department of Interior contracting officer, terminated almost all aspects of the current UCP contract. Again, the Florence Project learned about the nearly complete termination of services under the UCP contract through an email notification from the government prime contractor on the UCP program, the Acacia Center for Justice, at approximately 8:15 a.m. Arizona time. The termination was effective the same day we received it, March 21, 2025. As noted, HHS terminated the contract with respect to three of the four contract line numbers ("CLINs"): CLIN 2, which funds legal representation for unaccompanied children, as well as shelter advocacy and other non-representation services, such as pro bono referrals, friend of court services, and data

tracking[3]; (3) Attorney recruitment project and IJC fellows; and (4) Spanish language instruction and interpretation. CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, which funds Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN 1, which funds KYR presentations and confidential legal consultations for pro se children in ORR custody. Per the termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS has not provided any justification for the termination of these services other than, allegedly, the "Government's convenience."

33. On March 21, 2025, shortly after receiving the notice of termination of CLINs 2, 3, and 4 under the UCP contract, Florence Project leadership promptly notified all staff regarding the terminations and provided additional specific instruction to staff who provided services under the UCP clarifying how they would need to change aspects of their work to follow that order. That guidance explained to staff the different ways in which aspects of the critical legal services we provide children would be treated moving forward. For those key legal services falling under CLIN 1 – initial KYRs and legal consultations – Florence Project leadership explained to impacted staff that these services can and would continue without pause, explaining details like the fact that staff can and should use Acacia resources for third-language interpretation for such services. However, for those other critical and core aspects of our work with unaccompanied children – notably our direct representation of said children, friend of court and docket presence, and data entry – the Florence Project leadership communicated that such work would no longer fall under the UCP, staff may not refer to these programs as being through Acacia or the UCP, and staff cannot use Acacia interpretation resources to support such cases. Per instructions from Acacia regarding documenting "unavoidable work" on open cases under the terminated CLINs for possible, but not guaranteed, reimbursement through a potential termination settlement, Florence Project leadership requested that Florence Project staff continue to carefully document time, mileage, and data for internal purposes for any work done on represented cases or other parts of the terminated CLINs. Additionally, because the Florence Project's mission is to provide free legal and social services to unaccompanied children in Arizona, with a core value of ensuring that no child ever stands alone in immigration court, we also immediately began to discuss how we could potentially transition the critical representational, shelter advocacy, and friend of court services that had been conducted under terminated CLINs of the UCP to other legal access mechanisms. As such, we also provided initial instruction to staff on how we envision ensuring continuity of legal and social services for children appearing pro se before EOIR as well as those whom we were already representing under CLIN 2 without government funding. However, Florence Project funding is such that, without a massive new source of revenue to support such efforts, the Florence Project will only be able to sustain these efforts at our current level based on general funding for a short period of time. Finally, we notified staff in our children's program targeted communication that, given the loss of UCP funding, we had to hold on responding to any new case referrals

---

[3] On March 25, 2025, Florence Project received word that the government was considering moving data reporting requirements from CLIN 1 to CLIN 2, a process that still must undergo bilateral negotiation on pricing.

and refrain from entering into any new attorney/client relationships for unaccompanied children in Arizona.

## **Organizational Harm Caused By Loss of UCP Contract Services**

34. As an initial matter, the termination of CLINs 2, 3, and 4 under the UCP contract will cause serious financial harm to the Florence Project. The UCP subcontract constitutes a major portion of the Florence Project's overall annual budget, with an average value of approximately 12 million per option year on the full contract. The terminated CLINs represent – depending on the option year being considered – a lost value of over 8 to nearly 10 million dollars of funding that supports Florence Project's core legal and social services for unaccompanied children. Moreover, the termination of the majority of the UCP contract also means that the Florence Project will also have to pay out-of-pocket for interpretation services for the child clients we currently directly represent – over 800 children with whom we entered into representation in good faith specifically under this contract – for those who do not speak either Spanish or English. Given the vast number of clients we serve and the many languages they speak, this also represents a significant additional expense. For example, in one month, Florence Project staff reported requiring at least 11,000 minutes of interpreter time. Without language support through the UCP contract, this cost will be incurred by the Florence Project.

