IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-2847<br><br>**DECLARATION DANIELA HERNÁNDEZ CHONG CUY IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**DECLARATION OF DANIELA HERNÁNDEZ CHONG CUY**
**FOUNDER, DIRECTING ATTORNEY AND OWNER OF THE LAW OFFICE OF**
**DANIELA HERNÁNDEZ CHONG CUY**

*I, Daniela Hernández Chong Cuy, make the following statements on behalf of myself and the Law Office of Daniela Hernández Chong Cuy. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Daniela Hernández Chong Cuy and I am the founder, owner and Directing attorney of the Law Office of Daniela Hernández Chong Cuy, a Professional Corporation. ("Law Office of D. H. CH. C."). Based in Pasadena, California, the Law Office of D. H. CH. C. provides comprehensive legal representation to unaccompanied immigrant children formerly in the custody the Office of Refugee Resettlement ("ORR") in Los Angeles, San Bernadino, Ventura, and Riverside counties. We are also the sole legal service provider for two ORR long-term foster care facilities: Building Bridges Foster Family Agency in Ontario, CA, and MarSell Wellness in Montebello, CA.

2. Our office provides legal representation in a variety of immigration matters, including representing adults in immigration detention who have been found incompetent to represent themselves, and families with affirmative USCIS applications. However, since 2023, our work with unaccompanied children has become a central component of our firm's work. We have developed a team of specialized immigration experts to best serve unaccompanied children with holistic services. Our mission is to provide "client-centered" and trauma-informed legal representation that recognizes both the autonomy of underaged clients and their vulnerabilities, caused by age, class, gender, race, status differences, or mental health needs, always acting with a humanizing and holistic approach to lawyering.

3. In order to carry out this mission, the Law Office of D. H. CH. C. has several main work components: (1) Representing children in long-term foster care under ORR custody in immigration proceedings; (2) Representing unaccompanied minors who are not in ORR custody in immigration proceedings; and (3) Providing educational services in the form of legal education "know your rights" ("KYR") presentations for unaccompanied minors under the Post-release Initial Legal Service ("PILS") program.

4. The Law Office of D. H. CH. C. has been providing legal services for unaccompanied immigrant children in California since May 2023. In May 2023, as subcontractors of the Unaccompanied Children's Program, we began providing legal representation for children detained in an LTFC in Ontario, California, and for unaccompanied minors who were no longer in ORR custody in Los Angeles, San Bernardino, Ventura, and Riverside counties. In 2024, our services under the contract expanded to include a second LTFC facility in Montebello, California, and to cover a larger number of released unaccompanied children.

1

5. Since 2023, our office has initiated a combined total of 75 cases. In 2024, we initiated representation for 15 children in long-term foster care and 27 children that have been released from previous ORR custody—a total of 42 children just that year. Just in the first few months of 2025 alone, we have initiated representation of eight unaccompanied minors in long-term foster care, which is likely explained due to the uptick of children in need of long-term care.

6. Currently our office has 60 open cases under the ORR contract. To fulfill our duties as a provider of legal services for unaccompanied minors, I have had to restructure my business model and the clientele my Law Office serves, limiting the number of private clients I can take at any given time to accommodate the growing demand of competent legal service providers for this vulnerable population.

7. With U.S. Department of Health and Human Services ("HHS") funding, the Law Office of D. H. CH. C. has maintained four staff members dedicated to providing legal services to unaccompanied immigrant children. Specifically, our team is composed of two full-time attorneys, including myself, and two full-time paralegals. Our fourth and most recent hire was welcomed to our team in October 2024.

8. Staff providing representation and KYR presentations to children in long-term foster care regularly travel to meet each child in person to conduct client interviews and prepare clients for Immigration Court hearings. Our staff visits the facilities at least once a month, with in-person visits often occurring on a bi-weekly basis. The LTFC clients can also request a virtual meeting with their attorney for faster and more convenient scheduling; we take these sorts of meetings at least twice a week. In-person visits can range from one to four hours, depending on the legal work to be done and the youth served on each visit. Child representation requires a trauma-informed approach, so the work cannot be rushed. The clients will set the tone and pace for our work and conversations.

