IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-2847<br><br>**DECLARATION OF JILL MARTIN DIAZ, ESQ. (VAAP) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**DECLARATION OF JILL MARTIN DIAZ, ESQ.**
**EXECUTIVE DIRECTOR FOR VERMONT ASYLUM ASSISTANCE PROJECT**

*I, Jill Martin Diaz, make the following statements on behalf of Vermont Asylum Assistance Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Jill Martin Diaz (they/them pronouns and Mx. honorific), and I am the Executive Director at Vermont Asylum Assistance Project (VAAP; www.vaapvt.org). VAAP is a nonprofit immigration law firm dedicated to expanding access to critical legal services for noncitizens across Vermont. VAAP grew from years of grassroots advocacy to meet low-income Vermonters' increasingly urgent needs for structured, equitable, and trauma-informed immigration representation. Today, VAAP is Vermont's only firm dedicated to providing legal services to indigent unaccompanied immigrant children exiting detention, other youth and adult subpopulations in removal proceedings.

2. VAAP is a legal services organization committed to expanding access to immigration legal knowledge and direct services. We envision a Vermont where noncitizens fully understand and access their legal rights, and where immigrant and mixed-status families feel a true sense of belonging, regardless of legal status. Founded in 2021 by grassroots volunteers, VAAP incorporated as an independent 501(c)(3) in late 2023. Now guided by an 11-member board and staffed by a supervising attorney and three legal advocates, including two pending admission to practice, VAAP is mobilizing dozens of pro bono attorneys and transforming Vermont's immigration legal landscape through direct representation, pro bono coordination, technical assistance, and advocacy at the state and federal levels.

3. In order to carry out this mission, VAAP has several main work components, including: (1) Providing educational and pro se services in the form of legal education "know your rights" ("KYR") presentations, conducting individual consultations (intakes), and conducting pro se workshops with all unrepresented children exiting ORR custody into Vermont; and (2) Representing unaccompanied minors who are not in ORR custody in immigration proceedings. We further host Immigrant Justice Corps (IJC) fellows to represent unaccompanied children in removal proceedings and provide Spanish-language tutoring for staff representing unaccompanied children.

4. VAAP has been providing legal services for unaccompanied immigrant children in Vermont since 2024. This marked a significant milestone for access to justice as VAAP doubled its staff and brought Vermont its first-ever IJC Legal Fellows: Cameron Briggs Ramos and Emma Matters-Wood. Both are Unaccompanied Children Program (UCP) fellows who started in September 2024 and expanded VAAP's intake criteria to not only include legal services for immigrant youth and over-18 UCs but also to guarantee universal

1

representation for all under-18 UCs exiting ORR custody into Vermont (noting Vermont lacks any ORR facilities in-state.).

5.  Since VAAP added two full time IJC UCP fellows to our staff in September 2024, we have begun serving a combined annual number of around 135 immigrant children including: (a) about 15 under-18 unaccompanied children leaving ORR custody and seeking full-scope representation on asylum, Special Immigrant Juvenile Status (SIJS), or related humanitarian relief; (b) about 20 factually unaccompanied children who were not so-designated and/or were over-18 at intake and are also seeking full-scope representation; and (c) about 100 derivative beneficiary children included in their parents' *pro se* asylum applications filed at VAAP-supervised pro bono legal clinics.

6.  With U.S. Department of Health and Human Services (HHS) funding, VAAP currently has hired two full time staff members dedicated to providing legal services to unaccompanied immigrant children. Specifically, VAAP employs IJC UCP Fellow Emma Matters-Wood on a full-time basis directly serving clients statewide for a renewable one-year contract period from September 1, 2024, through August 31, 2025; and IJC UCP Fellow Cameron Briggs Ramos on a full-time basis directly serving clients statewide for a two-year contract period from September 1, 2024, through August 31, 2026.

7.  VAAP staff providing representation and KYR presentations to children leaving ORR facilities to a Vermont parent or caregiver regularly meet clients to conduct client interviews, prepare clients for hearings, as well as provide legal education, individual consultations, and pro se workshops for pro se children. The kinds of legal matters VAAP represents children in include removal proceedings in immigration court, affirmative relief like asylum before USCIS, SIJS in state court, and advocacy in terms of equal access and enjoyment of state law-based rights and remedies.

8.  As Vermont's foremost immigration technical assistance provider and main conduit between regional and national communities of practice and local communities, the unmet need for KYR services/pro se workshops and/or legal representation is astonishing. These unmet needs are due to, for example, unaccompanied children not being able to afford representation, age of children, trauma, language barriers, geographic isolation, technological and transportation barriers isolating rural parts of the state, lack of attorneys due to remoteness of Vermont towns, and scant amount of nonprofit and private immigration attorneys in the region.

