IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-2847<br><br>**DECLARATION OF MARION ("MICKEY") DONOVAN-KALOUST (IMMDEF) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

# DECLARATION OF MARION DONOVAN-KALOUST
# DIRECTOR OF LEGAL SERVICES FOR IMMIGRANT DEFENDERS LAW CENTER

*I, Marion Donovan-Kaloust, make the following statements on behalf of myself and Immigrant Defenders Law Center. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Marion Donovan-Kaloust, and I am the Director of Legal Services of the Children's Representation Project ("CRP") at Immigrant Defenders Law Center ("ImmDef"), where I have been employed for almost ten years. ImmDef is a non-profit organization headquartered in Los Angeles, California, with additional offices in Santa Ana, Riverside and San Diego. ImmDef believes in providing universal representation so that no immigrant is forced to face removal proceedings without an attorney or accredited representative at their side. ImmDef is the largest provider of legal services to unaccompanied children in California and currently provides legal services to children housed in seventeen Office of Refugee Resettlement ("ORR") facilities throughout Southern California. ImmDef also represents thousands of unaccompanied children who have been released from ORR and are residing with sponsors in the Greater Los Angeles area.

2. ImmDef's mission and vision is that no immigrant should have to face deportation proceedings alone. We believe that every person facing removal deserves to have zealous, competent counsel at their side. We represent approximately 3,100 noncitizens annually in their removal proceedings and provide other legal services to approximately 33,000 additional noncitizens. We provide pro bono representation and other legal services to unaccompanied minor children, indigent detained adults, individuals deemed mentally incompetent to represent themselves, deported veterans, and families separated at the border, among others. Our CRP program is the largest of our departments and has primary responsibility for carrying out this mission and vision as it relates to unaccompanied children.

3. In order to carry out its mission, ImmDef's CRP program has several main work components: (1) Providing legal education "know your rights" ("KYR") presentations, conducting individual consultations (legal screenings), and making referrals to legal service providers for detained children who will not remain in our service area, as well as Child Advocate referrals and appearing as Friend of Court for unrepresented detained children; (2) Representing unaccompanied minors who are not in ORR custody in immigration proceedings, including children who have been released to sponsors, and those residing in the Unaccompanied Refugee Minor ("URM") program; and (3) Representing children in ORR custody in immigration proceedings. We represent children in short-term ORR custody as well as children who have been placed in long-term foster care settings.

>We further host Immigrant Justice Corps ("IJC") fellows to represent released unaccompanied children in removal proceedings and provide Spanish-language tutoring for non-Spanish speaking staff representing unaccompanied children.

4. ImmDef has been providing legal services for unaccompanied immigrant children in California since 2015. Providing legal services to unaccompanied children has always been at the core of ImmDef's work. In 2024 alone, we provided KYRs and legal screenings to over 3,750 children and made over 4,200 referrals for legal services. We offered full-scope representation to over 670 detained children and to over 175 children who had been released from ORR custody, including children placed in the URM program. ImmDef currently represents over 1,900 unaccompanied children in their removal proceedings under the UCP contract.

5. Of our staff of over 200, ImmDef has hired approximately 113 staff funded with U.S. Department of Health and Human Services ("HHS") funding dedicated to providing legal services to unaccompanied immigrant children. Specifically, ImmDef's CRP project employs forty-three attorneys, four IJC Attorney Fellows, and thirty-eight non-attorney support staff providing direct representation services. We also employ twenty-five Program Associates and Program Coordinators with primary responsibility for providing KYRs, legal screenings and referrals for detained children.

6. ImmDef staff providing representation and non-representation legal services (such as KYRs and legal screenings to children) in ORR-subcontracted facilities regularly travel to each such facility in person to conduct client interviews, prepare clients for hearings, and provide legal education and individual consultations. Our team visits each of the thirteen short-term ORR subcontracted facilities whenever there are new arrivals, as well as when children in care need follow-up legal services (typically resulting in weekly facility visits). Attorneys also regularly visit children detained in each of the four long-term foster care programs we serve to help them pursue their immigration cases. The vast majority of children we serve have fled dangerous circumstances in their home countries, including trafficking, child abuse and neglect, and community violence. Take for example some of our clients—a 16-year-old girl, and her one-year-old son. Beginning at the age of six years-old, our older client was sex trafficked by her own family in Mexico. After giving birth to her son, she fled to the U.S. to save him from the same fate.

