IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-2847<br><br>**DECLARATION OF GAUTAM JAGANNATH (SJC) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

# DECLARATION OF GAUTAM JAGANNATH, ESQ.
## EXECUTIVE DIRECTOR FOR SOCIAL JUSTICE COLLABORATIVE

*I, Gautam Jagannath, Esq., make the following statements on behalf of SOCIAL JUSTICE COLLABORATIVE. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Gautam Jagannath, and I am the Executive Director at Social Justice Collaborative ("SJC"). We are based in Berkeley, California in the San Francisco Bay Area and have been provided full-scope deportation defense services for low-income noncitizens all over the nine Bay Area counties as well as the California central valley. SJC is one of the primary organizations dedicated to providing legal services to indigent unaccompanied immigrant children who are not in detention as well as those held in Office of Refugee Resettlement ("ORR") custody throughout Northern and Central California.

2. Our organization teams are composed of administration, executive staff, attorneys, legal assistants, social workers and other individuals who work together in units to represent clients, ensure that their needs are met and that we continually prevail in court. Because we are a legal services organization, we operate like a law office and our teams depend on having lawyers and legal assistants work on all aspects of the case, from intake to work-up and preparation for trial.

3. In order to carry out this mission, SJC has several main work components, but relevant to the instant litigation, we represent unaccompanied minors who are not in ORR custody in immigration proceedings. We further host Immigrant Justice Corps ("IJC") fellows to represent unaccompanied children in removal proceedings. Our programs at SJC are unique because we have always provided full-scope representation to vitally underserved minors as well as families, but we also provide access to wrap around services including social workers to help navigate challenges of newcomer life in the United States.

4. SJC has been providing legal services for unaccompanied immigrant children in California since 2012. Since our inception, we have always taken cases for any indigent immigrant in California, we represent thousands of families a year. Our unaccompanied minor clients represent about a third of all we represent in immigration proceedings. Specifically, SJC serves a combined annual number of around over 400 unaccompanied children. Roughly

1

for at least the fiscal year 2024, our representative breakdown for these minors was 35% adjustment of status, 38% asylum proceedings, 25% special juvenile status. The residue balance is composed of U/T nonimmigrant relief, refugee petitions and other applications. Naturally, a lot of work authorizations are not included for all these children to get kids the benefits, both entitlements and means tested that they deserve in California. That represents over 200 applications just in FY 2024.

5. With U.S. Department of Health and Human Services ("HHS") funding, SJC currently has hired three (3) staff members, all of whom are IJC fellows, dedicated to providing legal services to unaccompanied immigrant children. Specifically, one is a California lawyer and two of the staff members are law graduates with pending bar admission results.

6. Staff providing representation to children regularly conduct client interviews, prepare clients for hearings, as well as provide legal education, individual consultations, and attend court hearings and other appointments for clients as well as their families. SJC represents children in all stage of removal proceedings in immigration court, BIA appeals, petitions for review at the Ninth Circuit, affirmative relief like asylum before USCIS, SIJS predicates in state court.

7. In recent months, we have had several referrals come from youth-serving professionals who are actively trying to find help for the children they work with. Even those who regularly refer to legal service providers are hitting roadblocks. Waitlists are closed. Pro bono and nonprofit providers are overwhelmed. Paying for legal services is out of reach for the vast majority of adult immigrants let alone children who need to be in school.

8. We routinely place cases for that have made their way through the immigration system to pro bono counsel at our firm partners through our legal clinics. These legal clinics are held frequently throughout the year and would be severely, albeit indirectly, affected by the loss of funding through this grant.

9. In 2023, SJC's new Special Immigrant Juvenile ("SIJ") Task Force completed its first full year. The task force was created in response to the growing demand for legal representation for minors. This was based on an increased number of intakes and referrals. However,

conversations with partners across various sectors made it clear this was not an isolated issue. It reflected broader, statewide, and national trends.

10. SJC is one of the few organizations who works in areas considered legal deserts in California. In some of these regions, we are one of the only organizations offering any legal services, including full-scope removal defense. We do not merely fill forms for clients and wish them luck. Even in more populated counties where other providers exist, the demand still far exceeds what's available.

11. A partner recently shared that a very young immigrant child believed that carrying a red card—a know-your-rights resource widely distributed in immigrant communities—would prevent them from being detained if stopped. While red cards are an important tool for asserting one's rights, this child was under the impression that the card functioned more like a legal shield. It's easy to understand how a young person, without legal guidance, could draw that conclusion not knowing much more.

