IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-2847<br><br>**DECLARATION OF LAURA NALLY (AMICA CENTER) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

# DECLARATION OF LAURA NALLY,
## PROGRAM DIRECTOR FOR THE CHILDREN'S PROGRAM AT AMICA CENTER FOR IMMIGRANT RIGHTS (FORMERLY CAPITAL AREA IMMIGRANTS' RIGHTS ("CAIR") COALITION)

*I, Laura Nally, make the following statements on behalf of Amica Center for Immigrant Rights. I certify under penalty of perjury that the following statements are true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Laura Nally, and I am the Program Director overseeing the Children's Program at Amica Center for Immigrant Rights ("Amica Center"), formerly known as the Capital Area Immigrants' Rights ("CAIR") Coalition. Amica Center is a Washington, D.C.-based nonprofit legal services organization that strives to ensure equal justice for all indigent immigrant men, women, and children at risk of detention and deportation in the Washington, D.C. area and beyond, through providing pro bono legal services and representation. I am an attorney licensed in Virginia and the District of Columbia and have been practicing immigration law for more than 15 years. I joined the Children's Program at Amica Center in August 2019.

2. Amica Center operates three main programs: the Detained Adult Program ("DAP"), the Children's Program ("DUCs" or the "Children's Program"), and the Immigration Impact Lab. DUCs' work specifically focuses on offering legal services and representation to unaccompanied immigrant children held by the Office of Refugee Resettlement ("ORR") at ORR-subcontracted facilities, including shelter and foster care programs, as well as children in ORR Unaccompanied Refugee Minor ("ORR URM") programs in the greater Washington, D.C. and Baltimore areas.

3. Since 2010, Amica Center's Children's Program has worked to serve children detained in ORR programs throughout the Capital region, including shelters, long-term foster care ("LTFC") programs, and transitional foster care programs. Our staff provide legal services to children in ORR custody across eight ORR-subcontracted facilities throughout Virginia, Maryland, and Washington, D.C. While the populations at each shelter fluctuate, the funded capacity across all the ORR-subcontracted facilities at which Amica Center provides services is 310 beds. Amica Center provides direct legal representation to some children in the care of the above-listed ORR programs, as well as all children who are released from one of those programs to a sponsor residing within our geographic area of service ("geozone"). Amica Center's geozone currently includes Washington, D.C.; Prince William County and Manassas City, Virginia; and Baltimore City and County, Maryland. We also provide representation to all children in an LTFC program in Virginia and ORR URM programs in Washington, D.C.; Fairfax, Virginia; and Richmond, Virginia.

1

4. To provide these services, Amica Center's Children's Program now has 33 full-time and 4 part-time staff members. Specifically, the Children's Program employs a program director, deputy program director, three managing attorneys, one supervising attorney, five senior attorneys, six staff attorneys, one Immigrant Justice Corps ("IJC") Attorney Fellow, two contract attorneys, two managing paralegals, four senior paralegals, seven paralegals, one senior program associate, and three social services staff members. Several additional positions are currently vacant due to challenges hiring qualified attorneys in a climate of funding uncertainty. We rely on funding from the U.S. Department of Health and Human Services ("HHS"), distributed to us through the Acacia Center for Justice as sub-contractor, to fund over 96% of our program.

5. Children's Program staff work to provide legal support, direct representation, and social services to unaccompanied immigrant children who are currently or have been released from ORR custody at juvenile facilities in Washington, D.C., Virginia, and Maryland. Our goals are to educate children about their rights and their legal options while in ORR custody, ensure that their needs are being met and their rights respected, and to represent children in pursuing any immigration relief or applications for which they may be eligible.

6. This work has two principal work components: (1) providing legally-required "Know Your Rights" presentations to children held in ORR-subcontracted facilities; conducting age-appropriate and trauma-informed one-on-one legal screenings for eligibility for immigration relief; referring children reunified outside of our geozone to other legal service providers; and preparing and accompanying all detained unaccompanied children in our geozone to their court appearances; and (2) providing in-house direct legal representation to unaccompanied children in immigration court, before federal agencies, and in state court to pursue immigration relief and applications, as well as referring cases to and mentoring pro-bono attorneys.

