IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-2847<br><br>**DECLARATION OF WENDY YOUNG (KIND) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

# DECLARATION OF WENDY YOUNG, PRESIDENT OF KIDS IN NEED OF DEFENSE

I, Wendy Young, make the following statements on behalf of KIND, Inc. Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the following statements are true and correct.

1. My name is Wendy Young, and I am the President of KIND, Inc., doing business as Kids in Need of Defense ("KIND"). KIND is the leading international not-for-profit organization devoted to protecting the rights and well-being of unaccompanied and separated children. Founded in 2008, KIND now has seventeen locations across the United States that have provided legal rights education to more than 78,000 children, and legal representation in immigration matters to more than 17,000 children in the United States. KIND staff provides legal services to unaccompanied immigrant children who are in the custody of the Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS) at 20 short-term shelter care or foster care facilities, five long-term foster care programs, and three Unaccompanied Refugee Minor (URM) programs served by KIND's offices in Atlanta, GA; Boston, MA; Fresno, CA; Hartford, CT; Houston, TX; Los Angeles, CA; New York, NY; Sacramento, CA; and Seattle, WA. KIND also serves children released from ORR care and living in the communities served by those offices and by our offices and locations in Baltimore, MD; the District of Columbia; Jacksonville, FL; Newark, NJ; Northern Virginia; Orlando, FL; Providence, RI; and San Francisco, CA.

2. KIND provides representation and other services to migrant children in part through its staff, and in part through pro bono partnerships with nearly 900 law firms, corporations, law schools, and bar associations, whose lawyers provide children with pro bono representation with training and support from KIND. KIND also provides psychosocial support to children and families; works to address the root causes of child migration; and advocates for laws, policies, and practices to improve the protection of unaccompanied children within the U.S. and abroad.

3. KIND's services to unaccompanied children in the United States comprise several main components:

    (1) During children's time in ORR custody, KIND conducts educational "know your rights" ("KYR") presentations that provide unaccompanied children with information about the immigration system, their rights and responsibilities, and what to expect in immigration court. KIND also conducts legal screenings to assess each child's protection needs and evaluate options for legal relief as well as making appropriate referrals for further legal or social services during or after ORR custody. As needed, KIND may also support children in requests for release on recognizance or with notifications relating to changes of address and venue.

(2) During ORR custody, if a child is required to attend immigration court, KIND will educate the child about immigration court processes and prepare them to attend the hearing, and will accompany the child to court in the capacity of "friend of the court" or, in limited circumstances, as attorney of record.

(3) During ORR custody, KIND may provide legal representation for certain children where services as "friend of the court" are not sufficient for the child's needs – for example, for children who are required to enter pleadings in their immigration removal proceedings during their time in ORR care, or children who are placed in federal long-term foster care.

(4) Many children who live in communities served by KIND following release from ORR custody receive free legal representation through KIND's network of pro bono attorneys and/or KIND staff. The KIND mentor assigned to each pro bono attorney offers specialized training programs and guidance on substantive law and skills needed for representing children, addresses the pro bono attorney's questions, consults on case strategy, offers access to psychosocial services and other resources, and provides support at all phases of a child's immigration case. KIND staff and KIND pro bono attorneys represent children in proceedings before the immigration courts, in administrative proceedings before U.S. Citizenship and Immigration Services (USCIS), in ancillary proceedings in state courts, and occasionally before the Board of Immigration Appeals, federal district courts, or federal courts of appeal.

(5) Many children receiving legal services through KIND following release from ORR custody also receive psychosocial services through KIND, through a combination of direct services and referrals.

4. KIND's five original offices began providing legal services for released unaccompanied immigrant children through pro bono partnerships in January 2009, with two of those offices adding services for detained children later that year. Over time, KIND's programming expanded to include additional locations in the United States, plus a program dedicated to serving children separated from their parents. Beyond the United States, KIND has staff in Mexico, Central America, and several countries in Europe, with a focus on protection, family unity, and strengthening child protection systems and access to lawful immigration pathways. KIND works with organizational and private sector partners to harness additional capacity in those regions.

