YAAKOV M. ROTH
Acting Assistant Attorney General
WILLIAM C. SILVIS (DCBN 485572)
Assistant Director
MICHAEL A. CELONE (MDBN 1312170145)
CHRISTINA PARASCANDOLA (DCBN 468479)
KATELYN MASETTA ALVAREZ (OHBN 97857)
JONATHAN K. ROSS (NCBN 50203)
Senior Litigation Counsels
ZACHARY A. CARDIN (MDBN 1812110052)
Trial Attorney

    U.S. Department of Justice, Civil Division
    Office of Immigration Litigation
    General Litigation and Appeals Section
    P.O. Box 878, Ben Franklin Station
    Washington, DC 20044
    (202) 305-2040
    Michael.A.Celone@usdoj.gov

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *ET AL.*, <br><br>       Plaintiffs, <br><br>   v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *ET AL.*, <br><br>       Defendants. | Case No. 3:25-cv-02847-AMO <br><br> **DEFENDANTS' OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** <br><br> Date:  April 1, 2025 <br> Time: 10:00 a.m. <br> Location:  Courtroom 10 <br><br> Hon. Araceli Martínez-Olguín <br> United States District Judge |

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ..............................................................................................................1

II.    BACKGROUND ...............................................................................................................2

A.     Legal Framework ..............................................................................................................2

    1.     The Homeland Security Act ("HSA") ...................................................................2

    2.     The Trafficking Victims Protection Reauthorization Act ("TVPRA") ................3

    3.     The Foundational Rule..........................................................................................3

    4.     Appropriations Acts and Congressional Intent ....................................................4

    5.     The Current Contract and Termination Decision..................................................5

III.   STANDARDS OF REVIEW .............................................................................................6

IV.    ARGUMENT .....................................................................................................................6

A.     Plaintiffs cannot demonstrate that they are likely to succeed on the merits. ...................6

    1.     Plaintiffs lack standing because they are not within the zone of interests that
       8 U.S.C. § 1232 is intended to protect. ...............................................................6

    2.     The APA does not waive sovereign immunity for the monetary relief
       Plaintiffs seek...........................................................................................................8

    3.     This Court lacks jurisdiction over Plaintiffs' claims because the rights they
       seek to enforce must be brought in the Federal Court of Claims...........................11

    4.     Plaintiffs cannot show that a favorable decision in this case would likely
       redress their alleged injuries. ..............................................................................13

    5.     The Termination Contract Termination at Issue Does Not Violate the APA ...................14

    6.     The Foundational Rule Does Not Require Funding for Taxpayer-funded
       Direct Immigration Legal Representation Consistent with Available
       Appropriations. ....................................................................................................15

B.     Plaintiffs Will Not Face Irreparable Harm Without a TRO.............................................17

C.     The Balance of the Equities and Public Interest Weigh Against Entry of a Temporary
    Restraining Order. ..........................................................................................................19

D.     If the Court issues a TRO, it should require Plaintiffs to Post Security. .......................21

V.     CONCLUSION................................................................................................................21

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

*Al Otro Lado, Inc. v. Mayorkas*,
   2024 WL 4370577 (S.D. Cal. Sept. 30, 2024) ................................................................. 15

*Arcamuzi v. Continental Air Lines*, Inc.,
   819 F.2d 935 (9th Cir. 1987) ........................................................................................... 18

*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ......................................................................................... 18

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) ........................................................................................... 19

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*,
   501 U.S. 1301 (1991) ....................................................................................................... 19

*BFP v. Resolution Trust Corp.*,
   511 U.S. 531 (1994) ............................................................................................................. 8

*Caribbean Marine Servs. Co. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988) ...................................................................................... 17, 18

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ......................................................................................................... 19

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
   601 U.S. 416 (2024) ......................................................................................................... 14

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) ......................................................................................... 19

*Earth Island Inst. v. Carlton*,
   626 F.3d 462 (9th Cir. 2010) ............................................................................................. 6

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) ....................................................................................... 6, 17

*Goldie's Bookstore, Inc. v. Superior Court*,
   739 F.2d 466 (9th Cir. 1984) ........................................................................................... 18

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002) ............................................................................................................. 9

*I.N.S. v. Legalization Assistance Project of Los Angeles Cnty. Fed'n of Lab.*,
   510 U.S. 1301 (1993) ..................................................................................................... 6, 7

*Int'l Union, UAW v. Donovan*,
   746 F.2d 855 (D.C. Cir. 1984) ................................................................................. 15

*Koller v. Brown*,
   224 F. Supp. 3d 871 (N.D. Cal. 2016) ..................................................................... 17

*Lane v. Pena*,
   518 U.S. 187 (1996) .................................................................................................. 9

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ................................................................................................ 11

*Lopez v. Brewer*,
   680 F.3d 1068 (9th Cir. 2012) ................................................................................. 6

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
   634 F.2d 1197 (9th Cir. 1980) ............................................................................... 18

*Lucas R. v. Becerra*, No.,
   CV 18-5741, 2022 WL 2177454 (C.D. Cal. Mar. 11, 2022) ................................... 5

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ......................................................................................... 13, 14

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ............................................................................................. 6, 7

*Maryland v. King*,
   567 U.S. 1301 (2012) ............................................................................................ 20

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ................................................................................................ 7

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ............................................................................... 12

*Nken v. Holder*,
   556 U.S. 418 (2009) .............................................................................................. 19

*North Side Lumber v. Block*,
   753 F.2d 1482 (9th Cir. 1985) ............................................................................... 12

*Novak v. United States*,
   795 F.3d 1012 (9th Cir. 2015) ............................................................................... 13

*Pit River Tribe v. BLM*,
   793 F.3d 1147 (9th Cir. 2015) ................................................................................. 7

*Renee v. Duncan,*
   686 F.3d 1002 (9th Cir. 2012) ......................................................................... 13

*Salazar v. Ramah Navajo Chapter,*
   567 U.S. 182 (2012)......................................................................................... 15

*Sampson v. Murray,*
   415 U.S. 61 (1974) .......................................................................................... 18

*Sharp v. Weinberger,*
   798 F.2d 1521 (D.C. Cir. 1986) ...................................................................... 12

*Star Alaska v. United States,*
   14 F.3d 36 (9th Cir. 1994) ................................................................................ 9

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
   240 F.3d 832 (9th Cir. 2001) ............................................................................ 6

*the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) .......................................................................... 6

*United Aeronautical Corp. v. United States Air Force,*
   80 F.4th 1017 (9th Cir. 2023) .................................................................... 12, 13

*United States Conf. of Cath. Bishops v. U.S. Dep't of State,*
   No. 1:25-CV-00465, 2025 WL 763738 (D.D.C. Mar. 11, 2025) .................... 12

*United States ex rel. Accardi v. Shaughnessy,*
   347 U.S. 260 (1954)........................................................................................ 15

*United States v. Mitchell,*
   463 U.S. 206 (1983)......................................................................................... 9

