**Pages 1 - 59**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, et al.,

Plaintiffs,

vs.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

Defendants.

**NO. C 25-cv-02847-AMO**

San Francisco, California
Tuesday, April 1, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, California 90027
**BY: KAREN C. TUMLIN, ATTORNEY AT LAW**

IMMIGRANT DEFENDERS LAW CENTER
634 S. Spring Street, 10th Floor
Los Angeles, California 90014
**BY: CARSON SCOTT, ATTORNEY AT LAW**
**ALVARO M. HUERTA, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
Official Reporter, CSR No. 12219

**APPEARANCES**: **(CONTINUED)**

For Plaintiffs:

AMICA CENTER FOR IMMIGRANT RIGHTS
1025 Connecticut Ave. NW - Suite 701
Washington, D.C. 20036
**BY: SAMANTHA HSIEH, ATTORNEY AT LAW**

NATIONAL IMMIGRANT LAW CENTER
3450 Wilshire Boulevard - 108-62
Los Angeles, California 90010
**BY: ESTHER H. SUNG, ATTORNEY AT LAW**

For Defendants:

U.S. DEPARTMENT OF JUSTICE
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
**BY: JONATHAN K. ROSS, ATTORNEY AT LAW**

**Tuesday - April 1, 2025** **9:59 a.m.**

**P R O C E E D I N G S**

---o0o---

**THE CLERK:** All rise. Court is now in session. The Honorable Araceli Martínez-Olguín presiding.

**THE COURT:** You may be seated.

**THE CLERK:** Your Honor, now calling Civil Matter 25-2847, Community Legal Services In East Palo Alto, et al., versus United States Department of Health and Human Services, et al.

Counsel, if you can please approach the lectern and state your appearances, beginning with the plaintiffs' counsel.

**MS. TUMLIN:** Good morning, Your Honor. Karen Tumlin for the plaintiffs. With the Court's indulgence, can I please ask my co-counsel to state their appearances?

**THE COURT:** Certainly.

**MS. SCOTT:** Good morning, Your Honor. Carson Scott for plaintiffs.

**MS. SUNG:** Good morning, Your Honor. Esther Sung for the plaintiffs.

**MR. HUERTA:** Good morning, Your Honor. Alvaro Huerta with the plaintiffs.

**MS. HSIEH:** Good morning, Your Honor. Samantha Hsieh for plaintiffs.

**MR. ROSS:** Good morning, Your Honor. Jonathan Ross

for the United States.

**THE COURT:** Good morning, Counsel.

**MR. ROSS:** Thank you.

**THE COURT:** All right.

So, folks, we're here because this is the time that I set for the hearing on the TRO.

But before we jump in -- and I have questions for you all on the TRO; but before we jump into those, I just want to start by laying out where I think we are at this point.

So I got the motion for the TRO. I requested a response from the Government, which I have received. The Government has raised a number of jurisdictional questions.

And I don't have anything from the plaintiffs on that at this point. And, look, I'm happy to have you all address it orally today if that is what you want to do.

But I also am interested, given the standing questions, the issue of discretion and how that applies for whether or not this is even judicable under the APA. My inclination is to ask plaintiffs if they wouldn't rather convert this into a PI and figure out a reply brief, or have you all meet and confer and figure out an additional briefing schedule so that I can get fuller briefing from you all on those questions.

So, Ms. Tumlin, let me ask you -- thoughts on that.

**MS. TUMLIN:** Yeah, absolutely. Thank you, Your Honor,

for pointing that out.

And certainly we recognize that the Court has been crunched by the parties' requests for a temporary restraining order, and not having reply briefing and the benefit of reply briefing. What we would ask is to be able to present to the Court orally the questions that the defendants have raised about committed to agency discretion or standing today, really in light of the ongoing irreparable harms that started accruing on March 21st to the plaintiffs.

Certainly, if the Court would like briefing, I can huddle with my co-counsel and see how quickly we could put that in. But we maintain that the harms are severe, they are irreparable, they started on March 21st, and that a temporary restraining order would be appropriate here.

**THE COURT:** I'm assuming that you are good with that?

**MR. ROSS:** Your Honor, the plaintiffs bear the burden to demonstrate eligibility for extraordinary relief. And if the Court is not satisfied at the conclusion of oral argument today, it's the Government's position that the Court should deny the motion and then the parties can take up matters by conferencing afterwards.

**THE COURT:** All right. Well, folks, with that then, let's go ahead and proceed.

So for those of you -- actually, this applies to all of you who -- none of you have appeared in front of me before.

So it is my -- it's become my habit to go ahead and ask you all my questions, and then let you present argument, if you would like to thereafter, on anything further so.

So let me -- let me start by asking, since it is -- since it is plaintiffs' motion, let me -- let me start by asking with -- so the questions that are sitting sort of most front-of-mind for me, which is -- right? -- the Government's brief is very pointed about the fact that neither the statute -- or, rather, that both the statute and the regulation leave discretion with the agency about these legal services; and, to my mind, that can get -- that becomes most important perhaps with regard to why you can bring this as an APA challenge at all.

So tell me, Ms. Tumlin, why are they wrong?

**MS. TUMLIN:** Certainly. Thank you, Your Honor. Those are really important questions.

So to start with, I want to be clear that the defendants have not raised this as a jurisdictional matter. They're raising this within the merits of: Do we have an APA challenge, yes or no?

And certainly there is an exception under APA case law if a matter -- if the agency action challenged is committed to agency discretion and there's no law to apply, obviously that's *Heckler*, et cetera.

There is law to apply here. There is ample law to

apply. It is the text of the TVPRA, which has very specific mandates and congressional commands for what should happen with respect to legal representation for unaccompanied children. There is that law. There is also the Foundational Rule, which is the agency regulation implementing, of course, the TVPRA. So that's kind of broadly in terms of why *Heckler* doesn't apply.

There is law to apply here. The agencies may not like it. They may wish that they could change it. They may like other words to be put into the statute. But the Court has law to apply here.

And then secondly, I really want to say that a lot of this boils down to the text of the TVPRA that we are working with here, Your Honor, is -- and the wording is, and I'm just going to quote directly, that the Federal Government, quote (as read):

> "Shall ensure, to the greatest extent practicable, that all unaccompanied children have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking."

That's the end of the quote.

And I certainly, you know -- we would point out to the Court that there's at least three phrases in there that are incredibly important. There's the use of the word "all," when

talking about the children, the unaccompanied minors.

There's the term, quote, shall ensure, which is mandatory language. It's not optional. It's not discretionary.

And then there's the phrase, quote, to the greatest extent practicable.

And I get it, the Government has presented in their brief that they want to have discretion in how the funding is provided. But, Your Honor, we are bound by the text here. And does the agency retain some discretion? Sure they do. But this statute doesn't say, "Provide legal representation to the maximum extent of your discretion."

It doesn't say, "Provide legal representation as you see fit within your discretion."

It uses the word "practicable." And when we go look that up in the dictionary, the dictionary tells us "practicable" is "capable of being put into practice or being done, accomplished, or feasible."

So that would be kind of my high-level take, Your Honor, on why it is that this is not a matter that the APA said, "You know, there's no law to apply here. We don't bring the APA to bear. It's committed to agency discretion."

There's ample law to apply here and I'll be happy to talk to the Court more about that.

**THE COURT:** All right. So let's push past whether or

not you can bring this as an APA challenge. As long as we're examining the text of the TVPRA, let's stay with that.

