IMMIGRANT DEFENDERS LAW
CENTER
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org

JUSTICE ACTION
CENTER
Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

AMICA CENTER FOR IMMIGRANT
RIGHTS
Adina Appelbaum (*pro hac vice*)
Samantha Hsieh (*pro hac vice*)
Peter Alfredson (D.C. Bar No. 1780258)*
Evan Benz (*pro hac vice*)
Amica Center for Immigrant Rights
1025 Connecticut Ave., NW, Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*\*pro hac vice* forthcoming
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | Case No. 3:25-CV-02847-AMO<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:          TBD<br>Time:         TBD<br>Dept:         TBD<br>Judge:        Hon. Araceli Martínez-Olguín<br>Trial Date:  TBD<br>Date Action Filed:  March 26, 2025 |

## NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE that, pursuant to the Court's April 1, 2025 order, in the United States District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, CA 94102 that Plaintiffs Community Legal Services in East Palo Alto, Social Justice Collaborative, Amica Center for Immigrant Rights, Estrella del Paso, Florence Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project, Immigrant Defenders Law Center, National Immigrant Justice Center, Northwest Immigrant Rights Project, Rocky Mountain Immigrant Advocacy Network, and Vermont Asylum Assistance Project will, and hereby do, move this Court for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a).

As long as congressional appropriations are available, Defendants United States Department of Health and Human Services, Office of Refugee Resettlement, and Department of the Interior are required to provide funding to legal services providers to provide direct representation to unaccompanied immigrant children under 8 U.S.C. § 1232(c)(5) and 45 C.F.R. § 410.1309(a)(4). On March 21, 2025, despite the existence of congressionally appropriated funds for this purpose, Defendants abruptly terminated long-standing funding for direct representation for unaccompanied children. On April 1, 2025, the Court issued a temporary restraining order to protect Plaintiffs until the Court rules on this motion, enjoining Defendants from "withdrawing the services or funds" Defendants provided under the TVPRA and Foundational Rule as of March 20, 2025, and precluding Defendants from "cutting off access to congressionally appropriated funding for its duration." Plaintiffs now move for a preliminary injunction preserving the status quo and extending the Court's temporary restraining order through the resolution of this case.

The motion is based upon this notice of motion; the memorandum of points and authorities in support thereof that follows; the declarations of Roxana Avila-Cimpeanu, Daniela Hernández

Chong Cuy, Jill Martin Diaz, Ana Raquel Devereaux, Marion Donovan Kaloust, Miguel Angel Mexicano Furmanska, Vanessa Gutierrez, Ashley T. Harrington, Joel Frost-Tift, Elizabeth Sanchez Kennedy, Lisa Koop, Melissa Mari Lopez, Laura Nally, Martha Ruch, and Wendy Young, filed concurrently herewith; the proposed order filed concurrently herewith; the pleadings, Plaintiffs' Motion for a Temporary Restraining Order and declarations of Roxana Avila-Cimpeanu, Daniela Hernández Chong Cuy, Jill Martin Diaz, Ana Raquel Devereaux, Marion Donovan Kaloust, Miguel Angel Mexicano Furmanska, Vanessa Gutierrez, Ashley T. Harrington, Joel Frost-Tift, Gautam Jagannath, Elizabeth Sanchez Kennedy, Lisa Koop, Melissa Mari Lopez, Laura Nally, Martha Ruch, and Wendy Young filed concurrently therewith, records, and papers on file in this action; oral argument of counsel; and any other matters properly before the Court.

DATED: April 4, 2025                                Respectfully submitted,


By: /s/ Alvaro M. Huerta                            /s/ Samantha Hsieh
_____                            _____


IMMIGRANT DEFENDERS LAW              AMICA CENTER FOR IMMIGRANT
CENTER                               RIGHTS
Alvaro M. Huerta (CA Bar No. 274787)    Adina Appelbaum (*pro hac vice*)
Carson A. Scott (CA Bar No. 337102)     Samantha Hsieh (*pro hac vice*)
Lya Ferreyra (CA Bar No. 340148)        Peter Alfredson (D.C. Bar No. 1780258)*
Immigrant Defenders Law Center          Evan Benz (*pro hac vice*)
634 S. Spring St., 10th Floor           Amica Center for Immigrant Rights
Los Angeles, CA                         1025 Connecticut Ave., NW, Suite 701
(213) 634-0999                          Washington, D.C. 20036
ahuerta@immdef.org                      (202) 331-3320
cscott@immdef.org                       adina@amicacenter.org
lferreyra@immdef.org                    sam@amicacenter.org
                                        peter@amicacenter.org
                                        evan@amicacenter.org

/s/ Karen C. Tumlin
_____                *Attorneys for Plaintiffs*


JUSTICE ACTION
CENTER
Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)
JUSTICE ACTION CENTER

P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

STANDARD OF REVIEW ................................................................................................. 3

ARGUMENT ................................................................................................................... 4

    I. ...... PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ....................................... 4

        A.    Plaintiffs Have Standing to Bring Their Claims and Their Claims are Redressable. ..................................................................................... 4

        B.    This Court has Jurisdiction Over Plaintiffs' Claims. ................................ 5

        C.    The Cancellation Order Determines Plaintiffs' Legal Rights and Obligations and is Final Agency Action Reviewable Under the APA. ....................................... 7

        D.    Termination of the Direct Representation Programs Violates the TVPRA ............. 11

        E.    Terminating Direct Representation Programs Violates the ORR Foundational Rule .................................................................................... 12

        F.    Terminating Funding for Direct Representation is Arbitrary and Capricious. ......... 14

        1.    Defendants Failed to Adequately Explain the Basis for the Decision. ................... 15

        2.    Defendants Failed to Consider All Relevant Factors and Articulate a Rational Connection Between the Facts Found and the Choice Made. ........................... 17

        3.    Defendants Failed to Offer a Reasoned Explanation for Their Policy Reversal. ..... 18

        4.    To the Extent Defendants Offer Any Reasons, Those Reasons Are Pretextual. ..... 19

    II. ...... PLAINTIFFS SATISFY THE REMAINING REQUIREMENTS FOR A PRELIMINARY INJUNCTION .......... 20

        A.    Plaintiffs Face Irreparable Harm ...................................................... 20

        B.    The Balance of Equities ................................................................ 23

    III. ..... A NATIONWIDE INJUNCTION IS APPROPRIATE ...................................................... 24

    IV. ..... THE COURT SHOULD NOT REQUIRE AN INJUNCTION BOND ................................... 25

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES
## Cases

*In re Aiken Cnty,*
    725 F.3d 255 (D.C. Cir. 2013) ........................................................17

*Al Otro Lado, Inc. v. Mayorkas,*
    2024 WL 4370577 (S.D. Cal. Sept. 30, 2024)............................. 12, 13

*Alcaraz v. I.N.S.,*
    384 F.3d 1150 (9th Cir. 2004)........................................................12

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011).........................................................3

*All. for the Wild Rockies v. Pena,*
    865 F.3d 1211 (9th Cir. 2017).........................................................3

*Ariz. Dream Act Coal. v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014).......................................................20

*Arizona Power Pooling Asso. v. Morton,*
    527 F.2d 721 (9th Cir. 1975)......................................................9, 10

*Bennett v. Spear,*
    520 U.S. 154 (1997) ......................................................................7

*Bowen v. Mich. Acad. of Fam. Physicians,*
    476 U.S. 667 (1986) ......................................................................9

*Bowen v. Mass.,*
    487 U.S. 879 (1988) ......................................................................6

