IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | **SUPPLEMENTAL DECLARATION OF MARION ("MICKEY") DONOVAN-KALOUST (IMMDEF) IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

# SUPPLEMENTAL DECLARATION OF MARION DONOVAN-KALOUST
# DIRECTOR OF LEGAL SERVICES AT IMMIGRANT DEFENDERS LAW CENTER

*I, Marion Donovan-Kaloust, make the following statements on behalf of myself and Immigrant Defenders Law Center. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 7-8) as if fully set forth herein.

2. I am the Director of Legal Services of the Children's Representation Project ("CRP") at Immigrant Defenders Law Center ("ImmDef"), where I have been employed for almost ten years. ImmDef is a non-profit organization headquartered in Los Angeles, California, with additional offices in Santa Ana, Riverside and San Diego. ImmDef believes in providing universal representation so that no immigrant is forced to face removal proceedings without an attorney or accredited representative at their side. ImmDef is the largest provider of legal services to unaccompanied children in California and currently provides legal services to children housed in seventeen Office of Refugee Resettlement ("ORR") facilities throughout Southern California. ImmDef also represents thousands of unaccompanied children who have been released from ORR and are residing with sponsors in the Greater Los Angeles area.

3. On April 1, 2025, as a result of the March 21, 2025, near total termination of funding for legal services for unaccompanied children, ImmDef laid off twenty-four staff out of the 113 employees previously funded under the Unaccompanied Children's Program ("UCP"). Supervisors are struggling to redistribute work and ensure no balls are dropped. Support that was previously available to attorneys to best represent clients is now unavailable. For example, we were forced to lay off multiple case managers who provided key social services support for our child clients. Case managers assist children with school enrollment, housing insecurity, and other social services needs they require to adjust to a new community and culture. As I stated in my prior declaration, most of our child clients are indigent, so having staff assist them in accessing social services is key to their ability to participate meaningfully in their immigration cases-- a child facing homelessness is not likely to be able to focus on keeping appointments with their attorney. We also know that our child clients often face barriers in accessing school enrollment, due to linguistic and cultural challenges, or schools not understanding their sponsor's authority to enroll them in school. Our child clients, and thus our mission to provide comprehensive immigration representation, will suffer without this key support.

1

4. We also laid off multiple members of our legal assistant team. These team members were some of the first points of contact for clients and their families and played a key role in maintaining files, submitting filings and supporting our client representation. As mentioned in my prior declaration, we have over 1,900 open cases funded under the terminated UCP program, and over 3,000 open cases organization wide. In such a high-volume practice, administrative support is key to ensuring that nothing falls through the cracks and that our ethical responsibilities to our clients are faithfully discharged. Without this support, even more burden will fall on our attorney team at a time of incredible stress, and at a time when unaccompanied children's cases are being expedited through the deportation process.

5. We were also forced to lay off multiple members of our Detained Youth Empowerment Project. In addition to providing Know Your Rights presentations and legal screenings (which were not immediately terminated under CLIN1), these team members played an incredibly important role in the provision of CLIN2 services. They were some of the first friendly faces detained children saw in the United States, and were key sources of stability and empathy for children under incredible stress. These team members made referrals to the Young Center for Immigrant Children's rights as well as to legal services for children who will reunify with a sponsor outside our service area. They also provide planning support for children aging out of ORR custody. This age-out support is crucial, especially as we expect to see more children turn eighteen and "age out" of ORR care due to changing ORR policies which make it increasingly difficult for children to be reunified with family members. Laid off staff prepared unrepresented children for court appearances and assisted with the provision of "Friend of Court" services. They heard shelter conditions concerns from children and elevated them to ORR subcontracted facility members and ORR officials to ensure children's rights are respected while in government care. All of these services were defunded.

6. In an attempt to retain specialized attorney staff members, we transferred one attorney from the Children's Representation Project onto another grant, rather than hiring externally for that role. With a hiring freeze in place, we cannot replace him on the Children's Representation Project. Instead, other attorneys in the Children's Representation Project will now have to absorb his cases into their already growing caseloads. Additionally, three staff members tendered their resignations in March and early April because of the uncertainty created by the UCP program termination and the fear they might soon be laid off. As mentioned in my previous declaration, our reserves will only last about six months. If the funding is not restored, additional layoffs impacting all positions would be required, with disastrous consequences for our child clients and on our mission.

7. In addition to the layoffs, resignations and reassignments, there have been multiple immediate impacts on the children we serve. After the UCP program partial termination, we reached out to the ORR-subcontracted facilities we service to let them know we could

2

not retain new clients. Some Long-Term Foster care programs had just accepted new children, and asked us what to do, since the children would now be without counsel. The government's complete lack of a stop gap plan has left us with no guidance with which to address these concerns. Emergencies in these detained unaccompanied children's cases are ongoing despite their lack of access to representation. One child ages out in just a couple months, and is losing precious time to apply for relief every day that passes they are without counsel. Other recently arrived children now face being warehoused until they are deported or age out. Without funding and with layoffs on the table, we were unfortunately unable to offer these children representation. The subcontracted facilities asked if they should stop accepting children since they will lack access to counsel, and I had to tell them that every single LSP in the country is facing the same drastic cut, and likely every detained child in the nation would be unable to access counsel.

