IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>　　　　　　　Defendants. | Case No. 3:25-cv-2847<br><br>**SUPPLEMENTAL DECLARATION OF ANA RAQUEL DEVEREAUX (MIRC) IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

## SUPPLEMENTAL DECLARATION OF ANA RAQUEL DEVEREAUX
## SENIOR MANAGING ATTORNEY AT MICHIGAN IMMIGRANT RIGHTS CENTER

*I, Ana Raquel Devereaux, make the following statements on behalf of myself and the Michigan Immigrant Rights Center ("MIRC"). I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 7-6) as if fully set forth herein.

2. My name is Ana Raquel Devereaux, and I am a Senior Managing Attorney at the Michigan Immigrant Rights Center (hereinafter, "MIRC"). MIRC is a non-profit organization that provides free legal services for children and other non-citizens who have suffered abuse, trafficking, and persecution. MIRC is the only organization serving unaccompanied children in the custody of the Office of Refugee Resettlement (hereinafter, "ORR") in Michigan and the primary organization providing legal services to children in the unaccompanied refugee minor program in Michigan and to children released from ORR custody to sponsors in Michigan.

3. Michigan Immigrant Rights Center (MIRC) is a legal resource center for Michigan's immigrant communities. MIRC works to build a thriving Michigan where immigrant communities experience equity and belonging. The Michigan Immigrant Rights Center is a program of Michigan Statewide Advocacy Services (MSAS). MIRC has five local offices throughout the state of Michigan which provide direct legal services to unaccompanied children and also provide general community immigration legal services. Our five local offices are located in Detroit, Ypsilanti, Lansing, Grand Rapids, and Kalamazoo. These five offices are supported by a statewide structure within MIRC to provide training, administrative and supervisory support, community engagement, and pro bono support.

4. Since the drafting of our prior declaration, MIRC moved forward with logistics for implementing largescale layoffs based on the loss of funding. Originally, we planned to give staff notice on April 1, 2025. While MIRC was able to secure some other funding and planned to shift some staff to other funded work, the layoffs would have involved the majority of staff who had been employed under the Acacia contract. We intended to provide staff with notice according to their employment contracts and some additional severance benefits. The funding for the staff notice period and severance benefits is coming exclusively from MIRC's reserves and totals about $1.5 million. We had set the April 1st timeframe expecting to learn about the funding by the end of the original option year 2 contracting period, which concluded on March 29, 2025. However, with the loss of CLINs 2, 3, and 4 on March 21st, the time between March 21 and April 1st is additional time of paying for staff time without funding. That additional time totals about $500,000 so far. Despite the additional cost, when CLINs 2, 3, and 4 were terminated, MIRC leadership

1

decided that it was worth keeping our originally scheduled April 1st timeframe for providing layoff notices so that we could receive further information on any funding beyond Option Year 2 of the contract and because of the very significant level of logistics involved in preparing to provide appropriate notice and communication to over 100 employees about their employment status, rights, and benefits.

5. Upon learning of the hearing on the temporary restraining order scheduled in the instant case on April 1st, we moved our date for communicating layoffs to April 7, 2025. In light of the temporary restraining order in this case, we are awaiting future decisions in this case before scheduling a new date for the layoffs and related staff communications.

6. If there is not a permanent injunction in this case, permanently enjoining ORR from withdrawing funding from legal services for unaccompanied children for the duration of the appropriations period, we will immediately schedule a time to communicate layoffs to staff. This will involve immediate layoffs (after completing the notice periods in their employment contracts) of staff whose work was covered under CLINs 2, 3, and 4, and delayed layoffs for staff doing work under CLIN 1 since the government has only provided a six-month extension for that work and has clearly signaled they are not intending to continue funding that work.

7. It is very important to note that at the time of the writing of this declaration more than one full business day from the issuance of the temporary restraining order, ORR has not issued a new or restored contract for CLINs 2, 3, and 4. So it is not clear when or how the government intends to comply with the order. This gives MIRC significant additional financial concern and we have to continue to make decisions without the contract in place, despite the TRO being in place. Without a restored contract, we continue to use funding from our reserves and other parts of our organizational budgets, which affects our work overall, our ability to fulfill our commitment to our other funders, and puts into significant jeopardy what other severance benefits we may be able to offer our laid off staff in the event of no permanent injunction in this case.

