NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe (Cal. Bar No. 299296)
Diane de Gramont (Cal. Bar No. 324360)
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email: mwroe@youthlaw.org

*Attorneys for Amici Curiae*
*Additional counsel listed on following page*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,

Defendants.

Case No. 25-cv-02847-AMO

*AMICUS CURIAE* BRIEF OF THE NATIONAL CENTER FOR YOUTH LAW, THE CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW, CHILDREN'S RIGHTS, AND THE UC DAVIS IMMIGRATION LAW CLINIC IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Judge: Hon. Araceli Martínez-Olguín

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
Bardis Vakili (Cal. Bar No. 247783)
Sarah E. Kahn (Cal. Bar No. 341901)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org

CHILDREN'S RIGHTS
Leecia Welch (Cal. Bar No. 208741)
88 Pine Street, Suite 800
New York, NY 10005
Telephone: (212) 683-2210
Email: lwelch@childrensrights.org

UNIVERSITY OF CALIFORNIA
DAVIS SCHOOL OF LAW, IMMIGRATION LAW CLINIC
Holly S. Cooper (Cal. Bar No. 197626)
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu

## TABLE OF CONTENTS

I. Identity and Interests of *Amici Curiae* .......... 1

II. Introduction .......... 3

III. Argument .......... 5

A. Unaccompanied children are extraordinarily vulnerable to mistreatment and abuse while in ORR custody.......... 5

1. *Amici*'s litigation enforcing the *Flores* Settlement demonstrates the harm children suffer in ORR custody. .......... 7

2. Numerous other accounts confirm severe mistreatment of detained unaccompanied children. .......... 10

3. ORR lacks the necessary oversight to protect children in its custody from mistreatment. .......... 12

B. Funded legal service providers are essential to protect detained children from mistreatment. .......... 14

C. Critical protections in federal law, regulation, and policy are meaningless without funded legal representation. .......... 19

IV. Conclusion .......... 24

## TABLE OF AUTHORITIES

### CASES

Complaint, *John Doe v. Shenandoah Valley Juvenile Center Commission*, No. CV 17-0097 (W.D. Va. Oct. 4, 2017) ........ 11

Complaint, *U.S. v. Southwest Key Programs, Inc.*, No. CV 24-00798 (W.D. Tex. July 17, 2024) ........ 12, 18

*Flores v. Barr*, 407 F. Supp. 3d 909 (C.D. Cal. 2019) ........ 7

*Flores v. Garland*, No. CV 85-4544, 2024 WL 3467715 (C.D. Cal. June 28, 2024) ........ 7, 12, 13

*Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017) ........ 7, 8

*Flores v. Sessions*, No. CV 85-4544, 2018 WL 10162328 (C.D. Cal. July 30, 2018) ........ 8

*Lucas R. v. Becerra*, No. CV 18-5741-DMG (PLAx), 2022 WL 2177454 (C.D. Cal. Mar. 11, 2022) ........ 4, 20, 22, 23

*Saravia v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) ........ 22

### STATUTES

42 U.S.C. § 5106a(b)(2)(B) ........ 19

8 U.S.C. § 1232 ........ passim

8 U.S.C. § 1522(d) ........ 22, 23

### REGULATIONS

45 C.F.R. § 400.112 ........ 23

45 C.F.R. § 400.116 ........ 23

45 C.F.R. § 410.1001 ........ 13

45 C.F.R. § 410.1205 ........ 23

45 C.F.R. § 410.1206 ........ 23

45 C.F.R. § 410.1207 ........ 22

45 C.F.R. § 410.1302 ........ 13

45 C.F.R. § 410.1308 ........ 19

45 C.F.R. § 410.1309 ........ 18, 19, 21, 22

45 C.F.R. § 410.1901 ........ 20

45 C.F.R. § 410.1902 ........ 20

45 C.F.R. § 410.2002 ........ 14

Investigations of Child Abuse and Neglect Rule, 89 Fed. Reg. 93498 (Nov. 27, 2024) (codified at 45 C.F.R. § 412) .......... 13

ORR Foundational Rule, 45 C.F.R. § 410.1000, *et seq.* .......... 7

**OTHER AUTHORITIES**

Fola Akinnibi, *Child Migrant Watchdog Gutted in DOGE Cuts*, Bloomberg, Feb. 19, 2025, https://www.bloomberg.com/news/articles/2025-02-19/unaccompanied-children-office-of-the-ombuds-gutted-in-doge-cuts .......... 14

Jodi A. Quas, & Thomas D. Lyon, *Questioning Unaccompanied Immigrant Children: Lessons from Developmental Science on Forensic Interviewing*, Society for Research in Child Development Child Evidence Brief (Oct. 2019) https://www.srcd.org/research/questioning-unaccompanied-immigrant-children-lessons-developmental-science-forensic .......... 16

National Association of Counsel for Children, *State Models of Children's Legal Representation* (October 2024), https://counselforkids.org/wp-content/uploads/2024/10/Model-of-Rep-Chart-October-2024.pdf .......... 20

National Scientific Council on the Developing Child, *Supportive Relationships and Active Skill-Building Strengthen the Foundations of Resilience: Working paper 13* (2015), https://developingchild.harvard.edu/wp-content/uploads/2024/10/The-Science-of-Resilience2.pdf .......... 15

Office of Refugee Resettlement, ORR Guide to Eligibility, Placement, and Services for Unaccompanied Refugee Minors (URM): Section 1, https://acf.gov/orr/policy-guidance/orr-guide-eligibility-placement-and-services-unaccompanied-refugee-minors-urm (last accessed April 8, 2025) .......... 21, 23

ORR Unaccompanied Children Bureau Policy Guide, Section 5.8.11, https://acf.gov/orr/policy-guidance/unaccompanied-children-bureau-policy-guide (last accessed April 9, 2025). .......... 21

Ryan Matlow, Melissa Adamson, Neha Desai, Julian Ford, *Guidance for Mental Health Professionals Serving Unaccompanied Children Released from Government Custody*, (Nov. 2021) https://youthlaw.org/sites/default/files/attachments/2022-03/2021_Guidance-for-Mental-Health-Professionals-Serving-Unaccompanied-Children-Released-from-Government-Custody.pdf .......... 6, 24

