YAAKOV M. ROTH
Acting Assistant Attorney General
WILLIAM C. SILVIS (DCBN 485572)
Assistant Director
MICHAEL A. CELONE (MDBN 1312170145)
CHRISTINA PARASCANDOLA (DCBN 468479)
KATELYN MASETTA ALVAREZ (OHBN 97857)
JONATHAN K. ROSS (NCBN 50203)
Senior Litigation Counsels
ZACHARY A. CARDIN (MDBN 1812110052)
Trial Attorney

U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-2040
Michael.A.Celone@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *ET AL.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *ET AL.*,<br><br>Defendants. | Case No. 3:25-cv-02847-AMO<br><br>**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: April 23, 2025<br>Time: 2:00 p.m.<br>Location: Courtroom 10<br><br>Hon. Araceli Martínez-Olguín<br>United States District Judge |

# TABLE OF CONTENTS

I. INTRODUCTION .......... 1
II. BACKGROUND .......... 2
A. Legal Framework .......... 2
1. The Homeland Security Act ("HSA") .......... 2
2. The Trafficking Victims Protection Reauthorization Act ("TVPRA") .......... 3
3. The Foundational Rule .......... 3
4. Appropriations Acts and Congressional Intent .......... 4
B. The Current Contract and Termination Decision .......... 5
III. STANDARDS OF REVIEW .......... 5
IV. ARGUMENT .......... 6
A. Plaintiffs Cannot Establish a Likelihood of Success on the Merits .......... 6
1. Plaintiffs Lack Statutory Standing Because They Are Not Within the Zone of Interests That 8 U.S.C. § 1232 Is Intended to Protect .......... 6
2. The APA Does Not Waive Sovereign Immunity for the Relief Plaintiffs Seek .......... 7
3. The Tucker Act Precludes Jurisdiction under the APA .......... 8
4. The APA does not waive sovereign immunity because HHS's funding decisions are committed to agency discretion. .......... 11
5. Plaintiffs Cannot Establish that a Favorable Ruling Would Redress Their Alleged Injuries. .......... 12
a. No Legal Mandate to Fund Plaintiffs .......... 12
b. Discretionary Nature of Relief .......... 13
c. Speculative and Indirect Path to Relief .......... 14
6. Contrary to Plaintiffs' assertion, the Foundational Rule does not require taxpayer-funded direct immigration legal representation. .......... 14
B. Plaintiffs Will Not Face Irreparable Harm Without a Preliminary Injunction .......... 19
1. Plaintiffs' Alleged Harm is Primarily Monetary and Thus Not Irreparable. .......... 19
2. Plaintiffs' Asserted Non-Monetary Harms are Speculative or Result from Their Own Operational Choices. .......... 20
C. The Balance of the Equities and Public Interest Weigh Against Entry of a Preliminary Injunction. .......... 21

D. If the Court issues a Preliminary Injunction, it should require Plaintiffs to Post Security. ................24
E. Any Injunctive Relief Must Be Narrowly Tailored and Cannot Extend Nationwide. .......................25
V. CONCLUSION.........................................................................................................................25
CERTIFICATE OF COMPLIANCE......................................................................................... I

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .......... 17

*Accardi v. Shaughnessy*,
74 S. Ct. 499 (1954) .......... 14

*Alcaraz v. INS*,
384 F.3d 1150 (9th Cir. 2004) .......... 16

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......... 6

*Arcamuzi v. Continental Air Lines, Inc.*,
819 F.2d 935 (9th Cir. 1987) .......... 20

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) .......... 20

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) .......... 21

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*,
501 U.S. 1301 (1991) .......... 21

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) .......... 7

*California v. U.S. Dep't of Educ.*,
No. CV 25-10548-MJJ, 2025 WL 760825 (D. Mass. Mar. 10, 2025) .......... 7

*Caribbean Marine Servs. Co.*,
844 F.2d at 676 .......... 19, 20

*City & Cnty. Of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) .......... 18

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 19, 21, 25

*Clarke v. Sec. Indus. Ass'n*,
479 U.S. 388 (1987) .......... 7

*CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*,
48 F.3d 618 (1st Cir. 1995) .......... 25

*Council Oil Co. v. Lader*,
56 F.3d 234 (D.C. Cir. 1995) .......... 10

*Crowley Gov't Servs., Inc. v. GSA.*,
38 F.4th 1099 (D.C. Cir. 2022) .......... 9, 10

*Dennis Melancon, Inc. v. City of New Orleans*,
703 F.3d 262 (5th Cir. 2012) .......... 23

*Dep't of Army v. Blue Fox, Inc.*,
525 U.S. 255 (1999) .......... 7

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019) .......... 18, 19

*Dep't of Educ. v. California*,
604 U.S. ----, 2025 WL 1008354 (Apr. 4, 2025) .......... 1, *passim*

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) .......... 21

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) .......... 5

*FDIC v. Meyer*,
510 U.S. 471 (1994) .......... 7

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
98 F.4th 1180 (9th Cir. 2024) .......... 25

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) .......... 5, 19

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002) .......... 7, 8

*Heckler v. Turner*,
468 U.S. 1305 (1984) .......... 23

*INS v. Legalization Assistance Project*,
510 U.S. 1301 (1993) .......... 7, 8

*Lincoln v. Vigil*,
508 U.S. 182 (1993) .......... 12, 18

*Lopez v. Brewer*,
680 F.3d 1068 (9th Cir. 2012) .......... 5

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
634 F.2d 1197 (9th Cir. 1980) ........ 20

*Lucas R. v. Becerra*, No.,
CV 18-5741, 2022 WL 2177454 (C.D. Cal. Mar. 11, 2022) ........ 4

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........ 13

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........ 6

*Maryland v. King*,
567 U.S. 1301 (2012) ........ 23

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ........ 6

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ........ 22

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ........ 9

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 21

*North Side Lumber v. Block,*
753 F.2d 1482 (9th Cir. 1985) ........ 9

*Novak v. United States*,
795 F.3d 1012 (9th Cir. 2015) ........ 13

*Pacito v. Trump*,
No. 2:25-cv-255, 2025 WL 893530 (W.D. Wash. Mar. 24, 2025) ........ 8

*People of the State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*,
766 F.2d 1319 (9th Cir. 1985) ........ 24

*Renee v. Duncan,*
686 F.3d 1002 (9th Cir. 2012) ........ 13

*Sampson v. Murray*,
415 U.S. 61 (1974) ........ 20

*United Aeronautical Corp. v. United States Air Force*,
80 F.4th 1017 (9th Cir. 2023) ........ 9

*United States Conf. of Cath. Bishops v. U.S. Dep't of State*, --- F.Supp.3d ----, 2025 WL 763738 (D.D.C. Mar. 11, 2025) .......... 10

Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7 (2008) .......... 5, 19

**STATUTES**

5 U.S.C. § 701 .......... 1

5 U.S.C. § 701(a)(1) .......... 8

5 U.S.C. § 701(a)(2) .......... 11

5 U.S.C. § 702 .......... 7

6 U.S.C. § 279 .......... 2

6 U.S.C. § 279(b)(1) .......... 3, 12

6 U.S.C. § 279(b)(1)(A) .......... 2, 3

6 U.S.C. § 279(b)(1)(I) .......... 15

6 U.S.C. § 279(g)(2) .......... 2

6 U.S.C. § 279(a) .......... 2

8 U.S.C. § 1232 .......... 1

8 U.S.C. § 1232(b)(1) .......... 3

8 U.S.C. § 1232(c)(5) .......... 3, *passim*

8 U.S.C. § 1232(c)(6) .......... 6

8 U.S.C. § 1232(i) .......... 12

8 U.S.C. § 1362 .......... 3, 11, 15, 16

31 U.S.C. § 6305 .......... 3

**FEDERAL RULES OF APPELLATE PROCEDURE**

Federal Rule of Civil Procedure 65(c) .......... 24

## REGULATIONS

45 C.F.R. Part 410 .......... 3

45 C.F.R. § 410.1309(a)(4) .......... 1, *passim*

45 C.F.R. § 410.1309(a)(2)(i)-(v) .......... 4

**The Homeland Security Act:**

Pub. L. No. 107-296, 116 Stat. 2135 .......... 2

**William Wilberforce Trafficking Victims Protection Act of 2008 ("TVPRA"):**

Pub. L. No. 110-457 .......... 1

**Further Consolidated Appropriations Act:**

Pub. L. No. 118-47 .......... 4, 11

**Full-Year Continuing Appropriations and Extensions Act, 2025:**

Pub. L. No. 119-4 .......... 4, 11

## OTHER AUTHORITIES

89 Fed. Reg. at 34,529 .......... 14

89 Fed. Reg. at 34,529 .......... 15

89 Fed. Reg. at 34,526 .......... 16

## I. INTRODUCTION

Plaintiffs ask this Court to enter extraordinary relief unsupported by law or fact. Their motion for a preliminary injunction, ECF No. 37, overreaches on every front—seeking to convert a discretionary, resource-limited federal program into a court-mandated entitlement. The Court should deny the motion. The requested relief would upend, not preserve, the longstanding management of legal services for unaccompanied alien children ("UAC")—services that remain subject to available appropriations and the agency's discretionary judgment. The Supreme Court recently rejected a similar attempt to utilize the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*., to compel continued payments under a program that the Executive branch has been given significant discretion to manage. *See Dep't of Educ. v. California*, 604 U.S. ----, 2025 WL 1008354, at 1 (Apr. 4, 2025). This Court should do the same.

