**MOEEL LAH FAKHOURY LLP**
Shaffy Moeel (CA Bar. No. 238732)
Hanni Fakhoury (CA Bar. No. 252629)
Andrew Lah (CA Bar. No. 234580)
2006 Kala Bagai Way, Suite 16
Berkeley, CA 94704
(510) 500-9994
shaffy@mlf-llp.com
hanni@mlf-llp.com
andrew@mlf-llp.com

**YOUNG CENTER FOR IMMIGRANT CHILDREN'S RIGHTS**
Jane Liu (D.C. Bar No. 989847)*
Young Center for Immigrant Children's Rights
67 E. Madison St., Suite 1810
Chicago, Illinois 60603
(773) 360-8920
jliu@theyoungcenter.org

*pro hac vice* forthcoming
Counsel for Amicus Curiae Young Center for Immigrant Children's Rights

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al*., <br><br> Defendants. | Case No. 25-cv-2847-AMO <br><br> **BRIEF OF AMICUS CURIAE YOUNG CENTER FOR IMMIGRANT CHILDREN'S RIGHTS IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

## TABLE OF CONTENTS

IDENTITY AND INTEREST OF AMICUS CURIAE ................................................................. 1

INTRODUCTION ....................................................................................................................... 2

   I. ACCESS TO LEGAL REPRESENTATION IS IN CHILDREN'S BEST INTERESTS ...... 3

      A. The Best Interests of the Child Standard ......................................................................... 3

      B. Children's Unique Needs and Vulnerabilities Require Legal Representation in
         Immigration Proceedings ................................................................................................ 6

      C. A History of Trauma Complicates a Child's Navigation of Removal Proceedings........ 7

      D. International Law Mandates Unaccompanied Immigrant Children's Access to Free
         Legal Representation ....................................................................................................... 8

  II. ORR-FUNDED LEGAL REPRESENTATION HAS HELPED TO ENSURE THAT
      UNACCOMPANIED CHILDREN HAVE A FAIR OPPORTUNITY TO SEEK
      SAFETY AND PROTECTION IN THE UNITED STATES ........................................... 9

 III. CHILDREN'S ATTORNEYS HELP TO PROTECT AND PROMOTE THE SAFETY,
      HEALTH AND WELL-BEING OF CHILDREN OUTSIDE OF THE CONTEXT OF
      IMMIGRATION PROCEEDINGS ................................................................................ 12

      A. Children's Attorneys Assist in Identifying Particularly Vulnerable Children in Need of
         Child Advocate Services That May Not Otherwise be Identified................................. 12

      B. Children's Attorneys Help to Protect Children in Government Custody from Harm and
         Mistreatment................................................................................................................ 13

 IV. WITHOUT LEGAL REPRESENTATION, CHILDREN ARE AT RISK OF IMMEDIATE
      AND SIGNIFICANT HARM ....................................................................................... 16

      A. ORR's Termination of Funding for Direct Representation Has Already Harmed
         Children ........................................................................................................................ 16

      B. Without ORR-Funded Legal Representation, Most Children Will Likely be
         Unrepresented and Have No Meaningful Opportunity to Pursue Immigration Relief . 18

      C. Pro Bono Representation is Unlikely to Fill the Gap Created by the Termination in
         Funding........................................................................................................................ 20

CONCLUSION......................................................................................................................... 21

# TABLE OF AUTHORITIES

**Statutes**

8 U.S.C. § 1101(a)(27)(J)(ii)..................................................................................... 4
8 U.S.C. § 1232(c)(2)................................................................................................ 4
8 U.S.C. § 1232(c)(6)(A) .......................................................................................... 1

**Other Authorities**

Chanelle Diaz et al., *Harmful by Design—A Qualitative Study of the Health Impacts of
   Immigration Detention*, 38 J. Gen. Intern. Med. 2030 (2022),
   https://pmc.ncbi.nlm.nih.gov/articles/PMC9713141/pdf/11606_2022_Article_7914.pdf ....... 14

CHILD WELFARE INFORMATION GATEWAY, U.S. DEP'T OF HEALTH AND HUMAN SERVICES,
   DETERMINING THE BEST INTERESTS OF THE CHILD (2024),
   https://www.childwelfare.gov/pubPDFs/best_interest.pdf ................................................... 3, 5

Chris Newlin et al., *Child Forensic Interviewing: Best Practices*, JUVENILE JUSTICE BULLETIN,
   OFFICE OF JUVENILE JUSTICE AND DELINQUENCY PREVENTION, U.S. DEP'T OF JUSTICE (Sept.
   2015), https://ojjdp.ojp.gov/sites/g/files/xyckuh176/files/pubs/248749.pdf ............................ 7

Comm. on the Protection of the Rights of All Migrant Workers and Members of Their Families
   and Comm. On the Rights of the Child, Joint General Comment No. 3 (2017) & No. 22 (2017)
   on the General Principles Regarding the Human Rights of Children in the Context of
   International Migration in Countries of Origin, Transit, Destination and Return, U.N. Doc.
   CMW/C/GC/23, https://docs.un.org/en/CRC/C/GC/23........................................................... 8

CRCL Complaint Letter re: Abuse of Unaccompanied Minors in Customs and Border Protection
   Custody, January 2023 to June 2024 from Carson Scott, Immigrant Defenders Law Center
   Staff Attorney, to U.S. Department of Homeland Security Office of Civil Rights and Civil
   Liberties, (Sept. 12,
   2024), https://www.immdef.org/_files/ugd/c2ad78_c9bf3fe55acc490da766d2d1641f911d.pdf
   ....................................................................................................................................... 15

