**Pages 1 - 52**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martinez-Olguin, Judge

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, et al.

Plaintiffs,

VS.

UNITED STATES DEPARTMENT OF HEALTH and HUMAN SERVICES, et al.,

Defendants.

**NO. C 25-02847 AMO**

San Francisco, California
Wednesday, April 23, 2025

**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**: (via videoconference)

For Plaintiffs:

IMMIGRANT DEFENDERS LAW CENTER
634 South Spring Street - 10th Floor
Los Angeles, California 90014
**BY: CARSON SCOTT, ATTORNEY AT LAW**

JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, California 90027
**BY: KAREN C. TUMLIN, ATTORNEY AT LAW**

AMICA CENTER FOR IMMIGRANT RIGHTS
1025 Connecticut Ave. NW - Suite 701
Washington, D.C. 20036
**BY: SAMANTHA HSIEH, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Remotely Reported: Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
U.S. District Court - Official Reporter

**APPEARANCES:** (continued via videoconference)

For Defendants:

U.S. DEPARTMENT OF JUSTICE
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044

**BY: JONATHAN K. ROSS, ATTORNEY AT LAW**

Also Present: **TOBY BISWAS**
**SHARON ROBERTS**

**Wednesday - April 23, 2025** **2:03 p.m.**

**P R O C E E D I N G S**

---000---

**THE CLERK:** This court is now in session. The Honorable Araceli Martinez-Olguin presiding.

Calling civil matter 25-2847, Community Legal Services and East Palo Alto, et al. v. United States Department of Health and Human Services, et al.

Counsel, please state your appearances for the record starting with the Government.

**MR. ROSS:** Jonathan Ross for the United States.

**THE COURT:** Good afternoon.

**MR. ROSS:** Good afternoon.

**MS. TUMLIN:** Good afternoon, Your Honor, Karen Tumlin for the Plaintiffs.

**MS. SCOTT:** Carson Scott for the Plaintiffs.

**MS. HSIEH:** Good afternoon, Your Honor, Samantha Hsieh for Plaintiffs.

**THE COURT:** Apologies, I'm just moving you all around on my screen so I have you three on the top. All right.

So, Counsel, I just want to start by noting that we are here today on Plaintiffs' motion for a preliminary injunction. We are not here on the motions to enforce. I will note for you that those are regularly noticed motions and are presently set to be heard on May 15th and May 22nd, respectively.

Indeed, the first motion isn't fully briefed yet, and Plaintiffs' reply isn't due until the 28th of April. Counsel's ECF entry setting a hearing on these motions for today does not change the timeline laid out in the local rules. So, we are not here for that today.

That said, I do take seriously the assertion that the Government has not complied with the Court's orders, and I do want to hear from the witnesses I ordered to appear today.

So -- that I can understand the Government's conduct to date, and I will also want to hear from them after I hear argument from you-all about the PI because I want to make sure that I understand what -- what actions can be taken by the Government Defendants and on what timeline.

So, I guess before we jump into the PI, I do have -- well, let me ask you, Mr. Ross, just before we start, I had ordered to appear both Toby Biswas as well as Sharon Roberts. Are they with you?

**MR. ROSS:** Yes, Your Honor.

**THE COURT:** Okay. You tell -- I'm inclined to hear from them possibly at the end -- I'm of two minds. I am inclined to have you-all talk with me about the motion for preliminary injunction and take them at the end. My hesitation with that is that it requires them to stay here for the entire time that the lawyers are talking. So, maybe just to save -- to save some of their time, why don't we go ahead and speak

with them first.

Let me ask you, Mr. Ross, I imagine that it is likely most -- assuming -- are they in the room with you or are they also on the Zoom?

**MR. ROSS:** Your Honor, they are here in person with me right now.

**THE COURT:** Okay.

**MR. ROSS:** As well as several other members of the Department of Justice, Health and Human Services and the Department of the Interior.

**THE COURT:** All right. Does it -- my sense then is that it might -- you tell me what your technological capabilities are. My sense would be to have them possibly come to the lectern where you are standing. I see you have a remote. So, if it is possible for you to redirect the camera, why don't we, if we can start, maybe start with Mr. Biswas.

**MR. ROSS:** Very good. Mr. Biswas is right here.

**THE COURT:** Good afternoon, Mr. Biswas. I have your declaration. I think my lingering question for you -- let me make that more specific. I have your declaration dated April 8th. It's on the docket as 45-1. I think my question for you is -- will likely be no surprise; right. That declaration is dated April 8th. I can see what you have attested -- the conduct you undertook from April 2nd to the 8th.

Mr. Biswas, is there anything that you have done since this date?

**TOBY BISWAS:** No, Your Honor. We have been in communication with our contracting officer, folks over at the Department of Interior to follow up on this contract modification necessary for the provision of the CLINS 2, 3 and 4 under the contract.

**THE COURT:** Mr. Biswas, is there anything that you or ORR still need to do at this point -- is there anything that you-all still need to do rescind the March 21st partial termination?

**TOBY BISWAS:** To my knowledge, no.

**THE COURT:** All right. Then, Mr. Biswas, I think those -- that may be the extent of my questions for you. Mr. Ross, if I can impose on you to help me -- to redirect me now to Ms. Roberts.

**MR. ROSS:** Yes, absolutely. I will bring her into frame now.

**THE COURT:** Okay, thank you.

(Pause in proceedings.)

**THE COURT:** Good afternoon, Ms. Roberts. So -- actually, Mr. Ross, this may actually be a note for you while I have it. Ms. Roberts, I have reviewed -- this is for both of you. Ms. Roberts, I have reviewed both of your declarations. There was the declaration that was submitted on April 8th and

it is ECF 45-2, and I also have a declaration submitted in support of the Government's consolidated opposition. It is ECF 74-1. I will note, however, that that document is unsigned.

So, I imagine, Mr. Ross, that may be something that you want to take -- fix and take care of because I don't have Ms. Roberts' signature on this. So, it isn't actually attested to. But, Ms. Roberts, I have looked -- I have read carefully through your declarations, and I think the pieces I'm trying to understand from you is -- this takes me through all the way to the 21st when it was signed. It's -- that's only a few days ago, but I think I'm at this point curious to understand what is left to be done.

**SHARON ROBERTS:** Right now we are actually in the very final stages of processing the modification. Late on the 21st we did receive Acacia's updated reinstatement proposal. We are finalizing the documentation as we speak for that modification. We plan to send that to Acacia. It's a bilateral modification. And once they sign that, we will sign it and it will be in place.

**THE COURT:** And if I followed that, Ms. Roberts, could you -- do you --

(Pause in proceedings.)

**THE COURT:** Do you have a sense of when -- if I followed that, you were -- it is at the point where -- the

papers -- the ball is with you, and then it is going back to Acacia and then it's coming back to you and that would be the end of it. Did I follow that?

