1
2
3
4                        UNITED STATES DISTRICT COURT
5                      NORTHERN DISTRICT OF CALIFORNIA
6
7    COMMUNITY LEGAL SERVICES IN             Case No.  25-cv-02847-AMO
     EAST PALO ALTO, et al.,
8                                            **ORDER GRANTING PLAINTIFFS'**
                  Plaintiffs,                **MOTION FOR PRELIMINARY**
9                                            **INJUNCTION**
           v.
10                                           Re: Dkt. No. 37
     UNITED STATES DEPARTMENT OF
11   HEALTH AND HUMAN SERVICES, et
     al.,
12
                  Defendants.
13

14         This matter comes before the Court on a Motion for Preliminary Injunction filed by

15   Plaintiff nonprofit organizations that provide legal representation to unaccompanied children in

16   immigration courts across the country.  Plaintiffs challenge the recent termination of funding for

17   counsel representing unaccompanied children by Defendants the United States Department of

18   Health and Human Services ("HHS"), HHS's Office of Refugee Resettlement ("ORR"), and the

19   United States Department of the Interior ("DOI") (collectively, "Government" or "Defendants").

20   Having considered Plaintiffs' motion, Defendants' response, the arguments of the Parties at the

21   April 23, 2025 hearing, and the relevant case law, the Court hereby **GRANTS** Plaintiffs' Motion

22   for Preliminary Injunction for the following reasons.

23   **I.     BACKGROUND**

24          **A.     Legal Framework**

25          Congress established a coordinated scheme to govern the legal representation of

26   unaccompanied children in immigration proceedings, a scheme primarily reflected in two statutes:

27   the Homeland Security Act of 2002 ("HSA") and the William Wilberforce Trafficking Victims

28

1    Protection Act of 2008 ("TVPRA").  Giving effect to the TVPRA, ORR promulgated the

2    Unaccompanied Children Program Foundational Rule.

3         As relevant to this case, the HSA defines an "unaccompanied alien child" (hereafter

4    "unaccompanied children") as "a child who – (A) has no lawful immigration status in the United

5    States; (B) has not attained 18 years of age; and (C) with respect to whom – (i) there is no parent

6    or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is

7    available to provide care and physical custody."  6 U.S.C. § 279(g)(2).  Further, the HSA assigns

8    ORR broad authority over the care and custody of unaccompanied children while they are in

9    federal custody.  This authority includes coordinating their care and placement, ensuring their best

10   interests in custodial decisions, and developing plans to "ensure that qualified and independent

11   legal counsel is timely appointed to represent the interests of each such child."  6 U.S.C.

12   § 279(b)(1)(A).  These responsibilities are carried out through cooperative agreements and

13   contracts with care providers under ORR policies and oversight.  *See* 6 U.S.C. § 279(b)(1); 31

14   U.S.C. § 6305.

15        Congress enacted the TVPRA to strengthen protections for unaccompanied children.

16   Consistent with the HSA, the TVPRA makes the HHS Secretary responsible for the care and

17   custody of unaccompanied children.  8 U.S.C. § 1232(b)(1).  It requires HHS to "ensure, to the

18   greatest extent practicable . . . , that all unaccompanied alien children . . . have counsel to represent

19   them in legal proceedings or matters and protect them from mistreatment, exploitation, and

20   trafficking."  8 U.S.C. § 1232(c)(5).

21        In April 2024, ORR promulgated the Unaccompanied Children Program Foundational

22   Rule ("Foundational Rule"), codified at 45 C.F.R. Part 410, to establish comprehensive

23   regulations governing programs for unaccompanied children.  The Foundational Rule, which

24   became effective July 1, 2024, provides that ORR "shall fund legal service providers to provide

25   direct immigration legal representation for certain unaccompanied children" only "to the extent

26   ORR determines that appropriations are available," and only if securing pro bono counsel is "not

27   practicable."  45 C.F.R. § 410.1309(a)(4).  Other subsections of the Foundational Rule impose

28   obligations – requiring, for example, ORR to ensure unaccompanied children receive mandatory

services such as a "presentation concerning the rights and responsibilities of undocumented children," "information regarding the availability of free legal assistance," and a "confidential legal consultation." 45 C.F.R. § 410.1309(a)(2)(i)-(v).

## B. Congressional Funding and ORR's Termination

Since 2012, Congress has consistently appropriated funds for the direct legal representation of unaccompanied children in immigration proceedings, including the most recent appropriation for over $5 billion to ensure "all children . . . have access to counsel in their immigration proceedings." Compl. ¶¶ 77-87. Congressional appropriations for direct legal representation of unaccompanied children remain available until September 2027, including funds appropriated as recently as March 15, 2025, one week before the Government's challenged actions. *See, e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, Div. A Tit. I Sec. 1101(8) (2025); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 665-666 (2024); S. Rep. 118-84, at 169. Despite funding being available, ORR decided on or about March 20, 2025, to partially terminate the contract funding direct legal representation services. Biswas Decl. (ECF 24-1) ¶¶ 12-13. This termination followed a directive memorandum signed by the Acting Assistant Secretary of the Administration for Children and Families dated February 3, 2025. *Id.* ¶¶ 13-14; *see also* Biswas Decl., Ex. 1 (ECF 24-2, the "Secretarial Directive"). The Secretarial Directive instructed agency personnel to pause all payments to contractors and vendors related to immigration and refugee resettlement "for payment integrity." *Id.* On March 21, 2025, DOI sent a letter to Acacia Center for Justice, the sole contractor for direct representation legal services, terminating the contract line items through which HHS and ORR provided funding for counsel for unaccompanied children in immigration proceedings. Compl. ¶ 11; Biswas Decl. ¶ 12, Ex. 2 (ECF 24-3, the "Cancellation Order"). The Cancellation Order instructed Acacia to "immediately stop all work" on the contract. *Id.* The Cancellation Order terminated funding for direct legal representation services "for the Government's convenience" and made no reference to the Secretarial Directive. *Id.* Acacia notified its direct representation subcontractors, including Plaintiffs, of the Cancellation Order the same day. *See, e.g.*, FIRRP Decl. (ECF 7-4) ¶ 32.

3

United States District Court
Northern District of California

**C.    Plaintiff Organizations**

Plaintiffs include the following organizations: Community Legal Services in East Palo Alto, Social Justice Collaborative, Amica Center for Immigrant Rights, Estrella del Paso, Florence Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project, Immigrant Defenders Law Center, National Immigrant Justice Center, Northwest Immigrant Rights Project, Rocky Mountain Immigrant Advocacy Network, and Vermont Asylum Assistance Project (collectively, "Plaintiffs").  Plaintiffs previously received funding for their work from ORR disbursed through Acacia Center for Justice.  Compl. ¶¶ 64-65; 88.  The organizations share the mission of ensuring persons in immigration proceedings, including the uniquely vulnerable population of unaccompanied children, have legal representation.  *See, e.g.*, FIRRP Supp. Decl. (ECF 37-5) ¶ 5 ("Since the Florence Project began serving children in 2000, a central tenet of our mission has been that no child should have to stand alone in court."); NWIRP Decl. (ECF 7-10) ¶¶ 1-2 (Northwest Immigrant Rights Project "provides legal services to unaccompanied immigrant children and youth" in accordance with its "mission to promote justice by defending and advancing the rights of immigrants through direct legal services, systemic advocacy, and community education."); KIND Decl. (ECF 7-18) ¶ 1 (describing KIND's "mission [to] ensur[e] that no child appears in immigration court without high-quality legal representation."); *see also* Compl. ¶ 102.