35. As noted above, over 100 staff members' salaries are directly funded by the UCP subcontract and the loss of more than 70% of the funding for the Children's Program means that the Florence Project now faces needing to pay for those salaries using general funding sources. The Florence Project's ability to pay staff to continue our core work providing legal and social services to unaccompanied children, work that is mandated by statute and regulation, will become fiscally untenable in a matter of months unless the terminated CLINs are reinstated, or another massive influx of alternative funding can be identified.

36. The termination of all but a small portion of the UCP funding reflects the Government's intent to permanently shrink in size and end the provision of these critical legal and social services to unaccompanied children. This is cause for serious concern as to the Florence Project's overall budget, staffing plans, staff morale, longstanding community and stakeholder relationships, and the ability to keep qualified and trained staff with the organization. At the outset, due to transitions, internal promotions, and staff departures, the Florence Project's UCP subcontract contemplates 20 additional positions that are currently open. However, as a direct result of this termination, the Florence Project is undergoing a hiring pause on all currently unfilled positions. This hiring pause extends beyond only those positions that would have been funded under the UCP; rather it touches hiring for all currently open positions across the organization, with very few exceptions, given that general funding will need to be tapped to cover the substantial lost funding for salaries that would have been covered under the UCP. Thus, staff and programs across the organization, not only within the Children's Program, feel both the negative financial and morale ripple effects of this loss of UCP funding.

37. Moreover, the uncertainty around the budget and the Florence Project's long-term ability to pay our staff's salaries with general funds or fundraising is creating a sense of overwhelm and stress among remaining staff, both on the directly impacted team as well as on other teams, which negatively affects morale and people's sense of job security. While the Florence Project hopes to avoid immediate layoffs, unless the terminated CLINs are reinstated or some miracle fundraising occurs, it is extremely likely that the all-but-total termination of funding under the UCP will necessitate substantial downsizing of the Children's Program staffing. Indeed, Florence Project leadership has determined that, based on this lost funding, layoffs will be necessary unless funding is reinstated, or we receive miracle fundraising. As such, Florence Project leadership is beginning the managerial and administrative preparation for likely layoffs. Because the Florence Project is a unionized workplace, for most of our staff, the Florence Project must comply with specific terms of our collective bargaining agreement ("CBA") regarding communication with the union about termination, notice prior to termination of employment, and severance payments. This, in itself, results in the Florence Project incurring additional financial burdens in the form of legal expenses to plan for potential necessary layoffs with our labor and employment counsel to ensure compliance with our CBA and applicable laws as well as the financial loss of severance pay to any employees who may be subject to layoffs.

38. It is also critical to note that people are not like cogs in a machine where one can be interchangeably and readily replaced by another; once layoffs are announced and/or begin in earnest, the Florence Project will lose staff and, with them, their experience, expertise, and work towards our mission. Even if funding were to be restarted, we would not be able to simply replace lost staff with equally qualified and experienced people. We would have to invest significantly in recruitment and training any new or replacement staff, which poses additional costs to the organization. Moreover, in the uncertain world of non-profit services, an organization's reputation as a relatively steady or secure place to work carries great weight in that organization's ability to recruit and keep qualified staff. Thus, if we must undergo significant lay-offs due to lack of funding, the harm to the Florence Project's reputation as being able to offer reasonably secure employment will be irreparably undermined, which will make it exceedingly difficult for us to hire to replace positions even if funding is eventually restored.

39. Additionally, the termination of all portions of the UCP contract touching on representation of clients substantially harms both the Florence Project and our clients because the termination notice, it seems, provided no guidance, support, or wind-down process for the cases in which our attorneys have already entered. Florence Project attorneys are currently entered on over 800 UCP cases in Arizona. As is the case with all of Florence Project's services, our representation of these children is entirely free of charge to the clients. As attorneys, we have ethical obligations to our clients, particularly those with imminent court appearances or key case filings or other deadlines. We cannot ethically simply stop representing our child clients – doing so would not only be morally wrong but also would subject the Florence Project to substantial legal liability and our attorneys to discipline from the bar. Beyond this fact, we must also take into account the