9. In addition to providing representation in removal proceedings before the Immigration Court, we provide representation for unaccompanied children before United States Citizenship and Immigration Services ("USCIS") and California Family, Probate, and Dependency court as needed. A majority of the children we represent are eligible for Special Immigrant Juvenile Status ("SIJS"), a critical form of immigration relief for children who have suffered abuse, abandonment, or neglect. SIJS proceedings are especially pertinent to children in long-term foster care, who require dependency courts to designate an institutional caregiver to ensure their well-being. Many children we serve are also eligible for asylum, as they fear persecution in their countries of origin. Our office provides services not only to initiate their asylum applications, but to accompany them to their critical asylum interview before USCIS. Other children we serve are eligible for U Nonimmigrant Visas, as they have been victims of criminal activity in the United States,

     thus we provide representation before the necessary law enforcement agencies to prepare their case.

10. A large part of our ORR contract focuses on serving unaccompanied children in long-term foster care.  Unaccompanied immigrant children are placed in long-term foster care when they have no one in the United States who is available to care for them.  These children require a particular form of representation, due to the increased vulnerability of not having an adult to be released to in the United States.  Due to their circumstances, children in long-term foster care do not have the financial resources to pay for an immigration attorney. Further, many of these children experienced severe abuse, neglect, or persecution in their countries of origin, and require trauma-informed advocates to help them navigate the complex world of immigration law. We have clients as young as two years old, who would be unable to represent themselves before any court or government agency or to find a paid attorney. We represented a client belonging to the Hazara/Suni ethnic and religious minority who fled Afghanistan after the takeover by the Taliban regime in 2021; we helped him prepare and present his asylum application before the Los Angeles Asylum Office, and file other applications for relief before USCIS, all complex procedures he would be unable to navigate on his own, due to age, and cultural and language barriers. We have an indigenous Raramuri client, a 16-year-old girl who has no known direct relatives either in Mexico or in the United States; we provided representation for the appointment of an institutional guardian in state court and just received notices of approval of her SIJS application. We advocated before multiple stakeholders so that a family of four young children from Angola be released from ORR custody to reunify with their family in Canada.  None of these clients would have been able to seek relief without our assistance.

11. Our work is critical not only in preserving our clients' access to justice, but in ensuring that the Immigration Court's juvenile docket runs efficiently. The consistency in the way we have provided legal representation for our detained clients and prepared applications for relief during the past two years has led to an efficient management of the juvenile docket at the Immigration Court in Santa Ana, California, where our cases are routinely terminated or administratively closed.  This avoids unnecessary delays, alleviates the Court's and ICE's case load, and directs resources where they may be best and most efficiently used. Our advocacy for our clients ensures that the due process rights of children in immigration proceedings are respected without need of the Immigration Court mandating unnecessary continuances of their proceedings, or without requiring that the Immigration Judge take additional time to explain to the children before them their rights in those proceedings and how they could in theory advocate for themselves.  In every court appearance, Immigration Judges have expressed their gratitude for our work.

12. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs).

3

Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025

13. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children as well as other non-representation services such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2, and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place CLIN 1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities, and CLIN 5, which funds Immigrant Justice Corps fellows who represent children not covered under other CLINs. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

14. On March 21, 2025, I was notified via email communication by the Acacia Center for Justice that a stop work order had been issued for all the legal work we do under the unaccompanied children's program. Immediately, I communicated this message to my team, ordering them to cancel any activity that was not strictly necessary to fulfill our ethical duties and giving them the rest of the guidelines necessary to comply with the order.

15. When I learned about the stop work order and termination of the contract, my office staff was in State Court attending to guardianship hearings for LTFC clients, and in the LTFC program we serve. As soon as I was able to speak with them, I informed my staff to cease all work under the contract. Our office is scheduled to appear in Court on Friday, March 28, 2025, on two separate cases, and to prepare for asylum interviews with the Asylum Office and respond to USCIS notices before April 1, 2025. Until I am able to determine how to proceed on each one of the cases without being in violation of the rules of professional conduct, I plan to appear in Court for our scheduled cases, and to attend all legal and court mandated deadlines, so long as it is financially feasible.

16. Earlier today, the Lead Case Manager for one of the LTFCs my office serves, requested that I make arrangements to speak with our clients tomorrow, March 27, 2025, to inform them of the termination of the contract, per the request of their Regional Director. At this point, I continue to navigate the ethical implications of the termination of the contract and

4

the impact this will have on representation of my detained and non-detained clients. I respectfully declined the program's request and informed them that termination of the contract does not automatically terminate legal representation, and that I will schedule to speak with the minors as soon as I am able to provide them with clear responses of the full extent of the implications of the termination of the contract.