9.  Vermont-based children trying to apply for various kinds of relief and/or advocate for themselves without an attorney find it functionally impossible to access their removal proceedings in the Boston and Chelmsford Immigration Courts, as Vermont lacks public transportation, services, and awareness and only represented parties can access virtual proceedings. Caregivers for unrepresented Vermont children as young as five years old have contacted VAAP letting us know that without a cash grant for transportation and

2

overnight accommodation and meaningful language access assistance, they would be unable to get the children to Immigration Court let alone to assist them to prepare and file the children's meritorious applications for legal relief. When VAAP has been able to offer representation—universally to eligible UCs through the IJC UCP Fellows, and ad hoc to other immigrant children in Vermont—we have successfully stabilized children's status by securing relief including SIJS; and promoted judicial economy by terminating proceedings for children where court jurisdiction is improper.

10. As a hybrid direct presentation/pro bono coordination service provider, VAAP provides full-scope direct representation to about 35-40 children each year through our two IJC UCP Fellow positions. VAAP also mobilizes limited assistance for dozens more who are derivative beneficiaries of primary asylum seeker clinics accessing pro bono services on a limited basis in VAAP-coordinated attorney-for-the-day clinics.

11. Numerous judges, clerks, and staff of local state and immigration courts, as well as the Department of Homeland Security's field office staff, have commended VAAP staff for promoting more streamlined, fair, and efficient through their legal work. For example, on several occasions Chelmsford and Boston Immigration Courts have thanked us for helping to prevent unnecessary status conferences, at least, and at best for giving previously unrepresented parties the precious chance to fully developing their clearly meritorious claims for relief. Representing Vermont children also prevents the courts from interfacing with confused respondents about their travels and allows Vermont respondents to appear efficiently via Webex video conferencing.

12. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025.

13. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective on the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN1, which funds KYR

3

presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

14. Through social media/word-of-mouth, VAAP staff Emma and Cameron were the first to become aware of the February 21 and March 21 orders threatening their funding, exacerbating the adverse impacts them and their clients. On February 21, the information VAAP staff received was incomplete and changing, and as their supervisor I was not equipped to either confirm or deny rumors until IJC provided written guidance a few hours later, which they supplemented in the days that followed with a town halls for IJC hosts and a one-on-one meeting with me. On March 21, VAAP staff were first to learn about the new order, doing so from their peer fellows hosted by other organizations. Again, I confirmed shortly thereafter with IJC, this time in person since the order was issued while IJC was gathered in New York City for its inaugural alumni convening.

15. This funding loss is devastating to VAAP's financial picture. Currently, the number of immigrant children VAAP currently represents under the CLIN2 subcontract is about 15 and growing, as our contract is new and VAAP was in the process of conducting outreach with referring partners statewide to connect incoming children with us as counsel—an onerous piece of work considering Vermont lacks any in-state ORR detention. For context, Office of Refugee Resettlement-originated funding, including but not limited to our CLIN2 subcontract, accounts for about half of VAAP's overall operating budget and accounts for about 75% of the funding VAAP needs to host our two IJC UCP fellows. As a newer organization with limited cashflow and mostly reimbursement-based funding sources, VAAP cannot administer payroll without UCP contract funding, and may need to furlough its two IJC UCP fellows. Indeed, when the Stop-Work Order was first announced in February, VAAP temporarily furloughed our two IJC UCP fellows effective immediately causing financial harm to the fellow and to VAAP and legal harm to VAAP clients including children in proceedings. When IJC UCP Fellows are furloughed, I am rendered the sole remaining direct legal service practitioner on staff and must absorb two full-time caseloads in addition to my existing full-time administrative, fiscal, and professional duties. Only with IJC's commitment of an expedited reimbursement for expenses incurred last quarter plus an additional 30 days of prepaid funding for the month of March was VAAP able to restore Emma and Cam to full-time after a 48-hour furlough.

16. Notably, the February Stop-Work order conspicuously co-occurred with the *J.O.P. v. Department of Homeland Security* class settlement deadline of February 24, 2025, the date when unaccompanied children class members were required to file their asylum applications with USCIS at pain of waving initial USCIS jurisdiction over their claims. VAAP staff were placed in the impossible posture of either working without pay to meet professional duties to several class member clients or leaving the work piled onto my

4

catastrophically overloaded docket at risk of permanent legal harm to clients and professional liability for VAAP. VAAP staff worked without pay to meet their child clients' deadlines, causing undue delay to their own contingency planning to replace lost income and prevent rent arrearage and loss of housing.

17. Moreover, since February, the threat to UCP funding has closed VAAP to new legal intakes, including for unaccompanied children in deportation proceedings. Intake closure comes at a time when DHS is ramping up enforcement and detention activities in our northern border state, causing an increasing volume of indigent Vermont children and youth to enter removal proceedings in Boston and Chelmsford Immigration Courts without counsel.