7. Our office represents children like these pro bono in their removal proceedings, including representation before immigration courts and U.S. Citizenship and Immigration Services ("USCIS"). We also represent children before the California Superior Court in connection with applications for Special Immigrant Juvenile Findings (which are necessary to apply for Special Immigrant Juvenile Status, a form of immigration protection available to children who have experienced abuse, abandonment or neglect). We pursue victim-based relief such as asylum, T-nonimmigrant status for victims of trafficking, U-nonimmigrant

status for children who have experienced crimes in the United States, and Special Immigrant Juvenile Status, as well as litigating any other relief for which the children may be eligible

8. For detained children, we play a key role in advocating with ORR-subcontracted facilities and other stakeholders to ensure that children's needs are being met while in ORR custody. For example, we make referrals to Child Advocates, advocate directly with ORR to avoid unnecessary "step ups" for children at risk of being placed in more restrictive detention settings, and request Trafficking Victim designations from the Office of Trafficking in Persons. Because we are an independent, non-governmental organization, children often share concerns with us they do not feel comfortable sharing with ORR-subcontracted staff or other stakeholders. Thus, we are key voices for detained children—ensuring their rights are respected and their needs are being met while in care. As an example, I once met with a detained child who was wearing a thick, hooded sweatshirt with the hood up in 95+ degree weather. When I asked her about it, she explained that her Muslim faith required her to cover her hair, but the ORR-subcontracted facility had not provided her with head coverings. ImmDef was able to advocate for her religious rights to be respected and her cultural needs met. Every day there are new similar examples of our life-saving and life-affirming work.

9. The children we serve range in age from infants to teenagers, and the vast majority are indigent (which is unsurprising given that they are children). Children, especially detained children, are still recovering from their journey and have yet to reach a place of security and permanency. Our team must often conduct multiple meetings with children to build trust and rapport. We also serve children from diverse geographic, linguistic and cultural backgrounds. While most of our staff are bilingual in Spanish and English, in recent years, we have seen an increase of children from non-majority-Spanish-speaking countries, who require interpretation in order for their stories to be told and their rights to be vindicated. We also often serve indigenous children from Mexico, Guatemala and Ecuador who similarly require interpretation into a Mayan language or Quechua. The vast majority of children we serve have also experienced significant trauma, whether in their home countries, on the journey to the United States, or at the hands of U.S. Immigration Officials (or all three). As a result of these factors, ImmDef's staff is highly trained to conduct our services using child-friendly, trauma-informed and culturally responsive methods. Due to these same factors, the children cannot be expected to represent themselves in immigration court, nor can they expect to rely on a private attorney who may charge much more than they can afford, and who may lack the training and linguistic or cultural responsiveness to effectively represent them.

10. We also serve children detained in remote ORR-subcontracted facilities, far from the Los Angeles city center. As ORR-subcontracted bed capacity expanded in the last several years, ImmDef was repeatedly tapped to serve children in the more remote facilities because no

other attorneys would agree to travel to those distant locations. Because of ImmDef's mission and vision, and our expertise serving unaccompanied children, we agreed to take on the work—we refused to leave children unserved, even though doing so stretched our capacity. It would be unreasonable to expect that these children's needs might be met by the private bar in these underserved regions—we have seen in practice that it cannot be done.

11. Finally, immigration is an exceedingly complex area of law that changes rapidly. Our legal staff is constantly monitoring changes in case law, listservs, the news, and government announcements to ensure we have up-to-date information to provide the best representation for our clients. Children cannot be expected to navigate our complicated legal immigration system on their own. In fact, when ImmDef has worked with pro bono attorneys to provide legal representation for children, we have found that even licensed attorneys who are not specialized in this area of law need intensive training and support to be able to effectively represent their clients.

12. This work has resulted not only in children stabilizing their legal status but stabilizing their lives. Without the looming anxiety of removal proceedings, we have seen children thrive. One of our clients, a youth from West Africa who faced parental abandonment and persecution in his home country, recently received a full-ride athletic scholarship to college.