12. Stories like this make it painfully clear that general information, no matter how widely shared, is not a substitute for individualized legal support. Children need someone who can walk them through their options and answer their questions. That is where SJC often comes in. We have a team of legal professionals working up and prevailing on legal status, but we also are providing social workers to support our children.

13. We currently have clients who are not yet one year old. Even without considering trauma, language barriers, or lack of resources, there is no path forward for a child that young without help. But of course, we do have to consider those things. Many of our clients are indigenous and do not speak Spanish, a language many assume they would speak. These minors often face not only trauma and language access issues but also deep cultural barriers and a long-standing experience with systems that overlook or ignore them. This makes it extremely difficult—if not impossible—for children to find legal representation, let alone secure it in time to meet the deadlines in their cases.

14. Immigration Judges ("IJ's") have over the past decade and more have expressed gratitude to SJC staff attorneys for the efficiency our providers bring to their dockets, which are often

expedited, and caseload management. It is not uncommon for the EOIR based in San Francisco, Concord and Sacramento to make referrals of minors to SJC's intake team. Many IJs appreciate our work product because we are known for bringing cases fully prepared for trial, well developed, and often fully documented. We have often been able to engage in stipulations with government counsel to avoid unnecessary continuances and appeals especially for minors.

15. Our organization repeatedly earns praise from the California State Bar, as we are an IOLTA funded legal service provider. We are also regularly praised by the California Department of Social Services who has continuously renewed contractual awards with SJC since 2015. We recently have been praised for maintained a shared vision centered on program assessment, we advance diversity and inclusion, we emphasize excellence, achieve goals, foster communication, engage staff at all levels, and ensure proper training and resource management. SJC exhibits a strong client-centered delivery system with programming aligned to our vision and funding requirements. We also demonstrate cultural competence through understanding of diverse community needs and histories, effectively engage with eligible populations, and establish appropriate partnerships with government and community organizations.

16. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025.

17. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers

(CLINs): CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN 1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

18. We learned of the contract cancellation through an email from a statement put out by Jojo Annobil, the CEO of Immigrant Justice Corps.

19. The terminated funding accounts for roughly 8% of our organization's total budget. SJC had been funded to represent roughly 45 unaccompanied minors per year under CLIN 2. The staff affected would be three IJC fellows. If we had to lose this funding and there was no new funding to be secured, we would be forced to lay off these fellows ASAP because we do not have operating budget to sustain their work. We have not yet secured any additional or new funding to secure these fellows.

20. The funding loss is a huge blow to our immigrant communities and morale of staff. We have been fortunate enough to survive almost a decade and a half without a single layoff and yet this could be our first.

21. For example, the SJC cases of Y, JS, and MHC represent particularly compelling scenarios for continued IJC funding support. All three individuals are currently not in active removal proceedings. Each presents strong affirmative relief claims requiring immediate legal intervention—specifically through asylum and SIJS pathways—demonstrating clear harm if representation were terminated. Financial barriers are insurmountable for all three cases: Y's family faces demonstrable poverty alone, JS as a dependent high school student has no income source, and MHC's family lacks financial means for private representation. Critically, none of these clients have any alleged gang affiliations or criminal history. Furthermore, each client has been released to documented sponsors with lawful immigration status—Y to a U.S. resident sponsor with a Social Security number, JS to a

21. sponsor with asylum-based residency, and MHC to a sponsor with SIJS-based residency—all people with valid legal status. Without sustained IJC funding, these vulnerable youth with strong relief eligibility would face the complex immigration processes without counsel, dramatically reducing their likelihood of securing protection despite qualifying under established legal criteria.

22. In the face of these layoffs, we may be forced to try and refer out the clients such as the ones described above who were previously represented by our IJC fellows. However, we know that all organizations doing this work are overly burdened and many cannot take new cases. As noted above, all providers are overburdened. Thus, it is highly unclear whether we would be successful in referring out our affected clients.

23. If we are unsuccessful in referring these clients to other organizations, then we believe under California law and relevant legal ethics that we would be forced to continue representation of clients without ORR funding. This would lead to further depletion of limited resources. This patently hurts staff morale, especially when our other staff are already working at and above their full capacity. Trying to competently represent affected clients without sufficient funding will likely lead to burn-out and result in other staff resigning or leaving for other jobs, thereby further harming our organization and the clients.

---

I declare under penalty of perjury under the Laws of the United States that the foregoing is true and correct.

Executed on the 25th of March 2025, in Berkeley, California, United States.

*Gautam Jagannath*

Gautam Jagannath, Esq.
Executive Director
SOCIAL JUSTICE COLLABORATIVE
1832 Second Street
Berkeley, CA 94710
(p) 510.992.3964