7. To deliver KYR, legal screening, and other non-representational services, Amica Center staff travel in person to each ORR-subcontracted facility on a weekly basis. In calendar year 2024, we provided "Know Your Rights" trainings and intakes to nearly 1,600 children in more than 20 languages. In 2023, our team developed a specialized KYR presentation using cartoon animals to provide age-appropriate services to tender age (under 12) children. Amica Center utilizes a weekly visit model to ensure that all children receive these initial services within 10 days of their arrival in ORR custody. Depending on the children's language needs, multiple Know Your Rights presentations may be provided on any given day. Most children do not understand why they are being held in government custody, that they will be placed in removal proceedings, or that legal protections exist for children under U.S. immigration law. Our staff are trained not only to break down complex information and topics in age- and culturally-appropriate ways, but to utilize active engagement strategies to ensure that children are fully engaged and focused on the material and able to ask questions. Children then immediately receive a legal screening with a staff member

        trained in trauma-informed and child-friendly interviewing. It is not uncommon for a legal screening to take place over multiple meetings if a child is too emotionally overwhelmed to tell their story or needs time to build trust before recounting traumatic events.

8. The Children's Program also provides a crucial suite of nonrepresentational services including court preparation, courtroom assistance and accompaniment, and legal referrals. When a child in an ORR-subcontracted facility is scheduled for an appearance in immigration court, we meet individually with the child to explain what to expect in court and then appear alongside the child as "Friend of the Court" to share information and updates with the immigration court such as the child's expected reunification location. We also help children with matters related to their placement and rights within the ORR system. When a child is expected to remain in ORR custody until their 18th birthday, we have assisted the ORR-subcontracted facility staff to identify suitable post-18 placements such as transitional housing programs for young adults and liaised with the Immigration and Customs Enforcement ("ICE") Field Office Juvenile Coordinator to advocate for the child's release to a community-based program rather than transfer to ICE detention. When we identify a child to be a potential victim of trafficking, we refer them to the Office on Trafficking in Persons ("OTIP") for a determination of eligibility for benefits and services under federal law.

9. Amica Center staff offer full legal representation to children in the ORR-subcontracted facilities we serve who do not have a viable ORR sponsor, who are placed into an LTFC program, who wish to return to their home countries, whose immigration proceedings advance to a point where they are expected to make substantive decisions about their legal case, and who are confirmed to be reunifying into our geozone to ensure continuity of legal services. We also initiate representation for particularly vulnerable children, including victims of trafficking, children who have experienced abuse or neglect in custody, or children who have been placed in restrictive settings or out-of-network placements.

10. Between March 30, 2024, and March 20, 2025, we initiated representation with 192 children in ORR-subcontracted facilities and ORR URM programs. Children's Program attorneys represent unaccompanied children in removal proceedings before the Hyattsville, Baltimore, Annandale, and Sterling Immigration Courts and the Board of Immigration Appeals ("BIA"). DUCs staff also represent children in applications with U.S. Citizen and Immigration Services ("USCIS") including asylum, Special Immigrant Juvenile Status ("SIJS"), family-based and humanitarian (U and T) visas, Temporary Protected Status ("TPS") and self-petitions under the Violence Against Women Act ("VAWA"). In addition to providing direct legal services, Amica Center staff also work to recruit, train, and supervise teams of pro bono attorneys who represent unaccompanied children in immigration proceedings and applications for immigration status. These pro bono attorneys are a critical part of Amica Center's mission and model which allows us to leverage

3

        volunteer legal services to more efficiently represent children. Approximately 15% of cases currently open with the Children's Program are placed with pro bono attorneys.

11.      Amica Center's Children's Program has continuously received HHS funding since 2015. We currently have more than 850 open cases that were initiated and continuously funded through HHS funding. Children released to sponsors or transitional living programs live throughout the Washington, D.C. and Baltimore, MD metropolitan areas, including in the suburbs of Virginia and Maryland. Specific bar licensure is required to represent children in SIJS cases in each of the three jurisdictions where we practice, and this affects how case assignments are made among our attorneys. Due to the significant backlogs in state courts, USCIS, and the immigration courts, children's immigration cases often take years to resolve before an eligible child is granted asylum, a U or T visa, or lawful permanent residence.