5. For the period January 2022 through December 2024 inclusive, KIND's subcontract with Acacia supported know-your-rights presentations and legal screenings to over 16,900 children in ORR custody, immigration legal representation for approximately 6,700 children through KIND and its pro bono attorneys, and psychosocial services for approximately 2,400 children. During the same period, through other contracts and other

resources, KIND and its pro bono partners additionally represented approximately 3,700 children, and KIND provided psychosocial services to approximately 1,100 children.

6. In or about March 2022, KIND entered into a subcontract with the Vera Institute of Justice to deliver specified legal services to children arriving in the United States as unaccompanied children, renewable annually over a five-year period. KIND's current contract with Acacia Center for Justice is a novation of that contract. The KIND-Acacia subcontract is in turn funded by a contract between Acacia and ORR. All of KIND's seventeen locations in the United States deliver legal and social services funded through its subcontract with Acacia. From 2009 through 2021, KIND served children pursuant to subcontracts with Acacia's predecessor, the Vera Institute for Justice.

7. KIND staff regularly travel to almost twenty ORR shelter care and transitional foster care facilities in person, while one shelter regularly arranges for groups of children to visit the local KIND office in person due to capacity limitations at the ORR facility. The frequency of these visits varies with need, but on average, each KIND site held about four visits per month during 2024. KIND uses these visits to provide know-your-rights presentations, conduct legal screenings, prepare clients for court hearings, or conduct individual legal consultations. KIND staff also represent children placed in federal long-term foster care and in the Unaccompanied Refugee Minors program.

8. Immigration removal proceedings are adversarial proceedings commenced by the Department of Homeland Security before immigration courts within the Department of Justice. Unaccompanied children, including very young children, are named as "respondents," and must answer charges of removability and bear the burden of proof to establish a defense to forcible removal to countries where their rights, well-being, safety, or even their lives were at risk. The free legal and psychosocial services provided by KIND, and by other ORR-funded legal services providers, are essential to protecting the basic rights of children facing this process. Unaccompanied children do not have the financial resources to hire private counsel at market rates, and in KIND's experience, few have family members of such means. Without free services, unaccompanied children -- including very young, pre-verbal, and non-walking children -- would be forced to represent themselves through complex legal processes, facing trained and experienced government counsel while striving to present evidence and legal arguments in their own defense.

9. Legal screenings by KIND staff for children in ORR custody serve to determine whether it is unsafe for a child to return to their country of origin, and to identify options for available legal relief in the United States. These assessments are necessary prerequisites to placement with pro bono attorneys who primarily practice in areas of law other than immigration, and depend on KIND for case assessments, training, practice guidance, and ongoing mentorship. KIND's pro bono partners contributed approximately 1,487,244

3

hours of legal services, valued at over $889,000,000 dollars from 2009 to 2023. Thus, pro bono representation with KIND mentorship multiplies the effectiveness of the funding ORR provides to KIND.

10. Through legal representation by KIND or its pro bono partners, children pursue one or more forms of humanitarian relief, such as protection from parental maltreatment through special immigrant juvenile status, asylum based on a fear of persecution, T- or U-visas that protect victims of trafficking or other serious crimes, or temporary protected status based on untenable conditions in the country of origin. Children's immigration cases have long timelines: in KIND's experience, while a small proportion of cases resulting in permanent status are completed within two years, the majority take five to seven years to complete, with some taking longer. The chief reason is adjudication timelines. The immigration court backlog currently stands at well over 3.6 million cases, with wait times between hearings typically stretching to months or years. Moreover, most applications for humanitarian relief are adjudicated outside immigration courts. In 2024, USCIS stated that over 1.1 million asylum applications were pending before it, and applicants for other forms of relief likewise face years-long delays, most notably, the years-long waits for the limited supply of visas affecting special immigrant juveniles waiting to apply for green cards. These delays are beyond the control of children and their advocates. In addition, the process of preparing children's applications for relief is time-consuming for several reasons. First, depending on the relief sought, evidentiary support for applications may include elements that require time and effort to obtain, such as: state juvenile court orders issued after evidentiary hearings; attestations by state or federal law enforcement officers; and/or medical, psychological, or other expert evaluations. In cases where a child's initial request for relief is not approved, further time may be required to respond to requests for evidence or notices of intent to deny, as well as for appellate processes. Second, children in general, and particularly those who have experienced traumatic events, will need time to develop trust in unfamiliar adults and in the legal process itself, as the American Bar Association has recognized in cautioning against pressuring children to discuss distressing experiences before they are ready to do so. Third and more generally, preparation of a child's case takes time due to the capacity limitations inherent in children's ongoing cognitive and emotional development. As a principal drafter of the 2008 TVPRA explained, a child "usually knows nothing about U.S. courts or immigration policies and frequently does not speak English . . . . The majority of these children have been forced to struggle through an immigration system designed for adults." (Cong. Rec. S10886 (Dec. 10, 2008) (Sen. Feinstein)). State codes of professional responsibility typically require attorneys representing children with diminished capacity to maintain a normal attorney-client relationship to the greatest extent possible, and under American Bar Association standards, children must be afforded the right to meaningfully participate in decision-making in their cases. Accordingly, best practices for representing unaccompanied children contemplate applying trauma-informed and child-sensitive practices and