*United States v. White Mountain Apache Tribe,*
   537 U.S. 465 (2003)......................................................................................... 9

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)....................................................................................... 6, 17

## STATUTES

**Immigration and Nationality Act of 1952, as amended:**

5 U.S.C. § 701............................................................................................................ 2

5 U.S.C. § 701(a)(2) ................................................................................................. 10

5 U.S.C. § 702............................................................................................................ 9

6 U.S.C. § 279............................................................................................................ 2

6 U.S.C. § 279(a) .................................................................................................. 2

6 U.S.C. § 279(b)(1) ........................................................................................ 3, 10

6 U.S.C. § 279(b)(1)(A) ................................................................................... 2, 3

6 U.S.C. § 279(b)(1)(I) ...................................................................................... 15

6 U.S.C. § 279(g)(2) ......................................................................................... 2, 3

8 U.S.C. § 1232(i) .............................................................................................. 10

8 U.S.C. § 1232 ......................................................................................... 1, 6, 19

8 U.S.C. § 1232(b)(1) ........................................................................................... 3

8 U.S.C. § 1232(c)(1) ........................................................................................... 7

8 U.S.C. § 1232(c)(2) ........................................................................................... 7

8 U.S.C. § 1232(c)(3) ........................................................................................... 7

8 U.S.C. § 1232(c)(4) ........................................................................................... 7

8 U.S.C. § 1232(c)(5) ............................................................................. 3, *passim*

8 U.S.C. § 1232(c)(6) ........................................................................................... 7

8 U.S.C. § 1362 ....................................................................................... 3, 7, 10, 16

28 U.S.C. § 1491(a)(1) ....................................................................................... 11

31 U.S.C. § 6305 .................................................................................................. 3

**The Homeland Security Act:**

Pub. L. No. 107-296 .............................................................................................. 2

**William Wilberforce Trafficking Victims Protection Act of 2008 ("TVPRA"):**

Pub. L. No. 110-457 .............................................................................................. 1

**Further Consolidated Appropriations Act:**

Pub. L. No. 118-47 ............................................................................................ 4, 10

**Full-Year Continuing Appropriations and Extensions Act, 2025:**

Pub. L. No. 119-4 ............................................................................................. 4, 10

**FEDERAL RULES OF APPELLATE PROCEDURE**

Fed. R. Civ. P. 65(c) .................................................................................................... 21

**REGULATIONS**

45 C.F.R. Part 410 .......................................................................................................... 3

45 C.F.R. § 410 .............................................................................................................. 19

45 C.F.R. § 410.1309(a)(2)(i)-(v) .................................................................................. 4

45 C.F.R. § 410.1309(a)(4) ................................................................................ 1, *passim*

**OTHER AUTHORITIES**

H.R. Rep. No. 1656, 94th Cong., 2d Sess. 13 ................................................................ 12

Standing Order, section 6 and L.R. 11-6.1 .................................................................... 24

*Unaccompanied Children Program Foundational Rule*,
   89 Fed. Reg. 34384, 34,529 (Apr. 30, 2024) ........................................................... 15

89 Fed. Reg. at 34,529 ........................................................................................... 16, 17

I.    **<u>INTRODUCTION</u>**

The Court should deny Plaintiffs' extraordinary request for a temporary restraining order and preliminary injunction, ECF No. 7 ("motion"). Plaintiffs' motion is legally unfounded, factually overstated, and disregards both the statutory and regulatory discretion Congress expressly conferred upon the federal government. The relief they seek would not preserve the status quo, but instead disrupt the government's longstanding management of legal services for unaccompanied alien children ("UAC")—services that remain subject to available appropriations and the agency's judgment.

Plaintiffs are legal service providers seeking to compel the United States Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR"), to indefinitely fund direct legal representation for UAC through specific contracting arrangements. But the governing statute—the William Wilberforce Trafficking Victims Protection Act of 2008 ("TVPRA"), Pub. L. No. 110-457 (codified in principal part at 8 U.S.C. § 1232)—expressly conditions any such representation on practicability and the availability of pro bono counsel. It does not create an enforceable right to government-funded representation, let alone compel the agency to maintain any particular scope of services or contractual relationship. Similarly, the regulatory language Plaintiffs cite, the Foundational Rule, codified at 45 C.F.R. § 410.1309(a)(4), confirms that ORR's obligation to fund direct representation is contingent on both available appropriations and ORR's discretionary determinations. Congress never mandated indefinite funding for these services, and nothing in the TVPRA or ORR's Foundational Rule suggests otherwise.

As a threshold matter, Plaintiffs seek to convert a discretionary, resource-dependent program into a judicially enforceable entitlement. That effort fails as a matter of law. Plaintiffs lack organizational standing, cannot show that the termination decision constitutes final agency action reviewable under the APA and can identify no statutory or regulatory provision that imposes a binding duty on the government to maintain uninterrupted direct representation contracts. At most, Plaintiffs disagree with the government's policy judgment to conserve resources and reallocate funding within the broad framework of the TVPRA—a judgment that courts have repeatedly held is committed to agency discretion.

Regardless, this Court lacks jurisdiction over what is, at bottom, a dispute over the partial termination of a federal contract. Under the Tucker Act and the Contract Disputes Act, challenges to

government contract terminations must be brought in the U.S. Court of Federal Claims. Plaintiffs' attempt to recast a contract termination as a violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*., cannot circumvent that exclusive remedial scheme. Moreover, decisions regarding whether and how to terminate government contracts—particularly for the government's convenience—are classic examples of actions committed to agency discretion and are not subject to judicial review under the APA.

Nor can Plaintiffs establish any of the equitable factors required for injunctive relief. Their claims of irreparable harm rest on speculative predictions about staffing decisions and funding shortfalls that are neither immediate nor irreversible. Nothing in the record suggests that Plaintiffs are barred from continuing their work, pursuing other funding sources, or seeking relief through the dispute resolution provisions of the contract, setting aside the fact that none of the plaintiffs are actually a party to that agreement. A TRO's extraordinary relief is not an appropriate mechanism for restructuring federal contract policy to align with a particular group of stakeholders' policy preferences, particularly where the asserted harms are financial and the underlying legal theory is without merit. The Court should therefore deny Plaintiffs' motion.

## II.    BACKGROUND

### A.    Legal Framework

The statutory and regulatory framework governing legal representation for UAC in federal care and custody reflects a coordinated scheme established by Congress to balance the protection of vulnerable children with the Executive's discretion over immigration and programmatic resource allocation. This framework primarily originates in two statutes: the Homeland Security Act of 2002 ("HSA") and the TVPRA.

### 1.    The Homeland Security Act ("HSA")

In 2002, Congress enacted the HSA, Pub. L. No. 107-296, 116 Stat. 2135 (codified in relevant part at 6 U.S.C. § 279), abolishing the Immigration and Naturalization Service ("INS") and transferring the responsibility for the care and placement of UAC from INS to ORR. 6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2).