Tell me, that phrase that you're describing right now, "to the greatest extent practicable," why doesn't it leave discretion with the agency to do what it's done here?

**MS. TUMLIN:** Right. So it doesn't leave discretion with the agency to do what it's done here because what the agency has done is terminated all funding for legal representation, including pro bono support to unaccompanied minors.

And just taking a step back, unaccompanied minors are, of course, incredibly vulnerable children who arrive in our nation without a parent or legal guardian to stand for them and stand with them, including in court.

So Congress saw fit to make very specific mandates about what should happen to them with respect to how they go into courtrooms.

And so the Government would have you believe that you're in some land of where you only have two options; that there's a binary here that all that the statute allows is either what they have done -- which is to remove all funding for unaccompanied children and legal representation -- or that the Court, if they -- if you agreed with us, has to put back in place the contract fully on its prior terms.

I would submit, Your Honor, that that is a false

dichotomy. That's, like, Door Number 1 is put back in place the -- the contract in -- exactly as it was.

Door Number 2 is the challenged agency action which violates the TVPRA.

Plaintiffs submit that there is a very large Door Number 3, which is comply with the TVPRA, comply with the agency's own regulations and the Foundational Rule, and ensure, quote, to the greatest extent practicable, that little kids don't face court alone, particularly when, as the Foundational Rule says, Congress has seen fit to appropriate it funds. There are funds appropriated at least for two and a half more years.

**THE COURT:** Aren't you asking for Door Number 1?

**MS. TUMLIN:** It's my own fault when I label the doors.

**THE COURT:** I'm sorry. Let me put a finer point on it and then, Mr. Ross, I'll get you in here.

Aren't you asking for everything to go back -- right? -- you're asking essentially for vacatur of the cancellation order?

**MS. TUMLIN:** No, Your Honor. And I think this is like a really important question.

We are asking for a vacatur of the agency's actions. The agency's actions were to remove all funding for legal services. We're not asking for re-institution of a contract. In fact, we couldn't make that ask.

We're saying go back to the status quo, which is when you were complying with the TVPRA.

When you looked, did Congress give us some money for this purpose?

Oh, the answer is yes. They appropriated over $5 billion. We will figure out how to divide it up and make sure that you do it in a way that ensures that little children -- some as young as five months old -- don't go to court alone.

**THE COURT:** I promise, Mr. Ross, you're going to get a chance.

Here's -- talk to me, then, about redressability and why that is a harm that -- how that cures your clients' harms, because as much as you may talk to me about the children, the children are not your clients here.

**MS. TUMLIN:** Absolutely, Your Honor.

**THE COURT:** The clients' clients.

**MS. TUMLIN:** Yes, that's right. Absolutely. Super important point.

So, again, defendants want to make this as if my clients, the 11 legal service providers, are saying, "You have to pay up to me and you have to give me the same amount that you have given me before."

That -- they would be okay with that, but that is not what they are in court today asking the Court for.

What they're saying is, "We represent small children. We are representing hundreds and thousands of them right now. They have proceedings, deadlines, hearings this week. And you, the Government, told us we couldn't work on those cases anymore unless we could come up with imaginary money and do it for free. But you, the Government, didn't tell us who is going to help our child clients. Who is taking them to court this week? Who is going to make sure they don't miss statutory deadlines?"

So we are asking for a return to the status quo where the Government had a plan -- any kind of plan. If they choose not to fund our clients, who have all this expertise and who have been funded for over a decade for this purpose, fine. But they need to make sure, to the greatest extent practicable, that there is a plan, and children don't go unrepresented and the TVPRA is not violated.

**THE COURT:** All right. That feels like a good moment to turn to you, Mr. Ross.

And my instinct is to let you go ahead and pick it up wherever you would like in response to the original questions I asked Ms. Tumlin, either with regard to the APA and the discretionary piece, anywhere -- any and all of it that you would like to address.

**MR. ROSS:** Thank you, Your Honor.

And they certainly are interlaced. And it's absolutely not lost on the Government that we are dealing with

a vulnerable population, a population that Congress has mandated have rights, and in- -- indeed we intend to be bound by those rights and fulfill those rights.

And really, that's everything that the Government's brief lays out -- is, we recognize that under the TVPRA we have a duty to provide know-your-rights presentations, to provide legal screening to unaccompanied children in federal care and custody, to provide a list of pro bono attorneys. And really what we've done is a return to that -- that core.

Plaintiffs are asking the Court -- to the Court's questions about the APA and redressability and standing, essentially they want to maintain funding for a contract that is expired at the same funding level when they weren't even parties to the contract.

And so the Government contends that this still is a -- very much a contractual dispute that belongs in the proper forum, because regardless of how plaintiffs dress up the claim now, it really is about funding. Children that are in federal care and custody are getting the core suite of legal protections that the TVPRA and the Foundational Rule require.

There's additional elements, too, to the TVPRA, the section that my colleague read, that focuses on pro bono representation, and that portion is illustrative because it was the -- it was always the foundation of that -- of that provision to provide access to counsel.

Yes, children who are in federal care and custody shall have access to counsel. And that counsel should be provided as practicable. But that is inherently discretionary and it's up to the -- the executive and the agency that runs the program to allocate those resources accordingly.

Relatedly, the fact that the -- the Foundational Rule very much plays into this. There is an interplay between it. In essence, the TVPRA established the foundation for the -- for the legal protections that children should receive.

And the Foundational Rule -- which, again, the Government intends to be bound by -- established what -- what that would entail. And it's -- that comes from the Flores Settlement Agreement that ultimately was worked into the Foundational Rule and, actually, enhanced to provide the most robust coverages, legal protections, and other protections to this vulnerable class.

So the Government is -- is -- views this, again, as a contract dispute, but plaintiffs are not party to the contract.

**THE COURT:** Well, so this is actually my question to you about that argument. I -- because they're not party to the contract, it isn't clear to me how you think that their rights arise from the contract they aren't party to.

**MR. ROSS:** That's indeed part of the challenge. And I think that the Government is left wondering that element as well, and that's why there's so many alternative arguments laid

out because we, too, seek to understand the foundation of plaintiffs' motion.

**THE COURT:** All right. So let's take a step back. Because the way -- when I say that cuts both ways, to my mind, that means that when you look at the megaplus test -- pulse test, that means their rights aren't based on that contract. They're not party to that contract. That isn't a point on which I think you would agree with me.

**MR. ROSS:** I'm sorry?

**THE COURT:** I wouldn't imagine that you agree with that point. Because if they -- right? -- if they can survive the *Megapulse* test, then they can be here and not in the federal court of claims.

**MR. ROSS:** Precisely. Yes, Your Honor.

**THE COURT:** Okay. So I guess this is where I think we've moved to, and I'm curious about it because ultimately I -- at some point before I had the Government's opposition and reading plaintiffs' TRO, was wondering what legal significance there was that Acacia isn't before me -- right? -- that what I have are the subcontractors to the contractor.

And I think the Government's answer is -- well, I think it's twofold. I think, on the one hand, you raise it as an issue about redressability and -- which has issues with -- which raises standing issues.

And I guess I do have that question for plaintiffs.

And maybe I've already asked you to address this, Ms. Tumlin, but -- right? -- I guess it sounds like -- the TRO that you all initially asked for I understood to be for -- I'm looking at page 2 of the notice, which says you're (as read):

"...seeking a temporary restraining order preventing defendants from violating the APA by illegally ceasing funding for direct legal services" --

(Reporter interrupts for clarification of the record.)