*Bresgal v. Brock,*
    843 F.2d 1163(9th Cir. 1987)........................................................24

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962) ....................................................................18

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ....................................................................25

*Caribbean Marine Servs. Co. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988)........................................................20

*Carnation Co. v. Sec'y of Lab.,*
    641 F.2d 801 (9th Cir. 1981)........................................................12

*City & Cnty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018).......................................................19

*City and Cnty of San Francisco v. U.S. Citizen and Immigration Servs.,*
    981 F.3d 742 (9th Cir. 2020)........................................................15

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.,*
  38 F.4th 1099 (D.C. Cir. 2022) ........................................................................6

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019) ........................................................................................15

*Dept. of Homeland Sec. v. Regents of the U. of Cal.,*
  591 U.S. 1 (2020) ......................................................................................14, 18

*Disney Enters., Inc. v. VidAngel, Inc.,*
  869 F.3d 848 (9th Cir. 2017)..........................................................................23

*E. Bay Sanctuary Covenant v. Biden,*
  993 F.3d 640 ...........................................................................................4, 24, 25

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ...................................................................................17, 18

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,*
  98 F.4th 1180 (9th Cir. 2024)..........................................................................3

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ..........................................................................................7

*HIAS, Inc. v. Trump,*
  985 F.3d 309 (4th Cir. 2021)...........................................................................25

*Humane Soc. of U.S. v. Locke,*
  626 F.3d 1040 (9th Cir. 2010).................................................................14, 15

*Imm. Defs. Law Ctr. v. U.S. Dep't of Homeland Sec.,*
  No. 2:21-cv-00395, Dkt. 304 (C.D. Cal. Mar. 14, 2025) .............................7

*Jajati v. United States Customs & Border Prot.,*
  102 F.4th 1011 (9th Cir. 2024).........................................................................9

*Jicarilla Apache Nation v. U.S. Dep't of the Interior,*
  613 F.3d 1112 (D.C. Cir. 2010) ................................................................18, 19

*Kucana v. Holder,*
  558 U.S. 233 (2010) ..........................................................................................9

*League of Women Voters of N.C. v. North Carolina,*
  769 F.3d 224 (4th Cir. 2014)...........................................................................20

*League of Women Voters of U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) .............................................................................20

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) .....................................................................................9, 10

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012) ...........................................................................................4

*Me. Cmty. Health Options v. U.S.*,
   590 U.S. 296 (2020) ................................................................................6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................14

*Nat'l Council of Nonprofits v. OMB*,
   2025 WL 368852 (D.D.C. Feb. 3, 2025) ............................................7

*Nat'l Council of Nonprofits v. OMB*,
   2025 WL 597959 (D.D.C. Feb. 25, 2025) ..........................................25

*Nken v. Holder*,
   556 U.S. 418 (2009) ..........................................................................3, 23

*Pacito v. Trump*,
   2025 WL 655075 (W.D. Wash. Feb. 28, 2025) ................................6, 11

*Pacito v. Trump*,
   2025 WL 893530 (W.D. Wash. Mar. 24, 2025) ..................................5

*Renee v. Duncan*,
   686 F.3d 1002 (9th Cir. 2012) ............................................................5

*Robbins v. Reagan*,
   780 F.2d 37 (D.C. Cir. 1985) ............................................................11

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) ..........................................................23

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ..........................................................................15

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engs.*,
   255 F. Supp. 3d 101 (D.D.C. 2017) ..................................................18

*State v. Azar*,
   385 F. Supp. 3d 960 (N.D. Cal. 2019) ..............................................24

*Torres v. U.S. Dep't of Homeland Sec.*,
   411 F. Supp. 3d 1036 (C.D. Cal. 2019) ............................................13

*Tourus Recs., Inc. v. Drug Enforcement Admin.*,
   259 F.3d 731 (D.C. Cir. 2001) ..........................................................15

*Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Fed. R.R. Admin.*,
   988 F.3d 1170 (9th Cir. 2021) ..........................................................15

*United States v. 1996 Freightliner Fld Tractor VIN1FUYDXYB-TP822291*,
   634 F.3d 1113 (9th Cir. 2011) ..........................................................12

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,
   766 F.2d 1319 (9th Cir.1985) ............................................................25

*Walczak v. EPL Prolong, Inc.*,
   198 F.3d 725 (9th Cir. 1999)......................................................................................25

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017)..................................................................................25

*Wawszkiewicz v. Dep't of Treasury*,
   670 F.2d 296 (D.C. Cir. 1981) .................................................................................18

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
   586 U.S. 9 (2018)..................................................................................................9, 10

*Winter v. Nat'l Res. Def. Council*,
   555 U.S. 7 (2008)..................................................................................................3, 23

*Zepeda v. I.N.S.*,
   753 F.2d 719 (9th Cir. 1983)...................................................................................23

**Statutes**

5 U.S.C. § 551(13) .........................................................................................................7

5 U.S.C. § 701(a)(1) .......................................................................................................8

5 U.S.C. § 702 ...............................................................................................................7

5 U.S.C. § 706(2)(A).....................................................................................................14

8 U.S.C. § 1232(c)(5) ....................................................................................1, 4, 5, 9, 11

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4,
   Div. A Tit. I § 1101(8) (2025)............................................................................10, 13

Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138
   Stat. 460, 665-666 (2024) .................................................................................10, 13

**Other Authorities**

H. Rep. 117-403.............................................................................................................17

Olga Byrne & Elise Miller, *The Flow of Unaccompanied Children Through the*
   *Immigration System* (March 2012), https://shorturl.at/KI3Jt.................................16

S. Rep. 118-84 ..........................................................................................................10, 13

**Rules**

Federal Rule of Civil Procedure 65(c)..........................................................................25

**Regulations**

45 C.F.R. § 410.1309(a)(4)...................................................................................1, 10, 13

89 Fed. Reg. 34526 .......................................................................................................13

89 Fed. Reg. 34529 ........................................................................................................... 13, 24

## INTRODUCTION

Each year, tens of thousands of unaccompanied noncitizen children ("UCs") arrive in the United States without a parent or legal guardian and are placed in the custody of the Office of Refugee Resettlement ("ORR"). Absent intervention from legal services providers, they must navigate our country's complicated immigration processes alone. Plaintiffs are a group of legal services providers dedicated to providing legal support to these children. In furtherance of their missions, Plaintiffs provide congressionally mandated direct representation and services to UCs.

In 2008, recognizing that children navigating complicated legal proceedings need counsel, Congress directed the Secretary of Health and Human Services ("HHS") by statute to "ensure, to the greatest extent practicable . . . , that all unaccompanied alien children . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5) (the "TVPRA"). Under this mandate, Congress has funded direct representation for UCs since 2012. In 2024, confirming its responsibility to provide these congressionally mandated legal services, ORR issued its Unaccompanied Children Program Foundational Rule ("Foundational Rule") and bound itself to funding legal services providers, so long as congressional appropriations are available. 45 C.F.R. § 410.1309(a)(4). Congress has appropriated funding through September 30, 2027.

Despite these congressional and regulatory mandates, on March 21, 2025, Defendants abruptly cut funding for the legal representation and other legal services work, including friend of court services assisting UCs in immigration court and efforts to refer UCs whom Plaintiffs could not represent to pro bono attorneys, in clear violation of the Administrative Procedure Act ("APA"). For brevity, Plaintiffs use "direct representation" throughout to refer to the legal services cancelled by Defendants. Defendants provided Plaintiffs no information about how Plaintiffs should address their ongoing commitments to represent UCs (including UCs with immigration

court dates in the coming days) or about how Defendants intended to comply with their obligations to provide direct representation to UCs to the greatest extent practicable.