8. Even children with counsel are experiencing additional hurdles to their ongoing representation. The week after the termination, a child we represent who speaks a Mayan language had to be prepared for an upcoming hearing. Our access to interpretation services had been terminated along with all representation services, and the child's attorney was unable to communicate with him. Though ImmDef has a direct contract with an interpretation service and could thankfully pay out of pocket for these services (at least for now), that interpretation service does not offer Mayan languages. The attorney had to seek a continuance in immigration court due to the inability to communicate with her client, delaying the proceedings needlessly.

9. The program termination also places children in danger. The week after the termination, ImmDef staff learned of a significant, potentially life-threatening safety incident impacting a detained infant. In addition to placing the baby's safety at risk, the incident also likely impacted their eligibility for legal relief. Because of the seriousness of the situation, ImmDef stepped in to offer support and advocacy on the child's behalf, knowing we would likely not be compensated for this work. The UCP program termination has put us in a position that forces attorneys to choose between their moral duty to protect an infant from harm and working without compensation.

10. The UCP program termination has also had immediate impacts on stakeholders. As mentioned above, ORR subcontracted facilities are at a loss about what to do for children in their care who are in imminent need of representation. The same day as the UCP program termination, on March 21, 2025, we learned that ORR-subcontracted facilities were warned by ORR to prepare for expedited removal hearings for detained children. Over the past week, we saw those hearings roll out as subcontracted facilities struggled to understand their responsibilities and how to make the children available for these expedited hearings.

11. At the detained juvenile docket held April 2, 2025, ImmDef represented all the children at facilities we serve who were scheduled on that docket and appeared on their behalf despite the fact that funding has not been restored in light of our ethical responsibilities to our clients. The week following the UCP program termination and again on April 2, the Immigration Judge asked whether ImmDef would be able to provide Friend of Court services because they help the hearings run much more smoothly and efficiently. He pressed the attorney appearing to find a solution that would allow us to continue to serve as Friend of Court. ImmDef was forced to advise him that we are assessing the situation, because as of now, funding has not been restored despite the TRO. Without funding, there is no solution to be had.

12. ImmDef has 15-25 immigration and state court hearings for children represented under the UCP program *each week* over the next month. We had over twelve hearings scheduled for April 2, *alone*. We expect the number of hearings to increase as removal cases of detained children continue to be expedited. Furthermore, after years of receiving very few asylum interview notices due to backlogs at the asylum office, in late March, after the termination notice, we received over ten asylum interview notices for the weeks of April 1 and April 7, 2025, and expect to receive many more, as we have hundreds of pending asylum applications for unaccompanied children. While no change in scheduling priorities has been announced by the asylum office, ImmDef and sister organizations across the nation have reported that it appears unaccompanied children are suddenly being prioritized for asylum interview scheduling. The preparation for an asylum interview can take multiple weeks and dozens of hours depending on the complexity of the case. The asylum interview itself is typically an all-day endeavor. Interviews take place in Tustin, CA, about two hours from our headquarters. It is typical to have to wait two to three hours past the scheduled interview time, if not more, and the interview itself can take multiple hours. It is not clear how, without funding, we will be able to continue to represent these children at their hearings and interviews, but to withdraw now would seriously prejudice their cases. It is also not clear how we will be able to continue to sustain the increased workload caused by expedited hearings and asylum interviews if we are further forced to reduce staff in the coming weeks.

13. Unfortunately, ImmDef knows firsthand that filling this kind of gap with the assistance of pro bono counsel is simply not practicable. Shortly after its founding, ImmDef created a pro bono program in which we placed our more straightforward children's cases with pro bono counsel and provided them with mentorship. Recruitment was a challenge, requiring a full-time pro bono coordinator as well as other support staff to try to identify sufficient pro bono counsel to take on even a fraction of our child clients. We placed the more "straightforward" cases (meaning not as legally complex and cases where the child hadn't experienced extreme trauma) with pro bono attorneys because we knew that pro bono attorneys typically lacked the specialized training and experience to handle more complex

matters, even with mentorship. More complex cases, or cases with serious trauma or other complicating factors had to remain with our specialized staff attorneys. Unfortunately, we found that, while we appreciated pro bono attorneys' generosity with their time and willingness to help, they typically lacked the language skills and cultural responsiveness to be able to build rapport with their child clients. They also needed intensive training on an ongoing basis due to the rapidly changing nature of immigration law. Even with these supports, we found that pro bono counsel unfortunately made mistakes that prejudiced or could prejudice their clients and in many instances, ImmDef ended up "taking back" a client that was previously placed with pro bono counsel either because of such mistakes or because the pro bono attorney requested us to when they came to fully appreciate the amount of work representing unaccompanied children entailed. Another issue was that immigration cases can take years, and many pro bono attorneys left their firms during the pendency of the case, asking ImmDef to take it back upon their departure. Furthermore, any cases we did place with pro bono attorneys were never while the child was actively in the custody of ORR. This is because in order to represent a child in government custody, an individual needs to go through extensive background checks, including fingerprinting and other background checks to ensure the children's safety. These clearances can take several weeks if not longer to obtain, making it impracticable for pro bono attorneys to represent detained children, especially in light of recent expedited hearings. In sum, while we appreciated the generosity of the attorneys who volunteered, found that the pro bono model was a much less efficient and effective way to provide legal representation to unaccompanied children and we terminated our pro bono program as a result of these challenges.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 3rd of April 2025, in Riverside, CA.

_____

**Marion ("Mickey") Donovan-Kaloust**
**Immigrant Defenders Law Center**
**634 S. Spring Street, 10th Floor**
**Los Angeles, CA 90014**
**Tel: (213) 674-9438**
**Fax: (213) 282-3133**
mickey@immdef.org

5