8. As a result of the temporary restraining order, we have delayed staff layoffs for a second time. But knowing that layoffs are forthcoming is absolutely devastating to staff morale and our ability to retain highly-trained, skilled staff who have built critical rapport with our child clients. While the delay has provided some reprieve for clients and staff, staff continue to be impacted knowing that layoffs were planned and are still looming until a resolution of this lawsuit and the government's compliance with the court's order. Since the writing of our prior declaration, we have gotten eleven more resignations of staff members and we get a new one almost every day. Almost every one of the departing staff members specifically state in their resignation letters that they love working at MIRC and are departing because of the funding uncertainty, with the most recent resignation letter specifically stating,

> Good afternoon, I am writing to provide you all with notification of my resignation from MIRC. I want to be completely clear that the one and only reason for my

resignation is funding instability; I love everything about this job and everyone I work with. My supervisors in Grand Rapids have been nothing short of extraordinary, and I have learned so much in my time here. I'm inspired daily by our work and our mission. [...]Thank you so much for such an incredible experience and opportunity, and for the ongoing support shown to the staff in these difficult times. I will always be so proud of having been part of the MIRC family.

9. These resignations include some of our most experienced attorneys and other essential staff. Our ability to hire replacement staff will be hindered by the general public insecurity with federal contracts at this moment and to be even more clear, ORR's stop work and termination orders over the past six weeks.

10. Even if we are able to hire to replace the staff who have departed, my direct experience in leading MIRC's extremely successful hiring efforts, specifically for staff serving unaccompanied children, the incoming staff will mostly be new to the practice of law, immigration law, and working with unaccompanied children. So the training and time needed to bring those potentially new staff up to the level of our staff who departed due to the funding uncertainty will be very difficult during this time of transition Likely, the interim burdens to onboard in this environment will put even more pressure on existing staff and lead to further resignations, thereby compounding and worsening these effects..

11. Another cost of ORR's termination of funding for representational services for unaccompanied children has been the over 130 staff hours I, along with senior MIRC leadership, have devoted to planning for layoffs, the funds spent on seeking employment law and human resources advice to ensure we are complying with legal requirements and following best practices in deciding on and carrying out layoffs.

12. While waiting to put into action a layoff plan, MIRC staff have been continuing to work on the cases of currently represented unaccompanied children, but even this has been tailored to account for the funding uncertainty and the possibility of staff layoffs in the immediate future. We have had staff working on emergency aspects of these cases but refrained from taking other case actions that would make it harder for us to withdraw in the near future. In practice, we are primarily limiting the filings and appearances our staff are doing on behalf of unaccompanied children in state court, unless there is an imminent deadline. These state court cases will be much harder to withdraw from, so we are waiting until we know the funding is fully restored before we return to doing that work for our child clients.

13. If a preliminary injunction is not issued in this case, we will proceed to almost immediate layoff notices and those will be followed by a plan which we will share the following business day after layoff notices that will direct our staff to begin withdrawing from all cases previously funded by ORR where we have not been able to obtain alternate funding, which is more than 800 cases.

14. Since March 21, 2025 and until ORR provides a restored or new contract for representational services, MIRC has not taken any new cases of children in ORR custody.

We receive daily emails from staff at ORR facilities asking us to take the cases and or offer some stop-gap services. Each week, the Detroit immigration court has at least one docket day dedicated to unaccompanied children. Moreover, with the expansion of rocket dockets for unaccompanied children in removal proceedings across the country, we, too, have seen master calendar cases reset for our currently-represented clients as well as new children in ORR custody. We continue to represent our clients who have master calendar hearings by either appearing in court fully or offering friend-of-the-court services, all unfunded, including all seventeen hearings that occurred yesterday, April 3rd. Additionally, we have received multiple requests for representing children in custody at the newly scheduled hearings yesterday and upcoming April 7th and this will continue indefinitely. Unless, or until, ORR restores the funding as ordered by the temporary restraining order, we must decline to represent these children at their hearings for funding reasons. The same would be true and in even greater measure if the preliminary injunction is not granted.