Talia Kraemer & Eliza Patten, *Establishing a Trauma-Informed Lawyer-Client Relationship (Part One)*, 33 ABA Child Law Practice (Oct. 2014) https://www.americanbar.org/groups/public_interest/child_law/resources/child_law_practiceonline/child_law_practice/vol-33/october-2014/establishing-a-trauma-informed-lawyer-client-relationship/ .......... 16

U.S. Dep't of Health & Human Services Office of Inspector General, *Operational Challenges Within ORR and the ORR Emergency Intake Site at Fort Bliss Hindered Case Management for Children*, OEI-07-21-00251 (Sept. 27, 2022), https://www.congress.gov/118/meeting/house/116285/documents/HMTG-118-IF02-20230726-SD007.pdf ........ 11

U.S. Dep't of Health and Human Services, Office of Inspector General, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody*, (Sept. 2019), http://oig.hhs.gov/oei/reports/oei-09-18-00431.asp ........ 17

U.S. Gov't Accountability Office, *Actions Needed to Improve Grant Application Reviews and Oversight of Care Facilities*, GAO-20-609 (Sept. 2020), https://www.gao.gov/assets/gao-20-609.pdf ........ 13

## I. Identity and Interests of *Amici Curiae*

*Amici curiae* are children's civil rights legal organizations with decades of experience representing detained immigrant children. The *amici* organizations all serve, or have previously served, as counsel to the nationwide plaintiff classes in *Flores v. Bondi*, No. CV 85-4544-DMG (AGRx) (C.D. Cal.) and *Lucas R. v. Becerra*, No. CV 18-5741-DMG (PLAx) (C.D. Cal.), two cases that established critical legal protections for children in federal immigration custody.

Through our hundreds of interviews with children in immigration custody and investigations of detention conditions across the nation over many years, *amici* are deeply familiar with how vulnerable unaccompanied immigrant children are to "mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5). In our experience litigating *Flores* and *Lucas R.*, we have become highly knowledgeable about the mistreatment that too many children endure while they are in the federal government's custody. We have also witnessed numerous children spend months or years in Office of Refugee Resettlement ("ORR") congregate care facilities without access to meaningful education or the opportunity to experience a normal childhood. *Amici* are invested in ensuring children can access fully funded legal representation because we have seen how children's attorneys play a necessary and critical role in protecting children from mistreatment and abuse and assisting them in exercising their legal rights, including their right to placement "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A).

The National Center for Youth Law ("NCYL") is a non-profit law firm that has fought to protect the rights of children and youth for more than fifty years. Headquartered in Oakland, California, NCYL leads high impact campaigns that weave together litigation, research, policy development, and technical assistance. NCYL's Immigration Team works to ensure that immigrant children are able to live in communities rather than in government custody and have the resources they need to heal and thrive. NCYL has been co-counsel to the plaintiff class in *Flores*

*v. Bondi*, landmark litigation that set minimum standards for youth detained in federal immigration custody, since the case's inception in 1985. NCYL also filed *Lucas R. v. Becerra* and *Duchitanga v. Lloyd,* which expanded due process rights for children in immigration custody and ensured their timely release to safe sponsors. NCYL also led the development of the Children's Safe Welcome Act, a federal bill introduced in 2022 and 2024 that restructures the immigration system to prioritize the best interests of children. Supported by leading child-focused experts and advocates, this legislation served as a key building block for the ORR Foundational Rule. For decades, NCYL has sought to advance the rights of detained immigrant youth through litigation and policy.

The Center for Human Rights and Constitutional Law ("CHRCL") is a non-profit organization that provides training and technical support to direct legal service providers, addresses systemic injustice through advocacy and impact litigation, and advances and protects the rights of immigrants, refugees, children, and communities impacted by systems of oppression. CHRCL attorneys have been appointed class counsel in a number of nationwide class actions regarding the rights of immigrants in government custody, including in *Flores v. Bondi* and *Lucas R. v. Becerra*. Through its work with immigrant communities and legal service providers, CHRCL is acutely aware of the critical importance of legal representation in protecting the rights of immigrant children.

Children's Rights is a national organization that investigates, exposes, and combats violations of the rights of children through strategic advocacy and class action litigation. Children's Rights is co-counsel for the plaintiff class in *Flores v. Bondi* and regularly meets with class members throughout the U.S. to monitor compliance with the Settlement Agreement. Children's Rights also works to improve outcomes for immigrant children in state foster systems by ensuring they have access to their Special Immigrant Juvenile status ("SIJS") entitlements. Additionally, Children's Rights provides direct representation and

legal advocacy to SIJS clients. Children's Rights has a 30-year track record of holding governments accountable, creating positive systemic change, and keeping children safe.

The UC Davis School of Law Immigration Clinic ("The Clinic") has expertise in immigration and juvenile law and has been recognized for its complex federal litigation on behalf of detained immigrants, including detained unaccompanied children. The Clinic provides representation and legal assistance to detained immigrants and challenges unlawful and prolonged detention to protect the rights of people in immigration detention. The Clinic has represented plaintiffs in *Flores v. Bondi* and *Saravia v. Sessions* and is currently representing plaintiffs in *Lucas R. v. Becerra.* All of these cases dealt with procedural and substantive protections for immigrant children in federal immigration custody. The Clinic has a long history of representing detained immigrants on such issues and has represented clients or provided amicus briefing in multiple favorable published decisions, including cases related to the right to a bond hearing, federal court habeas jurisdiction, and criminal deportability.

## II. Introduction

ORR's elimination of funded legal representation undermines Congress's central objective in passing the Trafficking Victims Protection Reauthorization Act (TVPRA): to protect unaccompanied children.

Based on our significant experience representing children in ORR custody, *amici* recognize that funding the direct representation of children is an integral part of protecting detained children from harm. Congress also recognized this. The TVPRA directs ORR to ensure unaccompanied children "who are or have been in [ORR] custody . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5). "The use of the conjunctive 'and' indicates that counsel for minors shall *both* represent minors in legal matters and *also* protect them from

mistreatment, exploitation, and trafficking. The role of counsel is thus inextricably linked to protection against those enumerated harms." *Lucas R. v. Becerra*, No. CV 18-5741-DMG (PLAx), 2022 WL 2177454, at *30 (C.D. Cal. Mar. 11, 2022).