Plaintiffs are legal service providers seeking to compel the United States Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR"), to indefinitely fund direct legal representation for UAC through specific contracting arrangements. But the governing statute—the William Wilberforce Trafficking Victims Protection Act of 2008 ("TVPRA"), Pub. L. No. 110-457 (codified in principal part at 8 U.S.C. § 1232)—expressly conditions any such representation on agency discretion, including considerations for practicability and the availability of pro bono counsel. It does not create an enforceable right to government-funded representation, let alone compel the agency to maintain any particular scope of services or contractual relationship. Similarly, the regulatory language Plaintiffs cite, the Foundational Rule, codified at 45 C.F.R. § 410.1309(a)(4), confirms that ORR's obligation to fund direct representation is contingent on both available appropriations and ORR's discretionary determinations. Congress never mandated indefinite funding for these services, and neither should this Court.

At the threshold, Plaintiffs lack organizational standing. They also fail to show that the termination decision constitutes final agency action reviewable under the APA. Furthermore, they cannot identify any statutory or regulatory provision that imposes a binding duty on the government to maintain uninterrupted direct representation contracts. At most, Plaintiffs disagree with the government's policy judgment to conserve resources and reallocate funding within the broad framework of the TVPRA—a judgment that courts have repeatedly held is committed to agency discretion. Moreover, decisions regarding whether and how to terminate government contracts—particularly for the government's convenience—are classic examples of actions committed to agency discretion and are not subject to judicial review under the APA.

In essence, this dispute pertains to the partial termination of a federal contract, which should be adjudicated in the Court of Federal Claims, not here. Under the Tucker Act and the Contract Disputes Act, challenges to government contract terminations must be brought in the U.S. Court of Federal Claims. Plaintiffs' attempt to recast a contract termination as a violation of the APA cannot circumvent that exclusive remedial scheme.

Furthermore, Plaintiffs fail to establish any of the equitable factors required for injunctive relief. Their claims of irreparable harm rest on speculative predictions about staffing decisions and funding shortfalls that are neither immediate nor irreversible. Nothing in the record suggests that Plaintiffs are barred from continuing their work, pursuing other funding sources, or seeking relief through the dispute resolution provisions of whatever contracts they hold with Acacia. A preliminary injunction's extraordinary relief is not an appropriate mechanism for restructuring federal contract policy to align with a particular group of stakeholders' policy preferences, particularly where the asserted harms are financial, the underlying legal theory lacks merit, and the injunction will require the expenditure of taxpayer funds that will never be recouped once spent. For these reasons and others, the Court should deny Plaintiffs' motion.

## II. BACKGROUND

### A. Legal Framework

The statutory and regulatory framework governing legal representation for UAC in federal care and custody reflects a coordinated scheme established by Congress to balance the protection of vulnerable children with the Executive's discretion over immigration and programmatic resource allocation. This framework primarily originates in two statutes: the Homeland Security Act of 2002 ("HSA") and the TVPRA.

#### 1. The Homeland Security Act ("HSA")

In 2002, Congress enacted the HSA, Pub. L. No. 107-296, 116 Stat. 2135 (codified in relevant part at 6 U.S.C. § 279), abolishing the Immigration and Naturalization Service ("INS") and transferring the responsibility for the care and placement of UAC from INS to ORR. 6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2).

The HSA defines a UAC as "a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom— (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2). Further, it assigns ORR broad authority over the care and custody of UAC while they are in federal custody due to their immigration status, including coordinating their care and placement, ensuring their best interests in custodial decisions, and developing plans to "ensure that qualified

and independent legal counsel is timely appointed to represent the interests of each such child." 6 U.S.C. § 279(b)(1)(A). These responsibilities are carried out through cooperative agreements and contracts with care providers under ORR policies and oversight. *See* 6 U.S.C. § 279(b)(1); 31 U.S.C. § 6305.

### 2. The Trafficking Victims Protection Reauthorization Act ("TVPRA")

Congress enacted the TVPRA in 2008 to strengthen protections for UAC and support their safe repatriation or appropriate placement. The statute, consistent with the HSA, makes the Secretary of HHS responsible for the care and custody of UAC. 8 U.S.C. § 1232(b)(1). The TVPRA explicitly directs HHS to prioritize the utilization of pro bono counsel and does not mandate direct government-funded legal representation: Section 235 of the TVPRA encourages HHS to ensure UAC have counsel "to the greatest extent practicable" and "make every effort to utilize the services of pro bono counsel who agree to provide representation without charge." 8 U.S.C. § 1232(c)(5).

Further, Section 235 encourages HHS to ensure that counsel is available to represent UAC in "legal proceedings or matters," expressly linking representation duties with protecting children from "mistreatment, exploitation, and trafficking." Additionally, it cross-references Section 292 of the Immigration and Nationality Act ("INA"), which specifies representation "at no expense to the Government." 8 U.S.C. § 1362. Therefore, it is clear that HHS is not required to fund access to legal counsel for UAC. The TVPRA's language and structure demonstrate Congress's intent to establish public-private partnerships and encourage pro bono counsel as the primary source of legal assistance for UAC, and conferring on ORR exclusive discretion to determine when direct government-funded representation might be utilized (e.g., where pro bono resources are impractical or unavailable).

### 3. The Foundational Rule

In April 2024, ORR promulgated the Unaccompanied Children Program Foundational Rule, codified at 45 C.F.R. Part 410, to establish comprehensive regulations governing its UAC program. The Rule, which became effective July 1, 2024, formalized previously informal procedures and explicitly articulated ORR's discretion regarding legal representation funding. Specifically, the Rule provides that ORR "shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children" only "to the extent ORR determines that appropriations are available," and only if securing pro bono counsel is impractical. 45 C.F.R. § 410.1309(a)(4).

In contrast, other subsections impose mandatory obligations. For instance, the Rule explicitly requires ORR to ensure UAC receive mandatory services such as a "presentation concerning the rights and

responsibilities of undocumented children," "information regarding the availability of free legal assistance," and a "confidential legal consultation." 45 C.F.R. § 410.1309(a)(2)(i)-(v). This intentional distinction clarifies that direct funding for legal representation remains discretionary, conditional upon the availability of appropriations, and subject to agency determination. The Rule also reinforces congressional policy choices articulated in the TVPRA, highlighting the preferred reliance on pro bono counsel and emphasizing that direct representation services funded by ORR are not guaranteed and remain subject to the agency's discretionary resource management.

**4. Appropriations Acts and Congressional Intent**

Congress periodically appropriates funds to support ORR's UAC program, including legal services. Appropriations language, however, consistently remains broad and nonspecific regarding precise funding allocations. ECF No. 24-1, Ex. A, Declaration of Toby Biswas ("Biswas Decl."), ¶ 16. For example, the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, provides general appropriations to execute activities under Section 235 of the TVPRA without earmarking specific amounts for direct legal representation. This general appropriation approach affords ORR flexibility in determining the allocation of resources based on agency priorities, the availability of pro bono counsel, and shifting immigration policy needs. Biswas Decl., ¶ 16.

Subsequent acts, including the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, similarly maintain funding levels and provide broad discretion without altering statutory obligations or imposing specific mandates for funding legal representation. *Id.* This ongoing legislative practice underscores Congress's intent to maintain flexibility for ORR, allowing the agency to prioritize resources efficiently and adaptively. *Id.* Such discretionary funding practices reflect a longstanding Congressional policy to balance support for legal services with practical constraints, prioritizing public-private partnerships and pro bono resources where feasible, rather than imposing fixed or rigid funding mandates. *Id.*

Indeed, at least one other court has considered this issue and concluded that Congress did not specify what types of legal services ORR must fund with the appropriations intended for implementing Section 235 of the TVPRA. *Lucas R. v. Becerra*, No. CV 18-5741, 2022 WL 2177454, at *31 (C.D. Cal. Mar. 11, 2022) (holding that the agency retained discretion even when vulnerable populations are involved). Rather, ORR is "entitled to prioritize what type of legal representation ORR supports with appropriated funds, in furtherance of the TVPRA." *Id.* The same analysis applies here: without a mandate from Congress in the most recent

appropriations legislation, ORR has discretion to prioritize what types of services it funds to further the purpose of the TVPRA.