Executive Office of Immigration Review, Operating Policies and Procedures Memorandum
   (OPPM) 17-03, Guidelines for the Immigration Court Cases Involving Juveniles, Including
   Unaccompanied Alien Children (December 20, 2017), available at
   https://www.justice.gov/eoir/file/oppm17-03/dl......................................................................... 7

Florence Immigrant & Refugee Rights Project, *Handcuffed, Pushed, and Afraid: immigrant
   children share terrifying experiences while in Border Patrol custody* (September 2024),
   https://firrp.org/wp-content/uploads/2024/09/September-2024_Handcuffed-Pushed-and-
   Afraid-Immigrant-children-share-terrifying-experiences-while-in-Border-Patrol-custody.pdf.
   ....................................................................................................................................... 15

Off. of Refugee Resettlement, Admin. For Children & Families, U.S. Dep't of Health & Human Serv., *ORR Field Guidance #27*, (March 14, 2025), https://acf.gov/sites/default/files/documents/orr/FG-27_-_DNA_Testing_Expansion.pdf ...... 19

Off. of Refugee Resettlement, Admin. For Children & Families, U.S. Dep't of Health & Human Serv., *ORR Guide: Children Entering the United States Unaccompanied* § 3.3.15 (updated on February 27, 2025), https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-3#3.3.15 ................................................ 14

Off. of Refugee Resettlement, Admin. For Children & Families, U.S. Dep't of Health & Human Serv., *ORR Guide: Children Entering the United States Unaccompanied*, § 2.2.4 (updated on March 7, 2025), https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2#2.2.4 ................................................................ 19

Sara B. Johnson et al., *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J. Adolescent Health 216 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/ ...................................................... 6

Subcomm. on Best Interests, Interagency Working Grp. on Unaccompanied and Separated Children, *Framework for Considering the Best Interests of Unaccompanied Children*, (2016).. ........................................................................................................................................ 5

U.N High Commissioner for Refugees, Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection (2016), https://www.unhcr.org/us/sites/en-us/files/legacy-pdf/56fc266f4. .............................. 7

U.N. Committee on the Rights of the Child, General Comment No. 14 (2013) on the Right of the Child to Have His or Her Best Interests Taken as a Primary Consideration (art. 3, para. 1), U.N. Doc. CRC/C/GC/14 (May 29, 2013), https://www2.ohchr.org/english/bodies/crc/docs/gc/crc_c_gc_14_eng.pdf ......................... 4, 5

U.N. Committee on the Rights of the Child, General Comment No. 6 (2005) Treatment of Unaccompanied and Separated Children Outside their Country of Origin, U.N. Doc. CRC/GC/2005/6 (Sept. 1, 2005), https://www.refworld.org/legal/general/crc/2005/en/38046 . 8

Vanessa Sacks & David Murphey, *The Prevalence of Adverse Childhood Experiences, Nationally, by State, and by Race or Ethnicity,* Child Trends, February 12, 2018.................... 9

Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 ........................... 4

## Regulations

45 C.F.R. § 410.1001 ....................................................................................................................... 5
45 C.F.R. § 410.1304 ..................................................................................................................... 14

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

The Young Center for Immigrant Children's Rights (Young Center) is a national non-profit organization whose mission is to protect and advance the rights and best interests of immigrant children in accordance with state, federal, and international law.  Since 2004, the Young Center has been appointed by the Office of Refugee Resettlement (ORR) within the U.S. Department of Health and Human Services to serve as the independent Child Advocate, akin to a best interests guardian *ad litem*, for unaccompanied and separated immigrant children. The Young Center is appointed as Child Advocate pursuant to the Trafficking Victims Protection Reauthorization Act (TVPRA), which authorizes ORR to appoint Child Advocates to "child trafficking victims and other vulnerable unaccompanied [immigrant] children."  8 U.S.C. § 1232(c)(6)(A).  The Young Center is the only organization appointed by ORR to serve in this capacity.  The Young Center's Child Advocate Program currently operates in nine locations across the country.

In accordance with the TVPRA, Young Center Child Advocates "advocate for the best interest" of each child to whom they are appointed.  *Id*.  Because it is in children's best interests to have legal representation in immigration proceedings, the Young Center has a vested interest in ensuring that unaccompanied children have access to legal representation.  Legal representation is essential to ensuring that children have a fair opportunity to seek protection from danger, harm, and persecution and to pursue permanency in the United States.

---

[1] No party's counsel authored this brief in whole or in part, and no person other than amicus or its counsel made a monetary contribution to the preparation or submission of this brief.

## INTRODUCTION

For over two decades, Young Center Child Advocates have worked with thousands of unaccompanied children, all of whom were referred to ORR as vulnerable children in need of child advocate services and most of whom are seeking some form of legal protection in the United States. The role of the Child Advocate is to determine and represent the best interests of children on matters related to a child's custody, placement, transfer, reunification with family or another sponsor, access to services, immigration case, and repatriation, where appropriate. In that capacity, the Young Center provides government officials with recommendations on the best interests of each child. Child Advocates submit these recommendations—referred to as "best interests determinations" (BIDs)—to various federal agencies that engage in decision-making that affects unaccompanied children, including but not limited to the Executive Office for Immigration Review (EOIR) within the Department of Justice (DOJ), Immigration and Customs Enforcement (ICE) within the Department of Homeland Security (DHS), and ORR.

Child Advocates and attorneys play different but interconnected roles in the complex system in which children seek release from government custody and permanent protection through immigration cases. Child Advocates identify and advocate for the *best interests* of children on all issues impacting the child. A child's best interests are determined by considering the child's expressed wishes, but also the child's safety and rights to family integrity, liberty, development, and identity. In contrast, a child's attorney is obligated to pursue the child's *stated (expressed) interests*. Because a child's immigration case directly impacts the child's best interests, Young Center Child Advocates have worked closely and regularly with children's attorneys—the vast majority of whom are ORR-funded— and have therefore observed firsthand the vital role that children's attorneys play in promoting children's safety, health, well-being, and rights.