**SHARON ROBERTS:** That is correct.

**THE COURT:** All right. So, the ball is with you. When -- do you have a sense of when you are sending it back to Acacia?

**SHARON ROBERTS:** We anticipate that that is going to be in the next day or two that we are going to be sending to Acacia.

**THE COURT:** Ms. Roberts, can I -- I just want to check a few more things with you. Am I correct that the only party to the contract is -- the parties to the contract are DOI and Acacia?

**SHARON ROBERTS:** We do have a contract with Acacia only. That is correct.

**THE COURT:** Does the contract contemplate which entities Acacia will subcontract with?

**SHARON ROBERTS:** Potentially when the contract was proposed, they may have included subcontractors but they are -- they do have the ability to make changes or make those determinations.

**THE COURT:** And was that -- Ms. Roberts, I understand you to be referring to the most recent iteration. Was that consistent through the recent iteration of the contract as well

as the recently expired iteration of the contract?

**SHARON ROBERTS:** That is correct.

**THE COURT:** I think those are the extent of my questions at this point. So, I want to thank you both Ms. Roberts and Mr. Biswas, for being here. I realize that on the East Coast, it is after 5:00, so I apologize. I actually should apologize to everyone on the East Coast. It is after 5:00. That's the joy of transnational litigation.

I'm going to go ahead and excuse you-all and then we will just move from there on to -- on to my questions for Counsel about the motion for the preliminary injunction. So, thank you-all.

**SHARON ROBERTS:** Thank you.

**MR. ROSS:** Thank you, Your Honor. May the Government have the indulgence of the Court for just a moment as we realign?

**THE COURT:** Of course. Thank you for figuring out the technology in the first place to make that all happen, Mr. Ross.

**MR. ROSS:** We have some good folks to help us with that. It's definitely not my specialty. Thank you, Your Honor.

(Pause in proceedings.)

**MR. ROSS:** Thank you very much to my colleagues. Thank you to the Court. The Government is ready to resume.

**THE COURT:** Thank you, Mr. Ross. So folks, I understand that on Plaintiffs' side different counsel will be addressing different portions. I do want to note for you, I would love to tell you that I had drafted my questions discreetly enough so that I could just engage with one of you at a time. They are not that -- they are not that -- they are linear to my way of thinking. They are not linear necessarily in the order that I think that Ms. Araceli [sic] put out in the papers.

So, here is what I'm going to ask you-all to do: I'm going to run you through the questions that I've got -- this may be akin to what we did at the TRO stage. I'm going to run you through the questions that I have got. I will -- whoever the question is directed to, I will give -- I will give the other side an opportunity to respond to that piece.

When we have gone through my questions, I will give you-all some time if there are additional points you want to make time to address that I haven't -- that I haven't asked you-all to, to make sure that you get to put into the record whatever it is that you would like to have even if it wasn't something that particularly interested me today.

So, to that end, my first couple of questions are for Plaintiffs' Counsel, and I will just leave it to you-all to play jump ball with the question and direct it as you need to to the right attorney.

So, Plaintiffs, I need you to help me understand better the scope of relief that you are requesting. It looks to me like you are asking for the Government to comply with the TVPRA and the Foundational Rule in a way that ensures representation for unaccompanied children in immigration proceedings. My question to you really is: Have I got that right or how would you -- how would you pin that down if it is not the right -- if I have not described it the way you would?

**MS. SCOTT:** Good afternoon, Your Honor, Carson Scott for Plaintiffs.

**MS. TUMLIN:** I think that's mine; is that right? Okay, that's good. We will, in fact, play jump ball. So, thank you for the question, Your Honor. You do have that right in terms of the scope of relief that we are requesting, and I want to say a few additional things about it.

So, you know, we are not asking the Court to say that the exact contract that was in place before gets put back in place. That's the Government's decision. It looks like from the testimony of the two declarants that Your Honor just heard from, that is the choice that they have made; but the how to comply with the TVPRA and Foundational Rule requirements, that's up to the Government. And we are simply asking that they do comply, right, that they comply to the extent that small children, who are unaccompanied minors, are getting legal representation to the greatest extent practicable taking into

account the Congressional funds that have been authorized and whether or not there are pro bono resources available. That is what is necessary.

Now, the Government has made the determination that the way for them to comply with that relief that was presented in the Court's TRO from 21 days ago is to extend the contract, but that's the Government's choice and we are not here to quibble with the choice that they make.

**THE COURT:** So, let me ask, can you draw a line for me between the relief you seek and the redressability issue raised by the Government in opposing your standing? More specifically, I'm asking what relief you seek -- if you can sort of pin down how I can be sure that the relief you seek is redressable equitable relief under the APA.

**MS. TUMLIN:** Absolutely, it is a good question, Your Honor. So, first of all, I would start from the principle that the test for redressability does not mean that 100 percent of all of Plaintiffs' harms have to be remedied. And so, I will give you an example -- and, you know, it is a painful example -- one of the harms that Plaintiffs talk about is having to lay off staff because of the unlawful actions of the U.S. Government in cutting the funding that is required -- that has been appropriated by Congress and is mandated to be provided for representation of unaccompanied kids.

If the Government decided that they wanted to fund some

other phantom set of legal service providers who were experts in representing unaccompanied children to satisfy these requirements and no funding flowed to our clients, well that one harm that we have alleged it may not be addressed but the other harms -- the mission harms of all eleven Plaintiffs who were mission driven with preexisting core activities to represent child clients in court so no child stands alone -- that would be redressed and that would be sufficient, Your Honor.

**THE COURT:** So, I think we have addressed this some. I do want to pin this down. Are you asking me to specifically order the Government to keep paying the bill? And if so, do I have authority to do that?

**MS. TUMLIN:** I -- I am not -- so, just to get real precise on that question, when you say "keep paying the bill," do you mean the prior contract, Your Honor? We are not asking for that. If you mean "keep paying the bill," which is expend some dollars on unaccompanied children and ensuring they have legal representation, yes. And that is because of two things. You do have the authority to do it because it is your job, and you have the authority to ensure that statutes and regulations are enforced.

The TVPRA says "shall provide representation to all children to the greatest extent practical." The Foundational Rules tells us more. It says if funds have been appropriated,

they have. The U.S. Government doesn't contest that. It further says it is in their discretion after they look and see whether pro bono representation is available how to meet this mandate; but there is no evidence in the record before this Court that pro bono representation is available.

When we were in person on April the 1st, the Government posited that there might be some pro bono army that was going to rise up and take the place of the trained and skilled legal service providers who have been providing this representation to children, but nothing in the evidence they presented to the Court shows that that's happened.

Instead, they opine in their opposition to our preliminary injunction motion that they, quote, trust that pro bono legal providers will take on the, quote, most meritorious cases. Trust isn't enough given the TVPRA requirement and the Foundational Rule, Your Honor.