In response to the Cancellation Order, and the resulting funding termination, Plaintiffs state that they have been forced to choose between cutting vital organizational programs or dismissing their specialized and seasoned attorneys.  *See, e.g.*, GHIRP Supp. Decl. (ECF 53-2) ¶ 3 (describing the layoff of eight staff members due to the Cancellation Order's termination of funding).  Further, the Cancellation Order prevents Plaintiffs from providing thousands of unaccompanied children direct representation, impeding Plaintiffs from ensuring unaccompanied children are supported by legal counsel.  *See, e.g.*, Estrella del Paso Supp. Decl. (ECF 53-4) ¶¶ 3-4; ImmDef Supp. Decl. (ECF 53-5) ¶ 8.  The unaccompanied children to whom Plaintiffs would normally have provided representation are instead facing immigration court proceedings without counsel.  *See, e.g.*, GHIRP Supp. Decl. (ECF 53-2) ¶¶ 4-7. Consequently, "[t]his means that

1   children who want voluntary departure will have their return home unacceptably delayed, [and]

2   victims of trafficking will not be able to access the protections they deserve[.]"  ImmDef Decl.

3   (ECF 7-8) ¶ 25.

4       **D.    Procedural History**

5       Plaintiffs brought this lawsuit against the Government on the bases that the Cancellation

6   Order (1) violates the TVPRA, (2) conflicts with the Foundational Rule, and (3) constitutes an

7   "arbitrary and capricious" agency action, each of which gives rise to a claim for violation of the

8   Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).  Compl. ¶¶ 127-46.

9       On March 27, 2025, Plaintiffs filed a motion for temporary restraining order ("TRO") and

10   preliminary injunction.  ECF 7.  The Court issued an order setting a hearing, as well as a deadline

11   for the Government's written response to Plaintiffs' TRO motion.  ECF 17.  On March 31, 2025,

12   in accordance with the schedule set on March 27, the Government filed its opposition to Plaintiffs'

13   motion.  *See* ECF 24.  On April 1, 2025, the parties appeared for a hearing on Plaintiffs' motion.

14   ECF 30.

15      After taking the matter under submission, the Court granted Plaintiffs' motion, issued a

16   TRO, and set an expedited briefing schedule on Plaintiffs' request for a preliminary injunction.

17   ECF 33.  The TRO provided,

18          Defendants are **ENJOINED** from withdrawing the services or funds
            provided by the Office of Refugee Resettlement ("ORR") as of
19          March 20, 2025, under the Trafficking Victims Protection
            Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5),
20          and ORR's Foundational Rule, 45 C.F.R. § 410.1309(a)(4),
            particularly ORR's provision of funds for direct legal representation
21          services to unaccompanied children.  This injunction precludes
            cutting off access to congressionally appropriated funding for its
22          duration.

23   ECF 33 at 7.

24      After the TRO grant, several motions were filed.  Plaintiffs filed their motion for

25   preliminary injunction (ECF 37), as well as two motions to enforce the TRO (ECF 40, ECF 53).

26   The Government moved to dissolve the TRO (ECF 38) and for recusal of a district judge pursuant

27   to Title 28 U.S.C. § 455 (ECF 47).  Finding that consideration of the recusal motion constituted

28   good cause, the Court extended the TRO for an additional 14 days in accordance with Federal

United States District Court
Northern District of California

1    Rule of Civil Procedure 65(b)(2), set a briefing schedule on the recusal motion, and continued the

2    hearing on Plaintiffs' motion for preliminary injunction. *See* ECF 48. The Government sought to

3    appeal the TRO following its extension. ECF 56. The Government additionally moved to stay the

4    TRO pending that appeal. ECF 57.

5         Following complete briefing, this Court denied the Government's motion for recusal. ECF

6    69. A panel of the Ninth Circuit subsequently determined that the TRO was not appealable and

7    dismissed the Government's appeal, *see Cmty. Legal Servs. in East Palo Alto v. Dept. Health &*

8    *Hum. Servs.*, Case No. 25-2358, Order (9th Cir. Apr. 18, 2025), rendering the Government's

9    motion for a stay pending appeal (ECF 57) moot.[1] The Court denied the Government's motion to

10    dissolve the TRO by written order dated April 21, 2025. ECF 75. At the time of writing, the TRO

11    remains in effect.

## II.  DISCUSSION

13         Plaintiffs move for a preliminary injunction on much of the same reasoning underlying the

14    TRO. The Government opposes on several bases. The Court first addresses the Government's

15    arguments regarding threshold issues of standing and subject matter jurisdiction before turning to

16    the merits of Plaintiffs' motion.

### A.    Plaintiffs' Standing

18         The Court understands the Government to challenge Plaintiffs' standing under two

19    theories. First, the Government contends that Plaintiffs lack Article III standing to bring this

20    lawsuit because Plaintiffs' purported harms are not redressable by a favorable ruling from this

21    Court. Second, the Government contends that Plaintiffs fall outside the "zone of interests"

22    necessary to bring their APA claims. Though not squarely challenged by Government, the Court

23    first considers whether the Plaintiffs have adequately established organizational injury in fact in

24    support of Article III standing and then takes up each of the Government's standing arguments in

25    turn.

---

[1] The Government sought en banc review, which was denied. *Cmty. Legal Servs. in E. Palo Alto v. United States Dept. of Health and Human Servs.*, No. 25-2358, 2025 WL 1203167, at *1 (9th Cir. Apr. 25, 2025).

United States District Court
Northern District of California

United States District Court
Northern District of California

1.      **Article III**

Article III standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* at 338 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

a.      **Organizational Injury in Fact**

"Organizations can assert standing on behalf of their own members, or in their own right[.]" *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021) ("*EBSC III*") (citations omitted). "[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *Id.* at 663; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (setting forth organizational standing test of "frustration of mission" coupled with "diversion of resources"). Organizational plaintiffs may also "demonstrate organizational standing" by showing that a government policy "will cause them to lose a substantial amount of funding." *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 766-67 (9th Cir. 2018) ("*EBSC I*").

Here, Plaintiffs establish that the Government's conduct "has frustrated [their] mission and caused [them] to divert resources in response to that frustration of purpose." *EBSC III*, 993 F.3d at 663. The organizations share the mission of ensuring persons in immigration proceedings, including the uniquely vulnerable population of unaccompanied children, have legal representation. *See, e.g.*, FIRRP Supp. Decl. (ECF 37-5) ¶ 5 ("Since the Florence Project began serving children in 2000, a central tenet of our mission has been that no child should have to stand alone in court."); NWIRP Decl. (ECF 7-10) ¶¶ 1-2 (Northwest Immigrant Rights Project "provides legal services to unaccompanied immigrant children and youth" in accordance with its "mission to promote justice by defending and advancing the rights of immigrants through direct legal services, systemic advocacy, and community education."); KIND Decl. (ECF 7-18) ¶ 1 (describing KIND's

"mission [to] ensur[e] that no child appears in immigration court without high-quality legal representation."). Plaintiffs' missions and ethical duties drive them to continue legal representation of unaccompanied children in immigration proceedings. By cancelling all funding for direct legal representation of unaccompanied children, the Government "perceptibly impair[s]" Plaintiffs' ability to fulfill their shared organizational mission. *See EBSC III*, 993 F.3d at 663. Plaintiffs present significant evidence that unaccompanied children were not provided counsel following the Cancellation Order, leaving them unrepresented in immigration proceedings, subject to removal and/or unable to pursue desired relief. *See, e.g.*, KIND Decl. ¶¶ 13-19; Estrella Supp. Decl. (ECF 40-2) ¶¶ 4-9. Plaintiffs thus satisfy the "frustration of mission" requirement for organizational standing as set forth by this circuit.