particular vulnerabilities of our clients – such as their young age, their lack of financial resources and in many cases their inability to work in order to raise funds for paid counsel, language and education barriers, and the technical complexity of many of their case – when determining whether terminating or otherwise limiting our representation would be ethical or appropriate. As a result, minimally, the Florence Project will certainly incur significant expenses to continue representation to our clients who we are ethically obligated to continue representing despite the termination of these funds. And, given that our mission continues to be to provide free legal and social services with a vision of ensuring that all unaccompanied children have access to counsel and are treated fairly and humanely, Florence Project continues to be dedicated to seeking means to continue representation of all of our clients, current and prospective, as well. This means that our development efforts have been diverted from other critical initiatives to instead attempt to replace as much as possible this lost funding and to try to reduce the impact of this massive loss.

40. The complete termination of all CLINs touching on representation services, shelter advocacy, friend of court services, and more will irreparably harm the people that the Florence Project serves and severely hamper our ability to provide our core services. Indeed, just prior to the announcement of the termination of these programs, Florence Project staff noted DHS in Phoenix advancing cases of children in ORR custody, speeding up the removal process. Similarly, in the Tucson EOIR, Florence Project staff recently noted the appearance of children's names on the court docket even where there is no evidence that Notices to Appear have even been filed yet with the courts in those cases and no notice of hearing listed on the EOIR Automated Case information system, raising serious questions both about accelerating the court process for children and doing so in ways that may not comport with statutes, regulations, or due process. However, without funding to provide representation or even appear as friend of court, it has become unclear how Florence Project staff can best advocate regarding the legal propriety of placing children on a 'rocket docket' or scheduling children for court before charging documents have even been filed. It is not realistic to expect children to navigate the complexities of immigration court on their own in general, much less on an expedited timeline. Additionally, our staff have recently experienced judges denying reasonable requests, such as administrative closure for children with claims for relief before USCIS. I personally witnessed an Immigration Judge in Phoenix conduct group master calendar hearings rife with due process issues in which children were forced to answer the judge's questions related to notice, service, and, notably, best language out loud and all at once. Practices such as these all but guarantee that, without robust UCP services in place continuously, children's cases will be expedited in a way that deny children the opportunity to reunify with sponsors and will result in children being ordered removed not because of the merits of their case, but because of their age, developmental stage, lack of education or language abilities, and lack of knowledge or understanding of the legal requirements.

41. The due process cost of so many unaccompanied children potentially losing experienced pro bono counsel across the state of Arizona, and indeed the nation, at the same time, is

also going to be unmeasurable. Florence Project staff currently represent many children who will suffer immediate harm if we are unable to continue representing them pro bono.

42. For example, Florence Project attorneys currently represent a set of siblings who fled their country of origin after their mother died and their sister was murdered in front of one of the siblings. All three have applications for asylum pending before USCIS and they have been recently approved for SIJS with deferred action. Both are processes that will require additional complicated legal work, including potential asylum interviews and adjustment of status applications among other things, which will require the assistance of an attorney. Additionally, given the rapidly changing landscape in immigration law, policy, and enforcement, it is apparent that these children will likely require additional support for legal counsel while their process is pending. Indeed, just recently, despite having actively been participating in their immigration process – they had attended USCIS biometric appointments and receiving approved I-360 Petition for Special Immigrant Juvenile Status with deferred action, and the immigration court case was already concluded with non-opposition by DHS to allow them to move forward with the USCIS process – despite all of this, armed immigration enforcement officers came to their home claiming they were "missing" and demanding to speak to them about their cases. While seasoned attorneys work diligently to keep abreast of changes in immigration law, policy, and enforcement and have training in how to respond to a situation like this, it is unreasonable to expect children like these siblings to do the same on their own. Additionally, with three children all needing legal services, the cost to hire private counsel would be a significant financial burden their sponsor. As such, the elimination of funding to support children like these would seriously harm these clients and cut to the very core of the Florence Project's mission and services.