17. Currently, the funds we receive for our unaccompanied children's work accounts for 70-75% of our overall budget.  Similarly, most of the work we perform on our daily operation relates to these contracts. As a small firm, our entire staff is affected by a loss of unaccompanied children's funding. Before we entered into this contract with ORR, my Law Office was not dependent on this funding, but its demands have required me to restructure my Law Office's clientele and expand my staff.  From May 2023 to September 2024, we managed to operate with two attorneys and one paralegal; we welcomed the fourth member of our team in October 2024.  Because my office is a private practice, the partial termination of this program will have a severe financial impact on the operation of my Law Office.  Within two months I will not be able to cover the financial obligations towards my staff or cover the cost of our daily operations.  As a private practice, we are established as an "S" corporation, and do not have the tax structure or lobbying capacity necessary to secure the external funding required to solvently continue providing these types of legal services without the payment previously contracted.

18. For the duration of the original stop work order which occurred on February 18, 2025, we were fortunate enough to continue providing the strictly necessary legal services to our existing clients and fulfill our ethical duties with minimum repercussions.  Still, we were forced to reschedule appointments with clients and provide services like attending court hearings without knowing if we were going to be compensated for the work done, while avoiding unnecessary stress or burden for our clients.

19. The effects of the current termination on our office are immediate.  The impact on our morale is severe, as it forces us to restrict communications and services presented to our clients to the bare minimum, which is contrary to our client-centered approach.  Moreover, it will not be possible to provide a living wage to my staff and quality legal services to my clients as a Law Office without unaccompanied children's funds. A shutdown of the unaccompanied children's program income leaves us in the precarious situation of having *de facto* 60 new unfunded clients, from our total of approximately 150 clients, to whom we have a duty to continue to provide service, at least for the foreseeable future.  Under the California Rules of Professional Conduct, attorneys in general *may* withdraw from their representation if they are paid for services if the client breaches the agreement and the attorney gives them reasonable time to secure new representation, amongst other conditions.  However, the representation contract we entered with the children from the unaccompanied children's program is pro bono. That is, our attorneys cannot unilaterally terminate their client's legal representation solely for lack of payment or professional

5

funding, particularly because it would be highly prejudicial for them as unaccompanied children while they are detained or underage. Under Rule 1.16(d), a lawyer shall not terminate representation until they have taken reasonable steps to avoid reasonably foreseeable prejudice to the rights of the client, such as giving the client sufficient notice to permit the client to retain other counsel or obtain a copy of their legal file. It is very difficult to see a scenario under which our young clients under long-term foster care, ages 2-17, would be able to retain legal counsel on their own or to be able to present competent representation that would make our withdrawal permissive under California Rules.

20. Continuing to operate with at least 60 unfunded clients for the foreseeable future will likely bankrupt my small business. It will force me to incur significant debt to try to once again redistribute the ratio of my client portfolio to serve additional private clients. With my reduced staff, and considering that we already serve over 150 clients, it would be nearly impossible to manage a clientele restructuring while maintaining a full staff and sound finances.

21. In addition, on January 8, 2025, my house was completely destroyed in the Eaton fire, in Altadena, California. This forced my family of three, including my two-year old, to be displaced. It was not until March 1, 2025, that we were able to secure temporary housing. The disaster my family experienced disrupted my business operations. While my office continued working, and the rest of my staff was spared from the fire, I had to take extraordinary measures to be able to respond to the stop work order and the financial implications that followed.

22. When I started the Law Office of D. H. CH. C. in 2020, I wanted to create a private law practice that could provide both a balanced environment for my staff and provide services so that clients of all backgrounds and resources could find competent and caring legal services. To this day, we aim to provide zealous, competent and holistic representation to our clients in the immigration system, whether detained or non-detained, and at all stages of their immigration removal proceedings. Our mission is still to provide client-centered and trauma-informed legal representation. I hope that we can carry on with this vision without it leading to financial ruin.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 26 of March 2025, in Pasadena, CA.

*[signature: Daniela Hernández]*

_____

**Daniela Hernandez Chong Cuy**
**Directing Attorney/Owner**
**Law Office of Daniela Hernández Chong Cuy**
**UCP Legal Service Provider**