18. For existing clients, VAAP staff describes the act of strategizing on individual cases or managing their overall dockets long term as "impossible," since they are finishing each workday without knowing whether they will be returning the next. Funding threats and associated uncertainty of employment is threatening legal service quality and making it difficult for VAAP staff to prioritize among increasing, overlapping case emergencies.

19. For example, one CLIN2 subcontract client from Sudan has a pending asylum application and an approved USCIS Form I-360 granting Special Immigrant Juvenile Status. Prior to seeking refuge in Vermont, Sudanese law enforcement repeatedly refused to offer client with protection from the physical and verbal attacks he faced for reasons relating to his nationality, ethnicity, and religion. The child client was being held in ORR custody for an extended period in a southern U.S. state, since the SIJS sponsoring organization required proof of counsel in Vermont before permitting the child to be released here. Client was on his way to release to Vermont with VAAP's offer of full-scope representation, which we have suddenly rescinded considering this funding loss. The child clients' navigation of removal proceedings *pro se* from his unnecessarily prolonged detention hangs in the balance.

20. Another CLIN2 subcontract client from Mexico has a pending asylum application and was just beginning the SIJS process when funding was cut. Prior to seeking refuge in Vermont, the child witnessed neighbors, friends, and peers his age tortured and killed by cartel members and their families, and all were denied assistance by local police. When the client began receiving threats that the same would happen to him, he fled. Since arriving in the United States, a severe health condition and hospitalizations have made client's court appearances literally impossible to access without resource-intensive assistance from counsel including home visits to his rural Vermont town. Resultantly, he was up against the *J-O-P-* deadline to file his asylum application and receive the benefits to which he was entitled and nearly lost out in spite of his and counsel's heroic efforts to overcome his health condition and make his filing deadline. They were just able to submit client's meritorious asylum application in time, despite the odds they were up against. Client will not be able

to continue pursuing his applications for relief without counsel, given his young age and fragile health.

21. Yet another CLIN2 subcontract client from Mexico has a pending asylum application with an upcoming biometrics appointment. Prior to seeking refuge in Vermont, the now 10-year-old child's uncle was murdered in his presence. The same group that murdered his uncle threatened our child client and attempted his kidnapping, at which point he fled for his life to the United States. Unfortunately, our client and the family he reunited with in the United States were then subjected to severe forms of labor trafficking. After all of this, our client made his way to Vermont and had just managed to secure our representation and to file his asylum claim when funding was cut. This young child needs our legal assistance to access his upcoming biometrics appointment, to understand and prepare evidence substantiating his claims, and to share his story in an asylum interview. The child client will be unable to complete his interview without the assistance of counsel, as he is incredibly shy and has either panic attacks or breaks into inconsolable sobs when he attempts to speak about it.

22. The uncertainty of future funding has prompted VAAP's difficult decision to not renew the contract of the one paralegal advocacy/program coordination person on staff and eliminate the position. Now, VAAP staff is shrinking from four to three, and potentially to one, at a time when the complexity and volume of unmet legal service needs are increasing.

23. In the interest of prioritizing professional duties owed to child clients above all else, VAAP is also forgoing administrative work that would reimburse staff for work-related expenses and replace lost funding to sustain VAAP's ongoing operations. My professional duties to clients and fiscal duties to the future of VAAP are now in direct conflict because of this contract cancellation. As a result of these sudden, unplanned resource constraints, existing child clients are waiting longer to hear back from VAAP regarding clients' increasingly frightened requests for clarification and assistance.

24. Without restored funding, I will likely be the only full-time attorney at VAAP within the next four-to-six weeks, rendering me solely responsible for the firm's existing attorney-client duties as well as all existing fiscal and administrative ones. My resource constraints and conflicting professional and administrative duties would require me to keep our intake closed and to withdraw from representation in all child clients' removal proceedings. This would irreparably harm clients' legal claims for relief and increase their likelihood of deportation, as there are no other legal service providers of this type serving Vermont. Harm to VAAP clients is harmful to VAAP's mission-based staff. That said, continued representation of clients under ethical obligations without funding is also harmful to staff.

25. Even if VAAP can diversify funding at the last minute to prevent IJC UCP staff from becoming re-furloughed because of contract cancellation, the harm of February's stop-work order continues to distract staff energy and drain organizational morale. One of VAAP's fellows, Cameron, was forced to sit the February Bar Exam during her temporary

furlough period. She described herself as being distracted from her final days of study because of severe worry over what would happen to her clients' cases during her furlough, in addition to the stress of how she would pay Burlington, Vermont's exorbitant rent. The other fellow, Emma, was unable to avoid working without pay, especially in Cameron's absence. She made the difficult decision to forgo finishing bereavement leave to which she was entitled at the time, given a family loss she was grieving during the same period.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on the 25 of March 2025, in Burlington, Vermont.


/s/ Jill Martin Diaz

**Jill Martin Diaz, Esq.**
**Executive Director, Vermont Asylum Assistance Project**