13. While our work often results in positive outcomes for our child clients, we have also seen that government stakeholders benefit from our work. Since its founding in 2015, ImmDef has staffed the Detained Juvenile Docket, currently held on Wednesday afternoons at Santa Ana Immigration Court. Our presence both as counsel for detained children, as well as Friend of Court for unrepresented children, makes the hearings run much more efficiently. Judges are not required to painstakingly attempt to explain immigration law or next steps to children—rather, they can move quickly through hearings, because the children are assisted in the matters by counsel or Friend of Court. Over the years, ImmDef has appeared before multiple Immigration Judges who preside over the Detained Juvenile Docket, and each has expressed their gratitude for our pro bono assistance on the cases.

14. We have also developed strong stakeholder relationships with ORR Federal Field Specialists and ORR-subcontracted facility staff. As ORR and the subcontracted facility work to care for the children, ImmDef provides key information to the children about the next steps in their immigration processes and reassurances about what's to come. We have often heard from ORR-subcontracted staff that receiving appropriate immigration advice alleviates children's anxiety and stress. Further, as mentioned above, we are often able to help ORR staff and ORR-subcontracted facility staff identify issues the children are facing, because children may feel more comfortable sharing these concerns with a third party. Whether it's a child sharing that they have not been provided with sufficient clean clothing,

or that they have been subjected to sexual abuse in care, our ability to note these issues and raise them appropriately means that children are better protected, and ORR is able to urgently respond to pressing needs. Over the years, we have worked alongside multiple Federal Field Specialists in the greater Los Angeles region who have expressed that they rely on and trust us to raise issues that may be occurring at the subcontracted facilities. In some cases, our notifications led ORR to investigate and take corrective action against subcontracted facilities.

15. We have also developed positive working relationships with Immigration and Customs Enforcement Office of the Principal Legal Advisor ("OPLA") attorneys. For example, when children who were previously enrolled in the Migrant Protection Protocol ("MPP") started entering ORR-subcontracted facilities in 2019, the government was not adequately tracking them. Through our work in ORR-subcontracted facilities, ImmDef was able to identify these children and notify OPLA of their presence in ORR custody before they received an *in absentia* order for failing to appear at their immigration hearings in MPP. A child being ordered removed for failing to appear at a hearing through no fault of their own because they were in federal custody in a distant location is an illogical outcome all parties wanted to avoid.

16. The arrival of MPP-impacted children into ORR custody was just one instance when ImmDef stepped in to fill a gap in communication between government agencies. During the "Zero Tolerance" policy in 2017 and 2018, when children were routinely being separated from their parents, we found that ORR-subcontracted facilities often did not know where parents were detained or how to contact them. ImmDef played a key role in locating separated parents for children's case managers to ensure that parents and children had contact, and that ORR knew where parents were being held. More recently, we have seen the same pattern play out, with parents being separated from their children because they are serving as material witnesses, because of hospitalizations, or for a number of other reasons. ImmDef has been the first to identify the separation and flag it for ORR, to locate the separated parent, and to assist in troubleshooting barriers to communication between the child and parent in multiple instances. Thus, we have seen that ORR-subcontracted facilities often rely on ImmDef to bridge gaps in communication or tracking of families between government agencies that interact with the children.

17. On March 21, 2025, HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. Effective immediately, HHS' terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children as well as other non-representation services such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2, and CLIN 4, Spanish language tutoring for organizational staff who work with

5

children. For the time being, HHS has left in place CLIN 1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

18. At around 8:15 AM on Friday March 21, our office received an email from the Acacia Center for Justice notifying us of the contract termination they had received from the Department of the Interior. ImmDef staff was already in our offices, on the way to hearings, and preparing to meet with detained clients. Our work was unable to stop as requested due to our ethical responsibilities under California Attorney Ethics rules to zealously represent our clients and avoid prejudice to their cases.

19. Over the ten years that ImmDef has participated in the contract, ImmDef has built an active client caseload of 1,900 clients and has represented nearly 4,000 children in total. We have provided non-representation legal services to over 25,000 children. We hired staff and opened satellite offices to meet the demands of contract deliverables and ensure children in need were being served. While no individual contract year was ever guaranteed, we relied on the fact that these services are mandated in the Trafficking Victims Protection Reauthorization Act ("TVPRA") and the multi-year nature of the contract to make decisions regarding our organization's growth. The abrupt termination of the contract puts the organization as a whole in peril. Funding impacted by the contract termination makes up approximately 55% of ImmDef's budget.