12.      The need for legal representation and other support services for unaccompanied children—especially those in government custody and those facing deportation—is truly critical. Immigration law and procedures are incredibly complex and becoming more so every day. The overwhelming majority of unaccompanied children that we encounter in ORR-subcontracted facilities do not have the means to pay for a qualified private immigration attorney to represent them. ORR-subcontracted facilities are often located in rural areas where there are limited or no pro bono resources. For example, one of the ORR-subcontracted facilities that we serve is located approximately two hours away from Washington, D.C., the closest metropolitan area, by car and far from any other potential service providers.

13.      It is even more obvious that children cannot represent themselves effectively in removal proceedings. The children with whom we work range in age from infants to 17 years old. Most have limited formal education and have experienced some form of trauma. To explain the concept of an adversarial court proceeding to children during our KYR presentations, we use the metaphor of a soccer game. The judge is the referee, the child is on one team, and the government is on the other team. If the government has a trained professional on their team (most children suggest Messi or Ronaldo), we explain, it is very important that they have a trained professional—their own lawyer—to be on their team. Without one, we already know who will win.

14.      In our experience, other government stakeholders including immigration judges, ORR-subcontracted facility staff, and the DHS Office of the Principal Legal Advisor ("OPLA") attorneys also prefer and appreciate when an unaccompanied child is represented by counsel. We frequently appear as Friend of Court to relay important updates regarding a child's reunification to OPLA and the immigration court and to coordinate appropriate changes of address and changes of venue. ORR-subcontracted facility staff often have questions for us about the logistics for children's appearances in court. Immigration judges

have sometimes requested that we enter appearances for children if the judge has doubts about the child's competency or understanding of their legal options. We also play a critical role in identifying and referring children for appointment of a Child Advocate. For children who are reunifying outside of our geozone, we provide legal referrals, either directly to another Acacia Center network provider or by providing a list of potential pro bono or low-cost resources directly to the child and sponsor. Because capacity for free and low-cost representation is overstretched in most areas, however, these resources can be very difficult to access.

15. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a Stop Work Order for Legal Services for Unaccompanied Children, effective immediately, which extended to "all activities" under the contract. Attached hereto as **Exhibit 1** is a true and correct copy of the Stop Work Order, dated February 18, 2025. Without further elaboration as to duration or reasoning, the Stop Work Order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." Ex. 1 at 1. HHS then rescinded the Stop Work Order without explanation on February 21, 2025. Attached hereto as **Exhibit 2** is a true and correct copy of the Stop Work Order Recission, dated February 21, 2025.

16. The chilling effect of the February Stop Work Order has had lasting effects on the Children's Program. Two staff members, including one Senior Paralegal and one IJC Attorney Fellow, have accepted employment with private immigration firms and cited as the deciding factor the job insecurity generated by doubts about the security of our HHS funding. This climate of uncertainty has also had a chilling effect on hiring qualified attorney candidates to fill existing vacancies, which in turn increases the caseloads of existing staff and has a negative effect on morale and retention.

17. On March 21, 2025, again without warning, HHS (through the Department of the Interior) announced that it was partially terminating its contract with the Acacia Center for Justice to provide Legal Services for Unaccompanied Children, effective immediately, for two of the three Contract Line Item Numbers ("CLINs") under which we are currently funded: CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services such as referrals and data tracking; and CLIN 3, which funds Immigrant Justice Corps fellows to represent unaccompanied children separately from those represented through CLIN 2. Attached hereto as **Exhibit 3** is a true and correct copy of the Notice of Partial Contract Termination, dated March 21, 2025. Only CLIN 1, covering KYR presentations and legal services for children in ORR-subcontracted facilities, was not impacted by the partial contract termination. Ex. 3 at 1.

18. Our program was notified of the Partial Termination via an email from the Acacia Center for Justice shortly after 11 AM on March 21. We called a teamwide meeting several minutes

later to share the news with staff and answer their questions. Although our staff are understandably concerned about their job security and their ability to obtain future employment due to the sweeping expanse of the cuts to funded legal representation for children, their overwhelming response was to look for solutions for how to continue to represent the clients who trust and rely on us for their legal cases.