affording sufficient time to support the child client's understanding of the proceedings and deliberation on matters affecting the child's well-being. Fourth, children are not self-sufficient, so their participation in preparing a legal case depends on facilitation by individual or institutional caregivers who may present time constraints that are beyond a child's control – for example, something as simple as a caregiver being unable to obtain leave from work to transport a child to a session with an attorney or expert. In sum, representing children in immigration matters requires a sustained multi-year time commitment in order to meet stringent evidentiary burdens, present effective advocacy, and support children in navigating complex and high-stakes processes.

11. Officials with government agencies have repeatedly recognized how KIND's work contributes to their efficient and effective operations in handling children's cases. Among other contributions, at the request of agency officials, KIND staff have conducted numerous training programs on topics relating to children's immigration matters for staff of the immigration courts, USCIS, and the ICE Office of the Principal Legal Advisor (OPLA), which represents the government in removal proceedings. As one example among many, after KIND staff presented to USCIS asylum office staff on child-friendly interviewing techniques, senior officials of the office sent handwritten notes thanking KIND staff for the program. The office director stated, "I know our officers will greatly benefit from it!" and one training officer added, "We hope we can make it an annual event."

12. Another example is a well-received initiative by KIND's Boston office to accelerate the successful completion of numerous pending cases of KIND clients awaiting adjudication of their applications for lawful permanent residency (LPR) status, also known as a green card. LPR applicants have already cleared high legal standards and progressed through years-long waiting lists, only to wait again for scheduling of a merits hearing date in immigration court. To alleviate that bottleneck, during 2021, KIND staff identified dozens of clients who were immediately eligible to adjust status, lacking only a date on the court's calendar for an adjustment hearing. Normally, just a handful of cases would be scheduled for an adjustment hearing on a given date, but through KIND's coordination with OPLA attorneys and immigration court staff, 50 adjustment-ready cases were calendared on two selected dates in May and November 2021. By organizing required information to share with OPLA in advance, KIND helped to ensure a smooth and efficient hearing for each case. The court approved 21 cases on the May 2021 date, 25 children on the November 2021 date, and the remainder on follow-up dates. Both the immigration court and OPLA praised KIND for efficiencies that resulted in removing cases in bulk from the court's crowded docket as the KIND clients received permanent status.

13. On the afternoon of February 18, 2025, Acacia emailed KIND a redacted copy of a nationwide order that HHS (through the U.S. Department of the Interior) issued to stop work under the Legal Services for Unaccompanied Children contract, effective

immediately. The stop-work order applied to all lines of work performed under the contract, including KIND's work on KYR presentations and legal screenings for children in ORR facilities, and legal representation for unaccompanied children in and outside ORR custody. Without further elaboration, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance."

14. Based on the directives in the stop-work order, KIND instructed staff to immediately suspend visits to facilities served under the contract, stop accepting new referrals, cancel intake meetings with prospective clients, and not sign retainer agreements to take on new clients. KIND also instructed staff to continue critical ongoing work necessary to fulfill professional responsibilities to clients, including meeting filing deadlines and attending scheduled hearings and administrative interviews with clients. On the afternoon of February 21, 2025, KIND learned from Acacia that HHS had rescinded the stop-work order, without explanation.