The HSA defines a UAC as "a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom— (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide

care and physical custody." 6 U.S.C. § 279(g)(2). Further, it assigns ORR broad authority over the care and custody of UAC while they are in federal custody due to their immigration status, including coordinating their care and placement, ensuring their best interests in custodial decisions, and developing plans to "ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such child." 6 U.S.C. § 279(b)(1)(A). These responsibilities are carried out through cooperative agreements and contracts with care providers under ORR policies and oversight. *See* 6 U.S.C. § 279(b)(1); 31 U.S.C. § 6305.

### 2. The Trafficking Victims Protection Reauthorization Act ("TVPRA")

Congress enacted the TVPRA in 2008 to strengthen protections for UAC and support their safe repatriation or appropriate placement. The statute, consistent with the HSA, makes the Secretary of HHS responsible for the care and custody of UAC. 8 U.S.C. § 1232(b)(1). The TVPRA explicitly directs HHS to prioritize the utilization of pro bono counsel and does not mandate direct government-funded legal representation: Section 235 of the TVPRA encourages HHS to ensure UAC have counsel "to the greatest extent practicable" and "make every effort to utilize the services of pro bono counsel who agree to provide representation without charge." 8 U.S.C. § 1232(c)(5).

Further, Section 235 encourages HHS to ensure that counsel is available to represent UAC in "legal proceedings or matters," expressly linking representation duties with protecting children from "mistreatment, exploitation, and trafficking." Additionally, it cross-references Section 292 of the Immigration and Nationality Act ("INA"), which specifies representation "at no expense to the Government." 8 U.S.C. § 1362. Therefore, it is clear that HHS is not required to fund access to legal counsel for UAC. The TVPRA's language and structure demonstrate Congress's intent to establish public-private partnerships and encourage pro bono counsel as the primary source of legal assistance for UC, and conferring on ORR exclusive discretion to determine when direct government-funded representation might be utilized (e.g., where pro bono resources are impractical or unavailable).

### 3. The Foundational Rule

In April 2024, ORR promulgated the Unaccompanied Children Program Foundational Rule, codified at 45 C.F.R. Part 410, to establish comprehensive regulations governing its UAC program. The

Rule, which became effective July 1, 2024, formalized previously informal procedures and explicitly articulated ORR's discretion regarding legal representation funding. Specifically, the Rule provides that ORR "shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children" only "to the extent ORR determines that appropriations are available," and only if securing pro bono counsel is impractical. 45 C.F.R. § 410.1309(a)(4).

In contrast, other subsections impose mandatory obligations. For instance, the Rule explicitly requires ORR to ensure UAC receive mandatory services such as a "presentation concerning the rights and responsibilities of undocumented children," "information regarding the availability of free legal assistance," and a "confidential legal consultation." 45 C.F.R. § 410.1309(a)(2)(i)-(v). This intentional distinction clarifies that direct funding for legal representation remains discretionary, conditional upon the availability of appropriations, and subject to agency determination. The Rule also reinforces congressional policy choices articulated in the TVPRA, highlighting the preferred reliance on pro bono counsel and emphasizing that direct representation services funded by ORR are not guaranteed and remain subject to the agency's discretionary resource management.

### 4.    Appropriations Acts and Congressional Intent

Congress periodically appropriates funds to support ORR's UAC program, including legal services. Appropriations language, however, consistently remains broad and nonspecific regarding precise funding allocations. Ex. A, Declaration of Toby Biswas ("Biswas Decl."), ¶ 16. For example, the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, provides general appropriations to execute activities under Section 235 of the TVPRA without earmarking explicit amounts for direct legal representation. This general appropriation approach allows ORR flexibility in determining the allocation of resources based on agency priorities, the availability of pro bono counsel, and shifting immigration policy needs. Biswas Decl., ¶ 16.

Subsequent acts, including the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, similarly maintain funding levels and provide broad discretion without altering statutory obligations or imposing specific mandates for funding legal representation. *Id.* This ongoing legislative practice underscores Congress's intent to maintain flexibility for ORR, allowing the agency to prioritize resources efficiently and adaptively. *Id.* Such discretionary funding practices reflect a

longstanding Congressional policy to balance support for legal services with practical constraints, prioritizing public-private partnerships and pro bono resources where feasible, rather than imposing fixed or rigid funding mandates. *Id.*

Indeed, at least one other court has considered this issue and determined that Congress did not specify what types of legal services ORR must fund with the appropriations intended for carrying out Section 235 of the TVPRA. *Lucas R. v. Becerra*, No. CV 18-5741, 2022 WL 2177454, at *31 (C.D. Cal. Mar. 11, 2022). Rather, ORR is "entitled to prioritize what type of legal representation ORR supports with appropriated funds, in furtherance of the TVPRA." *Id.* The same analysis applies here: without a mandate from Congress in the most recent appropriations legislation, ORR has discretion to prioritize what types of services it funds to further the purpose of the TVPRA.

### 5.    The Current Contract and Termination Decision

The present dispute arises from ORR's partial termination and descoping of a federal contract administered by the Department of the Interior ("DOI"), which serves as the contracting agent through its Interior Business Center.  *Id.* ¶ 13. ORR directed DOI to partially terminate a contract previously funding direct legal representation services.  *Id.* ¶¶ 12–13. This termination was executed through a formal decision memorandum signed by the Acting Assistant Secretary of the Administration for Children and Families ("ACF"). *Id.* ¶¶ 13–14.

ORR's decision reflects a deliberate exercise of statutory discretion to prioritize available appropriations and pro bono legal services.  While general direct representation contract funding was terminated, ORR maintains other legally required activities, including "know your rights" presentations and confidential legal screening consultations.  *Id.* ¶ 5, 11.

This contract termination aligns with ORR's statutory and regulatory discretion under the TVPRA, the Foundational Rule, and relevant appropriations acts, none of which mandate continuous, direct legal representation funding when viable alternatives, such as pro bono representation, exist.  *Id.* ¶ 14. Additionally, the termination decision reflects ORR's commitment to fiscal responsibility, ensuring that limited resources are allocated effectively, prudently managing public funds, and preserving governmental flexibility to respond to evolving priorities and urgent programmatic needs.  *Id.* ¶ 11, 16.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.    STANDARDS OF REVIEW

Preliminary injunctive relief "is an extraordinary and drastic remedy," *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (internal quotation marks and citation omitted), that is "never awarded as of right," *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (internal quotation marks and citation omitted); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that the standard for issuing a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction).  Thus, this relief "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Lopez*, 680 F.3d at 1072 (internal quotation marks and citation omitted; emphasis in original).  This is a "difficult task."  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).  To prove their entitlement to such relief, Plaintiffs must establish that:  (1) they are likely to succeed on the merits, (2) are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Under the Ninth Circuit's sliding scale test for preliminary injunctive relief, "serious questions going to the merits" and "a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

### IV.    ARGUMENT

**A.    Plaintiffs cannot demonstrate that they are likely to succeed on the merits.**

**1.    Plaintiffs lack standing because they are not within the zone of interests that 8 U.S.C. § 1232 is intended to protect.**