**THE COURT:** I'm so sorry, Ruth. It's the reading. One more time. Where did you leave me?

(as read):

"...by illegally ceasing funding for direct legal representation services for unaccompanied immigrant children."

All right. So maybe that doesn't -- maybe that isn't about -- maybe that isn't about requiring funding for your clients. You -- they are just raising that.

All right. Let me ask you a few more things, Ms. Tumlin -- or, well, yes, let me ask you a few more things, Ms. Tumlin.

We've been -- we've looked at the language of the TVPRA. I want to look at the Foundational Rule. The Foundational Rule -- well, the Foundational Rule squarely seems to leave room for the agency's discretion -- right? -- and I

think I just -- I'm curious -- right? -- I read your motion, clearly. You all think that the Foundational Rule creates a binding obligation on the agency.

Tell me how I'm supposed to read out the part that says "subject to ORR's discretion."

**MS. TUMLIN:** Yeah. Thank you, Your Honor.

And certainly we don't want you to read out any parts of either the statute or the Foundational Rule. And it is in the Foundational Rule where the word "discretion" comes up and where we should start talking about it.

So it's a long, complicated clause but let's just go through it because it's -- it -- obviously, I would say a few things to start with.

The Foundational Rule, of course, can't expand the Government's obligation under the TVPRA. It doesn't make it bigger; right? If anything, it defines it. It cabins it. It gives us more precision; right? So I kind of want to start there.

TVPRA tells us all kids, legal proceedings, greatest extent practicable. Then the Foundational Rule comes in and it tells us a few things.

First, it says there has to be money on the table; right? Is there money on the table? That's the -- that's the clause, quote, to the extent ORR determines that appropriations are available.

And, Your Honor, on this record before you, nobody contests that there's money available until at least September 30th, 2027, two and a half years from now.

All right. So we've passed the first hurdle. Let's go on.

Then it says, "and insofar as it is not practicable for ORR to secure pro bono counsel."

Okay. So they are saying: Is there money?

Yeah, there's money.

Then proceed.

And is it practicable for ORR to secure pro bono counsel?

So, first of all, I would say a few things about pro bono counsel, because the Government makes a fair amount of this in the brief that they submitted yesterday.

First of all, the cancellation order of March 21st, cut funding for pro bono counsel. That's what called CLIN 2, C-L-I-N. I'm pretty sure that means Contract Line Item Number 2. That was terminated. It was brought to zero.

So the Government hasn't proffered -- they say a lot about how maybe pro bono counsel is going to come in as some fictional army and save the day here, but they haven't told us how it's going to happen; and most importantly for my clients, they haven't said: Here's the plan for all the kids you represent today for turning them over to pro bono counsel.

Okay. But we're -- I promise we're going to get to discretion, but we had to do the first ones first because we're not going to read anything out of the Foundational Rule.

Then it says, quote, (as read):

"ORR shall provide" -- pardon me. I'm sorry. I misspoke. (as read):

"ORR shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied kids subject to ORR's discretion and available appropriations."

And that's the end of the quote.

So what does that mean?

Well, it means a few things.

We're using mandatory language again. It says "shall." It doesn't mean "may." It doesn't mean "might." It doesn't mean "sometimes." It means you got to do it. There's money on the table and you can't meet the demand with pro bono counsel. And you need to do it for direct immigration legal representation, but you get discretion and you get to tweak what you're providing based on how much money is on the table.

And we are not here today asking the Court to micromanage the agency, ORR, in its determination. Of the funding that's available from now until September 30th, 2027, how much of it should go to support pro bono counsel? How much of it should go to paid expert unaccompanied child legal

representatives? How much of it should go for know-your-rights presentation?

We're not here to get up in their business and tell them how to divide up that pot of money. And that's what the Foundational Rule is saying. It is saying ORR is an expert, they get to decide.

But why we are here in court is, they decided to take it to zero, Your Honor, and that's the problem. That's what they can't do.

**THE COURT:** Mr. Ross?

**MR. ROSS:** Your Honor, the Government has not taken it to zero. And I think that I -- again, my colleague raises a very good point about discretion; that it's vital that the agency is in the best position possible to understand what the current needs are, what the current priorities are.

It's not -- what is -- what is left to discretion and what is practicable isn't just purely based on financial means. It's based on the discretion of the agency and the needs that present.

So I think that's a critical distinction that needs to be made. And discretion is still very much part of the portion that my colleague -- that plaintiffs read to the Court.

In terms of not asking the Court to step in in place of the agency, it seems that that's exactly what they're asking the Court to do. They're asking the Court to say -- to enter

an order saying that we are going to allow funding to -- to continue to flow in a contract that would have naturally terminated anyway by now, at the end of March. The contract was set to normally terminate at the end of March regardless.

And a new contract has indeed been formed with -- with the parties to that contract, between HHS and Acacia. And those contracts, consistent with the previous contract, even considering the portions that were terminated -- because, again, it was not brought to zero -- still includes coverage for know-your-rights and the other core suite of legal protections that children are entitled to.

Inasmuch as there's -- plaintiffs are now, for the first time, raising that the termination included other provisions, to the extent that that issue is even before the Court -- because, again, I -- to the Government's recollection, that was not included in any of their pleadings or the complaint, the motion for TRO.

To the extent it is before the Court, again, the core of what the Government has contracted for and what the Government is committed to providing is what's required by the TVPRA and the Foundational Rule.

Any discretionary cuts that were made, were made only to provisions -- and this is put forth in the Biswas declaration -- only were made to areas that were discretionary and not required.

**THE COURT:** Mr. Ross, you mentioned a new contract. When did that -- when was that formed?

**MR. ROSS:** The new contract was formed shortly after the termination of the original contract.

**THE COURT:** For the line items that weren't cancelled; is that right?

**MR. ROSS:** That's correct. And, again, that's included in the declaration by Mr. Biswas.

**THE COURT:** And let me ask, Mr. Ross, is there anything -- would is -- would you -- this is an odd question.

Ms. Tumlin walked me through the language of the regulation. I'm curious if you have any -- do you have anything to add?

**MR. ROSS:** Your Honor, just that -- I mean, I think that we actually -- the parties are in agreement with certain provisions of this; that, yes, the TVPRA established that -- the foundation and with the Foundational Rule was -- was -- come in and gave it meaning, explained those -- explained what broad strokes were to effectuate the terms of the TVPRA; right?

And so I -- where the TVPRA is kind of -- well, where the Foundational Rule is perhaps the most illustrative at this point -- because it does say, yes, there is an entitlement to pro bono counsel, there is nothing that prevents any legal service provider or duly licensed attorney from providing these vulnerable children pro bono representation. They're still

free to do that.

Even in light of the contract termination, even in light of the new contract, they're still free to provide those services on a pro bono basis. Indeed, these children do have direct access to direct counsel. In addition to that, to that avenue, they have a robust suite of legal protections --

**THE COURT:** I'm going to pause you for just a moment because I think -- that's the point, I understand that no one is -- we're not talking about the pro bono counsel; right? We are talking about the funded direct legal services and the cancellation of that.

So I'm trying to understand if there's anything else that you want to point out to me in the language of this regulation different from the way Ms. Tumlin has walked me through it?

**MR. ROSS:** If I could have the Court's diligence.

(Pause in proceedings.)

**MR. ROSS:** The line of the Foundational Rule at A4 before Roman numeral I, II, III, IV, again, which my colleague read, puts an emphasis on -- the clause is explicitly qualified by "subject to ORR's discretion and available appropriations."