Plaintiffs' missions are to ensure immigrants in the United States—particularly UCs—have legal support and do not face the immigration system alone. To that end, Plaintiffs collectively represent thousands of UCs through funding from Defendants mandated by the TVPRA and Foundational Rule. By refusing to fund direct representation for UCs, in violation of these mandates, Defendants put Plaintiffs in an impossible position: Plaintiffs' missions and ethical duties compel them to continue legal representation of UC clients. Although doing so without federal funding may ultimately bankrupt Plaintiffs, to do otherwise would betray their core missions and ethical obligations to their clients. The Court can (and should) redress this harm by issuing an injunction ordering Defendants to meet TVPRA and regulatory requirements to fund direct representation, as the Court temporarily did with its current TRO.

Defendants' actions contravene congressional and regulatory mandate and are arbitrary and capricious. They also violate this Court's temporary restraining order. To prevent irreparable harm to Plaintiffs, to say nothing of irreparable harm to their UC clients, this Court should issue a preliminary injunction, enjoining Defendants through the resolution of this case from cutting off funding for direct representation required under the TVPRA and Foundational Rule.

## BACKGROUND

Plaintiffs refer the Court to their Motion for a Temporary Restraining Order for a full factual background. *See* Dkt. 7 at 11-17. On those facts, the Court issued a temporary restraining order on April 1, 2025 (the "Order"), commanding Defendants to fund required direct representation for UCs through April 16, 2025. *See* Dkt. 33 at 1-2. Although Defendants stated they "are in receipt of the Court's order and are taking steps to comply expeditiously," Amica

Supp. Decl. ¶ 13, as of this filing, Plaintiffs are not aware of *any* actual steps Defendants have taken to comply. *Id.* ¶ 15. Plaintiffs intend to move to enforce compliance with the Order.

Further, on April 2, 2025, Defendants said they would not produce the administrative record until the latest time permitted by the Local Rules: with Defendants' answer. *Id.* ¶ 14.

Finally, Plaintiffs wish to clarify the state of the contract between Defendants and Acacia, which Defendants partially cancelled on March 21, 2025, given Defendants' incorrect indication at the April 1, 2025, hearing that there was no contract in place at all. The Cancellation Order cancelled three of the four contract "line items," leaving only the first line item ("know your rights" presentations and legal consultations). *See* Dkt. 7-15, Ex. 3. The contract was due to expire March 29, 2025, but Defendants issued a six-month extension for the first line item. *See* Dkt. 24-1 ¶ 11.

## STANDARD OF REVIEW

A preliminary injunction is warranted when plaintiffs establish: (1) likelihood of success on the merits; (2) irreparable harm; (3) the balance of equities favors them; and (4) an injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008)). When the government is the defendant, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Ninth Circuit uses the "serious questions" test, which allows the court to evaluate the *Winter* test on a 'sliding scale' . . . under which a party is entitled to a preliminary injunction if it demonstrates (1) 'serious questions going to the merits,' (2) 'a likelihood of irreparable injury,' (3) 'a balance of hardships that tips sharply towards the plaintiff,' and (4) 'the injunction is in the public interest.'" *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (citing *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)). This "standard is 'a lesser showing than likelihood of success on the merits.'" *Id.*

## ARGUMENT

### I.    Plaintiffs are Likely to Succeed on the Merits

Agency action cannot stand if it is contrary to law or if it is arbitrary and capricious. Because Defendants' termination of direct representation services is contrary to the TVPRA and ORR's own regulations and is also arbitrary and capricious, Plaintiffs have, at minimum, demonstrated serious questions going to the merits and are likely to succeed on the merits.

### A.  Plaintiffs Have Standing to Bring Their Claims and Their Claims are Redressable.

The Court has found Plaintiffs fall within the "zone of interests" of the TVPRA and have articulated harms that can be redressed by this Court.  Defendants' assertions otherwise remain meritless, and the Court can and should reject them again.

*Prudential standing*:  As the Court already found, Plaintiffs have prudential standing because their APA claims are in the zone of interests protected by the TVPRA.  *See* Dkt. 33 at 3-4.  While Defendants insist the injury Plaintiffs plead is entirely financial, Plaintiffs face harms to their core activities and organizational missions, including their commitment to ensuring UCs are not left to navigate the immigration system alone.  *See e.g.*, Estrella Supp. Decl. ¶ 2; ImmDef Supp. Decl. ¶ 2; FIRRP Supp. Decl. ¶¶ 3, 5.  These interests are at least "'marginally related to' and 'arguably within' the scope of" the TVPRA, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021) (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224--25 (2012)), as well as Congress's interest in "ensuring, to the greatest extent practicable" that all UCs receive legal "counsel to represent them in legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5).

*Redressability*:  Plaintiffs' core business activities and organizational missions—which include ensuring UCs have legal representation—have been critically and irreparably harmed by Defendant's actions.  The requested injunctive relief will redress these harms.  While Defendants

have latitude to determine the mechanism by which they comply with the TVPRA and Foundational Rule—whether via reviving the terminated portions of the contract or another method of funding direct representation, either approach significantly increases the likelihood Plaintiffs will obtain relief from their harms. *See Meese v. Keene*, 481 U.S. 465, 476-77 (1987).

The showing required for the redressability prong of Article III standing is modest. *See Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012). It is sufficient for Plaintiffs to demonstrate a "significant increase in the likelihood" that they will obtain relief redressing their injury as a "practical consequence" of an order from the court. *Id.* The reinstatement of required funding for direct representation to UCs significantly increases the likelihood that Plaintiffs will obtain relief, either through funding to continue their own representations or an alternative plan providing legal representation to UCs consistent with congressional appropriations, the TVPRA, and the Foundational Rule. The requested injunctive relief is extremely likely to ensure that Plaintiffs' clients maintain representation—as Plaintiffs' missions demand—without forcing Plaintiffs to divert resources from other mission critical initiatives.

The TVPRA's directive requires "ensuring, to the greatest extent practicable" that all UCs receive legal "counsel to represent them in legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5). Direct redress of Plaintiffs' harms is a practical consequence of enjoining "Defendants nationwide from ceasing to fund counsel to represent unaccompanied children in violation of the TVPRA and the Foundational Rule." Dkt. 1 at 39. This is true regardless of how Defendants fashion the injunctive relief.

## B. This Court has Jurisdiction Over Plaintiffs' Claims.

This Court rejected Defendants' argument that the Tucker Act deprives the Court of jurisdiction over Plaintiffs' claims. Dkt. 33 at 3 (citing *Pacito v. Trump*, 2025 WL 893530, at *4–7 (W.D. Wash. Mar. 24, 2025)). The Court is correct, and Plaintiffs address this issue only briefly.

The law is clear: the Tucker Act only deprives the Court of jurisdiction of claims that are both (1) founded upon contract-based rights and (2) seek a contract-based remedy. *See United Aeronautical Corp. U.S. Air Force*, 80 F.4th 1017, 1025-26 (9th Cir. 2023).