15. One specific example of these requests involved the ORR subcontractor practically begging MIRC to take a child's case because they had been scheduled for a master calendar hearing and asking what other resources we could provide if we couldn't represent the child. In this chain, eventually, an employee from ORR told the sub-contractor that "most [Legal Service Providers] already serve as "friends of court" but maybe they are still able to offer this on the side," ignoring the fact that ORR chose to cut the funding for these friend of the court services specifically as part of the termination of CLIN 2.

16. In another instance, an ORR sub-contractor asked MIRC to represent a child in short-term custody who was suddenly scheduled for a master calendar hearing and we had to decline because we have no funding to take on new cases and are using up other MIRC funding to carry the unaccompanied children's cases we already have. After we declined, they told us they found another pro bono attorney to take the case. Yet two days before the hearing, the shelter staff and the Young Center advocate for the child reached out again to see if MIRC could take the case. They specifically referenced the news of the temporary restraining order and assumed that we would now have funding to do this work, which has yet to be restored. It is clear that ORR is not providing internal communication to its staff on the ground and its sub-contractors about the state of the funding for legal services and how ORR intends to ensure children receive these services. Additionally, we don't yet have the details as to what happened with the pro bono attorney who had seemingly committed to taking the case, but it is a clear example of the harm in the termination of the funding, even when MIRC has been expending significant other resources coming from other crucial services to cover a large portion of the gap.

17. The example above of a pro bono attorney's inability to actual step in and cover the representational needs of even one hearing is only the beginning of the picture we can paint of how pro bono attorneys in Michigan are unable supplant the funded legal services work for unaccompanied children. Since the termination of CLINs 2, 3, and 4, we have been using our funding reserves to continue to staff our pro bono mentors and coordinators for the time being, and even in this situation where we are covering what ORR should have

been funding, pro bono attorneys cannot even begin to assist unaccompanied child clients in Michigan.

18. As a result of the loss of funding for the representation of unaccompanied children, MIRC's pro bono team specifically has been engaged in pro bono attorney recruitment efforts with the intent of putting together a list of pro bono attorneys that ORR sub-contractors can reach out to for the unaccompanied children's cases. Only nine attorneys have signed up for the list. Most of them only speak English. Most of them indicated they could not appear in all of the forums required for the representation of unaccompanied children. All of them indicate they require mentorship or support from MIRC. We are still working to determine their true ability to take these cases for full representation and do so without mentorship, but, based on my ten years leading this work in Michigan, I can confidently state that pro bono is not the answer to address these funding cuts. For further context, over the past year, MIRC has dedicated considerable time to placing these cases with pro bono attorneys and offered to provide unlimited training, mentorship, language assistance, covering the client's court and filing fees, and assisting with other logistics. In that time, not one attorney took a case of an unaccompanied child in Michigan (including those who are now indicating they are interested in taking cases).

19. Law firms have told MIRC that they are only interested in doing short-term pro bono work (usually about a commitment of one day) because of the high turnover rates of their staff. Additionally, we have been told by firms who once took a few unaccompanied children's cases that they no longer wish to do that type of pro bono work because they don't like dealing with the realities of unaccompanied children.

20. The few who often show interest in volunteering at a higher time commitment level are retired attorneys who have no experience in immigration law and no office resources, including meeting space, technology, malpractice insurance, administrative support, interpretation, and so on. So while they may have time and interest, they cannot provide pro bono legal services to unaccompanied children without the full infrastructure of MIRC's mentorship, offices, malpractice insurance, technology, and administrative resources.

21. A reality in Michigan is that pro bono is not a requirement for those licensed in Michigan and so there is little incentive for attorneys to offer their services in a pro bono context. Even those who try to offer pro bono services from a place of charitable intentions lack the resources or full commitment to do so, as demonstrated by the examples shared above.