Direct legal representation of children "protect[s] [children] from mistreatment" in numerous forms. 8 U.S.C. § 1232(c)(5). Children's attorneys have played a critical role in identifying and protecting children from abuse, unduly restrictive conditions, and barriers to family reunification that *amici* have litigated in *Flores* and *Lucas R.*

The 1997 *Flores* Settlement Agreement sets basic standards for the detention of immigrant children nationwide, including their right to release without unnecessary delay. *See Flores v. Johnson*, No. CV 85-4544-DMG (AGRx), ECF No. 101 (Exhibits 1-3) (C.D. Cal. Feb. 2, 2015) (hereinafter "*Flores*"). The *Lucas R.* litigation established unaccompanied children's rights to due process when ORR places them in a restrictive setting or denies release to a close relative sponsor. *See Lucas R.*, 2022 WL 2177454. Settlements in *Lucas R.* also protect the rights of unaccompanied children with disabilities and children prescribed psychotropic medications and establish that ORR may not retaliate against legal service providers for representing children in matters adverse to ORR. *See* Memorandum in Support of Joint Motion for Final Approval of Settlements, *Lucas R.*, 5-7, ECF No. 418-1.

Through our work, *amici* have consistently witnessed both insufficient oversight within ORR facilities to protect children's rights and numerous barriers for children to report concerns and abuses. In this context, having access to an independent and outside advocate whom the child trusts—their attorney—is necessary to protect them from serious harm in custody. As one of the only trusted and consistent adult advocates in a child's life while they are detained, the child's attorney is naturally well-positioned to identify when a child is being harmed and to act on that information. Children's attorneys also help ensure that ORR provides

children safe placements "in the least restrictive setting that is in the[ir] best interest," and expeditiously releases them to a safe and suitable sponsor—two express goals of the TVPRA. 8 U.S.C. § 1232(c)(2)(A). Numerous protections in ORR's governing regulations—the ORR Foundational Rule—and ORR's policies, which exist to ensure children can exercise their rights under the Due Process Clause of the U.S. Constitution and the TVPRA, become meaningless without access to counsel.

Cutting off funding for direct representation not only runs contrary to the TVPRA and Foundational Rule, but also leaves unaccompanied children more vulnerable to mistreatment and abuse while they are in ORR custody. *Amici* respectfully request that this Court grant Plaintiffs' Motion for a Preliminary Injunction.

## III. Argument

Unaccompanied children are particularly vulnerable because they arrive to the United States without their parent or legal guardian and are placed in a system that lacks sufficient oversight and protections for their well-being. Independent attorneys build trust and confidence with detained youth over the course of a child's time in detention and are a critical mitigating force to the harms of detention in congregate care settings. The presence of independent counsel in ORR facilities helps to ensure the TVPRA's requirement that youth "have counsel to represent them . . . and protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5).

### A. Unaccompanied children are extraordinarily vulnerable to mistreatment and abuse while in ORR custody.

*Amici* have met with and listened to the stories of hundreds of unaccompanied children over more than two decades. Many of these children have experienced significant trauma stemming from extreme poverty, abuse in their home, war, political violence, organized crime, or sexual assault. When children

attempt to flee to the United States, they face long and hazardous journeys, often crossing several international borders and traveling hundreds of miles on foot, by bus, boat, plane, or precariously riding atop massive freight trains. The "lack of parents or other caregivers places unaccompanied children at higher risks of experiencing additional traumatic events, such as physical or sexual assault, during their trip to the United States."[1] These traumatic events compound children's previous traumatic experiences in their home countries. Throughout unaccompanied children's migration journey, "separation and disconnection from primary caregivers and family supports puts children at risk for additional exposure to traumatic stressors, adding to the cumulative burden of peri-migration trauma exposure." *Id.* at 20. This risk continues when children enter government custody. "Because of children's disconnection and limited opportunities for contact with caregivers and family while in government custody, children lack protection from institutional or predatory violence, exploitation, and victimization." *Id.*

Trusted adults, such as legal service providers, are essential to protecting children's basic safety while in government custody. *Amici*'s multiple motions to enforce the *Flores* Settlement in recent years highlight the vulnerability of unaccompanied children in ORR custody and the enduring need for oversight to ensure their safety. Decades of well-corroborated accounts of the severe mistreatment unaccompanied children have faced in government custody, and the structural deficiencies within ORR that result in this mistreatment, illustrate the necessity of funded legal representation in fulfilling Congress's objective of ensuring the safety of unaccompanied children.

---

[1] Ryan Matlow, Melissa Adamson, Neha Desai, Julian Ford, *Guidance for Mental Health Professionals Serving Unaccompanied Children Released from Government Custody*, 12, (Nov. 2021) https://youthlaw.org/sites/default/files/attachments/2022-03/2021_Guidance-for-Mental-Health-Professionals-Serving-Unaccompanied-Children-Released-from-Government-Custody.pdf.

**1. *Amici*'s litigation enforcing the *Flores* Settlement demonstrates the harm children suffer in ORR custody.**

In 1985, *amici* NCYL and CHRCL filed the *Flores* lawsuit to challenge the Immigration and Naturalization Service's ("INS") inhumane practices of denying children release to suitable adult relatives and detaining them in horrific conditions. *See* Complaint, *Flores*, ECF No. 1. In INS facilities, children were forced to share sleeping quarters with unrelated adults, were denied access to education and recreation, and were subjected to strip and body cavity searches. *Id.* at ¶¶ 42-46. The *Flores* plaintiffs and the federal government reached an agreement in 1997, which is now binding on the INS's successor agencies, the Department of Homeland Security ("DHS") and the Department of Health and Human Services ("HHS"). The case remains under the judicial supervision of Chief District Judge Dolly M. Gee in the District Court for the Central District of California, although it has been partially terminated as to HHS in light of the ORR Foundational Rule, 45 C.F.R. § 410.1000, *et seq*. *See Flores v. Garland*, 2024 WL 3467715, at *9 (C.D. Cal. June 28, 2024). As noted by the district court in 2019, "the evidentiary record [in *Flores*] overwhelmingly shows that throughout several presidential administrations, the Agreement has been necessary, relevant, and critical to the public interest in maintaining standards for the detention and release of minors arriving at the United States' borders." *Flores v. Barr*, 407 F. Supp. 3d 909, 928-29 (C.D. Cal. 2019).