**B. <u>The Current Contract and Termination Decision</u>**

The present dispute arises from ORR's partial termination and descoping of a federal contract administered by the Department of the Interior ("DOI"), which serves as the contracting agent through its Interior Business Center. *Id.* ¶ 13. ORR directed DOI to partially terminate a contract previously funding direct legal representation services. *Id.* ¶¶ 12–13. This termination was executed through a formal decision memorandum signed by the Acting Assistant Secretary of the Administration for Children and Families ("ACF"). *Id.* ¶¶ 13–14.

ORR's decision reflects a deliberate exercise of statutory discretion to prioritize available appropriations and pro bono legal services. While general direct representation contract funding was terminated, ORR maintains other legally required activities, including "know your rights" presentations and confidential legal screening consultations. *Id.* ¶ 5, 11.

This contract termination aligns with ORR's statutory and regulatory discretion under the TVPRA, the Foundational Rule, and relevant appropriations acts, none of which mandate continuous, direct legal representation funding when viable alternatives, such as pro bono representation, exist. *Id.* ¶ 14. Additionally, the termination decision reflects ORR's commitment to fiscal responsibility, ensuring that limited resources are allocated effectively, prudently managing public funds, and preserving governmental flexibility to respond to evolving priorities and urgent programmatic needs. *Id.* ¶ 11, 16.

## III. <u>STANDARDS OF REVIEW</u>

Preliminary injunctive relief "is an extraordinary and drastic remedy," *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (internal quotation marks and citation omitted), that is "never awarded as of right," *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (internal quotation marks and citation omitted). Thus, this relief "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez*, 680 F.3d at 1072 (internal quotation marks and citation omitted; emphasis in original). This is a "difficult task." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). To prove their entitlement to such relief, Plaintiffs must establish that: (1) they are likely to succeed on the merits, (2) are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the Ninth Circuit's sliding scale test for preliminary injunctive relief, "serious questions going to the merits" and "a hardship

balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

## IV. ARGUMENT

### A. Plaintiffs Cannot Establish a Likelihood of Success on the Merits

The law and undisputed facts confirm what the Court's TRO Order implicitly recognized: Plaintiffs cannot carry their burden of demonstrating a likelihood of success on the merits. The Court's TRO Order found only that Plaintiffs had raised "serious questions" going to the merits, declining to decide whether they were likely to prevail. *Id.* at 4-5. But at this stage of the litigation, Plaintiffs must demonstrate a clear likelihood of success—a burden they cannot carry. Plaintiffs ask the Court to transform a discretionary, resource-dependent program into a judicially enforceable entitlement, but their claims falter on multiple independently dispositive grounds. They lack standing under the relevant statute, cannot overcome jurisdictional limits rooted in sovereign immunity and the Tucker Act, and seek relief that would not redress their alleged harms. Their theory improperly recasts a contract dispute as an APA claim and disregards the discretion Congress conferred on ORR to manage limited appropriations. The agency's contract termination at issue here was and remains lawful, rational, and supported by both the statutory and regulatory framework. In short, Plaintiffs' claims are legally untenable, jurisdictionally barred, and unsupported by any evidence of arbitrary or unlawful agency action.

#### 1. Plaintiffs Lack Statutory Standing Because They Are Not Within the Zone of Interests That 8 U.S.C. § 1232 Is Intended to Protect.

Plaintiffs lack standing because the statutory provision that, according to them, ensures that UAC have access to legal counsel—8 U.S.C. § 1232(c)(5)—was not intended to protect Plaintiffs. That provision protects the interests of unaccompanied children, not legal-service providers. Its plain text directs HHS to ensure UAC "have counsel," to the extent practicable and "at no expense to the Government," with an explicit preference for pro bono representation. *See* 8 U.S.C. §§ 1232(c)(5), 1362. Nothing in the text or structure confers rights or entitlements on organizations like Plaintiffs. To the contrary, when Congress wanted to confer funding on a service provider, it did so expressly—for child advocates. *See* 8 U.S.C. § 1232(c)(6). That juxtaposition confirms that legal-service providers are not intended beneficiaries of § 1232(c)(5).

To assert an APA claim, a plaintiff must show that its asserted injury falls within the "zone of interests" protected by the statute at issue. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). Courts do not examine the APA itself, but rather focus on "the statute that the plaintiff says was violated." *Patchak*, 567 U.S. at 224. And while

the test is not especially demanding, courts routinely find plaintiffs outside the zone where the statute protects a different group or purpose. *See INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers).

Here, Plaintiffs allege economic harm and mission frustration, but § 1232(c)(5) was not enacted to protect service providers' finances or operational goals. Instead, it was enacted to protect UAC. Because Plaintiffs are not within that protected class, and their interests are not regulated or safeguarded by the statute, they fall outside the zone. As the Supreme Court has emphasized, the zone-of-interests test "forecloses suit when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

**2. The APA Does Not Waive Sovereign Immunity for the Relief Plaintiffs Seek.**

Although Plaintiffs style their claim as an APA claim for injunctive and declaratory relief, their core demand is payment under an expired and terminated contract. This Court lacks jurisdiction to order the Government to pay money pursuant to this expired contract, or to order the Government to enter into a new contract. To the extent that they have any claim at all, whether through contract, statute, or regulation, they must bring their suit in the Court of Federal Claims.

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). The Supreme Court has "frequently held" that a waiver of sovereign immunity must be "strictly construed, in terms of its scope, in favor of the sovereign." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999). Plaintiffs have the burden of proving they meet this "high standard." *Id.* The APA's waiver of sovereign immunity only applies to actions "seeking relief other than money damages." 5 U.S.C. § 702. The Supreme Court has explained that suits seeking to compel the Government to pay a sum of money are suits for "money damages,"—regardless of whether they seek this relief through judgment, injunction, or declaration. *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (citing *Bowen v. Massachusetts*, 487 U.S. 879, 918–919 (1988) (Scalia, J., dissenting)).

The Supreme Court has recently confirmed that Plaintiffs are not likely to succeed on the merits of their claims. *Dep't of Educ*, 2025 WL 1008354. There, various States brought suit under the APA, arguing that the Department of Education's decision to withhold appropriated funds from the States was arbitrary and capricious. *California v. U.S. Dep't of Educ.*, No. CV 25-10548-MJJ, 2025 WL 760825, at *1 (D. Mass. Mar. 10, 2025). The district court granted a TRO, finding that it had jurisdiction over the States' claims because their

disputes hinged on "federal statute and regulations." *Id.* The district court ordered the Department of Education to "restore Plaintiff States to the pre-existing status quo prior to the termination under all previously awarded [ ] grants for recipients in Plaintiff States. *Id.* at *5. The Supreme Court, however, granted DOE's emergency application for relief and stayed the TRO. It held that the "Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Dep't of Educ.*, 2025 WL 1008354, at *1. The Government is likely to succeed on the merits for the same reasons here.

The APA does not waive sovereign immunity over the relief that Plaintiffs seek: payment. Specifically, Plaintiffs ask this Court to: (1) declare that "Defendants are required to *continue funding* legal representation to unaccompanied children, consistent with the TVPRA and ORR's Foundational Rule; (2) enjoin Defendants nationwide from *ceasing to fund counsel* to represent unaccompanied children in violation of the TVPRA and the Foundational Rule; (3) to declare that Defendants' actions violate the APA; and (4) to set aside Defendants' actions. ECF No. 1 at 39. Regardless of whether Plaintiffs style their relief as a judgment, injunction, or declaration, it is undeniable that they are seeking to compel the government to pay money, which is unavailable under the APA. *Knudson*, 534 U.S. at 210; *Dep't of Educ.*, 2025 WL 1008354, at *1. Because the APA does not waive sovereign immunity over Plaintiffs' claims for continued funding, and this Court lacks jurisdiction over their claims.