2

In this brief, the Young Center seeks to inform the Court of the impact of ORR's termination of funding for legal representation and friend of court services on children; specifically, that the loss of these services is detrimental to children's best interests. Legal representation is essential to ensuring that children have a fair opportunity to be heard in immigration proceedings and to pursue permanency in the United States. Furthermore, children's attorneys protect children's safety, health, well-being, and rights through their advocacy in contexts outside of immigration proceedings, such as issues related to separation from family and release from government custody; conditions, treatment, and services while in government custody; and issues that arise after the child's release, but before their immigration case concludes. Denying children access to government-funded legal representation, when the vast majority of children cannot afford to retain counsel, and when demand far exceeds pro bono representation capacity, causes significant harm to children. Indeed, Young Center Child Advocates have witnessed the harmful effects that termination of government-funded legal representation has already had on children.

## I.    ACCESS TO LEGAL REPRESENTATION IS IN CHILDREN'S BEST INTERESTS

### A.  The Best Interests of the Child Standard

The "best interests of the child" is a foundational principle of child protection in state and federal law. All 50 states and the District of Columbia require courts to consider a child's best interests in decisions about the child's custody, placement, or other critical life issues.[2] Over the past several decades, Congress has incorporated this universal standard into multiple aspects of immigration law, notably through Special Immigrant Juvenile Status (SIJS), which is granted by

---

[2] *See* CHILD WELFARE INFORMATION GATEWAY, U.S. DEP'T OF HEALTH AND HUMAN SERVICES, DETERMINING THE BEST INTERESTS OF THE CHILD 2 (2024), https://www.childwelfare.gov/pubPDFs/best_interest.pdf.

U.S. Citizenship and Immigration Services (USCIS) only after a state court finding that return to the country of origin is not in a child's best interests.  8 U.S.C. § 1101(a)(27)(J)(ii).  Under the TVPRA, federal agencies that take unaccompanied children into custody must place them in the least restrictive setting that is in their best interests.  8 U.S.C. § 1232(c)(2).  The ORR Foundational Rule, regulations regarding the care and custody of unaccompanied children that were issued by ORR in 2024, defines "best interest" as "the standard ORR applies in determining the types of decisions and actions it makes in relation to the care of an unaccompanied child."  45 C.F.R. § 410.1001.  And as discussed above, through the TVPRA, Congress has authorized the appointment of independent Child Advocates to identify and advocate for the best interests of child trafficking victims and other vulnerable unaccompanied children.

Furthermore, international law incorporates the best interests standard as a "fundamental value" of the rights of children, "aimed at ensuring both the full and effective enjoyment of all the rights recognized in the Convention [on the Rights of the Child] and the holistic development of the child."[3]  The Convention on the Rights of the Child (CRC) mandates that "[i]n all actions concerning children … the best interests of the child shall be a primary consideration."[4]  As a signatory to the CRC, the U.S. government cannot act in contravention of the principles articulated in the CRC.[5]

---

[3] U.N. Committee on the Rights of the Child, General Comment No. 14 (2013) on the Right of the Child to Have His or Her Best Interests Taken as a Primary Consideration (art. 3, para. 1), ¶¶ 1, 4, U.N. Doc. CRC/C/GC/14 (May 29, 2013), https://www2.ohchr.org/english/bodies/crc/docs/gc/crc_c_gc_14_eng.pdf.

[4] United Nations Convention on the Rights of the Child, art. 3, ¶1-3, *opened for signature* Nov. 20, 1989, 1577 U.N.T.S. 3 (entered into force Sept. 2, 1990).  All other countries except the United States have ratified the CRC.

[5] Vienna Convention on the Law of Treaties, art. 18, May 23, 1969, 1155 U.N.T.S. 331.

While the "best interests of the child" principle has no single definition, widely-accepted elements include: a child's safety and well-being; a child's expressed interests; a child's health; a child's right to family integrity; a child's right to liberty; a child's right to development; and a child's right to identity.[6] In defining the best interest standard, the ORR Foundational Rule provides a "non-exhaustive list of factors" that includes many of these elements. *See* 45 C.F.R. § 410.1001 (listing the child's "expressed interests"; the child's "mental and physical health"; "the intimacy of relationship(s)" between the child and the child's family; the child's "cultural background and primary language"; "length or lack of time the…child has lived in a stable environment"; the child's "individualized needs, including any needs related to the…child's disability"; and the child's "development and identity").

Considering these best interests factors in the context of unaccompanied children, who enter ORR custody separated from adult family or caregivers and are at risk of prolonged custody and removal, access to government-funded legal representation is in children's best interests. Legal representation ensures that unaccompanied children are not left to navigate complex legal proceedings on their own. It is vital to ensuring that children have the information and assistance they need to understand their rights, express their interests, and have their voice heard in immigration proceedings. Without legal representation in immigration proceedings, unaccompanied children can have no fair opportunity to pursue immigration relief, which is critical to their permanency, safety, and protection.

---

[6] *See* DETERMINING THE BEST INTERESTS OF THE CHILD, *supra* note 2, at 3-4. *See also* Subcomm. on Best Interests, Interagency Working Grp. on Unaccompanied and Separated Children, *Framework for Considering the Best Interests of Unaccompanied Children* 5, (2016); *General Comment No. 14*, *supra* note 3, at ¶¶ 52-79.