**THE COURT:** The Government -- Mr. Ross, this is my last question for them about the relief; and then I will give you a chance to address these and then I will have a question for you. But, Plaintiffs, the Government seems pretty convinced that the relief you seek sounds in contract. You see from my recent orders I disagree. Help me put my mind at ease about why this is a -- why this is a case that is not about contractual payment.

**MS. TUMLIN:** My colleague, Ms. Hsieh, will address

that, Your Honor.

**MS. HSIEH:** Yes, I'm happy to answer that, Your Honor. So, the Ninth Circuit and the D.C. Circuit apply the *Megapulse* test, which looks at both the source of rights for the contracts and the relief that is requested. And so, under both these factors, Plaintiffs have made a strong showing that this is not a contracts case that's subject to the Tucker Act.

So, first, on the type of claims we raise, we are raising statutory and regulatory claims under the TVPRA and the Foundational Rule. We are not raising contractual claims either in form or function in that -- in order for Your Honor to decide our claims, there's no need to look at the terms of the contracts because the Government's obligation comes from outside of the contracts that it has with Acacia and Acacia with Plaintiffs.

Now, I will say the Government is trying to argue for a but-for test for the kind of claims that we are raising. It is saying that if it weren't for these contracts, Plaintiffs wouldn't be in this court today; but that's the kind of test that has been rejected numerous times by both the Ninth Circuit and the D.C. Circuit, which apply the same test.

So, for example, in the Ninth Circuit in the *North Side Lumber* case said that even where the claims are contract related, as long as the source of rights come from another authority, they can proceed in district court.

Similarly, the Ninth Circuit ruled more recently in the *United Aeronautical Corporation* decision that even where Plaintiffs -- even where Defendants raise a contract as a defense, that still doesn't mean that that case is subject to the Tucker Act.

And I also want to point this Court to the D.C. Circuit decisions in *Crowley* and in *Megapulse*, where it acknowledged that it is okay for claims to presuppose the existence of a contract. That's not the correct test. Instead, you have to again look at the source of the rights.

We also meet the second factor under the *Megapulse* test, which is the kind of the relief we are seeking. As my colleague Ms. Tumlin was discussing, we are arguing -- we are seeking for the Government to comply with its statutory and regulatory obligations to continue funding representation for these unaccompanied kids as a whole. We are not seeking contract specific relief such as specific performance or backpay.

And I want to emphasize that the kind of relief that would be -- that we would be able to get in the Court of Federal Claims is only contract specific. So, litigating there is not an adequate substitute for us litigating in this court, Your Honor.

And, finally, there is another potential hurdle to us litigating in the Court of Federal Claims as well. Plaintiffs

are subcontractors, and it's generally accepted that subcontractors cannot litigate in the Court of Federal Claims unless they have permission from the prime contractor; here, Acacia.

And so, for all these reasons, it is not an adequate substitute for us to be litigating under the Tucker Act in the Court of Federal Claims; and this Court has jurisdiction to hear this case.

**THE COURT:** Thank you, Ms. Hsieh. Mr. Ross, I'm going to ask you to pick up on the points that I have asked them; and then once you have addressed those to your satisfaction, let me know. I have got a question for you moving -- related to discretion.

**MR. ROSS:** Thank you, Your Honor. Plaintiffs are asking for something that the law does not provide, an order from this Court requiring the Government to continue dispersing discretionary funds in a terminated contract. And reading from their motion, their proposed order reads that Defendants are enjoined from withdrawing the services or funds provided, and it goes on to cite the TVPRA and the Foundational Rule.

But to the extent that Plaintiffs say that their relief -- that the relief that they want doesn't lie in contract is contravened by the fact that they are asking for this Court to enjoin the Court from withdrawing discretionary funds.

It's also critical to note that the two primary sources

that they cite in an effort to show redressability, the laying off of their staff -- but seemingly maybe even conceding that point -- and turning only to the implication that it has on their mission, they don't have a right -- the TVPRA and the Foundational Rule don't convey on them a right to continue their mission. They are outside of the zone of interests.

And the APA similarly doesn't authorize the type of relief that Plaintiffs seek. And in essence they are challenging a decision that the law committed specifically to agency discretion and not only agency discretion on funding but also as it goes to personnel and infrastructure and things that the agency -- and, quite frankly, not this Court -- are in the best position to determine.

**THE COURT:** Part of the discussion regarding Plaintiffs' likelihood of success centers on whether implementation of the TVPRA and the Foundational Rule is left to the agency's discretion. Could you please tell me how much discretion is left to the agencies where Congress appropriates funding for a certain task? Your paper suggests that the agency can simply elect not to spend the money, but that doesn't seem to comport with Congress' direction.

**MR. ROSS:** Your Honor, the -- as we discussed at length with the temporary retraining order back on April 1st, the language to the greatest extent practicable, practicable inherently, as I said, includes things beyond funding. It

includes infrastructure and personnel and other matters that are historically left to agency discretion and a considerable amount of discretion too as the cases that we cite to in our brief indicate.

Not only in the TVPRA -- excuse me -- not only in the Foundational Rule does the word "discretion" expressly appear, but courts have routinely interpreted that to the greatest extent practicable means that the agency has discretion with the who, the what, the why, the how and the when. So, the agency is very much acting consistent with the TVPRA and the Foundational Rule when it provides the things that it must provide; legal screenings as well as know your rights presentations.

Anything beyond that is discretionary and is left to not only whether there is funding available but a number of other considerations too that the agency is in the best position to ascertain.

**THE COURT:** All right. So, Plaintiffs, I have a couple of questions for you about your *Accardi* claim. The Government's opposition states that you have identified -- that you have not identified any internal policy that HHS has disregarded. I understand your *Accardi* claim to be based on the Foundational Rule. Is there some additional internal policy with which you are seeking compliance?

**MS. TUMLIN:** No. You are correct, Your Honor. Our

*Accardi* claim are based on the four corners of the Foundational Rule.

**THE COURT:** All right. My second question relates to the relationship between your claim premised on *Accardi* and the one premised on the TVPRA. I want you to help me understand if those rise and fall together.

**MS. TUMLIN:** Um, Your Honor, I -- I don't think that the claims rise and fall together. I think that sometimes the *Accardi* case law, even within the Ninth Circuit, is a bit mushy, to be honest. And the contrary to law claim, the Court could find that they simply on the text of the TVPRA, that the Defendant's actions of the cancellation order violate the TVPRA's requirement, full stop, without ever reaching an *Accardi* claim based on the text of the Foundational Rule.

**THE COURT:** Thank you. Mr. Ross, do you want to address either of those questions?

**MR. ROSS:** Your Honor, I think that it's -- it's -- yes, we would. In terms of the claims that Plaintiffs are putting forward, they are in essence trying to have it both ways; right. They are in essence saying that they are not asking for -- there's tension between what they are asking for and the mechanisms by which they are giving the Court to give meaning to -- to those claims. And in as much as they ask, they present that they are not asking for a contractual remedy, the only way to give meaning to the relief that they seek is by

means of contract.