In addition to demonstrating a frustration of mission, Plaintiffs must also establish that the Government's actions required them to divert resources that they would have spent in other ways. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F3d 936, 943 (9th Cir. 2011). Plaintiffs have needed to draw on funds intended for other organizational purposes to respond to the suddenly diminished funding resulting from the Government's Cancellation Order. *See, e.g.*, FIRRP Supp. Decl. (ECF 37-5) ¶ 3 ("Florence Project has continued to provide services to our clients, drawing on funding from other sources and fundraising to ensure that we are able to provide legal representation, pro bono placement and mentoring, additional legal services, court preparation, and friend of court services to unrepresented children in keeping with our mission for as long as we can responsibly financially manage to do so."); NIJC Supp. Decl. (ECF 37-11) ¶ 3 ("Since the ORR funding ceased, NIJC was forced to temporarily shift staff members to work on other NIJC projects."). Given the ways in which Plaintiffs have had to divert resources to adequately advocate for unaccompanied children, there can be little doubt that the Government's conduct has "impaired [Plaintiffs'] ability to provide [legal] services" to unaccompanied children, and "there can be no question that the organization[s] ha[ve] suffered injury in fact." *Havens*, 455 U.S. at 379; *see also EBSC III*, 993 F.3d at 663 (finding standing where new administrative rule

1  barring access to asylum procedures for certain migrants caused diversion of resources for

2  organizations formed to assist asylum seekers).[2]

3                    **b.    Redressability**

4          The Government asserts that Plaintiffs cannot satisfy Article III's requirements because

5  they cannot establish that a favorable ruling would redress their alleged injuries.  *See* Opp. at 12-

6  14.  Redressability, the third element of Article III standing, demands that it "be likely, as opposed

7  to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S.

8  at 561 (citation and internal quotation marks omitted).  Plaintiffs' burden to establish

9  redressability is "relatively modest."  *Bennett v. Spear*, 520 U.S. 154, 171 (1997); *Tucson v. City*

10 *of Seattle*, 91 F.4th 1318, 1325 (9th Cir. 2024).  "Plaintiffs need not demonstrate that there is a

11 guarantee that their injuries will be redressed by a favorable decision."  *Renee v. Duncan*, 686 F.3d

12 1002, 1013 (9th Cir. 2012) (internal citation and quotation omitted).  Rather, Plaintiffs need only

13 show that a favorable decision would result in a "change in a legal status," and that a "practical

14 consequence of that change would amount to a significant increase in the likelihood that the

15 plaintiff would obtain relief that directly redresses the injury suffered."  *Utah v. Evans*, 536 U.S.

16 452, 464 (2002).

17         The Government argues that Plaintiffs' purported harms are not redressable because the

18 agencies hold no obligation to continue to fund the Plaintiff organizations.  Opp. at 12-13.

19 However, this argument distorts Plaintiffs' claims as sounding in contract, an incorrect

20 characterization for reasons discussed in greater depth below.  *See* Section II.B.  Plaintiffs pursue

21 injunctive relief requiring the Government to ensure legal representation of unaccompanied

22 children in immigration proceedings.  Plaintiffs concede that the Government can accomplish this

23 by means other than by paying for their services and, if the Government takes steps to ensure

24 direct representation through others, the harm Plaintiffs suffer in the form of providing

25 ─────────────────

26 [2] Though standing is not challenged on this basis, Plaintiffs likely also have standing to challenge
   the Government's Cancellation Order because of the new and ongoing operational costs they
27 allege.  *City and Cnty. of San Francisco v. United States Citizenship and Immigration Servs.*, 944
   F.3d 773, 787-88 (9th Cir. 2019).  Plaintiffs have suffered near-immediate financial impacts, and
28 they have thus made a sufficient showing of concrete and imminent economic injury.  *See, e.g.*,
   Estrella del Paso Decl. ¶ 13 (describing staff furloughs in response to Cancellation Order).

United States District Court
Northern District of California

1    representation without payment or diverting resources would be alleviated.  *See* Reply (ECF 63) at

2    14.  The reinstatement of funding for direct representation to unaccompanied children increases

3    the likelihood that Plaintiffs will obtain relief, either through funding to continue their own

4    representations or an alternative plan providing legal representation to unaccompanied children

5    consistent with the TVPRA and the Foundational Rule.  *Id.*  The requested injunctive relief thus is

6    likely to ensure that the unaccompanied children have and maintain counsel, which will redress

7    the injury to Plaintiffs' missions, and this is sufficient to establish standing.

                        **2.      APA – Zone of Interests**

8

9        The Government avers that Plaintiffs fall outside the zone of interests to bring their APA

10   claims because the TVPRA was not enacted to protect service providers' finances or operational

11   goals.  *See* Opp at 7-6.  The Government contends that Plaintiffs fall outside the zone of interests

12   because the organizations are not in the class of unaccompanied minors intended for the TVPRA's

13   protections.  *Id.*  These arguments miss the mark.

14       "The breadth of the zone-of-interests test varies, depending on the provisions of law at

15   issue.  Under the APA, the test is not especially demanding.  The zone-of-interests analysis

16   forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the

17   purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that

18   plaintiff to sue."  *EBSC III*, 993 F.3d at 667 (citing *Lexmark Int'l, Inc., v. Static Control*

19   *Components, Inc.*, 572 U.S. 118, 129 (2014)) (internal quotation marks omitted).  "[B]ecause the

20   APA provides a cause of action only to those 'suffering legal wrong because of agency action . . .

21   within the meaning of a relevant statute,' the relevant zone of interest is that of the" TVPRA.  *See*

22   *id.* at 667.

23       Plaintiffs' interests in ensuring TVPRA protections for unaccompanied children, including

24   direct representation legal services, is consistent with the TVPRA's purpose of "[p]reventing the

25   trafficking of unaccompanied [noncitizen] children found in the United States by ensuring that

26   they are not repatriated into the hands of traffickers or abusive families, and are well cared for."

27   H.R. Rep. No. 110-430 at 35 (2007); *see EBSC III*, 993 F.3d at 668 (concluding that courts are

28   "not limited to considering the specific statute under which plaintiffs sued, but may consider any

United States District Court
Northern District of California

provision that helps [them] to understand Congress' overall purposes in enacting the statute.")
(internal quotation marks omitted); *see also EBSC I*, 932 F.3d at 768 (finding organizational
plaintiffs in the Immigration and Nationality Act's zone of interests because their "interest in
aiding immigrants seeking asylum is consistent with the INA's purpose to establish the statutory
procedure for granting asylum to refugees") (internal quotation marks and alterations omitted).
Under the TVPRA, the Government "shall ensure, to the greatest extent practicable[,] . . . that all
unaccompanied [noncitizen] children who are or have been in the custody of the Secretary of
[HHS] or the Secretary of Homeland Security . . . have counsel to represent them in legal
proceedings" and that, "[t]o the greatest extent practicable, the Secretary of [HHS] shall make
every effort to utilize the services of pro bono counsel[.]" 8 U.S.C. § 1232(c)(5). Indeed, ORR
contracted with Acacia Center, and Acacia in turn subcontracted with Plaintiffs to fill this role
contemplated by the TVPRA. Plaintiffs fit within the zone of interests because their interests are
congruent with the TVPRA's and Foundational Rule's beneficiaries, namely, unaccompanied
children. Indeed, Plaintiffs' missions align with Congress's purpose in enacting the TVPRA,
ensuring representation for unaccompanied children to prevent their trafficking and abuse. *EBSC
I*, 932 F.3d at 768 (finding organizational plaintiffs in zone of interests where "Congress took
steps to ensure that pro bono legal services of the type that the Organizations provide are available
to" those protected by the relevant statutes). Given the zone of interests test for APA claims is not
"especially demanding," *Lexmark*, 572 U.S. at 130, the Court is persuaded that Plaintiffs have
more than met their burden to show that their interests are "marginally related to" and "arguably
within" the scope of the relevant statutes. *See EBSC III*, 993 F.3d at 668.