43. In another example, Florence Project staff attorneys recently learned about two separate cases of children, both babies, under the age of two-years-old who are in one of the Arizona tender-aged shelters who are currently not getting reunified with their parents and require additional advocacy for the government to follow protocols established under the *Ms. L. v. ICE* settlement agreement – a settlement agreement arising out of the massive violation of rights of children and parents that occurred under "zero tolerance" family separation policies from 2017 to 2018. Like most two-year-olds, both of these children are pre-verbal and unable to advocate for themselves about anything, much less complicated matters involving legal settlement agreements and reunification policies. However, given the current termination of representation under the UCP, there is no funding to represent these children or even advocate for them in any way short of full representation. As such, Florence Project managers are currently assessing to what extent we will be able to help these extremely young children without any funding, knowing that we must either absorb the cost of representation for these extremely vulnerable children by drawing down on general funding or reassigning funds from other programs or stand by and allow the rights of these children to be violated.

44. Elimination of funding for the UCP program also creates an untenable system whereby access by legal advocates to children in detention will be left up to the government

offices and workers, who are at times the very people abusing and trafficking children. With this funding eliminated, children will have to pay for attorneys out of pocket, a concept which boggles the mind, especially considering the dearth of experienced immigration pro bono counsel in the United States. Moreover, there is already a serious shortfall of attorneys in Arizona who have the specialized experience needed to work on detained children's cases, which pose unique issues of law. The pool of attorneys willing to do the work is even smaller for children's cases, as many children's cases require additional expertise in juvenile law in Arizona, which all FIRRP attorneys have, but which many private practioners do not. Indeed, while immigration court is a federal system which allows attorneys barred in any state to represent clients, only attorneys barred in the state of Arizona may represent clients in state court proceedings; many private immigration attorneys who practice in Arizona (who may be barred outside of Arizona and legally work on federal immigration cases) may not even be qualified to represent unaccompanied children who require these state court proceedings.

45. Without federal funding for UCP work, access to counsel also will be largely left up to the ORR shelters. If this were to pass, it would create a clear conflict of interest, as ORR is often the perpetrator of abuse, mistreatment, or failure to follow legal protections for children. With the recent dismantling of the ORR Ombudsman office, and the Office of Civil Rights and Civil Liberties, children detained in ORR custody are placed in a system with even less independent oversight and accountability than before, which makes access to free counsel more important than ever.

46. Finally, elimination of access to the unaccompanied children who are detained in ORR custody for representation, for the first time since we began working with unaccompanied children 25 years ago, is deeply disruptive to our core legal service model and will directly harm children who will be deprived free legal and social services, attorneys to represent them in court or assist as friend of court when they are waiting to reunify with family members. Unaccompanied children, particularly those who are placed in LTFC shelters, or who remain in ORR custody during their removal proceedings, or who are near to turning 18 and require immediate urgent action on their cases to protect their rights, all groups children who the Florence Project now routinely represents as a matter of course, will have no means to pay any private attorney to represent them, leaving those who are in many ways the most vulnerable most likely to be denied their basic rights. The loss of funding to support these services cut deeply at the Florence Project's core mission and vision.  Children will no longer have caring advocates they can trust, who will get to know their cases through expert and age-appropriate methods and advocate for their expressed interests. Even the threat of loss of access and the resulting uncertainty it has caused within our staff has had a profound impact on the morale of our staff who have dedicated their careers to serving unaccompanied children; now, facing the termination of all but the most basic KYR services to the thousands of children we serve is devastating to staff morale.

47. Additionally, FIRRP's vision that every person facing removal have access to counsel, understand their rights, and be treated fairly and humanely is also severely undermined by the elimination of the UCP. First, for the majority of children in ORR custody in

Arizona, Florence Project attorneys and staff working under the UCP are likely their only access to counsel and opportunity to receive pro bono representation. Eliminating access to representation and friend of court services under the UCP will ensure that children are forced into removal proceedings – proceedings we have already seen are being accelerated and conducted in part using mass hearings that violate due process – without counsel. Termination of all but CLIN 1 of the UCP will effectively guarantee that more children in ORR custody in Arizona will go through their removal proceedings without an attorney to represent them or even help them navigate the system during their court process. No child should be expected to be able to learn immigration law and present a complex legal case against a trained government attorney, often in a language they do not understand, on their own.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of March, 2025 in Phoenix, Arizona.

*Roxana Avila-Cimpeanu*
Roxana Avila-Cimpeanu
Deputy Director
Florence Immigrant and Refugee Rights Project