20. As mentioned above, we employ 113 of our approximately 200-person staff under this grant. While we have limited flexible funding that has allowed us to continue to employ staff to discharge our ethical responsibilities to our clients following the contract termination we cannot continue for long without reinstatement of unaccompanied children's funding. Our current reserves will be completely exhausted within six months, and dramatic cuts in staffing will be needed well before that to avoid completely bankrupting the organization. In fact, we have already had to provide 27 staff with layoff notices in response to the contract termination. Further, before the contract termination, our reserves were intended to fund other mission-focused work such as providing pro se clinics to new arrivals and rapid response to immigration raids. Reallocating those reserves to fund the children's work would have negative ripple effects across our entire organization. We have taken additional steps to prevent further dipping into our reserves, including stopping any non-essential support for clients, such as helping to pay for medical exams needed for adjustment of status applications, and putting a pause on all non-essential office supply purchases.

21. As reserves run out, we would have to take drastic action to terminate staff across all positions funded under this contract. As mentioned, we have already sent layoff notices to

27 staff, but additional layoffs would be necessary were the funding not restored. These cuts would be incompatible with our ethical responsibilities to the over 1,900 child clients we currently represent. We have limited ability to retrain and reassign staff to other programs under other funding sources. Prior to each grant or contract year, agreements are outlined, and existing staff are identified within each program for the contract or grant year, which results in little room for unexpected shifts in already approved budgets. Restructuring other grants to absorb unaccompanied children's staff mid-year is not feasible, and we don't have the capacity or the ability to absorb over 1,900 cases into other attorneys' caseloads. Furthermore, retraining staff takes time and resources—resources that our organization does not have without this funding.

22. Additional furloughs and layoffs are inevitable if we are not able to restore funding. However, as mentioned—we have over 1,900 open children's cases. Laying off staff funded under this grant would prevent us from competently representing our existing child clients. In response to a prior stop work order, we instituted a hiring freeze, which will remain ongoing in light of the contract cancelation. There are open positions of case-carrying attorneys and paralegals that we cannot fill, putting additional strain on a team that will be further exacerbated in light of the contract termination.

23. The contract termination presents an immediate existential threat to ImmDef's existence and to our mission. The contract termination froze, without notice, funding to represent nearly 2000 children with whom we undertook attorney-client relationships in reliance on that funding. These cases are complex, often take years to complete, and require highly skilled attorneys to competently handle them. For example, our office filed an asylum application for one youth from West Africa in February 2025. He. is currently awaiting an interview with the asylum office. As a speaker of a language from the Niger-Congo language family, his case requires specialized translations and in-depth country conditions research. His case could be pending before the asylum office for years, and without representation at the ready, he risks having to present his asylum case before USCIS alone.

24. Currently, we have over twenty-five immigration and state court hearings for children whose representation is funded under the contract scheduled in the week following the contract termination, including one for a 4-year-old child from Mexico. It would be impossible to withdraw from these cases on such short notice without seriously prejudicing our clients—if the courts would even allow us to do so.

25. It has been a full-time job, as the leader of our Children's Representation Project, to field questions from staff about what the abrupt contract termination means for them and for their clients. It has been a challenge to keep staff focused on representing clients while they understandably feel panic about whether they will even have a job tomorrow. While we continue to provide key non-representational services and represent existing clients, the contract termination has forced us to stop offering new representation to children currently

7

detained. At this very moment, there are children in ORR custody who need our representation who are not receiving it. This means that children who want voluntary departure will have their return home unacceptably delayed, victims of trafficking will not be able to access the protections they deserve, and children fleeing persecution will not be able to have their day in court. These impacts are unacceptable to an organization founded on the belief that no child—some of whose feet don't even touch the floor when they sit in court—should have to face a trained government prosecutor alone.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 24 of March 2025, in Riverside, California.



_____
Marion ("Mickey") Donovan-Kaloust
**Immigrant Defenders Law Center**
634 S. Spring Street, 10th Floor
Los Angeles, CA 90014
Tel: (213) 674-9438
Fax: (213) 282-3133
mickey@immdef.org