19. The abrupt termination of CLIN 2 funding for representation and associated services represents a loss of approximately 30% of Amica Center's total annual budget and 75% of the budget for the Children's Program. Amica Center has not yet set a timeline by which decisions would need to be made regarding staff layoffs or the discontinuation of any major aspects of our work. However, all work on cases where representation was undertaken during the preceding 10 years of HHS funding through the Acacia Center for Justice is now being funded using general operating funds. The organization has taken this position due to our ongoing ethical obligations to our clients and to preserve our ability to continue providing high-quality representation to those clients by minimizing the loss of qualified staff members. Amica Center cannot continue to fund this casework using general operating funds indefinitely. We are urgently seeking funding from other sources, but the collective impact of a nationwide shutdown is so great that the gap cannot be filled by private donors. To the extent that cases initiated under HHS funding could be transferred to funding streams held by other Amica Center programs (for example, state or local funding currently being used for adult representation), this would interfere with Amica Center's mission to maximize representation for indigent immigration men, women, and children at risk for detention and deportation by directly supplanting the organization's ability to represent other affected individuals.

20. The alternative—to immediately withdraw from representation in our 850 affected cases—is antithetical to our ethical obligations as attorneys and our values as a mission-driven organization. In many of the open legal cases for our child clients, there are upcoming hearings or deadlines which mean that withdrawing from the case would not be possible. Across the Children's Program, we have six clients scheduled for hearings with local immigration courts between March 24 and March 27. Not only is it nearly logistically impossible to withdraw from an immigration matter in that time frame, since withdrawal requires leave of the immigration judge, it is also impossible to do so without prejudicing the client's legal interests. We have dozens of open matters pending with state courts for children who are eligible for SIJS. In addition to upcoming hearings, there are ongoing time-sensitive legal requirements in those cases, including service of process on opposing parties, requests for orders of default, and other procedural requirements that, if not timely completed, could lead to dismissal or significant delay. Pro bono attorneys are heavily reliant on mentorship from experienced in-house immigration attorneys and at risk of committing errors or omissions in their cases without mentorship.

21. Although KYR presentations and legal screenings remain funded for now through CLIN 1, significant, interrelated pieces of our work have been terminated, the consequences of which are immediate and severe. For example, if a child at one of the ORR-subcontracted facilities we serve is identified as having an urgent legal need such as an outstanding removal order, Amica Center—the only legal provider with access to the ORR-subcontracted facility—would not be funded to provide the necessary legal service to protect the child from imminent removal. Many children who enter ORR custody with prior removal orders are eligible to have their immigration court proceedings reopened, but doing so requires filing a motion as quickly as possible, something which children simply cannot do without the help of an experienced attorney. Similarly, without timely access to competent legal services, older children are at risk of losing access to protections based on their age. A 17-year-11-month-old child who has been severely abused by their parent(s), for example, is eligible under federal law to petition for Special Immigrant Juvenile Status until age 21. In Virginia, however, the Juvenile and Domestic Relations ("JDR") court, must make the necessary findings of fact regarding eligibility, must obtain jurisdiction before the child turns 18. Without access to legal representation who can initiate the necessary proceedings before the child's 18th birthday, that child's right and ability to seek protection through SIJS is functionally eliminated.

22. One of the children currently represented by the Children's Program is a four-year-old boy from Haiti, referred to here as "Jean." He is currently in an ORR URM program living with foster parents in Virginia. Jean entered the United States shortly after he turned three years old and was placed in ORR custody. After it was determined that there were no viable sponsors for him in the United States, Jean was released from custody to an ORR URM program served by Amica Center. Amica Center coordinated with the HHS-funded legal provider which had been working with him at his ORR placement to transfer his legal case and substitute counsel on all of his pending matters to avoid an interruption in representation. Jean has a TPS application pending, is eligible for SIJS and is in removal proceedings. SIJS findings for Jean would be made through his open foster care proceeding in Virginia, and he is scheduled for a hearing on April 2, 2025. His Amica Center attorney has been working to prepare the necessary motion and proposed order in advance to ensure that the matter can be heard at the upcoming hearing. Jean is also scheduled for a Master Calendar Hearing in early June at which it is obvious that he could neither engage with the proceeding nor provide relevant updates to the court regarding his other pending legal matters to the court other than through counsel.