15. On March 21, 2025, Acacia informed KIND via email that Acacia had received a notice partially terminating Contract 140D0422C0009, under which KIND is a subcontractor, for the government's convenience. Acacia stated that the contract was terminated effective that same date for three of the four Contract Line Numbers (CLINs), and directed that work stop immediately under CLIN2, Legal representation for unaccompanied children not in ORR custody; CLIN3, which funds Immigrant Justice Corps fellows to represent unaccompanied children separately from those represented through CLIN 2; and CLIN4, Spanish language tutoring for organizational staff who work with children. KIND understands that only CLIN1, which funds KYR presentations and confidential legal consultations for unrepresented children in ORR facilities, remains in place, and is awaiting guidance from Acacia regarding whether there will be revisions to the relevant task orders, such as modifications to KYR services and any attendant budget or staffing changes.

16. Partial termination of the Acacia contract deprives KIND of the funding KIND relies on to employ approximately 350 professionals actively engaged in delivering or supporting the legal representation of some 6,700 clients. KIND cannot retain employees once contractual funding sources are unavailable, and we anticipate significant layoffs, starting within days of the contract termination. This interruption of employment disrupts the productivity, career development, and morale of scores of qualified and experienced workers who are skilled and experienced in serving unaccompanied children, and who cannot easily find replacement opportunities due to the broad geographic scope of the partial contract termination. More importantly, the partial contract termination makes the qualifications and experience of these employees unavailable to children in need of specialized services. Most funding KIND has received through other sources is dedicated to employing staff who provide specified services to additional clients through other

programs, and thus such employees and funding cannot compensate for the needs created by the partial contract termination.

17. Partial termination of the Acacia contract will disrupt thousands of attorney-client relationships on which children have relied, for multiple years in some cases, and leaves children without support for the completion of their pending cases. The sudden disruption of an established attorney-client relationship would be a blow for children who have invested time to develop a relationship of trust, particularly in the wake of traumatic experiences that led them to migrate in search of safety. This is particularly so because child clients benefit from a trauma-informed and child-centered practice as is cultivated at KIND. Many children served through KIND face impending deadlines or events in their cases. As of the date of this declaration, approximately 200 clients represented by KIND staff or by pro bono attorneys receiving KIND's mentorship are scheduled for master or individual hearings in immigration courts in the next 60 days. This includes clients with immigration court hearings docketed for March 25, March 27, and April 8. A similar number of other required actions are scheduled in KIND's cases in the next 60 days, including hearings in state court proceedings, deadlines to respond to requests for evidence in connection with immigration applications, and other filing deadlines and events.

18. KIND relied on contractual funding to commence representation in thousands of matters that, as discussed above, require years to complete. ORR's partial termination of the contract will not automatically suspend pending removal proceedings nor resolve pending applications for relief. Nor will the partial contract termination automatically suspend deadlines in children's cases, such as requirements to file an application or motion within a specified time period or before a client reaches a specified age. KIND retains professional obligations toward these thousands of vulnerable clients. By issuing the partial termination order with immediate effect, ORR has not even provided a timeline for communicating the changed circumstances to KIND's thousands of clients; nor for attending to time-sensitive client needs or impending deadlines; nor for any accommodation of a lawyer's ethical obligations to a client under such circumstances, be they fulfilled through continued representation with alternative financial support, substitution of counsel, or withdrawal from representation.

19. The partial termination of the Acacia contract impedes KIND's mission of ensuring that no child appears in immigration court without high-quality legal representation. For all of the reasons discussed here, KIND believes that the partial termination of the Acacia contract will upset children's serious reliance interests in ongoing attorney-client relationships, diminish fairness, implicate due process considerations, impede the efficiency and effectiveness of court and agency processes due to increased numbers of unrepresented children, and thereby risk severe harm to children who have relied on their attorneys to see their claims for protection and relief through to conclusion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 25th of March 2025, in Falls Church, Virginia

        */s/ Wendy Young*

Wendy Young
President
Kids in Need of Defense
PO Box 27839
Washington, DC 20038