Plaintiffs lack standing because the statutory provision that, according to Plaintiffs, ensures that UAC have access to legal counsel, 8 U.S.C. § 1232(c)(5), was not intended to protect Plaintiffs. When an organization challenges an agency action under the APA, the organization must show that it is within the "zone of interests" that the statute was meant to protect. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *I.N.S. v. Legalization Assistance Project of Los Angeles Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1305 (1993). To fall within the "zone of interests" of a statutory provision, "the plaintiff must establish that the *injury* he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of

interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 883 (1990); *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). When a plaintiff brings an APA claim against a federal agency, courts look to "the statute that [the plaintiff] says was violated," rather than the APA itself to determine whether the party's injury is within the zone of interests. *Match-E-Be-Nash-She-Wish*, 567 U.S. at 224 (quotation marks omitted). While an "explicit mention" of Congress's intent is not required, something in the "particular provision of law upon which the plaintiff relies" must indicate that Congress intended to protect the organization. *Pit River Tribe v. BLM*, 793 F.3d 1147, 1157 (9th Cir. 2015) (citation omitted). That an agency rule or policy may affect the way an organization allocates its resources does not give standing to an entity which is not within the zone of interests the statute meant to protect. *Legalization Assistance Project*, 510 U.S. at 1305.

Nothing in the text of 8 U.S.C. § 1232(c)(5), nor in the legislative history, indicates that Congress enacted the legal-services provision to address the financial interests of organizations such as Plaintiffs in this case. Rather, the plain text focuses on the interests of the UAC: it requires HHS, to the greatest extent practicable and "consistent with 8 U.S.C. § 1362," to ensure that certain UAC "have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." *Id.* § 1232(c)(5). This provision protects UAC from mistreatment, not to line Plaintiffs' pocketbooks with taxpayer funding. Indeed, when reviewing the statute as a whole, the only intended beneficiary of subsection (c), entitled "Providing safe and secure placements for children," are UAC.[1]

Moreover, Congress's caveat that such legal services must be "consistent with 8 U.S.C. 1362" demonstrates that Congress did not intend for the government to front the bill for legal services or to pay organizations, such as Plaintiffs. 8 U.S.C. § 1362 provides that aliens have the right to representation in immigration proceedings, as long as the representation is "at no expense to the Government." Congress's

---

[1] Each sub-subsection provides safeguards for ensuring the safety of UAC who are in HHS's custody. *See id.* § 1232(c)(1) (requiring agencies to implement policies to protect UAC from trafficking, victimization, and exploitation); *id.* § 1232(c)(2) (requiring UAC to be placed in the least restrictive setting that is in their best interest); *id.* § 1232(c)(3) (requiring that UAC be placed with custodians who will provide for their well-being); *id.* § 1232(c)(4) (ensuring that custodians receive legal orientation explaining the custodian's responsibility to ensure that the UAC appear at immigration proceedings and are protected from harm); *id.* § 1232(c)(5) (*see supra*); *id.* § 1232(c)(6) (authorizing HHS to appoint child advocates for UAC who are particularly vulnerable).

reference to this statutory provision allows no room for doubt: Congress directed HHS to refrain from using taxpayer funding to pay for UAC legal services in immigration proceedings. Further, the second part of § 1232(c)(5) confirms that Congress did not intend to financially benefit legal-services organizations. Congress required that HHS "shall make every effort to utilize the services of *pro bono* counsel" who will represent UAC "without charge." *Id.* § 1232(c)(5). Congress intended that HHS would not spend money on legal services for UAC and, instead, would seek counsel who would represent UAC without using taxpayer funding. *Id.*

Further, Congress's provision for funding child advocates in subsection (c) implies that Congress's silence—or, indeed, prohibition—regarding funding for legal services confirms that Congress never intended for legal-service providers to receive taxpayer funding. "[I]t is generally presumed that Congress acts intentionally and purposefully when it includes particular language in one section of a statute but omits it in another." *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) (internal quotation marks omitted). Congress explicitly provides federal funding for child advocates, and thereby intends to benefit child advocates, in subsection (c)(6). By comparison, in subsection (c)(5), Congress discourages federal funding for legal-service providers, mandating that HHS secure "pro bono" counsel and prohibiting federal funding for counsel in immigration proceedings. The juxtaposition of these two subsections leaves no doubt as to Congress's intent: federal funding should not be used to fund legal-service organizations like Plaintiffs.

That Plaintiffs have lost funding and need to reallocate resources does not place them within the zone of interests that Congress meant to protect. Accordingly, Plaintiffs likely cannot show that they have standing to challenge HHS's funding decisions under the APA.

### 2. The APA does not waive sovereign immunity for the monetary relief Plaintiffs seek.

Plaintiffs are also unlikely to succeed on the merits of their claim because they seek monetary relief, and the APA does not waive sovereign immunity over such claims. Although styled as a request for declaratory and injunctive relief, the relief that they seek is simple: they want to compel the United States to continue making payments—relief precluded under the APA.

1    "It is axiomatic that the United States may not be sued without its consent and that the existence

2    of consent is a prerequisite for jurisdiction." *United States v. Mitchell,* 463 U.S. 206, 212 (1983).

3    Accordingly, before a court may exercise jurisdiction over any suit against the United States, the plaintiff

4    must unequivocally show that the United States has waived sovereign immunity, and that their claims fall

5    squarely within the terms of that waiver. *United States v. White Mountain Apache Tribe,* 537 U.S. 465,

6    472 (2003) (citations omitted); *see also Lane v. Pena,* 518 U.S. 187, 192 (1996) (stating that the waiver

7    of sovereign immunity cannot be implied, but "must be unequivocally expressed in statutory text.").

8    Relevant here, the APA only waives sovereign immunity over actions seeking relief "other than

9    monetary damages." 5 U.S.C. § 702. The APA "does not waive sovereign immunity for contract claims

10   seeking equitable relief." *N. Star Alaska v. United States*, 14 F.3d 36, 38 (9th Cir. 1994) (cleaned up). As

11   a result, a court must carefully discern whether a request dressed up as a claim for injunctive or declaratory

12   relief is actually seeking monetary relief, as "any claim for legal relief can, with lawyerly inventiveness,

13   be phrased in terms of an injunction." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 211

14   n.1 (2002).

15   The APA does not provide a waiver of sovereign immunity here because the relief Plaintiffs seek

16   is payment. Specifically, Plaintiffs ask this Court to: (1) declare that "Defendants are required to *continue*

17   *funding* legal representation to unaccompanied alien children, consistent with the TVPRA and ORR's

18   Foundational Rule; (2) enjoin Defendants nationwide from *ceasing to fund counsel* to represent

19   unaccompanied alien children in violation of the TVPRA and the Foundational Rule; (3) to declare that

20   Defendants' actions violate the APA; and (4) to set aside Defendants' actions. ECF No. 1 at 39 (emphases

21   added).[2]  Regardless of how Plaintiffs label their request for relief, the result of granting any of their

22   requests is the same: HHS must continue paying Acacia, and consequently, continue paying Plaintiffs.