Plaintiffs can't just say that one of those two things applies and the other doesn't.

**THE COURT:** Then, I suppose, Ms. Tumlin, I'm trying to understand why -- you're right, it's a long -- it's one very

long sentence. And I'm trying to understand why that final clause doesn't qualify everything else that came before it.

**MS. TUMLIN:** I think that the final clause does qualify what came before it.

But I think the trouble that Mr. Ross is having is that the only thing that has been preserved under the new contract is group know-your-rights presentations and legal consults.

That's not what came before the clause about discretion. What came before the clause about discretion does talk about pro bono counsel, that's been cut entirely. It does talk about direct immigration legal representation for certain unaccompanied children, that's been cut entirely.

That's the problem with how much discretion they have. They do not have discretion either under the Foundational Rule and certainly not under the TVPRA to bring to absolutely zero funding when it has been appropriated for either pro bono support or for paid legal representation.

**THE COURT:** I want to echo Mr. Ross' -- I guess I'm trying to understand -- I did not understand you to be challenging anything related to pro bono counsel, only to the direct legal services. I heard you say -- also sort of say that feels new --

**MS. TUMLIN:** Well, so I just want to explain how, like -- the word "pro bono counsel" gets used a lot, and, in

fact, it was used a lot in the Government's brief yesterday, but there's a few flavors of it. Let's talk about them.

There is a specific flavor of pro bono counsel that was articulated under the contract that has been terminated. And that is the flavor that goes like this:

The legal service providers, the 11 plaintiffs here before you, are super experienced in getting children who have been through trauma, and who are alone, to talk to them, to work with them. They're super experienced in immigration court.

And there has been funding for them to seek out and train and mentor pro bono counsel -- generally, members of the private Bar, generally members of major law firms maybe who sit and do mergers and acquisitions every day at a very big law firm. To get them to represent some of these kids, it takes money, it takes support, and it takes oversight. That's what was in the contract. It was lined out to zero.

I also want to say to Your Honor that whether or not pro bono counsel were adequate in order to meet the dictates of the TVPRA, we're not writing on a blank slate here, Your Honor. This is something that we discussed in our complaint. And I'll point the Court to the history of pro bono counsel here, if you give me just one second.

So there's two things. So the first that I want to talk about is the pilot program on pro bono counsel, and I

would direct the Court to our complaint paragraphs 50 to 53 here.

And then second I'm going to talk about what we know about pro bono counsel after the TVPRA was passed.

So in our complaint paragraphs 50 to 53, Congress commissioned ORR to do a three-year pilot program on pro bono representation --

(Reporter interrupts for clarification of the record.)

**MS. TUMLIN:** Sorry. Sorry.

To conduct a three-year pilot program on pro bono representation for unaccompanied children. So this is before the TVPRA passes. And after that three-year period, ORR concluded that paid attorneys would be required to cover a significant percentage of the representation needed.

So this is the predecessor to the TVPRA's mandate that we have been talking about, the requirement that was passed in 2008 and has been reauthorized since that time to provide representation to the greatest extent practicable.

And then after the passage of the TVPRA, and since 2012, the legislative history makes clear in various appropriation reports that funding had to be allocated to direct legal representation and that allocating funding only to know-your-rights or pro bono representation was insufficient.

We lay this out in our complaint in paragraph 60 to 63.

**THE COURT:** I'm trying to find -- Mr. Ross, would you talk with me, again -- so I found it very interesting that the proposed order you submitted had me granting the TRO but issuing a -- but requiring a bond.

I'm assuming that was an error. Tell me if I'm wrong.

**MR. ROSS:** It was not an error, Your Honor; it was to extent that a proposed order would be necessary. It's the Government's position that the Court can deny plaintiffs' motion, and should deny plaintiffs' motion, purely based on its own proposed order; however, if the Court would like a corrected or updated order, the Government is happy to comply.

**THE COURT:** No, it's fine. It just caught my eye because it's the first time I have ever seen opposing counsel -- the opposing party's proposed order with a grant. I really had to look at it a few times.

But I think the piece I want to talk with you about is your suggestion that a bond be required.

If you could go ahead and just tell me, again, why you think a bond is necessary.

**MR. ROSS:** Yes, Your Honor.

The -- the -- as plaintiffs put up -- point out in their legal filings, their -- they are used to receiving, at just one of their firms, in excess of $200,000 per month in order to fund their pro bono activities -- or, excuse me, to fund their direct legal service activities. And so it's the

Government's position that a TRO would be inappropriate in this case.

However, if the Court does find that there's jurisdiction and redressability and the litany of things that we find as potential threshold issues that the Court needs to resolve first or really that plaintiffs need to satisfy their burden on, a bond would be -- is allowed for under the Federal Rules and would be appropriate here considering the potentially vast sums of money.

And potentially even the -- not to assign anyone homework but to the extent that it would be helpful to the Court -- should we get to that stage, supplemental briefing may be helpful in discussing what those -- what those numbers look like, but...

**MS. TUMLIN:** Can I address that briefly, Your Honor?

**THE COURT:** Mm-hmm.

**MS. TUMLIN:** Yes, it's surprising to me as well. I'm super old. I've been litigating for over 20 years, and I've never had the Federal Government ask for a bond, so I also looked into this.

So, first, I assume that this comes from the White House directive where the White House has instructed Government attorneys to, quote, curb activist judges and deter litigation by seeking what I would consider to be both an excessive and a punitive bond in cases like this.

And I want to be clear that the bond request is not tailored to this case. It has no merit under Rule 65. And that the outcome of setting any bond here, anything above zero dollars, would be to chill the ability of plaintiffs to bring lawsuits just like this.

And that is why there is ample settled case law. I'll point out just one for the Court, and I will be slow this time. This is a DDC case, *National Resources Defense Council* -- or NRDC -- *versus Morton*, 337 F.Supp at 167, is that courts have to be very careful not to set any bonds that would effectively kick a party out of court, especially when a bond would have the effect of denying the plaintiffs their right to seek judicial review of agency action in the first place.

So obviously you maintain a discretion to set no bond, and in cases like this, courts set zero dollars as the bond.

**THE COURT:** Ms. Tumlin, do you happen to have what year that case was from?

**MS. TUMLIN:** Sorry?

**THE COURT:** Do you happen to have what year that case was from?

**MS. TUMLIN:** Oh, why, yes, it's from 1971, because this is not a novel question and it's well cited.

**THE COURT:** So let me make sure I don't have any other questions written down for you all. I think we've hit the ones that I wanted.

I do want to give you all an opportunity to address any other points that you want to.

But I'll tell you that, on some level, I'm a little bit back where we started in terms of wanting -- I mean, I appreciate Ms. Tumlin pointing me to *Heckler* for the pieces related to the APA or to the extent that we've discussed redressability. But on some level, beyond the oral argument, I think it would be helpful for me to have the supplemental briefing. And to the extent the Government is offering it on the bond, I think there's some value in having you all submit something further.

So let me propose this:

Plaintiffs are here on a TRO because they want this all done expeditiously. I understand that. But at the risk of giving you all homework -- and I don't want to be the one to give those deadlines.

So why don't I -- I'm going to suggest that we break for 10, 15 minutes; or if you all can chat about it sooner and let me know sort of a timeline that you think makes sense to proceed with some of that briefing -- if you get it done -- I'll plan to come back out in about -- at quarter -- at quarter to 11:00.

If you all need more time, please let my courtroom deputy know. If you get it done sooner, let my courtroom deputy know and I'll be back out sooner. And we can sort of go

from there.