Neither of those conditions are met here. The Tucker Act "yields when the obligation-creating statute provides its own detailed remedies, or when the [APA] provides an avenue for relief." *Me. Cmty. Health Options v. U.S.*, 590 U.S. 296, 323–24 (2020); *see also Pacito v. Trump*, 2025 WL 655075, at *17 (W.D. Wash. Feb. 28, 2025) (rejecting argument Tucker Act bars APA review). Plaintiffs' claims stem from the TVPRA, the Foundational Rule, and the APA: Defendants' refusal to fund direct representation for UCs violates their obligations under those authorities and, in turn, violates the APA and is a breach of the Accardi doctrine, and arbitrary and capricious. See Dkt. 7 at 20-24. Thus, Plaintiffs' claims do not rely on or arise from any contract.

Because Plaintiffs seek "declaratory and injunctive relief" under their statutory rights to prevent Defendants unlawfully refusing to provide any funding for counsel for UCs instead of "money in compensation for . . . losses," the Tucker Act does not apply. *Bowen v. Massachusetts,* 487 U.S. 879, 893, 895; *see also Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1111 (D.C. Cir. 2022) (declaratory and injunctive relief are not "specific to actions that sound in contract"); *Pacito*, 2025 WL 655075 at *17 ("[B]ecause Plaintiffs seek specific remedies, not damages," Tucker Act did not apply). As "Claims Court[s do] not have the general equitable powers of a district court to grant prospective relief," a district court is the proper venue for Plaintiffs' APA claims. *Bowen*, 487 U.S. at 905–07. That Defendants previously fulfilled their statutory and regulatory obligations by contracting does not change this analysis—were that the case, no plaintiff could challenge Defendants' illegal actions. *See, e.g.*, *Crowley*, 38 F.4th at 1107

(rejecting the "broad notion that any case requiring some reference to or incorporation of a contract" cannot be heard in district courts) (cleaned up).

### C. The Cancellation Order Determines Plaintiffs' Legal Rights and Obligations and is Final Agency Action Reviewable Under the APA.

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). Persons or organizations, like Plaintiffs here, who are "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, [are] entitled to judicial review thereof." 5 U.S.C. § 702. "[A]gency action" includes not only agencies' affirmative acts, but also their omissions and failures to act. *Id.*; 5 U.S.C. § 551(13).

Under the APA, this Court may set aside and enjoin unlawful agency action, and compel agency action unlawfully withheld, if it is a (1) "final agency action" "for which there is no other adequate remedy in a court," so long as (2) there are no "statutes [that] preclude judicial review" and "agency action is [not] committed to agency discretion by law." 5 U.S.C. §§ 701(a), 704. Plaintiffs satisfy each of these criteria here, and APA relief is therefore proper.

*Final Agency Action*. An agency action is final for APA review where two conditions are satisfied: (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks and citations omitted). Defendants' refusal to fund direct representation for UCs is a final agency action. *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025) (attempt to "pause" funding and disbursements is final agency action); *Imm. Defs. Law Ctr. v. U.S. Dep't of Homeland Sec.*, No. 2:21-cv-00395, Dkt. 304, at *18–19 (C.D. Cal. Mar.

14, 2025) (in TVPRA context, final agency action found because policy was not tentative, decision-making was not ongoing, and legal consequences would flow from action).

Here, Defendants clearly ceased funding direct representation for UCs in violation of an express statutory mandate and their own regulatory frameworks.  The Cancellation Order directed Plaintiffs to stop all work providing direct representation to UCs, including pre-existing clients.  This notification is final.  VAAP Decl. (Dkt. 7-7) ¶ 13; NWIRP Decl. (Dkt. 7-10) ¶ 10; RMIAN Decl. (Dkt. 7-11) ¶ 12; Estrella Decl. (Dkt. 7-14) ¶ 11.

Since the Cancellation Order and its ensuing consequences, the choices facing Plaintiffs have grown even more dire.  Defendants' actions and failure to comply with the Court's Order continue to force Plaintiffs to choose between providing unfunded direct representation with extremely limited resources; cutting other vital organizational programs, laying off, furloughing, or terminating staff; and/or seeking to withdraw from their ongoing representation duties for court hearings, client meetings, and other important preparations for legal proceedings.  *See e.g.*, Dkt. 7 at 10-11; ImmDef Supp. Decl. ¶ 9; Amica Supp. Decl. ¶ 3; VAAP Decl. (Dkt. 7-7) ¶ 21.  The longer Plaintiffs go without funding or clarity regarding how to handle their current clients, the fewer services they can provide as they are forced to withdraw from ongoing representations, cut other core programs, and/or lay off or reassign staff. Amica Supp. Decl. ¶ 3; VAAP Decl. (Dkt. 7-7) ¶ 20–22; ImmDef Supp. Decl. ¶ 7; NWIRP Decl. (Dkt. 7-10) ¶ 14.  Thus, the termination has an immediate effect on parties' rights or obligations.

<u>No Bar to Review:</u> Defendants' actions do not fall within the limited exceptions to judicial review under the APA.  The longstanding presumption of judicial review for agency actions under the APA "may be rebutted only if the relevant statute precludes review, 5 U.S.C. § 701(a)(1), or if

the action is 'committed to agency discretion by law,' § 701(a)(2)." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018).  Neither exception applies here.

First, the "well-settled" presumption of judicial review for agency actions can be overcome only by "clear and convincing evidence" of congressional intent to preclude judicial review.  *See, e.g.*, *Kucana v. Holder*, 558 U.S. 233, 252-53 (2010).  No statute bars review of Plaintiffs' claims here.  *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670–71 (1986).

Second, Defendants' refusal to fund direct representation for UCs does not fall into the "very narrow" exception for actions committed to agency discretion.  *Arizona Power Pooling Ass'n. v. Morton*, 527 F.2d 721, 727 (9th Cir. 1975).  This exception is "restrict[ed] to those rare circumstances where the relevant statute is drawn so that a court would have *no meaningful standard* against which to judge the agency's exercise of discretion." *Weyerhaeuser Co.*, 586 U.S. at 23 (emphasis added) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).  The Ninth Circuit applies this exception only when "there is truly no law to apply." *Jajati v. U.S. Customs & Border Prot.*, 102 F.4th 1011, 1014 (9th Cir. 2024) (quotation marks omitted).

The TVPRA, agency regulations, and Defendants' own policies and announcements, provide "meaningful standards under which courts can review whether [Defendants'] wielded its discretion in a permissible manner." *Jajati*, 102 F.4th at 1014.  As the Court noted in its Order, Defendants' actions "potentially violate[] Congress's express directive in the TVPRA and ORR's own commitments in the Foundational Rule," both "meaningful standards" under which the Court can review Defendants' actions.  Dkt. 33 at 5.  Both the TVPRA and ORR regulations include language describing Defendants' obligations to fund direct representations.  *See* 8 U.S.C. § 1232(c)(5) (Defendants "*shall* ensure, to the greatest extent practicable," that *all* UCs receive legal "counsel to represent them in legal proceedings") (emphasis added); 45 C.F.R.

§ 410.1309(a)(4) (ORR "*shall* fund legal service providers . . . subject to ORR's discretion and available appropriations").  This language offers a clear standard to judge Defendants' actions.  *See e.g.*, *Arizona Power Pooling Ass'n,* 527 F.2d at 727 (holding that statutory language instructing that the agency "shall" devise the "most feasible plan" for obtaining electronic power made it "clear that . . . the [agency did] not have unfettered discretion" and the exception for actions committed to agency discretion did not apply).