22. We also recently offered two critical opportunities for training for pro bonos, one was in guardianships, to allow pro bono attorneys to take on a more short-term portion of these children's cases that is essential to special immigrant juvenile status, and only one person attended, and has not accepted cases from that training. The other was on addressing secondary trauma which is a key tool for doing this work healthily and sustainably, only two people attended. Even so, these trainings are ones we would not be able to offer without this funding.

5

23. Two additional realities that make pro bono an impossibility as a way to fulfill the obligation to provide legal services to unaccompanied is the high levels of logistical hurdles required for providing legal services to children, which pro bonos are unable to cross (either at all or unassisted) and the administrative burden of the local ORR subcontractors to have to establish an independent relationship with each pro bono lawyer for each case.

24. The first logistical hurdle is that ORR requires individuals working with children in custody to undergo essential background check processes and also to use high levels of encryption for case data. The background checks can take weeks at best and months at worst. The encryption is expensive and requires IT expertise to ensure compliance with these requirements to safeguard the information of the children we are working with. These hurdles are very important and MIRC has dedicated significant staffing resources to ensuring our staff comply with these requirements, but that is a barrier that pro bono attorneys struggle with, even with all the MIRC assistance we can provide to smooth the path to meeting these requirements. As an example, we have been trying to place a specific case of a fourteen-year-old unaccompanied child in Michigan with a pro bono attorney since December 2024. One attorney was interested but specifically declined due to the need to take time to do background checks. Another didn't fully decline, but was not licensed in Michigan for the critical state court appearance, and never took proactive steps to complete their background check, so the case remains unplaced. Even if this case was placed, these attorneys would need ongoing funded support from MIRC to continue their work.

25. The other hurdle is accessing the children in custody. Pro bono attorneys are not generally well-positioned to visit children in ORR facilities. In some of Michigan's ORR short-term shelters, in particular, the children cannot be transported to lawyers offices and the shelters have difficulty coordinating the logistics for universal access to lawyers through remote communication, even with significant planning and assistance, so pro bono attorneys would be unable to even access these children.

26. One of the benefits to MIRC's provision of services to unaccompanied children in Michigan is that we are the only provider doing this work in the state and we are part of a unified and internally regulated network of legal service providers. When working with us, the ORR subcontractors have centralized points of contact and uniform processes, we gather together every quarter to troubleshoot logistical challenges in service provision for the children. Local ORR-subcontractor staff also know who in our management structure to reach out to if any individual attorney is not meeting the legal needs of the child they are working with. None of this would be available if ORR looked to pro bono attorneys to fulfill the obligation of legal services to unaccompanied children. In our experience of working with pro bonos who take cases in the adult context (since as I mentioned above, we cannot get pro bonos to take cases of unaccompanied children in Michigan), a pro bono attorney can handle at most two or three cases at any given time, but most only take one, if any. So it would require 300-800 individual pro bono attorneys to provide the services in Michigan if MIRC was not funded for this work. And this is only for currently represented cases. That number will grow by at least 100-300 each year. These hypothetical

6

800 individual pro bono attorneys would not have the ability to organize themselves, and there would be no supervision structure to provide coordination, training, and accountability since MIRC would not be funded to do this work without ORR restoring funding for the provision of legal services.

27. To be clear and knowing full well the beneficence within the pro bono legal community, pro bono is not the answer to addressing the legal needs of all of these children after the funding cuts.

28. The harm to Michigan's unaccompanied children is already taking place (even despite the issuance of the temporary restraining order) and every day that follows more harm is caused to children who are required to appear in immigration court without attorneys, and MIRC is suffering a daily loss of funding that was crucial to the provision of other essential services, daily losing critical staff, and soon will have to let go of the majority of staff with the expertise and experience to serve unaccompanied children and there will be no one left to do this work on behalf of unaccompanied children in Michigan if the funding is not reinstated.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 4th of April 2025, in Lansing, Michigan.

*[signature]*

Ana Raquel Devereaux
Senior Managing Attorney
Michigan Immigrant Rights Center