In 2016, *Flores* counsel challenged ORR's practice of "detain[ing] unaccompanied minors for months, and even years, without providing them with any opportunity to be heard before a neutral person with authority to review the basis for the detention." *Flores v. Sessions*, 862 F.3d 863, 872 (9th Cir. 2017). Our clients, wrongfully confined in secure detention facilities, described horrific and prison-like conditions. *Id.* at 872-73 (citing children's descriptions of being "'locked [] up in the cells every night, to sleep on benches made out of cement

with mattresses'"; "threatened with [] pepper spray"; and held in a facility "with flooding toilets and unusable showers.").[2] Children's immigration attorneys provided critical evidence of the abuse of children in restrictive placements and the lack of process they were afforded to contest their confinement. *See, e.g.*, Declaration of Lorilei Alicia Williams, *Flores*, ECF No. 239-2 (Ex. 10).

In 2018, *Flores* counsel challenged ORR's practices of "(1) placing Class Members in Residential Treatment Centers ("RTCs"), staff-secure facilities, and secure facilities; (2) administering psychotropic drugs to Class Members without first obtaining a court order or the informed consent of a person authorized by state law to approve such decisions; and (3) unnecessarily prolonging Class Members' detention in ORR facilities." *Flores v. Sessions*, No. CV 85-4544, 2018 WL 10162328, at *1 (C.D. Cal. July 30, 2018). Youth in restrictive facilities reported being told by facility staff that if they refused to take psychotropic medication, they would remain detained, be denied release to their sponsor, or be physically forced to take the drugs. *See, e.g.*, Declaration of Julio Z. ¶¶ 15-16, *Flore*s, ECF No. 420-5 (Ex. 64); Declaration of Rosa L. ¶ 5, *Flores*, ECF No. 420-2 (Ex. 17). Children also described being physically threatened by facility staff and either experiencing or witnessing forced medication injections. *See, e.g.*, Decl. of Julio Z.¶¶ 15-16, *Flores*, ECF No. 409-5 (Ex. 64) ("The staff threatened to throw me on the ground and force me to take the medication. I also saw staff throw another youth to the ground, pry his mouth open and force him to take the medicine. . . .); Decl. of Rosa L. ¶ 6, *Flores*, ECF No. 420-2 (Ex. 17), ("Sometimes they give me forced injections . . . one or two staff hold my arms and the nurse gives me an injection.").

---

[2] The Ninth Circuit affirmed the district court's holding that ORR must afford bond hearings to unaccompanied children under the *Flores* Settlement. *Id.* at 881.

In 2019, *Flores* counsel challenged ORR's practice of holding children in prison-like conditions at the unlicensed influx facility in Homestead, Florida, for prolonged periods. Corrected Points and Authorities in Support of Mot. to Enforce Settlement Agreement, *Flores*, ECF No. 578. Children we interviewed described being threatened by staff, and every child expressed fear and anxiety regarding the rules and the threats staff used to coerce compliance. In interviews with children detained at Homestead, Dr. Matlow, a licensed psychologist and Clinical Assistant Professor in the Department of Psychiatry and Behavioral Science at the Stanford School of Medicine, observed "the signs and symptoms of acute distress that are expected in reaction to ongoing trauma" including "despair and hopelessness," "emotional flatness, numbing, and avoidance of thoughts and feelings related to their experience…" and that "[t]he acute forms of distress and functional impairment that were observed during site visits are expected to have a lasting and pervasive impact on the children detained." Declaration of Dr. Ryan Matlow at 91, *Flores*, ECF No. 578-1 (Ex. 7).

In 2021, the government opened 14 unlicensed "emergency intake sites" (EISs) across the country. *See* Memorandum in Support of Motion to Enforce Settlement re Emergency Intake Sites ("*Flores* EIS Motion to Enforce"), 5, *Flores*, ECF No. 1161-1. ORR contracted with private companies that used widely varying physical facilities to hold children, ranging from massive tent structures on military bases, to convention halls, to oil worker "man camps." Children's immigration attorneys were among the first to raise concerns about the terrible conditions their young clients were subjected to at EISs. *See, e.g.*, Declaration of Jonathan D. Ryan, *Flores*, ECF No. 1161-8 (attorney describing children's reports of receiving undercooked and cold food, having to wear the same undergarments for multiple days, not receiving education, being separated from their siblings, and being unable to go outside for days on end).

*Amici* interviewed nearly 200 children in EISs and challenged ORR's practice of detaining children in unsafe conditions at these sites for prolonged periods of time. *See Flores* EIS Motion to Enforce. The extended periods children spent detained in EISs, with no guidance as to when they would be released, little to no individual attention from adults, and insufficient structured activities caused children to suffer severe mental distress, including anxiety attacks, difficulty sleeping and eating, self-harm, and suicidal thoughts. *See, e.g.*, Declaration of E.A.M.R. ¶ 17, *Flores*, ECF No. 1136-6 ("Some of the girls have plastic identification cards on a lanyard around their neck, but I can't have one of those because I was on the 1:1 suicide watch list. Some girls were using the plastic identification cards to cut themselves . . . ."). The EISs also had little to no oversight from trained staff—ORR did not require contractors or staff to speak Spanish or have experience in caring for children. *See Flores* EIS Motion to Enforce at 9-10. This resulted in staff who were unable to protect children from bullying or physical assault, as detailed by a legal service provider whose clients were transferred to restrictive facilities after inadequate staffing and supervision at an EIS led to unsafe conditions. *See* Declaration of Hannah P. Flamm ¶¶ 23-26, *Flores*, ECF No. 1161-12.

From *amici*'s experience litigating *Flores*, we are deeply familiar with the serious mistreatment children may experience in ORR custody and how children's immigration attorneys remain an essential backstop to identify and prevent this abuse.

**2. Numerous other accounts confirm severe mistreatment of detained unaccompanied children.**

Other well-documented accounts of harm to children established through litigation, government investigations, and independent reports corroborate the mistreatment and exploitation of detained children that we as *amici* have witnessed firsthand.