Plaintiffs attempt to sidestep *Dep't of Educ.* by relying on the district court's decision in *Pacito v. Trump*, No. 2:25-cv-255, 2025 WL 893530 (W.D. Wash. Mar. 24, 2025). Pls' Mot. for PI, ECF No. 37, at 16. That decision has been appealed, however, and the Ninth Circuit has stayed the preliminary injunction that Plaintiffs rely upon. *Pacito v. Trump*, No. 25-1313 (9th Cir. Mar. 25, 2025), ECF No. 28.1. Thus, this Court should not accord any weight to the district court's decision in *Pacito.* Instead, this Court should seek guidance from the Supreme Court, which has already held that the Government is likely to succeed on the merits in a case seeking essentially the same relief. *Dep't of Educ.*, 2025 WL 1008354 at *1.

**3. The Tucker Act Precludes Jurisdiction under the APA.**

This Court also lacks subject-matter jurisdiction because the Tucker Act precludes Plaintiffs from bringing their claims under the APA. Although Plaintiffs assert that their claims arise under the TVPRA and HHS's Foundational Rule, well-established case law confirms that Plaintiffs' claims sound in contract and therefore must be brought in the Federal Court of Claims.

The APA explicitly does not apply "to the extent that statutes preclude judicial review." 5 U.S.C. § 701(a)(1). The Tucker Act "impliedly forbids" APA claims involving government contracts. *Id.* at

1485 (citation omitted). "[A]n action against the United States which is *at its essence* a contract claim lies within the Tucker Act and . . . a district court has no power to grant injunctive relief in such a case." *Megapulse*, 672 F.2d at 967 (emphasis added). If a plaintiff's claim is "concerned solely with rights created within the contractual relationship and has nothing to do with duties arising independently" of the contract, then their claim is based upon a contract with the United States and subject to the jurisdictional restrictions in the Tucker Act. *North Side Lumber v. Block,* 753 F.2d 1482, 1486 (9th Cir. 1985), *cert. denied,* 474 U.S. 931 (1985) (citing *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 967–68 (D.C. Cir. 1982)).

To determine whether the Tucker Act precludes a contract claim "disguised" as an APA claim, the Ninth Circuit employs the D.C. Circuit's *Megapulse* test. *United Aeronautical Corp. v. United States Air Force*, 80 F.4th 1017, 1025–26 (9th Cir. 2023) (citing *Megapulse,* 672 F.2d at 967–68). Under *Megapulse*, a court must decide whether "the source of the rights upon which the plaintiff bases its claims" arises under a contract and whether "the type of relief sought" is normally available as a contract remedy. *Id.* "If rights and remedies are *statutorily* or *constitutionally* based, then district courts have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims does, even if the plaintiff formally seeks injunctive relief." *Id.* (emphasis in original).

To assess the "source of rights" that form the basis of the plaintiff's claim, the Court must consider the following factors: (1) whether the plaintiff's asserted rights and the government's purported authority arise from statute or contract; (2) whether the plaintiff's rights "exist[ ] prior to and apart from rights created under the contract,"; and (3) whether the plaintiff "seek[s] to enforce any duty imposed upon" the government "by the . . . relevant contracts to which" the government "is a party." *Crowley Gov't Servs., Inc. v. GSA.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (internal quotations and citations omitted).

All three of these considerations confirm that Plaintiffs' source of rights is a contract. *First*, Plaintiffs' only asserted rights arise under the contract they have with Acacia; neither the TVPRA nor HHS's Foundational Rule provide Plaintiffs any right to the funds Congress appropriated. *Second*, Plaintiffs' rights cannot "exist prior to and apart from rights created under the contract." *Id.* Had Acacia never entered into a contract with the United States to provide direct legal services to UAC, Plaintiffs would not have entered into a subcontract with Acacia, would never have received funding to provide such services, and thus would have no injury to complain of. As a result, their rights do not predate the Acacia contract, nor are they entitled to funds apart from the contract. *Third*, Plaintiffs seek to enforce a duty imposed by the contract. Indeed, throughout their Complaint, they challenge the Government's "Cancellation Order," which cancelled the

contract with Acacia, as the basis of their injuries. *See* ECF No. 1, ¶ 12 ("The Cancellation Order flies in the face of the TVPRA and the Foundational Rule."); *id.* ¶ 37 ("Defendants' Cancellation Order severely limits Plaintiffs in performing their respective missions to provide legal representation the law requires be made available to unaccompanied children."); *id.* ¶ 131; *id.* ¶ 143. While Plaintiffs stop short of asking the Court to reinstate the Acacia contract—likely to avoid the Tucker Act—this is the only relief that would redress Plaintiffs' injuries. Plaintiffs' recent Motion to Enforce underscores this point. Plaintiffs complained that the Government had not complied with the TRO because they had not received funding. As the Government explained in its status report, Plaintiffs' funding is contingent on a contract with Acacia, which is still in the approval process. Plaintiffs cannot obtain their payment—their relief under the TRO—without a contract in place. Regardless of how they frame it, Plaintiffs seek to enforce the Acacia contract, as it is their only source of rights to funding.

Under the second prong of *Megapulse*, the Court must determine whether the type of relief is typical in actions that sound in contract. *A & S Council Oil Co. v. Lader*, 56 F.3d 234, 240 (D.C. Cir. 1995). Accordingly, a claim is subject to the Tucker Act if, "in whole or in part, it explicitly or 'in essence' seeks more than $10,000 in monetary relief from the federal government." *Crowley*, 38 F.4th at 1107 (citation omitted). Just weeks ago, a different federal-district court confronted a materially identical scenario—an organization's APA suit to restore terminated grant funding—and held that the claim must be heard in the Court of Federal Claims because the nature of the plaintiffs' relief "sounds in contract." *United States Conf. of Cath. Bishops v. U.S. Dep't of State*, --- F.Supp.3d ----, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025). Like here, the relief sought in *Conf. of Cath. Bishops* was styled as a request for an injunction, yet the court correctly reasoned that, in actuality, the relief sought was for "the Government to keep paying up." *Id.* at *5. That court rightly recognized that a demand for the government to continue grant payments "sounds in contract" even if pleaded under the APA. *Id.* at *5. Likewise here, Plaintiffs cannot sidestep the Tucker Act by repackaging their contract-based grievance as an APA claim. As discussed, Plaintiffs seek monetary relief in excess of $10,000. *See supra* Section IV.A.2; *see also* ECF No. 1 at ¶ 105 (explaining that Estrella faces a budget deficit of $200,000 per month without HHS funding). Because the rights and remedies they assert are fundamentally contractual, exclusive jurisdiction lies in the Court of Federal Claims.

Lastly, to the extent that the Court has any doubt as to whether the Tucker Act precludes jurisdiction, the Supreme Court has recently confirmed that it does. In *Dep't of Education*, the Supreme Court held that the States' claims for grant funding were based on a contract—even though the States allegedly only sought to

enjoin the government from withholding appropriated funds, as Plaintiffs likewise allege in this case. 2025 WL 1008354 at *1. Although Plaintiffs are not a party to a contract with the government, they are beneficiaries to Acacia's contract with the government, and they essentially seek to compel the government to reinstate those contract terms.

In short, Plaintiffs seek what the Tucker Act forbids: judicial enforcement of an expired funding arrangement disguised as APA review. Their claims are inextricably linked to the now partially terminated contract with Acacia, and they identify no legal entitlement to *their* continued funding independent of that agreement. Without the contract, there is no injury, no enforceable right, and no legal pathway to relief. Because their asserted harm arises solely from the termination of a contractual relationship—and the relief they seek is monetary—their claims fall squarely within the jurisdiction of the Court of Federal Claims.

#### 4. The APA does not waive sovereign immunity because HHS's funding decisions are committed to agency discretion.

Regardless, the APA also precludes review here because HHS's funding decision under the TVPRA and the Foundational Rule are discretionary. The APA does not permit judicial review of "agency action" that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The TVPRA provides HHS broad discretion in determining how to provide legal services to UAC. While Section 235 mandates that HHS ensure that counsel is available to represent UAC "to the greatest extent practicable" in "legal proceedings or matters," it also cross-references the provision of the INA—8 U.S.C. § 1362—which specifies that "the privilege" of being represented in removal proceedings is "at no expense to the Government." The TVPRA also directs HHS to "make every effort to utilize the services of pro bono counsel who agree to provide representation without charge." 8 U.S.C. § 1232(c)(5). Likewise, the Foundational Rule explicitly articulates ORR's discretion regarding legal representation funding. 45 C.F.R. § 410.1309(a)(4). The decision to fund direct legal services is "subject to ORR's discretion and available appropriations." *Id.*

Moreover, Congress's funding of ORR's UAC program, including legal services, demonstrates that HHS has been granted discretion in allocating resources. For example, the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, provides general appropriations to execute activities under Section 235 of the TVPRA without earmarking explicit amounts for direct legal representation. And subsequent acts, including the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, similarly maintain funding levels and provide broad discretion without altering statutory obligations or imposing specific mandates for funding legal representation. Biswas Decl. ¶¶ 16-17. This ongoing legislative practice underscores Congress's intent to maintain flexibility for ORR, allowing the agency to prioritize

resources efficiently and adaptively. *Id.*; *see also* 6 U.S.C. § 279(b)(1) (making the Director of ORR responsible for activities including coordinating and implementing the care of UAC and implementing policies with respect to the care and placement of UAC); 8 U.S.C. § 1232(i) (authorizing the Secretary of HHS to "award grants to, and enter into contracts with, voluntary agencies to carry out this section and section 279 of title 6.").