**B. Children's Unique Needs and Vulnerabilities Require Legal Representation in Immigration Proceedings**

The U.S. immigration system, its laws, and its procedures are enormously complex. Children facing removal from the United States are confronted with largely the same immigration court system as adults. The overarching structure is an adversarial, courtroom-based proceeding. The child faces opposition from a government attorney and appears before an immigration judge in the same courtroom as adults, following largely the same adversarial procedures applied to adults and with nearly the same evidentiary and substantive standards as adults. A child who wishes to remain in the United States may seek protection in that courtroom. However, the child may—and sometimes must—also apply for protection from other agencies entirely separate from the immigration courts. Those agencies have their own fact-finding processes and own adjudicators. In short, children confront a complex maze of options that can confuse even experienced attorneys.

At the same time, children have unique needs and vulnerabilities that make it critical for children to be afforded special procedural safeguards and legal assistance in order to have a full and fair opportunity to be heard. Children are developmentally distinct from adults, as research shows that children's brains continue to develop well into their twenties.[7] Children face capacity limitations inherent in their ongoing intellectual, social, and emotional development and are dependent upon others to facilitate their participation in legal systems and processes that are not designed for children. Indeed, EOIR Guidance recognizes that "[i]mmigration cases involving children are complicated and implicate sensitive issues beyond those encountered in adult cases"

---

[7] Sara B. Johnson et al., *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J. Adolescent Health 216 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/.

and requires immigration judges to "employ age-appropriate procedures whenever a juvenile respondent or witness is present in the courtroom."[8]

### C.  A History of Trauma Complicates a Child's Navigation of Removal Proceedings

The need for legal representation for children facing removal is heightened by the impact of trauma on children's ability to seek and obtain relief.  Many unaccompanied children have suffered trafficking, abuse, or other violence, and the resulting trauma histories exacerbate the gap that a child must bridge to prepare a legal defense to removal.  In particular, child migration from Central America has been conclusively connected to gang violence, the erosion of human rights, violence in the home, and other grave danger and serious harm in children's countries of origin.[9]

With some exceptions, children in removal proceedings primarily seek humanitarian relief. The factual predicates that support humanitarian relief—childhood experiences grounded in violence and/or deprivation—also act as burdens or barriers to demonstrating eligibility for that relief.  Trauma history may "interfere with a child's ability or willingness to report information about violent incidents."[10]  Children who have experienced trauma may have piecemeal or nonlinear memories of the harm they suffered and may also struggle to tell their stories in a formal adversarial proceeding.[11]  Legal representation by an attorney with whom the child can build

---

[8] Executive Office of Immigration Review, Operating Policies and Procedures Memorandum (OPPM) 17-03, Guidelines for the Immigration Court Cases Involving Juveniles, Including Unaccompanied Alien Children, 2-3 (December 20, 2017), available at https://www.justice.gov/eoir/file/oppm17-03/dl.  These guidelines were rescinded on December 21, 2023, but were reinstated on January 29, 2025.

[9] U.N HIGH COMMISSIONER FOR REFUGEES, CHILDREN ON THE RUN: UNACCOMPANIED CHILDREN LEAVING CENTRAL AMERICA AND MEXICO AND THE NEED FOR INTERNATIONAL PROTECTION 9-11 (2016), https://www.unhcr.org/us/sites/en-us/files/legacy-pdf/56fc266f4.

[10] Chris Newlin et al., *Child Forensic Interviewing: Best Practices*, JUVENILE JUSTICE BULLETIN, OFFICE OF JUVENILE JUSTICE AND DELINQUENCY PREVENTION, U.S. DEP'T OF JUSTICE 5 (Sept. 2015), https://ojjdp.ojp.gov/sites/g/files/xyckuh176/files/pubs/248749.pdf.

[11] *Id.*

rapport and trust over time and who is able to identify and address the impact of trauma on a child's oral account of their experience, is critical to ensuring that their story and expressed wishes are heard during their immigration proceedings.

### D. International Law Mandates Unaccompanied Immigrant Children's Access to Free Legal Representation

Recognizing the particular vulnerability of migrant children, international law explicitly mandates the provision of free legal representation for asylum-seeking children to protect their rights, safety, and best interests. The CRC requires countries to "take appropriate measures to ensure that a child who is seeking refugee status…shall…receive appropriate protection and humanitarian assistance in the enjoyment of applicable rights set forth in the [CRC][.]"[12] The United Nations Committee on the Rights of the Child has explained regarding rights under the CRC for unaccompanied children: "The unaccompanied or separated child should…in all cases, be given access, free of charge, to a qualified legal representative[.]"[13] The Committee has further stated that for children in the context of international migration, children's right to be heard under the CRC mandates "the appointment of a legal representative for all children…as soon as possible on arrival, free of charge."[14]

---

[12] Convention on the Rights of the Child, *supra* note 4, art. 22.

[13] U.N. Committee on the Rights of the Child, General Comment No. 6 (2005) Treatment of Unaccompanied and Separated Children Outside their Country of Origin, ¶ 69, U.N. Doc. CRC/GC/2005/6 (Sept. 1, 2005), https://www.refworld.org/legal/general/crc/2005/en/38046. *See also id.*, ¶ 36 ("In cases where children are involved in asylum procedures or administrative or judicial proceedings, they should, in addition to the appointment of a guardian, be provided with legal representation.").

[14] Comm. on the Protection of the Rights of All Migrant Workers and Members of Their Families and Comm. On the Rights of the Child, Joint General Comment No. 3 (2017) & No. 22 (2017) on the General Principles Regarding the Human Rights of Children in the Context of International Migration in Countries of Origin, Transit, Destination and Return, ¶ 36, U.N. Doc. CMW/C/GC/23, https://docs.un.org/en/CRC/C/GC/23.