(Pause in the proceedings.)

**MS. TUMLIN:** Your Honor, can I add one thing on that point?

**THE COURT:** Go ahead. It gives me a chance to take down the rest of my notes with regard to Mr. Ross.

**MS. TUMLIN:** Great, I'm here for that. What I wanted to add to redressability -- just because of what Mr. Ross just said -- that I want to make clear that there are very specific things where there is now evidence in the record where an order of this Court, just like what we have in our proposed order for the preliminary injunction, would indeed redress Plaintiffs' harms.

So, for example, this is all uncontested evidence before this Court in the last three weeks since the TRO has issued. So, we know that now tender age children have gone unrepresented in their removal proceedings as a result of the Defendant's actions and noncompliance with the TRO. That's in the FIRRP declaration at docket 53-3, paragraphs 2 and 3, and the Estrella declaration at docket 53-4, at paragraph 5.

We know that small children have appeared in court alone. This is in the FIRRP declaration 53-3, paragraphs 4 and 6. We know at least one child that we are aware of has been deported and that is in the Estrella declaration at 42-2, paragraphs 4 through 9. And we also know that immigration judges and

shelter staff have asked our client to represent new unaccompanied kids in reliance on the Court's TRO. This is at the ImmDef declaration 53-5, paragraphs 7 and 8.

And, finally, we know that children have been held in detention in ORR shelters for longer than necessary because they have no one to explain their rights to them. This is the FIRRP declaration 53-3, paragraph 3.

I cite all of that to outline this isn't about the dollars and cents. If the Defendants were taking actions to ensure that unaccompanied children could get some of the funds that Congress expended on their behalf and have representation -- even if it was not representation by our clients -- they would have redressability; their harms would be addressed; they would be able to fulfill their mission of ensuring that children don't stand alone in immigration court.

**THE COURT:** I want to shift gears a little bit and speak with you both about the arbitrary and capricious claim asserted by Plaintiffs. Mr. Ross, your opposition asserts that the administrative record here reflects reasoned decision driven by policy and fiscal considerations. However, I don't have an administrative record.

So, can you -- much less one that the evidence is the reasoned decision making you assert. So, can you talk to me a little bit please about how I can rule in your favor if I end up reaching the arbitrary and capricious claim.

**MR. ROSS:** Yes, Your Honor. And apologies for any -- for, perhaps, not expressing that as artfully as we could have. I think it is more accurate to describe it as record evidence that -- in terms of the evidence that's in the record.

And what is in the record before the Court is, for example, the termination notice that -- that the Government sent out on March 21st explaining its rationale for the -- for the termination.

And, Your Honor, with the Court's indulgence too, I would like to respond to what my colleague just raised about three different distinct harms that yet again --

**THE COURT:** I'm going to stop you for one more moment on the record because I just want to make sure -- I will forget to come back to this. So, if I'm hearing you right, Mr. Ross, that part of your -- that part of your opposition is intended to point to the record evidence and that would be the recision letter from March 21st; is that right?

**MR. ROSS:** I believe so, Your Honor.

**THE COURT:** All right. And --

**MR. ROSS:** If something comes to light that makes me change the Government's thoughts on that, then surely we will inform the Court, but --

**THE COURT:** Okay. And then just so I'm clear, yes, so that's the document you would point me to. All right. That's helpful. All right. By all means, you can have a moment to

address Ms. Tumlin's remarks about some of the children -- her assertions about what's been happening. Go ahead.

**MR. ROSS:** Yes, Your Honor. And these are -- what Ms. Tumlin is describing are things that are certainly well reported in the news and that are -- the folks with the Government that are there on the ground, we understand that this is happening and we understand the effect that it's having.

Really what it comes down to at the end of the day, though, is not whether legal -- the provision of legal services is good. Really what it comes down to is whether there is a statute or regulation or an interplay of the two that requires that type and scope of representation. And unfortunately, there is -- fortunately or unfortunately -- perhaps unfortunately for Plaintiffs -- there is not. There is not a statutory or regulatory requirement.

And even Ms. Tumlin, I have a great deal of respect for her, however, the three distinct things that she points to in support of Plaintiffs' claims are really the same single thing. They are all mission focused; that children are appearing unrepresented in court and that they are in some cases being served with notices to appear in removal proceedings or appearing in court by themselves or with one of ORRs provided guardians or case managers.

All of those point to the fact that children, who are once

receiving legal representation are no longer receiving it. However, that -- they are not receiving it anymore, not because the Government decided that it was just going to arbitrarily withdraw these services. It was predicated on a reasoned and thoughtful evaluation of not only the fiscal component of this but also the -- the other -- not only the fiscal means by which services is provided but whether it was required by the law and how it was best implemented; again, things that are left to the agency's discretion.

But really the overarching point that I want to get to is that there is no -- there is no right -- not only is there not a right to direct legal representation at the expense of the Government, the harms that Plaintiffs point to were otherwise redressable, there is no prohibition for pro bono counsel stepping in to serve these children. In fact, in light of the Court's temporary retraining order, someone who is operating potentially in a pro bono capacity would at worst do pro bono work and not be paid for it and at best be able to potentially seek to get payment after the fact citing the Court's order. So, to a certain extent these harms are created by Plaintiffs not stepping in when there is nothing prohibiting them from doing that.

**THE COURT:** Mr. Ross, can I make sure I'm following you? There is a couple of times there when you said "pro bono counsel." Normally pro bono counsel are attorneys who are

volunteering without being paid, and that's not the same as folks who are providing direct representation through a contract with the Government. Am I wrong?

I think throughout these proceedings, I think we have talked about pro bono. I understand you're -- usually when you invoke the phrase pro bono counsel to mean folks who are volunteering, not necessarily the attorneys who work for Plaintiffs; but I think you just conflated them. I just want to make sure if I'm misunderstanding or if you haven't maybe conflated them in your last point there.

**MR. ROSS:** Thank you for the opportunity to clarify. No. When I refer to "pro bono," it is consistent with the Court's construction of pro bono; but that was the principal point that the Government was making is that there is no right to Government funded direct legal representation.

The core rights that the TVPRA and the Foundational Rule extend are the know your rights presentations and the legal screening, which have continued. And so, to the extent that Ms. Tumlin says that no one is informing these unaccompanied children of their rights is simply not true. They are still receiving those services that are required under the law. But the second point being that there is no prohibition on the provision of pro bono services.

So, to the extent that children were in a position where Plaintiffs felt compelled consistent with their mission to

participate in the proceedings, nothing was preventing them from being able -- consistent with their mission to step in and to assist these children.

**THE COURT:** Mr. Ross, then, would you -- if I understand your point, you contend that providing service to one of the children that Ms. Tumlin gave examples of, your contention is that providing services to that additional client doesn't take away from the Plaintiff organization's resources; is that right?