**B.    Subject Matter Jurisdiction (Tucker Act)**

Having resolved the Government's challenges to Plaintiffs' standing, the Court turns to the
Government's argument that the Tucker Act requires Plaintiffs' claims be brought in the Federal
Court of Claims because they sound in contract, and thus this Court lacks subject matter
jurisdiction. *See* Opp. at 8-11. The Government is mistaken.

The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over suits
based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

However, "the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). "Generally speaking, the Tucker Act does not permit the [Court of Federal Claims] to grant equitable or declaratory relief." *N. Star Alaska v. United States*, 9 F.3d 1430, 1432 (9th Cir. 1993). "Due to this limited remedial authority, a contract-based action falls within the scope of the Tucker Act only if the plaintiff seeks *money damages* for the breach of a government contract." *United Aeronautical Corp. v. United States Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (emphasis in original). Nonetheless, the Supreme Court has long recognized that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages' " within the meaning of the APA's and Tucker Act's jurisdictional limitations. *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (holding that federal district courts, not the Court of Federal Claims, have jurisdiction to review federal agency action such as the denial of reimbursements owed for Medicaid expenditures).

The Ninth Circuit has held that the Tucker Act " 'impliedly forbid[s]' an APA action seeking injunctive and declaratory relief only if that action is a 'disguised' breach-of-contract claim." *United Aeronautical Corp.*, 80 F.4th at 1026 (citing *Megapulse*, 672 F.2d at 968). To assess whether an APA claim is an improperly disguised contract claim, the court adopted the same two-part test from the D.C. Circuit's *Megapulse* decision, requiring assessment of (1) "the source of the rights upon which the plaintiff bases its claims" and (2) "the type of relief sought (or appropriate)." *United Aeronautical Corp.*, 80 F.4th at 1026 (citing *Doe v. Tenet*, 329 F.3d 1135, 1141 (9th Cir. 2003)); *see also Megapulse*, 672 F.2d at 968. To assess the "source of rights" that form the basis of a plaintiff's claim, the Court must consider whether: (a) the plaintiff's asserted rights and the government's purported authority arise from statute or contract; (b) the plaintiff's rights "exist[ ] prior to and apart from rights created under the contract"; and (c) the plaintiff "seek[s] to enforce any duty imposed upon" the government "by the . . . relevant contracts to which" the government "is a party." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (internal quotations and citations omitted).

1    Here, the source of Plaintiffs' claims is the APA.  They aver that the Government's refusal

2    to fund direct representation for unaccompanied children violates the agencies' obligations under

3    the TVPRA and the Foundational Rule.  They advance that the Government's conduct gives rise

4    to a claim under the APA as contradictory to law, another claim under the APA as contravening

5    the agencies' regulations, and a third claim under the APA for arbitrary and capricious acts.

6    Plaintiffs assert no breach-of-contract claim for money damages.  Indeed, although the

7    Government repeatedly contends that Plaintiffs seek to enforce contractual rights, the contract

8    underlying the Cancellation Order was between DOI and Acacia Center – these legal services

9    providers were not parties to that contract and assert no rights related to that contract.[3]  Moreover,

10   as discussed above, Plaintiffs' asserted harms arise from the frustration of their mission and

11   diversion of resources to ensure unaccompanied children have legal representation.  Plaintiffs'

12   asserted rights do not rely on or arise from any contract, are not contract claims in disguise, and

13   thus do not implicate the Tucker Act under the first prong of the *Megapulse* test.

14       Turning to the second prong, the type of relief sought, Plaintiffs seek "declaratory and

15   injunctive relief" under the APA to prevent the Government from refusing to fund counsel for

16   unaccompanied children.  Their action does not seek money damages to compensate them for

17   losses; instead, they seek an injunction and vacatur of the purportedly unlawful Cancellation

18   Order.  That such relief may result in the payment of money does not transform their claim into

19   one for money damages.  *Cf. Bowen*, 487 U.S. at 893.  Plaintiffs could not obtain the injunctive

20   relief they seek in the Court of Federal Claims, which "has no power to grant equitable relief[.]"

21   *Richardson v. Morris*, 409 U.S. 464, 465 (1973).  Because Plaintiffs seek injunctive relief rather

22   than money damages, the claims do not implicate the Tucker Act under the second prong of the

23   *Megapulse* test.  Finally, Plaintiffs do not seek to enforce any duty imposed on the Government by

24   a contract.  The Government makes clear that the contract by which ORR funded direct

25

26   _____

27   [3] Even if Plaintiffs brought a claim for breach of the contract between DOI and Acacia Center under a theory of third-party liability, they likely would not be able to litigate in the Federal Court of Claims – given the absence of privity between the Government and subcontractors like

28   Plaintiffs, there is no express or implied contract that would implicate the Tucker Act.  *See United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550-51 (Fed. Cir. 1983).

United States District Court
Northern District of California

1   representation of unaccompanied children was coming to a close by its own terms, potentially

2   hampering any potential claim to enforce a duty under that contract.  *See* Biswas Decl. (ECF 24-1)

3   ¶ 11 (stating that the Government's contract with Acacia was set to expire March 29, 2025).

4   Plaintiffs' claims for injunctive relief do not seek enforcement of any contractual duty; rather, they

5   pursue enforcement of the TVPRA and the Foundational Rule.  *See* Compl. ¶¶ 127-46. Because all

6   of the *Crowley Government Services* factors indicate that Plaintiffs' claims do not sound in

7   contract, the Court rejects the Government's argument that it lacks jurisdiction over this case.

8          The Government resists this conclusion by attempting to analogize this case to the

9   Supreme Court's recent order staying a different district court's temporary restraining order in

10  *Department of Education v. California*, 604 U.S. ----, 145 S. Ct. 966 (2025).[4]  In *Department of*

11  *Education*, the state government plaintiffs brought an APA challenge to the Department of

12  Education's termination of contracts for the payment of certain educational grants to the respective

13  states.  *Id.*, 145 S. Ct. at 968.  The district court issued a TRO enjoining the Government from

14  terminating the grants and requiring "the Government to pay out past-due grant obligations and to

15  continue paying obligations as they accrue."  *Id.*  The Supreme Court granted the Government's

16  request for a stay of the TRO on the basis that the district court "lacked jurisdiction to order the

17  payment of money under the APA."  *Id.*  The Court further held, based in significant part on the

18  relief pursued by the state governments, that the Government would likely show the district court

19  lacked jurisdiction over the contractual claims calling for payment, as those claims are committed

20  to the Court of Federal Claims pursuant to the Tucker Act.  *Id.* (citing 28 U.S.C. § 1491(a)(1)).

21         In the course of this litigation, this Court has already found *Department of Education*

22  insufficient to warrant dissolution of the TRO.  ECF 75.  It adds that *Department of Education* is

23  distinguishable from Plaintiffs' APA claims related to the termination of funding for legal services

24  for unaccompanied children in immigration proceedings.  These Plaintiffs, in contrast to the state

25  governments in *Department of Education*, are subcontractors lacking privity with the Government,

26

27  ───────────────
    [4] The Government earlier moved to dissolve the TRO in reliance on the same order from the
    Supreme Court's emergency docket.  *See* ECF 38.  The Court denied the Government's motion to
28  dissolve the TRO.  ECF 75.  The Court's earlier reasoning regarding the inapplicability of
    *Department of Education* remains applicable.