23. The interruption and subsequent termination of funding for representation and nonrepresentational services to unaccompanied children has already frustrated Amica Center's mission and threatened the sustainability of our work. Providing a legal screening without the ability to refer a child for long-term representation, connect them to benefits

and services for victims of trafficking, or prepare and accompany them to court, fundamentally restricts the efficacy of that legal orientation and screening.

24. The Children's Program has invested significant resources over recent years in reducing employee turnover and building institutional expertise in the provision of the services that were abruptly terminated. Most of our managing attorneys began their legal careers at Amica Center and have worked on our team for more than 5 years. We have built strong relationships with local and national stakeholders, significant expertise in ORR policy and procedures and the provision of specialized services for unaccompanied children, and the necessary internal and administrative systems to ensure compliance with all aspects of HHS contractual requirements.

25. If the Children's Program were forced to lay off staff due to sudden and unexpected termination of funding, it would be a drain on our organizational expertise in the delivery of legal representation and other services to the unaccompanied immigrant children held in ORR custody. The collective experience of our specialized staff would be nearly impossible to recover and would hobble our ability to deliver high-quality services to unaccompanied children in ORR custody in the Capital region, even if funding were restored to similar levels in the future. The level of investment required to hire and train new staff, fellows, volunteers, or interns would divert significant director and manager time and resources from the continued provision of representation to existing clients and have a lasting impact on the morale and retention of supervisors and managers. My own time over the past month has been overwhelmingly diverted from essential case supervision and legal guidance in a rapidly changing area of immigration practice, to responding to threats to our funding and program stability.

26. The continued funding of this work is critical to ensuring that children do not experience irreparable harm to their ability to access legal protections in the United States. Children who have spent months and years building trust and rapport with an attorney or legal advocate will be faced with the prospect of navigating a complicated and increasingly hostile legal system alone or urgently seeking out either the few remaining low-cost resources for representation in this space or the resources to pay for private counsel, reliving and recounting some of their most personal and traumatic experiences with a stranger.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 25 of March 2025, in Alexandria, Virginia.

*Laura Nally*

_____

**Laura Nally**
Director, Detained Children's Program
Amica Center for Immigrant Rights
1025 Connecticut Ave. NW, Suite 701
Washington, D.C. 20036
P: (202) 916-8179
laura@amicacenter.org

# Exhibit 1

 United States Department of the Interior

INTERIOR BUSINESS CENTER
Washington, DC 20240

Acacia Center for Justice
1025 Connecticut Avenue NW
Suite 1000A
Washington, DC 20036

February 18, 2025

Re: Immediate Stop Work Order

Dear

This letter constitutes an official Stop Work Order for **all activities** under Contract 140D0422C0009 – Legal Services for Unaccompanied Children.

In accordance with FAR 42.1303, the Government hereby directs your firm to stop all work associated with the scope of Contract 140D0422C0009. Therefore, your firm shall cease all services and the ordering of supplies.

All subcontractors shall be notified immediately that a stop-work order has been issued to the prime contractor. The stop-work order shall remain in place until you are notified otherwise by the CO. As soon as feasible and prior to the lifting of the stop-work order, appropriate action shall be taken to either terminate the contract or extend the period of performance, if necessary. The stop work order is being implemented due to causes outside of your control and should not be misconstrued as an indication of poor performance by your firm.

Please do not hesitate to contact me with any questions or concerns.

Sincerely,



# Exhibit 2



**United States Department of the Interior**
INTERIOR BUSINESS CENTER
Washington, DC 20240

Acacia Center for Justice
1025 Connecticut Avenue NW
Suite 1000A
Washington, DC 20036

February 21, 2025

Re: Cancelation of Stop Work Order

Dear

This letter cancels the Stop Work Order issued February 18, 2025. Acacia Center for Justice may resume **all activities** under Contract 140D0422C0009 – Legal Services for Unaccompanied Children.