23   The APA does not waive sovereign immunity for such a claim, and thus, this Court lacks jurisdiction to

24   order Defendants to provide Plaintiffs with the monetary relief they seek. *N. Star Alaska*, 14 F.3d at 38.

25

26

27   ───────────────

     [2] Page number references, when to filings on the Court's docket in this case, are to the page number in

28   the header supplied by the Court's ECF system.

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
3:25-CV-02847- AMO                          9

1    The APA also does not provide a waiver of sovereign immunity here because HHS's funding

2  decision under the TVPRA and the Foundational Rule are discretionary. The APA does not permit judicial

3  review of "agency action" that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The

4  TVPRA provides HHS broad discretion in determining how to provide legal services to UAC. While

5  Section 235 mandates that HHS ensure that counsel is available to represent UAC "to the greatest extent

6  practicable" in "legal proceedings or matters," it also cross-references the provision of the INA—8 U.S.C.

7  § 1362—which specifies that "the privilege" of being represented in removal proceedings is "at no

8  expense to the Government." The TVPRA also directs HHS to "make every effort to utilize the services

9  of pro bono counsel who agree to provide representation without charge." 8 U.S.C. § 1232(c)(5). Likewise,

10  the Foundational Rule explicitly articulates ORR's discretion regarding legal representation funding. It

11  provides that ORR "shall fund legal service providers to provide direct immigration legal representation

12  for certain unaccompanied children" only "to the extent ORR determines that appropriations are

13  available," and only if securing pro bono counsel is impractical. 45 C.F.R. § 410.1309(a)(4). The decision

14  to fund direct legal services is "subject to ORR's discretion and available appropriations." *Id.*

15    Moreover, Congress's funding of ORR's UAC program, including legal services, demonstrates

16  that HHS has been allowed discretion in how it allocates resources. For example, the Further Consolidated

17  Appropriations Act, 2024, Pub. L. No. 118-47, provides general appropriations to execute activities under

18  Section 235 of the TVPRA without earmarking explicit amounts for direct legal representation. And

19  subsequent acts, including the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L.

20  No. 119-4, similarly maintain funding levels and provide broad discretion without altering statutory

21  obligations or imposing specific mandates for funding legal representation. *Id.* ¶ 16. This ongoing

22  legislative practice underscores Congress's intent to maintain flexibility for ORR, allowing the agency to

23  prioritize resources efficiently and adaptively. *Id.*; *see also* 6 U.S.C. 279(b)(1) (making the Director of

24  ORR responsible for activities including coordinating and implementing the care of UAC and

25  implementing policies with respect to the care and placement of unaccompanied alien children);

26  8 U.S.C. § 1232(i) (authorizing the Secretary of HHS to "award grants to, and enter into contracts with,

27  voluntary agencies to carry out this section and section 279 of title 6.").

28

The Court therefore lacks jurisdiction because decisions about the substance of HHS's decision to reallocate resources from direct representation into other aspects of the UAC program is firmly committed to the agency's discretion. In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decision making standards. *See id.* at 185–88. The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192.

Indeed, an agency's allocation of funds from a lump-sum appropriation requires "a complicated balancing of a number of factors which are peculiarly within its expertise": whether its "resources are best spent" on one program or another; whether it "is likely to succeed" in fulfilling its statutory mandate; whether a particular program "best fits the agency's overall policies"; and, "indeed, whether the agency has enough resources to fund a program at all." *Id.* at 193 (internal citations omitted). "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude." *Id.* Because the TVPRA confers HHS discretion to determine how best to allocate and administer the funding for the UAC program, HHS's decisions are not subject to review under the APA.

### 3. This Court lacks jurisdiction over Plaintiffs' claims because the rights they seek to enforce must be brought in the Federal Court of Claims.

Although Plaintiffs cite to the APA as the basis for their claims, the rights that they seek to enforce, and the relief that they seek, are only available to them through contract, and thus their claims are precluded by the Tucker Act.[3] If a plaintiff's claim is "concerned solely with rights created within the contractual relationship and has nothing to do with duties arising independently" of the contract, then their

---

[3] The Tucker Act provides: "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, *or upon any express or implied contract with the United States.*" 28 U.S.C. § 1491(a)(1) (emphasis added).

1    claim is based upon a contract with the United States and subject to the jurisdictional restrictions in the

2    Tucker Act. *North Side Lumber v. Block,* 753 F.2d 1482, 1486 (9th Cir. 1985), *cert. denied,* 474 U.S. 931

3    (1985) (citing *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 967–68 (D.C. Cir. 1982)). The Tucker Act

4    "impliedly forbids" APA claims involving government contracts. *Id.* at 1485 (citing H.R. Rep. No. 1656,

5    94th Cong., 2d Sess. 13). To determine whether the Tucker Act precludes a contract claim "disguised" as

6    an APA claim, the Ninth Circuit employs the D.C. Circuit's *Megapulse* test. *United Aeronautical Corp.*

7    *v. United States Air Force*, 80 F.4th 1017, 1025–26 (9th Cir. 2023) (citing *Megapulse,* 672 F.2d at 967–

8    68). Under *Megapulse*, a court must decide whether "the source of the rights upon which the plaintiff

9    bases its claims" arises under a contract and whether "the type of relief sought" is normally available as a

10   contract remedy. *Id.* "If rights and remedies are *statutorily* or *constitutionally* based, then districts courts

11   have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims

12   does, even if the plaintiff formally seeks injunctive relief." *Id.* (emphases in original).

13       Two weeks ago, a district court in the District of Columbia decided a case very similar to this one

14   and determined that the plaintiff organization's claims resounded in contact and, thus, had to be brought

15   in the Court of Federal Claims. *United States Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 1:25-CV-

16   00465, 2025 WL 763738, at *2 (D.D.C. Mar. 11, 2025). Like here, the relief sought in *Conf. of Cath.*

17   *Bishops* was styled as a request for an injunction, yet the court correctly reasoned that, in actuality, the

18   relief sought was for "the Government to keep paying up." *Id.* at *5. The district court therefore held that

19   the claim was "founded upon a contract" and "must be heard in Claims Court." *Id.* at *7 (citing *Sharp v.*

20   *Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) (Scalia, J.) ("We know of no case in which a court has

21   asserted jurisdiction . . . to issue an injunction compelling the United States to fulfill its contractual

22   obligations.")). So too here.