But like the -- for those of you in the audience who may -- who may not be following along or came in late, essentially, don't expect a ruling today; right? But the idea is, of course, we are still trying to move quickly, so soon. So if anyone doesn't want to stay past the recess, I will take no offense.

All right, folks. Let me know and we'll be back.

**THE CLERK:** Court is in recess.

(Recess taken at 10:38 a.m.)

(Proceedings resumed at 10:58 a.m.)

**THE CLERK:** Please remain seated. Court will come to order.

**THE COURT:** All right. Folks -- go ahead.

All right, folks. Tell me where we are.

**MS. TUMLIN:** Your Honor, we think the Court would like a reply brief on our temporary restraining order, and we are delighted to provide that. We can do that by -- what we discussed with Jonathan was that we could provide a reply brief by Thursday at noon.

If you don't like what we're laying out, and you need us to work faster -- because we are, in fact, here on a temporary restraining order, plaintiffs are not trying to convert this to a preliminary injunction, Your Honor. We haven't even talked about the irreparable harms yet today. And

it's for that reason.

So, unfortunately, where the parties disagree is we -- we, the plaintiffs, believe that we can get you in a brief to address the questions that you have raised today by noon on Thursday. We are at your disposal after that.

If you want to have another hearing, we are happy to come back this week. We understand we asked for this and it is a temporary restraining order. I would note that we have court hearings in Boston on Monday and Thursday of next week.

But where we disagree is that the Government would like to put in a brief after we file our reply. We did discuss -- we think that that would have to have -- we don't think it is necessary; it's our motion. But if it was necessary, we discussed giving similar time.

Not counting today, because we're all quite busy today, we would have a day and a half to put in our reply. And then the Government would have a day and a half to put in whatever it is they're putting in, whatever they want to call it, in response to our reply.

Again, we don't think it's necessary, but they did, in fact, ask for it, and I think it's really up to you whether you think it's necessary.

And I should be quiet and let Mr. Ross speak.

**THE COURT:** Mr. Ross.

**MR. ROSS:** Thank you, Your Honor.

And thank you to plaintiffs' counsel as well.

The Government is -- came prepared today to discuss the harms. If that's something that the Court would indulge the parties in, we're happy to engage with it.

Ultimately, it's plaintiffs who bear the burden here, and on an inconclusive record, they lose, so the Court should deny the motion for a temporary restraining order.

And as the Court indicated also before the recess just now, it seems that they're adding in new arguments and new facts to their motion, so perhaps a preliminary injunction conversion would be the most appropriate, and the parties can go through normal briefing that we would in due course there.

The Government offered plaintiffs to file supplemental briefing, I think more accurately captures what the Court was -- was contemplating, supplemental briefing from plaintiffs on Monday the 7th, followed by supplemental briefing from the Government on the 14th, the Monday afterwards.

And, again, on an expedited schedule in light of plaintiffs' request, but ultimately at the end of the day, this is a dispute over a contract that, under any scenario, terminated or not, would have already expired. This is not -- this is not, in the Government's view at least, as urgent or pressing as plaintiffs make it out to be, although we're certainly empathetic to the position that they're coming from, their representation of their clients can continue.

**THE COURT:** Let me repeat back to you all the two separate timelines I think you all are setting out.

So plaintiffs' timeline -- well, so -- let me maybe also say this just so it's abundantly clear. By virtue of having held a hearing and asking for -- well, I don't know if it's asking for the briefing or not.

But by virtue of having held a hearing and some of the other proceedings -- procedures that we've undertaken, there's a decent chance that if you all go up on appeal, this will be reviewable as a PI, regardless.

So I think, Ms. Tumlin, what I hear you saying is you don't want to convert it to a PI, which is to mean you don't want to -- you do not want a more extended schedule, which is why -- what I heard you lay out was, you all get me a brief -- supplemental briefing by Thursday at noon, and then the Government sur-reply or additional -- we can just call them supplemental briefs.

Because in the end there is a degree to which what I want to see from plaintiffs is a reply in the sense that you have not addressed some of the fundamental -- some of the jurisdictional things that are raised by the Government in their brief.

We talked about them some today -- right? -- you're flagging *Heckler* for me. You're flagging -- you're explaining why you are so confident that this can be heard under the APA.

And I would appreciate more about redressability to the extent that that goes to your standing and how the -- how the injunction you seek will inure to your clients' benefit, not just to Acacia's benefit; right?

Those are the pieces that I'm not clear about after the Government's brief.

It's Ms. Tumlin's dime, so I'm sort of inclined to give her the schedule she's leaning toward.

Let me ask you, Mr. Ross, did you all talk page limits at all?

**MR. ROSS:** We did not.

**THE COURT:** Of course not because I'm the one who has to set those. That's okay. That comes with the territory. All right.

So let's stay on the shorter timeline. Let's go ahead and ask the plaintiffs to have their submissions in Thursday at noon. Mr. Ross, I think Ms. Tumlin gave me a day and time and I was not quick enough, so when would yours be due?

**MR. ROSS:** Your Honor, the Government would ask for at least four business days.

**THE COURT:** Objections?

**MS. TUMLIN:** We did object. We thought that if we were getting a day and a half -- business days, they should get a day and a half, wrapping this up by Friday.

And, Your Honor, I want to say just one thing about

TRO versus PI, which is, we would be happy to slow down if a TRO issued to preserve the status quo.

And secondly, if we were in a preliminary injunction land, we want the administrative record. We have an arbitrary and capricious claim. We haven't talked about, like, what is the timing for the production of the administrative record. I don't want to be briefing that without having the administrative record before me and being able to raise all of the proper claims in our complaint on a proper preliminary injunction motion.

**MR. ROSS:** Your Honor, may the Government be heard?

**THE COURT:** Of course.

**MR. ROSS:** If we're headed towards preliminary injunction territory anyway, that's the -- the administrative record production, all of those factors are things that the parties would meet upon in due course. And that timing baked into it is baked in for a reason, for the parties to resolve those issues so the Count doesn't have to.

**MS. TUMLIN:** And, again, Your Honor, we're happy to address this in the reply briefing. But what we are concerned about, what the 11 clients -- the 11 plaintiffs before you are concerned about is, there are children with hearings and deadlines this week who don't have representation; that clients have been put in this catch-22 where their choices are, provide legal representation for free, which means financial ruin for

their organizations, doubling up on caseloads, like, all the things articulated in harms.

Terminations have occurred. Terminations of staff have already occurred for both ImmDeff and GHIRP, who are two of the clients. So that's why we're here on a TRO motion because we need preservation of the status quo for the period that is necessary to have a proper record and proper briefing on a preliminary injunction.

**THE COURT:** Mr. Ross, I'm going to ask the Government to get me their brief Wednesday morning.

**MR. ROSS:** Thank you, Your Honor.

**THE COURT:** I think that is three-ish business days, but I'll ask you to get that for me on the 9th, please, by 9:00 a.m.

And we didn't talk page limits, but I'm going to ask you all to keep them to ten pages or less.

My sense is just -- again, I think I started to give plaintiffs a sense of what would be helpful for me to see from -- I heard Mr. Ross indicate that the Government might want to submit a little bit more about the bond.

I reiterate that now only to the extent that I'm flagging it as an issue that if plaintiffs want to put anything about that as well, it might be worthwhile since, you know, some -- a little bit more is coming, and it is an issue raised in the Government's opposition that the plaintiffs didn't

address.

All right. Anything else before we break for the day?