Defendants' cancellation of all funding is not the type of "lump-sum appropriation" or other judgment that is presumptively committed to agency discretion.  *Weyerhaeuser Co.*, 586 U.S. at 23.  In their Opposition to Plaintiffs' Motion for TRO, Defendants rely heavily on *Lincoln v. Vigil* to argue that funding for direct representation for UCs is wholly committed to agency discretion.  *See* Dkt. 24 at 18; *Lincoln v. Vigil*, 508 U.S. 182 (1993).  There, the Court emphasized the relevant "appropriations Acts . . . do not mention the [cancelled] Program," the relevant statutes "speak about Indian health only in general terms," and "Congress never expressly appropriated funds" for the cancelled program.  *Id*. at 186, 193–94.  In contrast, here, the relevant statutes point to Defendants' obligations to ensure direct representation to the "greatest extent practicable" and Congress has expressly appropriated funds for services required under the TVPRA, including provision of counsel.  *See, e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, Div. A Tit. I Sec. 1101(8) (2025); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 664–665 (2024); S. Rep. 118-84, at 169.

That Defendants have some discretion in *how* to allocate funds for direct representation does not render their actions unreviewable under the APA.  Even "grants [of] broad discretion to an agency" do "not render the agency's decisions completely nonreviewable . . . unless the statutory scheme, taken together with other relevant materials, provides *absolutely no guidance* as

to how that discretion is to be exercised." *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (emphasis added). Here, both the statutory and regulatory schemes clearly provide such guidance.

**D. Termination of the Direct Representation Programs Violates the TVPRA.**

Under the TVPRA, Congress mandated the government "shall ensure, to the greatest extent practicable," that *all* UCs receive legal "counsel to represent them in legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5). Canceling funding for direct representation services to UCs when appropriations are available (as they are) violates this express congressional mandate.

The TVPRA, which requires Defendants to "ensure [UC direct representation] to the greatest extent practicable," prohibits Defendants refusing to fund direct representation so long as Defendants have available appropriations (as they do). *See, e.g.*, *Pacito*, 2025 WL 655075, at *18 (APA violated when agencies withheld appropriated funds because they were "required, 'to the extent of available appropriations,' to ensure provision of support services for resettled refugees"). Defendants terminated funding and ordered Plaintiffs to cease work without providing any other avenues of legal services for UCs—failing to "ensure, to the greatest extent practicable," that UCs have access to legal counsel. The Cancellation Order effectively ends meaningful direct representation for UCs. Amica Supp. Decl. ¶ 8; VAAP Decl. (Dkt. 7-7) ¶¶ 20–21.

Although the TVPRA grants Defendants some discretion in *how* to allocate appropriated funds for legal access, it does not grant discretion to choose *not to* allocate appropriated funds at all. Defendants cannot simply cease funding for direct representation in its entirety, as they did here. *See Pacito*, 2025 WL 655075, at *18. Further, Defendants failed to provide any guidance to Plaintiffs regarding their ongoing UC representations, or any alternative plan for carrying out their duties under the statute and applicable ethical rules. Amica Decl. (Dkt. 7-15) Ex. 3.

**E.  Terminating Direct Representation Programs Violates the ORR Foundational Rule.**

The government is "bound by the regulations it imposes upon itself."  *See United States v. 1996 Freightliner Fld. Tractor VIN 1FUYDXYB-TP822291*, 634 F.3d 1113, 1116 (9th Cir. 2011). Under the *Accardi* doctrine, parties may bring claims under the APA asserting that an agency has failed to follow its own rules and internal policies.  *See, e.g.*, *Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004).

For an *Accardi* claim, Plaintiffs must show (1) the government violated its own regulations; and (2) Plaintiffs are substantially prejudiced by that violation.  *See Al Otro Lado, Inc. v. Mayorkas*, 2024 WL 4370577, at *8–9 (S.D. Cal. Sept. 30, 2024); *see also Carnation Co. v. Sec'y of Lab.*, 641 F.2d 801, 804 n.4 (9th Cir. 1981) (the *Accardi* standard is "whether violation of the regulation prejudiced the party involved").  Defendants' actions violate their express commitment in the binding Foundational Rule to fund direct representation as long as appropriations are available.  Plaintiffs are substantially prejudiced because they are mission-bound to serve their UC clients in cases formerly funded by Defendants, and there are no other government-funded legal service providers to whom Plaintiffs can transfer those cases.  Amica Supp. Decl. ¶ 8; Estrella Decl. (Dkt. 7-14) ¶ 3, 16; KIND Decl. (Dkt. 7-18) ¶ 19; VAAP Supp. Decl. ¶ 2; *see also* MM Supp. Decl. ¶ 4-5; DHCC Supp. Decl. ¶ 7.  Plaintiffs are spending discretionary funds to maintain representations for as long as possible because withdrawing is antithetical to their missions and, for some, impermissible under local ethics rules, particularly where no other service providers can take the cases.  Without an injunction, Plaintiffs will have to choose between bankruptcy and abandoning their missions .  Amica Supp. Decl. ¶ 3; GHIRP Supp. Decl. ¶¶ 3, 7–8; RMIAN Decl. (Dkt. 7-11) ¶ 14; Estrella Decl. (Dkt. 7-14) ¶ 15; *see also infra* Section II.A.

ORR has "recognize[d] that most unaccompanied children need legal services to resolve their immigration status and that representation appears to have a significant impact on both the

court appearance rate and the outcome of cases for unaccompanied children." 89 Fed. Reg. 34384, 34529 (Apr. 30, 2024); *see also Al Otro Lado*, 2024 WL 4370577, at *9 (preambles may sufficiently bind agencies under *Accardi*). Just last year, ORR stated its intention to provide "universal legal representation for unaccompanied children by FY 2027." HHS: Administration for Children & Families, *Justification of Estimates for Appropriations Committees*, at 78 (2024), https://shorturl.at/4VDSL; *see also* 89 Fed. Reg. at 34526 ("ORR strives for 100 percent legal representation of unaccompanied children."). Thus, in 2024, ORR adopted the Foundational Rule, which states in relevant part:

> To the extent ORR determines that appropriations are available, and insofar as it is not practicable for ORR to secure pro bono counsel, ORR *shall fund legal service providers* to provide direct immigration legal representation for certain unaccompanied children, subject to ORR's discretion and available appropriations.

45 C.F.R. § 410.1309(a)(4) (emphasis added). Defendants' actions on March 21, 2025, subvert these ORR commitments and regulations, violate the *Accardi* doctrine, and are both contrary to law and arbitrary and capricious under the APA. *See Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1068–69 (C.D. Cal. 2019) (agency's violation of its own procedures violates the APA). Congressional appropriations are readily available until September 2027 to fund direct representation, including funds appropriated as recently as March 15, 2025, one week before Defendants' challenged actions. *See, e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, Div. A Tit. I Sec. 1101(8) (2025); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 665-666 (2024); S. Rep. 118-84, at 169. Without explanation and without a plan to replace these critical legal services for unaccompanied children, the Cancellation Order violates Defendants' obligations and has caused and will continue to cause Plaintiffs substantial hardship, as described below. *See also infra* Section II.A. Because

Defendants' actions violate their own stated policies and substantially prejudice Plaintiffs, Plaintiffs are likely to succeed on the merits of their claims.