In 2017, unaccompanied children detained at the Shenandoah Valley Juvenile Center filed a federal class action lawsuit alleging "violence by staff, abusive and excessive use of seclusion and restraints, and the denial of necessary mental health care." Complaint at 1, *John Doe v. Shenandoah Valley Juvenile Center Commission*, No. CV 17-0097 (W.D. Va. Oct. 4, 2017), ECF No. 1. Children detained at Shenandoah described being handcuffed and shackled, placed in solitary confinement, and tied to chairs with bags over their heads. *See, e.g.*, Declaration of John Doe 1 ¶ 20, *Flores*, ECF No. 409-5 (Ex. 73) ("I was forced to wear handcuffs on my wrists and shackles on my feet for approximately 10 days in a row."); Declaration of John Doe 3 ¶ 12, *Flores*, ECF No. 409-5 (Ex. 75) ("[W]henever I was put in restriction, they took away my mattress and blanket. They took my clothes away about 8 times."); Declaration of D.M. ¶¶ 16-17, *Flores*, ECF No. 409-5 (Ex. 76) ("Once you're strapped down, they have total control over you. They also put a bag over your head. It has little holes; you can see through it. But you feel suffocated with the bag on.").

In 2022, the HHS Office of Inspector General found that staff reported being discouraged from or being retaliated against for raising concerns about children's safety at ORR's Fort Bliss Emergency Intake Site.[3]

In 2024, the U.S. Department of Justice sued Southwest Key Programs, Inc., the largest operator of ORR facilities in the nation. The lawsuit alleged that "[f]rom at least 2015 through at least 2023, multiple Southwest Key employees have subjected unaccompanied children in their care to repeated and unwelcome sexual abuse, harassment, and misconduct and a hostile housing environment,

---

[3] *See* U.S. Dep't of Health & Human Services Office of Inspector General, *Operational Challenges Within ORR and the ORR Emergency Intake Site at Fort Bliss Hindered Case Management for Children*, OEI-07-21-00251, 20 (Sept. 27, 2022), https://www.congress.gov/118/meeting/house/116285/documents/HMTG-118-IF02-20230726-SD007.pdf.

including severe sexual abuse and rape, solicitation of sex acts, solicitation of nude photos, entreaties for sexually inappropriate relationships, sexual comments and gestures, leering, and inappropriate touching. . . . In harassing these children, these Southwest Key employees exploited the children's vulnerabilities, language barriers, and distance from family and loved ones." Complaint ¶ 1, *U.S. v. Southwest Key Programs, Inc.*, No. CV 24-00798 (W.D. Tex. July 17, 2024), ECF No. 1. The complaint describes numerous instances over several years of Southwest Key employees failing to report knowledge of the sexual abuse of children, further emphasizing the need for funded legal representation to protect children from this mistreatment and exploitation. *See generally id.*

**3. ORR lacks the necessary oversight to protect children in its custody from mistreatment.**

*Amici* have long had serious concerns regarding ORR's ability to effectively oversee the grantee facilities it contracts with to detain unaccompanied children. These concerns are based on *amici*'s numerous interviews with children, reports from legal service providers, government investigations, and regulatory changes in licensing requirements. ORR's inadequate oversight amplifies unaccompanied children's vulnerability to abuse while in government custody.

As evident from the years of *amici*'s litigation discussed above, enforcement of the *Flores* Settlement has been the primary oversight mechanism for children in ORR custody for decades. However, upon ORR's publication of governing regulations in the form of the Foundational Rule, the district court partially terminated some provisions of the Settlement as to HHS, pursuant to the Settlement's terms.[4] *Flores*, 2024 WL 3467715, at *7-8. The court's partial

---

[4] Paragraph 40 of the FSA provides that all terms of the Settlement "shall terminate 45 days following defendants' publication of final regulations implementing this

termination of the Settlement was conditioned on ORR not later rescinding or modifying the Foundational Rule to make its policies inconsistent with the Settlement. *Id.* at *9.

Pursuant to the Foundational Rule, ORR facilities are generally required to either have a state license or meet the requirements of state licensing if the state refuses to license ORR facilities. *See* 45 C.F.R. §§ 410.1001, 410.1302. Historically, the majority of ORR placements have been in Texas and Florida, two states that refuse to license ORR facilities. Investigations of Child Abuse and Neglect Rule, 89 Fed. Reg. 93498, 93499-501 (Nov. 27, 2024) (codified at 45 C.F.R. § 412). For unaccompanied children placed in these states, the only oversight mechanism is ORR itself.

However, the Foundational Rule does not require ORR to vet or inspect new facilities to ensure they are capable of meeting minimum standards before accepting children, which is especially concerning as the Government Accountability Office (GAO) has previously found that ORR repeatedly failed to take minimum steps to vet its grantees and adhere to its own regulations when auditing facilities.[5]

Although the Foundational Rule created an Unaccompanied Children's Office of the Ombudsperson that "may" receive complaints regarding ORR's compliance with its regulation and standards, more than half of the Office's staff

---

Agreement." *Flores*, 2024 WL 3467715, at *1. The Settlement remains in full force as to the provisions governing secure, heightened supervision, and out-of-network facilities, because ORR did not consistently implement those provisions of the Settlement. *Id.* at *6.

[5] *See* U.S. Gov't Accountability Office, *Actions Needed to Improve Grant Application Reviews and Oversight of Care Facilities*, GAO-20-609, 2, 16-21, 33-34 (Sept. 2020), https://www.gao.gov/assets/gao-20-609.pdf.

was fired in February 2025.[6] *See* 45 C.F.R. § 410.2002(a). The absence of independent state licensing oversight, combined with inadequate ORR monitoring and the reduced capacity of the Office of the Ombudsperson, underscores the critical role of legal service providers in safeguarding their clients from mistreatment and exploitation.

### B. Funded legal service providers are essential to protect detained children from mistreatment.

Attorneys directly representing immigrant children are typically the best positioned to identify abuse and protect children from mistreatment while they are in ORR custody, because they are independent and trusted adults.

A child's attorney is typically one of the only adults—and sometimes *the* only adult—independent of ORR or its contractors who has regular interactions with the child when they are in custody. For many children, the attorney-client relationship may be the only consistent, supportive relationship they experience while in detention. *Amici* have met with countless detained children who suffer from severe stress, anxiety, and depression. These experiences are typically rooted in the child's separation from their caregivers and the uncertainty of not knowing when they will be released from custody. Having an ongoing relationship with a stable, supportive adult whose sole purpose is to advocate for them helps them cope with the uncertainty of detention.