The Court therefore lacks jurisdiction to review HHS's decision to reallocate resources from direct representation into other aspects of the UAC program. This decision is firmly committed to the agency's discretion. In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the Indian Health Service's decision to discontinue a previously funded program and reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decision making standards. *See id.* at 185-88. The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192.

Indeed, an agency's allocation of funds from a lump-sum appropriation requires "a complicated balancing of a number of factors which are peculiarly within its expertise": whether its "resources are best spent" on one program or another; whether it "is likely to succeed" in fulfilling its statutory mandate; whether a particular program "best fits the agency's overall policies"; and, "indeed, whether the agency has enough resources to fund a program at all." *Id.* at 193 (internal citations omitted). "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude." *Id.* Because the TVPRA confers HHS discretion to determine how best to allocate and administer the funding for the UAC program, HHS's decisions are not subject to review under the APA.

### 5. Plaintiffs Cannot Establish that a Favorable Ruling Would Redress Their Alleged Injuries.

#### a. No Legal Mandate to Fund Plaintiffs

Even if Plaintiffs could overcome the above hurdles, they still fail to demonstrate Article III standing, because they cannot show that the relief they seek would likely redress their alleged harm. The "irreducible constitutional minimum" of Article III standing consists of (1) "injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) a likelihood "that the injury will be redressed by

a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks omitted). The third element of Article III standing, redressability, requires that it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan,* 504 U.S. at 561 (citation and internal quotation marks omitted). To show a likelihood of redressability, Plaintiffs must "show that there would be a 'change in a legal status' as a consequence of a favorable decision" and that this change would significantly increase the likelihood that they would obtain the relief sought. *Novak v. United States*, 795 F.3d 1012, 1019–20 (9th Cir. 2015) (quoting *Renee v. Duncan,* 686 F.3d 1002, 1013 (9th Cir. 2012)).

Plaintiffs cannot make that showing here. The relief that Plaintiffs seek—if untethered to their contract claim—would not likely provide them with the monetary relief they seek. Enforcing the statutory authority Plaintiffs rely on in arguing that Congress intended to fund direct-legal services, 8 U.S.C. § 1232(c)(5), would have the opposite effect of the relief Plaintiffs seek. As explained above, Congress did not intend to financially benefit Plaintiffs in ensuring that UAC would have access to legal services; instead, Congress envisioned that such legal services would generally be provided *pro bono* at no expense to the government. 8 U.S.C. § 1232(c)(5). If the Court were to enforce the plain language and purpose of Section 235 of the TVPRA, it would order the government to seek out *pro bono* counsel for direct legal services and, to the extent possible, avoid funding legal services at the government's expense. Of course, this result would not redress Plaintiffs' injuries, as they seek to be paid for their services and not acting in a *pro bono* capacity.

**b. Discretionary Nature of Relief**

Likewise, because the Foundational Rule provides HHS with discretion in determining whether and how to disburse appropriations for direct legal services, Plaintiffs cannot show that ordering HHS to comply with its regulation would redress their injury. In short, Plaintiffs ask for an injunction, but there is no *likelihood* that such relief would put dollars back into their coffers. To the contrary, even absent the contract, ORR would pursue its statutory mission by focusing on pro bono referrals rather than paid contracts. Biswas Decl., ¶ 17. And even if HHS changed course and decided to exercise favorable discretion by funding direct legal services, it could contract with organizations other than Acacia and Plaintiffs. *Id.* ¶ 19. There is nothing that Plaintiffs can cite that would require or encourage HHS to continue funding the Plaintiffs *in this case*. *Id.* ¶¶ 17-19. In other words, even if the agency continued funding direct legal services, Plaintiffs cannot show that it is likely that HHS will continue to contract with Acacia or with any of the Plaintiffs in this case. *Id.* Thus, Plaintiffs' redressability—that HHS would continue funding Acacia or any of the Plaintiffs—is speculative at best and insufficient to establish standing. *Lujan,* 504 U.S. at 561.

**c. Speculative and Indirect Path to Relief**

While Plaintiffs attempt to reframe their alleged harm as an impairment to their "core activities and organizational missions" (Mot. at 4), this is, in essence, a repackaged claim for funding. Courts routinely reject efforts to inflate financial harm into mission-based injury when the true source of the injury is the loss of a government contract or grant. And even under the "modest" standard of redressability cited in *Renee v. Duncan*, Plaintiffs cannot show a meaningful change in legal status that would significantly increase the likelihood of renewed funding. The TVPRA and Foundational Rule confer no entitlement to such funding, and nothing about a favorable ruling on the merits would create a long-term direct pathway for money to flow back to these Plaintiffs. Because an APA order would not necessitate renewed payments to Plaintiffs, they cannot satisfy redressability. Their alleged injuries—loss of funding and programmatic cutbacks—are economic harms that could only be remedied by an award of money to them, which is unavailable under the APA. At a minimum, this casts serious doubt on Plaintiffs' standing and underscores the uphill battle they face in demonstrating a likelihood of success.

**6. Contrary to Plaintiffs' assertion, the Foundational Rule does not require taxpayer-funded direct immigration legal representation.**

Plaintiffs claim that Defendants' terminations violate ORR's Foundational Rule in contravention of the *Accardi* doctrine, *see Accardi v. Shaughnessy*, 74 S. Ct. 499 (1954). But these claims, too, lack merit. The government has not, as Plaintiffs contend, "violate[d] its own regulations." ECF No. 37 at 12. Although Plaintiffs assert that the government breached an "express commitment" "to fund direct representation as long as appropriations [are] available," *id.*, they fail to cite or quote any provision in the Foundational Rule that so binds HHS. The Foundational Rule states, in relevant part:

> (4) *Direct immigration legal representation services for unaccompanied children currently or previously under ORR care.* To the extent ORR determines that appropriations are available, *and insofar as it is not practicable for ORR to secure pro bono counsel*, ORR shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children, *subject to ORR's discretion* and available appropriations.

45 C.F.R. § 410.1309(a)(4) (emphases added). Plaintiffs misread section 1309(a)(4) to unconditionally require taxpayer-funded direct immigration legal representation for UAC. Funding for legal representation, under subsection 1309(a)(4) is contingent upon several conditions. Funding is required *insofar that it is not practicable for ORR to secure pro bono counsel.* 45 C.F.R. § 410.1309(a)(4). As HHS noted in the preamble to the Foundational Rule, ORR, consistent with the TVPRA, makes every effort to use pro bono legal services "to the greatest extent practicable" to secure counsel for UAC in these contexts. 89 Fed. Reg. at 34,529. HHS

notes that ORR-funded legal services providers may help coordinate referral to pro bono legal services and that ORR provides each UAC with a list of pro bono service providers.[1] *Id.* Presumably, when an organization "coordinates referral" to pro bono legal services, the organization is not providing direct legal representation itself. Further, by conditioning funding "to the greatest extent practicable," HHS acknowledges that, in some cases, it is impracticable for ORR to secure pro bono legal services. *Id.* The determination of when it is "impracticable" for ORR to secure pro bono legal services lies solely with HHS.

Further, HHS notes in the preamble that ORR must be selective in the kinds of legal services it funds, and, therefore, proposed to establish its discretion to fund legal services for specific purposes "based on its judgment and priorities." 89 Fed. Reg. at 34,529. The language "based on its judgment and priorities" underscores the substantial discretion that ORR possesses to determine the manner in which legal services to UAC are provided. Thus, the language of section 410.1309(a)(4) limits the funding of taxpayer-funded legal services to instances where it is impracticable for ORR to secure pro bono counsel. The determination of when it is impracticable is a decision to be made by HHS and not by Plaintiffs or the Court.

Plaintiffs also fail to consider the condition in subsection 1309(a)(4) of the Foundational Rule, which stipulates that ORR shall provide direct immigration legal representation for certain unaccompanied children, *subject to ORR's discretion*.[2] 45 C.F.R. § 410.1309(a)(4). While Plaintiffs cite Congress's appropriations, they overlook the clause that such funding is subject to ORR's discretion.