## II. ORR-FUNDED LEGAL REPRESENTATION HAS HELPED TO ENSURE THAT UNACCOMPANIED CHILDREN HAVE A FAIR OPPORTUNITY TO SEEK SAFETY AND PROTECTION IN THE UNITED STATES

Over the years, Young Center Child Advocates have observed firsthand the immeasurable benefit of government-funded legal representation to unaccompanied children. For children's immigration cases, ORR-funded legal representation has meant that children have an attorney with expertise and experience in children's immigration cases to stand with them in court, advocate for them, advise them, and make sure their voices are heard. In many cases, attorneys are able to build trust and rapport with their child clients, which has not only helped children to establish their eligibility for immigration relief but also benefited children's health and well-being, as a positive relationship with a trusted adult has been found to be a primary protective factor for children with incidents of adverse childhood experiences.[15] And in those cases where children have been able to obtain immigration relief, legal representation has meant the difference between living in safety in the United States or being returned to a country where they may face danger and physical harm, including trafficking and persecution.

The following accounts reflect just a few examples among the countless Young Center cases where ORR-funded legal representation was essential to keeping the child safe and healthy:

The Young Center worked with **Daniel**, a teenage boy who was the victim of trafficking.[16] Daniel struggled while in ORR custody due to symptoms arising from Post Traumatic Stress Disorder. Fortunately, Daniel developed a particularly close bond with his attorney and trusted them. The Child Advocate and Daniel's attorney worked together to advocate for the youth's

---

[15] Vanessa Sacks & David Murphey, *The Prevalence of Adverse Childhood Experiences, Nationally, by State, and by Race or Ethnicity,* Child Trends, February 12, 2018, https://www.childtrends.org/publications/prevalence-adverse-childhood-experiences-nationally-state-race-ethnicity.
[16] *Amicus* uses pseudonyms for some of the children in this brief.

needs in government custody, including outpatient mental health services and proper medical care. The attorney arranged for Daniel to receive a mental health evaluation by an outpatient provider to support his legal case. The attorney then submitted an application for a T-visa on Daniel's behalf, which was supported by a BID from the Child Advocate. The Child Advocate also advocated over many months for the child to be placed in the Unaccompanied Refugee Minor (URM) program, a foster care program that provides specialized services and benefits and is available only to children who meet certain criteria. After over two years in ORR custody, Daniel was released to a URM placement. Daniel was later granted a T-visa.

The Young Center worked with **Angel**, a teenager who had been sexually abused by a staff member at the ORR facility where they were being held. In discussing the abuse with their attorney, Angel disclosed that they had previously been the victim of sex trafficking and had fled to the United States to escape the traffickers. Angel's attorney and Child Advocate worked together to advocate for Angel's needs. The Child Advocate focused on ensuring that Angel received proper care and services within the facility and advocating for their release to a foster care placement, while Angel's attorney accompanied Angel to report the abuse to the police. The attorney also contacted Homeland Security Investigations to report the trafficking that Angel had suffered. After nearly 10 months in ORR custody, Angel was released to a URM placement, and their attorney filed an asylum application on their behalf.

The Young Center was appointed to **Marco**, a teenage boy with significant medical and mental health diagnoses that impacted his cognitive functioning and emotional regulation. Marco spent years in ORR custody and during that time, his attorney and his Child Advocate collaborated closely to advocate for his needs. In partnership with his attorney, the Child Advocate arranged for an in-depth psychological evaluation of Marco in order to understand his diagnoses and his

10

ability to meaningfully participate in court proceedings. When the evaluation results indicated Marco lacked capacity to participate in court, the attorney sought a hearing in immigration court to evaluate his competency.  The court, relying on the psychological evaluation and his Child Advocate's BID, found Marco incompetent and issued an order requiring a number of procedural protections for future proceedings.  With that court order, the attorney sought procedural protections when Marco was called for his asylum interview before USCIS.  USCIS applied those protections during his interview, and Marco was eventually granted asylum.

One particularly vulnerable population of children for whom ORR-funded legal representation has filled a critical gap in services is unaccompanied children who find themselves involved in a state child welfare system after their release from ORR custody.  In some cases, unaccompanied children released to a sponsor are subsequently taken into protective custody after the sponsorship breaks down or after an allegation of abuse or neglect arises.  Children placed in state foster care may find themselves in this system for months or years.  Because these systems are most accustomed to serving U.S. citizen children, there are often significant gaps in the understanding of, and resources for, the unique needs of immigrant children, including their eligibility for permanent protection in the U.S because of the circumstances that brought them into the child welfare system.  Very few states have services in place to provide immigrant children in foster care with immigration attorneys.  ORR-funded attorneys have been critical to filling this crucial gap in services.  Only through pursuing pathways to permanent status can immigrant children in foster care connect with critical services and be prepared to transition out of foster care to independence.

III.   **CHILDREN'S ATTORNEYS HELP TO PROTECT AND PROMOTE THE SAFETY, HEALTH, AND WELL-BEING OF CHILDREN OUTSIDE OF THE CONTEXT OF IMMIGRATION PROCEEDINGS**

   A.  **Children's Attorneys Assist in Identifying Particularly Vulnerable Children in Need of Child Advocate Services That May Not Otherwise be Identified**

Aside from providing legal representation for children in immigration proceedings, ORR-funded attorneys advance unaccompanied children's safety, well-being, and best interests in myriad other ways.  For instance, Child Advocates depend upon attorneys to identify and refer some of the most vulnerable children for best interests advocacy. Child Advocates are not made aware of every child in custody; rather, they are appointed to children's cases after other actors—federal officials, ORR facility staff, or in many cases, attorneys—identify a child as vulnerable and submit a referral for appointment of a Child Advocate. Some particularly vulnerable children, including young children, youth who are pregnant or parenting, or youth at risk of turning 18 while in custody, are easily identified by many stakeholders. However, there are certain children that only attorneys are likely to identify.  An attorney is sometimes the only stakeholder to refer a child who has been harmed in government custody, as some children are wary of disclosing abuse to staff at the facilities where they are harmed.  Attorney referrals for children harmed in custody open the door for a Child Advocate's best interests advocacy on the child's placement after a disclosure of harm, access to health services, and release to a sponsor.