**MR. ROSS:** Not exactly, Your Honor. In terms of taking away from their resources, the point that -- the overarching point is more of a general one. And that is, that attorneys who are duly licensed to practice law before the immigration courts may still continue to do so, whether in a pro bono capacity or not. It really comes down to a question of whether the Government is required under law to pay for those services.

**THE COURT:** I understand the point you are making. All right.

Let's talk for a moment about the scope of any injunction. So, Mr. Ross, you argue that any injunction should be limited to these Plaintiffs. I don't think I saw in your papers you take up vacatur under the APA. So, I'm trying to go -- I want to give you an opportunity to do that here and maybe talk with me about how vacatur could be limited to these Plaintiffs.

**MR. ROSS:** Your Honor, the -- I don't have an answer prepared for that question; however, the Government is happy to provide a supplemental response addressing that.

**THE COURT:** Let me ask you one other question. I guess I'm also trying to understand -- I'm engaging your suggestion that an injunction be limited to just these Plaintiffs. From what I have just learned from -- from Ms. Roberts, the -- well, I'm not sure that I have -- I'm trying to formulate another question on the fly and as you can see, it is harder than when I come with them all written out. I will see if I can formulate it better.

In essence what I'm trying to get to is what I got from Ms. Roberts is that the contract is ultimately with Acacia. So, presumably any injunction would have to be about the Government continuing to provide these services and I think at that point -- well --

(Pause in proceedings.)

**MR. ROSS:** Your Honor, if I may.

**THE COURT:** Yeah, and I realize that it may be me circling back to a question for the Plaintiffs, whether it is Ms. Tumlin or Ms. Hsieh or Ms. Scott. Go ahead, Mr. Ross.

**MR. ROSS:** The mechanism by which an injunction would have any meaning, just as it was with the temporary retraining order, it rests in contract. The Government would have to, as it has and as it work towards despite what is normally 120-day

timeline, what it has been able to accomplish in the span of less than three weeks -- it involves the creation of a contract modification; and it just further supports the proposition that Plaintiffs are in essence trying to force the Court -- make the order -- make the Court put an order on the Government to force it to contract with -- and entity, which in this case happens to be Acacia, to give substance to the relief that they seek. It is simply a power that the Court cannot force the Government to contract.

**THE COURT:** Folks, I have one additional question for both of you. Mr. Ross, since you have got the mic, I'm going to go ahead and ask you to answer it first.

If I find that Plaintiffs are likely to succeed on any one of their claims, is that sufficient to warrant a preliminary injunction?

**MR. ROSS:** No, Your Honor, it's not because not only is it a matter of the likelihood of success, but it is also a question of do the harms that they claim are they irreparable harms and that the harms that the Plaintiffs cite impact to laying off staff and impacts to their institutional impact don't warrant the type of extraordinary relief that's contemplated in the preliminary injunction context.

And, similarly, going back to my previous point in terms of equities and public interest, The court -- the Court is not in a position to order the Government to enter into a contract

specifically when it comes to the disbursement of discretionary funds; that the agency is in the best position to determine how best to give meaning to what -- the flexibility that Congress has extended it.

**THE COURT:** Same question to Plaintiffs. If I find that you-all are likely to succeed on any one of your claims is that enough for a PI? Maybe I shouldn't yet pass the mic to them, Mr. Ross, because I think what I meant to make inherent in my question is presuming that I find that the equities are in their favor, that there is irreparable harm, I guess I'm asking if ultimately they need to succeed on all three of their claims or is it enough for them for there to be a likelihood of success on any one of their claims.

**MR. ROSS:** Plaintiffs would need to succeed on all of their claims specifically because they are pointing to statutory and regulatory authority to support their APA claim, which is, as the Government has contended, is squarely within the Tucker Act and the Court of Federal Funds.

**THE COURT:** Thank you, Mr. Ross. Plaintiffs, same question to you.

**MS. TUMLIN:** Thank you, Your Honor. We do not need to succeed on all three of our merits arguments in order for complete relief to issue.

Any single one of those could give rise and should give rise to the relief that we have sought in our proposed order,

whether it is the arbitrary and capricious claim, the contrary to law claim or the *Accardi* claim.

**THE COURT:** Let me talk with you-all one more minute -- this will be my last question and then I will give you-all some space to argue about anything else you want to bring to my attention or that you think is worth highlighting -- because this is fresh or may be relevant because Ms. Tumlin just referenced the proposed order.

So, let me ask because unsurprisingly my -- part of my consideration when I look at proposed orders is to figure out whether or not it is actually enforceable, right, is this specific enough that should we need to have a conversation thereafter about whether or not it's being complied with, is it specific enough that we are not arguing about, you know, sort of broad terms therein.

So, let me ask Plaintiffs -- and then Mr. Ross if you would like to answer this, I will take it to you too -- I guess I'm curious if since the time you submitted your proposed order if there are edits you would make at this point to ensure that it is sufficiently specific and thorough so that it is clear when compliance is achieved.

**MS. TUMLIN:** Yes, Your Honor. You know, obviously this is something we have been giving a great amount of thought to in the 21 days since the TRO issued and, you know, listening to Your Honor's questioning of the two Government declarants at

the top of the hearing.

So, I would say that we are clearly at the point where in addition to the proposed order, I think that extremely regular reporting on compliance would be required from the Government. I -- it's really hard to wrap my mind around how it is the case that we have a sworn statement from a Government declarant on April 8th saying that their choice of how to comply with the TRO was at the final approval stage; but here we are, you know, almost 20 days -- whatever, two weeks after that -- and that still hasn't been completed.

So, in light of what has been both a pattern of clear noncompliance with the TRO and what can only look like an effort to run down the clock on the TRO with extremely active motion practice both before this Court and the Ninth Circuit, we would need regular reporting from the Government on the steps that have been taken until it becomes clear that some steps have been taken to comply with the TVPRA and Foundational Rule requirements.

**THE COURT:** Thank you, Ms. Tumlin. Mr. Ross, can I get your thoughts on that?

**MR. ROSS:** Yes, Your Honor. Respectfully, the Government takes issue with Plaintiffs' contention that we have been anything but diligent. As our declarant expressed, and as I just said a moment ago, this is an inherently complicated contracting provision where we are giving -- breathing life

back into a contract that has been terminated.

And although we can debate whether the -- whether it was a lawful termination, as Defendants contend or an unlawful termination as Plaintiffs allege, it really doesn't change the fact that this is a contract that was set to expire any way at the conclusion of March 2025.

And that contracting provisions of this size, complexity, magnitude and the volume of funds involved is a 120-day process as detailed by the declarations that the Government has filed in this action. We have been extremely diligent in making sure, number one, that due diligence is done but also to ensure that it is done correctly and as quickly as possible.

There were a number of ways that the Government could, as Plaintiffs -- as Plaintiffs noted at the beginning of the hearing -- that there was -- that they didn't challenge the way -- the Government's choice in how we chose to comply with the temporary restraining order. We picked the process that would yield the fastest result, and that's really the point that I want to drive home first.