United States District Court
Northern District of California

1    and they have no contractual rights to enforce.  Moreover, though the Government regularly

2    characterizes their claims as nothing more than a money grab, the legal service providers do not

3    seek payout – they seek to ensure representation for unaccompanied children in immigration

4    proceedings, regardless of which lawyers provide it.  *Department of Education* has no bearing here

5    given the lack of (1) contractual relationship or (2) contractual relief sought against the United

6    States by Plaintiffs, the two hallmarks of actions left to the jurisdiction of the Federal Court of

7    Claims.

8         For these reasons, Plaintiffs' claims have no business before the Federal Court of Claims

9    and this Court has jurisdiction to consider Plaintiffs' APA claims.

10        **C.     Preliminary Injunction**

11        Having rejected the Government's jurisdictional arguments, the Court next examines

12   whether Plaintiffs are entitled to the extraordinary relief they seek.  To obtain preliminary

13   injunctive relief, the moving party must show: (1) a likelihood of success on the merits, (2) a

14   likelihood of irreparable harm to the moving party in the absence of preliminary relief, (3) the

15   balance of equities tips in the favor of the moving party, and (4) an injunction is in the public

16   interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Where the government

17   is a party, courts merge the analysis of the final two *Winter* factors, the balance of equities and the

18   public interest.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing

19   *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Courts "explore the relative harms to applicant and

20   respondent, as well as the interests of the public at large."  *Barnes v. E-Sys., Inc. Grp. Hosp. Med.*

21   *& Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (internal quotation marks and citation omitted).

22   The *Winter* factors may be evaluated on a sliding scale, such that preliminary relief may be issued

23   when the moving party demonstrates "that serious questions going to the merits were raised and

24   the balance of hardships tips sharply in the plaintiff's favor."  *All. for the Wild Rockies v. Cottrell*,

25   632 F.3d 1127, 1134-35 (9th Cir. 2011) (citation omitted).

26        **1.     Likelihood of Success on the Merits**

27        The APA establishes a "basic presumption of judicial review [for] one 'suffering legal

28   wrong because of agency action.' "  *Dep't of Homeland Sec. v. Regents of the Univ. of California*,

15

591 U.S. 1, 16 (2020) (citation omitted). "The [APA] was adopted to provide, inter alia, that administrative policies affecting individual rights and obligations be promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished ad hoc determinations." *Morton v. Ruiz*, 415 U.S. 199, 232 (1974). To that end, "[t]he APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). It authorizes judicial review for those "suffering legal wrong" or "adversely affected" by a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. §§ 702, 704.[5]

The Government contends that Plaintiffs are unlikely to succeed on the merits of their APA claims because the provisions at issue leave discretion to the agencies that evades judicial review. The Court takes up this issue first, and after concluding the conduct at issue is not committed to Government discretion, it then considers the substance of Plaintiffs' three APA claims. Though Plaintiffs' need only show a likelihood of success on one claim to demonstrate likelihood of success in support of a preliminary injunction, the Court analyzes each of their claims.

### a.    Bar to Review

The Government argues that Title 5 U.S.C. § 701(a)(2) precludes judicial review of the Cancelation Order. Section 701(a)(2) provides an exception to the waiver of sovereign immunity found in Sections 702 and 706 of the APA. Under Section 701(a)(2), a court may not review an agency action if the "agency action is committed to agency discretion by law." However, the Section 701(a)(2) waiver is a narrow exception.

An agency action "is committed to agency discretion by law" only "where a statute is drawn in such broad terms that in a given case there is no law to apply, and the court would have no meaningful standard against which to judge the agency's exercise of discretion." *Webster v.*

---

[5] The parties do not appear to dispute that the Cancellation Order constitutes a final agency action for purposes of APA review. In the interest of thoroughness, the Court finds that the Cancellation Order is a final agency action as the Government has not indicated, much less evidenced, that it intends to take further steps in its decision-making process and, thus, the termination of funding leads to legal consequences. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

United States District Court
Northern District of California

1    *Doe*, 486 U.S. 592, 592 (1988); *see Jajati v. United States Customs & Border Prot.*, 102 F.4th

2    1011, 1014 (9th Cir. 2024) (holding that the Section 701(a)(2) exception applies when "there is

3    truly no law to apply").  The Supreme Court requires courts to "read the exception in § 701(a)(2)

4    quite narrowly" such that it should apply only in "rare circumstances."  *Weyerhaeuser Co. v. U.S.*

5    *Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).

6    Even when Congress intended to create a wide zone within which decisions are committed to an

7    agency's discretion, the agency still must meet "permissible statutory objectives."  *Lincoln*, 508

8    U.S. at 183.

9         In one of the few cases in which the Supreme Court applied the Section 701(a)(2)

10   exception, it held the exception applied in cases involving "agency decisions that courts have

11   traditionally regarded as unreviewable, such as the allocation of funds from a lump-sum

12   appropriation."  *Weyerhaeuser*, 586 U.S. at 23 (citing *Lincoln*, 508 U.S. at 191).  In *Lincoln*, the

13   Court found the Indian Health Service's particular use of funds from a "lump sum" grant was

14   committed to its discretion because "the very point of a lump-sum appropriation is to give an

15   agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in

16   what it sees as the most effective or desirable way."  *Lincoln*, 508 U.S. at 192.  That is, "a lump-

17   sum appropriation reflects a congressional recognition that an agency must be allowed flexibility

18   to shift funds within a particular appropriation account so that the agency can make necessary

19   adjustments for unforeseen developments and changing requirements."  *Id.* at 193 (internal citation

20   omitted).

21        The Government argues that the appropriation for direct legal representation of

22   unaccompanied children at issue here mirrors the lump sum appropriation over which the Indian

23   Health Service maintained discretion to allocate funds in *Lincoln*.  *See* Opp. at 11-12.  But unlike

24   the appropriation in *Lincoln*, the TVPRA mandates direct legal representation, and Congress has

25   expressly appropriated funds for services required under the TVPRA, including direct

26   representation.  *See, e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L.

27   119-4, Div. A Tit. I Sec. 1101(8) (2025); Further Consolidated Appropriations Act, 2024, Pub. L.

28   118-47, Div. D Tit. I, 138 Stat. 460, 664-65 (2024); S. Rep. 118-84, at 169.  The Government's

1  cancellation of all funding for direct representation is not the type of judgment regarding how to

2  spend appropriated funds that is presumptively committed to agency discretion.

3        Beyond the appropriations question, the Court has several meaningful standards against

4  which to judge the agencies' discretion. *Cf. Weyerhaeuser*, 586 U.S. at 23.  Indeed, the TVPRA

5  and the Foundational Rule provide "meaningful standards under which courts can review whether

6  [the Government] wielded its discretion in a permissible manner." *Jajati*, 102 F.4th at 1014.  Both

7  the TVPRA and Foundational Rule include language describing the Government's obligations to

8  fund direct representation. *See* 8 U.S.C. § 1232(c)(5) (HHS "shall ensure, to the greatest extent

9  practicable," that all unaccompanied children receive legal "counsel to represent them in legal

10  proceedings"); 45 C.F.R. § 410.1309(a)(4) (ORR "shall fund legal service providers . . . subject to

11  ORR's discretion and available appropriations").  Such statutory and regulatory language offers a

12  clear standard to assess the Government's actions; therefore, Section 701(a)(2) does not bar review

13  of the Government's actions in this case.