If Acacia intends to submit a Request for Equitable Adjustment under FAR 52.242-15, please submit it to the Contracting Officer no later than 30 days after the receipt of this letter.

Please do not hesitate to contact me with any questions or concerns.



# Exhibit 3



# United States Department of the Interior
INTERIOR BUSINESS CENTER
Washington, DC 20240

March 25, 2025

To: ███████████████████████████
      Acacia Center for Justice
      1025 Connecticut Avenue NW
      Suite 1000A
      Washington, DC 20036

Subject: Notice of Partial Termination for the Government's Convenience

Contract 140D0422C0009, awarded on March 29, 2022, by the United States Department of the Interior (DOI), Interior Business Center (IBC), Acquisition Services Directorate (AQD) on behalf of the Department of Health and Human Services (HHS), Administration for Children and Families (ACF), Office Refugee Resettlement (ORR) as a part of our Interagency Agreement for acquisition services, *is hereby **partially terminated** for the Government's convenience*. Contract Line Items (CLINs) 2 – Direct Representation, 3 – Recruitment, and 4 – Direct Representation Expansion are terminated for the Government's convenience.

In accordance with FAR 52.212-4 Contract Terms and Conditions – Commercial Items (Alternate I) (Nov 2021) – (l) *Termination for the Government's convenience*

"(l) Termination for the Government's convenience. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. **Subject to the terms of this contract, the Contractor shall be paid an amount for direct labor hours (as defined in the Schedule of the contract) determined by multiplying the number of direct labor hours expended before the effective date of termination by the hourly rate(s) in the contract, less any hourly rate payments already made to the Contractor plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system that have resulted from the termination**. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred that reasonably could have been avoided." Emphasis added.

*Recovery for any unpaid Firm-Fixed-Price work would be subject to the non-Alternate I version of FAR 52.212-4(l).

You are hereby notified to immediately stop work on CLINs 2, 3, and 4 and that effective close of business March 21, 2025, the Contracting Officer is terminating CLINs 2, 3, and 4 on Contract 140D022C0009 for the Government's convenience in accordance with FAR 52.212-4 (l) (Alternate I) for T&M work and paragraph (l) of the non-Alternate I version of FAR 52.212-4(l) for any Firm-Fixed-Price effort or products. CLIN 1 – Know Your Rights and Legal Screenings shall remain in full force and effect.

As defined in 44 U.S.C. § 3301, any Federal records created, received, or maintained by Acacia Center for Justice, or its subcontractors, pursuant to this ACF contract, are due back to the ORR No Later Than (NLT) 30 days from this notice. ACF owns the rights to all data and records produced as part of this order. Acacia Center for Justice. is notified that any deliverables under the contract not specifically called out in this memo, are the property of the U.S. Government and are expected to be included in the records turnover NLT 30 days from this notice.

Any deliverables under CLINs 2, 3, and 4 that are scheduled for delivery after March 21, 2025, are hereby terminated for the Government's convenience in their entirety. Timely response to this request will be reflected in the CPARS evaluation. Additionally, the Government will ensure to include a narrative to explain the termination was not due to fault of the contractor.

Should you wish to submit a termination settlement proposal, the *final* shall be submitted to the Contracting Officer as promptly as possible, but no later than ~~forty-five (45) calendar days~~ six-months from March 21, 2025.  However, if after considering the costs incurred and the costs previously paid by the Government, Acacia Center for Justice determines a no-cost settlement is in the company's best interest, please contact the undersigned Contracting Officer.

Please acknowledge receipt of this notice, as provided below.



_____
Date

*Acknowledgment of Notice*

The undersigned hereby acknowledges receipt of this notice. The Contractor must promptly return one signed pdf version of this notice to the Contracting Officer at ████████████████████.

_____
Digitally signed by ████████
Date: 2025.03.25 17:31:03 -04'00'

Acacia Center for Justice
1025 Connecticut Avenue NW
Suite 1000A
Washington, DC 20036

3/25/25
_____
Date