23       As explained, Section IV.A.2, *supra*, the relief Plaintiffs seek is for "the Government to keep

24   paying up," *Conf. of Cath. Bishops*, 2025 WL 763738, at *2. Because they seek monetary relief, which is

25   unavailable under the APA but normally available in a contract dispute, their claim is precluded by the

26   Tucker Act. *Id.* at *7; *United Aeronautical Corp.*, 80 F.4th at 1025–26.

27       Not only does Plaintiffs' requested relief resound in contract, but the "source of rights" upon which

28   they base their claims arises from a contract. *Megapulse,* 672 F.2d at 967–68. Plaintiffs cannot separate

their causes of action from their contractual relationship with Acacia. Plaintiffs lack standing to assert claims against the United States absent the contract that HHS has with Acacia because without it they would have no injury. In other words, had Acacia never entered into a contract with HHS to provide direct legal services to UAC, Plaintiffs would have never received funding to provide such legal services and would have no injury to complain of. No statute or regulation requires HHS to compensate *Plaintiffs* for their legal services. Absent a statutory or constitutional entitlement to the appropriated funds that they seek, their injury arises from termination of a contract. Because Plaintiffs' "source of rights" for funding from appropriations stems solely from their contract with Acacia, this Court lacks jurisdiction over their claims. *Id.* at 967–68; *United Aeronautical Corp.*, 80 F.4th at 1025–26.

    **4.**    **Plaintiffs cannot show that a favorable decision in this case would likely redress their alleged injuries.**

To the extent Plaintiffs argue that they are not challenging the government's decision to end the contract with Acacia but, rather, the decision to discontinue providing appropriated funds to any legal-services organization, they likewise lack standing to assert such a claim. The "irreducible constitutional minimum" of Article III standing consists of (1) "injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks omitted). The third element of Article III standing, redressability, requires that it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan,* 504 U.S. at 561 (citation and internal quotation marks omitted). To show a likelihood of redressability, Plaintiffs must "show that there would be a 'change in a legal status' as a consequence of a favorable decision" and that this change would significantly increase the likelihood that they would obtain the relief sought. *Novak v. United States*, 795 F.3d 1012, 1019–20 (9th Cir. 2015) (quoting *Renee v. Duncan,* 686 F.3d 1002, 1013 (9th Cir. 2012)).

The relief that Plaintiffs seek—if untethered to their contract claim—would not likely provide them with the monetary relief they seek. Enforcing the statutory authority Plaintiffs rely on in arguing that Congress intended to fund direct-legal services, 8 U.S.C. § 1232(c)(5), would have the opposite effect of the relief Plaintiffs seek. As explained above, Congress did not intend to financially benefit Plaintiffs in ensuring that UAC would have access to legal services; instead, Congress envisioned that such legal

services would generally be provided *pro bono* at no expense to the government. 8 U.S.C. § 1232(c)(5). If the Court were to enforce the plain language and purpose of Section 235 of the TVPRA, it would order the government to seek out *pro bono* counsel for direct legal services and, to the extent possible, avoid funding legal services at the government's expense. Of course, this result would not redress Plaintiffs' injuries, as they seek to be paid for their services and not acting in a *pro bono* capacity.

Likewise, because the Foundational Rule provides HHS with discretion as to whether and how to disburse appropriations for direct legal services, Plaintiffs cannot show that ordering HHS to comply with its regulation would redress their injury. Under the plain language of the regulation, HHS would maintain the discretion to determine whether to fund direct-legal services for UAC, and, using that discretion, it would likely continue to decline to continue funding. Biswas Decl., ¶ 17. And even if HHS changed course and decided to exercise favorable discretion by funding direct legal services, it could contract with organizations other than Acacia and Plaintiffs. *Id.* ¶ 19. There is nothing that Plaintiffs can cite to that would require or encourage HHS to continue funding the Plaintiffs *in this case. Id.* ¶¶ 17-19. In other words, even if the agency continued funding direct legal services, Plaintiffs cannot show that it is likely that HHS will continue to contract with Acacia or with any of the Plaintiffs in this case. *Id.* Thus, Plaintiffs' redressability—that HHS would continue funding Acacia or any of the Plaintiffs—is speculative at best and insufficient to establish standing. *Lujan*, 504 U.S. at 561. Accordingly, Plaintiffs fail to show that they likely have Article III standing because enforcing the relevant policies and statutes would not redress their alleged injury.

### 5. The Termination Contract Termination at Issue Does Not Violate the APA

Plaintiffs erroneously argue that termination of direct legal services violate the APA. Although, the money was authorized by Congress, Congress never mandated its spending. When Congress does not require the agency to spend a certain amount of the appropriated fund, the agency has discretion over how much to spend up to the cap provided by Congress. *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 432 (2024) ("The appropriation of "sums not exceeding" a specified amount did not by itself mandate that the Executive spend that amount; as was the case in England, such appropriations instead provided the Executive discretion over how much to spend up to a cap."). When

courts determine whether money is mandatory or discretionary, they must look to the language of the appropriations bill to determine whether Congress required the funds appropriated to be used in a particular way. *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182 (2012) ("An agency's discretion to spend appropriated funds is cabined only by the 'text of the appropriation,' not by Congress' expectations of how the funds will be spent, as might be reflected by legislative history.") (quoting *Int'l Union, UAW v. Donovan*, 746 F.2d 855, 860-61 (D.C. Cir. 1984) (Scalia, J.))

6.   **The Foundational Rule Does Not Require Funding for Taxpayer-funded Direct Immigration Legal Representation Consistent with Available Appropriations.**

Plaintiffs contend that Defendants have "ended" funding for legal representation of unaccompanied alien children despite the availability of appropriated funds for this purpose through at least September 30, 2027, and that, by the supposed ending, Defendants violate what they believe is a mandate in the Foundational Rule to provide counsel for UAC to the extent there are appropriated funds available to do so.  ECF No. 1 ¶ 139.  As Plaintiffs note, to establish a claim under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954), such a claim must show: (1) that the government has violated its own regulations; and (2) that Plaintiffs are substantially prejudiced by that violation. ECF No. 7 at 14 (citing  *Al Otro Lado, Inc. v. Mayorkas*, 2024 WL 4370577, at *8–9 (S.D. Cal. Sept. 30, 2024)). To start, Plaintiffs have not shown that Defendants have violated their own regulations. Indeed, Plaintiffs overlook the fact that the funding at issue here is required only "insofar that it is not practicable for ORR to secure pro bono counsel."  45 C.F.R. § 410.1309(a)(4).  As HHS noted in the preamble to its Foundational Rule, ORR, consistent with the TVPRA, makes every effort to use pro bono legal services "to the greatest extent practicable" to secure counsel for UAC in these contexts. Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384, 34,529 (Apr. 30, 2024). HHS notes that ORR-funded legal services providers may help coordinate referral to pro bono legal services and that ORR provides each UAC with a list of pro bono service providers.[4]  *Id*.  Historically, HHS has acknowledged that, in some cases, it is impracticable for ORR to secure pro bono legal services, such as in markets where demand exceeds supply, or during times of influx.  *Id*.  But where

---

[4] The list of pro bono service providers is statutorily required under the TVPRA. 6 U.S.C. § 279(b)(1)(I).

and when it is "impracticable" for ORR to secure pro bono legal services is a determination to be made by ORR. *Id.* (noting that the decision is subject to ORR's "discretion."). Further, since ORR must be selective in the kinds of legal services it funds, it therefore proposed to establish its discretion to fund legal services for specific purposes "based on its judgment and priorities." 89 Fed. Reg. at 34,529. The clause "based on its judgment and priorities" reflects that ORR has considerable discretion to determine how the provision of legal services to UAC is funded. The determination of when such provision is "impracticable" is a decision to be made exclusively by ORR, applying its expertise, and not by Plaintiffs or the Court.