**MS. TUMLIN:** Your Honor, if the Court has time, I would love to have my colleague, Carson Scott, talk very briefly about the harms so that it's in the Court's mind and in case the Court has any questions.

**THE COURT:** Did I hear, Mr. Ross, that you were also prepared to address the harms today?

**THE WITNESS:** Yes, Your Honor.

**THE COURT:** Okay. Let's do that.

**MS. SCOTT:** Good morning, Your Honor.

**THE COURT:** Good morning.

**MS. SCOTT:** Carson Scott with Immigrant Defenders Law Center for plaintiffs. I would like to address the remaining elements of the TRO, namely irreparable harm and the balance of the equities, for the Court.

When a defendant's actions have perceptively impaired an organizational plaintiff's programs, and have frustrated its mission, there can be no question that the organization has suffered irreparable harm.

And indeed there's no question here that plaintiff organizations in this case and their child clients, some as young as five months old, have suffered and are actively suffering irreparable harm as a result of defendants' actions.

Plaintiffs in this case are 11 legal service providers

whose shared core mission is to ensure no unaccompanied child faces their immigration proceedings alone.

They are there to provide quality legal services, and they have built their legal service models in reliance on the mandates of the TVPRA and the ORR Foundational Rule. They play a critical role in ensuring the safety and well-being of unaccompanied children, and their core business activities in furtherance of their mission include a number of services including providing KYR presentations, legal screenings, and referrals to other legal service providers.

They mobilize pro bono attorneys and provide technical assistance to those pro bono attorneys. They provide friend-of-court services for unrepresented detained children, and they provide full-scope representation to thousands of detained and non-detained unaccompanied children.

But on March 21st, defendants abruptly and with no explanation, terminated the contract that enabled plaintiffs and their sister LSPs to provide these critical services to thousands of unaccompanied children nationwide.

The irreparable harm resulting from this decision takes many forms. The Vermont Asylum Assistance Project has already had to rescind its offer to fully represent a Sudanese child who fled ethnic and religious persecution.

Nearly all plaintiffs are facing an existential threat. On Monday, March 24th, plaintiffs began furloughing

and laying off their employees. For example, GHIRP will have to terminate almost all of their immigrant youth and child staff in approximately four weeks.

ImmDeff was forced to lay off 27 of my staff -- of my colleagues and reallocate reserves that are meant to fund other mission-driven work for -- in order to cover the representation of their existing unaccompanied child clients. It anticipates that those reserves will be exhausted within six months, and dramatic cuts to staffing will be needed well before then to avoid completely bankrupting the organization.

As FIRRP stated (as read):

"Once layoffs are announced and/or begin in earnest, the Florence will lose staff and, with them, their experience, expertise, and work towards our mission. Even if funding were restarted, we would not be able to simply replace lost staff with equally qualified and experienced people."

These employees, Your Honor, represent professionals who are highly trained to conduct the services in a child-friendly manner and in trauma-informed methods.

They specialize in protecting the safety and the due process rights of unaccompanied children, as is required by the TVPRA and the ORR Foundational Rule.

Not anyone can do this job. In fact, plaintiffs are so adept at these services, they have developed really strong

stakeholder relationships with ORR and with OPLA attorneys.

In both EOIR and ICE stakeholder meetings, the Government partners routinely express thanks for the services our plaintiffs provide and their sister legal service providers nationwide provide.

The crucial point here is that the defendants' actions have put plaintiffs in an impossible dilemma. Plaintiffs collectively have an ethical obligation to thousands of children that are detained and non-detained, and continuing to represent them with no funding presents an existential threat to their organizations.

But as Amica stated (as read):

> "The alternative, to immediately withdraw from representing these thousands of affected cases, is antithetical to the ethical obligations as attorneys and our values as a mission-driven organization."

The Ninth Circuit has repeatedly found these forms of harm in much less severe context to confer standing and to constitute irreparable harm. And we believe that the picture painted here is quite clear. Plaintiffs, whose core mission is to represent unaccompanied children, have, with the stroke of a pen, lost any viable way to do so; with them, years of institutional knowledge will be lost.

I also want to briefly address the balance of equities, unless Your Honor has questions about harm.

**THE COURT:** Actually, one.

So in -- in the motion you all cite -- I won't remember the -- the recent Supreme Court case about standing which actually, to my mind, calls *Havens* into question; right?

Much of what you all are relying on is *Havens*' standing. So I was sort of intrigued and caught offguard that -- and I'm trying to find it now. I think it's *Hippocratic Medicine*.

**MS. SCOTT:** Yes, Your Honor*, Hippocratic Medicine*.

**THE COURT:** So what do you make of the Supreme Court's calling *Havens* into question, or at least seeming to infer that it should be limited?

**MS. SCOTT:** Your Honor, I actually read *Hippocratic Method* [sic] to reaffirm what *Havens* stated, and bring back the organizational standing inquiry to what *Havens* laid out.

So that being said, *Havens* and *Hippocratic Method* both have stated that, where plaintiffs' mission are frustrated and their core businesses -- business practices have been perceptively impaired, there's no doubt that they have suffered irreparable harm, or that they have standing.

And, in fact, here, that's exactly what has happened. Plaintiffs' core business activities is to represent and protect unaccompanied child clients, and they can no longer do so because of termination of the contract.

**THE COURT:** You're welcome to move on to balancing of

the harms.

**MS. SCOTT:** Okay.

The Court should also find that the balance of the equities and the public interest favor plaintiffs in this case.

First, the Government cannot suffer harm from an injunction that ends an unlawful practice.

Interestingly, the Government argues that, quote (as read):

"An injunction here would effectively disable the administration from effecting its executive order consistent with their constitutional and statutory authorities."

In doing so, it cites to *Maryland v. King*, 567 U.S. 1301, from 2012. But that case stands for the proposition that, quote (as read):

"Any time a Government is enjoined by a court from effectuating statutes enacting [sic] by representatives of its people, it suffers a form of irreparable injury."

The Government clearly has it backwards this in case. Here, the Government has completely walked away from effectuating the mandates of the TVPRA and the funds that were appropriated by the representatives of its people to represent unaccompanied children.

Plaintiffs here are merely asking to bring defendants

back into compliance with the mandates of the TVPRA and the ORR Foundational Rule. And Congress has already appropriated funds for those services, so continuing that does not affect the Government in any way. The only parties who are suffering here are plaintiffs and the thousands of clients who have now -- who will now face removal proceedings alone.

Further, courts have consistently held that it's in the public interest to have the Government agencies abide by the laws that govern their existence and operations.

Here, defendants' cancellation order not only violates their legal obligations to unaccompanied children, but it exposes them to greater harm. For example, legal service providers are the first to spot signs of trafficking among unaccompanied children.

ImmDeff and FIRRP both describe in their declarations how during the zero-tolerance policies of 2017, their staff were some of the first to note and whistleblow the policy. They played a key role in locating separated parents and facilitating contact between parents and children in ORR facilities.

This sort of advocacy continues to be needed. In fact, FIRRP declared that it has two children under the age of two who have been separated from their parents. It should go without saying that having legal representation and protection for preverbal, tender-aged children serves the public interest

and aids the Government.

When children have suffered abuse in ORR facilities, we are there to advocate for the child's needs. Independent, non-governmental organizations like plaintiffs' serve crucial roles in ensuring the safety and well-being of unaccompanied children, which no doubt serves the public interest.

And lastly, our programs also promote judicial economy and help immigration judges fulfill their statutory obligations to unaccompanied children. Plaintiffs are regularly praised for the assistance they provide in courts and in ORR facilities.