## F. Terminating Funding for Direct Representation is Arbitrary and Capricious.

Defendants' decision to stop funding any direct representation for any UCs ignores the well-documented efficacy of direct representation for UCs and is arbitrary and capricious. Defendants have refused to produce any administrative record to justify their decision until they file their answer. Amica Supp. Decl. ¶ 14. Plaintiffs and the Court are left to evaluate Defendants' justification through statements in the Stop Work Order, Cancellation Order, and filings in this action. The Stop Work Order provides no explanation, Dkt. 7-15, Ex. 1, and the Cancellation Order says only that the decision was for Defendants' "convenience," *id.* at Ex. 3. This leaves the Court with only Defendants' post-hoc justifications offered through litigation, but these are plainly insufficient. *Dept. of Homeland Sec. v. Regents of the U. of Cal.*, 591 U.S. 1, 23 (2020) (agencies cannot support their actions via "belated justifications" or "convenient litigating positions" (quotation marks and citations omitted). To the extent such reasons are properly before the Court, Defendants' proffered justifications of saving money and encouraging pro bono representation fail to address the requirements outlined above. *See* Dkt. 24-1 ¶¶ 14–15; Dkt. 24 at 8.

A court "shall" set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983); *see also Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1048 (9th Cir. 2010). Agency action should be set aside as arbitrary and capricious if the agency fails to explain the basis of its decision, fails to consider all relevant factors and articulate a "rational connection between the facts found and the choice made," or fails to offer a "reasoned analysis" for departure from preexisting policies. *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 42–43. In cases where the purported rationale for agency action is pretextual, it must be

set aside. *See, e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 780-85 (2019); *Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Fed. R.R. Admin.*, 988 F.3d 1170, 1182-85 (9th Cir. 2021). Here, Defendants fail on all grounds, justifying preliminary injunctive relief (as well as ultimate relief on the merits).

### 1.    Defendants Failed to Adequately Explain the Basis for the Decision.

A "fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." *Tourus Recs., Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001) (quotation marks omitted); *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Unsupported conclusions are insufficient, *see City and Cnty of San Francisco v. U.S. Citizen and Immigration Servs.*, 981 F.3d 742, 761 (9th Cir. 2020) (rejecting agency's "conclusory mantra" and lack of "detailed justification"), as are post hoc rationalizations in briefing, unsupported by an administrative record, *see Humane Soc'y of U.S.*, 626 F.3d at 1049-50.

Defendants' decision to cut all funding for direct representation they have funded for more than a decade—with appropriations available until at least September 30, 2027—came with no explanation, let alone one that can stand up to judicial scrutiny. Defendants have refused to produce any administrative record at this stage that could justify their actions. *See,* Amica Supp. Decl. ¶ 14. Even if Defendants' post-hoc justifications offered in this case could be considered, Defendants fail to address the fact that Congress has already appropriated these funds through September 2027, and offer no explanation of how a "shift" to pro bono services could fulfill their TVPRA and Foundational Rule obligations to provide counsel "to the greatest extent possible." Defendants also offer no evidence they are doing anything to facilitate a "shift," and even if they were, they created a significant shortfall in representation in the interim.

History and congressional statements show pro bono counsel alone cannot provide counsel "to the greatest extent possible," under the TVPRA. *See* Dkt. 1 ¶¶ 51–63 (citing original sources). ORR *already tried* relying solely on pro bono counsel. The idea that funding representation actually "disincentivizes the recruitment of and the volunteering of pro bono counsel" (Dkt. 24-1 ¶ 24) gets the history backward—funded representation stepped in to fill huge representation gaps left by relying only on pro bono capacity. *See also* Estrella Supp. Decl. ¶ 5 (of the 64,008 individuals Estrella served in 2024, they have only secured pro bono assistance for one). ORR's 2008 pro bono pilot program produced a report acknowledging pro bono counsel alone were insufficient to represent UCs. *See* Olga Byrne & Elise Miller, *The Flow of Unaccompanied Children Through the Immigration System*, at 22–23 (Mar. 2012), https://shorturl.at/KI3Jt. That is why ORR started funding direct representation. *See* Dkt. 1 ¶¶ 57–59.

Funding legal services providers like Plaintiffs *increases* pro bono representation of UCs, because Plaintiffs oversee and mentor large networks of pro bono attorneys—non-experts in immigration who could not represent UCs without the aid of immigration professionals. *See, e.g.,* Dkt. 7-4 ¶¶ 11, 44; Dkt. 7-7 ¶ 2; NWIRP Supp. Decl. ¶ 7. When Plaintiff "ImmDef has worked with pro bono attorneys to provide legal representation for children, [they] have found that even licensed attorneys who are not specialized in this area of law need intensive training [from ImmDef] and support to be able to effectively represent their clients." Dkt. 7-8 ¶ 11. "[P]ro bono attorneys do not generally have immigration expertise," most do not speak the languages UCs speak, many "are unwilling to commit to the timeframe of children's immigration cases or with the special care needed when working with children," and pro bono attorneys need experts to "train and support [them]." Dkt. 7-6 ¶ 12; *see also* RMIAN Supp. Decl. ¶ 9 ("The vast majority of RMIAN's volunteer attorneys do not have immigration law experience and would never consider

taking an immigration case without RMIAN's [support.]"); Amica Supp. Decl. ¶ 11; VAAP Supp. Decl. ¶ 8; DHCC Supp. Decl. ¶ 7; Public Counsel Supp. Decl. ¶ 5; NIJC Supp. Decl. ¶¶ 6–8; KIND Supp. Decl. ¶ 7. The Cancellation Order cut funding for this essential mentorship and training. Amica Supp. Decl. ¶ 8. And Plaintiffs cannot sustain their representations (or take new ones) without funding. *See, infra,* at 20–22; ImmDef Supp. Decl. ¶ 7–12. Defendants' post hoc "shift" justification is contradicted by facts and history—and by what funding Defendants chose to cut.

Defendant's attempt to justify this as a cost-saving measure is likewise unavailing. Dkt. 24-1 ¶ 18. The TVPRA and the Foundational Rule require Defendants to fund direct representation to the "greatest extent practicable" with appropriated funds. *See, supra,* at 11, 13. And Congress has ordered Defendants to spend appropriated funding to provide funded representation for UCs. For example, in 2022, the House Appropriations Committee, in support of "the continued expansion of independent legal services for unaccompanied children," directed that funded representations should "be made available to children *up to funded capacity.*" H. Rep. 117-403, at 200 (emphasis added). An administration's "policy" of cutting spending is simply not a legally cognizable reason to refuse to spend appropriated funds: the Executive cannot withhold or delay disbursement of appropriated funds, even if it "has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program." *See In re Aiken Cnty*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (plurality).

Because even these post hoc reasons offered in litigation fall apart under the slightest scrutiny, the decision is arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("Where the agency has failed to provide even a minimal level of analysis" for its decision, "its action is arbitrary and capricious.").

> **2.    Defendants Failed to Consider All Relevant Factors and Articulate a Rational Connection Between the Facts Found and the Choice Made.**

To survive arbitrary and capricious review, an agency must have "demonstrated a rational connection between the facts found and the choice made." *Wawszkiewicz v. Dep't of Treasury*, 670 F.2d 296, 301 (D.C. Cir. 1981) (quotation marks and citations omitted). Courts "do not defer to the agency's conclusory or unsupported suppositions." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engs.*, 255 F. Supp. 3d 101, 121–22 (D.D.C. 2017) (quotation marks and citations omitted). Even crediting Defendants' 'shift to pro bono' rationale, Defendants have not offered any analysis or findings that could show that such a "shift" is justified and could provide counsel "to the greatest extent practicable." And significant evidence demonstrates that ending funding for direct representation will decrease the number of pro bono representations as well. *See, supra*, at 16–17. Where, as here, "no findings and no analysis . . . justify the choice made," the APA "will not permit" a court to accept the agency's decision. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962). Because Defendants "should have considered those matters but did not," their "failure was arbitrary and capricious in violation of the APA." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).