Over our many years of interviewing detained children, they have consistently expressed to us how important their attorneys are to them. As one girl, Camila, put it: "My lawyer has really helped me to learn about my rights and has supported me in times where I have been very afraid." Declaration of Camila G. ¶ 16, *Flores*, ECF No. 420-4 (Ex. 55). As experts in adolescent psychology

[6] Fola Akinnibi, *Child Migrant Watchdog Gutted in DOGE Cuts*, Bloomberg, Feb. 19, 2025, https://www.bloomberg.com/news/articles/2025-02-19/unaccompanied-children-office-of-the-ombuds-gutted-in-doge-cuts.

confirm, a child's access to at least one stable, caring relationship with an adult improves their ability to cope with experiences of adversity—such as the uncertainty inherent in ORR custody.[7]

This supportive relationship is the foundation on which the unaccompanied child's attorney builds trust. The child's attorney visits them in person where they are detained and has phone or video conversations with them on a routine basis. The attorney is sometimes the only adult who is able or willing to answer the child's questions about what is happening to them and what will happen next. Through these repeated, supportive interactions, a child's attorney builds rapport and establishes trust. As a result, the child is comfortable disclosing sensitive information that will help determine their options for immigration relief. But beyond helping the attorneys do their job, this rapport building has the accompanying effect of ensuring there is an adult the child trusts enough to talk to if they are being mistreated or abused in ORR custody. As explained below, this type of relationship and trust simply cannot be replicated through a one-time "know your rights" presentation and legal screening.

Unaccompanied children are often reluctant to disclose mistreatment to staff members in the ORR facility where they are detained. Children who have experienced violence or trauma in their familial relationships—like some unaccompanied children—often lack trust in others because "[t]hese youth have learned that adults cannot keep them safe, do not attend to their needs, and may

[7] National Scientific Council on the Developing Child, *Supportive Relationships and Active Skill-Building Strengthen the Foundations of Resilience: Working paper 13* at 5 (2015), https://developingchild.harvard.edu/wp-content/uploads/2024/10/The-Science-of-Resilience2.pdf.

harm them."[8] For immigrant children, their fears are amplified by language and cultural barriers.[9]

Indeed, many *Flores* class members said they did not trust staff members enough to make a report that they were being mistreated or abused. Children have reported to *amici* that facility staff threaten to write reports that will affect their immigration case, take away privileges, or delay their release from custody if they misbehave. *See, e.g.*, Declaration of H.M. ¶ 6, *Flores*, ECF No. 578-4 (Ex. 55) ("When I arrived, the staff here told me the rules . . . If we break the rules, we will get a report. The staff say that if we get a report, they will send it to the judge who decides whether we will stay in this country."); Declaration of H.S. ¶ 11, *Flores*, ECF No. 578-4 (Ex. 49) ("Getting a report means we will spend more time here. The YCs [Youth Counselors] tell us this themselves, and I have heard them say this directly to groups of us many times."); Declaration of W.V.V. ¶ 16, *Flores*, ECF No. 1161-17 ("Some kids won't report bad things that happen because they are afraid."). These threats from staff "engender [children's] distrust and lack of confidence in the adults around them." Psychological Evaluation of Children and Conditions at Fort Bliss Emergency Intake Site at 6 ("Dr. Matlow Eval"), *Flores*, ECF No. 1161-7. The children who do muster the courage to speak up about being mistreated—whether at the hands of staff or other youth—are often ignored or

---

[8] Talia Kraemer & Eliza Patten, *Establishing a Trauma-Informed Lawyer-Client Relationship (Part One)*, 33 ABA Child Law Practice (Oct. 2014) https://www.americanbar.org/groups/public_interest/child_law/resources/child_law_practiceonline/child_law_practice/vol-33/october-2014/establishing-a-trauma-informed-lawyer-client-relationship/.

[9] Jodi A. Quas, & Thomas D. Lyon, *Questioning Unaccompanied Immigrant Children: Lessons from Developmental Science on Forensic Interviewing*, Society for Research in Child Development Child Evidence Brief (Oct. 2019) https://www.srcd.org/research/questioning-unaccompanied-immigrant-children-lessons-developmental-science-forensic.

punished. *See, e.g.*, Declaration of Alejandro G. ¶ 5, *Flores*, ECF 420-4 (Ex. 52) ("The staff punished me . . . when I told them that I felt unsafe."); Declaration of Daniel F. ¶ 6, *Flores*, ECF No. 420-4 (Ex. 51) ("One youth here has physically assaulted me . . . I have filed at least twelve complaints to the staff to report the youth's conduct, but the staff have taken no action to protect me").

The staff members children interact with in the facilities where they are detained frequently change, making it difficult to build trusting relationships. In facilities with a constant rotation of staff, children cannot "develop[] supportive relationships that provide a consistent source of trust, stability, and security." Dr. Matlow Eval at 7, *Flores*, ECF No. 1161-7; *see also, e.g.*, Declaration of Bryan Ortiz Vela ¶ 5, *Flores*, ECF No. 239-3 (Ex. 14) ("A few weeks later, they switched me to a different psychologist. I felt that I had developed a relationship with the first psychologist I was meeting with and felt uncomfortable having to share my thoughts and feelings with a new person."); Declaration of D.J. ¶ 14, *Flores*, ECF No. 547-6 (Ex. 54) ("The YCs [Youth Counselors] change often, and it is hard to get to know the YCs very well. I do not feel comfortable with the YCs because I feel like I don't know them and I don't trust them."). Mental health care providers in ORR facilities themselves have recognized that many institutional barriers hurt their ability to build rapport with children.[10]

Moreover, ORR has historically failed to ensure that facilities consistently provide language interpretation and translation services, which obviously impedes its ability to protect children in its custody. At the dangerous Emergency Intake Sites ORR opened in 2021, ORR did not even require contractors or staff to speak

---

[10] *See* U.S. Dep't of Health and Human Services, Office of Inspector General, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody*, 11, 14 (Sept. 2019), http://oig.hhs.gov/oei/reports/oei-09-18-00431.asp (citing high caseloads, rotating assignments, and children's perception of their clinicians as immigration agents as obstacles to developing rapport with children).