Plaintiffs note that HHS has an obligation "to the greatest extent practicable" and consistent with 8 U.S.C. § 1362, to ensure that UAC have counsel in their immigration proceedings.[3] HHS interpreted "to the greatest extent practicable" to permit a grant of authority to pay for legal services beyond those provided by pro bono legal service providers. 89 Fed. Reg. at 24,529. However, "to the greatest extent practicable" cannot reasonably be construed as a mandate for HHS to unconditionally pay for direct immigration legal representation for all UAC. In the preamble to the Foundational Rule, HHS acknowledged that some commenters expressed a desire for ORR "to fully fund legal services to all [UAC]," while also receiving comments questioning ORR's legal authority to pay for legal services for UAC and suggesting that ORR refrain from using taxpayer funding for legal representation for UAC. *Id.* HHS determined that "its

[1] The list of pro bono service providers is statutorily required under the TVPRA. 6 U.S.C. § 279(b)(1)(I).

[2] Defendants do not contest that the conditions "to the extent ORR determines that appropriations are available" and "subject to . . . available appropriations," in 45 C.F.R. § 410.1309(a)(4), are met here.

[3] In section 1362, Congress provides that: "In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose." 8 U.S.C. § 1362.

approach to providing legal services to unaccompanied children by enabling them to access pro bono counsel 'to the greatest extent practicable' and funding legal services for additional unaccompanied children, as resources allow, is consistent with ORR's statutory obligations." *Id.* HHS's interpretation of the INA and TVPRA as Congress's grant of discretion to ORR to provide funding for immigration legal services to UAC is far from a *mandate* to provide such funding.

Even more broadly, Plaintiffs seek to expand the *Accardi* doctrine to bind federal agencies to their statements regarding general, long term policy goals. Respectfully, the Court should decline the invitation. Plaintiffs argue that HHS has failed to follow its "internal policies," ECF No. 37 at 22, relying upon *Alcaraz v. INS*, 384 F.3d 1150, 1152 (9th Cir. 2004), a decision that is inapposite here. *Alcaraz* was a petition for review by two aliens from the Board of Immigration Appeals' ("BIA's") final order for their removal and denial of suspension of deportation, in which the BIA failed to follow an explicit policy directive from the Department of Justice to administratively close the cases of eligible aliens who qualified for suspension of deportation but for the new stop-time rule. *Id.* at 1162. The *Alcaraz* court observed that when rights of individuals are affected, agencies are obligated to follow their own procedures, even if these internal procedures are possibly more rigorous than necessary. Consequently, the court remanded the matter for the BIA to apply the administrative-closure policy. *Id.*

In contrast, the present Plaintiffs fail to identify any "internal policy" that HHS disregarded. Furthermore, they do not point to any legally-recognized rights that are adversely affected by the contract termination. Instead, Plaintiffs cite a single phrase in the preamble to the Foundational Rule. ECF No. 37 at 23 (quoting 89 Fed. Reg. at 34,526) ("ORR strives for 100% legal representation and will continue to work towards that goal to the extent possible."). Plaintiffs also cite one part of HHS's FY 2024 budget justification to Congress, reiterating the sentence in the preamble. *Id.* at 23 ("Just last year ORR stated its intention to provide 'universal legal representation for unaccompanied children by FY 2027.") (quoting HHS FY2024 Administration for Children and Families' Justification of Estimates for Appropriations Committees ("FY2024 Justification"), available at https://acf.gov/sites/default/files/documents/olab/fy-2024-congressional-justification.pdf (last viewed Apr. 10, 2025), for the same proposition.

A statement of a diffuse, long-range policy goal that an agency "strives" for, such as "universal legal representation," with no specific instruction or end date, is not an "internal policy" or directive to perform a particular act or procedure than an agency can follow. Such a broad policy goal could not reasonably be construed to affect, much less create, any rights or even an expectation or a reliance interest. This is especially

so where, as here, there likely exists a myriad of ways in which to achieve a policy goal (universal legal representation) and when policy goals are subject to change. Not surprisingly, Plaintiffs have not alleged any rights of theirs that are affected by the contract termination. By failing to articulate a concrete policy or procedural directive or any rights affected by such a policy or directive, Plaintiffs' *Accardi* argument that Defendants have "violated their own policies" fails.

**a. Defendants Offered a Reasoned Explanation for their Actions.**

Finally, to the extent Plaintiffs argue that ORR's action was arbitrary and capricious because the agency failed to consider important aspects or secretly harbored an improper motive (Mot. at 14 – 17), those arguments are unfounded. Agency action is entitled to a presumption of regularity, and the administrative record here reflects a reasoned decision driven by policy and fiscal considerations—not any impermissible factor. Plaintiffs may disagree with ORR's policy priorities, but that does not make the decision irrational.

Plaintiffs' reliance on *Encino Motorcars, LLC v. Navarro*, is misplaced. Mot. at 18 (citing 579 U.S. 211, 221-22 (2016)). Unlike in *Encino*, where an agency failed to acknowledge its change in position, ORR explicitly acknowledged the change from the prior expansion of direct representation and provided a reasoned explanation—namely, the need to conserve funds and realign with the statutory model favoring pro bono representation. There is also no "serious reliance interests" akin to those in *Encino* here. While Plaintiffs certainly benefitted from past funding, they were operating under time-limited contract agreements that expressly depended on annual appropriations. They could not reasonably assume that funding would continue unabated regardless of circumstances.

Nor is this a case of unreasoned fiat. ORR's rationale, focusing on legal orientation and screenings to ensure all UAC receive basic legal information, while trusting that pro bono resources (supplemented by post-release services and child advocates in special cases) will provide representation in meritorious cases, is a rational strategy to fulfill its statutory obligations in a sustainable way. Plaintiffs' own preferred policy (full government-funded representation for every child) might be different, but the APA does not permit the Court to substitute Plaintiffs' policy preferences for the agency's judgment.

Plaintiffs further contend that ORR faced a heightened burden to explain its change in policy under *Encino Motorcars* and *Jicarilla Apache Nation*. But those cases apply only when an agency either disregards significant reliance interests or offers no explanation for its reversal. That is not the case here. ORR explicitly acknowledged the shift from prior expansion of direct representation and provided a detailed rationale: aligning with the TVPRA's pro bono preference, addressing fiscal constraints, and rebalancing priorities to

ensure core legal orientation and screening services reach all UAC. As in *Lincoln v. Vigil*, where the Supreme Court upheld an agency's decision to discontinue direct services in favor of reallocation, ORR's decision reflects a permissible adjustment in program emphasis, not an unexplained or arbitrary reversal.

Plaintiffs argue that government-funded legal service providers historically increased pro bono capacity by mentoring volunteer attorneys and that shifting to a pro bono-only model undermines ORR's goals. Mot. at 16 – 17. But this argument merely reinforces the discretionary nature of ORR's program design—not a legal entitlement to any particular funding mechanism. Even assuming some government-funded mentorship contributed to broader pro bono engagement, that does not negate ORR's authority to now pursue a more targeted, fiscally sustainable strategy. Plaintiffs' citation to the Byrne & Miller report, which suggests that pro bono alone is insufficient to meet all legal needs, at most identifies a policy disagreement. It does not transform discretionary funding into a mandatory obligation. ORR retains the authority to weigh competing considerations and adapt its funding model accordingly.

So long as ORR considered the relevant factors and articulated a rational connection between the facts and the choice made, the decision must be upheld. That standard is easily met here. ORR did not ignore any factor the law obligates it to consider. In fact, it took into consideration the welfare of children, the availability of alternative counsel, and the need to manage finite taxpayer funds. For example, Plaintiffs contend ORR failed to account for the impact on immigration court efficiency or on the organizations' missions. *See* Amicus Curiae Br. of Fmr. IJs & Fmr. Members of the BIA in Supp. of Pls.' Mot. for TRO & Prelim. Inj., at 4, ECF No. 23-1 ("IJs' Br."); Mot. at 2, 4. But ORR's mandate is to care for children and facilitate their access to counsel, not to optimize immigration court dockets or to guarantee nonprofit funding.

In any event, any such collateral impacts do not render the decision arbitrary. Immigration Judges routinely adjudicate cases involving pro se children (especially given the statutory reality that counsel is not guaranteed), and the Executive Office for Immigration Review ("EOIR") has tools to ensure fairness and efficiency for unrepresented respondents (*see* IJs' Br. at 4). ORR reasonably could conclude that continuing KYR presentations and referrals would mitigate potential inefficiencies. Biswas Decl. ¶ 10. There is certainly no indication that ORR's stated rationale—aligning the program with the TVPRA's pro bono emphasis and addressing budgetary limitations—was pretextual.