Similarly, attorneys may be the only stakeholder to refer cases where the government has improperly denied a child's release to family or prevented the child's "step-down" to a less restrictive setting.  In those cases, other stakeholders may have little incentive to draw attention to decisions that would likely be challenged by a Child Advocate.  Finally, attorneys representing children after their release from custody may be the only stakeholder to learn that a child has experienced trafficking or other harm upon release.  While the attorney pursues legal protections

for that child as a survivor of trafficking or abuse, they simultaneously refer cases for a Child Advocate who, if appointed, can advocate for services that are in the child's best interests

### B. Children's Attorneys Help to Protect Children in Government Custody from Harm and Mistreatment

Children's attorneys also advocate for children's safety and well-being in other contexts, such as issues related to family reunification and release from government custody, and conditions, treatment, and services while in government custody. In cases where the child is also appointed a Child Advocate, the Child Advocate and attorney often work together to advocate for the child. This advocacy benefits not only the children whom attorneys represent, but also all unaccompanied children, by providing critical oversight over the government's treatment and custody of children and identifying systemic issues that threaten all children's safety and well-being.

For instance, Young Center Child Advocates have worked closely with ORR-funded children's attorneys on cases where ORR has improperly "stepped-up" a child to a more restrictive placement, such as a residential treatment facility or a secure facility, where children's movement is significantly limited. In those cases, the Child Advocate will collaborate closely with the attorney to advocate against the "step-up" or advocate for the child to be "stepped-down" promptly to a less restrictive placement that is in the child's best interests. This joint advocacy is critical to preventing children's improper or prolonged detention in restrictive facilities, which can significantly harm their mental and physical health.

Young Center Child Advocates have also worked with legal service providers to prevent improper age redetermination by ORR. The consequences of an incorrect age redetermination are severe, as it results in the child's transfer to adult ICE detention, which is a particularly harmful environment for most young people and which is ill-equipped to serve the needs of youth with

trauma histories.[17]  For example, in one case, when ORR improperly determined that a child was older than their stated age based on their physical features, the child's legal service provider worked with the Young Center and attorneys in the child's country of origin to obtain the necessary government-authenticated identity documents to prove the child's stated age and prevent their transfer to adult detention.

The Young Center has also worked with legal service providers to address issues related to conditions, treatment, and services that children have experienced while in ORR custody, such as mistreatment of children by facility staff, denial of language access to children whose preferred language is not Spanish or English, and failure to accommodate a child's disability.  For instance, when an ORR facility was improperly subjecting children to segregation in violation of ORR policy and regulations,[18] Young Center Child Advocates collaborated with the children's legal service provider, who advocated with the facility to cease the unlawful practice. The legal service provider also advocated with the state child welfare agency to investigate the issue and educate facility staff on state child welfare laws.

Legal service providers have also advocated to address abuse suffered by children while in government custody, including DHS custody.  In just the past few years, legal service providers have filed numerous complaints with DHS's Office of Civil Rights and Civil Liberties and Office of Inspector General, documenting complaints made by hundreds of unaccompanied children of

---

[17] Chanelle Diaz et al., *Harmful by Design—A Qualitative Study of the Health Impacts of Immigration Detention*, 38 J. Gen. Intern. Med. 2030, 2033-2035 (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9713141/pdf/11606_2022_Article_7914.pdf.

[18] *See, e.g.*, 45 C.F.R. § 410.1304; Off. of Refugee Resettlement, Admin. For Children & Families, U.S. Dep't of Health & Human Serv., *ORR Guide: Children Entering the United States Unaccompanied* [hereinafter *ORR Policy Guide*] § 3.3.15 (updated on February 27, 2025), https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-3#3.3.15.

verbal and physical abuse and inhumane conditions while in U.S. Customs and Border Protection detention and demanding investigation and systemic reforms.[19]

In some cases, the Young Center has collaborated with legal service providers to address abuse experienced by children while in ORR custody.  In one case involving abuse of multiple children by a staff member at an ORR facility, the Young Center and the legal service provider advocated with ORR to promptly and thoroughly investigate the abuse, identify all impacted children, ensure that children in the facility were safe from any further abuse, and to take all corrective actions to prevent abuse in the future.

The work that legal service providers do to protect and advocate for unaccompanied children in ORR custody is particularly critical in light of the fact that a child's attorney may be the only adult apart from ORR staff and facility staff with whom the child regularly interacts in-person while in custody.  Unfortunately, this is the case even for many children that are particularly vulnerable, as the number of vulnerable children eligible for child advocate services far exceeds the capacity of the Child Advocate program funded by ORR.  In 2024 alone, the Young Center received referrals for over 6,000 children for a program funded to serve approximately 1,300 children.  Given this gap in services for many of the most vulnerable children in ORR custody, ORR-funded attorneys serve a key function in protecting children from harm while in custody.