And I think that the -- the evidence that's before this Court readily demonstrates that and that -- at no time despite the motions practice that went on in this court, nothing -- nothing detracted from the lawyers doing the work of the lawyers and the agency doing the work of the agency.

**MS. TUMLIN:** Your Honor, I just -- I have one more

point on what -- the specificity that might be required should the Court be inclined to issue a preliminary injunction motion after reviewing all of the evidence and the argument -- you know, well, actually two points.

First, to Mr. Ross' last point about choosing the fastest method, I want to just really be clear that what the Government is trying to do is hide behind a contract here. We are not here on a contract. We are here on the TVPRA. We are here on the Foundational Rule. And whatever steps the Government usually takes in issuing its contracts or its protocols or the 120 days they say that it usually takes, that's really neither here nor there, Your Honor, for what is required when the Court finds that we are likely to succeed on the merits of our claims and that irreparable harm is happening and the public interest tips in our favor. So, being faster than 120 days is not good enough. That's kind of point one.

And then, secondly, Your Honor, what we are asking for right now is a preliminary injunction as quickly as the Court is able to reach a decision on that. We are not asking or moving for contempt right now, and the Government would be able to appeal a preliminary injunction, of course, if you choose to issue one. I want to be very clear, however; that if the Government does not do what any preliminary injunction requires, we would expect then to return to this Court to seek orders of contempt directed against the responsible Government

actors including the declarants who appeared on Zoom today.

We have a very well documented pattern of noncompliance over the past 20 -- almost 22 days, and it's just not acceptable.

**MR. ROSS:** Your Honor, may the Government be heard?

**THE COURT:** Of course.

**MR. ROSS:** Thank you. Again, a tremendous amount of respect to Plaintiffs. However, the way that they are contending that the Government has -- that any grounds for sanctions or that any noncompliance has occurred fails -- falls flat on its face. It is simply not an issue where the Government is trying to hide behind a contract. There must be a mechanism by which Acacia receives payment that Plaintiffs are asking for this Court to resume, in fact, the TRO -- the relief contemplated by the TRO expressly related to the provision of services that were provided through contractual means to Acacia.

So, it is not a matter of hiding behind a contract -- to use Plaintiffs' terminology -- there needs to be a way to write the check. And, quite frankly, this was the best most -- the best and fastest way to give meaning to the Court's order. The Government has been diligent at every single step of this process.

(Pause in proceedings.)

**THE COURT:** I thank you both for taking me through

that. Folks, I am through my questions. Let me ask you-all, you can have a few more minutes on both sides if there are other things you want to highlight or bring to my attention that I haven't asked you-all about. It's Plaintiffs' motion, so you all are welcome to hit -- to do that first.

**MS. TUMLIN:** Sure. Sam, I think you wanted to handle one point first and then I can do the rest if that works.

**MS. HSIEH:** Yeah, of course. I'm happy to do that. So, the Government, Your Honor, is arguing that the only way for them to comply with this -- with your Court's TRO and a potential PI is through contracts. And so, that, therefore, they are somehow absolved from complying. That is not the case, Your Honor.

Here, the Court's TRO and a potential PI would give the Government discretion and allow it to resume funding in almost an unlimited number of ways. Here, for the TRO, the specific mechanism they chose was the contract with these Plaintiff organizations. So, once they choose that path, they have to follow through with it. This -- we are not asking for this Court to tell the Government exactly how to contract, whom to contract with, what terms. We are asking for the Government to comply with the mandates under the TVPRA and Foundational Rule. Whatever path they chose -- they choose, they have to follow through with it. I also did want to just briefly touch on the DOE decision.

This Court has already decided that the DOE decision is not a change in law and is inapplicable to this case. I just wanted to raise two additional points on top of the reasoning that this Court gave in its recent order denying the Government's motion to dissolve the TRO.

And so, in addition to the reasons that this Court gave, DOE is also entitled to less weight because of its specific procedural posture. There, the Supreme Court was ruling on the Government's emergency motion to stay the lower court's TRO. It was not a decision on the merits. The Supreme Court did not have the benefit of full briefing or an argument.

And this Court cited to the *Pacito* case in its TRO order and I want to note that more recently the *Pacito* court also found this; that DOE is not the same as a full decision on the merits. And so, it is inapplicable in determining whether to re-visit the -- a prior PI or to grant a PI here.

I also want to emphasize that the harms to the Government that the Supreme Court noted in DOE are not present here. Here, we have a specific statutory and regulatory mandate to continue this funding unlike in DOE. And this funding has been appropriated through 2027. The Government cannot show irreparable harm by being ordered to comply with the law.

And for reasons, Your Honor, that's why DOE -- in addition to the reasons that this Court gave earlier -- is not applicable to this case and does not prevent this Court from

ordering a PI.

**THE COURT:** Thank you, Ms. Hsieh. Ms. Tumlin, did I understand you have something further to add?

**MS. TUMLIN:** Yes, just a couple of quick things, Your Honor, on the discussions you had with Mr. Ross. First, on the arbitrary and capricious claim, you asked about whether it mattered that there was no administrative record; and, you know, Mr. Ross pointed you to the four corners of the cancellation order itself.

And so, what that means, of course, is that the only reason that has been given for the departure of the long-standing practice of providing -- of spending the Congressionally appropriated funds for direct representation of unaccompanied children is convenience. And that simply fails under all arbitrary and capricious precedent in terms of being a rationale decision of an agency that is defensible.

Secondly, Mr. Ross talked a fair amount about how in his mind or in the Government's mind, the obligations of the TVPRA and Foundational Rule are being met by the provision of group know your rights presentations or legal intakes.

So, I want to clear that up. So, I want to clear that up in kind of two specific ways. That is not what the TVPRA or the Foundational Rule mandates to be provided. And there is no better place than to always look than the text.

The TVPRA itself, the provision that we are saying is

contrary to law with the cancellation order is contrary to law, talks about "have counsel to represent them in legal proceedings or matters."

So, all unaccompanied children, which the text of the same sentence of the TVPRA having counsel to represent them in legal proceedings is absolutely not a group know your rights presentation at an ORR funded shelter. They are apples and oranges. It is not a legal intake that may happen after such a presentation.

And then separately, the text of the Foundational Rule that we are talking about for our *Accardi* claim is a specific section. It is 45 CFR 410.1309(a), number 4.

In that section the exact language -- and, again, this is a quote -- is that, quote, "ORR shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied kids -- children" -- sorry.

What Mr. Ross is talking about is an entirely separate section of the Foundational Rule that goes on to talk about the requirements for know your rights presentations. And if I was classier, I would still have that section before me; but I'm going to pull it up if I --

(Pause in proceedings.)

**MS. TUMLIN:** -- if I can. I will give it to you in a second and I will carry on; but it is, in fact, a separate provision. Let's see.