14              **b.    First Claim – Agency Action Not in Accordance with Law**

15        The APA requires reviewing courts to "hold unlawful and set aside agency action . . .

16  found to be . . . not in accordance with law"; "contrary to constitutional right [or] power"; or "in

17  excess of statutory jurisdiction [or] authority."  5 U.S.C. § 706(2)(A)-(C).  Plaintiffs argue that the

18  Government's termination of funding for direct legal representation violates the TVPRA.  *See*

19  Mot. (ECF 37) at 11.  The relevant subsection provides that the Government "shall ensure, to the

20  greatest extent practicable," that all unaccompanied children receive legal "counsel to represent

21  them in legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking."

22  8 U.S.C. § 1232(c)(5).[6]  By cancelling all funding for direct representation of unaccompanied

23

24  _____

   [6] The provision reads in full:

25        The Secretary of Health and Human Services shall ensure, to the
      greatest extent practicable and consistent with section 292 of the
26      Immigration and Nationality Act (8 U.S.C. 1362), that all
      unaccompanied alien children who are or have been in the custody
27      of the Secretary or the Secretary of Homeland Security, and who are
      not described in subsection (a)(2)(A), have counsel to represent
28      them in legal proceedings or matters and protect them from
      mistreatment, exploitation, and trafficking. To the greatest extent

United States District Court
Northern District of California

1    children and failing to ensure that the children receive counsel when funds remain available for

2    that purpose, Plaintiffs contend, the Government violates the express mandate of the TVPRA.

3            The Government asserts that the TVPRA "does not mandate government-funded legal

4    representation," Opp (ECF 55) at 9, arguing Section 235 of the TVPRA merely "encourages"

5    HHS to ensure unaccompanied children have counsel "to the greatest extent practicable," *id.* at 11.

6    The Court disagrees.  Section 235 creates an affirmative obligation on the Government, requiring

7    the agencies "shall ensure" unaccompanied children have legal counsel "to the greatest extent

8    practicable."  8 U.S.C. § 1232(c)(5).  There is no dispute that congressionally appropriated funds

9    for legal representation are available, making the provision of direct legal services "practicable,"

10    particularly in the absence of alternative methods to provide counsel.  *See* Further Consolidated

11    Appropriations Act, 2024, Pub. L.118-47, § 4, 130 Stat. 460, 461.  The Government here

12    terminated all funding for direct legal services through its Cancellation Order, *see* Biswas Decl.,

13    Ex. 2 (ECF 24-3), effectively eliminating direct representation for unaccompanied children.

14    Amica Supp. Decl. ¶ 8; VAAP Decl. (ECF 7-7) ¶¶ 20-21.  While the Government posits that " 'to

15    the greatest extent practicable' cannot reasonably be construed as a mandate for HHS to

16    unconditionally pay for direct immigration legal representation for all" unaccompanied children,

17    that is not what Plaintiffs seek nor what the TVPRA requires.  Opp. at 15.  The TVPRA's proviso

18    that HHS "shall ensure" counsel to represent unaccompanied children "to the greatest extent

19    practicable" requires something more than zero expenditure where appropriated funds are

20    available and the agencies fail to show any effort to ensure representation through alternative

21    means.  The Government violates the TVPRA by withholding funding for direct legal

22    representation entirely, with no supplemental plan to ensure unaccompanied children have legal

23    counsel "to the greatest extent practicable."  *Cf. Pacito v. Trump*, No. 2:25-CV-255-JNW, 2025

24    WL 655075, at *18 (W.D. Wash. Feb. 28, 2025) (finding that withholding congressionally

25

26    _____

27            practicable, the Secretary of Health and Human Services shall make
        every effort to utilize the services of pro bono counsel who agree to
        provide representation to such children without charge.

28    8 U.S.C. § 1232(c)(5).

United States District Court
Northern District of California

1    appropriated funding for private service providers likely violated the APA and supported the grant

2    of a preliminary injunction).  On this basis, Plaintiffs show likelihood of success on their first

3    APA claim.

### c.    Second Claim – *Accardi* Violation

5    Under the *Accardi* doctrine, "an administrative agency is required to adhere to its own

6    internal operating procedures."  *Church of Scientology of Cal. v. United States*, 920 F.2d 1481,

7    1487 (9th Cir. 1990) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268

8    (1954)).  In accordance with this principle, agencies must follow a regulation if they promulgate

9    one.  *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003).  To establish an

10   APA claim under the *Accardi* doctrine, Plaintiffs must show both that (1) the Government violated

11   its own regulations, and (2) Plaintiffs suffer substantial prejudice as a result of that violation.  *See*

12   *Al Otro Lado, Inc. v. Mayorkas*, 2024 WL 4370577, at *8-9 (S.D. Cal. Sept. 30, 2024).

13   Here, Plaintiffs aver that the Government violated the Foundational Rule, under which

14   "ORR shall fund legal service providers" "[t]o the extent ORR determines that appropriations are

15   available and insofar as it is not practicable for ORR to secure pro bono counsel."  45 C.F.R.

16   § 410.1309(a)(4).[7]  The Government argues that interpreting the Foundational Rule to require

17

18   ———————————————

     [7] The provision reads in full:

19

20           Direct immigration legal representation services for unaccompanied
             children currently or previously under ORR care. To the extent ORR

21           determines that appropriations are available, and insofar as it is not
             practicable for ORR to secure pro bono counsel, ORR shall fund

22           legal service providers to provide direct immigration legal
             representation for certain unaccompanied children, subject to ORR's
             discretion and available appropriations. Examples of direct

23           immigration legal representation include, but are not limited to:

24           (i) For unrepresented unaccompanied children who become enrolled
             in ORR Unaccompanied Refugee Minor (URM) programs, provided

25           they have not yet obtained immigration relief or reached 18 years of
             age at the time of retention of an attorney;

26           (ii) For unaccompanied children in ORR care who are in
             proceedings before EOIR, including unaccompanied children

27           seeking voluntary departure, and for whom other available
             assistance does not satisfy the legal needs of the individual child;

28           (iii) For unaccompanied children released to a sponsor residing in
             the defined service area of the same legal service provider who

continued funding of direct representation for unaccompanied children conflicts with Title 8

U.S.C. § 1362, which provides that the privilege of being represented by counsel in immigration

proceedings shall be "at no expense to the Government." *See* Opp. at 15. The Court finds no

conflict between these two provisions. Section 1362 simply clarifies that *Gideon v. Wainwright*,

372 U.S. 335 (1963), does not extend to immigration proceedings – meaning persons subject to

removal proceedings have a right to counsel, but that right does not require the Government to

provide such counsel. The Foundational Rule does not conflict with Section 1362 because it does

not create a substantive right to counsel at the expense of the Government. Instead, it creates an

obligation for ORR to seek out direct representation counsel for unaccompanied children,

including by securing pro bono counsel or utilizing appropriated funds when ORR is not able to

secure pro bono counsel. It is undisputed that appropriations for direct representation remain

available, and the Government has evidenced no effort to ensure pro bono counsel. Thus, the

Government cannot invoke this perceived statutory conflict as a basis for failing to comply with its

obligations under the Foundational Rule.