Plaintiffs next overlook the fact that ORR shall fund legal service providers *subject to ORR's discretion,*[5] a clause further conditioned by the foundational rules' "subject to . . . available appropriations" language. 45 C.F.R. § 410.1309(a)(4). Again, Plaintiffs cite to Congress's appropriations but overlook the clause that confers upon ORR the discretion to fund (or not fund) legal service providers for direct immigration legal representation. Plaintiffs therefore have not made a persuasive case that they will succeed on their claim that ORR is not following its own regulations.

Plaintiffs note that HHS has an obligation "to the greatest extent practicable" and consistent with 8 U.S.C. § 1362, to ensure that UAC have counsel in their immigration proceedings. HHS interpreted "to the greatest extent practicable" to open the door to a grant of authority to pay for legal services beyond that available from pro bono legal service providers. 89 Fed. Reg. at 24,529. "To the greatest extent practicable," however, cannot reasonably be read as a mandate for HHS to pay for direct immigration legal representation for all UAC, unconditionally. In the preamble to the Foundational Rule, HHS stated that it "understands that some commenters would like ORR "to fully fund legal services to all [UAC]." *Id.* HHS also observed that it received comments questioning ORR's legal authority to pay for legal services for UAC and suggesting that ORR not use taxpayer funding for legal representation for UAC. *Id.* HHS concluded that its approach to providing legal services to UAC, by enabling them to access ORR has determined that "its approach to providing legal services to unaccompanied children by enabling them to access pro bono counsel 'to the greatest extent

---

[5] Defendants do not contest that the conditions "to the extent ORR determines that appropriations are available" and "subject to . . .available appropriations," in 45 C.F.R. § 410.1309(a)(4), are met here.

practicable' and funding legal services for additional unaccompanied children, as resources allow, is consistent with ORR's statutory obligations." *Id*. HHS's interpretation of the INA and TVPRA – as Congress's grant of discretion to ORR to provide funding for immigration services to UAC – is far from a mandate to do provide such funding.

Similarly, and as Plaintiffs point out, HHS did acknowledge that most UAC need legal services to resolve their immigration status, and such representation appears to have a significant impact on court appearance. ECF No. 7 at 13 (citing 89 Fed. Reg. at 34,529). Further, as Plaintiffs note, HHS affirmed that "legal services providers who represent unaccompanied children undertake an important function" and explains ORR's goal of "100 percent legal representation of unaccompanied children." *Id*. (citing 89 Fed. Reg. at 34,526). But Plaintiffs fail to explain why they believe that such services must be funded by the taxpayer. HHS's shift to increased emphasis and reliance upon pro bono service providers might not be Plaintiffs' preference, but it is consistent with the plain language of section 1309(a)(4) and HHS's explanations for why it sculpted the language in 1309(a)(4) as it did. In their motion for a TRO, however, Plaintiffs are silent regarding the importance of pro bono counsel in providing advice and legal representation for UAC, an importance reflected in both section 1309(a)(4) and the preamble. ECF No. 7.

## B. <u>Plaintiffs Will Not Face Irreparable Harm Without a TRO</u>

The "most important" *Winter* factor is whether Plaintiffs demonstrate irreparable harm. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Koller v. Brown*, 224 F. Supp. 3d 871, 879 (N.D. Cal. 2016) (noting it is the "single most important prerequisite" for a TRO). The "possibility" of harm is insufficient to secure a TRO; Plaintiffs must show that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). "Speculative injury" does not suffice; Plaintiffs must show both immediacy and likelihood that they will be harmed absent a TRO. *See Caribbean Marine Servs. Co.*, 844 F.2d at 674. Where "[m]ultiple contingencies must occur" before Plaintiffs' claimed injuries, the injuries are "too speculative" to justify a TRO. *Id.* at 675.

Plaintiffs have failed to make the requisite threshold "clear showing of irreparable harm." *See Garcia*, 786 F.3d at 746 (reiterating that "[h]arm must be proved, not presumed"). Plaintiffs have failed to demonstrate irreparable harm sufficient to warrant extraordinary injunctive relief. Although

Plaintiffs characterize their harm as damaging their ability to provide services, their harm is merely monetary. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("Monetary injury is not normally considered irreparable."). Economic damages are not traditionally considered irreparable because the injury can later be remedied by a damage award. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury . . . ." (internal quotation omitted)); *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 676 (9th Cir. 1988) ("Subjective apprehensions and unsupported predictions of revenue loss are not sufficient to satisfy a plaintiff's burden of demonstrating an immediate threat of irreparable harm."); *Arcamuzi v. Continental Air Lines*, Inc., 819 F.2d 935, 938 (9th Cir. 1987) ("[Temporary economic loss alone generally is not a basis for injunctive relief."); *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 471 (9th Cir. 1984) ("Mere financial injury . . . will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation.").

While Plaintiffs characterize their harm as "frustrating their mission," the actual harm that Plaintiffs allege is "lack of funding," which is plainly monetary harm. *See* ECF No. 7 at 16 ("There is no question that *ceasing funding* for legal representation services for UAC and terminating the existing services will cause imminent harm that cannot be later remediated.") (emphasis added); *id.* at 17 ("Plaintiffs have relied on Congress's and Defendants' assurances that *funding* for these critical resources will continue to be available.") (emphasis added); *id.* ("Sustaining these services without this *funding* will cost the Northwest Immigrant Rights Project *$200,000 a month*.") (emphasis added). Plaintiffs cannot avoid the well-established case law holding that monetary loss (even if significant), is not irreparable harm.

Plaintiffs next allege that "ceasing funding for legal representation services for UAC and terminating existing contracts will cause imminent harm" because it will cause them to cease providing certain legal services. ECF No. 7 at 16. But that too is without merit as the Cancellation Order does not prevent Plaintiffs from continuing to provide legal services – it merely prevents them from receipt of

1    federally funded payment for those services. Indeed, Plaintiffs may freely  provide these services *pro*

2    *bono*, which is in line with the plain language and purpose of 8 U.S.C. § 1232(c)(5), and would be

3    welcomed by Defendants.

4        Plaintiffs' further assertion that "impacted attorneys and staff have years of individualized

5    experience and wisdom with clients making rehiring layoffs impracticable" is speculative and attenuated.