And, in fact, to quote from the amicus brief (as read):

> "The unknowledgeable minors are brought before these courts" -- "when unknowledgeable minors are brought before these courts, the assistance of trained, knowledgeable advocates is absolutely necessary to ensure due process is satisfied."

Legal representation and friend-of-court services are an essential component of the immigration court system for represent -- for unrepresented child respondents.

The injury to plaintiffs and their child clients is no doubt substantial, and the public's interest is served with -- by compliance of the APA. If a temporary restraining order is not issued, plaintiffs and the thousands of children that they

collectively represent, will face clear and immediate and irreparable harm.

Thank you, Your Honor.

**THE COURT:** Thank you, Ms. Scott.

You mentioned you were going to do the rest of the elements. Do you also want to talk about the scope of the injunction?

I don't feel the need to dive into that so much today, but I don't know if that's yours.

**MS. SCOTT:** Yes, Your Honor.

**THE COURT:** Go ahead.

**MS. SCOTT:** Yeah. So lastly, we do believe it is appropriate to issue a nationwide injunction in this case for complete relief.

Plaintiffs here are mission-driven organizations, and their core business practices are to protect the rights of unaccompanied children and -- as contemplated by the TVPRA and the ORR. So the scope of the injunction must be dictated by the extent of the violation, and the extent of the violation here is nationwide.

Unaccompanied children in our facilities oftentimes move to different parts of the country, and our legal service providers continue to represent them, or connect them to other legal services nationwide.

The Courts have also recognized that a fragmented

immigration policy would run afoul off the constitution and statutory requirements for uniform law in immigration policy.

**THE COURT:** Thank you. So anything further?

**MS. SCOTT:** Your Honor, I don't believe that the Government addressed the nationwide injunction, so we do believe that Your Honor has a binary decision here to either issue our TRO -- nationwide.

**THE COURT:** Thank you, Ms. Scott.

Mr. Ross, let me hear from you on any or all of these things.

**MR. ROSS:** Thank you, Your Honor. Very briefly.

Again, the Government does want to emphasize that counsel plays a tremendous role in making sure that it's -- it's well received that these are vulnerable children. And ORR is doing incredible work, as are plaintiffs' counsel and the other legal organizations that step in and provide these important services to children.

We take issue with the characterization that anything unlawful has been done because the Government maintains that we're continuing to provide what's required by the statute. And so to the extent that plaintiffs dismiss -- or rather conclude that a harm has been committed by virtue of a violation of a -- of a regulation or of a statute, it could be not be further from the truth.

Similarly, there's -- no one has a right to be a

federal contractor. In all federal contracts, indeed with the federal contracts at issue in this case, they're very transparent about the ability of -- for the Government to exercise its discretion and terminate the contract at any time for any reason.

Plaintiffs were on notice of this when they entered into the contract at the very beginning; at least the contracting agency was aware of this. And so, as subcontractors, again, they stood to know the implications of what this relationship -- what this business relationship would entail.

Inasmuch as there is an ethical obligation that attorneys have to their noncitizen clients, we recognize that as well. But nothing that the Government does has an effect on that ethical obligation. And indeed, for attorneys who have already appeared in immigration court and other proceedings on behalf of -- on behalf of noncitizen children, they do have a duty to that child and -- consistent with the Immigration Court Practice Manual and their state licensure as well.

In terms of a scope of an injunction, the Government, again, restates that plaintiffs -- that the record before the Court right now is inconclusive, and the threshold for a temporary restraining order is extraordinarily high. On that basis alone the Court should deny the TRO.

At any rate, even alternatively, were the Court to --

to issue an injunction, it should be limited -- as limited as possible, consistent with case law.

For the remainder, the Government rests on the brief, and thank you.

**THE COURT:** Thank you, Mr. Ross.

And thank you, again, Ms. Scott.

My sense is, I will just go ahead and get briefing from you all. But I see Ms. Tumlin has a note.

Go ahead. What you got?

**MS. TUMLIN:** Well, mainly, it's clarifying, Your Honor. I want to make sure that we know what our homework is. I believe that we have a brief due Thursday at noon; is that correct?

**THE COURT:** Correct.

**MS. TUMLIN:** Can you please clarify or repeat if there's a specific timeline Wednesday when the Government's brief was due?

**THE COURT:** I think I said 9:00 a.m.

**MS. TUMLIN:** 9:00 a.m. Okay.

**THE COURT:** Does that sound right to you, Mr. Ross?

**MR. ROSS:** I can check, but I believe so.

**MS. TUMLIN:** Okay. And does the Court anticipate having another hearing or hearing from the parties on the TRO after the Government's brief goes in?

**THE COURT:** No, but I say that, of course, having not

read the briefs yet.

**MS. TUMLIN:** Okay. So I mean, I guess what we want to say to Your Honor is, number one, we recognize that the Court is busy, but because it is a TRO, we're available. You know, if it needs to be a Zoom hearing because the Court has other commitments or whatever it needs to be, we are available. If the Court determines, upon reading it, that it -- that you need to hear from us again, we will make ourselves available; although, we might have those other court hearings.

But the point is simply, Your Honor -- and I really do want to emphasize that what we need is a TRO while the Court considers the briefing. And I just want to emphasize that, you know, obviously the Court always has jurisdiction to determine its own jurisdiction.

A TRO is necessary to protect the Court's jurisdiction here. In fact, it's generally considered as an appropriate bridge, just to allow the Court the time needed -- you know, 14 days -- to get proper briefing and make a more fulsome conclusion in light of what you've heard from my colleague, Ms. Scott.

We're precisely asking the Court for this kind of extraordinary relief because of the extraordinary action taken by the Government in violation of statute and regulation, and the extraordinary harms.

And so we want to give the Court everything the Court

wants, and we want to do it quickly; but we are humbly submitting that, in that interim period, there's harm happening every day and a TRO is appropriate as a stopgap measure contemplated by the Federal Rules to put the status quo back in place while you get briefing you need.

**THE COURT:** Let me ask about that, because to put the status quo back means that Acacia gets its funding back. But I think this is the hurdle and the problem that I'm having. Because from the conversation we had earlier, if I heard you correctly, and if remember correctly, Ms. Tumlin, part of your point and contention is that that is, in fact, what you're seeking, and that you understand and are comfortable with the idea that that may actually not result in the funding returning to your organizations.

**MS. TUMLIN:** That's correct, Your Honor.

We are not -- to put the status quo back in place does not mean that the same dollars need to flow to Acacia and then to our 11 clients. The status quo is provision of legal counsel to the greatest extent practicable. And, quite frankly, to be very direct, the Government needs to come up with a plan for that. It's on them.

It's not on you, as the Court, to micromanage. It's not on us, as the plaintiffs, to say: You have to do it our way. You have to do it Congress' way. You have to do it in comport -- to comport with the Foundational Rule.

Status quo says there's somebody to hand these cases off to.

If the Government has decided, "We don't like these providers anymore, we want a different set of providers," okay, that's their discretion. We talked about discretion earlier this morning, Your Honor. But they need a plan, and what instead they have is no dollars, no plan.

It violates the statute. It violates the Foundational Rule. Little kids are going to court alone, and that's why a TRO is needed right now and urgently.

**THE COURT:** Mr. Ross?

**MR. ROSS:** Your Honor, for plaintiffs to suggest that the Court enter a TRO when it's not even clear that the Court has jurisdiction to hear this matter at all just -- it would equate to an advisory opinion and a step beyond what the Court's power is. I think the parties need to resolve what it is that the Court has jurisdiction over and what is the proper forum for this -- for this complaint before the parties proceed.