### 3.    Defendants Failed to Offer a Reasoned Explanation for Their Policy Reversal.

When the government reverses its own established policy, it has an even greater burden to justify its actions. The agency must "acknowledge and provide an adequate explanation for its departure from established precedent, and an agency that neglects to do so acts arbitrarily and capriciously." *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) (quotation marks and citations omitted); *see also Encino Motorcars*, 579 U.S. at 221–22 (an agency cannot depart from prior policy without "explaining its changed position").

Defendants' refusal to fund *any* direct representation for UCs is a reversal of more than a decade of funding direct representation, continued year after year by congressional reports directing Defendants to fund direct representation and to *expand* such funding. By cancelling

funding with no explanation—or at most an insufficient and pretextual explanation—Defendants have acted arbitrarily and capriciously.  *See Jicarilla Apache Nation*, 613 F.3d at 1119.

4.      **To the Extent Defendants Offer Any Reasons, Those Reasons Are Pretextual.**

Defendants' two purported reasons for cutting off required funding are pretextual—Defendants want to substitute the Executive's policy goals for Congress's own considered policies that it expressed in the TVPRA and following appropriations bills and reports.  *See*, *supra*, at 13, 17.  Defendants have twice tried to stop funding legal representation for UCs.  The February 18, 2025, Stop Work Order gave no reason and, to the contrary, stressed to Acacia that the order had *nothing* to do with "poor performance" of the funded services.  *See* Dkt. 7-15, Ex. 1.  The March 21, 2025, Cancellation Order also gave no reason—it simply cited "the Government's convenience."  *See id*. at Ex. 3.  Recent court filings reveal the Cancellation Order was issued shortly after a Department of Government Efficiency ("DOGE") staffer was detailed to the HHS department overseeing ORR "to identify waste, fraud, and abuse" under the DOGE Executive Order and given access to the extremely sensitive database of information about unaccompanied children.  *See Am. Fed. Of Labor and Congress of Indus. Orgs. v. Dept. of Labor*, No. 1:25-cv-00339-JDB, Dkt. 73-2 at 11-12 (D.D.C.).  Defendants now admit the decision was made because of "this Administration's policy goals," Dkt. 24-1 ¶ 18, and offer two pretextual justifications for those goals.  But "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals."  *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018).  That is what happened here, and Defendants have declined to produce a record that could show otherwise.

## II.    Plaintiffs Satisfy the Remaining Requirements for a Preliminary Injunction

## A.  Plaintiffs Face Irreparable Harm

A preliminary injunction is appropriate where, as here, the moving party shows that it faces irreparable harm—harm which is (1) "immediate", *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988), and (2) "for which there is no adequate legal remedy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

The Court correctly found Plaintiffs "are likely to suffer irreparable harm in the absence of preliminary relief." Dkt. 33 at 5.  Defendants have not complied with the Court's Order, making the requested injunctive relief all the more critical.  Defendants' termination of funding for direct representation directly interferes with Plaintiffs' missions, immediately impeding their ability to provide legal representation that is at the heart of Plaintiffs' missions.  FIRRP Supp. Decl. ¶¶ 5–8; GHIRP Supp. Decl. ¶¶ 3, 7–8; ImmDef Supp. Decl. ¶ 7–12; VAAP Supp. Decl. ¶¶ 4, 7; Estrella Supp. Decl. ¶ 4; RMIAN Decl. (Dkt. 7-11) ¶ 22; VAAP Decl. (Dkt. 7-7) ¶¶ 21–22; NWIRP (Dkt. 7-10) ¶¶ 13–15; NIJC Supp. Decl. ¶ 9.  There is no question ceasing funding for direct representation for UCs and terminating existing services causes imminent and irreparable harm to Plaintiffs and their missions.  FIRRP Supp. Decl. ¶ 5; FIRRP Decl. (Dkt. 7-4) ¶ 37; NIJC Supp. Decl. ¶ 9.  The Cancellation Order prevents Plaintiffs from providing thousands of UCs the direct representation required by the TVPRA and the Foundational Rule, frustrating Plaintiffs' primary missions of ensuring UCs are supported by legal counsel, including by representing these children as contemplated by Congress and the TVPRA.  *See, e.g.*, FIRRP Supp. Decl. ¶ 5; ImmDef Decl. ¶ 2.  If this occurs, "'there can be no do over and no redress.'"  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).

Plaintiffs relied on Congress's and Defendants' assurances that funding would remain available.  Amica Decl. (Dkt. 7-15) ¶ 11; RMIAN Decl. (Dkt. 7-11) ¶ 18.  Cutting off funding threatens immediate and irreparable harm to Plaintiffs' missions and existence.  *See, e.g.*, CLSEPA Decl. (Dkt. 7-16) ¶ 13; VAAP Decl. (Dkt. 7-7) ¶¶ 22–24; KIND Decl. (Dkt. 7-18) ¶¶ 16–19.  For example, on April 1, 2025, ImmDef had to lay off twenty-four staff funded under the Unaccompanied Children's Program in response to the Cancellation Order; these staff losses threaten its ability to continue representing its 1,900 UC clients.  ImmDef Supp. Decl. ¶¶ 3–4; ImmDef Decl. (Dkt. 7-8) ¶¶ 20–22.  Since their initial declaration in this matter, VAAP has had to terminate 25% of their staff.  VAAP Supp. Decl. ¶ 3.  Amica Center has been unable to fill vacancies and expects it will only be able to fund representation of UC clients another 2 months, at most, before it materially limits other mission-driven work.  Amica Supp. Decl. ¶ 3.  Estrella del Paso has 324 cases and predicts the loss of funding will require layoffs and increase caseloads for its staff.  Estrella Decl. (Dkt. 7-14) ¶ 6. The Galveston-Houston Immigration Representation Project expects to lay off most of their Immigrant Children and Youth staff within four weeks.  GHIRP Decl. (Dkt. 7-17) ¶ 23.  Sustaining these services, in accordance with its mission but without this funding, will cost the Northwest Immigrant Rights Project $200,000 a month.  NWIRP Decl. (Dkt. 7-10) ¶ 13.  Private providers and other organizations predict devastating financial consequences, including the potential for bankruptcy.  DHCC Decl. (Dkt. 7-5) ¶ 20; MM Decl. (Dkt. 7-19) ¶ 18; *see also* KIND Supp. Decl. ¶ 4 ("[O]n March 27, 2025, KIND laid off over 240 staff members in legal services psychosocial services, and other program support roles").  These losses do not account for the organizational knowledge at risk of being lost.  Estrella Decl. (Dkt. 7-14) ¶ 6; FIRRP Decl. (Dkt. 7-4) ¶ 38; Amica Decl. (Dkt. 7-15) ¶ 25; ImmDef Decl. (Dkt. 7-8) ¶ 21.