Spanish. *See Flores* EIS Motion to Enforce at 9-10. *Amici* have also met with multiple children whom ORR incorrectly identified as Spanish speakers, when in fact they only spoke an indigenous language. These children are particularly vulnerable to mistreatment. *See* Declaration of Jonathan D. Ryan ¶¶ 21-22, *Flores*, ECF No. 1161-8; *see also* Complaint ¶¶ 65-66, *U.S. v. Southwest Key Programs, Inc.* ("[A]t 20 of Southwest Key's then-thirty-one shelters, children spoke a range of languages other than English or Spanish, including languages specific to Central American countries, such as K'iche' or Mam. Southwest Key fails to consistently offer interpretation services for those children . . . [this] creates a barrier to reporting and communicating about sexual abuse and harassment."). Indigenous children have reported to *amici* that their attorney was the first or only individual in the United States to even call an interpreter to speak to them in their native language.

It is no surprise, therefore, that attorneys directly representing children are almost always among the first individuals to sound the alarm about children being harmed in ORR custody, as highlighted above. *See supra*, Section III.A.1.

ORR's actions to arbitrarily and abruptly end funding for the direct legal representation of unaccompanied children will inevitably result in mistreatment and abuse of detained children that goes undetected and unaddressed. For vulnerable children without an independent, trusted adult to interact with, that void will not be filled by a one-time legal consultation. The mistrust of others that many children feel while detained is often heightened during the first few days or weeks in detention—the period in which the legal consultation must happen. *See* 45 C.F.R. §§ 410.1309(a)(2)(i), (v) (requiring legal presentation and consultation within 10 business days of a child's arrival to an ORR facility). The early timing of the consultation also means that it is not an opportunity for legal service providers to learn of abuse or mistreatment that might occur later during the child's detention. Defendants maintain that ORR can fulfill its obligations under the

TVPRA and the Foundational Rule by providing "know your rights" presentations and legal screening consultations with a legal service provider. Defs.' Opp. to Mot. for Temp. Restraining Ord. and Prelim. Inj. at 5, ECF No. 24. But the critical role that children's attorneys play in "protect[ing] them from mistreatment" in ORR custody will not and cannot be replicated through these one-off interactions. 8 U.S.C. § 1232(c)(5). First, the purpose of the consultation is limited to "determin[ing] possible forms of relief." 45 C.F.R. § 410.1309(a)(2)(v). Second, and more importantly, children—especially those who have experienced violence and trauma—need ongoing, consistent interactions with a supportive adult to build trust and rapport. That trust is the foundation that is often required before a child will disclose that they are being mistreated or abused.

For many unaccompanied children, their attorney is the only trusted adult they can turn to if they are being harmed in ORR custody. Eliminating funded direct representation of children undercuts Congress's objectives of ensuring "safe and secure placements" for children and having counsel to "protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5).

### C. Critical protections in federal law, regulation, and policy are meaningless without funded legal representation.

Even if children do not experience abuse and neglect in ORR custody, it is critical that they have access to trusted advocates to protect their well-being. While children are in ORR custody, ORR makes decisions with profound impacts on their legal rights and well-being, including decisions related to their placement, reunification with family, and access to healthcare and education. Unlike state child welfare systems, ORR does not guarantee children access to an attorney or even a guardian ad litem to advocate for them in these matters. *Compare* 45 C.F.R. §§ 410.1308(d), 410.1309(b)(2) (ORR *may* appoint a child advocate or fund non-immigration related legal counsel), *with* 42 U.S.C. § 5106a(b)(2)(B) (states must

provide a guardian ad litem in child welfare proceedings).[11] As a result, a child's immigration attorney is often their only and best advocate. In recognition of this role, ORR's regulations and policies require notice to attorneys of record of important developments in a child's case. If children lose direct representation in their immigration cases, they are also likely to be left to navigate ORR's administrative processes alone—even when what is at stake is their liberty and ability to grow up with family.

For example, if a child in ORR custody is transferred to a restrictive placement such as a juvenile detention center, they have rights under the U.S. Constitution and ORR's regulations to notice of the reasons for their placement and an administrative hearing to challenge the basis of their detention. *See Lucas R.*, 2022 WL 2177454, at *14-23; 45 C.F.R. §§ 410.1901, 410.1902. ORR must provide a copy of this notice to the child's "attorney of record, legal service provider, [and] child advocate" in all cases, and to a child's parent or legal guardian in most cases. 45 C.F.R. § 410.1901(c). This automatic notice to counsel is required because "[n]otice is not an effective safeguard of liberty interests if the child does not understand his or her right." *Lucas R.*, 2022 WL 2177454, at *21; *see also id.* ("Class Members must be able to *request* a hearing at which they can present their own evidence, with the assistance of counsel.").

Many legal service providers will offer legal representation to children placed in restrictive settings in recognition of their particular vulnerability. *See, e.g.*, Declaration of Laura Nally ¶ 9, March 25, 2025, ECF No. 7-15. When a child in a restrictive placement has a trusted immigration attorney, their attorney can help them understand their options related to their restrictive placement—including

[11] Over two-thirds of states provide children a right to counsel in child welfare proceedings. *See* National Association of Counsel for Children, *State Models of Children's Legal Representation* (October 2024), https://counselforkids.org/wp-content/uploads/2024/10/Model-of-Rep-Chart-October-2024.pdf.

possible implications for their immigration case—and in many cases will represent them pro bono in these administrative proceedings, consult with other legal service providers across the Acacia Center for Justice network, or seek other pro bono representation for the child. If a child does not have individual representation and the assigned legal service provider is funded only to provide a one-time consultation related to relief from removal, 45 C.F.R. § 410.1309(a)(2)(v), the child is highly unlikely to be able to exercise their due process rights alone.

ORR policy also requires notice to a child's attorney of record in other situations where a child's substantive rights are implicated, such as if a child is involved in an incident involving law enforcement or is arrested while in ORR custody.[12] In *amici's* role as *Flores* counsel, we became aware of multiple cases where children in ORR custody with significant mental health needs were arrested, discharged from ORR custody, detained by local law enforcement, and subsequently detained by Immigration and Customs Enforcement (ICE) before being transferred back to ORR. *See* Declaration of Mishan Wroe in Support of Opposition to Defendants' Motion to Terminate ¶¶ 16-17, May 31, 2024, *Flores*, ECF No. 1427-1. In those cases, ORR disclaimed responsibility for the children and it was children's individual immigration attorneys who played a vital role in protecting their legal rights and raising concerns about mistreatment. *See* Declaration of Jennifer Vanegas ¶¶ 7-12, July 19, 2022, *Flores*, ECF No. 1427-10 (MIRC attorney spent "countless hours trying to contact anyone whom I could identify as potentially having the ability to help" client detained by ICE in abusive conditions); Declaration of M. Vaneza Alvarado ¶¶ 6-9, June 24, 2022, *Flores*,

---

[12] *See* ORR Unaccompanied Children Bureau Policy Guide, Section 5.8.11, https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-5#5.8.11 (last accessed April 9, 2025).