Plaintiffs' insinuations of pretext, invoking *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), and *City & Cnty. Of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) (Mot. at 15, 19), are purely

speculative. Unlike those cases, here there is no evidence of a hidden agenda or contradictory internal record. Faced with burgeoning costs and an influx of UAC, ORR decided to prioritize cost-effective measures (like group legal orientations and initial screenings for relief eligibility) that reach more children, rather than continuing to pay for individual attorneys for some. That policy choice may be different than Plaintiffs would have made themselves, but it is not a sham; it is a policy judgment squarely within ORR's discretion. Plaintiffs have offered no proof—indeed, not even a substantial allegation—that ORR's justification is a lie or that improper considerations drove the decision. Absent such evidence, courts will not "probe the mental processes" of agency decisionmakers or accuse them of pretext. *Dep't of Commerce*, 139 S. Ct. at 2573-74. In sum, Plaintiffs' APA claims amount to disagreements over policy, not bona fide indications of legal error. Because ORR's action was grounded in the law and free of any procedural or substantive defect, Plaintiffs cannot demonstrate a likelihood of success on the merits.

In conclusion, Plaintiffs ask this Court to do what neither the APA nor equitable principles permit: compel the expenditure of federal funds in contravention of the agency's determination and the Supreme Court's clear guidance. At most, Plaintiffs have shown a policy disagreement—not a legal entitlement. A mere policy disagreement or "serious question" is not enough at this stage. Because Plaintiffs have not established a likelihood of success on any of their claims, the requested preliminary relief should be denied.

### B. Plaintiffs Will Not Face Irreparable Harm Without a Preliminary Injunction

Plaintiffs' request for extraordinary injunctive relief hinges on demonstrating irreparable harm. A mere "possibility" of harm is insufficient; Plaintiffs bear the burden of making a "clear showing" that "irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original); *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) ("Harm must be proved, not presumed"). Furthermore, the alleged harm must be immediate and non-speculative. *See Caribbean Marine Servs. Co.*, 844 F.2d at 674. Injuries dependent on "[m]ultiple contingencies" or a "speculative chain of possibilities" do not meet this demanding standard. *Id.* at 675; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Plaintiffs have failed to make the requisite showing.

#### 1. Plaintiffs' Alleged Harm is Primarily Monetary and Thus Not Irreparable.

At its core, the harm Plaintiffs allege stems from the cessation of federal funding—an injury that is fundamentally monetary. While Plaintiffs attempt to frame this as "frustrating their mission" or damaging their ability to provide services, their own submissions underscore the financial nature of the injury. *See* ECF No. 7 at 16 ("There is no question that *ceasing funding*… will cause imminent harm…") (emphasis added); *id.* at

17 ("Plaintiffs have relied on… assurances that *funding*… will continue…") (emphasis added); *id.* ("Sustaining these services without this *funding* will cost the Northwest Immigrant Rights Project *$200,000 a month.*") (emphasis added); Supplemental Declaration of Martha Ruchi (ECF No. 37-3 ¶¶ 3, 4) ("Without this funding, we must reconsider whether we have enough funding to cover the costs…").

It is well-established, however, that monetary injury does not constitute irreparable harm because it can be remedied later through damages. *See, e.g., Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) ("Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages."); *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury…"); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) (same). Plaintiffs cannot escape this fundamental principle simply by describing the consequences of a funding shortfall; their core injury remains economic and remediable. *See Caribbean Marine Servs. Co.*, 844 F.2d at 676 ("Subjective apprehensions and unsupported predictions of revenue loss are not sufficient…"); *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 938 (9th Cir. 1987) ("[T]emporary economic loss alone generally is not a basis for injunctive relief.").

**2. Plaintiffs' Asserted Non-Monetary Harms are Speculative or Result from Their Own Operational Choices.**

Plaintiffs attempt to recharacterize their monetary injury by focusing on operational consequences, such as staff layoffs and potential impacts on service delivery. These arguments also fail to establish irreparable harm. *First*, decisions regarding staffing—whether layoffs, terminations, or furloughs—are internal operational responses to budgetary changes, not irreparable injuries directly imposed by Defendants. (*See* Supplemental Declarations ECF Doc 37-4, 7, 8, 9, 10, 12, 16). These choices reflect specific management approaches to address funding shortfalls and are within Plaintiffs' control. Indeed, Plaintiffs' own submissions show varied responses: some organizations laid off staff, while The Amica Center for Immigrant Rights "has not issued any furloughs or laid off any staff members" (ECF Doc 37-15 ¶ 3), and others are actively "seeking alternative funding sources" (ECF Doc. 37-14 ¶ 4, Rocky Mountain Immigrant Advocacy Network). The existence of alternative strategies underscores that layoffs are not an inevitable, irreparable consequence of the funding decision. While potentially disruptive, such operational adjustments are not the type of permanent, unfixable harm warranting an injunction.

*Second*, Plaintiffs' claim that the funding cessation forces them to cease providing legal services, leaving UAC unrepresented, is overstated. (*See* ECF No. 7 at 16; Supplemental Declarations ECF Doc 37-5, 6, 11, 13, 15, 16). The challenged action concerns *payment* for services, not the *ability* to provide them. Plaintiffs

remain free to provide these services *pro bono*, consistent with the statutory framework emphasizing practicability. *See* 8 U.S.C. § 1232(c)(5). Indeed, Plaintiffs' submissions indicate that dedicated counsel *are* continuing this work, albeit sometimes with adjusted staffing levels. *See* ECF Doc 37-16 ¶ 4 (Vermont Asylum Assistance Project: "a reduced team of three is now carrying the work of four."). This reflects a resource allocation challenge, not irreparable cessation of services.

*Third*, Plaintiffs' assertion that the loss of experienced staff is irreparable because rehiring is "impracticable" (ECF No. 7 at 18) is precisely the type of speculative harm based on the predicted actions of third parties that cannot support an injunction. *See Clapper*, 568 U.S. at 410, 414 (rejecting injuries based on a "speculative chain of possibilities" or "speculation about the decisions of independent actors"); *Arpaio v. Obama*, 797 F.3d 11, 23 (D.C. Cir. 2015) (cautioning against crediting claims of anticipated injury based on predictions of future third-party action). Whether specific individuals might decline to return if recalled is hypothetical and insufficient to demonstrate a certain and immediate irreparable injury *to Plaintiffs*. Similarly, difficulties filling vacancies (ECF No. 37-15) reflect market conditions or operational challenges, not the type of clear, likely, and immediate irreparable harm required for preliminary relief.

In sum, Plaintiffs have demonstrated, at most, temporary financial loss and operational challenges stemming from their own management decisions or speculative future events. They have failed to make the clear showing of likely, immediate, and irreparable harm necessary to justify the extraordinary remedy of a preliminary injunction.

### C. The Balance of the Equities and Public Interest Weigh Against Entry of a Preliminary Injunction.

Where the government is a party, the balance of equities and public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (internal quotation marks and citation omitted). In weighing these factors, Plaintiffs rely on their previous arguments, including the assertion that the government cannot suffer harm from an injunction that merely ends what they contend is an unlawful practice (ECF No. 37, at 23 – 24). But as described above, Defendants' actions represent a permissible exercise of statutory and regulatory discretion, and Plaintiffs have not demonstrated a likelihood of success on the merits or irreparable harm sufficient to warrant an injunction.

Here, the balance of the equities and public interest tip decisively in Defendants' favor. Plaintiffs' motion fails to acknowledge the substantial governmental harm an injunction imposes by usurping executive

branch authority to manage complex programs and allocate billions in taxpayer funds. Forcing continuation of one specific contract or funding mechanism hinders ORR's ability to adapt to potentially changing needs, prioritize resources effectively across the entire UAC program spectrum, and implement potentially more cost-effective or impactful service models, consistent with the discretion afforded by Congress and ORR's own regulations.

Furthermore, the financial harm to the government is significant and likely irreparable. If Plaintiffs are given access now and draw down funds throughout the litigation, Defendants will be left with no meaningful recourse even if they prevail. Indeed, in granting the government's stay application in *Dep't. of Education v. California*, the Supreme Court expressly noted that the equities weighed in the government's favor where "respondents have not refuted the Government's representation that it is unlikely to recovery the [] funds once they are dispersed." 2025 WL 1008354 at 1. Such is the case here. And the loss of likely unrecoverable funds is a classic injury supporting interim relief for the government. *See Heckler v. Turner*, 468 U.S. 1305, 1308 (1984) (Rehnquist, J., in chambers) (prospect of the government being forced to make $1.3 million in improper payments per month supported a stay).