---

[19] *See*, *e.g.*, Florence Immigrant & Refugee Rights Project, *Handcuffed, Pushed, and Afraid: immigrant children share terrifying experiences while in Border Patrol custody* (September 2024), https://firrp.org/wp-content/uploads/2024/09/September-2024_Handcuffed-Pushed-and-Afraid-Immigrant-children-share-terrifying-experiences-while-in-Border-Patrol-custody.pdf; CRCL Complaint Letter re: Abuse of Unaccompanied Minors in Customs and Border Protection Custody, January 2023 to June 2024 from Carson Scott, Immigrant Defenders Law Center Staff Attorney, to U.S. Department of Homeland Security Office of Civil Rights and Civil Liberties, (Sept. 12, 2024), https://www.immdef.org/_files/ugd/c2ad78_c9bf3fe55acc490da766d2d1641f911d.pdf.

## IV.    WITHOUT LEGAL REPRESENTATION, CHILDREN ARE AT RISK OF IMMEDIATE AND SIGNIFICANT HARM

### A. ORR's Termination of Funding for Direct Representation Has Already Harmed Children

Young Center Child Advocates have already observed harm to children in just the past two weeks since ORR terminated funding for legal representation.  After the Young Center learned on March 21, 2025, that funding had been terminated, Child Advocates scrambled to figure out the implications for children to whom the Young Center is appointed, particularly those who had court hearings scheduled for the following week.  The sudden and abrupt termination of services, without any warning or advance notice to children, their attorneys, Child Advocates, and immigration judges and court personnel, created chaos and confusion in immigration courts.

During the days immediately following the termination of funding, Child Advocates observed immigration judges learning for the first time at court hearings that funding for legal representation and friend of court services for unaccompanied children had been terminated.  Upon arriving at court, children also learned for the first time that they would not have an attorney to represent them.  In one court, Young Center Child Advocates observed a 14-year-old girl break down in tears in the court's lobby when she was told that she would not have a lawyer and would need to stand up in court all alone.  Child Advocates observed children as young as five years old sitting at tables by themselves in front of judges.  Older teenagers without counsel were required to proceed in court with pleadings, in which they were required to admit or deny the charges and factual allegations regarding removal made by the government against them.  In cases where children were in ORR custody, immigration judges sometimes directed questions regarding children and their immigration cases towards ORR facility staff, including clinicians, case managers, or youth care workers (staff who monitor or transport children), who are not trained on the consequences of discussing a child's case in immigration court.  At one hearing, the

16

immigration judge failed to request an interpreter to interpret the proceedings, even though many non-English-speaking children were present, and instead directed questions only to ORR facility staff in English.

At another hearing, the immigration judge advised children of their rights through a Spanish interpreter and asked each child if they wanted to have additional time on their case. One teenage girl responded in Spanish, "No." When the judge asked if the youth wished to represent herself, the youth responded in Spanish, "No." The judge then asked the youth why she did not want more time. The youth then became confused and responded, "No entiendo nada," indicating that she did not understand anything being said. The Child Advocate explained to the judge that the youth could not understand the proceeding. The judge then instructed the interpreter to explain to the youth that the Young Center would work with the ORR facility and might be able to appoint to the youth's case to help. However, the interpreter misinterpreted, telling the youth in Spanish that the judge would come to the shelter and meet the child there. The Child Advocate asked the judge to instruct the interpreter to correct the interpretation.

In another case, **Nicolas**, a youth to whom the Young Center is appointed, had a court hearing in early April but right before his court hearing, he was transferred to another program. At the time of the court hearing, Nicolas was on a flight traveling to his new placement. Typically, a legal service provider would have filed a Change of Venue form with the immigration court to notify the court and the government attorney of the change and to have the child's case transferred to the nearest court. However, due to the interruptions and confusion caused by the loss of funding for direct representation, a Change of Venue form had not been filed and a legal service provider did not initially appear on the case. Fortunately, an attorney with a legal service provider eventually appeared at the hearing as an unfunded friend of court and explained Nicolas's inability

to appear in court due to his transfer.  If the attorney had not done so, and if no Child Advocate had been present to make a recommendation regarding a continuance, the court could have issued an order of removal *in absentia*.

In the last two weeks, some immigration judges have decided not to proceed with hearings and have continued cases for 45 to 60 days, because the children were unrepresented or lacked a friend of court.  In one child's case, a Child Advocate requested a 90-day continuance to assist the child—to whom the Young Center was not yet appointed at the time—in locating a pro bono attorney.  The Child Advocate requested that amount of time knowing how difficult it has become to secure the services of pro bono counsel when so many children are suddenly in need of representation. However, the government attorney requested a continuance of just 30 days; the judge ultimately granted a 60-day continuance.  In another court, the government attorney objected to all requests on behalf of children for continuances, regardless of the amount of time.  One judge granted continuances but indicated that they were inclined to proceed with pleadings if the children were still unrepresented at the next hearing.  In reality, the vast majority of these children will still have no attorney to represent them at their next court hearing if legal representation is not restored.

**B. Without ORR-Funded Legal Representation, Most Children Will Likely be Unrepresented and Have No Meaningful Opportunity to Pursue Immigration Relief**

These observations from just the past two weeks show very clearly the risk of significant harm to children by Defendants' actions: if ORR does not restore funding for legal representation services, the vast majority of unaccompanied children will have to proceed with their immigration cases alone and will have no meaningful opportunity to seek immigration relief and permanency in the United States.  This will mean that children who have been identified as eligible for legal relief—such as asylum and relief for trafficking victims—during legal screenings will likely have

no attorney to complete and file applications for humanitarian relief on their behalf. For children who are facing prolonged stays in ORR custody because they do not have available sponsors or because potential sponsors do not meet heightened requirements that ORR has recently imposed on sponsors,[20] the prospect of prolonged detention without any legal representation to be able to meaningfully seek permanency in the United States has caused them to feel even more anxious, frustrated, stressed, and fearful about their situations. Some children have expressed feelings of despair and hopelessness to their Child Advocates and are considering voluntary departure despite having protection claims. At the same time, children are being told to consult with an attorney regarding their legal options before pursuing voluntary departure, even though many no longer have attorneys to consult with.