Okay. So, I wanted to clear that up. Also, you asked a question of Mr. Ross regarding the scope of relief. He didn't have a clear answer despite it being the Government's position that relief should be limited geographically or otherwise in some fashion.

And I just want to say that any supplemental briefing that the Court may order should not be a basis to, one, continue to have noncompliance with the Court's TRO or to delay a ruling on the preliminary injunction in light of the uncontested record evidence of the harms that are amassing every day.

Okay, thanks to my brilliant co-counsel, the separate section of the Foundational Rule that I wanted is Subsection (a)(2). So, it is all the same 45 CFR 410.1309(a)(2), that's about know your rights. That's a whole different thing. We are not here to talk about that.

And (a)(4) is what we are here to talk about and why the provision or the continued funding for know your rights doesn't do anything to alleviate the unlawful actions of the Government that are at issue in this case.

And then there has been a lot of discussion about, like, oh, well, we really just want the contract to get extended and it takes time and it is complicated. I just got to really end where we started, which is that is the U.S. Government's decision. If they choose that the way that they want to comply with this Court's order and the TVPRA and the Foundational Rule

is to reinstitute the same contract, that's on them.

They have -- they do, in fact, have discretion. What they don't have discretion is to spend zero dollars. They do not have discretion to spend zero dollars on the provision -- on legal representation for unaccompanied children who are going to immigration court and who are facing a skilled government attorney on the other side trying to deport them. That is not a choice that they have.

There's a lot of talk about pro bono counsel, and the Government may think that pro bono means free to them. It does not. It means free to the client. Congress has spoken. They have appropriated the funds. They have said that they want little kids represented to the greatest extent practicable, and that needs to happen.

I think that's it, Your Honor. I could spend so much time talking to you about what's in our declarations, about the harms that are happening every day; but I really -- I will just give one example and then I'm sure we want to let Mr. Ross also add anything he has.

The example that I want to give is there's no place for our clients to go to hand off the children that they are already representing. Again, there is a lot of talk in this situation that maybe there is some pro bono counsel somewhere. Nobody has shown us where it is. And so, every day the attorneys at these organizations face their ethical obligation

of "what am I going to do." And then it is a limited pot of discretionary funds that these Plaintiffs have to continue their representation, and there is no hand-off. There is no mythical pro bono Army that has materialized to take care of these kids, and the violations continue every day.

And so, to close, Your Honor, I want to share the words of the Director of Legal Services at IMMDEF, Marion Donavon-Kaloust, from her declaration. It's at docket 53-5. You know, she describes in paragraph 7 what the detained juvenile docket looked like on April 9th. That's seven days after the TRO took effect. The immigration judge expressed frustration that front of the court services had not been restored to kids in his courtroom that day because he heard about the Court's TRO. And Ms. Donovan-Kaloust notes that using -- running an organizational deficit, ImmDef chose to provide front of the court services that day in reliance of the TRO. And she said -- and I'm quoting here -- quote, "One of our attorneys advocated on behalf of a child whose case was and should be funded under the terminated program who is so developmentally delayed that he does not understand where he is. We will continue to represent him despite the uncertainty regarding whether funding will be restored because of our ethical responsibility to do so and because he is simply not competent to navigate the system alone. No child is. But to know that if funding is not restored, our organization would

have to turn away children such as this client who lack even basic competence to understand what a court is, is antithetical to our mission and the concept of due process."

That's the end of the quote. And, Your Honor, that's what's at stake every day. And that Defendants continue to violate this Court's order, that's why we are here and that's why we urge the Court to order a preliminary injunction promptly. Thank you so much.

**THE COURT:** Mr. Ross, I want to give you the mic. I do -- Ms. Tumlin's remarks piqued one more question for me. I don't -- again, this is actually a jump ball between you-all. I don't know if anyone is prepared for this, and I don't think it is something we discussed.

Can we talk for a moment about the use of the words "pro bono" in statute? Ms. Tumlin is drawing this distinction between lawyers who are free to the client versus those who are free to the Government. I'm curious if you-all have any inkling of whether the statute actually offers any guidance in that regard.

**MS. TUMLIN:** Sure. Your Honor, we think the statute does offer guidance with regard to what pro bono is supposed to mean and that is because -- and I will pull this up for you -- it is because we didn't get to the Foundational Rule without having a history that came before -- in fact, both the TVPRA text that we are talking about. There was a long history.

There was a three-year study by the very institute -- this is all outlined in our complaint as well as our papers -- where first the U.S. Government was, like, Hey, maybe we can do what we want to do, which is represent little kids in immigration proceedings if we really do a better job trying to get together a pro bono bar to serve them. And the conclusion was, Oh, no, pro bono services will never be sufficient. It won't be enough. Some direct representation is required. And that is what led to the TVPRA provision that we have.

And then in addition we have -- I would point the Court to what the former ORR officials say about pro bono services -- and they have our understanding as well; that pro bono representation will not be sufficient to meet the requirements of the Foundational Rule. So -- so, that is what I would point the Court to with that respect. And if you give me one second, I will, in fact -- so, where we are outlining the three-year pilot program on pro bono, that's in our complaint, paragraphs 50 to 53 for the Court's reference.

**THE COURT:** Thank you, Ms. Tumlin. Mr. Ross, you are welcome to pick it up there or start anywhere you would like.

**MR. ROSS:** Thank you, Your Honor. And, respectfully, to answer the last question that the Court posed, the -- it is defined what pro bono means, that is defined as at no expense to the Government. That's at 8 U.S.C. 1362 and elsewhere as well, but critically that's what pro bono counsel means legally

and that is at no expense to the Government.

It is also critical to circle back to a quote that my colleague, Ms. Tumlin, read earlier that -- unfortunately and probably inadvertently -- omitted not one but two references to agency discretion as part of the provision of direct legal services.

And so, turning back to Section (a)(4), as she directed the Court, the sentence begins: To the extent ORR determines that appropriations are available -- now, it may be easy to skip to the chase and just say, by virtue of Congress laying out this money, that it inherently is -- those funds are inherent available. That is still a determination that the agency is left to make and understand what those funds are spent -- what those funds can be directed towards.

But -- so, then not only is there one discretionary determination there. It goes on after the provision that -- where Ms. Tumlin left her quote off, Subject to ORR's discretion and available appropriations, period. That part matters. "Subject to ORR's discretion" matters when we are talking about the question of what is practicable. That means it is a discretionary standard that means -- that does not create an enforceable right to counsel, and it doesn't guarantee that legal services in every case. It is a clear acknowledgment that full coverage is not achievable.

Despite this, there are robust mechanisms in place that

are available to children in ORR's care and custody despite Ms. Tumlin's averments that know your rights presentations and legal screenings are insufficient, for whatever reason that she failed to acknowledge other than saying that know your rights presentations are in group settings, that inherently doesn't mean that they are not -- they don't serve a purpose -- an important purpose, and that's why they were included actually in the TV -- excuse me -- in the Foundational Rule specifically to ensure that there was -- that children had access to counsel at no expense to the Government except for those discrete areas in the agency's discretion.