Changing tack, the Government next acknowledges the Foundational Rule obliges ORR to

"fund legal service providers to provide direct immigration legal representation for certain

unaccompanied children," but emphasizes the discretion ORR retains, as the obligation to fund

exists only "to the extent ORR determines that appropriations are available," and only if securing

pro bono counsel is impractical. 45 C.F.R. § 410.1309(a)(4). The Government contrasts this

provision to other subsections that leave ORR no discretion. For instance, the Foundational Rule

explicitly requires ORR to ensure unaccompanied children receive mandatory services such as a

"presentation concerning the rights and responsibilities of undocumented children," "information

regarding the availability of free legal assistance," and a "confidential legal consultation." 45

C.F.R. § 410.1309(a)(2)(i)-(v). According to the Government, this intentional distinction clarifies

---

provided the child legal services in ORR care, to promote continuity
of legal services; and

(iv) For other unaccompanied children, to the extent ORR
determines that appropriations are available.

45 C.F.R. § 410.1309(a)(4).

that direct funding for legal representation remains discretionary, conditional upon the availability of appropriations, and subject to agency determination.

Even so, the Government's argument does not address Plaintiffs' claim. The Government may be right that it retains some modicum of discretion related to how direct representation legal services are provided and to what degree the Government funds them; however, the Cancellation Order contravenes the Foundational Rule. The termination of all direct representation funding is incompatible with the Foundational Rule's requirement that the agency "shall fund" direct representation so long as funds remain available and pro bono legal services are not secured. The Government proffers no evidence that it found pro bono counsel or even sought out alternative representation for the unaccompanied children. Plaintiffs are prejudiced by the Government's failure to comply with the Foundational Rule because they are inhibited in their ability to fulfill their missions of ensuring representation for unaccompanied children. *See* Section II.A.1.a, above. The Government's Cancellation Order thus violates the Foundational Rule, and Plaintiffs have shown a likelihood of success on their APA claim under the *Accardi* doctrine.

### d.    Third Claim – Arbitrary and Capricious Agency Action

"[T]he touchstone of 'arbitrary and capricious' review under the APA is 'reasoned decisionmaking.' " *Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)). "[A]n agency's action can only survive arbitrary or capricious review where it has articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (citing *Altera Corp. & Subsidiaries*, 926 F.3d at 1080). "Although we may uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned, we may not infer an agency's reasoning from mere silence." *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (citations and quotation marks omitted). As the Supreme Court has elucidated, "[a]n agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. And of course the agency must show that there are good reasons for the new policy," even though it need not convince the court of the merits of its new policy. *FCC v.*

1    *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (internal citation omitted).  Also, where an

2    agency action rescinds a prior policy, the agency must show that it gave due consideration to

3    "serious reliance interests."  *Id.* at 515; *see also Dep't of Homeland Sec. v. Regents of the Univ. of*

4    *California*, 591 U.S. at 30 ("[W]hen an agency rescinds a prior policy its reasoned analysis must

5    consider the 'alternative[s]' that are 'within the ambit of the existing [policy].' ").

6         Here, only two documents are proffered to provide insight into the Government's change

7    in position – the February 3, 2025 Secretarial Directive and the March 21, 2025 Cancellation

8    Order.  *See* Biswas Decl., Ex. 1 (ECF 24-2) & Ex. 2 (ECF 24-3).[8]  Neither of the documents

9    contemplates any alternatives to the existing policy of funding legal services providers for direct

10   representation.  *Cf. Regents*, 591 U.S. at 30.  Neither of the documents finds any facts that would

11   support the decision to terminate all funding, nor do they draw a rational connection between any

12   facts considered and the decision made "for the Government's convenience."  Biswas Decl., Ex. 2

13   (ECF 24-3).  Rather, the Government identifies, for the first time in its opposition, a handful of

14   rationales for the decision to terminate funding for direct legal services, including "sustainability"

15   and "fiscal constraints."  The Government contends that "ORR's rationale, focusing on legal

16   orientation and screenings to ensure all UAC receive basic legal information, while trusting that

17   pro bono resources (supplemented by post-release services and child advocates in special cases)

18   will provide representation in meritorious cases, is a rational strategy to fulfill its statutory

19   obligations in a sustainable way."  Opp. at 17; *see also* Opp. at 17-18 (alternatively detailing the

20   rationale, without supporting citation, as "aligning with the TVPRA's pro bono preference,

21   addressing fiscal constraints, and rebalancing priorities to ensure core legal orientation and

22   screening services reach all" unaccompanied children).  None of these rationales are evidenced in

23   the record.  Neither of the agency documents in evidence refers to "legal orientation and

24

25   _____

     [8] The Government has so far refused to produce any administrative record to justify the funding
26   termination decision until it files its answer.  Amica Supp. Decl. (ECF 37-15) ¶ 13.  Moreover,
     though the Government argues that "the administrative record here reflects a reasoned decision,"
27   Opp. at 17, when pressed at the preliminary injunction hearing about the administrative record in
     this case, the Government conceded that its briefs should refer instead to "record evidence" in the
28   absence of an administrative record.  Hr'g Tr. (ECF 83) at 22-23.

United States District Court
Northern District of California

screenings" as a policy course to replace direct legal representation. Moreover, those legal services are separately required by the Foundational Rule. *See* 45 C.F.R. § 410.1309(a)(2) (enumerating a panoply of services an "unaccompanied child in ORR's legal custody child shall receive"). The Government's interpretation essentially reads the direct legal representation contemplated in (a)(4) out of the Foundational Rule. Further, neither of the agency documents in evidence refers to pro bono resources as a replacement for the direct legal representation available by use of congressionally earmarked funds.[9] "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Regents*, 591 U.S. at 20 (internal quotation marks and citation omitted). The Government's attempt to make up for its failure to provide meaningful explanation for the funding termination amounts to post hoc rationalization via attorney argument. This is insufficient to overcome the Government's failure to proffer any competent evidence of reasoned decision making. Though the Government characterizes this litigation as "a disagreement over policy," Opp. at 19, the agencies have failed to identify any reasoned policy with which Plaintiffs could disagree – there are no materials showing even the "minimal level of analysis" required under the APA. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016). On this record, the Court finds that Plaintiffs show a likelihood of success on their third APA claim for arbitrary and capricious agency action.

### 2. Irreparable Harm

Beyond establishing a likelihood of success of the merits, plaintiffs seeking a preliminary injunction must show that they are likely to suffer irreparable harm without preliminary relief. *Winter*, 555 U.S. at 20. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citation omitted). A "showing of a mere possibility of

---

[9] Because the exclusive use of pro bono attorneys to replace government-funded direct representation does not find any support in the record, the Court does not reach the parties' further dispute regarding the viability of relying exclusively on pro bono counsel to represent unaccompanied children. *See* Opp. at 19; Reply at 12; *see also* Amicus Br. Former HHS Officials (ECF 78) at 7-9 (describing impracticability of replacing funded direct representation with pro bono counsel).

1    irreparable harm is not sufficient under *Winter*." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 468

2    (9th Cir. 2010).

3           Here, Plaintiffs have shown that they are likely to suffer, if not already suffering,

4    irreparable harm in the absence of preliminary relief. The Government's termination of funding

5    has impacted Plaintiffs, forcing them to issue layoff notices and threatening to require them to

6    dismiss their specialized and seasoned attorneys. *See* GHIRP Decl. (ECF 53-2) ¶ 3 (describing the

7    layoff of eight staff members due to the Cancellation Order's termination of funding). As the

8    Court noted in its standing analysis, the Cancellation Order prevents Plaintiffs from providing

9    thousands of unaccompanied children with the direct representation required by the TVPRA and

10   the Foundational Rule, frustrating Plaintiffs' missions of ensuring unaccompanied children are

11   supported by legal counsel. *See, e.g.*, Estrella del Paso Supp. Decl. (ECF 53-4) ¶¶ 3-4; ImmDef

12   Supp. Decl. (ECF 53-5) ¶ 8. Given these harms, the Plaintiff organizations "have established a

13   likelihood of irreparable harm" based on their showing of serious "ongoing harms to their

14   organizational missions," including diversion of resources and the non-speculative loss of

15   substantial funding. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). The

16   Government's repetition of its arguments against standing fail to persuade. The irreparable harm

17   resulting from the Government's Cancellation Order weighs in favor of a preliminary injunction.

18                        **3.      Balance of Equities and Public Interest**

19          In deciding whether to grant an injunction, "courts must balance the competing claims of

20   injury and must consider the effect on each party of the granting or withholding of the requested

21   relief." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (quoting *Winter*,

22   555 U.S. at 24). Courts "explore the relative harms to applicant and respondent, as well as the

23   interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501

24   U.S. 1301, 1305 (1991) (internal quotation marks and citation omitted). Where the government is

25   a party, the balance of equities and public interest factors merge. *Drakes Bay Oyster Co.*, 747

26   F.3d at 1092 (citing *Nken*, 556 U.S. at 435).

27          When the Court issued the TRO, it concluded that these third and fourth *Winter* factors

28   supported enjoining the Cancellation Order. *See* ECF 33 at 5-6. The Court's reasoning remains

United States District Court
Northern District of California

intact.  The record reveals substantial, immediate, and ongoing harms to the Plaintiff organizations.  But further, as amici make clear, the risk of substantial harm to unaccompanied children as a result of not receiving counsel further weighs in favor of injunctive relief.  One group of amici, including civil rights legal organizations that represent detained immigrant children, details the important role that direct legal service providers play in recognizing and combatting the potential mistreatment of unaccompanied children in ORR custody.  *See* Amicus Br. of National Center for Youth Law et al. (ECF 79).  Another group of amici, former HHS officials, warns that unaccompanied children lacking counsel face greater risk of exploitation and human trafficking.  Amicus Br. of Former HHS Officials (ECF 78) at 5.  Such harms weigh in favor of injunctive relief.  The Government avers that it would suffer harm where executive branch authority is hindered, Opp. at 21-22, but the Government cites no authority that this is a factor properly considered.  *Id.* at 22.  Indeed, the Government's argument fails to address the equities of granting an injunction and instead merely reasserts its position that the Cancellation Order violates neither the TVPRA nor the Foundational Rule.  The public interest is not served by maintaining agency actions that conflict with federal law and federal agencies' own regulations.  *Valle del Sol*, 732 F.3d at 1029 (no legitimate government interest in violating federal law).  Because the Court has concluded that the Cancellation Order likely violates the APA, the balance of equities and the public interest both tip decisively in Plaintiffs' favor.

### 4.    Bond

The Government requests that the Court require Plaintiffs to post a bond as security for damages that may result from a wrongfully-granted injunction.  Opp. at 24.  In granting relief under Rule 65, "[t]he court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review."  *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985).  As result of the Cancellation Order, the Plaintiff organizations are unable to pay their staff and are laying some of them off.  *See e.g.*, MIRC Decl. (ECF 37-10) ¶ 4.  Based on this record, the Court finds that requiring a bond would stifle Plaintiffs' enforcement of their rights under the APA.  Because this litigation is brought by nonprofit organizations to protect

United States District Court
Northern District of California

1  the public interest and ensure compliance with federal law, the Court declines the Government's

2  request.

3              **5.        Scope of Relief**

4              The Government argues that any injunctive relief granted by the Court must be narrowly

5  tailored to address only the harm suffered by these Plaintiffs and may not extend nationwide.  *See*

6  Opp. at 25.  Under the APA, however, courts are required to "hold unlawful and set aside" agency

7  action found to be invalid such that the challenged agency action no longer applies to anyone, not

8  just the plaintiffs at bar.  5 U.S.C. § 706(2).  Indeed, appropriate relief for successful plaintiffs in

9  APA cases may necessarily reach nationwide.  *See, e.g.*, *Regents*, 591 U.S. at 9 (holding that the

10  rescission of a major federal program "must be vacated"); *see also Lujan*, 497 U.S. at 913

11  (Blackmun, J., dissenting) ("[I]f the plaintiff prevails, the result is that the rule is invalidated, not

12  simply that the court forbids its application to a particular individual.").

13              The Ninth Circuit has consistently recognized "the authority of district courts to enjoin

14  unlawful immigration policies on a universal basis."  *Regents of the Univ. of Cal. v. Dep't of*

15  *Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018) (citation omitted) ("A final principle is also

16  relevant: the need for uniformity in immigration policy."); *Hawaii v. Trump*, 878 F.3d 662, 701

17  (9th Cir. 2017), *rev'd on other grounds*, 585 U.S. 667 (2018) ("Because this case implicates

18  immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of

19  their rights."); *Washington v. Trump*, 847 F.3d 1151, 1166-67 (9th Cir. 2017) ("[A] fragmented

20  immigration policy would run afoul of the constitutional and statutory requirement for uniform

21  immigration law and policy." (citing *Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir.

22  2015)).  "Such relief is commonplace in APA cases, promotes uniformity in immigration

23  enforcement, and is necessary to provide the plaintiffs here with complete redress."  *Regents of the*

24  *Univ. of Cal. v. Dep't of Homeland Sec.*, 908 F.3d at 512.

25              In this case, there is no practical way to limit injunctive relief relating to immigration law

26  and policy by party or by geography.  Indeed, as discussed with the Government's declarants at

27  the preliminary injunction hearing, there exists only one contract for the provision of the subject

28  funding, and it applies to direct legal services nationwide.  *See* Hr'g Tr. at 8-9.  Moreover, the

1  Government fails to identify any way to limit injunctive relief only to these Plaintiffs.  Nor would

2  such fractured relief prove effective at addressing the scope of the Government's likely violation

3  of the APA.  The Government's Cancellation Order had nationwide effect; the relief necessary to

4  remedy the termination is for the Court to set aside that termination and require the Government to

5  comply with its statutory and regulatory obligations.  Therefore, the relief granted by the Court

6  must reach nationwide.

7  **III.     CONCLUSION**

8  　　　For the foregoing reasons, the Court **GRANTS** Plaintiffs' motion for preliminary

9  injunction.  The Court **ORDERS** as follows:

10  　　　　　Defendants are **ENJOINED** from withdrawing the services or funds
      provided by the Office of Refugee Resettlement ("ORR") as of
11  　　　　　March 20, 2025, under the Trafficking Victims Protection
      Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5),
12  　　　　　and ORR's Foundational Rule, 45 C.F.R. § 410.1309(a)(4),
      particularly ORR's provision of funds for direct legal representation
13  　　　　　services to unaccompanied children.  This injunction precludes
      cutting off access to congressionally appropriated funding for its
14  　　　　　duration.

15  This injunction takes effect **immediately**, replacing the Court's April 1, 2025 temporary

16  restraining order (ECF 33), and will remain in place until a final judgment on Plaintiffs' claims.

17  Defendants shall file a status report by no later than 2:00 p.m. PST, Friday, May 2, 2025, to report

18  on compliance with the injunction.  Additional status reports regarding compliance with the

19  injunction shall be filed no later than 2:00 p.m. PST, on May 9 and 23, 2025, and every 45 days

20  thereafter.  This Order shall apply to the maximum extent provided for by Federal Rule of Civil

21  Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706.  Non-compliance or delayed compliance may

22  result in a contempt finding and sanctions.

23  　　　　**IT IS SO ORDERED.**

24  Dated: April 29, 2025

25

26  _____

27  **ARACELI MARTÍNEZ-OLGUÍN**
    **United States District Judge**

28

United States District Court
Northern District of California