6    ECF No. 7 at 18. "Certain impending" injury cannot be shown when the asserted injury is based on a

7    "speculative chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), or on

8    "speculation about the decisions of independent actors," *id*. at 414. As the D.C. Circuit has cautioned:

9    "Because of the generally contingent nature of predictions of future third-party action," a court should

10   be "sparing in crediting claims of anticipated injury by market actors and other parties alike." *Arpaio v.*

11   *Obama*, 797 F.3d 11, 23 (D.C. Cir. 2015). The Court should likewise decline to entertain Plaintiffs'

12   speculative assertion about what third parties—individuals who *might* be laid off—would do if called

13   back to work.

14   **C.    The Balance of the Equities and Public Interest Weigh Against Entry of a Temporary Restraining Order.**

15       Where the government is a party, the balance of equities and public interest factors merge. *Drakes*

16   *Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435

17   (2009)).  Courts "explore the relative harms to applicant and respondent, as well as the interests of the

18   public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991)

19   (internal quotation marks and citation omitted).  In weighing these factors, Plaintiffs rely on their previous

20   arguments pointing to their allegation that harm arises from Defendants' "shirking [of] their voluntarily

21   undertaken obligations." Motion at 19. But as described above, neither the purported merit of their claims

22   nor their alleged injury support entry of a TRO.  This is particularly true because Plaintiffs make no

23   attempt to explain how the broad relief requested in their proposed order (Dkt. 7-3) is tethered to the harms

24   they claim.  On the other hand, Defendants are legally entitled to make decisions about the disbursement

25   of their federal grants. *See, e.g.*, 8 U.S.C. § 1232; 45 C.F.R. § 410.

26       Here, the balance of the equities and public interest tip decisively in Defendants' favor.  If the

27   status quo is preserved during the pendency of the case, Plaintiffs can still obtain any funding they may

28

1    be entitled to as a result of the case's ultimate resolution.  But the opposite is not true—if Plaintiffs are

2    given access now, and draw down the funds throughout the litigation, Defendants will be left with no

3    meaningful recourse even if they prevail.  Defendants will bear all the risk if the Court enters a preliminary

4    injunction, whereas Plaintiffs will bear none if it denies one. Such a proposition turns Plaintiffs' burden

5    of establishing irreparable harm on its head. In short, the equities clearly favor Defendants.

6          Plaintiffs' motion fails to acknowledge the governmental harm that will be imposed through

7    injunctive relief here, suggesting that the TRO is merely to spend appropriated funds. This ignores the

8    substantial harm an injunction imposes by usurping executive branch authority to manage complex

9    programs and allocate billions in taxpayer funds. Forcing continuation of one specific contract hinders

10   ORR's ability to adapt to potentially changing migration flows, shelter needs, health concerns, or to

11   implement potentially more cost-effective or impactful service models across the entire UAC program

12   spectrum.

13         What's more, the public interests at stake here include effective governance. While Plaintiffs

14   legitimately describe the public interest in protecting vulnerable children and upholding the TVPRA, the

15   public interest also encompasses the efficient, flexible, and responsible administration of federal

16   programs, interests which are opposed to forcing the government to continue to fund paid attorneys. It

17   includes ensuring ORR can make difficult choices to best serve the overall needs of all unaccompanied

18   alien children within its care, using its expertise and the discretion Congress provided. Judicial

19   micromanagement of appropriations allocation via Plaintiffs' requested TRO arguably undermines, rather

20   than serves, the broader public interest in competent government.

21         Indeed, an injunction here would effectively disable the administration from effectuating its

22   executive authority consistent with their constitutional and statutory authorities. *See Maryland v. King*,

23   567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up) ("[a]ny time a [government] is

24   enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of

25   irreparable injury."). Where the Government is legally entitled to make decisions about the disbursement

26   or allocation of federal funds, but is nonetheless ordered to release the funds, such funds may not be

27   retrievable afterwards. While Plaintiffs emphasize the mandate in 8 U.S.C. § 1232(c)(5) that HHS "shall

ensure . . . that all unaccompanied alien children . . . have counsel," this mandate is explicitly qualified by "to the greatest extent practicable". This is not mere suggestion; it is the legal standard set by Congress, inherently requiring agency judgment. Here, "practicable" arguably necessitates balancing the goal of providing counsel against competing demands, resource limitations across the entire UAC program, administrative feasibility, and the effectiveness of different service delivery models. It does not mandate funding one specific contract indefinitely, irrespective of other considerations.

In sum, the decision to terminate funding under the contract represents a permissible exercise of the discretion afforded to ORR by Congress under 8 U.S.C. § 1232(c)(5), and codified in its own regulations, *see* 45 C.F.R. § 410.1309(a)(4). It is not contrary to law or arbitrary and capricious. An injunction would improperly substitute judicial preference for agency judgment, unduly restricting the executive's ability to allocate resources and adapt to evolving needs. As a result, the balance of equities and the public interest, properly considered, weigh against granting the extraordinary relief of a TRO.

### D.   If the Court issues a TRO, it should require Plaintiffs to Post Security.

Finally, if the Court deems a TRO warranted (which it should not), Plaintiffs should be required to post bond.  Rule 65(c) provides that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  The circumstances here warrant requiring Plaintiffs to provide security in an amount that could compensate Defendants for the losses caused by a preliminary injunction (in the event that Defendants are found to have been wrongfully enjoined).  To the extent that the Court grants relief to Plaintiff, Defendants respectfully request that the Court require Plaintiffs to post security for any taxpayer funds distributed during the pendency of the Court's Order. Since this case is ultimately about financial allocation, it thus follows that Rule 65(c)'s explicit requirements necessitate Plaintiffs' posting of security.

## V.   CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a temporary restraining order.

1    DATED: March 31, 2025                    Respectfully submitted,

2

3                                             YAAKOV M. ROTH
                                              Acting Assistant Attorney General

4
                                              WILLIAM C. SILVIS
5                                             Assistant Director

6                                             CHRISTINA PARASCANDOLA
                                              KATE MASETTA ALVAREZ
7                                             JONATHAN K. ROSS
                                              Senior Litigation Counsels
8

9                                             ZACHARY A. CARDIN
                                              Trial Attorney
10

11                                            /s/ Michael A. Celone
                                              MICHAEL A. CELONE
12                                            Senior Litigation Counsel
                                              U.S. Department of Justice, Civil Division
13                                            Office of Immigration Litigation
                                              General Litigation and Appeals Section
14                                            P.O. Box 878, Ben Franklin Station
                                              Washington, DC 20044
15                                            (202) 305-2040
                                              Michael.A.Celone@usdoj.gov
16

17                                            Attorneys for Defendants

18

19

20

21

22

23

24

25

26

27

28

1

2

## <u>CERTIFICATE OF COMPLIANCE</u>

3

    The undersigned, counsel of record for Defendants certifies that this brief contains 22 pages,

4

which complies with the word limit of this Court's Standing Order, section 6 and L.R. 11-6.1.

5

6

                                   Respectfully submitted,

7

                                   */s/ Michael A. Celone*
                                   MICHAEL A. CELONE

8

                                   Senior Litigation Counsel
                                   Office of Immigration Litigation

9

                                   Civil Division

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
3:25-CV-02847- AMO                          i