**THE COURT:** So, Mr. Ross, let me ask you this: I tend to agree with you to the extent that I still have some reservation about redressability and that an order actually redresses a harm for the plaintiffs because the plaintiffs are the legal organizations and not the -- not the undocumented -- excuse me, not the unaccompanied minors. I'm hesitant -- for

that reason, I'm hesitant to issue a TRO now.

Now, that said, plaintiffs are offering to get me their brief Thursday that addresses those concerns. And so maybe what I -- what I want to note for you all is that I want to hear from you, but that may -- I -- the point of the supplemental briefing was to give the plaintiffs an opportunity to better address -- well, to help me by -- beyond what they can give me in oral argument flesh out why -- well, the TRO they asked for will address their harms, why they can bring them as an APA claim and -- right? -- why all of those things. All right.

So I while want the Government's brief, I'm -- if you want the -- right, part of the conversation we had is the timing. So if you want the additional time, that augurs toward not waiting for your brief and sort of dealing with it -- dealing with the TRO once I've got the last bit from plaintiffs on the points you've already raised.

I'm inclined to get the additional supplemental brief from you that you've asked for because I'd rather have a fuller record, but at some point, frankly, part of what I hear plaintiffs saying that I agree with is it needs to be dealt with.

So let me ask you -- and sort of with all those pieces -- well, let me start where Ms. Tumlin did. If I do read the briefs and decide I need to hear from you all again,

yes, we will do it over Zoom because we will move faster and no one will need to get on a plane; and I thank you all for doing so for -- for today's hearing. But we'll move faster for the next one.

To that end, I'm curious then as we're talking, Mr. Ross, if you want to move up your -- I don't -- I'm not asking you to negotiate against yourself and I've given you until Wednesday at 9:00 a.m., but I'm also inclined to say then do you want to move yours up?

**MR. ROSS:** Your Honor, I've already assigned myself homework. Now you're trying to shorten the deadline --

**THE COURT:** I am. Ask my law clerk, this is what I do.

So, no, if you're comfortable leaving time that's fine. I'm -- but I will -- I think what I'm flagging for you is the -- what I'm flagging for you is that I appreciate the point -- here's what I find tricky.

To the extent that what plaintiffs rest on is that the harms -- right? -- that this is irreparable harm, that's the whole reason we're here. If there are irreparable harms, then I just need you to convince me that redressability is -- that an injunction actually redresses a harm for your clients and not for your clients' clients; right? That connection -- I need a nexus better than I have presently.

If they do that in their brief, at that point, I have

a full enough record -- I want your briefing. I don't want to tell you -- I'm stopping short of saying to you that I'm going to figure -- that I'm going to make up my mind before I see your briefing.

But at that point, if they've -- if they've convinced me, I think, that Thursday realistically -- more realistically Friday, I'll have enough at least to know whether or not a TRO can issue, so that then we can move into further briefing beyond that.

**MR. ROSS:** Understood, Your Honor.

And, again, just because of the -- really the Court's point is well-taken and plaintiffs' as well.

Because the core issue here is what -- what is the relief that even plaintiffs wanted that the Court can grant in terms of bringing back to life a contract that was terminated, but that was going to expire anyway several, you know -- just a few days thereafter? And add a further wrinkle to it that now there's a new contract that's been entered into.

So, in essence, it's plaintiffs asking the Court to create a contract that -- whether or not it benefits them, it asks the Court to create a contract where there isn't one and there wouldn't under any other circumstance.

So for those reasons, you know, keeping -- keeping the timeline -- being cognizant of the timeline, that the Government still would like to respond and still requires that

time, respectfully.

**THE COURT:** I understand.

So even though I was addressing Mr. Ross, I hope built into that plaintiffs caught why I'm going to defer -- I'm going to defer ruling on the TRO at all at this point still. And I will wait to get your supplemental briefs -- go ahead, Ms. Tumlin.

**MS. TUMLIN:** Do you need us to move faster, Your Honor? If you need us to move faster, in light of our request, I'm told that we can put in our brief by end of day Wednesday, if that helps, then, the Government counsel to move faster.

**MR. ROSS:** Your Honor, it would -- I would be speaking out of line for my team, but as the Government, we still need time to digest what plaintiffs have put forward. Whether they do it faster or sooner, I think that more time would reflect a more detailed work product that might actually be more beneficial to the Court rather than just hastily putting something together.

Not to infer that it would be hasty, but to the extent that the Court wants the benefit from having a meaningful discussion, I think that all the parties would benefit, and for judicial economy, it would be better for plaintiffs to have the time to respond. It can respond earlier if they're so inclined, but the Government needs time to -- to unpack this

and to really understand where they're coming from.

**THE COURT:** Ms. Tumlin, you're offering it by Wednesday afternoon?

**MS. TUMLIN:** Well, I was saying Wednesday end of day.

**THE COURT:** We'll call it Wednesday night.

Mr. Ross, if they're taking a day off theirs, I'm going to take a day off yours. Let's get yours in by Tuesday and see where that leaves us.

**MS. TUMLIN:** And, Your Honor, I just want to say two very quick things.

I appreciate the Court's indulgence all day today with all the things. One is, we will fully brief the redressability question, but I think that I have not been clear, so let me say two sentences on that.

The plaintiffs here are mission-driven organizations; right? Their mission is to represent kids and to ensure that no child stands alone in immigration court. And so I want to be really direct and to say that we are not asking for the resuscitation of a terminated or expired contract.

We would not have a complaint if the Government had a plan to meet its TVPRA and Foundational Rule obligations by providing that counsel and ensuring that kids don't stand alone in immigration court with other people. But they haven't put that forward and that is their fundamental problem.

So it's easier for them to try to recast this and say,

"We want the dollars. We want to be paid up." No, we want children to get representation in court to the greatest extent practicable; that's what Congress commanded.

And these organizations, it's their mission, and asking that they have to do their mission repping kids for free, that just doesn't work and it fails to meet the mandates of the law here and the regulation.

And last, it's not unusual -- on issuing a TRO while the Court considers briefing, that's what TROs are for. That's what the Federal Rule of Civil Procedure 65 provides. It is a bridge for the Court to get what it needs.

That's why TROs are not appealable. They are just temporary. They are not the fulsome consideration of a preliminary injunction. We're not asking for that here. We need time to do to for the record, all of the things.

We're saying we are likely to succeed on the merits. The harms are severe, the public interest tips our way. We have met the factors for the temporary bridge of a TRO. The Court has that discretion under the rule, under the All Writs Act, and that's what we're asking for.

And I thank the Court for all the extra time.

**THE COURT:** Mr. Ross, would you like to respond at all?

**MR. ROSS:** Very briefly, Your Honor.

The plaintiffs seek extraordinary relief on a national

scale and they have not met their burden to show that.

**THE COURT:** I will continue to take it under submission and I'll think on it some more. But I think the -- if nothing else, I think the point that I'm hoping you all take from me is to sort of reiterate what I said before our recess, which is: Don't expect something from me from the bench today.

And I'll keep thinking on it, but -- we'll take it from there. All right.

Counsel, I thank you all. Have a good day.

**MR. ROSS:** Thank you, Your Honor.

**MS. TUMLIN:** Thank you, Your Honor.

**THE CLERK:** Court is adjourned.

(Proceedings adjourned at 11:36 a.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, April 1, 2025



Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court