The harm to Plaintiffs and their clients is imminent, irreparable, and ongoing, particularly given Defendants' failure to comply with this Court's Order.  The March 21, 2025, Cancellation Order terminated funding immediately, but provided no guidance as to how Plaintiffs could meet their existing obligations, including immigration court hearings scheduled for that week.  DHCC Decl. (Dkt. 7-5) ¶ 15; Amica Decl. (Dkt. 7-15) ¶ 20; ImmDef Decl. (Dkt. 7-8) ¶ 24.  Plaintiffs have ethical obligations to their clients and cannot immediately withdraw from representations; most attorneys require court permission to withdraw.  FIRRP Decl. (Dkt. 7-4) ¶ 39.  Plaintiffs and their clients are already experiencing irreparable harm far exceeding the mere loss of funding, including because they have had to furlough or layoff staff and increase the caseloads of staff who can stay on.  *See e.g.* ImmDef Decl. (Dkt. 7-8) ¶¶ 20–22; Amica Supp. Decl. ¶ 3–4; NWIRP Supp. Decl. ¶ 5; Estrella Supp. Decl. ¶ 3.  After reserves run out, ImmDef will be forced "to take drastic action to terminate staff across all positions funded under this contract." ImmDef Decl. (Dkt. 7-8) ¶ 21.  Children's immigration cases "are complex, often take years to complete, and require highly skilled attorneys to competently handle them."  *Id.* at ¶ 23.  Impacted staff have years of individualized experience with clients, making replacing them impracticable.

Harms to children will be swift and severe, further frustrating Plaintiffs' missions to ensure as many noncitizens as possible receive legal support.  For example, "if a child at one of the ORR-subcontracted facilities we serve is identified as having an urgent legal need such as an outstanding removal order, Amica Center—the only legal provider with access to the ORR-subcontracted facility—would not be funded to provide the necessary legal service to protect the child from imminent removal."  Amica Decl. (Dkt. 7-15) ¶ 21; Amica Supp. Decl. ¶ 8 (to their knowledge "*no* children in the ORR-subcontracted facilities with which [they] work have successfully obtained pro bono representation since March 21.").  This is even more troubling in light of policies

increasing the need for legal services, including notices on March 21, 2025 (the day of the Cancellation Order) that "DHS would begin serving Notices to Appear (NTAs) 'imminently' on children in ORR custody and that those Master Calendar Hearings were expected to take place 'in the coming days and weeks.'" Amica Supp. Decl. ¶ 76; FIRRP Supp. Decl. ¶¶ 5–8; NIJC Supp. Decl. ¶¶ 4, 9. Without funding or guidance, Plaintiffs will not be able to fulfill their missions and represent UCs in these proceedings. *See* RMIAN Supp. Decl. ¶ 6–7. As Plaintiff ImmDef explains, "[a]t this very moment, there are children in ORR custody who need our representation who are not receiving it. This means that children who want voluntary departure will have their return home unacceptably delayed, victims of trafficking will not be able to access the protections they deserve, and children fleeing persecution will not be able to have their day in court." ImmDef Decl. (Dkt. 7-8) ¶ 25. Absent a preliminary injunction, Plaintiffs will suffer irreparable harm.

## B.  The Balance of Equities

Finally, in considering whether to grant a preliminary injunction, the Court should "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (quoting *Winter*, 555 U.S. at ). Where an injunction will not "substantially injure the other [interested] parties," the balance of equities tips in plaintiffs' favor. *Nken*, 556 U.S. at 434. Here, the balance of the equities "tip[] sharply in the [Plaintiffs'] favor," supporting a preliminary injunction. *Cottrell*, 632 F.3d at 1135.

Defendants will not be harmed by a preliminary injunction: as the Court found, "[t]he Government fails to convince that it would suffer harm" from injunctive relief. Dkt. 33 at 6. The Government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *cf. Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983). Instead, "there is a substantial public interest in having governmental agencies

abide by the federal laws that govern their existence and operations." *State v. Azar*, 385 F. Supp. 3d 960, 985 (N.D. Cal. 2019), *vacated on other grounds and remanded sub nom. California ex rel. Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (quoting *Newby*, 838 F.3d at 12) (cleaned up).

Terminating funding for direct representation for UCs, without any plan to ensure current representations are not interrupted, violates Congress's directive in the TVPRA and ORR's own commitments in the Foundational Rule. And as the Court found, "the maintenance of funding for direct legal representation services furthers the critical public interests of ensuring children have access to legal representation and protection from human trafficking." Dkt. 33 at 6. Maintaining "funding of legal representation for unaccompanied children promotes efficiency and fairness within the immigration system." *Id.*; *see also* Dkt. 28 (former immigration judges explaining the importance of continued funding); 89 Fed. Reg. at 34528-29 (recognizing benefit of UC representation to the immigration system generally); *see also* Dkt. 7 at 29.

Because Defendants do not face any injury from the issuance of an injunction to stop their illegal action and Plaintiffs and the public have a substantial interest in maintaining legal representation, the balance of equities weighs heavily in favor of issuing a preliminary injunction. Defendants' failure to comply with this Court's Order only further weighs in favor of a preliminary injunction here.

## III.    A Nationwide Injunction is Appropriate

While injunctive relief must be tailored to the scope of the case, "there is no bar against . . . nationwide relief in federal district or circuit court when it is appropriate," such as when nationwide "breadth is necessary to give prevailing parties the relief to which they are entitled." *Bresgal v. Brock*, 843 F.2d 1163, 1170–71(9th Cir. 1987). A number of factors counsel in favor of a nationwide injunction here. **First**, APA injunctions are often nationwide, because when Defendants violated the APA, they did so without geographic limitation. *See E. Bay Sanctuary*

*Covenant*, 993 F.3d at 680-81 (cleaned up).  **Second**, nationwide injunctions are also common in cases like this that involve immigration policy set by Congress, because "a fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy."  *Washington v. Trump*, 847 F.3d 1151, 1166–67 (9th Cir. 2017).

**Third**, plaintiffs are located throughout the country, and "[d]ifferent interpretations of executive policy across circuit or state lines will needlessly complicate agency and individual action," *see E. Bay Sanctuary Covenant*, 993 F.3d at 681, and piecemeal injunctive relief for the more than 80 providers nationwide would be impractical to administer.  *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326–27 (4th Cir. 2021).  The only complete and manageable relief is a nationwide injunction.  *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

## IV.    The Court Should Not Require an Injunction Bond

Courts have broad discretion in determining whether a bond should be required under Federal Rule of Civil Procedure 65(c).  *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999).  And a district court may "dispense with the security requirement" entirely, or "request mere nominal security," if "requiring security would effectively deny access to judicial review."  *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir.1985); *see also Nat'l Council of Nonprofits*, 2025 WL 597959 at *19.  The Court found no injunction bond was necessary under Rule 65(c) to issue a temporary restraining order, Dkt. 33 at 7, and it should reach the same conclusion for a preliminary injunction—where the analysis is the same.

## CONCLUSION

Defendants' actions violate the APA.  Because this conduct causes Plaintiffs immediate and irreparable harm, this Court should grant provisional nationwide relief enjoining Defendants' illegal actions and preserving the status quo pending a final judgment.  The Court should tailor its relief in light of Defendants' failure to comply with the temporary restraining order.

Respectfully submitted,

April 4, 2025

*/s/ Alvaro M. Huerta*

IMMIGRANT DEFENDERS LAW CENTER
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org

*/s/ Karen C. Tumlin*

JUSTICE ACTION CENTER
Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)*
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

*/s/ Samantha Hsieh*

AMICA CENTER FOR IMMIGRANT
RIGHTS
Adina Appelbaum (*pro hac vice*)
Samantha Hsieh (*pro hac vice*)
Peter Alfredson (D.C. Bar No.
1780258)*
Evan Benz (*pro hac vice*)
Amica Center for Immigrant Rights
1025 Connecticut Ave., N.W., Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

**pro hac vice* forthcoming
*Attorneys for Plaintiffs*