ECF No. 1427-11 (RAICES attorney convinced local authorities that client was unlawfully being held with the adult population).

Children's attorneys also play an essential role in facilitating children's release to sponsors or, if no sponsor is available, the Unaccompanied Refugee Minor (URM) program. The TVPRA requires that unaccompanied children in ORR custody "be promptly placed in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A). This is usually with a sponsor. *See, e.g.*, *Saravia v. Sessions*, 905 F.3d 1137, 1142-43 (9th Cir. 2018). When no suitable sponsor is available, children who are victims of trafficking or have other qualifying immigration statuses may be placed in the URM program, which is a refugee foster care program. *See* 8 U.S.C. § 1232(c)(2)(A); 8 U.S.C. § 1522(d).

Legal service providers generally prioritize entering direct representation for children without available sponsors or with extended lengths of stay. *See, e.g.*, Declaration of Roxana Avila-Cimpeanu ¶ 15, March 26, 2025, ECF No. 7-4. Some children have spent years in ORR congregate care before being released to a sponsor or to the URM program. *See, e.g. Lucas R.*, 2022 WL 2177454, at *7. Because they have an ongoing relationship with the child, children's attorneys are well-positioned to help identify and ease obstacles to release. *See, e.g.*, 45 C.F.R. § 410.1207(b), (c) (requiring ORR or care provider staff to "work with the potential sponsor, relevant stakeholders, and ORR to address the portions of the sponsor application that remain unresolved" during 90-day reviews); 45 C.F.R. § 410.1309(c)(2) (requiring ORR to provide attorneys of record contact information of potential sponsors who have submitted a family reunification application, if the sponsor consents). Without direct representation, children with long lengths of stay in detention may not have anybody to advocate for their placement in a less restrictive setting or to work with ORR and the care provider to facilitate release.

Attorneys can also help protect children's constitutional rights to family reunification when ORR denies release to a close relative sponsor. *Lucas R.*, 2022 WL 2177454, at *14, 25. In these cases, due process requires that the "minor and minor's counsel are notified of the denial and have the opportunity to request to inspect the evidence." *Id.* at *27; *see also* 45 C.F.R. § 410.1205(e). When the sole reason for a release denial is a concern that the child is a danger to themselves or others, the child has a right to appeal the denial and to consult with their attorney of record. 45 C.F.R. §§ 410.1205(f), 410.1206(c). As with restrictive placement reviews, children who have direct legal representation are much more likely to understand their legal rights and their options in relation to release, including possible implications for their immigration case. Although ORR does not guarantee representation related to release appeals, children's immigration attorneys often engage in pro bono advocacy on behalf of their clients and refer clients and their sponsors to pro bono counsel when appropriate.

If a child does not have an available sponsor, their best option is usually the URM program. The URM program brings important benefits, including placement in a community setting where children can attend public school and enjoy significantly more freedom than in ORR custody, as well as access to the same range of benefits as children in state child welfare systems. 45 C.F.R. § 400.112(a); 45 C.F.R. § 400.116(a). But unaccompanied children are eligible for URM placement only if they have a qualifying immigration status. *See* 8 U.S.C. § 1232(c)(2)(A); 8 U.S.C. § 1522(d).[13] Without an immigration attorney, children are unlikely to obtain the documentation necessary to qualify for URM and can remain in limbo in ORR custody indefinitely.

[13] *See also* Office of Refugee Resettlement, ORR Guide to Eligibility, Placement, and Services for Unaccompanied Refugee Minors (URM): Section 1, https://acf.gov/orr/policy-guidance/orr-guide-eligibility-placement-and-services-unaccompanied-refugee-minors-urm (last accessed April 8, 2025).

Even under the best circumstances, children experience serious harm from prolonged institutional confinement such as ORR custody.[14] This harm is especially severe when they are placed in restrictive settings. *Id.* Children have repeatedly expressed to us their feelings of hopelessness when they do not see a prompt path to release. *See, e.g.*, Declaration of Gabriela N. ¶¶ 5, 9-10, June 8, 2018, *Lucas R.*, ECF No. 25-18 ("I have asked to meet with attorneys, but the staff says that no one is here to help me . . . I liked the attorney I worked with when I was at Shiloh. Now that I've been transferred, I don't know what's going on with my case . . . I can't stand being locked up any more. I feel so helpless and desperate. I don't know what to do. I want to be released so badly. I want to live with my family.").

Without an attorney to protect their interests, children in ORR custody without a suitable sponsor or whose sponsor is encountering obstacles to reunification may be left in institutional custody without hope that anyone is advocating for their release.

## IV. Conclusion

Over many years of representing detained children and working with their legal service providers, *amici* have seen how children's attorneys are rarely ever just their immigration attorney; they are advocates for children's health and safety and critical witnesses to the federal government's treatment of children. As Congress recognized in the TVPRA, funded legal representation is necessary to protect these particularly vulnerable children who are often mistreated and denied their rights in ORR custody. *Amici* respectfully request that this Court grant Plaintiffs' Motion for a Preliminary Injunction.

---

[14] *See* Ryan Matlow, Melissa Adamson, Neha Desai, Julian Ford, *Guidance for Mental Health Professionals Serving Unaccompanied Children Released from Government Custody* 25-27.

Respectfully submitted,

Dated: April 10, 2025

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe
Diane de Gramont

CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
Carlos R. Holguín
Bardis Vakili
Sarah Kahn

CHILDREN'S RIGHTS
Leecia Welch

UC DAVIS IMMIGRATION LAW CLINIC
Holly S. Cooper

*<u>/s/ Mishan Wroe</u>*
Mishan Wroe
*One of the Attorneys for Amici Curiae*