Should an injunction compel the payment of these taxpayer funds, and that injunction is later reversed or vacated, the government faces substantial, likely irreparable, financial loss. Indeed, just last week, the Supreme Court recognized this precise risk in the analogous grant-termination challenge at issue in *Dep't. of Education*, noting the government was "unlikely to recover the grant funds once they are disbursed," and even more so where no grantee had "promised to return withdrawn funds should its grant termination be reinstated." 604 U.S. ----, 2025 WL 1008354 at 1. So too here. Making matters worse though, this harm will be further exacerbated without the provision of bond as security under Rule 65(c). *See* Section D, *infra*. Any order mandating the direction of unrecoverable government funds constitutes clear irreparable harm to the public treasury and weighs heavily in favor of requiring security.

Moreover, the public interests at stake here include effective governance and fiscal responsibility. And, as long recognized by the Supreme Court, the government has a strong interest in safeguarding the public fisc. *See Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). While Plaintiffs and amici (ECF No. 28) legitimately describe the public interest in protecting vulnerable children and ensuring access to counsel, the public interest also encompasses the efficient, flexible, and responsible administration of federal programs. It includes ensuring ORR can make difficult choices to best serve the overall needs of all unaccompanied children within its care, using its expertise and the discretion Congress provided, including prioritizing pro bono resources as

directed by the TVPRA. The arguments raised in the amicus brief (ECF No. 28) regarding judicial efficiency do not override the Executive's prerogative to determine the most effective and practicable means of service delivery consistent with statute and available resources. Forcing the continuation of this specific funding mechanism ignores the statutory preference for pro bono counsel and ORR's discretion to determine when direct funding is practicable and necessary. *See* 8 U.S.C. § 1232(c)(5). Judicial micromanagement of appropriations allocation via Plaintiffs' requested preliminary injunction undermines, rather than serves, the broader public interest in competent government and respect for the separation of powers.

Indeed, an injunction here would effectively disable the administration from effectuating its executive authority consistent with its constitutional and statutory authorities. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up) ("[a]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). While Plaintiffs emphasize the mandate in 8 U.S.C. § 1232(c)(5) that HHS "shall ensure . . . that all unaccompanied alien children . . . have counsel," this mandate is explicitly qualified by the precise statutory language "to the greatest extent practicable." *Id.* This is not mere suggestion; it is the express qualification set by Congress, inherently requiring agency judgment and balancing against competing demands and resource limitations. It does not mandate funding one specific contract indefinitely, irrespective of other considerations.

Plaintiffs, by contrast, would not be irreparably harmed without entry of a preliminary injunction. They have no cognizable interest in receiving federal funds to which they are not legally entitled or on a timeline that is not legally compelled. In granting Plaintiffs' motion for a temporary restraining order, this court largely overlooked the fact that Plaintiffs' claimed harms are monetary and that, if they ultimately prevail, they will receive the funds to the extent required by law. *See Heckler*, 468 U.S. at 1308 (Rehnquist, J., in chambers); *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm") (brackets and citation omitted).

In sum, the decision to terminate funding under the contract represents a permissible exercise of the discretion afforded to ORR by Congress under 8 U.S.C. § 1232(c)(5), and codified in its own regulations, *see* 45 C.F.R. § 410.1309(a)(4). An injunction would improperly substitute judicial preference for agency judgment, unduly restricting the executive's ability to allocate resources and adapt to evolving needs. As a result, the balance of equities and the public interest, properly considered, weigh against granting the extraordinary relief requested.

### D. <u>If the Court issues a Preliminary Injunction, it should require Plaintiffs to Post Security.</u>

Finally, if the Court deems preliminary injunctive relief warranted (which it should not), Plaintiffs must be required to post security pursuant to Federal Rule of Civil Procedure 65(c). The Rule mandates that a court "may issue a preliminary injunction or a temporary restraining order *only if the movant gives security* in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). The circumstances here—specifically the potential for irrecoverable loss of public funds—compel the imposition of a bond. This risk of permanent loss to the public fisc—made even greater where Plaintiffs have not provided financial security by way of bond, *see* Fed. R. Civ. P. 65(c)—weighs heavily against injunctive relief.

Plaintiffs argue against security (ECF No. 37 at 25), citing the Court's discretion and invoking exceptions for public interest litigation. *Id.* (citing *People of the State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985)). Yet, while the Court has discretion, that discretion must account for the substantial risk to public funds at issue here. Nor is the public interest exception Plaintiffs invoke absolute, let alone even applicable here. Indeed, in *Van De Kamp*, what tipped in favor of a "minimal bond or no bond at all" was the fact that "Congress had provided for private enforcement of [the] statute" that the non-profit environmental groups there were suing under. *Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d at 1325 – 26. Congress has not provided for such private enforcement here, however. Furthermore, Plaintiffs fail to cite any authority sufficient to override the fundamental purpose of Rule 65(c): protecting the enjoined party from costs and damages.

Moreover, there is a significant countervailing public interest in ensuring federal funds are spent lawfully and protecting the public treasury from irrecoverable losses stemming from a potentially erroneous injunction. Plaintiffs, a coalition of over a half dozen legal organizations, have also failed to substantiate their claim that requiring *any* bond would effectively deny them access to judicial review. They have not submitted evidence demonstrating an inability to secure a bond, even a nominal one, commensurate with the circumstances. Their assertion that Defendants face no financial risk (ECF No. 37 at 33 – 35) is plainly incorrect; the potential inability to recover disbursed funds constitutes a direct, significant financial risk, as recognized by the Supreme Court. *See Dep't of Educ.*, 2025 WL 1008354 at 1. Given that this dispute centers on the allocation of federal funds – and involves a concrete risk of irrecoverable financial loss to the public fisc should the injunction be improvidently granted – Rule 65(c)'s security requirement is paramount. Plaintiffs must be required to post a bond sufficient to protect the public interest embodied in the federal treasury.

### E. Any Injunctive Relief Must Be Narrowly Tailored and Cannot Extend Nationwide.

Even if Plaintiffs could demonstrate entitlement to some form of preliminary relief (which they cannot), their request for what amounts to a nationwide injunction is vastly overbroad and constitutionally impermissible. Preliminary injunctions "must be tailored to remedy the specific harm alleged." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1195 (9th Cir. 2024) (internal quotation marks and citation omitted). The injunction's scope "must be no broader and no narrower than necessary to redress the injury shown *by the plaintiffs*." *Id.* (internal quotation marks, citation, and alteration omitted; emphasis added). Plaintiffs, however, seek relief extending far beyond their own alleged injuries to encompass non-parties across the country for whom no specific, irreparable harm has been demonstrated.

Any relief granted must be strictly limited to redressing the alleged harm *to these Plaintiffs*. Plaintiffs cannot obtain relief based on speculative or indirect injuries potentially suffered by non-party grant recipients. Such harms are insufficient to establish Article III standing for non-parties in this action. *See Clapper,* 568 U.S. at 402 (requiring harm that is "certainly impending," not merely hypothetical). While non-plaintiff recipients might theoretically incur monetary harms from funding changes, those are not Plaintiffs' harms. *See CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 622 (1st Cir. 1995) ("the issuance of a preliminary injunction requires a showing of irreparable harm to the movant rather than to one or more third parties").

As a result, should the Court determine that preliminary injunctive relief is warranted, such relief must be meticulously limited. At a minimum, any injunction must be restricted solely to the named Plaintiffs and further confined to only those specific line items for which *these Plaintiffs* have definitively established particularized, irreparable harm not redressable by later monetary damages. On the other hand, granting the broad, nationwide relief Plaintiffs seek would violate the fundamental principle that injunctive relief must be narrowly tailored to the specific injury proven by the specific plaintiffs presenting themselves before the court. *See Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1195.

## V. CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

DATED: April 11, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

WILLIAM C. SILVIS
Assistant Director

CHRISTINA PARASCANDOLA
KATELYN MASETTA ALVAREZ
JONATHAN K. ROSS
Senior Litigation Counsels

ZACHARY A. CARDIN
Trial Attorney

/s/ Michael A. Celone
MICHAEL A. CELONE
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-2040
Michael.A.Celone@usdoj.gov

Attorneys for Defendants

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants certifies that this brief contains 25 pages, which complies with Local Rule 7-3(a).

Respectfully submitted,

*/s/ Michael A. Celone*
MICHAEL A. CELONE
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division