For children who are nearing their 18th birthday and who may be eligible for SIJS, the need for legal representation is urgent. Children who seek SIJS must first obtain a state predicate order from a state juvenile court in order to apply for SIJS with USCIS. In most states, juvenile court jurisdiction ends when a child turns 18. Therefore, if a youth resides in one of those states, the youth will need an attorney to assist them with obtaining the state court order before they turn 18. The Young Center is currently appointed to a number of youth in this situation who now face the very real possibility that they will not have the legal representation they need to pursue SIJS protection.

---

[20] *See*, *e.g.*, ORR Policy Guide, *supra* note 18, § 2.2.4 (updated on March 7, 2025), https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2#2.2.4 (no longer accepting "foreign passport that contains a photograph" as an acceptable form of identification for sponsorship application); Off. of Refugee Resettlement, Admin. For Children & Families, U.S. Dep't of Health & Human Serv., *ORR Field Guidance #27*, (March 14, 2025), https://acf.gov/sites/default/files/documents/orr/FG-27_-_DNA_Testing_Expansion.pdf (requiring any potential sponsor who indicates a biological relationship with the child to submit to DNA testing).

### C. Pro Bono Representation is Unlikely to Fill the Gap Created by the Termination in Funding

The Young Center is concerned by the Defendants' argument in their opposition brief[21] that HHS has shifted to "increased emphasis and reliance upon pro bono service providers." The prospect of pro bono legal representation meeting the enormous gap in services created by ORR's termination of funding is highly unlikely. As a preliminary matter, it is extremely difficult for a child to find a pro bono attorney on their own, while they are in ORR custody. Even if ORR provided children with a list of pro bono providers, children's telephone access in ORR facilities is extremely restricted; they are not permitted access to telephones except in limited circumstances. It is also our understanding that ORR facility staff do not take any affirmative steps to assist children with finding pro bono counsel. Therefore, a child in ORR custody would likely require the assistance of their Child Advocate, if they are appointed one, or a legal service provider to locate pro bono counsel.

In the Young Center's experience, it is very difficult and time-consuming for anyone to locate pro bono counsel to represent children in immigration proceedings. In recent years, in rare cases where ORR-funded attorneys lacked capacity or were unable to represent a child due to a conflict, Child Advocates have attempted to find pro bono representation in the private bar. The process of locating pro bono counsel in the private bar was time-consuming and not always successful.

The likelihood of finding pro bono representation is even more difficult now, as many legal service providers have stopped taking on any new cases since the government terminated funding for direct representation. In the past two weeks, Young Center Child Advocates have made efforts

---

[21] Defs.' Opp. Mot. TRO and Prelim. Inj. 17, ECF No. 24, March 31, 2025.

to find legal representation for children to whom they are appointed, often at the direct request of children who are very concerned about their immigration cases, but have been largely unsuccessful.  Even with the temporary restraining order in place, many legal service providers have indicated that they are unable to take on new cases due to the loss of funding and ongoing uncertainty around funding.

At the same time, there is no indication that pro bono providers even have the capacity to accept or respond to requests for legal assistance for thousands of children facing removal proceedings.  To the contrary, Young Center Child Advocates continue to find it very difficult to find pro bono representation in the private bar.  When one Young Center Child Advocate recently reached out to an attorney in the private bar to see if the attorney's firm could provide pro bono representation to unaccompanied children in their immigration cases, the attorney responded that their firm was reluctant to do so, because they were not familiar with children's immigration cases and understood these cases to be complex and requiring an attorney with expertise in working with children.  Thus, the system that currently exists has no capacity to ensure that children who wish to seek protection will be able to find counsel on their own, or that such counsel are even available in numbers that could start to address the demand.

## CONCLUSION

As the Child Advocate appointed by ORR pursuant to the TVPRA to advocate for the best interests of unaccompanied children, the Young Center is deeply concerned by the harm that ORR's termination of funding for direct representation will cause to children.  Without ORR-funded legal representation, most children will not be able to find pro bono representation and will have to proceed with their immigration cases alone.  Denying children a meaningful opportunity to pursue permanency in the United States undermines children's safety and well-being and is

therefore not in children's best interests. No child should have to navigate complex immigration proceedings on their own. The Court should enjoin Defendants' actions and order the immediate restoration of ORR funding for direct representation and friend of court services.

Respectfully submitted,

/s/ *Shaffy Moeel*
_____

MOEEL LAH FAKHOURY LLP
Shaffy Moeel (CA Bar. No. 238732)
Hanni Fakhoury (CA Bar. No. 252629)
Andrew Lah (CA Bar. No. 234580)
2006 Kala Bagai Way, Suite 16
Berkeley, CA 94704
(510) 500-9994
shaffy@mlf-llp.com
hanni@mlf-llp.com
andrew@mlf-llp.com

YOUNG CENTER FOR IMMIGRANT
CHILDREN'S RIGHTS
Jane Liu (D.C. Bar No. 989847)*
Young Center for Immigrant Children's Rights
67 E. Madison St., Suite 1810
Chicago, Illinois 60603
(773) 360-8920
jliu@theyoungcenter.org

*pro hac vice* forthcoming
*Counsel for Amicus Curiae Young Center for Immigrant Children's Rights*

Dated: April 10, 2025