Your Honor, the Government has talked at length today about why Plaintiffs have not met their burden to show that a preliminary injunction should issue because they are not able to demonstrate a likelihood of success on the merits. They are outside of the zone of interests, and they are challenging a decision that the -- they are challenging a legal determination that Congress has expressly given to the agency.

But even overlooking that threshold question, they still are not able to point to harms that are actually irreparable in scope. The lack of -- the financial strain and impact on their institutional mission does not rise to the level of irreparable harm.

Similarly, equities of public interest favor the Government where Congress is told the agency that it is best in

a position -- not Plaintiffs' complaint -- to lay out what pro bono services can and should look like but for what the agency to determine what those services should look like.

*Department of Education* is informative for a reason that the Court has not addressed yet, and that is that the district court's temporary restraining order in *Department of Education* is strikingly similar to the one that this Court entered. And although the Government acknowledges that that decision is cabined to the extent that there is not a full record before the Court, apples are apples; and the Court can very easily look to the four corners of the TRO in that case to see the striking resemblance between the TRO issued there and the TRO issued here.

With respect to the proposed order that Plaintiffs put forward, it must be specific. It must be enforceable. And that is outlined not only by ample case law from the Supreme Court on down, but it must give meaning to whatever the Court intends to require if the Court finds that a preliminary injunction is appropriate here. And for the reasons that I gave, Plaintiffs have not met their burden.

Alternatively, if the Court were to issue a preliminary injunction, we still think -- consistent with the *Department of Education* -- there needs to be a security interest in here in the form of a bond because the money that is expended from this funding should it go forward, will never -- the Government will

never see that funding again if ultimately Plaintiffs do not succeed on the merits of their claims, which they will not.

Finally -- and in acknowledging that the Court has already decided this point -- the Court should dissolve the temporary restraining order here and now for the reasons that we have been able to lay out more fully since this matter was originally briefed and in light of the current state of compliance that the Government has shown.

**THE COURT:** Thank you, Mr. Ross. Absent anyone having anything further to add, I'm going to take your motion under submission. I'm very cognizant of the TROs, its duration. And so, my hope and expectation is that you-all should have something one way or the other before then so that the -- if I end up granting a preliminary injunction, there shouldn't be a gap between that. That is my hope. It is not a promise.

**MS. TUMLIN:** Okay. We will be really brief, Your Honor. One thing from me and then I will pass it to Ms. Carson to just close. The only thing I want to add is, Mr. Ross just in the last exchange made a reference to a specific INA section, which is Section 1352, actually the 8 U.S.C. And I do want to distinguish that we are not here for that section. That is the INA section which is drafted -- we address this in our reply brief also -- it is drafted to cover all immigration removal proceedings. The bulk of immigration removal proceedings are for adults. Sometimes they are for

family units that have an adult head and a child, and then, of course, unaccompanied children get put in removal proceedings too. The vast majority of that deals with adults or with family units.

So, what Congress said there for each and every flavor of immigration removal proceedings is, of course, superceded by the TVPRA, which directs for the small subset of unaccompanied kids, the type of representation that Congress intended. That then, of course, got interpreted again in the Foundational Rule, and I would simply also point the Court to, one, the preamble of the TVPRA that makes this clear and explains what the reference to INA Section 1362 is about; and, secondly, the brief of the form ORR officials that says they understood the law exactly the same way that we are explaining it to you today.

**MS. SCOTT:** Your Honor, I will quickly address zone of interest and irreparable harm. Plaintiffs are legal service providers who built their missions around protecting the TVPRA rights of unaccompanied children. They are here to ensure that no child appear in court on their own and that they are protected from exploitation, mistreatment and trafficking. And that's exactly what Congress intended with enacting the TVPRA. So, Plaintiffs -- there is no doubt Plaintiffs are squarely within the zone of interest of the TVPRA.

And just quickly on irreparable harm, Your Honor, this

Court should reaffirm its prior finding that Plaintiffs have suffered irreparable harm. Since that order, children have gone to court on their own. The Young Center amicus brief at docket 51, page 16 describes how a 14-year-old was in tears before her hearing frightened at the prospect of representing herself. Five-year-old children were sitting before immigration judges expected to represent themselves. A child in Estrella Del Paso service area was deported without the provision of legal services. That's at docket 40-2, paragraphs 5 through 6.

And that's just the harm to the children. Obviously, this is also harm to Plaintiffs' mission because Plaintiffs' mission is to, again, ensure no unaccompanied child goes to court alone; and they are unable to provide these services as contemplated by the TVPRA and the ORR Foundational Rule because of Defendants' actions.

Defendants make a big point about how this is merely financial loss. This financial loss is the exact kind of loss the Ninth Circuit has repeatedly said establishes irreparable harm. Defendants have now since the TRO -- since this Court's order -- had to execute layoffs. ImmDef laid off 24 staff. That's at our supplemental declaration, paragraphs 3 and 4. The Vermont Asylum Assistance Project has terminated 25 percent. FIRRP has laid off 8 staff, docket 53-2, paragraph 3. And with these staff is the loss of institutional

knowledge but it also places Plaintiffs in an ethical -- in an impossible ethical dilemma. Plaintiffs can either continue to divert resources -- scarce resources their organizations have to cover their existing obligations to the children they currently represent and work themselves into bankruptcy. ImmDef declared that it estimates --

**THE COURT:** I'm going to ask you to try and wrap this up because we have hit this. We have talked about some of these harms already today. So, please take just another minute or two but we have got this -- I have got this.

**MS. SCOTT:** Great, thank you, Your Honor. So, just to conclude, absent relief from this Court, those harms to both Plaintiffs' clients and Plaintiffs will continue; and the consequence is Plaintiffs will essentially cease to exist and will then forego the protection of thousands of unaccompanied children within our borders as was contemplated by the TVPRA.

**MR. ROSS:** Your Honor, can the Government be heard on one last thing that's not been fully fleshed out that Plaintiffs raised previously?

**THE COURT:** Go ahead.

**MR. ROSS:** Thank you. 8 U.S.C. 1232 is expressly incorporated into the TVPRA. Therefore, it is a definition of pro bono counsel that is free to UACs and also at no expense to the Government is contained in there expressly. Thank you.

**THE COURT:** Thank you, Mr. Ross. All right, Counsel,

I thank you for your presentations today and for all of your papers. We have got them. We have been pouring through them. We will continue to pour through them, and you will get an order as soon as we are able. Thank you-all. Have a good evening.

**MR. ROSS:** Thank you, Your Honor.

**MS. TUMLIN:** Thank you, Your Honor.

**MS. SCOTT:** Thank you.

(Proceedings adjourned at 3:20 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: April 25, 2025

Marla Knox

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter