No. 25-2808

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

**COMMUNITY LEGAL SERVICES IN EAST PALO ALTO**, et al.
Plaintiffs-Appellees,

v.

**UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES**, et al.
Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of California
District Court Case No. 3:25-cv-02847

———————————

**EMERGENCY MOTION PURSUANT TO CIRCUIT RULE 27-3
FOR STAY PENDING APPEAL
RELIEF REQUESTED BY MAY 12, 2025**

———————————

YAAKOV M. ROTH
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

WILLIAM C. SILVIS
Assistant Director

JONATHAN K. ROSS
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-7662
Jonathan.K.Ross@usdoj.gov

CHRISTINA PARASCANDOLA
KATELYN MASETTA ALVAREZ
MICHAEL A. CELONE
Senior Litigation Counsel

ZACHARY A. CARDIN
Trial Attorney

Attorneys for Defendants-Appellants

## INTRODUCTION

Defendants move for an immediate stay of the district court's Preliminary Injunction, ECF 87.  On March 21, 2025, the Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR") partially terminated $150 million in contract funds  for direct legal representation services ("direct-representation") for unaccompanied alien children ("UAC") consistent with its express statutory authority to ensure to the greatest extent practicable that unaccompanied alien children have counsel to represent them in legal proceedings and matters "at no expense to the government." .  That contract-termination decision not only reflects a core area of executive power to manage which entities perform contracting functions, but also falls squarely within ORR's express discretion to fund direct-representation.

Yet the district court enjoined that decision and is compelling the government to keep sending millions of taxpayer dollars out the door, with uncertain prospects for ever recovering those funds later.  Notably, the district court denied the government's request to stay materially identical relief at the TRO stage and extended that relief through the PI, leaving the government no option but to seek stays concurrently to prevent ongoing harm.  The injunction blatantly contravenes Supreme Court precedent barring the district court from exercising jurisdiction at all, as ten Circuit Judges recently observed in dissent from denial of rehearing en

banc. *CLSEPA v. HHS*, No. 25-2358, 2025 WL 1203167, at *1 (9th Cir. Apr. 25, 2025) (Bumatay & VanDyke, JJ., dissenting from denial of reh'g en banc, joined by Callahan, Ikuta, Bennett, R. Nelson, Bade, Collins, Lee, and Bress, JJ.). As the Supreme Court just held in *Department of Education v. California*, 145 S.Ct. 966, 968 (Apr. 4, 2025) (per curiam), sovereign immunity bars judicial orders enforcing "a contractual obligation to pay money," and plaintiffs cannot (as here) try to dress up breach-of-contract claims as Administrative Procedure Act ("APA") claims to evade that bar. Such claims instead should be brought in the Court of Federal Claims under the Tucker Act. As the ten dissenting judges explained, *Department of Education* is "indistinguishable" from this case and presents "the same issues." *CLSEPA*, 2025 WL 1203167, at *1 (dissent). This Court need go no further: injunctions that brazenly defy Supreme Court precedent warrant immediate vacatur.

Even if the district court had jurisdiction, the court should have rejected Plaintiffs' claims given ORR's entirely discretionary powers to decide whether to fund direct-representation. The relevant statute—8 U.S.C. § 1232(c)(5) ("TVPRA") merely directs the agency to "ensure, to the greatest extent practicable" that UAC have counsel—"at no expense to the government"—leaving implementation to the agency's discretion. The relevant regulation—the Foundational Rule (codified at 45 C.F.R. § 410.1309(a)(4))—is even clearer on this score, providing that even when funds are available, funding for direct-representation is "subject to ORR's

discretion." Under the APA, decisions whether to fund such representation are thus classic matters committed to agency discretion, because there is no judicially manageable standard to second-guess the agency's discretionary judgment about whether and how to allocate resources. Again, that independent merits problem should have foreclosed relief.

A stay is all the more warranted because the PI inflicts irreparable harm on the government. Forcing HHS to expend taxpayer dollars under a partially terminated contract—funds the agency lawfully determined should not be expended—causes unrecoverable monetary loss and directly undermines the Executive's constitutional role in managing federal appropriations. Meanwhile, Plaintiffs assert no irreparable injury of their own. Their alleged harm is purely financial and rooted in the loss of government funding to a third-party contractor, but that is no justification for injunctive relief, especially in the absence of any statutory or regulatory entitlement to government-paid counsel.

Moreover, the PI raises serious questions about the impartiality of the proceedings below. The district judge previously held a leadership role at one of the named Plaintiff organizations and maintained a longstanding personal relationship with one of Plaintiffs' lead counsel—circumstances that call for particular caution when reviewing this injunction. The Court should act immediately to vacate this

clearly unlawful injunction and stop the district court's ongoing attempt to seize

discretionary Executive Branch functions in violation of Supreme Court precedent.

## BACKGROUND

Plaintiffs are legal services organizations that previously received federal

funding through a contract administered by the Acacia Center for Justice ("Acacia"),

the prime contractor for ORR's provision of various legal services to UAC.  After

ORR elected to exercise its lawful discretion to partially terminate its contract with

Acacia, Plaintiffs filed suit on March 26, 2025, challenging the agency's decision.

*See* ECF 1.

Plaintiffs moved for emergency relief, and on April 1, 2025, the district court

issued a TRO requiring ORR to continue funding direct-representation.  *See* ECF

33.  While the TRO was still in place, the Supreme Court decided *Department of*

*Education*, 145 S.Ct. at 968.  In *Department of Education*, the Supreme Court stayed

another court's TRO, and it held that claims seeking judicial orders to compel

government funding under a terminated contract are not cognizable under the APA.

Instead, those claims must proceed in the Court of Federal Claims under the Tucker

Act.  Below, the government moved to dissolve the TRO based on this precedent.

*See* ECF 38.  The government further moved in the district court for recusal based

on the presiding judge's prior leadership role at Plaintiff CLSEPA and personal ties

to its counsel.  The district court cited its need to resolve that motion as the only

"good cause" justifying extension of the TRO for another fourteen days.  Soon after, the court denied the recusal motion, yet left the TRO in place.  *See* ECF 69.

On April 29, 2025, the district court granted Plaintiffs' motion for a PI, ordering ORR to continue funding direct-representation.  *See* ECF 87.  The PI—like the TRO before it—requires HHS to continue funding notwithstanding the agency's exercise of discretion to terminate the Acacia contract and redirect funds within the UAC Program.

Congress vested ORR with discretion whether to fund direct-representation.  *See* 45 C.F.R. § 410.1309(a)(4) (authorizing ORR to provide such representation "to the greatest extent practicable").  Nothing in the TVPRA or its implementing regulations mandates government-funded counsel in all circumstances.  The district court's injunction compels the government to expend funds on a program Congress made discretionary, not mandatory.  In fact, the PI does not meaningfully address the TVPRA's express incorporation of § 1362 (describing the "privilege" of direct-representation "at no expense to the government").  And those expenditures will very likely be unrecoverable when the government prevails at the conclusion of the litigation, as the court refused to require the plaintiffs to post any security under Rule 65(c).  *See* ECF 87 at 27.

The government appealed the PI on April 30, 2025.  *See* ECF 88.  This motion seeks an immediate stay of the district court's order, to prevent irreparable harm to

the government and ensure that discretionary appropriations decisions remain in the hands of the Executive Branch while this case is resolved.

## ARGUMENT

The government satisfies all four factors for an immediate stay of the PI: (1) a strong likelihood of success on the merits; (2) irreparable harm absent a stay; (3) no substantial harm to Plaintiffs if a stay is granted; and (4) that the public interest favors a stay. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Nken v. Holder*, 556 U.S. 418, 434 (2009). The government previously sought a stay of the TRO in the district court, which that court denied before entering a PI extending that injunction. This Court's intervention is therefore essential to avoid irreparable harm while the government concurrently pursues all available avenues for relief.

The district court's PI orders the government to disburse funds under a government contract, despite binding Supreme Court precedent confirming that such claims cannot proceed under the APA. Even if jurisdiction existed, Plaintiffs' claims are not reviewable because the statutory and regulatory scheme makes clear that the agency is vested with discretion over funding for the relevant program.

The injunction imposes immediate and irreparable harm on the government by compelling unrecoverable expenditures of public funds. And yet Plaintiffs—subcontractors asserting no independent entitlement to funding—face only classic, remediable monetary harm. Compounding the legal errors in the order, the district

court's prior dealings with Plaintiff CLSEPA and ties to its current counsel cast substantial doubt on the appearance of impartiality and should have triggered recusal. The equities and public interest overwhelmingly support a stay.

## I.    Defendants Are Likely to Succeed on the Merits of Their Appeal

### A.    The District Court Lacks Jurisdiction: Plaintiffs' Claims Must Proceed Under the Tucker Act.

This lawsuit is, at its core, an attempt to compel the government to continue paying money under a contract. Plaintiffs are subcontractors that provide legal services under a federal contract administered by Acacia, a prime contractor with HHS. They sued after HHS partially terminated the contract, claiming entitlement to continued payment. They styled their claims as APA violations and sought injunctive relief. But rebranding a contract dispute as an APA claim cannot sidestep Congress's jurisdictional limits. And subcontractors, like Plaintiffs, cannot use their one-step-removed status to work around those limits. Rather, under the statutory scheme that Congress designed, subcontractors have *fewer* rights than prime contractors.

It is well established that "absent a clear and unequivocal waiver of sovereign immunity," the "United States and its agencies are generally immune from suit in federal court." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Although the APA provides a limited waiver of the government's sovereign immunity for suits challenging final agency action and "seeking relief other than

money damages," it does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).

One example of such an implicit limitation on APA relief involves suits against the United States that sound in contract. The Tucker Act provides that the "Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). Federal courts have thus long recognized that "the Tucker Act 'impliedly forbids'" bringing "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004); *see United Aeronautical Corp. v. USAF*, 80 F.4th 1017, 1022 (9th Cir. 2023); *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982). That barrier is mandatory. It ensures contract claims are channeled into the court with "unique expertise," *Ingersoll-Rand Co. v. U.S.*, 780 F.2d 74, 78 (D.C. Cir. 1985), and which Congress has generally not empowered to grant injunctive relief like specific performance, *see James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998).

For that reason, the Supreme Court emphasized just last month that the APA's waiver of sovereign immunity is "limited" and "does not extend to orders 'to enforce a contractual obligation to pay money.'" *Department of Education*, 145 S.Ct. at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)); *see U.S. Conf. of Cath. Bishops v. DOS*, No. 1:25-cv-00465, 2025 WL 763738, at *2 (D.D.C. Mar. 11, 2025). Further, a plaintiff cannot evade the Tucker Act by artful pleading—the key question is the "source of rights" on which the claim is based. *Megapulse*, 672 F.2d at 967–68. If the only source of a plaintiff's right to payment is a contract with the government, then the claim must be heard, if at all, in the Court of Federal Claims—not in a district court.

Here, Plaintiffs' asserted "rights" and injuries indisputably originate from a federal contract and nowhere else. ORR chose to fund Plaintiffs' legal services through a contract (with a prime contractor, Acacia, which provided sub-grants to Plaintiffs). No statute or regulation requires HHS to pay anyone (let alone Plaintiffs) to provide direct-representation. Absent that contractual arrangement, Plaintiffs would have no lawful claim to any federal funds. If Acacia had not contracted with HHS to fund the services that Plaintiffs provide, Plaintiffs would have no injury to complain of. The termination of the contract is therefore the sole cause of Plaintiffs' alleged injuries. In short, because "Plaintiffs' lawsuit still fundamentally seeks 'to enforce a contractual obligation to pay money,' it cannot be brought under the

APA—just as in *Department of Education*." *CLSEPA*, 2025 WL 1203167, at *1 (dissent). Rather, the Tucker Act requires that such a claim proceed before the Court of Federal Claims.

As the ten dissenting judges observed, the district court thus "acted without jurisdiction" in issuing an injunction under the APA. *Id.* The APA does not convert funding interruptions under a discretionary contract into judicially reviewable claims. As the dissenters explained, *Department of Education* confirms beyond doubt that the district court lacked authority to entertain this case. 145 S.Ct. 968. In that case—which closely parallels this one—a district court enjoined the federal government from terminating certain grant payments, effectively ordering the government to keep paying money under a funding agreement. *Id.* The Supreme Court intervened and stayed that injunction, holding that the APA cannot be used to compel government payments in the guise of injunctive relief. *Id.* The Court emphasized that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money,'" and that "the Tucker Act grants the Court of Federal Claims jurisdiction over" such suits. *Id.* (quoting *Knudson*, 534 U.S. at 212). Accordingly, the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* (citing *Sampson v. Murray*, 415 U.S. 61, 87 (1974)).

10

That analysis is directly on point here. As in *Department of Education*, Plaintiffs sued under the APA but seek what is, in substance, monetary relief—they asked the court to require the government to keep paying them federal funds. And the district court's PI requires HHS to continue providing "funds for direct legal representation services to [UAC]" through ORR's contractor, Acacia. ECF 87 at 28.

However, no semantic reframing can obscure that the district court has ordered the payment of money pursuant to a federal contract. Indeed, the *Department of Education* district court similarly framed its injunction as "restoration of the status quo" rather than an award of damages, *California v. Dep't of Educ.*, No. 25-cv-10548-MJJ, 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025), but the Court examined the fundamental nature of the relief awarded, rather than the way the district court framed that relief. It treated an injunction "enjoining the Government from terminating . . . grants" as equivalent to ordering payment, and thus held that such relief was barred by the APA. *Department of Education*, 145 S.Ct. at 968.

The district court's attempt to distinguish this case from *Department of Education* based on Plaintiffs' status as subcontractors rather than prime contractors has no bite. To be sure, it is "a hornbook rule that, under ordinary government prime contracts, subcontractors do not have standing to sue the government under the Tucker Act . . . in the event of an alleged government breach." *Erickson Air Crane Co. of Wash., Inc. v. U.S.*, 731 F.2d 810, 813 (Fed. Cir. 1984). That is because the

"government consents to be sued only by those with whom it has privity of contract, which it does not have with subcontractors." *Id.* So subcontractors may proceed against the government only "through and in right of the prime contractor's contract, and with the prime contractor's consent and cooperation." *Id.* But that does not mean that subcontractors can evade the Tucker Act—and its limitations on relief by subcontractors—by instead suing under the APA.

As explained above, the APA does not "confer[] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The Tucker Act is a "statute that grants consent to suit"—specifically, for claims that exceed $10,000 and that are based on federal contracts. And it "forbids the relief which is sought"—relief to a subcontractor separate from the prime contractor. *See Erickson*, 731 F.2d at 813. The APA therefore does not provide a workaround for entities Congress chose not to grant access to the Tucker Act's waiver of sovereign immunity to instead seek the same relief via the APA. *See Sharp v. Weinberger*, 798 F.2d 1521, 1523-24 (D.C. Cir. 1986) ("The waiver of sovereign immunity in the [APA] does not run to actions seeking . . . specific performance in contract cases, because . . . the Tucker Act and Little Tucker Act impliedly forbid such relief.") (citations omitted); *see also Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 263 (1999) (holding that the APA did not provide jurisdiction over subcontractor's claims seeking monetary relief). Under

12

black-letter law, Plaintiffs' status as subcontractors means that they have *fewer* legal rights than prime contractors to pursue remedies under the contracts—not more. The district court's contrary conclusion would turn Congress's careful, narrow waiver of sovereign immunity on its head.

Thus, if this lawsuit may proceed at all, it must go forward in the Court of Federal Claims by and through Acacia, not in the district court as an APA action without Acacia's involvement. Because the district court lacked subject-matter jurisdiction, its PI is void. Defendants are therefore highly likely to prevail on appeal on this threshold ground.

## B.  The Statute and Regulation Grant HHS Discretion Over Funding for Direct-Representation.

Even if the APA did provide the district court jurisdiction, Plaintiffs' claims would still fail. The relevant statute and regulation make clear that the agency is not required to fund Acacia or the Plaintiff subcontractors, because it is instead vested with discretion over these funding decisions. *See CLSEPA*, 2025 WL 1203167, at *1 (dissent) ("The government exercised [its] discretion [under the TVPRA and the Foundational Rule] in March 2025 to terminate funding" to Acacia.). HHS's termination decision is therefore unreviewable under the APA, because the challenged action is committed to agency discretion by law. 5 U.S.C. § 701(a)(2).

"[W]here a statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," the APA does not authorize judicial review. *Webster v. Doe*, 486 U.S. 592, 600 (1988). That is precisely the case here. Congress deliberately left the provision of government-funded counsel to UAC to the agency's discretion by using broad, precatory language and by funding the program through a lump-sum appropriation. There is "no law to apply" in this context, only the agency's policy judgments about how best to allocate finite child-welfare resources. Accordingly, the APA bars courts from second-guessing HHS's decision to reduce or reallocate funding for direct-representation.

First, addressing the statutory framework regarding access to counsel, the TVPRA provides,

> **The Secretary of Health and Human Services shall ensure, to the greatest extent practicable** and consistent with section 292 of the Immigration and Nationality Act (8 U.S.C. 1362), that all [UAC] who are or have been in the custody of the Secretary or the Secretary of Homeland Security, and who are not described in subsection (a)(2)(A), have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking. **To the greatest extent practicable, the Secretary of Health and Human Services shall make every effort to utilize the services of pro bono counsel who agree to provide representation to such children without charge.**

8 U.S.C. § 1232(c)(5) (emphasis added). By its plain terms, § 1232(c)(5) does not mandate that HHS provide or fund attorneys for UAC. In fact, by expressly

incorporating § 1362, the TVPRA is clear that direct-representation be "at no expense to the government." Rather, it entrusts the agency to make practicable efforts to ensure UAC have legal representation, with a clear preference for pro bono counsel. *See id.*

Several aspects of this language confirm the discretionary nature of the task. First, the qualifier "to the greatest extent practicable" signals that providing counsel for UAC is an aspirational goal, not an absolute command. Congress left HHS leeway to pursue the goal of legal representation using practicable steps, not through particular mechanisms set forth by Congress. Second, the statute explicitly ties HHS's efforts to what is "consistent with section 292 of the Immigration and Nationality Act (8 U.S.C. 1362)." That cross-referenced provision guarantees that UAC in removal proceedings may be represented by counsel, but only "at no expense to the Government." In other words, existing law affirmatively precludes any interpretation that would obligate the government to provide counsel at government expense in immigration court. By requiring consistency with § 1362, Congress made clear that HHS's duty to "ensure" counsel are available should not be construed as creating a right to government-funded attorneys. Third, the section concludes with Congress's express directive that HHS must exercise its discretion to prefer pro bono representation over government-funded representation.

Nothing in the statute or relevant appropriation compels HHS to expend a particular sum, to guarantee an attorney for each child, or to prioritize expenditures for counsel over other important agency responsibilities. The provision is instead framed as a general policy "to protect [children] from mistreatment, exploitation, and trafficking" through efforts to increase direct-representation—not as a concrete rule that a court may enforce in any given instance. § 1232(c)(5). In sum, Congress set an important objective, "maximize legal counsel for these children," but also clarified that this be "at no expense to the government" and left the means and extent of achieving that objective to HHS's discretionary judgment.

The regulations applying the statute confirm that understanding. The Foundational Rule provides,

> **To the extent ORR determines** that appropriations are available, and **insofar as it is not practicable for ORR to secure pro bono counsel**, ORR shall fund legal service providers to provide direct immigration legal representation for certain [UAC], **subject to ORR's discretion and available appropriations**. . . .

45 C.F.R. § 410.1309(a)(4) (emphasis added); *see also id.* at (a)(1) ("This paragraph (a) describes ORR's responsibilities in relation to legal services for [UAC], consistent with 8 U.S.C. 1232(c)(5)."). That dual condition—express agency discretion plus limited appropriations—places these decisions beyond judicial review.

The Foundational Rule makes clear that funding for direct-representation is entirely subject to agency discretion. ORR's funding obligation comes into play only "[t]o the extent *ORR* determines that appropriations are available," demonstrating that at the threshold, ORR must make a discretionary assessment regarding the availability of limited funds within its lump-sum appropriation. 45 C.F.R. § 410.1309(a)(4) (emphasis added). Courts are not well-positioned to review that determination, which is expressly conferred on the agency. And even if ORR determines that funds are available, and that it is not practicable to use *pro bono* counsel, as required by statute, any provision of direct-representation is "subject to ORR's discretion." It is difficult to imagine language that more clearly vests an agency with discretion over a particular decision. Far from creating a binding entitlement, the regulation conditions these benefits on the agency's discretionary assessment as to the best allocation of resources.

Taken together, the TVPRA and Foundational Rule confer on the agency broad discretion to administer the UAC Program. They articulate goals and authorize spending, but do not require any specific level of funding or service. This is the hallmark of a decision that is committed to agency discretion. That programmatic discretion is bolstered by ORR's lump-sum appropriation, which allows the agency to decide how to allocate its funds—including whether to allocate any resources for direct-representation. As the Supreme Court explained, "the very

17

point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). When Congress funds a program through a general appropriation, it generally "allow[s] [the] agency flexibility to shift funds" and set priorities within the program. *Id.* at 193. That is exactly the case here. Each year, Congress appropriates a single, flexible sum to ORR to cover competing needs—shelter/care, legal services, and more. Nothing in the appropriation or the authorizing statute earmarks a mandatory amount for direct-representation. It is left to ORR to determine how much of the pot to devote to legal services contracts, consistent with the "practicable" standard. 8 U.S.C. § 1232(c)(5); 45 C.F.R. § 410.1309(a)(4). Such budgetary decisions are quintessential examples of matters "committed to agency discretion by law." *Lincoln*, 508 U.S. at 192–93. Just as the agency in *Lincoln* had discretion to discontinue a discretionary health service program despite a general mandate to serve Indian health needs, ORR retains discretion to adjust or terminate funding for representation without any legal constraint. There simply is "no meaningful standard" in § 1232(c)(5) for a court to apply in reviewing ORR's allocation of funds.

The district court mistakenly concluded that these provisions cabin HHS's discretion, but its reasoning cannot withstand scrutiny. The district court asserted

18

that "the TVPRA mandates direct legal representation, and Congress has expressly appropriated funds for [those] services."  ECF 87 at 17.  But as explained, the TVPRA does not mandate direct-representation paid for by the government; nor does it mandate such representation in every case.  To the extent it has any mandatory effect, it orders only an effort—to "ensure to the greatest extent practicable"—not a particular outcome.  8 U.S.C. § 1232(c)(5).

As for the district court's appropriations analysis, it misconceived the nature of a lump-sum appropriation.  Here, Congress made funds available for "services required under the TVPRA, including direct representation."  ECF 87 at 17 (citing Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, Div. A Tit. I Sec. 1101(8) (2025); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 664-65 (2024); S. Rep. 118-84, at 169).  That is an *option*, not a *requirement*.  The district court's citation to a Senate Report implying that Congress expected ORR to use some funds for this purpose, ECF 87 at 3, 17, makes no difference.  Even if a subjective expectation in legislative history could somehow bind an agency—which of course, it cannot—ORR's decision to terminate its contract with Acacia does not indicate that ORR will not spend any funds on direct-representation.  All that is at issue here is the agency's partial curtailment of funds in light of programmatic developments or policy changes.  And no statute or appropriation requires the agency to continue spending at the same level

it has elected in the past. Rather, the statute, regulations, and appropriations all reinforce that this program is subject to ORR's discretion—discretion it lawfully exercised in terminating its contract with Acacia. *See Lincoln*, 508 U.S. at 193; *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985).

Ongoing legislative efforts underscore that conclusion. After HHS terminated the grant at issue here, Senators introduced a bill designed "to provide [UAC] with legal representation" in immigration proceedings. S. 1297, 119th Cong. § 301(a)(1) (2025), https://www.congress.gov/bill/119th-congress/senate-bill/1297/text. That Congress is actively debating new legislation to guarantee direct-representation confirms that existing law imposes no such obligation. This Court should reject Plaintiffs' request to impose an obligation that Congress has so far declined to enact.

## II.    Equitable Factors Favor a Stay

The injunction imposes two forms of irreparable harm on the government and public, whose interests merge here. *See Nken*, 556 U.S. at 435. First, the injunction works irreparable harm to the separation of powers. Whenever a court issues a universal injunction against the Executive Branch, the United States suffers irreparable harm. The President is "a representative of the people" and holds "the mandate of the people to exercise his executive power." *Myers v. U.S.*, 272 U.S. 52, 123 (1926). The government has a substantial interest in implementing the President's policies. Courts play an important role in adjudicating the lawfulness of

those policies in justiciable cases, but they irreparably injure our democratic system when they forbid the government from effectuating those policies against anyone anywhere in the Nation.  *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).  And those concerns are heightened when, as here, the injunction undermines the Executive Branch's constitutional and statutory authority over immigration.  Indeed, the court's intrusion into the agency's discretionary decision as to the proper allocation of funds across ORR's areas of responsibility for services required under the TVPRA constitutes an "unwarranted judicial interference in the conduct of foreign policy."  *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 116 (2013).

Setting aside the separation of powers and the government's sovereign interests, the PI also requires the government to indefinitely disburse taxpayer funds that may never be recovered.  Again, this case mirrors *Department of Education*, in which the Supreme Court stayed the district court's order based on irreparable harm to the government.  As in that case, "[n]o grantee 'promised to return withdrawn funds should its grant termination be reinstated,' and the District Court declined to impose bond." *Department of Education*, 2025 WL 1008354, at *1.  The government is therefore "unlikely to recover the grant funds once they are disbursed." *Id.*  Here too, the district court's injunction, issued without complying with Rule 65's bond

requirement, would require the government to pay out taxpayer funds with no prospect of recovering those funds if it ultimately prevails in the litigation.

Meanwhile, Plaintiffs are unlikely to suffer irreparable harm if the injunction is stayed pending appeal. Plaintiffs have not asserted that they will have to cease operations if funds are withheld for the duration of the PI. Nor have they established any other source of certain, immediate irreparable harm. Indeed, the only "risk" they identify—that they might lose staff or expertise if government funding doesn't continue—is entirely speculative and classically reparable. *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("economic injury alone does not support a finding of irreparable harm").

The equities weigh especially heavily in these circumstances. The court denied stay relief for the TRO and entered a PI continuing that injunction, leaving the government to concurrently exhaust its remedies in both courts. That unusual posture underscores why appellate intervention is warranted now.

Further, as explained above, injunctions against the government work substantial harm to the public interest when they forbid the government from effectuating the policies of democratically-elected leaders. On top of that, the order at issue was entered by a judge whose background suggests serious concerns about the appearance of impartiality. The district judge in this case worked as managing attorney at one Plaintiff, Community Legal Services of East Palo Alto, and has a

personal friendship with Plaintiff's counsel.  *See* ECF 47, 68.  Those close relationships with a party and its counsel risk undermining the appearance of impartiality.  *See* 28 U.S.C. § 455(a).  Equities and public interest favor a stay.

## CONCLUSION

The Court should stay the injunction pending appeal.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

WILLIAM C. SILVIS
Assistant Director

CHRISTINA PARASCANDOLA
KATELYN MASETTA ALVAREZ
MICHAEL A. CELONE
Senior Litigation Counsel

ZACHARY A. CARDIN
Trial Attorney

/s/ *Jonathan K. Ross*
JONATHAN K. ROSS
Senior Litigation Counsel
U.S. Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-7662
Jonathan.K.Ross@usdoj.gov

Attorneys for Defendants-Appellants

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 27, I certify that foregoing motion complies with the type-volume limitation because it contains 5,179 words. This motion also complies with the typeface and type style requirements because it is proportionately spaced and has a 14-point Times New Roman typeface.

Respectfully submitted,

/s/ *Jonathan K. Ross*
JONATHAN K. ROSS
Senior Litigation Counsel
U.S. Department of Justice

Attorney for Defendants-Appellants

**CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2025, counsel for Respondent electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system and that service will be accomplished via the CM/ECF system.

Respectfully submitted,

/s/ *Jonathan K. Ross*
JONATHAN K. ROSS
Senior Litigation Counsel
U.S. Department of Justice

Attorney for Defendants-Appellants

**ADDENDUM**

## ADDENDUM TABLE OF CONTENTS

Motion for Temporary Restraining Order
(March 27, 2025) (Dkt. 7)...................................................................................... 1

      Exhibits (March 27, 2025)............................................................................ 41

Opposition to Motion for Temporary Restraining Order
(March 31, 2025) (Dkt. 24)............................................................................... 228

      Exhibits (March 31, 2025)........................................................................... 258

Temporary Restraining Order
(April 1, 2025) (Dkt. 33)................................................................................... 269

Motion to Dissolve Temporary Restraining Order (April 4, 2025)
(Dkt. 38)........................................................................................................... 276

Motion to Recuse Judge
(April 9, 2025) (Dkt. 47)................................................................................... 310

Order Extending Temporary Restraining Order
(April 10, 2025) (Dkt. 48)................................................................................. 323

Plaintiffs' Motion for Preliminary Injunction
(April 4, 2025) (Dkt. 37)................................................................................... 325

Defendants' Opposition to Motion for Preliminary Injunction
(April 11, 2025) (Dkt. 55)................................................................................. 433

Defendants' Motion to Stay TRO Pending Appeal
(April 11, 2025) (Dkt. 57)................................................................................. 468

Defendants' CA9 Motion re TRO Stay Pending Appeal
(April 14, 2025) (Dkt. 62)................................................................................. 475

Defendants' Reply iso Dissolution of TRO
(April 14, 2025) (Dkt. 64)................................................................................. 823

Order Denying Motions to Dissolve and Stay TRO
(April 21, 2025) (Dkt. 75)................................................................................. 830

Transcript from PI Hearing
(April 23, 2025) (Dkt. 83)................................................................................. 836

CA9 Order Denying Rehearing En Banc
(April 25, 2025) (Dkt. 89)..................................................................................... 889

Order Granting Plaintiffs' Motion for Preliminary Injunction
(April 29, 2025) (Dkt. 87)..................................................................................... 899

Defendants' Notice of Appeal
(April 30, 2025) (Dkt. 88)..................................................................................... 927

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO,<br>1861 Bay Road<br>East Palo Alto, CA 94303, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br>200 Independence Avenue, S.W.<br>Washington, DC 20201, *et al.*,<br><br>    Defendants. | Case No. 3:25-cv-2847<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        TBD<br>Time:        TBD<br>Dept:        TBD<br>Judge:        TBD<br>Trial Date:  TBD<br>Date Action Filed:  March 27, 2025 |

## NOTICE OF MOTION AND MOTION FOR A TEMPORARY RESTRAINING ORDER

PLEASE TAKE NOTICE as soon as it may be heard in the United States District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, CA 94102 that Plaintiffs Community Legal Services in East Palo Alto, Social Justice Collaborative, Amica Center for Immigrant Rights, Estrella del Paso, Florence Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project, Immigrant Defenders Law Center, National Immigrant Justice Center, Northwest Immigrant Rights Project, Rocky Mountain Immigrant Advocacy Network, and Vermont Asylum Assistance Project, will, and hereby do, move this Court for a temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b) or, in the alternative, for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a).

As long as congressional appropriations are available, Defendants United States Department of Health and Human Services, Office of Refugee Resettlement, and Department of the Interior are required to provide funding to legal services providers to provide direct legal representation to unaccompanied immigrant children under 8 U.S.C. § 1232(c)(5) and 45 C.F.R. § 410.1309(a)(4). But on March 21, 2025, Defendants abruptly terminated this long-standing funding for direct legal representation for these unaccompanied children. Accordingly, Plaintiffs seek a temporary restraining order preventing Defendants from violating the Administrative Procedure Act ("APA") by illegally ceasing funding for direct legal representation services for unaccompanied immigrant children in violation of 8 U.S.C. § 1232(c)(5) and 45 C.F.R. § 410.1309(a)(4).

Plaintiffs request that this motion be heard on an expedited basis. The motion is based upon this notice of motion; the memorandum of points and authorities in support thereof that follows; the declarations of Jill Martin Diaz, Laura Nally, Martha Ruch, Melissa Mari Lopez,

2

Roxana Avila-Cimpeanu, Elizabeth Sanchez Kennedy, Marion Donovan-Kaloust, Lisa Koop, Vanessa Gutierrez, Ashley T. Harrington, Joel Frost-Tift, Ana Raquel Devereaux, Wendy Young, Gautam Jagannath, Miguel Angel Mexicano Furmanska, and Daniela Hernández Chong Cuy filed concurrently herewith; the proposed order filed concurrently herewith; the pleadings, records, and papers on file in this action; oral argument of counsel; and any other matters properly before the Court.

DATED: March 27, 2025                    Respectfully submitted,


By: /s/ Alvaro M. Huerta                    /s/ Samantha Hsieh


IMMIGRANT DEFENDERS LAW                AMICA CENTER FOR IMMIGRANT
CENTER                                  RIGHTS
Alvaro M. Huerta (CA Bar No. 274787)    Adina Appelbaum (D.C. Bar No. 1026331)*
Carson A. Scott (CA Bar No. 337102)     Samantha Hsieh (V.A. Bar No. 90800)*
Lya Ferreyra (CA Bar No. 340148)        Peter Alfredson (D.C. Bar No. 1780258)*
Immigrant Defenders Law Center          Evan Benz (N.C. Bar No. 49077)*
634 S. Spring St., 10th Floor           Amica Center for Immigrant Rights
Los Angeles, CA                         1025 Connecticut Ave., NW, Suite 701
(213) 634-0999                          Washington, D.C. 20036
ahuerta@immdef.org                      (202) 331-3320
cscott@immdef.org                       adina@amicacenter.org
lferreyra@immdef.org                    sam@amicacenter.org
                                        peter@amicacenter.org
                                        evan@amicacenter.org

/s/ Karen C. Tumlin                     *pro hac vice forthcoming
                                        Attorneys for Plaintiffs
JUSTICE ACTION
CENTER
Esther H. Sung (CA Bar No. 255962)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)*
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................1

BACKGROUND ............................................................................................................2

    A.  Thousands of Unaccompanied Children Rely on Legal Representation Every Year to Exercise Their Legal Rights............................................................2

    B.  Congress Has Directed HHS to Ensure Unaccompanied Children Have Legal Counsel ............................................................3

    C.  ORR's Own 2024 Regulations Require Funding for Legal Services for Unaccompanied Children Consistent with Available Appropriations.......................4

    D.  Defendants Terminate Funding for Direct Legal Representation for Unaccompanied Children. ............................................................6

STANDARD OF REVIEW ............................................................................................8

ARGUMENT ............................................................................................................8

    I.        PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ............................................8

    A.  The Cancellation Order Determines Plaintiffs' Legal Rights and Obligations and is Final Agency Action Reviewable Under the APA............................................9

    B.  Termination of the Legal Representation Programs Violates the TVPRA..............11

    C.  Terminating the Legal Representation Programs Violates the ORR Foundational Rule. ............................................................13

    II.        PLAINTIFFS SATISFY THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF ......16

    A.  Plaintiffs Face Irreparable Harm............................................................16

    B.  The Balance of Equities ............................................................19

    III.      A NATIONWIDE INJUNCTION IS APPROPRIATE............................................................21

    IV.      PLAINTIFFS SEEK EXPEDITIOUS RESOLUTION OF THEIR CLAIMS ..............................23

CONCLUSION ............................................................................................................24

PI Appeal and Stay Addendum 004

# TABLE OF AUTHORITIES
## Cases

*Abbott Lab'ies v. Gardner*,
  387 U.S. 136 (1967) ...........................................................................11

*United States ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954), *superseded by statute on other grounds* ................................13

*AIG Annuity Ins. Co. v. Law Offs. of Theodore Coates*, *P.C.*,
  2008 WL 4543422 (D. Colo. Oct. 10, 2008) .........................................................23

*Al Otro Lado, Inc. v. Mayorkas*,
  2024 WL 4370577 (S.D. Cal. Sept. 30, 2024) .........................................................14

*Alcaraz v. I.N.S.*,
  384 F.3d 1150 (9th Cir. 2004) .........................................................................13

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ...........................................................................8

*Ariz. Dream Act Coal. v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014) .........................................................................16

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................9, 10

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ...........................................................................11

*Bowen v. Mich. Acad. of Fam. Physicians*,
  476 U.S. 667 (1986) ...........................................................................11

*Bresgal v. Brock*,
  843 F.2d 1163 (9th Cir. 1987) .........................................................................21

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ...........................................................................21

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) .........................................................................16

*Carnation Co. v. Sec'y of Lab.*,
  641 F.2d 801 (9th Cir. 1981) .........................................................................14

*Chang v. United States*,
  327 F.3d 911 (9th Cir. 2003) .........................................................................11

*Darby v. Cisneros*,
  509 U.S. 137 (1993) ...........................................................................11

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) .........................................................................19

PI Appeal and Stay Addendum 005

*Doe #1 v. Trump*,
   957 F.3d 1050 (9th Cir. 2020) ................................................................................21

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 ..........................................................................................................21, 22

*E. Bay Sanctuary Covenant v. Trump*,
   932 F.3d 742 (9th Cir. 2018) ................................................................................16

*FDA. v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ..............................................................................................16

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ..............................................................................................9

*Freedom Commc'ns Inc. v. F.D.I.C.*,
   157 F.R.D. 485 (C.D. Cal. 1994) ..........................................................................23

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ..............................................................................................16

*HIAS, Inc. v. Trump*,
   985 F.3d 309 (4th Cir. 2021) ................................................................................22

*Immigrant Defenders Law Center v. U.S. Department of Homeland Security*,
   No. 2:21-cv-00395, Dkt. 304 (C.D. Cal. Mar. 14, 2025) ....................................9

*League of Women Voters of N.C. v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ................................................................................17

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ..................................................................................17, 19

*Morton v. Ruiz*,
   415 U.S. 199 (1974) ..............................................................................................13

*Nat'l Council of Nonprofits v. OMB*,
   2025 WL 368852 (D.D.C. Feb. 3, 2025) ..............................................................9, 10

*Nken v. Holder*,
   556 U.S. 418 (2009) ..............................................................................................8, 19

*Pacesetter, Inc. v. Aortech Intl. PLC*,
   2012 WL 12894007 (C.D. Cal. Nov. 1, 2012) ......................................................23

*Pacito v. Trump*,
   2025 WL 655075 (W.D. Wash. Feb. 28, 2025) ....................................................12

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) ..............................................................................19

PI Appeal and Stay Addendum 006

*State v. Azar,*
    385 F. Supp. 3d 960 (N.D. Cal. 2019), *vacated on other grounds and remanded sub nom. California ex rel. Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020) ...................................................................................................19

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.,*
    240 F.3d 832 (9th Cir. 2001) ......................................................................8

*Torres v. U.S. Dep't of Homeland Sec.,*
    411 F. Supp. 3d 1036 (C.D. Cal. 2019) ....................................................15

*Trump v. Int'l. Refugee Assistance Project,*
    582 U.S. 571 (2017) ...................................................................................21

*United States v. 1996 Freightliner Fld Tractor VIN1FUYDXYB-TP822291,*
    634 F.3d 1113 (9th Cir. 2011) ...................................................................13

*Valle del Sol Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ...................................................................16

*Washington v. Trump,*
    847 F.3d 1151 (9th Cir. 2017) ...................................................................22

*Winter v. Nat'l Res. Def. Council,*
    555 U.S. 7 (2008) ..................................................................................8, 19

*Zepeda v. I.N.S.,*
    753 F.2d 719 (9th Cir. 1983) .....................................................................19

**Statutes**

                                                                                                        9

5 U.S.C. § 701(a) .............................................................................................9

5 U.S.C. § 701(b)(2) ........................................................................................9

5 U.S.C. § 702 .................................................................................................9

5 U.S.C. § 704 .................................................................................................9

5 U.S.C. § 706(a)(2)(A) .................................................................................12

6 U.S.C. § 279(a)(2)(i)(A) ...............................................................................5

6 U.S.C. § 279(b)(1)(*I*) ...................................................................................5

6 U.S.C. § 279(b)(1)(A) ...................................................................................3

6 U.S.C. § 279(g)(2) ........................................................................................3

8 U.S.C. § 1101(a)(27)(j) .................................................................................3

8 U.S.C. § 1158(b)(3)(C) .................................................................................3

7

8 U.S.C. § 1232(a)(5)(D) ........................................................................................3

8 U.S.C. § 1232(c)(5)..................................................................................1  4, 11

28 U.S.C. § 1657(a) ...........................................................................................23, 24

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4,
    Div. A Tit. I § 1101(8) (2025) ..............................................................6, 15

Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138
    Stat. 460, 665-666 (2024) ..................................................................15

Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, § 4, 130 Stat.
    460, 461................................................................................................12

Pub. L. 118-47 138 Stat. 460, 664 (2024).......................................................5

## Other Authorities

170 Congressional Record H1501-01 ...............................................................13

DHHS: Administration for Children & Families, *Justification of Estimates for
    Appropriations Committees* (2024), https://shorturl.at/4VDSL; ............14

H. Rep. No. 985, 98th Cong., 2d Sess. (1984), reprinted in 1984 U.S.C.C.A.N.
    5708, U.S.C.C.A.N. 5782 ....................................................................23

https://1.next.westlaw.com/Document/Ib5f6578989d511d9ac45f46c5ea084a3/Vie
    w/FullText.html?transitionType=Default&contextData=(oc.Default)&docume
    ntSection=co_pp_sp_506_923............................................................11

Olga Byrne & Elise Miller, *The Flow of Unaccompanied Children Through the
    Immigration System* (March 2012), https://shorturl.at/KI3Jt ...................4

ORR, Unaccompanied Alien Children Bureau Fact Sheet (March 7, 2025),
    https://acf.gov/orr/fact-sheet/programs/uc/fact-sheet .............................2

S. Rep. 118-84 (2023) ................................................................................5, 13, 15

Senate Report No. 118-84 ................................................................................13

Senator Mazie K. Hirono, Letter to HHS and Interior on Legal Services for
    Children in Immigration System (March 3, 2025), https://shorturl.at/RcUr3 .........7

William A. Kandel, *et al.*, CRS Report R43628, *Unaccompanied Alien Children:
    Potential Factors Contributing to Recent Immigration* (2014) ..................2

## Rules

9th Cir. Rule 27–12.......................................................................................23

## Regulations

45 C.F.R. § 410.1309(a)(4).....................................................................1, 5, 15

45 C.F.R. § 410.1309(d) ........................................................................................5

89 Fed. Reg. 34384 .............................................................................................3,

89 Fed. Reg. 34386 .............................................................................................4

89 Fed. Reg. 34526 .............................................................................................5, 14

89 Fed. Reg. 34529 .............................................................................................3, 4, 14, 15, 20

PI Appeal and Stay Addendum 009

## INTRODUCTION

Each year, tens of thousands of unaccompanied immigrant children ("UCs") are referred to the Office of Refugee Resettlement ("ORR") when they are encountered in the United States without an available parent or legal guardian. Absent intervention from legal services providers, they are forced to navigate our country's complicated immigration processes alone. Plaintiffs are a group of legal services providers who provide congressionally mandated legal representation and services to UCs in a variety of immigration proceedings. Recognizing the importance of this representation, Congress has appropriated funding for them since 2012, and continuing through September 2027. Nonetheless, on March 21, 2025, Defendants abruptly cancelled direct legal representation for UCs under the contract effectuating Congress's mandate. Without these congressionally mandated funds, Plaintiffs face the impossible choice of continuing to represent their UC clients in violation of Defendants' order and without compensation, or abandoning their core functions.

Recognizing that children navigating complicated legal proceedings need counsel, in 2008, Congress directed the Secretary of Health and Human Services ("HHS") to "ensure, to the greatest extent practicable . . . , that all unaccompanied alien children . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5). In keeping with that mandate, Congress has funded direct legal representation for UCs since 2012. In 2024, acknowledging its responsibility to provide these congressionally mandated legal services, ORR issued its Unaccompanied Children Program Foundational Rule ("Foundational Rule") and bound itself to funding legal services providers, so long as congressional appropriations were available. 45 C.F.R. § 410.1309(a)(4).

On March 21, 2025, Defendants ordered an immediate stop to the representation work in clear violation of the Administrative Procedure Act ("APA"). Defendants have provided no

information as to how or if they will now comply with their statutory and regulatory obligations. Defendants have also provided no information to Plaintiffs about how they should deal with their ongoing commitments to represent UCs (including UCs with immigration court dates as soon as this week).  As a result, Plaintiffs must choose between several intolerable options:  continuing to represent their clients without compensation, drawing down precious or scarce discretionary or reserve funding, cutting other organizational services, laying off or terminating experienced staff, or seeking to withdraw from representation, thereby abandoning their child clients in the middle of legally complex immigration proceedings they likely cannot navigate alone.  Defendants' actions are contrary to congressional and regulatory mandate and are arbitrary and capricious because they violate their own regulatory obligations.  To prevent irreparable harm to Plaintiffs, to say nothing of irreparable harm to their UC clients, this Court should enjoin Defendants' attempt to terminate direct legal representation for UCs under the APA.

This Court should expedite consideration of this motion under 28 U.S.C. § 1657(a) and grant immediate provisional relief enjoining Defendants' illegal action, which is creating ongoing and irreparable harm to Plaintiffs and their clients.

## BACKGROUND

### A.  Thousands of Unaccompanied Children Rely on Legal Representation Every Year to Exercise Their Legal Rights

In the 2024 fiscal year alone, nearly 100,000 new children were identified by federal authorities as UCs and referred to ORR.  ORR, *Unaccompanied Alien Children Bureau Fact Sheet* (March 7, 2025), https://acf.gov/orr/fact-sheet/programs/uc/fact-sheet.  These children's journeys to the United States may differ, but all of them are now in the United States without their parents or guardians.  William A. Kandel, *et al.*, CRS Report R43628, *Unaccompanied Alien Children: Potential Factors Contributing to Recent Immigration*, at 3, 10 (2014).  Of the UCs who moved

through ORR custody in 2024, nearly a quarter were 12 years old or younger.  ORR, Fact Sheets and Data, *supra*.

Given their inherent vulnerabilities, UCs have special legal rights, *see, e.g.*, 8 U.S.C. § 1232(a)(5)(D), including the right to apply for asylum, withholding of removal, relief under the Convention Against Torture and voluntary departure.  Many UCs also have the right to apply for Special Immigrant Juvenile Status ("SIJS"), which offers a path to lawful permanent resident status but requires state court proceedings that require counsel.  *See* 8 U.S.C. § 1101(a)(27)(j).  UCs may also pursue asylum before U.S. Citizenship and Immigration Services in a non-adversarial process without being subject to the one-year filing deadline applicable to adults.  *See* 8 U.S.C. § 1158(b)(3)(C).  But these rights are meaningless unless children are educated about their rights and equipped with the tools to exercise them, including legal counsel.  89 Fed. Reg. 34384, 34529 (Apr. 30, 2024).  Unaccompanied children primarily learn about and exercise their rights through either full legal representation or limited-scope assistance from a lawyer—often, until March 21, 2025, an attorney funded by Defendants, and provided by Plaintiffs.

**B.  Congress Has Directed HHS to Ensure Unaccompanied Children Have Legal Counsel**

Congress has recognized that UCs are uniquely vulnerable to trafficking, abuse in government custody, and injustices in the immigration legal system.  Through the Homeland Security Act of 2002, Congress gave Defendants Department of Health and Human Services ("HHS") and ORR legal custody of UCs, with the mandate to care for the children.  *See* 6 U.S.C. § 279(g)(2).  Congress also commanded Defendants HHS and ORR to "develop[] a plan to be submitted to Congress on how to ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such [unaccompanied] child." 6 U.S.C. § 279(b)(1)(A). Acting on this congressional command, in 2005, ORR developed a three-year pilot program to meet the legal needs of UCs through provision of pro bono legal services.  At the end of the pilot

PI Appeal and Stay Addendum 012

program in 2008, a summary report detailed that volunteer attorneys alone were not sufficient to meet the representation needs of UCs.  *See* Olga Byrne & Elise Miller, *The Flow of Unaccompanied Children Through the Immigration System*, at 22–23 (March 2012), https://shorturl.at/KI3Jt.  The report concluded that paid attorneys would be required to cover a significant percentage of the representation that UCs needed, spurring Congress to impose additional representation-related requirements on ORR and HHS through the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044 ("TVPRA").

The TVPRA, which Congress passed in 2008 and has regularly reauthorized since then (most recently in 2023), mandates that HHS must provide counsel for UCs: "The Secretary of Health and Human Services *shall ensure*, to the greatest extent practicable . . . that all unaccompanied alien children who are or have been in the custody of the Secretary or the Secretary of Homeland Security . . . have counsel to represent them in legal proceedings or matters."  8 U.S.C. §1232(c)(5) (emphasis added).  Defendants have violated this mandate.

## C.  ORR's Own 2024 Regulations Require Funding for Legal Services for Unaccompanied Children Consistent with Available Appropriations.

ORR has recognized "that most unaccompanied children need legal services to resolve their immigration status and that representation appears to have a significant impact on both the court appearance rate and the outcome of cases for unaccompanied children."  Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384, 34529 (April 30, 2024).  On April 30, 2024, ORR issued the final "Foundational Rule," which codified in part HHS's 1997 *Flores* settlement.  *Id.*  Section 410.1309 of the final rule, titled "Legal Services," affirms ORR's position

---

[1] The *Flores* settlement, entered into by the federal government and four noncitizen children in 1997, sets forth requirements regarding the care of UCs while in ORR custody.  89 Fed. Reg. at 34386.

that "legal services providers who represent unaccompanied children undertake an important function" and explains ORR's goal of "100 percent legal representation of unaccompanied children." *Id.* at 34526.

The Foundational Rule requires that ORR must—if it has available appropriations—"fund legal service providers to provide direct immigration legal representation for certain unaccompanied children."[2] 45 C.F.R. § 410.1309(a)(4). To comply with the TVPRA and the Immigration and Nationality Act ("INA"), the rule recognizes ORR must "ensure that all unaccompanied children who are or have been in ORR care have access to counsel" and provides, that "[t]o the extent ORR determines that appropriations are available, and insofar as it is not practicable for ORR to secure pro bono counsel, ORR shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children, subject to ORR's discretion and available appropriations." 45 C.F.R. § 410.1309(a)(4), (d).

---

[2] Congress has also required ORR to compile and provide lists of legal services providers "qualified to provide guardian and attorney representation services" for UCs. 6 U.S.C. § 279(b)(1)(*I*). The Foundational Rule also binds ORR to working with qualified legal services providers to provide orientations and consultations for UCs. (a)(2)(i)(A).

PI Appeal and Stay Addendum 014

release services . . . including . . . access to legal services." *Id.* at 168.  Finally, the Senate Report expressed its understanding that the TVPRA requires ORR to fund counsel for UCs:  "The Committee also expects these funds will be used to provide access to counsel, consistent with the goals of the [TVPRA] of 2008 for all children to have access to counsel in their immigration proceedings." *Id.* at 169.  On March 15, 2025, Congress continued funding at the same levels for UC legal representation.  Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, tit. I, § 1101(8) (2025)).  From December 2023 until March 21, 2025, Defendants satisfied this obligation through contracting with Acacia Center for Justice, who contracted with organizations like Plaintiffs to provide direct legal representation for unaccompanied children.

## D.  Defendants Terminate Funding for Direct Legal Representation for Unaccompanied Children.

Despite Congress's consistent funding of legal representation for UCs as mandated by the TVPRA, Defendants' actions undermine congressional appropriations, the TVPRA's mandate, and ORR's Foundational Rule.  On March 21, 2025, Defendant DOI sent a letter titled "Notice of Partial Termination for the Government's Convenience" (the "Cancellation Order") to the Acacia Center for Justice, the prime contractor on this contract, who then notified Plaintiffs of the termination.  The letter announced that Defendants were terminating funding for direct legal representation for UCs—both in and out of ORR's custody—as of close of business that day, ignoring the requirement to fund these programs under the TVPRA and the Foundational Rule. The letter further commanded the Plaintiffs to "immediately stop work" on any of the active representations of UCs and to stop taking on new engagements.  NWIRP Decl. ¶ 10; VAAP Decl. ¶ 13.  Up until the March 21 letter, Defendants enabled legal services providers, including Plaintiffs, consistently to provide direct and ongoing representations to tens of thousands of UCs in proceedings, including removal and SIJS proceedings.  The letter provided no explanation for

the termination nor guidance on how to handle existing representations, including those with imminent court hearings. Defendants were silent as to whether providers could continue existing representations (unfunded), despite the stop-work direction, or must withdraw immediately and (if granted) be forced to leave their clients in the lurch. *See* NWIRP Decl. ¶¶ 9, 11; VAAP Decl. ¶¶ 12, 13, 21; Estrella Decl. ¶¶ 13, 16; RMIAN Decl. ¶ 19.

This is not the first time that Defendants have acted to halt the legal representation of unaccompanied children. About a month earlier, on February 18, 2025, Defendant Department of the Interior ("DOI") and Defendant HHS issued an "Immediate Stop Work Order," ordering legal services providers—including Plaintiffs—to indefinitely "cease all services" and "stop all work" for active legal services. NWIRP Decl. ¶ 9; VAAP Decl. ¶ 12; MIRC Decl. ¶ 21; Public Counsel Decl. ¶ 10; Estrella Decl. ¶ 10; RMIAN Decl. ¶ 11. Although Defendants rescinded the stop work order three days later, Defendants' drastic actions spurred 32 Senators to sign a letter expressing "strong opposition" to the stop work order and noting its violation of the TVPRA. NWIRP Decl. ¶ 9; VAAP Decl. ¶ 12; Estrella Decl. ¶ 10; RMIAN Decl. ¶ 11; *see* Senator Mazie K. Hirono, Letter to HHS and Interior on Legal Services for Children in Immigration System (March 3, 2025), https://shorturl.at/RcUr3.

Despite this strong opposition and TVPRA's mandate, Defendants terminated funding on March 21, 2025, and have further provided no information about whether or how they intend to replace these critical legal services for UCs. Terminating funding for these legal services has devastating and irreparable effects on Plaintiffs, which are all the more devastating for the harm they will do to UCs. Estrella Decl. ¶ 7. For example, VAAP previously furloughed two of its three direct legal service practitioners on staff after the February stop work order, leaving the remaining practitioner to bear two additional full caseloads at a time. VAAP Decl. ¶¶ 15, 19. Even

if Defendants reinstate funding for counsel for UCs at some unknown future time, the providers'
funded children's legal programs and the UCs that depend on their vital counsel will have already
been dealt a fatal blow via mass layoffs of staff for the nonprofits and private providers, *see, e.g.*,
VAAP Decl. ¶¶ 15, 19, and prolonged government custody or deportations for the children—
including children who could have raised valid claims to lawful immigration status.

## STANDARD OF REVIEW

Motions for temporary restraining orders are governed by the same standards as motions
for preliminary injunctions. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240
F.3d 832, 839 n.7 (9th Cir. 2001) (explaining the analysis for a TRO and preliminary injunction
are "substantially identical"). A temporary restraining order is warranted where the plaintiffs
establish: (1) their likelihood of success on the merits; (2) irreparable harm; (3) the balance of
equities tips in their favor; and (4) that an injunction is in the public interest. *All. for the Wild
Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter v. Nat'l Res. Def. Council*,
555 U.S. 7, 20 (2008)); *see also Stuhlbarg*, 240 F.3d at 839 n.7 (applying preliminary injunction
standard to a temporary restraining order). Where the government is the defendant, the last two
factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

Agency action cannot stand if it is contrary to law. Because Defendants' termination of
direct legal representation services is contrary to the TVPRA and ORR's own regulations,
Plaintiffs are likely to succeed on the merits.

8

A.  **The Cancellation Order Determines Plaintiffs' Legal Rights and Obligations and is Final Agency Action Reviewable Under the APA.**

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  Persons or organizations, like Plaintiffs here, who are "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, [are] entitled to judicial review thereof." 5 U.S.C. § 702.  "[A]gency action" includes not only agencies' affirmative acts, but also their omissions and failures to act. *Id.*; 5 U.S.C. § 551(13).

Under the APA, this Court may set aside and enjoin unlawful agency action, and compel agency action unlawfully withheld, if it is a (1) "final agency action," (2) "for which there is no other adequate remedy in a court," so long as (3) there are no "statutes [that] preclude judicial review" and "agency action is [not] committed to agency discretion by law." 5 U.S.C. §§ 701(a), 704.  Plaintiffs satisfy each of these criteria here, and APA relief is therefore proper.

*Final Agency Action*.  Under the APA, "agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); 5 U.S.C. § 701(b)(2).  An agency action is final where two conditions are satisfied: (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks and citations omitted).

Defendants' refusal to fund or otherwise provide direct legal representation for UCs is a final agency action.  *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025) (attempt to "pause" funding and disbursements constituted final agency action). *Immigrant Defenders Law Center v. U.S. Department of Homeland Security*, No. 2:21-

9

cv-00395, Dkt. 304 (C.D. Cal. Mar. 14, 2025), is instructive.  In that case, plaintiffs alleged that the Department of Homeland Security unlawfully denied the rights guaranteed by the TVPRA from unaccompanied children who had previously been processed under the Department of Homeland Security's Migrant Protection Protocols Policy ("MPP"), despite having entered and been designated as UCs.  *Id.* at *21–22.  The court held that plaintiffs met the first requirement because "nothing in the record indicates that the Policy is tentative or that decisionmaking is ongoing." *Id.* at *18. As to the second, the court found the policy at issue was final because it was "an agency action 'from which legal consequences will flow.'"  *Id.* at *19 (quoting *Bennett*, 520 U.S. at 178).

Here, Defendants clearly ceased funding direct legal representation to UCs in violation of an express statutory mandate and their own regulatory frameworks.  The Cancellation Order directed Plaintiffs to stop all work providing direct legal representation to UCs, including existing clients whom Plaintiffs undertook to represent before the Cancellation Order.  This notification is final:  it terminates all funding for and orders a halt to all direct legal representation, leaving only funding for certain Know Your Rights ("KYR") presentations and confidential legal consultations. VAAP Decl. ¶ 13; NWIRP Decl. ¶ 10; RMIAN Decl. ¶ 12; Estrella Decl. ¶ 11.  That order went into effect immediately on March 21, 2025.

As a result, Plaintiffs are forced to choose between continuing to provide unfunded legal representation in the face of extremely limited resources; cutting other vital organizational programs, laying off, furloughing, or terminating staff; or seeking to withdraw from their ongoing representation duties for court hearings, client meetings, and other important preparations for legal proceedings as soon as this week.  VAAP Decl. ¶ 21.  The longer Plaintiffs go without this funding or clarity regarding how to handle their current clients, the fewer services they can provide as they

are forced to withdraw from ongoing representations, cut other core programs, and/or lay off or reassign staff.  VAAP Decl. ¶ 20–22; NWIRP Decl. ¶ 14.  Institutional knowledge will be permanently lost if significant numbers of experienced staff are laid off, irreparably damaging the Plaintiffs' capabilities, regardless of whether funding is ever reinstated.  Thus, this termination undeniably has an immediate effect on parties' rights or obligations.

    _No Other Adequate Remedy_.  Plaintiffs do not have any other adequate remedy for their claims.  The Supreme Court narrowly interprets the "other adequate remedy" limitation, stressing that it "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action."  *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988); *see also Chang v. United States*, 327 F.3d 911, 923 (9th Cir. 2003) ("generous" APA review provisions must be given "hospitable" interpretation (citing *Abbott Labs v. Gardner*, 387 U.S. 136, 140, 141 (1967))).  Instead, "Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions."  *Darby v. Cisneros*, 509 U.S. 137, 146 (1993).  Here, no such special procedures have been established.

    _No Statutory Bar to Review_.  Finally, no statute bars review of Plaintiffs' claims here, and Congress has done nothing to override "the strong presumption that Congress intends judicial review" of the administrative actions Plaintiffs challenge.  *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670–71 (1986).

## B.  Termination of the Legal Representation Programs Violates the TVPRA.

    Under the TVPRA, Congress requires that the government "shall ensure, to the greatest extent practicable," that *all* UCs receive legal "counsel to represent them in legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking."  8 U.S.C. § 1232(c)(5).  Canceling funding for and ordering stoppage of direct legal representation services to UCs violates

an express congressional mandate.  The Cancellation Order should be held unlawful and set aside. 5 U.S.C. § 706(a)(2)(A).

The TVPRA, requiring Defendants to "ensure [UC legal representation] to the greatest extent practicable," precludes them from terminating the legal representation program and nullifying its congressionally appropriated funding under circumstances here.  *See, e.g.*, *Pacito v. Trump*, 2025 WL 655075, at *18 (W.D. Wash. Feb. 28, 2025) (government agencies violated the APA when they withheld appropriated funds when agencies were "required, 'to the extent of available appropriations,' to ensure provision of support services for resettled refugees"). Defendants terminated this funding and ordered Plaintiffs to cease UC client representation without providing any other avenues of legal services for UCs—failing to "ensure, to the greatest extent practicable," that UCs have legal counsel in their immigration proceedings.  Defendants' Cancellation Order effectively ends meaningful legal representation for UCs by Plaintiffs and forecloses other providers from providing similar legal representation.  VAAP Decl. ¶¶ 20–21.

Although the TVPRA grants Defendants some discretion in *how* to allocate appropriated funds for legal access, Defendants cannot simply cease funding for direct legal representation in its entirety.  *See Pacito*, 2025 WL 655075, at *18.  That is precisely what happened here: Defendants cut off funding for direct legal representation services without providing any guidance or explanation to Plaintiffs regarding how they should deal with their ongoing representations and without any alternative plan for implementing their duties under the statute.  Amica Decl. Ex. 3.

Ultimately, canceling the programs defies express congressional mandates in both the TVPRA and appropriations bills.  *See* Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, § 4, 130 Stat. 460, 461 (incorporating the explanatory statement published at 170 Congressional Record H1501-01, which in turn incorporates Senate Report No. 118-84).  Out of

the $5,506,258,000 the Senate Report specified for the UCP, the Report recommended "no less than the fiscal year 2023 funding level for post-release services; *legal services and access to counsel*; and child advocates," and that such "funds will be used to provide access to counsel, consistent with the goals of the [TVPRA]."  S. Rep. 118-84 at 167–70 (2023) (emphases added).

After mandating in the TVPRA that Defendants provide legal representation to UCs "to the greatest extent practicable," Congress facilitated the provision of legal representation by appropriating billions of dollars to the UCP program, which includes (among other services) direct legal representation to UCs.  By consistently appropriating funds for this program for more than a decade, Congress not only ensured that it *would* be practicable to provide legal representation to UCs, but also expressly intended to ensure this outcome.  Given that appropriations are available to fund access to direct legal representation, Defendants cannot, consistent with their TVPRA obligations, simply refuse to fund such representation.

## C.  Terminating the Legal Representation Programs Violates the ORR Foundational Rule.

The government also is "bound by the regulations it imposes upon itself."  *See United States v. 1996 Freightliner Fld Tractor VIN1FUYDXYB-TP822291*, 634 F.3d 1113, 1116 (9th Cir. 2011).  "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."  *Morton v. Ruiz*, 415 U.S. 199, 235 (1974).  Under the *Accardi* doctrine, parties may bring claims under the APA asserting that an agency has failed to follow its own rules and internal policies.  *See, e.g.*, *Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004).  *Accardi* concerned the failure by the Board of Immigration Appeals to exercise its independent discretion in deciding an appeal as required by the agency's own regulations.  *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954), *superseded by statute on other grounds*.

13

*Otro Lado, Inc. v. Mayorkas*, 2024 WL 4370577, at *8–9 (S.D. Cal. Sept. 30, 2024) (plaintiffs sufficiently alleged a policy violation based on a rule preamble and alleged substantial hardship based on border turnback policy); *see also Carnation Co. v. Sec'y of Lab.*, 641 F.2d 801, 804 n.4 (9th Cir. 1981) (the standard for an *Accardi* violation is "whether violation of the regulation prejudiced the party involved"). Here, Defendants' actions violate their express commitment in the Foundational Rule, a binding regulation, to fund legal services providers to provide UC legal representation as long as appropriations are available. Plaintiffs are substantially prejudiced because they rely on that funding to provide critical legal services to UCs and will, in some cases, be forced to stop providing that representation to their UC clients. Plaintiffs will have to choose between financial survival and adhering to binding ethical obligations as to existing clients if Defendants' actions are not enjoined. RMIAN Decl. ¶ 14; Estrella Decl. ¶ 15; *see also infra* Section II.A.

ORR has "recognize[d] that most unaccompanied children need legal services to resolve their immigration status and that representation appears to have a significant impact on both the court appearance rate and the outcome of cases for unaccompanied children." 89 Fed. Reg. at 34529; *see also Al Otro Lado*, 2024 WL 4370577, at *9 (preambles may sufficiently bind agencies under *Accardi*). Accordingly, ORR just last year stated its intention to provide "universal legal representation for unaccompanied children by FY 2027." HHS: Administration for Children & Families, *Justification of Estimates for Appropriations Committees*, at 78 (2024), https://shorturl.at/4VDSL; *see also* 89 Fed. Reg. at 34526 ("ORR strives for 100 percent legal representation of unaccompanied children and will continue to work towards that goal to the extent possible."). Thus, in 2024, ORR adopted the Foundational Rule, which states in relevant part:

> To the extent ORR determines that appropriations are available, and insofar as it is
> not practicable for ORR to secure pro bono counsel, ORR *shall fund legal service*

> *providers* to provide direct immigration legal representation for certain
> unaccompanied children, subject to ORR's discretion and available appropriations.

45 C.F.R. § 410.1309(a)(4) (emphasis added).  ORR explicitly noted that "in some cases it is impracticable for ORR to secure pro bono legal services for unaccompanied children," and provided that ORR would fund legal services with available congressional appropriations for those cases.  89 Fed. Reg. at 34529.  The Foundational Rule thus explicitly obligates ORR to fund legal services providers to provide direct immigration legal representation, so long as congressional appropriations are available and pro bono counsel is not practicable.  *See id.* at 34529 ("ORR has determined that its approach to providing legal services to unaccompanied children by enabling them to access pro bono counsel 'to the greatest extent practicable' and funding legal services for additional unaccompanied children, as resources allow, is consistent with ORR's statutory obligations.").

Defendants' actions on March 21, 2025, subvert these ORR commitments and regulations, violate the *Accardi* doctrine, and are both contrary to law and arbitrary and capricious under the APA.  *See Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1068–69 (C.D. Cal. 2019).  Congressional appropriations are readily available until September 2027 to fund these legal services, including funds appropriated as recently as March 15, 2025.  *See, e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, Div. A Tit. I Sec. 1101(8) (2025); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 665-666 (2024); S. Rep. 118-84, at 169.  Nonetheless, without explanation and without a plan to replace these critical legal services, the Cancellation Order violates Defendants' obligations and has caused and will continue to cause Plaintiffs substantial hardship, as described below.  *See also infra* Section II.A.  Because Defendants' actions violate their own stated policies and substantially prejudice Plaintiffs, the termination order should be enjoined.

## II.  Plaintiffs Satisfy the Remaining Requirements for Injunctive Relief

### A.  Plaintiffs Face Irreparable Harm

A temporary restraining order is appropriate where, as here, the moving party shows that it faces irreparable harm—harm which is (1) "immediate", *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988), and (2) "for which there is no adequate legal remedy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

Here, immediate injunctive relief is necessary to protect Plaintiffs from suffering severe and irreparable harm.  Defendants' abrupt termination of funding for direct legal representation directly interferes with Plaintiffs' missions, immediately impeding their ability to provide critical legal representation that is at the heart of Plaintiffs' core activities.  RMIAN Decl. ¶ 22; VAAP Decl. ¶¶ 21–22; NWIRP ¶¶ 13–15.  There is no question that ceasing funding for legal representation services for UCs and terminating the existing services will cause imminent harm that cannot be later remediated.  MIRC Decl. ¶ 32–33; FIRRP Decl. ¶ 37.  The Cancellation Order prevents Plaintiffs from providing thousands of unaccompanied children with the direct legal representation required under the TVPRA and the Foundational Rule, frustrating Plaintiffs'

16

primary mission of representing these children as contemplated by Congress and the TVPRA.  *See, e.g.*, ImmDef Decl. ¶ 2.  If this occurs, "'there can be no do over and no redress.'"  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).

Plaintiffs have relied on Congress's and Defendants' assurances that funding for these critical resources will continue to be available.  Amica Decl. ¶ 11; RMIAN Decl. ¶ 18.  Cutting off this vital resource threatens immediate and irreparable harm.  *See, e.g.*, CLSEPA Decl. ¶ 13; VAAP Decl. ¶¶ 22–24; KIND Decl. ¶¶ 16–19.  For example, Immigrant Defenders Law Center has already had to provide 27 staff with layoff notices in response to the Cancellation Order and anticipates additional cuts would be necessary if funding is not restored; these staff losses threaten its ability to continue representing the 1900 UCs it currently represents.  ImmDef Decl. ¶¶ 20–22.  In Texas, Estrella del Paso currently manages 324 pending cases and predicts the loss of funding will require staff layoffs and increase caseloads for existing staff.  Estrella Decl. ¶ 6.  The Galveston-Houston Immigration Representation Project expects to lay off most of their Immigrant Children and Youth staff within four weeks.  GHIRP Decl. ¶ 21.  Sustaining these services without this funding will cost the Northwest Immigrant Rights Project $200,000 a month.  NWIRP Decl. ¶ 13.  Private providers predict devastating financial consequences, including the potential for bankruptcy.  DHCC Decl. ¶ 19; MM Decl. ¶ 18.  And these losses do not even account for the organizational knowledge at risk of being lost.  Estrella Decl. ¶ 6; FIRRP Decl. ¶ 38; Amica Decl. ¶ 25; ImmDef Decl. ¶ 21.

These harms cannot be remediated or redressed, even if Defendants later provide alternative routes for providing direct legal representation for UCs.  The harm to Plaintiffs and their clients is imminent and irreparable.  The termination of services took effect immediately upon

17

receipt of Defendants' letter on March 21, 2025, which provided no guidance as to what Plaintiffs should do with their existing obligations, including immigration court hearings scheduled for this week.  DHCC Decl. ¶ 15; Amica Decl. ¶ 20; ImmDef Decl. ¶ 24.  Plaintiffs have ethical obligations to their clients and cannot simply immediately withdraw from representation; indeed, most attorneys will require court permission to withdraw.  FIRRP ¶ 34.  Plaintiffs and their clients are already experiencing irreparable harm far exceeding the mere loss of funding, including because they have to furlough or layoff staff and increase the caseloads of staff who can stay on.  After limited reserves run out, Immdef will be forced "to take drastic action to terminate staff across all positions funded under this contract."  Immdef Decl. ¶ 21.  Similarly, KIND "anticipate[s] significant layoffs, starting within days" after the termination of funding.  KIND ¶ 16.  Children's immigration cases "are complex, often take years to complete, and require highly skilled attorneys to competently handle them."  *Id.* at ¶ 23. Impacted attorneys and staff have years of individualized experience and wisdom with clients, making rehiring after layoffs impracticable.

The imminent potential harms to children are immediate and severe.  For example, "if a child at one of the ORR-subcontracted facilities we serve is identified as having an urgent legal need such as an outstanding removal order, Amica Center—the only legal provider with access to the ORR-subcontracted facility—would not be funded to provide the necessary legal service to protect the child from imminent removal."  Amica Decl. ¶ 21.  Further, "[a]t this very moment, there are children in ORR custody who need our representation who are not receiving it.  This means that children who want voluntary departure will have their return home unacceptably delayed, victims of trafficking will not be able to access the protections they deserve, and children fleeing persecution will not be able to have their day in court."  ImmDef Decl. ¶ 25.  The Court

cannot later reset the clock.  Absent a temporary restraining order Plaintiffs will suffer harm that

cannot later be fixed.

## B.  The Balance of Equities

Finally, in considering whether to grant a temporary restraining order, the Court should

"balance the competing claims of injury and . . . consider the effect on each party of the granting

or withholding of the requested relief."  *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866

(9th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  Where an

injunction will not "substantially injure the other [interested] parties," the balance of equities tips

in plaintiffs' favor.  *Nken*, 556 U.S. at 434.

Here, there will be no harm to Defendants if this Court issues a temporary restraining order:

the Government "cannot suffer harm from an injunction that merely ends an unlawful practice."

*Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *cf. Zepeda v. I.N.S.*, 753 F.2d 719, 727

(9th Cir. 1983).  Instead, "there is a substantial public interest in having governmental agencies

abide by the federal laws that govern their existence and operations."  *State v. Azar*, 385 F. Supp.

3d 960, 985 (N.D. Cal. 2019), *vacated on other grounds and remanded sub nom. California ex rel.*

*Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (quoting *Newby*, 838 F.3d at 12) (cleaned up).

Terminating funding for direct legal representation for UCs, without any plan to ensure

that current representations are not interrupted, violates Congress's express directive in the

TVRPA and ORR's own commitments in the Foundational Rule.  Enjoining Defendants from

effectively terminating these services merely prevents Defendants from defying these mandates

and shirking their own voluntarily undertaken obligations.  Paying out funds already appropriated

for these services cannot harm Defendants in any meaningful way compared to the harms that

Plaintiffs and their clients will suffer if this Court does not issue a temporary restraining order.

19

Maintaining funding for these direct legal representation services furthers critical public interests: ensuring children have access to legal representation and protection from trafficking, as well as promoting efficiency and fairness within the immigration system for thousands of children who have viable claims for immigration relief in the United States. *See* 89 Fed. Reg. at 34529 (recognizing benefit of UC representation to the immigration system generally). Plaintiffs' work with UCs is widely recognized and commended by the legal community writ large, including by Immigration Judges, clerks, and the Department of Homeland Security's field office staff. VAAP Decl. ¶ 11; MIRC Decl. ¶ 19; ImmDef Decl. ¶ 13. The programs promote judicial economy by preventing immigration courts from bearing expenses such as unnecessary status conferences, VAAP Decl. ¶ 11, terminating proceedings for children where jurisdiction is improper, VAAP Decl. ¶ 9; RMIAN Decl. ¶ 10, and efficiently funneling contact with the courts through a single point of contact rather than having 50 or more representatives reaching out individually, MIRC Decl. ¶ 19. Plaintiffs play a key role in ensuring that children's needs are being met while in ORR custody. ImmDef Decl. ¶ 8. For example, Plaintiffs make referrals to Child Advocates, advocate directly with ORR to avoid unnecessary "step ups" for children at risk of being placed in more restrictive detention settings, and request Trafficking Victim designations from the Office of Trafficking in Persons. *Id.* Because Plaintiffs are independent, non-governmental organizations, children often share concerns with Plaintiffs they do not feel comfortable sharing with ORR-subcontracted staff or other stakeholders. *Id.* A temporary restraining order enjoining the Cancellation Order is in the public interest.

If the Court does not issue a temporary restraining order, Plaintiffs and the thousands of UCs they represent will face clear, immediate, and irreparable harms. Defendants themselves, meanwhile, do not face any injury from the issuance of a temporary restraining order to stop their

20

illegal action.  Given these considerations, the balance of equities weighs heavily in favor of issuing a temporary restraining order here.

### III. A Nationwide Injunction is Appropriate

While injunctive relief must be tailored to the scope of the case, "there is no bar against . . . nationwide relief in federal district or circuit court when it is appropriate." *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987).  Moreover, "an injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Id.* at 1170–71.  Accordingly, "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) (cleaned up).  The appropriate injunctive relief "often depend[s] as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l. Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017).

Here, because "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff," a nationwide injunction is necessary to provide Plaintiffs complete relief. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020) (nationwide scope of injunction proper to provide complete relief).  Defendants' decision to terminate direct legal representation directly violates the TVPRA and the Foundational Rule as to every legal services provider and will cause irreparable harm if allowed to proceed.  A nationwide injunction is the only way to effectively grant Plaintiffs the relief they seek: the preservation of their mission to provide critical legal services for UCs across the country who would otherwise be left to navigate the immigration system alone.  It is also the only way to ensure that Defendants comply with the congressional mandate and their own

<div align="center">21</div>

regulatory obligations to provide legal representation to UCs to the greatest extent practicable

Without a nationwide injunction, Defendants may continue to deny funding to other nonprofit

organizations providing similar services, preventing thousands of UCs from receiving legal

representation and assistance, and forcing Plaintiffs to make an impossible choice between serving

their mission unfunded or turning their backs on vulnerable clients.  Plaintiffs, whose primary

mission and core organizational activities include critical direct legal representation for these

children, will be forced to either deplete their reserves by continuing to provide as much direct

legal representation services as possible or turn their backs on vulnerable clients.  Notably,

Defendants—who, consistent with congressional appropriations, already allocated funding for

direct legal representation—will not face any harm from a nationwide injunction requiring them

to continue funding legal representation as planned.  Thus, the balance of equities weighs heavily

in favor of a nationwide injunction.

Courts have recognized that "a fragmented immigration policy would run afoul of the

constitutional and statutory requirement for uniform immigration law and policy." *Washington v.*

*Trump*, 847 F.3d 1151, 1166–67 (9th Cir. 2017).  "For these reasons, in immigration cases, [this

Court] consistently recognize[s] the authority of district courts to enjoin unlawful policies on a

universal basis." *E. Bay Sanctuary*, 993 F.3d at 681 (quotation marks and citations omitted).

Moreover, plaintiffs are located throughout the country, and "[d]ifferent interpretations of

executive policy across circuit or state lines will needlessly complicate agency and individual

action," *see E. Bay Sanctuary*, 993 F.3d at 681, and piecemeal injunctive relief for the more than

80 providers nationwide would be impractical and difficult to administer.  *See HIAS, Inc. v. Trump*,

985 F.3d 309, 326–27 (4th Cir. 2021).  Accordingly, a nationwide injunction is appropriate in this

case.

22

### IV. Plaintiffs Seek Expeditious Resolution of their Claims

Under 28 U.S.C. § 1657(a), courts "shall expedite the consideration of any action . . . if good cause therefor is shown." Actions for preliminary or temporary injunctive relief "are named the highest priority civil actions," and "special consideration" should be given to "actions asserting federal rights." *Freedom Commc'ns Inc. v. F.D.I.C.*, 157 F.R.D. 485, 486 (C.D. Cal. 1994). Further, "[l]itigants who can persuasively assert that there is a special public or private interest in expeditious treatment of their case will be able to use the general expedition provision." H. Rep. No. 985, 98th Cong., 2d Sess. (1984), reprinted in 1984 U.S.C.C.A.N. 5708, 1984 U.S.C.C.A.N. 5782.

Courts have found that "good cause" is shown where the effective relief hinges on appropriate timing. *See, e.g.*, *Pacesetter, Inc. v. Aortech Intl. PLC*, 2012 WL 12894007, at *1 (C.D. Cal. Nov. 1, 2012) (expediting when a regularly scheduled motion would exceed the time allotted in defendant's Rectification Notice); *see also* 9th Cir. Rule 27-12 (allowing for expedited briefing and hearing "upon showing of good cause"). Actions also may be expedited where one party's income stream is dependent on the outcome of the case. *See, e.g.*, *AIG Annuity Ins. Co. v. Law Offs. of Theodore Coates*, *P.C.*, 2008 WL 4543422, at *3 (D. Colo. Oct. 10, 2008).

Here, funding for the direct legal representation that Plaintiffs provide to UCs has already abruptly been rescinded. Plaintiffs have been ordered to stop work and no longer receive funding, effective March 21, 2025. NWIRP Decl. ¶ 10; VAAP Decl. ¶ 13. Not only will Plaintiffs be irreparably injured, *see supra* Section II.A, but the thousands of children whom Plaintiffs and other service providers assist will also be harmed if these services are not restored. VAAP Decl. ¶ 21; NWIRP Decl. ¶¶ 14–15; Estrella Decl. ¶ 16; RMIAN Decl. ¶ 21. With every passing day that funding is blocked for these services, more children will appear in court proceedings across the country without any guidance or assistance to help them navigate these complex proceedings even

as provider organizations stretch their resources to fulfill their missions.  Estrella Decl. ¶ 7; VAAP Decl. ¶ 9.  In addition to the harm to these children's due process rights, the loss of representation will cause dysfunction and confusion in the immigration system, including the immigration courts. VAAP Decl. ¶¶ 9, 11; RMIAN Decl. ¶ 10; MIRC Decl. ¶ 19.  Accordingly, there is sufficient "good cause" to expedite the consideration of this motion under 28 U.S.C. § 1657(a).

## CONCLUSION

Defendants' actions violate the APA.  Because this conduct will immediately cause Plaintiffs irreparable harm, this Court should grant immediate provisional and nationwide relief enjoining Defendants' illegal actions and preserving the status quo pending a final judgment.

Respectfully submitted,

March 27, 2025

/s/  Alvaro M. Huerta_____          /s/  Samantha Hsieh_____

IMMIGRANT DEFENDERS LAW CENTER          AMICA CENTER FOR IMMIGRANT
Alvaro M. Huerta (CA Bar No. 274787)          RIGHTS
Carson A. Scott (CA Bar No. 337102)          Adina Appelbaum (D.C. Bar No.
Lya Ferreyra (CA Bar No. 340148)          1026331)*
Immigrant Defenders Law Center          Samantha Hsieh (V.A. Bar No. 90800)*
634 S. Spring St., 10th Floor          Peter Alfredson (D.C. Bar No.
Los Angeles, CA          1780258)*
(213) 634-0999          Evan Benz (N.C. Bar No. 49077)*
ahuerta@immdef.org          Amica Center for Immigrant Rights
cscott@immdef.org          1025 Connecticut Ave., N.W., Suite 701
lferreyra@immdef.org          Washington, D.C. 20036
          (202) 331-3320
          adina@amicacenter.org
          sam@amicacenter.org
JUSTICE ACTION CENTER          peter@amicacenter.org
Esther H. Sung (CA Bar No. 255962)          evan@amicacenter.org
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)*          *pro hac vice forthcoming
JUSTICE ACTION CENTER          Attorneys for Plaintiffs
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

PI Appeal and Stay Addendum 034

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| | Case No. 3:25-cv-2847 |
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, <br> 1861 Bay Road <br> East Palo Alto, CA 94303, *et al.*, | |
| Plaintiffs, | |
| v. | **DECLARATION OF ALVARO M. HUERTA** |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| 200 Independence Avenue, S.W. | |
| Washington, DC 20201, *et al.*, | |
| Defendants. | |

1

I, Alvaro M. Huerta, declare as follows:

1.      I am an adult over the age of 18 and a resident of the state of California.  The information set forth herein is true and correct of my own personal knowledge and if asked to testify thereto, I would do so competently.

2.      Pursuant to Local Civil Rule 65-1(a)(5), immediately prior to making this application to the Court, I provided Pamela Johann, Chief of the Civil Division of the United States Attorney's Office of the Northern District of California, with actual notice that Plaintiffs are filing this motion, along with electronic copies of the complaint and the brief accompanying this motion, via e-mail before completing this electronic filing.

Dated: March 27, 2025           /s/ Alvaro M. Huerta
                               Alvaro M. Huerta

PI Appeal and Stay Addendum 036

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| | Case No. 3:25-cv-2847 |
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO,<br>1861 Bay Road<br>East Palo Alto, CA 94303, *et al.*, | |
| Plaintiffs, | |
| v. | **[PROPOSED] ORDER TO SHOW CAUSE TO DENY PRELIMINARY INJUNCTION** |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| 200 Independence Avenue, S.W. | |
| Washington, DC 20201, *et al.*, | |
| Defendants. | |

Upon reading the accompanying Memorandum of Law, dated March 26, 2025, and upon all prior pleadings and proceedings had, and good cause being alleged, it is hereby:

Enjoining Defendants from interfering with the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and the Office of Refugee Resettlement's ("ORR") Foundational Rule, 45 C.F.R. § 410.1309(a)(4) requirements to provide direct legal representation services to unaccompanied children, including by cutting off access to congressionally appropriated funding.

1

FURTHER ORDERED that pending a hearing and determination of the Order to Show Cause, the Cancellation Order shall be enjoined;

FURTHER ORDERED that service upon Defendants of a conformed copy of this Order to Show Cause, together with copies of the papers in support thereof, shall be made upon counsel for Defendants by electronic service through ECF, and email, on or before the __ day of _____, 2025, shall be deemed good and sufficient service thereof; and it is

FURTHER ORDERED that Defendants' opposition papers, if any, shall be served so as to be received by counsel for Plaintiffs, on or before the __ day of _____, 2025.

_____
UNITED STATES DISTRICT JUDGE

PI Appeal and Stay Addendum 038

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

Case No. 3:25-cv-2847

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO,
1861 Bay Road
East Palo Alto, CA 94303, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

200 Independence Avenue, S.W.

Washington, DC 20201, *et al.*,

Defendants.

**[PROPOSED] TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

1

**AND NOW**, this ___ day of _____, 2025, upon consideration of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, the memorandum and evidence in support thereof, and Defendants' response thereto, it is **HEREBY ORDERED** that Plaintiffs' Motion is **GRANTED** as follows:

> Enjoining Defendants from interfering with the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and the Office of Refugee Resettlement's ("ORR") Foundational Rule, 45 C.F.R. § 410.1309(a)(4) requirements to provide direct legal representation services to unaccompanied children, including by cutting off access to congressionally appropriated funding.

FURTHER ORDERED that pending a hearing and determination of the Order to Show Cause, the Cancellation Order shall be enjoined.

_____

UNITED STATES DISTRICT JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

Case No. 3:25-cv-2847

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

**DECLARATION OF ROXANA AVILA-
CIMPEANU (FIRRP) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

## DECLARATION OF ROXANA AVILA-CIMPEANU FOR THE
## FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT

I, Roxana Avila-Cimpeanu, make the following statement on behalf of the Florence Immigrant & Refugee Rights Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1. My name is Roxana Avila-Cimpeanu. I am a licensed attorney and a member in good standing in the State Bar of Arizona. I am currently employed as Deputy Director of the Florence Immigrant & Refugee Rights Project ("Florence Project" or "FIRRP"). I joined the Florence Project on September 6, 2016, and have served in my current role since September 2024. Before I assumed my current position, I previously served as Children's Legal Program Manager, Managing Attorney for the Children's Pro Bono Program, Pro Bono Mentor, Staff Attorney, and Law Graduate with the Florence Project's Children's Legal Program serving unaccompanied immigrant children in Arizona.  During my time at the Florence Project, I have personally provided free legal services, including friend of court services, direct representation, legal orientation and education, and *pro bono* mentorship, to at least 140 children. Additionally, as Children's Legal Program Manager and Deputy Director I have supervised attorneys, pro bono volunteer attorneys, law graduates, accredited representatives, legal assistants, intake specialists, and social workers who have provided free legal services, both direct representation and pro se services, to thousands of individuals detained in Office of Refugee Resettlement "ORR" and ICE custody in Arizona.

### Florence Project's Mission and Scope

2. Founded in 1989, the Florence Project is a 501(c)(3) non-profit legal services organization with offices in Tucson, Phoenix, and Florence, Arizona. The Florence Project's mission is to provide free legal and social services to detained adults and children facing immigration removal proceedings in Arizona. On any given day, there are thousands of people detained and facing deportation proceedings in Arizona, including adults in rural detention centers in Eloy and Florence, Arizona and unaccompanied children who are or were previously in the custody of the Office of Refugee Resettlement ("ORR") in shelters in the Phoenix and Tucson metropolitan areas. With no public defender structure in immigration removal proceedings, the vast majority of people facing removal are forced to go unrepresented in immigration court due to poverty or lack of access to counsel, this includes unaccompanied children who are in the country without a parent or legal guardian. The Florence Project's vision is to ensure that all immigrants facing removal have access to counsel, understand their rights under the law, and are treated fairly and humanely.

3. The Florence Project is the sole 501(c)(3) non-profit organization dedicated to providing free immigrant legal services to unaccompanied children in Arizona. Through our attorneys, accredited representatives, law graduates, intake specialists, legal assistants, social workers, and network of pro bono attorneys, the Florence Project provides free

legal education and free representation and social services to thousands of
unaccompanied children who are facing deportation proceedings in Arizona.

### Florence Project's Services Under the Unaccompanied Children's Program

4.  The Florence Project began providing legal services to unaccompanied children who
    were detained and facing deportation proceedings in Arizona in 2000. At the time,
    unaccompanied children were detained in the custody of the former Immigration and
    Naturalization Service, ("INS"), the same agency that managed adult immigration
    detention and removal, in jail-like facilities in Central Arizona. Those facilities were ill-
    equipped to manage the special needs of children and children regularly suffered harmful
    treatment–for example, routine strip searches before attorney visits, prolonged detention,
    placement in solitary confinement, and other restraints. In 2002 as part of the general
    restructuring of immigration enforcement under the Homeland Security Act, and in
    recognition of the special needs of children, Congress moved away from the adult
    detention model and transferred the care and custody of unaccompanied immigrant
    children to the Office of Refugee Resettlement "ORR". At or about that same time,
    children began to be detained in shelter facilities in the Phoenix area. The Florence
    Project subsequently opened an office in Phoenix to better facilitate serving these
    unaccompanied child clients. In 2014, ORR opened additional shelters in the Tucson area
    and, again, the Florence Project opened a Tucson office to serve those clients. The
    Florence Project has continuously served unaccompanied children detained in Arizona
    since 2000.

5.  As it pertains to unaccompanied children, in order to carry out our mission of providing
    free legal and social services to unaccompanied children facing removal proceedings in
    Arizona, the Florence Project's Children's Legal Program and Children's Social Services
    Team has a number of main work components that involve providing unaccompanied
    children with legal education and know your rights presentations, legal screenings, legal
    advocacy, friend of court assistance, and direct representation both from Florence Project
    attorneys and through pro bono placements. Each of these facets of Florence Project's
    work is addressed in more detail below.

6.  First, the foundational level of our services to unaccompanied children are based on
    providing age-appropriate legal education services and "know your rights" presentations
    and conducting individual legal screenings(intakes) with all unrepresented children in
    ORR custody in Arizona. Under the UCP, Florence Project staff ensure that every
    unaccompanied child who is detained in ORR custody in Arizona receives age-
    appropriate, basic "know your rights" information and an intake in a language they
    understand within 10 business days of their arrival in an Arizona ORR shelter facility,
    where possible, in keeping with 45 CFR 410.1309(a)(2)(i)(B). For children who are
    reunified to a sponsor before Florence Project staff are able to meet with them, staff call
    the child and provide a know your rights presentation and intake over the phone. Every
    year, Florence Project staff provide these educational services to tens of thousands of
    children in Arizona; in 2023 alone, Florence Project staff provided 17,514

unaccompanied children with a "know your rights" presentation.  These are critical services because unaccompanied children almost universally lack resources to afford legal representation and, without the Florence Project, would not have meaningful access to accurate and age-appropriate resources to help them understand their rights, responsibilities, or legal options.

7.  Second, Florence Project attorneys also attend every detained Unaccompanied Minor children's docket in the Phoenix and Tucson Immigration Courts and, where allowed by the judge and appropriate, serve as Friend of Court for any cases in which the child is still seeking and likely to attain reunification with a sponsor or family member, and the Court requires additional information to assess next steps. Because the Trafficking Victims Protection Reauthorization Act ("TVPRA") requires that unaccompanied children "be promptly placed in the least restrictive setting that is in the best interest of the child," many of the children to whom we provide educational "know your rights" services eventually reunify with sponsors elsewhere in the United States. As a result, Florence Project staff do not immediately enter as counsel on every child's case in Arizona, but we do ensure that no child is alone in court by being present and to help provide critical information to the Court regarding the status of the reunification process, best language, special vulnerabilities and other critical information, where appropriate and allowed by the Court.

8.  Third, the Florence Project provides non-representational legal advocacy for non-represented children in ORR custody. This includes advocating with ORR shelters for things like communication in the proper language, access to medical care, religious accommodations, access to education, access to proper food, access to communication with family and sponsors, and access to counsel. Through this type of non-representational advocacy, the Florence Project works to ensure that children in ORR care are being treated with dignity, respect, and are not subject to discrimination or mistreatment, and that the shelters are abiding by laws surrounding the treatment of children.

9.  Fourth, every year Florence Project attorneys provide direct representation to hundreds of unaccompanied children in Arizona; in 2023 alone Florence Project attorneys represented 1,091 unaccompanied children in Arizona. Excepting cases of ethical conflict, Florence Project attorneys represent all unaccompanied children who are placed into Long-Term Foster Care ("LTFC") facilities in Arizona, as well as other unaccompanied children who remain in ORR custody during their removal proceedings or as they approach "aging-out" of the age of minority by turning 18. Additionally, Florence Project attorneys represent unaccompanied children who have passed through ORR custody and reunified with family members or sponsors here in Arizona, or have been placed in the Unaccompanied Refugee Minor Program in Phoenix, AZ. In all these cases, Florence Project's representation of these unaccompanied children can include representation before the Immigration Courts and the United States Citizenship and Immigration Services ("USCIS"), as well as representation in Arizona State Court juvenile or probate proceedings where necessary and appropriate for children who have been abandoned, abused, or neglected.

10. Fifth, Florence Project also has two specialized direct representation teams, which are partially funded by UCP. The first is the Children's Trafficking Response Team, which works to educate and guide staff and community stakeholders and partners on how to identify and support child survivors or trafficking, or children at risk of trafficking. This team is partially funded by UCP and works directly with unaccompanied minors who are at risk of or have survived trafficking, whether in the U.S., their country of origin, or on their journey to the U.S. The second in the Released Representation team which focuses on providing direct legal and social services to children who were formerly detained by ORR and living in the Phoenix metropolitan area.

11. The Sixth and final major component of the Florence Project's Children's Legal Program is our Children's Pro Bono Team, who receive pro bono case referrals from Children's Program staff and then connect unrepresented unaccompanied children with pro bono counsel from law firms or pro bono private immigration practitioners. Each year, our pro bono team places dozens of cases with volunteer attorneys before the immigration court, USCIS, Arizona state courts, and Board of Immigration Appeals and provides full-service mentorship, ongoing training, and technical support on those cases. Pro bono screening and mentorship in cases before the agency also are funded and conducted, through the UCP contract.

12. As of February 28, 2025,  the Florence Project provided free legal services to unaccompanied children at 24 shelters located in the State of Arizona, primarily in the Phoenix and Tucson metropolitan areas. These shelters have a combined capacity to detain over 2,000 children on any given day. Of these, 18 facilities are located in Maricopa County and 6 are located in Pima or Pinal counties. These shelters include 3 LTFC facilities as well as 3 transitional foster care facilities that serve particularly vulnerable or special needs populations such as children under the age of 13, siblings detained together, teens who are parenting or pregnant, and children with special needs. Unaccompanied children in Arizona with active immigration court cases generally are docketed on either the Phoenix or Tucson immigration court dockets and, as noted above, Florence Project staff ensure that no detained unaccompanied child in Arizona stands alone in immigration court, either by representing children or being present to provide Friend of the Court services as deemed appropriate and approved by the Court.

13. The Florence Project currently employs 114 full time staff who are dedicated to directly providing services under the UCP and whose positions are largely funded through U.S. Department of Health and Human Services ("HHS") funding. Specifically, Florence Project employs 1 Program Manager and 1 Associate Program Manager as well as 9 managing attorneys, 9 managing legal assistants, and 1 managing social worker who directly oversee and train staff providing UCP legal services, help manage legal and contractual compliance, and directly provide legal services under the UCP themselves.

---

[1] On February 28, 2025, Florence Project staff began to learn of "stop placement orders" and an accompanying depopulation of various shelters we have historically served. The reason, scope, and anticipated duration of the stop placement order and accompanying depopulation remain unclear at this time as do any possible plans for opening potential replacement shelter services in our region.

Additionally, Florence Project employs 21 staff attorneys and law graduates, and 4 accredited representatives who provide direct representation, legal consultation, and legal education and screenings under the UCP;  1 pro bono Managing Attorney who oversees the Pro Bono Program, screens volunteer attorneys, places cases, and supervises the Pro Bono team, and 2 pro bono mentors who provide technical support to pro bono attorneys; 49 legal assistants and intake specialists who help provide know your rights presentations and legal screenings under attorney supervision; 9 social workers; and 3 legal administrative assistants who support the team with UCP related data entry and billing requirements.  Due to staff turnover, internal transitions, and promotions, the Florence Project also has 20 open positions that are contemplated under the Florence Project's UCP that we have yet to backfill. In addition to our regular full-time employees noted above, the Florence Project also currently hosts 3 Immigrant Justice Corps ("IJC") fellows and one Equal Justice Works ("EJW") Fellow who work in conjunction with our general staff to represent unaccompanied children in removal proceedings.

14. Staff providing representation and "know your rights" presentations to children in ORR facilities routinely travel to each of the 24 shelter facilities in person to conduct client interviews and screenings, prepare clients for hearings, as well as provide legal education, legal screenings, and other legal support to detained children. Florence Project staff are typically present in shelters anywhere from 3-5 days a week. The Florence Project represents unaccompanied children in removal proceedings in immigration court, affirmative relief such as seeking asylum before USCIS, U-visas and T-visas, Special Immigrant Juvenile Status ("SIJS") applications both before the agency and in state courts for necessary predicate orders, BIA appeals, and petitions for review to the Ninth Circuit Court of Appeals.

15. For every child that passes through ORR in Arizona, the Florence Project monitors to make sure that the child is on track for reunification with a sponsor. If the shelter indicates that a child does not have a sponsor, or if the child has been detained for an extended period of time, or if the child's case merits entering of representation, the Florence Project will place the case with an in-house attorney or accredited Representative, or with a volunteer pro-bono attorney from the community.

16. The Florence Project currently directly represents over 800 children under the UCP contract. Some are children still in detention, and many are children who have been released from ORR and are living in Arizona, and have been waiting for their cases to be resolved for years due to government backlogs. Some cases take up to 6 years to conclude at the Legal Permanent Resident stage, and the presence of an attorney is critical during that long time span since Immigration Law changes at a rapid rate.

17. These various services provided under the UCP, from education through full representation are a critical safety net for unaccompanied children who are or have been in ORR custody. The children the Florence Project serves are often extremely vulnerable – they have often experienced significant trauma, have been abused, abandoned, or neglected. Many have experienced discrimination, trafficking, or harm in their country of origin or en route to the United States. We routinely work with children who identify as

LGBTQ. We also regularly work with children who are experiencing symptoms of significant disabilities including mental health conditions as well as medical disabilities that can directly impact their ability to participate in proceedings, for example vision or hearing impairment. Moreover, some of our child clients are very young such that their age presents unique barriers to their ability to participate in their legal cases. The Florence Project also serves facilities that specialize in young or "tender aged" children under the age of 13, where the children we at times encounter children who are so young that they do not know even their parent's names (aside from "mom" or "dad"). Florence Project staff have even represented children who were pre-verbal, with at least one client who was only six-months old. For such children, the UCP is a critical safety net since, without the UCP, the vast majority of these particularly vulnerable children would be left without any information and most likely would face significant barriers to adequately and efficiently preparing their cases without counsel, nor would a child be well-positioned to pay the thousands of dollars required to retain counsel. Indeed, almost universally, unaccompanied children lack sufficient resources and knowledge to obtain private counsel and the Florence Project is the only non-profit organization that provides free legal services to unaccompanied children who are detained by ORR in Arizona. Without the services the Florence Project provides under the UCP, unaccompanied children in Arizona would be forced to go through their legal process entirely alone, without a lawyer. However, immigration law is famously complex and given the educational/literacy barriers, language barriers, developmental stage barriers, age barriers, and emotional and mental hurdles caused by past discrimination, trauma, and harm, the vast majority of our child clients would be simply incapable of navigating their legal proceedings without assistance from trusted, independent legal and social service providers like the Florence Project. Additionally, a significant number of the children we work with are eligible for Special Immigrant Juvenile Status ("SIJS"), which requires proceedings and findings before state juvenile courts, which children simply cannot obtain without the assistance of counsel.

18. Looking at SIJS in particular is useful to understanding how complicated and specialized the work the Florence Project does with unaccompanied minors is. SIJS requires attorneys to be well-versed and competent to represent clients in not one, but two complicated areas of law: immigration removal defense and state court child welfare processes, which vary from state to state. In Florence Project's experience, not only do our advocates need to be completely fluent in both areas to advocate in individual client's cases, but historically we have had to do a great deal of education for both the state courts and the immigration courts about what the other side of the coin looks like and how the other court system operates. This requires regular stakeholder outreach, developing strong relationships with courts, and participating in opportunities to educate judges and court staff, extending even to formal trainings where courts have requested such support, to ensure cases that involve both systems are able to move forward effectively and efficiently.

19. In addition to representing clients in their immigration proceedings, Florence Project represents clients in various forms of advocacy that arise incident to their custody. In this context, Florence Project staff play a critical role in building trust with clients and being a

constant, dependable point of contact who is independent and not part of the United States government, which allows these vulnerable youth to share information regarding abuse or mistreatment these children have experienced both before, during, and after their custody by the U.S. government. Because we build this trusting connection with the children we serve, Florence Project clients have not only felt comfortable sharing examples of abuse and violence they experienced in their countries of origin and during their journeys to the United States that are critical to developing their legal cases for relief here in the United States, but also regularly share information about abuses they experienced while in the custody of the United States government.

20. Examples of the types of abuses our unaccompanied children clients have reported to us, and about which the Florence Project has engaged in advocacy on our clients' behalf, include lack of access to proper food, religious services, regular communication with parents or potential sponsors, clothing, hygiene items, parenting ability, and appropriate medical care in both Customs and Border Patrol ("CBP") and ORR custody; verbal and physical assaults in CBP custody; physical abuse and sexual assaults in ORR custody; and attempted trafficking and/or grooming by ORR staff. Because we begin working with these children within days of their arrival into ORR custody, Florence Project staff often are the first to learn about harmful government policies – things like widespread family separations in 2017-2018 and the unlawful use of dental imaging as the sole basis to redetermine a child's age as a justification for moving a minor into adult ICE custody. Because we are independent legal service providers, we have the unique ability to advocate on our clients' behalf to raise awareness and push back against such harmful policies.

21. For example, Florence Project staff screen each child for abuse or mistreatment at CBP facilities prior to their arrival in ORR through questions designed to ensure that children's legal rights are respected and that children are treated humanely by CBP. Many children the Florence Project encounters report being held for extended periods of time beyond that allowed by the TVPRA, lacking proper food, being held in ice-cold facilities or cages, having possessions, including religious items and medical items removed, and being verbally and physically abused by CBP officers. We have heard stories of young mothers not being provided with blankets or diapers for their babies. In fact, over the last year alone, the Florence Project has documented over 150 complaints on behalf of children and filed at least 30 formal complaints with the Office of Civil Rights and Civil Liberties to seek official review and redress over abusive treatment or conditions children face while in CBP custody.[2] For many children, it can take some time before they feel willing to open up regarding abuse or harm they have experienced. Limiting funding for legal service providers like the Florence Project to exclusively know your rights presentations and intakes, will limit opportunities for Florence Project staff to build the type of trusting relationship with these children that enables children to feel

sufficiently safe to disclose abuse experienced, particularly abuse experienced at the hands of U.S. Government officials. This will create circumstances that put children in increased danger of abuse and harm by government officials and allow abusive CBP officials to continue to act with increasing impunity, emboldened by the knowledge that children will have few, if any, opportunity to report harm or resources necessary to do so in a way that would potentially result in any accountability. This directly undermines the Florence Project's mission to ensure that all people facing deportation are treated fairly and humanely. Florence Project's ability to build meaningful trusting relationships with unaccompanied children under the UCP helps our staff identify disturbing patterns and trends in the types of abuses our children clients report. The role of possible representation is particularly crucial in cases where serious trends of harm appear, as was the case, for example, when Florence Project staff were some of the first to note and blow the whistle on how the Trump administration's "Zero Tolerance" border prosecution policy resulted in widespread separations of minor children from their parents at the border. The type of public advocacy and media that eventually brought a halt to that egregious family separation policy is only possible under portions of the UCP that allow for additional legal services and representation, a fact that is surely not lost on this second Trump administration in this decision to eliminate all portions of funding that allowed the Florence Project to advocate for our children clients in this way.

22. Beyond advocating for our clients when they have experienced more extreme abuses and harm while in ORR or CBP custody, Florence Project staff also routinely support clients with other types of advocacy which are equally necessary to ensure the rights of vulnerable children are properly respected. This type of advocacy can include advocating for less restrictive or more appropriate placements in custody as well as the least restrictive placement when a child turns 18. It also includes advocating for access to proper medical care and treatment in custody – from everything for advocating that a client with vision impairment be given glasses so they could see, to advocating that a client with serious medical condition such as a coma is placed in a facility that is equipped to care for their needs. We help our clients file complaints with oversight agencies to document and resolve myriad of issues that arise as a result of our clients' custody and vulnerable status.

23. Many of our child clients also speak languages other than English or Spanish and our staff not only provide them with legal services and education in a language they understand, as required by the Foundational Rule, but also advocate that they have appropriate language access in immigration court as well as other spaces, including ORR communications and medical appointments. For example, our child clients frequently report to Florence Project staff that ORR staff insist on communicating with them in Spanish, despite that fact the child does not speak Spanish or prefers another language. Children also report to Florence Project staff being discriminated against by shelter staff for speaking indigenous language, or African languages. Many indigenous children or children who are part of a minority have experienced discrimination at home due to their ethnicity, race, or national origin, and it can be difficult for them to advocate for themselves for access to communication in their best language, especially if the shelter staff are displaying prejudice or discrimination against them. Ensuring that

communication takes place in the appropriate language that a child understands is critical and this is even more true when shelters or judges are attempting to share important information with the child. Florence Project staff not only regularly advocates that important government communications be conducted in the child's best language, but also meet with children in detention, build trust with our clients, and empower them to assert their language rights themselves.

24. Florence Project staff also often advocate for the medical needs of children. Florence Project staff have seen countless examples of ORR not taking adequate measures to protect the health of children. Attorneys have advocated for visits to medical professionals who were able to diagnose conditions requiring surgery or medication, including for broken arms and necessary blood transfusions. Staff have learned of special medical needs from children that the shelter did not know about, which resulted in children receiving life-saving treatment. Staff have advocated for proper dental care for children who had a difficult time eating due to mouth pain. Children have also reported ORR staff misrepresenting the purpose of medical visits, children being told they are going to routine dental appointments only to later learn that the dental exams were actually completed for the purposes of age redetermination to facilitate transferring minors into adult ICE custody. Staff have also pushed back in cases where ORR was attempting to pressure minors to return to home country before proper medical care could be assured for things like traumatic brain injuries, or other conditions.

25. The Florence Project also regularly advocates for First Amendment protections, particularly access to religious activities, including ensuring that children are taken to services, are given the proper diet, and are provided with adequate space and time to complete religious rites. Children who observe fasting have been denied food after breaking fast, have had nighttime prayers interrupted, and have faced discrimination at the hand of ORR staff for their religious observances. In such cases, the Florence Project plays a critical role as an independent third party able to both identify potential first amendment and civil rights violations and empower our child clients to assert their rights as well.

26. Florence Project staff also frequently work with ORR and shelter staff to ensure that shelter staff refrain from the unauthorized practice of law. ORR staff are not legally trained and are not lawyers with the associated privilege and confidentiality – they are not able to advise children as to their legal rights or counsel them on their legal options. Despite these known facts and rules against unauthorized practice of law, in many cases ORR staff have provided legal advice to children, which more often than not has been incorrect, harmful, or contrary to the child's wishes. Florence Project attorneys regularly correct mistakes by ORR staff, for example, when ORR staff submit case assistance requests through the Office of Trafficking in Persons ("OTIP"). The Florence Project has observed countless cases where ORR staff's submission was denied due to a lack of understanding of the requirements of an OTIP request for assistance, the child's life, the legal definitions of trafficking, or a combination thereof. In such cases, Florence Project attorneys have re-submitted requests and received OTIP approvals for case assistance for children who have rightly been determined to be survivors of severe forms of trafficking.

27. The Florence Project has long enjoyed a cooperative stakeholder relationship with our Arizona immigration courts. Beginning from the initial call to action by an Immigration Judge that led to the creation of the Florence Project, Immigration Judges in Arizona have consistently engaged with and welcomed the Florence Project's legal education services. In the context of unaccompanied children, both the Phoenix and Tucson Immigration Courts have a long history of working collaboratively with the Florence Project. For example, in both courts this cooperative stakeholder relationship has allowed for the coordination of specialized dockets for unaccompanied children. The Florence Project has worked with the court and individual judges to ensure the children's docket are as child-friendly as possible, with one judge even electing to wear a more informal Hawaiian shirt instead of the traditional black robes. For decades, the vast majority of judges on the children's docket have welcome Florence Project attorneys to serve as friend of court to assist the court by sharing important information, such as updates regarding likelihood and timeline of reunification, the child's best language, and other information necessary to properly and efficiently adjudicate children's cases.  This cooperation has included everything from willingness to provide Florence Project staff space in the physical courtrooms to conduct pre-court orientations to children before their hearings, to smaller acts of appreciation, including swearing in Florence Project law graduates into the bar. Judges in Phoenix and Tucson have long relied on the Florence Project as a resource to which they may refer respondents who are confused or unclear about the next step in their immigration court process. Judges in Phoenix have also allowed the Florence Project to serve as friend of court over the Government's objection, in acknowledgement of the critical information provided for children's cases. In both EOIR and ICE stakeholder meetings, government partners routinely express thanks and emphasize the value of the services the Florence Project provides.

**UCP Stop Work Order, Stop Work Recission, and Subsequent Termination of all but CLIN 1 Funding Under UCP Contract**

remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication of poor performance."

29. On February 18, 2025, shortly after receiving the stop work notice, Florence Project leadership promptly notified all staff regarding receipt of the UCP stop work order and provided additional specific instruction to staff who provided services under the UCP clarifying how they would need to change aspects of their work to follow that order. However, because the Florence Project's mission is to provide free legal and social services to unaccompanied children in Arizona, we also immediately began to discuss how we could potentially transition the critical services that had been conducted under the UCP to other legal access mechanisms, specifically legal access as envisioned by provisions of the TVPRA mandating that "to the greatest extent practicable...that all unaccompanied alien children who are or have been in the custody of [HHS or DHS] have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." As such, we also provided instruction to staff on how we envisioned ensuring continuity of legal and social services for children in ORR shelters served by the organization without government funding, at least for the short term.

30. Just three days after it was abruptly issued, the UCP stop work order was just as abruptly rescinded on February 21, 2025. Like the original stop work order, the cancellation of said order came via email notification from the UCP prime contractor and the actual recission order from the government contracting office provided little to no information as to why the stop work order had been issued originally or why that decision had now been reversed. It simply stated that the stop work order had been cancelled and that all activities under the contract could be resumed.

31. In the three-day window in which the UCP stop work order was in effect, Florence Project staff were consistently allowed to continue to access our child clients in ORR custody without interruption from shelter or ORR staff using our own funds to support this work. As of this date, it is not clear what, if any, reimbursement for those services Florence Project will receive.

32. On March 21, 2025, again without warning, the Florence Project learned that HHS through the U.S. Department of Interior contracting officer, terminated almost all aspects of the current UCP contract. Again, the Florence Project learned about the nearly complete termination of services under the UCP contract through an email notification from the government prime contractor on the UCP program, the Acacia Center for Justice, at approximately 8:15 a.m. Arizona time. The termination was effective the same day we received it, March 21, 2025. As noted, HHS terminated the contract with respect to three of the four contract line numbers ("CLINs"): CLIN 2, which funds legal representation for unaccompanied children, as well as shelter advocacy and other non-representation services, such as pro bono referrals, friend of court services, and data

tracking[3]; (3) Attorney recruitment project and IJC fellows; and (4) Spanish language instruction and interpretation. CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, which funds Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN 1, which funds KYR presentations and confidential legal consultations for pro se children in ORR custody. Per the termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS has not provided any justification for the termination of these services other than, allegedly, the "Government's convenience."

33. On March 21, 2025, shortly after receiving the notice of termination of CLINs 2, 3, and 4 under the UCP contract, Florence Project leadership promptly notified all staff regarding the terminations and provided additional specific instruction to staff who provided services under the UCP clarifying how they would need to change aspects of their work to follow that order. That guidance explained to staff the different ways in which aspects of the critical legal services we provide children would be treated moving forward. For those key legal services falling under CLIN 1 – initial KYRs and legal consultations – Florence Project leadership explained to impacted staff that these services can and would continue without pause, explaining details like the fact that staff can and should use Acacia resources for third-language interpretation for such services. However, for those other critical and core aspects of our work with unaccompanied children – notably our direct representation of said children, friend of court and docket presence, and data entry – the Florence Project leadership communicated that such work would no longer fall under the UCP, staff may not refer to these programs as being through Acacia or the UCP, and staff cannot use Acacia interpretation resources to support such cases. Per instructions from Acacia regarding documenting "unavoidable work" on open cases under the terminated CLINs for possible, but not guaranteed, reimbursement through a potential termination settlement, Florence Project leadership requested that Florence Project staff continue to carefully document time, mileage, and data for internal purposes for any work done on represented cases or other parts of the terminated CLINs. Additionally, because the Florence Project's mission is to provide free legal and social services to unaccompanied children in Arizona, with a core value of ensuring that no child ever stands alone in immigration court, we also immediately began to discuss how we could potentially transition the critical representational, shelter advocacy,and friend of court services that had been conducted under terminated CLINs of the UCP to other legal access mechanisms. As such, we also provided initial instruction to staff on how we envision ensuring continuity of legal and social services for children appearing pro se before EOIR as well as those whom we were already representing under CLIN 2 without government funding. However, Florence Project funding is such that, without a massive new source of revenue to support such efforts, the Florence Project will only be able to sustain these efforts at our current level based on general funding for a short period of time.  Finally, we notified staff in our children's program targeted communication that, given the loss of UCP funding, we had to hold on responding to any new case referrals

---

[3] On March 25, 2025, Florence Project received word that the government was considering moving data reporting requirements from CLIN 1 to CLIN 2, a process that still must undergo bilateral negotiation on pricing.

and refrain from entering into any new attorney/client relationships for unaccompanied children in Arizona.

## **Organizational Harm Caused By Loss of UCP Contract Services**

34. As an initial matter, the termination of CLINs 2, 3, and 4 under the UCP contract will cause serious financial harm to the Florence Project. The UCP subcontract constitutes a major portion of the Florence Project's overall annual budget, with an average value of approximately 12 million per option year on the full contract. The terminated CLINs represent – depending on the option year being considered – a lost value of over 8 to nearly 10 million dollars of funding that supports Florence Project's core legal and social services for unaccompanied children. Moreover, the termination of the majority of the UCP contract also means that the Florence Project will also have to pay out-of-pocket for interpretation services for the child clients we currently directly represent – over 800 children with whom we entered into representation in good faith specifically under this contract – for those who do not speak either Spanish or English. Given the vast number of clients we serve and the many languages they speak, this also represents a significant additional expense. For example, in one month, Florence Project staff reported requiring at least 11,000 minutes of interpreter time. Without language support through the UCP contract, this cost will be incurred by the Florence Project.

35. As noted above, over 100 staff members' salaries are directly funded by the UCP subcontract and the loss of more than 70% of the funding for the Children's Program means that the Florence Project now faces needing to pay for those salaries using general funding sources. The Florence Project's ability to pay staff to continue our core work providing legal and social services to unaccompanied children, work that is mandated by statute and regulation, will become fiscally untenable in a matter of months unless the terminated CLINs are reinstated, or another massive influx of alternative funding can be identified.

36. The termination of all but a small portion of the UCP funding reflects the Government's intent to permanently shrink in size and end the provision of these critical legal and social services to unaccompanied children. This is cause for serious concern as to the Florence Project's overall budget, staffing plans, staff morale, longstanding community and stakeholder relationships, and the ability to keep qualified and trained staff with the organization. At the outset, due to transitions, internal promotions, and staff departures, the Florence Project's UCP subcontract contemplates 20 additional positions that are currently open. However, as a direct result of this termination, the Florence Project is undergoing a hiring pause on all currently unfilled positions. This hiring pause extends beyond only those positions that would have been funded under the UCP; rather it touches hiring for all currently open positions across the organization, with very few exceptions, given that general funding will need to be tapped to cover the substantial lost funding for salaries that would have been covered under the UCP. Thus, staff and programs across the organization, not only within the Children's Program, feel both the negative financial and morale ripple effects of this loss of UCP funding.

37. Moreover, the uncertainty around the budget and the Florence Project's long-term ability to pay our staff's salaries with general funds or fundraising is creating a sense of overwhelm and stress among remaining staff, both on the directly impacted team as well as on other teams, which negatively affects morale and people's sense of job security. While the Florence Project hopes to avoid immediate layoffs, unless the terminated CLINs are reinstated or some miracle fundraising occurs, it is extremely likely that the all-but-total termination of funding under the UCP will necessitate substantial downsizing of the Children's Program staffing. Indeed, Florence Project leadership has determined that, based on this lost funding, layoffs will be necessary unless funding is reinstated, or we receive miracle fundraising. As such, Florence Project leadership is beginning the managerial and administrative preparation for likely layoffs. Because the Florence Project is a unionized workplace, for most of our staff, the Florence Project must comply with specific terms of our collective bargaining agreement ("CBA") regarding communication with the union about termination, notice prior to termination of employment, and severance payments. This, in itself, results in the Florence Project incurring additional financial burdens in the form of legal expenses to plan for potential necessary layoffs with our labor and employment counsel to ensure compliance with our CBA and applicable laws as well as the financial loss of severance pay to any employees who may be subject to layoffs.

38. It is also critical to note that people are not like cogs in a machine where one can be interchangeably and readily replaced by another; once layoffs are announced and/or begin in earnest, the Florence Project will lose staff and, with them, their experience, expertise, and work towards our mission. Even if funding were to be restarted, we would not be able to simply replace lost staff with equally qualified and experienced people. We would have to invest significantly in recruitment and training any new or replacement staff, which poses additional costs to the organization. Moreover, in the uncertain world of non-profit services, an organization's reputation as a relatively steady or secure place to work carries great weight in that organization's ability to recruit and keep qualified staff. Thus, if we must undergo significant lay-offs due to lack of funding, the harm to the Florence Project's reputation as being able to offer reasonably secure employment will be irreparably undermined, which will make it exceedingly difficult for us to hire to replace positions even if funding is eventually restored.

39. Additionally, the termination of all portions of the UCP contract touching on representation of clients substantially harms both the Florence Project and our clients because the termination notice, it seems, provided no guidance, support, or wind-down process for the cases in which our attorneys have already entered. Florence Project attorneys are currently entered on over 800 UCP cases in Arizona. As is the case with all of Florence Project's services, our representation of these children is entirely free of charge to the clients. As attorneys, we have ethical obligations to our clients, particularly those with imminent court appearances or key case filings or other deadlines. We cannot ethically simply stop representing our child clients – doing so would not only be morally wrong but also would subject the Florence Project to substantial legal liability and our attorneys to discipline from the bar. Beyond this fact, we must also take into account the

particular vulnerabilities of our clients – such as their young age, their lack of financial resources and in many cases their inability to work in order to raise funds for paid counsel, language and education barriers, and the technical complexity of many of their case – when determining whether terminating or otherwise limiting our representation would be ethical or appropriate. As a result, minimally, the Florence Project will certainly incur significant expenses to continue representation to our clients who we are ethically obligated to continue representing despite the termination of these funds. And, given that our mission continues to be to provide free legal and social services with a vision of ensuring that all unaccompanied children have access to counsel and are treated fairly and humanely, Florence Project continues to be dedicated to seeking means to continue representation of all of our clients, current and prospective, as well. This means that our development efforts have been diverted from other critical initiatives to instead attempt to replace as much as possible this lost funding and to try to reduce the impact of this massive loss.

40. The complete termination of all CLINs touching on representation services, shelter advocacy, friend of court services, and more will irreparably harm the people that the Florence Project serves and severely hamper our ability to provide our core services. Indeed, just prior to the announcement of the termination of these programs, Florence Project staff noted DHS in Phoenix advancing cases of children in ORR custody, speeding up the removal process. Similarly, in the Tucson EOIR, Florence Project staff recently noted the appearance of children's names on the court docket even where there is no evidence that Notices to Appear have even been filed yet with the courts in those cases and no notice of hearing listed on the EOIR Automated Case information system, raising serious questions both about accelerating the court process for children and doing so in ways that may not comport with statutes, regulations, or due process. However, without funding to provide representation or even appear as friend of court, it has become unclear how Florence Project staff can best advocate regarding the legal propriety of placing children on a 'rocket docket' or scheduling children for court before charging documents have even been filed. It is not realistic to expect children to navigate the complexities of immigration court on their own in general, much less on an expedited timeline. Additionally, our staff have recently experienced judges denying reasonable requests, such as administrative closure for children with claims for relief before USCIS. I personally witnessed an Immigration Judge in Phoenix conduct group master calendar hearings rife with due process issues in which children were forced to answer the judge's questions related to notice, service, and, notably, best language out loud and all at once. Practices such as these all but guarantee that, without robust UCP services in place continuously, children's cases will be expedited in a way that deny children the opportunity to reunify with sponsors and will result in children being ordered removed not because of the merits of their case, but because of their age, developmental stage, lack of education or language abilities, and lack of knowledge or understanding of the legal requirements.

41. The due process cost of so many unaccompanied children potentially losing experienced pro bono counsel across the state of Arizona, and indeed the nation, at the same time, is

also going to be unmeasurable. Florence Project staff currently represent many children who will suffer immediate harm if we are unable to continue representing them pro bono.

42. For example, Florence Project attorneys currently represent a set of siblings who fled their country of origin after their mother died and their sister was murdered in front of one of the siblings. All three have applications for asylum pending before USCIS and they have been recently approved for SIJS with deferred action. Both are processes that will require additional complicated legal work, including potential asylum interviews and adjustment of status applications among other things, which will require the assistance of an attorney. Additionally, given the rapidly changing landscape in immigration law, policy, and enforcement, it is apparent that these children will likely require additional support for legal counsel while their process is pending. Indeed, just recently, despite having actively been participating in their immigration process – they had attended USCIS  biometric appointments and receiving approved I-360 Petition for Special Immigrant Juvenile Status with deferred action, and the immigration court case was already concluded with non-opposition by DHS to allow them to move forward with the USCIS process – despite all of this, armed immigration enforcement officers came to their home claiming they were "missing" and demanding to speak to them about their cases. While seasoned attorneys work diligently to keep abreast of changes in immigration law, policy, and enforcement and have training in how to respond to a situation like this, it is unreasonable to expect children like these siblings to do the same on their own. Additionally, with three children all needing legal services, the cost to hire private counsel would be a significant financial burden their sponsor. As such, the elimination of funding to support children like these would seriously harm these clients and cut to the very core of the Florence Project's mission and services.

43. In another example, Florence Project staff attorneys recently learned about two separate cases of children, both babies, under the age of two-years-old who are in one of the Arizona tender-aged shelters who are currently not getting reunified with their parents and require additional advocacy for the government to follow protocols established under the *Ms. L. v. ICE* settlement agreement – a settlement agreement arising out of the massive violation of rights of children and parents that occurred under "zero tolerance" family separation policies from 2017 to 2018. Like most two-year-olds, both of these children are pre-verbal and unable to advocate for themselves about anything, much less complicated matters involving legal settlement agreements and reunification policies. However, given the current termination of representation under the UCP, there is no funding to represent these children or even advocate for them in any way short of full representation. As such, Florence Project managers are currently assessing to what extent we will be able to help these extremely young children without any funding, knowing that we must either absorb the cost of representation for these extremely vulnerable children by drawing down on general funding or reassigning funds from other programs or stand by and allow the rights of these children to be violated.

44.  Elimination of funding for the UCP program also creates an untenable system whereby access by legal advocates to children in detention will be left up to the government

offices and workers, who are at times the very people abusing and trafficking children. With this funding eliminated, children will have to pay for attorneys out of pocket, a concept which boggles the mind, especially considering the dearth of experienced immigration pro bono counsel in the United States. Moreover, there is already a serious shortfall of attorneys in Arizona who have the specialized experience needed to work on detained children's cases, which pose unique issues of law. The pool of attorneys willing to do the work is even smaller for children's cases, as many children's cases require additional expertise in juvenile law in Arizona, which all FIRRP attorneys have, but which many private practioners do not. Indeed, while immigration court is a federal system which allows attorneys barred in any state to represent clients, only attorneys barred in the state of Arizona may represent clients in state court proceedings; many private immigration attorneys who practice in Arizona (who may be barred outside of Arizona and legally work on federal immigration cases) may not even be qualified to represent unaccompanied children who require these state court proceedings.

45. Without federal funding for UCP work, access to counsel also will be largely left up to the ORR shelters. If this were to pass, it would create a clear conflict of interest, as ORR is often the perpetrator of abuse, mistreatment, or failure to follow legal protections for children. With the recent dismantling of the ORR Ombudsman office, and the Office of Civil Rights and Civil Liberties, children detained in ORR custody are placed in a system with even less independent oversight and accountability than before, which makes access to free counsel more important than ever.

46. Finally, elimination of access to the unaccompanied children who are detained in ORR custody for representation, for the first time since we began working with unaccompanied children 25 years ago, is deeply disruptive to our core legal service model and will directly harm children who will be deprived free legal and social services, attorneys to represent them in court or assist as friend of court when they are waiting to reunify with family members. Unaccompanied children, particularly those who are placed in LTFC shelters, or who remain in ORR custody during their removal proceedings, or who are near to turning 18 and require immediate urgent action on their cases to protect their rights, all groups children who the Florence Project now routinely represents as a matter of course, will have no means to pay any private attorney to represent them, leaving those who are in many ways the most vulnerable most likely to be denied their basic rights. The loss of funding to support these services cut deeply at the Florence Project's core mission and vision.  Children will no longer have caring advocates they can trust, who will get to know their cases through expert and age-appropriate methods and advocate for their expressed interests. Even the threat of loss of access and the resulting uncertainty it has caused within our staff has had a profound impact on the morale of our staff who have dedicated their careers to serving unaccompanied children; now, facing the termination of all but the most basic KYR services to the thousands of children we serve is devastating to staff morale.

47. Additionally, FIRRP's vision that every person facing removal have access to counsel, understand their rights, and be treated fairly and humanely is also severely undermined by the elimination of the UCP. First, for the majority of children in ORR custody in

Arizona, Florence Project attorneys and staff working under the UCP are likely their only access to counsel and opportunity to receive pro bono representation. Eliminating access to representation and friend of court services under the UCP will ensure that children are forced into removal proceedings – proceedings we have already seen are being accelerated and conducted in part using mass hearings that violate due process – without counsel. Termination of all but CLIN 1 of the UCP will effectively guarantee that more children in ORR custody in Arizona will go through their removal proceedings without an attorney to represent them or even help them navigate the system during their court process. No child should be expected to be able to learn immigration law and present a complex legal case against a trained government attorney, often in a language they do not understand, on their own.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of March, 2025 in Phoenix, Arizona.

_____
Roxana Avila-Cimpeanu
Deputy Director
Florence Immigrant and Refugee Rights Project

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

  v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

Case No. 3:25-cv-2847

**DECLARATION DANIELA
HERNÁNDEZ CHONG CUY IN
SUPPORT OF PLAINTIFFS' MOTION
FOR A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION**

## DECLARATION OF DANIELA HERNÁNDEZ CHONG CUY
## FOUNDER, DIRECTING ATTORNEY AND OWNER OF THE LAW OFFICE OF
## DANIELA HERNÁNDEZ CHONG CUY

*I, Daniela Hernández Chong Cuy, make the following statements on behalf of myself and the Law Office of Daniela Hernández Chong Cuy. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Daniela Hernández Chong Cuy and I am the founder, owner and Directing attorney of the Law Office of Daniela Hernández Chong Cuy, a Professional Corporation. ("Law Office of D. H. CH. C."). Based in Pasadena, California, the Law Office of D. H. CH. C. provides comprehensive legal representation to unaccompanied immigrant children formerly in the custody the Office of Refugee Resettlement ("ORR") in Los Angeles, San Bernadino, Ventura, and Riverside counties. We are also the sole legal service provider for two ORR long-term foster care facilities: Building Bridges Foster Family Agency in Ontario, CA, and MarSell Wellness in Montebello, CA.

3. In order to carry out this mission, the Law Office of D. H. CH. C. has several main work components: (1) Representing children in long-term foster care under ORR custody in immigration proceedings; (2) Representing unaccompanied minors who are not in ORR custody in immigration proceedings; and (3) Providing educational services in the form of legal education "know your rights" ("KYR") presentations for unaccompanied minors under the Post-release Initial Legal Service ("PILS") program.

4. The Law Office of D. H. CH. C. has been providing legal services for unaccompanied immigrant children in California since May 2023. In May 2023, as subcontractors of the Unaccompanied Children's Program, we began providing legal representation for children detained in an LTFC in Ontario, California, and for unaccompanied minors who were no longer in ORR custody in Los Angeles, San Bernardino, Ventura, and Riverside counties. In 2024, our services under the contract expanded to include a second LTFC facility in Montebello, California, and to cover a larger number of released unaccompanied children.

1

5. Since 2023, our office has initiated a combined total of 75 cases. In 2024, we initiated representation for 15 children in long-term foster care and 27 children that have been released from previous ORR custody—a total of 42 children just that year. Just in the first few months of 2025 alone, we have initiated representation of eight unaccompanied minors in long-term foster care, which is likely explained due to the uptick of children in need of long-term care.

6. Currently our office has 60 open cases under the ORR contract. To fulfill our duties as a provider of legal services for unaccompanied minors, I have had to restructure my business model and the clientele my Law Office serves, limiting the number of private clients I can take at any given time to accommodate the growing demand of competent legal service providers for this vulnerable population.

7. With U.S. Department of Health and Human Services ("HHS") funding, the Law Office of D. H. CH. C. has maintained four staff members dedicated to providing legal services to unaccompanied immigrant children.  Specifically, our team is composed of two full-time attorneys, including myself, and two full-time paralegals. Our fourth and most recent hire was welcomed to our team in October 2024.

8. Staff providing representation and KYR presentations to children in long-term foster care regularly travel to meet each child in person to conduct client interviews and prepare clients for Immigration Court hearings. Our staff visits the facilities at least once a month, with in-person visits often occurring on a bi-weekly basis. The LTFC clients can also request a virtual meeting with their attorney for faster and more convenient scheduling; we take these sorts of meetings at least twice a week. In-person visits can range from one to four hours, depending on the legal work to be done and the youth served on each visit. Child representation requires a trauma-informed approach, so the work cannot be rushed. The clients will set the tone and pace for our work and conversations.

9. In addition to providing representation in removal proceedings before the Immigration Court, we provide representation for unaccompanied children before United States Citizenship and Immigration Services ("USCIS") and California Family, Probate, and Dependency court as needed.  A majority of the children we represent are eligible for Special Immigrant Juvenile Status ("SIJS"), a critical form of immigration relief for children who have suffered abuse, abandonment, or neglect. SIJS proceedings are especially pertinent to children in long-term foster care, who require dependency courts to designate an institutional caregiver to ensure their well-being.  Many children we serve are also eligible for asylum, as they fear persecution in their countries of origin.  Our office provides services not only to initiate their asylum applications, but to accompany them to their critical asylum interview before USCIS.  Other children we serve are eligible for U Nonimmigrant Visas, as they have been victims of criminal activity in the United States,

2

thus we provide representation before the necessary law enforcement agencies to prepare their case.

10. A large part of our ORR contract focuses on serving unaccompanied children in long-term foster care.  Unaccompanied immigrant children are placed in long-term foster care when they have no one in the United States who is available to care for them.  These children require a particular form of representation, due to the increased vulnerability of not having an adult to be released to in the United States.  Due to their circumstances, children in long-term foster care do not have the financial resources to pay for an immigration attorney. Further, many of these children experienced severe abuse, neglect, or persecution in their countries of origin, and require trauma-informed advocates to help them navigate the complex world of immigration law. We have clients as young as two years old, who would be unable to represent themselves before any court or government agency or to find a paid attorney. We represented a client belonging to the Hazara/Suni ethnic and religious minority who fled Afghanistan after the takeover by the Taliban regime in 2021; we helped him prepare and present his asylum application before the Los Angeles Asylum Office, and file other applications for relief before USCIS, all complex procedures he would be unable to navigate on his own, due to age, and cultural and language barriers. We have an indigenous Raramuri client, a 16-year-old girl who has no known direct relatives either in Mexico or in the United States; we provided representation for the appointment of an institutional guardian in state court and just received notices of approval of her SIJS application. We advocated before multiple stakeholders so that a family of four young children from Angola be released from ORR custody to reunify with their family in Canada.  None of these clients would have been able to seek relief without our assistance.

11. Our work is critical not only in preserving our clients' access to justice, but in ensuring that the Immigration Court's juvenile docket runs efficiently. The consistency in the way we have provided legal representation for our detained clients and prepared applications for relief during the past two years has led to an efficient management of the juvenile docket at the Immigration Court in Santa Ana, California, where our cases are routinely terminated or administratively closed.  This avoids unnecessary delays, alleviates the Court's and ICE's case load, and directs resources where they may be best and most efficiently used. Our advocacy for our clients ensures that the due process rights of children in immigration proceedings are respected without need of the Immigration Court mandating unnecessary continuances of their proceedings, or without requiring that the Immigration Judge take additional time to explain to the children before them their rights in those proceedings and how they could in theory advocate for themselves.  In every court appearance, Immigration Judges have expressed their gratitude for our work.

12. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs).

3

Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025

13. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children as well as other non-representation services such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2, and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place CLIN 1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities, and CLIN 5, which funds Immigrant Justice Corps fellows who represent children not covered under other CLINs. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

14. On March 21, 2025, I was notified via email communication by the Acacia Center for Justice that a stop work order had been issued for all the legal work we do under the unaccompanied children's program. Immediately, I communicated this message to my team, ordering them to cancel any activity that was not strictly necessary to fulfill our ethical duties and giving them the rest of the guidelines necessary to comply with the order.

15. When I learned about the stop work order and termination of the contract, my office staff was in State Court attending to guardianship hearings for LTFC clients, and in the LTFC program we serve. As soon as I was able to speak with them, I informed my staff to cease all work under the contract. Our office is scheduled to appear in Court on Friday, March 28, 2025, on two separate cases, and to prepare for asylum interviews with the Asylum Office and respond to USCIS notices before April 1, 2025. Until I am able to determine how to proceed on each one of the cases without being in violation of the rules of professional conduct, I plan to appear in Court for our scheduled cases, and to attend all legal and court mandated deadlines, so long as it is financially feasible.

16. Earlier today, the Lead Case Manager for one of the LTFCs my office serves, requested that I make arrangements to speak with our clients tomorrow, March 27, 2025, to inform them of the termination of the contract, per the request of their Regional Director. At this point, I continue to navigate the ethical implications of the termination of the contract and

4

the impact this will have on representation of my detained and non-detained clients. I respectfully declined the program's request and informed them that termination of the contract does not automatically terminate legal representation, and that I will schedule to speak with the minors as soon as I am able to provide them with clear responses of the full extent of the implications of the termination of the contract.

17. Currently, the funds we receive for our unaccompanied children's work accounts for 70-75% of our overall budget.  Similarly, most of the work we perform on our daily operation relates to these contracts. As a small firm, our entire staff is affected by a loss of unaccompanied children's funding. Before we entered into this contract with ORR, my Law Office was not dependent on this funding, but its demands have required me to restructure my Law Office's clientele and expand my staff.  From May 2023 to September 2024, we managed to operate with two attorneys and one paralegal; we welcomed the fourth member of our team in October 2024.  Because my office is a private practice, the partial termination of this program will have a severe financial impact on the operation of my Law Office.  Within two months I will not be able to cover the financial obligations towards my staff or cover the cost of our daily operations.  As a private practice, we are established as an "S" corporation, and do not have the tax structure or lobbying capacity necessary to secure the external funding required to solvently continue providing these types of legal services without the payment previously contracted.

18. For the duration of the original stop work order which occurred on February 18, 2025, we were fortunate enough to continue providing the strictly necessary legal services to our existing clients and fulfill our ethical duties with minimum repercussions.  Still, we were forced to reschedule appointments with clients and provide services like attending court hearings without knowing if we were going to be compensated for the work done, while avoiding unnecessary stress or burden for our clients.

19. The effects of the current termination on our office are immediate.  The impact on our morale is severe, as it forces us to restrict communications and services presented to our clients to the bare minimum, which is contrary to our client-centered approach.  Moreover, it will not be possible to provide a living wage to my staff and quality legal services to my clients as a Law Office without unaccompanied children's funds. A shutdown of the unaccompanied children's program income leaves us in the precarious situation of having *de facto* 60 new unfunded clients, from our total of approximately 150 clients, to whom we have a duty to continue to provide service, at least for the foreseeable future.  Under the California Rules of Professional Conduct, attorneys in general *may* withdraw from their representation if they are paid for services if the client breaches the agreement and the attorney gives them reasonable time to secure new representation, amongst other conditions.  However, the representation contract we entered with the children from the unaccompanied children's program is pro bono. That is, our attorneys cannot unilaterally terminate their client's legal representation solely for lack of payment or professional

5

funding, particularly because it would be highly prejudicial for them as unaccompanied children while they are detained or underage. Under Rule 1.16(d), a lawyer shall not terminate representation until they have taken reasonable steps to avoid reasonably foreseeable prejudice to the rights of the client, such as giving the client sufficient notice to permit the client to retain other counsel or obtain a copy of their legal file. It is very difficult to see a scenario under which our young clients under long-term foster care, ages 2-17, would be able to retain legal counsel on their own or to be able to present competent representation that would make our withdrawal permissive under California Rules.

20. Continuing to operate with at least 60 unfunded clients for the foreseeable future will likely bankrupt my small business. It will force me to incur significant debt to try to once again redistribute the ratio of my client portfolio to serve additional private clients. With my reduced staff, and considering that we already serve over 150 clients, it would be nearly impossible to manage a clientele restructuring while maintaining a full staff and sound finances.

21. In addition, on January 8, 2025, my house was completely destroyed in the Eaton fire, in Altadena, California. This forced my family of three, including my two-year old, to be displaced. It was not until March 1, 2025, that we were able to secure temporary housing. The disaster my family experienced disrupted my business operations. While my office continued working, and the rest of my staff was spared from the fire, I had to take extraordinary measures to be able to respond to the stop work order and the financial implications that followed.

22. When I started the Law Office of D. H. CH. C. in 2020, I wanted to create a private law practice that could provide both a balanced environment for my staff and provide services so that clients of all backgrounds and resources could find competent and caring legal services. To this day, we aim to provide zealous, competent and holistic representation to our clients in the immigration system, whether detained or non-detained, and at all stages of their immigration removal proceedings. Our mission is still to provide client-centered and trauma-informed legal representation. I hope that we can carry on with this vision without it leading to financial ruin.

6

I declare under penalty of perjury that the foregoing is true and correct.


Executed on the 26 of March 2025, in Pasadena, CA.

_____

**Daniela Hernandez Chong Cuy**
**Directing Attorney/Owner**
**Law Office of Daniela Hernández Chong Cuy**
**UCP Legal Service Provider**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

            Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

Case No. 3:25-cv-2847

**DECLARATION OF ANA RAQUEL
DEVEREAUX (MIRC) IN SUPPORT
OF PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION**

## DECLARATION OF ANA RAQUEL DEVEREAUX

## SENIOR MANAGING ATTORNEY FOR MICHIGAN IMMIGRANT RIGHTS CENTER

*I, Ana Raquel Devereaux, make the following statements on behalf of the Michigan Immigrant Rights Center. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Ana Raquel Devereaux, and I am a Senior Managing Attorney at the Michigan Immigrant Rights Center (hereinafter, "MIRC"). MIRC is a non-profit organization that provides free legal services for children and other non-citizens who have suffered abuse, trafficking, and persecution. MIRC is the only organization serving unaccompanied children in the custody of the Office of Refugee Resettlement (hereinafter, "ORR") in Michigan and the primary organization providing legal services to children in the unaccompanied refugee minor program in Michigan and to children released from ORR custody to sponsors in Michigan.

2. Michigan Immigrant Rights Center (MIRC) is a legal resource center for Michigan's immigrant communities. MIRC works to build a thriving Michigan where immigrant communities experience equity and belonging. The Michigan Immigrant Rights Center is a program of                                        . MIRC has five local offices throughout the state of Michigan which provide direct legal services to unaccompanied children and also provide general community immigration legal services. Our five local offices are located in Detroit, Ypsilanti, Lansing, Grand Rapids, and Kalamazoo. These five offices are supported by a statewide structure within MIRC to provide training, administrative and supervisory support, community engagement, and pro bono support.

3. In order to carry out this mission with respect to providing legal services to unaccompanied children, MIRC has several main work components: (1) Providing educational and pro se services in the form of legal education "know your rights" ("KYR") presentations, conducting individual consultations (intakes), and conducting pro se workshops with all unrepresented children in ORR custody in Michigan; (2) Representing unaccompanied minors who are not in ORR custody in immigration proceedings; and (3) Representing children in ORR custody in immigration proceedings. We further host Immigrant Justice Corps (IJC) fellows to represent unaccompanied children in removal proceedings and provide Spanish-language support for staff representing unaccompanied children.

4. MIRC has been providing legal services for unaccompanied immigrant children in Michigan since 2009 at a smaller scale and with a dedicated unaccompanied children's

1

team beginning in 2017 when MIRC received its first subcontract to serve children in ORR custody in Michigan. That first contract focused on providing KYR presentations, legal screening, support for hearings, and representation as needed for all children in short-term ORR custody in Michigan and providing universal immigration representation to all children in long-term ORR custody in Michigan.

5. Since 2017, the ORR bed capacity in Michigan for short and long-term shelters and foster care facilities has expanded significantly to its current capacity of 335 short-term beds and 122 long-term beds. In 2021, MIRC's subcontract expanded to permit MIRC to offer representation to children in Michigan who have been released from ORR custody and are in removal proceedings. MIRC has grown its capacity to represent released children from 240 to 565. Additionally, in 2021, an Emergency Intake Site was opened in Michigan with 225 beds. MIRC served all of the children in that facility by providing KYR presentations, conducting intakes, and conducting pro se workshops with all unrepresented children in ORR custody in Michigan, and offering representation, especially when the facility turned over its population and housed most of the Afghan Unaccompanied Minors who arrived in ORR custody and the contract provided for and required asylum and work authorization for these youth while in ORR custody. MIRC continues to serve all ORR beds in Michigan and remains ready to expand to serve any additional facilities that serve unaccompanied children in the state and to reach as many released children for representation as is within our capacity, which we have continually expanded to address the unmet need in the state of Michigan. At this time, we serve the following facilities: BCC Caminos Nacional – Michigan Children's Home Society, Bethany Christian Services – Wedgwood Christian Services, Bethany TLC, Bethany USCCB (Bellaview and Casa del Sol), LIRS – BCS MI Kalamazoo LTFC – Casa de Esperanza, LIRS – BCS MI Kalamazoo LTFC TGH – Hacienda De Luz, Samaritas LTFC, LIRS–BCS MI Alma Shelter, LIRS–BCS MI East Lansing TFC, LIRS–BCS MI Grand Rapids Shelter – TAC, LIRS–BCS MI Grand Rapids TFC, LIRS–BCS MI Holland TFC, LIRS–BCS MI Muskegon TFC, USCCB Catholic Charities West Michigan TFC, Samaritas Shelter – Grand Rapids,  Samaritas URM – LIRS – Lansing, MI , Bethany Christian Services URM – USCCB – Kalamazoo, MI , Bethany Christian Services URM – USCCB/LIRS – Grand Rapids, MI , Bethany Christian Services URM – LIRS – Traverse City, MI.

6. With U.S. Department of Health and Human Services (HHS) funding, MIRC currently has 147 positions serving children in and released from ORR custody in Michigan. Specifically, these 147 positions encompass 113 full-time employee's worth of funding and dedicated services to unaccompanied children. Of these roles 58 are attorney staff roles (including attorney managers), 3 of which are Immigration Justice Corps Attorney Fellows, 47 are paralegals (all of whom are either DOJ-Accredited or are working towards their DOJ-Accreditation), 13 are paralegal supervisors, and the remaining staff

2

focus on data reporting, administrative case support, case intake, training, and communication.

7. Staff providing representation and KYR presentations to children in ORR facilities regularly travel to each facility in person to conduct client interviews, prepare clients for hearings, as well as provide legal education, individual consultations, and pro se workshops for pro se children.  MIRC serves children in 9 short-term facilities, which range in size from 12 beds to 36 beds. Each week, MIRC staff visit the facility one to two days to provide KYRs and intakes with each child who has arrived within the last week and also to provide follow-up services to children who have been at the facility for an extended time or are otherwise in need of representational legal services. Additionally, the children come to our offices one additional day during the week as that additional time is usually required to complete all the services within the contractually required 7-10 business day period after their arrival in custody.  Additionally, we have 8 long-term ORR facilities in Michigan, ranging in bed size from 8 to 32. When children arrive to long-term ORR facilities, MIRC assigns an attorney/paralegal team to meet with the child and offer representation within 30 days of their arrival.

8. For children released from custody, the children are either referred through the Acacia-facilitated referral system, UCORD, or by calling our intake line, once we determine that the child meets the eligibility criteria while offices are accepting new cases, we then meet with the child within 30 days to offer representation. For children with whom we have entered representational agreements, MIRC's legal teams represent children in state and immigration court, file petitions with USCIS, file motions and petitions with the immigration court, file mandamus and habeas actions in the Eastern and Western Federal District Courts in Michigan, file appeals with the Michigan Court of Appeals, USCIS, EOIR, the BIA (and in similar cases, we have proceeded as far at pursuing appeals in 6th Circuit Federal Court of Appeals, but it has not been necessary yet for a case under this contract), as well as pursue other advocacy efforts within ORR and other spaces where unaccompanied children are detained and/or receive services.

9. Children in short-term ORR custody have just arrived in this country and generally have never been in a formal custodial system. They speak many different languages and have a variety of educational backgrounds, ranging from no formal education to middle school level schooling, including high school-age children because they have rarely had high school educational opportunities. Due to all of these factors, they are not yet equipped with the resources to fully understand what rights they have while in custody and it is essential for them to meet with legal services providers to understand that they have a right to bodily safety, contact with family, medical care, and educational services, among other rights guaranteed in the Flores Settlement and the Foundational Rule. Additionally, the immigration legal system is extremely complex and nuanced, and without an orientation with a legal service provider, it would be near impossible for children, let

3

alone the non-attorney staff at these short-term custodial sites to be able to explain, to understand critical pieces of the system that affect them, including the importance of keeping addresses up to date and attending immigration hearings (and even how to understand the notices that arrive indicating when a hearing will occur).

10. A reality that must be addressed is that children in custody are incredibly vulnerable by the nature of a custodial system where the vulnerability factors for sexual and physical abuse are extremely prevalent. A bad actor may take advantage of these systemic vulnerabilities. If these children do not have access to legal counsel that is independent from ORR and the organizations that sub-contract to provide the custodial services, these children surely will face even greater levels of abuse in custody. MIRC intervened and represented children in 2023 when there was an instance of systemic sexual abuse of children in short-term custody in one of the ORR Michigan facilities. MIRC worked to represent individual children, supporting them in reporting to law enforcement and participating in the prosecution of the crime, and holding agency staff and ORR leadership accountable for ensuring further protections are put in place for future children in custody at that facility. Additionally, MIRC represented individual children who faced abuse in ORR foster homes and as soon as the child disclosed the circumstances to MIRC, we ensured they received protection and there was accountability for the individual and systemic failures that harmed the child.

11. In Michigan, if MIRC did not provide these services under the HHS contract, it would be impossible for the majority of the children to receive representation. The private bar in Michigan is relatively small and generally at capacity. Very few private immigration practitioners take children's cases, due to the specialty area of law it encompasses. The few attorneys who do take the cases will charge $10,000 on average, which is outside of reach for most children released to the community and impossible for all children in ORR custody who by definition have no family or financial support in the country. Before MIRC began working under the contract, we would receive frequent calls from staff at the ORR facilities asking us to take the cases because no one else would do so, but without offering any funding for the work. We turned down a large number of these cases due to a lack of capacity.

12. Since MIRC's founding in 2009, MIRC has engaged in recruitment and mentorship of pro bono attorneys to the fullest extent possible, but a significant challenge has been that in the state of Michigan, pro bono attorneys do not generally have immigration expertise, only speak English (and unwilling to pay for interpretation for pro bono cases), and are unwilling to commit to the timeframe of children's immigration cases or with the special care needed when working with children. Only recently have we had some small success involving pro bono attorneys in our children's work, and it has been because the HHS contract funds language support for the pro bono attorneys and we have a dedicated team to train and support those pro bono attorneys. Even with this support, the pro bono

4

attorneys will usually only offer support in small ways and rarely or never take on full cases for representation.

13. A few other small non-profit legal service providers exist in the state of Michigan, but all of them are quite small and have only had capacity to focus on primarily adult and USCIS-only representation, leaving no other non-profit options for children in removal proceedings aside from MIRC.

14. In addition to MIRC providing the only available and financially accessible legal representation for unaccompanied immigrant children in the state of Michigan, MIRC dedicates significant resources to ensuring the staff MIRC hires are culturally humble, are passionate about serving immigrant children, are trained in best practices for trauma-informed and child-friendly legal services, follow strict child abuse prevention guidelines, and as much as possible share cultural, linguistic, and experiential backgrounds with our child clients.

15. Under the unaccompanied child legal services program, since 2017, MIRC has entered representation for 1,697 children, provided 5,686 Know Your Rights sessions, 4,061 legal screenings, and identified 6,158 potential pathways for relief for our young clients. We have represented children as young as 10 months old. In 2024, MIRC offered legal services and representation to children who spoke 62 different languages MIRC has filed asylum for 725 children, with an 83% approval rate, and filed 351 applications for permanent residency, with 155 of those already approved (the remaining are pending). MIRC currently has over 900 cases open for unaccompanied children in removal proceedings. These numbers result in real, meaningful changes in the lives of children and families, children who grow up to thrive and be part of our communities.

16. MIRC has represented children fleeing abuse, including those who were regularly whipped with electric cords or who faced ongoing sexual abuse with no hope of protection from their communities. MIRC has reunited children with loved ones–children should have the opportunity to be children and the law requires them to be placed in the least restrictive environment feasible, the best place for a traumatized child is with the family or community members with whom they feel most comfortable. These were courses of action that required a lawyer due to their complexity, the legal expertise required, the many logistical barriers within USCIS and immigration court. Without legal representation, these children would have been forced to return to situations of abuse, persecution, and lack of safety due to the inability for a child to meaningfully present their case.

17. We have also represented children who have been trafficked, such as children who were forced to do dangerous work and beaten when they were too sick to go to work. One of the most powerful tools that traffickers use is the threat of deportation to intimidate their

targets. Taking lawyers away from children strengthens traffickers' hands. Many times our legal services have prevented children from falling through the cracks–sometimes by identifying abuse in custody and supporting children in coming forward to authorities about such abuse and sometimes by helping children who find themselves in an unsafe situation obtain safe housing or meet other needs to escape violence.

18. In addition to the work we do for children in and released from ORR custody in Michigan, we also work to connect children with counsel when they are moved to an ORR placement outside of Michigan or are released out of state. We work with the child and use the information we obtained during intake consultation to prepare a referral and have staff dedicated to following up to do our best to connect children to free legal counsel in their new location.

19. MIRC is well respected among the local state courts, immigration courts, ICE, USCIS, and local ORR subcontractor staff. MIRC developed norms with each ORR-subcontracted facility by having quarterly meetings to work through logistics and continue to uphold best practices on behalf of the children in custody. Staff from these agencies regularly express their gratitude for MIRC staff and how essential they are for the children. MIRC and the immigration court staff developed a weekly call framework where MIRC efficiently funnels the matters needing the court's attention through one central point of contact, rather than having more than fifty representatives reaching out individually to get questions answered or provide information. The court regularly approaches MIRC for support for pro se respondents and in support of MIRC remaining on the court *pro bono* list (MIRC is the only organization on that list in Michigan). MIRC regularly engages with ICE and USCIS both in representational settings and in stakeholder engagement contexts respectfully and collaboratively on behalf of the clients when possible. One of Detroit's Immigration Judges recently took some time after a hearing to thank our staff member for working for MIRC and for all the great and important work MIRC does.

20. Additionally, MIRC received the Champion of Change award in 2024 from the Governor's Task Force on Child Abuse and Neglect and Children's Advocacy Centers of Michigan, as part of the nomination for the award, Veronica Thronson, leader of the Michigan State University College of Law's Immigration Clinic, was quoted as praising MIRC as follows:

> The nominee has been a champion for children since its inception, through direct representation of children and their families in seeking protection in immigration and state contexts... These children have been abused, neglected, or abandoned in the State of Michigan. MIRC's team has grown from two attorneys to its current size of [, with] staff members focused specifically on protecting the rights of children in federal custody in Michigan, achieving permanent protection for

<center>6</center>

children through state and federal courts, and advancing the law to create the greatest access to these protections for all children in Michigan. MIRC has stood in the gap during family separation under the Zero Tolerance policy and ensured that all children in Michigan were reunited with their families according to their wishes. Further, MIRC has held the federal government and its subcontractors accountable when children's rights were violated in federal care in Michigan, in licensed and unlicensed facilities. The nominee has led efforts to try to ensure responses to abuse in custody are trauma-informed and provide the protection needed for children in care.  Illustrative of the difference that the nominee's services have made in the lives of children, in 2023 alone, the nominee served over one thousand children through Know Your Rights presentations, legal screenings, and direct representation in immigration, state court, and before immigration agencies. Also in 2023, the nominee secured state court protections in multiple counties and began a path toward citizenship for hundreds of immigrant children. More stable immigration status allows children to thrive in all other aspects of their lives.

The nominee recently added an innovative team to address social, emotional, and physical needs, which has already assisted over 150 children. The nominee has increased knowledge of protections for immigrant children in state courts throughout Michigan, creating a safety net for children across the state. These children who are released to sponsors or relatives frequently went without access to an attorney before the nominee's programming emerged to serve them. MIRC has been the leader in appellate cases that have enshrined protections available under the law to immigrant children who have been abused, neglected, or abandoned. In particular, the nominee has won two critical appeals that serve as seminal case law impacting immigrant children in Michigan.

The nominee leads several collaborative efforts with stakeholders to enhance outcomes for children, through joint advocacy, training, and resource sharing. As new populations of immigrant children enter the state, the nominee has taken a leading role in assisting service providers to be ready to welcome children in a culturally informed and humble manner. Where necessary, the nominee has advocated on behalf of children whose religious and cultural needs were not fully met by other service providers and to ensure that children who are victims of sexual assault, human trafficking, and other crimes are met with a holistic and culturally sensitive response. For example, the nominee has worked with law enforcement to inform them of the impact of trauma on specific populations, such as youth arriving from Afghanistan who had been evacuated during the Taliban's takeover and who had been separated from their families.

The nominee has also championed change through legislative advocacy at the

7

state level to enhance protections for children who are harmed through child labor, to expand access to Medicaid to children in need, and to ensure language access for state services. In particular, the nominee has partnered with state legislators to increase protections for children exposed to exploitative labor practices, partnering with various stakeholders and leaders to testify on the needs of children to local, state, and national media.

Overall, MIRC has changed the landscape of representation for immigrant children for the better in ways that are measurable in the law and the experience of children and their families in the community. Over the years, thousands of children have safety, stability, and the opportunity to thrive in no small part due to the team focused on the rights and representation of immigrant children in Michigan that the nominee has been able to cultivate and grow and seeks to keep doing so to continue to serve children.

21. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs): 1. KYR presentations and legal services for pro se children in ORR facilities; 2. Legal representation for unaccompanied children not in ORR custody; 3. Legal representation for unaccompanied children in ORR custody; 4. Spanish language tutoring for organizational staff who work with children; and 5. Immigrant Justice Corps fellows who represent children not covered under other CLINs. Without further elaboration on duration or reasoning, the stop work order states that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance."

22. Some MIRC staff were on a virtual meeting led by the Acacia Center for Justice on other matters when the Acacia Center for Justice received notice of the stop work order around 1:00 PM EST. Information was shared on that call and an email was sent shortly thereafter to the entire network. We then immediately had to sort out what this meant in practice and how to ensure every staff member received the information and began to act accordingly. We had an urgent leadership meeting to understand the stop work order and attended an Acacia call hosted on the topic of the stop work order and then held a meeting for our team to explain what we knew at that point, which was very little.

23. During the stop work order, MIRC used a small fund reserve to ensure our clients had the best possible service for as long as possible. The stop-work order did not cut off legal representation for children who are already represented. Because MIRC's lawyers had already filed paperwork with the court and USCIS as the attorney of record for our cases, they are obligated to continue representation or face the possibility of sanctions or bar complaints — unless they ask a judge to be removed from the case, which takes time and

8

has very specific ethics rules that guide how to make this request and when and if a judge will grant it. These reserves can only carry our staff for a few weeks. Roughly 80% of MIRC's budget is funded through the unaccompanied children's HHS funding. If we lose this funding in the long term, we would expect to let go of all of 113 employees, in other words, we do not expect meaningful replacement funding that would allow us to carry on the work under this contract. We would also need to seek to withdraw from all of the 1,205 open cases under the contract and would need to use reserves to have staff focus on that work. The reserves are a critical part of MIRC's long-term sustainability, so the Stop Work Order and any other loss of funding under this contract affects MIRC's other work in the community for other vulnerable populations.

24. During the stop work order, we paused offering KYRs and intakes for children in ORR custody and focused on using our limited resources to maintain our ethical obligations to current child clients.

25. Time spent on stop-work order logistics cost us valuable time in needing to communicate, understand, and change our case management practices to account for the change under the stop-work order. More than that, it has caused a significant feeling of instability, stress, and low morale. MIRC's highly trained, experienced, and specialized staff are beginning to put in their resignation notices to go to jobs that have more funding security. MIRC has built an outstanding reputation as an employer and has been able to attract unusually high quantities of staff to our work, compared to similar local non-profits, because of our commitment to the community, our stable funding, and our efforts to train and support our staff in their work. This reputation is being significantly undermined by the stop work order and the subsequent lack of security around the ongoing funding of the contract and it will make it harder to attract new staff in the future to replace those who have left during this time.

26. When the stop work order was rescinded, MIRC resumed providing all services under the UCP contract. On March 21, 2025, MIRC received notice of ORR's termination of CLINs 2, 3, and 4 of the Acacia UCP contract, effective at the close of business that day.

27. MIRC currently represents over one thousand children under the Acacia UCP contract CLINs 2 and 3 work. These cases involve representation before Michigan local state courts, USCIS, and the Detroit Immigration Court. Without CLIN 2, 3, and 4 funding, MIRC will begin an immediate process to withdraw from these cases. Even though we have made significant efforts to fundraise with individual, foundation, and local government funding, there is no meaningful replacement for the funding offered for representational services of unaccompanied children under the UCP contract. Our alternate fundraising may allow us to keep as many as 100-200 cases open, which would leave over 800 children whose representation we will need to withdraw from immediately. While we will begin our efforts to withdraw from the cases for which we

9

did not obtain alternate funding, the process of withdrawal takes some time with ensuring the proper wrap-up tasks have been completed so the client is not unduly prejudiced by the withdrawal and counsel needs to formally seek to withdraw where we have entered appearances before tribunals, which takes time and is subject to the decision of the judge on each case.

28. While we have attempted to do the most we could for each client before we were in the position, we still have many clients for whom no relief has been filed because we have only begun working on their cases recently or there were external hurdles to accomplishing our initial goals in the case. Almost every one of the children MIRC represents qualifies for protection under the immigration law, however, it is a lengthy, arduous, and legally complex process that allows us to usher the client to the point of receiving the immigration status they qualify for. Many of the children whom we will no longer be able to represent due to the termination of CLINs 2, 3, and 4 of the UCP contract will be unable to secure new counsel and be unable to navigate the immigration processes without counsel, and so will be left without protections they qualified for and will be deported to situations where they would face abuse, neglect, persecution, separation from critical caregivers and services. In all of this, expecting these children to face the immigration system without counsel will have deprived these children of their right to due process under the law.

29. CLINs 2, 3, and 4, comprise about 75% of MIRC's budget. Of the 113 full-time employee's worth of funding in our UCP budget, about 98 of those are in CLINs 2, 3, and 4. If funding from CLINs 2, 3, and 4 is not restored within a few days, MIRC will need to proceed to provide layoff notices to the majority of staff funded under those CLINs. We are able to use some of the funds we raised to allow us to provide staff a short notice period to withdraw from cases and honor their rights as employees. Even this little bit of essential transition period after a layoff notice, will cost MIRC at least 1.2 million dollars of funds drawn from other sources that take away from MIRC's ability to serve other vulnerable populations.

30. However, if the restoration of CLIN 2, 3, and 4 funding is delayed any more than a week and we have already given staff their layoff notices, we expect most staff will still seek to depart, even if funding is restored, because of the uncertainty and individualized detriment to their morale to know they specifically were not retained. Even as we have been nearing the end of the contract period, more and more staff have been departing, especially our more seasoned staff, because the earlier stop work order gave them concern for the future of the funding.

31. If the restoration of CLIN 2, 3, and 4 funding is delayed any more than a month, and we would be in a position to have to rehire for the work, it would be unlikely that most of the laid-off staff would be interested in returning. Before this season of funding uncertainty,

PI Appeal and Stay Addendum 078

MIRC has been close to exhausting the hiring pool of those interested in and able to do work under the UCP contract, especially where attorneys are concerned, and so I expect our success in bringing on new staff would be limited, to begin with, and it would cost us the months of labor in recruiting, hiring, onboarding, and building their familiarity with the work that it takes to return to the staffing norm we have now.

32. Beyond the cost to the staff themselves, the cost to the clients of closing cases, laying off staff, then having to bring on new staff, and trying to reach out to clients to try to offer them representation again is devastating, specifically shattering those relationships of trust which have taken so much to build. A stable and trusting relationship is critical for children. They will have no reason to trust our ability to continue to keep their cases and they will have to build relationships with new people, assuming they are available, which is already hard for anyone having to share the most traumatic details of their life story in order to pursue immigration relief, but it is especially hard for a child in that situation.

33. The uninterrupted and ongoing funding of this work with unaccompanied children is critical to the protection of children from harm in custody and against the significant risk posed by going through removal proceedings without counsel and the subsequent harm that would result from removal. Not only that, but the stability of this funding is critical to MIRC's ongoing work as an anchor immigrant rights organization.

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing is true and correct.

Executed on the 22 of March 2025, in Lansing, Michigan.

Ana Raquel Deveraux (P79145)
Senior Managing Attorney
Michigan Immigrant Rights Center

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

               Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

            Defendants.

Case No. 3:25-cv-2847

**DECLARATION OF JILL MARTIN
DIAZ, ESQ. (VAAP) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

## DECLARATION OF JILL MARTIN DIAZ, ESQ.
## EXECUTIVE DIRECTOR FOR VERMONT ASYLUM ASSISTANCE PROJECT

*I, Jill Martin Diaz, make the following statements on behalf of Vermont Asylum Assistance Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Jill Martin Diaz (they/them pronouns and Mx. honorific), and I am the Executive Director at Vermont Asylum Assistance Project (VAAP; www.vaapvt.org). VAAP is a nonprofit immigration law firm dedicated to expanding access to critical legal services for noncitizens across Vermont. VAAP grew from years of grassroots advocacy to meet low-income Vermonters' increasingly urgent needs for structured, equitable, and trauma-informed immigration representation. Today, VAAP is Vermont's only firm dedicated to providing legal services to indigent unaccompanied immigrant children exiting detention, other youth and adult subpopulations in removal proceedings.

2. VAAP is a legal services organization committed to expanding access to immigration legal knowledge and direct services. We envision a Vermont where noncitizens fully understand and access their legal rights, and where immigrant and mixed-status families feel a true sense of belonging, regardless of legal status. Founded in 2021 by grassroots volunteers, VAAP incorporated as an independent 501(c)(3) in late 2023. Now guided by an 11-member board and staffed by a supervising attorney and three legal advocates, including two pending admission to practice, VAAP is mobilizing dozens of pro bono attorneys and transforming Vermont's immigration legal landscape through direct representation, pro bono coordination, technical assistance, and advocacy at the state and federal levels.

3. In order to carry out this mission, VAAP has several main work components, including: (1) Providing educational and pro se services in the form of legal education "know your rights" ("KYR") presentations, conducting individual consultations (intakes), and conducting pro se workshops with all unrepresented children exiting ORR custody into Vermont; and (2) Representing unaccompanied minors who are not in ORR custody in immigration proceedings. We further host Immigrant Justice Corps (IJC) fellows to represent unaccompanied children in removal proceedings and provide Spanish-language tutoring for staff representing unaccompanied children.

4. VAAP has been providing legal services for unaccompanied immigrant children in Vermont since 2024. This marked a significant milestone for access to justice as VAAP doubled its staff and brought Vermont its first-ever IJC Legal Fellows: Cameron Briggs Ramos and Emma Matters-Wood. Both are Unaccompanied Children Program (UCP) fellows who started in September 2024 and expanded VAAP's intake criteria to not only include legal services for immigrant youth and over-18 UCs but also to guarantee universal

1

representation for all under-18 UCs exiting ORR custody into Vermont (noting Vermont lacks any ORR facilities in-state.).

5. Since VAAP added two full time IJC UCP fellows to our staff in September 2024, we have begun serving a combined annual number of around 135 immigrant children including: (a) about 15 under-18 unaccompanied children leaving ORR custody and seeking full-scope representation on asylum, Special Immigrant Juvenile Status (SIJS), or related humanitarian relief; (b) about 20 factually unaccompanied children who were not so-designated and/or were over-18 at intake and are also seeking full-scope representation; and (c) about 100 derivative beneficiary children included in their parents' *pro se* asylum applications filed at VAAP-supervised pro bono legal clinics.

6. With U.S. Department of Health and Human Services (HHS) funding, VAAP currently has hired two full time staff members dedicated to providing legal services to unaccompanied immigrant children. Specifically, VAAP employs IJC UCP Fellow Emma Matters-Wood on a full-time basis directly serving clients statewide for a renewable one-year contract period from September 1, 2024, through August 31, 2025; and IJC UCP Fellow Cameron Briggs Ramos on a full-time basis directly serving clients statewide for a two-year contract period from September 1, 2024, through August 31, 2026.

7. VAAP staff providing representation and KYR presentations to children leaving ORR facilities to a Vermont parent or caregiver regularly meet clients to conduct client interviews, prepare clients for hearings, as well as provide legal education, individual consultations, and pro se workshops for pro se children. The kinds of legal matters VAAP represents children in include removal proceedings in immigration court, affirmative relief like asylum before USCIS, SIJS in state court, and advocacy in terms of equal access and enjoyment of state law-based rights and remedies.

8. As Vermont's foremost immigration technical assistance provider and main conduit between regional and national communities of practice and local communities, the unmet need for KYR services/pro se workshops and/or legal representation is astonishing. These unmet needs are due to, for example, unaccompanied children not being able to afford representation, age of children, trauma, language barriers, geographic isolation, technological and transportation barriers isolating rural parts of the state, lack of attorneys due to remoteness of Vermont towns, and scant amount of nonprofit and private immigration attorneys in the region.

9. Vermont-based children trying to apply for various kinds of relief and/or advocate for themselves without an attorney find it functionally impossible to access their removal proceedings in the Boston and Chelmsford Immigration Courts, as Vermont lacks public transportation, services, and awareness and only represented parties can access virtual proceedings. Caregivers for unrepresented Vermont children as young as five years old have contacted VAAP letting us know that without a cash grant for transportation and

overnight accommodation and meaningful language access assistance, they would be unable to get the children to Immigration Court let alone to assist them to prepare and file the children's meritorious applications for legal relief. When VAAP has been able to offer representation—universally to eligible UCs through the IJC UCP Fellows, and ad hoc to other immigrant children in Vermont—we have successfully stabilized children's status by securing relief including SIJS; and promoted judicial economy by terminating proceedings for children where court jurisdiction is improper.

10. As a hybrid direct presentation/pro bono coordination service provider, VAAP provides full-scope direct representation to about 35-40 children each year through our two IJC UCP Fellow positions. VAAP also mobilizes limited assistance for dozens more who are derivative beneficiaries of primary asylum seeker clinics accessing pro bono services on a limited basis in VAAP-coordinated attorney-for-the-day clinics.

11. Numerous judges, clerks, and staff of local state and immigration courts, as well as the Department of Homeland Security's field office staff, have commended VAAP staff for promoting more streamlined, fair, and efficient through their legal work. For example, on several occasions Chelmsford and Boston Immigration Courts have thanked us for helping to prevent unnecessary status conferences, at least, and at best for giving previously unrepresented parties the precious chance to fully developing their clearly meritorious claims for relief. Representing Vermont children also prevents the courts from interfacing with confused respondents about their travels and allows Vermont respondents to appear efficiently via Webex video conferencing.

12. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025.

13. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective on the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN1, which funds KYR

3

presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

14. Through social media/word-of-mouth, VAAP staff Emma and Cameron were the first to become aware of the February 21 and March 21 orders threatening their funding, exacerbating the adverse impacts them and their clients. On February 21, the information VAAP staff received was incomplete and changing, and as their supervisor I was not equipped to either confirm or deny rumors until IJC provided written guidance a few hours later, which they supplemented in the days that followed with a town halls for IJC hosts and a one-on-one meeting with me. On March 21, VAAP staff were first to learn about the new order, doing so from their peer fellows hosted by other organizations. Again, I confirmed shortly thereafter with IJC, this time in person since the order was issued while IJC was gathered in New York City for its inaugural alumni convening.

15. This funding loss is devastating to VAAP's financial picture. Currently, the number of immigrant children VAAP currently represents under the CLIN2 subcontract is about 15 and growing, as our contract is new and VAAP was in the process of conducting outreach with referring partners statewide to connect incoming children with us as counsel—an onerous piece of work considering Vermont lacks any in-state ORR detention. For context, Office of Refugee Resettlement-originated funding, including but not limited to our CLIN2 subcontract, accounts for about half of VAAP's overall operating budget and accounts for about 75% of the funding VAAP needs to host our two IJC UCP fellows. As a newer organization with limited cashflow and mostly reimbursement-based funding sources, VAAP cannot administer payroll without UCP contract funding, and may need to furlough its two IJC UCP fellows. Indeed, when the Stop-Work Order was first announced in February, VAAP temporarily furloughed our two IJC UCP fellows effective immediately causing financial harm to the fellow and to VAAP and legal harm to VAAP clients including children in proceedings. When IJC UCP Fellows are furloughed, I am rendered the sole remaining direct legal service practitioner on staff and must absorb two full-time caseloads in addition to my existing full-time administrative, fiscal, and professional duties. Only with IJC's commitment of an expedited reimbursement for expenses incurred last quarter plus an additional 30 days of prepaid funding for the month of March was VAAP able to restore Emma and Cam to full-time after a 48-hour furlough.

16. Notably, the February Stop-Work order conspicuously co-occurred with the *J.O.P. v. Department of Homeland Security* class settlement deadline of February 24, 2025, the date when unaccompanied children class members were required to file their asylum applications with USCIS at pain of waving initial USCIS jurisdiction over their claims. VAAP staff were placed in the impossible posture of either working without pay to meet professional duties to several class member clients or leaving the work piled onto my

4

catastrophically overloaded docket at risk of permanent legal harm to clients and professional liability for VAAP. VAAP staff worked without pay to meet their child clients' deadlines, causing undue delay to their own contingency planning to replace lost income and prevent rent arrearage and loss of housing.

17. Moreover, since February, the threat to UCP funding has closed VAAP to new legal intakes, including for unaccompanied children in deportation proceedings. Intake closure comes at a time when DHS is ramping up enforcement and detention activities in our northern border state, causing an increasing volume of indigent Vermont children and youth to enter removal proceedings in Boston and Chelmsford Immigration Courts without counsel.

18. For existing clients, VAAP staff describes the act of strategizing on individual cases or managing their overall dockets long term as "impossible," since they are finishing each workday without knowing whether they will be returning the next. Funding threats and associated uncertainty of employment is threatening legal service quality and making it difficult for VAAP staff to prioritize among increasing, overlapping case emergencies.

19. For example, one CLIN2 subcontract client from Sudan has a pending asylum application and an approved USCIS Form I-360 granting Special Immigrant Juvenile Status. Prior to seeking refuge in Vermont, Sudanese law enforcement repeatedly refused to offer client with protection from the physical and verbal attacks he faced for reasons relating to his nationality, ethnicity, and religion. The child client was being held in ORR custody for an extended period in a southern U.S. state, since the SIJS sponsoring organization required proof of counsel in Vermont before permitting the child to be released here. Client was on his way to release to Vermont with VAAP's offer of full-scope representation, which we have suddenly rescinded considering this funding loss. The child clients' navigation of removal proceedings *pro se* from his unnecessarily prolonged detention hangs in the balance.

20. Another CLIN2 subcontract client from Mexico has a pending asylum application and was just beginning the SIJS process when funding was cut. Prior to seeking refuge in Vermont, the child witnessed neighbors, friends, and peers his age tortured and killed by cartel members and their families, and all were denied assistance by local police. When the client began receiving threats that the same would happen to him, he fled. Since arriving in the United States, a severe health condition and hospitalizations have made client's court appearances literally impossible to access without resource-intensive assistance from counsel including home visits to his rural Vermont town. Resultantly, he was up against the *J-O-P-* deadline to file his asylum application and receive the benefits to which he was entitled and nearly lost out in spite of his and counsel's heroic efforts to overcome his health condition and make his filing deadline. They were just able to submit client's meritorious asylum application in time, despite the odds they were up against. Client will not be able

5

to continue pursuing his applications for relief without counsel, given his young age and fragile health.

21. Yet another CLIN2 subcontract client from Mexico has a pending asylum application with an upcoming biometrics appointment. Prior to seeking refuge in Vermont, the now 10-year-old child's uncle was murdered in his presence. The same group that murdered his uncle threatened our child client and attempted his kidnapping, at which point he fled for his life to the United States. Unfortunately, our client and the family he reunited with in the United States were then subjected to severe forms of labor trafficking. After all of this, our client made his way to Vermont and had just managed to secure our representation and to file his asylum claim when funding was cut. This young child needs our legal assistance to access his upcoming biometrics appointment, to understand and prepare evidence substantiating his claims, and to share his story in an asylum interview. The child client will be unable to complete his interview without the assistance of counsel, as he is incredibly shy and has either panic attacks or breaks into inconsolable sobs when he attempts to speak about it.

22. The uncertainty of future funding has prompted VAAP's difficult decision to not renew the contract of the one paralegal advocacy/program coordination person on staff and eliminate the position. Now, VAAP staff is shrinking from four to three, and potentially to one, at a time when the complexity and volume of unmet legal service needs are increasing.

23. In the interest of prioritizing professional duties owed to child clients above all else, VAAP is also forgoing administrative work that would reimburse staff for work-related expenses and replace lost funding to sustain VAAP's ongoing operations. My professional duties to clients and fiscal duties to the future of VAAP are now in direct conflict because of this contract cancellation. As a result of these sudden, unplanned resource constraints, existing child clients are waiting longer to hear back from VAAP regarding clients' increasingly frightened requests for clarification and assistance.

24. Without restored funding, I will likely be the only full-time attorney at VAAP within the next four-to-six weeks, rendering me solely responsible for the firm's existing attorney-client duties as well as all existing fiscal and administrative ones. My resource constraints and conflicting professional and administrative duties would require me to keep our intake closed and to withdraw from representation in all child clients' removal proceedings. This would irreparably harm clients' legal claims for relief and increase their likelihood of deportation, as there are no other legal service providers of this type serving Vermont. Harm to VAAP clients is harmful to VAAP's mission-based staff. That said, continued representation of clients under ethical obligations without funding is also harmful to staff.

25. Even if VAAP can diversify funding at the last minute to prevent IJC UCP staff from becoming re-furloughed because of contract cancellation, the harm of February's stop-work order continues to distract staff energy and drain organizational morale. One of VAAP's fellows, Cameron, was forced to sit the February Bar Exam during her temporary

6

furlough period. She described herself as being distracted from her final days of study because of severe worry over what would happen to her clients' cases during her furlough, in addition to the stress of how she would pay Burlington, Vermont's exorbitant rent. The other fellow, Emma, was unable to avoid working without pay, especially in Cameron's absence. She made the difficult decision to forgo finishing bereavement leave to which she was entitled at the time, given a family loss she was grieving during the same period.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on the 25 of March 2025, in Burlington, Vermont.

/s/ Jill Martin Diaz

**Jill Martin Diaz, Esq.**
**Executive Director, Vermont Asylum Assistance Project**

7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*, | Case No. 3:25-cv-2847 |
|  | **DECLARATION OF MARION ("MICKEY") DONOVAN-KALOUST (IMMDEF) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| Plaintiffs, |  |
| v. |  |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, |  |
| Defendants. |  |

### DECLARATION OF MARION DONOVAN    ALOUST
### DIRECTOR OF LE   AL SERVICES FOR IMMI   RANT DEFENDERS LA    CENTER

*I, Marion Donovan-  aloust, make the following statements on behalf of myself and Immigrant Defenders   aw Center.  I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

Case 3:25-cv-02847-AMO Document 91-7 Filed 05/09/25 Page 16 of 95

*in absentia*



Case 3:25-cv-02847-AMO Document 9 Filed 04/23/25 Page 2 of 5

**Immi rant De enders La  Center**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

               Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

          Defendants.

Case No. 3:25-cv-2847

**DECLARATION OF JOEL FROST-TIFT
(PUBLIC COUNSEL) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

**DECLARATION OF JOEL FROST-TIFT,**
**SENIOR SUPERVISING ATTORNEY FOR PUBLIC COUNSEL'S IMMIGRANTS'**
**RIGHTS PROJECT, UNACCOMPANIED CHILDREN'S TEAM**

*I, Joel Frost-Tift, make the following statements on behalf of Public Counsel. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Joel Frost-Tift, and I am the Senior Supervising Attorney of the Unaccompanied Children's Team at Public Counsel, a nonprofit public interest law firm in Los Angeles dedicated to advancing civil rights and racial and economic justice, as well as to amplifying the power of our clients through comprehensive legal advocacy. Public Counsel is one of the primary organizations dedicated to providing legal services to indigent unaccompanied immigrant children who are released from Office of Refugee Resettlement (ORR) custody throughout the greater Los Angeles area.

2. The Unaccompanied Children's team is the largest of four teams within the Immigrants' Rights Project at Public Counsel. The Immigrants' Rights Project practices holistic, trauma-informed advocacy, recognizing that our clients come to us with extraordinary strengths, but also vulnerability due to the violence many have experienced through forced migration and our dysfunctional immigration system. Our team of advocates collaborates with immigrant clients and communities to fight fearlessly for legal protections and a just immigration system.

3. In order to carry out this mission, Public Counsel represents unaccompanied children who are not in ORR custody in immigration proceedings. We further host Immigrant Justice Corps (IJC) fellows to represent unaccompanied children in removal proceedings and provide Spanish-language tutoring for staff representing unaccompanied children.

4. Public Counsel has been providing legal services for unaccompanied children funded by U.S. Department of Health and Human Services (HHS) in the greater Los Angeles area since 2014. Public Counsel serves around 200 unaccompanied children each year.

5. Public Counsel currently has 14 staff members funded by HHS who are dedicated to providing legal services to unaccompanied children. They are a supervising attorney, a program manager, six staff attorneys, one IJC fellow, one social worker, one case coordinator, and three paralegals.

6. Public Counsel provides full scope representation, which includes representation in state courts, in removal proceedings before the immigration court, in appellate proceedings before the Board of Immigration Appeals, in petitions for review in the U.S. Court of Appeals for the Ninth Circuit, and in applications for affirmative humanitarian relief like asylum and Special Immigrant Juvenile Status before USCIS. Our staff frequently

1

represent clients in the Los Angeles, Orange County, and Van Nuys immigration courts, the Los Angeles Asylum Office, and state courts in Los Angeles, Orange, San Bernardino, Riverside, Ventura and Santa Barbara counties. We also provide Know Your Rights services to communities throughout Southern California.

7. Public Counsel has witnessed pro se children in court struggle to articulate their claims due to their age, language barriers, and the complexity of immigration law. Most of these children cannot afford private attorneys, so the loss of the HHS funding would prove devastating for them since it would greatly decrease the number of providers who could represent them.

8. Our Unaccompanied Children's team receives referrals from existing clients, the community, and the online Acacia Center for Justice referral database system. Once we receive a referral we conduct a brief phone screening, followed by a more in-depth intake before initiating representation of a child by signing a representation agreement. When we have capacity to take on cases, we accept all cases that are eligible under HHS funding guidelines where the child resides within our service area.

9. Immigration judges have often expressed gratitude to Public Counsel for the efficiency we bring to their dockets, and they have referred children to Public Counsel. They have remarked to our clients that they are lucky to have such quality representation.

10. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all four Contract Line Numbers (CLINs) of the contract for which Public Counsel is a subcontractor of the Acacia Center for Justice: (1) KYR presentations and legal consultations for pro se children in ORR facilities; (2) Legal representation for unaccompanied children not in ORR custody; (3) Legal representation for unaccompanied children in ORR custody; and (4) Spanish-language tutoring for organizational staff who work with children. Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance."

11. Members of Public Counsel learned of the stop work order suddenly on February 18, 2025, when we received communications from the Acacia Center for Justice and from the Center for Gender and Refugee Studies abruptly informing us that trainings and officer hours had been cancelled. Then, just as suddenly, HHS rescinded the stop work order on February 21, 2025.

12. On March 21, 2025, again without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated this same contract with Acacia Center for Justice for which Public Counsel is a subcontractor. This termination was effective the

2

same day, March 21, 2025. HHS terminated the contract with respect to three of the four Contract Line Numbers CLINs: (1) CLIN2, Legal representation for unaccompanied children not in ORR custody; (2) CLIN3, Legal representation for unaccompanied children in ORR custody; and (3) CLIN4, Spanish-language tutoring for organizational staff who work with children. For now, HHS has left in place only CLIN1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors—which includes Public Counsel—to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

13. HHS provides about $1 million per year in funding for 14 of the 15 staff members on Public Counsel's Unaccompanied Children's Team. This accounts for about 5% of Public Counsel's annual operating budget. Without this funding, we will be unable to maintain this staffing of the Unaccompanied Children's team. This loss of staff would have a devastating impact on our ability to continue to represent unaccompanied children.

14. The partial contract termination and the uncertainty of continued HHS funding have had a serious deleterious effect on morale within the organization. Members of our staff have stated their intention to look for other jobs because of the need for reliable continued employment. The anxiety that the partial contract termination and the uncertainty has caused our staff as well as the time we have devoted to contingency planning have impacted our ability to focus squarely on representing our clients. In addition, we are unable to take on new clients due to the funding uncertainty.

15. Children without representation are much more likely to be denied relief and ordered removed to countries where they fear harm, contrary to Public Counsel's mission of advancing civil rights and justice for all.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on the 22nd of March 2025, in Burbank, CA.

Senior Supervising Attorney
Unaccompanied Children's Team
Public Counsel

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

            Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

            Defendants.

**DECLARATION OF VANESSA
GUTIERREZ (NWIRP) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

**DECLARATION OF VANESSA GUTIERREZ**
**DEPUTY DIRECTOR FOR NORTHWEST IMMIGRANT RIGHTS PROJECT**

*I, Vanessa Gutierrez, make the following statements on behalf of Northwest Immigrant Rights Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Vanessa Gutierrez, and I am the Deputy Director at Northwest Immigrant Rights Project ("NWIRP") who oversees NWIRP's Unaccompanied Children Program ("UCP"). NWIRP provides legal services to unaccompanied immigrant children and youth who have been released from Office of Refugee Resettlement ("ORR") custody to sponsors throughout Washington State.

3. NWIRP has provided legal services through UCP since 2022. We expanded to provide In-Person Post-Release Legal Services to children and youth released from emergency ORR facilities in 2023, and we expanded again to provide representation to youth entering the

1

URM program in February 2025. NWIRP has over 500 open UCP cases in which we are providing direct legal representation to unaccompanied children and youth released from ORR custody.

4. With funding from the U.S. Department of Health and Human Services (HHS), NWIRP currently has 20.9 full-time equivalent (FTE) staff members dedicated to providing direct legal services to unaccompanied immigrant children and youth. Specifically, we have a directing attorney, 3.65 FTE supervising attorneys, 8.7 FTE staff attorneys, 7 FTE legal advocates, and one social services advocate. In addition to these staff, NWIRP has three FTE Immigrant Justice Corps (IJC) fellow attorneys who provide direct representation for unaccompanied children and youth in removal proceedings.

5. NWIRP UCP staff represent unaccompanied children and youth in removal proceedings in immigration court, BIA appeals, affirmative relief before USCIS (including asylum, Special Immigrant Juvenile (SIJ) classification, Adjustment of Status, T visas and U visas), and state court cases (including dependencies, minor guardianships, parenting plans, and vulnerable youth guardianships). Staff must regularly travel to the Seattle Immigration Court, and occasionally the Portland Immigration Court, as well as state courts throughout Washington for court filings and hearings.

6. NWIRP's UCP Program provides critical legal services to unaccompanied children and youth, who are not guaranteed appointment of counsel in removal proceedings. Most unaccompanied children and youth in our state lack the financial resources to be able to hire private immigration attorneys. There are not many attorneys in Washington state who provide representation in removal proceedings for unaccompanied children and youth or in state court for SIJ-eligible children and youth, especially on a low bono or pro bono basis. Due to their young age (we have represented UCP clients as young as 1 year old), the trauma they may have experienced, language barriers, and the complexity of immigration law, it is not realistic to expect unaccompanied children and youth to attempt to apply for immigration relief before USCIS, pursue state court cases, or advocate for themselves in immigration court without an attorney.

7. NWIRP successfully serves children and youth in rural and urban areas of Washington State. When we receive a referral for a UCP-eligible child, we direct the referral to the UCP team at the NWIRP office that covers the county where the child lives and schedule an individual consultation. If the child would like NWIRP to represent them in their immigration case, we accept their case on a universal representation basis, without regard for the type of relief they may qualify for or the strength of their case. We then assign their case to an attorney, or a legal advocate working in collaboration with an attorney. When possible, for children and youth who are eligible for SIJ classification, we try to place their state court case with a pro bono attorney. We regularly engage in pro bono recruitment and mentorship, and we periodically offer training to pro bono attorneys. When NWIRP is

2

unable to find a pro bono attorney, we take on the state court case in-house. We provide in-house representation on the immigration case before the immigration court and USCIS.

8. For most of NWIRP's UCP clients, we represent them in their first appearance in immigration court. Many of our UCP clients have never been to any court ever in their life before their first immigration court hearing. Before their hearing, their assigned NWIRP attorney meets with them to explain what to expect during the hearing, including who will be present, what the layout of the courtroom will be, what the immigration judge may ask during the hearing, what their NWIRP advocate may say on their behalf, and what some possible outcomes of their hearing may be. We review the factual allegations and charges of removability in their Notice to Appear with them, and we review the forms of immigration relief that we have already discussed with them, making sure they fully understand and that we answer any questions they have. This preparation helps put the child or youth more at ease, helps ensure their presence at their scheduled hearing, and helps the hearing run more efficiently and smoothly because the child better understands what is happening.

9. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all four Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS later rescinded the stop work order without explanation on February 21, 2025. Even this short lapse in funding negatively impacted NWIRP's UCP work. The stop work order created confusion among staff over how to categorize and memorialize the work they continued to do on behalf of our clients, adding extra timekeeping requirements that took away valuable time that could have been spent advocating for clients. During the stop work order, we continued the direct representation and legal services without interruption, as ethically required by the Rules of Professional Conduct in Washington State, but we did not know if we would ever be reimbursed for our work while the stop work order was in effect. Even after NWIRP submitted a Request for Equitable Adjustment for the work completed while the stop work order was in effect, it was communicated to NWIRP that our submissions are "not" official invoices and that our submission "does not" guarantee reimbursement and we were told that it "will ultimately be decided by the government."

10. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs):

3

CLIN2, Legal representation for unaccompanied children as well as other non-representation services such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2, and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. For NWIRP, this results in a full termination of our entire UCP contract. HHS provided no justification for the partial termination other than "the Government's convenience."

11. NWIRP learned about this contract termination through an email communication from Acacia Center for Justice, sent at 8:15 a.m. on March 21, 2025 to NWIRP's Executive Director, Malou Chávez. The title of the email was "Urgent: Notice of Partial Termination for the Government's Convenience." Acacia hosted a meeting for further discussion of the contract termination.

12. While NWIRP is still considering how to respond to the contract termination, we are committed to continuing to represent existing clients, at least in the short term. Our organization's ability to continue representing clients long-term depends on many factors, including whether any case continuity funding might be available to support the winding down of the contract through HHS.

13. UCP funding represents approximately 10% of NWIRP's overall annual budget. Loss of funding impacts 28 staff (20.9 FTEs) at NWIRP. Over the short-term, NWIRP aims to maintain all positions to ensure continuity of representation. The organization will do so by borrowing from its reserves and by seeking support from donors and is currently in the process of determining how long this solution will sustain the services previously funded by the UCP contract. Sustaining services will cost NWIRP at least $200,000 per month. Since NWIRP provides extensive legal services beyond its UCP contract, it must consider all of its mission-focused work when determining use of limited reserve funding or donor resources. Any funds that NWIRP directs to sustain services under this contract take away from other critical services that NWIRP is committed to providing in the community, especially during this period of exponentially-increased demand for immigration legal services. We anticipate that NWIRP will be unable to sustain services over the long-term and will need to reduce its staff accordingly.

14. The UCP contract termination detrimentally impacts NWIRP's mission to promote justice by defending and advancing the rights of immigrants through direct legal services, systemic advocacy, and community education. Research has shown that unrepresented children and youth are more likely to be issued an order of removal, even if they have a strong immigration claim, demonstrating the high need for legal representation in these cases.

While NWIRP aims to continue representation in as many cases as possible, we will have extremely limited capacity to assist children and youth who need representation in the future, negatively impacting their chances of gaining immigration relief and likely changing the trajectory of their lives.

15. Having to turn away youth from services is difficult for our committed legal staff, many of whom are immigrants themselves and share an understanding of the experiences the children and youth are facing. Contract termination will undoubtedly negatively impact the morale of staff who already work under challenging conditions in the immigration system.

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing is true and correct.

Executed on the 21st of March 2025, in Wenatchee, Washington.

*Vanessa D. Gutierrez*

**Vanessa Gutierrez**
**Deputy Director**
**Northwest Immigrant Rights Project**

5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>   Plaintiffs,<br><br> v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>   Defendants. | Case No. 3:25-cv-2847<br><br>**DECLARATION OF ASHLEY T. HARRINGTON (RMIAN) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**DECLARATION OF ASHLEY T. HARRINGTON
CHILDREN'S PROGRAM MANAGING ATTORNEY FOR THE
ROCKY MOUNTAIN IMMIGRANT ADVOCACY NETWORK**

*I, Ashley T. Harrington make the following statements on behalf of the Rocky Mountain Immigrant Advocacy Network. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Ashley T. Harrington, and I am the Children's Program Managing Attorney at the Rocky Mountain Immigrant Advocacy Network ("RMIAN"). RMIAN is a Colorado-based nonprofit organization that provides free immigration legal and social services to individuals in civil immigration detention, as well as to immigrant children and families. Through its staff attorneys, paralegals, social workers, and a network of hundreds of *pro bono* attorneys, RMIAN provides legal education and free legal representation to low-income immigrants who otherwise would not be able to afford an attorney.

2. RMIAN's primary programs are 1) the Detention Program which provides free legal services to individuals in civil detention; 2) the Children's Program which provides free legal services to children and families in immigration proceedings; and 3) the Social Service project which provides comprehensive supportive services to particularly vulnerable individuals, children and families.

3. RMIAN is the primary organization dedicated to providing legal services to indigent unaccompanied immigrant children in Colorado. Specifically, RMIAN provides free legal representation to unaccompanied children who have been released from the Office of Refugee Resettlement ("ORR") to sponsors, to unaccompanied children who have been placed in the Unaccompanied Refugee Minors program, and to unaccompanied children in ORR Long-Term Foster Care. RMIAN previously also provided free legal services to children in ORR short-term shelters in Colorado.

4. RMIAN has been providing legal services for unaccompanied immigrant children in Colorado through U.S. Department of Health and Human Services (HHS) funding since the first ORR short-term shelter opened in Colorado in 2019. RMIAN provided know-your-rights presentations, individual legal screenings, legal representation and referrals to hundreds of youth in ORR custody in Colorado from December 2019 through May 2023 when the shelters closed.

5. RMIAN has continued providing representation to unaccompanied children who were released from ORR custody—both from the shelters in Colorado as well as shelters all over the country. With HHS funding, RMIAN is currently representing 160 unaccompanied children, including unaccompanied children released to individual sponsors and children released into the Unaccompanied Refugee Minor Program. In addition, RMIAN recently

1

expanded its services to provide representation to children in the ORR Long-Term Foster Care program placed in Colorado.

6. With HHS funding, RMIAN currently employs approximately six full-time-equivalent staff dedicated to providing legal services to unaccompanied immigrant children. This includes a managing attorney, staff attorneys, a law clerk, coordinators, a paralegal, and an administrative assistant.

7. RMIAN represents unaccompanied children in removal proceedings in immigration court and in humanitarian relief applications before U.S. Citizenship and Immigration Services, including asylum, Special Immigrant Juvenile Status, U and T nonimmigrant status, adjustment of status to lawful permanent residency, and applications for employment authorization. In addition, RMIAN staff attorneys and pro bono partners represent children in state court proceedings, including guardianship, allocation of parental responsibilities and child welfare proceedings.

8. RMIAN has initiated representation with unaccompanied children as young as two years up to those on the eve of their eighteenth birthday. None of these children are fluent in English or have received higher education. These children's cases require navigating a complicated maze of laws and legal processes necessary to secure lawful status and defend from deportation. Most require analysis of both state and federal laws and require simultaneous applications and motions before the immigration court, a State court and U.S. Citizenship and Immigration Services. Each of these forums have specific, detailed procedures that must be followed to ensure cases don't result in rejection or denial. Children's legal cases often take several years to ultimately result in lawful permanent residency, requiring constant monitoring and regular required filings during the lengthy process. It would be virtually impossible for a child to successfully navigate all the requirements to avoid deportation and successfully obtain lawful status without an attorney.

9. The unaccompanied children RMIAN represents have often been through complex and significant trauma. Many of RMIAN's child clients have been subjected to sex and labor trafficking, child abuse, neglect and abandonment, sexual abuse and other violence. Many of the applications for legal protection require detailed declarations and interviews regarding the trauma and abuse these children have endured—something that would be incredibly difficult to endure without a trauma-informed attorney's assistance.

10. RMIAN's services are not only beneficial to the children in removal proceedings, but also to immigration judges, court staff and government attorneys. RMIAN has built strong relationships with Denver's immigration judges and staff as well as attorneys for the Immigration and Customs Enforcement Office of the Principal Legal Advisor (OPLA). RMIAN routinely meets with immigration judges and staff along with OPLA to discuss how to improve services and efficiency. RMIAN has worked jointly with OPLA to request and obtain dismissal of removal proceedings for dozens of unaccompanied children

2

pursuing relief applications with U.S. Citizenship and Immigration Services, thereby preserving the court and OPLA's time and resources for cases ripe for resolution by the court. In addition, when a RMIAN attorney enters their appearance with the immigration court, typically the next hearing is cancelled and written deadlines are provided, thereby saving the court's limited time for other cases. RMIAN routinely receives requests from immigration court staff and judges to assist unaccompanied children and families with anything from a change of address form to a screening for potential human trafficking. RMIAN ensures that children are fully informed of their rights and options and, wherever possible, that they have expert legal representation to navigate the immigration legal system more efficiently and effectively. Without RMIAN, removal proceedings would take far longer and the dockets would be clogged with cases that are not even under the court's jurisdiction while a child is pursuing legal status with U.S. Citizenship and Immigration Services. Immigration judges and court staff regularly express gratitude for the ways in which RMIAN's services assist the court.

11. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025.

12. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective the same day, March 21, 2025.HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows and Randstad placements who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

13. RMIAN received news of both the stop work order and the notice of contract termination from the Acacia Center for Justice via email. RMIAN staff had to immediately pivot from

providing representation to children to informing all staff of the stop work order and contract termination and planning for its impact on RMIAN's services and funding.

14. Funding from HHS for unaccompanied children's legal services comprises approximately 15% of RMIAN's total annual budget and 26% of its Children's Program Budget—approximately $772,000 this year. Because there are currently no ORR shelters in Colorado, RMIAN does not receive any funding for CLIN1 services to children in ORR custody. Thus, the partial contract termination serves as a complete termination of all funding for RMIAN's work under the contract.

15. HHS funding currently allows RMIAN to employ approximately six full-time-equivalent staff positions, including attorneys, a law clerk, coordinators, a paralegal and an administrative assistant. It remains uncertain whether staff and client cases could be shifted to other funding sources. RMIAN would need to pull from its reserves and limited unrestricted funds to continue paying staff and providing representation to unaccompanied children. This would only be possible on a temporary basis until layoffs would need to be considered.

When news of the stop work order broke, RMIAN received panicked calls from children, their caregivers, foster care providers, and case managers worried that the stop work order meant that RMIAN would no longer provide representation. Similar panic ensued following the news of the contract termination. Instead of focusing on preparing children's legal applications, RMIAN staff had to respond to countless calls and inquiries about how the stop work order and contract termination would impact its child clients. While RMIAN has been able to provide temporary reassurance that children will continue to be represented using RMIAN's reserves and limited unrestricted funding, its staff will be unable to provide such assurances long-term.

17. RMIAN firmly believes that no child should be forced to navigate immigration legal proceedings alone, and that every child deserves to have an attorney to inform them of their rights and options and to represent them in any defenses they may qualify for under the law. In reliance on the government's consistent funding, RMIAN has been steadily building its Children's Program to be able to increase how many children it is able to serve each year. RMIAN hopes to continue expanding programming and staffing so that more unaccompanied children in Colorado have access to expert legal representation. However, without HHS funding, not only will RMIAN not be able to provide representation to any additional children, but the ability to provide continued representation to current child clients is also under threat.

18. RMIAN has relied upon the government's consistent funding of legal services for unaccompanied children in building its Children's Program, and in crafting the representational agreements RMIAN has executed with child clients. In reliance on the government's consistent funding consistent with congressional appropriations, the

4

TVPRA, the Foundational Rule, and in accordance with RMIAN's subcontract with Acacia, RMIAN's representation agreements with most unaccompanied children include a commitment to continue representation through obtaining asylum, U/T nonimmigrant status, or permanent residency, if they are eligible for this relief under U.S. law. For most of RMIAN's clients, this means that it has promised to continue representation for several years due to extreme delays and backlogs in processing and adjudications of these relief applications.

19. RMIAN has legally and ethically binding obligations to its clients to continue providing representation despite this halt in funding. Ethical rules require attorneys to continue representation to the conclusion of the matters undertaken on behalf of clients. Withdrawal may only be permitted under ethical rules if withdrawal would not be materially adverse to the client's case. Withdrawal from children's cases would be materially adverse because they cannot competently represent themselves in matters before the immigration court, the state court, or before USCIS, they could not afford private counsel to represent them, and withdrawal would more than likely lead to their cases being denied—resulting in their removal.

20. RMIAN is committed to continuing to represent its child clients despite this termination of funding. However, it will have to pull from limited reserves and unrestricted funding to do so, and may have to consider staff layoffs. Ultimately, if significant layoffs become necessary, despite the significant detrimental impact on clients, RMIAN may need to consider withdrawing from clients' cases if it does not have sufficient staff to continue representation.

21. RMIAN will have to dedicate its limited staff time to fundraising to try to raise the funds necessary to continue providing representation, with no guarantee of success. This diverts limited time and resources away from providing representation. It also diverts limited funding for representation of other clients as well as funding that allows for staff leave and benefits, staff wellness initiatives, and necessary organizational infrastructure. The stop work order caused great distress among staff, but was short-lived. The termination of funding has significantly impacted staff morale and caused staff stress and concern about whether they will continue to have a job and be able to provide for themselves and their families. Even if layoffs don't become immediately necessary, this worry may cause staff to leave RMIAN for employment that is more securely funded. This would leave RMIAN short-staffed and place more of the burden to continue representation on fewer staff, and would increase the likelihood RMIAN would have to consider withdrawal from clients' cases.

22. Any interruption, reduction or termination in HHS funding significantly harms RMIAN and its mission to provide legal representation to unaccompanied children.

5

I declare under penalty of perjury that the foregoing is true and correct.

 Executed on the 22nd day of March 2025, in Westminster, Colorado.

**Ashley T. Harrington, Esq.**

6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

          Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

         Defendants.

Case No. 3:25-cv-2847

**DECLARATION OF GAUTAM
JAGANNATH (SJC) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

**DECLARATION OF GAUTAM JAGANNATH, ESQ.**
**EXECUTIVE DIRECTOR FOR SOCIAL JUSTICE COLLABORATIVE**

*I, Gautam Jagannath, Esq., make the following statements on behalf of SOCIAL JUSTICE COLLABORATIVE.  I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Gautam Jagannath, and I am the Executive Director at Social Justice Collaborative ("SJC").  We are based in Berkeley, California in the San Francisco Bay Area and have been provided full-scope deportation defense services for low-income noncitizens all over the nine Bay Area counties as well as the California central valley. SJC is one of the primary organizations dedicated to providing legal services to indigent unaccompanied immigrant children who are not in detention as well as those held in Office of Refugee Resettlement ("ORR") custody throughout Northern and Central California.

2. Our organization teams are composed of administration, executive staff, attorneys, legal assistants, social workers and other individuals who work together in units to represent clients, ensure that their needs are met and that we continually prevail in court.  Because we are a legal services organization, we operate like a law office and our teams depend on having lawyers and legal assistants work on all aspects of the case, from intake to work-up and preparation for trial.

3. In order to carry out this mission, SJC has several main work components, but relevant to the instant litigation, we represent unaccompanied minors who are not in ORR custody in immigration proceedings. We further host Immigrant Justice Corps ("IJC") fellows to represent unaccompanied children in removal proceedings.  Our programs at SJC are unique because we have always provided full-scope representation to vitally underserved minors as well as families, but we also provide access to wrap around services including social workers to help navigate challenges of newcomer life in the United States.

4. SJC has been providing legal services for unaccompanied immigrant children in California since 2012. Since our inception, we have always taken cases for any indigent immigrant in California, we represent thousands of families a year.  Our unaccompanied minor clients represent about a third of all we represent in immigration proceedings. Specifically, SJC serves a combined annual number of around over 400 unaccompanied children. Roughly

1

for at least the fiscal year 2024, our representative breakdown for these minors was 35% adjustment of status, 38% asylum proceedings, 25% special juvenile status. The residue balance is composed of U/T nonimmigrant relief, refugee petitions and other applications. Naturally, a lot of work authorizations are not included for all these children to get kids the benefits, both entitlements and means tested that they deserve in California. That represents over 200 applications just in FY 2024.

5. With U.S. Department of Health and Human Services ("HHS") funding, SJC currently has hired three (3) staff members, all of whom are IJC fellows, dedicated to providing legal services to unaccompanied immigrant children. Specifically, one is a California lawyer and two of the staff members are law graduates with pending bar admission results.

6. Staff providing representation to children regularly conduct client interviews, prepare clients for hearings, as well as provide legal education, individual consultations, and attend court hearings and other appointments for clients as well as their families. SJC represents children in all stage of removal proceedings in immigration court, BIA appeals, petitions for review at the Ninth Circuit, affirmative relief like asylum before USCIS, SIJS predicates in state court.

7. In recent months, we have had several referrals come from youth-serving professionals who are actively trying to find help for the children they work with. Even those who regularly refer to legal service providers are hitting roadblocks. Waitlists are closed. Pro bono and nonprofit providers are overwhelmed. Paying for legal services is out of reach for the vast majority of adult immigrants let alone children who need to be in school.

8. We routinely place cases for that have made their way through the immigration system to pro bono counsel at our firm partners through our legal clinics. These legal clinics are held frequently throughout the year and would be severely, albeit indirectly, affected by the loss of funding through this grant.

9. In 2023, SJC's new Special Immigrant Juvenile ("SIJ") Task Force completed its first full year. The task force was created in response to the growing demand for legal representation for minors. This was based on an increased number of intakes and referrals. However,

2

conversations with partners across various sectors made it clear this was not an isolated issue. It reflected broader, statewide, and national trends.

10. SJC is one of the few organizations who works in areas considered legal deserts in California. In some of these regions, we are one of the only organizations offering any legal services, including full-scope removal defense.  We do not merely fill forms for clients and wish them luck. Even in more populated counties where other providers exist, the demand still far exceeds what's available.

11. A partner recently shared that a very young immigrant child believed that carrying a red card—a know-your-rights resource widely distributed in immigrant communities—would prevent them from being detained if stopped. While red cards are an important tool for asserting one's rights, this child was under the impression that the card functioned more like a legal shield. It's easy to understand how a young person, without legal guidance, could draw that conclusion not knowing much more.

12. Stories like this make it painfully clear that general information, no matter how widely shared, is not a substitute for individualized legal support. Children need someone who can walk them through their options and answer their questions.  That is where SJC often comes in.  We have a team of legal professionals working up and prevailing on legal status, but we also are providing social workers to support our children.

13. We currently have clients who are not yet one year old. Even without considering trauma, language barriers, or lack of resources, there is no path forward for a child that young without help. But of course, we do have to consider those things. Many of our clients are indigenous and do not speak Spanish, a language many assume they would speak. These minors often face not only trauma and language access issues but also deep cultural barriers and a long-standing experience with systems that overlook or ignore them. This makes it extremely difficult—if not impossible—for children to find legal representation, let alone secure it in time to meet the deadlines in their cases.

14. Immigration Judges ("IJ's") have over the past decade and more have expressed gratitude to SJC staff attorneys for the efficiency our providers bring to their dockets, which are often

3

expedited, and caseload management.  It is not uncommon for the EOIR based in San Francisco, Concord and Sacramento to make referrals of minors to SJC's intake team. Many IJs appreciate our work product because we are known for bringing cases fully prepared for trial, well developed, and often fully documented.  We have often been able to engage in stipulations with government counsel to avoid unnecessary continuances and appeals especially for minors.

15.  Our organization repeatedly earns praise from the California State Bar, as we are an IOLTA funded legal service provider.  We are also regularly praised by the California Department of Social Services who has continuously renewed contractual awards with SJC since 2015. We recently have been praised for maintained a shared vision centered on program assessment, we advance diversity and inclusion, we emphasize excellence, achieve goals, foster communication, engage staff at all levels, and ensure proper training and resource management. SJC exhibits a strong client-centered delivery system with programming aligned to our vision and funding requirements. We also demonstrate cultural competence through understanding of diverse community needs and histories, effectively engage with eligible populations, and establish appropriate partnerships with government and community organizations.

16.  Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025.

17.  On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers

(CLINs):  CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN 1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

18.  We learned of the contract cancellation through an email from a statement put out by Jojo Annobil, the CEO of Immigrant Justice Corps.

19. The terminated funding accounts for roughly 8% of our organization's total budget.  SJC had been funded to represent roughly 45 unaccompanied minors per year under CLIN 2. The staff affected would be three IJC fellows.  If we had to lose this funding and there was no new funding to be secured, we would be forced to lay off these fellows ASAP because we do not have operating budget to sustain their work.  We have not yet secured any additional or new funding to secure these fellows.

20. The funding loss is a huge blow to our immigrant communities and morale of staff.  We have been fortunate enough to survive almost a decade and a half without a single layoff and yet this could be our first.

21. For example, the SJC cases of Y, JS, and MHC represent particularly compelling scenarios for continued IJC funding support. All three individuals are currently not in active removal proceedings. Each presents strong affirmative relief claims requiring immediate legal intervention—specifically through asylum and SIJS pathways—demonstrating clear harm if representation were terminated. Financial barriers are insurmountable for all three cases: Y's family faces demonstrable poverty alone, JS as a dependent high school student has no income source, and MHC's family lacks financial means for private representation. Critically, none of these clients have any alleged gang affiliations or criminal history. Furthermore, each client has been released to documented sponsors with lawful immigration status—Y to a U.S. resident sponsor with a Social Security number, JS to a

5

sponsor with asylum-based residency, and MHC to a sponsor with SIJS-based residency—all people with valid legal status. Without sustained IJC funding, these vulnerable youth with strong relief eligibility would face the complex immigration processes without counsel, dramatically reducing their likelihood of securing protection despite qualifying under established legal criteria.

22. In the face of these layoffs, we may be forced to try and refer out the clients such as the ones described above who were previously represented by our IJC fellows. However, we know that all organizations doing this work are overly burdened and many cannot take new cases. As noted above, all providers are overburdened. Thus, it is highly unclear whether we would be successful in referring out our affected clients.

23. If we are unsuccessful in referring these clients to other organizations, then we believe under California law and relevant legal ethics that we would be forced to continue representation of clients without ORR funding. This would lead to further depletion of limited resources. This patently hurts staff morale, especially when our other staff are already working at and above their full capacity. Trying to competently represent affected clients without sufficient funding will likely lead to burn-out and result in other staff resigning or leaving for other jobs, thereby further harming our organization and the clients.

---

I declare under penalty of perjury under the Laws of the United States that the foregoing is true and correct.

Executed on the 25th of March 2025, in Berkeley, California, United States.

*Gautam Jagannath*
_____

Gautam Jagannath, Esq.
Executive Director
SOCIAL JUSTICE COLLABORATIVE
1832 Second Street
Berkeley, CA 94710
(p) 510.992.3964

6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

       Plaintiffs,

  v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

       Defendants.

Case No. 3:25-cv-2847

**DECLARATION OF LISA KOOP (NIJC)
IN SUPPORT OF PLAINTIFFS'
MOTION FOR A TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

**DECLARATION OF LISA OOP**
**NATIONAL DIRECTOR OF LE AL SERVICES**
**FOR T E NATIONAL IMMI RANT JUSTICE CENTER**

*I, isa oop, make the following statements on behalf of the ational Immigrant Justice Center IJC . I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

Case 3:25-cv-02847-AMO Document 97-13 Filed 05/09/25 Page 151 of 956

Case 3:25-cv-02847-AMO Document 97 Filed 05/07/25 Page 124 of 776

Case 3:25-cv-02847-AMO Document 9-7 Filed 03/27/25 Page 46 of 56

Case 3:25-cv-02847-AMO Document 99 Filed 05/27/25 Page 155 of 956

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

Case No. 3:25-cv-2847

**DECLARATION OF MELISSA MARI
LOPEZ (ESTRELLA DEL PASO) IN
SUPPORT OF PLAINTIFFS' MOTION
FOR A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION**

**DECLARATION OF MELISSA MARI LOPEZ**
**EXECUTIVE DIRECTOR**
**ESTRELLA DEL PASO**

*I, Melissa Mari Lopez, make the following statements on behalf of Diocesan Migrant and Refugee Services doing business as Estrella del Paso. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

.   My name is Melissa Mari. Lopez, and I am the Executive Director at Diocesan Migrant & Refugee Services doing business as Estrella del Paso ("Estrella del Paso"). Estrella del Paso is the largest provider of free immigration legal services in West Texas and New Mexico. Estrella del Paso is based out of El Paso, Texas but provides legal services to populations living anywhere in West Texas and the state of New Mexico who have removal proceedings venued in the El Paso, Texas before the El Paso Non-Detained Immigration Court, the El Paso Detained Immigration Court, or the Otero Detained Immigration Court. Estrella del Paso is the primary organization in West Texas and New Mexico providing legal services to indigent, unaccompanied immigrant children who are not in detention as well as those detained in Office of Refugee Resettlement (ORR) custody in El Paso County.

.   Estrella del Paso was founded in 1986 to provide immigration legal services, advocacy, and community outreach to protect the rights of immigrants in West Texas and New Mexico, and advance justice in the spirit of the Gospel. We believe all people are made in the image of God and are welcome in our community. Our organization currently employs 78 people. There are 6 legal units and two units who do not provide legal representation. The two units that do not provide legal representation are the Refugee Services unit and our Administrative team, which includes our Operations team, Communications team, Data team, Development team, and Executive team. Each legal unit is tasked with assisting different migrant populations. Among the six legal units is our Unaccompanied Children Program, which employs a team of 28 people. The Unaccompanied Children Program staff is exclusively dedicated to working with unaccompanied children housed at local ORR shelters as well as children released from ORR shelters, or children who are released to Estrella del Paso's designated geographic zone. In terms of staff, the Unaccompanied Children's Program accounts for more than one third of our entire organizational staff.

.   Our work in the Unaccompanied Minors Program is consist with our mission. Our Unaccompanied Children Program has several main work components and is tasked with (1) Providing educational and pro-se services in the form of legal education "know your rights" ("KYR") presentations, conducting individual consultations (intakes), and case monitoring for all unrepresented children in ORR custody in El Paso County, Texas; (2)

1

Representing unaccompanied minors who are not in ORR custody in immigration proceedings; and (3) Representing children in ORR custody in immigration proceedings. We further host an Immigrant Justice Corps (IJC) fellow to represent unaccompanied children in removal proceedings and provide Spanish-language tutoring for staff representing unaccompanied children. Our organization is also comprised of other work components such as our Legal Orientation Program ("LOP") and Immigration Court Help Desk ("ICH"), through these units we provide educational and pro se services in the form of legal education "know your rights" ("KYR") presentations/orientations, conduct individual consultations/orientations (intakes), and conduct pro se workshops with all unrepresented non-detained noncitizens who have hearings before the El Paso Non-detained Immigration court as well as detained noncitizens in the custody of Immigration and Customs Enforcement ("ICE") at facilities located in El Paso, Texas and Chaparral, New Mexico; (2) We attempt to connect unrepresented noncitizens who cannot afford a lawyer with pro bono attorneys or refer them for in-house representation by Estrella del Paso; (3) Estrella del Paso also provides in-house representation to people in removal proceedings through our Removal Defense unit and as mentioned herein through our Unaccompanied Children's Programs; (4) Through our affirmative legal services program, Estrella del Paso provides representation before United States Citizenship and Immigration Services ("USCIS") and United States Department of State ("DOS"). Within our affirmative legal services program, we have two subunits specifically dedicated to assisting religious workers and survivors of crime and human trafficking.

. Estrella del Paso has been providing legal services for unaccompanied immigrant children in El Paso County, Texas since 2007. Estrella del Paso was initially contacted by the VERA Institute of Justice ("VERA") in March of 2007 to oversee the Unaccompanied Immigrant Children's program in El Paso, Texas. Initial services under this first contract included the provision of Know Your Rights presentations to all unaccompanied children detained in El Paso, Texas and screening their cases for relief from removal, and to gather statistics on the unaccompanied children as well to develop a pro bono program model in El Paso, Texas to recruit, train, and mentor pro bono attorneys to represent the children in their immigration removal proceedings. Our initial contract was for provision of these services at three ORR shelters. Since the opening of the program in 2007 the need for services has only increased. In 2007, we provided services to approximately 546 children. In 2022, we provided services to 6,073 children, that number increased in 2023 to 7,449 children, and in 2024 to 4,921 children. The number of shelters in our area has also expanded from 3 permanent shelters to as many as 8 with the need in some years for the opening of emergency intake sites at places like Tornillo, Texas; Fort Bliss Army Base; and a facility in Pecos, Texas. Though the initial contract was limited to educating unaccompanied children, the con ract was eventually expanded to include legal representation for unaccompanied children appearing before the El Paso Immigration Court as well as

2

children released from ORR custody to the larger El Paso region. From the inception of our program in 2007 until today, Estrella del Paso has provided services to approximately 47,498 children. Last year alone, we provided services to 4,921 children and undertook representation of 117 children.

. With United States Department of Health and Human Services (HHS) funding, Estrella del Paso currently employs 28 staff members dedicated to providing legal services to unaccompanied immigrant children. Specifically, all 28 of our staff members are full-time employees. Our Children's Program Director is an attorney who has been licensed to practice law since 2010. She oversees the program and supervises the work of 7 Managing Attorneys, 4 Legal Assistants, 1 IJC Law Fellow, 3 Data Clerks, 3 Social Service Providers, and 9 Orientation Specialists. Together the team of 28 provides services to all detained children located throughout the 8 shelters in El Paso County. The shelters are spread throughout the county, the closest shelter is approximately 2 miles from our office while there are shelters 16 miles west of the office and shelters up to 31 miles east of the office. ORR funding provides both funding and the necessary access to the shelter and to the children detained in the shelters. Without ORR funding, we would be unable to continue providing these services.

. Staff providing representation and KYR presentations to children in ORR facilities regularly travel to each facility in person to conduct client interviews, prepare clients for hearings, as well as provide legal education and individual consultations. Our attorneys often appear as Friend of the Court in cases where children have been reunified outside of the El Paso, Texas Immigration Court Jurisdiction. Our representation of children is all encompassing, we have some clients we have represented for years from the time they were at the shelter to the time when they get released and ultimately obtain lawful status in the United States. A large part of our representation caseload involves representing children for Special Immigrant Juvenile Status ("SIJS"). Once a child obtains SIJS status, it can be several years before they qualify to obtain their lawful permanent residency, in the meantime their case remains open with our organization, meaning our representation of children often spans several years. At present, we have 324 pending cases, losing funding for this program, will pose an extreme hardship to our organizational capacity as it will mean not only laying off the attorneys, specifically trained to handle these cases but also inheriting a high case load to be worked by less staff, causing us to have to turn other work away.

. According to the Census Bureau, 18.3 percent of the population of El Paso, Texas and 17.8 percent of the population of New Mexico live in poverty, surpassing the national average of 11.5 percent. El Paso and its surrounding areas are not home to large corporations or law firms. Most attorneys who practice any type of law in this region tend to be solo

3

practitioners who cannot afford and do not have the capacity to take on pro-bono matters. Because there are no large law firms or corporations in this region, there is very limited access to attorneys who can provide pro-bono services. Likewise, El Paso is not home to any law schools. The closest law schools to El Paso are Texas Tech University School of Law based in Lubbock, Texas and the University of New Mexico School of Law based in Albuquerque, New Mexico. Both schools are several hundreds of miles away from the Immigration courts we serve and do not currently have the capacity to take on very many cases. Given that this region is impoverished, it is hard for an organization like ours to rely on local private philanthropy to fund the necessary services. Given the large geographic region we serve, the services provided by the unaccompanied minors program to unaccompanied children in our region are crucial. Most children cannot afford private attorneys, and most private attorneys in our area cannot afford to take on pro bono matters, especially in the case of children at shelters due to the extra level of logistical planning required for attorneys to visit their clients at shelters versus having the client visit the attorney at their office. Without our program, the children detained at the 5 shelters operating in El Paso County would largely go without counsel.

. In addition to providing direct representation, legal screenings and know your rights presentations to children sheltered in El Paso County and released in El Paso County and Dona Ana County, our team also provides referrals to children who end up living outside our geographic zone. The mission of our team is to try and obtain legal counsel for all children even when children do not live in our geographic zone. In 2024, our team was able to provide 7,174 referrals. Referrals consist of notifying children and their sponsors of local attorneys and non-profits in their areas who may be able to take on their cases. Often, our team can make a direct referral to other legal services providers if the children we serve are going to an area where there is an Acacia funded legal services provider to take over the child's case. This "warm hand off" amongst providers ensures a continuum of representation and that the child not only appears for all their court hearings but also often ensures the child is on the best pathway to later obtain lawful status in the United States of America.

. Estrella del Paso has an excellent and long-standing relationship with our local Immigration Judges, (Executive Office for Immigration Review [EOIR]), USCIS (United States Citizenship and Immigration Services), ORR Shelters, and Immigration and Customs Enforcement (ICE) officers. At the El Paso Non-Detained Immigration Court, there is a dedicated docket for unaccompanied detained and non-detained children. The judges who oversee these dockets have often expressed gratitude with our team as we represent most children who appear before the court, but we also provide the court with ti ely updates on the children's cases. As mentioned earlier, for children that end up being docketed before our court but who ultimately reunify outside of the El Paso immigration

4

court jurisdiction area, we provide Friend of the Court services, so those children's cases get transferred elsewhere. Likewise, we assist the court in efficient docket management by notifying the court ahead of time of rare language interpretation needs so that the court can coordinate the need for these interpreters ahead of scheduled hearings. The judges appreciate that in many of the cases that we enter representation on, we are often successful in obtaining the termination of the case and thereby reducing the docket load the court has as we pursue legalization for our clients through affirmative means. As for the shelters, we maintain daily communication with them and provide training for shelter staff on how to avoid the unlawful practice of law and how our office can help children. Often children at the shelter are scared about what comes next for them and our office helps to dissipate that fear by providing know your rights presentations and explaining to children the options available to them in the United States. Our office also assists ICE in cases where a child wishes to repatriate to their home country. In those cases, we reach out to our local ICE office and work together to honor the child's wishes and assure their return to their home country as soon as possible – this work reduces the workload of the El Paso Immigration courts.

. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all four Contract Line Numbers (CLINs): 1. KYR presentations and legal services for pro se children in ORR facilities; 2. Legal representation for unaccompanied children not in ORR custody; 3. Legal representation for unaccompanied children in ORR custody; and 4. Spanish language tutoring for organizational staff who work with children. Without further elaboration on duration or reasoning, the stop-work order states that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025.

. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective on the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN 1, which funds KYR presentations and confidential legal consultations for pro-se children in ORR facilities. Per

the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination o her than "the Government's convenience."

. On Friday, March 21, 2025, at 8:29 AM, I received an email from the Acacia Center for Justice notifying me of the near complete termination of the funding by HHS for the services mentioned in this affidavit. This information was then communicated to the entire Unaccompanied Children Program at Estrella del Paso.

. As a result of the near complete termination of funded services, Estrella del Paso had to immediately place 2 Data Entry Clerks, 4 Managing Attorneys, 9 Orientation Specialists, and 2 Social Service Providers on furlough. 4 Legal Assistants were temporarily reassigned to two other departments to avoid the need to immediately furlough them; however, this reassignment is temporary and likely only feasible for two weeks. At the end of two weeks, these 4 Legal Assistants will also be furloughed. Given the lack of advance notice of termination, the decision to furlough staff in lieu of immediate termination allows Estrella del Paso Management and the Board of Directors to fully discuss the impact of the termination as well as the details of the termination notice and make decisions in the best interest of the entire organization. This termination raises immediate concerns about Estrella del Paso's obligation to clients whom we represent. As attorneys, we have an ethical obligation to our clients. We cannot ethically withdraw from representing clients simply because the government made the decision to terminate the funding. We entered representation agreements with every client while under a government subcontract providing funding for representation and with the expectation that funding would continue throughout the entire course of representation, especially given we were required to enter representation pursuant to the contract. Additionally, the government's shift to five-year contracts made their commitment to continued funding more secure from our perspective.

. After staff were furloughed, we began an immediate review of all pending cases. We are in the process of assessing each case and determining what needs to be done to ensure continuity of our representation. Given that the notice of termination was just received yesterday, we are still in the process of triaging our case load and trying to figure out what next steps we will need to take. We are committed to our ethical and legal obligations to our clients, and our assessment of our obligations under the various jurisdictions in which our attorneys are licensed requires our representation continue despite the termination of funding.

. The Unaccompanied Children's Program accounts for about forty percent of our overall organizational budget. The Unaccompanied children's Program is by far our largest unit – employing 28 full-time individuals. Prior to the termination, our Unaccompanied

6

Children's Pro ram was funded at a monthly cost of approximately $284,000 per month. As a result of this nearly complete termination of funding, we believe our new anticipated monthly funding will be approximately $53,000 per month. However, given the nature of the termination and lack of details provided, we are unsure of the exact amount of continued funding. If the final funding total is lower than the funding currently being received, there will be a need to furlough additional staff. The current funding, if it remains level, will partially cover the salaries and benefits of the remaining 6 staff; however, it will not cover the true costs of running the program. This will require Estrella del Paso to continue representing our clients and run the remaining portion of the program at a deficit for the organization. The costs of the Unaccompanied Children's Program are so high that running the program absent reimbursement would be fiscally irresponsible. The carrying costs of this program threaten to completely decimate our cash flow if not reimbursed monthly. As a non-profit organization with limited savings, we are in the precarious position of terminating staff as any prolonged closure of the program or prolonged reimbursement for work done by program staff threatens to leave our organization running at a deficit. This would also impact other programs at our organization as any money depleted from our savings cannot be easily replenished as this programs sole source of funding comes from this contract. There are no other sources of funding for this team. Our organization prides ourselves in providing completely free legal services since late 2022. With this termination, it will be necessary to use reserve funds to ensure continuity of representation for unaccompanied children clients. The depletion of our reserve funds would likely require us to abandon our 100% free legal services program and begin charging for legal representation in certain cases once more.

. Despite the termination order and the lack of funding, Estrella del Paso staff would be ethically required to continue representing the hundreds of children whose cases are currently pending without any funding. This ethical obligation would cause further financial obligations and distress for the organization as we would have to continue to employ sufficient staff to continue to represent all children without any financial assistance. This would be a detriment to the entire organization and affect our ability to carry out our nearly 40-year mission of service that has assisted more than half a million people. This termination has already had a significant impact on the morale of our team. The broader Estrella del Paso team is frustrated, angry, and absolutely devastated by the furlough of 18 of their co-workers. The remaining 6 Unaccompanied Children Program staff are gutted by the loss of their co-workers, but they are committed to continuing the work on their behalf. I admire their commitment; however, I am concerned about the long-term effects of this termination on their mental and physical health as well as morales. The remaining 6 employees will need to undertake work that prior to March 21, 2025, was done by a team of 30. This level of work and expectation by the federal government is untenable.

7

I declare und r penalty of perjury that the foregoing is true and correct.

Executed on the 22nd of March 2025, in El Paso, Texas.

**Melissa Mari Lopez**

Digitally signed by Melissa M. Lopez
Date: 2025.03.24 13:23:15 -06'00'

8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

Case No. 3:25-cv-2847

**DECLARATION OF LAURA NALLY
(AMICA CENTER) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

**DECLARATION OF LAURA NALLY,**
**PROGRAM DIRECTOR FOR THE CHILDREN'S PROGRAM AT AMICA CENTER**
**FOR IMMIGRANT RIGHTS (FORMERLY CAPITAL AREA IMMIGRANTS' RIGHTS**
**("CAIR") COALITION)**

*I, Laura Nally, make the following statements on behalf of Amica Center for Immigrant Rights. I certify under penalty of perjury that the following statements are true and correct pursuant to 28 U.S.C. § 1746.*

1.    My name is Laura Nally, and I am the Program Director overseeing the Children's Program at Amica Center for Immigrant Rights ("Amica Center"), formerly known as the Capital Area Immigrants' Rights ("CAIR") Coalition. Amica Center is a Washington, D.C.-based nonprofit legal services organization that strives to ensure equal justice for all indigent immigrant men, women, and children at risk of detention and deportation in the Washington, D.C. area and beyond, through providing pro bono legal services and representation. I am an attorney licensed in Virginia and the District of Columbia and have been practicing immigration law for more than 15 years. I joined the Children's Program at Amica Center in August 2019.

2.    Amica Center operates three main programs: the Detained Adult Program ("DAP"), the Children's Program ("DUCs" or the "Children's Program"), and the Immigration Impact Lab. DUCs' work specifically focuses on offering legal services and representation to unaccompanied immigrant children held by the Office of Refugee Resettlement ("ORR") at ORR-subcontracted facilities, including shelter and foster care programs, as well as children in ORR Unaccompanied Refugee Minor ("ORR URM") programs in the greater Washington, D.C. and Baltimore areas.

3.

1

4.   To provide these services, Amica Center's Children's Program now has 33 full-time and 4 part-time staff members. Specifically, the Children's Program employs a program director, deputy program director, three managing attorneys, one supervising attorney, five senior attorneys, six staff attorneys, one Immigrant Justice Corps ("IJC") Attorney Fellow, two contract attorneys, two managing paralegals, four senior paralegals, seven paralegals, one senior program associate, and three social services staff members. Several additional positions are currently vacant due to challenges hiring qualified attorneys in a climate of funding uncertainty. We rely on funding from the U.S. Department of Health and Human Services ("HHS"), distributed to us through the Acacia Center for Justice as sub-contractor, to fund over 96% of our program.

5.   Children's Program staff work to provide legal support, direct representation, and social services to unaccompanied immigrant children who are currently or have been released from ORR custody at juvenile facilities in Washington, D.C., Virginia, and Maryland. Our goals are to educate children about their rights and their legal options while in ORR custody, ensure that their needs are being met and their rights respected, and to represent children in pursuing any immigration relief or applications for which they may be eligible.

6.   This work has two principal work components: (1) providing legally-required "Know Your Rights" presentations to children held in ORR-subcontracted facilities; conducting age-appropriate and trauma-informed one-on-one legal screenings for eligibility for immigration relief; referring children reunified outside of our geozone to other legal service providers; and preparing and accompanying all detained unaccompanied children in our geozone to their court appearances; and (2) providing in-house direct legal representation to unaccompanied children in immigration court, before federal agencies, and in state court to pursue immigration relief and applications, as well as referring cases to and mentoring pro-bono attorneys.

7.   To deliver KYR, legal screening, and other non-representational services, Amica Center staff travel in person to each ORR-subcontracted facility on a weekly basis. In calendar year 2024, we provided "Know Your Rights" trainings and intakes to nearly 1,600 children in more than 20 languages. In 2023, our team developed a specialized KYR presentation using cartoon animals to provide age-appropriate services to tender age (under 12) children. Amica Center utilizes a weekly visit model to ensure that all children receive these initial services within 10 days of their arrival in ORR custody. Depending on the children's language needs, multiple Know Your Rights presentations may be provided on any given day. Most children do not understand why they are being held in government custody, that they will be placed in removal proceedings, or that legal protections exist for children under U.S. immigration law. Our staff are trained not only to break down complex information and topics in age- and culturally-appropriate ways, but to utilize active engagement strategies to ensure that children are fully engaged and focused on the material and able to ask questions. Children then immediately receive a legal screening with a staff member

2

trained in trauma-informed and child-friendly interviewing. It is not uncommon for a legal screening to take place over multiple meetings if a child is too emotionally overwhelmed to tell their story or needs time to build trust before recounting traumatic events.

8.    The Children's Program also provides a crucial suite of nonrepresentational services including court preparation, courtroom assistance and accompaniment, and legal referrals. When a child in an ORR-subcontracted facility is scheduled for an appearance in immigration court, we meet individually with the child to explain what to expect in court and then appear alongside the child as "Friend of the Court" to share information and updates with the immigration court such as the child's expected reunification location. We also help children with matters related to their placement and rights within the ORR system. When a child is expected to remain in ORR custody until their 18th birthday, we have assisted the ORR-subcontracted facility staff to identify suitable post-18 placements such as transitional housing programs for young adults and liaised with the Immigration and Customs Enforcement ("ICE") Field Office Juvenile Coordinator to advocate for the child's release to a community-based program rather than transfer to ICE detention. When we identify a child to be a potential victim of trafficking, we refer them to the Office on Trafficking in Persons ("OTIP") for a determination of eligibility for benefits and services under federal law.

9.    Amica Center staff offer full legal representation to children in the ORR-subcontracted facilities we serve who do not have a viable ORR sponsor, who are placed into an LTFC program, who wish to return to their home countries, whose immigration proceedings advance to a point where they are expected to make substantive decisions about their legal case, and who are confirmed to be reunifying into our geozone to ensure continuity of legal services. We also initiate representation for particularly vulnerable children, including victims of trafficking, children who have experienced abuse or neglect in custody, or children who have been placed in restrictive settings or out-of-network placements.

10.    Between March 30, 2024, and March 20, 2025, we initiated representation with 192 children in ORR-subcontracted facilities and ORR URM programs. Children's Program attorneys represent unaccompanied children in removal proceedings before the Hyattsville, Baltimore, Annandale, and Sterling Immigration Courts and the Board of Immigration Appeals ("BIA"). DUCs staff also represent children in applications with U.S. Citizen and Immigration Services ("USCIS") including asylum, Special Immigrant Juvenile Status ("SIJS"), family-based and humanitarian (U and T) visas, Temporary Protected Status ("TPS") and self-petitions under the Violence Against Women Act ("VAWA"). In addition to providing direct legal services, Amica Center staff also work to recruit, train, and supervise teams of pro bono attorneys who represent unaccompanied children in immigration proceedings and applications for immigration status. These pro bono attorneys are a critical part of Amica Center's mission and model which allows us to leverage

<div align="center">3</div>

volunteer legal services to more efficiently represent children. Approximately 15% of cases currently open with the Children's Program are placed with pro bono attorneys.

11.     Amica Center's Children's Program has continuously received HHS funding since 2015. We currently have more than 850 open cases that were initiated and continuously funded through HHS funding. Children released to sponsors or transitional living programs live throughout the Washington, D.C. and Baltimore, MD metropolitan areas, including in the suburbs of Virginia and Maryland. Specific bar licensure is required to represent children in SIJS cases in each of the three jurisdictions where we practice, and this affects how case assignments are made among our attorneys. Due to the significant backlogs in state courts, USCIS, and the immigration courts, children's immigration cases often take years to resolve before an eligible child is granted asylum, a U or T visa, or lawful permanent residence.

12.     The need for legal representation and other support services for unaccompanied children—especially those in government custody and those facing deportation—is truly critical. Immigration law and procedures are incredibly complex and becoming more so every day. The overwhelming majority of unaccompanied children that we encounter in ORR-subcontracted facilities do not have the means to pay for a qualified private immigration attorney to represent them. ORR-subcontracted facilities are often located in rural areas where there are limited or no pro bono resources. For example, one of the ORR-subcontracted facilities that we serve is located approximately two hours away from Washington, D.C., the closest metropolitan area, by car and far from any other potential service providers.

13.

14.     In our experience, other government stakeholders including immigration judges, ORR-subcontracted facility staff, and the DHS Office of the Principal Legal Advisor ("OPLA") attorneys also prefer and appreciate when an unaccompanied child is represented by counsel. We frequently appear as Friend of Court to relay important updates regarding a child's reunification to OPLA and the immigration court and to coordinate appropriate changes of address and changes of venue. ORR-subcontracted facility staff often have questions for us about the logistics for children's appearances in court. Immigration judges

<center>4</center>

have sometimes requested that we enter appearances for children if the judge has doubts about the child's competency or understanding of their legal options. We also play a critical role in identifying and referring children for appointment of a Child Advocate. For children who are reunifying outside of our geozone, we provide legal referrals, either directly to another Acacia Center network provider or by providing a list of potential pro bono or low-cost resources directly to the child and sponsor. Because capacity for free and low-cost representation is overstretched in most areas, however, these resources can be very difficult to access.

15.   Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a Stop Work Order for Legal Services for Unaccompanied Children, effective immediately, which extended to "all activities" under the contract. Attached hereto as **Exhibit 1** is a true and correct copy of the Stop Work Order, dated February 18, 2025. Without further elaboration as to duration or reasoning, the Stop Work Order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." Ex. 1 at 1. HHS then rescinded the Stop Work Order without explanation on February 21, 2025. Attached hereto as **Exhibit 2** is a true and correct copy of the Stop Work Order Recission, dated February 21, 2025.

16.   The chilling effect of the February Stop Work Order has had lasting effects on the Children's Program. Two staff members, including one Senior Paralegal and one IJC Attorney Fellow, have accepted employment with private immigration firms and cited as the deciding factor the job insecurity generated by doubts about the security of our HHS funding. This climate of uncertainty has also had a chilling effect on hiring qualified attorney candidates to fill existing vacancies, which in turn increases the caseloads of existing staff and has a negative effect on morale and retention.

17.

18.   Our program was notified of the Partial Termination via an email from the Acacia Center for Justice shortly after 11 AM on March 21. We called a teamwide meeting several minutes

5

later to share the news with staff and answer their questions. Although our staff are understandably concerned about their job security and their ability to obtain future employment due to the sweeping expanse of the cuts to funded legal representation for children, their overwhelming response was to look for solutions for how to continue to represent the clients who trust and rely on us for their legal cases.

19. The abrupt termination of CLIN 2 funding for representation and associated services represents a loss of approximately 30% of Amica Center's total annual budget and 75% of the budget for the Children's Program. Amica Center has not yet set a timeline by which decisions would need to be made regarding staff layoffs or the discontinuation of any major aspects of our work. However, all work on cases where representation was undertaken during the preceding 10 years of HHS funding through the Acacia Center for Justice is now being funded using general operating funds. The organization has taken this position due to our ongoing ethical obligations to our clients and to preserve our ability to continue providing high-quality representation to those clients by minimizing the loss of qualified staff members. Amica Center cannot continue to fund this casework using general operating funds indefinitely. We are urgently seeking funding from other sources, but the collective impact of a nationwide shutdown is so great that the gap cannot be filled by private donors. To the extent that cases initiated under HHS funding could be transferred to funding streams held by other Amica Center programs (for example, state or local funding currently being used for adult representation), this would interfere with Amica Center's mission to maximize representation for indigent immigration men, women, and children at risk for detention and deportation by directly supplanting the organization's ability to represent other affected individuals.

20. The alternative—to immediately withdraw from representation in our 850 affected cases—is antithetical to our ethical obligations as attorneys and our values as a mission-driven organization. In many of the open legal cases for our child clients, there are upcoming hearings or deadlines which mean that withdrawing from the case would not be possible. Across the Children's Program, we have six clients scheduled for hearings with local immigration courts between March 24 and March 27. Not only is it nearly logistically impossible to withdraw from an immigration matter in that time frame, since withdrawal requires leave of the immigration judge, it is also impossible to do so without prejudicing the client's legal interests. We have dozens of open matters pending with state courts for children who are eligible for SIJS. In addition to upcoming hearings, there are ongoing time-sensitive legal requirements in those cases, including service of process on opposing parties, requests for orders of default, and other procedural requirements that, if not timely completed, could lead to dismissal or significant delay. Pro bono attorneys are heavily reliant on mentorship from experienced in-house immigration attorneys and at risk of committing errors or omissions in their cases without mentorship.

6

21.    Although KYR presentations and legal screenings remain funded for now through CLIN 1, significant, interrelated pieces of our work have been terminated, the consequences of which are immediate and severe. For example, if a child at one of the ORR-subcontracted facilities we serve is identified as having an urgent legal need such as an outstanding removal order, Amica Center—the only legal provider with access to the ORR-subcontracted facility—would not be funded to provide the necessary legal service to protect the child from imminent removal. Many children who enter ORR custody with prior removal orders are eligible to have their immigration court proceedings reopened, but doing so requires filing a motion as quickly as possible, something which children simply cannot do without the help of an experienced attorney. Similarly, without timely access to competent legal services, older children are at risk of losing access to protections based on their age. A 17-year-11-month-old child who has been severely abused by their parent(s), for example, is eligible under federal law to petition for Special Immigrant Juvenile Status until age 21. In Virginia, however, the Juvenile and Domestic Relations ("JDR") court, must make the necessary findings of fact regarding eligibility, must obtain jurisdiction before the child turns 18. Without access to legal representation who can initiate the necessary proceedings before the child's 18th birthday, that child's right and ability to seek protection through SIJS is functionally eliminated.

22.    One of the children currently represented by the Children's Program is a four-year-old boy from Haiti, referred to here as "Jean." He is currently in an ORR URM program living with foster parents in Virginia. Jean entered the United States shortly after he turned three years old and was placed in ORR custody. After it was determined that there were no viable sponsors for him in the United States, Jean was released from custody to an ORR URM program served by Amica Center. Amica Center coordinated with the HHS-funded legal provider which had been working with him at his ORR placement to transfer his legal case and substitute counsel on all of his pending matters to avoid an interruption in representation. Jean has a TPS application pending, is eligible for SIJS and is in removal proceedings. SIJS findings for Jean would be made through his open foster care proceeding in Virginia, and he is scheduled for a hearing on April 2, 2025. His Amica Center attorney has been working to prepare the necessary motion and proposed order in advance to ensure that the matter can be heard at the upcoming hearing. Jean is also scheduled for a Master Calendar Hearing in early June at which it is obvious that he could neither engage with the proceeding nor provide relevant updates to the court regarding his other pending legal matters to the court other than through counsel.

23.    The interruption and subsequent termination of funding for representation and nonrepresentational services to unaccompanied children has already frustrated Amica Center's mission and threatened the sustainability of our work. Providing a legal screening without the ability to refer a child for long-term representation, connect them to benefits

7

and services for victims of trafficking, or prepare and accompany them to court, fundamentally restricts the efficacy of that legal orientation and screening.

24.

25. If the Children's Program were forced to lay off staff due to sudden and unexpected termination of funding, it would be a drain on our organizational expertise in the delivery of legal representation and other services to the unaccompanied immigrant children held in ORR custody. The collective experience of our specialized staff would be nearly impossible to recover and would hobble our ability to deliver high-quality services to unaccompanied children in ORR custody in the Capital region, even if funding were restored to similar levels in the future. The level of investment required to hire and train new staff, fellows, volunteers, or interns would divert significant director and manager time and resources from the continued provision of representation to existing clients and have a lasting impact on the morale and retention of supervisors and managers. My own time over the past month has been overwhelmingly diverted from essential case supervision and legal guidance in a rapidly changing area of immigration practice, to responding to threats to our funding and program stability.

26. The continued funding of this work is critical to ensuring that children do not experience irreparable harm to their ability to access legal protections in the United States. Children who have spent months and years building trust and rapport with an attorney or legal advocate will be faced with the prospect of navigating a complicated and increasingly hostile legal system alone or urgently seeking out either the few remaining low-cost resources for representation in this space or the resources to pay for private counsel, reliving and recounting some of their most personal and traumatic experiences with a stranger.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 25 of March 2025, in Alexandria, Virginia.



8

_____

Director, Detained Children's Program
Amica Center for Immigrant Rights
1025 Connecticut Ave. NW, Suite 701
Washington, D.C. 20036
P: (202) 916-8179
laura@amicacenter.org

9

# Exhibit

# 1



# United States Department of the Interior

### INTERIOR BUSINESS CENTER
### Washington, DC 20240

Acacia Center for Justice
1025 Connecticut Avenue NW
Suite 1000A
Washington, DC 20036

February 18, 2025

Re: Immediate Stop Work Order

Dear

This letter constitutes an official Stop Work Order for **all activities** under Contract
140D0422C0009 – Legal Services for Unaccompanied Children.

In accordance with FAR 42.1303, the Government hereby directs your firm to stop all work
associated with the scope of Contract 140D0422C0009. Therefore, your firm shall cease all
services and the ordering of supplies.

All subcontractors shall be notified immediately that a stop-work order has been issued to the
prime contractor. The stop-work order shall remain in place until you are notified otherwise by
the CO.  As soon as feasible and prior to the lifting of the stop-work order, appropriate action
shall be taken to either terminate the contract or extend the period of performance, if necessary.
The stop work order is being implemented due to causes outside of your control and should not
be misconstrued as an indication of poor performance by your firm.

Please do not hesitate to contact me with any questions or concerns.

Sincerely,



# Exhibit

# 2



# United States Department of the Interior

### INTERIOR BUSINESS CENTER
### Washington, DC 20240

Acacia Center for Justice
1025 Connecticut Avenue NW
Suite 1000A
Washington, DC 20036

February 21, 2025

Re: Cancelation of Stop Work Order

Dear

This letter cancels the Stop Work Order issued February 18, 2025. Acacia Center for Justice may resume **all activities** under Contract 140D0422C0009 – Legal Services for Unaccompanied Children.

If Acacia intends to submit a Request for Equitable Adjustment under FAR 52.242-15, please submit it to the Contracting Officer no later than 30 days after the receipt of this letter.

Please do not hesitate to contact me with any questions or concerns.

# Exhibit

# 3



[redacted]

*is hereby* ***partially terminated*** *for the Government's convenience*

*Termination for the Government's convenience*

**Subject to the terms of this contract, the Contractor shall be paid an amount for direct labor hours (as defined in the Schedule of the contract) determined by multiplying the number of direct labor hours expended before the effective date of termination by the hourly rate(s) in the contract, less any hourly rate payments already made to the Contractor plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system that have resulted from the termination**

*final* ____

[redacted]

3/25/2025

*Acknowledgment of Notice*

[redacted]

[redacted] D D d [redacted]

**2 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

Case No. 3:25-cv-2847

**DECLARATION OF MARTHA RUCH
(CLSEPA) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

Case 3:25-cv-02847-AMO Document 7-16 Filed 04/27/25 Page 2 of 5

**DECLARATION OF MART A RUC**
**LEAD IMMI RATION MANA IN ATTOREY FOR CLSEPA**

*I, Martha uch, make the following statements on behalf of myself and Community egal Services in ast Palo Alto C S PA . I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

**Mart  a Ruc**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

            Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

           Defendants.

**DECLARATION OF ELIZABETH
SANCHEZ KENNEDY (GHIRP) IN
SUPPORT OF PLAINTIFFS' MOTION
FOR A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION**

### DECLARATION OF ELIZABETH SANCHEZ KENNEDY
### EXECUTIVE DIRECTOR FOR GALVESTON-HOUSTON IMMIGRANT
### REPRESENTATION PROJECT (GHIRP)

*I, Elizabeth Sanchez Kennedy, make the following statements on behalf of the Galveston-Houston Immigrant Representation Project (GHIRP). I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Elizabeth Sanchez Kennedy, and I am the Executive Director at the Galveston-Houston Immigrant Representation Project. GHIRP is a legal services organization that was launched in October 2020 with a mission to build a resilient, diverse community by providing comprehensive representation and holistic legal services to immigrants in need. GHIRP's legal services range from outreach and education to complex litigation in the Galveston-Houston area. Our legal team provides holistic and comprehensive representation to immigrants in the community, including unaccompanied minors, adults, and women, children, and families.

3. GHIRP's Immigrant Children & Youth program is dedicated to representing indigent unaccompanied immigrant children who are not in detention as well as those held in Office of Refugee Resettlement (ORR) custody throughout the Galveston-Houston area. This program was directly impacted by the termination of funds dedicated to unaccompanied immigrant children. Core to GHIRP's mission and legal services, is providing representation to unaccompanied immigrant children and youth. GHIRP was founded with funding for unaccompanied immigrant children and our first year of services focused almost exclusively on legal services for detained and released unaccompanied immigrant children. The contract termination, which cuts funding dedicated to one of our main legal services, perceptibly impairs our core business activities.

4. In order to carry out our mission, GHIRP has several main work components: (1) providing educational and pro se services in the form of legal education "know your rights" (KYR) presentations, conducting individual consultations (intakes), and conducting pro se services with unrepresented children in ORR custody in the Greater Houston Area; (2) representing unaccompanied minors who are not in ORR custody in immigration

1

proceedings; (3) representing children in ORR custody in immigration proceedings; (4) referring children for pro bono legal services outside of the Galveston-Houston area; and (5) providing social services to unaccompanied children. We further host an Immigrant Justice Corps (IJC) fellow to represent unaccompanied children in removal proceedings and provide Spanish-language tutoring for staff representing unaccompanied children.

5. GHIRP has been providing legal services to unaccompanied immigrant children in Galveston and Houston since 2020, when the organization was founded. Since the organization opened, our legal services dedicated to unaccompanied immigrant children have expanded each year. In 2020, we provided direct representation to approximately 35 unaccompanied immigrant children. In 2021, GHIRP initiated services in a newly opened ORR facility in Houston (Children's First Residential Care TX Gasmer), providing KYR presentations, intakes, direct representation, social services, and referrals for children who were released to other jurisdictions. In 2023, GHIRP began providing the same legal services to unaccompanied children in a second ORR shelter named LSSS Upbring Krause Children's Center. GHIRP's direct representation services dedicated to children who are not in custody have also expanded, from 35 cases in our first year of existence (2020) to now serving approximately 300 clients per year (2025). Currently, GHIRP serves a combined annual number of nearly 1,500 children per year, including approximately 1,500 children detained in ORR custody, approximately 300 children receiving direct representation services per year, 120-150 children receiving social services per year, and approximately 35-50 children receiving *pro se* assistance per year.

6. Wholly with U.S. Department of Health and Human Services (HHS) funding, GHIRP has hired 19 staff members dedicated to providing legal services to unaccompanied immigrant children. Specifically, our team comprises seven (7) attorneys, one (1) Department of Justice Accredited Representative, nine (9) legal assistants, and two (2) social services coordinators. As executive director, I oversee the program, support the managing attorney, and provide mentorship to the legal team. All staff on GHIRP's Immigrant Children & Youth team are full time employees, and one of the attorneys is an Immigrant Justice Corps fellow. Through this contract, we serve recently arriving children in the ORR facilities, as well as released children in the community.

7. GHIRP's Immigrant Children & Youth team serves detained children who are between the ages of six (6) and seventeen (17) years old, and non-detained children of all ages. We provide legal services to children within seven to ten (7-10) business days of their arrival to the ORR facilities, if not sooner.

8. GHIRP staff provide detained services in the facilities two to four (2-4) times per week, for approximately two to four (2-4) hours or more each visit. Staff providing direct representation and KYR presentations to children in ORR facilities regularly travel to each facility in person to conduct client interviews, prepare clients for hearings, gather evidence,

2

as well as provide legal education, individual consultations, and pro se legal services. Our team also provides "friend of court" legal services so that children appearing in court without an attorney do not have to appear alone. The courts function more efficiently when legal representatives are involved as "friend of court" as they explain technical requirements at preliminary hearings and move the cases along while protecting their rights. GHIRP's legal team also advocates for children in ORR custody seeking release or transfers, reporting disclosed physical or sexual abuse while in custody, and ensuring that their basic needs are met by the facility and staff (such as language access and access to education and recreation). If and when a child is released to a location outside of our geographic area, we refer children for legal services in the location where they are going.

9. The GHIRP legal team is trained to provide child-friendly, trauma-informed, culturally competent services to tender aged children, as well as pre-teen and teenage children. When we meet the children for the first time, they can be confused, vulnerable, and they often do not understand the complex immigration system that they must navigate. Many children do not understand where they are, why they are in a shelter, or that they have rights. Through our KYR presentations we teach them about their rights, the immigration system, and what they must to do seek relief in the United States. We also explain what their obligations and rights are after they leave the ORR shelter.

10. Our staff teaches children about how to identify harmful behavior by caretakers. The goal is to provide complex information to children of all ages in a way that they can comprehend and retain. The GHIRP legal team tailors presentations and individual consultations to meet the needs and capacities of each child. We developed materials and resources specific to all age groups so that children remain engaged and empowered by our services. During individual consultations, our staff are trained to meet each child at their developmental level to ensure that the intake is effective and comprehensive. We have seen firsthand how this information and engagement in our services is critical to preventing trafficking and abuse after minors leave the facility, as well as safeguarding their legal rights in the immigration system.

11. The GHIRP legal team provides representation to detained children appearing in immigration court and those who are released to the Galveston-Houston area. We identify children who are eligible for legal relief and assist them in preparing their case from the initial filing of the application or appearance in court, to the finality of their case. We represent children in matters before the Houston immigration courts, the Board of Immigration Appeals, federal district courts and petitions for review in circuit courts, as well as children seeking affirmative relief before USCIS and the USCIS Houston Asylum Office, and family court petitions in state court. Our legal team represents children seeking humanitarian relief such as asylum, U-visa and T-visa applications, Special Immigrant Juvenile visa petitions, and VAWA petitions. GHIRP conducts pro se workshops for children who qualify for legal relief but cannot obtain an attorney to represent them.

3

12. Many children that receive our legal services do not speak English, have experienced trauma, and do not have the resources to hire an attorney. Some clients are so young they cannot read or write in their own language, much less present a legally sufficient case in English in an adversarial court system. We have represented non-verbal children, children with mental and physical disabilities, and parenting children who have been sexually abused from a young age. Given their particular vulnerabilities, many of our young clients do not have the resources to hire a private attorney and they cannot present a legally sufficient case before the court without an attorney by their side. GHIRP's free, accessible representation is their only chance to meaningfully participate in their case and obtain a fair outcome.

13. GHIRP attorneys regularly appear before juvenile docket Immigration Judges for our clients that are unaccompanied immigrant children. The attorneys are knowledgeable about legal issues specific to immigrant children and understand the preferences of the judges including required motions and evidence to be filed before hearings. This familiarity with the juvenile judges and issues ensures efficient adjudication of cases, or dismissals of removal proceedings where relief is available outside of the court. By frequently appearing with children in the courts, GHIRP attorneys are able to effectively prepare our child clients for hearings, eliminating the stress and trauma of appearing before an Immigration Judge.

14. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation to GHIRP on February 21, 2025.

15. On March 21, 2025, also without warning, GHIRP learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds GHIRP's legal services for unaccompanied children. This termination was effective the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Item Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN 1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work

4

immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

16. I received notification of the contract termination by email. I notified the Immigrant Children & Youth team that the contract was terminated effective immediately, and that work on cases under the contract should stop due to a lack of funding. As a team, we assessed our cases that are currently in progress, our clients' reliance on our representation, immediate next steps for clients, and work that needed to be prioritized given the time-sensitive nature of the cases.

17. Notification of the contract termination has significantly impacted our organization, staff, and clients. GHIRP currently represents 292 clients with funding from the current contract with Acacia Center for Justice. Our youngest client is two (2) years old. We represent clients who have imminent hearings, filing deadlines, and time-sensitive motions before the court.  Our clients are scheduled to appear in court as soon as April 2, 9, and 10, 2025. The April 2, 2025 hearing is for a detained client who needs to file relief and be prepared to plead in his second setting in Immigration Court, which has necessitated urgent work to prepare an application this week. Another client has an Individual Hearing on April 9, 2025 that will require substantial attorney preparation time, in addition to working closely with the client on his testimony, and another client has a filing deadline for that same day.

18. Some cases require complex legal arguments, such as our client who is contesting the judge's jurisdictional decision related to his asylum claim. The law entitles this client to explicit procedural due process protections for unaccompanied children, including filing his asylum application with the asylum office first. Our attorney has filed two separate motions and appeared at a hearing related to this issue and is scheduled to appear again in court to resolve the matter.  Our young client will not be able to advocate for his rights alone if we are forced to abruptly withdraw from his case.

19. GHIRP's IJC Fellow represents "Evelyn," a 12-year-old girl from Mexico who has endured significant abuse starting at a very young age.  Before entering the United States, she was labor trafficked at the young age of 5 years old and endured physical and sexual abuse at the hands of her caretakers who were her extended family members. We assisted Evelyn in filing her asylum application and are in the process of gathering documentation and information to file a T-visa application. These forms of relief will ensure that she can stay in the U.S. with her sponsor and heal from her past trafficking and abuse. Evelyn was issued a Notice to Appear and will soon be required to appear in the Houston Immigration Court. To withdraw from her case at this stage would likely result in her abandoning both forms of relief and being forced to return to the very dangers she fled.

20. GHIRP also represents "Rosa," a 15-year-old girl from Honduras, in her immigration case seeking both SIJS and asylum.  When we met Rosa, she was incapable of speaking due to

5

her severe trauma. She would sit silently with her attorney, picking at her skin and repeating nervous ticks due to her extreme discomfort and anxiety. Through multiple meetings and building rapport, Rosa disclosed her history of parental abandonment and neglect, as well as surviving sexual abuse in her home country. She continues to display extensive distress related to her past trauma. GHIRP filed her asylum application (which is currently pending) and her family court case is pending in state court, which forms the basis for an application for SIJS. Rosa is not capable of complying with family court requirements for service of process, establishing parentage, and meeting the legal standards for the requested proposed order without an attorney representing her. Furthermore, she will soon be required to appear in the Houston Immigration Court and will need her trusted attorney to represent her in those proceedings as well.

21. These clients have an expectation that GHIRP will timely prepare their case, appear in court on their behalf, and complete the case in accordance with our attorney-client representation agreements. In order to comply with our client obligations, we have had to utilize operating expenses that were set aside for other purposes because we are not able to halt legal representation on a moment's notice.

22. GHIRP's legal team will not withdraw from client cases immediately. Our management team is determining how long we can continue representing our clients without funding, considering the number of clients we represent, the procedural posture of each case, and the staff capacity for casework with a reduced team due to funding. Due to the sudden contract termination, we must decide which cases to retain, and which staff will remain at the organization (if any). GHIRP attorneys and representatives have an ethical duty to represent our current clients and to advocate for their interests. To abruptly withdraw from our clients' cases will be detrimental to their legal case, and a direct impairment to our existing core activities. Clients will age out of legal relief, may be forced to abandon relief due to missed filing deadlines, and/or they will not be able to pursue their cases in court effectively alone without representation. Our attorneys are the attorney of record in immigration court and state court, and judges may not allow for our withdrawal at such a late stage of the case. If they do allow for withdrawal, our young clients will not have the time and resources to obtain new counsel within the courts' deadlines and/or scheduled hearings.

23. The financial impact of the contract termination profoundly affects GHIRP, as the entire contract for legal services for unaccompanied children represents approximately 45% of our organizational budget and staff. Our organization served 2,625 immigrants in the community last year, of which 1,469 (or 57%) were unaccompanied children receiving services through this contract. GHIRP is not able to maintain the same level of legal services for unaccompanied minors without HHS funding, and we will be required to lay off most of our Immigrant Children and Youth staff in approximately four weeks. We will rely on unrestricted funds and savings to pay staff during this time, however, drawing down

6

on these funds will destabilize the organization as a whole. This will divert unrestricted funds away from other services, as these resources typically cover gaps in funding between contract cycles on other grants, underfunded programs, or new initiatives that are responsive to emerging needs of the community.

24. GHIRP's staff members serving immigrant children and youth are exceptionally passionate about providing legal services to children and are currently distraught by the recent contract termination. All have had formal and/or on-the-job training related to educating and representing children and youth and have developed unique skills to provide child-friendly legal services.  Over the years, our team has built rapport with our clients, assisted them in navigating personal and legal issues, and dedicated a significant amount of time and resources to zealously advocating for their clients.  Through our services, we hope to achieve our goals of obtaining safety and stability for our clients so that they can thrive. An interruption in services risks re-traumatizing them and causing them to lose the progress they have made so far in their trajectory toward opportunity. The abrupt contract termination has impacted staff morale and caused incredible amounts of stress. Having to withdraw representation may be a violation of our ethical duties to our clients and will likely lead to their deportation, placing our clients in harm's way.  Our children view our team as a reliable support, which many clients lack in other aspects of their lives. These consequences deeply impact our staff, who are dedicated, compassionate professionals.

25. Such results are antithetical to our values and impede our ability to carry out GHIRP's mission.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on the 25th of March 2025, in Houston, Texas.


 /s/ Elizabeth Sanchez Kennedy
**Elizabeth Sanchez Kennedy**
Executive Director

6001 Savoy Drive, Ste. 400
Houston, Texas 77036
Ph: (713) 588-2260
Email: Chiqui@ghirp.org

7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

**DECLARATION OF WENDY YOUNG
(KIND) IN SUPPORT OF PLAINTIFFS'
MOTION FOR A TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

## DECLARATION OF WENDY YOUNG,
## PRESIDENT OF KIDS IN NEED OF DEFENSE

I, Wendy Young, make the following statements on behalf of KIND, Inc. Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the following statements are true and correct.

1. My name is Wendy Young, and I am the President of KIND, Inc., doing business as Kids in Need of Defense ("KIND"). KIND is the leading international not-for-profit organization devoted to protecting the rights and well-being of unaccompanied and separated children. Founded in 2008, KIND now has seventeen locations across the United States that have provided legal rights education to more than 78,000 children, and legal representation in immigration matters to more than 17,000 children in the United States. KIND staff provides legal services to unaccompanied immigrant children who are in the custody of the Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS) at 20 short-term shelter care or foster care facilities, five long-term foster care programs, and three Unaccompanied Refugee Minor (URM) programs served by KIND's offices in Atlanta, GA; Boston, MA; Fresno, CA; Hartford, CT; Houston, TX; Los Angeles, CA; New York, NY; Sacramento, CA; and Seattle, WA. KIND also serves children released from ORR care and living in the communities served by those offices and by our offices and locations in Baltimore, MD; the District of Columbia; Jacksonville, FL; Newark, NJ; Northern Virginia; Orlando, FL; Providence, RI; and San Francisco, CA.

2. KIND provides representation and other services to migrant children in part through its staff, and in part through pro bono partnerships with nearly 900 law firms, corporations, law schools, and bar associations, whose lawyers provide children with pro bono representation with training and support from KIND. KIND also provides psychosocial support to children and families; works to address the root causes of child migration; and advocates for laws, policies, and practices to improve the protection of unaccompanied children within the U.S. and abroad.

(1) During children's time in ORR custody, KIND conducts educational "know your rights" ("KYR") presentations that provide unaccompanied children with information about the immigration system, their rights and responsibilities, and what to expect in immigration court. KIND also conducts legal screenings to assess each child's protection needs and evaluate options for legal relief as well as making appropriate referrals for further legal or social services during or after ORR custody. As needed, KIND may also support children in requests for release on recognizance or with notifications relating to changes of address and venue.

1

(2) During ORR custody, if a child is required to attend immigration court, KIND will educate the child about immigration court processes and prepare them to attend the hearing, and will accompany the child to court in the capacity of "friend of the court" or, in limited circumstances, as attorney of record.

(3) During ORR custody, KIND may provide legal representation for certain children where services as "friend of the court" are not sufficient for the child's needs – for example, for children who are required to enter pleadings in their immigration removal proceedings during their time in ORR care, or children who are placed in federal long-term foster care.

(4) Many children who live in communities served by KIND following release from ORR custody receive free legal representation through KIND's network of pro bono attorneys and/or KIND staff. The KIND mentor assigned to each pro bono attorney offers specialized training programs and guidance on substantive law and skills needed for representing children, addresses the pro bono attorney's questions, consults on case strategy, offers access to psychosocial services and other resources, and provides support at all phases of a child's immigration case. KIND staff and KIND pro bono attorneys represent children in proceedings before the immigration courts, in administrative proceedings before U.S. Citizenship and Immigration Services (USCIS), in ancillary proceedings in state courts, and occasionally before the Board of Immigration Appeals, federal district courts, or federal courts of appeal.

4.  KIND's five original offices began providing legal services for released unaccompanied immigrant children through pro bono partnerships in January 2009, with two of those offices adding services for detained children later that year. Over time, KIND's programming expanded to include additional locations in the United States, plus a program dedicated to serving children separated from their parents. Beyond the United States, KIND has staff in Mexico, Central America, and several countries in Europe, with a focus on protection, family unity, and strengthening child protection systems and access to lawful immigration pathways. KIND works with organizational and private sector partners to harness additional capacity in those regions.

5.  For the period January 2022 through December 2024 inclusive, KIND's subcontract with Acacia supported know-your-rights presentations and legal screenings to over 16,900 children in ORR custody, immigration legal representation for approximately 6,700 children through KIND and its pro bono attorneys, and psychosocial services for approximately 2,400 children. During the same period, through other contracts and other

2

resources, KIND and its pro bono partners additionally represented approximately 3,700 children, and KIND provided psychosocial services to approximately 1,100 children.

6.  In or about March 2022, KIND entered into a subcontract with the Vera Institute of Justice to deliver specified legal services to children arriving in the United States as unaccompanied children, renewable annually over a five-year period. KIND's current contract with Acacia Center for Justice is a novation of that contract. The KIND-Acacia subcontract is in turn funded by a contract between Acacia and ORR. All of KIND's seventeen locations in the United States deliver legal and social services funded through its subcontract with Acacia. From 2009 through 2021, KIND served children pursuant to subcontracts with Acacia's predecessor, the Vera Institute for Justice.

7.  KIND staff regularly travel to almost twenty ORR shelter care and transitional foster care facilities in person, while one shelter regularly arranges for groups of children to visit the local KIND office in person due to capacity limitations at the ORR facility. The frequency of these visits varies with need, but on average, each KIND site held about four visits per month during 2024. KIND uses these visits to provide know-your-rights presentations, conduct legal screenings, prepare clients for court hearings, or conduct individual legal consultations. KIND staff also represent children placed in federal long-term foster care and in the Unaccompanied Refugee Minors program.

8.  Immigration removal proceedings are adversarial proceedings commenced by the Department of Homeland Security before immigration courts within the Department of Justice. Unaccompanied children, including very young children, are named as "respondents," and must answer charges of removability and bear the burden of proof to establish a defense to forcible removal to countries where their rights, well-being, safety, or even their lives were at risk. The free legal and psychosocial services provided by KIND, and by other ORR-funded legal services providers, are essential to protecting the basic rights of children facing this process. Unaccompanied children do not have the financial resources to hire private counsel at market rates, and in KIND's experience, few have family members of such means. Without free services, unaccompanied children -- including very young, pre-verbal, and non-walking children -- would be forced to represent themselves through complex legal processes, facing trained and experienced government counsel while striving to present evidence and legal arguments in their own defense.

9.  Legal screenings by KIND staff for children in ORR custody serve to determine whether it is unsafe for a child to return to their country of origin, and to identify options for available legal relief in the United States. These assessments are necessary prerequisites to placement with pro bono attorneys who primarily practice in areas of law other than immigration, and depend on KIND for case assessments, training, practice guidance, and ongoing mentorship. KIND's pro bono partners contributed approximately 1,487,244

3

hours of legal services, valued at over $889,000,000 dollars from 2009 to 2023.  Thus, pro bono representation with KIND mentorship multiplies the effectiveness of the funding ORR provides to KIND.

10. Through legal representation by KIND or its pro bono partners, children pursue one or more forms of humanitarian relief, such as protection from parental maltreatment through special immigrant juvenile status, asylum based on a fear of persecution, T- or U-visas that protect victims of trafficking or other serious crimes, or temporary protected status based on untenable conditions in the country of origin.  Children's immigration cases have long timelines:  in KIND's experience, while a small proportion of cases resulting in permanent status are completed within two years, the majority take five to seven years to complete, with some taking longer.  The chief reason is adjudication timelines.  The immigration court backlog currently stands at well over 3.6 million cases, with wait times between hearings typically stretching to months or years.  Moreover, most applications for humanitarian relief are adjudicated outside immigration courts.  In 2024, USCIS stated that over 1.1 million asylum applications were pending before it, and applicants for other forms of relief likewise face years-long delays, most notably, the years-long waits for the limited supply of visas affecting special immigrant juveniles waiting to apply for green cards.  These delays are beyond the control of children and their advocates.  In addition, the process of preparing children's applications for relief is time-consuming for several reasons.  First, depending on the relief sought, evidentiary support for applications may include elements that require time and effort to obtain, such as: state juvenile court orders issued after evidentiary hearings; attestations by state or federal law enforcement officers; and/or medical, psychological, or other expert evaluations.  In cases where a child's initial request for relief is not approved, further time may be required to respond to requests for evidence or notices of intent to deny, as well as for appellate processes.  Second, children in general, and particularly those who have experienced traumatic events, will need time to develop trust in unfamiliar adults and in the legal process itself, as the American Bar Association has recognized in cautioning against pressuring children to discuss distressing experiences before they are ready to do so.  Third and more generally, preparation of a child's case takes time due to the capacity limitations inherent in children's ongoing cognitive and emotional development.  As a principal drafter of the 2008 TVPRA explained, a child "usually knows nothing about U.S. courts or immigration policies and frequently does not speak English . . . . The majority of these children have been forced to struggle through an immigration system designed for adults." (Cong. Rec. S10886 (Dec. 10, 2008) (Sen. Feinstein)).  State codes of professional responsibility typically require attorneys representing children with diminished capacity to maintain a normal attorney-client relationship to the greatest extent possible, and under American Bar Association standards, children must be afforded the right to meaningfully participate in decision-making in their cases.  Accordingly, best practices for representing unaccompanied children contemplate applying trauma-informed and child-sensitive practices and

4

affording sufficient time to support the child client's understanding of the proceedings and deliberation on matters affecting the child's well-being. Fourth, children are not self-sufficient, so their participation in preparing a legal case depends on facilitation by individual or institutional caregivers who may present time constraints that are beyond a child's control – for example, something as simple as a caregiver being unable to obtain leave from work to transport a child to a session with an attorney or expert. In sum, representing children in immigration matters requires a sustained multi-year time commitment in order to meet stringent evidentiary burdens, present effective advocacy, and support children in navigating complex and high-stakes processes.

11. Officials with government agencies have repeatedly recognized how KIND's work contributes to their efficient and effective operations in handling children's cases. Among other contributions, at the request of agency officials, KIND staff have conducted numerous training programs on topics relating to children's immigration matters for staff of the immigration courts, USCIS, and the ICE Office of the Principal Legal Advisor (OPLA), which represents the government in removal proceedings. As one example among many, after KIND staff presented to USCIS asylum office staff on child-friendly interviewing techniques, senior officials of the office sent handwritten notes thanking KIND staff for the program. The office director stated, "I know our officers will greatly benefit from it!" and one training officer added, "We hope we can make it an annual event."

12. Another example is a well-received initiative by KIND's Boston office to accelerate the successful completion of numerous pending cases of KIND clients awaiting adjudication of their applications for lawful permanent residency (LPR) status, also known as a green card. LPR applicants have already cleared high legal standards and progressed through years-long waiting lists, only to wait again for scheduling of a merits hearing date in immigration court. To alleviate that bottleneck, during 2021, KIND staff identified dozens of clients who were immediately eligible to adjust status, lacking only a date on the court's calendar for an adjustment hearing. Normally, just a handful of cases would be scheduled for an adjustment hearing on a given date, but through KIND's coordination with OPLA attorneys and immigration court staff, 50 adjustment-ready cases were calendared on two selected dates in May and November 2021. By organizing required information to share with OPLA in advance, KIND helped to ensure a smooth and efficient hearing for each case. The court approved 21 cases on the May 2021 date, 25 children on the November 2021 date, and the remainder on follow-up dates. Both the immigration court and OPLA praised KIND for efficiencies that resulted in removing cases in bulk from the court's crowded docket as the KIND clients received permanent status.

13. On the afternoon of February 18, 2025, Acacia emailed KIND a redacted copy of a nationwide order that HHS (through the U.S. Department of the Interior) issued to stop work under the Legal Services for Unaccompanied Children contract, effective

immediately.  The stop-work order applied to all lines of work performed under the contract, including KIND's work on KYR presentations and legal screenings for children in ORR facilities, and legal representation for unaccompanied children in and outside ORR custody.  Without further elaboration, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance."

14. Based on the directives in the stop-work order, KIND instructed staff to immediately suspend visits to facilities served under the contract, stop accepting new referrals, cancel intake meetings with prospective clients, and not sign retainer agreements to take on new clients. KIND also instructed staff to continue critical ongoing work necessary to fulfill professional responsibilities to clients, including meeting filing deadlines and attending scheduled hearings and administrative interviews with clients.  On the afternoon of February 21, 2025, KIND learned from Acacia that HHS had rescinded the stop-work order, without explanation.

15. On March 21, 2025, Acacia informed KIND via email that Acacia had received a notice partially terminating Contract 140D0422C0009, under which KIND is a subcontractor, for the government's convenience.  Acacia stated that the contract was terminated effective that same date for three of the four Contract Line Numbers (CLINs), and directed that work stop immediately under CLIN2, Legal representation for unaccompanied children not in ORR custody; CLIN3, which funds Immigrant Justice Corps fellows to represent unaccompanied children separately from those represented through CLIN 2; and CLIN4, Spanish language tutoring for organizational staff who work with children. KIND understands that only CLIN1, which funds KYR presentations and confidential legal consultations for unrepresented children in ORR facilities, remains in place, and is awaiting guidance from Acacia regarding whether there will be revisions to the relevant task orders, such as modifications to KYR services and any attendant budget or staffing changes.

16. Partial termination of the Acacia contract deprives KIND of the funding KIND relies on to employ approximately 350 professionals actively engaged in delivering or supporting the legal representation of some 6,700 clients.  KIND cannot retain employees once contractual funding sources are unavailable, and we anticipate significant layoffs, starting within days of the contract termination. This interruption of employment disrupts the productivity, career development, and morale of scores of qualified and experienced workers who are skilled and experienced in serving unaccompanied children, and who cannot easily find replacement opportunities due to the broad geographic scope of the partial contract termination.  More importantly, the partial contract termination makes the qualifications and experience of these employees unavailable to children in need of specialized services.  Most funding KIND has received through other sources is dedicated to employing staff who provide specified services to additional clients through other

6

programs, and thus such employees and funding cannot compensate for the needs created by the partial contract termination.

17. Partial termination of the Acacia contract will disrupt thousands of attorney-client relationships on which children have relied, for multiple years in some cases, and leaves children without support for the completion of their pending cases. The sudden disruption of an established attorney-client relationship would be a blow for children who have invested time to develop a relationship of trust, particularly in the wake of traumatic experiences that led them to migrate in search of safety. This is particularly so because child clients benefit from a trauma-informed and child-centered practice as is cultivated at KIND. Many children served through KIND face impending deadlines or events in their cases. As of the date of this declaration, approximately 200 clients represented by KIND staff or by pro bono attorneys receiving KIND's mentorship are scheduled for master or individual hearings in immigration courts in the next 60 days. This includes clients with immigration court hearings docketed for March 25, March 27, and April 8. A similar number of other required actions are scheduled in KIND's cases in the next 60 days, including hearings in state court proceedings, deadlines to respond to requests for evidence in connection with immigration applications, and other filing deadlines and events.

18. KIND relied on contractual funding to commence representation in thousands of matters that, as discussed above, require years to complete. ORR's partial termination of the contract will not automatically suspend pending removal proceedings nor resolve pending applications for relief. Nor will the partial contract termination automatically suspend deadlines in children's cases, such as requirements to file an application or motion within a specified time period or before a client reaches a specified age. KIND retains professional obligations toward these thousands of vulnerable clients. By issuing the partial termination order with immediate effect, ORR has not even provided a timeline for communicating the changed circumstances to KIND's thousands of clients; nor for attending to time-sensitive client needs or impending deadlines; nor for any accommodation of a lawyer's ethical obligations to a client under such circumstances, be they fulfilled through continued representation with alternative financial support, substitution of counsel, or withdrawal from representation.

7

19. The partial termination of the Acacia contract impedes KIND's mission of ensuring that no child appears in immigration court without high-quality legal representation. For all of the reasons discussed here, KIND believes that the partial termination of the Acacia contract will upset children's serious reliance interests in ongoing attorney-client relationships, diminish fairness, implicate due process considerations, impede the efficiency and effectiveness of court and agency processes due to increased numbers of unrepresented children, and thereby risk severe harm to children who have relied on their attorneys to see their claims for protection and relief through to conclusion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 25th of March 2025, in Falls Church, Virginia

_____ */s/ Wendy Young*_____

Wendy Young
President
Kids in Need of Defense
PO Box 27839
Washington, DC 20038

8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*, | Case No. 3:25-cv-2847 |
| Plaintiffs, | **DECLARATION OF MIGUEL ANGEL MEXICANO  FURMANSKA IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| v. | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | |
| Defendants. | |

Case 3:25-cv-02847-AMO Document 9-19 Filed 04/27/25 Page 62 of 75

**DECLARATION OF MI UEL AN EL MEXICANO FURMANS A MANA IN ATTORNEY AND O NER OF T E LA OFFICE OF MI UEL MEXICANO**

*I, Miguel Angel Me icano urmanska, make the following statements on behalf of myself and the aw Office of Miguel Me icano, PC. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

*J.O.P. v. DHS*

PI Appeal and Stay Addendum 182

Mi uel An el Mexicano Furmans a
Mana in  Attorney O ner
La  O ice o  Mi uel Mexicano, PC
UCP Le al Service Provider

1

IMMIGRANT DEFENDERS LAW CENTER

2
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)

3
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center

4
634 S. Spring St., 10th Floor
Los Angeles, CA

5
(213) 634-0999

6
ahuerta@immdef.org

7
lferreyra@immdef.org

8
JUSTICE ACTION CENTER

9
Esther H. Sung (CA Bar No. 255962)
Karen C. Tumlin (CA Bar No. 234691)

10
Laura Flores-Perilla (CA Bar No. 355645)*
JUSTICE ACTION CENTER

11
P.O. Box 27280
Los Angeles, CA 90027

12
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org

13
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

14

AMICA CENTER FOR IMMIGRANT RIGHTS
Adina Appelbaum (D.C. Bar No. 1026331)*
Samantha Hsieh (V.A. Bar No. 90800)*
Peter Alfredson (D.C. Bar No. 1780258)*
Evan Benz (N.C. Bar No. 49077)*
Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*pro hac vice forthcoming

Attorneys for Plaintiffs

15

IN THE UNITED STATES DISTRICT COURT

16

FOR THE NORTHERN DISTRICT OF CALIFORNIA

17

18
COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO,

19
1861 Bay Road
East Palo Alto, CA 94303;

20

21
SOCIAL JUSTICE COLLABORATIVE,
1832 Second Street

22
Berkeley, CA 94710;

23
AMICA CENTER FOR IMMIGRANT RIGHTS,
1025 Connecticut Avenue NW, Suite 701

24
Washington, DC 20036;

25
ESTRELLA DEL PASO,

26
2400A E. Yandell Drive
El Paso, TX 79903;

27
FLORENCE IMMIGRANT AND REFUGEE

28
RIGHTS PROJECT,

CASE NO. 3:25-cv-2847

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

1

PO Box 654
Florence, AZ 85132;

GALVESTON-HOUSTON IMMIGRANT
REPRESENTATION PROJECT,
6001 Savoy Drive, Ste. 400
Houston, TX 77036;

IMMIGRANT DEFENDERS LAW CENTER,
634 South Spring Street, 10th Floor

NATIONAL IMMIGRANT JUSTICE CENTER,
111 W. Jackson Boulevard, Suite 800
Chicago, IL 60604;

NORTHWEST IMMIGRANT RIGHTS
PROJECT,
615 Second Avenue, Suite 400
Seattle, WA 98104;

ROCKY MOUNTAIN IMMIGRANT
ADVOCACY NETWORK,
7301 Federal Boulevard, Suite 300
Westminster, CO 80030;

VERMONT ASYLUM ASSISTANCE
PROJECT,
P.O. Box 814 Elmwood Avenue
Burlington, VT 05402,

                    Plaintiffs,

          v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
200 Independence Avenue, S.W.
Washington, DC 20201;

OFFICE OF REFUGEE RESETTLEMENT,
Administration for Children and Families
Mary E. Switzer Building
330 C Street, Room 5123
Washington, DC 20201;

DEPARTMENT OF THE INTERIOR,
1849 C Street N.W.
Washington, DC 20240,

2

Defendants.

3

PI Appeal and Stay Addendum 186

**INTRODUCTION**

1.      Every day, in immigration courts across the country, unaccompanied children stand (or sit, with legs dangling over chairs, or are held in caretakers' arms) in front of federal immigration judges, across from Department of Homeland Security lawyers, in adversarial removal proceedings. Thousands of other unaccompanied children are not in removal proceedings—but nonetheless must navigate the country's complex immigration laws as they attempt to complete complicated and lengthy applications allowing them to seek lawful status in the United States.  These children, including babies and toddlers, arrived in the United States without a parent or legal guardian.  The vast majority do not speak English; the babies do not speak at all.  Most do not have the means to hire a lawyer.

2.      In one case, a one-year-old named Johan appeared in the Phoenix Immigration Court in 2018 with a bottle of milk and a purple ball—but without a parent or legal guardian.  The judge in Johan's case was "embarrassed to ask" if Johan understood the proceedings.  Turning to Johan's attorney, the judge addressed the absurdity of the legal theater playing out in his courtroom:  "I don't know who you would explain it to, unless you think that a 1-year-old could learn immigration law." Sasha Ingber, *1-Year-Old Shows Up In Immigration Court*, NPR (July 8, 2018), https://perma.cc/ALU7-RM6V.  Johan's story is not unusual, and demonstrates that the *only* way that many unaccompanied children can navigate the immigration legal system is with the help of a lawyer.

3.      Each unaccompanied child has their own individual story, but there are common themes. While many unaccompanied children are from Central America and the "Northern Triangle" countries of Guatemala, Honduras, and El Salvador, unaccompanied children come from all over the world. Most speak Spanish; some only speak indigenous Central American languages.  Few speak much English.  Many fled their home countries for their personal safety, escaping from gang violence, sexual violence, political violence, extreme poverty, and other dangers, only to experience further violence

4

and even trafficking during their long and dangerous journeys north to the United States. No matter their country of origin or spoken language, all are incredibly vulnerable.

4.    Recognizing the needs of these children who are attempting to navigate the complex immigration system on their own, Congress enacted laws to provide special protections for unaccompanied children in that system. These include the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), which requires that the government "shall ensure, to the greatest extent practicable," that all unaccompanied children receive legal counsel to represent them in "legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking." Pub. L. No. 110-457, § 235(c)(5), 122 Stat. 5044, 5079.

5.    More recently, the Department of Health and Human Services' ("HHS") Office of Refugee Resettlement ("ORR") issued a Foundational Rule, published in 2024, meant, in part, to carry out the agency's obligations under the TVPRA as well as the earlier 1997 settlement in *Flores v. Reno* (which dictates certain government obligations to unaccompanied children). Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384 (Apr. 30, 2024) (codified at 45 C.F.R. pt. 410 (the "Foundational Rule")). The Foundational Rule requires the government to "fund legal service providers to provide direct immigration legal representation" to unaccompanied children if there are "available appropriations" and to ensure children receive a legal orientation, consultation with a lawyer, and ongoing access to lawyers. 45 C.F.R. § 410.1309(a) (2024).

6.    Congress has appropriated funds to ensure as many unaccompanied children as possible are represented by lawyers. For fiscal year 2024, for example, Congress appropriated more than $5 billion for Defendants to deliver services to unaccompanied children under various statutory obligations, which includes funding to provide legal representation for unaccompanied children under the TVPRA "to the greatest extent practicable." This appropriation is now available to fund legal representations through September 30, 2027.

5

7.      For more than a decade, until March 21, 2025—under different presidential administrations and changing immigration policies—the government fulfilled its obligations under the TVPRA and ongoing congressional appropriations to fund legal representation for unaccompanied children.  Through this funding, every unaccompanied child in government custody (at shelters run by ORR, under the authority of HHS) had the opportunity to receive a group "know your rights" session and an individual legal screening, and many children received direct legal representation from legal service providers.  These representations helped bridge the significant gap in legal access for unaccompanied children, only a small number of whom can afford paid representation or are able to independently retain a pro bono attorney.  They also helped immigration courts function efficiently and avoided forcing immigration judges and government lawyers to engage directly with children in responding to immigration charges and related questions around relief from removal.

8.      Plaintiffs are legal service providers that, until March 21, 2025, provided representation and related services to unaccompanied children with funding from Defendants.  Plaintiffs furthered the TVPRA's goals and the requirements in the TVPRA and the Foundational Rule by providing basic legal services to unaccompanied children and by representing unaccompanied children in immigration court, affirmative immigration proceedings, and related state court proceedings.

9.      Now, Plaintiffs have largely had to stop taking on new clients and face the real threat of not being able to continue their ongoing representations.  For example, without funding from Defendants, Plaintiff Community Legal Service in East Palo Alto has had to stop taking on new unaccompanied children clients—even if the children face upcoming court dates without a lawyer—and if it cannot find other funding sources, its ability to represent existing clients (taken on in reliance on continued funding from Defendants) will be in jeopardy.  Plaintiffs' inability to serve new clients or provide certainty for existing clients is an enormous harm to their mission to serve as many unaccompanied children as possible.

6

10.     Plaintiffs' clients range in age from infants to teenagers, all of whom depend on Plaintiffs for critical legal counsel.  For example, Plaintiff Immigrant Defenders Law Center represents a 16-year-old girl and her one-year-old son in cases that were funded by Defendants until March 21, 2025.  Beginning at the age of six years old, the girl was sex trafficked by her family in Mexico.  After giving birth to her son, she fled to the U.S. to save him from the same fate.

11.     On March 21, 2025, without warning, Defendant the U.S. Department of the Interior ("DOI") sent a notice terminating the contract line items through which Defendants HHS and ORR had provided funding for counsel for unaccompanied children and ordering Plaintiffs to "immediately stop work" on their ongoing funded representations (the "Cancellation Order").  Defendants issued this order despite the TVPRA's mandate that the government provide unaccompanied children with legal counsel to the greatest extent practicable and despite the existence of congressionally appropriated funds to pay for precisely these services through at least September 30, 2027.  As a result, many of the approximately 26,000 unaccompanied children around the country represented by attorneys through now-terminated funding from Defendants—including children with immigration court hearings scheduled for the following business day—were placed at imminent risk of being cut off from their lawyers.  The children subject to this risk include many children now facing imminent removal from the United States despite being prima facie eligible for immigration relief.

12.     The Cancellation Order flies in the face of the TVPRA and the Foundational Rule.  In addition to interrupting and obstructing attorney-client relationships, contrary to the mandate to provide legal counsel to unaccompanied children, it also defeats the broader purpose of both the TVPRA and the Foundational Rule.  Through the funded representations, Plaintiffs play a key role in identifying and helping child trafficking victims, fulfilling one of Congress's primary objectives in the TVPRA (to "protect [unaccompanied children] from mistreatment, exploitation and trafficking").  *See* TVPRA, Pub. L. No. 110-457, § 235(c)(5), 122 Stat. 5044, 5079 (2008).  By subverting Congress's funding of

7

counsel for unaccompanied children, Defendants ensure more children will remain separated from their families, fewer trafficking victims will be identified and protected, and more children will be at risk of being trafficked in the future.

13.     Defendants' actions will also cause chaos throughout the immigration legal system and are particularly harmful because they come at a time when the government is reinstating expedited docketing for removal cases for unaccompanied children.  Unaccompanied children across the country have immigration court dates this week, at which some will now appear without an attorney.  Other children have impending deadlines to apply for immigration relief for which they are eligible, but will need an attorney's assistance to submit their application.

14.     As a consequence of Defendants ordering Plaintiffs to stop providing direct legal services, many unaccompanied children will never speak to a lawyer, will never apply for immigration relief for which they are eligible, will remain in tenuous status for longer, and will not understand what is happening as they are rushed through adversarial removal proceedings.  Immigration judges will be left to carry the burden, on their own, to expend limited government resources to educate child respondents (some only a few months old) on arcane immigration law and apply the law to their cases, without a full understanding of the reasons the children left their countries or the realities facing their removal.  This will cause immigration judges to spend more time on cases for unaccompanied children at a time when the immigration court backlog is already at an all-time high.

15.     Plaintiffs seek to enjoin Defendants from ceasing funding for legal representation of unaccompanied children, an action contrary to Congress's TVPRA mandate and subsequent congressional funding, contrary to Defendant ORR's own Foundational Rule on funding for counsel for unaccompanied children, and in violation of the Administrative Procedure Act ("APA").

16.     Plaintiffs respectfully ask this Court to grant declaratory and injunctive relief, declaring that Defendants are violating the law and requiring them to continue funding legal representation

8

consistent with the TVPRA and the Foundational Rule. Plaintiffs ask this Court to enjoin Defendants nationwide from refusing to fund counsel for unaccompanied children in violation of the TVPRA and the Foundational Rule.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over the claims alleged in this Complaint under 28 U.S.C. § 1331, as they arise under federal law, including the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232, and the 2024 Unaccompanied Children Program Foundational Rule (the "Foundational Rule"), 89 Fed. Reg. 34384.

18. The APA waives the U.S. government's sovereign immunity where, as here, federal agencies have acted in a manner that is arbitrary and capricious, an abuse of discretion, or otherwise in violation of the law. 5 U.S.C. § 706(2)(A).

19. The Court has authority to issue a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

21. Venue properly lies in the Northern District of California under 28 U.S.C. § 1391(e)(1)(C) because Defendants are "officer[s]," "employee[s]," and "agenc[ies]," of the United States acting in their official capacities, and because Plaintiffs Community Legal Services in East Palo Alto and Social Justice Collaborative are California non-profit organizations headquartered in and providing services in the Northern District. No real property is involved in this action.

22. Venue is proper in the San Francisco Division because "a substantial part of the events or omissions giving rise to the claim occurred" in this Division. 28 U.S.C. § 1391(b)(2). Plaintiff Community Legal Services in East Palo Alto is headquartered in San Mateo County, in this Division,

9

Plaintiffs Community Legal Services in East Palo Alto and Social Justice Collaborative both conduct substantial business in this Division including by serving unaccompanied children living in the San Francisco Division and in San Francisco Immigration Court, and Defendants' conduct has caused harm to these Plaintiffs in this Division by harming their ability to represent and serve unaccompanied children in the San Francisco Division.

## PARTIES

### A.    Plaintiffs

23.    Plaintiffs are nonprofit organizations that have received funding from Defendants HHS and ORR to provide legal representation and other legal services to unaccompanied children. Plaintiffs share a mission to expand access to legal information and services for unaccompanied children, and to ensure that as many unaccompanied children as possible are represented by a lawyer.

24.    Plaintiff Community Legal Services in East Palo Alto ("CLSEPA") is a nonprofit organization in East Palo Alto, California. CLSEPA serves unaccompanied children in San Mateo County and Santa Clara County. Through funding from Defendants, CLSEPA provided legal representation for non-detained unaccompanied children. CLSEPA currently represents 23 unaccompanied children in cases formerly funded by Defendants.

25.    Plaintiff Social Justice Collaborative ("SJC") is a nonprofit organization in Berkeley, California, operating across the Bay Area and in California's central valley—including in areas where it is one of the only organizations offering legal services to immigrants. It serves unaccompanied children in San Francisco Immigration Court, Concord Immigration Court, and Sacramento Immigration Court. Through funding from Defendants, SJC provided legal representation to about 45 non-detained unaccompanied children per year and hosted Immigrant Justice Corps fellows.

unaccompanied children in the greater Washington, D.C. and Baltimore areas, appearing before the Baltimore, Hyattsville, Sterling, and Annandale Immigration Courts. Through funding from Defendants, Amica Center provided legal orientations for children in ORR custody, legal representation for children in ORR custody and released from ORR custody, and hosted an Immigration Justice Corps fellow. Amica Center currently represents more than 850 unaccompanied children in cases formerly funded by Defendants.

27. Plaintiff Estrella del Paso ("Estrella") is a nonprofit organization based in Texas and the largest provider of free immigration legal services in West Texas and New Mexico. It serves unaccompanied children appearing before the El Paso Immigration Court and has provided legal services for unaccompanied children in El Paso since 2007. Through funding from Defendants, Estrella provided legal services to indigent, unaccompanied immigrant children who are not in detention, as well as those in ORR custody in El Paso County, and conducted "know your rights" presentations and individual consultations. Estrella currently represents 324 unaccompanied children in cases formerly funded by Defendants.

28. Plaintiff Florence Immigrant and Refugee Rights Project ("Florence Project") is a nonprofit organization in Arizona. The Florence Project has provided legal services for unaccompanied children in Arizona since 2000. It serves unaccompanied children in Tucson Immigration Court and Phoenix Immigration Court, and in 24 ORR shelters. Through funding from Defendants, the Florence Project provided legal orientations, legal representation for detained and non-detained unaccompanied children, Spanish-language tutoring, and hosting for Immigrant Justice Corps fellows. The Florence Project is the only non-profit organization that provides free legal services to unaccompanied children in Arizona and currently represents more than 800 unaccompanied children in cases formerly funded by Defendants.

11

29.     Plaintiff Galveston-Houston Immigrant Representation Project ("GHIRP") is a nonprofit organization in the Galveston-Houston area of Texas.  It serves unaccompanied children in the Galveston-Houston area and Houston Immigration Court.  Through funding from Defendants, GHIRP provided legal orientations, legal representation for detained and non-detained unaccompanied children, and hosting for Immigrant Justice Corps fellows.  GHIRP currently represents 292 unaccompanied children in cases formerly funded by Defendants.

30.     Plaintiff Immigrant Defenders Law Center ("ImmDef") is a nonprofit organization in Los Angeles, California.  It serves unaccompanied children in three Immigration Courts:  Van Nuys, West Los Angeles, and Santa Ana.  ImmDef provided legal orientations and direct legal representation through funding from Defendants for nearly 2,000 detained and non-detained unaccompanied children, along with Spanish-language tutoring for attorneys, and hosting for Immigrant Justice Corps fellows.  ImmDef currently represents nearly 2,000 unaccompanied children in cases formerly funded by Defendants.

31.     Plaintiff National Immigrant Justice Center ("NIJC") is a nonprofit organization headquartered in Chicago, Illinois and has provided services to unaccompanied children for more than 40 years.  It serves unaccompanied children in Chicago Immigration Court.  Through funding from Defendants, NIJC provided legal orientations and individual consultations as well as representation to unaccompanied children in immigration proceedings both in and out of ORR custody.  NIJC currently represents approximately 500 unaccompanied children in cases formerly funded by Defendants.

32.     Plaintiff Northwest Immigrant Rights Project ("NWIRP") is a nonprofit organization located in Washington State.  It serves unaccompanied children in Seattle Immigration Court (and occasionally Portland Immigration Court), and has provided free immigration legal services for over 40 years.  Through funding from Defendants, NWIRP provided legal services to unaccompanied immigrant children and youth who have been released from ORR custody throughout Washington

12

State. NWIRP currently represents approximately 500 unaccompanied children in cases formerly funded by Defendants.

33. Plaintiff Rocky Mountain Immigrant Advocacy Network ("RMIAN") is a nonprofit organization in Colorado. It serves unaccompanied children in Denver Immigration Court. Through funding from Defendants, RMIAN provided legal representation for non-detained unaccompanied children and Spanish-language tutoring for staff. RMIAN is the primary organization providing free legal services to unaccompanied children in Colorado. RMIAN currently represents 160 unaccompanied children in cases formerly funded by Defendants.

34. Plaintiff Vermont Asylum Assistance Project ("VAAP") is a non-profit organization in Vermont. It serves unaccompanied children in Chelmsford Immigration Court and Boston Immigration Court. Through funding from Defendants, VAAP provided legal representation for detained and non-detained unaccompanied children, and hosting for two Immigrant Justice Corps fellows. VAAP provides legal services to about 135 unaccompanied children annually, with 35-40 full scope direct representations each year. Serving unaccompanied children in Vermont is particularly urgent because unaccompanied children in Vermont are often unable to access removal proceedings in far-away Boston and Chelmsford without legal assistance—and VAAP is the only legal services provider for unaccompanied children in Vermont.

35. For years, Plaintiffs heeded Congress's call to provide critical legal services to unaccompanied children. Plaintiffs collectively represent thousands of unaccompanied children, including children in removal proceedings and children applying for affirmative forms of immigration relief, and their organizational missions and ethical obligations compel them to represent these clients to the best of their abilities. Defendants' Cancellation Order severely limits Plaintiffs in performing their respective missions to provide legal representation the law requires be made available to unaccompanied children. To pay for existing representations, Plaintiffs face the need to use up any

13

discretionary or reserve funding, and to lay off employees. If Plaintiffs are unable to maintain staffing levels necessary to handle their current caseloads, they will have to assess their ability to meet ongoing ethical and court-required obligations to their clients and may be forced to withdraw from ongoing cases.

36.     For many Plaintiffs, these consequences are imminent or already occurring. For example, ImmDef has already been forced to give layoff notices to 27 staff to try to stay financially viable and able to serve unaccompanied children for as long as possible. SJC will have to lay off its three Immigrant Justice Corps fellows if it cannot find other funding. To maintain its representations, Estrella has had to furlough 18 of the 28 employees in its unaccompanied children program. VAAP has had to not renew the contract of one of its four employees and may have to furlough another two employees—leaving it with only a single remaining employee. In four weeks, GHIRP will have to lay off most of its 19 employees who provide services to unaccompanied children.

**B.     Defendants**

37.     Defendant HHS is the department of the federal government that receives appropriations from Congress to fulfill its statutory obligations under the TVPRA to aid and provide legal representation to unaccompanied children to the greatest extent practicable. HHS most recently received an appropriation for services (including provision of counsel) required under the TVPRA for unaccompanied children on March 23, 2024, in the 2024 Further Consolidated Appropriations Act. *See* Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D, tit. II, 138 Stat. 460, 664–65 (2024) (funding continued through September 30, 2025, by the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, tit. I, § 1101(8) (2025)). This appropriation extends funding for services under the TVPRA through September 30, 2027. *See id*.

38.     Defendant ORR is the office of HHS (situated within HHS's Administration for Children and Families Division) that oversees services for unaccompanied children under the TVPRA

14

and is the agency that passed the Foundational Rule in 2024 through notice-and-comment rulemaking. Defendant ORR's Unaccompanied Alien Children Bureau is the government body that interacts most directly with unaccompanied children.

39.    Defendant DOI is the department of the federal government primary contractor listed for the contract through which Defendants HHS and ORR provided the required funding for counsel for unaccompanied children.  DOI issued the Cancellation Order on March 21, 2025.

## STATEMENT OF FACTS

**A.    HHS And ORR Are Required By Law To Care For Unaccompanied Children.**

40.    "Unaccompanied child" is defined by statute as any individual younger than 18 and without lawful immigration status, who has no parent or legal guardian who is in the United States able to provide care and physical custody.  *See* 6 U.S.C. § 279(g)(2).  Once a child is identified as unaccompanied under this definition, they are treated as unaccompanied even if they are later released to a sponsor—the "unaccompanied" designation applies throughout their time navigating U.S. immigration law.

41.    In the 2024 fiscal year, nearly 100,000 children, toddlers, and babies were identified by federal authorities as being unaccompanied children.  These children entered the United States without their parents for many reasons, most commonly because they were separated from their parents on their way to the United States, because they were trafficked to the United States, because they were separated from their families by immigration authorities after entering the United States, or because they fled their home countries without their parents.  A large majority of the children are from Central America and arrived in the United States after a long and dangerous journey north to the U.S.-Mexico border.  Many fled unspeakable violence in their home countries and arrived in the United States only to face detention and deportation on their own.

15

42.     The United States has long struggled to care for unaccompanied children.  Change has come as Congress has recognized that unaccompanied children are uniquely vulnerable to trafficking, abuse in government custody, and injustices in the immigration legal system.

43.     Until 2002, the former Immigration and Naturalization Services detained unaccompanied children, treating them similarly to detained noncitizen adults.

44.     The Homeland Security Act of 2002 changed this model, giving Defendants HHS and ORR legal custody of unaccompanied children, with the mandate to care for these children.  *See* 6 U.S.C. § 279(a).

45.     In 2008, the TVPRA imposed further responsibilities on HHS and ORR's custody of unaccompanied children, including that HHS and ORR "shall ensure, to the greatest extent practicable . . . that all unaccompanied alien children . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking."  8 U.S.C. § 1232(c)(5).

**B.  Unaccompanied Children Have Special Legal Rights.**

46.     Unaccompanied children have special legal rights, including the right to go through full removal proceedings before an immigration judge, unlike other individuals who may be put through expedited removal proceedings.  *See* 8 U.S.C. § 1232(a)(5)(D).  If an unaccompanied child applies for asylum, they are entitled to go through the non-adversarial process of an asylum determination through DHS's Asylum Office—instead of in immigration court, where an immigration judge would preside over an adversarial hearing between a DHS lawyer and the unaccompanied child.  *See* 8 U.S.C. § 1158(b)(3)(C).  Unaccompanied children also have the right to apply for other forms of immigration relief, like Special Immigrant Juvenile Status, Withholding of Removal, relief under the Convention Against Torture, and U or T visas.

47.     Although U.S. law guarantees unaccompanied children these rights, the children are not able to avail themselves of these rights unless the children understand their rights, are equipped with

16

the tools to exercise them, and are given legal counsel.  For this reason, Congress and ORR have both

recognized the importance of providing unaccompanied children with legal representation—and taken

steps to maximize the number of unaccompanied children represented by attorneys.  The TVPRA

requires Defendants to provide legal representation to unaccompanied children to the greatest extent

practicable, and Congress has consistently appropriated funds annually to pay for that representation.

48.     And all children (unaccompanied or otherwise) are protected by regulations that prevent

immigration judges from accepting an admission of removability from respondents under the age of

18—unless the respondent is represented by an attorney or other designated individual.  *See* 8 C.F.R.

1240.10(c).

49.     ORR, recognizing its obligations under the TVPRA, committed to providing legal

representation to children unable to secure counsel, subject to ORR's discretion to the extent it

determines appropriations are available.  ORR "strives for 100 percent legal representation of

unaccompanied children."  89 Fed. Reg. 34384, 34526 (Apr. 30, 2024).

## C.      The TVPRA Requires Defendants to Provide Legal Services to Unaccompanied Children.

51.     Acting on this congressional command, ORR contracted with the Vera Institute for

Justice in 2005 to administer what was then called the "Unaccompanied Children Pro Bono Project"

(the "Project").  The Project was a three-year pilot to develop and test ways to meet the legal needs of

unaccompanied children through pro bono legal services.

52.     Through the Project, ORR and Vera collaborated to design a program of subcontracting

with nonprofit legal service organizations to provide basic legal orientation to unaccompanied children,

17

to screen their cases to identify those with potential claims for relief from removal, and to recruit and train volunteer lawyers to represent children in immigration court.  Initially, the nonprofit legal service providers were not permitted to use government funding to provide direct representation.

53.      At the end of the pilot period in 2008, Vera issued a report to ORR, explaining that volunteer attorneys alone could not represent all unaccompanied children in ORR custody. Accordingly, the government could not meet its goal of ensuring that a significant percentage of unaccompanied children were represented unless it funded attorneys to represent them.

54.      On the heels of this pilot program, Congress imposed additional mandates on ORR and HHS in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA").  The TVPRA mandates HHS to provide counsel for unaccompanied children:

> **The Secretary of Health and Human Services shall ensure**, **to the greatest extent practicable** and consistent with section 292 of the Immigration and Nationality Act (8 U.S.C. 1362), **that all unaccompanied alien children who are or have been in the custody of the Secretary or the Secretary of Homeland Security**, and who are not described in subsection (a)(2)(A), **have counsel to represent them in legal proceedings or matters** and protect them from mistreatment, exploitation, and trafficking. To the greatest extent practicable, the Secretary of Health and Human Services shall make every effort to utilize the services of pro bono counsel who agree to provide representation to such children without charge.

8 U.S.C. § 1232(c)(5) (emphasis added).

55.      In other words, the TVPRA directs that Defendants "shall ensure, to the greatest extent practicable . . ." that unaccompanied children have counsel to represent them in legal proceedings.  If Defendants have funding they can spend to provide counsel for unaccompanied children, they must spend that funding to provide such counsel.

**D.      Defendants Satisfied Their Congressional Mandate To Provide Legal Services To Unaccompanied Children By Paying Plaintiffs With Funding Appropriated By Congress.**

18

the greatest extent practicable." *See* Supplemental Appropriations Act, 2009, Pub L. 111-32, tit. VIII, 123 Stat. 1859, 1884 (2009); Consolidated Appropriations Act, 2010, Pub. L. 111-117, div. D tit. II, 123 Stat. 3034, 3249–3250 (2009); Consolidated Appropriations Act, 2012, Pub. L. 112-74, div. F tit. II, 125 Stat. 786, 1077 (2011); Consolidated Appropriations Act, 2014, Pub. L. 113-76, div. H tit. II, 128 Stat. 5, 376 (2014); Consolidated and Further Continuing Appropriations Act, 2015, div. G tit. II, Pub. L. 113-235, 128 Stat. 2130, 2479 (2014); Consolidated Appropriations Act, 2016, Pub. L. 114-113, div. H tit. II, 129 Stat. 2242, 2612 (2015); Further Continuing and Security Assistance Appropriations Act, 2017, Pub. L. 114-254, 130 Stat. 1005, 1011 (2016); Consolidated Appropriations Act, 2017, Pub. L. 115-31, div. H tit. II, 131 Stat. 135, 531 (2017); Consolidated Appropriations Act, 2018, Pub. L. 115-141, div. H tit. II, 132 Stat. 348, 728 (2018); Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. 115-245, div. B tit. II, 132 Stat. 2981, 3082 (2018); Consolidated Appropriations Act, 2021, Pub. L. 116-260, div. H tit. II, 134 Stat. 1183, 1582 (2020); Consolidated Appropriations Act, 2022, Pub. L. 117-103, div. H tit. II, 136 Stat. 49, 458 (2022); Consolidated Appropriations Act, 2023, Pub. L. 117-328, div. H tit. II, 136 Stat. 4459, 4870 (2022); Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023, Pub. L. 117-180, div. A sec. 147, 136 Stat. 2114, 2124 (2022); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D tit. I, 138 Stat. 460, 664-665 (2024) (funding continued through September 30, 2025, by the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A tit. I Sec. 1101(8) (2025)).

57.    Until 2012, funds for legal representation were used only to match unrepresented unaccompanied children with available pro bono counsel.  In 2009, the House Appropriations Committee—following the passage of the TVPRA—explained that "legal representation is absolutely critical to ensure that children understand their rights as they navigate the legal process to determine their status in the United States."  H. Rep. 111-220, at 165.  The Committee commended the earlier

19

pilot program for legal representation for unaccompanied children and included funding "to continue and expand this initiative" "to work towards ensuring that all unaccompanied alien children understand their legal rights and have access to pro bono representation." *Id.* at 165-66. But success of this program to match unaccompanied children with volunteer attorneys was highly dependent on local circumstances, and it was clear pro bono representation alone could not meet the representational needs of unaccompanied children.

58.    Beginning in 2012, funding became available to pay lawyers dedicated to representing unaccompanied children, in addition to referring them to pro bono counsel.

59.    Over time, ORR and Congress have directed that funded representation be expanded again and again. In reports accompanying appropriations bills, Congress has built on its mandates for funded legal representation for unaccompanied children over the years. For example, in 2018 the Senate Appropriations Committee noted "that services provided by qualified and independent legal counsel to [unaccompanied children] can increase the efficiency and effectiveness of immigration proceedings and significantly reduce the failure-to-appear rate of children who are released from HHS custody. The Committee recommendation directs ORR to continue the scope and funding of these legal services at no less than fiscal year 2017 levels." S. Rep. 115-289, at 150.

60.    In 2019, the House Appropriations Committee directed funding specifically for "qualified and independent legal services for unaccompanied children, including but not limited to know-your- rights orientations, legal screenings, court preparation and assistance, **representation**, and pro bono referrals" and recommended expanding funded representations. H. Rep. 116-62 at 145 (emphasis added).

61.    In 2020, the House Appropriations Committee recommended "no less than $30,000,000 to be spent in fiscal year 2021 for **direct representation** services to children" and encouraged "ORR

to work with legal service providers to develop a strategy to minimize the risks of any child having to go to immigration court without independent legal counsel." H. Rep. 116-450 at 180 (emphasis added).

62.     In 2021, the House Appropriations Committee again supported funded representations, instructing that there should be even more funded representation for unaccompanied children released from ORR custody and that such direct representation "shall be made available to children **up to the funded capacity.**" H. Rep. 117-96, at 211 (emphasis added).

63.     In 2022, the House Appropriations Committee again supported "the continued expansion of independent legal services for unaccompanied children" and directed that funded representations should "be made available to children **up to funded capacity.**" H. Rep. 117-403, at 200 (emphasis added).

64.     Until March 21, 2025, the Acacia Center for Justice ("Acacia") managed a network of 89 legal services organizations (including Plaintiffs) in 159 offices across the country providing representation to unaccompanied children through funding from HHS and ORR, under a contract between Acacia and DOI (contracting on behalf of HHS and ORR).

65.     This contract had four funded line items:

1.  Work in ORR shelter facilities, including "know your rights" presentations, intakes to connect detained children with attorneys, and initial screenings with detained children;

2.  Full legal representation for children in and out of ORR custody, as well as other non-representation services such as "friend of court" services in hearings for unaccompanied children appearing in immigration court or preparing forms without attorneys;

3.  Immigrant Justice Corps fellows who represent unaccompanied children not covered by the second line item;

21

66.     As of March 21, 2025, Plaintiffs and other attorneys across the country represented approximately 26,000 children, toddlers, and babies—who arrived in the U.S. without parents or other caregivers—through funding appropriated by Congress and delivered under this contract.

**E.      Past Government Statements Acknowledge The Benefits Of Funding Counsel For Unaccompanied Children and Babies**

67.     The importance of legal representation for unaccompanied children is borne out in immigration court statistics.  Increasing representation for unaccompanied children makes immigration courts run more efficiently, leads to more unaccompanied children who qualify for immigration relief receiving that relief, and leads to more unaccompanied children without a case for relief requesting voluntary departure instead of unnecessary proceedings.

68.     Unrepresented children effectively never receive relief from removal.  A 2024 Congressional Research Service report explained that from 2005 to 2017, 90% of unaccompanied children in removal proceedings without a lawyer were removed and *less than 1% received some form of immigration relief* (only 308 children out of nearly 90,000).  *See* "Unaccompanied Alien Children: An Overview," CONGRESSIONAL RESEARCH SERVICE (Sept. 5, 2024), https://www.congress.gov/crs-product/R43599.  On the other hand, only 21% of represented unaccompanied children received a removal order over the same time period, and 73% attain some form of relief, including asylum and other paths to lawful permanent resident status.  Moreover, a greater percentage of unaccompanied children with attorneys chose to depart the country voluntarily than those without lawyers, showing the role attorneys play in helping children understand both their options and—in some circumstances—their lack of options.

69.     Represented children are also more likely to attend their hearings than unrepresented children, and more likely to understand what happens in their cases, easing the burden on immigration judges to explain proceedings.  From 2005 to 2017, 76% of all unaccompanied children continued to appear as scheduled for their cases—but for represented unaccompanied children, that rate was a near-

22

perfect 97%.  *See* Alyssa Snider and Rebecca DiBennardo, "Representation Matters: No Child Should Appear in Immigration Proceedings Alone," VERA INSTITUTE OF JUSTICE (Dec. 2021), https://vera-institute.files.svdcdn.com/production/downloads/publications/representation-matters.pdf.

70.    ORR has acknowledged "that most unaccompanied children need legal services to resolve their immigration status and that representation appears to have a significant impact on both the court appearance rate and the outcome of cases for unaccompanied children."  Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384, 34529 (April 30, 2024) (to be codified at 4 C.F.R. pt. 410).

## F.    Immigration Judges And Other Government Officials Regularly Praise Plaintiffs' Work, Which Makes Their Jobs Easier

71.    In the past weeks, immigration judges have expressed their concern that Plaintiffs might no longer be working in their courtrooms and helping courts function smoothly.  Plaintiff Community Legal Services in East Palo Alto prioritizes positive interactions with immigration judges and adopts a proactive approach to advocacy, working with ICE counsel to ensure that their clients can advance their cases without missing school—a benefit to everyone involved.

72.    A judge in Chicago Immigration Court specifically expressed her concern that NIJC might not be available anymore to represent unaccompanied children appearing before her.  Judges praise NIJC's work as allowing the court to operate efficiently and with confidence that unaccompanied children are making informed decisions and have been screened for relief and other needs.

73.    Plaintiff the Florence Project was created after a call to action by an immigration judge. The Florence Project works with the court and individual judges to coordinate the specialized docket for unaccompanied children, serving as friend of the court frequently.  Judges show their appreciation for the Florence Project's work by giving its staff space in courtrooms to conduct pre-hearing orientations for children and even by swearing in Florence Project staff who have just been admitted

23

to the Arizona Bar.  In stakeholder meetings with the government, government partners routinely thank the Florence Project for its work and emphasize the value of the services it provides.

74.    Immigration judges and other stakeholders rely on Amica Center's services. Immigration judges rely on Amica Center's friend of court services and ask Amica Center to enter appearances in cases where the judge doubts the child understands their legal options or is competent to appear in court.  ORR shelter staff lean on Amica Center to answer questions about court appearances for the children they house.

75.    Immigration judges overseeing dedicated dockets for unaccompanied children in El Paso express gratitude for the work Estrella does both in its representations and its friend of court services.  Judges appreciate that Estrella helps them reduce their docket loads.  ORR shelter staff appreciate Estrella's help and training in caring for unaccompanied children.

76.    Immigration judges and government attorneys regularly thank RMIAN for its work, and RMIAN and government employees work together to improve immigration court efficiency in Denver. RMIAN saves the court and the government unnecessary time and effort by obtaining dismissal in cases where dismissal is proper and by avoiding unnecessary status hearings.  The Denver Immigration Court regularly asks RMIAN to provide friend of court services to assist unaccompanied children with anything from a change of address form to a screening for potential human trafficking.

77.    Judges, clerks, and other immigration court staff, and DHS field office staff praise VAAP's work as making the immigration legal system more fair and efficient.  VAAP's services help immigration courts avoid unnecessary proceedings and help unaccompanied children efficiently appear in court remotely.

## G.    In 2024, ORR Issued A Foundational Rule On Funding For Legal Services For Unaccompanied Children

78.    On April 30, 2024, ORR issued a final rule following full notice-and-comment rulemaking:  the "Unaccompanied Children Program Foundational Rule," which took effect July 1,

24

2024.  Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384, 34529 (April 30, 2024) (to be codified at 4 C.F.R. pt. 410).  The rule is meant to codify regulations "consistent with ORR's statutory duties" and "responsibilities for coordinating and implement the care and placement of unaccompanied children . . . under the Homeland Security Act of 2002 (HSA) and the [TVPRA]." *Id.*, 89 CFR 34384.

79.     Section 410.1309 of the Foundational Rule is titled "Legal Services."  *Id.*, 89 Fed. Reg. 34526.  This section of the Foundational Rule affirms ORR's belief that "legal services providers who represent unaccompanied children undertake an important function" and stated, "ORR strives for 100 percent legal representation of unaccompanied children and will continue to work towards that goal to the extent possible."  *Id.*

80.     The Foundational Rule requires that unaccompanied children in ORR custody *must* receive a legal orientation from "an independent legal service provider" and a "confidential legal consultation with a qualified attorney."  *Id.*, 89 CFR 34603.

81.     The rule also provides that ORR must—if it has available appropriations—"fund legal service providers to provide direct immigration legal representation for certain unaccompanied children."  *Id.*

82.     To comply with the TVPRA and INA, the rule recognizes ORR must "ensure that all unaccompanied children who are or have been in ORR care have access to counsel" and provides, "ORR may make grants, in its discretion and subject to available resources . . . or contracts under this section . . . for the purpose of providing immigration legal representation, assistance and related services to unaccompanied children."  *Id.*

## H.     In 2024, Congress Reauthorized Funding For The Services, And That Funding Is Available Today

83.     On March 23, 2024, Congress passed H.R. 2882, the Further Consolidated Appropriations Act of 2024, which appropriated funding for many federal departments and programs,

25

including Defendants HHS and ORR.  Congress specifically appropriated funds "for carrying out . . . section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008," the TVPRA.  Pub. L. 118-47 138 Stat. 460, 664.  Section 235 of the TVPRA includes the requirement to provide funding for counsel for unaccompanied children "to the greatest extent practicable"—so the appropriation was, in part, meant to pay for this representation.  8 U.S.C. § 1232(c)(5).

84.     The Senate Report accompanying the 2024 appropriations bill commanded Defendant HHS to fund the Services.  The Senate Committee on Appropriations specified there should be "$5,506,258,000 for the Unaccompanied Children [UC] program."  S. Rep. 118-84, at 167.  It went on to direct, "The Committee recommendation includes no less than the fiscal year 2023 funding level for post-release services; legal services and access to counsel; and child advocates.  The Committee expects HHS will continue to expand child-welfare focused post-release services . . . including . . . access to legal services."  *Id.* at 168.

85.     The Senate Report expressed its understanding that the TVPRA requires ORR to fund counsel for unaccompanied children:  "The Committee also expects these funds will be used to provide access to counsel, consistent with the goals of the Trafficking Victims Protection Reauthorization Act of 2008 **for all children to have access to counsel in their immigration proceedings.**"  *Id.* at 169 (emphasis added).

86.     On March 15, 2025, Congress continued funding at the levels set in the Further Consolidated Appropriations Act.  Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A tit. I sec. 1101(8) (2025).

87.     This appropriated funding for counsel for unaccompanied children is now available to Defendants through September 30, 2027.  The initial 2024 appropriation extended for two years, through September 30, 2026, Pub. L. 118-47 138 Stat. 460, 664, and the Full-Year Continuing Appropriations and Extensions Act of 2025 further extended the appropriation by another year, Pub.

26

L. 119-4, div. A tit. I sec. 1103 ("Appropriations provided by this division that, in the applicable appropriations Act for fiscal year 2024, carried a multiple-year or no-year period of availability shall retain a comparable period of availability").

I.    **Defendants Abruptly Shut Down And Later Resumed Funding For Counsel For Unaccompanied Children Without Explanation**

88.    Despite Congress's consistent funding of legal representation for unaccompanied children, consistent with the TVPRA, Defendants seek to undermine congressional appropriations and the TVPRA's mandate.  On Tuesday, February 18, 2025, without warning, Defendant DOI and Defendant HHS issued a "Stop Work Order" to Acacia, ordering service providers—including Plaintiffs—to "cease all services" and "stop all work" for those services under the contract between Acacia and DOI.  The order included no end date; it indefinitely suspended the services.  The stop work order gave no explanation, but said it had nothing to do with how the legal services were being run: "The stop work order is being implemented due to causes outside of [Acacia's] control and should not be misconstrued as an indication of poor performance by [Acacia]."  Nevertheless, the order explained, the stop work order could lead Defendants to "terminate the contract."

89.    Three days later, and after significant backlash, on Friday, February 21, 2025, Defendants voluntarily rescinded the stop work order without explanation.

J.    **On March 3, 2025, 32 Senators Reminded Defendants That Ending Funding For Counsel For Unaccompanied Children Violates the TVPRA**

90.    On March 3, 2025, 32 Senators wrote to HHS Secretary Robert F. Kennedy, Jr. and DOI Secretary Doug Burgum to express their "strong opposition" to the now-rescinded stop work order and to note their "concern[] about the chaos and confusion it caused for legal services providers and the children they serve."  Sens. Ossoff, Hirono, et al, *Letter to Secretary Robert F. Kennedy, Jr. and Secretary Doug Burgum* (Mar. 3, 2025), accessible at https://www.hirono.senate.gov/ imo/media/doc/250305lettertohhsandinterioronlegalservicesforchildreninimmigrationsystem.pdf.

27

91.     The Senators explained that the stop work order—and any other attempt to stop funding counsel for unaccompanied children—is a violation of the TVPRA: "**Pausing or terminating the provision of legal services to unaccompanied children under this contract runs directly counter to the requirements of the Trafficking Victims Protection Reauthorization Act** (TVPRA) and places 26,000 unaccompanied children at increased risk of trafficking, exploitation, and other harm. The TVPRA, passed by Congress in 2008 on a bipartisan basis, requires the Department of Health and Human Services (HHS) to ensure, to the greatest extent practicable, that all unaccompanied children have counsel to represent them in legal proceedings and protect them from mistreatment, exploitation, and trafficking. Shirking this statutory mandate heightens the risk of harm for these uniquely vulnerable children." *Id.* (emphasis added).

92.     The Senators went on to explain that representation makes it more likely that unaccompanied children will appear at their hearings, less likely that the government will lose track of unaccompanied children, and less likely that the unaccompanied children will be trafficked. *Id.* at 2.

93.     The Senators requested a briefing from Defendants about why the stop work order was issued and Defendants' "plan for compliance with your statutory mandate to ensure that children have counsel in immigration proceedings." *Id.*

94.     Plaintiffs are not aware of any response from Defendants to the Senators.

**K.     On March 21, 2025, Defendants Again Stopped Funding Counsel for Unaccompanied Children**

95.     Although Defendants rescinded their February 18, 2025 stop work order, they apparently continued to look for ways to avoid the TVPRA's and Foundational Rule's requirement that they fund legal representation for unaccompanied children.  On March 21, 2025, Defendant DOI sent a letter titled "Notice of Partial Termination for the Government's Convenience" to Acacia (the "Cancellation Order").  The letter announced that Defendants were terminating funding for contract line items two through four:  legal representation for unaccompanied children—both in and out of

28

detention—and other legal services like "friend of court" assistance in *pro se* matters, Immigrant Justice Corps fellows, and Spanish-language tutoring. The letter further commanded Acacia and Plaintiffs to "immediately stop work" on these representations.

96. On information and belief, Defendants have no plans to fund any legal representation for unaccompanied children—whether by reinstating the cancelled contract line items or by finding alternative ways to pay lawyers to represent unaccompanied children.

97. The Cancellation Order took effect at close of business on Friday, March 21, 2025, and Plaintiffs represent clients with immigration court hearings that were scheduled for Monday March 24, 2025—the very next business day. Yet Plaintiffs received no guidance from Defendants regarding how those representations should continue—forcing them to choose between seeking to withdraw from their representations or attempting to continue representing their clients unfunded. Their clients are at risk of losing access to the legal counsel provided by the TVPRA and Foundational Rule.

**L.    Defendants' Termination Of Funding To Represent Unaccompanied Children Frustrates Plaintiffs' Missions, Causes Plaintiffs Irreparable Harm, and Serves No Legitimate Purpose.**

98. Terminating funding for attorneys to represent unaccompanied children has devastating and irreparable effects, even more so for the harm it does to unaccompanied children. Even if Defendants reinstate funding for counsel for unaccompanied children at some unknown future time (an unlikely supposition), the funded representations, the non-profits and attorneys that administer them, and the unaccompanied children that receive vital counsel from them already will have been dealt an irreparable blow.

99. **Defendants' actions will cause Plaintiffs to lay off employees and lose huge percentages of their overall funding.** For Plaintiffs, the funding Congress has consistently appropriated to provide services under the TVPRA is existentially important.

29

100.     For example, funding for the services Defendants have illegally cancelled makes up approximately 55% of ImmDef's budget and pays for 113 of ImmDef's approximately 200 employees. The cancelled funding made up nearly half of VAAP's and GHIRP's operating budgets, 30% of Amica Center's budget, over 25% of NIJC's budget, 15% of RMIAN's budget, and 10% of NWIRP's budget. The Florence Project received about $12 million a year from the now-cancelled funding, which supported more than 100 employees.

101.     Many organizations will have to lay off staff.  SJC will soon have to lay off its three Immigrant Justice Corps fellows unless it can find another source of funding for their salaries, ImmDef has already been forced to give layoff notices to 27 staff, Estrella has had to furlough 18 of the 28 employees in its unaccompanied children program, GHIRP will have to lay off most of its 19 children's program staff in four weeks, and VAAP has had to not renew the contract of one of its four employees, and may have to furlough another two employees—leaving it with only a single remaining employee.

102.     **Because Plaintiffs' mission is to serve unaccompanied children, they will incur huge losses to keep doing so.**  Plaintiffs' ethical responsibilities to their clients and commitment to their mission of serving as many unaccompanied children as possible mean that Plaintiffs cannot simply cut off services and representations for unaccompanied children.  The organizations will hold on for as long as they can without funding from Defendants, but the impacts will be harsh whether they are immediate or sightly delayed.

103.     For example, CLSEPA has had to stop taking on new clients, even if they are unaccompanied children in removal proceedings without an attorney.  CLSEPA is seeking new funding to continue existing representations of unaccompanied children, but is faced with the risk of having to withdraw from ongoing representations—which is entirely antithetical to CLSEPA's mission to serve immigrants in Santa Clara and San Mateo counties.

30

104.    SJC is facing the prospect of having to lay off three Immigrant Justice Corps fellows who represent unaccompanied children and may be forced to try to find other organizations that can take on their clients.

105.    Estrella faces a budget deficit of more than $200,000 per month to maintain its services for unaccompanied children without funding from Defendants.  To continue representing the 324 unaccompanied children clients it took on in reliance on funding from Defendants, Estrella will have to operate at this significant deficit, threatening Estrella's other programming.  Once Estrella's reserves are depleted, it will likely not be able to offer free legal representation in many circumstances.

106.    The Florence Project is drawing on general funds to sustain its services for unaccompanied children but will likely have to conduct significant layoffs of its team of more than 100 employees who are dedicated to serving unaccompanied children.  Still, the Florence Project is determined to continue its representations of more than 800 unaccompanied children—even without the funding it relied on when it entered into the representations—though it will cost the organization significantly to continue this work.

107.    To support their existing Immigrant Children and Youth staff, GHIRP will have to rely on unrestricted funds and savings, destabilizing the organization as a whole. This will divert unrestricted funds away from other services, as these resources typically cover gaps in funding between contract cycles on other grants, underfunded programs, or new initiatives that are responsive to emerging needs in their community.

108.    ImmDef has 1,900 cases that were funded by Defendants.  ImmDef estimates its reserve funding will be exhausted within 6 months, and to hang on that long it will have to dramatically cut its staffing.  Just to position itself to survive in the short-term, ImmDef has had to lay off 27 staff.  Once ImmDef's reserves run out, it will have to terminate all 113 staff formerly funded by money appropriated by Congress to provide services under the TVPRA.  As ImmDef has to cut staff, it will

31

be unable to reallocate its 1,900 formerly funded cases to other attorneys—so it will be unable to competently represent existing unaccompanied child clients.

109.    NWIRP will have to spend at least $200,000 per month to sustain its services for unaccompanied children that were previously funded by Defendants.

110.    NIJC is transferring employees away from its children's services to try to make it feasible to maintain a limited staff to attempt to sustain existing representations.

111.    RMIAN will have to draw from its financial reserves and the limited funding it receives that is not pre-allocated for restricted purposes to delay layoffs, and it cannot provide long-term assurances to its clients that they will not be left without lawyers if RMIAN cannot afford to keep its unaccompanied children staff employed.

112.    VAAP's remaining staff of three are stretched as they try to continue to support their clients.  Two of those three may soon need to be furloughed, leaving only one attorney for all of VAAP's clients.

113.    **Every harm to their clients is a severe harm to Plaintiffs' mission to help their clients.**  Plaintiffs' clients are significantly harmed by the uncertainty they now face, as Plaintiffs may be forced to withdraw from ongoing representations.  The cases Plaintiffs took on in reliance on funding from Defendants are complex and often take years to resolve, and clients will be harmed if they are no longer represented by Plaintiffs.

32

attorneys remaining on staff to represent him at his interview when it is scheduled, and ImmDef is helpless to provide him any assurances.

115.    In representations formerly funded by Defendants, SJC represents—for example—three individuals not in active removal proceedings, with strong cases for affirmative immigration relief that would allow them to stay in the country.  None of these clients could afford to hire a lawyer, but with free representation from SJC each has a clear path to relief.  If SJC cannot continue to represent them, they will be unlikely to secure the relief they qualify for.

116.    The Amica Center represents a four-year-old boy from Haiti in a case formerly funded by Defendants.  The four-year-old has a hearing in the process of obtaining SIJS relief on April 2, 2025.  He also has an immigration court hearing in early June.  Without an attorney, the four-year-old could not engage in these proceedings or obtain any of the immigration relief for which he is eligible.  The Amica Center is continuing to represent him and its other unaccompanied child clients, though continuing its now-unfunded representations is very costly to the organization.

117.    The Florence Project currently represents a set of three siblings who fled their home country after their mother died and their sister was murdered.  All three siblings have pending asylum applications and are in the process of obtaining SIJS relief.  Both the asylum and SIJS processes require complex legal work, and the siblings would have little hope of obtaining relief without an attorney.  Were the three to lose their Florence Project lawyer—previously funded by Defendants—they would be severely harmed, a result antithetical to the Florence Project's mission.

118.    **Defendants' illegal actions prevent Plaintiffs pursuing their missions.**  Because Plaintiffs' missions are founded on the belief that no child should face a trained government prosecutor alone, Plaintiffs also suffer significant harms to their missions because without funding from Defendants, they cannot take on new clients.  Every unaccompanied child in ORR custody who needs but does not receive representation because Defendants have ceased funding legal representation under

33

the TVPRA is a harm to Plaintiffs, as organizations that exist to serve these children and to ensure as few as possible go without a lawyer. Unrepresented children will be unable to apply for voluntary departure to return home, children who have been trafficked will be unable to access the protections afforded to them by U.S. law, and children with strong cases for asylum who fled persecution in their home countries will be unable to apply for asylum. These impacts are unacceptable for Plaintiffs.

119. If Plaintiffs are forced to shut down or stop providing services to unaccompanied children entirely, these mission harms will be even more acute because entire populations will be left unserved. For example, SJC serves remote areas of California's central valley where there are few other resources for unaccompanied children, VAAP is the only legal service provider for unaccompanied children in Vermont, RMIAN is the primary free legal service provider for unaccompanied children in Colorado, and for the majority of unaccompanied children in ORR custody in Arizona, the Florence Project represents their only access to counsel and only opportunity to receive free legal representation.

**120. Defendants' illegal actions are also causing collateral harm to other parts of Plaintiffs' missions.** While work serving unaccompanied children is a large portion of what most Plaintiffs do, many Plaintiffs also serve other immigrant populations—but Defendants' illegal refusal to fund legal representation has knock-on effects that harm all of Plaintiffs' efforts and other missions.

121. The Florence Project has had to institute a hiring freeze and cannot fill twenty open positions that would be dedicated to serving unaccompanied children. Because the Florence Project is having to use general funding to maintain its representations of unaccompanied children, it has also had to freeze hirings in all non-unaccompanied-children service areas across the organization, limiting its ability to carry out other elements of its mission to provide legal services to immigrants.

34

122.    As GHIRP draws down its savings to continue serving its unaccompanied child clients, the financial strain threatens its other programming, which also relies on GHIRP maintaining funds to cover gaps in funding for those other programs.

123.    For ImmDef, transferring funds from other efforts to try to sustain legal representations of unaccompanied children for as long as possible will mean cutting back on other services it planned to provide for immigrants, including pro se clinics.  ImmDef has also had to stop providing any non-essential support for its clients (like paying for medical exams required for certain adjustment of status applications), though its mission is to support its clients as much as possible.  And ImmDef has had to freeze all hiring across its organization, hampering its ability to fulfill its overall mission of providing legal services to immigrants.

124.    NWIRP is being forced to draw from its reserves, at the expense of using that money for the other services it provides immigrants in Washington state.

125.    RMIAN will be forced to dedicate its already-limited staff time to fundraise to try to cover the gap left by the cancelled funding.  RMIAN is concerned that its staff might take other jobs with organizations that are more securely funded.

126.    Because VAAP is a small organization, its remaining staff of three has struggled to keep up its legal work and field client questions, and has been unable to engage in basic administrative work to keep the organization running.

<div align="center">

**FIRST CLAIM FOR RELIEF**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Not in Accordance with Law**

</div>

127.    Plaintiffs incorporate herein by reference paragraphs 1 through 126 as if fully rewritten herein.

128.    The Administrative Procedure Act ("APA") authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5

<div align="center">35</div>

U.S.C. § 706(2)(A).  Defendants' cancellation of funding for counsel to represent unaccompanied children violates the TVPRA.

129.   The TVPRA requires Defendants HHS and ORR to "ensure, to the greatest extent practicable . . . that all unaccompanied . . . children who are or have been in the custody of [Defendants HHS and ORR] . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5).  This language in the TVPRA is and has been understood to require Defendants HHS and ORR to fund attorneys to represent unaccompanied children.

130.   Congress has consistently and specifically appropriated funds to Defendants HHS and ORR to provide services required by the TVPRA, including funding legal representation.  These congressionally appropriated funds remain available to Defendants to pay for legal representation through September 30, 2027.

131.   On March 21, 2025, Defendants terminated the contract line items that funded legal representation under the TVPRA.  On information and belief, Defendants are not funding the required legal representations for unaccompanied children in any other way.  Instead, the Cancellation Order ends government-funded legal representation for unaccompanied children despite the availability of appropriated funding for such representations through at least September 30, 2027—two-and-a-half years from now.

132.   By ending funding for legal representation of unaccompanied children despite the availability of appropriated funds for this purpose, Defendants violate the TVPRA's mandate to provide counsel for unaccompanied children "to the greatest extent practicable."  Funds remain available for this purpose, and Defendants are subverting congressional appropriations and the TVPRA by failing to fund legal representation for unaccompanied children.

133. Because Defendants' termination of funding for counsel for unaccompanied children is not in accordance with the TVPRA, it is "not in accordance with law" within the meaning of the APA and should be set aside.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
***Accardi* Doctrine**

</div>

134. Plaintiffs incorporate herein by reference paragraphs 1 through 126 as if fully rewritten herein.

135. The APA authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Defendants' cancellation of funding for counsel to represent unaccompanied children violates the APA under the *Accardi* Doctrine because it violates ORR's own policies and regulations.

136. Longstanding Supreme Court caselaw mandates that agencies must adhere to their own policies and regulations, and that failure to do so violates the APA. *See U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954), *superseded by statute on other grounds*; *see also Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004) ("The legal proposition that agencies may be required to abide by certain internal policies is well-established.").

137. The 2024 Unaccompanied Children Program Foundational Rule requires the government to "fund legal service providers to provide direct immigration legal representation" to unaccompanied children if there are "available appropriations" and to ensure children receive a legal orientation, consultation with a lawyer, and ongoing access to lawyers. 89 CFR 34604.

138. The ORR Unaccompanied Alien Children Bureau Policy Guide expressly states that "ORR funds legal service providers (LSPs) to provide direct immigration legal representation or representation in non-immigration related matters to the extent of available appropriations, and insofar as it is not practicable for ORR to secure pro bono counsel." *See* "ORR Unaccompanied Alien Children

<div align="center">37</div>

Bureau Policy Guide: Section 3.7.2 Direct Legal Representation," OFFICE OF REFUGEE RESETTLEMENT (revised Aug. 1, 2024), https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-3#3.7.2.

139.    By ending funding for legal representation of unaccompanied children despite the availability of appropriated funds for this purpose through at least September 30, 2027, Defendants violate the Foundational Rule's mandate to provide counsel for unaccompanied children to the extent there are appropriated funds available to do so and violate ORR's policy of funding legal service providers "to the extent of available appropriations."  Defendants' violations of ORR's own rule and policy violate the APA.

140.    Because Defendants' termination of funding for counsel for unaccompanied children violates the Foundational Rule and ORR's own Policy Guide, it violates the APA and should be set aside under the *Accardi* Doctrine as "arbitrary, capricious, an abuse of discretion [and] otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

141.    Plaintiffs incorporate herein by reference paragraphs 1 through 126 as if fully rewritten herein.

142.    The APA authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

143.    Defendants have given no reasoned justification for their abrupt cancellation of mandated and appropriated funding for legal representations for unaccompanied children.   The Cancellation Order gives no reasoning at all.  And the February stop work order expressly disclaimed that it was issued for any "poor performance" of the legal representations.

144.    There is significant evidence that providing legal representation improves efficiency in immigration court and conserves immigration court time and resources.  Cancelling funding for legal representation will only make immigration courts operate less efficiently.

145.    In addition, Defendants' unlawful cancellation of funding for legal representations directly undermines Plaintiff organizations' missions to provide representation for as many unaccompanied children as possible.  Defendants have "entirely failed to consider an important aspect of the problem" by failing to consider the impact to Plaintiffs and their clients.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

146.    Because Defendants' termination of the Programs is arbitrary and capricious, Plaintiffs ask that the Court set aside Defendants' actions as violative of the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.    Declare that Defendants' actions violate the APA because they are "arbitrary, capricious, an abuse of discretion, or otherwise in violation of the law."

2.    Declare that Defendants are required to continue funding legal representation to unaccompanied children, consistent with the TVPRA and ORR's Foundational Rule.

3.    Set aside Defendants' actions that violate the APA.

4.    Enjoin Defendants nationwide from ceasing to fund counsel to represent unaccompanied children in violation of the TVPRA and the Foundational Rule.

5.    Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

6.    Award such other relief as this Court may deem just and proper.

39

Respectfully submitted,

March 26, 2025

s/ *Alvaro M. Huerta*
IMMIGRANT DEFENDERS LAW CENTER

Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org

s/ *Samantha Hsieh*
AMICA CENTER FOR IMMIGRANT
RIGHTS

Adina Appelbaum (D.C. Bar No. 1026331)*
Samantha Hsieh (V.A. Bar No. 90800)*
Peter Alfredson (D.C. Bar No. 1780258)*
Evan Benz (N.C. Bar No. 49077)*
Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*pro hac vice* forthcoming

s/ *Karen C. Tumlin*
JUSTICE ACTION CENTER

Esther H. Sung
Karen C. Tumlin
Laura Flores-Perilla
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

40

# CIVIL COVER SHEET

This civil cover sheet does not replace or supplement the filing and service of pleadings or other papers. The information on this form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket. Instructions are on the reverse of this form.

## I. PLAINTIFF(S)

Community Legal Services in East Palo Alto; (see attachment)

County of Residence of First Listed Plaintiff: San Mateo County
*Leave blank in cases where United States is plaintiff.*

Attorney or Pro Se Litigant Information *(Firm Name, Address, and Telephone Number)*

Alvaro M. Huerta (see attachment)

## DEFENDANT(S)

United States Department of Health and Human Services; (see attachment)

County of Residence of First Listed Defendant:
*Use ONLY in cases when United States is plaintiff.*

Defendant's Attorney's Name and Contact Information *(if known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] U.S. Government Plaintiff
- [x] U.S. Government Defendant
- [ ] Federal Question *(U.S. Government Not a Party)*
- [ ] Diversity

## III. CAUSE OF ACTION

Cite the U.S. Statute under which you are filing: *(Use jurisdictional statutes only for diversity)*
5 U.S.C.  702

Brief description of case: Violation of Administrative Procedure Act

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment & Enforcement of Judgment | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 151 Medicare Act | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 350 Motor Vehicle | 371 Truth in Lending | 790 Other Labor Litigation | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** | 480 Consumer Credit |
| | 360 Other Personal Injury | 385 Property Damage Product Liability | | 861 HIA (1395ff) | 485 Telephone Consumer Protection Act |
| 160 Stockholders' Suits | 362 Personal Injury –Medical | | **IMMIGRATION** | 862 Black Lung (923) | 490 Cable/Sat TV |
| 190 Other Contract | | | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 864 SSID Title XVI | 890 Other Statutory Actions |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | 865 RSI (405(g)) | 891 Agricultural Acts |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 871 IRS–Third Party 26 U.S.C. § 7609 | 896 Arbitration |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | [x] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] Original Proceeding
- [ ] Removed from State Court
- [ ] Remanded from Appellate Court
- [ ] Reinstated or Reopened
- [ ] Transferred from Another District
- [ ] Multidistrict Litigation–Transfer
- [ ] Multidistrict Litigation–Direct File

## VI. FOR DIVERSITY CASES ONLY: CITIZENSHIP OF PRINCIPAL PARTIES

*(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

| Plaintiff | Defendant | |
|---|---|---|
| [ ] | [ ] | Citizen of California |
| [ ] | [ ] | Citizen of Another State |
| [ ] | [ ] | Citizen or Subject of a Foreign Country |
| [ ] | [ ] | Incorporated or Principal Place of Business in California |
| [ ] | [ ] | Incorporated and Principal Place of Business In Another State |
| [ ] | [ ] | Foreign Nation |

## VII. REQUESTED IN COMPLAINT

- [ ] Check if the complaint contains a **jury demand.**
- [ ] Check if the complaint contains a **monetary demand.** Amount: 
- [ ] Check if the complaint seeks **class action** status under Fed. R. Civ. P. 23.
- [x] Check if the complaint seeks a **nationwide injunction** or Administrative Procedure Act vacatur.

## VIII. RELATED CASE(S) OR MDL CASE

*Provide case name(s), number(s), and presiding judge(s).*

## IX. DIVISIONAL ASSIGNMENT pursuant to Civil Local Rule 3-2

*(Place an "X" in One Box Only)*

- [x] SAN FRANCISCO/OAKLAND
- [ ] SAN JOSE
- [ ] EUREKA-MCKINLEYVILLE

DATE  03/26/2025

SIGNATURE OF ATTORNEY OR PRO SE LITIGANT  /s/ Alvaro M. Huerta

Appendix and Addendum 224

# COMPLETING THE CIVIL COVER SHEET

Complete the form as follows:

I. **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.

   **Attorney/Pro Se Litigant Information**. Enter the firm name, address, telephone number, and email for attorney of record or pro se litigant. If there are several individuals, list them on an attachment.

II. **Jurisdiction.** Under Federal Rule of Civil Procedure 8(a), pleadings must establish the basis of jurisdiction. If multiple bases for jurisdiction apply, prioritize them in the order listed:

   (1) *United States plaintiff.* Jurisdiction based on 28 U.S.C. §§ 1345 and 1348 for suits filed by the United States, its agencies or officers.

   (2) *United States defendant.* Applies when the United States, its agencies, or officers are defendants.

   (3) *Federal question.* Select this option when jurisdiction is based on 28 U.S.C. § 1331 for cases involving the U.S. Constitution, its amendments, federal laws, or treaties (but use choices 1 or 2 if the United States is a party).

   (4) *Diversity of citizenship.* Select this option when jurisdiction is based on 28 U.S.C. § 1332 for cases between citizens of different states and complete Section VI to specify the parties' citizenship. Note: Federal question jurisdiction takes precedence over diversity jurisdiction.

III. **Cause of Action.** Enter the statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless jurisdiction is based on diversity. Example: U.S. Civil Statute: 47 U.S.C. § 553. Brief Description: Unauthorized reception of cable service.

IV. **Nature of Suit.** Check one of the boxes. If the case fits more than one nature of suit, select the most definitive or predominant.

V. **Origin.** Check one of the boxes:

   (1) *Original Proceedings.* Cases originating in the United States district courts.

   (2) *Removed from State Court.* Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C. § 1441. When the petition for removal is granted, check this box.

   (3) *Remanded from Appellate Court.* Check this box for cases remanded to the district court for further action, using the date of remand as the filing date.

   (4) *Reinstated or Reopened.* Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

   (5) *Transferred from Another District.* Check this box for cases transferred under Title 28 U.S.C. § 1404(a). Do not use this for within-district transfers or multidistrict litigation (MDL) transfers.

   (6) *Multidistrict Litigation Transfer.* Check this box when a multidistrict (MDL) case is transferred into the district under authority of Title 28 U.S.C. § 1407.

   (7) *Multidistrict Litigation Direct File.* Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

VI. **Residence (citizenship) of Principal Parties.** Mark for each principal party *only* if jurisdiction is based on diversity of citizenship.

VII. **Requested in Complaint.**

   (1) *Jury demand.* Check this box if plaintiff's complaint demanded a jury trial.

   (2) *Monetary demand.* For cases demanding monetary relief, check this box and enter the actual dollar amount being demanded.

   (3) *Class action.* Check this box if plaintiff is filing a class action under Federal Rule of Civil Procedure 23.

   (4) *Nationwide injunction.* Check this box if plaintiff is seeking a nationwide injunction or nationwide vacatur pursuant to the Administrative Procedures Act.

VIII. **Related Cases.** If there are related pending case(s), provide the case name(s) and number(s) and the name(s) of the presiding judge(s). If a short-form MDL complaint is being filed, furnish the MDL case name and number.

IX. **Divisional Assignment.** Identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated." Note that case assignment is made without regard for division in the following case types: Property Rights (Patent, Trademark and Copyright), Prisoner Petitions, Securities Class Actions, Anti-Trust, Bankruptcy, Social Security, and Tax.

**Additional Plaintiffs:**

Amica Center For Immigrant Rights; Estrella Del Paso; Florence Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project; Immigrant Defenders Law Center; National Immigrant Justice Center; Northwest Immigrant Rights Project; Rocky Mountain Immigrant Advocacy Network; Social Justice Collaborative; Vermont Asylum Assistance Project.


**Additional Attorney or Pro Se Litigant Information:**

IMMIGRANT DEFENDERS LAW CENTER

Alvaro M. Huerta (CA Bar No. 274787)

Carson A. Scott (CA Bar No. 337102)

Lya Ferreyra (CA Bar No. 340148)

Immigrant Defenders Law Center

634 S. Spring St.,

10th Floor Los Angeles, CA

Telephone: (213) 634-0999


JUSTICE ACTION NETWORK

Esther H. Sung (CA Bar No. 255962)

Karen C. Tumlin (CA Bar No. 234691)

Laura Flores-Perilla (CA Bar No. 355645)*

JUSTICE ACTION CENTER

P.O. Box 27280

Los Angeles, CA 90027

Telephone: (323) 450-7272


AMICA CENTER FOR IMMIGRANT RIGHTS

Adina Appelbaum (D.C. Bar No. 1026331)*

Samantha Hsieh (V.A. Bar No. 90800)*

Peter Alfredson (D.C. Bar No. 1780258)*

Evan Benz (N.C. Bar No. 49077)*

Amica Center for Immigrant Rights

1025 Connecticut Avenue NW, Suite 701

Washington, DC 20036

Telephone: (202) 331-3320


**Additional Defendants:**

Office of Refugee Resettlement; Department of Interior

1  YAAKOV M. ROTH
   Acting Assistant Attorney General
2  WILLIAM C. SILVIS (DCBN 485572)
   Assistant Director
3  MICHAEL A. CELONE (MDBN 1312170145)
4  CHRISTINA PARASCANDOLA (DCBN 468479)
   KATELYN MASETTA ALVAREZ (OHBN 97857)
5  JONATHAN K. ROSS (NCBN 50203)
   Senior Litigation Counsels
6  ZACHARY A. CARDIN (MDBN 1812110052)
7  Trial Attorney

8        U.S. Department of Justice, Civil Division
         Office of Immigration Litigation
9        General Litigation and Appeals Section
         P.O. Box 878, Ben Franklin Station
10       Washington, DC 20044
         (202) 305-2040
11       Michael.A.Celone@usdoj.gov

12

13  Attorneys for Defendants

14              UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16                SAN FRANCISCO DIVISION

17
    COMMUNITY LEGAL SERVICES IN EAST   )  Case No. 3:25-cv-02847-AMO
18  PALO ALTO, *ET AL.*,               )
                                       )  **DEFENDANTS' OPPOSITION TO MOTION**
19          Plaintiffs,                )  **FOR TEMPORARY RESTRAINING ORDER**
                                       )  **AND PRELIMINARY INJUNCTION**
20      v.                             )
                                       )  Date:  April 1, 2025
21  UNITED STATES DEPARTMENT OF        )  Time: 10:00 a.m.
                                       )  Location:  Courtroom 10
22                                     )
                                       )  Hon. Araceli Martínez-Olguín
23          Defendants.                )  United States District Judge
                                       )
24                                     )
                                       )
25  _____)

26

27

28

# **TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................1

II. BACKGROUND .........................................................................................................2

A. Legal Framework .......................................................................................................2

   1. The Homeland Security Act ("HSA") ..................................................................2

   2. The Trafficking Victims Protection Reauthorization Act ("TVPRA") ...............3

   3. The Foundational Rule..........................................................................................3

   4. Appropriations Acts and Congressional Intent ....................................................4

   5. The Current Contract and Termination Decision .................................................5

III. STANDARDS OF REVIEW .......................................................................................6

IV. ARGUMENT ...............................................................................................................6

A. Plaintiffs cannot demonstrate that they are likely to succeed on the merits. ............6

   1. Plaintiffs lack standing because they are not within the zone of interests that 8 U.S.C. § 1232 is intended to protect. ..................................................................6

   2. The APA does not waive sovereign immunity for the monetary relief Plaintiffs seek..........................................................................................................8

   3. This Court lacks jurisdiction over Plaintiffs' claims because the rights they seek to enforce must be brought in the Federal Court of Claims......................11

   4. Plaintiffs cannot show that a favorable decision in this case would likely redress their alleged injuries. ..............................................................................13

   5. The Termination Contract Termination at Issue Does Not Violate the APA ...14

   6. The Foundational Rule Does Not Require Funding for Taxpayer-funded Direct Immigration Legal Representation Consistent with Available Appropriations. ....................................................................................................15

B. Plaintiffs Will Not Face Irreparable Harm Without a TRO.....................................17

C. The Balance of the Equities and Public Interest Weigh Against Entry of a Temporary Restraining Order. ..................................................................................19

D. If the Court issues a TRO, it should require Plaintiffs to Post Security. ..................21

V. CONCLUSION ..........................................................................................................21

CERTIFICATE OF COMPLIANCE

1

**TABLE OF AUTHORITIES**

2

**CASES**

3
*Al Otro Lado, Inc. v. Mayorkas*,
4     2024 WL 4370577 (S.D. Cal. Sept. 30, 2024) ................................................................... 15

5
*Arcamuzi v. Continental Air Lines*, Inc.,
6     819 F.2d 935 (9th Cir. 1987) ....................................................................................... 18

7
*Ariz. Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ..................................................................................... 18
8

9
*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ...................................................................................... 19

10
*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*,
11     501 U.S. 1301 (1991) .................................................................................................. 19

12
*BFP v. Resolution Trust Corp.*,
    511 U.S. 531 (1994) ..................................................................................................... 8
13

14
*Caribbean Marine Servs. Co. v. Baldrige*,
    844 F.2d 668 (9th Cir. 1988) .................................................................................. 17, 18

15
*Clapper v. Amnesty Int'l USA*,
16     568 U.S. 398 (2013) .................................................................................................... 19

17
*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
    601 U.S. 416 (2024) .................................................................................................... 14
18

19
*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014) ..................................................................................... 19

20
*Earth Island Inst. v. Carlton*,
21     626 F.3d 462 (9th Cir. 2010) ......................................................................................... 6

22
*Garcia v. Google, Inc*.,
23     786 F.3d 733 (9th Cir. 2015) .................................................................................... 6, 17

24
*Goldie's Bookstore, Inc. v. Superior Court*,
    739 F.2d 466 (9th Cir. 1984) ....................................................................................... 18
25

26
*Great-W. Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002) ...................................................................................................... 9

27
*I.N.S. v. Legalization Assistance Project of Los Angeles Cnty. Fed'n of Lab.*,
28     510 U.S. 1301 (1993) ................................................................................................. 6, 7

*Int'l Union, UAW v. Donovan*,
   746 F.2d 855 (D.C. Cir. 1984) ................................................................. 15

*Koller v. Brown*,
   224 F. Supp. 3d 871 (N.D. Cal. 2016) ................................................... 17

*Lane v. Pena*,
   518 U.S. 187 (1996) ................................................................................. 9

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ............................................................................... 11

*Lopez v. Brewer*,
   680 F.3d 1068 (9th Cir. 2012) ................................................................ 6

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
   634 F.2d 1197 (9th Cir. 1980) .............................................................. 18

*Lucas R. v. Becerra*, No.,
   CV 18-5741, 2022 WL 2177454 (C.D. Cal. Mar. 11, 2022) ................... 5

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ......................................................................... 13, 14

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ............................................................................ 6, 7

*Maryland v. King*,
   567 U.S. 1301 (2012) ............................................................................ 20

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ................................................................................ 7

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ............................................................. 12

*Nken v. Holder*,
   556 U.S. 418 (2009) .............................................................................. 19

*North Side Lumber v. Block*,
   753 F.2d 1482 (9th Cir. 1985) .............................................................. 12

*Novak v. United States*,
   795 F.3d 1012 (9th Cir. 2015) .............................................................. 13

*Pit River Tribe v. BLM*,
   793 F.3d 1147 (9th Cir. 2015) ................................................................ 7

*Renee v. Duncan,*
  686 F.3d 1002 (9th Cir. 2012) ............................................................. 13

*Salazar v. Ramah Navajo Chapter,*
  567 U.S. 182 (2012) ............................................................................. 15

*Sampson v. Murray,*
  415 U.S. 61 (1974) ............................................................................... 18

*Sharp v. Weinberger,*
  798 F.2d 1521 (D.C. Cir. 1986) .......................................................... 12

*Star Alaska v. United States,*
  14 F.3d 36 (9th Cir. 1994) ..................................................................... 9

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
  240 F.3d 832 (9th Cir. 2001) ................................................................. 6

*the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ............................................................... 6

*United Aeronautical Corp. v. United States Air Force,*
  80 F.4th 1017 (9th Cir. 2023) ........................................................ 12, 13

*United States Conf. of Cath. Bishops v. U.S. Dep't of State,*
  No. 1:25-CV-00465, 2025 WL 763738 (D.D.C. Mar. 11, 2025) .......... 12

*United States ex rel. Accardi v. Shaughnessy,*
  347 U.S. 260 (1954) ............................................................................. 15

*United States v. Mitchell,*
  463 U.S. 206 (1983) ............................................................................... 9

*United States v. White Mountain Apache Tribe,*
  537 U.S. 465 (2003) ............................................................................... 9

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................................. 6, 17

---

### Immigration and Nationality Act of 1952, as amended:

5 U.S.C. § 701 ............................................................................................ 2

5 U.S.C. § 701(a)(2) ................................................................................. 10

5 U.S.C. § 702 ............................................................................................ 9

6 U.S.C. § 279 ............................................................................................ 2

6 U.S.C. § 279(a) ............................................................................................... 2

6 U.S.C. § 279(b)(1) ..................................................................................... 3, 10

6 U.S.C. § 279(b)(1)(A) .................................................................................. 2, 3

6 U.S.C. § 279(b)(1)(I) ...................................................................................... 15

6 U.S.C. § 279(g)(2) ........................................................................................ 2, 3

8 U.S.C. § 1232(i) ............................................................................................. 10

8 U.S.C. § 1232 ....................................................................................... 1, 6, 19

8 U.S.C. § 1232(b)(1) .......................................................................................... 3

8 U.S.C. § 1232(c)(1) .......................................................................................... 7

8 U.S.C. § 1232(c)(2) .......................................................................................... 7

8 U.S.C. § 1232(c)(3) .......................................................................................... 7

8 U.S.C. § 1232(c)(4) .......................................................................................... 7

8 U.S.C. § 1232(c)(5) ................................................................................ 3, *passim*

8 U.S.C. § 1232(c)(6) .......................................................................................... 7

8 U.S.C. § 1362 ........................................................................... 3, 7, 10, 16

28 U.S.C. § 1491(a)(1) ..................................................................................... 11

31 U.S.C. § 6305 ................................................................................................. 3

**The Homeland Security Act:**

Pub. L. No. 107-296 ........................................................................................... 2

**William Wilberforce Trafficking Victims Protection Act of 2008 ("TVPRA"):**

Pub. L. No. 110-457 ........................................................................................... 1

**Further Consolidated Appropriations Act:**

Pub. L. No. 118-47 ......................................................................................... 4, 10

**Full-Year Continuing Appropriations and Extensions Act, 2025:**

Pub. L. No. 119-4 .......................................................................................... 4, 10

1

## FEDERAL RULES OF APPELLATE PROCEDURE

2

Fed. R. Civ. P. 65(c) ........................................................................................................... 21

3

## REGULATIONS

4

45 C.F.R. Part 410 .................................................................................................................. 3

5

45 C.F.R. § 410 .................................................................................................................... 19

6

7

45 C.F.R. § 410.1309(a)(2)(i)-(v) ......................................................................................... 4

8

9

## OTHER AUTHORITIES

10

H.R. Rep. No. 1656, 94th Cong., 2d Sess. 13 ...................................................................... 12

11

Standing Order, section 6 and L.R. 11-6.1 .......................................................................... 24

12

*Unaccompanied Children Program Foundational Rule*,
    89 Fed. Reg. 34384, 34,529 (Apr. 30, 2024) ................................................................. 15

13

14

89 Fed. Reg. at 34,529 .................................................................................................. 16, 17

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I. **INTRODUCTION**

The Court should deny Plaintiffs' extraordinary request for a temporary restraining order and preliminary injunction, ECF No. 7 ("motion"). Plaintiffs' motion is legally unfounded, factually overstated, and disregards both the statutory and regulatory discretion Congress expressly conferred upon the federal government. The relief they seek would not preserve the status quo, but instead disrupt the government's longstanding management of legal services for unaccompanied alien children ("UAC")—services that remain subject to available appropriations and the agency's judgment.

Plaintiffs are legal service providers seeking to compel the United States Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR"), to indefinitely fund direct legal representation for UAC through specific contracting arrangements. But the governing statute—the William Wilberforce Trafficking Victims Protection Act of 2008 ("TVPRA"), Pub. L. No. 110-457 (codified in principal part at 8 U.S.C. § 1232)—expressly conditions any such representation on practicability and the availability of pro bono counsel. It does not create an enforceable right to government-funded representation, let alone compel the agency to maintain any particular scope of services or contractual relationship. Similarly, the regulatory language Plaintiffs cite, the Foundational Rule, codified at 45 C.F.R. § 410.1309(a)(4), confirms that ORR's obligation to fund direct representation is contingent on both available appropriations and ORR's discretionary determinations. Congress never mandated indefinite funding for these services, and nothing in the TVPRA or ORR's Foundational Rule suggests otherwise.

As a threshold matter, Plaintiffs seek to convert a discretionary, resource-dependent program into a judicially enforceable entitlement. That effort fails as a matter of law. Plaintiffs lack organizational standing, cannot show that the termination decision constitutes final agency action reviewable under the APA and can identify no statutory or regulatory provision that imposes a binding duty on the government to maintain uninterrupted direct representation contracts. At most, Plaintiffs disagree with the government's policy judgment to conserve resources and reallocate funding within the broad framework of the TVPRA—a judgment that courts have repeatedly held is committed to agency discretion.

Regardless, this Court lacks jurisdiction over what is, at bottom, a dispute over the partial termination of a federal contract. Under the Tucker Act and the Contract Disputes Act, challenges to

government contract terminations must be brought in the U.S. Court of Federal Claims. Plaintiffs' attempt to recast a contract termination as a violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*., cannot circumvent that exclusive remedial scheme. Moreover, decisions regarding whether and how to terminate government contracts—particularly for the government's convenience—are classic examples of actions committed to agency discretion and are not subject to judicial review under the APA.

Nor can Plaintiffs establish any of the equitable factors required for injunctive relief. Their claims of irreparable harm rest on speculative predictions about staffing decisions and funding shortfalls that are neither immediate nor irreversible. Nothing in the record suggests that Plaintiffs are barred from continuing their work, pursuing other funding sources, or seeking relief through the dispute resolution provisions of the contract, setting aside the fact that none of the plaintiffs are actually a party to that agreement. A TRO's extraordinary relief is not an appropriate mechanism for restructuring federal contract policy to align with a particular group of stakeholders' policy preferences, particularly where the asserted harms are financial and the underlying legal theory is without merit. The Court should therefore deny Plaintiffs' motion.

## II.    BACKGROUND

### A.    Legal Framework

The statutory and regulatory framework governing legal representation for UAC in federal care and custody reflects a coordinated scheme established by Congress to balance the protection of vulnerable children with the Executive's discretion over immigration and programmatic resource allocation. This framework primarily originates in two statutes: the Homeland Security Act of 2002 ("HSA") and the TVPRA.

In 2002, Congress enacted the HSA, Pub. L. No. 107-296, 116 Stat. 2135 (codified in relevant part at 6 U.S.C. § 279), abolishing the Immigration and Naturalization Service ("INS") and transferring the responsibility for the care and placement of UAC from INS to ORR. 6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2).

The HSA defines a UAC as "a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom— (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide

care and physical custody." 6 U.S.C. § 279(g)(2). Further, it assigns ORR broad authority over the care and custody of UAC while they are in federal custody due to their immigration status, including coordinating their care and placement, ensuring their best interests in custodial decisions, and developing plans to "ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such child." 6 U.S.C. § 279(b)(1)(A). These responsibilities are carried out through cooperative agreements and contracts with care providers under ORR policies and oversight. *See* 6 U.S.C. § 279(b)(1); 31 U.S.C. § 6305.

### 2. The Trafficking Victims Protection Reauthorization Act ("TVPRA")

Congress enacted the TVPRA in 2008 to strengthen protections for UAC and support their safe repatriation or appropriate placement. The statute, consistent with the HSA, makes the Secretary of HHS responsible for the care and custody of UAC. 8 U.S.C. § 1232(b)(1). The TVPRA explicitly directs HHS to prioritize the utilization of pro bono counsel and does not mandate direct government-funded legal representation: Section 235 of the TVPRA encourages HHS to ensure UAC have counsel "to the greatest extent practicable" and "make every effort to utilize the services of pro bono counsel who agree to provide representation without charge." 8 U.S.C. § 1232(c)(5).

Further, Section 235 encourages HHS to ensure that counsel is available to represent UAC in "legal proceedings or matters," expressly linking representation duties with protecting children from "mistreatment, exploitation, and trafficking." Additionally, it cross-references Section 292 of the Immigration and Nationality Act ("INA"), which specifies representation "at no expense to the Government." 8 U.S.C. § 1362. Therefore, it is clear that HHS is not required to fund access to legal counsel for UAC. The TVPRA's language and structure demonstrate Congress's intent to establish public-private partnerships and encourage pro bono counsel as the primary source of legal assistance for UC, and conferring on ORR exclusive discretion to determine when direct government-funded representation might be utilized (e.g., where pro bono resources are impractical or unavailable).

### 3. The Foundational Rule

In April 2024, ORR promulgated the Unaccompanied Children Program Foundational Rule, codified at 45 C.F.R. Part 410, to establish comprehensive regulations governing its UAC program. The

Rule, which became effective July 1, 2024, formalized previously informal procedures and explicitly articulated ORR's discretion regarding legal representation funding. Specifically, the Rule provides that ORR "shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children" only "to the extent ORR determines that appropriations are available," and only if securing pro bono counsel is impractical. 45 C.F.R. § 410.1309(a)(4).

In contrast, other subsections impose mandatory obligations. For instance, the Rule explicitly requires ORR to ensure UAC receive mandatory services such as a "presentation concerning the rights and responsibilities of undocumented children," "information regarding the availability of free legal assistance," and a "confidential legal consultation." 45 C.F.R. § 410.1309(a)(2)(i)-(v). This intentional distinction clarifies that direct funding for legal representation remains discretionary, conditional upon the availability of appropriations, and subject to agency determination. The Rule also reinforces congressional policy choices articulated in the TVPRA, highlighting the preferred reliance on pro bono counsel and emphasizing that direct representation services funded by ORR are not guaranteed and remain subject to the agency's discretionary resource management.

### 4.    Appropriations Acts and Congressional Intent

Congress periodically appropriates funds to support ORR's UAC program, including legal services. Appropriations language, however, consistently remains broad and nonspecific regarding precise funding allocations. Ex. A, Declaration of Toby Biswas ("Biswas Decl."), ¶ 16. For example, the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, provides general appropriations to execute activities under Section 235 of the TVPRA without earmarking explicit amounts for direct legal representation. This general appropriation approach allows ORR flexibility in determining the allocation of resources based on agency priorities, the availability of pro bono counsel, and shifting immigration policy needs. Biswas Decl., ¶ 16.

Subsequent acts, including the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, similarly maintain funding levels and provide broad discretion without altering statutory obligations or imposing specific mandates for funding legal representation. *Id.* This ongoing legislative practice underscores Congress's intent to maintain flexibility for ORR, allowing the agency to prioritize resources efficiently and adaptively. *Id.* Such discretionary funding practices reflect a

longstanding Congressional policy to balance support for legal services with practical constraints, prioritizing public-private partnerships and pro bono resources where feasible, rather than imposing fixed or rigid funding mandates. *Id.*

Indeed, at least one other court has considered this issue and determined that Congress did not specify what types of legal services ORR must fund with the appropriations intended for carrying out Section 235 of the TVPRA. *Lucas R. v. Becerra*, No. CV 18-5741, 2022 WL 2177454, at *31 (C.D. Cal. Mar. 11, 2022). Rather, ORR is "entitled to prioritize what type of legal representation ORR supports with appropriated funds, in furtherance of the TVPRA." *Id.* The same analysis applies here: without a mandate from Congress in the most recent appropriations legislation, ORR has discretion to prioritize what types of services it funds to further the purpose of the TVPRA.

### 5.     The Current Contract and Termination Decision

The present dispute arises from ORR's partial termination and descoping of a federal contract administered by the Department of the Interior ("DOI"), which serves as the contracting agent through its Interior Business Center.  *Id.* ¶ 13. ORR directed DOI to partially terminate a contract previously funding direct legal representation services.  *Id.* ¶¶ 12–13. This termination was executed through a formal decision memorandum signed by the Acting Assistant Secretary of the Administration for Children and Families ("ACF"). *Id.* ¶¶ 13–14.

ORR's decision reflects a deliberate exercise of statutory discretion to prioritize available appropriations and pro bono legal services.  While general direct representation contract funding was terminated, ORR maintains other legally required activities, including "know your rights" presentations and confidential legal screening consultations.  *Id.* ¶ 5, 11.

This contract termination aligns with ORR's statutory and regulatory discretion under the TVPRA, the Foundational Rule, and relevant appropriations acts, none of which mandate continuous, direct legal representation funding when viable alternatives, such as pro bono representation, exist.  *Id.* ¶ 14. Additionally, the termination decision reflects ORR's commitment to fiscal responsibility, ensuring that limited resources are allocated effectively, prudently managing public funds, and preserving governmental flexibility to respond to evolving priorities and urgent programmatic needs.  *Id.* ¶ 11, 16.

### III. <u>STANDARDS OF REVIEW</u>

Preliminary injunctive relief "is an extraordinary and drastic remedy," *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (internal quotation marks and citation omitted), that is "never awarded as of right," *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (internal quotation marks and citation omitted); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that the standard for issuing a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction). Thus, this relief "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez*, 680 F.3d at 1072 (internal quotation marks and citation omitted; emphasis in original). This is a "difficult task." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). To prove their entitlement to such relief, Plaintiffs must establish that: (1) they are likely to succeed on the merits, (2) are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the Ninth Circuit's sliding scale test for preliminary injunctive relief, "serious questions going to the merits" and "a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

### IV. <u>ARGUMENT</u>

**A.  Plaintiffs cannot demonstrate that they are likely to succeed on the merits.**

    **1.  Plaintiffs lack standing because they are not within the zone of interests that 8 U.S.C. § 1232 is intended to protect.**

Plaintiffs lack standing because the statutory provision that, according to Plaintiffs, ensures that UAC have access to legal counsel, 8 U.S.C. § 1232(c)(5), was not intended to protect Plaintiffs. When an organization challenges an agency action under the APA, the organization must show that it is within the "zone of interests" that the statute was meant to protect. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *I.N.S. v. Legalization Assistance Project of Los Angeles Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1305 (1993). To fall within the "zone of interests" of a statutory provision, "the plaintiff must establish that the *injury* he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of

interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 883 (1990); *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). When a plaintiff brings an APA claim against a federal agency, courts look to "the statute that [the plaintiff] says was violated," rather than the APA itself to determine whether the party's injury is within the zone of interests. *Match-E-Be-Nash-She-Wish*, 567 U.S. at 224 (quotation marks omitted). While an "explicit mention" of Congress's intent is not required, something in the "particular provision of law upon which the plaintiff relies" must indicate that Congress intended to protect the organization. *Pit River Tribe v. BLM*, 793 F.3d 1147, 1157 (9th Cir. 2015) (citation omitted). That an agency rule or policy may affect the way an organization allocates its resources does not give standing to an entity which is not within the zone of interests the statute meant to protect. *Legalization Assistance Project*, 510 U.S. at 1305.

Nothing in the text of 8 U.S.C. § 1232(c)(5), nor in the legislative history, indicates that Congress enacted the legal-services provision to address the financial interests of organizations such as Plaintiffs in this case. Rather, the plain text focuses on the interests of the UAC: it requires HHS, to the greatest extent practicable and "consistent with 8 U.S.C. § 1362," to ensure that certain UAC "have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." *Id.* § 1232(c)(5). This provision protects UAC from mistreatment, not to line Plaintiffs' pocketbooks with taxpayer funding. Indeed, when reviewing the statute as a whole, the only intended beneficiary of subsection (c), entitled "Providing safe and secure placements for children," are UAC.[1]

Moreover, Congress's caveat that such legal services must be "consistent with 8 U.S.C. 1362" demonstrates that Congress did not intend for the government to front the bill for legal services or to pay organizations, such as Plaintiffs. 8 U.S.C. § 1362 provides that aliens have the right to representation in immigration proceedings, as long as the representation is "at no expense to the Government." Congress's

---

[1] Each sub-subsection provides safeguards for ensuring the safety of UAC who are in HHS's custody. *See id.* § 1232(c)(1) (requiring agencies to implement policies to protect UAC from trafficking, victimization, and exploitation); *id.* § 1232(c)(2) (requiring UAC to be placed in the least restrictive setting that is in their best interest); *id.* § 1232(c)(3) (requiring that UAC be placed with custodians who will provide for their well-being); *id.* § 1232(c)(4) (ensuring that custodians receive legal orientation explaining the custodian's responsibility to ensure that the UAC appear at immigration proceedings and are protected from harm); *id.* § 1232(c)(5) (*see supra*); *id.* § 1232(c)(6) (authorizing HHS to appoint child advocates for UAC who are particularly vulnerable).

reference to this statutory provision allows no room for doubt: Congress directed HHS to refrain from using taxpayer funding to pay for UAC legal services in immigration proceedings. Further, the second part of § 1232(c)(5) confirms that Congress did not intend to financially benefit legal-services organizations. Congress required that HHS "shall make every effort to utilize the services of *pro bono* counsel" who will represent UAC "without charge." *Id.* § 1232(c)(5). Congress intended that HHS would not spend money on legal services for UAC and, instead, would seek counsel who would represent UAC without using taxpayer funding. *Id.*

Further, Congress's provision for funding child advocates in subsection (c) implies that Congress's silence—or, indeed, prohibition—regarding funding for legal services confirms that Congress never intended for legal-service providers to receive taxpayer funding. "[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) (internal quotation marks omitted). Congress explicitly provides federal funding for child advocates, and thereby intends to benefit child advocates, in subsection (c)(6). By comparison, in subsection (c)(5), Congress discourages federal funding for legal-service providers, mandating that HHS secure "pro bono" counsel and prohibiting federal funding for counsel in immigration proceedings. The juxtaposition of these two subsections leaves no doubt as to Congress's intent: federal funding should not be used to fund legal-service organizations like Plaintiffs.

That Plaintiffs have lost funding and need to reallocate resources does not place them within the zone of interests that Congress meant to protect. Accordingly, Plaintiffs likely cannot show that they have standing to challenge HHS's funding decisions under the APA.

Plaintiffs are also unlikely to succeed on the merits of their claim because they seek monetary relief, and the APA does not waive sovereign immunity over such claims. Although styled as a request for declaratory and injunctive relief, the relief that they seek is simple: they want to compel the United States to continue making payments—relief precluded under the APA.

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
3:25-CV-02847- AMO                                 8

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell,* 463 U.S. 206, 212 (1983). Accordingly, before a court may exercise jurisdiction over any suit against the United States, the plaintiff must unequivocally show that the United States has waived sovereign immunity, and that their claims fall squarely within the terms of that waiver. *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 472 (2003) (citations omitted); *see also Lane v. Pena,* 518 U.S. 187, 192 (1996) (stating that the waiver of sovereign immunity cannot be implied, but "must be unequivocally expressed in statutory text.").

Relevant here, the APA only waives sovereign immunity over actions seeking relief "other than monetary damages." 5 U.S.C. § 702. The APA "does not waive sovereign immunity for contract claims seeking equitable relief." *N. Star Alaska v. United States*, 14 F.3d 36, 38 (9th Cir. 1994) (cleaned up). As a result, a court must carefully discern whether a request dressed up as a claim for injunctive or declaratory relief is actually seeking monetary relief, as "any claim for legal relief can, with lawyerly inventiveness, be phrased in terms of an injunction." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 211 n.1 (2002).

The APA does not provide a waiver of sovereign immunity here because the relief Plaintiffs seek is payment. Specifically, Plaintiffs ask this Court to: (1) declare that "Defendants are required to *continue funding* legal representation to unaccompanied alien children, consistent with the TVPRA and ORR's Foundational Rule; (2) enjoin Defendants nationwide from *ceasing to fund counsel* to represent unaccompanied alien children in violation of the TVPRA and the Foundational Rule; (3) to declare that Defendants' actions violate the APA; and (4) to set aside Defendants' actions. ECF No. 1 at 39 (emphases added).[2]  Regardless of how Plaintiffs label their request for relief, the result of granting any of their requests is the same: HHS must continue paying Acacia, and consequently, continue paying Plaintiffs. The APA does not waive sovereign immunity for such a claim, and thus, this Court lacks jurisdiction to order Defendants to provide Plaintiffs with the monetary relief they seek. *N. Star Alaska*, 14 F.3d at 38.

---

[2] Page number references, when to filings on the Court's docket in this case, are to the page number in the header supplied by the Court's ECF system.

1    The APA also does not provide a waiver of sovereign immunity here because HHS's funding

2    decision under the TVPRA and the Foundational Rule are discretionary. The APA does not permit judicial

3    review of "agency action" that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).  The

4    TVPRA provides HHS broad discretion in determining how to provide legal services to UAC. While

5    Section 235 mandates that HHS ensure that counsel is available to represent UAC "to the greatest extent

6    practicable" in "legal proceedings or matters," it also cross-references the provision of the INA—8 U.S.C.

7    § 1362—which specifies that "the privilege" of being represented in removal proceedings is "at no

8    expense to the Government." The TVPRA also directs HHS to "make every effort to utilize the services

9    of pro bono counsel who agree to provide representation without charge." 8 U.S.C. § 1232(c)(5). Likewise,

10   the Foundational Rule explicitly articulates ORR's discretion regarding legal representation funding.  It

11   provides that ORR "shall fund legal service providers to provide direct immigration legal representation

12   for certain unaccompanied children" only "to the extent ORR determines that appropriations are

13   available," and only if securing pro bono counsel is impractical. 45 C.F.R. § 410.1309(a)(4). The decision

14   to fund direct legal services is "subject to ORR's discretion and available appropriations." *Id.*

15   Moreover, Congress's funding of ORR's UAC program, including legal services, demonstrates

16   that HHS has been allowed discretion in how it allocates resources.  For example, the Further Consolidated

17   Appropriations Act, 2024, Pub. L. No. 118-47, provides general appropriations to execute activities under

18   Section 235 of the TVPRA without earmarking explicit amounts for direct legal representation. And

19   subsequent acts, including the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L.

20   No. 119-4, similarly maintain funding levels and provide broad discretion without altering statutory

21   obligations or imposing specific mandates for funding legal representation. *Id.* ¶ 16.  This ongoing

22   legislative practice underscores Congress's intent to maintain flexibility for ORR, allowing the agency to

23   prioritize resources efficiently and adaptively.  *Id.*; *see also* 6 U.S.C. 279(b)(1) (making the Director of

24   ORR responsible for activities including coordinating and implementing the care of UAC and

25   implementing policies with respect to the care and placement of unaccompanied alien children);

26   8 U.S.C. § 1232(i) (authorizing the Secretary of HHS to "award grants to, and enter into contracts with,

27   voluntary agencies to carry out this section and section 279 of title 6.").

28

1    The Court therefore lacks jurisdiction because decisions about the substance of HHS's decision to

2    reallocate resources from direct representation into other aspects of the UAC program is firmly committed

3    to the agency's discretion.  In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the

4    Indian Health Service's decision to discontinue a program it had previously funded and to instead

5    reallocate those funds to other programs was committed to agency discretion by law and thus not

6    reviewable under the APA's reasoned-decision making standards.  *See id.* at 185–88.  The Court explained

7    that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally

8    regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to

9    give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in

10   what it sees as the most effective or desirable way."  *Id.* at 192.

11   Indeed, an agency's allocation of funds from a lump-sum appropriation requires "a complicated

12   balancing of a number of factors which are peculiarly within its expertise": whether its "resources are best

13   spent" on one program or another; whether it "is likely to succeed" in fulfilling its statutory mandate;

14   whether a particular program "best fits the agency's overall policies"; and, "indeed, whether the agency

15   has enough resources to fund a program at all."  *Id.* at 193 (internal citations omitted).  "Congress may

16   always circumscribe agency discretion to allocate resources by putting restrictions in the operative

17   statutes."  *Id.*  But as long as the agency abides by the relevant statutes (and whatever self-imposed

18   obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to

19   intrude."  *Id.*  Because the TVPRA confers HHS discretion to determine how best to allocate and

20   administer the funding for the UAC program, HHS's decisions are not subject to review under the APA.

21   **3.   This Court lacks jurisdiction over Plaintiffs' claims because the rights they seek to enforce must be brought in the Federal Court of Claims.**

22   Although Plaintiffs cite to the APA as the basis for their claims, the rights that they seek to enforce,

23   and the relief that they seek, are only available to them through contract, and thus their claims are

24   precluded by the Tucker Act.[3]

25

26

27   ---

[3] The Tucker Act provides: "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any

28   regulation of an executive department, *or upon any express or implied contract with the United States.*" 28 U.S.C. § 1491(a)(1) (emphasis added).

1    claim is based upon a contract with the United States and subject to the jurisdictional restrictions in the

2    Tucker Act. *North Side Lumber v. Block,* 753 F.2d 1482, 1486 (9th Cir. 1985), *cert. denied,* 474 U.S. 931

3    (1985) (citing *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 967–68 (D.C. Cir. 1982)). The Tucker Act

4    "impliedly forbids" APA claims involving government contracts. *Id.* at 1485 (citing H.R. Rep. No. 1656,

5    94th Cong., 2d Sess. 13). To determine whether the Tucker Act precludes a contract claim "disguised" as

6    an APA claim, the Ninth Circuit employs the D.C. Circuit's *Megapulse* test. *United Aeronautical Corp.*

7    *v. United States Air Force*, 80 F.4th 1017, 1025–26 (9th Cir. 2023) (citing *Megapulse,* 672 F.2d at 967–

8    68). Under *Megapulse*, a court must decide whether "the source of the rights upon which the plaintiff

9    bases its claims" arises under a contract and whether "the type of relief sought" is normally available as a

10   contract remedy. *Id.* "If rights and remedies are *statutorily* or *constitutionally* based, then districts courts

11   have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims

12   does, even if the plaintiff formally seeks injunctive relief." *Id.* (emphases in original).

13          Two weeks ago, a district court in the District of Columbia decided a case very similar to this one

14   and determined that the plaintiff organization's claims resounded in contact and, thus, had to be brought

15   in the Court of Federal Claims. *United States Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 1:25-CV-

16   00465, 2025 WL 763738, at *2 (D.D.C. Mar. 11, 2025). Like here, the relief sought in *Conf. of Cath.*

17   *Bishops* was styled as a request for an injunction, yet the court correctly reasoned that, in actuality, the

18   relief sought was for "the Government to keep paying up." *Id.* at *5. The district court therefore held that

19   the claim was "founded upon a contract" and "must be heard in Claims Court." *Id.* at *7 (citing *Sharp v.*

20   *Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) (Scalia, J.) ("We know of no case in which a court has

21   asserted jurisdiction . . . to issue an injunction compelling the United States to fulfill its contractual

22   obligations.")). So too here.

23          As explained, Section IV.A.2, *supra*, the relief Plaintiffs seek is for "the Government to keep

24   paying up," *Conf. of Cath. Bishops*, 2025 WL 763738, at *2. Because they seek monetary relief, which is

25   unavailable under the APA but normally available in a contract dispute, their claim is precluded by the

26   Tucker Act. *Id.* at *7; *United Aeronautical Corp.*, 80 F.4th at 1025–26.

27          Not only does Plaintiffs' requested relief resound in contract, but the "source of rights" upon which

28   they base their claims arises from a contract. *Megapulse,* 672 F.2d at 967–68. Plaintiffs cannot separate

their causes of action from their contractual relationship with Acacia. Plaintiffs lack standing to assert claims against the United States absent the contract that HHS has with Acacia because without it they would have no injury. In other words, had Acacia never entered into a contract with HHS to provide direct legal services to UAC, Plaintiffs would have never received funding to provide such legal services and would have no injury to complain of. No statute or regulation requires HHS to compensate *Plaintiffs* for their legal services. Absent a statutory or constitutional entitlement to the appropriated funds that they seek, their injury arises from termination of a contract. Because Plaintiffs' "source of rights" for funding from appropriations stems solely from their contract with Acacia, this Court lacks jurisdiction over their claims. *Id.* at 967–68; *United Aeronautical Corp.*, 80 F.4th at 1025–26.

### 4. Plaintiffs cannot show that a favorable decision in this case would likely redress their alleged injuries.

To the extent Plaintiffs argue that they are not challenging the government's decision to end the contract with Acacia but, rather, the decision to discontinue providing appropriated funds to any legal-services organization, they likewise lack standing to assert such a claim. The "irreducible constitutional minimum" of Article III standing consists of (1) "injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks omitted). The third element of Article III standing, redressability, requires that it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan,* 504 U.S. at 561 (citation and internal quotation marks omitted). To show a likelihood of redressability, Plaintiffs must "show that there would be a 'change in a legal status' as a consequence of a favorable decision" and that this change would significantly increase the likelihood that they would obtain the relief sought. *Novak v. United States*, 795 F.3d 1012, 1019–20 (9th Cir. 2015) (quoting *Renee v. Duncan,* 686 F.3d 1002, 1013 (9th Cir. 2012)).

The relief that Plaintiffs seek—if untethered to their contract claim—would not likely provide them with the monetary relief they seek. Enforcing the statutory authority Plaintiffs rely on in arguing that Congress intended to fund direct-legal services, 8 U.S.C. § 1232(c)(5), would have the opposite effect of the relief Plaintiffs seek. As explained above, Congress did not intend to financially benefit Plaintiffs in ensuring that UAC would have access to legal services; instead, Congress envisioned that such legal

services would generally be provided *pro bono* at no expense to the government. 8 U.S.C. § 1232(c)(5). If the Court were to enforce the plain language and purpose of Section 235 of the TVPRA, it would order the government to seek out *pro bono* counsel for direct legal services and, to the extent possible, avoid funding legal services at the government's expense. Of course, this result would not redress Plaintiffs' injuries, as they seek to be paid for their services and not acting in a *pro bono* capacity.

Likewise, because the Foundational Rule provides HHS with discretion as to whether and how to disburse appropriations for direct legal services, Plaintiffs cannot show that ordering HHS to comply with its regulation would redress their injury. Under the plain language of the regulation, HHS would maintain the discretion to determine whether to fund direct-legal services for UAC, and, using that discretion, it would likely continue to decline to continue funding. Biswas Decl., ¶ 17. And even if HHS changed course and decided to exercise favorable discretion by funding direct legal services, it could contract with organizations other than Acacia and Plaintiffs. *Id.* ¶ 19. There is nothing that Plaintiffs can cite to that would require or encourage HHS to continue funding the Plaintiffs *in this case*. *Id.* ¶¶ 17-19. In other words, even if the agency continued funding direct legal services, Plaintiffs cannot show that it is likely that HHS will continue to contract with Acacia or with any of the Plaintiffs in this case. *Id.* Thus, Plaintiffs' redressability—that HHS would continue funding Acacia or any of the Plaintiffs—is speculative at best and insufficient to establish standing. *Lujan,* 504 U.S. at 561. Accordingly, Plaintiffs fail to show that they likely have Article III standing because enforcing the relevant policies and statutes would not redress their alleged injury.

### 5.    The Termination Contract Termination at Issue Does Not Violate the APA

Plaintiffs erroneously argue that termination of direct legal services violate the APA. Although, the money was authorized by Congress, Congress never mandated its spending. When Congress does not require the agency to spend a certain amount of the appropriated fund, the agency has discretion over how much to spend up to the cap provided by Congress. *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 432 (2024) ("The appropriation of "sums not exceeding" a specified amount did not by itself mandate that the Executive spend that amount; as was the case in England, such appropriations instead provided the Executive discretion over how much to spend up to a cap."). When

courts determine whether money is mandatory or discretionary, they must look to the language of the appropriations bill to determine whether Congress required the funds appropriated to be used in a particular way. *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182 (2012) ("An agency's discretion to spend appropriated funds is cabined only by the 'text of the appropriation,' not by Congress' expectations of how the funds will be spent, as might be reflected by legislative history.") (quoting *Int'l Union, UAW v. Donovan*, 746 F.2d 855, 860-61 (D.C. Cir. 1984) (Scalia, J.))

> **6.    The Foundational Rule Does Not Require Funding for Taxpayer-funded Direct Immigration Legal Representation Consistent with Available Appropriations.**

Plaintiffs contend that Defendants have "ended" funding for legal representation of unaccompanied alien children despite the availability of appropriated funds for this purpose through at least September 30, 2027, and that, by the supposed ending, Defendants violate what they believe is a mandate in the Foundational Rule to provide counsel for UAC to the extent there are appropriated funds available to do so.  ECF No. 1 ¶ 139.  As Plaintiffs note, to establish a claim under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954), such a claim must show: (1) that the government has violated its own regulations; and (2) that Plaintiffs are substantially prejudiced by that violation. ECF No. 7 at 14 (citing  *Al Otro Lado, Inc. v. Mayorkas*, 2024 WL 4370577, at *8–9 (S.D. Cal. Sept. 30, 2024)). To start, Plaintiffs have not shown that Defendants have violated their own regulations. Indeed, Plaintiffs overlook the fact that the funding at issue here is required only "insofar that it is not practicable for ORR to secure pro bono counsel."  45 C.F.R. § 410.1309(a)(4).  As HHS noted in the preamble to its Foundational Rule, ORR, consistent with the TVPRA, makes every effort to use pro bono legal services "to the greatest extent practicable" to secure counsel for UAC in these contexts. Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384, 34,529 (Apr. 30, 2024). HHS notes that ORR-funded legal services providers may help coordinate referral to pro bono legal services and that ORR provides each UAC with a list of pro bono service providers.[4]  *Id*.  Historically, HHS has acknowledged that, in some cases, it is impracticable for ORR to secure pro bono legal services, such as in markets where demand exceeds supply, or during times of influx.  *Id*.  But where

---

[4] The list of pro bono service providers is statutorily required under the TVPRA. 6 U.S.C. § 279(b)(1)(I).

and when it is "impracticable" for ORR to secure pro bono legal services is a determination to be made by ORR. *Id.* (noting that the decision is subject to ORR's "discretion."). Further, since ORR must be selective in the kinds of legal services it funds, it therefore proposed to establish its discretion to fund legal services for specific purposes "based on its judgment and priorities." 89 Fed. Reg. at 34,529. The clause "based on its judgment and priorities" reflects that ORR has considerable discretion to determine how the provision of legal services to UAC is funded. The determination of when such provision is "impracticable" is a decision to be made exclusively by ORR, applying its expertise, and not by Plaintiffs or the Court.

Plaintiffs next overlook the fact that ORR shall fund legal service providers *subject to ORR's discretion*,[5]

Plaintiffs note that HHS has an obligation "to the greatest extent practicable" and consistent with 8 U.S.C. § 1362, to ensure that UAC have counsel in their immigration proceedings. HHS interpreted "to the greatest extent practicable" to open the door to a grant of authority to pay for legal services beyond that available from pro bono legal service providers. 89 Fed. Reg. at 24,529. "To the greatest extent practicable," however, cannot reasonably be read as a mandate for HHS to pay for direct immigration legal representation for all UAC, unconditionally. In the preamble to the Foundational Rule, HHS stated that it "understands that some commenters would like ORR "to fully fund legal services to all [UAC]." *Id.* HHS also observed that it received comments questioning ORR's legal authority to pay for legal services for UAC and suggesting that ORR not use taxpayer funding for legal representation for UAC. *Id.* HHS concluded that its approach to providing legal services to UAC, by enabling them to access ORR has determined that "its approach to providing legal services to unaccompanied children by enabling them to access pro bono counsel 'to the greatest extent

---

[5] Defendants do not contest that the conditions "to the extent ORR determines that appropriations are available" and "subject to . . .available appropriations," in 45 C.F.R. § 410.1309(a)(4), are met here.

1   practicable' and funding legal services for additional unaccompanied children, as resources allow, is

2   consistent with ORR's statutory obligations." *Id*.  HHS's interpretation of the INA and TVPRA – as

3   Congress's grant of discretion to ORR to provide funding for immigration services to UAC – is far

4   from a mandate to do provide such funding.

5       Similarly, and as Plaintiffs point out, HHS did acknowledge that most UAC need legal services

6   to resolve their immigration status, and such representation appears to have a significant impact on

7   court appearance.  ECF No. 7 at 13 (citing 89 Fed. Reg. at 34,529).  Further, as Plaintiffs note, HHS

8   affirmed that "legal services providers who represent unaccompanied children undertake an important

9   function" and explains ORR's goal of "100 percent legal representation of unaccompanied children."

10  *Id*. (citing 89 Fed. Reg. at 34,526).  But Plaintiffs fail to explain why they believe that such services

11  must be funded by the taxpayer.  HHS's shift to increased emphasis and reliance upon pro bono service

12  providers might not be Plaintiffs' preference, but it is consistent with the plain language of section

13  1309(a)(4) and HHS's explanations for why it sculpted the language in 1309(a)(4) as it did.  In their

14  motion for a TRO, however, Plaintiffs are silent regarding the importance of pro bono counsel in

15  providing advice and legal representation for UAC, an importance reflected in both section 1309(a)(4)

16  and the preamble.  ECF No. 7.

17      **B.    <u>Plaintiffs Will Not Face Irreparable Harm Without a TRO</u>**

18      The "most important" *Winter* factor is whether Plaintiffs demonstrate irreparable harm.  *Caribbean*

19  *Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Koller v. Brown*, 224 F. Supp.

20  3d 871, 879 (N.D. Cal. 2016) (noting it is the "single most important prerequisite" for a TRO).  The

21  "possibility" of harm is insufficient to secure a TRO; Plaintiffs must show that "irreparable injury is *likely*

22  in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original).  "Speculative injury" does

23  not suffice; Plaintiffs must show both immediacy and likelihood that they will be harmed absent a TRO.

24  *See Caribbean Marine Servs. Co*., 844 F.2d at 674.  Where "[m]ultiple contingencies must occur" before

25  Plaintiffs' claimed injuries, the injuries are "too speculative" to justify a TRO.  *Id.* at 675.

26      Plaintiffs have failed to make the requisite threshold "clear showing of irreparable harm." *See*

27  *Garcia*, 786 F.3d at 746 (reiterating that "[h]arm must be proved, not presumed").  Plaintiffs have failed

28  to demonstrate irreparable harm sufficient to warrant extraordinary injunctive relief.  Although

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
3:25-CV-02847- AMO                          17                     PI Appeal and Stay Addendum 251

Plaintiffs characterize their harm as damaging their ability to provide services, their harm is merely monetary. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("Monetary injury is not normally considered irreparable."). Economic damages are not traditionally considered irreparable because the injury can later be remedied by a damage award. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury . . . ." (internal quotation omitted)); *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 676 (9th Cir. 1988) ("Subjective apprehensions and unsupported predictions of revenue loss are not sufficient to satisfy a plaintiff's burden of demonstrating an immediate threat of irreparable harm."); *Arcamuzi v. Continental Air Lines*, Inc., 819 F.2d 935, 938 (9th Cir. 1987) ("[Temporary economic loss alone generally is not a basis for injunctive relief."); *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 471 (9th Cir. 1984) ("Mere financial injury . . . will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation.").

While Plaintiffs characterize their harm as "frustrating their mission," the actual harm that Plaintiffs allege is "lack of funding," which is plainly monetary harm. *See* ECF No. 7 at 16 ("There is no question that *ceasing funding* for legal representation services for UAC and terminating the existing services will cause imminent harm that cannot be later remediated.") (emphasis added); *id.* at 17 ("Plaintiffs have relied on Congress's and Defendants' assurances that *funding* for these critical resources will continue to be available.") (emphasis added); *id.* ("Sustaining these services without this *funding* will cost the Northwest Immigrant Rights Project *$200,000 a month*.") (emphasis added). Plaintiffs cannot avoid the well-established case law holding that monetary loss (even if significant), is not irreparable harm.

Plaintiffs next allege that "ceasing funding for legal representation services for UAC and terminating existing contracts will cause imminent harm" because it will cause them to cease providing certain legal services. ECF No. 7 at 16. But that too is without merit as the Cancellation Order does not prevent Plaintiffs from continuing to provide legal services – it merely prevents them from receipt of

1    federally funded payment for those services. Indeed, Plaintiffs may freely  provide these services *pro*

2    *bono*, which is in line with the plain language and purpose of 8 U.S.C. § 1232(c)(5), and would be

3    welcomed by Defendants.

4         Plaintiffs' further assertion that "impacted attorneys and staff have years of individualized

5    experience and wisdom with clients making rehiring layoffs impracticable" is speculative and attenuated.

6    ECF No. 7 at 18. "Certain impending" injury cannot be shown when the asserted injury is based on a

7    "speculative chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), or on

8    "speculation about the decisions of independent actors," *id.* at 414. As the D.C. Circuit has cautioned:

9    "Because of the generally contingent nature of predictions of future third-party action," a court should

10   be "sparing in crediting claims of anticipated injury by market actors and other parties alike." *Arpaio v.*

11   *Obama*, 797 F.3d 11, 23 (D.C. Cir. 2015). The Court should likewise decline to entertain Plaintiffs'

12   speculative assertion about what third parties—individuals who *might* be laid off—would do if called

13   back to work.

14      **C.**    **The Balance of the Equities and Public Interest Weigh Against Entry of a Temporary**

15                  **Restraining Order.**

     Where the government is a party, the balance of equities and public interest factors merge. *Drakes*

16   *Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435

17   (2009)).  Courts "explore the relative harms to applicant and respondent, as well as the interests of the

18   public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991)

19   (internal quotation marks and citation omitted).  In weighing these factors, Plaintiffs rely on their previous

20   arguments pointing to their allegation that harm arises from Defendants' "shirking [of] their voluntarily

21   undertaken obligations." Motion at 19. But as described above, neither the purported merit of their claims

22   nor their alleged injury support entry of a TRO.  This is particularly true because Plaintiffs make no

23   attempt to explain how the broad relief requested in their proposed order (Dkt. 7-3) is tethered to the harms

24   they claim.  On the other hand, Defendants are legally entitled to make decisions about the disbursement

25   of their federal grants. *See, e.g.*, 8 U.S.C. § 1232; 45 C.F.R. § 410.

26        Here, the balance of the equities and public interest tip decisively in Defendants' favor.  If the

27   status quo is preserved during the pendency of the case, Plaintiffs can still obtain any funding they may

28

1  be entitled to as a result of the case's ultimate resolution.  But the opposite is not true—if Plaintiffs are

2  given access now, and draw down the funds throughout the litigation, Defendants will be left with no

3  meaningful recourse even if they prevail.  Defendants will bear all the risk if the Court enters a preliminary

4  injunction, whereas Plaintiffs will bear none if it denies one. Such a proposition turns Plaintiffs' burden

5  of establishing irreparable harm on its head. In short, the equities clearly favor Defendants.

6          Plaintiffs' motion fails to acknowledge the governmental harm that will be imposed through

7  injunctive relief here, suggesting that the TRO is merely to spend appropriated funds. This ignores the

8  substantial harm an injunction imposes by usurping executive branch authority to manage complex

9  programs and allocate billions in taxpayer funds. Forcing continuation of one specific contract hinders

10  ORR's ability to adapt to potentially changing migration flows, shelter needs, health concerns, or to

11  implement potentially more cost-effective or impactful service models across the entire UAC program

12  spectrum.

13          What's more, the public interests at stake here include effective governance. While Plaintiffs

14  legitimately describe the public interest in protecting vulnerable children and upholding the TVPRA, the

15  public interest also encompasses the efficient, flexible, and responsible administration of federal

16  programs, interests which are opposed to forcing the government to continue to fund paid attorneys. It

17  includes ensuring ORR can make difficult choices to best serve the overall needs of all unaccompanied

18  alien children within its care, using its expertise and the discretion Congress provided. Judicial

19  micromanagement of appropriations allocation via Plaintiffs' requested TRO arguably undermines, rather

20  than serves, the broader public interest in competent government.

21          Indeed, an injunction here would effectively disable the administration from effectuating its

22  executive authority consistent with their constitutional and statutory authorities. *See Maryland v. King*,

23  567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up) ("[a]ny time a [government] is

24  enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of

25  irreparable injury."). Where the Government is legally entitled to make decisions about the disbursement

26  or allocation of federal funds, but is nonetheless ordered to release the funds, such funds may not be

27  retrievable afterwards. While Plaintiffs emphasize the mandate in 8 U.S.C. § 1232(c)(5) that HHS "shall

28

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
3:25-CV-02847- AMO                     20                      PI Appeal and Stay Addendum 254

ensure . . . that all unaccompanied alien children . . . have counsel," this mandate is explicitly qualified by "to the greatest extent practicable". This is not mere suggestion; it is the legal standard set by Congress, inherently requiring agency judgment. Here, "practicable" arguably necessitates balancing the goal of providing counsel against competing demands, resource limitations across the entire UAC program, administrative feasibility, and the effectiveness of different service delivery models. It does not mandate funding one specific contract indefinitely, irrespective of other considerations.

In sum, the decision to terminate funding under the contract represents a permissible exercise of the discretion afforded to ORR by Congress under 8 U.S.C. § 1232(c)(5), and codified in its own regulations, *see* 45 C.F.R. § 410.1309(a)(4). It is not contrary to law or arbitrary and capricious. An injunction would improperly substitute judicial preference for agency judgment, unduly restricting the executive's ability to allocate resources and adapt to evolving needs. As a result, the balance of equities and the public interest, properly considered, weigh against granting the extraordinary relief of a TRO.

## D. If the Court issues a TRO, it should require Plaintiffs to Post Security.

Finally, if the Court deems a TRO warranted (which it should not), Plaintiffs should be required to post bond. Rule 65(c) provides that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The circumstances here warrant requiring Plaintiffs to provide security in an amount that could compensate Defendants for the losses caused by a preliminary injunction (in the event that Defendants are found to have been wrongfully enjoined). To the extent that the Court grants relief to Plaintiff, Defendants respectfully request that the Court require Plaintiffs to post security for any taxpayer funds distributed during the pendency of the Court's Order. Since this case is ultimately about financial allocation, it thus follows that Rule 65(c)'s explicit requirements necessitate Plaintiffs' posting of security.

## V.   CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a temporary restraining order.

DATED: March 31, 2025                    Respectfully submitted,

                                          YAAKOV M. ROTH
                                          Acting Assistant Attorney General

                                          WILLIAM C. SILVIS
                                          Assistant Director

                                          CHRISTINA PARASCANDOLA
                                          KATE MASETTA ALVAREZ
                                          JONATHAN K. ROSS
                                          Senior Litigation Counsels

                                          ZACHARY A. CARDIN
                                          Trial Attorney

                                          /s/ Michael A. Celone
                                          MICHAEL A. CELONE
                                          Senior Litigation Counsel
                                          U.S. Department of Justice, Civil Division
                                          Office of Immigration Litigation
                                          General Litigation and Appeals Section
                                          P.O. Box 878, Ben Franklin Station
                                          Washington, DC 20044
                                          (202) 305-2040
                                          Michael.A.Celone@usdoj.gov

                                          Attorneys for Defendants

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Defendants certifies that this brief contains 22 pages, which complies with the word limit of this Court's Standing Order, section 6 and L.R. 11-6.1.

Respectfully submitted,

*/s/ Michael A. Celone*
MICHAEL A. CELONE

Office of Immigration Litigation
Civil Division

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

Case No: 3:25-cv-2847 (AMO)

## <u>DECLARATION OF TOBY BISWAS</u>

I, Toby Biswas, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Director of the Division of Unaccompanied Alien Children (UAC) Policy for the UAC Bureau of the Office of Refugee Resettlement (ORR), within the Administration for Children and Families (ACF), a component of the U.S. Department of Health and Human Services (HHS).

2.      I have held various roles within ORR since I first started working at the agency in November 2009, and I have held my current role since April 2023. My job duties include, among other things, responsibility for all aspects of the development and implementation of ORR's policies and procedures concerning the care and custody UAC, including those related to the provision of legal services to UAC. In this capacity, I am responsible for ensuring ORR's implementation of and compliance with programmatic policy prerogatives and statutory responsibilities, such as those arising under the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), 8 U.S.C. § 1232, and ORR's Foundational Rule, 45 CFR part 410, which include provisions related to the provision of UAC legal services.[1]

3.      This declaration is based upon my personal knowledge, information acquired by me in the course of performing my official duties, information contained in the records of ACF and ORR, and information conveyed to me by current agency employees and contractors. Further, I have reviewed the pleadings in this matter, and am generally familiar with the facts and circumstances underlying plaintiffs'

---

[1] ORR policies with respect to UAC are also embodied in the ORR UAC Bureau Policy Guide ("UAC Policy Guide"), which is publicly available on ORR's website, and has recently been made available to the public in a Freedom of Information Act reading room: https://acf.gov/e-reading-room

1

allegations concerning the termination of a portion of the Acacia contract for the provision of UAC legal services in March.  I also have personal knowledge of the facts and circumstances leading to the termination decision at issue here.

4.      Acacia Center for Justice ("Acacia")[2] is an ORR contractor who provides legal services and other assistance to UAC in and released from ORR care in the sectors defined by ORR, as explained below.  Acacia may further sub-award ORR funds to other organizations to provide these services.  In this posture, ORR has no direct relationship with these sub-awardees. Rather, as the federal contractor, Acacia is responsible under HHS regulations for, among other things, clearly identifying every sub-award as such, evaluating each subrecipient's risk of noncompliance with Federal requirements, and monitoring subrecipient activities to ensure the subaward is used for authorized purposes, identifying sub-awardees as either subrecipients or sub-contractors. *See* 45 CFR 75.352; *see also* 45 CFR 75.101(b)(1) (making 75.352 applicable to HHS contracts).

6.      Acacia has provided these services pursuant to Contract 140D0422C0009.

7.      Collectively, these services cost ACF/ORR—and by extension U.S. taxpayers—a grand total of $796,720,624.01.

8.      On February 3, 2025, Acting HHS Secretary Dorothy Fink issued the "Secretarial Directive on Program Payment Integrity" ("Secretarial Directive"), which directed all HHS personnel to briefly pause all payments to contractors, vendors, and grantees related to immigration and refugee resettlement for internal review.  A true and correct copy of the Secretarial Directive is attached hereto as "Exhibit 1."

9.      Specifically, the Secretarial Directive directed that "Agency personnel shall briefly pause all payments made by the Administration for Children and Families to contractors, vendors, and grantees related to immigration and refugee resettlement for internal review for payment integrity.  Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts

---

[2] Acacia was previously known as the Vera Institute of Justice, or "Vera."

2

and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy."  Exhibit 1.

10.     In late February, all ORR contracts, including the contract for legal services, were evaluated for termination and modification to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of the President's Administration. The evaluation consisted of making a determination of whether the contracted services were legally required, whether the services provided by the vendor aligned with the administration's priorities, and whether the services could be provided through other means more cost effectively. During that time period, ORR leadership determined that the contract for legal services was only partially required in order to meet statutory requirements and decided to reduce the scope of the contract in order to reduce spending and achieve more cost efficiency.

11.     As a result of the program integrity review conducted pursuant to the Secretarial Directive, ACF and ORR leadership decided, on or about March 20, 2025, to partially terminate the Acacia contract—which was already set to expire on March 29, 2025—with respect to the funding of direct representation of UAC; however, ACF/ORR decided to renew the Acacia contract with respect to the provision of KYR trainings and legal screenings, based on its understanding of its non-discretionary obligations, and in keeping with the Administration's general policy of protecting the public fisc by ensuring taxpayer dollars are only spent on statutorily-required government-funded services.

12.     Accordingly, on March 21, 2025, Acacia was notified of the partial termination decision by the Acquisition Services Directorate of the Interior Business Center within the Department of the Interior ("DOI").  A true and correct copy of the Acacia partial termination notice is attached hereto as "Exhibit 2."

13.     DOI provides assisted acquisition services to HHS and its component agencies, including ACF/ORR, under the Interior Franchise Fund.[3]  Simply put, DOI serves as the technical administrator of the Acacia contract, due to its greater capacity for contract management and administration, but ACF/ORR remains the decisionmaker with respect to all aspects of the Acacia contract, and, for that matter, the development and implementation of all UAC policies, as expressly directed by Congress. *See* 6 U.S.C. §279(a), 8 U.S.C. § 1232.  DOI merely communicates those decisions to the contractor on ACF/ORR's behalf.  Hence, the partial termination letter Acacia received was from DOI, not ACF/ORR.

3

14.     As stated in the partial termination letter, ORR has determined to terminate aspects of the Acacia contract related to direct representation of UAC because the TVPRA does not require HHS/ORR to fund direct legal representation. Under the TVPRA, at 8 U.S.C. 1232(c)(5), the Secretary of HHS must "ensure, to the greatest extent practicable and consistent with section 292 of the INA (8 U.S.C. 1362)," that all unaccompanied alien children who are or have been in its custody or in the custody of DHS, with certain exceptions, have counsel "to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." The Secretary of Health and Human Services "shall make every effort to utilize the services of pro bono counsel who agree to provide representation to such children without charge." 8 U.S.C. 1362 provides, "In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (*at no expense to the Government*) by such counsel, authorized to practice in such proceedings, as he shall choose." (emphasis added). ORR has for several years funded at great public expense direct legal representation services for unaccompanied alien children. The TVPRA which authorizes such funding, does not require it, and such services are entirely at the agency's discretion.

15.     ORR's regulations were written based on the understanding that it is responsible for providing access to counsel, but at no expense to the government. *See* 89 Fed. Reg. 34384, 34526-27 (prefacing discussion of 45 CFR 410.1309 with an explanation of requirements under the TVPRA). Thus, even where ORR regulations describe funding direct representation of UAC (e.g., 45 CFR 410.1309(a)(4)), the regulations state that such funding is provided "[t]o the extent ORR determines that appropriations are available, and insofar as it is not practicable for ORR to secure pro bono counsel." As a result, although historically ORR has funded direct representation, it has done so as a matter of its exclusive discretion.  Like many discretionary policies, this one has changed with the change in Administration, and ORR has now determined that it will no longer fund direct representation for UAC.

16.     Congress periodically appropriates funds to support ORR's UAC program, including legal services.  Appropriations language, however, consistently remains broad and nonspecific regarding precise funding allocations.  For example, the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, provides general appropriations to execute activities under Section 235 of the TVPRA without earmarking explicit amounts for direct legal representation.  This general appropriation approach allows ORR flexibility in determining the allocation of resources based on agency priorities, the availability of pro bono counsel, and shifting immigration policy needs.  Subsequent acts, including the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, similarly maintain funding

4

levels and provide broad discretion without altering statutory obligations or imposing specific mandates for funding legal representation.

17.     Had Acacia never entered into a contract with the United States to provide direct legal services to UAC, Plaintiffs would have never received funding to provide such legal services. Under the Foundation Rule, HHS would maintain the discretion to determine whether to fund direct-legal services for UAC, and, using that discretion, it would likely continue to decline to continue funding. Moreover, while it has cancelled aspects of the Acacia contract pertaining to direct representation of UAC, ORR has not canceled those aspects pertaining to the provision of the KYR trainings and legal screenings because ORR's regulations require the provision of both the KYR presentation and the legal screening. *See* 45 CFR 410.1309(a)(2)(i) and (v).

18.     The termination of the Acacia contract is in the public's best interest as almost $800 million has been spent on legal services, much of which is not legally mandated, and to continue funding such services that are not legally required does not fulfill this Administration's policy goals of reducing unnecessary public expenditures. The law gives HHS discretion on how to use ORR's funding and given the priorities to reduce public expenditures, ORR has directed such funding be curtailed.

19.     ORR has not made any commitment or representation to Plaintiffs, including Acacia or any other entity involved in this case, that it would continue funding direct legal services through their contracts. The decision to fund such services, if continued, remains subject to the agency's discretion, appropriations, and programmatic priorities. There is no obligation under the applicable statutes or regulations that mandates HHS to maintain contractual relationships with specific service providers, including the Plaintiffs in this matter.

20.     Despite the recent change in the scope of the Acacia contract, ORR will continue to ensure UAC in the agency's custody are provided KYR presentations and legal screenings through the use of legal service providers whether through awards or subawards.

21.     Under the renewed contract, ACF/ORR will still pay $27,318.224.88 remaining costs to Acacia to provide KYR Trainings and legal screenings on a go-forward basis.

22.     UAC have, and remain, free to retain any attorney they wish to represent them in any matter they wish to contest at no cost to the Government, and Plaintiffs and any other legal service providers remains free to provide direct legal services on a truly pro bono basis. Legal service providers who wish to provide pro bono services may contact the agency to have their contact information updated and included in ORR's *Legal Resource Guide – Legal Service Provider List* which provides a state by state breakdown on legal service providers. Lists of local attorneys are provided to UAC when they enter care and when they leave it. The *Legal Service Guide* also provides weblinks to other pro bono resources

from the Immigration Advocates Network and the U.S. Department of Justice's List of Pro Bono Legal Service Providers. The *Legal Resource Guide* is provided to children within 24 hours of their admission into an ORR care provider.

23.     ACF/ORR complies with all federal laws and regulations. Requiring the agency to provide direct representation for UAC prohibits the discretion Congress intentionally conferred upon HHS.

24.     Further, ACF/ORR is concerned that large multimillion dollar contracts create a market for paid legal service providers to take on cases, which disincentivizes the recruitment of and the volunteering of pro bono counsel. Notably, many jurisdictions require or encourage attorneys to take on cases for indigent clients or cases in the public interest pro bono and have annual reporting requirements for attorneys to report those hours. A large influx of public funding for direct representation therefore may have the perverse effect of discouraging the utilization of pro bono counsel in the first instance.

Executed on March 31, 2025.


_____

Toby Biswas

# Exhibit 1.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary
Washington, D.C. 20201

## SECRETARIAL DIRECTIVE ON PROGRAM AND PAYMENT INTEGRITY

February 3, 2025

In June 2022, at the request of Florida Governor Ron DeSantis, the Supreme Court of Florida impaneled a statewide grand jury to investigate the impact of illegal immigration on Florida. One of that grand jury's reports, published in March 2023, outlined over 100 allegations concerning deficiencies in the Office of Refugee Resettlement's (ORR) administration of the Unaccompanied Alien Children (UAC) Program. Allegations included sponsor vetting failures, identity verification lapses, instances of child trafficking, and fraud in the sponsorship process.

These are serious programmatic failures and yet it is currently impossible to access sufficient information from a centralized source within the Department of Health and Human Services to assess them. Specifically, there is no one method to determine whether payments the agency is making to contractors, vendors, and grantees for functions related to immigration and refugee settlement are contributing to the serious problems and acute harms the State of Florida identified in its investigation. It is also currently impossible to assess whether payments the Department is making are free from fraud, abuse, and duplication, as well as to assess whether current contractual arrangements, vendor agreements, and grant awards related to these functions are in the best interests of the United States. *See* FAR 12.403(b), 49.101; 45 C.F.R. § 75.371–372. Finally, it is also impossible to determine with current systems whether current contracts and grant awards are tailored to ameliorate these specific problems and the broader problem of illegal immigration—rather than exacerbate them. The Department has an obligation to ensure that no taxpayer dollars are lost to abuse or expended on anything other than advancing the best interests of the nation.

For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. § 75.371–372, the Secretary of Health and Human Services hereby DIRECTS as follows:

> **Agency personnel shall briefly pause all payments made by the Administration for Children and Families to contractors, vendors, and grantees related to immigration and refugee settlement for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities.**

This Directive shall be implemented through the Department's payment management system by personnel with responsibility for that system who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument. Whenever a payment is paused for review, Department personnel shall immediately send such payment to Principal Deputy Assistant Secretary Andrew Gradison at the Administration for Children and Families for prompt review to determine whether or not the payment is appropriate and should be made. Paused payments shall remain paused pending completion of that review to the maximum extent permitted by law and all applicable notice and procedural requirements in the affected award, agreement, or other instrument.

I thank you for your attention to this matter, as well as your efforts to ensure that no taxpayer dollars are misspent.

Dorothy A. Fink, M.D., Acting Secretary



# United States Department of the Interior

### INTERIOR BUSINESS CENTER
Washington, DC 20240

March 21, 2025

To:      Leah Prestamo
            Acacia Center for Justice
            1025 Connecticut Avenue NW
            Suite 1000A
            Washington, DC 20036

Subject:        Notice of Partial Termination for the Government's Convenience

Contract 140D0422C0009, awarded on March 29, 2022, by the United States Department of the Interior (DOI), Interior Business Center (IBC), Acquisition Services Directorate (AQD) on behalf of the Department of Health and Human Services (HHS), Administration for Children and Families (ACF), Office Refugee Resettlement (ORR) as a part of our Interagency Agreement for acquisition services, *is hereby **partially terminated** for the Government's convenience*. Contract Line Items (CLINs) 2 – Direct Representation, 3 – Recruitment, and 4 – Direct Representation Expansion are terminated for the Government's convenience.

In accordance with FAR 52.212-4 Contract Terms and Conditions – Commercial Items (Alternate I) (Nov 2021) – (l) *Termination for the Government's convenience*

"(l) Termination for the Government's convenience. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. **Subject to the terms of this contract, the Contractor shall be paid an amount for direct labor hours (as defined in the Schedule of the contract) determined by multiplying the number of direct labor hours expended before the effective date of termination by the hourly rate(s) in the contract, less any hourly rate payments already made to the Contractor plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system that have resulted from the termination.** The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred that reasonably could have been avoided." Emphasis added.

*Recovery for any unpaid Firm-Fixed-Price work would be subject to the non-Alternate I version of FAR 52.212-4(l).

You are hereby notified to immediately stop work on CLINs 2, 3, and 4 and that effective close of business March 21, 2025, the Contracting Officer is terminating CLINs 2, 3, and 4 on Contract 140D022C0009 for the Government's convenience in accordance with FAR 52.212-4 (l) (Alternate I) for T&M work and paragraph (l) of the non-Alternate I version of FAR 52.212-4(l) for any Firm-Fixed-Price effort or products. CLIN 1 – Know Your Rights and Legal Screenings shall remain in full force and effect.

As defined in 44 U.S.C. § 3301, any Federal records created, received, or maintained by Acacia Center for Justice, or its subcontractors, pursuant to this ACF contract, are due back to the ORR No Later Than (NLT) 30 days from this notice. ACF owns the rights to all data and records produced as part of this order. Acacia Center for Justice is notified that any deliverables under the contract not specifically called out in this memo, are the property of the U.S. Government and are expected to be included in the records turnover NLT 30 days from this notice.

Any deliverables under CLINs 2, 3, and 4 that are scheduled for delivery after March 21, 2025, are hereby terminated for the Government's convenience in their entirety. Timely response to this request will be reflected in the CPARS evaluation. Additionally, the Government will ensure to include a narrative to explain the termination was not due to fault of the contractor.

Should you wish to submit a termination settlement proposal, the *final* <u>shall</u> be submitted to the Contracting Officer as promptly as possible, but no later than forty-five (45) calendar days from receipt of this notice.  However, if after considering the costs incurred and the costs previously paid by the Government, Acacia Center for Justice determines a no-cost settlement is in the company's best interest, please contact the undersigned Contracting Officer.

Please acknowledge receipt of this notice, as provided below.


_____          _____
Shelita Saint-Louis, Contracting Officer          Date
U.S. Department of the Interior
Interior Business Center / Acquisition Services Directorate
381 Elden St, Suite 2000A
Herndon, VA 20170




                                                 Shelita_Saint-Louis@ibc.doi.gov.



_____          _____
Acacia Center for Justice                         Date
1025 Connecticut Avenue NW
Suite 1000A
Washington, DC 20036

PI Appeal and Stay Addendum 267

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL.,<br><br>Defendants. | No. 3:25-cv-02847-AMO<br><br>**[PROPOSED] ORDER REQUIRING SECURITY UNDER FED. R. CIV. P. 65(C)**<br><br>Honorable Araceli Martínez-Olguín<br>United States District Judge |

The Court, having reviewed Defendants' request to issue preliminary injunction bond pursuant to Federal Rule Civil Procedure 65(c), hereby enters the following order:

IT IS HEREBY ORDERED that the request is GRANTED. The Court orders Plaintiffs to post security as required under Federal Rule Civil Procedure 65(c).

DATED: _____        /s/_____
                      Honorable Araceli Martínez-Olguín
                      United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, et al., | Case No. 25-cv-02847-AMO |
| Plaintiffs, | **ORDER GRANTING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | Re: Dkt. No. 7 |
| Defendants. | |

This matter comes before the Court on a Motion for a Temporary Restraining Order filed by Plaintiff nonprofit organizations that received funding from Defendants to provide legal representation and other legal services to unaccompanied children in immigration courts across the country.[1]  Plaintiffs challenge the actions of Defendants the United States Department of Health and Human Services ("HHS"), HHS's Office of Refugee Resettlement ("ORR"), and the United States Department of the Interior (collectively, "Government" or "Defendants") in the recent termination of funding for counsel representing unaccompanied children in immigration proceedings.  Having considered Plaintiffs' motion, Defendants' response, and the arguments of the Parties at the April 1, 2025 hearing, the Court hereby **GRANTS** Plaintiffs' emergency Motion for a Temporary Restraining Order, effective 8:00 a.m. on April 2, 2025.  The Court VACATES the previous briefing schedule set at the conclusion of the hearing on April 1, 2025, and it SETS a

---

[1] Plaintiffs include the following organizations: Community Legal Services in East Palo Alto, Social Justice Collaborative, Amica Center for Immigrant Rights, Estrella del Paso, Florence Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project, Immigrant Defenders Law Center, National Immigrant Justice Center, Northwest Immigrant Rights Project, Rocky Mountain Immigrant Advocacy Network, and Vermont Asylum Assistance Project (collectively, "Plaintiffs").

United States District Court
Northern District of California

preliminary injunction briefing schedule at the conclusion of this Order.  The Court enters the following findings of fact and conclusions of law supporting the maintenance of status quo ante pending further briefing from the parties.

# I.        BACKGROUND

Plaintiffs previously received funding for their work from ORR disbursed through Acacia Center for Justice.  Compl. ¶¶ 64-65; 88.  Defendants issued a letter to Acacia Center for Justice on March 21, 2025, terminating the contract line items through which HHS and ORR provided funding for counsel for unaccompanied children in immigration court.  Compl. ¶ 11; Biswas Decl., Ex. 2 (ECF 24-3, the "Cancellation Order").  The letter ordered Plaintiffs to "immediately stop all work" on their ongoing funded representations.  *Id.*  Plaintiffs share the mission of ensuring legal representation for the thousands of unaccompanied children in immigration proceedings throughout the country.  Compl. ¶ 102.  Congress has consistently appropriated funds for this purpose, including the most recent appropriation for over $5 billion to ensure "all children . . . have access to counsel in their immigration proceedings."  Compl. ¶¶ 77-87.

Plaintiffs contend that the Government's Cancellation Order violates its obligations under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), which requires that the Government "shall ensure, to the greatest extent practicable," that all unaccompanied children receive legal counsel to represent them in "legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking."  Pub. L. No. 110-457, § 235(c)(5), 122 Stat. 5044, 5079.  Plaintiffs argue that the Cancellation Order additionally violates the Government's obligations under ORR's own "Foundational Rule," which requires the Government to "fund legal service providers to provide direct immigration legal representation" to unaccompanied children if there are "available appropriations" and to ensure children receive a legal orientation, consultation with a lawyer, and ongoing access to lawyers. 45 C.F.R. § 410.1309(a) (2024).  Plaintiffs allege that Defendants' Cancellation Order conflicts with these legal requirements and thus violates the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Compl. ¶¶ 127-46.

In response to the Cancellation Order, Plaintiffs state that they are forced to choose between few harsh alternatives, including continuing to provide unfunded legal representation in the face of limited resources; cutting other vital organizational programs; laying off, furloughing, or terminating staff; or seeking to withdraw from their ongoing representation duties. *See, e.g.*, VAAP Decl. ¶ 21.

## II.     DISCUSSION

The Court has jurisdiction over Defendants and the subject matter of this action. *See* Administrative Procedure Act, 5 U.S.C. § 702.  Contrary to the Government's assertions, this is not a contract dispute in which Plaintiffs seek money damages such that their suit belongs before the Federal Court of Claims.  *Pacito v. Trump*, No. 2:25-CV-255-JNW, 2025 WL 893530, at *4-7 (W.D. Wash. Mar. 24, 2025).  A temporary restraining order against Defendants, as provided below, is necessary until the Court can consider Plaintiff States' forthcoming motion for a preliminary injunction.

### A.     Standing

PI Appeal and Stay Addendum 271

1  'arguably within' the scope of the statute." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640,

2  668 (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209,

3  225 (2012)).  In sum, Plaintiffs have standing to bring this suit.

4       **B.**     **Entitlement to Temporary Relief**

5       Federal Rule of Civil Procedure 65 authorizes a trial court to grant a temporary restraining

6  order "to preserve the status quo and the rights of the parties until a final judgment issues in the

7  cause."  *See Ramos v. Wolf*, 975 F.3d 872, 887 (9th Cir. 2020) (quoting *U.S. Philips Corp. v. KBC*

8  *Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010)).  The status quo in this context "refers not simply

9  to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which

10  preceded the pending controversy[.]' "  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210

11  (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir.

12  1963)).  "The standard for issuing a temporary restraining order is identical to the standard for

13  issuing a preliminary injunction."  *Lockheed Missile & Space Co. v. Hughes Aircraft Co.*, 887 F.

14  Supp. 1320, 1323 (N.D. Cal. 1995).

15       To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of

16  success on the merits, (2) a likelihood of irreparable harm to the moving party in the absence of

17  preliminary relief, (3) the balance of equities tips in the favor of the moving party, and (4) an

18  injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20

19  (2008).  Where the government is a party, courts merge the analysis of the final two *Winters*

20  factors, the balance of equities and the public interest.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

21  1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Courts "explore the

22  relative harms to applicant and respondent, as well as the interests of the public at large."  *Barnes*

23  *v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (internal

24  quotation marks and citation omitted).  The *Winters* factors may be evaluated on a sliding scale,

25  such that preliminary relief may be issued when the moving party demonstrates "that serious

26  questions going to the merits were raised and the balance of hardships tips sharply in the

27  plaintiff's favor."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011)

28  (citation omitted).

1    Here, the Court finds that Plaintiffs raise serious questions going to the merits.  In

2    particular, the TVPRA requires that the government "shall ensure, to the greatest extent

3    practicable," that all unaccompanied children receive legal "counsel to represent them in legal

4    proceedings" and to "protect them from mistreatment, exploitation, and trafficking."  8 U.S.C.

5    § 1232(c)(5).  The Government argues that HHS's funding decisions under the TVPRA and the

6    Foundational Rule remain discretionary and do not mandate funding of direct legal representation

7    such as that provided by Plaintiffs.  But this raises a "serious question" going to the merits –

8    whether the TVPRA requires the Government to ensure the provision of counsel for unrepresented

9    children in immigration proceedings prior to the cancellation of funding for direct legal

10   representation by organizations such as Plaintiffs.  This serious question weighs in favor of

11   reinstating the status quo ante while the record and the parties' arguments are developed further.

12   Plaintiffs have also shown that they are likely to suffer irreparable harm in the absence of

13   preliminary relief.  Defendants' termination of funding has impacted Plaintiffs, forcing them to

14   issue layoff notices and threatening to require them to dismiss their highly-specialized and

15   seasoned attorneys.  *See* ImmDef Decl. ¶¶ 20-23.  Relevant to the issue of standing raised above,

16   Defendants' termination of funding for direct legal representation directly interferes with

17   Plaintiffs' missions, impeding their ability to provide the direct legal representation of

18   unaccompanied children in immigration proceedings that is fundamental to Plaintiffs' core

19   activities.  RMIAN Decl. ¶ 22; VAAP Decl. ¶¶ 21-22; NWIRP ¶¶ 13-15.  The irreparable harm

20   resulting from Defendants' actions weighs in favor of temporary injunctive relief.

21   The Government argues that it would suffer harm in the form of being compelled to spend

22   down congressionally appropriated funds for the unaccompanied children in immigration

23   proceedings during the pendency of the preliminary injunctive relief.  Not so.  Terminating

24   funding for direct legal representation for unaccompanied children, without any plan to ensure

25   continuity in representation, potentially violates Congress's express directive in the TVRPA and

26   ORR's own commitments in the Foundational Rule.  Moreover, courts regularly find that "[t]here

27   is generally no public interest in the perpetuation of unlawful agency action."  *League of Women*

28   *Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citations omitted).  "To the

United States District Court
Northern District of California

5

contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.' " *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).  The Government fails to convince that it would suffer harm at this stage.

On the other hand, the maintenance of funding for direct legal representation services furthers the critical public interests of ensuring children have access to legal representation and protection from human trafficking.  Indeed, ORR itself recognizes "that most unaccompanied children need legal services to resolve their immigration status and that representation appears to have a significant impact on both the court appearance rate and the outcome of cases for unaccompanied children."  Foundational Rule, 89 Fed. Reg. 34384, 34529; *see also id.* at 34526 (stating ORR's goal of "100 percent legal representation of unaccompanied children.").  The Court additionally finds that the continued funding of legal representation for unaccompanied children promotes efficiency and fairness within the immigration system.  *See generally* Br. for Amicus Curiae Former Immigration Judges & Former Members of the Board of Immigration Appeals (ECF 28).  A temporary restraining order enjoining the Cancellation Order serves the public interest.

In sum, the balance of equities tips sharply toward the Plaintiffs and the public interest strongly weighs in favor of entering temporary relief.

//
//
//
//
//
//
//
//
//
//

## III.    TEMPORARY RESTRAINING ORDER

For the foregoing reasons, the Court hereby **GRANTS** Plaintiffs' motion for Temporary Restraining Order.  The Court hereby **ORDERS** that:

> Defendants are **ENJOINED** from withdrawing the services or funds provided by the Office of Refugee Resettlement ("ORR") as of March 20, 2025, under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and ORR's Foundational Rule, 45 C.F.R. § 410.1309(a)(4), particularly ORR's provision of funds for direct legal representation services to unaccompanied children.  This injunction precludes cutting off access to congressionally appropriated funding for its duration.

The Court deems no security bond is required under Rule 65(c).  This injunction shall remain in effect until Wednesday, April 16, 2025, at 7:59 a.m. PST.

The Court **SETS** the following briefing schedule for Plaintiffs' Motion for Preliminary Injunction:

- Plaintiffs' opening brief shall be filed by no later than 4:00 p.m. on Friday, April 4, 2025.  Defendants' opposition brief shall be filed by no later than 4:00 p.m. on Friday, April 11, 2025.
- Plaintiffs' reply brief shall be filed by no later than noon on Monday, April 14, 2025.

The Court will set a remote hearing on Plaintiffs' Motion for Preliminary Injunction if it deems one necessary.

**IT IS SO ORDERED.**

Dated: April 1, 2025

ARACELI MARTÍNEZ-OLGUÍN
**United States District Judge**

United States District Court
Northern District of California

1   YAAKOV M. ROTH
    Acting Assistant Attorney General
2   WILLIAM C. SILVIS
    Assistant Director
3   MICHAEL A. CELONE
4   CHRISTINA PARASCANDOLA
    KATE MASETTA ALVAREZ
5   JONATHAN K. ROSS
    Senior Litigation Counsels
6   ZACHARY A. CARDIN
7   Trial Attorney

8        U.S. Department of Justice, Civil Division
         Office of Immigration Litigation
9        General Litigation and Appeals Section
         P.O. Box 878, Ben Franklin Station
10       Washington, DC 20044
         (202) 305-2040
11       Michael.A.Celone@usdoj.gov

12

13  Attorneys for Defendants

14              UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16                SAN FRANCISCO DIVISION

17

18  PALO ALTO,                          )  Case No. 3:25-cv-02847-AMO
                                        )
19           Plaintiffs,                )  **DEFENDANTS' MOTION TO DISSOLVE**
                                        )  **TEMPORARY RESTRAINING ORDER**
20       v.                             )
                                        )  Date: May 15. 2025
21  UNITED STATES DEPARTMENT OF         )  Time: 2:00 p.m.
    HEALTH AND HUMAN SERVICES, *ET AL.*,)  Location:  Courtroom 10
22                                      )
             Defendants.                )
23                                      )
                                        )
24  _____    )

25

26

27

28

**DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISSOLVE TEMPORARY RESTRAINING ORDER**

PLEASE TAKE NOTICE that on May 15, 2025, at 2:00 p.m., or as soon thereafter as counsel may be heard, in the United States District Court for the Northern District of California, Courtroom 10, 19th Floor, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants United States Department of Health and Human Services, Office of Refugee Resettlement, and Department of the Interior will and hereby do move this Court to dissolve the Temporary Restraining Order (TRO) entered on April 1, 2025.

This motion is based upon this Notice of Motion, the accompanying memorandum of points and authorities, the pleadings and papers on file in this action, oral argument of counsel, and any other matters properly before the Court.

1    DATED: April 4, 2025                    Respectfully submitted,

2

3                                            YAAKOV M. ROTH
                                             Acting Assistant Attorney General
4

5                                            WILLIAM C. SILVIS
                                             Assistant Director
6
                                             CHRISTINA PARASCANDOLA
7

8                                            MICHAEL A. CELONE
                                             Senior Litigation Counsels
9
                                             ZACHARY A. CARDIN
10                                           Trial Attorney

11                                           /s/ Jonathan K. Ross
                                             JONATHAN K. ROSS
12                                           Senior Litigation Counsel
                                             U.S. Department of Justice, Civil Division
13                                           Office of Immigration Litigation
                                             General Litigation and Appeals Section
14                                           P.O. Box 878, Ben Franklin Station
                                             Washington, DC 20044
15                                           (202) 305-7662
                                             Jonathan.K.Ross@usdoj.gov
16
                                             Attorneys for Defendants
17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

On April 1, 2025, this Court entered a Temporary Restraining Order ("TRO"), ECF No. 33, enjoining Defendants from "withdrawing the services or funds provided by the Office of Refugee Resettlement ("ORR") as of March 20, 2025, under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and the United States Department of Health and Human Services ("HHS") Office of Refugee Resettlement's ("ORR") Unaccompanied Children Program Foundational Rule (codified at 45 C.F.R. § 410.1309(a)(4)) ("Foundational Rule") particularly ORR's provision of funds for direct legal representation services to unaccompanied children." TRO, 7. The Order also enjoins Defendants from "cutting off access to congressionally appropriated funding for its duration." *Id.*

In Defendants' opposition to Plaintiffs' motion requesting the TRO, Defendants argued that the Administrative Procedure Act ("APA") only waives sovereign immunity over actions seeking relief "other than monetary damages." 5 U.S.C. § 702; *see also N. Star Alaska v. United States*, 14 F.3d 36, 38 (9th Cir. 1994) (The APA "does not waive sovereign immunity for contract claims seeking equitable relief.") (cleaned up); *see also RAJMP, Inc. v. United States*, No. 19-CV-876 AJB (WVG), 2020 WL 905592, at *4 (S.D. Cal. Feb. 25, 2020) ("The Ninth Circuit has held several times that the APA does not waive sovereign immunity over non-monetary, contract-based claims because the Tucker Act impliedly forbids equitable relief."). TRO Opp., 16 (ECF No. 24). Specifically, Defendants argued that the APA does not provide a waiver of sovereign immunity in this case because the relief Plaintiffs seek is payment. TRO Opp., 16. Additionally, Defendants argued that Plaintiffs' claims were barred by the Tucker Act because the rights that they seek to enforce and the relief that they seek is only available to them through contract. TRO Opp., 18-20 (citing *United States Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 1:25-CV-00465, 2025 WL 763738, at *2, 7 (D.D.C. Mar. 11, 2025) (holding that claim requiring the government to keep paying, though styled as an injunction, was "founded upon a contract" and "must be heard in Claims Court.")). Despite the fact that a TRO would require Defendants to pay funds to Plaintiffs, and that their only entitlement to the funds was based on a contract, the Court ruled that "this is not a contract dispute

1   in which Plaintiffs seek money damages such that their suit belongs before the Federal Court of Claims,"

2   and granted the TRO. TRO, 3.

3          Only days after the Court issued the TRO, the Supreme Court issued a decision today that at least

4   severely undermines this Court's assertion of jurisdiction over this case—if it is not outright controlling

5   here. Specifically, the Supreme Court vacated a temporary restraining order enjoining the government

6   from terminating various education-related grants. *Dep't of Education v. California*, No. 24A910, 2025

7   WL 1008354, at *1 (U.S. Apr. 4, 2025) (Attached as "Ex. A"). Like this case, the plaintiffs there filed

8   their claims under the APA, even though they ultimately sought monetary relief under governmental

9   contracts. *Id.* The Court held that the government is "likely to succeed in showing the District Court lacked

10  jurisdiction to order the payment of money under the APA." *Id.* The Court reasoned that APA does not

11  waive sovereign immunity over cases where a statute either grants consent to suit expressly or impliedly

12  forbids the relief which is sought, such as the Tucker Act's implied preclusion of review over contract

13  claims in courts other than the Court of Federal Claims. *Id.* (citing 5 U. S. C. § 702). It further explained

14  that the APA does not waive sovereign immunity for suits involving monetary relief. *Id.* "Instead, the

15  Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "'any express or implied

16  contract with the United States.'" *Id.* (citing 28 U. S. C. § 1491(a)(1)).

17         The Supreme Court's decision confirms that Plaintiffs cannot show that they are likely to prevail

18  on the merits of their claims, and that this Court very likely lacked jurisdiction to issue a temporary

19  restraining order requiring the government to pay funds, where Plaintiffs' only entitlement to the funds

20  was through a contract. Rather, as the Court noted, Plaintiffs here must bring their claims in the Court of

21  Federal Claims. *Id.* The Supreme Court's decision is thus an intervening change in the controlling law that

22  warrants vacatur of this Court's TRO.

23                                      **ARGUMENT**

24  **A.    Legal Standard for Dissolving a Temporary Restraining Order.**

25         A party may seek dissolution of a TRO or preliminary injunction based on a material change in

26  facts or law that warrants revision or dissolution. *See Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir.

27  2019) (per curiam) (citing *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000)). The test for dissolving

28  or modifying an injunction has two parts. The moving party must show: (1) a significant change in fact

or law; and (2) that in light of the significant change, the injunction should be dissolved or modified under the legal standard that governed the issuance of the injunction in the first place. S*ee Karnoski*, 926 F.3d at 1198 & n.14; *Sharp*, 233 F.3d at 1170. A subsequent challenge to a preliminary injunction "must rest on grounds that could not have been raised before." *Alto v. Black*, 738 F.3d 1111, 1120 (9th Cir. 2013) (citation omitted). Here, *Department of Education v. California* is a significant change warranting dissolution, and it could not have been raised before because it was issued earlier today.

**B.    *Dep't of Education v. California* is a Significant Change in Law.**

"[E]vents have largely overtaken this litigation." *See Martinez v. Wilson*, 32 F.3d 1415, 1419 (9th Cir. 1994). The Supreme Court's decision in *Department of Education v. California* significantly shifted the legal landscape governing the federal government's authority to terminate funding, affirming the discretion of federal agencies to make funding determinations without judicial interference. This decision directly impacts the Court's prior issuance of the TRO in this case, as the TRO was based on a premise that the government lacked discretion to terminate funding for legal representation under the TVPRA and Foundational Rule.

The TRO enjoined Defendants from withdrawing ORR-funded legal representation services, based in part on the Court's interpretation that the TVPRA mandates ongoing funding for legal services for unaccompanied children. However, the Supreme Court's decision clarified that federal agencies retain the discretion to terminate or alter funding arrangements when they deem it necessary, particularly when appropriations are limited or policy priorities evolve. *Dep't of Education v. California*, 2025 WL 1008354, at *2 ("[T]he APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money[.]'") (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U. S. 204, 212 (2002)); *see id.* **1-2.

Additionally, the Supreme Court's ruling highlights that the Judiciary should not interfere with agency funding decisions absent clear statutory mandates. *Id.* at **1-2. The decision emphasized that

maintaining funding contrary to agency determinations improperly encroaches on executive discretion. *Id.* Therefore, the significant change in controlling law established by *Dep't of Education v. California* warrants dissolving the TRO, as the legal basis for the Court's prior order has been substantially undermined.

**C.    *Dep't of Education v. California* Warrants Dissolution of the TRO.**

When courts assess whether a change "warrants . . . dissolution of the injunction," the "inquiry should be guided by the same criteria that govern the issuance of a preliminary injunction."[1]   *Karnoski*, 926 F.3d at 1198 (quoting *Sharp*, 233 F.3d at 1170).   District courts have applied these instructions from *Karnoski* in several ways.   *See Lo v. Cnty. of Siskiyou*, 2022 WL 1505909, at *7 (E.D. Cal. May 12, 2022) (listing cases).   The *Lo* Court observed that one district court required the movant to show an injunction is unwarranted under each of the four criteria, whereas another district court concluded that the defendant may prevail by disproving any one or more of the four criteria.   *Id.* (citing *CW Baice Ltd. v. Wisdomobile Grp. Ltd.*, No. 20-03526, 2021 WL 3053147, at *4 (N.D. Cal. July 20, 2021); *Index Newspapers LLC v. City of Portland*, No. 20-1035, 2022 WL 72124, at *9 (D. Or. Jan. 7, 2022)).   Ultimately, the *Lo* Court "borrowed the terms of *Karnoski*," to conclude that a district court may be "guided by" the "traditional" standard for injunctive relief and "address" each part of that standard without applying the standard mechanically or as a checklist.   *Id.* (citing *Karnoski*, 926 F.3d at 1199, 1202) (cleaned up).   "This more flexible interpretation recognizes district courts' wide discretion to ensure their injunctions are just and to fit those injunctions to the evolving circumstances of each case."   *Id.* (quotations and internal modifications omitted); *see also id.*, at *8 ("Viewing the question in this way demonstrates why a

---

[1] Under those criteria, plaintiffs seeking preliminary injunctions must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).   But "[w]here, as here, the government opposes a preliminary injunction, the third and fourth factors merge into one inquiry." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021).

1    defendant who seeks to modify or dissolve an injunction should not be required to prove that each element

2    of the four-part test weighs in its favor.").

3          As applied here, *Dep't of Education v. California* warrants dissolution of the TRO.  *First*, Plaintiffs

4    cannot demonstrate a likelihood of success on the merits.  The Court's TRO was premised on the

5    conclusion that Plaintiffs were likely to succeed on the merits of their claims under the APA.  TRO, 3.

6    The Court's TRO rested on the presumption that Plaintiffs could enforce ORR's funding obligations

7    through the APA.  However, under the Supreme Court's recent decision in *Department of Education v.*

8    *California*, such relief is explicitly unavailable, as the APA's waiver of sovereign immunity does not

9    extend to enforcing contractual obligations or compelling the government to pay money. See 2025 WL

10   1008354, at 2. Given that the APA provided the sole jurisdictional basis for the TRO, the Supreme Court's

11   ruling eliminates Plaintiffs' likelihood of success on the merits.

12        *Second*, Plaintiffs cannot demonstrate irreparable injury because any funding-related harm can be

13   remedied through monetary relief in the appropriate forum.  As the Supreme Court emphasized in

14   *Department of Education*, where plaintiffs retain the ability to seek reimbursement of withheld funds

15   through an appropriate suit, the harm alleged is monetary and does not rise to the level of irreparable injury

16   warranting injunctive relief.  2025 WL 1008354, at 2.  Here, Plaintiffs' asserted injuries stem solely from

17   the termination of funding—an injury explicitly remediable through monetary damages in the proper

18   venue, such as a claim under the Tucker Act.  Therefore, Plaintiffs fail to meet the irreparable harm

19   threshold necessary to sustain the TRO.

20        Moreover, as the Supreme Court also observed, it is the government—not the Plaintiffs—that faces

21   irreparable injury from the disbursement of funds unlikely ever to be recovered once they are disbursed.

22   *Dep't of Education v. California,* 2025 WL 1008354, at 2.  Like the plaintiffs in *Dep't of Education v.*

23   *California*, none of the Plaintiffs here "promised to return withdrawn funds should its grant termination

DEFENDANTS' MOTION TO DISSOLVE TRO
3:25-CV-02847- AMO                              5                    PI Appeal and Stay Addendum 283

be reinstated," and this Court declined to impose bond under Rule 65(c).  *Id.*; TRO, 7.  Thus, Plaintiffs fail to satisfy the irreparable harm threshold necessary to sustain the TRO.

*Third*, the Supreme Court's decision underscores the government's significant interest in maintaining discretion over funding decisions to ensure that appropriations reflect evolving policy priorities and fiscal considerations.  *Dep't of Education v. California*, 2025 WL 1008354, at 2. Judicial interference with this discretion not only disrupts agency management of limited resources but also undermines the public interest by constraining the government's ability to effectively allocate taxpayer funds.  Given the clarity of the Supreme Court's instruction, neither the balance of equities nor the public interest favors continuation of the TRO.  On the contrary, these factors strongly support dissolving the TRO to align with current controlling authority.

Alternatively, the Court should stay the TRO to prevent the government from losing funds that this Court likely lacked jurisdiction to disburse.  *See Dep't of Education v. California*, 2025 WL 1008354, at 2. For all of the same reasons explained above, in prior briefing, and now in *Department of Education v. California*, a stay pending potential appeal is warranted here.

## CONCLUSION

The legal basis on which the TRO rested has, as the case law puts it, evaporated.  Accordingly, the Court should dissolve the TRO. Alternatively, this Court should stay the TRO pending an appeal by the government.

DATED: April 4, 2025                          Respectfully submitted,


                                             YAAKOV M. ROTH
                                             Acting Assistant Attorney General

                                             WILLIAM C. SILVIS
                                             Assistant Director

                                             CHRISTINA PARASCANDOLA
                                             KATE MASETTA ALVAREZ
                                             MICHAEL A. CELONE
                                             Senior Litigation Counsels

                                             ZACHARY A. CARDIN
                                             Trial Attorney

                                             */s/ Jonathan K. Ross*
                                             JONATHAN K. ROSS
                                             Senior Litigation Counsel
                                             U.S. Department of Justice, Civil Division
                                             Office of Immigration Litigation
                                             General Litigation and Appeals Section
                                             P.O. Box 878, Ben Franklin Station
                                             Washington, DC 20044
                                             (202) 305-7662
                                             Jonathan.K.Ross@usdoj.gov

                                             Attorneys for Defendants

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                      SAN FRANCISCO DIVISION

5

6   COMMUNITY LEGAL SERVICES IN EAST   )   Case No. 3:25-cv-02847-AMO
    PALO ALTO,                          )
7                                       )   **[PROPOSED] ORDER GRANTING**
                Plaintiffs,             )   **DEFENDANTS' MOTION TO DISSOLVE**
8                                       )   **TEMPORARY RESTRAINING ORDER**
       v.                               )
9                                       )
    UNITED STATES DEPARTMENT OF         )
10  HEALTH AND HUMAN SERVICES, *ET AL.*,)
                                        )
11              Defendants.             )
                                        )
12  _____)

13

14          Having read and considered Defendants' Motion to Dissolve the Temporary Restraining Order

15  and finding good cause therefor:

16          IT IS HEREBY ORDERED that Defendants' motion is GRANTED.  The Temporary

17  Restraining Order, ECF No. 33, is hereby DISSOLVED.

18          [Alternatively, should dissolution not be granted, the Court hereby ORDERS that the Temporary

19  Restraining Order be STAYED pending an appeal by the government.]

20

21  Dated:

22

23                                      _____
                                        Hon. Araceli Martínez-Olguín
24                                      UNITED STATES DISTRICT JUDGE

25

26

27

28

                                        1

1

2                       UNITED STATES DISTRICT COURT

3                     NORTHERN DISTRICT OF CALIFORNIA

4                         SAN FRANCISCO DIVISION

5

6    COMMUNITY LEGAL SERVICES IN EAST  )   Case No. 3:25-cv-02847-AMO
     PALO ALTO,                        )
7                                      )   **DEFENDANTS' EXHIBIT A**
               Plaintiffs,             )
8                                      )   *Dep't of Education v. California*, No. 24A910, 2025
        v.                             )   WL 1008354, at *1 (U.S. Apr. 4, 2025)
9                                      )
     UNITED STATES DEPARTMENT OF       )
10   HEALTH AND HUMAN SERVICES, *ET AL.*, )
                                       )
11             Defendants.             )
                                       )
12   _____  )

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Cite as: 604 U. S. ____ (2025)          1

Per Curiam

# SUPREME COURT OF THE UNITED STATES

————————

No. 24A910

————————

## DEPARTMENT OF EDUCATION, ET AL. *v.* CALIFORNIA, ET AL.

### ON APPLICATION TO VACATE THE ORDER ISSUED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

[April 4, 2025]

PER CURIAM.

On March 10, 2025, the United States District Court for the District of Massachusetts issued what it styled as a temporary restraining order (TRO) enjoining the Government from terminating various education-related grants. The order also requires the Government to pay out past-due grant obligations and to continue paying obligations as they accrue. The District Court's conclusion rested on a finding that respondents are likely to succeed on the merits of their claims under the Administrative Procedure Act (APA), 60 Stat. 237. On March 26, the Government filed this applica-

tended on March 24) and requested an immediate administrative stay. The application was presented to JUSTICE JACKSON and by her referred to the Court.

Although the Courts of Appeals generally lack appellate jurisdiction over appeals from TROs, several factors counsel in favor of construing the District Court's order as an appealable preliminary injunction. Among other considerations, the District Court's order carries many of the hallmarks of a preliminary injunction. See *Sampson* v. *Murray*, 415 U. S. 61, 87 (1974); *Abbott* v. *Perez*, 585 U. S. 579, 594 (2018). Moreover, the District Court's "basis for issuing the order [is] strongly challenged," as the Government is likely

2        DEPARTMENT OF EDUCATION *v.* CALIFORNIA

Per Curiam

to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA. *Sampson*, 415 U. S., at 87. The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U. S. C. §702. Nor does the waiver apply to claims seeking "money damages." *Ibid.* True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen* v. *Massachusetts*, 487 U. S. 879, 910 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 212 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U. S. C. §1491(a)(1).

As for the remaining stay factors, respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed. No grantee "promised to return withdrawn funds should its grant termination be reinstated," and the District Court declined to impose bond. App. to Application To Vacate Order 15a, 17a. By contrast, the Government compellingly argues that respondents would not suffer irreparable harm while the TRO is stayed. Respondents have represented in this litigation that they have the financial wherewithal to keep their programs running. So, if respondents ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate forum. And if respondents instead decline to keep the programs operating, then any ensuing irreparable harm would be of their own making. "Such self-imposed costs are not properly the subject of inquiry on a motion for stay." *Cuomo* v. *NRC*, 772 F. 2d 972, 977 (CADC 1985) (*per curiam*).

Cite as: 604 U. S. ____ (2025)                3

Per Curiam

We construe the application as seeking a stay pending
appeal and grant the application.  The March 10, 2025 or-
der and March 24, 2025 extension of the United States Dis-
trict Court for the District of Massachusetts, case No. 1:25–
cv–10548, is stayed pending the disposition of the appeal in
the United States Court of Appeals for the First Circuit and
disposition of a petition for a writ of certiorari, if such a writ
is timely sought.  Should certiorari be denied, this stay shall
terminate automatically.  In the event certiorari is granted,
the stay shall terminate upon the sending down of the judg-
ment of this Court.

*It is so ordered.*

KAGAN, J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

No. 24A910

———————

## DEPARTMENT OF EDUCATION, ET AL. *v.* CALIFORNIA, ET AL.

### ON APPLICATION TO VACATE THE ORDER ISSUED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

[April 4, 2025]

JUSTICE KAGAN, dissenting.

It is a mistake for the Court to grant this emergency application. Nowhere in its papers does the Government defend the legality of canceling the education grants at issue here. And contra the *per curiam*, the respondent States have consistently represented that the loss of these grants will force them—indeed, has already forced them—to curtail teacher training programs. See, *e.g.,* Brief in Opposition to Application 39–40; App. to Application To Vacate Order 7a–8a, 34a–35a. The remaining issue is whether this suit, brought under the Administrative Procedure Act (APA), belongs in an ordinary district court or the Court of Federal Claims. As the Court acknowledges, the general rule is that APA actions go to district courts, even when a remedial order "may result in the disbursement of funds." *Ante,* at 2 (citing *Bowen* v. *Massachusetts,* 487 U. S. 879, 910 (1988)). To support a different result here, the Court relies exclusively on *Great-West Life & Annuity Ins. Co.* v. *Knudson,* 534 U. S. 204 (2002). But *Great-West* was *not* brought under the APA, as the Court took care to note. See *id.,* at 212 (distinguishing *Bowen* for that reason). So the Court's reasoning is at the least under-developed, and very possibly wrong.

The risk of error increases when this Court decides

2          DEPARTMENT OF EDUCATION *v.* CALIFORNIA

KAGAN, J., dissenting

cases—as here—with barebones briefing, no argument, and scarce time for reflection.  Sometimes, the Court must act in that way despite the risk.  And there will of course be good-faith disagreements about when that is called for.  But in my view, nothing about this case demanded our immediate intervention.  Rather than make new law on our emergency docket, we should have allowed the dispute to proceed in the ordinary way.  I respectfully dissent.

Cite as: 604 U. S. ____ (2025)                    1

JACKSON, J., dissenting

# SUPREME COURT OF THE UNITED STATES

––––––––––

No. 24A910

––––––––––

## DEPARTMENT OF EDUCATION, ET AL. *v.* CALIFORNIA, ET AL.

ON APPLICATION TO VACATE THE ORDER ISSUED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

[April 4, 2025]

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins, dissenting.

This application concerns the Department of Education's decision to cancel, with no meaningful explanation, more than 100 grants the Federal Government had previously awarded to public schools and universities across the country. The District Court issued a temporary restraining order (TRO) finding that the Department's decision was likely unlawful and pausing the grant cancellations while the court considers a pending motion for a preliminary injunction. The TRO expires in three days, and it will become moot even earlier if the District Court rules on the preliminary-injunction motion this week.

With the TRO on its last legs, a majority of this Court has chosen to dive into this dispute today, allowing the Department to implement immediately its new summary grant-termination policy. It does so even though the TRO preserves the pretermination status quo and causes zero concrete harm to the Government. By contrast, reinstating the challenged grant-termination policy will inflict significant harm on grantees—a fact that the Government barely contests. Worse still, the Government does not even deign to defend the lawfulness of its actions. Instead, it asks us to superintend the lower courts' real-time decisions about ancillary

2        DEPARTMENT OF EDUCATION *v.* CALIFORNIA

JACKSON, J., dissenting

threshold and remedial questions, which we could easily
wait to address in the ordinary course.

It is beyond puzzling that a majority of Justices conceive
of the Government's application as an emergency. It is like-
wise baffling that anyone is persuaded that the equities fa-
vor the Government when the Government does not even
argue that the lower courts erred in concluding that it likely
behaved unlawfully. This application should have been de-
nied for numerous obvious and independent reasons, and
the Court does itself—and the legal process—no favors in
deciding to grant it.

I

A

To address a nationwide shortage of qualified teachers,
Congress has enacted several competitive grant programs
that facilitate the recruitment, training, and support of ed-
ucators. This application concerns the Department's recent
efforts to terminate grants that were awarded under two
such programs: the Teacher Quality Partnership (TQP) pro-
gram and the Supporting Effective Educator Development
(SEED) program.

Congress established the TQP program in 2008, author-
izing the Department to award grants to high-need educa-
tional agencies and schools for the purpose of training
teachers. 20 U. S. C. §§1021(6), 1022a(a), 1022a(c)(1),
1022h. In the statute that creates this program, Congress
made plain its intent to (1) "improve student achievement,"
 "improve the quality of . . . teachers," (3) "hold teacher
preparation programs at institutions of higher education
accountable," and (4) "recruit highly qualified individuals,
including minorities and individuals from other occupa-
tions, into the teaching force." §1022.

By statute, the Department awards each TQP grant
based on a peer-review process "for a period of five years."
§§1022b(a), (b)(3). Similarly, under the SEED program,

JACKSON, J., dissenting

Congress has mandated that the Department "shall award grants" to institutions of higher education and nonprofit entities that provide certain education-related services, including "evidence-based professional development activities" for teachers. §§6672(a)(2), (f). Congress dictated that SEED grants "shall be" awarded for up to a 3-year period, subject to a possible 2-year extension. §§6672(b)(1)–(2).

On February 5, 2025, the Acting Secretary of Education issued an internal directive requiring Department personnel to review "'issued grants'" to "'ensur[e] that Department grants do not fund discriminatory practices'" that are "'contrary to law or to the Department's policy objectives'" and that "'all grants are free from fraud, abuse, and duplication.'" App. to Application To Vacate Order 12a (App.). The directive expressly extends to "'practices . . . in the form of [diversity, equity, and inclusion ("DEI")].'" *Ibid.* (alteration in original).

Two days later, TQP and SEED grant recipients began to receive letters from the Department announcing the termination of their grant awards. The letters were identical, save for differences in the addressees, grant-award numbers, and termination dates. Each letter included a single paragraph regarding the Department's justification for the grant termination, which stated, in full, as follows:

> "'The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The

JACKSON, J., dissenting

grant is therefore inconsistent with, and no longer ef-
fectuates, Department priorities. See 2 C.F.R.
§200.340(a)(4); see also 34 C.F.R. §75.253. Therefore,
pursuant to, among other authorities, 2 C.F.R.
§200.339–43, 34 C.F.R. §75.253, and the termination
provisions in your grant award, the Department hereby
terminates grant No. [grant award number] in its en-
tirety effective [date of letter].'"  Complaint in No. 25–
cv–10548 (D Mass.), ECF Doc. 1, p. 35 (alterations in
original).

Most grantees also received revised grant-award notifica-
tion letters stating solely that their grants had been
"deemed to be inconsistent with, and no longer effectuat[e],
Department priorities. See 2 C.F.R. 200.340(a)(4); see also
34 C.F.R. 75.253." *Id.*, at 36–37.

### B

On March 6, 2025, eight States sued the Department in
the District of Massachusetts, claiming that this mass,
summary termination of TQP and SEED grants was arbi-
trary and capricious, and not in accordance with law, in vi-
olation of the Administrative Procedure Act (APA).
5 U. S. C. §706(2)(A).  The Plaintiff States alleged that, as
a result of the grant terminations, their public universities,
schools, and other institutions "now face abrupt shortfalls
to their current year budgets collectively exceeding ten mil-
lion dollars."  ECF Doc. 1, at 41.  As relevant, the Plaintiff
States sought declaratory and injunctive relief to set aside
the termination of the previously awarded grants.  They
also sought a TRO to immediately block termination of the
grants.

After holding a 2-hour hearing, the District Court issued
a TRO on March 10.  The order "restore[d] Plaintiff States
to the pre-existing status quo prior to the termination un-
der all previously awarded TQP or SEED grants for recipi-

JACKSON, J., dissenting

ents in Plaintiff States," and "temporarily enjoined" the De-
partment from terminating any previously awarded or in-
dividual TQP or SEED grants for recipients in Plaintiff
States. ___ F. Supp. 3d ___, ___–___ (Mass. 2025), App. 9a–
10a. The order also contained an exception permitting the
Department to make individual grant terminations con-
sistent with applicable law and regulations.

By its terms, the TRO was "effective immediately" and
would "remain in effect for 14 days," until March 24. *Id*., at
10a. The District Court then separately construed the
Plaintiff States' TRO motion as a motion for a preliminary
injunction and set that motion for a hearing on March 28.
The District Court subsequently extended the TRO for an
additional 14 days, until April 7, while also expressing its
"intent that the TRO be temporary and short." ECF Doc.
79.

Seeking to enforce its termination decisions during the
period in which the TRO remained in effect, the Govern-
ment requested a stay pending appeal. The District Court
denied the request, as did a unanimous panel of the First
Circuit. The First Circuit panel assumed without deciding
that it had jurisdiction to review the TRO and made several
determinations, including: that the States were likely to
succeed on the merits of their claim that the Department's
termination of the grants was arbitrary and capricious; that
the Government's assertions of irreparable harm consisted
of "speculation and hyperbole"; and that the equitable stay
factors cut against the Government. ___ F. 4th ___, ___–___
(2025), App. 24a–35a. The Government then turned to us
for an emergency stay.

## II

First and foremost, the Government's application should
have been swiftly denied because this Court lacks jurisdic-
tion over this interlocutory order. It is clear beyond cavil
that, ordinarily, "orders granting . . . temporary restraining

6          DEPARTMENT OF EDUCATION v. CALIFORNIA

JACKSON, J., dissenting

orders are not appealable."  16 C. Wright, A. Miller, & E.
Cooper, Federal Practice and Procedure §3922.1 (3d ed.
2012).  This Court has recognized an exception for TROs
and other interlocutory orders that are "potentially unlim-
ited" in duration, *Sampson* v. *Murray*, 415 U. S. 61, 87
(1974), and risk imposing a "'serious, perhaps irreparable,
consequence,'" *Carson* v. *American Brands, Inc.*, 450 U. S.
79, 84 (1981).  But this time-limited TRO presents no such
threat.

   To start, the District Court has merely ordered restora-
tion of the "pre-existing status quo prior to the termination"
of the grants in the Plaintiff States.  App. 9a.  Its order
comes in the form of an injunction only insofar as it has pro-
hibited the Government from implementing the abruptly
announced terminations—the District Court has *not* or-
dered that the Government do anything other than what
was required by law before the termination letters issued.

   Notably, the TRO also includes an exception that permits
the Government to make individual grant terminations
while the order is in effect "to the extent the final agency
action is consistent with Congressional authorization and
appropriations, relevant federal statute[s], including the
requirements of the APA, the requirements of the relevant
implementing regulations, [and] the grant terms and con-
ditions."  *Id.*, at 10a.  Thus, the Government is only pre-
cluded from implementing what the Plaintiff States chal-
lenge as a "mass termination" of previously issued grants;
the Government can still proceed with reasoned, individu-
alized grant terminations under its usual review process.[1]

————————

   The Department now rejects the "mass termination" characterization
on the grounds that it allowed 5 TQP and SEED grants (out of 109) to
remain in place.  App. 14a.  But Department employees previously in-
formed grantees that "*[a]ll* the grants have been terminated."  ECF Doc.
8–13, pp. 6, 60 (emphasis added).  These inconsistent statements under-
score the need for additional factual development below before this Court
gets involved.

JACKSON, J., dissenting

This TRO is also expressly time limited and is set to expire just three days from now. All agree that the order falls squarely within the time limitations prescribed by the Federal Rule of Civil Procedure governing TROs. See Fed. Rule Civ. Proc. 65(b)(2) (providing that a TRO is "not to exceed 14 days" unless "the court, for good cause, extends it for a like period"). That is true even though the District Court has granted a one-time extension of the TRO while it considers and rules upon the Plaintiff States' motion for a preliminary injunction. See *ibid.* The Government provides no reason to believe that the District Court intends to extend the order again. Quite to the contrary, the fact that the District Court construed the Plaintiff States' TRO motion as a motion for a preliminary injunction, and has already held a hearing, indicates that the court is moving with dispatch and is in no way attempting to shield its interim order from appellate review.

This TRO thus falls squarely within the "general congres-

### III

Even assuming that the TRO is reviewable on appeal, the Government's application does not demonstrate the sort of exigency that warrants emergency relief—what I have elsewhere called a "line-jumping justification," *Labrador* v. *Poe*, 601 U. S. ___, ___ (2024) (opinion dissenting from grant of stay) (slip op., at 1). As explained above, TQP and SEED are statutorily authorized grant programs that have been implemented by the Department for more than a decade—since 2008 and 2015, respectively. What is new here is the Department's insistence that it need not go through the notice and review procedures the agency has traditionally used to terminate grants it has awarded. Instead, the Department now seeks to terminate the pending grants en masse, through the use of boilerplate language that is not

JACKSON, J., dissenting

particularized to any grant recipient.

The Government has not provided any persuasive reason for why it urgently needs to be relieved of the lower court's requirement that it wait 14 days (and now 28) to execute its preferred grant-termination policy. Even if the Government is right about the merits of the arguments it raises in this application (which is doubtful), there is no reason why the Government cannot proceed through the usual litigation and appeals process to receive its vindication, as other litigants must. To reiterate, the TRO expires in three days, and the District Court held a hearing on the Plaintiff States' preliminary-injunction motion a week ago. The only hint of urgency that the Government offers to justify its unusual request for our intervention is that, during the waning days of the TRO period, some grant recipients might seek to draw down grant funds that the Government wants to terminate.

If true, that would be unfortunate, but worse things have happened. And that possibility does not come anywhere close to explaining why *this* Court must take the "'extraordinary'" step of intervening *now*. *Williams* v. *Zbaraz*, 442 U. S. 1309, 1311 (1979) (Stevens, J., in chambers); cf. *Nken* v. *Holder*, 556 U. S. 418, 433 (2009) ("'A stay is not a matter of right, even if irreparable injury might otherwise result'"). In my view, the patent lack of exigency alone warrants denying the Government's bid for emergency relief. See *Labrador*, 601 U. S., at ___ (JACKSON, J., dissenting from grant of stay) (slip op., at 1). But, wait, there's more.

The Government's assertions of harm are speculative, at best, and appear to be far from irreparable. Importantly, there is no evidence that grantees have rushed to draw down the remaining $65 million in grant funds since the District Court entered the TRO 25 days ago. If the past is the best predictor of the future, then there is no factual basis for concluding that any terminated-recipient grant runs are likely to occur in the three days remaining in the TRO.

JACKSON, J., dissenting

The Government's speculation is also contrary to the way that the TQP and SEED programs operate. As the Plaintiff States explain, TQP and SEED grantees typically "receive funds spread over the multi-year period of their grants" and "generally submit periodic draw-down requests for expenses they have already incurred." Brief in Opposition to Application 7. Grant recipients are also closely supervised with respect to such withdrawals: "The Department is authorized to monitor draw-down activity for all grants," and certain recipients are even "subject to an annual audit." *Id.*, at 8–9.

Finally, even if the feared flood of recipient withdrawals occurs, the Government has various legal mechanisms to recoup these kinds of funds. See, *e.g.*, 20 U. S. C. §§1234a, 1234b; 2 CFR §200.346 (2024); see also J. Shaffer & D. Ramish, Federal Grant Practice §36:29 (2024 ed.) ("In the end, the Government usually gets its money"). It is likely that, given the Department's new policy position with respect to terminations, it will be extra vigilant about recording any withdrawals made while the TRO is in effect, so that the money can be clawed back if appropriate. Thus, the alleged funding drain at which the Government gestures does not even appear to be irreparable. The Government has certainly not met its burden to show otherwise. See *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*) (stay applicants bear the burden to show, among other things, "a likelihood [of] irreparable harm").

The Court nonetheless swoops in to stay a TRO that will be mooted imminently by either the District Court's ruling on the preliminary-injunction motion or the natural expiration of the TRO period. Instead of playing remedy police in this nascent case, I would permit the litigation to proceed in the lower courts as usual, as we would expect in any other case in which the Government was not the applicant.

JACKSON, J., dissenting

### IV

To review, the Court has now granted the Government's request for "emergency" relief, staying a TRO that will expire in just three days in a case where appellate jurisdiction is wanting and the Government's assertions of harm are illusory.  One might reasonably assume that, for the Supreme Court of the United States to step in and grant relief in this posture, the applicant would have at least presented a rock-solid argument in support of its underlying merits position.  Thus, here, one would expect the Government to vigorously maintain that the Department was legally entitled to all but eliminate two grant programs that Congress established a decade ago.  But in this Court, the Government offers *no defense* against the Plaintiff States' claim that the Department's erasure of the grants at issue was arbitrary and capricious. Instead, the Government raises several threshold and remedial questions about the scope of the District Court's power to review the Government's allegedly unlawful conduct.[2]

The Government's request for emergency relief from this Court—without presenting any defense as to the merits of the Plaintiff States' arbitrary-and-capricious challenge—is striking.  And the Court now blesses this strategic decision to sidestep the underlying merits by reinstating grant terminations that both lower courts have said are likely unlawful.  This seems like a development in our practices related to emergency applications that, at a minimum, requires further exploration.  If the emergency docket has now become a vehicle for certain defendants to obtain this

_____

[2]To be specific, the Government argues that the lawfulness of the terminations is irrelevant for present purposes because (1) the Court of Fed eral Claims, not the District Court, has original jurisdiction over this dispute; (2) the Department's grant-termination decisions are "committed to agency discretion by law" and thus not reviewable under the APA, 5 U. S. C. §701(a)(2); and (3) the TRO at issue is too broad.

Cite as: 604 U. S. ____ (2025)          11

Court's real-time opinion about lower court rulings on various auxiliary matters, we should announce that new policy and be prepared to shift how we think about, and address, these kinds of applications.

I, for one, think it would be a grave mistake to permit parties seeking equitable emergency relief not only to make an inadequate showing of interim harm but also to seek relief on the basis of their concerns about issues that can be addressed later, in the ordinary course. In an appeals system that is supposed to provide prompt resolution of all legal challenges, this new avenue for piecemeal interlocutory review enables strategic delay and facilitates obfuscation of the weaknesses of the defendant's merits positions.

A

Take this case, for example. In my preliminary evaluation, the lower courts' early assessment that the Department's mass grant terminations were probably unlawful is not unreasonable, for the reasons I explain in this section. If the lower courts were left alone, they would be able to provide prompt rulings on the core legal question that we could then review, together with the Department's other arguments, in the ordinary course.

The APA requires, among other things, that an agency must not act arbitrarily or capriciously, and that it must explain its actions. See, *e.g.*, *FCC* v. *Prometheus Radio Project*, 592 U. S. 414, 423 (2021) ("The APA's arbitrary-and-capricious standard requires that agency action be reason-

JACKSON, J., dissenting

ment's decisionmaking with respect to any individual ter-
mination decision. It also appears that the grant recipients
did not receive any pretermination notice or any oppor-
tunity to be heard, much less a chance to cure, which the
regulations seem to require. See, *e.g.*, 2 CFR §§200.339,
200.208(c) (permitting grant termination only after an
agency "determines that noncompliance cannot be reme-
died by imposing additional conditions," such as by
"[r]equiring additional project monitoring," by requiring
that the recipient obtain technical or management assis-
tance, or by "[e]stablishing additional prior approvals").

The Department's robotic rollout of its new mass grant-
termination policy means that grant recipients and review-
ing courts are "compelled to guess at the theory underlying
the agency's action." *SEC* v. *Chenery Corp.*, 332 U. S. 194,
196–197 (1947). Moreover, the agency's abruptness leaves
one wondering whether any reasoned decisionmaking has
occurred with respect to these terminations at all.[3] These
are precisely the kinds of concerns that the APA's bar on
arbitrary-and-capricious agency decisionmaking was
meant to address. See *Prometheus Radio Project*, 592 U. S.,
at 423 (explaining that the APA requires a reviewing court
to ensure that "the agency . . . has reasonably considered
the relevant issues and reasonably explained the decision").

It also seems clear that at least one of the items included
on the Department's undifferentiated laundry list of possi-
ble reasons for terminating these grants—that the entity
may have participated in unspecified DEI practices—would

--------

[3]The Government suggested before the First Circuit that its retention
of 5 of the 109 previously awarded grants proves that it engaged in rea-
soned decisionmaking. But the Government has not yet supplied an ad-
ministrative record to facilitate judicial review. App. 30a; accord, ECF
Doc. 69, p. 13. Without documentation of the Department's reasoning,
its failure to terminate every single grant could just as easily reflect ne
glect or even additional arbitrariness. Cf. ECF Doc. 76, p. 7, n. 1 (noting
that one remaining grant "proposed to 'focus on culturally responsive
practices'").

JACKSON, J., dissenting

not suffice as a basis for termination under the law as it currently exists. That is because termination is only permissible for recipient conduct that is inconsistent with the terms of the grants and the statutes that authorize them. But the TQP and SEED statutes *expressly contemplate* that grant recipients will train educators on teaching "diverse populations" in "traditionally underserved" schools, and on improving students' "social, emotional, and physical development." 20 U. S. C. §§1022e(b)(4), 6672(a)(1), 1022a(d)(1)(ii).[4] It would be manifestly arbitrary and capricious for the Department to terminate grants for funding diversity-related programs that the law expressly requires. Cf. *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983) (explaining that an agency acts arbitrarily and capriciously if it relies "on factors which Congress has not intended it to consider").

B

It is thus small wonder that the Government has chosen not to press its merits arguments in this emergency application. See n. 2, *supra*. What better way to avoid prompt consideration of the Plaintiff States' serious claims about the unlawful arbitrariness of the Government's conduct than to demand that jurists turn away from those core questions and entertain a host of side issues about the power of the District Court on an "emergency" basis?

───────────
[4]See also, *e.g.*, §1022a(d)(5) (encouraging TQP grantees to "recrui[t] into the teaching profession . . . individuals from under[-]represented populations," "former military personnel," and "individuals to teach in rural communities"); §1022a(e)(2)(A)(vi) (permitting TQP teacher-residency programs to consider choosing "applicants who reflect the communities in which they will teach as well as consideration of individuals from underrepresented populations"); §6672(b)(3) (requiring the Department to ensure that SEED grants are, to the extent practicable, "distributed among eligible entities that will serve geographically diverse areas, including urban, suburban, and rural areas").

JACKSON, J., dissenting

Courts that are properly mulling interim injunctive relief (to prevent imminent harms and thereby facilitate fair adjudication of potentially meritorious claims) should be wary of allowing defendants with weak underlying arguments to divert all attention to ancillary threshold and remedial questions. Children, pets, and magicians might find pleasure in the clever use of such shiny-object tactics. But a court of law should not be so easily distracted.

Yet, here we are. Instead of leaving the lower court judges alone to do the important work of efficiently adjudicating all of the parties' legal claims, the Supreme Court has decided to enter the fray. We have intervened to stay an almost-expired TRO that is plainly preventing the Plaintiff States from suffering imminent harm—*not* because the harms will not occur (no one seriously disputes this), and *not* because the Government has shown that any harm will actually befall it if the TRO remains in place for another three days, but because the Government has technical questions about which court is the proper forum to hear this case and what relief that court can order. Albeit interesting, and perhaps even ultimately dispositive, surely those nonurgent issues can get sorted out in the ordinary course as part of the lower court's expedited consideration of the legal claims both sides have made. There is no reason they have to be addressed by *this* Court at *this* moment. And it is truly bizarre that a Court that purports to be "a court of review, not of first view," *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005), has seen fit to rouse itself to respond to the Government's queries by addressing these tangential legal issues and disturbing a well-justified, harm-based TRO in the process.[5]

_____

[5] Indeed, other than paving the way for the Plaintiff States' immediate suffering, it appears that the primary effect of today's emergency stay is to hand the Government an early "win"—a notch in its belt at the start of a legal battle in which the long-term prospects for its eventual success

JACKSON, J., dissenting

## V

Finally, even if this were a "close cas[e]," *Hollingsworth*, 558 U. S., at 190, the balance of the equities clearly counsel against staying the TRO and reinstating the grant terminations. On one side of the balance, the Government's assertions of harm if the TRO remains in place amount to "speculation and hyperbole," as the First Circuit put it. App. 33a. On the other, there is ample evidence that the loss of grants during the remaining days of the TRO period will inflict significant harm on the Plaintiff States and their instrumentalities.[6]

Those harms are concrete. In Massachusetts, Boston Public Schools has already had to fire multiple full-time employees due to this loss of grant funding. ECF Doc. 8–2, pp. 11–12. In New Jersey, the College of New Jersey has canceled the remainder of its teacher-residency program for the same reason. ECF Doc. 8–9, pp. 8–9. In Illinois, Chi-

───────────

seem doubtful. And I don't blame the Government for trying. If you're likely to lose on the merits, why not use the Court's procedures to fight on new and creative fronts? The Government has now gotten this Court to nullify clearly warranted interim injunctive relief, deflecting attention away from the Government's own highly questionable behavior, all without any showing of urgency or need. I worry that permitting the emergency docket to be hijacked in this way, by parties with tangential legal questions unrelated to imminent harm, damages our institutional credibility.

[6]The majority asserts that the Plaintiff States' harms may not be irreparable because they "have represented in this litigation that they have the financial wherewithal to keep their programs running." *Ante*, at 2. At most, the Plaintiff States represented below that the Department's decision to terminate grants would require their institutions to either "expend public funds . . . or suffer the obvious public harms resulting from a scarcity of qualified teachers." Appellees' Opposition to Appellants' Motion for Stay in No. 25-1244 (CA1), p. 22. In any event, the majority ignores the District Court's finding that the abrupt grant terminations have caused the Plaintiff States numerous harms that money cannot remedy. App. 8a.

16      DEPARTMENT OF EDUCATION *v.* CALIFORNIA

JACKSON, J., dissenting

cago Public Schools—which already faces a multimillion-dollar budget deficit—may have to shut down its successful teacher-pipeline program.  ECF Doc. 8–13, p. 7.  In California, California State University has ended support for 26 students currently enrolled in its teacher-residency program and has eliminated financial assistance for about 50 incoming students.  ECF Doc. 8–3, p. 7.

On the current record, I perceive no clear error in the Dis-

ens of programs upon which public schools, public universities, students, teachers, and faculty rely will be gutted." App. 9a.  The harms that will result from permitting the Department to reinstate these terminations are directly contrary to Congress's goals in enacting the TQP and SEED programs and in entrusting the Department with their implementation.  It boggles the mind to equate the devastation wrought from such abrupt funding withdrawals with the mere risk that some grantees might seek to draw down previously promised funds that the Department wants to yank away from them.

*      *      *

This Court's eagerness to insert itself into this early stage of ongoing litigation over the lawfulness of the Department's actions—even when doing so facilitates the infliction of significant harms on the Plaintiff States, and even though the Government has not bothered to press any argument that the Department's harm-causing conduct is lawful—is equal parts unprincipled and unfortunate.  It is also entirely unwarranted.  We do not ordinarily exercise jurisdiction over TROs, and this one is no different.  The Government has not articulated any concrete harm it will suffer if the grant terminations are not implemented in the next three days.  And this Court will have every opportunity to address all of the legal issues the Government has hastily

JACKSON, J., dissenting

shoved up the chain of review, and more, in due course.  Because we could have and should have easily denied this application, I respectfully dissent.[7]

_____

[7]Apparently not content to insert itself into this action for no reason, the majority goes further, seizing on this opportunity.  Without oral argument and with less than one week's worth of deliberation, the Court now has determined that, at least in this context, restoring the grants at issue might qualify as an order to "'enforce a contractual obligation to pay money'" such that it is the Court of Federal Claims, rather than the District Court, that has jurisdiction over the Plaintiff States' challenge. *Ante*, at 2 (quoting *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 212 (2002)).  Even assuming that *Great-West* has any bearing on this issue, the majority's characterization of the relief granted by the District Court is dubious given what the Plaintiff States actually say in their complaint about the legal problem and the relief they are requesting. *See* ECF Doc. 1, pp. 46–47, 51–52; see also *Bowen* v. *Massachusetts*, 487 U. S. 879, 893 (1988) ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages'").  And the majority does not dispute the "basic reality" that some APA challenges to grant-related administrative action may proceed in district court, even if they have as their "natural consequence . . . the release of funds to the plaintiff down the road." *Department of State* v. *AIDS Vaccine Advocacy Coalition*, 604 U. S. ___, ___ (2025) (ALITO, J., dissenting from denial of application) (slip op., at 6).

In any event, the District Court in this case is now hard at work evaluating this and other arguments in the context of the pending preliminary-injunction motion.  The majority's attempt to inject itself into the ongoing litigation by suggesting new, substantive principles for the District Court to consider in this case is unorthodox and, in my view, inappropriate.

1   YAAKOV M. ROTH
    Acting Assistant Attorney General
2   WILLIAM C. SILVIS
    Assistant Director
3   MICHAEL A. CELONE
4   CHRISTINA PARASCANDOLA
    KATELYN MASETTA-ALVAREZ
5   JONATHAN K. ROSS
    Senior Litigation Counsels
6   ZACHARY A. CARDIN
7   Trial Attorney

8       U.S. Department of Justice, Civil Division
        Office of Immigration Litigation
9       General Litigation and Appeals Section
        P.O. Box 878, Ben Franklin Station
10      Washington, DC 20044
        (202) 514-0120
11      Katelyn.Masetta.Alvarez@usdoj.gov

12

13  Attorneys for Defendants

14              UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16              SAN FRANCISCO DIVISION

17
    COMMUNITY LEGAL SERVICES IN EAST    )   Case No. 3:25-cv-02847-AMO
18  PALO ALTO                           )
                                        )   **DEFENDANTS' MOTION FOR RECUSAL OF A**
19          Plaintiffs,                 )   **DISTRICT JUDGE  PURSUANT TO 28 U.S.C.**
                                        )   **§ 455 AND REASSIGNMENT**
20      v.                              )
                                        )   Hearing Date: May 15. 2025
21  UNITED STATES DEPARTMENT OF         )   Time: 2:00 p.m.
    HEALTH AND HUMAN SERVICES, *ET AL.*,)   Location:  Courtroom 10
22                                      )
                                        )
23          Defendants.                 )
                                        )
24  _____   )

25

26

27

28

**DEFENDANTS' NOTICE OF MOTION AND MOTION**

**FOR RECUSAL OF A DISTRICT COURT JUDGE PURSUANT TO 28 U.S.C. § 455 AND**

**REASSIGNMENT**

PLEASE TAKE NOTICE that on May 15, 2025, at 2:00 p.m., or as soon thereafter as counsel may be heard, in the United States District Court for the Northern District of California, Courtroom 10, 19th Floor, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants United States Department of Health and Human Services, Office of Refugee Resettlement, and Department of the Interior will and hereby do move for the recusal of Honorable Araceli Martínez-Olguín and for reassignment.

This motion is based upon this Notice of Motion, the accompanying memorandum of points and authorities, the pleadings and papers on file in this action, oral argument of counsel, and any other matters properly before the Court.

The basis for this motion is that there is an appearance of bias toward Plaintiffs in this case because Judge Martínez-Olguín previously worked as a managing attorney at Community Legal Services in East Palo Alto (CLSEPA)—the lead Plaintiff in this case. As explained more fully in the accompanying memorandum, a reasonable person would likely question Judge Martínez-Olguín's impartiality, and accordingly, recusal is required under 28 U.S.C. § 455(a). In addition, due to Judge Martínez-Olguín's experience as a managing attorney at CLSEPA, she likely has personal knowledge of the irreparable harm that CLSEPA is alleging, which is a disputed fact in this proceeding. Thus, recusal is also required under 28 U.S.C. § 455(b)(1).

DATED: April 9, 2025                         Respectfully submitted,


                                             YAAKOV M. ROTH
                                             Acting Assistant Attorney General

                                             WILLIAM C. SILVIS
                                             Assistant Director

                                             CHRISTINA PARASCANDOLA
                                             JONATHAN K. ROSS
                                             MICHAEL A. CELONE
                                             Senior Litigation Counsel

                                             ZACHARY A. CARDIN
                                             Trial Attorney

                                             /s/ Katelyn Masetta-Alvarez

**INTRODUCTION**

Fair proceedings free from impartiality are critical to the integrity and legitimacy of the judiciary and to halt the inappropriate infringements into President Trump's exercises of Executive Power. In this involving President Trump's determinations on the appropriate expenditure of resources related to various immigration-related priorities.

Although recusal under 28 U.S.C. § 455 is normally undertaken by a judge sua sponte, counsel may bring the issue to a Judge's attention by formal motion or raise it informally.[1] Local Civil Rule 3 – 14 Commentary. Recusal is required in this case for at least three reasons. First, Judge Martínez-Olguín was previously employed as a managing attorney by the lead Plaintiff in this case, Community Legal Services in East Palo Alto (CLSEPA), so a reasonable person would likely question her impartiality. 28 U.S.C. § 455(a). Second, Judge Martínez-Olguín has made various statements critical of President Trump's immigration agenda, further underscoring the appearance of partiality in this case. And third, given Judge Martínez-Olguín's likely knowledge about CLSEPA's budget and organization, she presumably has personal knowledge regarding the irreparable harm that CLSEPA alleges it will suffer absent federal funding, an issue that is contested in this case. Because she likely has personal knowledge about a disputed fact, 28 U.S.C. § 455(b)(1) mandates recusal.

Defendants therefore respectfully request that Judge Martínez-Olguín recuse herself from presiding over this case, vacate the injunctive relief entered, and reassign the case to a different judge whose impartiality would not be questioned.

**STATEMENT OF RELEVANT FACTS**

From 2017 to 2018, Judge Martínez-Olguín was an attorney at CLSEPA. *See* Araceli Martínez-Olguín, Questionnaire for Judicial Nominees, at 2,

---

[1] Additionally, under California Rule of Professional Conduct 8.4(f), a lawyer engages in "professional misconduct" if she "knowingly assist[s], solicit[s], or induce[s] a judge or judicial officer in conduct that is a violation of an applicable code of judicial ethics or code of judicial conduct, or other law." Cal. Rules of Prof'l Conduct R. 8.4(f). Because no disclosures about possible conflicts of interest were made at the start of litigation, counsel for Defendants bring these issues to the Court's attention now.

https://www.judiciary.senate.gov/imo/media/doc/Martínez-Olguín%20SJQ%20Public%20Final.pdf (last accessed Apr. 8, 2025). Specifically, in 2017, she was employed as a Senior Immigrants' Rights Attorney and, in 2018, she was the "Managing Attorney" of CLSEPA's Immigrant Rights' Project. *Id.* In 2018, Judge Martínez-Olguín began her career at the National Immigration Law Center, where she was a staff attorney from 2018 to 2020 and then a Supervising Attorney from 2020 until her nomination to the federal judiciary. *Id.* Notably, during her time at National Immigration Law Center, Judge Martínez-Olguín represented a class of individuals who were eligible for Deferred Action for Childhood Arrivals (DACA). *Id.* at 31. One of her co-counsel for that case was Karen C. Tumlin. *Id.* In February 2023, Judge Martínez-Olguín was confirmed as Judge for the Northern District of California.

On March 26, 2025, Plaintiff CLSEPA and other similar organizations filed this lawsuit challenging the government's decision to withhold funding for direct legal services for unaccompanied alien children. *See* ECF No. 1. Plaintiffs are represented by Judge Martinez-Olguin's former employer, National Immigration Law Center, and Karen Tumlin, among others. The following day, Plaintiffs moved for a Temporary Restraining Order (TRO). ECF No. 7. The Court ordered the government to file a response to the TRO motion by noon on March 31, 2025. ECF No. 17. The government filed its opposition accordingly. ECF No. 24. The next day, hours after a hearing on the TRO motion, the Court granted Plaintiffs' TRO Motion. ECF No. 33.

## LEGAL STANDARD

Recusal is mandatory where a judge's "impartiality might reasonably be questioned." 28 U.S.C. § 455(a) (explaining that a federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned"). Recusal under this subsection is appropriate where a "reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be in question." *Yagman v. Republic Ins.*, 987 F.2d 622, 626 (9th Cir. 1993). That standard is an objective one; the "reasonable person" for this inquiry is not "someone who is 'hypersensitive or unduly suspicious,' but rather is a 'well-informed, thoughtful observer.'" *United States v. Holland,* 519 F.3d 909, 913 (9th Cir. 2008) (citations omitted). Whether a reasonable person would question a judge's impartiality is not based on one single factor, but on the "totality of the circumstances." *See Yagman*, 987 F.2d at 626 (impartiality might be reasonably questioned considering "all the facts."); *see also Doe*

1  *v. Cabrera*, 134 F. Supp. 3d 439, 450 (D.D.C. 2015) (looking to the "totality of the circumstances" to
2  determine whether a reasonable person would question the judge's impartiality).

3        The touchstone for recusal under Section 455(a) is "not the reality of bias or prejudice but its
4  appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994). "The very purpose of § 455(a) is to
5  promote confidence in the judiciary by avoiding even the appearance of impropriety whenever
6  possible." *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003) (quoting *Liljeberg v. Health*
7  *Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988)). Thus, "any doubts must be resolved in favor of
8  recusal." *Id.*; *see also Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988) ("It has been
9  stated on numerous occasions that when a judge harbors any doubts concerning whether his
10  disqualification is required he should resolve the doubt in favor of disqualification.").

11        A judge also "shall" recuse where she has "personal knowledge of disputed evidentiary facts
12  concerning the proceeding" or "has a personal bias or prejudice concerning a party." 28 U.S.C.
13  § 455(b)(1). Unlike 455(a), if one of the provisions of section 455(b) applies, then disqualification is
14  mandatory regardless of whether a reasonable person would question the judge's impartiality. *Liljeberg*,
15  486 U.S. at 859 n. 8. Section 455(b) applies a subjective standard for the judge to determine whether he
16  or she can be truly impartial when trying the case. If the judge believes there is a risk of prejudice, it is
17  "incumbent on him to recuse himself from the case as failure to do so would amount to an abdication of
18  duty" and would be "in clear derogation of the solemn promise he made when he took his oath of
19  office." *United States v. Holland*, 519 F.3d 909, 915 (9th Cir. 2008).

20                                         **DISCUSSION**

21        There is little doubt that a reasonable person would question Judge Martínez-Olguín's
22  impartiality in this case. CLSEPA is the lead Plaintiff in the case, yet Judge Martínez-Olguín served as
23  CLSEPA's managing attorney within Plaintiff's organizations from 2017-2018. In this role, Judge
24  Martínez-Olguín established and ran the Immigration Rights project where she "identified issues for
25  local or state policy advocacy and impact litigation, engaged in community education, and provided
26  advice and counsel to community groups." Araceli Martínez-Olguín, <u>Questionnaire for Judicial</u>
27  <u>Nominees</u>, at 24, https://www.judiciary.senate.gov/imo/media/doc/Martínez-

28

1  Olguín was part of CLSEPA's management team, where she set and implemented policies and practices.

2  *Id.* at 48.

3  The conflicts created by Judge Martínez-Olguín's affiliation with the lead Plaintiff is

4  unavoidable. Judge Martínez-Olguín held senior roles for at least one of the litigating parties; her

5  connection to the Plaintiffs is too substantial for a reasonable person to ignore or minimize the risk of

6  impropriety. Further underscoring the close entwinement between CLSEPA and Judge Martínez-Olguín,

7  upon her elevation to the bench in 2023, CLSEPA posted a public Facebook post celebrating that

8  "former CLSEPA attorney Araceli Martínez-Olguín ha[d] been confirmed as a U.S. district judge."

9  Community Legal Services in East Palo Alto, Facebook (Mar. 6, 2023), https://tinyurl.com/58nhrsna.

10  Indeed, at least one media outlet has noted the previous employment relationship between Judge

11  Martínez-Olguín and CLSEPA and has suggested that her recusal may be necessary. *See* Chuck Ross,

12  <u>Federal Judge Orders Trump Admin To Resume Funding Left-Wing Immigration Groups—Including</u>

13  _____                                        _____

14  administration/federal-judge-orders-trump-admin-to-resume-funding-left-wing-immigration-groups-

15  including-her-former-employer ("Martínez-Olguín's work for one of the plaintiffs in the litigation could

16  lead to calls for her recusal from the case."). Recusal is thus warranted because the public would

17  reasonably question her ability to be impartial. The responsibility of the Court is not only to be fair and

18  impartial but to appear fair and impartial to the public.

19  Beyond her affiliation with CLSEPA, Judge Martínez-Olguín has not kept her disdain for

20  President Trump quiet. Instead, she has voiced her political views both inside and outside the courtroom.

21  In various past statements made in her capacity as an immigrant-rights advocate, Judge Martínez-Olguín

22  described President Trump's immigration policies implicating minor aliens as "unlawful and cruel,"

23  National Immigration Law Center, Facebook (Nov. 12, 2019), https://tinyurl.com/5c8jjmr3, and she

24  further rebuked President Trump for his views on various immigration issues, *e.g.*, *Trump admin*

25  *proposal would hike fees for immigration applications, impose asylum charge*, CBS News (Nov. 17,

26  2019), https://tinyurl.com/cnp7urvt. In other public fora, Judge Martínez-Olguín criticized Trump

27  "administration efforts to chip away at DACA" and disclaimed the INA's various jurisdictional

28

boundaries to judicial review of President Trump's immigration efforts. ACS Los Angeles 2019-2020 Supreme Court Review (Aug. 11, 2020), https://tinyurl.com/2kxe8jcc.

Those statements are directly germane to the issues Judge Martínez-Olguín is presiding over and therefore would give a reasonable person pause as to whether she can be impartial. The instant case involves the government's decision to discontinue providing direct legal services to unaccompanied alien children. Plaintiffs filed a Motion for a TRO citing irreparable harm to their organization if the funding stops. *See* Decl. of Marth Ruch, Lead Immigration Managing Attorney, CLSEPA, ECF No. 7-16 ¶ 5 (attesting that "[w]ith [HHS] funding, CLSEPA employs six staff members dedicated to providing legal services to unaccompanied immigrant children," and that representation of unaccompanied children makes up a significant portion of the six staff members' case work). And Defendants raised jurisdictional defects with Plaintiffs' claims that the court rejected outright. *See* Def's Opp, ECF 24, at 1, 10–12. (Mar. 31, 2025).

In addition to her prior role as managing attorney for a party in this case and her professional background, Judge Martínez-Olguín also has a relationship with the attorneys representing Plaintiffs in this case. One of the organizations representing Plaintiffs is the National Immigration Law Center, where Judge Martínez-Olguín worked as an attorney up until her confirmation as a district-court judge. In her Senate Questionnaire for Judicial Nominees, she noted that "potential conflicts of interest could be presented in matters being litigated before me by the lawyers from the National Immigration Law Center. If a conflict were to arise, I would immediately recuse myself from the matter." Araceli Martínez-Olguín, Questionnaire for Judicial Nominees, at 50,

1    Tumlin represented a class of individuals who qualified for DACA, challenging the first Trump

2    Administration's decision to restrict the DACA program. *See Batalla Vidal v. Wolf*, No.

3    16CV4756NGGVMS, 2020 WL 7121849, at *1 (E.D.N.Y. Dec. 4, 2020) (explaining the background of

4    the case). Similarly, Judge Martínez-Olguín represented DACA recipients alongside Ms. Tumlin in

5    *Arizona Dream Act Coalition v. Brewer*, 12-cv-2546 (D. Ariz.). While her representation alongside

6    Plaintiff's counsel in other cases involving foreign-national children may not be sufficient to create an

7    appearance of bias by itself, considering the totality of the circumstances—including her previous

8    employment with Plaintiff CLSEPA and relationship with National Immigration Law Center—a

9    reasonable person would question Judge Martínez-Olguín's impartiality here. *See Yagman*, 987 F.2d at

10   626; *see also Doe*, 134 F. Supp. 3d at 450 (looking to the "totality of the circumstances" to determine

11   whether a reasonable person would question the judge's impartiality).

12          Overall, a reasonable person would question whether a former managing attorney could be

13   impartial when deciding whether her previous employer and employees, represented by her former co-

14   counsel, will be irreparably harmed by a President's policies that the Judge has criticized in the public

15   square as an advocate. That appearance of impropriety mandates recusal.

16          Beyond positional conflicts, Judge Martínez-Olguín should recuse because she, as a former

17   managing attorney at Plaintiff CLSEPA, very likely has personal knowledge of the organization's

18   budget and operations and therefore has personal knowledge about CLSEPA's allegations regarding

19   irreparable harm—a disputed fact in this case. Judge Martínez-Olguín presumably has personal

20   knowledge about how CLSEPA obtains funding, its budget considerations, and its financial dependency

21   upon funding from the federal government. ECF 7-16 at 6. If Judge Martínez-Olguín does, in fact,

22   possess such knowledge based on her previous experience, her recusal is required by law. 28 U.S.C.

23   § 455(b)(1).

24                                          **CONCLUSION**

25          Defendants deserve a court proceeding free from concerns about impartiality. To remove the

26   possibility of any impartiality to these proceedings and to maintain the public's confidence in the judicial

27   system, Defendants respectfully request that this Court recuse itself and return this matter to assignment

28

before a judge who does not have a personal connection to a party or counsel in this case. Moreover, given the partiality identified in this filing, Defendants request immediate dissolution of the Court's temporary restraining order, based on concerning conflicts of interest that have created a serious appearance of impropriety. *See Liljeberg*, 486 U.S. at 870 (holding the vacatur was proper remedy for violation of 28 U.S.C. § 455).

DATED: April 9, 2025                     Respectfully submitted,


                                          YAAKOV M. ROTH
                                          Acting Assistant Attorney General

                                          WILLIAM C. SILVIS
                                          Assistant Director

                                          CHRISTINA PARASCANDOLA
                                          JONATHAN K. ROSS
                                          MICHAEL A. CELONE
                                          Senior Litigation Counsel

                                          ZACHARY A. CARDIN
                                          Trial Attorney

                                          /s/ Katelyn Masetta-Alvarez
                                          KATELYN MASETTA-ALVAREZ
                                          Senior Litigation Counsel
                                          U.S. Department of Justice, Civil Division
                                          Office of Immigration Litigation
                                          General Litigation and Appeals Section
                                          P.O. Box 878, Ben Franklin Station
                                          Washington, DC 20044
                                          (202) 514-0120
                                          Katelyn.Masetta.Alvarez@usdoj.gov

                                          Attorneys for Defendants

# CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2025, I electronically filed the foregoing Notice of Motion for Recusal and Reassignment and accompanying points and authorities with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.


*s/ Katelyn Masetta-Alvarez*
KATELYN MASETTA-ALVAREZ
Senior Litigation Counsel

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, | Case No. 3:25-cv-02847-AMO |
| Plaintiffs, | **[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION FOR RECUSAL PURSUANT TO 28 U.S.C. 455 AND FOR REASSIGNMENT** |
| v. | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *ET AL.*, | |
| Defendants. | |

Having read and considered Defendants' Motion for Recusal Pursuant to 28 U.S.C. 455 and for Reassignment, and finding good cause therefore:

IT IS HEREBY ORDERED that Defendants' motion is GRANTED.  Judge Araceli Martinez-Olguin is recused from presiding over this case, and the case will be reassigned to a judge within this district who does not have the appearance of impartiality.

In addition, the Court hereby VACATES the Temporary Restraining Order entered in Plaintiffs' favor, ECF No. 33.

Dated:

_____
Hon. Araceli Martínez-Olguín
UNITED STATES DISTRICT JUDGE

1

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COMMUNITY LEGAL SERVICES IN
EAST PALO ALTO, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, et
al.,

Defendants.

Case No. 25-cv-02847-AMO

**ORDER EXTENDING TEMPORARY
RESTRAINING ORDER, ORDERING
FURTHER BRIEFING, AND
RESETTING HEARINGS**

Re: Dkt. No. 47

Before the Court is Defendants' motion for recusal and reassignment. The Court must address this pending motion before further consideration of the case. Thus, the Court finds that consideration of the motion for recusal constitutes good cause requiring extension of the Temporary Restraining Order dated April 1, 2025 ("TRO"). *See* ECF 33; Fed. R. Civ. Pro. 65(b)(2). Accordingly, the Court hereby **EXTENDS** the TRO, and it shall remain in effect until Wednesday, April 30, 2025, at 7:59 a.m. PST.

Plaintiffs' response to the motion for recusal shall be filed by no later than Monday, April 14, 2025, at 5:00 p.m. PST. The Government's reply in support of the motion for recusal shall be filed by no later than Thursday, April 17, 2025, at 9:00 a.m. PST.

The briefing schedule on Plaintiffs' motion for preliminary injunction remains in effect. *See* ECF 33. The briefing schedule on Defendants' motion to dissolve the TRO remains in effect. *See* ECF 42.

Both Plaintiffs' motion for preliminary injunction and Defendants' motion to dissolve the TRO shall be heard on Wednesday, April 23, 2025, at 2:00 p.m. PST via Zoom if the case remains with the undersigned following resolution of the motion for recusal. The Court **ORDERS**

declarants Toby Biswas and Sharon Roberts to appear on Zoom for the preliminary injunction

hearing.

**IT IS SO ORDERED.**

Dated: April 10, 2025

_____

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**

IMMIGRANT DEFENDERS LAW
CENTER
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org

JUSTICE ACTION
CENTER
Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

AMICA CENTER FOR IMMIGRANT
RIGHTS
Adina Appelbaum (*pro hac vice*)
Samantha Hsieh (*pro hac vice*)
Peter Alfredson (D.C. Bar No. 1780258)*
Evan Benz (*pro hac vice*)
Amica Center for Immigrant Rights
1025 Connecticut Ave., NW, Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*\*pro hac vice* forthcoming
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>            Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>            Defendants. | Case No. 3:25-CV-02847-AMO<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        TBD<br>Time:        TBD<br>Dept:        TBD<br>Judge:      Hon. Araceli Martínez-Olguín<br>Trial Date:  TBD<br>Date Action Filed:  March 26, 2025 |

## NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE that, pursuant to the Court's April 1, 2025 order, in the United States District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, CA 94102 that Plaintiffs Community Legal Services in East Palo Alto, Social Justice Collaborative, Amica Center for Immigrant Rights, Estrella del Paso, Florence Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project, Immigrant Defenders Law Center, National Immigrant Justice Center, Northwest Immigrant Rights Project, Rocky Mountain Immigrant Advocacy Network, and Vermont Asylum Assistance Project will, and hereby do, move this Court for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a).

As long as congressional appropriations are available, Defendants United States Department of Health and Human Services, Office of Refugee Resettlement, and Department of the Interior are required to provide funding to legal services providers to provide direct representation to unaccompanied immigrant children under 8 U.S.C. § 1232(c)(5) and 45 C.F.R. § 410.1309(a)(4). On March 21, 2025, despite the existence of congressionally appropriated funds for this purpose, Defendants abruptly terminated long-standing funding for direct representation for unaccompanied children. On April 1, 2025, the Court issued a temporary restraining order to protect Plaintiffs until the Court rules on this motion, enjoining Defendants from "withdrawing the services or funds" Defendants provided under the TVPRA and Foundational Rule as of March 20, 2025, and precluding Defendants from "cutting off access to congressionally appropriated funding for its duration." Plaintiffs now move for a preliminary injunction preserving the status quo and extending the Court's temporary restraining order through the resolution of this case.

The motion is based upon this notice of motion; the memorandum of points and authorities in support thereof that follows; the declarations of Roxana Avila-Cimpeanu, Daniela Hernández

Chong Cuy, Jill Martin Diaz, Ana Raquel Devereaux, Marion Donovan Kaloust, Miguel Angel

Mexicano Furmanska, Vanessa Gutierrez, Ashley T. Harrington, Joel Frost-Tift, Elizabeth

Sanchez Kennedy, Lisa Koop, Melissa Mari Lopez, Laura Nally, Martha Ruch, and Wendy Young,

filed concurrently herewith; the proposed order filed concurrently herewith; the pleadings,

Plaintiffs' Motion for a Temporary Restraining Order and declarations of Roxana Avila-

Cimpeanu, Daniela Hernández Chong Cuy, Jill Martin Diaz, Ana Raquel Devereaux, Marion

Donovan Kaloust, Miguel Angel Mexicano Furmanska, Vanessa Gutierrez, Ashley T. Harrington,

Joel Frost-Tift, Gautam Jagannath, Elizabeth Sanchez Kennedy, Lisa Koop, Melissa Mari Lopez,

Laura Nally, Martha Ruch, and Wendy Young filed concurrently therewith, records, and papers

on file in this action; oral argument of counsel; and any other matters properly before the Court.

DATED: April 4, 2025                    Respectfully submitted,


By: */s/ Alvaro M. Huerta*                    */s/ Samantha Hsieh*


IMMIGRANT DEFENDERS LAW          AMICA CENTER FOR IMMIGRANT
CENTER                           RIGHTS
Alvaro M. Huerta (CA Bar No. 274787)   Adina Appelbaum (*pro hac vice*)
Carson A. Scott (CA Bar No. 337102)    Samantha Hsieh (*pro hac vice*)
Lya Ferreyra (CA Bar No. 340148)       Peter Alfredson (D.C. Bar No. 1780258)*
Immigrant Defenders Law Center         Evan Benz (*pro hac vice*)
634 S. Spring St., 10th Floor          Amica Center for Immigrant Rights
Los Angeles, CA                        1025 Connecticut Ave., NW, Suite 701
(213) 634-0999                         Washington, D.C. 20036
ahuerta@immdef.org                     (202) 331-3320
cscott@immdef.org                      adina@amicacenter.org
lferreyra@immdef.org                   sam@amicacenter.org
                                       peter@amicacenter.org
                                       evan@amicacenter.org
*/s/ Karen C. Tumlin*

                                       *Attorneys for Plaintiffs*
JUSTICE ACTION
CENTER
Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)
JUSTICE ACTION CENTER

P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................ 2

STANDARD OF REVIEW .................................................................................. 3

ARGUMENT .................................................................................................... 4

   I. ....... PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...................................... 4

      A.   Plaintiffs Have Standing to Bring Their Claims and Their Claims are Redressable. ................................................................................. 4

      B.   This Court has Jurisdiction Over Plaintiffs' Claims. ................................... 5

      C.   The Cancellation Order Determines Plaintiffs' Legal Rights and Obligations and is Final Agency Action Reviewable Under the APA. ....................................... 7

      D.   Termination of the Direct Representation Programs Violates the TVPRA ............. 11

      E.   Terminating Direct Representation Programs Violates the ORR Foundational Rule ............................................................................................ 12

      F.   Terminating Funding for Direct Representation is Arbitrary and Capricious. ......... 14

      1.   Defendants Failed to Adequately Explain the Basis for the Decision. ................... 15

      2.   Defendants Failed to Consider All Relevant Factors and Articulate a Rational Connection Between the Facts Found and the Choice Made. ............................... 17

      3.   Defendants Failed to Offer a Reasoned Explanation for Their Policy Reversal. ..... 18

      4.   To the Extent Defendants Offer Any Reasons, Those Reasons Are Pretextual. ..... 19

   II. ...... PLAINTIFFS SATISFY THE REMAINING REQUIREMENTS FOR A PRELIMINARY INJUNCTION .......... 20

      A.   Plaintiffs Face Irreparable Harm ......................................................... 20

      B.   The Balance of Equities .................................................................... 23

   III. ..... A NATIONWIDE INJUNCTION IS APPROPRIATE ............................................. 24

   IV. ..... THE COURT SHOULD NOT REQUIRE AN INJUNCTION BOND ............................. 25

CONCLUSION ................................................................................................ 25

## TABLE OF AUTHORITIES
### Cases

*In re Aiken Cnty.,*
   725 F.3d 255 (D.C. Cir. 2013) ........................................17

*Al Otro Lado, Inc. v. Mayorkas,*
   2024 WL 4370577 (S.D. Cal. Sept. 30, 2024)....................... 12, 13

*Alcaraz v. I.N.S.,*
   384 F.3d 1150 (9th Cir. 2004) .........................................12

*All. for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011)...........................................3

*All. for the Wild Rockies v. Pena,*
   865 F.3d 1211 (9th Cir. 2017)...........................................3

*Ariz. Dream Act Coal. v. Brewer,*
   757 F.3d 1053 (9th Cir. 2014)..........................................20

*Arizona Power Pooling Asso. v. Morton,*
   527 F.2d 721 (9th Cir. 1975)........................................9, 10

*Bennett v. Spear,*
   520 U.S. 154 (1997) ....................................................7

*Bowen v. Mich. Acad. of Fam. Physicians,*
   476 U.S. 667 (1986) ....................................................9

*Bowen v. Mass.,*
   487 U.S. 879 (1988) ....................................................6

*Bresgal v. Brock,*
   843 F.2d 1163(9th Cir. 1987)..........................................24

*Burlington Truck Lines, Inc. v. United States,*
   371 U.S. 156 (1962) ...................................................18

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ...................................................25

*Caribbean Marine Servs. Co. v. Baldrige,*
   844 F.2d 668 (9th Cir. 1988)..........................................20

*Carnation Co. v. Sec'y of Lab.,*
   641 F.2d 801 (9th Cir. 1981)..........................................12

*City & Cnty. of San Francisco v. Trump,*
   897 F.3d 1225 (9th Cir. 2018).........................................19

*City and Cnty of San Francisco v. U.S. Citizen and Immigration Servs.,*
   981 F.3d 742 (9th Cir. 2020)..........................................15

Plaintiffs' Notice of Motion and Motion for a Preliminary Injunction

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
    38 F.4th 1099 (D.C. Cir. 2022) ..........................................................................6

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ...................................................................................15

*Dept. of Homeland Sec. v. Regents of the U. of Cal.*,
    591 U.S. 1 (2020) ................................................................................ 14, 18

*Disney Enters., Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017)........................................................................23

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 ................................................................................ 4, 24, 25

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ............................................................................ 17, 18

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
    98 F.4th 1180 (9th Cir. 2024)........................................................................3

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) .....................................................................................7

*HIAS, Inc. v. Trump*,
    985 F.3d 309 (4th Cir. 2021)........................................................................25

*Humane Soc. of U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010)............................................................... 14, 15

*Imm. Defs. Law Ctr. v. U.S. Dep't of Homeland Sec.*,
    No. 2:21-cv-00395, Dkt. 304 (C.D. Cal. Mar. 14, 2025) ...............................7

*Jajati v. United States Customs & Border Prot.*,
    102 F.4th 1011 (9th Cir. 2024).......................................................................9

*Jicarilla Apache Nation v. U.S. Dep't of the Interior*,
    613 F.3d 1112 (D.C. Cir. 2010) ............................................................ 18, 19

*Kucana v. Holder*,
    558 U.S. 233 (2010) .....................................................................................9

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014)........................................................................20

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .........................................................................20

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................................ 9, 10

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ......................................................................................4

Plaintiffs' Notice of Motion and Motion for a Preliminary Injunction

*Me. Cmty. Health Options v. U.S.*,
  590 U.S. 296 (2020) ...................................................................................6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...................................................................................14

*Nat'l Council of Nonprofits v. OMB*,
  2025 WL 368852 (D.D.C. Feb. 3, 2025) ...................................................7

*Nat'l Council of Nonprofits v. OMB*,
  2025 WL 597959 (D.D.C. Feb. 25, 2025)................................................25

*Nken v. Holder*,
  556 U.S. 418 (2009) .............................................................................3, 23

*Pacito v. Trump*,
  2025 WL 655075 (W.D. Wash. Feb. 28, 2025).....................................6, 11

*Pacito v. Trump*,
  2025 WL 893530 (W.D. Wash. Mar. 24, 2025) .........................................5

*Renee v. Duncan*,
  686 F.3d 1002 (9th Cir. 2012).....................................................................5

*Robbins v. Reagan*,
  780 F.2d 37 (D.C. Cir. 1985) ....................................................................11

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013)...................................................................23

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) ..................................................................................15

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engs.*,
  255 F. Supp. 3d 101 (D.D.C. 2017)...........................................................18

*State v. Azar*,
  385 F. Supp. 3d 960 (N.D. Cal. 2019) ......................................................24

*Torres v. U.S. Dep't of Homeland Sec.*,
  411 F. Supp. 3d 1036 (C.D. Cal. 2019) ....................................................13

*Tourus Recs., Inc. v. Drug Enforcement Admin.*,
  259 F.3d 731 (D.C. Cir. 2001) ..................................................................15

*Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp.*
  *Workers v. Fed. R.R. Admin.*,
  988 F.3d 1170 (9th Cir. 2021)...................................................................15

*United States v. 1996 Freightliner Fld Tractor VIN1FUYDXYB-TP822291*,
  634 F.3d 1113 (9th Cir. 2011)...................................................................12

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,
  766 F.2d 1319 (9th Cir.1985)....................................................................25

Plaintiffs' Notice of Motion and Motion for a Preliminary Injunction

*Walczak v. EPL Prolong, Inc.*,
    198 F.3d 725 (9th Cir. 1999)..........................................................................25

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017)......................................................................25

*Wawszkiewicz v. Dep't of Treasury*,
    670 F.2d 296 (D.C. Cir. 1981) .....................................................................18

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    586 U.S. 9 (2018) ....................................................................................9, 10

*Winter v. Nat'l Res. Def. Council*,
    555 U.S. 7 (2008)......................................................................................3, 23

*Zepeda v. I.N.S.*,
    753 F.2d 719 (9th Cir. 1983)........................................................................23

## Statutes

5 U.S.C. § 551(13) ...........................................................................................7

5 U.S.C. § 701(a)(1) .........................................................................................8

5 U.S.C. § 702 ..................................................................................................7

5 U.S.C. § 706(2)(A)........................................................................................14

8 U.S.C. § 1232(c)(5) .......................................................................1, 4, 5, 9, 11

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4,
    Div. A Tit. I § 1101(8) (2025).................................................................10, 13

Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138
    Stat. 460, 665-666 (2024) ......................................................................10, 13

## Other Authorities

H. Rep. 117-403................................................................................................17

Olga Byrne & Elise Miller, *The Flow of Unaccompanied Children Through the
Immigration System* (March 2012), https://shorturl.at/KI3Jt................................16

S. Rep. 118-84 ...........................................................................................10, 13

## Rules

Federal Rule of Civil Procedure 65(c).............................................................25

## Regulations

45 C.F.R. § 410.1309(a)(4)................................................................. 1, 10, 13

89 Fed. Reg. 34526 .........................................................................................13

89 Fed. Reg. 34529 ......................................................................................................... 13, 24

## INTRODUCTION

Each year, tens of thousands of unaccompanied noncitizen children ("UCs") arrive in the United States without a parent or legal guardian and are placed in the custody of the Office of Refugee Resettlement ("ORR").  Absent intervention from legal services providers, they must navigate our country's complicated immigration processes alone.  Plaintiffs are a group of legal services providers dedicated to providing legal support to these children.  In furtherance of their missions, Plaintiffs provide congressionally mandated direct representation and services to UCs.

In 2008, recognizing that children navigating complicated legal proceedings need counsel, Congress directed the Secretary of Health and Human Services ("HHS") by statute to "ensure, to the greatest extent practicable . . . , that all unaccompanied alien children . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking."  8 U.S.C. § 1232(c)(5) (the "TVPRA").  Under this mandate, Congress has funded direct representation for UCs since 2012.  In 2024, confirming its responsibility to provide these congressionally mandated legal services, ORR issued its Unaccompanied Children Program Foundational Rule ("Foundational Rule") and bound itself to funding legal services providers, so long as congressional appropriations are available.  45 C.F.R. § 410.1309(a)(4).  Congress has appropriated funding through September 30, 2027.

Despite these congressional and regulatory mandates, on March 21, 2025, Defendants abruptly cut funding for the legal representation and other legal services work, including friend of court services assisting UCs in immigration court and efforts to refer UCs whom Plaintiffs could not represent to pro bono attorneys, in clear violation of the Administrative Procedure Act ("APA").  For brevity, Plaintiffs use "direct representation" throughout to refer to the legal services cancelled by Defendants.  Defendants provided Plaintiffs no information about how Plaintiffs should address their ongoing commitments to represent UCs (including UCs with immigration

court dates in the coming days) or about how Defendants intended to comply with their obligations to provide direct representation to UCs to the greatest extent practicable.

Plaintiffs' missions are to ensure immigrants in the United States—particularly UCs—have legal support and do not face the immigration system alone. To that end, Plaintiffs collectively represent thousands of UCs through funding from Defendants mandated by the TVPRA and Foundational Rule. By refusing to fund direct representation for UCs, in violation of these mandates, Defendants put Plaintiffs in an impossible position: Plaintiffs' missions and ethical duties compel them to continue legal representation of UC clients. Although doing so without federal funding may ultimately bankrupt Plaintiffs, to do otherwise would betray their core missions and ethical obligations to their clients. The Court can (and should) redress this harm by issuing an injunction ordering Defendants to meet TVPRA and regulatory requirements to fund direct representation, as the Court temporarily did with its current TRO.

Defendants' actions contravene congressional and regulatory mandate and are arbitrary and capricious. They also violate this Court's temporary restraining order. To prevent irreparable harm to Plaintiffs, to say nothing of irreparable harm to their UC clients, this Court should issue a preliminary injunction, enjoining Defendants through the resolution of this case from cutting off funding for direct representation required under the TVPRA and Foundational Rule.

## BACKGROUND

Plaintiffs refer the Court to their Motion for a Temporary Restraining Order for a full factual background. *See* Dkt. 7 at 11-17. On those facts, the Court issued a temporary restraining order on April 1, 2025 (the "Order"), commanding Defendants to fund required direct representation for UCs through April 16, 2025. *See* Dkt. 33 at 1-2. Although Defendants stated they "are in receipt of the Court's order and are taking steps to comply expeditiously," Amica

Supp. Decl. ¶ 13, as of this filing, Plaintiffs are not aware of *any* actual steps Defendants have taken to comply.  *Id.* ¶ 15.  Plaintiffs intend to move to enforce compliance with the Order.

Further, on April 2, 2025, Defendants said they would not produce the administrative record until the latest time permitted by the Local Rules: with Defendants' answer.  *Id.* ¶ 14.

Finally, Plaintiffs wish to clarify the state of the contract between Defendants and Acacia, which Defendants partially cancelled on March 21, 2025, given Defendants' incorrect indication at the April 1, 2025, hearing that there was no contract in place at all.  The Cancellation Order cancelled three of the four contract "line items," leaving only the first line item ("know your rights" presentations and legal consultations).  *See* Dkt. 7-15, Ex. 3.  The contract was due to expire March 29, 2025, but Defendants issued a six-month extension for the first line item.  *See* Dkt. 24-1 ¶ 11.

## STANDARD OF REVIEW

A preliminary injunction is warranted when plaintiffs establish: (1) likelihood of success on the merits; (2) irreparable harm; (3) the balance of equities favors them; and (4) an injunction is in the public interest.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008)).  When the government is the defendant, the last two factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The Ninth Circuit uses the "serious questions" test, which allows the court to evaluate the *Winter* test on a "'sliding scale' . . .  under which a party is entitled to a preliminary injunction if it demonstrates (1) 'serious questions going to the merits,' (2) 'a likelihood of irreparable injury,' (3) 'a balance of hardships that tips sharply towards the plaintiff,' and (4) 'the injunction is in the public interest.'" *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (citing *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)).  This "standard is 'a lesser showing than likelihood of success on the merits.'" *Id.*

## ARGUMENT

### I.  Plaintiffs are Likely to Succeed on the Merits

Agency action cannot stand if it is contrary to law or if it is arbitrary and capricious. Because Defendants' termination of direct representation services is contrary to the TVPRA and ORR's own regulations and is also arbitrary and capricious, Plaintiffs have, at minimum, demonstrated serious questions going to the merits and are likely to succeed on the merits.

### A.  Plaintiffs Have Standing to Bring Their Claims and Their Claims are Redressable.

The Court has found Plaintiffs fall within the "zone of interests" of the TVPRA and have articulated harms that can be redressed by this Court.  Defendants' assertions otherwise remain meritless, and the Court can and should reject them again.

*Prudential standing*:  As the Court already found, Plaintiffs have prudential standing because their APA claims are in the zone of interests protected by the TVPRA.  *See* Dkt. 33 at 3-4.  While Defendants insist the injury Plaintiffs plead is entirely financial, Plaintiffs face harms to their core activities and organizational missions, including their commitment to ensuring UCs are not left to navigate the immigration system alone.  *See e.g.*, Estrella Supp. Decl. ¶ 2; ImmDef Supp. Decl. ¶ 2; FIRRP Supp. Decl. ¶¶ 3, 5.  These interests are at least "'marginally related to' and 'arguably within' the scope of" the TVPRA, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021) (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224–25 (2012)), as well as Congress's interest in "ensuring, to the greatest extent practicable" that all UCs receive legal "counsel to represent them in legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5).

*Redressability*:  Plaintiffs' core business activities and organizational missions—which include ensuring UCs have legal representation—have been critically and irreparably harmed by Defendant's actions.  The requested injunctive relief will redress these harms.  While Defendants

have latitude to determine the mechanism by which they comply with the TVPRA and Foundational Rule—whether via reviving the terminated portions of the contract or another method of funding direct representation, either approach significantly increases the likelihood Plaintiffs will obtain relief from their harms. *See Meese v. Keene*, 481 U.S. 465, 476-77 (1987).

The showing required for the redressability prong of Article III standing is modest. *See Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012). It is sufficient for Plaintiffs to demonstrate a "significant increase in the likelihood" that they will obtain relief redressing their injury as a "practical consequence" of an order from the court. *Id.* The reinstatement of required funding for direct representation to UCs significantly increases the likelihood that Plaintiffs will obtain relief, either through funding to continue their own representations or an alternative plan providing legal representation to UCs consistent with congressional appropriations, the TVPRA, and the Foundational Rule. The requested injunctive relief is extremely likely to ensure that Plaintiffs' clients maintain representation—as Plaintiffs' missions demand—without forcing Plaintiffs to divert resources from other mission critical initiatives.

The TVPRA's directive requires "ensuring, to the greatest extent practicable" that all UCs receive legal "counsel to represent them in legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5). Direct redress of Plaintiffs' harms is a practical consequence of enjoining "Defendants nationwide from ceasing to fund counsel to represent unaccompanied children in violation of the TVPRA and the Foundational Rule." Dkt. 1 at 39. This is true regardless of how Defendants fashion the injunctive relief.

**B. This Court has Jurisdiction Over Plaintiffs' Claims.**

This Court rejected Defendants' argument that the Tucker Act deprives the Court of jurisdiction over Plaintiffs' claims. Dkt. 33 at 3 (citing *Pacito v. Trump*, 2025 WL 893530, at *4–7 (W.D. Wash. Mar. 24, 2025)). The Court is correct, and Plaintiffs address this issue only briefly.

The law is clear: the Tucker Act only deprives the Court of jurisdiction of claims that are both (1) founded upon contract-based rights and (2) seek a contract-based remedy. *See United Aeronautical Corp. U.S. Air Force*, 80 F.4th 1017, 1025-26 (9th Cir. 2023).

Neither of those conditions are met here. The Tucker Act "yields when the obligation-creating statute provides its own detailed remedies, or when the [APA] provides an avenue for relief." *Me. Cmty. Health Options v. U.S.*, 590 U.S. 296, 323–24 (2020); *see also Pacito v. Trump*, 2025 WL 655075, at *17 (W.D. Wash. Feb. 28, 2025) (rejecting argument Tucker Act bars APA review). Plaintiffs' claims stem from the TVPRA, the Foundational Rule, and the APA: Defendants' refusal to fund direct representation for UCs violates their obligations under those authorities and, in turn, violates the APA and is a breach of the Accardi doctrine, and arbitrary and capricious. See Dkt. 7 at 20-24. Thus, Plaintiffs' claims do not rely on or arise from any contract.

Because Plaintiffs seek "declaratory and injunctive relief" under their statutory rights to prevent Defendants unlawfully refusing to provide any funding for counsel for UCs instead of "money in compensation for . . . losses," the Tucker Act does not apply. *Bowen v. Massachusetts,* 487 U.S. 879, 893, 895; *see also Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1111 (D.C. Cir. 2022) (declaratory and injunctive relief are not "specific to actions that sound in contract"); *Pacito*, 2025 WL 655075 at *17 ("[B]ecause Plaintiffs seek specific remedies, not damages," Tucker Act did not apply). As "Claims Court[s do] not have the general equitable powers of a district court to grant prospective relief," a district court is the proper venue for Plaintiffs' APA claims. *Bowen*, 487 U.S. at 905–07. That Defendants previously fulfilled their statutory and regulatory obligations by contracting does not change this analysis—were that the case, no plaintiff could challenge Defendants' illegal actions. *See, e.g.*, *Crowley*, 38 F.4th at 1107

(rejecting the "broad notion that any case requiring some reference to or incorporation of a contract" cannot be heard in district courts) (cleaned up).

## C. The Cancellation Order Determines Plaintiffs' Legal Rights and Obligations and is Final Agency Action Reviewable Under the APA.

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). Persons or organizations, like Plaintiffs here, who are "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, [are] entitled to judicial review thereof." 5 U.S.C. § 702. "[A]gency action" includes not only agencies' affirmative acts, but also their omissions and failures to act. *Id.*; 5 U.S.C. § 551(13).

Under the APA, this Court may set aside and enjoin unlawful agency action, and compel agency action unlawfully withheld, if it is a (1) "final agency action" "for which there is no other adequate remedy in a court," so long as (2) there are no "statutes [that] preclude judicial review" and "agency action is [not] committed to agency discretion by law." 5 U.S.C. §§ 701(a), 704. Plaintiffs satisfy each of these criteria here, and APA relief is therefore proper.

*Final Agency Action*. An agency action is final for APA review where two conditions are satisfied: (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks and citations omitted). Defendants' refusal to fund direct representation for UCs is a final agency action. *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025) (attempt to "pause" funding and disbursements is final agency action); *Imm. Defs. Law Ctr. v. U.S. Dep't of Homeland Sec.*, No. 2:21-cv-00395, Dkt. 304, at *18–19 (C.D. Cal. Mar.

14, 2025) (in TVPRA context, final agency action found because policy was not tentative, decision-making was not ongoing, and legal consequences would flow from action).

Here, Defendants clearly ceased funding direct representation for UCs in violation of an express statutory mandate and their own regulatory frameworks.  The Cancellation Order directed Plaintiffs to stop all work providing direct representation to UCs, including pre-existing clients. This notification is final.  VAAP Decl. (Dkt. 7-7) ¶ 13; NWIRP Decl. (Dkt. 7-10) ¶ 10; RMIAN Decl. (Dkt. 7-11) ¶ 12; Estrella Decl. (Dkt. 7-14) ¶ 11.

Since the Cancellation Order and its ensuing consequences, the choices facing Plaintiffs have grown even more dire.  Defendants' actions and failure to comply with the Court's Order continue to force Plaintiffs to choose between providing unfunded direct representation with extremely limited resources; cutting other vital organizational programs, laying off, furloughing, or terminating staff; and/or seeking to withdraw from their ongoing representation duties for court hearings, client meetings, and other important preparations for legal proceedings.  *See e.g.*, Dkt. 7 at 10-11; ImmDef Supp. Decl. ¶ 9; Amica Supp. Decl. ¶ 3; VAAP Decl. (Dkt. 7-7) ¶ 21.  The longer Plaintiffs go without funding or clarity regarding how to handle their current clients, the fewer services they can provide as they are forced to withdraw from ongoing representations, cut other core programs, and/or lay off or reassign staff. Amica Supp. Decl. ¶ 3; VAAP Decl. (Dkt. 7-7) ¶ 20–22; ImmDef Supp. Decl. ¶ 7; NWIRP Decl. (Dkt. 7-10) ¶ 14.  Thus, the termination has an immediate effect on parties' rights or obligations.

<u>No Bar to Review:</u> Defendants' actions do not fall within the limited exceptions to judicial review under the APA.  The longstanding presumption of judicial review for agency actions under the APA "may be rebutted only if the relevant statute precludes review, 5 U.S.C. § 701(a)(1), or if

the action is 'committed to agency discretion by law,' § 701(a)(2)." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018).  Neither exception applies here.

First, the "well-settled" presumption of judicial review for agency actions can be overcome only by "clear and convincing evidence" of congressional intent to preclude judicial review.  *See, e.g.*, *Kucana v. Holder*, 558 U.S. 233, 252-53 (2010).  No statute bars review of Plaintiffs' claims here.  *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670–71 (1986).

Second, Defendants' refusal to fund direct representation for UCs does not fall into the "very narrow" exception for actions committed to agency discretion.  *Arizona Power Pooling Ass'n. v. Morton*, 527 F.2d 721, 727 (9th Cir. 1975).  This exception is "restrict[ed] to those rare circumstances where the relevant statute is drawn so that a court would have *no meaningful standard* against which to judge the agency's exercise of discretion." *Weyerhaeuser Co.*, 586 U.S. at 23 (emphasis added) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).  The Ninth Circuit applies this exception only when "there is truly no law to apply."  *Jajati v. U.S. Customs & Border Prot.*, 102 F.4th 1011, 1014 (9th Cir. 2024) (quotation marks omitted).

The TVPRA, agency regulations, and Defendants' own policies and announcements, provide "meaningful standards under which courts can review whether [Defendants'] wielded its discretion in a permissible manner."  *Jajati*, 102 F.4th at 1014.  As the Court noted in its Order, Defendants' actions "potentially violate[] Congress's express directive in the TVPRA and ORR's own commitments in the Foundational Rule," both "meaningful standards" under which the Court can review Defendants' actions.  Dkt. 33 at 5.  Both the TVPRA and ORR regulations include language describing Defendants' obligations to fund direct representations.  *See* 8 U.S.C. § 1232(c)(5) (Defendants "*shall* ensure, to the greatest extent practicable," that *all* UCs receive legal "counsel to represent them in legal proceedings") (emphasis added); 45 C.F.R.

§ 410.1309(a)(4) (ORR "*shall* fund legal service providers . . . subject to ORR's discretion and available appropriations"). This language offers a clear standard to judge Defendants' actions. *See e.g.*, *Arizona Power Pooling Ass'n,* 527 F.2d at 727 (holding that statutory language instructing that the agency "shall" devise the "most feasible plan" for obtaining electronic power made it "clear that . . . the [agency did] not have unfettered discretion" and the exception for actions committed to agency discretion did not apply).

Defendants' cancellation of all funding is not the type of "lump-sum appropriation" or other judgment that is presumptively committed to agency discretion. *Weyerhaeuser Co.*, 586 U.S. at 23. In their Opposition to Plaintiffs' Motion for TRO, Defendants rely heavily on *Lincoln v. Vigil* to argue that funding for direct representation for UCs is wholly committed to agency discretion. *See* Dkt. 24 at 18; *Lincoln v. Vigil*, 508 U.S. 182 (1993). There, the Court emphasized the relevant "appropriations Acts . . . do not mention the [cancelled] Program," the relevant statutes "speak about Indian health only in general terms," and "Congress never expressly appropriated funds" for the cancelled program. *Id.* at 186, 193–94. In contrast, here, the relevant statutes point to Defendants' obligations to ensure direct representation to the "greatest extent practicable" and Congress has expressly appropriated funds for services required under the TVPRA, including provision of counsel. *See, e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, Div. A Tit. I Sec. 1101(8) (2025); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 664–665 (2024); S. Rep. 118-84, at 169.

That Defendants have some discretion in *how* to allocate funds for direct representation does not render their actions unreviewable under the APA. Even "grants [of] broad discretion to an agency" do "not render the agency's decisions completely nonreviewable . . . unless the statutory scheme, taken together with other relevant materials, provides *absolutely no guidance* as

to how that discretion is to be exercised." *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (emphasis added). Here, both the statutory and regulatory schemes clearly provide such guidance.

**D. Termination of the Direct Representation Programs Violates the TVPRA.**

Under the TVPRA, Congress mandated the government "shall ensure, to the greatest extent practicable," that *all* UCs receive legal "counsel to represent them in legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5). Canceling funding for direct representation services to UCs when appropriations are available (as they are) violates this express congressional mandate.

The TVPRA, which requires Defendants to "ensure [UC direct representation] to the greatest extent practicable," prohibits Defendants refusing to fund direct representation so long as Defendants have available appropriations (as they do). *See, e.g.*, *Pacito*, 2025 WL 655075, at *18 (APA violated when agencies withheld appropriated funds because they were "required, 'to the extent of available appropriations,' to ensure provision of support services for resettled refugees"). Defendants terminated funding and ordered Plaintiffs to cease work without providing any other avenues of legal services for UCs—failing to "ensure, to the greatest extent practicable," that UCs have access to legal counsel. The Cancellation Order effectively ends meaningful direct representation for UCs. Amica Supp. Decl. ¶ 8; VAAP Decl. (Dkt. 7-7) ¶¶ 20–21.

Although the TVPRA grants Defendants some discretion in *how* to allocate appropriated funds for legal access, it does not grant discretion to choose *not to* allocate appropriated funds at all. Defendants cannot simply cease funding for direct representation in its entirety, as they did here. *See Pacito*, 2025 WL 655075, at *18. Further, Defendants failed to provide any guidance to Plaintiffs regarding their ongoing UC representations, or any alternative plan for carrying out their duties under the statute and applicable ethical rules. Amica Decl. (Dkt. 7-15) Ex. 3.

**E.  Terminating Direct Representation Programs Violates the ORR Foundational Rule.**

The government is "bound by the regulations it imposes upon itself."  *See United States v. 1996 Freightliner Fld. Tractor VIN 1FUYDXYB-TP822291*, 634 F.3d 1113, 1116 (9th Cir. 2011). Under the *Accardi* doctrine, parties may bring claims under the APA asserting that an agency has failed to follow its own rules and internal policies.  *See, e.g.*, *Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004).

For an *Accardi* claim, Plaintiffs must show (1) the government violated its own regulations; and (2) Plaintiffs are substantially prejudiced by that violation.  *See Al Otro Lado, Inc. v. Mayorkas*, 2024 WL 4370577, at *8–9 (S.D. Cal. Sept. 30, 2024); *see also Carnation Co. v. Sec'y of Lab.*, 641 F.2d 801, 804 n.4 (9th Cir. 1981) (the *Accardi* standard is "whether violation of the regulation prejudiced the party involved").  Defendants' actions violate their express commitment in the binding Foundational Rule to fund direct representation as long as appropriations are available.  Plaintiffs are substantially prejudiced because they are mission-bound to serve their UC clients in cases formerly funded by Defendants, and there are no other government-funded legal service providers to whom Plaintiffs can transfer those cases.  Amica Supp. Decl. ¶ 8; Estrella Decl. (Dkt. 7-14) ¶ 3, 16; KIND Decl. (Dkt. 7-18) ¶ 19; VAAP Supp. Decl. ¶ 2; *see also* MM Supp. Decl. ¶ 4-5; DHCC Supp. Decl. ¶ 7.  Plaintiffs are spending discretionary funds to maintain representations for as long as possible because withdrawing is antithetical to their missions and, for some, impermissible under local ethics rules, particularly where no other service providers can take the cases.  Without an injunction, Plaintiffs will have to choose between bankruptcy and abandoning their missions .  Amica Supp. Decl. ¶ 3; GHIRP Supp. Decl. ¶¶ 3, 7–8; RMIAN Decl. (Dkt. 7-11) ¶ 14; Estrella Decl. (Dkt. 7-14) ¶ 15; *see also infra* Section II.A.

ORR has "recognize[d] that most unaccompanied children need legal services to resolve their immigration status and that representation appears to have a significant impact on both the

court appearance rate and the outcome of cases for unaccompanied children." 89 Fed. Reg. 34384, 34529 (Apr. 30, 2024); *see also Al Otro Lado*, 2024 WL 4370577, at *9 (preambles may sufficiently bind agencies under *Accardi*). Just last year, ORR stated its intention to provide "universal legal representation for unaccompanied children by FY 2027." HHS: Administration for Children & Families, *Justification of Estimates for Appropriations Committees*, at 78 (2024), https://shorturl.at/4VDSL; *see also* 89 Fed. Reg. at 34526 ("ORR strives for 100 percent legal representation of unaccompanied children."). Thus, in 2024, ORR adopted the Foundational Rule, which states in relevant part:

> To the extent ORR determines that appropriations are available, and insofar as it is not practicable for ORR to secure pro bono counsel, ORR *shall fund legal service providers* to provide direct immigration legal representation for certain unaccompanied children, subject to ORR's discretion and available appropriations.

45 C.F.R. § 410.1309(a)(4) (emphasis added). Defendants' actions on March 21, 2025, subvert these ORR commitments and regulations, violate the *Accardi* doctrine, and are both contrary to law and arbitrary and capricious under the APA. *See Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1068–69 (C.D. Cal. 2019) (agency's violation of its own procedures violates the APA). Congressional appropriations are readily available until September 2027 to fund direct representation, including funds appropriated as recently as March 15, 2025, one week before Defendants' challenged actions. *See, e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, Div. A Tit. I Sec. 1101(8) (2025); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 665-666 (2024); S. Rep. 118-84, at 169. Without explanation and without a plan to replace these critical legal services for unaccompanied children, the Cancellation Order violates Defendants' obligations and has caused and will continue to cause Plaintiffs substantial hardship, as described below. *See also infra* Section II.A. Because

Defendants' actions violate their own stated policies and substantially prejudice Plaintiffs, Plaintiffs are likely to succeed on the merits of their claims.

**F. Terminating Funding for Direct Representation is Arbitrary and Capricious.**

Defendants' decision to stop funding any direct representation for any UCs ignores the well-documented efficacy of direct representation for UCs and is arbitrary and capricious. Defendants have refused to produce any administrative record to justify their decision until they file their answer. Amica Supp. Decl. ¶ 14. Plaintiffs and the Court are left to evaluate Defendants' justification through statements in the Stop Work Order, Cancellation Order, and filings in this action. The Stop Work Order provides no explanation, Dkt. 7-15, Ex. 1, and the Cancellation Order says only that the decision was for Defendants' "convenience," *id.* at Ex. 3. This leaves the Court with only Defendants' post-hoc justifications offered through litigation, but these are plainly insufficient. *Dept. of Homeland Sec. v. Regents of the U. of Cal.*, 591 U.S. 1, 23 (2020) (agencies cannot support their actions via "belated justifications" or "convenient litigating positions" (quotation marks and citations omitted). To the extent such reasons are properly before the Court, Defendants' proffered justifications of saving money and encouraging pro bono representation fail to address the requirements outlined above. *See* Dkt. 24-1 ¶¶ 14–15; Dkt. 24 at 8.

A court "shall" set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983); *see also Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1048 (9th Cir. 2010). Agency action should be set aside as arbitrary and capricious if the agency fails to explain the basis of its decision, fails to consider all relevant factors and articulate a "rational connection between the facts found and the choice made," or fails to offer a "reasoned analysis" for departure from preexisting policies. *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 42–43. In cases where the purported rationale for agency action is pretextual, it must be

set aside.  *See, e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 780-85 (2019); *Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Fed. R.R. Admin.*, 988 F.3d 1170, 1182-85 (9th Cir. 2021).  Here, Defendants fail on all grounds, justifying preliminary injunctive relief (as well as ultimate relief on the merits).

> **1.    Defendants Failed to Adequately Explain the Basis for the Decision.**

A "fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." *Tourus Recs., Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001) (quotation marks omitted); *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  Unsupported conclusions are insufficient, *see City and Cnty of San Francisco v. U.S. Citizen and Immigration Servs.*, 981 F.3d 742, 761 (9th Cir. 2020) (rejecting agency's "conclusory mantra" and lack of "detailed justification"), as are post hoc rationalizations in briefing, unsupported by an administrative record, *see Humane Soc'y of U.S.*, 626 F.3d at 1049-50.

Defendants' decision to cut all funding for direct representation they have funded for more than a decade—with appropriations available until at least September 30, 2027—came with no explanation, let alone one that can stand up to judicial scrutiny.  Defendants have refused to produce any administrative record at this stage that could justify their actions.  *See,* Amica Supp. Decl. ¶ 14.  Even if Defendants' post-hoc justifications offered in this case could be considered, Defendants fail to address the fact that Congress has already appropriated these funds through September 2027, and offer no explanation of how a "shift" to pro bono services could fulfill their TVPRA and Foundational Rule obligations to provide counsel "to the greatest extent possible." Defendants also offer no evidence they are doing anything to facilitate a "shift," and even if they were, they created a significant shortfall in representation in the interim.

History and congressional statements show pro bono counsel alone cannot provide counsel "to the greatest extent possible," under the TVPRA. *See* Dkt. 1 ¶¶ 51–63 (citing original sources). ORR *already tried* relying solely on pro bono counsel. The idea that funding representation actually "disincentivizes the recruitment of and the volunteering of pro bono counsel" (Dkt. 24-1 ¶ 24) gets the history backward—funded representation stepped in to fill huge representation gaps left by relying only on pro bono capacity. *See also* Estrella Supp. Decl. ¶ 5 (of the 64,008 individuals Estrella served in 2024, they have only secured pro bono assistance for one). ORR's 2008 pro bono pilot program produced a report acknowledging pro bono counsel alone were insufficient to represent UCs. *See* Olga Byrne & Elise Miller, *The Flow of Unaccompanied Children Through the Immigration System*, at 22–23 (Mar. 2012), https://shorturl.at/KI3Jt. That is why ORR started funding direct representation. *See* Dkt. 1 ¶¶ 57–59.

Funding legal services providers like Plaintiffs *increases* pro bono representation of UCs, because Plaintiffs oversee and mentor large networks of pro bono attorneys—non-experts in immigration who could not represent UCs without the aid of immigration professionals. *See, e.g.,* Dkt. 7-4 ¶¶ 11, 44; Dkt. 7-7 ¶ 2; NWIRP Supp. Decl. ¶ 7. When Plaintiff "ImmDef has worked with pro bono attorneys to provide legal representation for children, [they] have found that even licensed attorneys who are not specialized in this area of law need intensive training [from ImmDef] and support to be able to effectively represent their clients." Dkt. 7-8 ¶ 11. "[P]ro bono attorneys do not generally have immigration expertise," most do not speak the languages UCs speak, many "are unwilling to commit to the timeframe of children's immigration cases or with the special care needed when working with children," and pro bono attorneys need experts to "train and support [them]." Dkt. 7-6 ¶ 12; *see also* RMIAN Supp. Decl. ¶ 9 ("The vast majority of RMIAN's volunteer attorneys do not have immigration law experience and would never consider

taking an immigration case without RMIAN's [support.]"); Amica Supp. Decl. ¶ 11; VAAP Supp.

Decl. ¶ 8; DHCC Supp. Decl. ¶ 7; Public Counsel Supp. Decl. ¶ 5; NIJC Supp. Decl. ¶¶ 6–8; KIND

Supp. Decl. ¶ 7.  The Cancellation Order cut funding for this essential mentorship and training.

Amica Supp. Decl. ¶ 8.  And Plaintiffs cannot sustain their representations (or take new ones)

without funding.  *See, infra,* at 20–22; ImmDef Supp. Decl. ¶ 7–12.  Defendants' post hoc "shift"

justification is contradicted by facts and history—and by what funding Defendants chose to cut.

Defendant's attempt to justify this as a cost-saving measure is likewise unavailing.  Dkt.

24-1 ¶ 18.  The TVPRA and the Foundational Rule require Defendants to fund direct

representation to the "greatest extent practicable" with appropriated funds.  *See, supra,* at 11, 13.

And Congress has ordered Defendants to spend appropriated funding to provide funded

representation for UCs.  For example, in 2022, the House Appropriations Committee, in support

of "the continued expansion of independent legal services for unaccompanied children," directed

that funded representations should "be made available to children *up to funded capacity.*" H. Rep.

117-403, at 200 (emphasis added).  An administration's "policy" of cutting spending is simply not

a legally cognizable reason to refuse to spend appropriated funds: the Executive cannot withhold

or delay disbursement of appropriated funds, even if it "has policy reasons . . . for wanting to spend

less than the full amount appropriated by Congress for a particular project or program."  *See In re*

*Aiken Cnty*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (plurality).

Because even these post hoc reasons offered in litigation fall apart under the slightest

scrutiny, the decision is arbitrary and capricious.  *See Encino Motorcars, LLC v. Navarro*, 136 S.

Ct. 2117, 2125 (2016) ("Where the agency has failed to provide even a minimal level of analysis"

for its decision, "its action is arbitrary and capricious.").

   **2.    Defendants Failed to Consider All Relevant Factors and Articulate a Rational**
   **Connection Between the Facts Found and the Choice Made.**

To survive arbitrary and capricious review, an agency must have "demonstrated a rational connection between the facts found and the choice made." *Wawszkiewicz v. Dep't of Treasury*, 670 F.2d 296, 301 (D.C. Cir. 1981) (quotation marks and citations omitted). Courts "do not defer to the agency's conclusory or unsupported suppositions." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engs.*, 255 F. Supp. 3d 101, 121–22 (D.D.C. 2017) (quotation marks and citations omitted). Even crediting Defendants' 'shift to pro bono' rationale, Defendants have not offered any analysis or findings that could show that such a "shift" is justified and could provide counsel "to the greatest extent practicable." And significant evidence demonstrates that ending funding for direct representation will decrease the number of pro bono representations as well. *See, supra*, at 16–17. Where, as here, "no findings and no analysis . . . justify the choice made," the APA "will not permit" a court to accept the agency's decision. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962). Because Defendants "should have considered those matters but did not," their "failure was arbitrary and capricious in violation of the APA." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).

### 3.     Defendants Failed to Offer a Reasoned Explanation for Their Policy Reversal.

When the government reverses its own established policy, it has an even greater burden to justify its actions. The agency must "acknowledge and provide an adequate explanation for its departure from established precedent, and an agency that neglects to do so acts arbitrarily and capriciously." *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) (quotation marks and citations omitted); *see also Encino Motorcars*, 579 U.S. at 221–22 (an agency cannot depart from prior policy without "explaining its changed position").

Defendants' refusal to fund *any* direct representation for UCs is a reversal of more than a decade of funding direct representation, continued year after year by congressional reports directing Defendants to fund direct representation and to *expand* such funding. By cancelling

funding with no explanation—or at most an insufficient and pretextual explanation—Defendants have acted arbitrarily and capriciously. *See Jicarilla Apache Nation*, 613 F.3d at 1119.

> **4.      To the Extent Defendants Offer Any Reasons, Those Reasons Are Pretextual.**

Defendants' two purported reasons for cutting off required funding are pretextual—Defendants want to substitute the Executive's policy goals for Congress's own considered policies that it expressed in the TVPRA and following appropriations bills and reports. *See*, *supra*, at 13, 17. Defendants have twice tried to stop funding legal representation for UCs. The February 18, 2025, Stop Work Order gave no reason and, to the contrary, stressed to Acacia that the order had *nothing* to do with "poor performance" of the funded services. *See* Dkt. 7-15, Ex. 1. The March 21, 2025, Cancellation Order also gave no reason—it simply cited "the Government's convenience." *See id*. at Ex. 3. Recent court filings reveal the Cancellation Order was issued shortly after a Department of Government Efficiency ("DOGE") staffer was detailed to the HHS department overseeing ORR "to identify waste, fraud, and abuse" under the DOGE Executive Order and given access to the extremely sensitive database of information about unaccompanied children. *See Am. Fed. Of Labor and Congress of Indus. Orgs. v. Dept. of Labor*, No. 1:25-cv-00339-JDB, Dkt. 73-2 at 11-12 (D.D.C.). Defendants now admit the decision was made because of "this Administration's policy goals," Dkt. 24-1 ¶ 18, and offer two pretextual justifications for those goals. But "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). That is what happened here, and Defendants have declined to produce a record that could show otherwise.

## II.    Plaintiffs Satisfy the Remaining Requirements for a Preliminary Injunction

## A.  Plaintiffs Face Irreparable Harm

A preliminary injunction is appropriate where, as here, the moving party shows that it faces irreparable harm—harm which is (1) "immediate", *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988), and (2) "for which there is no adequate legal remedy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

The Court correctly found Plaintiffs "are likely to suffer irreparable harm in the absence of preliminary relief." Dkt. 33 at 5. Defendants have not complied with the Court's Order, making the requested injunctive relief all the more critical. Defendants' termination of funding for direct representation directly interferes with Plaintiffs' missions, immediately impeding their ability to provide legal representation that is at the heart of Plaintiffs' missions. FIRRP Supp. Decl. ¶¶ 5–8; GHIRP Supp. Decl. ¶¶ 3, 7–8; ImmDef Supp. Decl. ¶ 7–12; VAAP Supp. Decl. ¶¶ 4, 7; Estrella Supp. Decl. ¶ 4; RMIAN Decl. (Dkt. 7-11) ¶ 22; VAAP Decl. (Dkt. 7-7) ¶¶ 21–22; NWIRP (Dkt. 7-10) ¶¶ 13–15; NIJC Supp. Decl. ¶ 9. There is no question ceasing funding for direct representation for UCs and terminating existing services causes imminent and irreparable harm to Plaintiffs and their missions. FIRRP Supp. Decl. ¶ 5; FIRRP Decl. (Dkt. 7-4) ¶ 37; NIJC Supp. Decl. ¶ 9. The Cancellation Order prevents Plaintiffs from providing thousands of UCs the direct representation required by the TVPRA and the Foundational Rule, frustrating Plaintiffs' primary missions of ensuring UCs are supported by legal counsel, including by representing these children as contemplated by Congress and the TVPRA. *See, e.g.*, FIRRP Supp. Decl. ¶ 5; ImmDef Decl. ¶ 2. If this occurs, "'there can be no do over and no redress.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).

Plaintiffs relied on Congress's and Defendants' assurances that funding would remain available.  Amica Decl. (Dkt. 7-15) ¶ 11; RMIAN Decl. (Dkt. 7-11) ¶ 18.  Cutting off funding threatens immediate and irreparable harm to Plaintiffs' missions and existence.  *See, e.g.*, CLSEPA Decl. (Dkt. 7-16) ¶ 13; VAAP Decl. (Dkt. 7-7) ¶¶ 22–24; KIND Decl. (Dkt. 7-18) ¶¶ 16–19.  For example, on April 1, 2025, ImmDef had to lay off twenty-four staff funded under the Unaccompanied Children's Program in response to the Cancellation Order; these staff losses threaten its ability to continue representing its 1,900 UC clients.  ImmDef Supp. Decl. ¶¶ 3–4; ImmDef Decl. (Dkt. 7-8) ¶¶ 20–22.  Since their initial declaration in this matter, VAAP has had to terminate 25% of their staff.  VAAP Supp. Decl. ¶ 3.  Amica Center has been unable to fill vacancies and expects it will only be able to fund representation of UC clients another 2 months, at most, before it materially limits other mission-driven work.  Amica Supp. Decl. ¶ 3.  Estrella del Paso has 324 cases and predicts the loss of funding will require layoffs and increase caseloads for its staff.  Estrella Decl. (Dkt. 7-14) ¶ 6. The Galveston-Houston Immigration Representation Project expects to lay off most of their Immigrant Children and Youth staff within four weeks. GHIRP Decl. (Dkt. 7-17) ¶ 23.  Sustaining these services, in accordance with its mission but without this funding, will cost the Northwest Immigrant Rights Project $200,000 a month.  NWIRP Decl. (Dkt. 7-10) ¶ 13.  Private providers and other organizations predict devastating financial consequences, including the potential for bankruptcy.  DHCC Decl. (Dkt. 7-5) ¶ 20; MM Decl. (Dkt. 7-19) ¶ 18; *see also* KIND Supp. Decl. ¶ 4 ("[O]n March 27, 2025, KIND laid off over 240 staff members in legal services psychosocial services, and other program support roles").  These losses do not account for the organizational knowledge at risk of being lost.  Estrella Decl. (Dkt. 7-14) ¶ 6; FIRRP Decl. (Dkt. 7-4) ¶ 38; Amica Decl. (Dkt. 7-15) ¶ 25; ImmDef Decl. (Dkt. 7-8) ¶ 21.

The harm to Plaintiffs and their clients is imminent, irreparable, and ongoing, particularly given Defendants' failure to comply with this Court's Order. The March 21, 2025, Cancellation Order terminated funding immediately, but provided no guidance as to how Plaintiffs could meet their existing obligations, including immigration court hearings scheduled for that week. DHCC Decl. (Dkt. 7-5) ¶ 15; Amica Decl. (Dkt. 7-15) ¶ 20; ImmDef Decl. (Dkt. 7-8) ¶ 24. Plaintiffs have ethical obligations to their clients and cannot immediately withdraw from representations; most attorneys require court permission to withdraw. FIRRP Decl. (Dkt. 7-4) ¶ 39. Plaintiffs and their clients are already experiencing irreparable harm far exceeding the mere loss of funding, including because they have had to furlough or layoff staff and increase the caseloads of staff who can stay on. *See e.g.* ImmDef Decl. (Dkt. 7-8) ¶¶ 20–22; Amica Supp. Decl. ¶ 3–4; NWIRP Supp. Decl. ¶ 5; Estrella Supp. Decl. ¶ 3. After reserves run out, ImmDef will be forced "to take drastic action to terminate staff across all positions funded under this contract." ImmDef Decl. (Dkt. 7-8) ¶ 21. Children's immigration cases "are complex, often take years to complete, and require highly skilled attorneys to competently handle them." *Id.* at ¶ 23. Impacted staff have years of individualized experience with clients, making replacing them impracticable.

Harms to children will be swift and severe, further frustrating Plaintiffs' missions to ensure as many noncitizens as possible receive legal support. For example, "if a child at one of the ORR-subcontracted facilities we serve is identified as having an urgent legal need such as an outstanding removal order, Amica Center—the only legal provider with access to the ORR-subcontracted facility—would not be funded to provide the necessary legal service to protect the child from imminent removal." Amica Decl. (Dkt. 7-15) ¶ 21; Amica Supp. Decl. ¶ 8 (to their knowledge "*no* children in the ORR-subcontracted facilities with which [they] work have successfully obtained pro bono representation since March 21."). This is even more troubling in light of policies

increasing the need for legal services, including notices on March 21, 2025 (the day of the Cancellation Order) that "DHS would begin serving Notices to Appear (NTAs) 'imminently' on children in ORR custody and that those Master Calendar Hearings were expected to take place 'in the coming days and weeks.'" Amica Supp. Decl. ¶ 76; FIRRP Supp. Decl. ¶¶ 5–8; NIJC Supp. Decl. ¶¶ 4, 9. Without funding or guidance, Plaintiffs will not be able to fulfill their missions and represent UCs in these proceedings. *See* RMIAN Supp. Decl. ¶ 6–7. As Plaintiff ImmDef explains, "[a]t this very moment, there are children in ORR custody who need our representation who are not receiving it. This means that children who want voluntary departure will have their return home unacceptably delayed, victims of trafficking will not be able to access the protections they deserve, and children fleeing persecution will not be able to have their day in court." ImmDef Decl. (Dkt. 7-8) ¶ 25. Absent a preliminary injunction, Plaintiffs will suffer irreparable harm.

## B.  The Balance of Equities

Finally, in considering whether to grant a preliminary injunction, the Court should "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (quoting *Winter*, 555 U.S. at ). Where an injunction will not "substantially injure the other [interested] parties," the balance of equities tips in plaintiffs' favor. *Nken*, 556 U.S. at 434. Here, the balance of the equities "tip[] sharply in the [Plaintiffs'] favor," supporting a preliminary injunction. *Cottrell*, 632 F.3d at 1135.

Defendants will not be harmed by a preliminary injunction: as the Court found, "[t]he Government fails to convince that it would suffer harm" from injunctive relief. Dkt. 33 at 6. The Government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *cf. Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983). Instead, "there is a substantial public interest in having governmental agencies

Plaintiffs' Notice of Motion and Motion for a Preliminary Injunction

23

abide by the federal laws that govern their existence and operations." *State v. Azar*, 385 F. Supp. 3d 960, 985 (N.D. Cal. 2019), *vacated on other grounds and remanded sub nom. California ex rel. Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (quoting *Newby*, 838 F.3d at 12) (cleaned up).

Terminating funding for direct representation for UCs, without any plan to ensure current representations are not interrupted, violates Congress's directive in the TVPRA and ORR's own commitments in the Foundational Rule. And as the Court found, "the maintenance of funding for direct legal representation services furthers the critical public interests of ensuring children have access to legal representation and protection from human trafficking." Dkt. 33 at 6. Maintaining "funding of legal representation for unaccompanied children promotes efficiency and fairness within the immigration system." *Id.*; *see also* Dkt. 28 (former immigration judges explaining the importance of continued funding); 89 Fed. Reg. at 34528-29 (recognizing benefit of UC representation to the immigration system generally); *see also* Dkt. 7 at 29.

Because Defendants do not face any injury from the issuance of an injunction to stop their illegal action and Plaintiffs and the public have a substantial interest in maintaining legal representation, the balance of equities weighs heavily in favor of issuing a preliminary injunction. Defendants' failure to comply with this Court's Order only further weighs in favor of a preliminary injunction here.

## III.    A Nationwide Injunction is Appropriate

While injunctive relief must be tailored to the scope of the case, "there is no bar against . . . nationwide relief in federal district or circuit court when it is appropriate," such as when nationwide "breadth is necessary to give prevailing parties the relief to which they are entitled." *Bresgal v. Brock*, 843 F.2d 1163, 1170–71(9th Cir. 1987). A number of factors counsel in favor of a nationwide injunction here. **First**, APA injunctions are often nationwide, because when Defendants violated the APA, they did so without geographic limitation. *See E. Bay Sanctuary*

*Covenant*, 993 F.3d at 680-81 (cleaned up).  **Second**, nationwide injunctions are also common in cases like this that involve immigration policy set by Congress, because "a fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy."  *Washington v. Trump*, 847 F.3d 1151, 1166–67 (9th Cir. 2017).

**Third**, plaintiffs are located throughout the country, and "[d]ifferent interpretations of executive policy across circuit or state lines will needlessly complicate agency and individual action," *see E. Bay Sanctuary Covenant*, 993 F.3d at 681, and piecemeal injunctive relief for the more than 80 providers nationwide would be impractical to administer.  *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326–27 (4th Cir. 2021).  The only complete and manageable relief is a nationwide injunction.  *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

## IV.    The Court Should Not Require an Injunction Bond

Courts have broad discretion in determining whether a bond should be required under Federal Rule of Civil Procedure 65(c).  *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999).  And a district court may "dispense with the security requirement" entirely, or "request mere nominal security," if "requiring security would effectively deny access to judicial review." *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir.1985); *see also Nat'l Council of Nonprofits*, 2025 WL 597959 at *19.  The Court found no injunction bond was necessary under Rule 65(c) to issue a temporary restraining order, Dkt. 33 at 7, and it should reach the same conclusion for a preliminary injunction—where the analysis is the same.

## CONCLUSION

Defendants' actions violate the APA.  Because this conduct causes Plaintiffs immediate and irreparable harm, this Court should grant provisional nationwide relief enjoining Defendants' illegal actions and preserving the status quo pending a final judgment.  The Court should tailor its relief in light of Defendants' failure to comply with the temporary restraining order.

Plaintiffs' Notice of Motion and Motion for a Preliminary Injunction

Respectfully submitted,

April 4, 2025

/s/ Alvaro M. Huerta                          /s/ Samantha Hsieh

IMMIGRANT DEFENDERS LAW CENTER          AMICA CENTER FOR IMMIGRANT
Alvaro M. Huerta (CA Bar No. 274787)          RIGHTS
Carson A. Scott (CA Bar No. 337102)          Adina Appelbaum (*pro hac vice*)
Lya Ferreyra (CA Bar No. 340148)          Samantha Hsieh (*pro hac vice*)
Immigrant Defenders Law Center          Peter Alfredson (D.C. Bar No.
634 S. Spring St., 10th Floor          1780258)*
Los Angeles, CA          Evan Benz (*pro hac vice*)
(213) 634-0999          Amica Center for Immigrant Rights
ahuerta@immdef.org          1025 Connecticut Ave., N.W., Suite 701
cscott@immdef.org          Washington, D.C. 20036
lferreyra@immdef.org          (202) 331-3320
          adina@amicacenter.org
          sam@amicacenter.org
/s/ Karen C. Tumlin          peter@amicacenter.org
          evan@amicacenter.org
JUSTICE ACTION CENTER
Esther H. Sung (*pro hac vice*)          *pro hac vice* forthcoming
Karen C. Tumlin (CA Bar No. 234691)          *Attorneys for Plaintiffs*
Laura Flores-Perilla (CA Bar No. 355645)*
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

Plaintiffs' Notice of Motion and Motion for a Preliminary Injunction

26

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>        Defendants. | Case No. 3:25-CV-02847-AMO<br><br>**[PROPOSED] PRELIMINARY INJUNCTION** |

1

**AND NOW**, this ___ day of _____, 2025, upon consideration of Plaintiffs' Motion for Preliminary Injunction, the memorandum and evidence in support thereof, Defendants' response thereto, and Plaintiff's reply, it is **HEREBY ORDERED** that Plaintiffs' Motion is **GRANTED** as follows:

> Defendants are **ENJOINED** from withdrawing the services or funds provided by the Office of Refugee Resettlement ("ORR") as of March 20, 2025, under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and ORR's Foundational Rule, 45 C.F.R. § 410.1309(a)(4), particularly ORR's provision of funds for direct legal representation services to unaccompanied children. This injunction precludes cutting off access to congressionally appropriated funding for its duration.

This injunction takes effect immediately, replacing the Court's April 1, 2025 temporary restraining order (Dkt. 33), and will remain in place until a final judgment on Plaintiffs' claims. Defendants will provide a status update to the court 3 business days from this order to report on compliance with the injunction. Non-compliance or delayed compliance may result in a contempt finding and sanctions.

_____
UNITED STATES DISTRICT JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

Case No. 3:25-cv-2847

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

**SUPPLEMENTAL DECLARATION OF
DANIELA HERNÁNDEZ CHONG CUY
(LAW OFFICE OF D. H. CH. C.) IN
SUPPORT OF PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

**SUPPLEMENTAL DECLARATION OF DANIELA HERNÁNDEZ CHONG CUY FOUNDER, DIRECTING ATTORNEY AND OWNER OF THE LAW OFFICE OF DANIELA HERNÁNDEZ CHONG CUY**

*I, Daniela Hernández Chong Cuy, make the following statements on behalf of myself and the Law Office of Daniela Hernández Chong Cuy. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 7-5) as if fully set forth herein.

2. My name is Daniela Hernández Chong Cuy and I am the founder, owner and Directing Attorney of the Law Office of Daniela Hernández Chong Cuy, a Professional Corporation. ("Law Office of D. H. CH. C."). Based in Pasadena, California, the Law Office of D. H. CH. C. provides comprehensive legal representation to unaccompanied immigrant children formerly in the custody the Office of Refugee Resettlement ("ORR") in Los Angeles, San Bernadino, Ventura, and Riverside counties. We are also the sole legal service provider for two ORR long-term foster care facilities ("LTFC"): Building Bridges Foster Family Agency in Ontario, CA, and MarSell Wellness in Montebello, CA.

3. My office currently represents around 60 children under the ORR contract. As of this date, I have not withdrawn representation for any case, but I am preparing to do so, for the reasons stated below.

4. My office faces the prospect of having to furlough and shut down operations by July 2025 if funding for the representation is not restored. On April 1, 2025, I retained Ethics Counsel, at my law firms' expense, to be able to ethically withdraw from cases before that date. I am currently preparing, with advice from my Ethics Counsel, an internal policy for withdrawing from cases, identifying which cases to withdraw from, and the timeline and procedures that would apply to those withdrawals.

5. As of this date, I have been unable to withdraw from any cases due to the number of court hearings and filing deadlines I have had to comply with in the weeks since the contract termination. In total, for the month of April 2025, my office has seven court hearings (in Immigration Court and State Court), one asylum interview, and one USCIS deadline to respond to for clients retained under the ORR contract. We had three additional asylum interviews for this month that we moved to reschedule for a later date, including one for a one-year-old LTFC client. Just today, April 2, 2025, we appeared for two cases in the detained juvenile docket in immigration court for clients in Long Term Foster Care. Tomorrow, April 3, 2025, we have an asylum interview in the Asylum Office for another client retained under the ORR contract.

1

6. Due to the imminency of those hearings and legal deadlines, we could not ethically withdraw from the cases without prejudicing our clients, so we have continued to represent them at our own expense. To give a minor example, our time and travel to the Asylum office, around 80 miles round trip from our office location, is no longer going to be reimbursed by the contract. The expenditure of human resources, time, and materials required to represent existing clients under the ORR contract does not allow a small office like mine to pivot finding additional sources of income.

7. I was advised by my Ethics Counsel to not seek non-immigration *pro bono* counsel to place cases, as I did not have the capacity to train them and supervise them, which could lead to inadequate representation and ethical violations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 2 of April 2025, in Pasadena, California.

_____

**Daniela Hernandez Chong Cuy**
**Directing Attorney/Owner**
**Law Office of Daniela Hernández Chong Cuy**
**UCP Legal Service Provider**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

Case No. 3:25-cv-2847

**SUPPLEMENTAL DECLARATION OF
MARTHA RUCH (CLSEPA) IN
SUPPORT OF PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

## SUPPLEMENTAL DECLARATION OF MARTHA RUCH
## LEAD IMMIGRATION MANAGING ATTOREY FOR CLSEPA

*I, Martha Ruch, make the following statements on behalf of myself and Community Legal Services in East Palo Alto (CLSEPA).  I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 7-16) as if fully set forth herein.

2. My name is Martha Ruch, and I am the Lead Managing Attorney of the Immigration Program at Community Legal Services in East Palo Alto ("CLSEPA"). I have been an immigration attorney with CLSEPA for five and a half years, since September 2019. CLSEPA is a non-profit legal aid organization that serves residents of San Mateo County and Santa Clara County, California. CLSEPA has offices in the city of East Palo Alto, San Francisco, and Mountain View. CLSEPA is one of the primary organizations dedicated to providing free immigration legal services to low-income immigrants in San Mateo County and Santa Clara County, California, including indigent unaccompanied immigrant children who are residing with sponsors in the San Francisco Bay Area after their release from Office of Refugee Resettlement ("ORR") custody.

3. CLSEPA represents 23 children in their immigration matters whose cases were funded by U.S. Department of Health and Human Services ("HHS"). One client's case is still in administratively closed deportation proceedings in immigration court. Since the termination of funding on March 21, 2025, CLSEPA attorneys have received one pending referral from Catholic Charities Santa Clara County for a new potential client. Due to the loss of funding from HHS that supports our legal representation of unaccompanied immigrant children, CLSEPA has been unable to accept new referrals.

4. The financial impact of the loss of this funding is difficult for our organization. HHS provided long-term funding that potentially could cover the full cost of the case. HHS provided sustainable funding that would allow for long-term representation that is required for these children, whose cases may remain in process for months or years into the future based on current processing times and policy. Without this funding, we must reconsider whether we have enough funding to cover the costs of representation in the future.

5. CLSEPA provides legal services in the areas of housing, workers' rights, and reentry, in addition to immigration. We assist all residents of San Mateo and Santa Clara Counties, no matter their race, ethnicity, age, national origin, veteran status, or language. HHS funding is one piece of our budget puzzle, but it is a critical piece that supports our work with our most vulnerable clients – children who are in foster care or ORR facilities and who face

PI Appeal and Stay Addendum 367

deportation. This work is time-consuming and requires high levels of competency with immigration law and with working with children. Our budget is always tight, and without this funding, we cannot backfill open positions on our immigration team. Each of CLSEPA's attorneys are now responsible for more clients since HHS abruptly cut the funding for our direct legal representation work and left us unable to rehire.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 3rd of April 2025, in San Francisco, California

**Martha Ruch**
Lead Managing Attorney, Immigration Program
CLSEPA

2

*et al.*

( )
**IN SUPPORT OF PLAINTIFFS'**

*et al.*

PI Appeal and Stay Addendum 369

## SUPPLEMENTAL DECLARATION OF MELISSA MARI LOPEZ
## EXECUTIVE DIRECTOR, ESTRELLA DEL PASO

*I, Melissa Mari Lopez, make the following statements on behalf of myself and Estrella del Paso. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 7-14) as if fully set forth herein.

2. My name is Melissa Mari. Lopez, and I am the Executive Director at Diocesan Migrant & Refugee Services doing business as Estrella del Paso ("Estrella del Paso"). Estrella del Paso is the largest provider of free immigration legal services in West Texas and New Mexico. Estrella del Paso is based out of El Paso, Texas but provides legal services to populations living anywhere in West Texas and the state of New Mexico who have removal proceedings venued in the El Paso, Texas before the El Paso Non-Detained Immigration Court, the El Paso Detained Immigration Court, or the Otero Detained Immigration Court. Estrella del Paso is the primary organization in West Texas and New Mexico providing legal services to indigent, unaccompanied immigrant children who are not in detention as well as those detained in Office of Refugee Resettlement (ORR) custody in El Paso County.

3. Despite the Temporary Restraining Order (TRO) being in effect since yesterday, the Office of Refugee Resettlement ("ORR") has not yet provided any updates as to the status of the termination. As a result, we have 22 staff members who remain on furlough despite the court's order. We have had shelters in our region reach out to let us know that they were provided notice by ORR that the funding for Long-Term Foster Care had been restored; however, this information has yet to be communicated to Estrella del Paso. We have kept all furlough employees on health insurance to ensure continuity of their medical care; however, because of ORR's failure to provide clarification regarding the continuation of work, Estrella del Paso is currently incurring the full cost of the medical insurance. There is grave concern on our part about the need for our furlough staff members to soon begin seeking other jobs. At present, all team members are highly trained and have been with the organization for more than one year. If these employees find alternative employment, this will have an incredible impact on our ability to reinstate the services previously terminated. Instead, we would have to focus numerous resources on hiring and training new employees.

4. The termination of funding has also had a tremendous impact on the children in ORR shelters. One child was not able to sleep the night before his court hearing on March 28 because he was so fearful of going to court and going to court without anyone there to assist him. Typically, our team would have met with him in advance of court to explain the

PI Appeal and Stay Addendum 370

process and what to expect, and we would have accompanied him to court in at minimum a Friend of the Court capacity. Instead, this child had to attend court alone. On March 28, 2025, 25 children appeared before the El Paso Immigration Court without the benefit of Friend of Court services. On April 4, 2025, 20 children appeared before the El Paso Immigration Court without the benefit of Friend of Court services. On April 11, 2025, 11 children appeared before the El Paso Immigration Court without the benefit of Friend of Court services. Finally, 11 children are currently in need of representation before the Texas State Family courts to pursue their immigration benefits and are unable to do so.

5. As noted in my original declaration Paragraph 7, El Paso has almost no pro bono service providers. In 2024, Estrella del Paso provided services to 64,008 individuals; however, we were only able to secure pro bono assistance for one case. In that case, the pro bono attorney only agreed to represent the unaccompanied child before the Family Court in El Paso but would not undertake representation of the immigration matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 3rd of April 2025, in El Paso, Texas.

Digitally signed by Melissa M. Lopez
Date: 2025.04.03 16:17:18 -06'00'

Melissa M. Lopez
Executive Director
Estrella del Paso

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

Case No. 3:25-cv-2847

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

         Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

         Defendants.

**SUPPLEMENTAL DECLARATION OF
ROXANA AVILA-CIMPEANU (FIRRP)
IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY
INJUNCTION**

**SUPPLEMENTAL DECLARATION OF ROXANA AVILA-CIMPEANU, DEPUTY DIRECTOR, THE FLORENCE IMMIGRANT AND REFUGEE RIGHTS PROJECT**

*I, Roxana Avila-Cimpeanu, make the following statements on behalf of myself and The Florence Immigrant and Refugee Rights Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 7-4) as if fully set forth herein.

2. My name is Roxana Avila-Cimpeanu. I am a licensed attorney and a member in good standing in the State Bar of Arizona. I am currently employed as Deputy Director of the Florence Immigrant & Refugee Rights Project ("Florence Project" or "FIRRP"). I joined the Florence Project on September 6, 2016, and have served in my current role since September 2024. Before I assumed my current position, I previously served as Children's Legal Program Manager, Managing Attorney for the Children's Pro Bono Program, Pro Bono Mentor, Staff Attorney, and Law Graduate with the Florence Project's Children's Legal Program serving unaccompanied immigrant children in Arizona. During my time at the Florence Project, I have personally provided free legal services, including friend of court services, direct representation, legal orientation and education, and pro bono mentorship, to at least 140 children. Additionally, as Children's Legal Program Manager and Deputy Director I have supervised attorneys, pro bono volunteer attorneys, law graduates, accredited representatives, legal assistants, intake specialists, and social workers who have provided free legal services, both direct representation and pro se services, to thousands of individuals detained in Office of Refugee Resettlement "ORR" and ICE custody in Arizona.

3. Since filing the Motion for Temporary Restraining Order (TRO) on March 27, 2025, the Florence Project has continued to provide services to our clients, drawing on funding from other sources and fundraising to ensure that we are able to provide legal representation, pro bono placement and mentoring, additional legal services, court preparation, and friend of court services to unrepresented children in keeping with our mission for as long as we can responsibly financially manage to do so. Since the termination order on March 21, 2025, Florence Project staff have provided over 500 hours of programmatic services that would have fallen under terminated portions of the UCP, including meeting with clients, preparing necessary applications and filings, preparing individuals for upcoming hearings and interviews, attending Immigration Court hearings, attending juvenile court hearings necessary for children who have been abandoned, abused, or neglected to seek immigration relief, and collecting and tracking necessary data and documentation for case management.

1

4. FIRRP attorneys have several important and imminent hearings for clients, for which withdrawal of representation would cause great harm to the children's cases and lives. FIRRP staff have at least eleven EOIR hearings and fourteen state court hearings scheduled for clients in the coming weeks. The hearings are essential to avoid removal while the children seek relief, including state court predicate orders for abused, abandoned, or neglected children.

5. The significant harms to our clients and our organizational mission that will take place if we are unable to continue our representation and other legal services are being exacerbated by current government policies that are accelerating the speed and need for immediate legal services. For example, in the Tucson Immigration Court, we have seen a return to so-called "rocket dockets," in which the government is rapidly scheduling a child to appear in court, moving them quickly into removal proceedings, even knowing that many such children are likely to reunify with sponsors outside of Arizona and should have their cases scheduled in those other locations. Indeed, in the Tucson Immigration Court children's names are being added to the docket before their Notice to Appear, the official charging document, is even formally filed, raising serious due process concerns. Rocket dockets historically have been used to pressure children to accept removal orders quickly before they have an opportunity to feel settled and supported and often undermine due process for children. Rocket dockets not only increase the speed at which Florence Project attorneys have to prepare cases of clients we are representing, but also create an increased need for Friend of Court services that have been cut under the UCP termination. Since the Florence Project began serving children in 2000, a central tenet of our mission has been that no child should have to stand alone in court. As Friend of Court, Florence Project staff meet that mission even when we cannot represent a child, by being present to stand with the child and help the Court understand key facts that are relevant to assess the appropriate next steps in the case, such as reunification status, best language, and potential forms of relief. As of the date of signing, Florence Project is aware of at least eleven cases moving forward next week on the rapid docket in Tucson, including four clients we already represent and seven children who do not have counsel, but to whom we would provide Friend of Court services. In two of these cases, the children who are on the court's docket do not appear to have a properly filed and served Notice to Appear.

6. The UCP contract termination also has aligned with increased need for legal services on a short timeframe in the context of children's asylum cases. Specifically, on or about March 27, 2025, Florence Project staff began to receive notices from USCIS of asylum office interviews being scheduled in cases with pending asylum applications. As of April 2, 2025, Florence Project staff have received asylum interview notices for at least seven clients, many with less than two-weeks' notice to prepare. Florence Project attorneys did not get any prior notice that an asylum office circuit ride – the term used when asylum officers come to Arizona to do many asylum interviews at one time – was planned prior to receiving

PI Appeal and Stay Addendum 374

notice of the scheduled interviews. Due to this asylum office circuit ride, Florence Project attorneys have had to quickly reach out to clients to schedule client meetings, conduct final preparation and supplemental briefing for interviews, and otherwise coordinate the logistics for an asylum interview including identifying and contracting with interpreters – in asylum interviews, the petitioner must provide a competent interpreter, which is also a cost that typically is paid for through now terminated provisions of the UCP. Asylum interviews are very traumatic for children and careful preparation and attention must be paid to avoid re-traumatization and to prepare children to talk about the worst days of their lives with a complete stranger. Additionally, attorneys must prepare updated, supplemental briefings in order to support their client's claim, which often requires translation of documents and evidence from the client's country of origin. With the loss of UCP-funded interpreter services, it has been extremely challenging to prepare the children, prepare the supplemental briefing, and schedule an interpreter for the hearing. This is further complicated by the fact that many FIRRP child clients speak rare Mayan indigenous languages, or unique dialects of less common languages for which interpreters are not readily available. Although a TRO has been entered in this case, the Florence Project has yet to receive any guidance about whether interpretation services are again available under the UCP and is currently paying for these services through other funding.

7. Six Florence Project clients also will be turning 18 in the month of April, and do not have any current sponsorship options. In such cases, Florence Project attorneys and social workers routinely work to identify safe, viable placements for these children to help ensure that children are placed in the least restrictive setting, as required under law[1], rather than sending these vulnerable youth to adult detention. Many such clients may be eligible for the Unaccompanied Refugee Minor program ("URM"), however children need support both in applying for the program and finding interim housing options since the URM program has been at capacity for the past 6 months. While this work historically was partially supported through the UCP, Florence Project is currently drawing on other funds to try to ensure that children who turn 18 in custody have options for release and do not experience the trauma of being moved to adult immigration detention. Furthermore, the Florence Project had received referrals for children ORR is intending to potentially transfer to the local Unaccompanied Refugee Minor Program, and FIRRP would be unable to offer representation to children in the program, resulting in a potential loss of counsel for the children.

8. Additionally, last week, five clients were targeted under DHS' so-called "missing children" visits, despite the children having active cases at USCIS and not actually being missing. In every case, Florence Project attorneys have had to work with our clients and their sponsors

---

[1] *See* Garcia Ramirez v. ICE, No. CV 18-508 (RC), 2021 WL 4284530, at *8, *14 (D.D.C. Sept. 21, 2021).

to help them know how to respond and answer their questions in response to this traumatizing, fear-inducing experience.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 4 of April 2025, in Seattle, Washington.

Roxana Avila-Cimpeanu
Deputy Director
The Florence Immigrant and Refugee Rights Project

4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | Case No. 3:25-cv-2847 <br><br> **SUPPLEMENTAL DECLARATION OF ELIZABETH SANCHEZ KENNEDY (GHIRP) IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

**SUPPLEMENTAL DECLARATION OF ELIZABETH SANCHEZ KENNEDY**
**Executive Director, Galveston-Houston Immigrant Representation Project (GHIRP)**

*I, Elizabeth Sanchez Kennedy, make the following statements on behalf of myself and Galveston-Houston Immigrant Representation Project (GHIRP). I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1.  I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 7-17) as if fully set forth herein.

2.  My name is Elizabeth Sanchez Kennedy, and I am the Executive Director at the Galveston-Houston Immigrant Representation Project. GHIRP is a legal services organization that was launched in October 2020 with a mission to build a resilient, diverse community by providing comprehensive representation and holistic legal services to immigrants in need. GHIRP's legal services range from outreach and education to complex litigation in the Galveston-Houston area. Our legal team provides holistic and comprehensive representation to immigrants in the community, including unaccompanied minors, adults, and women, children, and families.

3.  Despite the partial contract termination, GHIRP's Immigrant Children & Youth team continues to provide legal services to detained and released unaccompanied immigrant children in the Galveston-Houston area. For example, since this lawsuit was filed, GHIRP has performed the following work for existing clients: filed six I-765 applications, two I-589 applications, two motions to terminate, one motion to reopen, one T-visa application, and at least eleven (11) filings in state court for clients who qualify for Special Immigrant Juvenile status; and attended two hearings in Immigration Court and two hearings in state court. We are relying on general operations funding (reserved for other purposes and programs) to continue meeting our ethical obligations to our clients, including filing deadlines and court appearances, and serve children with emergency needs that have arisen since the partial contract termination. GHIRP management will implement staffing decisions, including layoffs, next week.

4.  GHIRP's casework continues at a high volume, as the courts are moving forward on cases and the detained dockets are moving at an expedited pace. In the next month, nine (9) of our clients have hearings in Immigration Court, including one Individual Hearing. GHIRP attorneys also have multiple hearings in state court scheduled for later this month for clients who could lose eligibility for Special Immigrant Juvenile status if we are not able to prove up their cases.

1

5. GHIRP mentors and supervises pro bono attorneys we have engaged on several clients' cases, particularly in the state court proceedings that provides the basis to seek Special Immigrant Juvenile status. We often recruit and engage pro bono attorneys to handle this portion of the immigration case because it can be time consuming, procedurally complicated, and very fact-specific. Among our clients with pending state court proceedings by pro bono attorneys are two sisters, ages 14 and 15, from Central America, who currently live in Galveston with their grandmother, and were previously abandoned by their father. GHIRP represents the girls in their Immigration Court proceedings and our legal team needs to be able to provide ongoing mentorship to the pro bono attorney who is handling their case in the local court.

6. GHIRP's legal team has continued preparing *pro se* detained children for their hearings in immigration court and provides "Friend of Court" services for those required to appear before the Immigration Judge. After the implementation of so-called 'rocket dockets' nationwide, the local ICE Field Office Juvenile Coordinators (FOJC) filed Notices to Appear immediately for the currently detained children. Cases are being fast-tracked, and children are being rapidly scheduled for Master Calendar Hearings on the Houston detained juvenile docket.

7. On April 2, 2025, a GHIRP attorney appeared as Friend of Court for the detained docket. The Immigration Judge asked about the status of the funding and exclaimed her gratitude when we informed her that we would continue providing these services, at least temporarily. She told our attorney that we are "invaluable" to her and explained that the prior week had been very difficult because many detained children at other facilities had hearings, but no ORR-funded attorneys had appeared as Friend of Court due to the loss of funding.

8. Through GHIRP's non-representational legal services at our two assigned ORR facilities, we have encountered several children requiring immediate legal assistance. The children would have previously been categorized as mandatory or priority representation cases under the contract activities requirements. However, now we face the difficult decision of representing the children without funding or leaving them to fend for themselves in situations that almost certainly will result in their immediate deportation.

9. Among the detained children we have met recently is a tender aged child who was taken into immigration custody after a local traffic stop. Immigration officials placed him in ORR custody which separated from his parents, who have lawful status, and he is now experiencing extreme trauma exacerbated by the fact that he is at imminent risk of deportation. Additionally, GHIRP is working with five siblings who were recently orphaned en route to the United States. Due to recent, heightened ORR evidentiary

PI Appeal and Stay Addendum 379

requirements for sponsors, the children face prolonged detention if GHIRP is not able to advocate for their interests.   Finally, we met two siblings, aged 10 and 13, who were trafficked by a family member and were placed in ORR custody after local police rescued one of the children from the streets. All of these children require child-friendly, trauma-informed legal services to ensure their safety and protection.

10. As a result of recent events, it has become more evident than ever that ORR facility staff at the two shelters we serve are appreciative of the work we do as legal service providers. When discussing the partial contract termination with one of our facilities, a senior shelter staff member stated, "we deeply appreciate the support you offer to the children in our program."

I declare under penalty of perjury that the foregoing is true and correct.


Executed on the 3rd of April 2025, in Houston, Harris County, Texas.

 /s/ Elizabeth Sanchez Kennedy
_____
**Elizabeth Sanchez Kennedy**
**Executive Director**
**Galveston-Houston Immigrant Representation Project (GHIRP)**

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

**SUPPLEMENTAL DECLARATION OF MARION ("MICKEY") DONOVAN-KALOUST (IMMDEF) IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**SUPPLEMENTAL DECLARATION OF MARION DONOVAN-KALOUST**
**DIRECTOR OF LEGAL SERVICES AT IMMIGRANT DEFENDERS LAW CENTER**

*I, Marion Donovan-Kaloust, make the following statements on behalf of myself and Immigrant Defenders Law Center. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 7-8) as if fully set forth herein.

2. I am the Director of Legal Services of the Children's Representation Project ("CRP") at Immigrant Defenders Law Center ("ImmDef"), where I have been employed for almost ten years. ImmDef is a non-profit organization headquartered in Los Angeles, California, with additional offices in Santa Ana, Riverside and San Diego. ImmDef believes in providing universal representation so that no immigrant is forced to face removal proceedings without an attorney or accredited representative at their side. ImmDef is the largest provider of legal services to unaccompanied children in California and currently provides legal services to children housed in seventeen Office of Refugee Resettlement ("ORR") facilities throughout Southern California. ImmDef also represents thousands of unaccompanied children who have been released from ORR and are residing with sponsors in the Greater Los Angeles area.

3. On April 1, 2025, as a result of the March 21, 2025, near total termination of funding for legal services for unaccompanied children, ImmDef laid off twenty-four staff out of the 113 employees previously funded under the Unaccompanied Children's Program ("UCP"). Supervisors are struggling to redistribute work and ensure no balls are dropped. Support that was previously available to attorneys to best represent clients is now unavailable. For example, we were forced to lay off multiple case managers who provided key social services support for our child clients. Case managers assist children with school enrollment, housing insecurity, and other social services needs they require to adjust to a new community and culture. As I stated in my prior declaration, most of our child clients are indigent, so having staff assist them in accessing social services is key to their ability to participate meaningfully in their immigration cases-- a child facing homelessness is not likely to be able to focus on keeping appointments with their attorney. We also know that our child clients often face barriers in accessing school enrollment, due to linguistic and cultural challenges, or schools not understanding their sponsor's authority to enroll them in school. Our child clients, and thus our mission to provide comprehensive immigration representation, will suffer without this key support.

1

4. We also laid off multiple members of our legal assistant team. These team members were some of the first points of contact for clients and their families and played a key role in maintaining files, submitting filings and supporting our client representation. As mentioned in my prior declaration, we have over 1,900 open cases funded under the terminated UCP program, and over 3,000 open cases organization wide. In such a high-volume practice, administrative support is key to ensuring that nothing falls through the cracks and that our ethical responsibilities to our clients are faithfully discharged. Without this support, even more burden will fall on our attorney team at a time of incredible stress, and at a time when unaccompanied children's cases are being expedited through the deportation process.

5. We were also forced to lay off multiple members of our Detained Youth Empowerment Project. In addition to providing Know Your Rights presentations and legal screenings (which were not immediately terminated under CLIN1), these team members played an incredibly important role in the provision of CLIN2 services. They were some of the first friendly faces detained children saw in the United States, and were key sources of stability and empathy for children under incredible stress. These team members made referrals to the Young Center for Immigrant Children's rights as well as to legal services for children who will reunify with a sponsor outside our service area. They also provide planning support for children aging out of ORR custody. This age-out support is crucial, especially as we expect to see more children turn eighteen and "age out" of ORR care due to changing ORR policies which make it increasingly difficult for children to be reunified with family members. Laid off staff prepared unrepresented children for court appearances and assisted with the provision of "Friend of Court" services. They heard shelter conditions concerns from children and elevated them to ORR subcontracted facility members and ORR officials to ensure children's rights are respected while in government care. All of these services were defunded.

6. In an attempt to retain specialized attorney staff members, we transferred one attorney from the Children's Representation Project onto another grant, rather than hiring externally for that role. With a hiring freeze in place, we cannot replace him on the Children's Representation Project. Instead, other attorneys in the Children's Representation Project will now have to absorb his cases into their already growing caseloads. Additionally, three staff members tendered their resignations in March and early April because of the uncertainty created by the UCP program termination and the fear they might soon be laid off. As mentioned in my previous declaration, our reserves will only last about six months. If the funding is not restored, additional layoffs impacting all positions would be required, with disastrous consequences for our child clients and on our mission.

7. In addition to the layoffs, resignations and reassignments, there have been multiple immediate impacts on the children we serve. After the UCP program partial termination, we reached out to the ORR-subcontracted facilities we service to let them know we could

2

not retain new clients. Some Long-Term Foster care programs had just accepted new children, and asked us what to do, since the children would now be without counsel. The government's complete lack of a stop gap plan has left us with no guidance with which to address these concerns. Emergencies in these detained unaccompanied children's cases are ongoing despite their lack of access to representation. One child ages out in just a couple months, and is losing precious time to apply for relief every day that passes they are without counsel. Other recently arrived children now face being warehoused until they are deported or age out. Without funding and with layoffs on the table, we were unfortunately unable to offer these children representation. The subcontracted facilities asked if they should stop accepting children since they will lack access to counsel, and I had to tell them that every single LSP in the country is facing the same drastic cut, and likely every detained child in the nation would be unable to access counsel.

8. Even children with counsel are experiencing additional hurdles to their ongoing representation. The week after the termination, a child we represent who speaks a Mayan language had to be prepared for an upcoming hearing. Our access to interpretation services had been terminated along with all representation services, and the child's attorney was unable to communicate with him. Though ImmDef has a direct contract with an interpretation service and could thankfully pay out of pocket for these services (at least for now), that interpretation service does not offer Mayan languages. The attorney had to seek a continuance in immigration court due to the inability to communicate with her client, delaying the proceedings needlessly.

9. The program termination also places children in danger. The week after the termination, ImmDef staff learned of a significant, potentially life-threatening safety incident impacting a detained infant. In addition to placing the baby's safety at risk, the incident also likely impacted their eligibility for legal relief. Because of the seriousness of the situation, ImmDef stepped in to offer support and advocacy on the child's behalf, knowing we would likely not be compensated for this work. The UCP program termination has put us in a position that forces attorneys to choose between their moral duty to protect an infant from harm and working without compensation.

10. The UCP program termination has also had immediate impacts on stakeholders. As mentioned above, ORR subcontracted facilities are at a loss about what to do for children in their care who are in imminent need of representation. The same day as the UCP program termination, on March 21, 2025, we learned that ORR-subcontracted facilities were warned by ORR to prepare for expedited removal hearings for detained children. Over the past week, we saw those hearings roll out as subcontracted facilities struggled to understand their responsibilities and how to make the children available for these expedited hearings.

11. At the detained juvenile docket held April 2, 2025, ImmDef represented all the children at facilities we serve who were scheduled on that docket and appeared on their behalf despite the fact that funding has not been restored in light of our ethical responsibilities to our clients. The week following the UCP program termination and again on April 2, the Immigration Judge asked whether ImmDef would be able to provide Friend of Court services because they help the hearings run much more smoothly and efficiently. He pressed the attorney appearing to find a solution that would allow us to continue to serve as Friend of Court. ImmDef was forced to advise him that we are assessing the situation, because as of now, funding has not been restored despite the TRO. Without funding, there is no solution to be had.

12. ImmDef has 15-25 immigration and state court hearings for children represented under the UCP program *each week* over the next month. We had over twelve hearings scheduled for April 2, *alone.* We expect the number of hearings to increase as removal cases of detained children continue to be expedited. Furthermore, after years of receiving very few asylum interview notices due to backlogs at the asylum office, in late March, after the termination notice, we received over ten asylum interview notices for the weeks of April 1 and April 7, 2025, and expect to receive many more, as we have hundreds of pending asylum applications for unaccompanied children. While no change in scheduling priorities has been announced by the asylum office, ImmDef and sister organizations across the nation have reported that it appears unaccompanied children are suddenly being prioritized for asylum interview scheduling. The preparation for an asylum interview can take multiple weeks and dozens of hours depending on the complexity of the case. The asylum interview itself is typically an all-day endeavor. Interviews take place in Tustin, CA, about two hours from our headquarters. It is typical to have to wait two to three hours past the scheduled interview time, if not more, and the interview itself can take multiple hours. It is not clear how, without funding, we will be able to continue to represent these children at their hearings and interviews, but to withdraw now would seriously prejudice their cases. It is also not clear how we will be able to continue to sustain the increased workload caused by expedited hearings and asylum interviews if we are further forced to reduce staff in the coming weeks.

13. Unfortunately, ImmDef knows firsthand that filling this kind of gap with the assistance of pro bono counsel is simply not practicable. Shortly after its founding, ImmDef created a pro bono program in which we placed our more straightforward children's cases with pro bono counsel and provided them with mentorship. Recruitment was a challenge, requiring a full-time pro bono coordinator as well as other support staff to try to identify sufficient pro bono counsel to take on even a fraction of our child clients. We placed the more "straightforward" cases (meaning not as legally complex and cases where the child hadn't experienced extreme trauma) with pro bono attorneys because we knew that pro bono attorneys typically lacked the specialized training and experience to handle more complex

4

matters, even with mentorship.  More complex cases, or cases with serious trauma or other complicating factors had to remain with our specialized staff attorneys. Unfortunately, we found that, while we appreciated pro bono attorneys' generosity with their time and willingness to help, they typically lacked the language skills and cultural responsiveness to be able to build rapport with their child clients.  They also needed intensive training on an ongoing basis due to the rapidly changing nature of immigration law.  Even with these supports, we found that pro bono counsel unfortunately made mistakes that prejudiced or could prejudice their clients and in many instances, ImmDef ended up "taking back" a client that was previously placed with pro bono counsel either because of such mistakes or because the pro bono attorney requested us to when they came to fully appreciate the amount of work representing unaccompanied children entailed.  Another issue was that immigration cases can take years, and many pro bono attorneys left their firms during the pendency of the case, asking ImmDef to take it back upon their departure.  Furthermore, any cases we did place with pro bono attorneys were never while the child was actively in the custody of ORR.  This is because in order to represent a child in government custody, an individual needs to go through extensive background checks, including fingerprinting and other background checks to ensure the children's safety.  These clearances can take several weeks if not longer to obtain, making it impracticable for pro bono attorneys to represent detained children, especially in light of recent expedited hearings.  In sum, while we appreciated the generosity of the attorneys who volunteered, found that the pro bono model was a much less efficient and effective way to provide legal representation to unaccompanied children and we terminated our pro bono program as a result of these challenges.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 3rd of April 2025, in Riverside, CA.

_____

**Marion ("Mickey") Donovan-Kaloust**
**Immigrant Defenders Law Center**
**634 S. Spring Street, 10th Floor**
**Los Angeles, CA 90014**
**Tel: (213) 674-9438**
**Fax: (213) 282-3133**
**mickey@immdef.org**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

  v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

Case No. 3:25-cv-2847

**SUPPLEMENTAL DECLARATION OF
WENDY YOUNG (KIND) IN SUPPORT
OF PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

0

**SUPPLEMENTAL DECLARATION OF WENDY YOUNG,
PRESIDENT OF KIDS IN NEED OF DEFENSE**

*I, Wendy Young, make the following statements on behalf of myself and KIND, Inc.  Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the following statement is true and correct.*

1.  I incorporate my March 25, 2025 Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 7-18) as if fully set forth herein.

2.  My name is Wendy Young, and I am the President of KIND, Inc., doing business as Kids in Need of Defense ("KIND").  KIND is the leading international not-for-profit organization devoted to protecting the rights and well-being of unaccompanied and separated children.  Founded in 2008, KIND grew to seventeen locations across the United States, providing legal services to unaccompanied immigrant children during and after their time in the custody of the Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS).

3.  KIND's subcontract with Acacia Center for Justice, incepted in March 2022, supported the employment of legal services, psychosocial services, and program support professionals across KIND's seventeen locations in the United States.  These employees include lawyers representing child clients in their immigration matters and directing or delivering related services; paralegals supporting case work and delivering know-your-rights programs and legal screenings; lawyers providing training, practice guidance, and mentorship to pro bono attorneys who represent child clients; social work professionals delivering psychosocial services and referrals to child clients; and a range of employees supporting program operations through functions such as program management and support, pro bono partnership support, training, legal technical assistance, technology support, and data management. As of March 21, 2025, the subcontract supported approximately 350 full-time positions.

4.  When the Acacia contract was partially terminated with immediate effect, staff engaged to serve children under the subcontract were required to stop performing many key functions of their roles, and KIND was deprived of funding needed to support their employment. Accordingly, on March 27, 2025, KIND laid off over 240 staff members in legal services, psychosocial services, and other program support roles, whose last day of employment at KIND was March 31, 2025, and has informed additional staff of termination dates in the coming months.  Absent restoration of the contract services and funding at March 20, 2025

1

levels, KIND will not only be unable to re-hire for the vacated positions, but also expects that the referenced additional layoffs will be necessary.

5. Because of the partial contract termination, KIND plans to consolidate the remaining operations of certain offices within a general region into a single location – specifically, a single location to house parts of the operations of KIND's locations serving Northern Virginia, Baltimore, MD, and Washington, DC; and a single location to house the remaining programming of KIND's New York and Newark locations. Also due to the partial contract termination, KIND expects to close several offices and reduce its footprint.

6. In connection with the loss of funding, the layoffs, and in anticipation of such office closures, KIND instructed staff to begin contacting thousands of clients who were being served under the contract to inform them that, due to a loss of funding, their KIND attorneys would be forced to seek permission to withdraw any appearances as counsel before immigration courts, state courts, and USCIS, and to end their legal services. KIND further instructed staff to begin preparing motions or requests to the relevant tribunals to substitute other counsel or to withdraw as counsel, where permitted by relevant rules of professional conduct. Meanwhile, KIND instructed staff to continue critical ongoing work necessary to fulfill professional responsibilities to clients, including meeting filing deadlines and attending scheduled hearings and administrative interviews with clients.

7. In parallel, KIND asked experienced pro bono partners and community partners to take over cases from KIND. Initial efforts resulted in placing a small fraction of the thousands of clients whose lawyers are no longer employed with KIND, with efforts continuing. KIND attributes the limited number of placements to several factors. Most pro bono attorneys whose primary practice area is not immigration law will prefer to receive a high degree of training and mentorship, due to the complexity of children's immigration matters and the additional challenges of serving a client who is a child. The cutbacks of services associated with the partial contract termination have severely curtailed KIND's staffing for pro bono recruiting and mentorship, in turn limiting the availability of one-on-one mentorship on which pro bono attorneys have relied. At the same time, with the advent of more restrictive immigration policies, demand for free immigration legal services is surging, so pro bono attorneys and immigration nonprofits offering free legal services face increased demands on their available time.

8. In the 60 days between this date and June 2, 2025, over 300 clients served through KIND are scheduled to attend hearings or interviews, including both master calendar and merits hearings in immigration court, asylum interviews with USCIS, and state court appearances in matters relating to guardianship, custody, or dependency. Due to the partial contract termination and ensuing layoffs at KIND, many of these clients must prepare for and attend these events with an unfamiliar attorney taking the place of a longstanding attorney. The

PI Appeal and Stay Addendum 389

precipitous partial termination of the contract afforded little time for clients' final communications with departing counsel and acclimation to substitute counsel. Such disruption of continuity compounds the uncertainty around an already stressful event, and burdens a child's efforts to participate in proceedings to the best of their ability.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 4th of April 2025, in Falls Church, Virginia.


_____ */s/ Wendy Young* _____

Wendy Young
President
Kids in Need of Defense

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>        Defendants. | Case No. 3:25-cv-2847<br><br>**SUPPLEMENTAL DECLARATION OF MIGUEL A. MEXICANO FURMANSKA (MM PC) IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

**SUPPLEMENTAL DECLARATION OF MIGUEL A. MEXICANO FURMANSKA**
**OWNER AND MANAGER OF LAW OFFICE OF MIGUEL MEXICANO PC**

*I, Miguel Angel Mexicano Furmanska, make the following statements on behalf of myself and Law Office of Miguel Mexicano.  I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 7-19) as if fully set forth herein.

2. I, Miguel Angel Mexicano Furmanska, serve as Managing Attorney and Proprietor of the Law Office of Miguel Mexicano, PC.

3. Since submitting my initial declaration, the financial impact of the contract termination has intensified substantially. I have been forced to implement immediate austerity measures, including reducing all team members' hours and instituting furloughs for two attorneys and two support staff members. Without restoration of funding within the next 21 days, I will have no alternative but to terminate employment for at least four staff members representing almost half of our dedicated team. The abrupt and unanticipated nature of the contract termination has left our firm without sufficient reserves to fulfill our financial obligations to departing staff, including legally mandated final wages and accrued paid time off. Consequently, I will be compelled to incur significant personal debt to meet these obligations, as our firm's limited remaining resources are insufficient to cover these costs. The long-term prospects for the Law Office of Miguel Mexicano are increasingly dire. Without immediate intervention, I anticipate the near dissolution of our legal team in the coming months, leaving me as the sole remaining attorney. This would render me personally responsible for approximately 120 immigration cases—a caseload that far exceeds what any individual practitioner could ethically manage.

4. Since the termination order, my legal team has fulfilled our ethical obligations by attending approximately twelve court appearances without compensation, striving to protect our clients' interests despite the contract's abrupt end. We have endeavored to manage our substantial caseload with significantly reduced staffing, but continuing this volume of uncompensated work is financially unsustainable. Despite our unwavering commitment to these vulnerable children, our capacity to maintain effective representation will inevitably diminish and, absent restored funding, will completely cease in the near future. This imminent collapse of legal services will leave dozens of children to navigate complex immigration proceedings alone, jeopardizing their legal rights and potentially their safety.

<div align="center">1</div>

5. On a personal level, the past ten days have been one of the most challenging and distressing periods in my professional life. Throughout my nearly twelve-year career as an immigration attorney, I have never encountered such profound despair or professional uncertainty. Having dedicated my practice to protecting society's most vulnerable individuals, I find it inconceivable that the government would abruptly withdraw funding for these essential legal services for unaccompanied children. These services stand as their sole protection against deportation to potentially life-threatening circumstances. This sudden abandonment not only undermines the children's legal rights but also betrays the core humanitarian principles that have guided this field for decades.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 2 of April 2025, in Los Angeles, California.

Miguel Angel Mexicano Furmanska
Owner and Managing Attorney
Law Office of Miguel Mexicano PC

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

Case No. 3:25-cv-2847

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

            Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

            Defendants.

**SUPPLEMENTAL DECLARATION OF
ANA RAQUEL DEVEREAUX (MIRC)
IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY
INJUNCTION**

**SUPPLEMENTAL DECLARATION OF ANA RAQUEL DEVEREAUX**
**SENIOR MANAGING ATTORNEY AT MICHIGAN IMMIGRANT RIGHTS CENTER**

*I, Ana Raquel Devereaux, make the following statements on behalf of myself and the Michigan Immigrant Rights Center ("MIRC"). I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 7-6) as if fully set forth herein.

2. My name is Ana Raquel Devereaux, and I am a Senior Managing Attorney at the Michigan Immigrant Rights Center (hereinafter, "MIRC"). MIRC is a non-profit organization that provides free legal services for children and other non-citizens who have suffered abuse, trafficking, and persecution. MIRC is the only organization serving unaccompanied children in the custody of the Office of Refugee Resettlement (hereinafter, "ORR") in Michigan and the primary organization providing legal services to children in the unaccompanied refugee minor program in Michigan and to children released from ORR custody to sponsors in Michigan.

3. Michigan Immigrant Rights Center (MIRC) is a legal resource center for Michigan's immigrant communities. MIRC works to build a thriving Michigan where immigrant communities experience equity and belonging. The Michigan Immigrant Rights Center is a program of Michigan Statewide Advocacy Services (MSAS). MIRC has five local offices throughout the state of Michigan which provide direct legal services to unaccompanied children and also provide general community immigration legal services. Our five local offices are located in Detroit, Ypsilanti, Lansing, Grand Rapids, and Kalamazoo. These five offices are supported by a statewide structure within MIRC to provide training, administrative and supervisory support, community engagement, and pro bono support.

4. Since the drafting of our prior declaration, MIRC moved forward with logistics for implementing largescale layoffs based on the loss of funding. Originally, we planned to give staff notice on April 1, 2025. While MIRC was able to secure some other funding and planned to shift some staff to other funded work, the layoffs would have involved the majority of staff who had been employed under the Acacia contract. We intended to provide staff with notice according to their employment contracts and some additional severance benefits. The funding for the staff notice period and severance benefits is coming exclusively from MIRC's reserves and totals about $1.5 million. We had set the April 1st timeframe expecting to learn about the funding by the end of the original option year 2 contracting period, which concluded on March 29, 2025. However, with the loss of CLINs 2, 3, and 4 on March 21st, the time between March 21 and April 1st is additional time of paying for staff time without funding. That additional time totals about $500,000 so far. Despite the additional cost, when CLINs 2, 3, and 4 were terminated, MIRC leadership

1

decided that it was worth keeping our originally scheduled April 1st timeframe for providing layoff notices so that we could receive further information on any funding beyond Option Year 2 of the contract and because of the very significant level of logistics involved in preparing to provide appropriate notice and communication to over 100 employees about their employment status, rights, and benefits.

5. Upon learning of the hearing on the temporary restraining order scheduled in the instant case on April 1st, we moved our date for communicating layoffs to April 7, 2025. In light of the temporary restraining order in this case, we are awaiting future decisions in this case before scheduling a new date for the layoffs and related staff communications.

6. If there is not a permanent injunction in this case, permanently enjoining ORR from withdrawing funding from legal services for unaccompanied children for the duration of the appropriations period, we will immediately schedule a time to communicate layoffs to staff. This will involve immediate layoffs (after completing the notice periods in their employment contracts) of staff whose work was covered under CLINs 2, 3, and 4, and delayed layoffs for staff doing work under CLIN 1 since the government has only provided a six-month extension for that work and has clearly signaled they are not intending to continue funding that work.

7. It is very important to note that at the time of the writing of this declaration more than one full business day from the issuance of the temporary restraining order, ORR has not issued a new or restored contract for CLINs 2, 3, and 4. So it is not clear when or how the government intends to comply with the order. This gives MIRC significant additional financial concern and we have to continue to make decisions without the contract in place, despite the TRO being in place. Without a restored contract, we continue to use funding from our reserves and other parts of our organizational budgets, which affects our work overall, our ability to fulfill our commitment to our other funders, and puts into significant jeopardy what other severance benefits we may be able to offer our laid off staff in the event of no permanent injunction in this case.

8. As a result of the temporary restraining order, we have delayed staff layoffs for a second time. But knowing that layoffs are forthcoming is absolutely devastating to staff morale and our ability to retain highly-trained, skilled staff who have built critical rapport with our child clients. While the delay has provided some reprieve for clients and staff, staff continue to be impacted knowing that layoffs were planned and are still looming until a resolution of this lawsuit and the government's compliance with the court's order. Since the writing of our prior declaration, we have gotten eleven more resignations of staff members and we get a new one almost every day. Almost every one of the departing staff members specifically state in their resignation letters that they love working at MIRC and are departing because of the funding uncertainty, with the most recent resignation letter specifically stating,

> Good afternoon, I am writing to provide you all with notification of my resignation from MIRC. I want to be completely clear that the one and only reason for my

PI Appeal and Stay Addendum 396

resignation is funding instability; I love everything about this job and everyone I work with. My supervisors in Grand Rapids have been nothing short of extraordinary, and I have learned so much in my time here. I'm inspired daily by our work and our mission. [...]Thank you so much for such an incredible experience and opportunity, and for the ongoing support shown to the staff in these difficult times. I will always be so proud of having been part of the MIRC family.

9.  These resignations include some of our most experienced attorneys and other essential staff. Our ability to hire replacement staff will be hindered by the general public insecurity with federal contracts at this moment and to be even more clear, ORR's stop work and termination orders over the past six weeks.

10. Even if we are able to hire to replace the staff who have departed, my direct experience in leading MIRC's extremely successful hiring efforts, specifically for staff serving unaccompanied children, the incoming staff will mostly be new to the practice of law, immigration law, and working with unaccompanied children. So the training and time needed to bring those potentially new staff up to the level of our staff who departed due to the funding uncertainty will be very difficult during this time of transition Likely, the interim burdens to onboard in this environment will put even more pressure on existing staff and lead to further resignations, thereby compounding and worsening these effects..

11. Another cost of ORR's termination of funding for representational services for unaccompanied children has been the over 130 staff hours I, along with senior MIRC leadership, have devoted to planning for layoffs, the funds spent on seeking employment law and human resources advice to ensure we are complying with legal requirements and following best practices in deciding on and carrying out layoffs.

12. While waiting to put into action a layoff plan, MIRC staff have been continuing to work on the cases of currently represented unaccompanied children, but even this has been tailored to account for the funding uncertainty and the possibility of staff layoffs in the immediate future. We have had staff working on emergency aspects of these cases but refrained from taking other case actions that would make it harder for us to withdraw in the near future. In practice, we are primarily limiting the filings and appearances our staff are doing on behalf of unaccompanied children in state court, unless there is an imminent deadline. These state court cases will be much harder to withdraw from, so we are waiting until we know the funding is fully restored before we return to doing that work for our child clients.

13. If a preliminary injunction is not issued in this case, we will proceed to almost immediate layoff notices and those will be followed by a plan which we will share the following business day after layoff notices that will direct our staff to begin withdrawing from all cases previously funded by ORR where we have not been able to obtain alternate funding, which is more than 800 cases.

14. Since March 21, 2025 and until ORR provides a restored or new contract for representational services, MIRC has not taken any new cases of children in ORR custody.

We receive daily emails from staff at ORR facilities asking us to take the cases and or offer some stop-gap services. Each week, the Detroit immigration court has at least one docket day dedicated to unaccompanied children. Moreover, with the expansion of rocket dockets for unaccompanied children in removal proceedings across the country, we, too, have seen master calendar cases reset for our currently-represented clients as well as new children in ORR custody. We continue to represent our clients who have master calendar hearings by either appearing in court fully or offering friend-of-the-court services, all unfunded, including all seventeen hearings that occurred yesterday, April 3rd. Additionally, we have received multiple requests for representing children in custody at the newly scheduled hearings yesterday and upcoming April 7th and this will continue indefinitely. Unless, or until, ORR restores the funding as ordered by the temporary restraining order, we must decline to represent these children at their hearings for funding reasons. The same would be true and in even greater measure if the preliminary injunction is not granted.

15. One specific example of these requests involved the ORR subcontractor practically begging MIRC to take a child's case because they had been scheduled for a master calendar hearing and asking what other resources we could provide if we couldn't represent the child. In this chain, eventually, an employee from ORR told the sub-contractor that "most [Legal Service Providers] already serve as "friends of court" but maybe they are still able to offer this on the side," ignoring the fact that ORR chose to cut the funding for these friend of the court services specifically as part of the termination of CLIN 2.

16. In another instance, an ORR sub-contractor asked MIRC to represent a child in short-term custody who was suddenly scheduled for a master calendar hearing and we had to decline because we have no funding to take on new cases and are using up other MIRC funding to carry the unaccompanied children's cases we already have. After we declined, they told us they found another pro bono attorney to take the case. Yet two days before the hearing, the shelter staff and the Young Center advocate for the child reached out again to see if MIRC could take the case. They specifically referenced the news of the temporary restraining order and assumed that we would now have funding to do this work, which has yet to be restored. It is clear that ORR is not providing internal communication to its staff on the ground and its sub-contractors about the state of the funding for legal services and how ORR intends to ensure children receive these services. Additionally, we don't yet have the details as to what happened with the pro bono attorney who had seemingly committed to taking the case, but it is a clear example of the harm in the termination of the funding, even when MIRC has been expending significant other resources coming from other crucial services to cover a large portion of the gap.

17. The example above of a pro bono attorney's inability to actual step in and cover the representational needs of even one hearing is only the beginning of the picture we can paint of how pro bono attorneys in Michigan are unable supplant the funded legal services work for unaccompanied children. Since the termination of CLINs 2, 3, and 4, we have been using our funding reserves to continue to staff our pro bono mentors and coordinators for the time being, and even in this situation where we are covering what ORR should have

4

been funding, pro bono attorneys cannot even begin to assist unaccompanied child clients in Michigan.

18. As a result of the loss of funding for the representation of unaccompanied children, MIRC's pro bono team specifically has been engaged in pro bono attorney recruitment efforts with the intent of putting together a list of pro bono attorneys that ORR sub-contractors can reach out to for the unaccompanied children's cases. Only nine attorneys have signed up for the list. Most of them only speak English. Most of them indicated they could not appear in all of the forums required for the representation of unaccompanied children. All of them indicate they require mentorship or support from MIRC. We are still working to determine their true ability to take these cases for full representation and do so without mentorship, but, based on my ten years leading this work in Michigan, I can confidently state that pro bono is not the answer to address these funding cuts. For further context, over the past year, MIRC has dedicated considerable time to placing these cases with pro bono attorneys and offered to provide unlimited training, mentorship, language assistance, covering the client's court and filing fees, and assisting with other logistics. In that time, not one attorney took a case of an unaccompanied child in Michigan (including those who are now indicating they are interested in taking cases).

19. Law firms have told MIRC that they are only interested in doing short-term pro bono work (usually about a commitment of one day) because of the high turnover rates of their staff. Additionally, we have been told by firms who once took a few unaccompanied children's cases that they no longer wish to do that type of pro bono work because they don't like dealing with the realities of unaccompanied children.

20. The few who often show interest in volunteering at a higher time commitment level are retired attorneys who have no experience in immigration law and no office resources, including meeting space, technology, malpractice insurance, administrative support, interpretation, and so on. So while they may have time and interest, they cannot provide pro bono legal services to unaccompanied children without the full infrastructure of MIRC's mentorship, offices, malpractice insurance, technology, and administrative resources.

21. A reality in Michigan is that pro bono is not a requirement for those licensed in Michigan and so there is little incentive for attorneys to offer their services in a pro bono context. Even those who try to offer pro bono services from a place of charitable intentions lack the resources or full commitment to do so, as demonstrated by the examples shared above.

22. We also recently offered two critical opportunities for training for pro bonos, one was in guardianships, to allow pro bono attorneys to take on a more short-term portion of these children's cases that is essential to special immigrant juvenile status, and only one person attended, and has not accepted cases from that training. The other was on addressing secondary trauma which is a key tool for doing this work healthily and sustainably, only two people attended. Even so, these trainings are ones we would not be able to offer without this funding.

23. Two additional realities that make pro bono an impossibility as a way to fulfill the obligation to provide legal services to unaccompanied is the high levels of logistical hurdles required for providing legal services to children, which pro bonos are unable to cross (either at all or unassisted) and the administrative burden of the local ORR subcontractors to have to establish an independent relationship with each pro bono lawyer for each case.

24. The first logistical hurdle is that ORR requires individuals working with children in custody to undergo essential background check processes and also to use high levels of encryption for case data. The background checks can take weeks at best and months at worst. The encryption is expensive and requires IT expertise to ensure compliance with these requirements to safeguard the information of the children we are working with. These hurdles are very important and MIRC has dedicated significant staffing resources to ensuring our staff comply with these requirements, but that is a barrier that pro bono attorneys struggle with, even with all the MIRC assistance we can provide to smooth the path to meeting these requirements. As an example, we have been trying to place a specific case of a fourteen-year-old unaccompanied child in Michigan with a pro bono attorney since December 2024. One attorney was interested but specifically declined due to the need to take time to do background checks. Another didn't fully decline, but was not licensed in Michigan for the critical state court appearance, and never took proactive steps to complete their background check, so the case remains unplaced. Even if this case was placed, these attorneys would need ongoing funded support from MIRC to continue their work.

25. The other hurdle is accessing the children in custody. Pro bono attorneys are not generally well-positioned to visit children in ORR facilities. In some of Michigan's ORR short-term shelters, in particular, the children cannot be transported to lawyers offices and the shelters have difficulty coordinating the logistics for universal access to lawyers through remote communication, even with significant planning and assistance, so pro bono attorneys would be unable to even access these children.

26. One of the benefits to MIRC's provision of services to unaccompanied children in Michigan is that we are the only provider doing this work in the state and we are part of a unified and internally regulated network of legal service providers. When working with us, the ORR subcontractors have centralized points of contact and uniform processes, we gather together every quarter to troubleshoot logistical challenges in service provision for the children. Local ORR-subcontractor staff also know who in our management structure to reach out to if any individual attorney is not meeting the legal needs of the child they are working with. None of this would be available if ORR looked to pro bono attorneys to fulfill the obligation of legal services to unaccompanied children. In our experience of working with pro bonos who take cases in the adult context (since as I mentioned above, we cannot get pro bonos to take cases of unaccompanied children in Michigan), a pro bono attorney can handle at most two or three cases at any given time, but most only take one, if any. So it would require 300-800 individual pro bono attorneys to provide the services in Michigan if MIRC was not funded for this work. And this is only for currently represented cases. That number will grow by at least 100-300 each year. These hypothetical

6

800 individual pro bono attorneys would not have the ability to organize themselves, and there would be no supervision structure to provide coordination, training, and accountability since MIRC would not be funded to do this work without ORR restoring funding for the provision of legal services.

27. To be clear and knowing full well the beneficence within the pro bono legal community, pro bono is not the answer to addressing the legal needs of all of these children after the funding cuts.

28. The harm to Michigan's unaccompanied children is already taking place (even despite the issuance of the temporary restraining order) and every day that follows more harm is caused to children who are required to appear in immigration court without attorneys, and MIRC is suffering a daily loss of funding that was crucial to the provision of other essential services, daily losing critical staff, and soon will have to let go of the majority of staff with the expertise and experience to serve unaccompanied children and there will be no one left to do this work on behalf of unaccompanied children in Michigan if the funding is not reinstated.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 4th of April 2025, in Lansing, Michigan.

Ana Raquel Devereaux
Senior Managing Attorney
Michigan Immigrant Rights Center

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| | Case No. 3:25-cv-2847 |
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*, | **SUPPLEMENTAL DECLARATION OF LISA KOOP (NIJC) IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | |
| Defendants. | |

**SUPPLEMENTAL DECLARATION OF LISA KOOP**
**NATIONAL DIRECTOR OF LEGAL SERVICES**
**FOR THE NATIONAL IMMIGRANT JUSTICE CENTER**

*I, Lisa Koop, make the following statements on behalf of myself and the National Immigrant Justice Center (NIJC). I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 7-13) as if fully set forth hererein.

2. My name is Lisa Koop. I am the National Director of Legal Services at the National Immigrant Justice Center (NIJC). NIJC is based in Chicago, Illinois and provides legal services to immigrants. NIJC is dedicated to providing legal services to indigent unaccompanied immigrant children who are not in detention as well as those held in the custody of the Office of Refugee Resettlement (ORR) in Illinois and Indiana.

3. Since the ORR funding ceased, NIJC was forced to temporarily shift staff members to work on other NIJC projects. Without secured ORR funding, NIJC's ability to continue its work of providing legal services to immigrant children through the Children's Protection Project is at imminent risk, without drastic restructuring.

4. NIJC has urgent filings for immigrant children imminently due. For example, on Monday of this week, after years of very limited asylum interview scheduling by the government, NIJC received notice of three asylum interviews scheduled for the third week in April. NIJC has about 250 asylum matters for unaccompanied children pending before the Chicago Asylum Office and expects more of those matters to be set for interviews in the near future. NIJC has 43 special immigrant juvenile cases to be filed, with over half of those cases awaiting state court hearings on requests for predicate orders. NIJC has about four U-visa and four T-visa cases in urgent need of filing.

5. Staff at the ORR-funded children's shelters and long-term foster care programs which house the immigrant children NIJC was funded to serve have asked NIJC staff to meet with children in their care. They report they are without recourse or answers for children when NIJC is unable to offer services to newly arrived children and has limited capacity to respond to the legal needs of existing clients.

6. Since the termination of funding from ORR for legal services for children, NIJC has aggressively sought to recruit pro bono attorneys to represent immigrant children. NIJC has requested to place pro bono cases with major law firms with offices in Chicago. Of those firms, one firm has offered to take two cases following training by NIJC. Another

1

firm suggested they may be able to take cases when their summer associates arrive in a few weeks. Several of NIJC's usual partner firms have suspended acceptance of new immigration matters due to messaging from the White House about pro bono involvement in immigration matters. Of the 250 children's asylum matters NIJC is seeking to place with pro bono attorneys, less than ten are likely to be placed in the coming weeks.

7. To equip pro bono attorneys to handle children's asylum matters, NIJC has scheduled a pro bono training the third week in April. Three NIJC asylum experts will prepare and present that training, with support from NIJC's pro bono manager. Pro bono attorneys who attend the training will receive intensive guidance from NIJC on asylum law and practice and best practices for working with immigrant children. To sustain a pro bono program, NIJC requires expert staff with significant experience who are available to support matters handled by pro bono attorneys, who are not immigration law experts and often have little familiarity with the agencies and systems involved in children's asylum matters. Without ORR funding to maintain those pro bono support positions, NIJC will not be able to provide pro bono attorneys with the support they expect and require to represent immigrant children.

8. Pro bono attorneys who accept matters through NIJC will typically only do so when NIJC commits to provide ongoing training and support. At present, most law firms that handle pro bono matters are unlikely to accept full representation of an asylum matter for the duration of the case. Rather, their preference is for NIJC to remain co-counsel in pro bono matters and to revert the case to NIJC after a set time. To run a pro bono project, NIJC must have capacity to re-absorb cases when pro bono attorneys become unavailable to continue pro bono matters. Given the length of many immigration cases, it is common for pro bono attorneys to transition away from their firms or otherwise become unavailable to continue representing their child immigrant clients.

9. The confluence of rapid filing of children's charging documents by Immigration and Customs Enforcement (ICE) with the immigration court (which results in court hearings where children could be deported), the sudden scheduling of children's asylum interviews after years of case stagnation, and the chilling effect of anti-pro bono attorney messaging from the White House results in a dire situation for the immigrant children NIJC seeks to serve. Children face deportation hearings and asylum interviews that will determine their futures at the very moment immigration attorneys have been unfunded and pro bono attorneys have been cautioned to avoid immigration matters. NIJC fears irreparable harm will ensue not only to NIJC, which may be forced to reduce its Children's Protection Project, including pro bono support, but to the children who desperately need NIJC's expert representation.

I declare under penalty of perjury that the foregoing is true and correct.

2

Executed on the 4th of April 2025, in Goshen, Indiana.

s/ Lisa Koop_____

Lisa Koop, National Director of Legal Services

National Immigrant Justice Center

110 E. Washington St., Goshen, IN 46528

111 W. Jackson Blvd, Suite 800, Chicago, IL 60604

T: 312.660.1321

lkoop@immigrantjustice.org

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| | Case No. 3:25-cv-2847 |
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*, | **SUPPLEMENTAL DECLARATION OF NORTHWEST IMMIGRANT RIGHTS PROJECT (NWIRP) IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | |
| Defendants. | |

**SUPPLEMENTAL DECLARATION OF
NORTHWEST IMMIGRANT RIGHTS PROJECT (NWIRP)**

*I, Vanessa Gutierrez, make the following statements on behalf of myself and Northwest Immigrant Rights Project (NWIRP). I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 7-10) as if fully set forth hererein.

2. My name is Vanessa Gutierrez, and I am the Deputy Director at Northwest Immigrant Rights Project ("NWIRP") who oversees NWIRP's Unaccompanied Children Program ("UCP"). NWIRP provides legal services to unaccompanied immigrant children and youth who have been released from Office of Refugee Resettlement ("ORR") custody to sponsors throughout Washington State.

3. Since learning, on March 21, 2025, of the termination of the U.S. Department of Health and Human Services (HHS) contract with Acacia for legal services for unaccompanied children (to which our organization is a subcontractor), NWIRP has had to use limited unrestricted funding and funds from our reserves to support our ongoing representation of UCP clients and retention of the 28 staff (20.9 FTEs) who provide this representation. Much of our funding is grant-specific, and as an organization we rely on our limited pool of unrestricted funding to support work that is not covered by a specific grant but is still vital for supporting the rights of immigrant communities in Washington, including representation of individuals detained at the Northwest ICE Processing Center, youth who are over the age of 18, and families seeking stability and reunification through the the family visa process. Any funds that NWIRP directs to sustain services previously provided under this contract take away from other critical services that NWIRP is committed to providing in the community.

4. Faced with the loss of UCP funding, and to avoid needing to resort to staff layoffs in the future, NWIRP has decided to shift UCP staff to other positions with dedicated funding sources. This month, we plan to shift two UCP attorneys to new positions that were initially intended to be temporary positions for which we planned to hire externally. Now, we are converting those positions into permanent positions, which will also exert a financial impact on NWIRP in the long term because we will need to secure funding to support these positions after the funding ends. Our remaining UCP staff will need to absorb the caseloads of the two shifting attorneys. We had already decided to pause accepting new unaccompanied children clients because of the contract termination, and now with increasing staff caseloads due to these internal shifts, future capacity to take on new children's cases will be that much more limited.

1

5. The contract termination has had a significant negative impact on staff morale. Staff are concerned about what the contract termination will mean for their long-term job security. While we try to reassure staff that we will do everything possible to avoid layoffs, we cannot guarantee that layoffs will never become necessary, especially if we lose other federal funding and we are not able to raise enough funds to make up the difference. Staff are also aware that another organization in our area that received UCP funding and did similar work to our UCP team has had to lay off nearly all of their staff and will be closing their office in less than two months. NWIRP's staff is also aware that there are now hundreds of children and youth who have lost representation in their immigration cases but we are unfortunately unable to assist all of those children and youth because of NWIRP's loss of the same funding. The loss of funding has also impacted our ability to hire new staff. We had extended an offer to a new attorney, with extensive prior experience serving UCP clients, to work with our UCP team in our Granger, WA office, where it has historically been very difficult to hire. This position would have represented children in the Unaccompanied Refugee Minors program, which was work NWIRP had recently agreed to take on under our Option Year 2 contract, and it would have supported the extremely high need that we have seen for representation for unaccompanied children in this part of Eastern Washington. The attorney was aware of the contract termination and ended up withdrawing acceptance of NWIRP's offer, in part, because of the uncertainty of funding in this area of work. We are unable to hire for this position now because of a hiring freeze we have had to impose as a result of the lost funding, but the high need for representation in this area remains.

6. Within the next month, NWIRP will need to attend at least one state court hearing for a UCP client and seven Master Calendar Hearings on the juvenile docket at the Seattle Immigration Court. Our UCP cases also require filing motions before the state and immigration courts and preparing applications for relief before USCIS. Any pause in this work could harm our UCP clients' cases and prospects for future immigration relief.

7. NWIRP is unable to rely only on pro bono counsel for representation. Our UCP team has made efforts to recruit and train pro bono attorneys who can take on state court cases for Special Immigrant Juvenile classification-eligible children and youth, but the number of pro bono attorneys who accept referrals for our clients remains low. For cases that UCP staff can place with pro bono attorneys, UCP staff end up needing to spend a significant amount of time and resources on mentorship, technical assistance, document review, and assistance with client communication. The loss of the UCP funding also ended our ability to provide pro bono attorneys with interpretation and translation services, which is often an obstacle to their ability to provide representation to NWIRP clients.

I declare under penalty of perjury that the foregoing is true and correct.

2

Executed on the 3rd of April 2025, in Wenatchee, Washington.

_Vanessa D. Gutierrez_

_____

**Vanessa Gutierrez**
**Deputy Director**
**Northwest Immigrant Rights Project**

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

Case No. 3:25-cv-2847

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

            Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

            Defendants.

**SUPPLEMENTAL DECLARATION OF
JOEL FROST-TIFT (PUBLIC
COUNSEL) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

**SUPPLEMENTAL DECLARATION OF JOEL FROST-TIFT
SUPERVISING ATTORNEY, UNACCOMPANIED CHILDREN'S TEAM,
PUBLIC COUNSEL**

*I, Joel Frost-Tift, make the following statements on behalf of myself and Public Counsel. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 7-9) as if fully set forth herein.

2. My name is Joel Frost-Tift, and I am the Senior Supervising Attorney of the Unaccompanied Children's Team at Public Counsel, a nonprofit public interest law firm in Los Angeles dedicated to advancing civil rights and racial and economic justice, as well as to amplifying the power of our clients through comprehensive legal advocacy. Public Counsel is one of the primary organizations dedicated to providing legal services to indigent unaccompanied immigrant children who are released from Office of Refugee Resettlement (ORR) custody throughout the greater Los Angeles area.

3. Public Counsel's Immigrants' Rights Project (IRP) is the second-oldest of Public Counsel's eight projects. IRP has over 30 full-time dedicated staff members. Within IRP, the UC team is the largest subproject, with 16 staff members, 15 of whom are funded by UCP. Without UCP funding, we will be unable to maintain this staffing of the Unaccompanied Children's team at its current level. This loss of staff would have a devastating impact on our ability to continue to represent unaccompanied children and on morale within IRP and the organization as a whole. In addition, we have been unable to take on new cases since the loss of funding, which has had a detrimental effect on unaccompanied children in our service area.

4. We have three hearings for unaccompanied children in the next month who need experienced attorneys trained in trauma-informed representation to present their humanitarian claims for relief. These children are presenting complicated claims for asylum and/or Special Immigrant Juvenile Status before the courts. Their claims touch on sensitive subjects such as child abuse, trafficking, and family separation. More often than not they do not speak English and have never told a soul about the abuse or mistreatment they suffered before coming to the United States. Over months — and in some cases years— our attorneys have built up trust and rapport with these children in order to prepare for the day they can finally present their story to a judge.

1

5.  Public Counsel has long collaborated with pro bono attorneys to assist in providing legal services to indigent clients.  Our pro bono partners are a cornerstone of our representation model and allow us to have a wider impact for the marginalized and underserved communities we serve.  However, pro bono counsel — no matter how experienced — requires mentorship and training, which in turn requires experienced staff.  If the UCP funding is not restored, we simply cannot rely on pro bono counsel to independently adequately represent the 200 unaccompanied children we serve annually.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on the 3 of April 2025, in Los Angeles, California.



_____

**Joel Frost-Tift**
**Senior Supervising Attorney, Unaccompanied Children's Team**
**Public Counsel**

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

Case No. 3:25-cv-2847

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

          Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

          Defendants.

**SUPPLEMENTAL DECLARATION OF
ASHLEY T. HARRINGTON (RMIAN)
IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY
INJUNCTION**

**SUPPLEMENTAL DECLARATION OF ASHLEY T. HARRINGTON**
**CHILDREN'S PROGRAM MANAGING ATTORNEY**
**ROCKY MOUNTAIN IMMIGRANT ADVOCACY NETWORK**

*I, Ashley T. Harrington make the following statements on behalf of myself and the Rocky Mountain Immigrant Advocacy Network (RMIAN). I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 7-11) as if fully set forth hererein.

2. My name is Ashley T. Harrington, and I am the Children's Program Managing Attorney at the Rocky Mountain Immigrant Advocacy Network ("RMIAN"). RMIAN is a Colorado-based nonprofit organization that provides free immigration legal and social services to individuals in civil immigration detention, as well as to immigrant children and families. Through its staff attorneys, paralegals, social workers, and a network of hundreds of *pro bono* attorneys, RMIAN provides legal education and free legal representation to low-income immigrants who otherwise would not be able to afford an attorney.

3. With HHS funding, RMIAN employs approximately six full-time-equivalent staff members to provide legal services to unaccompanied children, including: legal representation, pro bono recruitment, training, referrals and mentoring, coordination of language services, program management and administrative support. Each day without this funding has forced RMIAN to pull from its limited reserves in order to keep staff on and continue services for child clients.

4. RMIAN has limited development staff who are already tasked with fundraising to support the organization as a whole. They cannot realistically raise enough money under this expedited time frame to replace the funding from HHS that RMIAN relies upon in order to continue its services. This is especially true because RMIAN is one of approximately 90 legal service providers in the Acacia network who are faced with these drastic, sudden funding cuts. Most will be seeking alternate funding from the same sources, forcing them to compete against each other for scarce resources.

5. As a result of this contract termination, RMIAN is currently in an uncertain situation as it is reluctant to make any drastic changes in staffing or services while it awaits a final decision on what funding and services may be restored.

6. RMIAN's unaccompanied child clients have immigration court hearings scheduled as soon as April 11 and April 16, 2025 and state court hearings as soon as April 7, 2025. In addition to upcoming court hearings, other clients have court-ordered deadlines to submit pleadings

1

and status updates in April and May 2025. Even for RMIAN clients who don't have upcoming court hearings or deadlines, there are many urgent upcoming legal needs. For example, RMIAN represents many children whose notices to appear have not yet been filed with the immigration court. According to a new ICE memo reported by Reuters, ICE will be prioritizing filing those charging documents to initiate removal proceedings against unaccompanied children. RMIAN has had notices to appear filed for unaccompanied children as recently as March 24, 2025 with a hearing set for early May 2025. It is critical for an attorney to be monitoring for these notices, otherwise children run the risk of missing court hearings and being ordered removed in absentia.

7. Without restored funding, RMIAN will be unable to offer representation to additional unaccompanied children. The Denver Immigration Court will be holding initial juvenile dockets on April 4, April 11 and on an ongoing basis. RMIAN will be unable to offer representation to these children without continued funding, leaving these children to navigate complex proceedings alone.

8. RMIAN relies heavily on its network of pro bono attorneys to represent child clients, however pro bono attorneys cannot continue to represent clients with RMIAN's support. RMIAN regularly refers unaccompanied children to pro bono counsel for representation in partial or full proceedings. An example of a partial referral would be that the pro bono attorney provides representation in the state court proceeding only, while a RMIAN attorney handles removal proceedings and representation in front of U.S. Citizenship and Immigration Services. In other cases, the volunteer attorney may represent the child to a certain stage in their case, such as approval of Special Immigrant Juvenile Status and deferred action, and then pass the child's case back to RMIAN for ongoing representation. On rare occasions, a pro bono attorney might provide full representation to a child on all matters.

9. In order for a child's case to be successfully placed with a pro bono attorney several steps must occur. RMIAN first needs to make contact with the child, either at immigration court, through our hotline or via a referral. Then RMIAN staff must screen the child for immigration relief options, which requires developing trust and rapport with the child, having child-appropriate and trauma-informed interviewing skills, and having legal expertise to identify what immigration legal options a child might be eligible to pursue. RMIAN must also then find a competent pro bono attorney to handle the child's legal matter. This requires RMIAN staff to recruit, train and vet volunteer attorneys. The vast majority of RMIAN's volunteer attorneys do not have immigration law experience and would never consider taking an immigration case without RMIAN's referral, training, guidance, mentoring and malpractice coverage. RMIAN's attorneys provide constant training, mentoring, support and guidance to pro bono attorneys to assist them in providing

competent representation from before the time they accept a child's case through its conclusion. In addition, it is unfortunately not uncommon for a volunteer attorney to agree to provide representation, and then fail to do so, requiring RMIAN to take the child's case back to either place with another pro bono attorney or handle in-house. Even experienced pro bono attorneys who have handled multiple cases for RMIAN are regularly seeking guidance on the constant changes in immigration law and policy impacting their clients' cases. RMIAN's pro bono coordination team provides regular weekly updates to pro bono attorneys to help them stay abreast of critical updates and changes, and are available to provide regular ongoing mentoring support.

10. In addition, most of RMIAN's child clients are monolingual Spanish speakers, or speak communicate with their clients, or to obtain translation of necessary case-related documents without RMIAN's coordination and assistance. RMIAN relies on HHS funding to coordinate these essential language services which would otherwise not be available to pro bono attorneys.

11. In short—pro bono attorneys would be unable and unwilling to represent children in the complex web of state court and immigration proceedings without RMIAN's expert training, mentoring and language coordination throughout the case. As a result, countless children would be forced to navigate complex immigration court proceedings without counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 3rd of April 2025, in Westminster, Colorado.

_Ashley T. Harrington_

_____
Ashley T. Harrington
Children's Program Managing Attorney
Rocky Mountain Immigrant Advocacy Network (RMIAN)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

Case No. 3:25-cv-2847

**SUPPLEMENTAL DECLARATION OF
LAURA NALLY (AMICA CENTER) IN
SUPPORT OF PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

**SUPPLEMENTAL DECLARATION OF LAURA NALLY,**
**PROGRAM DIRECTOR FOR THE CHILDREN'S PROGRAM AT AMICA CENTER**
**FOR IMMIGRANT RIGHTS (FORMERLY CAPITAL AREA IMMIGRANTS' RIGHTS**
**("CAIR") COALITION)**

*I, Laura Nally, make the following statements on behalf of myself and Amica Center for Immigrant*
*Rights. I certify under penalty of perjury that the following statement is true and correct pursuant*
*to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining
   Order and Preliminary Injunction (Dkt. 7-15) as if fully set forth herein.

2. My name is Laura Nally, and I am the Program Director overseeing the Children's Program
   at Amica Center for Immigrant Rights ("Amica Center"), formerly known as the Capital
   Area Immigrants' Rights ("CAIR") Coalition. Amica Center is a Washington, D.C.-based
   nonprofit legal services organization that strives to ensure equal justice for all indigent
   immigrant men, women, and children at risk of detention and deportation in the
   Washington, D.C. area and beyond by providing free legal services and representation. I
   am an attorney licensed in Virginia and the District of Columbia and have been practicing
   immigration law for more than 15 years. I joined the Children's Program at Amica Center
   in August 2019.

3. Since filing my prior Declaration, executed on March 25, 2025, in this case, Amica
   Center's Children's Program has continued to face operational challenges related to the
   Cancellation Order issued on March 21, 2025. While we have not yet issued any furloughs
   or laid off any staff members, we have been unable to fill an increasing number of
   vacancies due to concerns about the stability of our funding. Since February 18, when we
   suddenly received a Stop Work Order, until now, one Senior Paralegal, one IJC Attorney
   Fellow, and two Staff Attorneys have resigned their positions with the Children's Program.
   The level of anxiety among staff has only increased as partner organizations issue furloughs
   and layoffs. We cannot responsibly hire new staff pending a resolution of the uncertainties
   surrounding continued funding for this work, and remaining attorneys are therefore faced
   with an increasingly difficult task of ensuring coverage for the legal needs of our more than
   850 clients.

4. Amica Center is currently funding this work entirely using other funds and had made the
   analysis that it could only afford to continue to do so for an additional 2 months, at most,
   before it begins to materially limit our other mission-driven work, including representation
   for adults in Virginia who are at risk of detention and deportation. On April 4, 2025,
   however, Amica Center received communications indicating that the Department of Justice
   (DOJ) had terminated for convenience several other programs which currently fund Amica

1

Center's Detained Adult Program (DAP). Although the scope and impact of such a termination order is not yet clear, the intersectional impact of sudden cuts to funding in other programs considerably shortens the period of time for which Amica Center can use other funds to continue the Children's Program. If HHS funding is not restored, we expect to downsize the Children's Program considerably, retaining only a few experienced staff members to wind down and transition casework in the most ethical and client-centered way possible under the circumstances.

5. Children represented by the Children's Program continue to have hearings and legal deadlines on a daily basis. Within the next month (April 3 to May 3, 2025), 48 of our child clients are scheduled to appear before an immigration court, a state court, or an asylum interview with USCIS. I was in court this morning seeking Special Immigrant Juvenile Status (SIJS) findings for an 11-year-old girl who was abandoned by her alcoholic father. The Children's Program has a total of three asylum interviews scheduled in the month of April, all of which were scheduled in the past two weeks for children in ORR custody including a boy who fled extreme child abuse at the age of 12 and a girl who fears gender-based and religious persecution. In addition to the urgent deadlines to file legal briefing and supporting evidence in advance of their asylum interviews, it is critical for these children to have consistency in their representation and the support of the attorneys with whom they have spent months and years building trust and rapport to minimize re-traumatization.

6. We also continue to receive requests for unfunded assistance from ORR-subcontracted staff at the facilities we serve, particularly requests for confirmation that our staff will appear with children at their upcoming immigration court hearing, whether and how the children are required to appear, and assistance navigating the logistics of how to connect to virtual hearings via Webex. It is clear from the nature of the questions we receive that ORR has not issued clear guidance to subcontracted facility staff regarding which services were terminated on March 21 and which have been extended. It has largely fallen to our staff to explain the impact of the Cancellation Order on the services we provide at local ORR-subcontracted facilities.

7. It is important to consider the timing of several intersecting government actions; the Cancellation Order was issued on the same day that ORR notified its care providers that DHS would begin serving Notices to Appear (NTAs) "imminently" on children in ORR custody and that those Master Calendar Hearings were expected to take place "in the coming days and weeks." In accordance with that policy, we have seen children increasingly scheduled on 'rocket dockets' where dozens of unrepresented children are set for mass hearings. The next large docket for children detained in ORR-subcontracted facilities we serve is scheduled for April 14 and currently includes 22 children. Notably, most of those hearings have been moved up within the past week from a docket which was

originally scheduled to take place on June 4, 2025. We learned of this change on April 1. In another example, four children who arrived at a local ORR-subcontracted facility the week of March 23, 2025, were scheduled for Master Calendar Hearings on April 10.

8.  We know from communications with staff at two local ORR-subcontracted facilities that in place of funded representation or Friend of Court services at upcoming hearings, ICE has provided the facilities with EOIR's List of Pro Bono Legal Service Providers. For the Annandale Immigration Court, where most of the children are scheduled to appear, this list does not represent a meaningful opportunity to obtain free counsel in our local area. The Annandale Immigration Court Juvenile Docket lists only four providers, one of which is Amica Center. Of these four providers, three—Kids in Need of Defense, Ayuda, and Amica Center—were providing pro bono representation through the HHS funding that has been terminated. The fourth—Restoration Immigration Legal Aid (RILA)— states explicitly that it does not accept cases for individuals in detention. To my knowledge, no children in the ORR-subcontracted facilities with which we work have successfully obtained pro bono representation since March 21. In a conversation with one of the URM ORR facilities with whom we work, program staff shared that their attempts to identify pro bono counsel for children who have arrived since March 21 have been largely unsuccessful; the few attorneys who expressed interest in volunteering had no previous immigration experience. The program asked Amica Center for information and guidance about how an attorney could begin learning about immigration law.

9.  The recruitment, training, and mentorship of pro bono attorneys is an important part of our model for expanding the availability of legal services for unaccompanied children. In my current position at Amica Center and prior positions at partner organizations within the Acacia network, I have trained hundreds of pro bono attorneys at dozens of law firms and corporations to represent children in pro bono immigration matters. The contribution of the skills and resources of law firms, in particular, is invaluable to complex cases involving trials in immigration court and appeals. Funding for this work was one of the tasks that was eliminated by the Cancellation Order on March 21.

10. Across each of these pro bono partnerships, attorneys and their supervising partners make clear that they rely on expert training and mentorship from the placing organization to a) appropriately screen cases and identify them as appropriate for pro bono placement; b) provide a threshold level of training so that attorneys with little to no experience in immigration matters can navigate this complex area of practice; and c) engage in hands-on mentorship throughout the course of the case. For Amica Center, this involves holding an introductory call to discuss pro bono counsel's questions before they meet with the clients, providing technical assistance by phone and email at all stages of the case, reviewing draft pleadings before submission, mooting for hearings or interviews, and often attending to

provide support, if requested by the pro bono team. This model fosters a relationship of mutual trust between the mentoring attorney and pro bono team with the goal of ensuring that clients receive high-quality representation. It also creates efficiencies for our government partners, as we provide the training and mentorship necessary for attorneys unfamiliar with local practice to interact efficiently and effectively with the state and immigration courts and other government agencies.

11. Pro bono attorneys often describe their work on our cases as some of the most rewarding that they've had the opportunity to do in their corporate jobs but emphasize that it would not be possible without a qualified mentor to ensure that they can competently practice in a field outside their own. This support and assurance will become even more important following the President's Executive Order "Preventing Abuses of the Legal System and the Federal Court," issued on March 22, which mentioned "Big Law pro bono practices" specifically in the context of an accusation that immigration attorneys and their pro bono partners "attempt to circumvent immigration policies." In this climate of intimidation, it is particularly important that firms and the attorneys working on immigration matters have access to expert advice from experienced practitioners to ensure that they are providing competent and ethical representation.

12. Attached hereto as **Exhibit 1** is a true and correct copy of the full email correspondence between the parties regarding compliance with the Temporary Restraining Order and administrative record, dated April 2, 2025 to April 3, 2025. On April 2, Plaintiffs emailed Defendants to inquire about Defendants' plan to comply with the Temporary Restraining Order that went into effect earlier that morning and ask when Defendants expect to produce the administrative record. Ex. 1 at 2.

13. Later that day, Defendants responded that they "are in receipt of the Court's order and are taking steps to comply expeditiously." *Id.* at 2. Defendants' response contained no detail regarding how or when they planned to comply. With regards to the administrative record, Defendants took the position that they have no obligation to provide the record until they file their answer and that they "intend to adhere to that timeframe here." *Id.* at 2.

14. Plaintiffs replied the following morning, requesting Defendants "outline what has been done to ensure compliance" with the Court's order, which had been in place for over 24 hours at that point. *Id.* at 1. Plaintiffs also urged Defendants to produce the administrative record earlier, given that it is necessary to Plaintiffs' request for Preliminary Injunction to inform our arbitrary and capricious claim. *Id.* at 1-2.

15. At the time of signing, Plaintiffs have not been informed of any actual steps taken by Defendants to comply with the Court's Order.

16. Attached hereto as **Exhibit 2** is a true and correct copy of the April 4, 2025, letter sent by the Department of Justice to the Acacia Center for Justice as referenced in paragraph 4.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on the 4th of April 2025, in Alexandria, VA.

**Laura Nally**
Director, Detained Children's Program
Amica Center for Immigrant Rights
1025 Connecticut Ave. NW, Suite 701
Washington, D.C. 20036
P: (202) 916-8179
laura@amicacenter.org

5

# Exhibit 1

 Outlook

## RE: [EXTERNAL] RE: Community Legal Services in East Palo Alto, et al, v. HHS, et al., 25-cv-2847 (N.D. Cal)

**From** Ross, Jonathan K. (CIV) <Jonathan.K.Ross@usdoj.gov>

**Date** Thu 4/3/2025 5:19 PM

**To** Karen Tumlin <karen.tumlin@justiceactioncenter.org>; Alvaro M. Huerta <ahuerta@immdef.org>; Silvis, William (CIV) <William.Silvis@usdoj.gov>; Masetta Alvarez, Katelyn (CIV) <Katelyn.Masetta.Alvarez@usdoj.gov>; Parascandola, Christina (CIV) <Christina.Parascandola@usdoj.gov>; Cardin, Zachary A. (CIV) <Zachary.A.Cardin@usdoj.gov>; Celone, Michael A. (CIV) <Michael.A.Celone@usdoj.gov>; Johann, Pamela (USACAN) <Pamela.Johann@usdoj.gov>; Sam Hsieh <Sam@amicacenter.org>; cscott@immdef.org <CScott@ImmDef.org>; Esther Sung <Esther.Sung@justiceactioncenter.org>

---

**[EXTERNAL EMAIL]** This message is from an EXTERNAL source. Please do not click on any links or open any attachments associated with this email unless it comes from a trusted source AND you were expecting to receive this information.

Hi Karen,

Acknowledging your email. Defendants will be back in touch shortly.

Thank you,
Jonathan

---

**From:** Karen Tumlin <karen.tumlin@justiceactioncenter.org>
**Sent:** Thursday, April 03, 2025 2:35 PM
**To:** Ross, Jonathan K. (CIV) <Jonathan.K.Ross@usdoj.gov>; Alvaro Huerta <AHuerta@immdef.org>; Silvis, William (CIV) <William.Silvis@usdoj.gov>; Masetta Alvarez, Katelyn (CIV) <Katelyn.Masetta.Alvarez@usdoj.gov>; Parascandola, Christina (CIV) <Christina.Parascandola@usdoj.gov>; Cardin, Zachary A. (CIV) <Zachary.A.Cardin@usdoj.gov>; Celone, Michael A. (CIV) <Michael.A.Celone@usdoj.gov>; Johann, Pamela (USACAN) <Pamela.Johann@usdoj.gov>; sam@amicacenter.org; cscott@immdef.org; Esther Sung <Esther.Sung@justiceactioncenter.org>
**Subject:** RE: [EXTERNAL] RE: Community Legal Services in East Palo Alto, et al, v. HHS, et al., 25-cv-2847 (N.D. Cal)

Dear Jonathan,

Thank you for your email. Please clarify what Defendants have done to ensure compliance with the Court's TRO, which took effect at 8 am PST yesterday. Your email yesterday says you are "taking steps to comply expeditiously" but since the TRO was already in effect at that time, please outline what has been done to ensure compliance. Our plaintiffs have not been informed of any action but have continued to receive requests from ORR subcontractors to take on new cases, explicitly referring to the news of the TRO as a basis to ask them to take on new cases. This is continuing the harms to our plaintiffs that the Court sought to rectify with her TRO Order.

Regarding the administrative record, you will recall that we discussed with the Court at Tuesday's hearing that moving into preliminary injunction territory (as we are now) requires the

administrative record. As you know, we have also brought an arbitrary and capricious claim. We re-urge our request for production of the administrative record.

Finally, we wanted to confirm understanding of the Acacia contract and correct any misunderstanding from Tuesday's hearing. The contract has been extended for six months as to CLIN 1 only. This is for KYR and legal consultations. We understand that some CLIN 2 services have been moved to CLIN 1.  So, to make clear, it is not correct that there is currently no contract in place today.

Thank you,
--Karen

---

**From:** Ross, Jonathan K. (CIV) <Jonathan.K.Ross@usdoj.gov>
**Sent:** Wednesday, April 2, 2025 4:31 PM
**To:** Alvaro Huerta <AHuerta@immdef.org>; Silvis, William (CIV) <William.Silvis@usdoj.gov>; Masetta Alvarez, Katelyn (CIV) <Katelyn.Masetta.Alvarez@usdoj.gov>; Parascandola, Christina (CIV) <Christina.Parascandola@usdoj.gov>; Cardin, Zachary A. (CIV) <Zachary.A.Cardin@usdoj.gov>; Celone, Michael A. (CIV) <Michael.A.Celone@usdoj.gov>; Johann, Pamela (USACAN) <Pamela.Johann@usdoj.gov>; sam@amicacenter.org; cscott@immdef.org; Karen Tumlin <karen.tumlin@justiceactioncenter.org>
**Subject:** Re: [EXTERNAL] RE: Community Legal Services in East Palo Alto, et al, v. HHS, et al., 25-cv-2847 (N.D. Cal)

Hi Alvaro,

Thanks for reaching out. Defendants are in receipt of the Court's order and are taking steps to comply expeditiously.

Regarding the administrative record, Defendants note that under L.R. 16-5, the government is not required to provide the administrative record until Defendants file our answer, and we intend to adhere to that timeframe here.

Best,
Jonathan

> On Apr 2, 2025, at 11:40 AM, Alvaro Huerta <AHuerta@immdef.org> wrote:
>
>
> Counsel,
>
> We are in receipt of last night's order from the Judge. At your earliest convenience, can you please let us know 1) how Defendants intend to comply with the Court's order, and 2) when you are able to provide the administrative record? Considering the Court's briefing schedule, we would appreciate a response as soon as possible. Many thanks.
>
> Best,
> Alvaro
>
> ---
> **Alvaro M. Huerta**
> Director of Litigation & Advocacy
> **Immigrant Defenders Law Center**
> ahuerta@immdef.org
> 213.338.7542

**From:** Ross, Jonathan K. (CIV) <Jonathan.K.Ross@usdoj.gov>
**Sent:** Friday, March 28, 2025 12:44 PM
**To:** Karen Tumlin <karen.tumlin@justiceactioncenter.org>; Silvis, William (CIV)
<William.Silvis@usdoj.gov>; Alvaro Huerta <AHuerta@ImmDef.org>; sam@amicacenter.org; Carson
Scott <CScott@ImmDef.org>
**Cc:** Masetta Alvarez, Katelyn (CIV) <Katelyn.Masetta.Alvarez@usdoj.gov>; Johann, Pamela (USACAN)
<Pamela.Johann@usdoj.gov>; Esther Sung <Esther.Sung@justiceactioncenter.org>
**Subject:** RE: Community Legal Services in East Palo Alto, et al, v. HHS, et al., 25-cv-2847 (N.D. Cal)

---

External email: Please be careful if sending personal information or when opening
attachments or clicking on links

---

This is great—thank you, Karen. Looking forward to being in touch.

---

**From:** Karen Tumlin <karen.tumlin@justiceactioncenter.org>
**Sent:** Friday, March 28, 2025 3:42 PM
**To:** Silvis, William (CIV) <William.Silvis@usdoj.gov>; Alvaro Huerta <AHuerta@ImmDef.org>;
sam@amicacenter.org; Carson Scott <CScott@ImmDef.org>
**Cc:** Masetta Alvarez, Katelyn (CIV) <Katelyn.Masetta.Alvarez@usdoj.gov>; Johann, Pamela (USACAN)
<Pamela.Johann@usdoj.gov>; Ross, Jonathan K. (CIV) <Jonathan.K.Ross@usdoj.gov>; Esther Sung
<Esther.Sung@justiceactioncenter.org>
**Subject:** [EXTERNAL] RE: Community Legal Services in East Palo Alto, et al, v. HHS, et al., 25-cv-2847
(N.D. Cal)

Hi all,

Adding Jonathan to this chain who just called Carson about this request and had not
seen the original email or our reply. Making sure we all have each other's email as
needed.

Thank you,
--Karen

---

**From:** Karen Tumlin <karen.tumlin@justiceactioncenter.org>
**Sent:** Thursday, March 27, 2025 4:42 PM
**To:** Silvis, William (CIV) <William.Silvis@usdoj.gov>; Alvaro Huerta <AHuerta@ImmDef.org>;
sam@amicacenter.org; Carson Scott <CScott@ImmDef.org>
**Cc:** Masetta Alvarez, Katelyn (CIV) <Katelyn.Masetta.Alvarez@usdoj.gov>; Johann, Pamela (USACAN)
<Pamela.Johann@usdoj.gov>
**Subject:** RE: Community Legal Services in East Palo Alto, et al, v. HHS, et al., 25-cv-2847 (N.D. Cal)

Dear Will,

Thank you for reaching out. I am also copying Pamela here as she reached out
separately while we were conferring on your email below. We think the court
carefully set the response deadline and hearing timing based on the court's
availability to digest your opposition and hear the matter quickly. Given the
irreparable harms we have set out that our clients are facing we have to oppose any
extension to the schedule.

If it still makes sense to hop on the phone, I can be reached at 323-316-0944. I'll try
to loop in my colleagues as well.

Thanks,
--Karen

---

**From:** Silvis, William (CIV) <William.Silvis@usdoj.gov>
**Sent:** Thursday, March 27, 2025 2:59 PM
**To:** Alvaro Huerta <AHuerta@ImmDef.org>; sam@amicacenter.org; Karen Tumlin
<karen.tumlin@justiceactioncenter.org>; Carson Scott <CScott@ImmDef.org>
**Cc:** Masetta Alvarez, Katelyn (CIV) <Katelyn.Masetta.Alvarez@usdoj.gov>
**Subject:** Community Legal Services in East Palo Alto, et al, v. HHS, et al., 25-cv-2847 (N.D. Cal)

Good afternoon counsel,

AUSA Pam Johann of the U.S. Attorney's Office provided me with your contact information.
This case has been assigned to my Office for handling. We note that the Court has entered
an order requiring a response to the TRO on Monday, March 31, and a hearing on April 1.
Would Plaintiffs be amenable to an extension of time of two days for the government's
response? We would like to have the opportunity to consult with the agencies on the relief
requested in your motion as well as the underlying circumstances set forth in the papers.
Please let me know if Plaintiffs are amenable to this request.

Thank you,

Will Silvis

**William C. Silvis**
**Assistant Director**
**United States Department of Justice**
**Office of Immigration Litigation**
**General Litigation and Appeals Section**
Post Office Box 878 | Ben Franklin Station | Washington, D.C.  20044-0878
(office) 202-307-4693
(cell) 202-598-9022



This communication, including any attachments, is covered by federal and state law governing
electronic communications and may contain confidential and legally privileged information.  If the
reader of this message is not the intended recipient, the reader is hereby notified that any
dissemination, distribution, use or copying of this message is strictly prohibited.  If you have received
this in error, please reply immediately to the sender and delete this message.

Confidentiality: This message is intended for the designated recipient(s) only and
may contained privileged information. Dissemination of this email or its attachments
to anyone other than the intended recipient is prohibited. If you received this
message in error, please notify the sender and destroy this message and all
attachments.

# Exhibit 2



VIA: Electronic Mail

<u>**NOTICE OF TERMINATION FOR CONVENIENCE**</u>

<u>Date:</u> April 3, 2025
<u>Vendor Name:</u> Acacia Center for Justice
<u>Subject:</u> Termination for Convenience

Dear Acacia Center for Justice,

This email's purpose is to notify your firm the contracts tied to the procurement instrument identifications (PIID) listed below and all subsequent call orders is hereby terminated for convenience effective April 3, 2025, per clause FAR 52.212-4(l) (Termination for the Government's Convenience).

PIIDs:
  15JPSS22F00000699
  15JPSS22F00000701
  15JPSS22F00000700
  15JPSS22F00000702
  15JPSS22F00000703
  15JPSS22F00000704
  15JPSS24F00000418
  15JPSS23F00000154

The Agency has determined that the services are no longer needed.  Effective April 3, 2025, please discontinue providing the services to the United States Department of Justice and its entities.

Please submit your final invoice with any reasonable charges that result from this termination.

If you have any questions, please feel free to contact me.

Sincerely,

*Allison Polizzi*

Allison J. Polizzi
Contracting Officer
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Please acknowledge receipt of this Notice of Termination for Convenience

(End of Notice)

PI Appeal and Stay Addendum 429

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

Case No. 3:25-cv-2847

**SUPPLEMENTAL DECLARATION OF
JILL MARTIN DIAZ OF VERMONT
ASYLUM ASSISTANCE PROJECT,
(VAAP) IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY
INJUNCTION**

**SUPPLEMENTAL DECLARATION OF JILL MARTIN DIAZ**
**EXECUTIVE DIRECTOR, VERMONT ASYLUM ASSISTANCE PROJECT**

*I, Jill Martin Diaz, make the following statements on behalf of myself and Vermont Asylum Assistance Project, I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 7-7) as if fully set forth hererein.

2. My name is Jill Martin Diaz (they/them), and I am the Executive Director at Vermont Asylum Assistance Project (VAAP). VAAP is a nonprofit immigration law firm dedicated to expanding access to critical legal services for noncitizens across Vermont. VAAP grew out of years of grassroots advocacy to meet low-income Vermonters' increasingly urgent and unmet needs for structured, equitable, and trauma-informed immigration representation. VAAP is the primary organization dedicated to providing legal services to indigent unaccompanied immigrant children who are not in detention in Vermont, among other immigrant youth and other subpopulations in removal proceedings.

3. Since I signed my initial declaration pertaining to this matter, the loss of funding has caused VAAP to terminate 25% of our staff. Our organization is too small to responsibly float salary liability without the surety of reimbursement and too stretched to responsibly absorb the caseloads of any furloughed legal staff. Accordingly, VAAP has had to eliminate the Paralegal Advocate/Program Coordinator position from our organization chart, reducing our staff to three Legal Advocates (including my role as a Legal Advocate/Executive Director).

4. Our reduced team of three is now carrying the work of four while the complexity of our work and conflicting demand for our time explodes. As the only organization of its kind in Vermont, VAAP staff are having to make zero-sum decisions between directly serving individual clients to whom we owe existing attorney-client duties and those whose cases are newly becoming the most legally urgent and perilous. We are torn between advancing state-based protections and participating in litigation to remedy systemic Constitutional and civil rights violations.

5. We received informal notice that next month (May 2025) the U.S. Citizenship and Immigration Services' Newark Asylum Office will resume conducting "circuit rides" to Vermont to hear affirmative asylum applicants' interviews for the first time in over eight years. The only affirmative Vermont asylum applicants who have had their cases heard in the last eight or so years are Afghan nationals, whose interviews the Newark Asylum Office

1

completed expeditiously pursuant to the Biden Administration's *Operations Allies Welcome*.

6. Many of VAAP's "unaccompanied children" clients have affirmative asylum applications pending and, as the Court is aware, asylum is a discretionary form of relief with a very complicated *prima facie* standard requiring highly technical expertise and intensive attorney time to meet. Moreover, an adverse credibility determination by an Asylum Officer can prejudice respondents' *de novo* asylum review by the Immigration Court in ways that are virtually nonreviewable and functionally impossible to overcome.

7. VAAP staff are seriously concerned that USCIS is finally granting our years-long requests for Newark Asylum Office circuit rides just weeks after we filed numerous "unaccompanied children" applications pursuant to the *J-O-P-* settlement filing deadline and amidst lost funding.

8. VAAP pro bono attorneys typically require an intensive volume of mentorship and support and are not realistically likely to absorb any work that our team cannot maintain responsibly in-house, especially with rapidly evolving law and practice.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on the 3rd of April 2025, in Washington, D.C.

/s/ Jill Martin Diaz

**Jill Martin Diaz, Esq.**
**Executive Director**
**Vermont Asylum Assistance Project**

2

YAAKOV M. ROTH
Acting Assistant Attorney General
WILLIAM C. SILVIS (DCBN 485572)
Assistant Director
MICHAEL A. CELONE (MDBN 1312170145)
CHRISTINA PARASCANDOLA (DCBN 468479)
KATELYN MASETTA ALVAREZ (OHBN 97857)
JONATHAN K. ROSS (NCBN 50203)
Senior Litigation Counsels
ZACHARY A. CARDIN (MDBN 1812110052)
Trial Attorney

      U.S. Department of Justice, Civil Division
      Office of Immigration Litigation
      General Litigation and Appeals Section
      P.O. Box 878, Ben Franklin Station
      Washington, DC 20044
      (202) 305-2040
      Michael.A.Celone@usdoj.gov

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *ET AL.*, <br><br>      Plaintiffs, <br><br>    v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *ET AL.*, <br><br>      Defendants. | Case No. 3:25-cv-02847-AMO <br><br> **DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date: April 23, 2025 <br> Time: 2:00 p.m. <br> Location: Courtroom 10 <br><br> Hon. Araceli Martínez-Olguín <br> United States District Judge |

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
3:25-CV-02847-AMO

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1

II. BACKGROUND .....................................................................................................2

A. Legal Framework ...................................................................................................2

   1. The Homeland Security Act ("HSA")..............................................................2

   2. The Trafficking Victims Protection Reauthorization Act ("TVPRA") ...................3

   3. The Foundational Rule .....................................................................................3

   4. Appropriations Acts and Congressional Intent ................................................4

B. The Current Contract and Termination Decision ..................................................5

III. STANDARDS OF REVIEW ..................................................................................5

IV. ARGUMENT ..........................................................................................................6

A. Plaintiffs Cannot Establish a Likelihood of Success on the Merits......................6

   1. Plaintiffs Lack Statutory Standing Because They Are Not Within the Zone of Interests That 8 U.S.C. § 1232 Is Intended to Protect....................................6

   2. The APA Does Not Waive Sovereign Immunity for the Relief Plaintiffs Seek......7

   3. The Tucker Act Precludes Jurisdiction under the APA.........................................8

   4. The APA does not waive sovereign immunity because HHS's funding decisions are committed to agency discretion. ......................................................11

   5. Plaintiffs Cannot Establish that a Favorable Ruling Would Redress Their Alleged Injuries. ......................................................................................12

      a. No Legal Mandate to Fund Plaintiffs ................................................12

      b. Discretionary Nature of Relief .........................................................13

      c. Speculative and Indirect Path to Relief ............................................14

   6. Contrary to Plaintiffs' assertion, the Foundational Rule does not require taxpayer-funded direct immigration legal representation.........................................14

B. Plaintiffs Will Not Face Irreparable Harm Without a Preliminary Injunction ...................19

   1. Plaintiffs' Alleged Harm is Primarily Monetary and Thus Not Irreparable............19

   2. Plaintiffs' Asserted Non-Monetary Harms are Speculative or Result from Their Own Operational Choices. ......................................................................20

C. The Balance of the Equities and Public Interest Weigh Against Entry of a Preliminary Injunction. ......................................................................................21

D.     If the Court issues a Preliminary Injunction, it should require Plaintiffs to Post Security. ................24

E.     Any Injunctive Relief Must Be Narrowly Tailored and Cannot Extend Nationwide. .....................25

V.     CONCLUSION.............................................................................................................................25

CERTIFICATE OF COMPLIANCE ...............................................................................................I

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

**Page(s)**

4

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ......................................................................................................... 17

5

*Accardi v. Shaughnessy,*
6
    74 S. Ct. 499 (1954) ......................................................................................................... 14

7

*Alcaraz v. INS,*
    384 F.3d 1150 (9th Cir. 2004) ......................................................................................... 16
8

9

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ........................................................................................... 6

10

*Arcamuzi v. Continental Air Lines, Inc.,*
11
    819 F.2d 935 (9th Cir. 1987) ........................................................................................... 20

12

*Ariz. Dream Act Coal. v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014) ......................................................................................... 20
13

14

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) .......................................................................................... 21

15

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan,*
16
    501 U.S. 1301 (1991) ....................................................................................................... 21

17

*Bowen v. Massachusetts,*
18
    487 U.S. 879 (1988) ........................................................................................................... 7

19

*California v. U.S. Dep't of Educ.,*
    No. CV 25-10548-MJJ, 2025 WL 760825 (D. Mass. Mar. 10, 2025) ............................. 7

20

*Caribbean Marine Servs. Co.,*
21
    844 F.2d at 676 ..........................................................................................................19, 20

22

*City & Cnty. Of San Francisco v. Trump,*
23
    897 F.3d 1225 (9th Cir. 2018) ......................................................................................... 18

24

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ............................................................................................ 19, 21, 25

25

*Clarke v. Sec. Indus. Ass'n,*
26
    479 U.S. 388 (1987) ........................................................................................................... 7

27

*CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.,*
28
    48 F.3d 618 (1st Cir. 1995) ............................................................................................. 25

*Council Oil Co. v. Lader*,
    56 F.3d 234 (D.C. Cir. 1995) ............................................................................ 10

*Crowley Gov't Servs., Inc. v. GSA.*,
    38 F.4th 1099 (D.C. Cir. 2022) ..................................................................... 9, 10

*Dennis Melancon, Inc. v. City of New Orleans*,
    703 F.3d 262 (5th Cir. 2012) .......................................................................... 23

*Dep't of Army v. Blue Fox, Inc.*,
    525 U.S. 255 (1999) ......................................................................................... 7

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ............................................................................. 18, 19

*Dep't of Educ. v. California*,
    604 U.S. ----, 2025 WL 1008354 (Apr. 4, 2025) .............................. 1, *passim*

*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014) ......................................................................... 21

*Earth Island Inst. v. Carlton*,
    626 F.3d 462 (9th Cir. 2010) ............................................................................ 5

*FDIC v. Meyer*,
    510 U.S. 471 (1994) ......................................................................................... 7

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
    98 F.4th 1180 (9th Cir. 2024) ......................................................................... 25

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ..................................................................... 5, 19

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002) .................................................................................... 7, 8

*Heckler v. Turner*,
    468 U.S. 1305 (1984) ...................................................................................... 23

*INS v. Legalization Assistance Project*,
    510 U.S. 1301 (1993) .................................................................................... 7, 8

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ............................................................................... 12, 18

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) .......................................................................... 5

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,*
   634 F.2d 1197 (9th Cir. 1980) ................................................................. 20

*Lucas R. v. Becerra,* No.,
   CV 18-5741, 2022 WL 2177454 (C.D. Cal. Mar. 11, 2022) ................. 4

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ............................................................................... 13

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990) ................................................................................. 6

*Maryland v. King,*
   567 U.S. 1301 (2012) ............................................................................. 23

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
   567 U.S. 209 (2012) ................................................................................. 6

*Mathews v. Eldridge,*
   424 U.S. 319 (1976) ............................................................................... 22

*Megapulse, Inc. v. Lewis,*
   672 F.2d 959 (D.C. Cir. 1982) ................................................................ 9

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................................... 21

*North Side Lumber v. Block,*
   753 F.2d 1482 (9th Cir. 1985) ................................................................. 9

*Novak v. United States,*
   795 F.3d 1012 (9th Cir. 2015) ............................................................... 13

*Pacito v. Trump,*
   No. 2:25-cv-255, 2025 WL 893530 (W.D. Wash. Mar. 24, 2025) ......... 8

*People of the State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency,*
   766 F.2d 1319 (9th Cir. 1985) ............................................................... 24

*Renee v. Duncan,*
   686 F.3d 1002 (9th Cir. 2012) ............................................................... 13

*Sampson v. Murray,*
   415 U.S. 61 (1974) ................................................................................. 20

*United Aeronautical Corp. v. United States Air Force,*
   80 F.4th 1017 (9th Cir. 2023) ................................................................. 9

*United States Conf. of Cath. Bishops v. U.S. Dep't of State,*
    --- F.Supp.3d ----, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ................................. 10

Winter v. Nat. Res. Def. Council, Inc.,
    555 U.S. 7 (2008) ............................................................................................ 5, 19

## STATUTES

5 U.S.C. § 701 ............................................................................................................. 1

5 U.S.C. § 701(a)(1) .................................................................................................. 8

5 U.S.C. § 701(a)(2) ................................................................................................ 11

5 U.S.C. § 702 ............................................................................................................ 7

6 U.S.C. § 279 ............................................................................................................ 2

6 U.S.C. § 279(b)(1) ............................................................................................ 3, 12

6 U.S.C. § 279(b)(1)(A) ....................................................................................... 2, 3

6 U.S.C. § 279(b)(1)(I) ........................................................................................... 15

6 U.S.C. § 279(g)(2) ................................................................................................. 2

6 U.S.C. § 279(a) ...................................................................................................... 2

8 U.S.C. § 1232 .......................................................................................................... 1

8 U.S.C. § 1232(b)(1) ............................................................................................... 3

8 U.S.C. § 1232(c)(5) ...................................................................................... 3, *passim*

8 U.S.C. § 1232(c)(6) ............................................................................................... 6

8 U.S.C. § 1232(i) ................................................................................................... 12

8 U.S.C. § 1362 .................................................................................... 3, 11, 15, 16

31 U.S.C. § 6305 ....................................................................................................... 3

## FEDERAL RULES OF APPELLATE PROCEDURE

Federal Rule of Civil Procedure 65(c) ................................................................... 24

**<u>REGULATIONS</u>**

45 C.F.R. Part 410 ................................................................................................................. 3

45 C.F.R. § 410.1309(a)(4) ................................................................................. 1, *passim*

45 C.F.R. § 410.1309(a)(2)(i)-(v) ........................................................................................ 4

**The Homeland Security Act:**

Pub. L. No. 107-296, 116 Stat. 2135 ................................................................................... 2

**William Wilberforce Trafficking Victims Protection Act of 2008 ("TVPRA"):**

Pub. L. No. 110-457 ............................................................................................................. 1

**Further Consolidated Appropriations Act:**

Pub. L. No. 118-47 ........................................................................................................ 4, 11

**Full-Year Continuing Appropriations and Extensions Act, 2025:**

Pub. L. No. 119-4 ......................................................................................................... 4, 11

**<u>OTHER AUTHORITIES</u>**

89 Fed. Reg. at 34,529 ...................................................................................................... 14

89 Fed. Reg. at 34,529 ...................................................................................................... 15

89 Fed. Reg. at 34,526 ...................................................................................................... 16

## I.  **INTRODUCTION**

Plaintiffs ask this Court to enter extraordinary relief unsupported by law or fact.  Their motion for a preliminary injunction, ECF No. 37, overreaches on every front—seeking to convert a discretionary, resource-limited federal program into a court-mandated entitlement. The Court should deny the motion.  The requested relief would upend, not preserve, the longstanding management of legal services for unaccompanied alien children ("UAC")—services that remain subject to available appropriations and the agency's discretionary judgment.  The Supreme Court recently rejected a similar attempt to utilize the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, to compel continued payments under a program that the Executive branch has been given significant discretion to manage. *See Dep't of Educ. v. California*, 604 U.S. ----, 2025 WL 1008354, at 1 (Apr. 4, 2025).  This Court should do the same.

Plaintiffs are legal service providers seeking to compel the United States Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR"), to indefinitely fund direct legal representation for UAC through specific contracting arrangements.  But the governing statute—the William Wilberforce Trafficking Victims Protection Act of 2008 ("TVPRA"), Pub. L. No. 110-457 (codified in principal part at 8 U.S.C. § 1232)—expressly conditions any such representation on agency discretion, including considerations for practicability and the availability of pro bono counsel.  It does not create an enforceable right to government-funded representation, let alone compel the agency to maintain any particular scope of services or contractual relationship.  Similarly, the regulatory language Plaintiffs cite, the Foundational Rule, codified at 45 C.F.R. § 410.1309(a)(4), confirms that ORR's obligation to fund direct representation is contingent on both available appropriations and ORR's discretionary determinations.  Congress never mandated indefinite funding for these services, and neither should this Court.

At the threshold, Plaintiffs lack organizational standing. They also fail to show that the termination decision constitutes final agency action reviewable under the APA.  Furthermore, they cannot identify any statutory or regulatory provision that imposes a binding duty on the government to maintain uninterrupted direct representation contracts.  At most, Plaintiffs disagree with the government's policy judgment to conserve resources and reallocate funding within the broad framework of the TVPRA—a judgment that courts have repeatedly held is committed to agency discretion. Moreover, decisions regarding whether and how to terminate government contracts—particularly for the government's convenience—are classic examples of actions committed to agency discretion and are not subject to judicial review under the APA.

In essence, this dispute pertains to the partial termination of a federal contract, which should be adjudicated in the Court of Federal Claims, not here. Under the Tucker Act and the Contract Disputes Act, challenges to government contract terminations must be brought in the U.S. Court of Federal Claims. Plaintiffs' attempt to recast a contract termination as a violation of the APA cannot circumvent that exclusive remedial scheme.

Furthermore, Plaintiffs fail to establish any of the equitable factors required for injunctive relief. Their claims of irreparable harm rest on speculative predictions about staffing decisions and funding shortfalls that are neither immediate nor irreversible. Nothing in the record suggests that Plaintiffs are barred from continuing their work, pursuing other funding sources, or seeking relief through the dispute resolution provisions of whatever contracts they hold with Acacia. A preliminary injunction's extraordinary relief is not an appropriate mechanism for restructuring federal contract policy to align with a particular group of stakeholders' policy preferences, particularly where the asserted harms are financial, the underlying legal theory lacks merit, and the injunction will require the expenditure of taxpayer funds that will never be recouped once spent. For these reasons and others, the Court should deny Plaintiffs' motion.

## II.    BACKGROUND

### A.    Legal Framework

The statutory and regulatory framework governing legal representation for UAC in federal care and custody reflects a coordinated scheme established by Congress to balance the protection of vulnerable children with the Executive's discretion over immigration and programmatic resource allocation. This framework primarily originates in two statutes: the Homeland Security Act of 2002 ("HSA") and the TVPRA.

#### 1.    The Homeland Security Act ("HSA")

In 2002, Congress enacted the HSA, Pub. L. No. 107-296, 116 Stat. 2135 (codified in relevant part at 6 U.S.C. § 279), abolishing the Immigration and Naturalization Service ("INS") and transferring the responsibility for the care and placement of UAC from INS to ORR. 6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2).

The HSA defines a UAC as "a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom— (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2). Further, it assigns ORR broad authority over the care and custody of UAC while they are in federal custody due to their immigration status, including coordinating their care and placement, ensuring their best interests in custodial decisions, and developing plans to "ensure that qualified

and independent legal counsel is timely appointed to represent the interests of each such child."
6 U.S.C. § 279(b)(1)(A).  These responsibilities are carried out through cooperative agreements and contracts with care providers under ORR policies and oversight.  *See* 6 U.S.C. § 279(b)(1); 31 U.S.C. § 6305.

## 2. The Trafficking Victims Protection Reauthorization Act ("TVPRA")

Congress enacted the TVPRA in 2008 to strengthen protections for UAC and support their safe repatriation or appropriate placement.  The statute, consistent with the HSA, makes the Secretary of HHS responsible for the care and custody of UAC.  8 U.S.C. § 1232(b)(1).  The TVPRA explicitly directs HHS to prioritize the utilization of pro bono counsel and does not mandate direct government-funded legal representation: Section 235 of the TVPRA encourages HHS to ensure UAC have counsel "to the greatest extent practicable" and "make every effort to utilize the services of pro bono counsel who agree to provide representation without charge." 8 U.S.C. § 1232(c)(5).

Further, Section 235 encourages HHS to ensure that counsel is available to represent UAC in "legal proceedings or matters," expressly linking representation duties with protecting children from "mistreatment, exploitation, and trafficking." Additionally, it cross-references Section 292 of the Immigration and Nationality Act ("INA"), which specifies representation "at no expense to the Government."  8 U.S.C. § 1362.  Therefore, it is clear that HHS is not required to fund access to legal counsel for UAC. The TVPRA's language and structure demonstrate Congress's intent to establish public-private partnerships and encourage pro bono counsel as the primary source of legal assistance for UAC, and conferring on ORR exclusive discretion to determine when direct government-funded representation might be utilized (e.g., where pro bono resources are impractical or unavailable).

## 3. The Foundational Rule

In April 2024, ORR promulgated the Unaccompanied Children Program Foundational Rule, codified at 45 C.F.R. Part 410, to establish comprehensive regulations governing its UAC program.  The Rule, which became effective July 1, 2024, formalized previously informal procedures and explicitly articulated ORR's discretion regarding legal representation funding.  Specifically, the Rule provides that ORR "shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children" only "to the extent ORR determines that appropriations are available," and only if securing pro bono counsel is impractical. 45 C.F.R. § 410.1309(a)(4).

In contrast, other subsections impose mandatory obligations.  For instance, the Rule explicitly requires ORR to ensure UAC receive mandatory services such as a "presentation concerning the rights and

responsibilities of undocumented children," "information regarding the availability of free legal assistance," and a "confidential legal consultation." 45 C.F.R. § 410.1309(a)(2)(i)-(v).  This intentional distinction clarifies that direct funding for legal representation remains discretionary, conditional upon the availability of appropriations, and subject to agency determination. The Rule also reinforces congressional policy choices articulated in the TVPRA, highlighting the preferred reliance on pro bono counsel and emphasizing that direct representation services funded by ORR are not guaranteed and remain subject to the agency's discretionary resource management.

### 4.    Appropriations Acts and Congressional Intent

Congress periodically appropriates funds to support ORR's UAC program, including legal services. Appropriations language, however, consistently remains broad and nonspecific regarding precise funding allocations.  ECF No. 24-1, Ex. A, Declaration of Toby Biswas ("Biswas Decl."), ¶ 16. For example, the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, provides general appropriations to execute activities under Section 235 of the TVPRA without earmarking specific amounts for direct legal representation.  This general appropriation approach affords ORR flexibility in determining the allocation of resources based on agency priorities, the availability of pro bono counsel, and shifting immigration policy needs. Biswas Decl., ¶ 16.

Subsequent acts, including the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, similarly maintain funding levels and provide broad discretion without altering statutory obligations or imposing specific mandates for funding legal representation. *Id.* This ongoing legislative practice underscores Congress's intent to maintain flexibility for ORR, allowing the agency to prioritize resources efficiently and adaptively. *Id.* Such discretionary funding practices reflect a longstanding Congressional policy to balance support for legal services with practical constraints, prioritizing public-private partnerships and pro bono resources where feasible, rather than imposing fixed or rigid funding mandates. *Id.*

Indeed, at least one other court has considered this issue and concluded that Congress did not specify what types of legal services ORR must fund with the appropriations intended for implementing  Section 235 of the TVPRA. *Lucas R. v. Becerra*, No. CV 18-5741, 2022 WL 2177454, at *31 (C.D. Cal. Mar. 11, 2022) (holding that the agency retained discretion even when vulnerable populations are involved). Rather, ORR is "entitled to prioritize what type of legal representation ORR supports with appropriated funds, in furtherance of the TVPRA." *Id.* The same analysis applies here: without a mandate from Congress in the most recent

appropriations legislation, ORR has discretion to prioritize what types of services it funds to further the purpose of the TVPRA.

## B.   The Current Contract and Termination Decision

The present dispute arises from ORR's partial termination and descoping of a federal contract administered by the Department of the Interior ("DOI"), which serves as the contracting agent through its Interior Business Center.  *Id.* ¶ 13. ORR directed DOI to partially terminate a contract previously funding direct legal representation services.  *Id.* ¶¶ 12–13. This termination was executed through a formal decision memorandum signed by the Acting Assistant Secretary of the Administration for Children and Families ("ACF"). *Id.* ¶¶ 13–14.

ORR's decision reflects a deliberate exercise of statutory discretion to prioritize available appropriations and pro bono legal services.  While general direct representation contract funding was terminated, ORR maintains other legally required activities, including "know your rights" presentations and confidential legal screening consultations.  *Id.* ¶ 5, 11.

This contract termination aligns with ORR's statutory and regulatory discretion under the TVPRA, the Foundational Rule, and relevant appropriations acts, none of which mandate continuous, direct legal representation funding when viable alternatives, such as pro bono representation, exist.  *Id.* ¶ 14.  Additionally, the termination decision reflects ORR's commitment to fiscal responsibility, ensuring that limited resources are allocated effectively, prudently managing public funds, and preserving governmental flexibility to respond to evolving priorities and urgent programmatic needs.  *Id.* ¶ 11, 16.

## III.   STANDARDS OF REVIEW

Preliminary injunctive relief "is an extraordinary and drastic remedy," *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (internal quotation marks and citation omitted), that is "never awarded as of right," *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (internal quotation marks and citation omitted).  Thus, this relief "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Lopez*, 680 F.3d at 1072 (internal quotation marks and citation omitted; emphasis in original).  This is a "difficult task."  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).  To prove their entitlement to such relief, Plaintiffs must establish that:  (1) they are likely to succeed on the merits, (2) are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Under the Ninth Circuit's sliding scale test for preliminary injunctive relief, "serious questions going to the merits" and "a hardship

balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

## IV.   ARGUMENT

### A.   Plaintiffs Cannot Establish a Likelihood of Success on the Merits

The law and undisputed facts confirm what the Court's TRO Order implicitly recognized: Plaintiffs cannot carry their burden of demonstrating a likelihood of success on the merits. The Court's TRO Order found only that Plaintiffs had raised "serious questions" going to the merits, declining to decide whether they were likely to prevail. *Id.* at 4-5. But at this stage of the litigation, Plaintiffs must demonstrate a clear likelihood of success—a burden they cannot carry. Plaintiffs ask the Court to transform a discretionary, resource-dependent program into a judicially enforceable entitlement, but their claims falter on multiple independently dispositive grounds. They lack standing under the relevant statute, cannot overcome jurisdictional limits rooted in sovereign immunity and the Tucker Act, and seek relief that would not redress their alleged harms. Their theory improperly recasts a contract dispute as an APA claim and disregards the discretion Congress conferred on ORR to manage limited appropriations. The agency's contract termination at issue here was and remains lawful, rational, and supported by both the statutory and regulatory framework. In short, Plaintiffs' claims are legally untenable, jurisdictionally barred, and unsupported by any evidence of arbitrary or unlawful agency action.

### 1.   Plaintiffs Lack Statutory Standing Because They Are Not Within the Zone of Interests That 8 U.S.C. § 1232 Is Intended to Protect.

Plaintiffs lack standing because the statutory provision that, according to them, ensures that UAC have access to legal counsel—8 U.S.C. § 1232(c)(5)—was not intended to protect Plaintiffs. That provision protects the interests of unaccompanied children, not legal-service providers. Its plain text directs HHS to ensure UAC "have counsel," to the extent practicable and "at no expense to the Government," with an explicit preference for pro bono representation. *See* 8 U.S.C. §§ 1232(c)(5), 1362. Nothing in the text or structure confers rights or entitlements on organizations like Plaintiffs. To the contrary, when Congress wanted to confer funding on a service provider, it did so expressly—for child advocates. *See* 8 U.S.C. § 1232(c)(6). That juxtaposition confirms that legal-service providers are not intended beneficiaries of § 1232(c)(5).

To assert an APA claim, a plaintiff must show that its asserted injury falls within the "zone of interests" protected by the statute at issue. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). Courts do not examine the APA itself, but rather focus on "the statute that the plaintiff says was violated." *Patchak*, 567 U.S. at 224. And while

1    the test is not especially demanding, courts routinely find plaintiffs outside the zone where the statute protects
2    a different group or purpose. *See INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305 (1993) (O'Connor,
3    J., in chambers).

4         Here, Plaintiffs allege economic harm and mission frustration, but § 1232(c)(5) was not enacted to
5    protect service providers' finances or operational goals. Instead, it was enacted to protect UAC. Because
6    Plaintiffs are not within that protected class, and their interests are not regulated or safeguarded by the statute,
7    they fall outside the zone. As the Supreme Court has emphasized, the zone-of-interests test "forecloses suit
8    when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute
9    that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479
     U.S. 388, 399 (1987).

10            **2.    The APA Does Not Waive Sovereign Immunity for the Relief Plaintiffs Seek.**

11        Although Plaintiffs style their claim as an APA claim for injunctive and declaratory relief, their core
12   demand is payment under an expired and terminated contract. This Court lacks jurisdiction to order the
13   Government to pay money pursuant to this expired contract, or to order the Government to enter into a new
14   contract. To the extent that they have any claim at all, whether through contract, statute, or regulation, they
15   must bring their suit in the Court of Federal Claims.

16        "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."
17   *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). The Supreme Court has "frequently held" that a waiver of sovereign
18   immunity must be "strictly construed, in terms of its scope, in favor of the sovereign." *Dep't of Army v. Blue
     Fox, Inc.*, 525 U.S. 255, 261 (1999). Plaintiffs have the burden of proving they meet this "high standard." *Id.*
19   The APA's waiver of sovereign immunity only applies to actions "seeking relief other than money damages."
20   5 U.S.C. § 702. The Supreme Court has explained that suits seeking to compel the Government to pay a sum
21   of money are suits for "money damages,"—regardless of whether they seek this relief through judgment,
22   injunction, or declaration. *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (citing *Bowen v.
23   Massachusetts*, 487 U.S. 879, 918–919 (1988) (Scalia, J., dissenting)).

24        The Supreme Court has recently confirmed that Plaintiffs are not likely to succeed on the merits of
25   their claims. *Dep't of Educ*, 2025 WL 1008354. There, various States brought suit under the APA, arguing that
26   the Department of Education's decision to withhold appropriated funds from the States was arbitrary and
27   capricious. *California v. U.S. Dep't of Educ.*, No. CV 25-10548-MJJ, 2025 WL 760825, at *1 (D. Mass. Mar. 10,
28   2025). The district court granted a TRO, finding that it had jurisdiction over the States' claims because their

---

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
3:25-CV-02847- AMO                              7

disputes hinged on "federal statute and regulations." *Id.* The district court ordered the Department of Education to "restore Plaintiff States to the pre-existing status quo prior to the termination under all previously awarded [ ] grants for recipients in Plaintiff States. *Id.* at *5. The Supreme Court, however, granted DOE's emergency application for relief and stayed the TRO. It held that the "Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Dep't of Educ.*, 2025 WL 1008354, at *1. The Government is likely to succeed on the merits for the same reasons here.

The APA does not waive sovereign immunity over the relief that Plaintiffs seek: payment. Specifically, Plaintiffs ask this Court to: (1) declare that "Defendants are required to *continue funding* legal representation to unaccompanied children, consistent with the TVPRA and ORR's Foundational Rule; (2) enjoin Defendants nationwide from *ceasing to fund counsel* to represent unaccompanied children in violation of the TVPRA and the Foundational Rule; (3) to declare that Defendants' actions violate the APA; and (4) to set aside Defendants' actions. ECF No. 1 at 39. Regardless of whether Plaintiffs style their relief as a judgment, injunction, or declaration, it is undeniable that they are seeking to compel the government to pay money, which is unavailable under the APA. *Knudson*, 534 U.S. at 210; *Dep't of Educ.*, 2025 WL 1008354, at *1. Because the APA does not waive sovereign immunity over Plaintiffs' claims for continued funding, and this Court lacks jurisdiction over their claims.

Plaintiffs attempt to sidestep *Dep't of Educ.* by relying on the district court's decision in *Pacito v. Trump*, No. 2:25-cv-255, 2025 WL 893530 (W.D. Wash. Mar. 24, 2025). Pls' Mot. for PI, ECF No. 37, at 16. That decision has been appealed, however, and the Ninth Circuit has stayed the preliminary injunction that Plaintiffs rely upon. *Pacito v. Trump*, No. 25-1313 (9th Cir. Mar. 25, 2025), ECF No. 28.1. Thus, this Court should not accord any weight to the district court's decision in *Pacito*. Instead, this Court should seek guidance from the Supreme Court, which has already held that the Government is likely to succeed on the merits in a case seeking essentially the same relief. *Dep't of Educ.*, 2025 WL 1008354 at *1.

### 3. The Tucker Act Precludes Jurisdiction under the APA.

This Court also lacks subject-matter jurisdiction because the Tucker Act precludes Plaintiffs from bringing their claims under the APA. Although Plaintiffs assert that their claims arise under the TVPRA and HHS's Foundational Rule, well-established case law confirms that Plaintiffs' claims sound in contract and therefore must be brought in the Federal Court of Claims.

The APA explicitly does not apply "to the extent that statutes preclude judicial review." 5 U.S.C. § 701(a)(1). The Tucker Act "impliedly forbids" APA claims involving government contracts. *Id.* at

1485 (citation omitted). "[A]n action against the United States which is *at its essence* a contract claim lies within the Tucker Act and . . . a district court has no power to grant injunctive relief in such a case." *Megapulse*, 672 F.2d at 967 (emphasis added). If a plaintiff's claim is "concerned solely with rights created within the contractual relationship and has nothing to do with duties arising independently" of the contract, then their claim is based upon a contract with the United States and subject to the jurisdictional restrictions in the Tucker Act. *North Side Lumber v. Block,* 753 F.2d 1482, 1486 (9th Cir. 1985), *cert. denied,* 474 U.S. 931 (1985) (citing *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 967–68 (D.C. Cir. 1982)).

To determine whether the Tucker Act precludes a contract claim "disguised" as an APA claim, the Ninth Circuit employs the D.C. Circuit's *Megapulse* test. *United Aeronautical Corp. v. United States Air Force*, 80 F.4th 1017, 1025–26 (9th Cir. 2023) (citing *Megapulse,* 672 F.2d at 967–68). Under *Megapulse*, a court must decide whether "the source of the rights upon which the plaintiff bases its claims" arises under a contract and whether "the type of relief sought" is normally available as a contract remedy. *Id.* "If rights and remedies are *statutorily* or *constitutionally* based, then district courts have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims does, even if the plaintiff formally seeks injunctive relief." *Id.* (emphasis in original).

To assess the "source of rights" that form the basis of the plaintiff's claim, the Court must consider the following factors: (1) whether the plaintiff's asserted rights and the government's purported authority arise from statute or contract; (2) whether the plaintiff's rights "exist[ ] prior to and apart from rights created under the contract,"; and (3) whether the plaintiff "seek[s] to enforce any duty imposed upon" the government "by the . . . relevant contracts to which" the government "is a party." *Crowley Gov't Servs., Inc. v. GSA.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (internal quotations and citations omitted).

All three of these considerations confirm that Plaintiffs' source of rights is a contract. *First*, Plaintiffs' only asserted rights arise under the contract they have with Acacia; neither the TVPRA nor HHS's Foundational Rule provide Plaintiffs any right to the funds Congress appropriated. *Second*, Plaintiffs' rights cannot "exist prior to and apart from rights created under the contract." *Id.* Had Acacia never entered into a contract with the United States to provide direct legal services to UAC, Plaintiffs would not have entered into a subcontract with Acacia, would never have received funding to provide such services, and thus would have no injury to complain of. As a result, their rights do not predate the Acacia contract, nor are they entitled to funds apart from the contract. *Third*, Plaintiffs seek to enforce a duty imposed by the contract. Indeed, throughout their Complaint, they challenge the Government's "Cancellation Order," which cancelled the

contract with Acacia, as the basis of their injuries. *See* ECF No. 1, ¶ 12 ("The Cancellation Order flies in the face of the TVPRA and the Foundational Rule."); *id.* ¶ 37 ("Defendants' Cancellation Order severely limits Plaintiffs in performing their respective missions to provide legal representation the law requires be made available to unaccompanied children."); *id.* ¶ 131; *id.* ¶ 143. While Plaintiffs stop short of asking the Court to reinstate the Acacia contract—likely to avoid the Tucker Act—this is the only relief that would redress Plaintiffs' injuries. Plaintiffs' recent Motion to Enforce underscores this point. Plaintiffs complained that the Government had not complied with the TRO because they had not received funding. As the Government explained in its status report, Plaintiffs' funding is contingent on a contract with Acacia, which is still in the approval process. Plaintiffs cannot obtain their payment—their relief under the TRO—without a contract in place. Regardless of how they frame it, Plaintiffs seek to enforce the Acacia contract, as it is their only source of rights to funding.

Under the second prong of *Megapulse*, the Court must determine whether the type of relief is typical in actions that sound in contract. *A & S Council Oil Co. v. Lader*, 56 F.3d 234, 240 (D.C. Cir. 1995). Accordingly, a claim is subject to the Tucker Act if, "in whole or in part, it explicitly or 'in essence' seeks more than $10,000 in monetary relief from the federal government." *Crowley*, 38 F.4th at 1107 (citation omitted). Just weeks ago, a different federal-district court confronted a materially identical scenario—an organization's APA suit to restore terminated grant funding—and held that the claim must be heard in the Court of Federal Claims because the nature of the plaintiffs' relief "sounds in contract." *United States Conf. of Cath. Bishops v. U.S. Dep't of State*, --- F.Supp.3d ----, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025). Like here, the relief sought in *Conf. of Cath. Bishops* was styled as a request for an injunction, yet the court correctly reasoned that, in actuality, the relief sought was for "the Government to keep paying up." *Id.* at *5. That court rightly recognized that a demand for the government to continue grant payments "sounds in contract" even if pleaded under the APA. *Id.* at *5. Likewise here, Plaintiffs cannot sidestep the Tucker Act by repackaging their contract-based grievance as an APA claim. As discussed, Plaintiffs seek monetary relief in excess of $10,000. *See supra* Section IV.A.2; *see also* ECF No. 1 at ¶ 105 (explaining that Estrella faces a budget deficit of $200,000 per month without HHS funding). Because the rights and remedies they assert are fundamentally contractual, exclusive jurisdiction lies in the Court of Federal Claims.

Lastly, to the extent that the Court has any doubt as to whether the Tucker Act precludes jurisdiction, the Supreme Court has recently confirmed that it does. In *Dep't of Education*, the Supreme Court held that the States' claims for grant funding were based on a contract—even though the States allegedly only sought to

enjoin the government from withholding appropriated funds, as Plaintiffs likewise allege in this case. 2025 WL 1008354 at *1. Although Plaintiffs are not a party to a contract with the government, they are beneficiaries to Acacia's contract with the government, and they essentially seek to compel the government to reinstate those contract terms.

In short, Plaintiffs seek what the Tucker Act forbids: judicial enforcement of an expired funding arrangement disguised as APA review. Their claims are inextricably linked to the now partially terminated contract with Acacia, and they identify no legal entitlement to *their* continued funding independent of that agreement. Without the contract, there is no injury, no enforceable right, and no legal pathway to relief. Because their asserted harm arises solely from the termination of a contractual relationship—and the relief they seek is monetary—their claims fall squarely within the jurisdiction of the Court of Federal Claims.

### 4. The APA does not waive sovereign immunity because HHS's funding decisions are committed to agency discretion.

Regardless, the APA also precludes review here because HHS's funding decision under the TVPRA and the Foundational Rule are discretionary. The APA does not permit judicial review of "agency action" that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The TVPRA provides HHS broad discretion in determining how to provide legal services to UAC. While Section 235 mandates that HHS ensure that counsel is available to represent UAC "to the greatest extent practicable" in "legal proceedings or matters," it also cross-references the provision of the INA—8 U.S.C. § 1362—which specifies that "the privilege" of being represented in removal proceedings is "at no expense to the Government." The TVPRA also directs HHS to "make every effort to utilize the services of pro bono counsel who agree to provide representation without charge." 8 U.S.C. § 1232(c)(5). Likewise, the Foundational Rule explicitly articulates ORR's discretion regarding legal representation funding. 45 C.F.R. § 410.1309(a)(4). The decision to fund direct legal services is "subject to ORR's discretion and available appropriations." *Id.*

Moreover, Congress's funding of ORR's UAC program, including legal services, demonstrates that HHS has been granted discretion in allocating resources. For example, the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, provides general appropriations to execute activities under Section 235 of the TVPRA without earmarking explicit amounts for direct legal representation. And subsequent acts, including the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, similarly maintain funding levels and provide broad discretion without altering statutory obligations or imposing specific mandates for funding legal representation. Biswas Decl. ¶¶ 16-17. This ongoing legislative practice underscores Congress's intent to maintain flexibility for ORR, allowing the agency to prioritize

resources efficiently and adaptively.  *Id.*; *see also* 6 U.S.C. § 279(b)(1) (making the Director of ORR responsible for activities including coordinating and implementing the care of UAC and implementing policies with respect to the care and placement of UAC); 8 U.S.C. § 1232(i) (authorizing the Secretary of HHS to "award grants to, and enter into contracts with, voluntary agencies to carry out this section and section 279 of title 6.").

The Court therefore lacks jurisdiction to review HHS's decision to reallocate resources from direct representation into other aspects of the UAC program.  This decision is firmly committed to the agency's discretion.  In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the Indian Health Service's decision to discontinue a previously funded program  and reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decision making standards.  *See id.* at 185-88.  The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Id.* at 192.

Indeed, an agency's allocation of funds from a lump-sum appropriation requires "a complicated balancing of a number of factors which are peculiarly within its expertise": whether its "resources are best spent" on one program or another; whether it "is likely to succeed" in fulfilling its statutory mandate; whether a particular program "best fits the agency's overall policies"; and, "indeed, whether the agency has enough resources to fund a program at all."  *Id.* at 193 (internal citations omitted).  "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes."  *Id.*  But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude."  *Id.*  Because the TVPRA confers HHS discretion to determine how best to allocate and administer the funding for the UAC program, HHS's decisions are not subject to review under the APA.

### 5.    Plaintiffs Cannot Establish that a Favorable Ruling Would Redress Their Alleged Injuries.

#### a.  No Legal Mandate to Fund Plaintiffs

Even if Plaintiffs could overcome the above hurdles, they still fail to demonstrate Article III standing, because they cannot show that the relief they seek would likely redress their alleged harm.  The "irreducible constitutional minimum" of Article III standing consists of (1) "injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) a likelihood "that the injury will be redressed by

a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks omitted). The third element of Article III standing, redressability, requires that it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan,* 504 U.S. at 561 (citation and internal quotation marks omitted). To show a likelihood of redressability, Plaintiffs must "show that there would be a 'change in a legal status' as a consequence of a favorable decision" and that this change would significantly increase the likelihood that they would obtain the relief sought. *Novak v. United States*, 795 F.3d 1012, 1019–20 (9th Cir. 2015) (quoting *Renee v. Duncan,* 686 F.3d 1002, 1013 (9th Cir. 2012)).

Plaintiffs cannot make that showing here. The relief that Plaintiffs seek—if untethered to their contract claim—would not likely provide them with the monetary relief they seek. Enforcing the statutory authority Plaintiffs rely on in arguing that Congress intended to fund direct-legal services, 8 U.S.C. § 1232(c)(5), would have the opposite effect of the relief Plaintiffs seek. As explained above, Congress did not intend to financially benefit Plaintiffs in ensuring that UAC would have access to legal services; instead, Congress envisioned that such legal services would generally be provided *pro bono* at no expense to the government. 8 U.S.C. § 1232(c)(5).  If the Court were to enforce the plain language and purpose of Section 235 of the TVPRA, it would order the government to seek out *pro bono* counsel for direct legal services and, to the extent possible, avoid funding legal services at the government's expense. Of course, this result would not redress Plaintiffs' injuries, as they seek to be paid for their services and not acting in a *pro bono* capacity.

### b.  Discretionary Nature of Relief

Likewise, because the Foundational Rule provides HHS with discretion in determining whether and how to disburse appropriations for direct legal services, Plaintiffs cannot show that ordering HHS to comply with its regulation would redress their injury.  In short, Plaintiffs ask for an injunction, but there is no *likelihood* that such relief would put dollars back into their coffers.  To the contrary, even absent the contract, ORR would pursue its statutory mission by focusing on pro bono referrals rather than paid contracts. Biswas Decl., ¶ 17. And even if HHS changed course and decided to exercise favorable discretion by funding direct legal services, it could contract with organizations other than Acacia and Plaintiffs. *Id.* ¶ 19. There is nothing that Plaintiffs can cite that would require or encourage HHS to continue funding the Plaintiffs *in this case. Id.* ¶¶ 17-19. In other words, even if the agency continued funding direct legal services, Plaintiffs cannot show that it is likely that HHS will continue to contract with Acacia or with any of the Plaintiffs in this case. *Id.* Thus, Plaintiffs' redressability—that HHS would continue funding Acacia or any of the Plaintiffs—is speculative at best and insufficient to establish standing. *Lujan,* 504 U.S. at 561.

### c. Speculative and Indirect Path to Relief

While Plaintiffs attempt to reframe their alleged harm as an impairment to their "core activities and organizational missions" (Mot. at 4), this is, in essence, a repackaged claim for funding. Courts routinely reject efforts to inflate financial harm into mission-based injury when the true source of the injury is the loss of a government contract or grant. And even under the "modest" standard of redressability cited in *Renee v. Duncan*, Plaintiffs cannot show a meaningful change in legal status that would significantly increase the likelihood of renewed funding. The TVPRA and Foundational Rule confer no entitlement to such funding, and nothing about a favorable ruling on the merits would create a long-term direct pathway for money to flow back to these Plaintiffs. Because an APA order would not necessitate renewed payments to Plaintiffs, they cannot satisfy redressability. Their alleged injuries—loss of funding and programmatic cutbacks—are economic harms that could only be remedied by an award of money to them, which is unavailable under the APA. At a minimum, this casts serious doubt on Plaintiffs' standing and underscores the uphill battle they face in demonstrating a likelihood of success.

### 6. Contrary to Plaintiffs' assertion, the Foundational Rule does not require taxpayer-funded direct immigration legal representation.

Plaintiffs claim that Defendants' terminations violate ORR's Foundational Rule in contravention of the *Accardi* doctrine, *see Accardi v. Shaughnessy*, 74 S. Ct. 499 (1954). But these claims, too, lack merit. The government has not, as Plaintiffs contend, "violate[d] its own regulations." ECF No. 37 at 12. Although Plaintiffs assert that the government breached an "express commitment" "to fund direct representation as long as appropriations [are] available," *id.*, they fail to cite or quote any provision in the Foundational Rule that so binds HHS. The Foundational Rule states, in relevant part:

> (4) *Direct immigration legal representation services for unaccompanied children currently or previously under ORR care.* To the extent ORR determines that appropriations are available, *and insofar as it is not practicable for ORR to secure pro bono counsel*, ORR shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children, *subject to ORR's discretion* and available appropriations.

45 C.F.R. § 410.1309(a)(4) (emphases added). Plaintiffs misread section 1309(a)(4) to unconditionally require taxpayer-funded direct immigration legal representation for UAC. Funding for legal representation, under subsection 1309(a)(4) is contingent upon several conditions. Funding is required *insofar that it is not practicable for ORR to secure pro bono counsel.* 45 C.F.R. § 410.1309(a)(4). As HHS noted in the preamble to the Foundational Rule, ORR, consistent with the TVPRA, makes every effort to use pro bono legal services "to the greatest extent practicable" to secure counsel for UAC in these contexts. 89 Fed. Reg. at 34,529. HHS

notes that ORR-funded legal services providers may help coordinate referral to pro bono legal services and that ORR provides each UAC with a list of pro bono service providers.[1] *Id.* Presumably, when an organization "coordinates referral" to pro bono legal services, the organization is not providing direct legal representation itself. Further, by conditioning funding "to the greatest extent practicable," HHS acknowledges that, in some cases, it is impracticable for ORR to secure pro bono legal services. *Id.* The determination of when it is "impracticable" for ORR to secure pro bono legal services lies solely with HHS.

Further, HHS notes in the preamble that ORR must be selective in the kinds of legal services it funds, and, therefore, proposed to establish its discretion to fund legal services for specific purposes "based on its judgment and priorities." 89 Fed. Reg. at 34,529. The language "based on its judgment and priorities" underscores the substantial discretion  that ORR possesses to determine the manner in which legal services to UAC are provided. Thus, the language of section 410.1309(a)(4) limits the funding of taxpayer-funded legal services to instances where it is impracticable for ORR to secure pro bono counsel. The determination of when it is impracticable is a decision to be made by HHS and not by Plaintiffs or the Court.

Plaintiffs also fail to consider  the condition in subsection 1309(a)(4) of the Foundational Rule, which stipulates that ORR shall provide direct immigration legal representation for certain unaccompanied children, *subject to ORR's discretion.*[2] 45 C.F.R. § 410.1309(a)(4). While Plaintiffs cite Congress's appropriations,  they overlook the clause that such funding is subject to ORR's discretion.

Plaintiffs note that HHS has an obligation "to the greatest extent practicable" and consistent with 8 U.S.C. § 1362, to ensure that UAC have counsel in their immigration proceedings.[3] HHS interpreted "to the greatest extent practicable" to permit a grant of authority to pay for legal services beyond those provided by pro bono legal service providers. 89 Fed. Reg. at 24,529. However, "to the greatest extent practicable" cannot reasonably be construed as a mandate for HHS to unconditionally pay for direct immigration legal representation for all UAC. In the preamble to the Foundational Rule, HHS acknowledged that some commenters expressed a desire for ORR "to fully fund legal services to all [UAC]," while also receiving comments questioning ORR's legal authority to pay for legal services for UAC and suggesting that ORR refrain from using taxpayer funding for legal representation for UAC.  *Id.*  HHS determined that "its

---

[1] The list of pro bono service providers is statutorily required under the TVPRA. 6 U.S.C. § 279(b)(1)(I).

[2] Defendants do not contest that the conditions "to the extent ORR determines that appropriations are available" and "subject to . . . available appropriations," in 45 C.F.R. § 410.1309(a)(4), are met here.

[3] In section 1362, Congress provides that: "In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose." 8 U.S.C. § 1362.

approach to providing legal services to unaccompanied children by enabling them to access pro bono counsel 'to the greatest extent practicable' and funding legal services for additional unaccompanied children, as resources allow, is consistent with ORR's statutory obligations." *Id.* HHS's interpretation of the INA and TVPRA as Congress's grant of discretion to ORR to provide funding for immigration legal services to UAC is far from a *mandate* to provide such funding.

Even more broadly, Plaintiffs seek to expand the *Accardi* doctrine to bind federal agencies to their statements regarding general, long term policy goals. Respectfully, the Court should decline the invitation. Plaintiffs argue that HHS has failed to follow its "internal policies," ECF No. 37 at 22, relying upon *Alcaraz v. INS*, 384 F.3d 1150, 1152 (9th Cir. 2004), a decision that is inapposite here. *Alcaraz* was a petition for review by two aliens from the Board of Immigration Appeals' ("BIA's") final order for their removal and denial of suspension of deportation, in which the BIA failed to follow an explicit policy directive from the Department of Justice to administratively close the cases of eligible aliens who qualified for suspension of deportation but for the new stop-time rule. *Id.* at 1162. The *Alcaraz* court observed that when rights of individuals are affected, agencies are obligated to follow their own procedures, even if these internal procedures are possibly more rigorous than necessary. Consequently, the court remanded the matter for the BIA to apply the administrative-closure policy. *Id.*

In contrast, the present Plaintiffs fail to identify any "internal policy" that HHS disregarded. Furthermore, they do not point to any  legally-recognized rights that are adversely affected by the contract termination. Instead, Plaintiffs cite  a single phrase in the preamble to the Foundational Rule.  ECF No. 37 at 23 (quoting 89 Fed. Reg. at 34,526) ("ORR strives for 100% legal representation and will continue to work towards that goal to the extent possible."). Plaintiffs also cite one part of HHS's FY 2024 budget justification to Congress, reiterating the sentence in the preamble. *Id.* at 23 ("Just last year ORR stated its intention to provide 'universal legal representation for unaccompanied children by FY 2027.") (quoting HHS FY2024 Administration for Children and Families' Justification of Estimates for Appropriations Committees ("FY2024 Justification"), available at https://acf.gov/sites/default/files/documents/olab/fy-2024-congressional-justification.pdf (last viewed Apr. 10, 2025), for the same proposition.

A statement of a diffuse, long-range policy goal that an agency "strives" for, such as "universal legal representation," with no specific instruction or end date, is not an "internal policy" or directive to perform a particular act or procedure than an agency can follow. Such a broad policy goal could not reasonably be construed to affect, much less create, any rights or even an expectation or a reliance interest. This is especially

so where, as here, there likely exists a myriad of ways in which to achieve a policy goal (universal legal representation) and when policy goals are subject to change. Not surprisingly, Plaintiffs have not alleged any rights of theirs that are affected by the contract termination. By failing to articulate a concrete policy or procedural directive or any rights affected by such a policy or directive, Plaintiffs' *Accardi* argument that Defendants have "violated their own policies" fails.

### a. Defendants Offered a Reasoned Explanation for their Actions.

Finally, to the extent Plaintiffs argue that ORR's action was arbitrary and capricious because the agency failed to consider important aspects or secretly harbored an improper motive (Mot. at 14 – 17), those arguments are unfounded. Agency action is entitled to a presumption of regularity, and the administrative record here reflects a reasoned decision driven by policy and fiscal considerations—not any impermissible factor. Plaintiffs may disagree with ORR's policy priorities, but that does not make the decision irrational.

Plaintiffs' reliance on *Encino Motorcars, LLC v. Navarro*, is misplaced. Mot. at 18 (citing 579 U.S. 211, 221-22 (2016)). Unlike in *Encino*, where an agency failed to acknowledge its change in position, ORR explicitly acknowledged the change from the prior expansion of direct representation and provided a reasoned explanation—namely, the need to conserve funds and realign with the statutory model favoring pro bono representation. There is also no "serious reliance interests" akin to those in *Encino* here. While Plaintiffs certainly benefitted from past funding, they were operating under time-limited contract agreements that expressly depended on annual appropriations. They could not reasonably assume that funding would continue unabated regardless of circumstances.

Nor is this a case of unreasoned fiat. ORR's rationale, focusing on legal orientation and screenings to ensure all UAC receive basic legal information, while trusting that pro bono resources (supplemented by post-release services and child advocates in special cases) will provide representation in meritorious cases, is a rational strategy to fulfill its statutory obligations in a sustainable way. Plaintiffs' own preferred policy (full government-funded representation for every child) might be different, but the APA does not permit the Court to substitute Plaintiffs' policy preferences for the agency's judgment.

Plaintiffs further contend that ORR faced a heightened burden to explain its change in policy under *Encino Motorcars* and *Jicarilla Apache Nation*. But those cases apply only when an agency either disregards significant reliance interests or offers no explanation for its reversal. That is not the case here. ORR explicitly acknowledged the shift from prior expansion of direct representation and provided a detailed rationale: aligning with the TVPRA's pro bono preference, addressing fiscal constraints, and rebalancing priorities to

1    ensure core legal orientation and screening services reach all UAC. As in *Lincoln v. Vigil*, where the Supreme

2    Court upheld an agency's decision to discontinue direct services in favor of reallocation, ORR's decision

3    reflects a permissible adjustment in program emphasis, not an unexplained or arbitrary reversal.

4         Plaintiffs argue that government-funded legal service providers historically increased pro bono

5    capacity by mentoring volunteer attorneys and that shifting to a pro bono-only model undermines ORR's

6    goals.  Mot. at 16 – 17.  But this argument  merely reinforces the discretionary nature of ORR's program

7    design—not a legal entitlement to any particular funding mechanism. Even assuming some government-

8    funded mentorship contributed to broader pro bono engagement, that does not negate ORR's authority to

9    now pursue a more targeted, fiscally sustainable strategy. Plaintiffs' citation to the Byrne & Miller report,

10   which suggests that pro bono alone is insufficient to meet all legal needs, at most identifies a policy

11   disagreement. It does not transform discretionary funding into a mandatory obligation. ORR retains the

     authority to weigh competing considerations and adapt its funding model accordingly.

12        So long as ORR considered the relevant factors and articulated a rational connection between the

13   facts and the choice made, the decision must be upheld.  That standard is easily met here.  ORR did not

14   ignore any factor the law obligates it to consider.  In fact,  it took into consideration the welfare of children,

15   the availability of alternative counsel, and the need to manage finite taxpayer funds.  For example, Plaintiffs

16   contend ORR failed to account for the impact on immigration court efficiency or on the organizations'

17   missions.  *See* Amicus Curiae Br. of Fmr. IJs & Fmr. Members of the BIA in Supp. of Pls.' Mot. for TRO &

18   Prelim. Inj., at 4, ECF No. 23-1 ("IJs' Br.");  Mot. at 2, 4.  But ORR's mandate is to care for children and

19   facilitate their access to counsel, not to optimize immigration court dockets or to guarantee nonprofit

     funding.

20        In any event, any such collateral impacts do not render the decision arbitrary.  Immigration Judges

21   routinely adjudicate cases involving pro se children (especially given the statutory reality that counsel is not

22   guaranteed), and the Executive Office for Immigration Review ("EOIR") has tools to ensure fairness and

23   efficiency for unrepresented respondents (*see* IJs' Br. at 4). ORR reasonably could conclude that continuing

24   KYR presentations and referrals would mitigate potential inefficiencies.  Biswas Decl. ¶ 10.  There is certainly

25   no indication that ORR's stated rationale—aligning the program with the TVPRA's pro bono emphasis and

26   addressing budgetary limitations—was pretextual.

27        Plaintiffs' insinuations of pretext, invoking *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), and

28   *City & Cnty. Of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) (Mot. at 15, 19), are purely

---

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
3:25-CV-02847- AMO                          18                    PI Appeal and Stay Addendum 458

speculative.  Unlike those cases, here there is no evidence of a hidden agenda or contradictory internal record. Faced with burgeoning costs and an influx of UAC, ORR decided to prioritize cost-effective measures (like group legal orientations and initial screenings for relief eligibility) that reach more children, rather than continuing to pay for individual attorneys for some.  That policy choice may be different than Plaintiffs would have made themselves, but it is not a sham;  it is a policy judgment squarely within ORR's discretion. Plaintiffs have offered no proof—indeed, not even a substantial allegation—that ORR's justification is a lie or that improper considerations drove the decision.  Absent such evidence, courts will not "probe the mental processes" of agency decisionmakers or accuse them of pretext.  *Dep't of Commerce*, 139 S. Ct. at 2573-74.  In sum, Plaintiffs' APA claims amount to disagreements over policy, not bona fide indications of legal error. Because ORR's action was grounded in the law and free of any procedural or substantive defect, Plaintiffs cannot demonstrate a likelihood of success on the merits.

In conclusion, Plaintiffs ask this Court to do what neither the APA nor equitable principles permit: compel the expenditure of federal funds in contravention of the agency's determination and the Supreme Court's clear guidance.  At most, Plaintiffs have shown a policy disagreement—not a legal entitlement.  A mere policy disagreement or "serious question" is not enough at this stage.  Because Plaintiffs have not established a likelihood of success on any of their claims, the requested preliminary relief should be denied.

**B.**   **Plaintiffs Will Not Face Irreparable Harm Without a Preliminary Injunction**

Plaintiffs' request for extraordinary injunctive relief hinges on demonstrating irreparable harm. A mere "possibility" of harm is insufficient; Plaintiffs bear the burden of making a "clear showing" that "irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original); *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) ("Harm must be proved, not presumed"). Furthermore, the alleged harm must be immediate and non-speculative. *See Caribbean Marine Servs. Co.*, 844 F.2d at 674. Injuries dependent on "[m]ultiple contingencies" or a "speculative chain of possibilities" do not meet this demanding standard. *Id.* at 675; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Plaintiffs have failed to make the requisite showing.

**1.**   **Plaintiffs' Alleged Harm is Primarily Monetary and Thus Not Irreparable.**

At its core, the harm Plaintiffs allege stems from the cessation of federal funding—an injury that is fundamentally monetary. While Plaintiffs attempt to frame this as "frustrating their mission" or damaging their ability to provide services, their own submissions underscore the financial nature of the injury. *See* ECF No. 7 at 16 ("There is no question that *ceasing funding*… will cause imminent harm…") (emphasis added); *id.* at

17 ("Plaintiffs have relied on… assurances that *funding*… will continue…") (emphasis added); *id.* ("Sustaining these services without this *funding* will cost the Northwest Immigrant Rights Project *$200,000 a month*.") (emphasis added); Supplemental Declaration of Martha Ruchi (ECF No. 37-3 ¶¶ 3, 4) ("Without this funding, we must reconsider whether we have enough funding to cover the costs…").

It is well-established, however, that monetary injury does not constitute irreparable harm because it can be remedied later through damages. *See, e.g., Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) ("Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages."); *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury…"); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) (same). Plaintiffs cannot escape this fundamental principle simply by describing the consequences of a funding shortfall; their core injury remains economic and remediable. *See Caribbean Marine Servs. Co.*, 844 F.2d at 676 ("Subjective apprehensions and unsupported predictions of revenue loss are not sufficient…"); *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 938 (9th Cir. 1987) ("[T]emporary economic loss alone generally is not a basis for injunctive relief.").

### 2. Plaintiffs' Asserted Non-Monetary Harms are Speculative or Result from Their Own Operational Choices.

Plaintiffs attempt to recharacterize their monetary injury by focusing on operational consequences, such as staff layoffs and potential impacts on service delivery. These arguments also fail to establish irreparable harm. *First*, decisions regarding staffing—whether layoffs, terminations, or furloughs—are internal operational responses to budgetary changes, not irreparable injuries directly imposed by Defendants. (*See* Supplemental Declarations ECF Doc 37-4, 7, 8, 9, 10, 12, 16). These choices reflect specific management approaches to address funding shortfalls and are within Plaintiffs' control. Indeed, Plaintiffs' own submissions show varied responses: some organizations laid off staff, while The Amica Center for Immigrant Rights "has not issued any furloughs or laid off any staff members" (ECF Doc 37-15 ¶ 3), and others are actively "seeking alternative funding sources" (ECF Doc. 37-14 ¶ 4, Rocky Mountain Immigrant Advocacy Network). The existence of alternative strategies underscores that layoffs are not an inevitable, irreparable consequence of the funding decision. While potentially disruptive, such operational adjustments are not the type of permanent, unfixable harm warranting an injunction.

*Second*, Plaintiffs' claim that the funding cessation forces them to cease providing legal services, leaving UAC unrepresented, is overstated. (*See* ECF No. 7 at 16; Supplemental Declarations ECF Doc 37-5, 6, 11, 13, 15, 16). The challenged action concerns *payment* for services, not the *ability* to provide them. Plaintiffs

remain free to provide these services *pro bono*, consistent with the statutory framework emphasizing practicability. *See* 8 U.S.C. § 1232(c)(5). Indeed, Plaintiffs' submissions indicate that dedicated counsel *are* continuing this work, albeit sometimes with adjusted staffing levels. *See* ECF Doc 37-16 ¶ 4 (Vermont Asylum Assistance Project: "a reduced team of three is now carrying the work of four."). This reflects a resource allocation challenge, not irreparable cessation of services.

*Third*, Plaintiffs' assertion that the loss of experienced staff is irreparable because rehiring is "impracticable" (ECF No. 7 at 18) is precisely the type of speculative harm based on the predicted actions of third parties that cannot support an injunction. *See Clapper*, 568 U.S. at 410, 414 (rejecting injuries based on a "speculative chain of possibilities" or "speculation about the decisions of independent actors"); *Arpaio v. Obama*, 797 F.3d 11, 23 (D.C. Cir. 2015) (cautioning against crediting claims of anticipated injury based on predictions of future third-party action). Whether specific individuals might decline to return if recalled is hypothetical and insufficient to demonstrate a certain and immediate irreparable injury *to Plaintiffs*. Similarly, difficulties filling vacancies (ECF No. 37-15) reflect market conditions or operational challenges, not the type of clear, likely, and immediate irreparable harm required for preliminary relief.

In sum, Plaintiffs have demonstrated, at most, temporary financial loss and operational challenges stemming from their own management decisions or speculative future events. They have failed to make the clear showing of likely, immediate, and irreparable harm necessary to justify the extraordinary remedy of a preliminary injunction.

## C.    The Balance of the Equities and Public Interest Weigh Against Entry of a Preliminary Injunction.

Where the government is a party, the balance of equities and public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (internal quotation marks and citation omitted). In weighing these factors, Plaintiffs rely on their previous arguments, including the assertion that the government cannot suffer harm from an injunction that merely ends what they contend is an unlawful practice (ECF No. 37, at 23 – 24). But as described above, Defendants' actions represent a permissible exercise of statutory and regulatory discretion, and Plaintiffs have not demonstrated a likelihood of success on the merits or irreparable harm sufficient to warrant an injunction.

Here, the balance of the equities and public interest tip decisively in Defendants' favor. Plaintiffs' motion fails to acknowledge the substantial governmental harm an injunction imposes by usurping executive

branch authority to manage complex programs and allocate billions in taxpayer funds. Forcing continuation of one specific contract or funding mechanism hinders ORR's ability to adapt to potentially changing needs, prioritize resources effectively across the entire UAC program spectrum, and implement potentially more cost-effective or impactful service models, consistent with the discretion afforded by Congress and ORR's own regulations.

Furthermore, the financial harm to the government is significant and likely irreparable. If Plaintiffs are given access now and draw down funds throughout the litigation, Defendants will be left with no meaningful recourse even if they prevail. Indeed, in granting the government's stay application in *Dep't. of Education v. California*, the Supreme Court expressly noted that the equities weighed in the government's favor where "respondents have not refuted the Government's representation that it is unlikely to recovery the [] funds once they are dispersed." 2025 WL 1008354 at 1. Such is the case here. And the loss of likely unrecoverable funds is a classic injury supporting interim relief for the government. *See Heckler v. Turner*, 468 U.S. 1305, 1308 (1984) (Rehnquist, J., in chambers) (prospect of the government being forced to make $1.3 million in improper payments per month supported a stay).

Should an injunction compel the payment of these taxpayer funds, and that injunction is later reversed or vacated, the government faces substantial, likely irreparable, financial loss. Indeed, just last week, the Supreme Court recognized this precise risk in the analogous grant-termination challenge at issue in *Dep't. of Education*, noting the government was "unlikely to recover the grant funds once they are disbursed," and even more so where no grantee had "promised to return withdrawn funds should its grant termination be reinstated." 604 U.S. ----, 2025 WL 1008354 at 1. So too here. Making matters worse though, this harm will be further exacerbated without the provision of bond as security under Rule 65(c). *See* Section D, *infra*. Any order mandating the direction of unrecoverable government funds constitutes clear irreparable harm to the public treasury and weighs heavily in favor of requiring security.

Moreover, the public interests at stake here include effective governance and fiscal responsibility. And, as long recognized by the Supreme Court, the government has a strong interest in safeguarding the public fisc. *See Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). While Plaintiffs and amici (ECF No. 28) legitimately describe the public interest in protecting vulnerable children and ensuring access to counsel, the public interest also encompasses the efficient, flexible, and responsible administration of federal programs. It includes ensuring ORR can make difficult choices to best serve the overall needs of all unaccompanied children within its care, using its expertise and the discretion Congress provided, including prioritizing pro bono resources as

directed by the TVPRA. The arguments raised in the amicus brief (ECF No. 28) regarding judicial efficiency do not override the Executive's prerogative to determine the most effective and practicable means of service delivery consistent with statute and available resources. Forcing the continuation of this specific funding mechanism ignores the statutory preference for pro bono counsel and ORR's discretion to determine when direct funding is practicable and necessary. *See* 8 U.S.C. § 1232(c)(5). Judicial micromanagement of appropriations allocation via Plaintiffs' requested preliminary injunction undermines, rather than serves, the broader public interest in competent government and respect for the separation of powers.

Indeed, an injunction here would effectively disable the administration from effectuating its executive authority consistent with its constitutional and statutory authorities. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up) ("[a]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). While Plaintiffs emphasize the mandate in 8 U.S.C. § 1232(c)(5) that HHS "shall ensure . . . that all unaccompanied alien children . . . have counsel," this mandate is explicitly qualified by the precise statutory language "to the greatest extent practicable." *Id.* This is not mere suggestion; it is the express qualification set by Congress, inherently requiring agency judgment and balancing against competing demands and resource limitations. It does not mandate funding one specific contract indefinitely, irrespective of other considerations.

Plaintiffs, by contrast, would not be irreparably harmed without entry of a preliminary injunction. They have no cognizable interest in receiving federal funds to which they are not legally entitled or on a timeline that is not legally compelled. In granting Plaintiffs' motion for a temporary restraining order, this court largely overlooked the fact that Plaintiffs' claimed harms are monetary and that, if they ultimately prevail, they will receive the funds to the extent required by law. *See Heckler*, 468 U.S. at 1308 (Rehnquist, J., in chambers); *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm") (brackets and citation omitted).

In sum, the decision to terminate funding under the contract represents a permissible exercise of the discretion afforded to ORR by Congress under 8 U.S.C. § 1232(c)(5), and codified in its own regulations, *see* 45 C.F.R. § 410.1309(a)(4). An injunction would improperly substitute judicial preference for agency judgment, unduly restricting the executive's ability to allocate resources and adapt to evolving needs. As a result, the balance of equities and the public interest, properly considered, weigh against granting the extraordinary relief requested.

**D.**   **If the Court issues a Preliminary Injunction, it should require Plaintiffs to Post Security.**

Finally, if the Court deems preliminary injunctive relief warranted (which it should not), Plaintiffs must be required to post security pursuant to Federal Rule of Civil Procedure 65(c). The Rule mandates that a court "may issue a preliminary injunction or a temporary restraining order *only if the movant gives security* in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). The circumstances here— specifically the potential for irrecoverable loss of public funds—compel the imposition of a bond. This risk of permanent loss to the public fisc—made even greater where Plaintiffs have not provided financial security by way of bond, *see* Fed. R. Civ. P. 65(c)—weighs heavily against injunctive relief.

Plaintiffs argue against security (ECF No. 37 at 25), citing the Court's discretion and invoking exceptions for public interest litigation. *Id.* (citing *People of the State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985)). Yet, while the Court has discretion, that discretion must account for the substantial risk to public funds at issue here. Nor is the public interest exception Plaintiffs invoke absolute, let alone even applicable here.  Indeed, in *Van De Kamp*, what tipped in favor of a "minimal bond or no bond at all" was the fact that "Congress had provided for private enforcement of [the] statute" that the non-profit environmental groups there were suing under. *Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d at 1325 – 26. Congress has not provided for such private enforcement here, however.  Furthermore, Plaintiffs fail to cite any authority sufficient to override the fundamental purpose of Rule 65(c): protecting the enjoined party from costs and damages.

Moreover, there is a significant countervailing public interest in ensuring federal funds are spent lawfully and protecting the public treasury from irrecoverable losses stemming from a potentially erroneous injunction. Plaintiffs, a coalition of over a half dozen legal organizations, have also failed to substantiate their claim that requiring *any* bond would effectively deny them access to judicial review. They have not submitted evidence demonstrating an inability to secure a bond, even a nominal one, commensurate with the circumstances. Their assertion that Defendants face no financial risk (ECF No. 37 at 33 – 35) is plainly incorrect; the potential inability to recover disbursed funds constitutes a direct, significant financial risk, as recognized by the Supreme Court. *See Dep't of Educ.*, 2025 WL 1008354 at 1. Given that this dispute centers on the allocation of federal funds – and involves a concrete risk of irrecoverable financial loss to the public fisc should the injunction be improvidently granted – Rule 65(c)'s security requirement is paramount. Plaintiffs must be required to post a bond sufficient to protect the public interest embodied in the federal treasury.

### E.   Any Injunctive Relief Must Be Narrowly Tailored and Cannot Extend Nationwide.

Even if Plaintiffs could demonstrate entitlement to some form of preliminary relief (which they cannot), their request for what amounts to a nationwide injunction is vastly overbroad and constitutionally impermissible. Preliminary injunctions "must be tailored to remedy the specific harm alleged." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1195 (9th Cir. 2024) (internal quotation marks and citation omitted). The injunction's scope "must be no broader and no narrower than necessary to redress the injury shown *by the plaintiffs*." *Id.* (internal quotation marks, citation, and alteration omitted; emphasis added). Plaintiffs, however, seek relief extending far beyond their own alleged injuries to encompass non-parties across the country for whom no specific, irreparable harm has been demonstrated.

Any relief granted must be strictly limited to redressing the alleged harm *to these Plaintiffs*. Plaintiffs cannot obtain relief based on speculative or indirect injuries potentially suffered by non-party grant recipients. Such harms are insufficient to establish Article III standing for non-parties in this action. *See Clapper,* 568 U.S. at 402 (requiring harm that is "certainly impending," not merely hypothetical). While non-plaintiff recipients might theoretically incur monetary harms from funding changes, those are not Plaintiffs' harms. *See CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 622 (1st Cir. 1995) ("the issuance of a preliminary injunction requires a showing of irreparable harm to the movant rather than to one or more third parties").

As a result, should the Court determine that preliminary injunctive relief is warranted, such relief must be meticulously limited. At a minimum, any injunction must be restricted solely to the named Plaintiffs and further confined to only those specific line items for which *these Plaintiffs* have definitively established particularized, irreparable harm not redressable by later monetary damages. On the other hand, granting the broad, nationwide relief Plaintiffs seek would violate the fundamental principle that injunctive relief must be narrowly tailored to the specific injury proven by the specific plaintiffs presenting themselves before the court. *See Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1195.

## V.   CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

DATED: April 11, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

WILLIAM C. SILVIS
Assistant Director

CHRISTINA PARASCANDOLA
KATELYN MASETTA ALVAREZ
JONATHAN K. ROSS
Senior Litigation Counsels

ZACHARY A. CARDIN
Trial Attorney

/s/ Michael A. Celone
MICHAEL A. CELONE
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-2040
Michael.A.Celone@usdoj.gov

Attorneys for Defendants

1

## <u>CERTIFICATE OF COMPLIANCE</u>

2

3    The undersigned, counsel of record for Defendants certifies that this brief contains 25 pages, which

4    complies with Local Rule 7-3(a).

5

6                                   Respectfully submitted,

7                                   */s/ Michael A. Celone*
                                    MICHAEL A. CELONE
8                                   Senior Litigation Counsel
                                    Office of Immigration Litigation
9                                   Civil Division

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  YAAKOV M. ROTH
   Acting Assistant Attorney General
2  WILLIAM C. SILVIS (DCBN 485572)
   Assistant Director
3  MICHAEL A. CELONE (MDBN 1312170145)
4  CHRISTINA PARASCANDOLA (DCBN 468479)
   KATELYN MASETTA ALVAREZ (OHBN 97857)
5  JONATHAN K. ROSS (NCBN 50203)
   Senior Litigation Counsel
6  ZACHARY A. CARDIN (MDBN 1812110052)
7  Trial Attorney

8       U.S. Department of Justice, Civil Division
        Office of Immigration Litigation
9       General Litigation and Appeals Section
        P.O. Box 878, Ben Franklin Station
10      Washington, DC 20044
        (202) 305-7662
11      Jonathan.K.Ross@usdoj.gov

12 Attorneys for Defendants

13                  UNITED STATES DISTRICT COURT

14                 NORTHERN DISTRICT OF CALIFORNIA

15                    SAN FRANCISCO DIVISION

16

17 COMMUNITY LEGAL SERVICES IN EAST  )  Case No. 3:25-cv-02847-AMO
   PALO ALTO, *ET AL.*,               )
18                                    )  **DEFENDANTS' NOTICE OF MOTION AND**
              Plaintiffs,             )  **RENEWED MOTION TO STAY TEMPORARY**
19                                    )  **RESTRAINING ORDER PENDING APPEAL**
       v.                             )
20                                    )  Hearing Date:  May 22, 2025
   UNITED STATES DEPARTMENT OF        )  Time: 2:00 p.m.
21 HEALTH AND HUMAN SERVICES, *ET AL.*, )  Location:  Courtroom 10
                                      )
22            Defendants.             )  Hon. Araceli Martínez-Olguín
                                      )  United States District Judge
23                                    )
                                      )
24 _____)

25

26

27

28

DEFENDANTS' MOT. TO STAY TRO PENDING APP.
3:25-CV-02847-AMO                                    PI Appeal and Stay Addendum 468

# NOTICE OF MOTION

PLEASE TAKE NOTICE that on May 22, 2025, at 2:00 p.m., or as soon thereafter as counsel may be heard, in the United States District Court for the Northern District of California, Courtroom 10, 19th Floor, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants United States Department of Health and Human Services, Office of Refugee Resettlement, and Department of the Interior will and hereby do move this Court for a stay pending appeal of (1) the Court's April 1, 2025 Order granting Plaintiffs' motion for a Temporary Restraining Order ("TRO") (ECF No. 33), and (2) the Court's April 10, 2025 sua sponte Order extending the TRO pending consideration of Defendants' motion for recusal (ECF No. 48).

This motion is made pursuant to Federal Rule of Civil Procedure 62 and is based on this Notice of Motion and Motion, the accompanying memorandum of points and authorities, the pleadings and papers on file in this action, oral argument of counsel, and any other matters properly before the Court.

Because Defendants previously moved for a stay on April 4, 2025 (ECF No. 38 at 6), they are concurrently seeking a stay from the Ninth Circuit at the same time as this renewed motion for a stay.

1    DATED: April 11, 2025                 Respectfully submitted,

2                                          YAAKOV M. ROTH
                                           Acting Assistant Attorney General
3

4                                          WILLIAM C. SILVIS
                                           Assistant Director
5

6                                          CHRISTINA PARASCANDOLA
                                           KATELYN MASETTA ALVAREZ
7                                          MICHAEL A. CELONE
                                           Senior Litigation Counsel
8

9                                          ZACHARY A. CARDIN
                                           Trial Attorney
10
                                           */s/ Jonathan K. Ross*
11                                         JONATHAN K. ROSS
                                           Senior Litigation Counsel
12                                         U.S. Department of Justice, Civil Division
                                           Office of Immigration Litigation
13                                         General Litigation and Appeals Section
                                           P.O. Box 878, Ben Franklin Station
14                                         Washington, DC 20044
                                           (202) 305-7662
15                                         Jonathan.K.Ross@usdoj.gov

16                                         Attorneys for Defendants

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 62, Defendants hereby respectfully move for a stay pending appeal of the Court's April 1, 2025 Order granting Plaintiffs' motion for a Temporary Restraining Order ("TRO") (ECF No. 33), as well as the Court's April 10, 2025 sua sponte Order extending the TRO pending "consideration of the motion for recusal." (ECF No. 48). Because Defendants previously moved for a stay on April 4, 2025 (ECF No. 38 at 6), they are concurrently seeking a stay from the Ninth Circuit at the same time as this renewed motion for a stay.

## II.    BACKGROUND

In its April 1, 2025 TRO, the Court enjoined Defendants from "withdrawing the services or funds provided by the United States Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR") as of March 20, 2025, under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and ORR Unaccompanied Children Program Foundational Rule (codified at 45 C.F.R. § 410.1309(a)(4)) ("Foundational Rule"), particularly ORR's provision of funds for direct legal representation services to unaccompanied children." TRO, 7. The Court also enjoined Defendants "from cutting off access to congressionally appropriated funding for its duration." *Id*. The TRO became effective on April 2, 2025, at 8:00 a.m. PT, through April 16, 2025, at 7:59 a.m. PT. *Id*.

On April 4, Defendants filed a motion to dissolve the TRO, citing the Supreme Court's recent decision in *Dep't of Educ. v. California*, 604 U.S. ----, 2025 WL 1008354, at 1 (Apr. 4, 2025), which rejected a similar attempt to use the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*., to compel continued discretionary payments. ECF No. 38. Defendants additionally moved the Court to stay the TRO. *Id.* at 6.

On April 7, Plaintiffs moved to enforce the TRO, prompting the Court to order Defendants to file a status report on compliance. ECF No. 42. Defendants filed that report on April 8, detailing steps taken to restore funding and services in alignment with the TRO. *See* ECF Nos. 44, 45.

On April 8, Defendants also filed a motion for recusal and reassignment of the case under 28 U.S.C. § 455(a) and (b)(1). ECF No. 47.

On April 10, without any request from Plaintiffs, the Court sua sponte extended the TRO until April 30, 2025, at 7:59 a.m. PT—a full 28 days from its original effective date. ECF No. 48. In doing so, the Court did not cite any alleged noncompliance by Defendants, nor did it explain how the mere pendency

of a recusal motion qualifies as "good cause" to extend emergency injunctive relief beyond the time limits prescribed by Rule 65.  *Id*.  On April 11, Defendants filed a notice of appeal of the Court's TRO, as extended.  ECF No. 56.

### III.  ARGUMENT

The Court should grant this renewed motion to stay the TRO.  Courts consider four factors in assessing a motion for stay pending appeal: (1) the movant's likelihood of prevailing on the merits of the appeal, (2) whether the movant will suffer irreparable harm absent a stay, (3) the harm that other parties will suffer if a stay is granted, and (4) the public interest.  *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Humane Soc'y of U.S. v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008).  When the government is a party, its interests and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, Defendants previously moved to stay the TRO in their motion to dissolve it, based on the Supreme Court's recent decision in *Dep't of Educ. v. California*, 2025 WL 1008354, at *1, which forecloses Plaintiffs' APA claim for continued discretionary payments.  ECF No. 38 at 6.  As further detailed in Defendants' opposition to Plaintiffs' motion for a preliminary injunction (ECF No. 55), the government satisfies all four factors favoring a stay of the TRO: it is likely to succeed on the merits, particularly in light of *Dep't of Educ.*; it faces irreparable harm from the unrecoverable disbursement of public funds; Plaintiffs' alleged harms are speculative and ultimately monetary; and the balance of equities and public interest—particularly agency discretion to manage appropriated funds—strongly favor a stay. *See Hilton*, 481 U.S. at 776; *Nken*, 556 U.S. at 435. Accordingly, a stay pending appeal is warranted here.

### IV.  CONCLUSION

For the foregoing reasons, the Court should stay the TRO.

1    DATED: April 11, 2025                    Respectfully submitted,

2                                             YAAKOV M. ROTH
                                              Acting Assistant Attorney General
3

4                                             WILLIAM C. SILVIS
                                              Assistant Director
5

6                                             CHRISTINA PARASCANDOLA
                                              KATELYN MASETTA ALVAREZ
                                              MICHAEL A. CELONE
7                                             Senior Litigation Counsel

8                                             ZACHARY A. CARDIN
                                              Trial Attorney
9

10                                            */s/ Jonathan K. Ross*
                                              JONATHAN K. ROSS
11                                            Senior Litigation Counsel
                                              U.S. Department of Justice, Civil Division
12                                            Office of Immigration Litigation
                                              General Litigation and Appeals Section
13                                            P.O. Box 878, Ben Franklin Station
                                              Washington, DC 20044
14                                            (202) 305-7662
                                              Jonathan.K.Ross@usdoj.gov
15

16                                            Attorneys for Defendants

17

18

19

20

21

22

23

24

25

26

27

28

# <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Defendants certifies that this brief contains 3 pages, which complies with Local Rule 7-3(a).

Respectfully submitted,

*/s/ Jonathan K. Ross*
JONATHAN K. ROSS
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division

No. 25-2358

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, et al.
Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, et al.
Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of California
District Court Case No. 3:25-cv-02847

———————————

EMERGENCY MOTION PURSUANT TO CIRCUIT RULE 27-3
FOR STAY PENDING APPEAL
RELIEF REQUESTED BY APRIL 16, 2025

———————————

YAAKOV M. ROTH
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

WILLIAM C. SILVIS
Assistant Director

MICHAEL A. CELONE
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-2040
michael.a.celone@usdoj.gov
CHRISTINA PARASCANDOLA
KATELYN MASETTA ALVAREZ
JONATHAN K. ROSS
Senior Litigation Counsel

ZACHARY A. CARDIN
Trial Attorney

Attorneys for Defendants-Appellants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

CIRCUIT RULE 27-3 CERTIFICATE ............................................................. iii

INTRODUCTION ..............................................................................................1

BACKGROUND .................................................................................................2

ARGUMENT ......................................................................................................5

     I.     Defendants Are Likely to Succeed on the Merits of Their Appeal.......5

     II.    Continuing Irreparable Harm to the United States Supports an
          Emergency Stay of the Temporary Restraining Order.......................10

     III. The balance of the equities and the public interest favor a stay..........11

CONCLUSION .................................................................................................12

CERTIFICATE OF COMPLIANCE.................................................................14

CERTIFICATE OF SERVICE .........................................................................14

PI Appeal and Stay Addendum 476

# TABLE OF AUTHORITIES

Page(s)

Cases

*Abbott v. Perez*,
    585 U.S. 579 (2018)...........................................................................7
*Department of Education v. California*,
    604 U.S. ----, 2025 WL 1008354 (U.S. Apr. 4, 2025)............................... passim
*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002)...........................................................................8
*Hilton v. Braunskill*,
    481 U.S. 770 (1987)...........................................................................5
*Kiobel v. Royal Dutch Petroleum*,
    569 U.S. 108 (2013).........................................................................10
*Liljeberg v. Health Servs. Acquisition Corp.*,
    486 U.S. 847 (1988)...........................................................................9
*Maryland v. King*,
    567 U.S. 1301 (2012).......................................................................10
*Myers v. United States*,
    272 U.S. 52 (1926)...........................................................................10
*Nken v. Holder*,
    556 U.S. 418 (2009).........................................................................10
*Sampson v. Murray*,
    415 U.S. 61 (1974)...........................................................................7

Statutes

8 U.S.C. § 1232(c)(5).............................................................................3
28 U.S.C. § 455(a) ................................................................................8
28 U.S.C. § 1491(a)(1)........................................................................7, 8
U.S.C. § 455(b)(1)................................................................................8

Rules

Fed. R. Civ. P. 65(b)(2).........................................................................9
Fed. R. Civ. P. 65(c) ....................................................................... vi, 3, 5

Regulations

45 C.F.R. § 410.1309(a)(4) ....................................................................3

PI Appeal and Stay Addendum 477

## CIRCUIT RULE 27-3 CERTIFICATE

Undersigned counsel certifies that the following is the information required

by Circuit Rule 27-3:

**(1) Telephone numbers and addresses of attorneys for the parties**

Counsel for Defendants-Appellants:

Yaakov M. Roth (yaakov.m.roth@usdoj.gov)
Drew C. Ensign (drew.c.ensign@usdoj.gov)
William C. Silvis (william.silvis@usdoj.gov)
Michael A. Celone (michael.a.celone@usdoj.gov)
Christina Parascandola (christina.parascandola@usdoj.gov)
Katelyn Masetta Alvarez (katelyn.masetta.alvarez@usdoj.gov)
Jonathan K. Ross (jonathan.k.ross@usdoj.gov)
Zachary A. Cardin (zachary.a.cardin@usdoj.gov)
United States Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-2040

Counsel for Plaintiffs-Appellees:

Adina Bassin Appelbaum (adina@amicacenter.org)
Frederick Evan Benz (evan@amicacenter.org)
Samantha Hsieh (sam@amicacenter.org)
Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
(202) 899-1412

Lya Ferreyra (lferreyra@immdef.org)
Alvaro M Huerta (ahuerta@immdef.org)
Carson Scott (cscott@immdef.org)
Immigrant Defenders Law Center
634 South Spring Street, 10th Fl.
Los Angeles, CA 90014

(213) 674-9451

Laura Flores-Perilla (laura.flores-perilla@justiceactioncenter.org)
Karen Cassandra Tumlin (karen.tumlin@justiceactioncenter.org)
Esther Hsiao-In Sung (esther.sung@justiceactioncenter.org)
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7267


Counsel for Amici Former Officials of the United States Department of Health and Human Services

Benjamin Joseph Bien-Kahn (bbien-kahn@rbgg.com)
Rosen Bien Galvan and Grunfeld LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830

Counsel for Amici Former Immigration Judges & Former Members of the Board of Immigration Appeals

Ashley Brooke Vinson Crawford (avcrawford@akingump.com)
Akin Gump Strauss Hauer & Feld
100 Pine Street, Suite 3200
San Francisco, CA 94111
415-765-9561

Counsel for Amici Young Center for Immigrant Children's Rights

Shaffy Moeel (shaffy@mlf-llp.com)
Moeel Lah Fakhoury LLP
2006 Kala Bagai Way, Suite 16
Berkeley, CA 94704
(510) 500-9994

Counsel for Amici National Center for Youth Law

Mishan Raini Wroe (mwroe@youthlaw.org)

iv

Riley Safer Holmes & Cancila LLP
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
(415) 275-8550

**(2) Facts showing the existence and nature of emergency**

As set forth more fully in the motion, the district court has extended its temporary restraining order despite overwhelming law and reasoning not only that Plaintiffs cannot show any clear likelihood of success on the merits, but are in fact foreclosed from success. The district court's order is not only plainly wrong and devoid of the required analysis, but requires the government to expend public money that it will be unable to recover when the government prevails, in part because the district court failed to require Plaintiffs to provide a bond under Fed. R. Civ. P. 65(c). Plaintiffs have filed two motions to enforce the temporary restraining order, where the district court could rule that Defendants have failed to comply.

**(3) When and how counsel notified**

Defendants' counsel notified counsel for Plaintiffs by email on April 11, 2025, of Defendants' intention to file this motion. On April 11, 2025, counsel for Plaintiffs responded that they opposed Defendants' motion. Service will be effected by electronic service through the CM/ECF system.

### (4) Submissions to the district court

Plaintiffs' complaint was filed March 26, 2025. ECF Docket 1, N.D. Cal. No. 25-cv-02847.[1] Plaintiffs moved for a temporary restraining order on March 27, 2025. Docket 7. Defendants opposed a temporary restraining order on March 31, 2025. Docket 24. On April 1, 2025, the district court entered a temporary restraining order enjoining Defendants from withdrawing certain services or funds, "particularly ORR's provision of funds for direct legal representation services to unaccompanied children," pending further proceedings until April 16, 2025. Docket 33.

On April 4, 2025, Defendants moved to dissolve the temporary restraining order and, in the alternative, for the district court to stay the temporary restraining order. Docket 38. The district court has not granted the request for a stay. On April 9, 2025, Defendants moved to recuse the district judge. Docket 47.

On April 10, 2025, the district court extended its temporary restraining order to April 30, 2025. Docket 48.

### (5) Decision requested by

A decision on the motion for a stay pending appeal is requested as soon as possible, but no later than April 16, 2025.

Counsel for Defendants-Appellants:

---

[1] Docket citations are to No. 25-cv-02847 unless otherwise noted.

vi

YAAKOV M. ROTH
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

WILLIAM C. SILVIS
Assistant Director

CHRISTINA PARASCANDOLA
KATELYN MASETTA ALVAREZ
JONATHAN K. ROSS
Senior Litigation Counsel

ZACHARY A. CARDIN
Trial Attorney

/s/ *Michael A. Celone*
MICHAEL A. CELONE
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC  20044
Tel: (202) 305-2040
michael.a.celone@usdoj.gov

Attorneys for Defendants-Appellants

# INTRODUCTION

The district court issued a universal injunction compelling the government to indefinitely fund direct legal representation for unaccompanied alien children through specific contracting arrangements, converting a discretionary, resource-limited federal program into a court-mandated entitlement. The requested relief would upend, not preserve, the longstanding management of legal services for unaccompanied alien children ("UAC")—services that remain subject to available appropriations and the agency's judgment. Even if the district court's order were not beyond the district court's jurisdiction and the scope of the APA, as the Supreme Court recently held in *Department of Education v. California*, 604 U.S. ----, 2025 WL 1008354, at *1 (U.S. Apr. 4, 2025) (per curiam), a closely analogous case, such an order would be outrageous—overriding the relevant statute and regulation, as well as the President's authority to administer those authorities. And the injunction entered is all the more outrageous given the district court is irrefutably conflicted from hearing the case and must recuse. Facing a motion for recusal filed by Defendants, the district judge *extended the TRO* and deemed consideration of her blatant conflict to be the basis for the extension. The district court order entered without jurisdiction by a judge with numerous conflicts imposes irreparable harms on the government and should be immediately stayed.

1

# BACKGROUND

On March 20, 2025, United States Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR") directed Department of the Interior ("DOI") to partially terminate a contract previously funding direct legal representation services. ECF Docket 31, Attachment 1 (Biswas Decl. ¶¶ 11–13), N.D. Cal. No. 25-cv-02847.[2] This termination was executed through a formal decision memorandum signed by the DOI Acting Assistant Secretary of the Administration for Children and Families ("ACF"). *Id.* ¶¶ 13–14.

Plaintiffs are legal service providers. On March 26, 2025, Plaintiffs filed their Complaint for Declaratory and Injunctive Relief seeking to enjoin the partial contract termination under the Administrative Procedure Act (APA). Docket No. 1. On March 27, 2025, Plaintiffs filed a motion and proposed order for a temporary restraining order to "grant immediate provisional and nationwide relief enjoining" "Defendants from interfering with [certain statutory and regulatory] requirements to provide direct legal representation services to unaccompanied children, including by cutting off access to congressionally appropriated funding." Docket No. 7. On March 31, 2025, Defendants opposed the motion, arguing, among other things, that the APA does not waive sovereign immunity for the monetary relief that Plaintiffs seek,

---

[2] Docket citations are to No. 25-cv-02847 unless otherwise noted.

2

and that the district court lacks jurisdiction over Plaintiffs' claims because the rights

they seek to enforce must be brought in the Court of Federal Claims. Docket 24.

On April 1, 2025, the district court granted Plaintiffs' Motion for Temporary

Restraining Order. Docket 33.

> Defendants are ENJOINED from withdrawing the services or funds
> provided by the Office of Refugee Resettlement ("ORR") as of March
> 20, 2025, under the Trafficking Victims Protection Reauthorization Act
> of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and ORR's Foundational
> Rule, 45 C.F.R. § 410.1309(a)(4), particularly ORR's provision of
> funds for direct legal representation services to unaccompanied
> children. This injunction precludes cutting off access to congressionally
> appropriated funding for its duration.

*Ibid.* The district court set the injunction to remain in effect until April 16, 2025, and

denied the government's request for an injunction bond under Fed. R. Civ. P. 65(c).

*Ibid.*

On April 4, 2025, Defendants moved to dissolve the temporary restraining

order based on the intervening Supreme Court decision in *Department of Education*

*v. California*, 2025 WL 1008354 at *1 (holding that "the government is 'likely to

succeed in showing the District Court lacked jurisdiction to order the payment of

money under the APA'" and requiring such cases to be transferred to the Court of

Federal Claims), and to shorten time to hear the dissolution motion. Docket 38, 39.

Defendants also asked for a stay of the temporary restraining order as alternative

relief. On April 7, 2025, Plaintiffs filed an emergency motion to enforce the

temporary restraining order. Docket 40. The district court granted the motion to

shorten time, and ordered status reports on compliance with the temporary restraining order. Docket 42. On April 11, 2025, Plaintiffs filed a second emergency motion to enforce the temporary restraining order. Docket 53.

On April 9, 2025, Defendants filed a motion seeking recusal of the district judge. That motion contends that the district judge was required to recuse because she was recently a managing attorney at Plaintiff Community Legal Services of East Palo Alto, and had publicly condemned President Trump's immigration policies as "cruel," meaning she had the appearance of bias. Moreover, the motion argued the district judge could not review the case because she has personal knowledge of the one Plaintiff's budget and operations directly relevant to a disputed fact in this case—namely, allegations regarding irreparable harm to the organization. Docket 47. In that motion, Defendants asked the district court to vacate the TRO based on the recusal requirement.

On April 10, 2025, the district court entered an order extending the temporary restraining order to April 30, 2025, asserting that

> Before the Court is Defendants' motion for recusal and reassignment. The Court must address this pending motion before further consideration of the case. Thus, the Court finds that consideration of the motion for recusal constitutes good cause requiring extension of the Temporary Restraining Order dated April 1, 2025 ("TRO").

Docket 48. In other words, the district court found the recusal motion *itself* served as the "good cause" required to extend the TRO for an additional fourteen days.

4

## ARGUMENT

An immediate stay pending appeal is warranted because the government can demonstrate: (1) a strong likelihood of success on the merits of its appeal; (2) irreparable harm absent a stay; (3) that Plaintiffs will not be substantially harmed by a stay; and (4) that the public interest favors a stay. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

The district court's order is fundamentally flawed. Although the district court is correct that it must adjudicate the recusal motion, that provides no excuse to extend the plainly improper temporary restraining order where a recent Supreme Court decision makes clear both that the district lacks jurisdiction and that the relief under the APA that Plaintiffs seek here is foreclosed. Even if recusal were not a foregone conclusion under the circumstances here, Plaintiffs cannot prevail on the merits and would not suffer irreparable harm absent a TRO. The district court abused its discretion by refusing to dissolve and instead extending the restraining order, particularly given that it rejected the government's request for an injunction bond under Fed. R. Civ. P. 65(c), creating a grave risk that the government would be unable to recover public funds once they are paid to comply with this lawless order.

## I.     Defendants Are Likely to Succeed on the Merits of Their Appeal

On April 4, 2025, the Supreme Court directly addressed several of the issues in this case in *Department of Education v. California*, 2025 WL 1008354. In that

5

case, a group of States challenged under the APA the termination of certain federal grants. *Id.* at *1. A district court granted several States' motion for temporary restraining order and required the government to pay out past-due grant obligations and to continue paying obligations as they accrued. *Ibid.* The government appealed and moved for a stay pending appeal; the court of appeals denied the stay; and the government filed an application with the Supreme Court to vacate the temporary restraining order and requested an immediate administrative stay. *Ibid.* The Supreme Court treated the government's application to vacate the order as seeking a stay pending appeal and granted the application. *Id.* at *2.

In its per curiam opinion, the Supreme Court held that the government was likely to succeed in showing that the district court lacked jurisdiction to order the payment of money under the APA, the relief sought by the States. *Id.* at *1. The Supreme Court stated that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money'" as the district court had ordered the government to continue, and that "the Tucker Act grants the Court of Federal Claims jurisdiction over [such] suits." *Ibid.* It therefore stayed the district court's temporary restraining order.

This Court should stay the district court's order for the same reasons. As a preliminary matter, it is an appealable order. "Although the Courts of Appeals generally lack jurisdiction over appeals from TROs, several factors counsel in favor

6

of construing the District Court's order as an appealable preliminary injunction." *Ibid.* Like the order in *California*, this order "carries many of the hallmarks of a preliminary injunction." *Ibid.* The court held an adversarial hearing, and "the court's basis for issuing the order [was] strongly challenged." *Sampson v. Murray*, 415 U.S. 61, 86-87 (1974). And the order has the same "practical effect of granting … an injunction," as it ordered the reactivation of grants and disbursement of funds. *Abbott v. Perez*, 585 U.S. 579, 594 (2018) (citation omitted).

Further, as in *California*, "the District Court's 'basis for issuing the order is strongly challenged,' as the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *California*, 2025 WL 1008354, at *1 (citation omitted). The Supreme Court made clear that federal district courts lack jurisdiction over claims like Plaintiffs'—which ask a court "to order the payment of money under the APA" or "enforce a contractual obligation to pay money." *Id.* (quotation marks and citation omitted). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1).

Those conclusions apply with equal force in this case. Plaintiffs proceeded under the APA but sought monetary relief. And the district court issued an order "to enforce a contractual obligation to pay money"—the sort of order that lies

7

exclusively in the province of the Court of Federal Claims. *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Defendants raised these issues to the district court in their motion to dissolve the temporary restraining order on April 4, the same day the Supreme Court decided *California*. Yet the district court inexplicably *extended*, rather than dissolved, the TRO. Because Plaintiffs' claims are not cognizable under the APA, and rather must be brought in the Court of Federal Claims under the Tucker Act, the district court abused its discretion and Defendants are likely to succeed on the merits of their appeal.

If that were not enough, the district court's stated justification for extending the temporary restraining order is patently insufficient. Defendants filed a recusal motion on April 9, raising the prospect of serious conflicts of interest—conflicts that may divest the district judge of authority over this case—for the court's attention. Specifically, Defendants explained that the district judge presiding over this case previously worked as a managing attorney at Plaintiff Community Legal Services in East Palo Alto (CLSEPA). That experience likely provides her with personal knowledge of CLSEPA's alleged irreparable harm—that loss of funds will impact CLSEPA's ability to operate—requiring recusal under 28 U.S.C. § 455(b)(1).

But at minimum, it raises the prospect that a reasonable person would likely question her impartiality, making recusal proper under 28 U.S.C. § 455(a). Those concerns are particularly acute as the district judge did not disclose her prior

8

employment to Defendants, who discovered it independently. Defendants further identified further context that underscores the appearance of partiality: the district judge has made various statements critical of President Trump's immigration agenda, which underpins this case; and she has personally served as co-counsel with at least one of Plaintiff's lawyers in previous cases involving child migrants. These facts raise serious questions about the appearance of impartiality here.

Yet rather than vacating its temporary restraining order—which, as Defendants explained, would be the proper remedy for a void order entered by a district judge required to recuse, *see Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 870 (1988)—the district court used the pending disqualification motion as its sole justification for extending that order. *See* Docket 48 ("The Court must address this pending motion before further consideration of the case. Thus, the Court finds that consideration of the motion for recusal constitutes good cause requiring extension of the Temporary Restraining Order dated April 1, 2025 ("TRO")). It cannot be that the prospect that an order is *void* provides good cause to *extend* that same order. And the district court offered no other justification for extending the temporary restraining order, which may only have effect beyond 14 days if "the court, for good cause, extends it." Fed. R. Civ. P. 65(b)(2) (also providing that the "reasons for an extension must be entered in the record").

9

Defendants are therefore likely to succeed on the merits of their appeal. This Court should vacate or stay the district court's temporary restraining order immediately.

## II. Continuing irreparable harm to the United States supports an emergency stay of the temporary restraining order

The injunction imposes irreparable harm on the government and public, whose interests merge here. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Whenever a district court issues a universal injunction against the Executive Branch, the United States suffers a form of irreparable harm. The President is "a representative of the people" and holds "the mandate of the people to exercise his executive power." *Myers v. United States* 272 U.S. 52, 123 (1926). The government has a substantial interest in carrying out the President's policies. Courts play an important role in adjudicating the lawfulness of those policies in justiciable cases, but they irreparably injure our democratic system when they forbid the government from effectuating those policies against anyone anywhere in the Nation. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). And those concerns are heightened when, as here, the injunction undermines the Executive Branch's constitutional and statutory authority over immigration and the admission of aliens, and thereby constitutes an "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 116 (2013).

10

And even separate from the government's sovereign interests, the temporary restraining order requires the government to disburse public funds that will be spent and never recovered. Again, this case mirrors *California*, in which the district court entered a stay pending appeal. "No grantee 'promised to return withdrawn funds should its grant termination be reinstated,' and the District Court declined to impose bond." *California*, 2025 WL 1008354, at *1. The government is therefore "unlikely to recover the grant funds once they are disbursed." *Id.*

### III. The balance of the equities and the public interest favor a stay

Finally, Plaintiffs are unlikely to suffer irreparable harm if the Court's temporary restraining order is stayed pending appeal. Plaintiffs have not asserted that they will have to cease operations if funds are withheld for the duration of the temporary restraining order—which is less than one month. Nor have they established any other source of certain, immediate irreparable harm; the "risk" of losing staff or expertise they cite is speculative.

And the public interest favors a stay. As explained above, injunctions against the government work substantial harm to the public interest when they forbid the government from effectuating the policies of democratically-elected leaders—and even more so when those injunctions apply against anyone anywhere in the Nation. Further, this order, issued without complying with Rule 65's bond requirement, would require the government to pay out taxpayer funds with no prospect of

11

recovering those funds if it ultimately prevails in the litigation. That concern is heightened when the order at issue was entered by a judge whose background suggests serious concerns about the appearance of impartiality.

The public interest is further served here by respecting Congress's deliberate policy choice to route claims sounding in contract or seeking to recover monies to the Court of Federal Claims. And it is disserved by orders, such as that entered below, that flout Congress's deliberate choice to vest exclusive jurisdiction with the Court of Federal Claims.

The equities and public interest therefore favor a stay.

## CONCLUSION

The Court should grant an emergency stay of the temporary restraining order pending appeal. Given that Plaintiffs are imminently seeking to enforce that temporary restraining order, this Court should also grant an immediate administrative stay while it considers the government's request for a full stay pending appeal.

12

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

WILLIAM C. SILVIS
Assistant Director

CHRISTINA PARASCANDOLA
KATELYN MASETTA ALVAREZ
JONATHAN K. ROSS
Senior Litigation Counsels

ZACHARY A. CARDIN
Trial Attorney

/s/ *Michael A. Celone*
MICHAEL A. CELONE
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-2040
michael.a.celone@usdoj.gov

Attorneys for Defendants-Appellants

13

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 27, I certify that foregoing motion complies with the type-volume limitation because it contains 2758 words. This motion also complies with the typeface and type style requirements because it is proportionately spaced and has a 14-point Times New Roman typeface.

/s/ *Michael A. Celone*
MICHAEL A. CELONE
Dated: April 12, 2025                                    Attorney for Respondent

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2025 counsel for Respondent electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system and that service will be accomplished via the CM/ECF system.

/s/ *Michael A. Celone*

**ADDENDUM**

# TABLE OF CONTENTS

Motion for Temporary Restraining Order
(March 27, 2025) (Dkt. 7)…………………………………………………1

Exhibits (March 27, 2025)……………….…………..………...41

Opposition to Motion for Temporary Restraining Order
(March 31, 2025) (Dkt. 24………………………………………….228

Exhibits (March 31, 2025) ………………………..………….258

Temporary Restraining Order
(April 1, 2025) (Dkt. 33)………………...………………….……269

Motion to Dissolve Temporary Restraining Order
(April 4, 2025) (Dkt. 38)……………………..………………...276

Motion to Recuse Judge
(April 9, 2025) (Dkt. 47)……………………..………………..310

Order Extending Temporary Restraining Order
(April 10, 2025) (Dkt. 48)……………………..………..………..323

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO,<br>1861 Bay Road<br>East Palo Alto, CA 94303, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br>200 Independence Avenue, S.W.<br>Washington, DC 20201, *et al.*,<br><br>    Defendants. | Case No. 3:25-cv-2847<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        TBD<br>Time:        TBD<br>Dept:        TBD<br>Judge:       TBD<br>Trial Date:  TBD<br>Date Action Filed:  March 27, 2025 |

## NOTICE OF MOTION AND MOTION FOR A TEMPORARY RESTRAINING ORDER

PLEASE TAKE NOTICE as soon as it may be heard in the United States District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, CA 94102 that Plaintiffs Community Legal Services in East Palo Alto, Social Justice Collaborative, Amica Center for Immigrant Rights, Estrella del Paso, Florence Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project, Immigrant Defenders Law Center, National Immigrant Justice Center, Northwest Immigrant Rights Project, Rocky Mountain Immigrant Advocacy Network, and Vermont Asylum Assistance Project, will, and hereby do, move this Court for a temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b) or, in the alternative, for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a).

As long as congressional appropriations are available, Defendants United States Department of Health and Human Services, Office of Refugee Resettlement, and Department of the Interior are required to provide funding to legal services providers to provide direct legal representation to unaccompanied immigrant children under 8 U.S.C. § 1232(c)(5) and 45 C.F.R. § 410.1309(a)(4). But on March 21, 2025, Defendants abruptly terminated this long-standing funding for direct legal representation for these unaccompanied children. Accordingly, Plaintiffs seek a temporary restraining order preventing Defendants from violating the Administrative Procedure Act ("APA") by illegally ceasing funding for direct legal representation services for unaccompanied immigrant children in violation of 8 U.S.C. § 1232(c)(5) and 45 C.F.R. § 410.1309(a)(4).

Plaintiffs request that this motion be heard on an expedited basis. The motion is based upon this notice of motion; the memorandum of points and authorities in support thereof that follows; the declarations of Jill Martin Diaz, Laura Nally, Martha Ruch, Melissa Mari Lopez,

Roxana Avila-Cimpeanu, Elizabeth Sanchez Kennedy, Marion Donovan-Kaloust, Lisa Koop, Vanessa Gutierrez, Ashley T. Harrington, Joel Frost-Tift, Ana Raquel Devereaux, Wendy Young, Gautam Jagannath, Miguel Angel Mexicano Furmanska, and Daniela Hernández Chong Cuy filed concurrently herewith; the proposed order filed concurrently herewith; the pleadings, records, and papers on file in this action; oral argument of counsel; and any other matters properly before the Court.

DATED: March 27, 2025                    Respectfully submitted,


By: /s/ Alvaro M. Huerta                 /s/ Samantha Hsieh


IMMIGRANT DEFENDERS LAW                  AMICA CENTER FOR IMMIGRANT
CENTER                                   RIGHTS
Alvaro M. Huerta (CA Bar No. 274787)     Adina Appelbaum (D.C. Bar No. 1026331)*
Carson A. Scott (CA Bar No. 337102)      Samantha Hsieh (V.A. Bar No. 90800)*
Lya Ferreyra (CA Bar No. 340148)         Peter Alfredson (D.C. Bar No. 1780258)*
Immigrant Defenders Law Center           Evan Benz (N.C. Bar No. 49077)*
634 S. Spring St., 10th Floor            Amica Center for Immigrant Rights
Los Angeles, CA                          1025 Connecticut Ave., NW, Suite 701
(213) 634-0999                           Washington, D.C. 20036
ahuerta@immdef.org                       (202) 331-3320
cscott@immdef.org                        adina@amicacenter.org
lferreyra@immdef.org                     sam@amicacenter.org
                                         peter@amicacenter.org
                                         evan@amicacenter.org

/s/ Karen C. Tumlin                      *pro hac vice forthcoming
                                         Attorneys for Plaintiffs
JUSTICE ACTION
CENTER
Esther H. Sung (CA Bar No. 255962)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)*
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

3

# TABLE OF CONTENTS

INTRODUCTION.................................................................................1

BACKGROUND ................................................................................2

    A.   Thousands of Unaccompanied Children Rely on Legal Representation Every Year to Exercise Their Legal Rights...........................................................2

    B.   Congress Has Directed HHS to Ensure Unaccompanied Children Have Legal Counsel ......................................................................................3

    C.   ORR's Own 2024 Regulations Require Funding for Legal Services for Unaccompanied Children Consistent with Available Appropriations.....................4

    D.   Defendants Terminate Funding for Direct Legal Representation for Unaccompanied Children. ..................................................................6

STANDARD OF REVIEW ....................................................................8

ARGUMENT .....................................................................................8

    I. ........PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .........................................8

    A.   The Cancellation Order Determines Plaintiffs' Legal Rights and Obligations and is Final Agency Action Reviewable Under the APA..........................................9

    B.   Termination of the Legal Representation Programs Violates the TVPRA..............11

    C.   Terminating the Legal Representation Programs Violates the ORR Foundational Rule.......................................................................................13

    II. ........PLAINTIFFS SATISFY THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF ......16

    A.   Plaintiffs Face Irreparable Harm...............................................................16

    B.   The Balance of Equities ....................................................................19

    III. ......A NATIONWIDE INJUNCTION IS APPROPRIATE............................................21

    IV. ......PLAINTIFFS SEEK EXPEDITIOUS RESOLUTION OF THEIR CLAIMS ..............................23

CONCLUSION ................................................................................24

# TABLE OF AUTHORITIES
## Cases

*Abbott Lab'ies v. Gardner,*
  387 U.S. 136 (1967) ...........................................................................11

*United States ex rel. Accardi v. Shaughnessy,*
  347 U.S. 260 (1954), *superseded by statute on other grounds* .............13

*AIG Annuity Ins. Co. v. Law Offs. of Theodore Coates, P.C.,*
  2008 WL 4543422 (D. Colo. Oct. 10, 2008) ........................................23

*Al Otro Lado, Inc. v. Mayorkas,*
  2024 WL 4370577 (S.D. Cal. Sept. 30, 2024) .....................................14

*Alcaraz v. I.N.S.,*
  384 F.3d 1150 (9th Cir. 2004) .............................................................13

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ...............................................................8

*Ariz. Dream Act Coal. v. Brewer,*
  757 F.3d 1053 (9th Cir. 2014) .............................................................16

*Bennett v. Spear,*
  520 U.S. 154 (1997).........................................................................9, 10

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) ............................................................................11

*Bowen v. Mich. Acad. of Fam. Physicians,*
  476 U.S. 667 (1986) ............................................................................11

*Bresgal v. Brock,*
  843 F.2d 1163 (9th Cir. 1987) .............................................................21

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ............................................................................21

*Caribbean Marine Servs. Co. v. Baldrige,*
  844 F.2d 668 (9th Cir. 1988) ...............................................................16

*Carnation Co. v. Sec'y of Lab.,*
  641 F.2d 801 (9th Cir. 1981) ...............................................................14

*Chang v. United States,*
  327 F.3d 911 (9th Cir. 2003) ...............................................................11

*Darby v. Cisneros,*
  509 U.S. 137 (1993)............................................................................11

*Disney Enters., Inc. v. VidAngel, Inc.,*
  869 F.3d 848 (9th Cir. 2017) ...............................................................19

*Doe #1 v. Trump*,
   957 F.3d 1050 (9th Cir. 2020) ............................................................21

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 ...........................................................................21, 22

*E. Bay Sanctuary Covenant v. Trump*,
   932 F.3d 742 (9th Cir. 2018) ............................................................16

*FDA. v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024).........................................................................16

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992).........................................................................9

*Freedom Commc'ns Inc. v. F.D.I.C.*,
   157 F.R.D. 485 (C.D. Cal. 1994) .....................................................23

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982).........................................................................16

*HIAS, Inc. v. Trump*,
   985 F.3d 309 (4th Cir. 2021) ............................................................22

*Immigrant Defenders Law Center v. U.S. Department of Homeland Security*,
   No. 2:21-cv-00395, Dkt. 304 (C.D. Cal. Mar. 14, 2025)...........................9

*League of Women Voters of N.C. v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ............................................................17

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .........................................................17, 19

*Morton v. Ruiz*,
   415 U.S. 199 (1974).........................................................................13

*Nat'l Council of Nonprofits v. OMB*,
   2025 WL 368852 (D.D.C. Feb. 3, 2025) .........................................9, 10

*Nken v. Holder*,
   556 U.S. 418 (2009).......................................................................8, 19

*Pacesetter, Inc. v. Aortech Intl. PLC*,
   2012 WL 12894007 (C.D. Cal. Nov. 1, 2012)....................................23

*Pacito v. Trump*,
   2025 WL 655075 (W.D. Wash. Feb. 28, 2025) .................................12

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) ..........................................................19

*State v. Azar,*
   385 F. Supp. 3d 960 (N.D. Cal. 2019), *vacated on other grounds and remanded sub nom. California ex rel. Becerra v. Azar,* 950 F.3d 1067 (9th Cir. 2020) ............................................................................................................................19

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.,*
   240 F.3d 832 (9th Cir. 2001) ...................................................................................8

*Torres v. U.S. Dep't of Homeland Sec.,*
   411 F. Supp. 3d 1036 (C.D. Cal. 2019) .................................................................15

*Trump v. Int'l. Refugee Assistance Project,*
   582 U.S. 571 (2017)................................................................................................21

*United States v. 1996 Freightliner Fld Tractor VIN1FUYDXYB-TP822291,*
   634 F.3d 1113 (9th Cir. 2011) ...............................................................................13

*Valle del Sol Inc. v. Whiting,*
   732 F.3d 1006 (9th Cir. 2013) ...............................................................................16

*Washington v. Trump,*
   847 F.3d 1151 (9th Cir. 2017) ...............................................................................22

*Winter v. Nat'l Res. Def. Council,*
   555 U.S. 7 (2008).............................................................................................8, 19

*Zepeda v. I.N.S.,*
   753 F.2d 719 (9th Cir. 1983) .................................................................................19

**Statutes**

.................................................................................................................................9

5 U.S.C. § 701(a) .........................................................................................................9

5 U.S.C. § 701(b)(2) ....................................................................................................9

5 U.S.C. § 702 .............................................................................................................9

5 U.S.C. § 704 .............................................................................................................9

5 U.S.C. § 706(a)(2)(A) .............................................................................................12

6 U.S.C. § 279(a)(2)(i)(A) ...........................................................................................5

6 U.S.C. § 279(b)(1)(*I*) ...............................................................................................5

6 U.S.C. § 279(b)(1)(A) ...............................................................................................3

6 U.S.C. § 279(g)(2) ....................................................................................................3

8 U.S.C. § 1101(a)(27)(j) .............................................................................................3

8 U.S.C. § 1158(b)(3)(C) .............................................................................................3

7

8 U.S.C. § 1232(a)(5)(D) .................................................................................3

8 U.S.C. § 1232(c)(5) ...........................................................................1  4, 11

28 U.S.C. § 1657(a) .....................................................................................23, 24

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4,
    Div. A Tit. I § 1101(8) (2025) ...............................................................6, 15

Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138
    Stat. 460, 665-666 (2024) ..........................................................................15

Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, § 4, 130 Stat.
    460, 461.......................................................................................................12

Pub. L. 118-47 138 Stat. 460, 664 (2024) .........................................................5

## Other Authorities

170 Congressional Record H1501-01 ................................................................13

DHHS: Administration for Children & Families, *Justification of Estimates for
    Appropriations Committees* (2024), https://shorturl.at/4VDSL; ...............14

H. Rep. No. 985, 98th Cong., 2d Sess. (1984), reprinted in 1984 U.S.C.C.A.N.
    5708, U.S.C.C.A.N. 5782 ............................................................................23

https://1.next.westlaw.com/Document/Ib5f6578989d511d9ac45f46c5ea084a3/Vie
    w/FullText.html?transitionType=Default&contextData=(oc.Default)&docume
    ntSection=co_pp_sp_506_923..................................................................11

Olga Byrne & Elise Miller, *The Flow of Unaccompanied Children Through the
    Immigration System* (March 2012), https://shorturl.at/KI3Jt .....................4

ORR, Unaccompanied Alien Children Bureau Fact Sheet (March 7, 2025),
    https://acf.gov/orr/fact-sheet/programs/uc/fact-sheet ..................................2

S. Rep. 118-84 (2023) .............................................................................5, 13, 15

Senate Report No. 118-84 ..................................................................................13

Senator Mazie K. Hirono, Letter to HHS and Interior on Legal Services for
    Children in Immigration System (March 3, 2025), https://shorturl.at/RcUr3 .......................7

William A. Kandel, *et al.*, CRS Report R43628, *Unaccompanied Alien Children:
    Potential Factors Contributing to Recent Immigration* (2014) ..................2

## Rules

9th Cir. Rule 27–12...........................................................................................23

## Regulations

45 C.F.R. § 410.1309(a)(4)......................................................................1, 5, 15

8

45 C.F.R. § 410.1309(d) .................................................................................................................5

89 Fed. Reg. 34384 ....................................................................................................................3,

89 Fed. Reg. 34386 .....................................................................................................................4

89 Fed. Reg. 34526 ................................................................................................................5, 14

89 Fed. Reg. 34529 ..............................................................................................3, 4, 14, 15, 20

9

## INTRODUCTION

Each year, tens of thousands of unaccompanied immigrant children ("UCs") are referred to the Office of Refugee Resettlement ("ORR") when they are encountered in the United States without an available parent or legal guardian. Absent intervention from legal services providers, they are forced to navigate our country's complicated immigration processes alone. Plaintiffs are a group of legal services providers who provide congressionally mandated legal representation and services to UCs in a variety of immigration proceedings. Recognizing the importance of this representation, Congress has appropriated funding for them since 2012, and continuing through September 2027. Nonetheless, on March 21, 2025, Defendants abruptly cancelled direct legal representation for UCs under the contract effectuating Congress's mandate. Without these congressionally mandated funds, Plaintiffs face the impossible choice of continuing to represent their UC clients in violation of Defendants' order and without compensation, or abandoning their core functions.

Recognizing that children navigating complicated legal proceedings need counsel, in 2008, Congress directed the Secretary of Health and Human Services ("HHS") to "ensure, to the greatest extent practicable . . . , that all unaccompanied alien children . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5). In keeping with that mandate, Congress has funded direct legal representation for UCs since 2012. In 2024, acknowledging its responsibility to provide these congressionally mandated legal services, ORR issued its Unaccompanied Children Program Foundational Rule ("Foundational Rule") and bound itself to funding legal services providers, so long as congressional appropriations were available. 45 C.F.R. § 410.1309(a)(4).

On March 21, 2025, Defendants ordered an immediate stop to the representation work in clear violation of the Administrative Procedure Act ("APA"). Defendants have provided no

1

information as to how or if they will now comply with their statutory and regulatory obligations. Defendants have also provided no information to Plaintiffs about how they should deal with their ongoing commitments to represent UCs (including UCs with immigration court dates as soon as this week). As a result, Plaintiffs must choose between several intolerable options: continuing to represent their clients without compensation, drawing down precious or scarce discretionary or reserve funding, cutting other organizational services, laying off or terminating experienced staff, or seeking to withdraw from representation, thereby abandoning their child clients in the middle of legally complex immigration proceedings they likely cannot navigate alone. Defendants' actions are contrary to congressional and regulatory mandate and are arbitrary and capricious because they violate their own regulatory obligations. To prevent irreparable harm to Plaintiffs, to say nothing of irreparable harm to their UC clients, this Court should enjoin Defendants' attempt to terminate direct legal representation for UCs under the APA.

This Court should expedite consideration of this motion under 28 U.S.C. § 1657(a) and grant immediate provisional relief enjoining Defendants' illegal action, which is creating ongoing and irreparable harm to Plaintiffs and their clients.

## BACKGROUND

### A. Thousands of Unaccompanied Children Rely on Legal Representation Every Year to Exercise Their Legal Rights

In the 2024 fiscal year alone, nearly 100,000 new children were identified by federal authorities as UCs and referred to ORR. ORR, Unaccompanied Alien Children Bureau Fact Sheet (March 7, 2025), https://acf.gov/orr/fact-sheet/programs/uc/fact-sheet. These children's journeys to the United States may differ, but all of them are now in the United States without their parents or guardians. William A. Kandel, *et al.*, CRS Report R43628, *Unaccompanied Alien Children: Potential Factors Contributing to Recent Immigration*, at 3, 10 (2014). Of the UCs who moved

through ORR custody in 2024, nearly a quarter were 12 years old or younger.  ORR, Fact Sheets and Data, *supra*.

Given their inherent vulnerabilities, UCs have special legal rights, *see, e.g.*, 8 U.S.C. § 1232(a)(5)(D), including the right to apply for asylum, withholding of removal, relief under the Convention Against Torture and voluntary departure.  Many UCs also have the right to apply for Special Immigrant Juvenile Status ("SIJS"), which offers a path to lawful permanent resident status but requires state court proceedings that require counsel.  *See* 8 U.S.C. § 1101(a)(27)(j).  UCs may also pursue asylum before U.S. Citizenship and Immigration Services in a non-adversarial process without being subject to the one-year filing deadline applicable to adults.  *See* 8 U.S.C. § 1158(b)(3)(C).  But these rights are meaningless unless children are educated about their rights and equipped with the tools to exercise them, including legal counsel.  89 Fed. Reg. 34384, 34529 (Apr. 30, 2024).  Unaccompanied children primarily learn about and exercise their rights through either full legal representation or limited-scope assistance from a lawyer—often, until March 21, 2025, an attorney funded by Defendants, and provided by Plaintiffs.

**B.  Congress Has Directed HHS to Ensure Unaccompanied Children Have Legal Counsel**

Congress has recognized that UCs are uniquely vulnerable to trafficking, abuse in government custody, and injustices in the immigration legal system.  Through the Homeland Security Act of 2002, Congress gave Defendants Department of Health and Human Services ("HHS") and ORR legal custody of UCs, with the mandate to care for the children.  *See* 6 U.S.C. § 279(g)(2).  Congress also commanded Defendants HHS and ORR to "develop[] a plan to be submitted to Congress on how to ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such [unaccompanied] child."  6 U.S.C. § 279(b)(1)(A). Acting on this congressional command, in 2005, ORR developed a three-year pilot program to meet the legal needs of UCs through provision of pro bono legal services.  At the end of the pilot

program in 2008, a summary report detailed that volunteer attorneys alone were not sufficient to meet the representation needs of UCs. *See* Olga Byrne & Elise Miller, *The Flow of Unaccompanied Children Through the Immigration System*, at 22–23 (March 2012), https://shorturl.at/KI3Jt. The report concluded that paid attorneys would be required to cover a significant percentage of the representation that UCs needed, spurring Congress to impose additional representation-related requirements on ORR and HHS through the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044 ("TVPRA").

The TVPRA, which Congress passed in 2008 and has regularly reauthorized since then (most recently in 2023), mandates that HHS must provide counsel for UCs: "The Secretary of Health and Human Services *shall ensure*, to the greatest extent practicable . . . that all unaccompanied alien children who are or have been in the custody of the Secretary or the Secretary of Homeland Security . . . have counsel to represent them in legal proceedings or matters." 8 U.S.C. §1232(c)(5) (emphasis added). Defendants have violated this mandate.

## C. ORR's Own 2024 Regulations Require Funding for Legal Services for Unaccompanied Children Consistent with Available Appropriations.

ORR has recognized "that most unaccompanied children need legal services to resolve their immigration status and that representation appears to have a significant impact on both the court appearance rate and the outcome of cases for unaccompanied children." Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384, 34529 (April 30, 2024). On April 30, 2024, ORR issued the final "Foundational Rule," which codified in part HHS's 1997 *Flores* settlement. *Id.* Section 410.1309 of the final rule, titled "Legal Services," affirms ORR's position

---

[1] The *Flores* settlement, entered into by the federal government and four noncitizen children in 1997, sets forth requirements regarding the care of UCs while in ORR custody. 89 Fed. Reg. at 34386.

that "legal services providers who represent unaccompanied children undertake an important function" and explains ORR's goal of "100 percent legal representation of unaccompanied children." *Id.* at 34526.

The Foundational Rule requires that ORR must—if it has available appropriations—"fund legal service providers to provide direct immigration legal representation for certain unaccompanied children."[2]  45 C.F.R. § 410.1309(a)(4).  To comply with the TVPRA and the Immigration and Nationality Act ("INA"), the rule recognizes ORR must "ensure that all unaccompanied children who are or have been in ORR care have access to counsel" and provides, that "[t]o the extent ORR determines that appropriations are available, and insofar as it is not practicable for ORR to secure pro bono counsel, ORR shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children, subject to ORR's discretion and available appropriations."  45 C.F.R. § 410.1309(a)(4), (d).

---

[2] Congress has also required ORR to compile and provide lists of legal services providers "qualified to provide guardian and attorney representation services" for UCs.  6 U.S.C. § 279(b)(1)(*I*).  The Foundational Rule also binds ORR to working with qualified legal services providers to provide orientations and consultations for UCs.  (a)(2)(i)(A).

PI Appeal and Stay Addendum 512

release services . . . including . . . access to legal services." *Id.* at 168. Finally, the Senate Report expressed its understanding that the TVPRA requires ORR to fund counsel for UCs: "The Committee also expects these funds will be used to provide access to counsel, consistent with the goals of the [TVPRA] of 2008 for all children to have access to counsel in their immigration proceedings." *Id.* at 169. On March 15, 2025, Congress continued funding at the same levels for UC legal representation. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, tit. I, § 1101(8) (2025)). From December 2023 until March 21, 2025, Defendants satisfied this obligation through contracting with Acacia Center for Justice, who contracted with organizations like Plaintiffs to provide direct legal representation for unaccompanied children.

**D. Defendants Terminate Funding for Direct Legal Representation for Unaccompanied Children.**

Despite Congress's consistent funding of legal representation for UCs as mandated by the TVPRA, Defendants' actions undermine congressional appropriations, the TVPRA's mandate, and ORR's Foundational Rule. On March 21, 2025, Defendant DOI sent a letter titled "Notice of Partial Termination for the Government's Convenience" (the "Cancellation Order") to the Acacia Center for Justice, the prime contractor on this contract, who then notified Plaintiffs of the termination. The letter announced that Defendants were terminating funding for direct legal representation for UCs—both in and out of ORR's custody—as of close of business that day, ignoring the requirement to fund these programs under the TVPRA and the Foundational Rule. The letter further commanded the Plaintiffs to "immediately stop work" on any of the active representations of UCs and to stop taking on new engagements. NWIRP Decl. ¶ 10; VAAP Decl. ¶ 13. Up until the March 21 letter, Defendants enabled legal services providers, including Plaintiffs, consistently to provide direct and ongoing representations to tens of thousands of UCs in proceedings, including removal and SIJS proceedings. The letter provided no explanation for

6

the termination nor guidance on how to handle existing representations, including those with imminent court hearings.  Defendants were silent as to whether providers could continue existing representations (unfunded), despite the stop-work direction, or must withdraw immediately and (if granted) be forced to leave their clients in the lurch.  *See* NWIRP Decl. ¶¶ 9, 11; VAAP Decl. ¶¶ 12, 13, 21; Estrella Decl. ¶¶ 13, 16; RMIAN Decl. ¶ 19.

This is not the first time that Defendants have acted to halt the legal representation of unaccompanied children.  About a month earlier, on February 18, 2025, Defendant Department of the Interior ("DOI") and Defendant HHS issued an "Immediate Stop Work Order," ordering legal services providers—including Plaintiffs—to indefinitely "cease all services" and "stop all work" for active legal services.  NWIRP Decl. ¶ 9; VAAP Decl. ¶ 12; MIRC Decl. ¶ 21; Public Counsel Decl. ¶ 10; Estrella Decl. ¶ 10; RMIAN Decl. ¶ 11.  Although Defendants rescinded the stop work order three days later, Defendants' drastic actions spurred 32 Senators to sign a letter expressing "strong opposition" to the stop work order and noting its violation of the TVPRA.  NWIRP Decl. ¶ 9; VAAP Decl. ¶ 12; Estrella Decl. ¶ 10; RMIAN Decl. ¶ 11; *see* Senator Mazie K. Hirono, Letter to HHS and Interior on Legal Services for Children in Immigration System (March 3, 2025), https://shorturl.at/RcUr3.

Despite this strong opposition and TVPRA's mandate, Defendants terminated funding on March 21, 2025, and have further provided no information about whether or how they intend to replace these critical legal services for UCs.  Terminating funding for these legal services has devastating and irreparable effects on Plaintiffs, which are all the more devastating for the harm they will do to UCs.  Estrella Decl. ¶ 7.  For example, VAAP previously furloughed two of its three direct legal service practitioners on staff after the February stop work order, leaving the remaining practitioner to bear two additional full caseloads at a time.  VAAP Decl. ¶¶ 15, 19.  Even

if Defendants reinstate funding for counsel for UCs at some unknown future time, the providers' funded children's legal programs and the UCs that depend on their vital counsel will have already been dealt a fatal blow via mass layoffs of staff for the nonprofits and private providers, *see, e.g.*, VAAP Decl. ¶¶ 15, 19, and prolonged government custody or deportations for the children—including children who could have raised valid claims to lawful immigration status.

## STANDARD OF REVIEW

Motions for temporary restraining orders are governed by the same standards as motions for preliminary injunctions. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (explaining the analysis for a TRO and preliminary injunction are "substantially identical"). A temporary restraining order is warranted where the plaintiffs establish: (1) their likelihood of success on the merits; (2) irreparable harm; (3) the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008)); *see also Stuhlbarg*, 240 F.3d at 839 n.7 (applying preliminary injunction standard to a temporary restraining order). Where the government is the defendant, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

Agency action cannot stand if it is contrary to law. Because Defendants' termination of direct legal representation services is contrary to the TVPRA and ORR's own regulations, Plaintiffs are likely to succeed on the merits.

8

**A.  The Cancellation Order Determines Plaintiffs' Legal Rights and Obligations and is Final Agency Action Reviewable Under the APA.**

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  Persons or organizations, like Plaintiffs here, who are "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, [are] entitled to judicial review thereof." 5 U.S.C. § 702.  "[A]gency action" includes not only agencies' affirmative acts, but also their omissions and failures to act. *Id.*; 5 U.S.C. § 551(13).

Under the APA, this Court may set aside and enjoin unlawful agency action, and compel agency action unlawfully withheld, if it is a (1) "final agency action," (2) "for which there is no other adequate remedy in a court," so long as (3) there are no "statutes [that] preclude judicial review" and "agency action is [not] committed to agency discretion by law." 5 U.S.C. §§ 701(a), 704.  Plaintiffs satisfy each of these criteria here, and APA relief is therefore proper.

*Final Agency Action*.  Under the APA, "agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); 5 U.S.C. § 701(b)(2).  An agency action is final where two conditions are satisfied: (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks and citations omitted).

Defendants' refusal to fund or otherwise provide direct legal representation for UCs is a final agency action. *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025) (attempt to "pause" funding and disbursements constituted final agency action). *Immigrant Defenders Law Center v. U.S. Department of Homeland Security*, No. 2:21-

cv-00395, Dkt. 304 (C.D. Cal. Mar. 14, 2025), is instructive.  In that case, plaintiffs alleged that the Department of Homeland Security unlawfully denied the rights guaranteed by the TVPRA from unaccompanied children who had previously been processed under the Department of Homeland Security's Migrant Protection Protocols Policy ("MPP"), despite having entered and been designated as UCs.  *Id.* at *21–22.  The court held that plaintiffs met the first requirement because "nothing in the record indicates that the Policy is tentative or that decisionmaking is ongoing."  *Id.* at *18. As to the second, the court found the policy at issue was final because it was "an agency action 'from which legal consequences will flow.'"  *Id.* at *19 (quoting *Bennett*, 520 U.S. at 178).

Here, Defendants clearly ceased funding direct legal representation to UCs in violation of an express statutory mandate and their own regulatory frameworks.  The Cancellation Order directed Plaintiffs to stop all work providing direct legal representation to UCs, including existing clients whom Plaintiffs undertook to represent before the Cancellation Order.  This notification is final:  it terminates all funding for and orders a halt to all direct legal representation, leaving only funding for certain Know Your Rights ("KYR") presentations and confidential legal consultations. VAAP Decl. ¶ 13; NWIRP Decl. ¶ 10; RMIAN Decl. ¶ 12; Estrella Decl. ¶ 11.  That order went into effect immediately on March 21, 2025.

As a result, Plaintiffs are forced to choose between continuing to provide unfunded legal representation in the face of extremely limited resources; cutting other vital organizational programs, laying off, furloughing, or terminating staff; or seeking to withdraw from their ongoing representation duties for court hearings, client meetings, and other important preparations for legal proceedings as soon as this week.  VAAP Decl. ¶ 21.  The longer Plaintiffs go without this funding or clarity regarding how to handle their current clients, the fewer services they can provide as they

10

are forced to withdraw from ongoing representations, cut other core programs, and/or lay off or reassign staff.  VAAP Decl. ¶ 20–22; NWIRP Decl. ¶ 14.  Institutional knowledge will be permanently lost if significant numbers of experienced staff are laid off, irreparably damaging the Plaintiffs' capabilities, regardless of whether funding is ever reinstated.  Thus, this termination undeniably has an immediate effect on parties' rights or obligations.

*No Other Adequate Remedy*.  Plaintiffs do not have any other adequate remedy for their claims.  The Supreme Court narrowly interprets the "other adequate remedy" limitation, stressing that it "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action."  *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988); *see also Chang v. United States*, 327 F.3d 911, 923 (9th Cir. 2003) ("generous" APA review provisions must be given "hospitable" interpretation (citing *Abbott Labs v. Gardner*, 387 U.S. 136, 140, 141 (1967))).  Instead, "Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions."  *Darby v. Cisneros*, 509 U.S. 137, 146 (1993).  Here, no such special procedures have been established.

*No Statutory Bar to Review*.  Finally, no statute bars review of Plaintiffs' claims here, and Congress has done nothing to override "the strong presumption that Congress intends judicial review" of the administrative actions Plaintiffs challenge.  *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670–71 (1986).

**B.  Termination of the Legal Representation Programs Violates the TVPRA.**

Under the TVPRA, Congress requires that the government "shall ensure, to the greatest extent practicable," that *all* UCs receive legal "counsel to represent them in legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking."  8 U.S.C. § 1232(c)(5).  Canceling funding for and ordering stoppage of direct legal representation services to UCs violates

11

an express congressional mandate.  The Cancellation Order should be held unlawful and set aside. 5 U.S.C. § 706(a)(2)(A).

The TVPRA, requiring Defendants to "ensure [UC legal representation] to the greatest extent practicable," precludes them from terminating the legal representation program and nullifying its congressionally appropriated funding under circumstances here.  *See, e.g.*, *Pacito v. Trump*, 2025 WL 655075, at *18 (W.D. Wash. Feb. 28, 2025) (government agencies violated the APA when they withheld appropriated funds when agencies were "required, 'to the extent of available appropriations,' to ensure provision of support services for resettled refugees"). Defendants terminated this funding and ordered Plaintiffs to cease UC client representation without providing any other avenues of legal services for UCs—failing to "ensure, to the greatest extent practicable," that UCs have legal counsel in their immigration proceedings.  Defendants' Cancellation Order effectively ends meaningful legal representation for UCs by Plaintiffs and forecloses other providers from providing similar legal representation.  VAAP Decl. ¶¶ 20–21.

Although the TVPRA grants Defendants some discretion in *how* to allocate appropriated funds for legal access, Defendants cannot simply cease funding for direct legal representation in its entirety.  *See Pacito*, 2025 WL 655075, at *18.  That is precisely what happened here: Defendants cut off funding for direct legal representation services without providing any guidance or explanation to Plaintiffs regarding how they should deal with their ongoing representations and without any alternative plan for implementing their duties under the statute.  Amica Decl. Ex. 3.

Ultimately, canceling the programs defies express congressional mandates in both the TVPRA and appropriations bills.  *See* Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, § 4, 130 Stat. 460, 461 (incorporating the explanatory statement published at 170 Congressional Record H1501-01, which in turn incorporates Senate Report No. 118-84).  Out of

the $5,506,258,000 the Senate Report specified for the UCP, the Report recommended "no less than the fiscal year 2023 funding level for post-release services; *legal services and access to counsel*; and child advocates," and that such "funds will be used to provide access to counsel, consistent with the goals of the [TVPRA]."  S. Rep. 118-84 at 167–70 (2023) (emphases added).

After mandating in the TVPRA that Defendants provide legal representation to UCs "to the greatest extent practicable," Congress facilitated the provision of legal representation by appropriating billions of dollars to the UCP program, which includes (among other services) direct legal representation to UCs.  By consistently appropriating funds for this program for more than a decade, Congress not only ensured that it *would* be practicable to provide legal representation to UCs, but also expressly intended to ensure this outcome.  Given that appropriations are available to fund access to direct legal representation, Defendants cannot, consistent with their TVPRA obligations, simply refuse to fund such representation.

**C.  Terminating the Legal Representation Programs Violates the ORR Foundational Rule.**

The government also is "bound by the regulations it imposes upon itself."  *See United States v. 1996 Freightliner Fld Tractor VIN1FUYDXYB-TP822291*, 634 F.3d 1113, 1116 (9th Cir. 2011).  "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."  *Morton v. Ruiz*, 415 U.S. 199, 235 (1974).  Under the *Accardi* doctrine, parties may bring claims under the APA asserting that an agency has failed to follow its own rules and internal policies.  *See, e.g.*, *Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004).  *Accardi* concerned the failure by the Board of Immigration Appeals to exercise its independent discretion in deciding an appeal as required by the agency's own regulations.  *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954), *superseded by statute on other grounds*.

13

*Otro Lado, Inc. v. Mayorkas*, 2024 WL 4370577, at *8–9 (S.D. Cal. Sept. 30, 2024) (plaintiffs sufficiently alleged a policy violation based on a rule preamble and alleged substantial hardship based on border turnback policy); *see also Carnation Co. v. Sec'y of Lab.*, 641 F.2d 801, 804 n.4 (9th Cir. 1981) (the standard for an *Accardi* violation is "whether violation of the regulation prejudiced the party involved"). Here, Defendants' actions violate their express commitment in the Foundational Rule, a binding regulation, to fund legal services providers to provide UC legal representation as long as appropriations are available. Plaintiffs are substantially prejudiced because they rely on that funding to provide critical legal services to UCs and will, in some cases, be forced to stop providing that representation to their UC clients. Plaintiffs will have to choose between financial survival and adhering to binding ethical obligations as to existing clients if Defendants' actions are not enjoined. RMIAN Decl. ¶ 14; Estrella Decl. ¶ 15; *see also infra* Section II.A.

ORR has "recognize[d] that most unaccompanied children need legal services to resolve their immigration status and that representation appears to have a significant impact on both the court appearance rate and the outcome of cases for unaccompanied children." 89 Fed. Reg. at 34529; *see also Al Otro Lado*, 2024 WL 4370577, at *9 (preambles may sufficiently bind agencies under *Accardi*). Accordingly, ORR just last year stated its intention to provide "universal legal representation for unaccompanied children by FY 2027." HHS: Administration for Children & Families, *Justification of Estimates for Appropriations Committees*, at 78 (2024), https://shorturl.at/4VDSL; *see also* 89 Fed. Reg. at 34526 ("ORR strives for 100 percent legal representation of unaccompanied children and will continue to work towards that goal to the extent possible."). Thus, in 2024, ORR adopted the Foundational Rule, which states in relevant part:

> To the extent ORR determines that appropriations are available, and insofar as it is
> not practicable for ORR to secure pro bono counsel, ORR *shall fund legal service*

> *providers* to provide direct immigration legal representation for certain
> unaccompanied children, subject to ORR's discretion and available appropriations.

45 C.F.R. § 410.1309(a)(4) (emphasis added). ORR explicitly noted that "in some cases it is impracticable for ORR to secure pro bono legal services for unaccompanied children," and provided that ORR would fund legal services with available congressional appropriations for those cases. 89 Fed. Reg. at 34529. The Foundational Rule thus explicitly obligates ORR to fund legal services providers to provide direct immigration legal representation, so long as congressional appropriations are available and pro bono counsel is not practicable. *See id.* at 34529 ("ORR has determined that its approach to providing legal services to unaccompanied children by enabling them to access pro bono counsel 'to the greatest extent practicable' and funding legal services for additional unaccompanied children, as resources allow, is consistent with ORR's statutory obligations.").

Defendants' actions on March 21, 2025, subvert these ORR commitments and regulations, violate the *Accardi* doctrine, and are both contrary to law and arbitrary and capricious under the APA. *See Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1068–69 (C.D. Cal. 2019). Congressional appropriations are readily available until September 2027 to fund these legal services, including funds appropriated as recently as March 15, 2025. *See, e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, Div. A Tit. I Sec. 1101(8) (2025); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 665-666 (2024); S. Rep. 118-84, at 169. Nonetheless, without explanation and without a plan to replace these critical legal services, the Cancellation Order violates Defendants' obligations and has caused and will continue to cause Plaintiffs substantial hardship, as described below. *See also infra* Section II.A. Because Defendants' actions violate their own stated policies and substantially prejudice Plaintiffs, the termination order should be enjoined.

## II. Plaintiffs Satisfy the Remaining Requirements for Injunctive Relief

### A. Plaintiffs Face Irreparable Harm

A temporary restraining order is appropriate where, as here, the moving party shows that it faces irreparable harm—harm which is (1) "immediate", *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988), and (2) "for which there is no adequate legal remedy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

Here, immediate injunctive relief is necessary to protect Plaintiffs from suffering severe and irreparable harm. Defendants' abrupt termination of funding for direct legal representation directly interferes with Plaintiffs' missions, immediately impeding their ability to provide critical legal representation that is at the heart of Plaintiffs' core activities. RMIAN Decl. ¶ 22; VAAP Decl. ¶¶ 21–22; NWIRP ¶¶ 13–15. There is no question that ceasing funding for legal representation services for UCs and terminating the existing services will cause imminent harm that cannot be later remediated. MIRC Decl. ¶ 32–33; FIRRP Decl. ¶ 37. The Cancellation Order prevents Plaintiffs from providing thousands of unaccompanied children with the direct legal representation required under the TVPRA and the Foundational Rule, frustrating Plaintiffs'

16

primary mission of representing these children as contemplated by Congress and the TVPRA.  *See, e.g.*, ImmDef Decl. ¶ 2.  If this occurs, "'there can be no do over and no redress.'"  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).

Plaintiffs have relied on Congress's and Defendants' assurances that funding for these critical resources will continue to be available.  Amica Decl. ¶ 11; RMIAN Decl. ¶ 18.  Cutting off this vital resource threatens immediate and irreparable harm.  *See, e.g.*, CLSEPA Decl. ¶ 13; VAAP Decl. ¶¶ 22–24; KIND Decl. ¶¶ 16–19.  For example, Immigrant Defenders Law Center has already had to provide 27 staff with layoff notices in response to the Cancellation Order and anticipates additional cuts would be necessary if funding is not restored; these staff losses threaten its ability to continue representing the 1900 UCs it currently represents.  ImmDef Decl. ¶¶ 20–22.  In Texas, Estrella del Paso currently manages 324 pending cases and predicts the loss of funding will require staff layoffs and increase caseloads for existing staff.  Estrella Decl. ¶ 6.  The Galveston-Houston Immigration Representation Project expects to lay off most of their Immigrant Children and Youth staff within four weeks.  GHIRP Decl. ¶ 21.  Sustaining these services without this funding will cost the Northwest Immigrant Rights Project $200,000 a month.  NWIRP Decl. ¶ 13.  Private providers predict devastating financial consequences, including the potential for bankruptcy.  DHCC Decl. ¶ 19; MM Decl. ¶ 18.  And these losses do not even account for the organizational knowledge at risk of being lost.  Estrella Decl. ¶ 6; FIRRP Decl. ¶ 38; Amica Decl. ¶ 25; ImmDef Decl. ¶ 21.

These harms cannot be remediated or redressed, even if Defendants later provide alternative routes for providing direct legal representation for UCs.  The harm to Plaintiffs and their clients is imminent and irreparable.  The termination of services took effect immediately upon

17

receipt of Defendants' letter on March 21, 2025, which provided no guidance as to what Plaintiffs should do with their existing obligations, including immigration court hearings scheduled for this week.  DHCC Decl. ¶ 15; Amica Decl. ¶ 20; ImmDef Decl. ¶ 24.  Plaintiffs have ethical obligations to their clients and cannot simply immediately withdraw from representation; indeed, most attorneys will require court permission to withdraw.  FIRRP ¶ 34.  Plaintiffs and their clients are already experiencing irreparable harm far exceeding the mere loss of funding, including because they have to furlough or layoff staff and increase the caseloads of staff who can stay on.  After limited reserves run out, Immdef will be forced "to take drastic action to terminate staff across all positions funded under this contract."  Immdef Decl. ¶ 21.  Similarly, KIND "anticipate[s] significant layoffs, starting within days" after the termination of funding.  KIND ¶ 16.  Children's immigration cases "are complex, often take years to complete, and require highly skilled attorneys to competently handle them."  *Id.* at ¶ 23. Impacted attorneys and staff have years of individualized experience and wisdom with clients, making rehiring after layoffs impracticable.

The imminent potential harms to children are immediate and severe.  For example, "if a child at one of the ORR-subcontracted facilities we serve is identified as having an urgent legal need such as an outstanding removal order, Amica Center—the only legal provider with access to the ORR-subcontracted facility—would not be funded to provide the necessary legal service to protect the child from imminent removal."  Amica Decl. ¶ 21.  Further, "[a]t this very moment, there are children in ORR custody who need our representation who are not receiving it.  This means that children who want voluntary departure will have their return home unacceptably delayed, victims of trafficking will not be able to access the protections they deserve, and children fleeing persecution will not be able to have their day in court."  ImmDef Decl. ¶ 25.  The Court

18

cannot later reset the clock.  Absent a temporary restraining order Plaintiffs will suffer harm that cannot later be fixed.

## B.  The Balance of Equities

Finally, in considering whether to grant a temporary restraining order, the Court should "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief."  *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  Where an injunction will not "substantially injure the other [interested] parties," the balance of equities tips in plaintiffs' favor.  *Nken*, 556 U.S. at 434.

Here, there will be no harm to Defendants if this Court issues a temporary restraining order: the Government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *cf. Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983).  Instead, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *State v. Azar*, 385 F. Supp. 3d 960, 985 (N.D. Cal. 2019), *vacated on other grounds and remanded sub nom. California ex rel. Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (quoting *Newby*, 838 F.3d at 12) (cleaned up).

Terminating funding for direct legal representation for UCs, without any plan to ensure that current representations are not interrupted, violates Congress's express directive in the TVRPA and ORR's own commitments in the Foundational Rule.  Enjoining Defendants from effectively terminating these services merely prevents Defendants from defying these mandates and shirking their own voluntarily undertaken obligations.  Paying out funds already appropriated for these services cannot harm Defendants in any meaningful way compared to the harms that Plaintiffs and their clients will suffer if this Court does not issue a temporary restraining order.

19

Maintaining funding for these direct legal representation services furthers critical public interests: ensuring children have access to legal representation and protection from trafficking, as well as promoting efficiency and fairness within the immigration system for thousands of children who have viable claims for immigration relief in the United States. *See* 89 Fed. Reg. at 34529 (recognizing benefit of UC representation to the immigration system generally). Plaintiffs' work with UCs is widely recognized and commended by the legal community writ large, including by Immigration Judges, clerks, and the Department of Homeland Security's field office staff. VAAP Decl. ¶ 11; MIRC Decl. ¶ 19; ImmDef Decl. ¶ 13. The programs promote judicial economy by preventing immigration courts from bearing expenses such as unnecessary status conferences, VAAP Decl. ¶ 11, terminating proceedings for children where jurisdiction is improper, VAAP Decl. ¶ 9; RMIAN Decl. ¶ 10, and efficiently funneling contact with the courts through a single point of contact rather than having 50 or more representatives reaching out individually, MIRC Decl. ¶ 19. Plaintiffs play a key role in ensuring that children's needs are being met while in ORR custody. ImmDef Decl. ¶ 8. For example, Plaintiffs make referrals to Child Advocates, advocate directly with ORR to avoid unnecessary "step ups" for children at risk of being placed in more restrictive detention settings, and request Trafficking Victim designations from the Office of Trafficking in Persons. *Id.* Because Plaintiffs are independent, non-governmental organizations, children often share concerns with Plaintiffs they do not feel comfortable sharing with ORR-subcontracted staff or other stakeholders. *Id.* A temporary restraining order enjoining the Cancellation Order is in the public interest.

If the Court does not issue a temporary restraining order, Plaintiffs and the thousands of UCs they represent will face clear, immediate, and irreparable harms. Defendants themselves, meanwhile, do not face any injury from the issuance of a temporary restraining order to stop their

illegal action.  Given these considerations, the balance of equities weighs heavily in favor of issuing a temporary restraining order here.

### III. A Nationwide Injunction is Appropriate

While injunctive relief must be tailored to the scope of the case, "there is no bar against . . . nationwide relief in federal district or circuit court when it is appropriate." *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987).  Moreover, "an injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Id.* at 1170–71.  Accordingly, "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640,681 (9th Cir. 2021) (cleaned up).  The appropriate injunctive relief "often depend[s] as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l. Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017).

Here, because "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff," a nationwide injunction is necessary to provide Plaintiffs complete relief.  *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020) (nationwide scope of injunction proper to provide complete relief).  Defendants' decision to terminate direct legal representation directly violates the TVPRA and the Foundational Rule as to every legal services provider and will cause irreparable harm if allowed to proceed.  A nationwide injunction is the only way to effectively grant Plaintiffs the relief they seek: the preservation of their mission to provide critical legal services for UCs across the country who would otherwise be left to navigate the immigration system alone.  It is also the only way to ensure that Defendants comply with the congressional mandate and their own

21

regulatory obligations to provide legal representation to UCs to the greatest extent practicable Without a nationwide injunction, Defendants may continue to deny funding to other nonprofit organizations providing similar services, preventing thousands of UCs from receiving legal representation and assistance, and forcing Plaintiffs to make an impossible choice between serving their mission unfunded or turning their backs on vulnerable clients.  Plaintiffs, whose primary mission and core organizational activities include critical direct legal representation for these children, will be forced to either deplete their reserves by continuing to provide as much direct legal representation services as possible or turn their backs on vulnerable clients.  Notably, Defendants—who, consistent with congressional appropriations, already allocated funding for direct legal representation—will not face any harm from a nationwide injunction requiring them to continue funding legal representation as planned.  Thus, the balance of equities weighs heavily in favor of a nationwide injunction.

Courts have recognized that "a fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy." *Washington v. Trump*, 847 F.3d 1151, 1166–67 (9th Cir. 2017).  "For these reasons, in immigration cases, [this Court] consistently recognize[s] the authority of district courts to enjoin unlawful policies on a universal basis." *E. Bay Sanctuary*, 993 F.3d at 681 (quotation marks and citations omitted).  Moreover, plaintiffs are located throughout the country, and "[d]ifferent interpretations of executive policy across circuit or state lines will needlessly complicate agency and individual action," *see E. Bay Sanctuary*, 993 F.3d at 681, and piecemeal injunctive relief for the more than 80 providers nationwide would be impractical and difficult to administer.  *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326–27 (4th Cir. 2021).  Accordingly, a nationwide injunction is appropriate in this case.

### IV. Plaintiffs Seek Expeditious Resolution of their Claims

Under 28 U.S.C. § 1657(a), courts "shall expedite the consideration of any action . . . if good cause therefor is shown."  Actions for preliminary or temporary injunctive relief "are named the highest priority civil actions," and "special consideration" should be given to "actions asserting federal rights."  *Freedom Commc'ns Inc. v. F.D.I.C.*, 157 F.R.D. 485, 486 (C.D. Cal. 1994). Further, "[l]itigants who can persuasively assert that there is a special public or private interest in expeditious treatment of their case will be able to use the general expedition provision."  H. Rep. No. 985, 98th Cong., 2d Sess. (1984), reprinted in 1984 U.S.C.C.A.N. 5708, 1984 U.S.C.C.A.N. 5782.

Courts have found that "good cause" is shown where the effective relief hinges on appropriate timing.  *See, e.g.*, *Pacesetter, Inc. v. Aortech Intl. PLC*, 2012 WL 12894007, at *1 (C.D. Cal. Nov. 1, 2012) (expediting when a regularly scheduled motion would exceed the time allotted in defendant's Rectification Notice); *see also* 9th Cir. Rule 27-12 (allowing for expedited briefing and hearing "upon showing of good cause").  Actions also may be expedited where one party's income stream is dependent on the outcome of the case.  *See, e.g.*, *AIG Annuity Ins. Co. v. Law Offs. of Theodore Coates*, *P.C.*, 2008 WL 4543422, at *3 (D. Colo. Oct. 10, 2008).

Here, funding for the direct legal representation that Plaintiffs provide to UCs has already abruptly been rescinded.  Plaintiffs have been ordered to stop work and no longer receive funding, effective March 21, 2025.  NWIRP Decl. ¶ 10; VAAP Decl. ¶ 13.  Not only will Plaintiffs be irreparably injured, *see supra* Section II.A, but the thousands of children whom Plaintiffs and other service providers assist will also be harmed if these services are not restored.  VAAP Decl. ¶ 21; NWIRP Decl. ¶¶ 14–15; Estrella Decl. ¶ 16; RMIAN Decl. ¶ 21.  With every passing day that funding is blocked for these services, more children will appear in court proceedings across the country without any guidance or assistance to help them navigate these complex proceedings even

as provider organizations stretch their resources to fulfill their missions.  Estrella Decl. ¶ 7; VAAP Decl. ¶ 9.  In addition to the harm to these children's due process rights, the loss of representation will cause dysfunction and confusion in the immigration system, including the immigration courts. VAAP Decl. ¶¶ 9, 11; RMIAN Decl. ¶ 10; MIRC Decl. ¶ 19.  Accordingly, there is sufficient "good cause" to expedite the consideration of this motion under 28 U.S.C. § 1657(a).

## CONCLUSION

Defendants' actions violate the APA.  Because this conduct will immediately cause Plaintiffs irreparable harm, this Court should grant immediate provisional and nationwide relief enjoining Defendants' illegal actions and preserving the status quo pending a final judgment.

Respectfully submitted,

March 27, 2025

/s/ Alvaro M. Huerta_____      /s/ Samantha Hsieh_____

IMMIGRANT DEFENDERS LAW CENTER
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org


JUSTICE ACTION CENTER
Esther H. Sung (CA Bar No. 255962)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)*
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

AMICA CENTER FOR IMMIGRANT
RIGHTS
Adina Appelbaum (D.C. Bar No.
1026331)*
Samantha Hsieh (V.A. Bar No. 90800)*
Peter Alfredson (D.C. Bar No.
1780258)*
Evan Benz (N.C. Bar No. 49077)*
Amica Center for Immigrant Rights
1025 Connecticut Ave., N.W., Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*pro hac vice forthcoming
Attorneys for Plaintiffs

25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| | Case No. 3:25-cv-2847 |
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO,<br>1861 Bay Road<br>East Palo Alto, CA 94303, *et al.*, | |
| Plaintiffs, | |
| v. | **DECLARATION OF ALVARO M. HUERTA** |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| 200 Independence Avenue, S.W. | |
| Washington, DC 20201, *et al.*, | |
| Defendants. | |

1

I, Alvaro M. Huerta, declare as follows:

1.     I am an adult over the age of 18 and a resident of the state of California.  The information set forth herein is true and correct of my own personal knowledge and if asked to testify thereto, I would do so competently.

2.     Pursuant to Local Civil Rule 65-1(a)(5), immediately prior to making this application to the Court, I provided Pamela Johann, Chief of the Civil Division of the United States Attorney's Office of the Northern District of California, with actual notice that Plaintiffs are filing this motion, along with electronic copies of the complaint and the brief accompanying this motion, via e-mail before completing this electronic filing.

Dated: March 27, 2025          /s/ Alvaro M. Huerta
                                    Alvaro M. Huerta

PI Appeal and Stay Addendum 534

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

Case No. 3:25-cv-2847

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO,
1861 Bay Road
East Palo Alto, CA 94303, *et al.*,

      Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

200 Independence Avenue, S.W.

Washington, DC 20201, *et al.*,

      Defendants.

**[PROPOSED] ORDER TO SHOW CAUSE TO DENY PRELIMINARY INJUNCTION**

Upon reading the accompanying Memorandum of Law, dated March 26, 2025, and upon all prior pleadings and proceedings had, and good cause being alleged, it is hereby:

Enjoining Defendants from interfering with the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and the Office of Refugee Resettlement's ("ORR") Foundational Rule, 45 C.F.R. § 410.1309(a)(4) requirements to provide direct legal representation services to unaccompanied children, including by cutting off access to congressionally appropriated funding.

1

**FURTHER ORDERED** that pending a hearing and determination of the Order to Show Cause, the Cancellation Order shall be enjoined;

**FURTHER ORDERED** that service upon Defendants of a conformed copy of this Order to Show Cause, together with copies of the papers in support thereof, shall be made upon counsel for Defendants by electronic service through ECF, and email, on or before the __ day of _____, 2025, shall be deemed good and sufficient service thereof; and it is

**FURTHER ORDERED** that Defendants' opposition papers, if any, shall be served so as to be received by counsel for Plaintiffs, on or before the __ day of _____, 2025.

_____
UNITED STATES DISTRICT JUDGE

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| | Case No. 3:25-cv-2847 |
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, <br> 1861 Bay Road <br> East Palo Alto, CA 94303, *et al.*, <br><br>       Plaintiffs, <br><br>    v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> 200 Independence Avenue, S.W. <br><br> Washington, DC 20201, *et al.*, <br><br>       Defendants. | **[PROPOSED] TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

1

AND NOW, this ___ day of _____, 2025, upon consideration of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, the memorandum and evidence in support thereof, and Defendants' response thereto, it is **HEREBY ORDERED** that Plaintiffs' Motion is **GRANTED** as follows:

> Enjoining Defendants from interfering with the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and the Office of Refugee Resettlement's ("ORR") Foundational Rule, 45 C.F.R. § 410.1309(a)(4) requirements to provide direct legal representation services to unaccompanied children, including by cutting off access to congressionally appropriated funding.

FURTHER ORDERED that pending a hearing and determination of the Order to Show Cause, the Cancellation Order shall be enjoined.

_____
UNITED STATES DISTRICT JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

Case No. 3:25-cv-2847

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

                Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

               Defendants.

**DECLARATION OF ROXANA AVILA-
CIMPEANU (FIRRP) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

## DECLARATION OF ROXANA AVILA-CIMPEANU FOR THE
## FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT

I, Roxana Avila-Cimpeanu, make the following statement on behalf of the Florence Immigrant & Refugee Rights Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1. My name is Roxana Avila-Cimpeanu. I am a licensed attorney and a member in good standing in the State Bar of Arizona. I am currently employed as Deputy Director of the Florence Immigrant & Refugee Rights Project ("Florence Project" or "FIRRP"). I joined the Florence Project on September 6, 2016, and have served in my current role since September 2024. Before I assumed my current position, I previously served as Children's Legal Program Manager, Managing Attorney for the Children's Pro Bono Program, Pro Bono Mentor, Staff Attorney, and Law Graduate with the Florence Project's Children's Legal Program serving unaccompanied immigrant children in Arizona.  During my time at the Florence Project, I have personally provided free legal services, including friend of court services, direct representation, legal orientation and education, and *pro bono* mentorship, to at least 140 children. Additionally, as Children's Legal Program Manager and Deputy Director I have supervised attorneys, pro bono volunteer attorneys, law graduates, accredited representatives, legal assistants, intake specialists, and social workers who have provided free legal services, both direct representation and pro se services, to thousands of individuals detained in Office of Refugee Resettlement "ORR" and ICE custody in Arizona.

### Florence Project's Mission and Scope

2. Founded in 1989, the Florence Project is a 501(c)(3) non-profit legal services organization with offices in Tucson, Phoenix, and Florence, Arizona. The Florence Project's mission is to provide free legal and social services to detained adults and children facing immigration removal proceedings in Arizona. On any given day, there are thousands of people detained and facing deportation proceedings in Arizona, including adults in rural detention centers in Eloy and Florence, Arizona and unaccompanied children who are or were previously in the custody of the Office of Refugee Resettlement ("ORR") in shelters in the Phoenix and Tucson metropolitan areas. With no public defender structure in immigration removal proceedings, the vast majority of people facing removal are forced to go unrepresented in immigration court due to poverty or lack of access to counsel, this includes unaccompanied children who are in the country without a parent or legal guardian. The Florence Project's vision is to ensure that all immigrants facing removal have access to counsel, understand their rights under the law, and are treated fairly and humanely.

3. The Florence Project is the sole 501(c)(3) non-profit organization dedicated to providing free immigrant legal services to unaccompanied children in Arizona. Through our attorneys, accredited representatives, law graduates, intake specialists, legal assistants, social workers, and network of pro bono attorneys, the Florence Project provides free

legal education and free representation and social services to thousands of unaccompanied children who are facing deportation proceedings in Arizona.

### Florence Project's Services Under the Unaccompanied Children's Program

4.  The Florence Project began providing legal services to unaccompanied children who were detained and facing deportation proceedings in Arizona in 2000. At the time, unaccompanied children were detained in the custody of the former Immigration and Naturalization Service, ("INS"), the same agency that managed adult immigration detention and removal, in jail-like facilities in Central Arizona. Those facilities were ill-equipped to manage the special needs of children and children regularly suffered harmful treatment–for example, routine strip searches before attorney visits, prolonged detention, placement in solitary confinement, and other restraints. In 2002 as part of the general restructuring of immigration enforcement under the Homeland Security Act, and in recognition of the special needs of children, Congress moved away from the adult detention model and transferred the care and custody of unaccompanied immigrant children to the Office of Refugee Resettlement "ORR". At or about that same time, children began to be detained in shelter facilities in the Phoenix area. The Florence Project subsequently opened an office in Phoenix to better facilitate serving these unaccompanied child clients. In 2014, ORR opened additional shelters in the Tucson area and, again, the Florence Project opened a Tucson office to serve those clients. The Florence Project has continuously served unaccompanied children detained in Arizona since 2000.

5.  As it pertains to unaccompanied children, in order to carry out our mission of providing free legal and social services to unaccompanied children facing removal proceedings in Arizona, the Florence Project's Children's Legal Program and Children's Social Services Team has a number of main work components that involve providing unaccompanied children with legal education and know your rights presentations, legal screenings, legal advocacy, friend of court assistance, and direct representation both from Florence Project attorneys and through pro bono placements. Each of these facets of Florence Project's work is addressed in more detail below.

6.  First, the foundational level of our services to unaccompanied children are based on providing age-appropriate legal education services and "know your rights" presentations and conducting individual legal screenings(intakes) with all unrepresented children in ORR custody in Arizona. Under the UCP, Florence Project staff ensure that every unaccompanied child who is detained in ORR custody in Arizona receives age-appropriate, basic "know your rights" information and an intake in a language they understand within 10 business days of their arrival in an Arizona ORR shelter facility, where possible, in keeping with 45 CFR 410.1309(a)(2)(i)(B). For children who are reunified to a sponsor before Florence Project staff are able to meet with them, staff call the child and provide a know your rights presentation and intake over the phone. Every year, Florence Project staff provide these educational services to tens of thousands of children in Arizona; in 2023 alone, Florence Project staff provided 17,514

unaccompanied children with a "know your rights" presentation. These are critical services because unaccompanied children almost universally lack resources to afford legal representation and, without the Florence Project, would not have meaningful access to accurate and age-appropriate resources to help them understand their rights, responsibilities, or legal options.

7. Second, Florence Project attorneys also attend every detained Unaccompanied Minor children's docket in the Phoenix and Tucson Immigration Courts and, where allowed by the judge and appropriate, serve as Friend of Court for any cases in which the child is still seeking and likely to attain reunification with a sponsor or family member, and the Court requires additional information to assess next steps. Because the Trafficking Victims Protection Reauthorization Act ("TVPRA") requires that unaccompanied children "be promptly placed in the least restrictive setting that is in the best interest of the child," many of the children to whom we provide educational "know your rights" services eventually reunify with sponsors elsewhere in the United States. As a result, Florence Project staff do not immediately enter as counsel on every child's case in Arizona, but we do ensure that no child is alone in court by being present and to help provide critical information to the Court regarding the status of the reunification process, best language, special vulnerabilities and other critical information, where appropriate and allowed by the Court.

8. Third, the Florence Project provides non-representational legal advocacy for non-represented children in ORR custody. This includes advocating with ORR shelters for things like communication in the proper language, access to medical care, religious accommodations, access to education, access to proper food, access to communication with family and sponsors, and access to counsel. Through this type of non-representational advocacy, the Florence Project works to ensure that children in ORR care are being treated with dignity, respect, and are not subject to discrimination or mistreatment, and that the shelters are abiding by laws surrounding the treatment of children.

9. Fourth, every year Florence Project attorneys provide direct representation to hundreds of unaccompanied children in Arizona; in 2023 alone Florence Project attorneys represented 1,091 unaccompanied children in Arizona. Excepting cases of ethical conflict, Florence Project attorneys represent all unaccompanied children who are placed into Long-Term Foster Care ("LTFC") facilities in Arizona, as well as other unaccompanied children who remain in ORR custody during their removal proceedings or as they approach "aging-out" of the age of minority by turning 18. Additionally, Florence Project attorneys represent unaccompanied children who have passed through ORR custody and reunified with family members or sponsors here in Arizona, or have been placed in the Unaccompanied Refugee Minor Program in Phoenix, AZ. In all these cases, Florence Project's representation of these unaccompanied children can include representation before the Immigration Courts and the United States Citizenship and Immigration Services ("USCIS"), as well as representation in Arizona State Court juvenile or probate proceedings where necessary and appropriate for children who have been abandoned, abused, or neglected.

10. Fifth, Florence Project also has two specialized direct representation teams, which are partially funded by UCP. The first is the Children's Trafficking Response Team, which works to educate and guide staff and community stakeholders and partners on how to identify and support child survivors or trafficking, or children at risk of trafficking. This team is partially funded by UCP and works directly with unaccompanied minors who are at risk of or have survived trafficking, whether in the U.S., their country of origin, or on their journey to the U.S. The second in the Released Representation team which focuses on providing direct legal and social services to children who were formerly detained by ORR and living in the Phoenix metropolitan area.

11. The Sixth and final major component of the Florence Project's Children's Legal Program is our Children's Pro Bono Team, who receive pro bono case referrals from Children's Program staff and then connect unrepresented unaccompanied children with pro bono counsel from law firms or pro bono private immigration practitioners. Each year, our pro bono team places dozens of cases with volunteer attorneys before the immigration court, USCIS, Arizona state courts, and Board of Immigration Appeals and provides full-service mentorship, ongoing training, and technical support on those cases. Pro bono screening and mentorship in cases before the agency also are funded and conducted, through the UCP contract.

12. As of February 28, 2025,  the Florence Project provided free legal services to unaccompanied children at 24 shelters located in the State of Arizona, primarily in the Phoenix and Tucson metropolitan areas. These shelters have a combined capacity to detain over 2,000 children on any given day. Of these, 18 facilities are located in Maricopa County and 6 are located in Pima or Pinal counties. These shelters include 3 LTFC facilities as well as 3 transitional foster care facilities that serve particularly vulnerable or special needs populations such as children under the age of 13, siblings detained together, teens who are parenting or pregnant, and children with special needs. Unaccompanied children in Arizona with active immigration court cases generally are docketed on either the Phoenix or Tucson immigration court dockets and, as noted above, Florence Project staff ensure that no detained unaccompanied child in Arizona stands alone in immigration court, either by representing children or being present to provide Friend of the Court services as deemed appropriate and approved by the Court.

13. The Florence Project currently employs 114 full time staff who are dedicated to directly providing services under the UCP and whose positions are largely funded through U.S. Department of Health and Human Services ("HHS") funding. Specifically, Florence Project employs 1 Program Manager and 1 Associate Program Manager as well as 9 managing attorneys, 9 managing legal assistants, and 1 managing social worker who directly oversee and train staff providing UCP legal services, help manage legal and contractual compliance, and directly provide legal services under the UCP themselves.

---

[1] On February 28, 2025, Florence Project staff began to learn of "stop placement orders" and an accompanying depopulation of various shelters we have historically served. The reason, scope, and anticipated duration of the stop placement order and accompanying depopulation remain unclear at this time as do any possible plans for opening potential replacement shelter services in our region.

Additionally, Florence Project employs 21 staff attorneys and law graduates, and 4 accredited representatives who provide direct representation, legal consultation, and legal education and screenings under the UCP;  1 pro bono Managing Attorney who oversees the Pro Bono Program, screens volunteer attorneys, places cases, and supervises the Pro Bono team, and 2 pro bono mentors who provide technical support to pro bono attorneys; 49 legal assistants and intake specialists who help provide know your rights presentations and legal screenings under attorney supervision; 9 social workers; and 3 legal administrative assistants who support the team with UCP related data entry and billing requirements.  Due to staff turnover, internal transitions, and promotions, the Florence Project also has 20 open positions that are contemplated under the Florence Project's UCP that we have yet to backfill. In addition to our regular full-time employees noted above, the Florence Project also currently hosts 3 Immigrant Justice Corps ("IJC") fellows and one Equal Justice Works ("EJW") Fellow who work in conjunction with our general staff to represent unaccompanied children in removal proceedings.

14. Staff providing representation and "know your rights" presentations to children in ORR facilities routinely travel to each of the 24 shelter facilities in person to conduct client interviews and screenings, prepare clients for hearings, as well as provide legal education, legal screenings, and other legal support to detained children. Florence Project staff are typically present in shelters anywhere from 3-5 days a week. The Florence Project represents unaccompanied children in removal proceedings in immigration court, affirmative relief such as seeking asylum before USCIS, U-visas and T-visas, Special Immigrant Juvenile Status ("SIJS") applications both before the agency and in state courts for necessary predicate orders, BIA appeals, and petitions for review to the Ninth Circuit Court of Appeals.

15. For every child that passes through ORR in Arizona, the Florence Project monitors to make sure that the child is on track for reunification with a sponsor. If the shelter indicates that a child does not have a sponsor, or if the child has been detained for an extended period of time, or if the child's case merits entering of representation, the Florence Project will place the case with an in-house attorney or accredited Representative, or with a volunteer pro-bono attorney from the community.

16. The Florence Project currently directly represents over 800 children under the UCP contract. Some are children still in detention, and many are children who have been released from ORR and are living in Arizona, and have been waiting for their cases to be resolved for years due to government backlogs. Some cases take up to 6 years to conclude at the Legal Permanent Resident stage, and the presence of an attorney is critical during that long time span since Immigration Law changes at a rapid rate.

17. These various services provided under the UCP, from education through full representation are a critical safety net for unaccompanied children who are or have been in ORR custody. The children the Florence Project serves are often extremely vulnerable – they have often experienced significant trauma, have been abused, abandoned, or neglected. Many have experienced discrimination, trafficking, or harm in their country of origin or en route to the United States. We routinely work with children who identify as

LGBTQ. We also regularly work with children who are experiencing symptoms of significant disabilities including mental health conditions as well as medical disabilities that can directly impact their ability to participate in proceedings, for example vision or hearing impairment. Moreover, some of our child clients are very young such that their age presents unique barriers to their ability to participate in their legal cases. The Florence Project also serves facilities that specialize in young or "tender aged" children under the age of 13, where the children we at times encounter children who are so young that they do not know even their parent's names (aside from "mom" or "dad"). Florence Project staff have even represented children who were pre-verbal, with at least one client who was only six-months old. For such individuals, the UCP is a critical safety net since, without the UCP, the vast majority of these particularly vulnerable children would be left without any information and most likely would face significant barriers to adequately and efficiently preparing their cases without counsel, nor would a child be well-positioned to pay the thousands of dollars required to retain counsel. Indeed, almost universally, unaccompanied children lack sufficient resources and knowledge to obtain private counsel and the Florence Project is the only non-profit organization that provides free legal services to unaccompanied children who are detained by ORR in Arizona. Without the services the Florence Project provides under the UCP, unaccompanied children in Arizona would be forced to go through their legal process entirely alone, without a lawyer. However, immigration law is famously complex and given the educational/literacy barriers, language barriers, developmental stage barriers, age barriers, and emotional and mental hurdles caused by past discrimination, trauma, and harm, the vast majority of our child clients would be simply incapable of navigating their legal proceedings without assistance from trusted, independent legal and social service providers like the Florence Project. Additionally, a significant number of the children we work with are eligible for Special Immigrant Juvenile Status ("SIJS"), which requires proceedings and findings before state juvenile courts, which children simply cannot obtain without the assistance of counsel.

18. Looking at SIJS in particular is useful to understanding how complicated and specialized the work the Florence Project does with unaccompanied minors is. SIJS requires attorneys to be well-versed and competent to represent clients in not one, but two complicated areas of law: immigration removal defense and state court child welfare processes, which vary from state to state. In Florence Project's experience, not only do our advocates need to be completely fluent in both areas to advocate in individual client's cases, but historically we have had to do a great deal of education for both the state courts and the immigration courts about what the other side of the coin looks like and how the other court system operates. This requires regular stakeholder outreach, developing strong relationships with courts, and participating in opportunities to educate judges and court staff, extending even to formal trainings where courts have requested such support, to ensure cases that involve both systems are able to move forward effectively and efficiently.

19. In addition to representing clients in their immigration proceedings, Florence Project represents clients in various forms of advocacy that arise incident to their custody. In this context, Florence Project staff play a critical role in building trust with clients and being a

constant, dependable point of contact who is independent and not part of the United States government, which allows these vulnerable youth to share information regarding abuse or mistreatment these children have experienced both before, during, and after their custody by the U.S. government. Because we build this trusting connection with the children we serve, Florence Project clients have not only felt comfortable sharing examples of abuse and violence they experienced in their countries of origin and during their journeys to the United States that are critical to developing their legal cases for relief here in the United States, but also regularly share information about abuses they experienced while in the custody of the United States government.

20. Examples of the types of abuses our unaccompanied children clients have reported to us, and about which the Florence Project has engaged in advocacy on our clients' behalf, include lack of access to proper food, religious services, regular communication with parents or potential sponsors, clothing, hygiene items, parenting ability, and appropriate medical care in both Customs and Border Patrol ("CBP") and ORR custody; verbal and physical assaults in CBP custody; physical abuse and sexual assaults in ORR custody; and attempted trafficking and/or grooming by ORR staff. Because we begin working with these children within days of their arrival into ORR custody, Florence Project staff often are the first to learn about harmful government policies – things like widespread family separations in 2017-2018 and the unlawful use of dental imaging as the sole basis to redetermine a child's age as a justification for moving a minor into adult ICE custody. Because we are independent legal service providers, we have the unique ability to advocate on our clients' behalf to raise awareness and push back against such harmful policies.

21. For example, Florence Project staff screen each child for abuse or mistreatment at CBP facilities prior to their arrival in ORR through questions designed to ensure that children's legal rights are respected and that children are treated humanely by CBP. Many children the Florence Project encounters report being held for extended periods of time beyond that allowed by the TVPRA, lacking proper food, being held in ice-cold facilities or cages, having possessions, including religious items and medical items removed, and being verbally and physically abused by CBP officers. We have heard stories of young mothers not being provided with blankets or diapers for their babies. In fact, over the last year alone, the Florence Project has documented over 150 complaints on behalf of children and filed at least 30 formal complaints with the Office of Civil Rights and Civil Liberties to seek official review and redress over abusive treatment or conditions children face while in CBP custody.[2] For many children, it can take some time before they feel willing to open up regarding abuse or harm they have experienced. Limiting funding for legal service providers like the Florence Project to exclusively know your rights presentations and intakes, will limit opportunities for Florence Project staff to build the type of trusting relationship with these children that enables children to feel

sufficiently safe to disclose abuse experienced, particularly abuse experienced at the hands of U.S. Government officials. This will create circumstances that put children in increased danger of abuse and harm by government officials and allow abusive CBP officials to continue to act with increasing impunity, emboldened by the knowledge that children will have few, if any, opportunity to report harm or resources necessary to do so in a way that would potentially result in any accountability. This directly undermines the Florence Project's mission to ensure that all people facing deportation are treated fairly and humanely. Florence Project's ability to build meaningful trusting relationships with unaccompanied children under the UCP helps our staff identify disturbing patterns and trends in the types of abuses our children clients report. The role of possible representation is particularly crucial in cases where serious trends of harm appear, as was the case, for example, when Florence Project staff were some of the first to note and blow the whistle on how the Trump administration's "Zero Tolerance" border prosecution policy resulted in widespread separations of minor children from their parents at the border. The type of public advocacy and media that eventually brought a halt to that egregious family separation policy is only possible under portions of the UCP that allow for additional legal services and representation, a fact that is surely not lost on this second Trump administration in this decision to eliminate all portions of funding that allowed the Florence Project to advocate for our children clients in this way.

22. Beyond advocating for our clients when they have experienced more extreme abuses and harm while in ORR or CBP custody, Florence Project staff also routinely support clients with other types of advocacy which are equally necessary to ensure the rights of vulnerable children are properly respected. This type of advocacy can include advocating for less restrictive or more appropriate placements in custody as well as the least restrictive placement when a child turns 18. It also includes advocating for access to proper medical care and treatment in custody – from everything for advocating that a client with vision impairment be given glasses so they could see, to advocating that a client with serious medical condition such as a coma is placed in a facility that is equipped to care for their needs.  We help our clients file complaints with oversight agencies to document and resolve myriad of issues that arise as a result of our clients' custody and vulnerable status.

23. Many of our child clients also speak languages other than English or Spanish and our staff not only provide them with legal services and education in a language they understand, as required by the Foundational Rule, but also advocate that they have appropriate language access in immigration court as well as other spaces, including ORR communications and medical appointments. For example, our child clients frequently report to Florence Project staff that ORR staff insist on communicating with them in Spanish, despite that fact the child does not speak Spanish or prefers another language. Children also report to Florence Project staff being discriminated against by shelter staff for speaking indigenous language, or African languages. Many indigenous children or children who are part of a minority have experienced discrimination at home due to their ethnicity, race, or national origin, and it can be difficult for them to advocate for themselves for access to communication in their best language, especially if the shelter staff are displaying prejudice or discrimination against them. Ensuring that

communication takes place in the appropriate language that a child understands is critical and this is even more true when shelters or judges are attempting to share important information with the child. Florence Project staff not only regularly advocates that important government communications be conducted in the child's best language, but also meet with children in detention, build trust with our clients, and empower them to assert their language rights themselves.

24. Florence Project staff also often advocate for the medical needs of children. Florence Project staff have seen countless examples of ORR not taking adequate measures to protect the health of children. Attorneys have advocated for visits to medical professionals who were able to diagnose conditions requiring surgery or medication, including for broken arms and necessary blood transfusions. Staff have learned of special medical needs from children that the shelter did not know about, which resulted in children receiving life-saving treatment. Staff have advocated for proper dental care for children who had a difficult time eating due to mouth pain. Children have also reported ORR staff misrepresenting the purpose of medical visits, children being told they are going to routine dental appointments only to later learn that the dental exams were actually completed for the purposes of age redetermination to facilitate transferring minors into adult ICE custody. Staff have also pushed back in cases where ORR was attempting to pressure minors to return to home country before proper medical care could be assured for things like traumatic brain injuries, or other conditions.

25. The Florence Project also regularly advocates for First Amendment protections, particularly access to religious activities, including ensuring that children are taken to services, are given the proper diet, and are provided with adequate space and time to complete religious rites. Children who observe fasting have been denied food after breaking fast, have had nighttime prayers interrupted, and have faced discrimination at the hand of ORR staff for their religious observances. In such cases, the Florence Project plays a critical role as an independent third party able to both identify potential first amendment and civil rights violations and empower our child clients to assert their rights as well.

26. Florence Project staff also frequently work with ORR and shelter staff to ensure that shelter staff refrain from the unauthorized practice of law. ORR staff are not legally trained and are not lawyers with the associated privilege and confidentiality – they are not able to advise children as to their legal rights or counsel them on their legal options. Despite these known facts and rules against unauthorized practice of law, in many cases ORR staff have provided legal advice to children, which more often than not has been incorrect, harmful, or contrary to the child's wishes.  Florence Project attorneys regularly correct mistakes by ORR staff, for example, when ORR staff submit case assistance requests through the Office of Trafficking in Persons ("OTIP"). The Florence Project has observed countless cases where ORR staff's submission was denied due to a lack of understanding of the requirements of an OTIP request for assistance, the child's life, the legal definitions of trafficking, or a combination thereof. In such cases, Florence Project attorneys have re-submitted requests and received OTIP approvals for case assistance for children who have rightly been determined to be survivors of severe forms of trafficking.

27. The Florence Project has long enjoyed a cooperative stakeholder relationship with our Arizona immigration courts. Beginning from the initial call to action by an Immigration Judge that led to the creation of the Florence Project, Immigration Judges in Arizona have consistently engaged with and welcomed the Florence Project's legal education services. In the context of unaccompanied children, both the Phoenix and Tucson Immigration Courts have a long history of working collaboratively with the Florence Project. For example, in both courts this cooperative stakeholder relationship has allowed for the coordination of specialized dockets for unaccompanied children. The Florence Project has worked with the court and individual judges to ensure the children's docket are as child-friendly as possible, with one judge even electing to wear a more informal Hawaiian shirt instead of the traditional black robes. For decades, the vast majority of judges on the children's docket have welcome Florence Project attorneys to serve as friend of court to assist the court by sharing important information, such as updates regarding likelihood and timeline of reunification, the child's best language, and other information necessary to properly and efficiently adjudicate children's cases. This cooperation has included everything from willingness to provide Florence Project staff space in the physical courtrooms to conduct pre-court orientations to children before their hearings, to smaller acts of appreciation, including swearing in Florence Project law graduates into the bar. Judges in Phoenix and Tucson have long relied on the Florence Project as a resource to which they may refer respondents who are confused or unclear about the next step in their immigration court process. Judges in Phoenix have also allowed the Florence Project to serve as friend of court over the Government's objection, in acknowledgement of the critical information provided for children's cases. In both EOIR and ICE stakeholder meetings, government partners routinely express thanks and emphasize the value of the services the Florence Project provides.

**UCP Stop Work Order, Stop Work Recission, and Subsequent Termination of all but CLIN 1 Funding Under UCP Contract**

remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication of poor performance."

29. On February 18, 2025, shortly after receiving the stop work notice, Florence Project leadership promptly notified all staff regarding receipt of the UCP stop work order and provided additional specific instruction to staff who provided services under the UCP clarifying how they would need to change aspects of their work to follow that order. However, because the Florence Project's mission is to provide free legal and social services to unaccompanied children in Arizona, we also immediately began to discuss how we could potentially transition the critical services that had been conducted under the UCP to other legal access mechanisms, specifically legal access as envisioned by provisions of the TVPRA mandating that "to the greatest extent practicable...that all unaccompanied alien children who are or have been in the custody of [HHS or DHS] have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." As such, we also provided instruction to staff on how we envisioned ensuring continuity of legal and social services for children in ORR shelters served by the organization without government funding, at least for the short term.

30. Just three days after it was abruptly issued, the UCP stop work order was just as abruptly rescinded on February 21, 2025. Like the original stop work order, the cancellation of said order came via email notification from the UCP prime contractor and the actual recission order from the government contracting office provided little to no information as to why the stop work order had been issued originally or why that decision had now been reversed. It simply stated that the stop work order had been cancelled and that all activities under the contract could be resumed.

31. In the three-day window in which the UCP stop work order was in effect, Florence Project staff were consistently allowed to continue to access our child clients in ORR custody without interruption from shelter or ORR staff using our own funds to support this work. As of this date, it is not clear what, if any, reimbursement for those services Florence Project will receive.

32. On March 21, 2025, again without warning, the Florence Project learned that HHS through the U.S. Department of Interior contracting officer, terminated almost all aspects of the current UCP contract. Again, the Florence Project learned about the nearly complete termination of services under the UCP contract through an email notification from the government prime contractor on the UCP program, the Acacia Center for Justice, at approximately 8:15 a.m. Arizona time. The termination was effective the same day we received it, March 21, 2025. As noted, HHS terminated the contract with respect to three of the four contract line numbers ("CLINs"): CLIN 2, which funds legal representation for unaccompanied children, as well as shelter advocacy and other non-representation services, such as pro bono referrals, friend of court services, and data

tracking[3]; (3) Attorney recruitment project and IJC fellows; and (4) Spanish language instruction and interpretation. CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, which funds Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN 1, which funds KYR presentations and confidential legal consultations for pro se children in ORR custody. Per the termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS has not provided any justification for the termination of these services other than, allegedly, the "Government's convenience."

33. On March 21, 2025, shortly after receiving the notice of termination of CLINs 2, 3, and 4 under the UCP contract, Florence Project leadership promptly notified all staff regarding the terminations and provided additional specific instruction to staff who provided services under the UCP clarifying how they would need to change aspects of their work to follow that order. That guidance explained to staff the different ways in which aspects of the critical legal services we provide children would be treated moving forward. For those key legal services falling under CLIN 1 – initial KYRs and legal consultations – Florence Project leadership explained to impacted staff that these services can and would continue without pause, explaining details like the fact that staff can and should use Acacia resources for third-language interpretation for such services. However, for those other critical and core aspects of our work with unaccompanied children – notably our direct representation of said children, friend of court and docket presence, and data entry – the Florence Project leadership communicated that such work would no longer fall under the UCP, staff may not refer to these programs as being through Acacia or the UCP, and staff cannot use Acacia interpretation resources to support such cases. Per instructions from Acacia regarding documenting "unavoidable work" on open cases under the terminated CLINs for possible, but not guaranteed, reimbursement through a potential termination settlement, Florence Project leadership requested that Florence Project staff continue to carefully document time, mileage, and data for internal purposes for any work done on represented cases or other parts of the terminated CLINs. Additionally, because the Florence Project's mission is to provide free legal and social services to unaccompanied children in Arizona, with a core value of ensuring that no child ever stands alone in immigration court, we also immediately began to discuss how we could potentially transition the critical representational, shelter advocacy, and friend of court services that had been conducted under terminated CLINs of the UCP to other legal access mechanisms. As such, we also provided initial instruction to staff on how we envision ensuring continuity of legal and social services for children appearing pro se before EOIR as well as those whom we were already representing under CLIN 2 without government funding. However, Florence Project funding is such that, without a massive new source of revenue to support such efforts, the Florence Project will only be able to sustain these efforts at our current level based on general funding for a short period of time. Finally, we notified staff in our children's program targeted communication that, given the loss of UCP funding, we had to hold on responding to any new case referrals

---

[3] On March 25, 2025, Florence Project received word that the government was considering moving data reporting requirements from CLIN 1 to CLIN 2, a process that still must undergo bilateral negotiation on pricing.

and refrain from entering into any new attorney/client relationships for unaccompanied children in Arizona.

## Organizational Harm Caused By Loss of UCP Contract Services

34. As an initial matter, the termination of CLINs 2, 3, and 4 under the UCP contract will cause serious financial harm to the Florence Project. The UCP subcontract constitutes a major portion of the Florence Project's overall annual budget, with an average value of approximately 12 million per option year on the full contract. The terminated CLINs represent – depending on the option year being considered – a lost value of over 8 to nearly 10 million dollars of funding that supports Florence Project's core legal and social services for unaccompanied children. Moreover, the termination of the majority of the UCP contract also means that the Florence Project will also have to pay out-of-pocket for interpretation services for the child clients we currently directly represent – over 800 children with whom we entered into representation in good faith specifically under this contract – for those who do not speak either Spanish or English. Given the vast number of clients we serve and the many languages they speak, this also represents a significant additional expense. For example, in one month, Florence Project staff reported requiring at least 11,000 minutes of interpreter time. Without language support through the UCP contract, this cost will be incurred by the Florence Project.

35. As noted above, over 100 staff members' salaries are directly funded by the UCP subcontract and the loss of more than 70% of the funding for the Children's Program means that the Florence Project now faces needing to pay for those salaries using general funding sources. The Florence Project's ability to pay staff to continue our core work providing legal and social services to unaccompanied children, work that is mandated by statute and regulation, will become fiscally untenable in a matter of months unless the terminated CLINs are reinstated, or another massive influx of alternative funding can be identified.

36. The termination of all but a small portion of the UCP funding reflects the Government's intent to permanently shrink in size and end the provision of these critical legal and social services to unaccompanied children. This is cause for serious concern as to the Florence Project's overall budget, staffing plans, staff morale, longstanding community and stakeholder relationships, and the ability to keep qualified and trained staff with the organization. At the outset, due to transitions, internal promotions, and staff departures, the Florence Project's UCP subcontract contemplates 20 additional positions that are currently open. However, as a direct result of this termination, the Florence Project is undergoing a hiring pause on all currently unfilled positions. This hiring pause extends beyond only those positions that would have been funded under the UCP; rather it touches hiring for all currently open positions across the organization, with very few exceptions, given that general funding will need to be tapped to cover the substantial lost funding for salaries that would have been covered under the UCP. Thus, staff and programs across the organization, not only within the Children's Program, feel both the negative financial and morale ripple effects of this loss of UCP funding.

37. Moreover, the uncertainty around the budget and the Florence Project's long-term ability to pay our staff's salaries with general funds or fundraising is creating a sense of overwhelm and stress among remaining staff, both on the directly impacted team as well as on other teams, which negatively affects morale and people's sense of job security. While the Florence Project hopes to avoid immediate layoffs, unless the terminated CLINs are reinstated or some miracle fundraising occurs, it is extremely likely that the all-but-total termination of funding under the UCP will necessitate substantial downsizing of the Children's Program staffing. Indeed, Florence Project leadership has determined that, based on this lost funding, layoffs will be necessary unless funding is reinstated, or we receive miracle fundraising. As such, Florence Project leadership is beginning the managerial and administrative preparation for likely layoffs. Because the Florence Project is a unionized workplace, for most of our staff, the Florence Project must comply with specific terms of our collective bargaining agreement ("CBA") regarding communication with the union about termination, notice prior to termination of employment, and severance payments. This, in itself, results in the Florence Project incurring additional financial burdens in the form of legal expenses to plan for potential necessary layoffs with our labor and employment counsel to ensure compliance with our CBA and applicable laws as well as the financial loss of severance pay to any employees who may be subject to layoffs.

38. It is also critical to note that people are not like cogs in a machine where one can be interchangeably and readily replaced by another; once layoffs are announced and/or begin in earnest, the Florence Project will lose staff and, with them, their experience, expertise, and work towards our mission. Even if funding were to be restarted, we would not be able to simply replace lost staff with equally qualified and experienced people. We would have to invest significantly in recruitment and training any new or replacement staff, which poses additional costs to the organization. Moreover, in the uncertain world of non-profit services, an organization's reputation as a relatively steady or secure place to work carries great weight in that organization's ability to recruit and keep qualified staff. Thus, if we must undergo significant lay-offs due to lack of funding, the harm to the Florence Project's reputation as being able to offer reasonably secure employment will be irreparably undermined, which will make it exceedingly difficult for us to hire to replace positions even if funding is eventually restored.

39. Additionally, the termination of all portions of the UCP contract touching on representation of clients substantially harms both the Florence Project and our clients because the termination notice, it seems, provided no guidance, support, or wind-down process for the cases in which our attorneys have already entered. Florence Project attorneys are currently entered on over 800 UCP cases in Arizona. As is the case with all of Florence Project's services, our representation of these children is entirely free of charge to the clients. As attorneys, we have ethical obligations to our clients, particularly those with imminent court appearances or key case filings or other deadlines. We cannot ethically simply stop representing our child clients – doing so would not only be morally wrong but also would subject the Florence Project to substantial legal liability and our attorneys to discipline from the bar. Beyond this fact, we must also take into account the

particular vulnerabilities of our clients – such as their young age, their lack of financial resources and in many cases their inability to work in order to raise funds for paid counsel, language and education barriers, and the technical complexity of many of their case – when determining whether terminating or otherwise limiting our representation would be ethical or appropriate. As a result, minimally, the Florence Project will certainly incur significant expenses to continue representation to our clients who we are ethically obligated to continue representing despite the termination of these funds. And, given that our mission continues to be to provide free legal and social services with a vision of ensuring that all unaccompanied children have access to counsel and are treated fairly and humanely, Florence Project continues to be dedicated to seeking means to continue representation of all of our clients, current and prospective, as well. This means that our development efforts have been diverted from other critical initiatives to instead attempt to replace as much as possible this lost funding and to try to reduce the impact of this massive loss.

40. The complete termination of all CLINs touching on representation services, shelter advocacy, friend of court services, and more will irreparably harm the people that the Florence Project serves and severely hamper our ability to provide our core services. Indeed, just prior to the announcement of the termination of these programs, Florence Project staff noted DHS in Phoenix advancing cases of children in ORR custody, speeding up the removal process. Similarly, in the Tucson EOIR, Florence Project staff recently noted the appearance of children's names on the court docket even where there is no evidence that Notices to Appear have even been filed yet with the courts in those cases and no notice of hearing listed on the EOIR Automated Case information system, raising serious questions both about accelerating the court process for children and doing so in ways that may not comport with statutes, regulations, or due process. However, without funding to provide representation or even appear as friend of court, it has become unclear how Florence Project staff can best advocate regarding the legal propriety of placing children on a 'rocket docket' or scheduling children for court before charging documents have even been filed. It is not realistic to expect children to navigate the complexities of immigration court on their own in general, much less on an expedited timeline. Additionally, our staff have recently experienced judges denying reasonable requests, such as administrative closure for children with claims for relief before USCIS. I personally witnessed an Immigration Judge in Phoenix conduct group master calendar hearings rife with due process issues in which children were forced to answer the judge's questions related to notice, service, and, notably, best language out loud and all at once. Practices such as these all but guarantee that, without robust UCP services in place continuously, children's cases will be expedited in a way that deny children the opportunity to reunify with sponsors and will result in children being ordered removed not because of the merits of their case, but because of their age, developmental stage, lack of education or language abilities, and lack of knowledge or understanding of the legal requirements.

41. The due process cost of so many unaccompanied children potentially losing experienced pro bono counsel across the state of Arizona, and indeed the nation, at the same time, is

also going to be unmeasurable. Florence Project staff currently represent many children who will suffer immediate harm if we are unable to continue representing them pro bono.

42. For example, Florence Project attorneys currently represent a set of siblings who fled their country of origin after their mother died and their sister was murdered in front of one of the siblings. All three have applications for asylum pending before USCIS and they have been recently approved for SIJS with deferred action. Both are processes that will require additional complicated legal work, including potential asylum interviews and adjustment of status applications among other things, which will require the assistance of an attorney. Additionally, given the rapidly changing landscape in immigration law, policy, and enforcement, it is apparent that these children will likely require additional support for legal counsel while their process is pending. Indeed, just recently, despite having actively been participating in their immigration process – they had attended USCIS biometric appointments and receiving approved I-360 Petition for Special Immigrant Juvenile Status with deferred action, and the immigration court case was already concluded with non-opposition by DHS to allow them to move forward with the USCIS process – despite all of this, armed immigration enforcement officers came to their home claiming they were "missing" and demanding to speak to them about their cases. While seasoned attorneys work diligently to keep abreast of changes in immigration law, policy, and enforcement and have training in how to respond to a situation like this, it is unreasonable to expect children like these siblings to do the same on their own. Additionally, with three children all needing legal services, the cost to hire private counsel would be a significant financial burden their sponsor. As such, the elimination of funding to support children like these would seriously harm these clients and cut to the very core of the Florence Project's mission and services.

43. In another example, Florence Project staff attorneys recently learned about two separate cases of children, both babies, under the age of two-years-old who are in one of the Arizona tender-aged shelters who are currently not getting reunified with their parents and require additional advocacy for the government to follow protocols established under the *Ms. L. v. ICE* settlement agreement – a settlement agreement arising out of the massive violation of rights of children and parents that occurred under "zero tolerance" family separation policies from 2017 to 2018. Like most two-year-olds, both of these children are pre-verbal and unable to advocate for themselves about anything, much less complicated matters involving legal settlement agreements and reunification policies. However, given the current termination of representation under the UCP, there is no funding to represent these children or even advocate for them in any way short of full representation. As such, Florence Project managers are currently assessing to what extent we will be able to help these extremely young children without any funding, knowing that we must either absorb the cost of representation for these extremely vulnerable children by drawing down on general funding or reassigning funds from other programs or stand by and allow the rights of these children to be violated.

44. Elimination of funding for the UCP program also creates an untenable system whereby access by legal advocates to children in detention will be left up to the government

offices and workers, who are at times the very people abusing and trafficking children. With this funding eliminated, children will have to pay for attorneys out of pocket, a concept which boggles the mind, especially considering the dearth of experienced immigration pro bono counsel in the United States. Moreover, there is already a serious shortfall of attorneys in Arizona who have the specialized experience needed to work on detained children's cases, which pose unique issues of law. The pool of attorneys willing to do the work is even smaller for children's cases, as many children's cases require additional expertise in juvenile law in Arizona, which all FIRRP attorneys have, but which many private practioners do not. Indeed, while immigration court is a federal system which allows attorneys barred in any state to represent clients, only attorneys barred in the state of Arizona may represent clients in state court proceedings; many private immigration attorneys who practice in Arizona (who may be barred outside of Arizona and legally work on federal immigration cases) may not even be qualified to represent unaccompanied children who require these state court proceedings.

45. Without federal funding for UCP work, access to counsel also will be largely left up to the ORR shelters. If this were to pass, it would create a clear conflict of interest, as ORR is often the perpetrator of abuse, mistreatment, or failure to follow legal protections for children. With the recent dismantling of the ORR Ombudsman office, and the Office of Civil Rights and Civil Liberties, children detained in ORR custody are placed in a system with even less independent oversight and accountability than before, which makes access to free counsel more important than ever.

46. Finally, elimination of access to the unaccompanied children who are detained in ORR custody for representation, for the first time since we began working with unaccompanied children 25 years ago, is deeply disruptive to our core legal service model and will directly harm children who will be deprived free legal and social services, attorneys to represent them in court or assist as friend of court when they are waiting to reunify with family members. Unaccompanied children, particularly those who are placed in LTFC shelters, or who remain in ORR custody during their removal proceedings, or who are near to turning 18 and require immediate urgent action on their cases to protect their rights, all groups children who the Florence Project now routinely represents as a matter of course, will have no means to pay any private attorney to represent them, leaving those who are in many ways the most vulnerable most likely to be denied their basic rights. The loss of funding to support these services cut deeply at the Florence Project's core mission and vision.  Children will no longer have caring advocates they can trust, who will get to know their cases through expert and age-appropriate methods and advocate for their expressed interests. Even the threat of loss of access and the resulting uncertainty it has caused within our staff has had a profound impact on the morale of our staff who have dedicated their careers to serving unaccompanied children; now, facing the termination of all but the most basic KYR services to the thousands of children we serve is devastating to staff morale.

47. Additionally, FIRRP's vision that every person facing removal have access to counsel, understand their rights, and be treated fairly and humanely is also severely undermined by the elimination of the UCP. First, for the majority of children in ORR custody in

Arizona, Florence Project attorneys and staff working under the UCP are likely their only access to counsel and opportunity to receive pro bono representation. Eliminating access to representation and friend of court services under the UCP will ensure that children are forced into removal proceedings – proceedings we have already seen are being accelerated and conducted in part using mass hearings that violate due process – without counsel. Termination of all but CLIN 1 of the UCP will effectively guarantee that more children in ORR custody in Arizona will go through their removal proceedings without an attorney to represent them or even help them navigate the system during their court process. No child should be expected to be able to learn immigration law and present a complex legal case against a trained government attorney, often in a language they do not understand, on their own.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of March, 2025 in Phoenix, Arizona.

_____
Roxana Avila-Cimpeanu
Deputy Director
Florence Immigrant and Refugee Rights Project

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

                Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

                Defendants.

Case No. 3:25-cv-2847

**DECLARATION DANIELA
HERNÁNDEZ CHONG CUY IN
SUPPORT OF PLAINTIFFS' MOTION
FOR A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION**

**DECLARATION OF DANIELA HERNÁNDEZ CHONG CUY
FOUNDER, DIRECTING ATTORNEY AND OWNER OF THE LAW OFFICE OF
DANIELA HERNÁNDEZ CHONG CUY**

*I, Daniela Hernández Chong Cuy, make the following statements on behalf of myself and the Law Office of Daniela Hernández Chong Cuy. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Daniela Hernández Chong Cuy and I am the founder, owner and Directing attorney of the Law Office of Daniela Hernández Chong Cuy, a Professional Corporation. ("Law Office of D. H. CH. C."). Based in Pasadena, California, the Law Office of D. H. CH. C. provides comprehensive legal representation to unaccompanied immigrant children formerly in the custody the Office of Refugee Resettlement ("ORR") in Los Angeles, San Bernadino, Ventura, and Riverside counties. We are also the sole legal service provider for two ORR long-term foster care facilities: Building Bridges Foster Family Agency in Ontario, CA, and MarSell Wellness in Montebello, CA.

3. In order to carry out this mission, the Law Office of D. H. CH. C. has several main work components: (1) Representing children in long-term foster care under ORR custody in immigration proceedings; (2) Representing unaccompanied minors who are not in ORR custody in immigration proceedings; and (3) Providing educational services in the form of legal education "know your rights" ("KYR") presentations for unaccompanied minors under the Post-release Initial Legal Service ("PILS") program.

4. The Law Office of D. H. CH. C. has been providing legal services for unaccompanied immigrant children in California since May 2023. In May 2023, as subcontractors of the Unaccompanied Children's Program, we began providing legal representation for children detained in an LTFC in Ontario, California, and for unaccompanied minors who were no longer in ORR custody in Los Angeles, San Bernardino, Ventura, and Riverside counties. In 2024, our services under the contract expanded to include a second LTFC facility in Montebello, California, and to cover a larger number of released unaccompanied children.

1

5. Since 2023, our office has initiated a combined total of 75 cases. In 2024, we initiated representation for 15 children in long-term foster care and 27 children that have been released from previous ORR custody—a total of 42 children just that year. Just in the first few months of 2025 alone, we have initiated representation of eight unaccompanied minors in long-term foster care, which is likely explained due to the uptick of children in need of long-term care.

6. Currently our office has 60 open cases under the ORR contract. To fulfill our duties as a provider of legal services for unaccompanied minors, I have had to restructure my business model and the clientele my Law Office serves, limiting the number of private clients I can take at any given time to accommodate the growing demand of competent legal service providers for this vulnerable population.

7. With U.S. Department of Health and Human Services ("HHS") funding, the Law Office of D. H. CH. C. has maintained four staff members dedicated to providing legal services to unaccompanied immigrant children.  Specifically, our team is composed of two full-time attorneys, including myself, and two full-time paralegals. Our fourth and most recent hire was welcomed to our team in October 2024.

8. Staff providing representation and KYR presentations to children in long-term foster care regularly travel to meet each child in person to conduct client interviews and prepare clients for Immigration Court hearings. Our staff visits the facilities at least once a month, with in-person visits often occurring on a bi-weekly basis. The LTFC clients can also request a virtual meeting with their attorney for faster and more convenient scheduling; we take these sorts of meetings at least twice a week. In-person visits can range from one to four hours, depending on the legal work to be done and the youth served on each visit. Child representation requires a trauma-informed approach, so the work cannot be rushed. The clients will set the tone and pace for our work and conversations.

9. In addition to providing representation in removal proceedings before the Immigration Court, we provide representation for unaccompanied children before United States Citizenship and Immigration Services ("USCIS") and California Family, Probate, and Dependency court as needed.  A majority of the children we represent are eligible for Special Immigrant Juvenile Status ("SIJS"), a critical form of immigration relief for children who have suffered abuse, abandonment, or neglect. SIJS proceedings are especially pertinent to children in long-term foster care, who require dependency courts to designate an institutional caregiver to ensure their well-being.  Many children we serve are also eligible for asylum, as they fear persecution in their countries of origin.  Our office provides services not only to initiate their asylum applications, but to accompany them to their critical asylum interview before USCIS.  Other children we serve are eligible for U Nonimmigrant Visas, as they have been victims of criminal activity in the United States,

2

thus we provide representation before the necessary law enforcement agencies to prepare their case.

10. A large part of our ORR contract focuses on serving unaccompanied children in long-term foster care. Unaccompanied immigrant children are placed in long-term foster care when they have no one in the United States who is available to care for them. These children require a particular form of representation, due to the increased vulnerability of not having an adult to be released to in the United States. Due to their circumstances, children in long-term foster care do not have the financial resources to pay for an immigration attorney. Further, many of these children experienced severe abuse, neglect, or persecution in their countries of origin, and require trauma-informed advocates to help them navigate the complex world of immigration law. We have clients as young as two years old, who would be unable to represent themselves before any court or government agency or to find a paid attorney. We represented a client belonging to the Hazara/Suni ethnic and religious minority who fled Afghanistan after the takeover by the Taliban regime in 2021; we helped him prepare and present his asylum application before the Los Angeles Asylum Office, and file other applications for relief before USCIS, all complex procedures he would be unable to navigate on his own, due to age, and cultural and language barriers. We have an indigenous Raramuri client, a 16-year-old girl who has no known direct relatives either in Mexico or in the United States; we provided representation for the appointment of an institutional guardian in state court and just received notices of approval of her SIJS application. We advocated before multiple stakeholders so that a family of four young children from Angola be released from ORR custody to reunify with their family in Canada. None of these clients would have been able to seek relief without our assistance.

11. Our work is critical not only in preserving our clients' access to justice, but in ensuring that the Immigration Court's juvenile docket runs efficiently. The consistency in the way we have provided legal representation for our detained clients and prepared applications for relief during the past two years has led to an efficient management of the juvenile docket at the Immigration Court in Santa Ana, California, where our cases are routinely terminated or administratively closed. This avoids unnecessary delays, alleviates the Court's and ICE's case load, and directs resources where they may be best and most efficiently used. Our advocacy for our clients ensures that the due process rights of children in immigration proceedings are respected without need of the Immigration Court mandating unnecessary continuances of their proceedings, or without requiring that the Immigration Judge take additional time to explain to the children before them their rights in those proceedings and how they could in theory advocate for themselves. In every court appearance, Immigration Judges have expressed their gratitude for our work.

12. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs).

Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025

13. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children as well as other non-representation services such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2, and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place CLIN 1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities, and CLIN 5, which funds Immigrant Justice Corps fellows who represent children not covered under other CLINs. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

14. On March 21, 2025, I was notified via email communication by the Acacia Center for Justice that a stop work order had been issued for all the legal work we do under the unaccompanied children's program. Immediately, I communicated this message to my team, ordering them to cancel any activity that was not strictly necessary to fulfill our ethical duties and giving them the rest of the guidelines necessary to comply with the order.

15. When I learned about the stop work order and termination of the contract, my office staff was in State Court attending to guardianship hearings for LTFC clients, and in the LTFC program we serve. As soon as I was able to speak with them, I informed my staff to cease all work under the contract. Our office is scheduled to appear in Court on Friday, March 28, 2025, on two separate cases, and to prepare for asylum interviews with the Asylum Office and respond to USCIS notices before April 1, 2025. Until I am able to determine how to proceed on each one of the cases without being in violation of the rules of professional conduct, I plan to appear in Court for our scheduled cases, and to attend all legal and court mandated deadlines, so long as it is financially feasible.

16. Earlier today, the Lead Case Manager for one of the LTFCs my office serves, requested that I make arrangements to speak with our clients tomorrow, March 27, 2025, to inform them of the termination of the contract, per the request of their Regional Director. At this point, I continue to navigate the ethical implications of the termination of the contract and

4

the impact this will have on representation of my detained and non-detained clients. I respectfully declined the program's request and informed them that termination of the contract does not automatically terminate legal representation, and that I will schedule to speak with the minors as soon as I am able to provide them with clear responses of the full extent of the implications of the termination of the contract.

17. Currently, the funds we receive for our unaccompanied children's work accounts for 70-75% of our overall budget. Similarly, most of the work we perform on our daily operation relates to these contracts. As a small firm, our entire staff is affected by a loss of unaccompanied children's funding. Before we entered into this contract with ORR, my Law Office was not dependent on this funding, but its demands have required me to restructure my Law Office's clientele and expand my staff. From May 2023 to September 2024, we managed to operate with two attorneys and one paralegal; we welcomed the fourth member of our team in October 2024. Because my office is a private practice, the partial termination of this program will have a severe financial impact on the operation of my Law Office. Within two months I will not be able to cover the financial obligations towards my staff or cover the cost of our daily operations. As a private practice, we are established as an "S" corporation, and do not have the tax structure or lobbying capacity necessary to secure the external funding required to solvently continue providing these types of legal services without the payment previously contracted.

18. For the duration of the original stop work order which occurred on February 18, 2025, we were fortunate enough to continue providing the strictly necessary legal services to our existing clients and fulfill our ethical duties with minimum repercussions. Still, we were forced to reschedule appointments with clients and provide services like attending court hearings without knowing if we were going to be compensated for the work done, while avoiding unnecessary stress or burden for our clients.

19. The effects of the current termination on our office are immediate. The impact on our morale is severe, as it forces us to restrict communications and services presented to our clients to the bare minimum, which is contrary to our client-centered approach. Moreover, it will not be possible to provide a living wage to my staff and quality legal services to my clients as a Law Office without unaccompanied children's funds. A shutdown of the unaccompanied children's program income leaves us in the precarious situation of having *de facto* 60 new unfunded clients, from our total of approximately 150 clients, to whom we have a duty to continue to provide service, at least for the foreseeable future. Under the California Rules of Professional Conduct, attorneys in general *may* withdraw from their representation if they are paid for services if the client breaches the agreement and the attorney gives them reasonable time to secure new representation, amongst other conditions. However, the representation contract we entered with the children from the unaccompanied children's program is pro bono. That is, our attorneys cannot unilaterally terminate their client's legal representation solely for lack of payment or professional

funding, particularly because it would be highly prejudicial for them as unaccompanied children while they are detained or underage. Under Rule 1.16(d), a lawyer shall not terminate representation until they have taken reasonable steps to avoid reasonably foreseeable prejudice to the rights of the client, such as giving the client sufficient notice to permit the client to retain other counsel or obtain a copy of their legal file. It is very difficult to see a scenario under which our young clients under long-term foster care, ages 2-17, would be able to retain legal counsel on their own or to be able to present competent representation that would make our withdrawal permissive under California Rules.

20. Continuing to operate with at least 60 unfunded clients for the foreseeable future will likely bankrupt my small business. It will force me to incur significant debt to try to once again redistribute the ratio of my client portfolio to serve additional private clients. With my reduced staff, and considering that we already serve over 150 clients, it would be nearly impossible to manage a clientele restructuring while maintaining a full staff and sound finances.

21. In addition, on January 8, 2025, my house was completely destroyed in the Eaton fire, in Altadena, California. This forced my family of three, including my two-year old, to be displaced. It was not until March 1, 2025, that we were able to secure temporary housing. The disaster my family experienced disrupted my business operations. While my office continued working, and the rest of my staff was spared from the fire, I had to take extraordinary measures to be able to respond to the stop work order and the financial implications that followed.

22. When I started the Law Office of D. H. CH. C. in 2020, I wanted to create a private law practice that could provide both a balanced environment for my staff and provide services so that clients of all backgrounds and resources could find competent and caring legal services. To this day, we aim to provide zealous, competent and holistic representation to our clients in the immigration system, whether detained or non-detained, and at all stages of their immigration removal proceedings. Our mission is still to provide client-centered and trauma-informed legal representation. I hope that we can carry on with this vision without it leading to financial ruin.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on the 26 of March 2025, in Pasadena, CA.

_____

**Daniela Hernandez Chong Cuy**
**Directing Attorney/Owner**
**Law Office of Daniela Hernández Chong Cuy**
**UCP Legal Service Provider**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

Case No. 3:25-cv-2847

**DECLARATION OF ANA RAQUEL
DEVEREAUX (MIRC) IN SUPPORT
OF PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION**

**DECLARATION OF ANA RAQUEL DEVEREAUX**

**SENIOR MANAGING ATTORNEY FOR MICHIGAN IMMIGRANT RIGHTS CENTER**

*I, Ana Raquel Devereaux, make the following statements on behalf of the Michigan Immigrant Rights Center. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Ana Raquel Devereaux, and I am a Senior Managing Attorney at the Michigan Immigrant Rights Center (hereinafter, "MIRC"). MIRC is a non-profit organization that provides free legal services for children and other non-citizens who have suffered abuse, trafficking, and persecution. MIRC is the only organization serving unaccompanied children in the custody of the Office of Refugee Resettlement (hereinafter, "ORR") in Michigan and the primary organization providing legal services to children in the unaccompanied refugee minor program in Michigan and to children released from ORR custody to sponsors in Michigan.

2. Michigan Immigrant Rights Center (MIRC) is a legal resource center for Michigan's immigrant communities. MIRC works to build a thriving Michigan where immigrant communities experience equity and belonging. The Michigan Immigrant Rights Center is a program of                                                    . MIRC has five local offices throughout the state of Michigan which provide direct legal services to unaccompanied children and also provide general community immigration legal services. Our five local offices are located in Detroit, Ypsilanti, Lansing, Grand Rapids, and Kalamazoo. These five offices are supported by a statewide structure within MIRC to provide training, administrative and supervisory support, community engagement, and pro bono support.

3. In order to carry out this mission with respect to providing legal services to unaccompanied children, MIRC has several main work components: (1) Providing educational and pro se services in the form of legal education "know your rights" ("KYR") presentations, conducting individual consultations (intakes), and conducting pro se workshops with all unrepresented children in ORR custody in Michigan; (2) Representing unaccompanied minors who are not in ORR custody in immigration proceedings; and (3) Representing children in ORR custody in immigration proceedings. We further host Immigrant Justice Corps (IJC) fellows to represent unaccompanied children in removal proceedings and provide Spanish-language support for staff representing unaccompanied children.

4. MIRC has been providing legal services for unaccompanied immigrant children in Michigan since 2009 at a smaller scale and with a dedicated unaccompanied children's

1

team beginning in 2017 when MIRC received its first subcontract to serve children in ORR custody in Michigan. That first contract focused on providing KYR presentations, legal screening, support for hearings, and representation as needed for all children in short-term ORR custody in Michigan and providing universal immigration representation to all children in long-term ORR custody in Michigan.

5. Since 2017, the ORR bed capacity in Michigan for short and long-term shelters and foster care facilities has expanded significantly to its current capacity of 335 short-term beds and 122 long-term beds. In 2021, MIRC's subcontract expanded to permit MIRC to offer representation to children in Michigan who have been released from ORR custody and are in removal proceedings. MIRC has grown its capacity to represent released children from 240 to 565. Additionally, in 2021, an Emergency Intake Site was opened in Michigan with 225 beds. MIRC served all of the children in that facility by providing KYR presentations, conducting intakes, and conducting pro se workshops with all unrepresented children in ORR custody in Michigan, and offering representation, especially when the facility turned over its population and housed most of the Afghan Unaccompanied Minors who arrived in ORR custody and the contract provided for and required asylum and work authorization for these youth while in ORR custody. MIRC continues to serve all ORR beds in Michigan and remains ready to expand to serve any additional facilities that serve unaccompanied children in the state and to reach as many released children for representation as is within our capacity, which we have continually expanded to address the unmet need in the state of Michigan. At this time, we serve the following facilities: BCC Caminos Nacional – Michigan Children's Home Society, Bethany Christian Services – Wedgwood Christian Services, Bethany TLC, Bethany USCCB (Bellaview and Casa del Sol), LIRS – BCS MI Kalamazoo LTFC – Casa de Esperanza, LIRS – BCS MI Kalamazoo LTFC TGH – Hacienda De Luz, Samaritas LTFC, LIRS–BCS MI Alma Shelter, LIRS–BCS MI East Lansing TFC, LIRS–BCS MI Grand Rapids Shelter – TAC, LIRS–BCS MI Grand Rapids TFC, LIRS–BCS MI Holland TFC, LIRS–BCS MI Muskegon TFC, USCCB Catholic Charities West Michigan TFC, Samaritas Shelter – Grand Rapids,  Samaritas URM – LIRS – Lansing, MI , Bethany Christian Services URM – USCCB – Kalamazoo, MI , Bethany Christian Services URM – USCCB/LIRS – Grand Rapids, MI , Bethany Christian Services URM – LIRS – Traverse City, MI.

6. With U.S. Department of Health and Human Services (HHS) funding, MIRC currently has 147 positions serving children in and released from ORR custody in Michigan. Specifically, these 147 positions encompass 113 full-time employee's worth of funding and dedicated services to unaccompanied children. Of these roles 58 are attorney staff roles (including attorney managers), 3 of which are Immigration Justice Corps Attorney Fellows, 47 are paralegals (all of whom are either DOJ-Accredited or are working towards their DOJ-Accreditation), 13 are paralegal supervisors, and the remaining staff

2

focus on data reporting, administrative case support, case intake, training, and communication.

7. Staff providing representation and KYR presentations to children in ORR facilities regularly travel to each facility in person to conduct client interviews, prepare clients for hearings, as well as provide legal education, individual consultations, and pro se workshops for pro se children.  MIRC serves children in 9 short-term facilities, which range in size from 12 beds to 36 beds. Each week, MIRC staff visit the facility one to two days to provide KYRs and intakes with each child who has arrived within the last week and also to provide follow-up services to children who have been at the facility for an extended time or are otherwise in need of representational legal services. Additionally, the children come to our offices one additional day during the week as that additional time is usually required to complete all the services within the contractually required 7-10 business day period after their arrival in custody.   Additionally, we have 8 long-term ORR facilities in Michigan, ranging in bed size from 8 to 32. When children arrive to long-term ORR facilities, MIRC assigns an attorney/paralegal team to meet with the child and offer representation within 30 days of their arrival.

8. For children released from custody, the children are either referred through the Acacia-facilitated referral system, UCORD, or by calling our intake line, once we determine that the child meets the eligibility criteria while offices are accepting new cases, we then meet with the child within 30 days to offer representation. For children with whom we have entered representational agreements, MIRC's legal teams represent children in state and immigration court, file petitions with USCIS, file motions and petitions with the immigration court, file mandamus and habeas actions in the Eastern and Western Federal District Courts in Michigan, file appeals with the Michigan Court of Appeals, USCIS, EOIR, the BIA (and in similar cases, we have proceeded as far at pursuing appeals in 6th Circuit Federal Court of Appeals, but it has not been necessary yet for a case under this contract), as well as pursue other advocacy efforts within ORR and other spaces where unaccompanied children are detained and/or receive services.

9. Children in short-term ORR custody have just arrived in this country and generally have never been in a formal custodial system. They speak many different languages and have a variety of educational backgrounds, ranging from no formal education to middle school level schooling, including high school-age children because they have rarely had high school educational opportunities. Due to all of these factors, they are not yet equipped with the resources to fully understand what rights they have while in custody and it is essential for them to meet with legal services providers to understand that they have a right to bodily safety, contact with family, medical care, and educational services, among other rights guaranteed in the Flores Settlement and the Foundational Rule. Additionally, the immigration legal system is extremely complex and nuanced, and without an orientation with a legal service provider, it would be near impossible for children, let

PI Appeal and Stay Addendum 569

alone the non-attorney staff at these short-term custodial sites to be able to explain, to understand critical pieces of the system that affect them, including the importance of keeping addresses up to date and attending immigration hearings (and even how to understand the notices that arrive indicating when a hearing will occur).

10. A reality that must be addressed is that children in custody are incredibly vulnerable by the nature of a custodial system where the vulnerability factors for sexual and physical abuse are extremely prevalent. A bad actor may take advantage of these systemic vulnerabilities. If these children do not have access to legal counsel that is independent from ORR and the organizations that sub-contract to provide the custodial services, these children surely will face even greater levels of abuse in custody. MIRC intervened and represented children in 2023 when there was an instance of systemic sexual abuse of children in short-term custody in one of the ORR Michigan facilities. MIRC worked to represent individual children, supporting them in reporting to law enforcement and participating in the prosecution of the crime, and holding agency staff and ORR leadership accountable for ensuring further protections are put in place for future children in custody at that facility. Additionally, MIRC represented individual children who faced abuse in ORR foster homes and as soon as the child disclosed the circumstances to MIRC, we ensured they received protection and there was accountability for the individual and systemic failures that harmed the child.

11. In Michigan, if MIRC did not provide these services under the HHS contract, it would be impossible for the majority of the children to receive representation. The private bar in Michigan is relatively small and generally at capacity. Very few private immigration practitioners take children's cases, due to the specialty area of law it encompasses. The few attorneys who do take the cases will charge $10,000 on average, which is outside of reach for most children released to the community and impossible for all children in ORR custody who by definition have no family or financial support in the country. Before MIRC began working under the contract, we would receive frequent calls from staff at the ORR facilities asking us to take the cases because no one else would do so, but without offering any funding for the work. We turned down a large number of these cases due to a lack of capacity.

12. Since MIRC's founding in 2009, MIRC has engaged in recruitment and mentorship of pro bono attorneys to the fullest extent possible, but a significant challenge has been that in the state of Michigan, pro bono attorneys do not generally have immigration expertise, only speak English (and unwilling to pay for interpretation for pro bono cases), and are unwilling to commit to the timeframe of children's immigration cases or with the special care needed when working with children. Only recently have we had some small success involving pro bono attorneys in our children's work, and it has been because the HHS contract funds language support for the pro bono attorneys and we have a dedicated team to train and support those pro bono attorneys. Even with this support, the pro bono

4

attorneys will usually only offer support in small ways and rarely or never take on full cases for representation.

13. A few other small non-profit legal service providers exist in the state of Michigan, but all of them are quite small and have only had capacity to focus on primarily adult and USCIS-only representation, leaving no other non-profit options for children in removal proceedings aside from MIRC.

14. In addition to MIRC providing the only available and financially accessible legal representation for unaccompanied immigrant children in the state of Michigan, MIRC dedicates significant resources to ensuring the staff MIRC hires are culturally humble, are passionate about serving immigrant children, are trained in best practices for trauma-informed and child-friendly legal services, follow strict child abuse prevention guidelines, and as much as possible share cultural, linguistic, and experiential backgrounds with our child clients.

15. Under the unaccompanied child legal services program, since 2017, MIRC has entered representation for 1,697 children, provided 5,686 Know Your Rights sessions, 4,061 legal screenings, and identified 6,158 potential pathways for relief for our young clients. We have represented children as young as 10 months old. In 2024, MIRC offered legal services and representation to children who spoke 62 different languages MIRC has filed asylum for 725 children, with an 83% approval rate, and filed 351 applications for permanent residency, with 155 of those already approved (the remaining are pending). MIRC currently has over 900 cases open for unaccompanied children in removal proceedings. These numbers result in real, meaningful changes in the lives of children and families, children who grow up to thrive and be part of our communities.

16. MIRC has represented children fleeing abuse, including those who were regularly whipped with electric cords or who faced ongoing sexual abuse with no hope of protection from their communities. MIRC has reunited children with loved ones–children should have the opportunity to be children and the law requires them to be placed in the least restrictive environment feasible, the best place for a traumatized child is with the family or community members with whom they feel most comfortable. These were courses of action that required a lawyer due to their complexity, the legal expertise required, the many logistical barriers within USCIS and immigration court. Without legal representation, these children would have been forced to return to situations of abuse, persecution, and lack of safety due to the inability for a child to meaningfully present their case.

17. We have also represented children who have been trafficked, such as children who were forced to do dangerous work and beaten when they were too sick to go to work. One of the most powerful tools that traffickers use is the threat of deportation to intimidate their

5

targets. Taking lawyers away from children strengthens traffickers' hands. Many times our legal services have prevented children from falling through the cracks–sometimes by identifying abuse in custody and supporting children in coming forward to authorities about such abuse and sometimes by helping children who find themselves in an unsafe situation obtain safe housing or meet other needs to escape violence.

18. In addition to the work we do for children in and released from ORR custody in Michigan, we also work to connect children with counsel when they are moved to an ORR placement outside of Michigan or are released out of state. We work with the child and use the information we obtained during intake consultation to prepare a referral and have staff dedicated to following up to do our best to connect children to free legal counsel in their new location.

19. MIRC is well respected among the local state courts, immigration courts, ICE, USCIS, and local ORR subcontractor staff. MIRC developed norms with each ORR-subcontracted facility by having quarterly meetings to work through logistics and continue to uphold best practices on behalf of the children in custody. Staff from these agencies regularly express their gratitude for MIRC staff and how essential they are for the children. MIRC and the immigration court staff developed a weekly call framework where MIRC efficiently funnels the matters needing the court's attention through one central point of contact, rather than having more than fifty representatives reaching out individually to get questions answered or provide information. The court regularly approaches MIRC for support for pro se respondents and in support of MIRC remaining on the court *pro bono* list (MIRC is the only organization on that list in Michigan). MIRC regularly engages with ICE and USCIS both in representational settings and in stakeholder engagement contexts respectfully and collaboratively on behalf of the clients when possible. One of Detroit's Immigration Judges recently took some time after a hearing to thank our staff member for working for MIRC and for all the great and important work MIRC does.

20. Additionally, MIRC received the Champion of Change award in 2024 from the Governor's Task Force on Child Abuse and Neglect and Children's Advocacy Centers of Michigan, as part of the nomination for the award, Veronica Thronson, leader of the Michigan State University College of Law's Immigration Clinic, was quoted as praising MIRC as follows:

> The nominee has been a champion for children since its inception, through direct representation of children and their families in seeking protection in immigration and state contexts... These children have been abused, neglected, or abandoned in the State of Michigan. MIRC's team has grown from two attorneys to its current size of [, with] staff members focused specifically on protecting the rights of children in federal custody in Michigan, achieving permanent protection for

children through state and federal courts, and advancing the law to create the greatest access to these protections for all children in Michigan. MIRC has stood in the gap during family separation under the Zero Tolerance policy and ensured that all children in Michigan were reunited with their families according to their wishes. Further, MIRC has held the federal government and its subcontractors accountable when children's rights were violated in federal care in Michigan, in licensed and unlicensed facilities. The nominee has led efforts to try to ensure responses to abuse in custody are trauma-informed and provide the protection needed for children in care. Illustrative of the difference that the nominee's services have made in the lives of children, in 2023 alone, the nominee served over one thousand children through Know Your Rights presentations, legal screenings, and direct representation in immigration, state court, and before immigration agencies. Also in 2023, the nominee secured state court protections in multiple counties and began a path toward citizenship for hundreds of immigrant children. More stable immigration status allows children to thrive in all other aspects of their lives.

The nominee recently added an innovative team to address social, emotional, and physical needs, which has already assisted over 150 children. The nominee has increased knowledge of protections for immigrant children in state courts throughout Michigan, creating a safety net for children across the state. These children who are released to sponsors or relatives frequently went without access to an attorney before the nominee's programming emerged to serve them. MIRC has been the leader in appellate cases that have enshrined protections available under the law to immigrant children who have been abused, neglected, or abandoned. In particular, the nominee has won two critical appeals that serve as seminal case law impacting immigrant children in Michigan.

The nominee leads several collaborative efforts with stakeholders to enhance outcomes for children, through joint advocacy, training, and resource sharing. As new populations of immigrant children enter the state, the nominee has taken a leading role in assisting service providers to be ready to welcome children in a culturally informed and humble manner. Where necessary, the nominee has advocated on behalf of children whose religious and cultural needs were not fully met by other service providers and to ensure that children who are victims of sexual assault, human trafficking, and other crimes are met with a holistic and culturally sensitive response. For example, the nominee has worked with law enforcement to inform them of the impact of trauma on specific populations, such as youth arriving from Afghanistan who had been evacuated during the Taliban's takeover and who had been separated from their families.

The nominee has also championed change through legislative advocacy at the

7

state level to enhance protections for children who are harmed through child labor, to expand access to Medicaid to children in need, and to ensure language access for state services. In particular, the nominee has partnered with state legislators to increase protections for children exposed to exploitative labor practices, partnering with various stakeholders and leaders to testify on the needs of children to local, state, and national media.

Overall, MIRC has changed the landscape of representation for immigrant children for the better in ways that are measurable in the law and the experience of children and their families in the community. Over the years, thousands of children have safety, stability, and the opportunity to thrive in no small part due to the team focused on the rights and representation of immigrant children in Michigan that the nominee has been able to cultivate and grow and seeks to keep doing so to continue to serve children.

21. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs): 1. KYR presentations and legal services for pro se children in ORR facilities; 2. Legal representation for unaccompanied children not in ORR custody; 3. Legal representation for unaccompanied children in ORR custody; 4. Spanish language tutoring for organizational staff who work with children; and 5. Immigrant Justice Corps fellows who represent children not covered under other CLINs. Without further elaboration on duration or reasoning, the stop work order states that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance."

22. Some MIRC staff were on a virtual meeting led by the Acacia Center for Justice on other matters when the Acacia Center for Justice received notice of the stop work order around 1:00 PM EST. Information was shared on that call and an email was sent shortly thereafter to the entire network. We then immediately had to sort out what this meant in practice and how to ensure every staff member received the information and began to act accordingly. We had an urgent leadership meeting to understand the stop work order and attended an Acacia call hosted on the topic of the stop work order and then held a meeting for our team to explain what we knew at that point, which was very little.

23. During the stop work order, MIRC used a small fund reserve to ensure our clients had the best possible service for as long as possible. The stop-work order did not cut off legal representation for children who are already represented. Because MIRC's lawyers had already filed paperwork with the court and USCIS as the attorney of record for our cases, they are obligated to continue representation or face the possibility of sanctions or bar complaints — unless they ask a judge to be removed from the case, which takes time and

8

has very specific ethics rules that guide how to make this request and when and if a judge will grant it. These reserves can only carry our staff for a few weeks. Roughly 80% of MIRC's budget is funded through the unaccompanied children's HHS funding. If we lose this funding in the long term, we would expect to let go of all of 113 employees, in other words, we do not expect meaningful replacement funding that would allow us to carry on the work under this contract. We would also need to seek to withdraw from all of the 1,205 open cases under the contract and would need to use reserves to have staff focus on that work. The reserves are a critical part of MIRC's long-term sustainability, so the Stop Work Order and any other loss of funding under this contract affects MIRC's other work in the community for other vulnerable populations.

24. During the stop work order, we paused offering KYRs and intakes for children in ORR custody and focused on using our limited resources to maintain our ethical obligations to current child clients.

25. Time spent on stop-work order logistics cost us valuable time in needing to communicate, understand, and change our case management practices to account for the change under the stop-work order. More than that, it has caused a significant feeling of instability, stress, and low morale. MIRC's highly trained, experienced, and specialized staff are beginning to put in their resignation notices to go to jobs that have more funding security. MIRC has built an outstanding reputation as an employer and has been able to attract unusually high quantities of staff to our work, compared to similar local non-profits, because of our commitment to the community, our stable funding, and our efforts to train and support our staff in their work. This reputation is being significantly undermined by the stop work order and the subsequent lack of security around the ongoing funding of the contract and it will make it harder to attract new staff in the future to replace those who have left during this time.

26. When the stop work order was rescinded, MIRC resumed providing all services under the UCP contract. On March 21, 2025, MIRC received notice of ORR's termination of CLINs 2, 3, and 4 of the Acacia UCP contract, effective at the close of business that day.

27. MIRC currently represents over one thousand children under the Acacia UCP contract CLINs 2 and 3 work. These cases involve representation before Michigan local state courts, USCIS, and the Detroit Immigration Court. Without CLIN 2, 3, and 4 funding, MIRC will begin an immediate process to withdraw from these cases. Even though we have made significant efforts to fundraise with individual, foundation, and local government funding, there is no meaningful replacement for the funding offered for representational services of unaccompanied children under the UCP contract. Our alternate fundraising may allow us to keep as many as 100-200 cases open, which would leave over 800 children whose representation we will need to withdraw from immediately. While we will begin our efforts to withdraw from the cases for which we

9

did not obtain alternate funding, the process of withdrawal takes some time with ensuring the proper wrap-up tasks have been completed so the client is not unduly prejudiced by the withdrawal and counsel needs to formally seek to withdraw where we have entered appearances before tribunals, which takes time and is subject to the decision of the judge on each case.

28. While we have attempted to do the most we could for each client before we were in the position, we still have many clients for whom no relief has been filed because we have only begun working on their cases recently or there were external hurdles to accomplishing our initial goals in the case. Almost every one of the children MIRC represents qualifies for protection under the immigration law, however, it is a lengthy, arduous, and legally complex process that allows us to usher the client to the point of receiving the immigration status they qualify for. Many of the children whom we will no longer be able to represent due to the termination of CLINs 2, 3, and 4 of the UCP contract will be unable to secure new counsel and be unable to navigate the immigration processes without counsel, and so will be left without protections they qualified for and will be deported to situations where they would face abuse, neglect, persecution, separation from critical caregivers and services. In all of this, expecting these children to face the immigration system without counsel will have deprived these children of their right to due process under the law.

29. CLINs 2, 3, and 4, comprise about 75% of MIRC's budget. Of the 113 full-time employee's worth of funding in our UCP budget, about 98 of those are in CLINs 2, 3, and 4. If funding from CLINs 2, 3, and 4 is not restored within a few days, MIRC will need to proceed to provide layoff notices to the majority of staff funded under those CLINs. We are able to use some of the funds we raised to allow us to provide staff a short notice period to withdraw from cases and honor their rights as employees. Even this little bit of essential transition period after a layoff notice, will cost MIRC at least 1.2 million dollars of funds drawn from other sources that take away from MIRC's ability to serve other vulnerable populations.

30. However, if the restoration of CLIN 2, 3, and 4 funding is delayed any more than a week and we have already given staff their layoff notices, we expect most staff will still seek to depart, even if funding is restored, because of the uncertainty and individualized detriment to their morale to know they specifically were not retained. Even as we have been nearing the end of the contract period, more and more staff have been departing, especially our more seasoned staff, because the earlier stop work order gave them concern for the future of the funding.

31. If the restoration of CLIN 2, 3, and 4 funding is delayed any more than a month, and we would be in a position to have to rehire for the work, it would be unlikely that most of the laid-off staff would be interested in returning. Before this season of funding uncertainty,

10

MIRC has been close to exhausting the hiring pool of those interested in and able to do work under the UCP contract, especially where attorneys are concerned, and so I expect our success in bringing on new staff would be limited, to begin with, and it would cost us the months of labor in recruiting, hiring, onboarding, and building their familiarity with the work that it takes to return to the staffing norm we have now.

32. Beyond the cost to the staff themselves, the cost to the clients of closing cases, laying off staff, then having to bring on new staff, and trying to reach out to clients to try to offer them representation again is devastating, specifically shattering those relationships of trust which have taken so much to build. A stable and trusting relationship is critical for children. They will have no reason to trust our ability to continue to keep their cases and they will have to build relationships with new people, assuming they are available, which is already hard for anyone having to share the most traumatic details of their life story in order to pursue immigration relief, but it is especially hard for a child in that situation.

33. The uninterrupted and ongoing funding of this work with unaccompanied children is critical to the protection of children from harm in custody and against the significant risk posed by going through removal proceedings without counsel and the subsequent harm that would result from removal. Not only that, but the stability of this funding is critical to MIRC's ongoing work as an anchor immigrant rights organization.

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing is true and correct.


Executed on the 22 of March 2025, in Lansing, Michigan.


Ana Raquel Deveraux (P79145)
Senior Managing Attorney
Michigan Immigrant Rights Center

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

           Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

         Defendants.

Case No. 3:25-cv-2847

**DECLARATION OF JILL MARTIN
DIAZ, ESQ. (VAAP) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

## DECLARATION OF JILL MARTIN DIAZ, ESQ.
## EXECUTIVE DIRECTOR FOR VERMONT ASYLUM ASSISTANCE PROJECT

*I, Jill Martin Diaz, make the following statements on behalf of Vermont Asylum Assistance Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Jill Martin Diaz (they/them pronouns and Mx. honorific), and I am the Executive Director at Vermont Asylum Assistance Project (VAAP; www.vaapvt.org). VAAP is a nonprofit immigration law firm dedicated to expanding access to critical legal services for noncitizens across Vermont. VAAP grew from years of grassroots advocacy to meet low-income Vermonters' increasingly urgent needs for structured, equitable, and trauma-informed immigration representation. Today, VAAP is Vermont's only firm dedicated to providing legal services to indigent unaccompanied immigrant children exiting detention, other youth and adult subpopulations in removal proceedings.

2. VAAP is a legal services organization committed to expanding access to immigration legal knowledge and direct services. We envision a Vermont where noncitizens fully understand and access their legal rights, and where immigrant and mixed-status families feel a true sense of belonging, regardless of legal status. Founded in 2021 by grassroots volunteers, VAAP incorporated as an independent 501(c)(3) in late 2023. Now guided by an 11-member board and staffed by a supervising attorney and three legal advocates, including two pending admission to practice, VAAP is mobilizing dozens of pro bono attorneys and transforming Vermont's immigration legal landscape through direct representation, pro bono coordination, technical assistance, and advocacy at the state and federal levels.

3. In order to carry out this mission, VAAP has several main work components, including: (1) Providing educational and pro se services in the form of legal education "know your rights" ("KYR") presentations, conducting individual consultations (intakes), and conducting pro se workshops with all unrepresented children exiting ORR custody into Vermont; and (2) Representing unaccompanied minors who are not in ORR custody in immigration proceedings. We further host Immigrant Justice Corps (IJC) fellows to represent unaccompanied children in removal proceedings and provide Spanish-language tutoring for staff representing unaccompanied children.

4. VAAP has been providing legal services for unaccompanied immigrant children in Vermont since 2024. This marked a significant milestone for access to justice as VAAP doubled its staff and brought Vermont its first-ever IJC Legal Fellows: Cameron Briggs Ramos and Emma Matters-Wood. Both are Unaccompanied Children Program (UCP) fellows who started in September 2024 and expanded VAAP's intake criteria to not only include legal services for immigrant youth and over-18 UCs but also to guarantee universal

1

representation for all under-18 UCs exiting ORR custody into Vermont (noting Vermont lacks any ORR facilities in-state.).

5. Since VAAP added two full time IJC UCP fellows to our staff in September 2024, we have begun serving a combined annual number of around 135 immigrant children including: (a) about 15 under-18 unaccompanied children leaving ORR custody and seeking full-scope representation on asylum, Special Immigrant Juvenile Status (SIJS), or related humanitarian relief; (b) about 20 factually unaccompanied children who were not so-designated and/or were over-18 at intake and are also seeking full-scope representation; and (c) about 100 derivative beneficiary children included in their parents' *pro se* asylum applications filed at VAAP-supervised pro bono legal clinics.

6. With U.S. Department of Health and Human Services (HHS) funding, VAAP currently has hired two full time staff members dedicated to providing legal services to unaccompanied immigrant children. Specifically, VAAP employs IJC UCP Fellow Emma Matters-Wood on a full-time basis directly serving clients statewide for a renewable one-year contract period from September 1, 2024, through August 31, 2025; and IJC UCP Fellow Cameron Briggs Ramos on a full-time basis directly serving clients statewide for a two-year contract period from September 1, 2024, through August 31, 2026.

7. VAAP staff providing representation and KYR presentations to children leaving ORR facilities to a Vermont parent or caregiver regularly meet clients to conduct client interviews, prepare clients for hearings, as well as provide legal education, individual consultations, and pro se workshops for pro se children. The kinds of legal matters VAAP represents children in include removal proceedings in immigration court, affirmative relief like asylum before USCIS, SIJS in state court, and advocacy in terms of equal access and enjoyment of state law-based rights and remedies.

8. As Vermont's foremost immigration technical assistance provider and main conduit between regional and national communities of practice and local communities, the unmet need for KYR services/pro se workshops and/or legal representation is astonishing. These unmet needs are due to, for example, unaccompanied children not being able to afford representation, age of children, trauma, language barriers, geographic isolation, technological and transportation barriers isolating rural parts of the state, lack of attorneys due to remoteness of Vermont towns, and scant amount of nonprofit and private immigration attorneys in the region.

9. Vermont-based children trying to apply for various kinds of relief and/or advocate for themselves without an attorney find it functionally impossible to access their removal proceedings in the Boston and Chelmsford Immigration Courts, as Vermont lacks public transportation, services, and awareness and only represented parties can access virtual proceedings. Caregivers for unrepresented Vermont children as young as five years old have contacted VAAP letting us know that without a cash grant for transportation and

overnight accommodation and meaningful language access assistance, they would be unable to get the children to Immigration Court let alone to assist them to prepare and file the children's meritorious applications for legal relief. When VAAP has been able to offer representation—universally to eligible UCs through the IJC UCP Fellows, and ad hoc to other immigrant children in Vermont—we have successfully stabilized children's status by securing relief including SIJS; and promoted judicial economy by terminating proceedings for children where court jurisdiction is improper.

10. As a hybrid direct presentation/pro bono coordination service provider, VAAP provides full-scope direct representation to about 35-40 children each year through our two IJC UCP Fellow positions. VAAP also mobilizes limited assistance for dozens more who are derivative beneficiaries of primary asylum seeker clinics accessing pro bono services on a limited basis in VAAP-coordinated attorney-for-the-day clinics.

11. Numerous judges, clerks, and staff of local state and immigration courts, as well as the Department of Homeland Security's field office staff, have commended VAAP staff for promoting more streamlined, fair, and efficient through their legal work. For example, on several occasions Chelmsford and Boston Immigration Courts have thanked us for helping to prevent unnecessary status conferences, at least, and at best for giving previously unrepresented parties the precious chance to fully developing their clearly meritorious claims for relief. Representing Vermont children also prevents the courts from interfacing with confused respondents about their travels and allows Vermont respondents to appear efficiently via Webex video conferencing.

12. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025.

13. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective on the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN1, which funds KYR

presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

14. Through social media/word-of-mouth, VAAP staff Emma and Cameron were the first to become aware of the February 21 and March 21 orders threatening their funding, exacerbating the adverse impacts them and their clients. On February 21, the information VAAP staff received was incomplete and changing, and as their supervisor I was not equipped to either confirm or deny rumors until IJC provided written guidance a few hours later, which they supplemented in the days that followed with a town halls for IJC hosts and a one-on-one meeting with me. On March 21, VAAP staff were first to learn about the new order, doing so from their peer fellows hosted by other organizations. Again, I confirmed shortly thereafter with IJC, this time in person since the order was issued while IJC was gathered in New York City for its inaugural alumni convening.

15. This funding loss is devastating to VAAP's financial picture. Currently, the number of immigrant children VAAP currently represents under the CLIN2 subcontract is about 15 and growing, as our contract is new and VAAP was in the process of conducting outreach with referring partners statewide to connect incoming children with us as counsel—an onerous piece of work considering Vermont lacks any in-state ORR detention. For context, Office of Refugee Resettlement-originated funding, including but not limited to our CLIN2 subcontract, accounts for about half of VAAP's overall operating budget and accounts for about 75% of the funding VAAP needs to host our two IJC UCP fellows. As a newer organization with limited cashflow and mostly reimbursement-based funding sources, VAAP cannot administer payroll without UCP contract funding, and may need to furlough its two IJC UCP fellows. Indeed, when the Stop-Work Order was first announced in February, VAAP temporarily furloughed our two IJC UCP fellows effective immediately causing financial harm to the fellow and to VAAP and legal harm to VAAP clients including children in proceedings. When IJC UCP Fellows are furloughed, I am rendered the sole remaining direct legal service practitioner on staff and must absorb two full-time caseloads in addition to my existing full-time administrative, fiscal, and professional duties. Only with IJC's commitment of an expedited reimbursement for expenses incurred last quarter plus an additional 30 days of prepaid funding for the month of March was VAAP able to restore Emma and Cam to full-time after a 48-hour furlough.

16. Notably, the February Stop-Work order conspicuously co-occurred with the *J.O.P. v. Department of Homeland Security* class settlement deadline of February 24, 2025, the date when unaccompanied children class members were required to file their asylum applications with USCIS at pain of waving initial USCIS jurisdiction over their claims. VAAP staff were placed in the impossible posture of either working without pay to meet professional duties to several class member clients or leaving the work piled onto my

4

catastrophically overloaded docket at risk of permanent legal harm to clients and professional liability for VAAP. VAAP staff worked without pay to meet their child clients' deadlines, causing undue delay to their own contingency planning to replace lost income and prevent rent arrearage and loss of housing.

17. Moreover, since February, the threat to UCP funding has closed VAAP to new legal intakes, including for unaccompanied children in deportation proceedings. Intake closure comes at a time when DHS is ramping up enforcement and detention activities in our northern border state, causing an increasing volume of indigent Vermont children and youth to enter removal proceedings in Boston and Chelmsford Immigration Courts without counsel.

18. For existing clients, VAAP staff describes the act of strategizing on individual cases or managing their overall dockets long term as "impossible," since they are finishing each workday without knowing whether they will be returning the next. Funding threats and associated uncertainty of employment is threatening legal service quality and making it difficult for VAAP staff to prioritize among increasing, overlapping case emergencies.

19. For example, one CLIN2 subcontract client from Sudan has a pending asylum application and an approved USCIS Form I-360 granting Special Immigrant Juvenile Status. Prior to seeking refuge in Vermont, Sudanese law enforcement repeatedly refused to offer client with protection from the physical and verbal attacks he faced for reasons relating to his nationality, ethnicity, and religion. The child client was being held in ORR custody for an extended period in a southern U.S. state, since the SIJS sponsoring organization required proof of counsel in Vermont before permitting the child to be released here. Client was on his way to release to Vermont with VAAP's offer of full-scope representation, which we have suddenly rescinded considering this funding loss. The child clients' navigation of removal proceedings *pro se* from his unnecessarily prolonged detention hangs in the balance.

20. Another CLIN2 subcontract client from Mexico has a pending asylum application and was just beginning the SIJS process when funding was cut. Prior to seeking refuge in Vermont, the child witnessed neighbors, friends, and peers his age tortured and killed by cartel members and their families, and all were denied assistance by local police. When the client began receiving threats that the same would happen to him, he fled. Since arriving in the United States, a severe health condition and hospitalizations have made client's court appearances literally impossible to access without resource-intensive assistance from counsel including home visits to his rural Vermont town. Resultantly, he was up against the *J-O-P-* deadline to file his asylum application and receive the benefits to which he was entitled and nearly lost out in spite of his and counsel's heroic efforts to overcome his health condition and make his filing deadline. They were just able to submit client's meritorious asylum application in time, despite the odds they were up against. Client will not be able

5

to continue pursuing his applications for relief without counsel, given his young age and fragile health.

21. Yet another CLIN2 subcontract client from Mexico has a pending asylum application with an upcoming biometrics appointment. Prior to seeking refuge in Vermont, the now 10-year-old child's uncle was murdered in his presence. The same group that murdered his uncle threatened our child client and attempted his kidnapping, at which point he fled for his life to the United States. Unfortunately, our client and the family he reunited with in the United States were then subjected to severe forms of labor trafficking. After all of this, our client made his way to Vermont and had just managed to secure our representation and to file his asylum claim when funding was cut. This young child needs our legal assistance to access his upcoming biometrics appointment, to understand and prepare evidence substantiating his claims, and to share his story in an asylum interview. The child client will be unable to complete his interview without the assistance of counsel, as he is incredibly shy and has either panic attacks or breaks into inconsolable sobs when he attempts to speak about it.

22. The uncertainty of future funding has prompted VAAP's difficult decision to not renew the contract of the one paralegal advocacy/program coordination person on staff and eliminate the position. Now, VAAP staff is shrinking from four to three, and potentially to one, at a time when the complexity and volume of unmet legal service needs are increasing.

23. In the interest of prioritizing professional duties owed to child clients above all else, VAAP is also forgoing administrative work that would reimburse staff for work-related expenses and replace lost funding to sustain VAAP's ongoing operations. My professional duties to clients and fiscal duties to the future of VAAP are now in direct conflict because of this contract cancellation. As a result of these sudden, unplanned resource constraints, existing child clients are waiting longer to hear back from VAAP regarding clients' increasingly frightened requests for clarification and assistance.

24. Without restored funding, I will likely be the only full-time attorney at VAAP within the next four-to-six weeks, rendering me solely responsible for the firm's existing attorney-client duties as well as all existing fiscal and administrative ones. My resource constraints and conflicting professional and administrative duties would require me to keep our intake closed and to withdraw from representation in all child clients' removal proceedings. This would irreparably harm clients' legal claims for relief and increase their likelihood of deportation, as there are no other legal service providers of this type serving Vermont. Harm to VAAP clients is harmful to VAAP's mission-based staff. That said, continued representation of clients under ethical obligations without funding is also harmful to staff.

25. Even if VAAP can diversify funding at the last minute to prevent IJC UCP staff from becoming re-furloughed because of contract cancellation, the harm of February's stop-work order continues to distract staff energy and drain organizational morale. One of VAAP's fellows, Cameron, was forced to sit the February Bar Exam during her temporary

6

furlough period. She described herself as being distracted from her final days of study because of severe worry over what would happen to her clients' cases during her furlough, in addition to the stress of how she would pay Burlington, Vermont's exorbitant rent. The other fellow, Emma, was unable to avoid working without pay, especially in Cameron's absence. She made the difficult decision to forgo finishing bereavement leave to which she was entitled at the time, given a family loss she was grieving during the same period.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on the 25 of March 2025, in Burlington, Vermont.


/s/ Jill Martin Diaz

**Jill Martin Diaz, Esq.**
**Executive Director, Vermont Asylum Assistance Project**

7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

                Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

           Defendants.

Case No. 3:25-cv-2847

**DECLARATION OF MARION
("MICKEY") DONOVAN-KALOUST
(IMMDEF) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

Case 3:25-cv-02847-AMO Document 97-8 Filed 05/09/25 Page 612 of 956

**DECLARATION OF MARION DONOVAN ALOUST**
**DIRECTOR OF LE AL SERVICES FOR IMMI RANT DEFENDERS LA CENTER**

*I, Marion Donovan- aloust, make the following statements on behalf of myself and Immigrant Defenders aw Center. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

Case 3:25-cv-01847-AMO Document 97-8 Filed 05/02/25 Page 615 of 956

*in absentia*



**Immi rant De enders La Center**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

Case No. 3:25-cv-2847

**DECLARATION OF JOEL FROST-TIFT
(PUBLIC COUNSEL) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

## DECLARATION OF JOEL FROST-TIFT,
## SENIOR SUPERVISING ATTORNEY FOR PUBLIC COUNSEL'S IMMIGRANTS'
## RIGHTS PROJECT, UNACCOMPANIED CHILDREN'S TEAM

*I, Joel Frost-Tift, make the following statements on behalf of Public Counsel. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1.  My name is Joel Frost-Tift, and I am the Senior Supervising Attorney of the Unaccompanied Children's Team at Public Counsel, a nonprofit public interest law firm in Los Angeles dedicated to advancing civil rights and racial and economic justice, as well as to amplifying the power of our clients through comprehensive legal advocacy. Public Counsel is one of the primary organizations dedicated to providing legal services to indigent unaccompanied immigrant children who are released from Office of Refugee Resettlement (ORR) custody throughout the greater Los Angeles area.

2.  The Unaccompanied Children's team is the largest of four teams within the Immigrants' Rights Project at Public Counsel. The Immigrants' Rights Project practices holistic, trauma-informed advocacy, recognizing that our clients come to us with extraordinary strengths, but also vulnerability due to the violence many have experienced through forced migration and our dysfunctional immigration system. Our team of advocates collaborates with immigrant clients and communities to fight fearlessly for legal protections and a just immigration system.

3.  In order to carry out this mission, Public Counsel represents unaccompanied children who are not in ORR custody in immigration proceedings. We further host Immigrant Justice Corps (IJC) fellows to represent unaccompanied children in removal proceedings and provide Spanish-language tutoring for staff representing unaccompanied children.

4.  Public Counsel has been providing legal services for unaccompanied children funded by U.S. Department of Health and Human Services (HHS) in the greater Los Angeles area since 2014. Public Counsel serves around 200 unaccompanied children each year.

5.  Public Counsel currently has 14 staff members funded by HHS who are dedicated to providing legal services to unaccompanied children. They are a supervising attorney, a program manager, six staff attorneys, one IJC fellow, one social worker, one case coordinator, and three paralegals.

6.  Public Counsel provides full scope representation, which includes representation in state courts, in removal proceedings before the immigration court, in appellate proceedings before the Board of Immigration Appeals, in petitions for review in the U.S. Court of Appeals for the Ninth Circuit, and in applications for affirmative humanitarian relief like asylum and Special Immigrant Juvenile Status before USCIS. Our staff frequently

1

represent clients in the Los Angeles, Orange County, and Van Nuys immigration courts, the Los Angeles Asylum Office, and state courts in Los Angeles, Orange, San Bernardino, Riverside, Ventura and Santa Barbara counties. We also provide Know Your Rights services to communities throughout Southern California.

7.  Public Counsel has witnessed pro se children in court struggle to articulate their claims due to their age, language barriers, and the complexity of immigration law. Most of these children cannot afford private attorneys, so the loss of the HHS funding would prove devastating for them since it would greatly decrease the number of providers who could represent them.

8.  Our Unaccompanied Children's team receives referrals from existing clients, the community, and the online Acacia Center for Justice referral database system. Once we receive a referral we conduct a brief phone screening, followed by a more in-depth intake before initiating representation of a child by signing a representation agreement. When we have capacity to take on cases, we accept all cases that are eligible under HHS funding guidelines where the child resides within our service area.

9.  Immigration judges have often expressed gratitude to Public Counsel for the efficiency we bring to their dockets, and they have referred children to Public Counsel. They have remarked to our clients that they are lucky to have such quality representation.

10. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all four Contract Line Numbers (CLINs) of the contract for which Public Counsel is a subcontractor of the Acacia Center for Justice: (1) KYR presentations and legal consultations for pro se children in ORR facilities; (2) Legal representation for unaccompanied children not in ORR custody; (3) Legal representation for unaccompanied children in ORR custody; and (4) Spanish-language tutoring for organizational staff who work with children. Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance."

11. Members of Public Counsel learned of the stop work order suddenly on February 18, 2025, when we received communications from the Acacia Center for Justice and from the Center for Gender and Refugee Studies abruptly informing us that trainings and officer hours had been cancelled. Then, just as suddenly, HHS rescinded the stop work order on February 21, 2025.

12. On March 21, 2025, again without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated this same contract with Acacia Center for Justice for which Public Counsel is a subcontractor. This termination was effective the

same day, March 21, 2025. HHS terminated the contract with respect to three of the four Contract Line Numbers CLINs: (1) CLIN2, Legal representation for unaccompanied children not in ORR custody; (2) CLIN3, Legal representation for unaccompanied children in ORR custody; and (3) CLIN4, Spanish-language tutoring for organizational staff who work with children. For now, HHS has left in place only CLIN1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors—which includes Public Counsel—to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

13. HHS provides about $1 million per year in funding for 14 of the 15 staff members on Public Counsel's Unaccompanied Children's Team. This accounts for about 5% of Public Counsel's annual operating budget. Without this funding, we will be unable to maintain this staffing of the Unaccompanied Children's team. This loss of staff would have a devastating impact on our ability to continue to represent unaccompanied children.

14. The partial contract termination and the uncertainty of continued HHS funding have had a serious deleterious effect on morale within the organization. Members of our staff have stated their intention to look for other jobs because of the need for reliable continued employment. The anxiety that the partial contract termination and the uncertainty has caused our staff as well as the time we have devoted to contingency planning have impacted our ability to focus squarely on representing our clients. In addition, we are unable to take on new clients due to the funding uncertainty.

15. Children without representation are much more likely to be denied relief and ordered removed to countries where they fear harm, contrary to Public Counsel's mission of advancing civil rights and justice for all.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on the 22nd of March 2025, in Burbank, CA.


Senior Supervising Attorney
Unaccompanied Children's Team
Public Counsel

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

             Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

            Defendants.

**DECLARATION OF VANESSA
GUTIERREZ (NWIRP) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

# DECLARATION OF VANESSA GUTIERREZ
## DEPUTY DIRECTOR FOR NORTHWEST IMMIGRANT RIGHTS PROJECT

*I, Vanessa Gutierrez, make the following statements on behalf of Northwest Immigrant Rights Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Vanessa Gutierrez, and I am the Deputy Director at Northwest Immigrant Rights Project ("NWIRP") who oversees NWIRP's Unaccompanied Children Program ("UCP"). NWIRP provides legal services to unaccompanied immigrant children and youth who have been released from Office of Refugee Resettlement ("ORR") custody to sponsors throughout Washington State.

3. NWIRP has provided legal services through UCP since 2022. We expanded to provide In-Person Post-Release Legal Services to children and youth released from emergency ORR facilities in 2023, and we expanded again to provide representation to youth entering the

1

URM program in February 2025. NWIRP has over 500 open UCP cases in which we are providing direct legal representation to unaccompanied children and youth released from ORR custody.

4. With funding from the U.S. Department of Health and Human Services (HHS), NWIRP currently has 20.9 full-time equivalent (FTE) staff members dedicated to providing direct legal services to unaccompanied immigrant children and youth. Specifically, we have a directing attorney, 3.65 FTE supervising attorneys, 8.7 FTE staff attorneys, 7 FTE legal advocates, and one social services advocate. In addition to these staff, NWIRP has three FTE Immigrant Justice Corps (IJC) fellow attorneys who provide direct representation for unaccompanied children and youth in removal proceedings.

5. NWIRP UCP staff represent unaccompanied children and youth in removal proceedings in immigration court, BIA appeals, affirmative relief before USCIS (including asylum, Special Immigrant Juvenile (SIJ) classification, Adjustment of Status, T visas and U visas), and state court cases (including dependencies, minor guardianships, parenting plans, and vulnerable youth guardianships). Staff must regularly travel to the Seattle Immigration Court, and occasionally the Portland Immigration Court, as well as state courts throughout Washington for court filings and hearings.

6. NWIRP's UCP Program provides critical legal services to unaccompanied children and youth, who are not guaranteed appointment of counsel in removal proceedings. Most unaccompanied children and youth in our state lack the financial resources to be able to hire private immigration attorneys. There are not many attorneys in Washington state who provide representation in removal proceedings for unaccompanied children and youth or in state court for SIJ-eligible children and youth, especially on a low bono or pro bono basis. Due to their young age (we have represented UCP clients as young as 1 year old), the trauma they may have experienced, language barriers, and the complexity of immigration law, it is not realistic to expect unaccompanied children and youth to attempt to apply for immigration relief before USCIS, pursue state court cases, or advocate for themselves in immigration court without an attorney.

7. NWIRP successfully serves children and youth in rural and urban areas of Washington State. When we receive a referral for a UCP-eligible child, we direct the referral to the UCP team at the NWIRP office that covers the county where the child lives and schedule an individual consultation. If the child would like NWIRP to represent them in their immigration case, we accept their case on a universal representation basis, without regard for the type of relief they may qualify for or the strength of their case. We then assign their case to an attorney, or a legal advocate working in collaboration with an attorney. When possible, for children and youth who are eligible for SIJ classification, we try to place their state court case with a pro bono attorney. We regularly engage in pro bono recruitment and mentorship, and we periodically offer training to pro bono attorneys. When NWIRP is

2

unable to find a pro bono attorney, we take on the state court case in-house. We provide in-house representation on the immigration case before the immigration court and USCIS.

8. For most of NWIRP's UCP clients, we represent them in their first appearance in immigration court. Many of our UCP clients have never been to any court ever in their life before their first immigration court hearing. Before their hearing, their assigned NWIRP attorney meets with them to explain what to expect during the hearing, including who will be present, what the layout of the courtroom will be, what the immigration judge may ask during the hearing, what their NWIRP advocate may say on their behalf, and what some possible outcomes of their hearing may be. We review the factual allegations and charges of removability in their Notice to Appear with them, and we review the forms of immigration relief that we have already discussed with them, making sure they fully understand and that we answer any questions they have. This preparation helps put the child or youth more at ease, helps ensure their presence at their scheduled hearing, and helps the hearing run more efficiently and smoothly because the child better understands what is happening.

9. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all four Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS later rescinded the stop work order without explanation on February 21, 2025. Even this short lapse in funding negatively impacted NWIRP's UCP work. The stop work order created confusion among staff over how to categorize and memorialize the work they continued to do on behalf of our clients, adding extra timekeeping requirements that took away valuable time that could have been spent advocating for clients. During the stop work order, we continued the direct representation and legal services without interruption, as ethically required by the Rules of Professional Conduct in Washington State, but we did not know if we would ever be reimbursed for our work while the stop work order was in effect. Even after NWIRP submitted a Request for Equitable Adjustment for the work completed while the stop work order was in effect, it was communicated to NWIRP that our submissions are "not" official invoices and that our submission "does not" guarantee reimbursement and we were told that it "will ultimately be decided by the government."

10. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs):

CLIN2, Legal representation for unaccompanied children as well as other non-representation services such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2, and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. For NWIRP, this results in a full termination of our entire UCP contract. HHS provided no justification for the partial termination other than "the Government's convenience."

11. NWIRP learned about this contract termination through an email communication from Acacia Center for Justice, sent at 8:15 a.m. on March 21, 2025 to NWIRP's Executive Director, Malou Chávez. The title of the email was "Urgent: Notice of Partial Termination for the Government's Convenience." Acacia hosted a meeting for further discussion of the contract termination.

12. While NWIRP is still considering how to respond to the contract termination, we are committed to continuing to represent existing clients, at least in the short term. Our organization's ability to continue representing clients long-term depends on many factors, including whether any case continuity funding might be available to support the winding down of the contract through HHS.

13. UCP funding represents approximately 10% of NWIRP's overall annual budget. Loss of funding impacts 28 staff (20.9 FTEs) at NWIRP. Over the short-term, NWIRP aims to maintain all positions to ensure continuity of representation. The organization will do so by borrowing from its reserves and by seeking support from donors and is currently in the process of determining how long this solution will sustain the services previously funded by the UCP contract. Sustaining services will cost NWIRP at least $200,000 per month. Since NWIRP provides extensive legal services beyond its UCP contract, it must consider all of its mission-focused work when determining use of limited reserve funding or donor resources. Any funds that NWIRP directs to sustain services under this contract take away from other critical services that NWIRP is committed to providing in the community, especially during this period of exponentially-increased demand for immigration legal services. We anticipate that NWIRP will be unable to sustain services over the long-term and will need to reduce its staff accordingly.

14. The UCP contract termination detrimentally impacts NWIRP's mission to promote justice by defending and advancing the rights of immigrants through direct legal services, systemic advocacy, and community education. Research has shown that unrepresented children and youth are more likely to be issued an order of removal, even if they have a strong immigration claim, demonstrating the high need for legal representation in these cases.

4

While NWIRP aims to continue representation in as many cases as possible, we will have extremely limited capacity to assist children and youth who need representation in the future, negatively impacting their chances of gaining immigration relief and likely changing the trajectory of their lives.

15. Having to turn away youth from services is difficult for our committed legal staff, many of whom are immigrants themselves and share an understanding of the experiences the children and youth are facing. Contract termination will undoubtedly negatively impact the morale of staff who already work under challenging conditions in the immigration system.

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing is true and correct.

Executed on the 21st of March 2025, in Wenatchee, Washington.

*Vanessa D. Gutierrez*

**Vanessa Gutierrez**
**Deputy Director**
**Northwest Immigrant Rights Project**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>        Defendants. | Case No. 3:25-cv-2847<br><br>**DECLARATION OF ASHLEY T. HARRINGTON (RMIAN) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**DECLARATION OF ASHLEY T. HARRINGTON**
**CHILDREN'S PROGRAM MANAGING ATTORNEY FOR THE**
**ROCKY MOUNTAIN IMMIGRANT ADVOCACY NETWORK**

*I, Ashley T. Harrington make the following statements on behalf of the Rocky Mountain Immigrant Advocacy Network.  I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Ashley T. Harrington, and I am the Children's Program Managing Attorney at the Rocky Mountain Immigrant Advocacy Network ("RMIAN"). RMIAN is a Colorado-based nonprofit organization that provides free immigration legal and social services to individuals in civil immigration detention, as well as to immigrant children and families. Through its staff attorneys, paralegals, social workers, and a network of hundreds of *pro bono* attorneys, RMIAN provides legal education and free legal representation to low-income immigrants who otherwise would not be able to afford an attorney.

2. RMIAN's primary programs are 1) the Detention Program which provides free legal services to individuals in civil detention; 2) the Children's Program which provides free legal services to children and families in immigration proceedings; and 3) the Social Service project which provides comprehensive supportive services to particularly vulnerable individuals, children and families.

3. RMIAN is the primary organization dedicated to providing legal services to indigent unaccompanied immigrant children in Colorado. Specifically, RMIAN provides free legal representation to unaccompanied children who have been released from the Office of Refugee Resettlement ("ORR") to sponsors, to unaccompanied children who have been placed in the Unaccompanied Refugee Minors program, and to unaccompanied children in ORR Long-Term Foster Care. RMIAN previously also provided free legal services to children in ORR short-term shelters in Colorado.

4. RMIAN has been providing legal services for unaccompanied immigrant children in Colorado through U.S. Department of Health and Human Services (HHS) funding since the first ORR short-term shelter opened in Colorado in 2019. RMIAN provided know-your-rights presentations, individual legal screenings, legal representation and referrals to hundreds of youth in ORR custody in Colorado from December 2019 through May 2023 when the shelters closed.

5. RMIAN has continued providing representation to unaccompanied children who were released from ORR custody—both from the shelters in Colorado as well as shelters all over the country. With HHS funding, RMIAN is currently representing 160 unaccompanied children, including unaccompanied children released to individual sponsors and children released into the Unaccompanied Refugee Minor Program. In addition, RMIAN recently

1

expanded its services to provide representation to children in the ORR Long-Term Foster Care program placed in Colorado.

6. With HHS funding, RMIAN currently employs approximately six full-time-equivalent staff dedicated to providing legal services to unaccompanied immigrant children. This includes a managing attorney, staff attorneys, a law clerk, coordinators, a paralegal, and an administrative assistant.

7. RMIAN represents unaccompanied children in removal proceedings in immigration court and in humanitarian relief applications before U.S. Citizenship and Immigration Services, including asylum, Special Immigrant Juvenile Status, U and T nonimmigrant status, adjustment of status to lawful permanent residency, and applications for employment authorization. In addition, RMIAN staff attorneys and pro bono partners represent children in state court proceedings, including guardianship, allocation of parental responsibilities and child welfare proceedings.

8. RMIAN has initiated representation with unaccompanied children as young as two years up to those on the eve of their eighteenth birthday. None of these children are fluent in English or have received higher education. These children's cases require navigating a complicated maze of laws and legal processes necessary to secure lawful status and defend from deportation. Most require analysis of both state and federal laws and require simultaneous applications and motions before the immigration court, a State court and U.S. Citizenship and Immigration Services. Each of these forums have specific, detailed procedures that must be followed to ensure cases don't result in rejection or denial. Children's legal cases often take several years to ultimately result in lawful permanent residency, requiring constant monitoring and regular required filings during the lengthy process. It would be virtually impossible for a child to successfully navigate all the requirements to avoid deportation and successfully obtain lawful status without an attorney.

9. The unaccompanied children RMIAN represents have often been through complex and significant trauma. Many of RMIAN's child clients have been subjected to sex and labor trafficking, child abuse, neglect and abandonment, sexual abuse and other violence. Many of the applications for legal protection require detailed declarations and interviews regarding the trauma and abuse these children have endured—something that would be incredibly difficult to endure without a trauma-informed attorney's assistance.

10. RMIAN's services are not only beneficial to the children in removal proceedings, but also to immigration judges, court staff and government attorneys. RMIAN has built strong relationships with Denver's immigration judges and staff as well as attorneys for the Immigration and Customs Enforcement Office of the Principal Legal Advisor (OPLA). RMIAN routinely meets with immigration judges and staff along with OPLA to discuss how to improve services and efficiency. RMIAN has worked jointly with OPLA to request and obtain dismissal of removal proceedings for dozens of unaccompanied children

pursuing relief applications with U.S. Citizenship and Immigration Services, thereby preserving the court and OPLA's time and resources for cases ripe for resolution by the court. In addition, when a RMIAN attorney enters their appearance with the immigration court, typically the next hearing is cancelled and written deadlines are provided, thereby saving the court's limited time for other cases. RMIAN routinely receives requests from immigration court staff and judges to assist unaccompanied children and families with anything from a change of address form to a screening for potential human trafficking. RMIAN ensures that children are fully informed of their rights and options and, wherever possible, that they have expert legal representation to navigate the immigration legal system more efficiently and effectively. Without RMIAN, removal proceedings would take far longer and the dockets would be clogged with cases that are not even under the court's jurisdiction while a child is pursuing legal status with U.S. Citizenship and Immigration Services. Immigration judges and court staff regularly express gratitude for the ways in which RMIAN's services assist the court.

11. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025.

12. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective the same day, March 21, 2025.HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows and Randstad placements who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

13. RMIAN received news of both the stop work order and the notice of contract termination from the Acacia Center for Justice via email. RMIAN staff had to immediately pivot from

providing representation to children to informing all staff of the stop work order and contract termination and planning for its impact on RMIAN's services and funding.

14. Funding from HHS for unaccompanied children's legal services comprises approximately 15% of RMIAN's total annual budget and 26% of its Children's Program Budget— approximately $772,000 this year. Because there are currently no ORR shelters in Colorado, RMIAN does not receive any funding for CLIN1 services to children in ORR custody. Thus, the partial contract termination serves as a complete termination of all funding for RMIAN's work under the contract.

15. HHS funding currently allows RMIAN to employ approximately six full-time-equivalent staff positions, including attorneys, a law clerk, coordinators, a paralegal and an administrative assistant. It remains uncertain whether staff and client cases could be shifted to other funding sources. RMIAN would need to pull from its reserves and limited unrestricted funds to continue paying staff and providing representation to unaccompanied children. This would only be possible on a temporary basis until layoffs would need to be considered.

When news of the stop work order broke, RMIAN received panicked calls from children, their caregivers, foster care providers, and case managers worried that the stop work order meant that RMIAN would no longer provide representation. Similar panic ensued following the news of the contract termination. Instead of focusing on preparing children's legal applications, RMIAN staff had to respond to countless calls and inquiries about how the stop work order and contract termination would impact its child clients. While RMIAN has been able to provide temporary reassurance that children will continue to be represented using RMIAN's reserves and limited unrestricted funding, its staff will be unable to provide such assurances long-term.

17. RMIAN firmly believes that no child should be forced to navigate immigration legal proceedings alone, and that every child deserves to have an attorney to inform them of their rights and options and to represent them in any defenses they may qualify for under the law. In reliance on the government's consistent funding, RMIAN has been steadily building its Children's Program to be able to increase how many children it is able to serve each year. RMIAN hopes to continue expanding programming and staffing so that more unaccompanied children in Colorado have access to expert legal representation. However, without HHS funding, not only will RMIAN not be able to provide representation to any additional children, but the ability to provide continued representation to current child clients is also under threat.

18. RMIAN has relied upon the government's consistent funding of legal services for unaccompanied children in building its Children's Program, and in crafting the representational agreements RMIAN has executed with child clients. In reliance on the government's consistent funding consistent with congressional appropriations, the

TVPRA, the Foundational Rule, and in accordance with RMIAN's subcontract with Acacia, RMIAN's representation agreements with most unaccompanied children include a commitment to continue representation through obtaining asylum, U/T nonimmigrant status, or permanent residency, if they are eligible for this relief under U.S. law. For most of RMIAN's clients, this means that it has promised to continue representation for several years due to extreme delays and backlogs in processing and adjudications of these relief applications.

19. RMIAN has legally and ethically binding obligations to its clients to continue providing representation despite this halt in funding. Ethical rules require attorneys to continue representation to the conclusion of the matters undertaken on behalf of clients. Withdrawal may only be permitted under ethical rules if withdrawal would not be materially adverse to the client's case. Withdrawal from children's cases would be materially adverse because they cannot competently represent themselves in matters before the immigration court, the state court, or before USCIS, they could not afford private counsel to represent them, and withdrawal would more than likely lead to their cases being denied—resulting in their removal.

20. RMIAN is committed to continuing to represent its child clients despite this termination of funding. However, it will have to pull from limited reserves and unrestricted funding to do so, and may have to consider staff layoffs. Ultimately, if significant layoffs become necessary, despite the significant detrimental impact on clients, RMIAN may need to consider withdrawing from clients' cases if it does not have sufficient staff to continue representation.

21. RMIAN will have to dedicate its limited staff time to fundraising to try to raise the funds necessary to continue providing representation, with no guarantee of success. This diverts limited time and resources away from providing representation. It also diverts limited funding for representation of other clients as well as funding that allows for staff leave and benefits, staff wellness initiatives, and necessary organizational infrastructure. The stop work order caused great distress among staff, but was short-lived. The termination of funding has significantly impacted staff morale and caused staff stress and concern about whether they will continue to have a job and be able to provide for themselves and their families. Even if layoffs don't become immediately necessary, this worry may cause staff to leave RMIAN for employment that is more securely funded. This would leave RMIAN short-staffed and place more of the burden to continue representation on fewer staff, and would increase the likelihood RMIAN would have to consider withdrawal from clients' cases.

22. Any interruption, reduction or termination in HHS funding significantly harms RMIAN and its mission to provide legal representation to unaccompanied children.

I declare under penalty of perjury that the foregoing is true and correct.

 Executed on the 22nd day of March 2025, in Westminster, Colorado.

**Ashley T. Harrington, Esq.**

6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

               Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

            Defendants.

Case No. 3:25-cv-2847

**DECLARATION OF GAUTAM
JAGANNATH (SJC) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

## DECLARATION OF GAUTAM JAGANNATH, ESQ.
## EXECUTIVE DIRECTOR FOR SOCIAL JUSTICE COLLABORATIVE

*I, Gautam Jagannath, Esq., make the following statements on behalf of SOCIAL JUSTICE COLLABORATIVE.  I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Gautam Jagannath, and I am the Executive Director at Social Justice Collaborative ("SJC").  We are based in Berkeley, California in the San Francisco Bay Area and have been provided full-scope deportation defense services for low-income noncitizens all over the nine Bay Area counties as well as the California central valley. SJC is one of the primary organizations dedicated to providing legal services to indigent unaccompanied immigrant children who are not in detention as well as those held in Office of Refugee Resettlement ("ORR") custody throughout Northern and Central California.

2. Our organization teams are composed of administration, executive staff, attorneys, legal assistants, social workers and other individuals who work together in units to represent clients, ensure that their needs are met and that we continually prevail in court.  Because we are a legal services organization, we operate like a law office and our teams depend on having lawyers and legal assistants work on all aspects of the case, from intake to work-up and preparation for trial.

3. In order to carry out this mission, SJC has several main work components, but relevant to the instant litigation, we represent unaccompanied minors who are not in ORR custody in immigration proceedings. We further host Immigrant Justice Corps ("IJC") fellows to represent unaccompanied children in removal proceedings.  Our programs at SJC are unique because we have always provided full-scope representation to vitally underserved minors as well as families, but we also provide access to wrap around services including social workers to help navigate challenges of newcomer life in the United States.

4. SJC has been providing legal services for unaccompanied immigrant children in California since 2012. Since our inception, we have always taken cases for any indigent immigrant in California, we represent thousands of families a year.  Our unaccompanied minor clients represent about a third of all we represent in immigration proceedings. Specifically, SJC serves a combined annual number of around over 400 unaccompanied children. Roughly

1

for at least the fiscal year 2024, our representative breakdown for these minors was 35% adjustment of status, 38% asylum proceedings, 25% special juvenile status. The residue balance is composed of U/T nonimmigrant relief, refugee petitions and other applications. Naturally, a lot of work authorizations are not included for all these children to get kids the benefits, both entitlements and means tested that they deserve in California. That represents over 200 applications just in FY 2024.

5.  With U.S. Department of Health and Human Services ("HHS") funding, SJC currently has hired three (3) staff members, all of whom are IJC fellows, dedicated to providing legal services to unaccompanied immigrant children. Specifically, one is a California lawyer and two of the staff members are law graduates with pending bar admission results.

6.  Staff providing representation to children regularly conduct client interviews, prepare clients for hearings, as well as provide legal education, individual consultations, and attend court hearings and other appointments for clients as well as their families. SJC represents children in all stage of removal proceedings in immigration court, BIA appeals, petitions for review at the Ninth Circuit, affirmative relief like asylum before USCIS, SIJS predicates in state court.

7.  In recent months, we have had several referrals come from youth-serving professionals who are actively trying to find help for the children they work with. Even those who regularly refer to legal service providers are hitting roadblocks. Waitlists are closed. Pro bono and nonprofit providers are overwhelmed. Paying for legal services is out of reach for the vast majority of adult immigrants let alone children who need to be in school.

8.  We routinely place cases for that have made their way through the immigration system to pro bono counsel at our firm partners through our legal clinics. These legal clinics are held frequently throughout the year and would be severely, albeit indirectly, affected by the loss of funding through this grant.

9.  In 2023, SJC's new Special Immigrant Juvenile ("SIJ") Task Force completed its first full year. The task force was created in response to the growing demand for legal representation for minors. This was based on an increased number of intakes and referrals. However,

conversations with partners across various sectors made it clear this was not an isolated issue. It reflected broader, statewide, and national trends.

10. SJC is one of the few organizations who works in areas considered legal deserts in California. In some of these regions, we are one of the only organizations offering any legal services, including full-scope removal defense. We do not merely fill forms for clients and wish them luck. Even in more populated counties where other providers exist, the demand still far exceeds what's available.

11. A partner recently shared that a very young immigrant child believed that carrying a red card—a know-your-rights resource widely distributed in immigrant communities—would prevent them from being detained if stopped. While red cards are an important tool for asserting one's rights, this child was under the impression that the card functioned more like a legal shield. It's easy to understand how a young person, without legal guidance, could draw that conclusion not knowing much more.

12. Stories like this make it painfully clear that general information, no matter how widely shared, is not a substitute for individualized legal support. Children need someone who can walk them through their options and answer their questions. That is where SJC often comes in. We have a team of legal professionals working up and prevailing on legal status, but we also are providing social workers to support our children.

13. We currently have clients who are not yet one year old. Even without considering trauma, language barriers, or lack of resources, there is no path forward for a child that young without help. But of course, we do have to consider those things. Many of our clients are indigenous and do not speak Spanish, a language many assume they would speak. These minors often face not only trauma and language access issues but also deep cultural barriers and a long-standing experience with systems that overlook or ignore them. This makes it extremely difficult—if not impossible—for children to find legal representation, let alone secure it in time to meet the deadlines in their cases.

14. Immigration Judges ("IJ's") have over the past decade and more have expressed gratitude to SJC staff attorneys for the efficiency our providers bring to their dockets, which are often

3

expedited, and caseload management. It is not uncommon for the EOIR based in San Francisco, Concord and Sacramento to make referrals of minors to SJC's intake team. Many IJs appreciate our work product because we are known for bringing cases fully prepared for trial, well developed, and often fully documented. We have often been able to engage in stipulations with government counsel to avoid unnecessary continuances and appeals especially for minors.

15. Our organization repeatedly earns praise from the California State Bar, as we are an IOLTA funded legal service provider. We are also regularly praised by the California Department of Social Services who has continuously renewed contractual awards with SJC since 2015. We recently have been praised for maintained a shared vision centered on program assessment, we advance diversity and inclusion, we emphasize excellence, achieve goals, foster communication, engage staff at all levels, and ensure proper training and resource management. SJC exhibits a strong client-centered delivery system with programming aligned to our vision and funding requirements. We also demonstrate cultural competence through understanding of diverse community needs and histories, effectively engage with eligible populations, and establish appropriate partnerships with government and community organizations.

16. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025.

17. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers

4

(CLINs):  CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN 1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

18.  We learned of the contract cancellation through an email from a statement put out by Jojo Annobil, the CEO of Immigrant Justice Corps.

19. The terminated funding accounts for roughly 8% of our organization's total budget.  SJC had been funded to represent roughly 45 unaccompanied minors per year under CLIN 2. The staff affected would be three IJC fellows.  If we had to lose this funding and there was no new funding to be secured, we would be forced to lay off these fellows ASAP because we do not have operating budget to sustain their work.  We have not yet secured any additional or new funding to secure these fellows.

20. The funding loss is a huge blow to our immigrant communities and morale of staff.  We have been fortunate enough to survive almost a decade and a half without a single layoff and yet this could be our first.

21. For example, the SJC cases of Y, JS, and MHC represent particularly compelling scenarios for continued IJC funding support. All three individuals are currently not in active removal proceedings. Each presents strong affirmative relief claims requiring immediate legal intervention—specifically through asylum and SIJS pathways—demonstrating clear harm if representation were terminated. Financial barriers are insurmountable for all three cases: Y's family faces demonstrable poverty alone, JS as a dependent high school student has no income source, and MHC's family lacks financial means for private representation. Critically, none of these clients have any alleged gang affiliations or criminal history. Furthermore, each client has been released to documented sponsors with lawful immigration status—Y to a U.S. resident sponsor with a Social Security number, JS to a

<div align="center">5</div>

sponsor with asylum-based residency, and MHC to a sponsor with SIJS-based residency—
all people with valid legal status. Without sustained IJC funding, these vulnerable youth
with strong relief eligibility would face the complex immigration processes without
counsel, dramatically reducing their likelihood of securing protection despite qualifying
under established legal criteria.

22. In the face of these layoffs, we may be forced to try and refer out the clients such as the
ones described above who were previously represented by our IJC fellows. However, we
know that all organizations doing this work are overly burdened and many cannot take new
cases. As noted above, all providers are overburdened. Thus, it is highly unclear whether
we would be successful in referring out our affected clients.

23. If we are unsuccessful in referring these clients to other organizations, then we believe
under California law and relevant legal ethics that we would be forced to continue
representation of clients without ORR funding. This would lead to further depletion of
limited resources. This patently hurts staff morale, especially when our other staff are
already working at and above their full capacity. Trying to competently represent affected
clients without sufficient funding will likely lead to burn-out and result in other staff
resigning or leaving for other jobs, thereby further harming our organization and the clients.

---

I declare under penalty of perjury under the Laws of the United States that the foregoing is true
and correct.

Executed on the 25th of March 2025, in Berkeley, California, United States.

*Gautam Jagannath*
_____

Gautam Jagannath, Esq.
Executive Director
SOCIAL JUSTICE COLLABORATIVE
1832 Second Street
Berkeley, CA 94710
(p) 510.992.3964

6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

  v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

Case No. 3:25-cv-2847

**DECLARATION OF LISA KOOP (NIJC)
IN SUPPORT OF PLAINTIFFS'
MOTION FOR A TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

**DECLARATION OF LISA    OOP**
**NATIONAL DIRECTOR OF LE   AL SERVICES**
**FOR T   E NATIONAL IMMI   RANT JUSTICE CENTER**


*I,   isa   oop, make the following statements on behalf of the   ational Immigrant Justice Center*
*   IJC .  I certify under penalty of perjury that the following statement is true and correct*
*pursuant to 28 U.S.C. § 1746.*

Case 3:25-cv-02847-AMO Document 87 Filed 04/27/25 Page 654 of 956

PI Appeal and Stay Addendum 623

Case 3:25-cv-02847-AMO Document 87 Filed 05/07/25 Page 626 of 748

Case 3:25-cv-02847-AMO Document 87 Filed 05/02/25 Page 653 of 956

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

Case No. 3:25-cv-2847

**DECLARATION OF MELISSA MARI
LOPEZ (ESTRELLA DEL PASO) IN
SUPPORT OF PLAINTIFFS' MOTION
FOR A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION**

**DECLARATION OF MELISSA MARI LOPEZ**
**EXECUTIVE DIRECTOR**
**ESTRELLA DEL PASO**

*I, Melissa Mari Lopez, make the following statements on behalf of Diocesan Migrant and Refugee Services doing business as Estrella del Paso. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

.  My name is Melissa Mari. Lopez, and I am the Executive Director at Diocesan Migrant & Refugee Services doing business as Estrella del Paso ("Estrella del Paso"). Estrella del Paso is the largest provider of free immigration legal services in West Texas and New Mexico. Estrella del Paso is based out of El Paso, Texas but provides legal services to populations living anywhere in West Texas and the state of New Mexico who have removal proceedings venued in the El Paso, Texas before the El Paso Non-Detained Immigration Court, the El Paso Detained Immigration Court, or the Otero Detained Immigration Court. Estrella del Paso is the primary organization in West Texas and New Mexico providing legal services to indigent, unaccompanied immigrant children who are not in detention as well as those detained in Office of Refugee Resettlement (ORR) custody in El Paso County.

.  Estrella del Paso was founded in 1986 to provide immigration legal services, advocacy, and community outreach to protect the rights of immigrants in West Texas and New Mexico, and advance justice in the spirit of the Gospel. We believe all people are made in the image of God and are welcome in our community. Our organization currently employs 78 people. There are 6 legal units and two units who do not provide legal representation. The two units that do not provide legal representation are the Refugee Services unit and our Administrative team, which includes our Operations team, Communications team, Data team, Development team, and Executive team. Each legal unit is tasked with assisting different migrant populations. Among the six legal units is our Unaccompanied Children Program, which employs a team of 28 people. The Unaccompanied Children Program staff is exclusively dedicated to working with unaccompanied children housed at local ORR shelters as well as children released from ORR shelters, or children who are released to Estrella del Paso's designated geographic zone. In terms of staff, the Unaccompanied Children's Program accounts for more than one third of our entire organizational staff.

.  Our work in the Unaccompanied Minors Program is consist with our mission. Our Unaccompanied Children Program has several main work components and is tasked with (1) Providing educational and pro-se services in the form of legal education "know your rights" ("KYR") presentations, conducting individual consultations (intakes), and case monitoring for all unrepresented children in ORR custody in El Paso County, Texas; (2)

1

Representing unaccompanied minors who are not in ORR custody in immigration proceedings; and (3) Representing children in ORR custody in immigration proceedings. We further host an Immigrant Justice Corps (IJC) fellow to represent unaccompanied children in removal proceedings and provide Spanish-language tutoring for staff representing unaccompanied children.  Our organization is also comprised of other work components such as our Legal Orientation Program ("LOP") and Immigration Court Help Desk ("ICH"), through these units we provide educational and pro se services in the form of legal education "know your rights" ("KYR") presentations/orientations, conduct individual consultations/orientations (intakes), and conduct pro se workshops with all unrepresented non-detained noncitizens who have hearings before the El Paso Non-detained Immigration court as well as detained noncitizens in the custody of Immigration and Customs Enforcement ("ICE") at facilities located in El Paso, Texas and Chaparral, New Mexico; (2) We attempt to connect unrepresented noncitizens who cannot afford a lawyer with pro bono attorneys or refer them for in-house representation by Estrella del Paso; (3) Estrella del Paso also provides in-house representation to people in removal proceedings through our Removal Defense unit and as mentioned herein through our Unaccompanied Children's Programs; (4) Through our affirmative legal services program, Estrella del Paso provides representation before United States Citizenship and Immigration Services ("USCIS") and United States Department of State ("DOS"). Within our affirmative legal services program, we have two subunits specifically dedicated to assisting religious workers and survivors of crime and human trafficking.

. Estrella del Paso has been providing legal services for unaccompanied immigrant children in El Paso County, Texas since 2007. Estrella del Paso was initially contacted by the VERA Institute of Justice ("VERA") in March of 2007 to oversee the Unaccompanied Immigrant Children's program in El Paso, Texas. Initial services under this first contract included the provision of Know Your Rights presentations to all unaccompanied children detained in El Paso, Texas and screening their cases for relief from removal, and to gather statistics on the unaccompanied children as well to develop a pro bono program model in El Paso, Texas to recruit, train, and mentor pro bono attorneys to represent the children in their immigration removal proceedings. Our initial contract was for provision of these services at three ORR shelters.  Since the opening of the program in 2007 the need for services has only increased. In 2007, we provided services to approximately 546 children. In 2022, we provided services to 6,073 children, that number increased in 2023 to 7,449 children, and in 2024 to 4,921 children. The number of shelters in our area has also expanded from 3 permanent shelters to as many as 8 with the need in some years for the opening of emergency intake sites at places like Tornillo, Texas; Fort Bliss Army Base; and a facility in Pecos, Texas. Though the initial contract was limited to educating unaccompanied children, the con ract was eventually expanded to include legal representation for unaccompanied children appearing before the El Paso Immigration Court as well as

2

children released from ORR custody to the larger El Paso region. From the inception of our program in 2007 until today, Estrella del Paso has provided services to approximately 47,498 children. Last year alone, we provided services to 4,921 children and undertook representation of 117 children.

. With United States Department of Health and Human Services (HHS) funding, Estrella del Paso currently employs 28 staff members dedicated to providing legal services to unaccompanied immigrant children. Specifically, all 28 of our staff members are full-time employees. Our Children's Program Director is an attorney who has been licensed to practice law since 2010. She oversees the program and supervises the work of 7 Managing Attorneys, 4 Legal Assistants, 1 IJC Law Fellow, 3 Data Clerks, 3 Social Service Providers, and 9 Orientation Specialists. Together the team of 28 provides services to all detained children located throughout the 8 shelters in El Paso County. The shelters are spread throughout the county, the closest shelter is approximately 2 miles from our office while there are shelters 16 miles west of the office and shelters up to 31 miles east of the office. ORR funding provides both funding and the necessary access to the shelter and to the children detained in the shelters. Without ORR funding, we would be unable to continue providing these services.

. Staff providing representation and KYR presentations to children in ORR facilities regularly travel to each facility in person to conduct client interviews, prepare clients for hearings, as well as provide legal education and individual consultations. Our attorneys often appear as Friend of the Court in cases where children have been reunified outside of the El Paso, Texas Immigration Court Jurisdiction. Our representation of children is all encompassing, we have some clients we have represented for years from the time they were at the shelter to the time when they get released and ultimately obtain lawful status in the United States. A large part of our representation caseload involves representing children for Special Immigrant Juvenile Status ("SIJS"). Once a child obtains SIJS status, it can be several years before they qualify to obtain their lawful permanent residency, in the meantime their case remains open with our organization, meaning our representation of children often spans several years. At present, we have 324 pending cases, losing funding for this program, will pose an extreme hardship to our organizational capacity as it will mean not only laying off the attorneys, specifically trained to handle these cases but also inheriting a high case load to be worked by less staff, causing us to have to turn other work away.

. According to the Census Bureau, 18.3 percent of the population of El Paso, Texas and 17.8 percent of the population of New Mexico live in poverty, surpassing the national average of 11.5 percent. El Paso and its surrounding areas are not home to large corporations or law firms. Most attorneys who practice any type of law in this region tend to be solo

3

practitioners who cannot afford and do not have the capacity to take on pro-bono matters. Because there are no large law firms or corporations in this region, there is very limited access to attorneys who can provide pro-bono services. Likewise, El Paso is not home to any law schools. The closest law schools to El Paso are Texas Tech University School of Law based in Lubbock, Texas and the University of New Mexico School of Law based in Albuquerque, New Mexico. Both schools are several hundreds of miles away from the Immigration courts we serve and do not currently have the capacity to take on very many cases. Given that this region is impoverished, it is hard for an organization like ours to rely on local private philanthropy to fund the necessary services. Given the large geographic region we serve, the services provided by the unaccompanied minors program to unaccompanied children in our region are crucial. Most children cannot afford private attorneys, and most private attorneys in our area cannot afford to take on pro bono matters, especially in the case of children at shelters due to the extra level of logistical planning required for attorneys to visit their clients at shelters versus having the client visit the attorney at their office. Without our program, the children detained at the 5 shelters operating in El Paso County would largely go without counsel.

. In addition to providing direct representation, legal screenings and know your rights presentations to children sheltered in El Paso County and released in El Paso County and Dona Ana County, our team also provides referrals to children who end up living outside our geographic zone. The mission of our team is to try and obtain legal counsel for all children even when children do not live in our geographic zone. In 2024, our team was able to provide 7,174 referrals. Referrals consist of notifying children and their sponsors of local attorneys and non-profits in their areas who may be able to take on their cases. Often, our team can make a direct referral to other legal services providers if the children we serve are going to an area where there is an Acacia funded legal services provider to take over the child's case. This "warm hand off" amongst providers ensures a continuum of representation and that the child not only appears for all their court hearings but also often ensures the child is on the best pathway to later obtain lawful status in the United States of America.

. Estrella del Paso has an excellent and long-standing relationship with our local Immigration Judges, (Executive Office for Immigration Review [EOIR]), USCIS (United States Citizenship and Immigration Services), ORR Shelters, and Immigration and Customs Enforcement (ICE) officers. At the El Paso Non-Detained Immigration Court, there is a dedicated docket for unaccompanied detained and non-detained children. The judges who oversee these dockets have often expressed gratitude with our team as we represent most children who appear before the court, but we also provide the court with ti ely updates on the children's cases. As mentioned earlier, for children that end up being docketed before our court but who ultimately reunify outside of the El Paso immigration

4

court jurisdiction area, we provide Friend of the Court services, so those children's cases get transferred elsewhere. Likewise, we assist the court in efficient docket management by notifying the court ahead of time of rare language interpretation needs so that the court can coordinate the need for these interpreters ahead of scheduled hearings. The judges appreciate that in many of the cases that we enter representation on, we are often successful in obtaining the termination of the case and thereby reducing the docket load the court has as we pursue legalization for our clients through affirmative means. As for the shelters, we maintain daily communication with them and provide training for shelter staff on how to avoid the unlawful practice of law and how our office can help children. Often children at the shelter are scared about what comes next for them and our office helps to dissipate that fear by providing know your rights presentations and explaining to children the options available to them in the United States. Our office also assists ICE in cases where a child wishes to repatriate to their home country. In those cases, we reach out to our local ICE office and work together to honor the child's wishes and assure their return to their home country as soon as possible – this work reduces the workload of the El Paso Immigration courts.

. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all four Contract Line Numbers (CLINs): 1. KYR presentations and legal services for pro se children in ORR facilities; 2. Legal representation for unaccompanied children not in ORR custody; 3. Legal representation for unaccompanied children in ORR custody; and 4. Spanish language tutoring for organizational staff who work with children. Without further elaboration on duration or reasoning, the stop-work order states that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025.

. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective on the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN 1, which funds KYR presentations and confidential legal consultations for pro-se children in ORR facilities. Per

5

the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination o her than "the Government's convenience."

. On Friday, March 21, 2025, at 8:29 AM, I received an email from the Acacia Center for Justice notifying me of the near complete termination of the funding by HHS for the services mentioned in this affidavit. This information was then communicated to the entire Unaccompanied Children Program at Estrella del Paso.

. As a result of the near complete termination of funded services, Estrella del Paso had to immediately place 2 Data Entry Clerks, 4 Managing Attorneys, 9 Orientation Specialists, and 2 Social Service Providers on furlough. 4 Legal Assistants were temporarily reassigned to two other departments to avoid the need to immediately furlough them; however, this reassignment is temporary and likely only feasible for two weeks. At the end of two weeks, these 4 Legal Assistants will also be furloughed. Given the lack of advance notice of termination, the decision to furlough staff in lieu of immediate termination allows Estrella del Paso Management and the Board of Directors to fully discuss the impact of the termination as well as the details of the termination notice and make decisions in the best interest of the entire organization. This termination raises immediate concerns about Estrella del Paso's obligation to clients whom we represent. As attorneys, we have an ethical obligation to our clients. We cannot ethically withdraw from representing clients simply because the government made the decision to terminate the funding. We entered representation agreements with every client while under a government subcontract providing funding for representation and with the expectation that funding would continue throughout the entire course of representation, especially given we were required to enter representation pursuant to the contract. Additionally, the government's shift to five-year contracts made their commitment to continued funding more secure from our perspective.

. After staff were furloughed, we began an immediate review of all pending cases. We are in the process of assessing each case and determining what needs to be done to ensure continuity of our representation. Given that the notice of termination was just received yesterday, we are still in the process of triaging our case load and trying to figure out what next steps we will need to take. We are committed to our ethical and legal obligations to our clients, and our assessment of our obligations under the various jurisdictions in which our attorneys are licensed requires our representation continue despite the termination of funding.

. The Unaccompanied Children's Program accounts for about forty percent of our overall organizational budget. The Unaccompanied children's Program is by far our largest unit – employing 28 full-time individuals. Prior to the termination, our Unaccompanied

6

Children's Pro ram was funded at a monthly cost of approximately $284,000 per month. As a result of this nearly complete termination of funding, we believe our new anticipated monthly funding will be approximately $53,000 per month. However, given the nature of the termination and lack of details provided, we are unsure of the exact amount of continued funding. If the final funding total is lower than the funding currently being received, there will be a need to furlough additional staff. The current funding, if it remains level, will partially cover the salaries and benefits of the remaining 6 staff; however, it will not cover the true costs of running the program. This will require Estrella del Paso to continue representing our clients and run the remaining portion of the program at a deficit for the organization. The costs of the Unaccompanied Children's Program are so high that running the program absent reimbursement would be fiscally irresponsible. The carrying costs of this program threaten to completely decimate our cash flow if not reimbursed monthly. As a non-profit organization with limited savings, we are in the precarious position of terminating staff as any prolonged closure of the program or prolonged reimbursement for work done by program staff threatens to leave our organization running at a deficit. This would also impact other programs at our organization as any money depleted from our savings cannot be easily replenished as this programs sole source of funding comes from this contract. There are no other sources of funding for this team. Our organization prides ourselves in providing completely free legal services since late 2022. With this termination, it will be necessary to use reserve funds to ensure continuity of representation for unaccompanied children clients. The depletion of our reserve funds would likely require us to abandon our 100% free legal services program and begin charging for legal representation in certain cases once more.

. Despite the termination order and the lack of funding, Estrella del Paso staff would be ethically required to continue representing the hundreds of children whose cases are currently pending without any funding. This ethical obligation would cause further financial obligations and distress for the organization as we would have to continue to employ sufficient staff to continue to represent all children without any financial assistance. This would be a detriment to the entire organization and affect our ability to carry out our nearly 40-year mission of service that has assisted more than half a million people. This termination has already had a significant impact on the morale of our team. The broader Estrella del Paso team is frustrated, angry, and absolutely devastated by the furlough of 18 of their co-workers. The remaining 6 Unaccompanied Children Program staff are gutted by the loss of their co-workers, but they are committed to continuing the work on their behalf. I admire their commitment; however, I am concerned about the long-term effects of this termination on their mental and physical health as well as morales. The remaining 6 employees will need to undertake work that prior to March 21, 2025, was done by a team of 30. This level of work and expectation by the federal government is untenable.

7

I declare und r penalty of perjury that the foregoing is true and correct.

Executed on the 22nd of March 2025, in El Paso, Texas.

**Melissa Mari Lopez**

Digitally signed by Melissa M.
Lopez
Date: 2025.03.24 13:23:15 -06'00'

8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

          Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

          Defendants.

Case No. 3:25-cv-2847

**DECLARATION OF LAURA NALLY
(AMICA CENTER) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

**DECLARATION OF LAURA NALLY,**
**PROGRAM DIRECTOR FOR THE CHILDREN'S PROGRAM AT AMICA CENTER**
**FOR IMMIGRANT RIGHTS (FORMERLY CAPITAL AREA IMMIGRANTS' RIGHTS**
**("CAIR") COALITION)**

*I, Laura Nally, make the following statements on behalf of Amica Center for Immigrant Rights. I certify under penalty of perjury that the following statements are true and correct pursuant to 28 U.S.C. § 1746.*

1.      My name is Laura Nally, and I am the Program Director overseeing the Children's Program at Amica Center for Immigrant Rights ("Amica Center"), formerly known as the Capital Area Immigrants' Rights ("CAIR") Coalition. Amica Center is a Washington, D.C.-based nonprofit legal services organization that strives to ensure equal justice for all indigent immigrant men, women, and children at risk of detention and deportation in the Washington, D.C. area and beyond, through providing pro bono legal services and representation. I am an attorney licensed in Virginia and the District of Columbia and have been practicing immigration law for more than 15 years. I joined the Children's Program at Amica Center in August 2019.

2.      Amica Center operates three main programs: the Detained Adult Program ("DAP"), the Children's Program ("DUCs" or the "Children's Program"), and the Immigration Impact Lab. DUCs' work specifically focuses on offering legal services and representation to unaccompanied immigrant children held by the Office of Refugee Resettlement ("ORR") at ORR-subcontracted facilities, including shelter and foster care programs, as well as children in ORR Unaccompanied Refugee Minor ("ORR URM") programs in the greater Washington, D.C. and Baltimore areas.

3.

1

4.      To provide these services, Amica Center's Children's Program now has 33 full-time and 4 part-time staff members. Specifically, the Children's Program employs a program director, deputy program director, three managing attorneys, one supervising attorney, five senior attorneys, six staff attorneys, one Immigrant Justice Corps ("IJC") Attorney Fellow, two contract attorneys, two managing paralegals, four senior paralegals, seven paralegals, one senior program associate, and three social services staff members. Several additional positions are currently vacant due to challenges hiring qualified attorneys in a climate of funding uncertainty. We rely on funding from the U.S. Department of Health and Human Services ("HHS"), distributed to us through the Acacia Center for Justice as sub-contractor, to fund over 96% of our program.

5.      Children's Program staff work to provide legal support, direct representation, and social services to unaccompanied immigrant children who are currently or have been released from ORR custody at juvenile facilities in Washington, D.C., Virginia, and Maryland. Our goals are to educate children about their rights and their legal options while in ORR custody, ensure that their needs are being met and their rights respected, and to represent children in pursuing any immigration relief or applications for which they may be eligible.

6.      This work has two principal work components: (1) providing legally-required "Know Your Rights" presentations to children held in ORR-subcontracted facilities; conducting age-appropriate and trauma-informed one-on-one legal screenings for eligibility for immigration relief; referring children reunified outside of our geozone to other legal service providers; and preparing and accompanying all detained unaccompanied children in our geozone to their court appearances; and (2) providing in-house direct legal representation to unaccompanied children in immigration court, before federal agencies, and in state court to pursue immigration relief and applications, as well as referring cases to and mentoring pro-bono attorneys.

7.      To deliver KYR, legal screening, and other non-representational services, Amica Center staff travel in person to each ORR-subcontracted facility on a weekly basis. In calendar year 2024, we provided "Know Your Rights" trainings and intakes to nearly 1,600 children in more than 20 languages. In 2023, our team developed a specialized KYR presentation using cartoon animals to provide age-appropriate services to tender age (under 12) children. Amica Center utilizes a weekly visit model to ensure that all children receive these initial services within 10 days of their arrival in ORR custody. Depending on the children's language needs, multiple Know Your Rights presentations may be provided on any given day. Most children do not understand why they are being held in government custody, that they will be placed in removal proceedings, or that legal protections exist for children under U.S. immigration law. Our staff are trained not only to break down complex information and topics in age- and culturally-appropriate ways, but to utilize active engagement strategies to ensure that children are fully engaged and focused on the material and able to ask questions. Children then immediately receive a legal screening with a staff member

2

trained in trauma-informed and child-friendly interviewing. It is not uncommon for a legal screening to take place over multiple meetings if a child is too emotionally overwhelmed to tell their story or needs time to build trust before recounting traumatic events.

8. The Children's Program also provides a crucial suite of nonrepresentational services including court preparation, courtroom assistance and accompaniment, and legal referrals. When a child in an ORR-subcontracted facility is scheduled for an appearance in immigration court, we meet individually with the child to explain what to expect in court and then appear alongside the child as "Friend of the Court" to share information and updates with the immigration court such as the child's expected reunification location. We also help children with matters related to their placement and rights within the ORR system. When a child is expected to remain in ORR custody until their 18th birthday, we have assisted the ORR-subcontracted facility staff to identify suitable post-18 placements such as transitional housing programs for young adults and liaised with the Immigration and Customs Enforcement ("ICE") Field Office Juvenile Coordinator to advocate for the child's release to a community-based program rather than transfer to ICE detention. When we identify a child to be a potential victim of trafficking, we refer them to the Office on Trafficking in Persons ("OTIP") for a determination of eligibility for benefits and services under federal law.

9. Amica Center staff offer full legal representation to children in the ORR-subcontracted facilities we serve who do not have a viable ORR sponsor, who are placed into an LTFC program, who wish to return to their home countries, whose immigration proceedings advance to a point where they are expected to make substantive decisions about their legal case, and who are confirmed to be reunifying into our geozone to ensure continuity of legal services. We also initiate representation for particularly vulnerable children, including victims of trafficking, children who have experienced abuse or neglect in custody, or children who have been placed in restrictive settings or out-of-network placements.

10. Between March 30, 2024, and March 20, 2025, we initiated representation with 192 children in ORR-subcontracted facilities and ORR URM programs. Children's Program attorneys represent unaccompanied children in removal proceedings before the Hyattsville, Baltimore, Annandale, and Sterling Immigration Courts and the Board of Immigration Appeals ("BIA"). DUCs staff also represent children in applications with U.S. Citizen and Immigration Services ("USCIS") including asylum, Special Immigrant Juvenile Status ("SIJS"), family-based and humanitarian (U and T) visas, Temporary Protected Status ("TPS") and self-petitions under the Violence Against Women Act ("VAWA"). In addition to providing direct legal services, Amica Center staff also work to recruit, train, and supervise teams of pro bono attorneys who represent unaccompanied children in immigration proceedings and applications for immigration status. These pro bono attorneys are a critical part of Amica Center's mission and model which allows us to leverage

3

volunteer legal services to more efficiently represent children. Approximately 15% of cases currently open with the Children's Program are placed with pro bono attorneys.

11.    Amica Center's Children's Program has continuously received HHS funding since 2015. We currently have more than 850 open cases that were initiated and continuously funded through HHS funding. Children released to sponsors or transitional living programs live throughout the Washington, D.C. and Baltimore, MD metropolitan areas, including in the suburbs of Virginia and Maryland. Specific bar licensure is required to represent children in SIJS cases in each of the three jurisdictions where we practice, and this affects how case assignments are made among our attorneys. Due to the significant backlogs in state courts, USCIS, and the immigration courts, children's immigration cases often take years to resolve before an eligible child is granted asylum, a U or T visa, or lawful permanent residence.

12.    The need for legal representation and other support services for unaccompanied children—especially those in government custody and those facing deportation—is truly critical. Immigration law and procedures are incredibly complex and becoming more so every day. The overwhelming majority of unaccompanied children that we encounter in ORR-subcontracted facilities do not have the means to pay for a qualified private immigration attorney to represent them. ORR-subcontracted facilities are often located in rural areas where there are limited or no pro bono resources. For example, one of the ORR-subcontracted facilities that we serve is located approximately two hours away from Washington, D.C., the closest metropolitan area, by car and far from any other potential service providers.

13.

14.    In our experience, other government stakeholders including immigration judges, ORR-subcontracted facility staff, and the DHS Office of the Principal Legal Advisor ("OPLA") attorneys also prefer and appreciate when an unaccompanied child is represented by counsel. We frequently appear as Friend of Court to relay important updates regarding a child's reunification to OPLA and the immigration court and to coordinate appropriate changes of address and changes of venue. ORR-subcontracted facility staff often have questions for us about the logistics for children's appearances in court. Immigration judges

have sometimes requested that we enter appearances for children if the judge has doubts about the child's competency or understanding of their legal options. We also play a critical role in identifying and referring children for appointment of a Child Advocate. For children who are reunifying outside of our geozone, we provide legal referrals, either directly to another Acacia Center network provider or by providing a list of potential pro bono or low-cost resources directly to the child and sponsor. Because capacity for free and low-cost representation is overstretched in most areas, however, these resources can be very difficult to access.

15.    Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a Stop Work Order for Legal Services for Unaccompanied Children, effective immediately, which extended to "all activities" under the contract. Attached hereto as **Exhibit 1** is a true and correct copy of the Stop Work Order, dated February 18, 2025. Without further elaboration as to duration or reasoning, the Stop Work Order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." Ex. 1 at 1. HHS then rescinded the Stop Work Order without explanation on February 21, 2025. Attached hereto as **Exhibit 2** is a true and correct copy of the Stop Work Order Recission, dated February 21, 2025.

16.    The chilling effect of the February Stop Work Order has had lasting effects on the Children's Program. Two staff members, including one Senior Paralegal and one IJC Attorney Fellow, have accepted employment with private immigration firms and cited as the deciding factor the job insecurity generated by doubts about the security of our HHS funding. This climate of uncertainty has also had a chilling effect on hiring qualified attorney candidates to fill existing vacancies, which in turn increases the caseloads of existing staff and has a negative effect on morale and retention.

17.

18.    Our program was notified of the Partial Termination via an email from the Acacia Center for Justice shortly after 11 AM on March 21. We called a teamwide meeting several minutes

5

later to share the news with staff and answer their questions. Although our staff are understandably concerned about their job security and their ability to obtain future employment due to the sweeping expanse of the cuts to funded legal representation for children, their overwhelming response was to look for solutions for how to continue to represent the clients who trust and rely on us for their legal cases.

19.     The abrupt termination of CLIN 2 funding for representation and associated services represents a loss of approximately 30% of Amica Center's total annual budget and 75% of the budget for the Children's Program. Amica Center has not yet set a timeline by which decisions would need to be made regarding staff layoffs or the discontinuation of any major aspects of our work. However, all work on cases where representation was undertaken during the preceding 10 years of HHS funding through the Acacia Center for Justice is now being funded using general operating funds. The organization has taken this position due to our ongoing ethical obligations to our clients and to preserve our ability to continue providing high-quality representation to those clients by minimizing the loss of qualified staff members. Amica Center cannot continue to fund this casework using general operating funds indefinitely. We are urgently seeking funding from other sources, but the collective impact of a nationwide shutdown is so great that the gap cannot be filled by private donors. To the extent that cases initiated under HHS funding could be transferred to funding streams held by other Amica Center programs (for example, state or local funding currently being used for adult representation), this would interfere with Amica Center's mission to maximize representation for indigent immigration men, women, and children at risk for detention and deportation by directly supplanting the organization's ability to represent other affected individuals.

20.     The alternative—to immediately withdraw from representation in our 850 affected cases— is antithetical to our ethical obligations as attorneys and our values as a mission-driven organization. In many of the open legal cases for our child clients, there are upcoming hearings or deadlines which mean that withdrawing from the case would not be possible. Across the Children's Program, we have six clients scheduled for hearings with local immigration courts between March 24 and March 27. Not only is it nearly logistically impossible to withdraw from an immigration matter in that time frame, since withdrawal requires leave of the immigration judge, it is also impossible to do so without prejudicing the client's legal interests. We have dozens of open matters pending with state courts for children who are eligible for SIJS. In addition to upcoming hearings, there are ongoing time-sensitive legal requirements in those cases, including service of process on opposing parties, requests for orders of default, and other procedural requirements that, if not timely completed, could lead to dismissal or significant delay. Pro bono attorneys are heavily reliant on mentorship from experienced in-house immigration attorneys and at risk of committing errors or omissions in their cases without mentorship.

6

21.  Although KYR presentations and legal screenings remain funded for now through CLIN 1, significant, interrelated pieces of our work have been terminated, the consequences of which are immediate and severe. For example, if a child at one of the ORR-subcontracted facilities we serve is identified as having an urgent legal need such as an outstanding removal order, Amica Center—the only legal provider with access to the ORR-subcontracted facility—would not be funded to provide the necessary legal service to protect the child from imminent removal. Many children who enter ORR custody with prior removal orders are eligible to have their immigration court proceedings reopened, but doing so requires filing a motion as quickly as possible, something which children simply cannot do without the help of an experienced attorney. Similarly, without timely access to competent legal services, older children are at risk of losing access to protections based on their age. A 17-year-11-month-old child who has been severely abused by their parent(s), for example, is eligible under federal law to petition for Special Immigrant Juvenile Status until age 21. In Virginia, however, the Juvenile and Domestic Relations ("JDR") court, must make the necessary findings of fact regarding eligibility, must obtain jurisdiction before the child turns 18. Without access to legal representation who can initiate the necessary proceedings before the child's 18th birthday, that child's right and ability to seek protection through SIJS is functionally eliminated.

22.  One of the children currently represented by the Children's Program is a four-year-old boy from Haiti, referred to here as "Jean." He is currently in an ORR URM program living with foster parents in Virginia. Jean entered the United States shortly after he turned three years old and was placed in ORR custody. After it was determined that there were no viable sponsors for him in the United States, Jean was released from custody to an ORR URM program served by Amica Center. Amica Center coordinated with the HHS-funded legal provider which had been working with him at his ORR placement to transfer his legal case and substitute counsel on all of his pending matters to avoid an interruption in representation. Jean has a TPS application pending, is eligible for SIJS and is in removal proceedings. SIJS findings for Jean would be made through his open foster care proceeding in Virginia, and he is scheduled for a hearing on April 2, 2025. His Amica Center attorney has been working to prepare the necessary motion and proposed order in advance to ensure that the matter can be heard at the upcoming hearing. Jean is also scheduled for a Master Calendar Hearing in early June at which it is obvious that he could neither engage with the proceeding nor provide relevant updates to the court regarding his other pending legal matters to the court other than through counsel.

23.  The interruption and subsequent termination of funding for representation and nonrepresentational services to unaccompanied children has already frustrated Amica Center's mission and threatened the sustainability of our work. Providing a legal screening without the ability to refer a child for long-term representation, connect them to benefits

7

and services for victims of trafficking, or prepare and accompany them to court, fundamentally restricts the efficacy of that legal orientation and screening.

24.

25. If the Children's Program were forced to lay off staff due to sudden and unexpected termination of funding, it would be a drain on our organizational expertise in the delivery of legal representation and other services to the unaccompanied immigrant children held in ORR custody. The collective experience of our specialized staff would be nearly impossible to recover and would hobble our ability to deliver high-quality services to unaccompanied children in ORR custody in the Capital region, even if funding were restored to similar levels in the future. The level of investment required to hire and train new staff, fellows, volunteers, or interns would divert significant director and manager time and resources from the continued provision of representation to existing clients and have a lasting impact on the morale and retention of supervisors and managers. My own time over the past month has been overwhelmingly diverted from essential case supervision and legal guidance in a rapidly changing area of immigration practice, to responding to threats to our funding and program stability.

26. The continued funding of this work is critical to ensuring that children do not experience irreparable harm to their ability to access legal protections in the United States. Children who have spent months and years building trust and rapport with an attorney or legal advocate will be faced with the prospect of navigating a complicated and increasingly hostile legal system alone or urgently seeking out either the few remaining low-cost resources for representation in this space or the resources to pay for private counsel, reliving and recounting some of their most personal and traumatic experiences with a stranger.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 25 of March 2025, in Alexandria, Virginia.



8

_____

Director, Detained Children's Program
Amica Center for Immigrant Rights
1025 Connecticut Ave. NW, Suite 701
Washington, D.C. 20036
P: (202) 916-8179
laura@amicacenter.org

9

# Exhibit
# 1



# United States Department of the Interior

### INTERIOR BUSINESS CENTER
Washington, DC 20240

███████████████

Acacia Center for Justice
1025 Connecticut Avenue NW
Suite 1000A
Washington, DC 20036

February 18, 2025

Re: Immediate Stop Work Order

Dear ██████████

This letter constitutes an official Stop Work Order for **all activities** under Contract 140D0422C0009 – Legal Services for Unaccompanied Children.

In accordance with FAR 42.1303, the Government hereby directs your firm to stop all work associated with the scope of Contract 140D0422C0009. Therefore, your firm shall cease all services and the ordering of supplies.

All subcontractors shall be notified immediately that a stop-work order has been issued to the prime contractor. The stop-work order shall remain in place until you are notified otherwise by the CO.  As soon as feasible and prior to the lifting of the stop-work order, appropriate action shall be taken to either terminate the contract or extend the period of performance, if necessary. The stop work order is being implemented due to causes outside of your control and should not be misconstrued as an indication of poor performance by your firm.

Please do not hesitate to contact me with any questions or concerns.

Sincerely,



# Exhibit

# 2



# United States Department of the Interior

### INTERIOR BUSINESS CENTER
### Washington, DC 20240

Acacia Center for Justice
1025 Connecticut Avenue NW
Suite 1000A
Washington, DC 20036

February 21, 2025

Re: Cancelation of Stop Work Order

Dear

This letter cancels the Stop Work Order issued February 18, 2025. Acacia Center for Justice may resume **all activities** under Contract 140D0422C0009 – Legal Services for Unaccompanied Children.

If Acacia intends to submit a Request for Equitable Adjustment under FAR 52.242-15, please submit it to the Contracting Officer no later than 30 days after the receipt of this letter.

Please do not hesitate to contact me with any questions or concerns.

# Exhibit

# 3



[REDACTED]

*is hereby **partially terminated** for the Government's convenience*

*Termination for the Government's convenience*

**Subject to the terms of this contract, the Contractor shall be paid an amount for direct labor hours (as defined in the Schedule of the contract) determined by multiplying the number of direct labor hours expended before the effective date of termination by the hourly rate(s) in the contract, less any hourly rate payments already made to the Contractor plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system that have resulted from the termination**

*final* ____

[redacted]

3/25/2025

*Acknowledgment of Notice*

[redacted]

[redacted] D D d [redacted]

2 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

Case No. 3:25-cv-2847

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

              Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

           Defendants.

**DECLARATION OF MARTHA RUCH
(CLSEPA) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

Case 3:25-cv-02847-AMO Document 82 Filed 04/08/25 Page 659 of 933

**DECLARATION OF MART  A RUC**
**LEAD IMMI  RATION MANA  IN  ATTOREY FOR CLSEPA**

*I, Martha  uch, make the following statements on behalf of myself and Community  egal Services in  ast Palo Alto  C  S  PA . I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

PI Appeal and Stay Addendum 655

PI Appeal and Stay Addendum 656

Case 3:25-cv-02847-AMO Document 97 Filed 05/13/25 Page 685 of 956

**Mart a Ruc**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>       Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>      Defendants. | **DECLARATION OF ELIZABETH SANCHEZ KENNEDY (GHIRP) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

## DECLARATION OF ELIZABETH SANCHEZ KENNEDY
## EXECUTIVE DIRECTOR FOR GALVESTON-HOUSTON IMMIGRANT
## REPRESENTATION PROJECT (GHIRP)

*I, Elizabeth Sanchez Kennedy, make the following statements on behalf of the Galveston-Houston Immigrant Representation Project (GHIRP). I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Elizabeth Sanchez Kennedy, and I am the Executive Director at the Galveston-Houston Immigrant Representation Project. GHIRP is a legal services organization that was launched in October 2020 with a mission to build a resilient, diverse community by providing comprehensive representation and holistic legal services to immigrants in need. GHIRP's legal services range from outreach and education to complex litigation in the Galveston-Houston area. Our legal team provides holistic and comprehensive representation to immigrants in the community, including unaccompanied minors, adults, and women, children, and families.

3. GHIRP's Immigrant Children & Youth program is dedicated to representing indigent unaccompanied immigrant children who are not in detention as well as those held in Office of Refugee Resettlement (ORR) custody throughout the Galveston-Houston area. This program was directly impacted by the termination of funds dedicated to unaccompanied immigrant children. Core to GHIRP's mission and legal services, is providing representation to unaccompanied immigrant children and youth. GHIRP was founded with funding for unaccompanied immigrant children and our first year of services focused almost exclusively on legal services for detained and released unaccompanied immigrant children. The contract termination, which cuts funding dedicated to one of our main legal services, perceptibly impairs our core business activities.

4. In order to carry out our mission, GHIRP has several main work components: (1) providing educational and pro se services in the form of legal education "know your rights" (KYR) presentations, conducting individual consultations (intakes), and conducting pro se services with unrepresented children in ORR custody in the Greater Houston Area; (2) representing unaccompanied minors who are not in ORR custody in immigration

1

proceedings; (3) representing children in ORR custody in immigration proceedings; (4) referring children for pro bono legal services outside of the Galveston-Houston area; and (5) providing social services to unaccompanied children. We further host an Immigrant Justice Corps (IJC) fellow to represent unaccompanied children in removal proceedings and provide Spanish-language tutoring for staff representing unaccompanied children.

5. GHIRP has been providing legal services to unaccompanied immigrant children in Galveston and Houston since 2020, when the organization was founded. Since the organization opened, our legal services dedicated to unaccompanied immigrant children have expanded each year. In 2020, we provided direct representation to approximately 35 unaccompanied immigrant children. In 2021, GHIRP initiated services in a newly opened ORR facility in Houston (Children's First Residential Care TX Gasmer), providing KYR presentations, intakes, direct representation, social services, and referrals for children who were released to other jurisdictions. In 2023, GHIRP began providing the same legal services to unaccompanied children in a second ORR shelter named LSSS Upbring Krause Children's Center. GHIRP's direct representation services dedicated to children who are not in custody have also expanded, from 35 cases in our first year of existence (2020) to now serving approximately 300 clients per year (2025). Currently, GHIRP serves a combined annual number of nearly 1,500 children per year, including approximately 1,500 children detained in ORR custody, approximately 300 children receiving direct representation services per year, 120-150 children receiving social services per year, and approximately 35-50 children receiving *pro se* assistance per year.

6. Wholly with U.S. Department of Health and Human Services (HHS) funding, GHIRP has hired 19 staff members dedicated to providing legal services to unaccompanied immigrant children. Specifically, our team comprises seven (7) attorneys, one (1) Department of Justice Accredited Representative, nine (9) legal assistants, and two (2) social services coordinators. As executive director, I oversee the program, support the managing attorney, and provide mentorship to the legal team. All staff on GHIRP's Immigrant Children & Youth team are full time employees, and one of the attorneys is an Immigrant Justice Corps fellow. Through this contract, we serve recently arriving children in the ORR facilities, as well as released children in the community.

7. GHIRP's Immigrant Children & Youth team serves detained children who are between the ages of six (6) and seventeen (17) years old, and non-detained children of all ages. We provide legal services to children within seven to ten (7-10) business days of their arrival to the ORR facilities, if not sooner.

8. GHIRP staff provide detained services in the facilities two to four (2-4) times per week, for approximately two to four (2-4) hours or more each visit. Staff providing direct representation and KYR presentations to children in ORR facilities regularly travel to each facility in person to conduct client interviews, prepare clients for hearings, gather evidence,

2

as well as provide legal education, individual consultations, and pro se legal services. Our team also provides "friend of court" legal services so that children appearing in court without an attorney do not have to appear alone. The courts function more efficiently when legal representatives are involved as "friend of court" as they explain technical requirements at preliminary hearings and move the cases along while protecting their rights. GHIRP's legal team also advocates for children in ORR custody seeking release or transfers, reporting disclosed physical or sexual abuse while in custody, and ensuring that their basic needs are met by the facility and staff (such as language access and access to education and recreation). If and when a child is released to a location outside of our geographic area, we refer children for legal services in the location where they are going.

9. The GHIRP legal team is trained to provide child-friendly, trauma-informed, culturally competent services to tender aged children, as well as pre-teen and teenage children. When we meet the children for the first time, they can be confused, vulnerable, and they often do not understand the complex immigration system that they must navigate. Many children do not understand where they are, why they are in a shelter, or that they have rights. Through our KYR presentations we teach them about their rights, the immigration system, and what they must to do seek relief in the United States. We also explain what their obligations and rights are after they leave the ORR shelter.

10. Our staff teaches children about how to identify harmful behavior by caretakers. The goal is to provide complex information to children of all ages in a way that they can comprehend and retain. The GHIRP legal team tailors presentations and individual consultations to meet the needs and capacities of each child. We developed materials and resources specific to all age groups so that children remain engaged and empowered by our services. During individual consultations, our staff are trained to meet each child at their developmental level to ensure that the intake is effective and comprehensive. We have seen firsthand how this information and engagement in our services is critical to preventing trafficking and abuse after minors leave the facility, as well as safeguarding their legal rights in the immigration system.

11. The GHIRP legal team provides representation to detained children appearing in immigration court and those who are released to the Galveston-Houston area. We identify children who are eligible for legal relief and assist them in preparing their case from the initial filing of the application or appearance in court, to the finality of their case. We represent children in matters before the Houston immigration courts, the Board of Immigration Appeals, federal district courts and petitions for review in circuit courts, as well as children seeking affirmative relief before USCIS and the USCIS Houston Asylum Office, and family court petitions in state court. Our legal team represents children seeking humanitarian relief such as asylum, U-visa and T-visa applications, Special Immigrant Juvenile visa petitions, and VAWA petitions. GHIRP conducts pro se workshops for children who qualify for legal relief but cannot obtain an attorney to represent them.

3

12. Many children that receive our legal services do not speak English, have experienced trauma, and do not have the resources to hire an attorney. Some clients are so young they cannot read or write in their own language, much less present a legally sufficient case in English in an adversarial court system.  We have represented non-verbal children, children with mental and physical disabilities, and parenting children who have been sexually abused from a young age.  Given their particular vulnerabilities, many of our young clients do not have the resources to hire a private attorney and they cannot present a legally sufficient case before the court without an attorney by their side. GHIRP's free, accessible representation is their only chance to meaningfully participate in their case and obtain a fair outcome.

13. GHIRP attorneys regularly appear before juvenile docket Immigration Judges for our clients that are unaccompanied immigrant children.  The attorneys are knowledgeable about legal issues specific to immigrant children and understand the preferences of the judges including required motions and evidence to be filed before hearings. This familiarity with the juvenile judges and issues ensures efficient adjudication of cases, or dismissals of removal proceedings where relief is available outside of the court. By frequently appearing with children in the courts, GHIRP attorneys are able to effectively prepare our child clients for hearings, eliminating the stress and trauma of appearing before an Immigration Judge.

14. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation to GHIRP on February 21, 2025.

15. On March 21, 2025, also without warning, GHIRP learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds GHIRP's legal services for unaccompanied children. This termination was effective the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Item Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN 1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work

4

immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

16. I received notification of the contract termination by email. I notified the Immigrant Children & Youth team that the contract was terminated effective immediately, and that work on cases under the contract should stop due to a lack of funding. As a team, we assessed our cases that are currently in progress, our clients' reliance on our representation, immediate next steps for clients, and work that needed to be prioritized given the time-sensitive nature of the cases.

17. Notification of the contract termination has significantly impacted our organization, staff, and clients. GHIRP currently represents 292 clients with funding from the current contract with Acacia Center for Justice. Our youngest client is two (2) years old. We represent clients who have imminent hearings, filing deadlines, and time-sensitive motions before the court. Our clients are scheduled to appear in court as soon as April 2, 9, and 10, 2025. The April 2, 2025 hearing is for a detained client who needs to file relief and be prepared to plead in his second setting in Immigration Court, which has necessitated urgent work to prepare an application this week. Another client has an Individual Hearing on April 9, 2025 that will require substantial attorney preparation time, in addition to working closely with the client on his testimony, and another client has a filing deadline for that same day.

18. Some cases require complex legal arguments, such as our client who is contesting the judge's jurisdictional decision related to his asylum claim. The law entitles this client to explicit procedural due process protections for unaccompanied children, including filing his asylum application with the asylum office first. Our attorney has filed two separate motions and appeared at a hearing related to this issue and is scheduled to appear again in court to resolve the matter. Our young client will not be able to advocate for his rights alone if we are forced to abruptly withdraw from his case.

19. GHIRP's IJC Fellow represents "Evelyn," a 12-year-old girl from Mexico who has endured significant abuse starting at a very young age. Before entering the United States, she was labor trafficked at the young age of 5 years old and endured physical and sexual abuse at the hands of her caretakers who were her extended family members. We assisted Evelyn in filing her asylum application and are in the process of gathering documentation and information to file a T-visa application. These forms of relief will ensure that she can stay in the U.S. with her sponsor and heal from her past trafficking and abuse. Evelyn was issued a Notice to Appear and will soon be required to appear in the Houston Immigration Court. To withdraw from her case at this stage would likely result in her abandoning both forms of relief and being forced to return to the very dangers she fled.

20. GHIRP also represents "Rosa," a 15-year-old girl from Honduras, in her immigration case seeking both SIJS and asylum. When we met Rosa, she was incapable of speaking due to

5

her severe trauma. She would sit silently with her attorney, picking at her skin and repeating nervous ticks due to her extreme discomfort and anxiety. Through multiple meetings and building rapport, Rosa disclosed her history of parental abandonment and neglect, as well as surviving sexual abuse in her home country. She continues to display extensive distress related to her past trauma. GHIRP filed her asylum application (which is currently pending) and her family court case is pending in state court, which forms the basis for an application for SIJS. Rosa is not capable of complying with family court requirements for service of process, establishing parentage, and meeting the legal standards for the requested proposed order without an attorney representing her. Furthermore, she will soon be required to appear in the Houston Immigration Court and will need her trusted attorney to represent her in those proceedings as well.

21. These clients have an expectation that GHIRP will timely prepare their case, appear in court on their behalf, and complete the case in accordance with our attorney-client representation agreements. In order to comply with our client obligations, we have had to utilize operating expenses that were set aside for other purposes because we are not able to halt legal representation on a moment's notice.

22. GHIRP's legal team will not withdraw from client cases immediately. Our management team is determining how long we can continue representing our clients without funding, considering the number of clients we represent, the procedural posture of each case, and the staff capacity for casework with a reduced team due to funding. Due to the sudden contract termination, we must decide which cases to retain, and which staff will remain at the organization (if any). GHIRP attorneys and representatives have an ethical duty to represent our current clients and to advocate for their interests. To abruptly withdraw from our clients' cases will be detrimental to their legal case, and a direct impairment to our existing core activities. Clients will age out of legal relief, may be forced to abandon relief due to missed filing deadlines, and/or they will not be able to pursue their cases in court effectively alone without representation. Our attorneys are the attorney of record in immigration court and state court, and judges may not allow for our withdrawal at such a late stage of the case. If they do allow for withdrawal, our young clients will not have the time and resources to obtain new counsel within the courts' deadlines and/or scheduled hearings.

23. The financial impact of the contract termination profoundly affects GHIRP, as the entire contract for legal services for unaccompanied children represents approximately 45% of our organizational budget and staff. Our organization served 2,625 immigrants in the community last year, of which 1,469 (or 57%) were unaccompanied children receiving services through this contract. GHIRP is not able to maintain the same level of legal services for unaccompanied minors without HHS funding, and we will be required to lay off most of our Immigrant Children and Youth staff in approximately four weeks. We will rely on unrestricted funds and savings to pay staff during this time, however, drawing down

6

on these funds will destabilize the organization as a whole. This will divert unrestricted funds away from other services, as these resources typically cover gaps in funding between contract cycles on other grants, underfunded programs, or new initiatives that are responsive to emerging needs of the community.

24. GHIRP's staff members serving immigrant children and youth are exceptionally passionate about providing legal services to children and are currently distraught by the recent contract termination. All have had formal and/or on-the-job training related to educating and representing children and youth and have developed unique skills to provide child-friendly legal services.  Over the years, our team has built rapport with our clients, assisted them in navigating personal and legal issues, and dedicated a significant amount of time and resources to zealously advocating for their clients.  Through our services, we hope to achieve our goals of obtaining safety and stability for our clients so that they can thrive. An interruption in services risks re-traumatizing them and causing them to lose the progress they have made so far in their trajectory toward opportunity. The abrupt contract termination has impacted staff morale and caused incredible amounts of stress. Having to withdraw representation may be a violation of our ethical duties to our clients and will likely lead to their deportation, placing our clients in harm's way.  Our children view our team as a reliable support, which many clients lack in other aspects of their lives. These consequences deeply impact our staff, who are dedicated, compassionate professionals.

25. Such results are antithetical to our values and impede our ability to carry out GHIRP's mission.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on the 25th of March 2025, in Houston, Texas.


 /s/ *Elizabeth Sanchez Kennedy*
**Elizabeth Sanchez Kennedy**
Executive Director

6001 Savoy Drive, Ste. 400
Houston, Texas 77036
Ph: (713) 588-2260
Email: Chiqui@ghirp.org

7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

**DECLARATION OF WENDY YOUNG (KIND) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## DECLARATION OF WENDY YOUNG,
## PRESIDENT OF KIDS IN NEED OF DEFENSE

I, Wendy Young, make the following statements on behalf of KIND, Inc. Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the following statements are true and correct.

1.  My name is Wendy Young, and I am the President of KIND, Inc., doing business as Kids in Need of Defense ("KIND"). KIND is the leading international not-for-profit organization devoted to protecting the rights and well-being of unaccompanied and separated children. Founded in 2008, KIND now has seventeen locations across the United States that have provided legal rights education to more than 78,000 children, and legal representation in immigration matters to more than 17,000 children in the United States. KIND staff provides legal services to unaccompanied immigrant children who are in the custody of the Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS) at 20 short-term shelter care or foster care facilities, five long-term foster care programs, and three Unaccompanied Refugee Minor (URM) programs served by KIND's offices in Atlanta, GA; Boston, MA; Fresno, CA; Hartford, CT; Houston, TX; Los Angeles, CA; New York, NY; Sacramento, CA; and Seattle, WA. KIND also serves children released from ORR care and living in the communities served by those offices and by our offices and locations in Baltimore, MD; the District of Columbia; Jacksonville, FL; Newark, NJ; Northern Virginia; Orlando, FL; Providence, RI; and San Francisco, CA.

2.  KIND provides representation and other services to migrant children in part through its staff, and in part through pro bono partnerships with nearly 900 law firms, corporations, law schools, and bar associations, whose lawyers provide children with pro bono representation with training and support from KIND. KIND also provides psychosocial support to children and families; works to address the root causes of child migration; and advocates for laws, policies, and practices to improve the protection of unaccompanied children within the U.S. and abroad.

      (1) During children's time in ORR custody, KIND conducts educational "know your rights" ("KYR") presentations that provide unaccompanied children with information about the immigration system, their rights and responsibilities, and what to expect in immigration court. KIND also conducts legal screenings to assess each child's protection needs and evaluate options for legal relief as well as making appropriate referrals for further legal or social services during or after ORR custody. As needed, KIND may also support children in requests for release on recognizance or with notifications relating to changes of address and venue.

1

(2) During ORR custody, if a child is required to attend immigration court, KIND will educate the child about immigration court processes and prepare them to attend the hearing, and will accompany the child to court in the capacity of "friend of the court" or, in limited circumstances, as attorney of record.

(3) During ORR custody, KIND may provide legal representation for certain children where services as "friend of the court" are not sufficient for the child's needs – for example, for children who are required to enter pleadings in their immigration removal proceedings during their time in ORR care, or children who are placed in federal long-term foster care.

(4) Many children who live in communities served by KIND following release from ORR custody receive free legal representation through KIND's network of pro bono attorneys and/or KIND staff.  The KIND mentor assigned to each pro bono attorney offers specialized training programs and guidance on substantive law and skills needed for representing children, addresses the pro bono attorney's questions, consults on case strategy, offers access to psychosocial services and other resources, and provides support at all phases of a child's immigration case.  KIND staff and KIND pro bono attorneys represent children in proceedings before the immigration courts, in administrative proceedings before U.S. Citizenship and Immigration Services (USCIS), in ancillary proceedings in state courts, and occasionally before the Board of Immigration Appeals, federal district courts, or federal courts of appeal.

4.  KIND's five original offices began providing legal services for released unaccompanied immigrant children through pro bono partnerships in January 2009, with two of those offices adding services for detained children later that year. Over time, KIND's programming expanded to include additional locations in the United States, plus a program dedicated to serving children separated from their parents.  Beyond the United States, KIND has staff in Mexico, Central America, and several countries in Europe, with a focus on protection, family unity, and strengthening child protection systems and access to lawful immigration pathways. KIND works with organizational and private sector partners to harness additional capacity in those regions.

5.  For the period January 2022 through December 2024 inclusive, KIND's subcontract with Acacia supported know-your-rights presentations and legal screenings to over 16,900 children in ORR custody, immigration legal representation for approximately 6,700 children through KIND and its pro bono attorneys, and psychosocial services for approximately 2,400 children.  During the same period, through other contracts and other

PI Appeal and Stay Addendum 668

resources, KIND and its pro bono partners additionally represented approximately 3,700 children, and KIND provided psychosocial services to approximately 1,100 children.

6.  In or about March 2022, KIND entered into a subcontract with the Vera Institute of Justice to deliver specified legal services to children arriving in the United States as unaccompanied children, renewable annually over a five-year period. KIND's current contract with Acacia Center for Justice is a novation of that contract.  The KIND-Acacia subcontract is in turn funded by a contract between Acacia and ORR.  All of KIND's seventeen locations in the United States deliver legal and social services funded through its subcontract with Acacia. From 2009 through 2021, KIND served children pursuant to subcontracts with Acacia's predecessor, the Vera Institute for Justice.

7.  KIND staff regularly travel to almost twenty ORR shelter care and transitional foster care facilities in person, while one shelter regularly arranges for groups of children to visit the local KIND office in person due to capacity limitations at the ORR facility.  The frequency of these visits varies with need, but on average, each KIND site held about four visits per month during 2024.  KIND uses these visits to provide know-your-rights presentations, conduct legal screenings, prepare clients for court hearings, or conduct individual legal consultations.  KIND staff also represent children placed in federal long-term foster care and in the Unaccompanied Refugee Minors program.

8.  Immigration removal proceedings are adversarial proceedings commenced by the Department of Homeland Security before immigration courts within the Department of Justice. Unaccompanied children, including very young children, are named as "respondents," and must answer charges of removability and bear the burden of proof to establish a defense to forcible removal to countries where their rights, well-being, safety, or even their lives were at risk.  The free legal and psychosocial services provided by KIND, and by other ORR-funded legal services providers, are essential to protecting the basic rights of children facing this process. Unaccompanied children do not have the financial resources to hire private counsel at market rates, and in KIND's experience, few have family members of such means.  Without free services, unaccompanied children -- including very young, pre-verbal, and non-walking children -- would be forced to represent themselves through complex legal processes, facing trained and experienced government counsel while striving to present evidence and legal arguments in their own defense.

9.  Legal screenings by KIND staff for children in ORR custody serve to determine whether it is unsafe for a child to return to their country of origin, and to identify options for available legal relief in the United States. These assessments are necessary prerequisites to placement with pro bono attorneys who primarily practice in areas of law other than immigration, and depend on KIND for case assessments, training, practice guidance, and ongoing mentorship.  KIND's pro bono partners contributed approximately 1,487,244

3

hours of legal services, valued at over $889,000,000 dollars from 2009 to 2023. Thus, pro bono representation with KIND mentorship multiplies the effectiveness of the funding ORR provides to KIND.

10.  Through legal representation by KIND or its pro bono partners, children pursue one or more forms of humanitarian relief, such as protection from parental maltreatment through special immigrant juvenile status, asylum based on a fear of persecution, T- or U-visas that protect victims of trafficking or other serious crimes, or temporary protected status based on untenable conditions in the country of origin. Children's immigration cases have long timelines: in KIND's experience, while a small proportion of cases resulting in permanent status are completed within two years, the majority take five to seven years to complete, with some taking longer. The chief reason is adjudication timelines. The immigration court backlog currently stands at well over 3.6 million cases, with wait times between hearings typically stretching to months or years. Moreover, most applications for humanitarian relief are adjudicated outside immigration courts. In 2024, USCIS stated that over 1.1 million asylum applications were pending before it, and applicants for other forms of relief likewise face years-long delays, most notably, the years-long waits for the limited supply of visas affecting special immigrant juveniles waiting to apply for green cards. These delays are beyond the control of children and their advocates. In addition, the process of preparing children's applications for relief is time-consuming for several reasons. First, depending on the relief sought, evidentiary support for applications may include elements that require time and effort to obtain, such as: state juvenile court orders issued after evidentiary hearings; attestations by state or federal law enforcement officers; and/or medical, psychological, or other expert evaluations. In cases where a child's initial request for relief is not approved, further time may be required to respond to requests for evidence or notices of intent to deny, as well as for appellate processes. Second, children in general, and particularly those who have experienced traumatic events, will need time to develop trust in unfamiliar adults and in the legal process itself, as the American Bar Association has recognized in cautioning against pressuring children to discuss distressing experiences before they are ready to do so. Third and more generally, preparation of a child's case takes time due to the capacity limitations inherent in children's ongoing cognitive and emotional development. As a principal drafter of the 2008 TVPRA explained, a child "usually knows nothing about U.S. courts or immigration policies and frequently does not speak English . . . . The majority of these children have been forced to struggle through an immigration system designed for adults." (Cong. Rec. S10886 (Dec. 10, 2008) (Sen. Feinstein)). State codes of professional responsibility typically require attorneys representing children with diminished capacity to maintain a normal attorney-client relationship to the greatest extent possible, and under American Bar Association standards, children must be afforded the right to meaningfully participate in decision-making in their cases. Accordingly, best practices for representing unaccompanied children contemplate applying trauma-informed and child-sensitive practices and

<div align="center">4</div>

affording sufficient time to support the child client's understanding of the proceedings and deliberation on matters affecting the child's well-being. Fourth, children are not self-sufficient, so their participation in preparing a legal case depends on facilitation by individual or institutional caregivers who may present time constraints that are beyond a child's control – for example, something as simple as a caregiver being unable to obtain leave from work to transport a child to a session with an attorney or expert. In sum, representing children in immigration matters requires a sustained multi-year time commitment in order to meet stringent evidentiary burdens, present effective advocacy, and support children in navigating complex and high-stakes processes.

11. Officials with government agencies have repeatedly recognized how KIND's work contributes to their efficient and effective operations in handling children's cases. Among other contributions, at the request of agency officials, KIND staff have conducted numerous training programs on topics relating to children's immigration matters for staff of the immigration courts, USCIS, and the ICE Office of the Principal Legal Advisor (OPLA), which represents the government in removal proceedings. As one example among many, after KIND staff presented to USCIS asylum office staff on child-friendly interviewing techniques, senior officials of the office sent handwritten notes thanking KIND staff for the program. The office director stated, "I know our officers will greatly benefit from it!" and one training officer added, "We hope we can make it an annual event."

12. Another example is a well-received initiative by KIND's Boston office to accelerate the successful completion of numerous pending cases of KIND clients awaiting adjudication of their applications for lawful permanent residency (LPR) status, also known as a green card. LPR applicants have already cleared high legal standards and progressed through years-long waiting lists, only to wait again for scheduling of a merits hearing date in immigration court. To alleviate that bottleneck, during 2021, KIND staff identified dozens of clients who were immediately eligible to adjust status, lacking only a date on the court's calendar for an adjustment hearing. Normally, just a handful of cases would be scheduled for an adjustment hearing on a given date, but through KIND's coordination with OPLA attorneys and immigration court staff, 50 adjustment-ready cases were calendared on two selected dates in May and November 2021. By organizing required information to share with OPLA in advance, KIND helped to ensure a smooth and efficient hearing for each case. The court approved 21 cases on the May 2021 date, 25 children on the November 2021 date, and the remainder on follow-up dates. Both the immigration court and OPLA praised KIND for efficiencies that resulted in removing cases in bulk from the court's crowded docket as the KIND clients received permanent status.

13. On the afternoon of February 18, 2025, Acacia emailed KIND a redacted copy of a nationwide order that HHS (through the U.S. Department of the Interior) issued to stop work under the Legal Services for Unaccompanied Children contract, effective

immediately.  The stop-work order applied to all lines of work performed under the contract, including KIND's work on KYR presentations and legal screenings for children in ORR facilities, and legal representation for unaccompanied children in and outside ORR custody.  Without further elaboration, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance."

14. Based on the directives in the stop-work order, KIND instructed staff to immediately suspend visits to facilities served under the contract, stop accepting new referrals, cancel intake meetings with prospective clients, and not sign retainer agreements to take on new clients. KIND also instructed staff to continue critical ongoing work necessary to fulfill professional responsibilities to clients, including meeting filing deadlines and attending scheduled hearings and administrative interviews with clients.  On the afternoon of February 21, 2025, KIND learned from Acacia that HHS had rescinded the stop-work order, without explanation.

15. On March 21, 2025, Acacia informed KIND via email that Acacia had received a notice partially terminating Contract 140D0422C0009, under which KIND is a subcontractor, for the government's convenience.  Acacia stated that the contract was terminated effective that same date for three of the four Contract Line Numbers (CLINs), and directed that work stop immediately under CLIN2, Legal representation for unaccompanied children not in ORR custody; CLIN3, which funds Immigrant Justice Corps fellows to represent unaccompanied children separately from those represented through CLIN 2; and CLIN4, Spanish language tutoring for organizational staff who work with children. KIND understands that only CLIN1, which funds KYR presentations and confidential legal consultations for unrepresented children in ORR facilities, remains in place, and is awaiting guidance from Acacia regarding whether there will be revisions to the relevant task orders, such as modifications to KYR services and any attendant budget or staffing changes.

16. Partial termination of the Acacia contract deprives KIND of the funding KIND relies on to employ approximately 350 professionals actively engaged in delivering or supporting the legal representation of some 6,700 clients.  KIND cannot retain employees once contractual funding sources are unavailable, and we anticipate significant layoffs, starting within days of the contract termination. This interruption of employment disrupts the productivity, career development, and morale of scores of qualified and experienced workers who are skilled and experienced in serving unaccompanied children, and who cannot easily find replacement opportunities due to the broad geographic scope of the partial contract termination.  More importantly, the partial contract termination makes the qualifications and experience of these employees unavailable to children in need of specialized services.  Most funding KIND has received through other sources is dedicated to employing staff who provide specified services to additional clients through other

6

programs, and thus such employees and funding cannot compensate for the needs created by the partial contract termination.

17. Partial termination of the Acacia contract will disrupt thousands of attorney-client relationships on which children have relied, for multiple years in some cases, and leaves children without support for the completion of their pending cases. The sudden disruption of an established attorney-client relationship would be a blow for children who have invested time to develop a relationship of trust, particularly in the wake of traumatic experiences that led them to migrate in search of safety. This is particularly so because child clients benefit from a trauma-informed and child-centered practice as is cultivated at KIND. Many children served through KIND face impending deadlines or events in their cases. As of the date of this declaration, approximately 200 clients represented by KIND staff or by pro bono attorneys receiving KIND's mentorship are scheduled for master or individual hearings in immigration courts in the next 60 days. This includes clients with immigration court hearings docketed for March 25, March 27, and April 8. A similar number of other required actions are scheduled in KIND's cases in the next 60 days, including hearings in state court proceedings, deadlines to respond to requests for evidence in connection with immigration applications, and other filing deadlines and events.

18. KIND relied on contractual funding to commence representation in thousands of matters that, as discussed above, require years to complete. ORR's partial termination of the contract will not automatically suspend pending removal proceedings nor resolve pending applications for relief. Nor will the partial contract termination automatically suspend deadlines in children's cases, such as requirements to file an application or motion within a specified time period or before a client reaches a specified age. KIND retains professional obligations toward these thousands of vulnerable clients. By issuing the partial termination order with immediate effect, ORR has not even provided a timeline for communicating the changed circumstances to KIND's thousands of clients; nor for attending to time-sensitive client needs or impending deadlines; nor for any accommodation of a lawyer's ethical obligations to a client under such circumstances, be they fulfilled through continued representation with alternative financial support, substitution of counsel, or withdrawal from representation.

7

19. The partial termination of the Acacia contract impedes KIND's mission of ensuring that no child appears in immigration court without high-quality legal representation.  For all of the reasons discussed here, KIND believes that the partial termination of the Acacia contract will upset children's serious reliance interests in ongoing attorney-client relationships, diminish fairness, implicate due process considerations, impede the efficiency and effectiveness of court and agency processes due to increased numbers of unrepresented children, and thereby risk severe harm to children who have relied on their attorneys to see their claims for protection and relief through to conclusion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 25th of March 2025, in Falls Church, Virginia

_____ /s/ Wendy Young _____

Wendy Young
President
Kids in Need of Defense
PO Box 27839
Washington, DC 20038

8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

               Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

           Defendants.

Case No. 3:25-cv-2847

**DECLARATION OF MIGUEL ANGEL
MEXICANO  FURMANSKA IN
SUPPORT OF PLAINTIFFS' MOTION
FOR A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION**

Case 3:25-cv-02847-AMO Document 92 Filed 04/27/25 Page 204 of 456

**DECLARATION OF MI UEL AN EL MEXICANO FURMANS A MANA IN ATTORNEY AND O NER OF T E LA OFFICE OF MI UEL MEXICANO**

*I, Miguel Angel Me icano urmanska, make the following statements on behalf of myself and the aw Office of Miguel Me icano, PC. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

Case 3:25-cv-02847-AMO Document 82 Filed 05/08/25 Page 704 of 748

*J.O.P. v. DHS*

Mi uel An el Mexicano Furmans a
Mana in  Attorney O ner
La  O ice o  Mi uel Mexicano, PC
UCP Le al Service Provider

IMMIGRANT DEFENDERS LAW CENTER
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org

lferreyra@immdef.org

JUSTICE ACTION CENTER
Esther H. Sung (CA Bar No. 255962)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)*
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

AMICA CENTER FOR IMMIGRANT RIGHTS
Adina Appelbaum (D.C. Bar No. 1026331)*
Samantha Hsieh (V.A. Bar No. 90800)*
Peter Alfredson (D.C. Bar No. 1780258)*
Evan Benz (N.C. Bar No. 49077)*
Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*pro hac vice forthcoming

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, 1861 Bay Road East Palo Alto, CA 94303; <br><br> SOCIAL JUSTICE COLLABORATIVE, 1832 Second Street Berkeley, CA 94710; <br><br> AMICA CENTER FOR IMMIGRANT RIGHTS, 1025 Connecticut Avenue NW, Suite 701 Washington, DC 20036; <br><br> ESTRELLA DEL PASO, 2400A E. Yandell Drive El Paso, TX 79903; <br><br> FLORENCE IMMIGRANT AND REFUGEE RIGHTS PROJECT, | CASE NO. 3:25-cv-2847 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

PO Box 654
Florence, AZ 85132;

GALVESTON-HOUSTON IMMIGRANT
REPRESENTATION PROJECT,
6001 Savoy Drive, Ste. 400
Houston, TX 77036;

IMMIGRANT DEFENDERS LAW CENTER,
634 South Spring Street, 10th Floor

NATIONAL IMMIGRANT JUSTICE CENTER,
111 W. Jackson Boulevard, Suite 800
Chicago, IL 60604;

NORTHWEST IMMIGRANT RIGHTS
PROJECT,
615 Second Avenue, Suite 400
Seattle, WA 98104;

ROCKY MOUNTAIN IMMIGRANT
ADVOCACY NETWORK,
7301 Federal Boulevard, Suite 300
Westminster, CO 80030;

VERMONT ASYLUM ASSISTANCE
PROJECT,
P.O. Box 814 Elmwood Avenue
Burlington, VT 05402,

                    Plaintiffs,

          v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
200 Independence Avenue, S.W.
Washington, DC 20201;

OFFICE OF REFUGEE RESETTLEMENT,
Administration for Children and Families
Mary E. Switzer Building
330 C Street, Room 5123
Washington, DC 20201;

DEPARTMENT OF THE INTERIOR,
1849 C Street N.W.
Washington, DC 20240,

2

Defendants.

PI Appeal and Stay Addendum 684

**INTRODUCTION**

1.      Every day, in immigration courts across the country, unaccompanied children stand (or sit, with legs dangling over chairs, or are held in caretakers' arms) in front of federal immigration judges, across from Department of Homeland Security lawyers, in adversarial removal proceedings. Thousands of other unaccompanied children are not in removal proceedings—but nonetheless must navigate the country's complex immigration laws as they attempt to complete complicated and lengthy applications allowing them to seek lawful status in the United States. These children, including babies and toddlers, arrived in the United States without a parent or legal guardian. The vast majority do not speak English; the babies do not speak at all. Most do not have the means to hire a lawyer.

2.      In one case, a one-year-old named Johan appeared in the Phoenix Immigration Court in 2018 with a bottle of milk and a purple ball—but without a parent or legal guardian. The judge in Johan's case was "embarrassed to ask" if Johan understood the proceedings. Turning to Johan's attorney, the judge addressed the absurdity of the legal theater playing out in his courtroom: "I don't know who you would explain it to, unless you think that a 1-year-old could learn immigration law." Sasha Ingber, *1-Year-Old Shows Up In Immigration Court*, NPR (July 8, 2018), https://perma.cc/ALU7-RM6V. Johan's story is not unusual, and demonstrates that the *only* way that many unaccompanied children can navigate the immigration legal system is with the help of a lawyer.

3.      Each unaccompanied child has their own individual story, but there are common themes. While many unaccompanied children are from Central America and the "Northern Triangle" countries of Guatemala, Honduras, and El Salvador, unaccompanied children come from all over the world. Most speak Spanish; some only speak indigenous Central American languages. Few speak much English. Many fled their home countries for their personal safety, escaping from gang violence, sexual violence, political violence, extreme poverty, and other dangers, only to experience further violence

4

and even trafficking during their long and dangerous journeys north to the United States. No matter their country of origin or spoken language, all are incredibly vulnerable.

4. Recognizing the needs of these children who are attempting to navigate the complex immigration system on their own, Congress enacted laws to provide special protections for unaccompanied children in that system. These include the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), which requires that the government "shall ensure, to the greatest extent practicable," that all unaccompanied children receive legal counsel to represent them in "legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking." Pub. L. No. 110-457, § 235(c)(5), 122 Stat. 5044, 5079.

5. More recently, the Department of Health and Human Services' ("HHS") Office of Refugee Resettlement ("ORR") issued a Foundational Rule, published in 2024, meant, in part, to carry out the agency's obligations under the TVPRA as well as the earlier 1997 settlement in *Flores v. Reno* (which dictates certain government obligations to unaccompanied children). Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384 (Apr. 30, 2024) (codified at 45 C.F.R. pt. 410 (the "Foundational Rule")). The Foundational Rule requires the government to "fund legal service providers to provide direct immigration legal representation" to unaccompanied children if there are "available appropriations" and to ensure children receive a legal orientation, consultation with a lawyer, and ongoing access to lawyers. 45 C.F.R. § 410.1309(a) (2024).

6. Congress has appropriated funds to ensure as many unaccompanied children as possible are represented by lawyers. For fiscal year 2024, for example, Congress appropriated more than $5 billion for Defendants to deliver services to unaccompanied children under various statutory obligations, which includes funding to provide legal representation for unaccompanied children under the TVPRA "to the greatest extent practicable." This appropriation is now available to fund legal representations through September 30, 2027.

5

7.     For more than a decade, until March 21, 2025—under different presidential administrations and changing immigration policies—the government fulfilled its obligations under the TVPRA and ongoing congressional appropriations to fund legal representation for unaccompanied children.  Through this funding, every unaccompanied child in government custody (at shelters run by ORR, under the authority of HHS) had the opportunity to receive a group "know your rights" session and an individual legal screening, and many children received direct legal representation from legal service providers.  These representations helped bridge the significant gap in legal access for unaccompanied children, only a small number of whom can afford paid representation or are able to independently retain a pro bono attorney.  They also helped immigration courts function efficiently and avoided forcing immigration judges and government lawyers to engage directly with children in responding to immigration charges and related questions around relief from removal.

8.     Plaintiffs are legal service providers that, until March 21, 2025, provided representation and related services to unaccompanied children with funding from Defendants.  Plaintiffs furthered the TVPRA's goals and the requirements in the TVPRA and the Foundational Rule by providing basic legal services to unaccompanied children and by representing unaccompanied children in immigration court, affirmative immigration proceedings, and related state court proceedings.

9.     Now, Plaintiffs have largely had to stop taking on new clients and face the real threat of not being able to continue their ongoing representations.  For example, without funding from Defendants, Plaintiff Community Legal Service in East Palo Alto has had to stop taking on new unaccompanied children clients—even if the children face upcoming court dates without a lawyer—and if it cannot find other funding sources, its ability to represent existing clients (taken on in reliance on continued funding from Defendants) will be in jeopardy.  Plaintiffs' inability to serve new clients or provide certainty for existing clients is an enormous harm to their mission to serve as many unaccompanied children as possible.

6

10. Plaintiffs' clients range in age from infants to teenagers, all of whom depend on Plaintiffs for critical legal counsel. For example, Plaintiff Immigrant Defenders Law Center represents a 16-year-old girl and her one-year-old son in cases that were funded by Defendants until March 21, 2025. Beginning at the age of six years old, the girl was sex trafficked by her family in Mexico. After giving birth to her son, she fled to the U.S. to save him from the same fate.

11. On March 21, 2025, without warning, Defendant the U.S. Department of the Interior ("DOI") sent a notice terminating the contract line items through which Defendants HHS and ORR had provided funding for counsel for unaccompanied children and ordering Plaintiffs to "immediately stop work" on their ongoing funded representations (the "Cancellation Order"). Defendants issued this order despite the TVPRA's mandate that the government provide unaccompanied children with legal counsel to the greatest extent practicable and despite the existence of congressionally appropriated funds to pay for precisely these services through at least September 30, 2027. As a result, many of the approximately 26,000 unaccompanied children around the country represented by attorneys through now-terminated funding from Defendants—including children with immigration court hearings scheduled for the following business day—were placed at imminent risk of being cut off from their lawyers. The children subject to this risk include many children now facing imminent removal from the United States despite being prima facie eligible for immigration relief.

12. The Cancellation Order flies in the face of the TVPRA and the Foundational Rule. In addition to interrupting and obstructing attorney-client relationships, contrary to the mandate to provide legal counsel to unaccompanied children, it also defeats the broader purpose of both the TVPRA and the Foundational Rule. Through the funded representations, Plaintiffs play a key role in identifying and helping child trafficking victims, fulfilling one of Congress's primary objectives in the TVPRA (to "protect [unaccompanied children] from mistreatment, exploitation and trafficking"). *See* TVPRA, Pub. L. No. 110-457, § 235(c)(5), 122 Stat. 5044, 5079 (2008). By subverting Congress's funding of

7

counsel for unaccompanied children, Defendants ensure more children will remain separated from their families, fewer trafficking victims will be identified and protected, and more children will be at risk of being trafficked in the future.

13.    Defendants' actions will also cause chaos throughout the immigration legal system and are particularly harmful because they come at a time when the government is reinstating expedited docketing for removal cases for unaccompanied children.  Unaccompanied children across the country have immigration court dates this week, at which some will now appear without an attorney.  Other children have impending deadlines to apply for immigration relief for which they are eligible, but will need an attorney's assistance to submit their application.

14.    As a consequence of Defendants ordering Plaintiffs to stop providing direct legal services, many unaccompanied children will never speak to a lawyer, will never apply for immigration relief for which they are eligible, will remain in tenuous status for longer, and will not understand what is happening as they are rushed through adversarial removal proceedings.  Immigration judges will be left to carry the burden, on their own, to expend limited government resources to educate child respondents (some only a few months old) on arcane immigration law and apply the law to their cases, without a full understanding of the reasons the children left their countries or the realities facing their removal.  This will cause immigration judges to spend more time on cases for unaccompanied children at a time when the immigration court backlog is already at an all-time high.

15.    Plaintiffs seek to enjoin Defendants from ceasing funding for legal representation of unaccompanied children, an action contrary to Congress's TVPRA mandate and subsequent congressional funding, contrary to Defendant ORR's own Foundational Rule on funding for counsel for unaccompanied children, and in violation of the Administrative Procedure Act ("APA").

16.    Plaintiffs respectfully ask this Court to grant declaratory and injunctive relief, declaring that Defendants are violating the law and requiring them to continue funding legal representation

consistent with the TVPRA and the Foundational Rule.  Plaintiffs ask this Court to enjoin Defendants nationwide from refusing to fund counsel for unaccompanied children in violation of the TVPRA and the Foundational Rule.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the claims alleged in this Complaint under 28 U.S.C. § 1331, as they arise under federal law, including the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232, and the 2024 Unaccompanied Children Program Foundational Rule (the "Foundational Rule"), 89 Fed. Reg. 34384.

18.     The APA waives the U.S. government's sovereign immunity where, as here, federal agencies have acted in a manner that is arbitrary and capricious, an abuse of discretion, or otherwise in violation of the law.  5 U.S.C. § 706(2)(A).

19.     The Court has authority to issue a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

21.     Venue properly lies in the Northern District of California under 28 U.S.C. § 1391(e)(1)(C) because Defendants are "officer[s]," "employee[s]," and "agenc[ies]," of the United States acting in their official capacities, and because Plaintiffs Community Legal Services in East Palo Alto and Social Justice Collaborative are California non-profit organizations headquartered in and providing services in the Northern District.  No real property is involved in this action.

22.     Venue is proper in the San Francisco Division because "a substantial part of the events or omissions giving rise to the claim occurred" in this Division.  28 U.S.C. § 1391(b)(2).  Plaintiff Community Legal Services in East Palo Alto is headquartered in San Mateo County, in this Division,

9

Plaintiffs Community Legal Services in East Palo Alto and Social Justice Collaborative both conduct substantial business in this Division including by serving unaccompanied children living in the San Francisco Division and in San Francisco Immigration Court, and Defendants' conduct has caused harm to these Plaintiffs in this Division by harming their ability to represent and serve unaccompanied children in the San Francisco Division.

## PARTIES

**A.    Plaintiffs**

23.    Plaintiffs are nonprofit organizations that have received funding from Defendants HHS and ORR to provide legal representation and other legal services to unaccompanied children. Plaintiffs share a mission to expand access to legal information and services for unaccompanied children, and to ensure that as many unaccompanied children as possible are represented by a lawyer.

24.    Plaintiff Community Legal Services in East Palo Alto ("CLSEPA") is a nonprofit organization in East Palo Alto, California. CLSEPA serves unaccompanied children in San Mateo County and Santa Clara County. Through funding from Defendants, CLSEPA provided legal representation for non-detained unaccompanied children. CLSEPA currently represents 23 unaccompanied children in cases formerly funded by Defendants.

25.    Plaintiff Social Justice Collaborative ("SJC") is a nonprofit organization in Berkeley, California, operating across the Bay Area and in California's central valley—including in areas where it is one of the only organizations offering legal services to immigrants. It serves unaccompanied children in San Francisco Immigration Court, Concord Immigration Court, and Sacramento Immigration Court. Through funding from Defendants, SJC provided legal representation to about 45 non-detained unaccompanied children per year and hosted Immigrant Justice Corps fellows.

10

unaccompanied children in the greater Washington, D.C. and Baltimore areas, appearing before the Baltimore, Hyattsville, Sterling, and Annandale Immigration Courts.  Through funding from Defendants, Amica Center provided legal orientations for children in ORR custody, legal representation for children in ORR custody and released from ORR custody, and hosted an Immigration Justice Corps fellow.  Amica Center currently represents more than 850 unaccompanied children in cases formerly funded by Defendants.

27.    Plaintiff Estrella del Paso ("Estrella") is a nonprofit organization based in Texas and the largest provider of free immigration legal services in West Texas and New Mexico.  It serves unaccompanied children appearing before the El Paso Immigration Court and has provided legal services for unaccompanied children in El Paso since 2007.  Through funding from Defendants, Estrella provided legal services to indigent, unaccompanied immigrant children who are not in detention, as well as those in ORR custody in El Paso County, and conducted "know your rights" presentations and individual consultations.  Estrella currently represents 324 unaccompanied children in cases formerly funded by Defendants.

28.    Plaintiff Florence Immigrant and Refugee Rights Project ("Florence Project") is a nonprofit organization in Arizona.  The Florence Project has provided legal services for unaccompanied children in Arizona since 2000.  It serves unaccompanied children in Tucson Immigration Court and Phoenix Immigration Court, and in 24 ORR shelters.  Through funding from Defendants, the Florence Project provided legal orientations, legal representation for detained and non-detained unaccompanied children, Spanish-language tutoring, and hosting for Immigrant Justice Corps fellows.  The Florence Project is the only non-profit organization that provides free legal services to unaccompanied children in Arizona and currently represents more than 800 unaccompanied children in cases formerly funded by Defendants.

11

29. Plaintiff Galveston-Houston Immigrant Representation Project ("GHIRP") is a nonprofit organization in the Galveston-Houston area of Texas. It serves unaccompanied children in the Galveston-Houston area and Houston Immigration Court. Through funding from Defendants, GHIRP provided legal orientations, legal representation for detained and non-detained unaccompanied children, and hosting for Immigrant Justice Corps fellows. GHIRP currently represents 292 unaccompanied children in cases formerly funded by Defendants.

30. Plaintiff Immigrant Defenders Law Center ("ImmDef") is a nonprofit organization in Los Angeles, California. It serves unaccompanied children in three Immigration Courts: Van Nuys, West Los Angeles, and Santa Ana. ImmDef provided legal orientations and direct legal representation through funding from Defendants for nearly 2,000 detained and non-detained unaccompanied children, along with Spanish-language tutoring for attorneys, and hosting for Immigrant Justice Corps fellows. ImmDef currently represents nearly 2,000 unaccompanied children in cases formerly funded by Defendants.

31. Plaintiff National Immigrant Justice Center ("NIJC") is a nonprofit organization headquartered in Chicago, Illinois and has provided services to unaccompanied children for more than 40 years. It serves unaccompanied children in Chicago Immigration Court. Through funding from Defendants, NIJC provided legal orientations and individual consultations as well as representation to unaccompanied children in immigration proceedings both in and out of ORR custody. NIJC currently represents approximately 500 unaccompanied children in cases formerly funded by Defendants.

32. Plaintiff Northwest Immigrant Rights Project ("NWIRP") is a nonprofit organization located in Washington State. It serves unaccompanied children in Seattle Immigration Court (and occasionally Portland Immigration Court), and has provided free immigration legal services for over 40 years. Through funding from Defendants, NWIRP provided legal services to unaccompanied immigrant children and youth who have been released from ORR custody throughout Washington

12

State.  NWIRP currently represents approximately 500 unaccompanied children in cases formerly funded by Defendants.

33.    Plaintiff Rocky Mountain Immigrant Advocacy Network ("RMIAN") is a nonprofit organization in Colorado.  It serves unaccompanied children in Denver Immigration Court.  Through funding from Defendants, RMIAN provided legal representation for non-detained unaccompanied children and Spanish-language tutoring for staff.  RMIAN is the primary organization providing free legal services to unaccompanied children in Colorado.   RMIAN currently represents 160 unaccompanied children in cases formerly funded by Defendants.

34.    Plaintiff Vermont Asylum Assistance Project ("VAAP") is a non-profit organization in Vermont.  It serves unaccompanied children in Chelmsford Immigration Court and Boston Immigration Court.  Through funding from Defendants, VAAP provided legal representation for detained and non-detained unaccompanied children, and hosting for two Immigrant Justice Corps fellows.  VAAP provides legal services to about 135 unaccompanied children annually, with 35-40 full scope direct representations each year.  Serving unaccompanied children in Vermont is particularly urgent because unaccompanied children in Vermont are often unable to access removal proceedings in far-away Boston and Chelmsford without legal assistance—and VAAP is the only legal services provider for unaccompanied children in Vermont.

35.    For years, Plaintiffs heeded Congress's call to provide critical legal services to unaccompanied children.  Plaintiffs collectively represent thousands of unaccompanied children, including children in removal proceedings and children applying for affirmative forms of immigration relief, and their organizational missions and ethical obligations compel them to represent these clients to the best of their abilities.  Defendants' Cancellation Order severely limits Plaintiffs in performing their respective missions to provide legal representation the law requires be made available to unaccompanied children.  To pay for existing representations, Plaintiffs face the need to use up any

13

discretionary or reserve funding, and to lay off employees.  If Plaintiffs are unable to maintain staffing levels necessary to handle their current caseloads, they will have to assess their ability to meet ongoing ethical and court-required obligations to their clients and may be forced to withdraw from ongoing cases.

36.     For many Plaintiffs, these consequences are imminent or already occurring.  For example, ImmDef has already been forced to give layoff notices to 27 staff to try to stay financially viable and able to serve unaccompanied children for as long as possible.  SJC will have to lay off its three Immigrant Justice Corps fellows if it cannot find other funding.  To maintain its representations, Estrella has had to furlough 18 of the 28 employees in its unaccompanied children program.  VAAP has had to not renew the contract of one of its four employees and may have to furlough another two employees—leaving it with only a single remaining employee.  In four weeks, GHIRP will have to lay off most of its 19 employees who provide services to unaccompanied children.

**B.    Defendants**

37.     Defendant HHS is the department of the federal government that receives appropriations from Congress to fulfill its statutory obligations under the TVPRA to aid and provide legal representation to unaccompanied children to the greatest extent practicable.  HHS most recently received an appropriation for services (including provision of counsel) required under the TVPRA for unaccompanied children on March 23, 2024, in the 2024 Further Consolidated Appropriations Act. *See* Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D, tit. II, 138 Stat. 460, 664– 65 (2024) (funding continued through September 30, 2025, by the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, tit. I, § 1101(8) (2025)).  This appropriation extends funding for services under the TVPRA through September 30, 2027.  *See id*.

38.     Defendant ORR is the office of HHS (situated within HHS's Administration for Children and Families Division) that oversees services for unaccompanied children under the TVPRA

14

and is the agency that passed the Foundational Rule in 2024 through notice-and-comment rulemaking. Defendant ORR's Unaccompanied Alien Children Bureau is the government body that interacts most directly with unaccompanied children.

39.     Defendant DOI is the department of the federal government primary contractor listed for the contract through which Defendants HHS and ORR provided the required funding for counsel for unaccompanied children.  DOI issued the Cancellation Order on March 21, 2025.

## STATEMENT OF FACTS

### A.     HHS And ORR Are Required By Law To Care For Unaccompanied Children.

40.     "Unaccompanied child" is defined by statute as any individual younger than 18 and without lawful immigration status, who has no parent or legal guardian who is in the United States able to provide care and physical custody.  *See* 6 U.S.C. § 279(g)(2).  Once a child is identified as unaccompanied under this definition, they are treated as unaccompanied even if they are later released to a sponsor—the "unaccompanied" designation applies throughout their time navigating U.S. immigration law.

41.     In the 2024 fiscal year, nearly 100,000 children, toddlers, and babies were identified by federal authorities as being unaccompanied children.  These children entered the United States without their parents for many reasons, most commonly because they were separated from their parents on their way to the United States, because they were trafficked to the United States, because they were separated from their families by immigration authorities after entering the United States, or because they fled their home countries without their parents.  A large majority of the children are from Central America and arrived in the United States after a long and dangerous journey north to the U.S.-Mexico border. Many fled unspeakable violence in their home countries and arrived in the United States only to face detention and deportation on their own.

15

42.     The United States has long struggled to care for unaccompanied children.  Change has come as Congress has recognized that unaccompanied children are uniquely vulnerable to trafficking, abuse in government custody, and injustices in the immigration legal system.

43.     Until 2002, the former Immigration and Naturalization Services detained unaccompanied children, treating them similarly to detained noncitizen adults.

44.     The Homeland Security Act of 2002 changed this model, giving Defendants HHS and ORR legal custody of unaccompanied children, with the mandate to care for these children.  *See* 6 U.S.C. § 279(a).

45.     In 2008, the TVPRA imposed further responsibilities on HHS and ORR's custody of unaccompanied children, including that HHS and ORR "shall ensure, to the greatest extent practicable . . . that all unaccompanied alien children . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking."  8 U.S.C. § 1232(c)(5).

**B.  Unaccompanied Children Have Special Legal Rights.**

46.     Unaccompanied children have special legal rights, including the right to go through full removal proceedings before an immigration judge, unlike other individuals who may be put through expedited removal proceedings.  *See* 8 U.S.C. § 1232(a)(5)(D).  If an unaccompanied child applies for asylum, they are entitled to go through the non-adversarial process of an asylum determination through DHS's Asylum Office—instead of in immigration court, where an immigration judge would preside over an adversarial hearing between a DHS lawyer and the unaccompanied child.  *See* 8 U.S.C. § 1158(b)(3)(C).  Unaccompanied children also have the right to apply for other forms of immigration relief, like Special Immigrant Juvenile Status, Withholding of Removal, relief under the Convention Against Torture, and U or T visas.

47.     Although U.S. law guarantees unaccompanied children these rights, the children are not able to avail themselves of these rights unless the children understand their rights, are equipped with

16

the tools to exercise them, and are given legal counsel.  For this reason, Congress and ORR have both recognized the importance of providing unaccompanied children with legal representation—and taken steps to maximize the number of unaccompanied children represented by attorneys.  The TVPRA requires Defendants to provide legal representation to unaccompanied children to the greatest extent practicable, and Congress has consistently appropriated funds annually to pay for that representation.

48.     And all children (unaccompanied or otherwise) are protected by regulations that prevent immigration judges from accepting an admission of removability from respondents under the age of 18—unless the respondent is represented by an attorney or other designated individual.  *See* 8 C.F.R. 1240.10(c).

49.     ORR, recognizing its obligations under the TVPRA, committed to providing legal representation to children unable to secure counsel, subject to ORR's discretion to the extent it determines appropriations are available.  ORR "strives for 100 percent legal representation of unaccompanied children."  89 Fed. Reg. 34384, 34526 (Apr. 30, 2024).

## C.     The TVPRA Requires Defendants to Provide Legal Services to Unaccompanied Children.

51.     Acting on this congressional command, ORR contracted with the Vera Institute for Justice in 2005 to administer what was then called the "Unaccompanied Children Pro Bono Project" (the "Project").  The Project was a three-year pilot to develop and test ways to meet the legal needs of unaccompanied children through pro bono legal services.

52.     Through the Project, ORR and Vera collaborated to design a program of subcontracting with nonprofit legal service organizations to provide basic legal orientation to unaccompanied children,

17

to screen their cases to identify those with potential claims for relief from removal, and to recruit and train volunteer lawyers to represent children in immigration court. Initially, the nonprofit legal service providers were not permitted to use government funding to provide direct representation.

53.     At the end of the pilot period in 2008, Vera issued a report to ORR, explaining that volunteer attorneys alone could not represent all unaccompanied children in ORR custody. Accordingly, the government could not meet its goal of ensuring that a significant percentage of unaccompanied children were represented unless it funded attorneys to represent them.

54.     On the heels of this pilot program, Congress imposed additional mandates on ORR and HHS in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"). The TVPRA mandates HHS to provide counsel for unaccompanied children:

> **The Secretary of Health and Human Services shall ensure**, **to the greatest extent practicable** and consistent with section 292 of the Immigration and Nationality Act (8 U.S.C. 1362), **that all unaccompanied alien children who are or have been in the custody of the Secretary or the Secretary of Homeland Security**, and who are not described in subsection (a)(2)(A), **have counsel to represent them in legal proceedings or matters** and protect them from mistreatment, exploitation, and trafficking. To the greatest extent practicable, the Secretary of Health and Human Services shall make every effort to utilize the services of pro bono counsel who agree to provide representation to such children without charge.

8 U.S.C. § 1232(c)(5) (emphasis added).

55.     In other words, the TVPRA directs that Defendants "shall ensure, to the greatest extent practicable . . ." that unaccompanied children have counsel to represent them in legal proceedings. If Defendants have funding they can spend to provide counsel for unaccompanied children, they must spend that funding to provide such counsel.

**D.     Defendants Satisfied Their Congressional Mandate To Provide Legal Services To Unaccompanied Children By Paying Plaintiffs With Funding Appropriated By Congress.**

18

the greatest extent practicable." *See* Supplemental Appropriations Act, 2009, Pub L. 111-32, tit. VIII, 123 Stat. 1859, 1884 (2009); Consolidated Appropriations Act, 2010, Pub. L. 111-117, div. D tit. II, 123 Stat. 3034, 3249–3250 (2009); Consolidated Appropriations Act, 2012, Pub. L. 112-74, div. F tit. II, 125 Stat. 786, 1077 (2011); Consolidated Appropriations Act, 2014, Pub. L. 113-76, div. H tit. II, 128 Stat. 5, 376 (2014); Consolidated and Further Continuing Appropriations Act, 2015, div. G tit. II, Pub. L. 113-235, 128 Stat. 2130, 2479 (2014); Consolidated Appropriations Act, 2016, Pub. L. 114-113, div. H tit. II, 129 Stat. 2242, 2612 (2015); Further Continuing and Security Assistance Appropriations Act, 2017, Pub. L. 114-254, 130 Stat. 1005, 1011 (2016); Consolidated Appropriations Act, 2017, Pub. L. 115-31, div. H tit. II, 131 Stat. 135, 531 (2017); Consolidated Appropriations Act, 2018, Pub. L. 115-141, div. H tit. II, 132 Stat. 348, 728 (2018); Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. 115-245, div. B tit. II, 132 Stat. 2981, 3082 (2018); Consolidated Appropriations Act, 2021, Pub. L. 116-260, div. H tit. II, 134 Stat. 1183, 1582 (2020); Consolidated Appropriations Act, 2022, Pub. L. 117-103, div. H tit. II, 136 Stat. 49, 458 (2022); Consolidated Appropriations Act, 2023, Pub. L. 117-328, div. H tit. II, 136 Stat. 4459, 4870 (2022); Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023, Pub. L. 117-180, div. A sec. 147, 136 Stat. 2114, 2124 (2022); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D tit. I, 138 Stat. 460, 664-665 (2024) (funding continued through September 30, 2025, by the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A tit. I Sec. 1101(8) (2025)).

57.     Until 2012, funds for legal representation were used only to match unrepresented unaccompanied children with available pro bono counsel.  In 2009, the House Appropriations Committee—following the passage of the TVPRA—explained that "legal representation is absolutely critical to ensure that children understand their rights as they navigate the legal process to determine their status in the United States."  H. Rep. 111-220, at 165.  The Committee commended the earlier

pilot program for legal representation for unaccompanied children and included funding "to continue and expand this initiative" "to work towards ensuring that all unaccompanied alien children understand their legal rights and have access to pro bono representation." *Id.* at 165-66. But success of this program to match unaccompanied children with volunteer attorneys was highly dependent on local circumstances, and it was clear pro bono representation alone could not meet the representational needs of unaccompanied children.

58. Beginning in 2012, funding became available to pay lawyers dedicated to representing unaccompanied children, in addition to referring them to pro bono counsel.

59. Over time, ORR and Congress have directed that funded representation be expanded again and again. In reports accompanying appropriations bills, Congress has built on its mandates for funded legal representation for unaccompanied children over the years. For example, in 2018 the Senate Appropriations Committee noted "that services provided by qualified and independent legal counsel to [unaccompanied children] can increase the efficiency and effectiveness of immigration proceedings and significantly reduce the failure-to-appear rate of children who are released from HHS custody. The Committee recommendation directs ORR to continue the scope and funding of these legal services at no less than fiscal year 2017 levels." S. Rep. 115-289, at 150.

60. In 2019, the House Appropriations Committee directed funding specifically for "qualified and independent legal services for unaccompanied children, including but not limited to know-your- rights orientations, legal screenings, court preparation and assistance, **representation**, and pro bono referrals" and recommended expanding funded representations. H. Rep. 116-62 at 145 (emphasis added).

61. In 2020, the House Appropriations Committee recommended "no less than $30,000,000 to be spent in fiscal year 2021 for **direct representation** services to children" and encouraged "ORR

20

to work with legal service providers to develop a strategy to minimize the risks of any child having to go to immigration court without independent legal counsel." H. Rep. 116-450 at 180 (emphasis added).

62.     In 2021, the House Appropriations Committee again supported funded representations, instructing that there should be even more funded representation for unaccompanied children released from ORR custody and that such direct representation "shall be made available to children **up to the funded capacity**." H. Rep. 117-96, at 211 (emphasis added).

63.     In 2022, the House Appropriations Committee again supported "the continued expansion of independent legal services for unaccompanied children" and directed that funded representations should "be made available to children **up to funded capacity**." H. Rep. 117-403, at 200 (emphasis added).

64.     Until March 21, 2025, the Acacia Center for Justice ("Acacia") managed a network of 89 legal services organizations (including Plaintiffs) in 159 offices across the country providing representation to unaccompanied children through funding from HHS and ORR, under a contract between Acacia and DOI (contracting on behalf of HHS and ORR).

65.     This contract had four funded line items:

1.  Work in ORR shelter facilities, including "know your rights" presentations, intakes to connect detained children with attorneys, and initial screenings with detained children;

2.  Full legal representation for children in and out of ORR custody, as well as other non-representation services such as "friend of court" services in hearings for unaccompanied children appearing in immigration court or preparing forms without attorneys;

3.  Immigrant Justice Corps fellows who represent unaccompanied children not covered by the second line item;

21

66.     As of March 21, 2025, Plaintiffs and other attorneys across the country represented approximately 26,000 children, toddlers, and babies—who arrived in the U.S. without parents or other caregivers—through funding appropriated by Congress and delivered under this contract.

**E.  Past Government Statements Acknowledge The Benefits Of Funding Counsel For Unaccompanied Children and Babies**

67.     The importance of legal representation for unaccompanied children is borne out in immigration court statistics.  Increasing representation for unaccompanied children makes immigration courts run more efficiently, leads to more unaccompanied children who qualify for immigration relief receiving that relief, and leads to more unaccompanied children without a case for relief requesting voluntary departure instead of unnecessary proceedings.

68.     Unrepresented children effectively never receive relief from removal.  A 2024 Congressional Research Service report explained that from 2005 to 2017, 90% of unaccompanied children in removal proceedings without a lawyer were removed and *less than 1% received some form of immigration relief* (only 308 children out of nearly 90,000).  *See* "Unaccompanied Alien Children: An Overview," CONGRESSIONAL RESEARCH SERVICE (Sept. 5, 2024), https://www.congress.gov/crs-product/R43599.  On the other hand, only 21% of represented unaccompanied children received a removal order over the same time period, and 73% attain some form of relief, including asylum and other paths to lawful permanent resident status.  Moreover, a greater percentage of unaccompanied children with attorneys chose to depart the country voluntarily than those without lawyers, showing the role attorneys play in helping children understand both their options and—in some circumstances—their lack of options.

69.     Represented children are also more likely to attend their hearings than unrepresented children, and more likely to understand what happens in their cases, easing the burden on immigration judges to explain proceedings.  From 2005 to 2017, 76% of all unaccompanied children continued to appear as scheduled for their cases—but for represented unaccompanied children, that rate was a near-

22

perfect 97%.  *See* Alyssa Snider and Rebecca DiBennardo, "Representation Matters: No Child Should Appear in Immigration Proceedings Alone," VERA INSTITUTE OF JUSTICE (Dec. 2021), https://vera-institute.files.svdcdn.com/production/downloads/publications/representation-matters.pdf.

70.     ORR has acknowledged "that most unaccompanied children need legal services to resolve their immigration status and that representation appears to have a significant impact on both the court appearance rate and the outcome of cases for unaccompanied children."  Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384, 34529 (April 30, 2024) (to be codified at 4 C.F.R. pt. 410).

**F.     Immigration Judges And Other Government Officials Regularly Praise Plaintiffs' Work, Which Makes Their Jobs Easier**

71.     In the past weeks, immigration judges have expressed their concern that Plaintiffs might no longer be working in their courtrooms and helping courts function smoothly.  Plaintiff Community Legal Services in East Palo Alto prioritizes positive interactions with immigration judges and adopts a proactive approach to advocacy, working with ICE counsel to ensure that their clients can advance their cases without missing school—a benefit to everyone involved.

72.     A judge in Chicago Immigration Court specifically expressed her concern that NIJC might not be available anymore to represent unaccompanied children appearing before her.  Judges praise NIJC's work as allowing the court to operate efficiently and with confidence that unaccompanied children are making informed decisions and have been screened for relief and other needs.

73.     Plaintiff the Florence Project was created after a call to action by an immigration judge. The Florence Project works with the court and individual judges to coordinate the specialized docket for unaccompanied children, serving as friend of the court frequently.  Judges show their appreciation for the Florence Project's work by giving its staff space in courtrooms to conduct pre-hearing orientations for children and even by swearing in Florence Project staff who have just been admitted

23

to the Arizona Bar.  In stakeholder meetings with the government, government partners routinely thank the Florence Project for its work and emphasize the value of the services it provides.

74.     Immigration judges and other stakeholders rely on Amica Center's services. Immigration judges rely on Amica Center's friend of court services and ask Amica Center to enter appearances in cases where the judge doubts the child understands their legal options or is competent to appear in court.  ORR shelter staff lean on Amica Center to answer questions about court appearances for the children they house.

75.     Immigration judges overseeing dedicated dockets for unaccompanied children in El Paso express gratitude for the work Estrella does both in its representations and its friend of court services.  Judges appreciate that Estrella helps them reduce their docket loads.  ORR shelter staff appreciate Estrella's help and training in caring for unaccompanied children.

76.     Immigration judges and government attorneys regularly thank RMIAN for its work, and RMIAN and government employees work together to improve immigration court efficiency in Denver. RMIAN saves the court and the government unnecessary time and effort by obtaining dismissal in cases where dismissal is proper and by avoiding unnecessary status hearings.  The Denver Immigration Court regularly asks RMIAN to provide friend of court services to assist unaccompanied children with anything from a change of address form to a screening for potential human trafficking.

77.     Judges, clerks, and other immigration court staff, and DHS field office staff praise VAAP's work as making the immigration legal system more fair and efficient.  VAAP's services help immigration courts avoid unnecessary proceedings and help unaccompanied children efficiently appear in court remotely.

**G.     In 2024, ORR Issued A Foundational Rule On Funding For Legal Services For Unaccompanied Children**

78.     On April 30, 2024, ORR issued a final rule following full notice-and-comment rulemaking:  the "Unaccompanied Children Program Foundational Rule," which took effect July 1,

24

2024.  Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384, 34529 (April 30, 2024) (to be codified at 4 C.F.R. pt. 410).  The rule is meant to codify regulations "consistent with ORR's statutory duties" and "responsibilities for coordinating and implement the care and placement of unaccompanied children . . . under the Homeland Security Act of 2002 (HSA) and the [TVPRA]." *Id.*, 89 CFR 34384.

79.     Section 410.1309 of the Foundational Rule is titled "Legal Services."  *Id.*, 89 Fed. Reg. 34526.  This section of the Foundational Rule affirms ORR's belief that "legal services providers who represent unaccompanied children undertake an important function" and stated, "ORR strives for 100 percent legal representation of unaccompanied children and will continue to work towards that goal to the extent possible."  *Id.*

80.     The Foundational Rule requires that unaccompanied children in ORR custody *must* receive a legal orientation from "an independent legal service provider" and a "confidential legal consultation with a qualified attorney."  *Id.*, 89 CFR 34603.

81.     The rule also provides that ORR must—if it has available appropriations—"fund legal service providers to provide direct immigration legal representation for certain unaccompanied children."  *Id*.

82.     To comply with the TVPRA and INA, the rule recognizes ORR must "ensure that all unaccompanied children who are or have been in ORR care have access to counsel" and provides, "ORR may make grants, in its discretion and subject to available resources . . . or contracts under this section . . . for the purpose of providing immigration legal representation, assistance and related services to unaccompanied children."  *Id*.

**H.     In 2024, Congress Reauthorized Funding For The Services, And That Funding Is Available Today**

83.     On March 23, 2024, Congress passed H.R. 2882, the Further Consolidated Appropriations Act of 2024, which appropriated funding for many federal departments and programs,

25

including Defendants HHS and ORR.  Congress specifically appropriated funds "for carrying out . . . section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008," the TVPRA.  Pub. L. 118-47 138 Stat. 460, 664.  Section 235 of the TVPRA includes the requirement to provide funding for counsel for unaccompanied children "to the greatest extent practicable"—so the appropriation was, in part, meant to pay for this representation.  8 U.S.C. § 1232(c)(5).

84.     The Senate Report accompanying the 2024 appropriations bill commanded Defendant HHS to fund the Services.  The Senate Committee on Appropriations specified there should be "$5,506,258,000 for the Unaccompanied Children [UC] program."  S. Rep. 118-84, at 167.  It went on to direct, "The Committee recommendation includes no less than the fiscal year 2023 funding level for post-release services; legal services and access to counsel; and child advocates.  The Committee expects HHS will continue to expand child-welfare focused post-release services . . . including . . . access to legal services."  *Id.* at 168.

85.     The Senate Report expressed its understanding that the TVPRA requires ORR to fund counsel for unaccompanied children:  "The Committee also expects these funds will be used to provide access to counsel, consistent with the goals of the Trafficking Victims Protection Reauthorization Act of 2008 **for all children to have access to counsel in their immigration proceedings.**"  *Id.* at 169 (emphasis added).

86.     On March 15, 2025, Congress continued funding at the levels set in the Further Consolidated Appropriations Act.  Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A tit. I sec. 1101(8) (2025).

87.     This appropriated funding for counsel for unaccompanied children is now available to Defendants through September 30, 2027.  The initial 2024 appropriation extended for two years, through September 30, 2026, Pub. L. 118-47 138 Stat. 460, 664, and the Full-Year Continuing Appropriations and Extensions Act of 2025 further extended the appropriation by another year, Pub.

26

L. 119-4, div. A tit. I sec. 1103 ("Appropriations provided by this division that, in the applicable appropriations Act for fiscal year 2024, carried a multiple-year or no-year period of availability shall retain a comparable period of availability").

**I.      Defendants Abruptly Shut Down And Later Resumed Funding For Counsel For Unaccompanied Children Without Explanation**

88.      Despite Congress's consistent funding of legal representation for unaccompanied children, consistent with the TVPRA, Defendants seek to undermine congressional appropriations and the TVPRA's mandate.  On Tuesday, February 18, 2025, without warning, Defendant DOI and Defendant HHS issued a "Stop Work Order" to Acacia, ordering service providers—including Plaintiffs—to "cease all services" and "stop all work" for those services under the contract between Acacia and DOI.  The order included no end date; it indefinitely suspended the services.  The stop work order gave no explanation, but said it had nothing to do with how the legal services were being run: "The stop work order is being implemented due to causes outside of [Acacia's] control and should not be misconstrued as an indication of poor performance by [Acacia]."  Nevertheless, the order explained, the stop work order could lead Defendants to "terminate the contract."

89.      Three days later, and after significant backlash, on Friday, February 21, 2025, Defendants voluntarily rescinded the stop work order without explanation.

**J.      On March 3, 2025, 32 Senators Reminded Defendants That Ending Funding For Counsel For Unaccompanied Children Violates the TVPRA**

90.      On March 3, 2025, 32 Senators wrote to HHS Secretary Robert F. Kennedy, Jr. and DOI Secretary Doug Burgum to express their "strong opposition" to the now-rescinded stop work order and to note their "concern[] about the chaos and confusion it caused for legal services providers and the children they serve."  Sens. Ossoff, Hirono, et al, *Letter to Secretary Robert F. Kennedy, Jr. and Secretary Doug Burgum* (Mar. 3, 2025), accessible at https://www.hirono.senate.gov/imo/media/doc/250305lettertohhsandinterioronlegalservicesforchildreninimmigrationsystem.pdf.

27

91.     The Senators explained that the stop work order—and any other attempt to stop funding counsel for unaccompanied children—is a violation of the TVPRA: "**Pausing or terminating the provision of legal services to unaccompanied children under this contract runs directly counter to the requirements of the Trafficking Victims Protection Reauthorization Act** (TVPRA) and places 26,000 unaccompanied children at increased risk of trafficking, exploitation, and other harm. The TVPRA, passed by Congress in 2008 on a bipartisan basis, requires the Department of Health and Human Services (HHS) to ensure, to the greatest extent practicable, that all unaccompanied children have counsel to represent them in legal proceedings and protect them from mistreatment, exploitation, and trafficking. Shirking this statutory mandate heightens the risk of harm for these uniquely vulnerable children." *Id.* (emphasis added).

92.     The Senators went on to explain that representation makes it more likely that unaccompanied children will appear at their hearings, less likely that the government will lose track of unaccompanied children, and less likely that the unaccompanied children will be trafficked. *Id.* at 2.

93.     The Senators requested a briefing from Defendants about why the stop work order was issued and Defendants' "plan for compliance with your statutory mandate to ensure that children have counsel in immigration proceedings." *Id.*

94.     Plaintiffs are not aware of any response from Defendants to the Senators.

**K.     On March 21, 2025, Defendants Again Stopped Funding Counsel for Unaccompanied Children**

95.     Although Defendants rescinded their February 18, 2025 stop work order, they apparently continued to look for ways to avoid the TVPRA's and Foundational Rule's requirement that they fund legal representation for unaccompanied children.  On March 21, 2025, Defendant DOI sent a letter titled "Notice of Partial Termination for the Government's Convenience" to Acacia (the "Cancellation Order").  The letter announced that Defendants were terminating funding for contract line items two through four:  legal representation for unaccompanied children—both in and out of

28

detention—and other legal services like "friend of court" assistance in *pro se* matters, Immigrant Justice Corps fellows, and Spanish-language tutoring. The letter further commanded Acacia and Plaintiffs to "immediately stop work" on these representations.

96. On information and belief, Defendants have no plans to fund any legal representation for unaccompanied children—whether by reinstating the cancelled contract line items or by finding alternative ways to pay lawyers to represent unaccompanied children.

97. The Cancellation Order took effect at close of business on Friday, March 21, 2025, and Plaintiffs represent clients with immigration court hearings that were scheduled for Monday March 24, 2025—the very next business day. Yet Plaintiffs received no guidance from Defendants regarding how those representations should continue—forcing them to choose between seeking to withdraw from their representations or attempting to continue representing their clients unfunded. Their clients are at risk of losing access to the legal counsel provided by the TVPRA and Foundational Rule.

**L. Defendants' Termination Of Funding To Represent Unaccompanied Children Frustrates Plaintiffs' Missions, Causes Plaintiffs Irreparable Harm, and Serves No Legitimate Purpose.**

98. Terminating funding for attorneys to represent unaccompanied children has devastating and irreparable effects, even more so for the harm it does to unaccompanied children. Even if Defendants reinstate funding for counsel for unaccompanied children at some unknown future time (an unlikely supposition), the funded representations, the non-profits and attorneys that administer them, and the unaccompanied children that receive vital counsel from them already will have been dealt an irreparable blow.

99. **Defendants' actions will cause Plaintiffs to lay off employees and lose huge percentages of their overall funding.** For Plaintiffs, the funding Congress has consistently appropriated to provide services under the TVPRA is existentially important.

29

100.    For example, funding for the services Defendants have illegally cancelled makes up approximately 55% of ImmDef's budget and pays for 113 of ImmDef's approximately 200 employees. The cancelled funding made up nearly half of VAAP's and GHIRP's operating budgets, 30% of Amica Center's budget, over 25% of NIJC's budget, 15% of RMIAN's budget, and 10% of NWIRP's budget. The Florence Project received about $12 million a year from the now-cancelled funding, which supported more than 100 employees.

101.    Many organizations will have to lay off staff.  SJC will soon have to lay off its three Immigrant Justice Corps fellows unless it can find another source of funding for their salaries, ImmDef has already been forced to give layoff notices to 27 staff, Estrella has had to furlough 18 of the 28 employees in its unaccompanied children program, GHIRP will have to lay off most of its 19 children's program staff in four weeks, and VAAP has had to not renew the contract of one of its four employees, and may have to furlough another two employees—leaving it with only a single remaining employee.

102.    **Because Plaintiffs' mission is to serve unaccompanied children, they will incur huge losses to keep doing so.**  Plaintiffs' ethical responsibilities to their clients and commitment to their mission of serving as many unaccompanied children as possible mean that Plaintiffs cannot simply cut off services and representations for unaccompanied children.  The organizations will hold on for as long as they can without funding from Defendants, but the impacts will be harsh whether they are immediate or sightly delayed.

103.    For example, CLSEPA has had to stop taking on new clients, even if they are unaccompanied children in removal proceedings without an attorney.  CLSEPA is seeking new funding to continue existing representations of unaccompanied children, but is faced with the risk of having to withdraw from ongoing representations—which is entirely antithetical to CLSEPA's mission to serve immigrants in Santa Clara and San Mateo counties.

30

104.    SJC is facing the prospect of having to lay off three Immigrant Justice Corps fellows who represent unaccompanied children and may be forced to try to find other organizations that can take on their clients.

105.    Estrella faces a budget deficit of more than $200,000 per month to maintain its services for unaccompanied children without funding from Defendants.  To continue representing the 324 unaccompanied children clients it took on in reliance on funding from Defendants, Estrella will have to operate at this significant deficit, threatening Estrella's other programming.  Once Estrella's reserves are depleted, it will likely not be able to offer free legal representation in many circumstances.

106.    The Florence Project is drawing on general funds to sustain its services for unaccompanied children but will likely have to conduct significant layoffs of its team of more than 100 employees who are dedicated to serving unaccompanied children.  Still, the Florence Project is determined to continue its representations of more than 800 unaccompanied children—even without the funding it relied on when it entered into the representations—though it will cost the organization significantly to continue this work.

107.    To support their existing Immigrant Children and Youth staff, GHIRP will have to rely on unrestricted funds and savings, destabilizing the organization as a whole. This will divert unrestricted funds away from other services, as these resources typically cover gaps in funding between contract cycles on other grants, underfunded programs, or new initiatives that are responsive to emerging needs in their community.

108.    ImmDef has 1,900 cases that were funded by Defendants.  ImmDef estimates its reserve funding will be exhausted within 6 months, and to hang on that long it will have to dramatically cut its staffing.  Just to position itself to survive in the short-term, ImmDef has had to lay off 27 staff.  Once ImmDef's reserves run out, it will have to terminate all 113 staff formerly funded by money appropriated by Congress to provide services under the TVPRA.  As ImmDef has to cut staff, it will

31

be unable to reallocate its 1,900 formerly funded cases to other attorneys—so it will be unable to competently represent existing unaccompanied child clients.

109.    NWIRP will have to spend at least $200,000 per month to sustain its services for unaccompanied children that were previously funded by Defendants.

110.    NIJC is transferring employees away from its children's services to try to make it feasible to maintain a limited staff to attempt to sustain existing representations.

111.    RMIAN will have to draw from its financial reserves and the limited funding it receives that is not pre-allocated for restricted purposes to delay layoffs, and it cannot provide long-term assurances to its clients that they will not be left without lawyers if RMIAN cannot afford to keep its unaccompanied children staff employed.

112.    VAAP's remaining staff of three are stretched as they try to continue to support their clients.  Two of those three may soon need to be furloughed, leaving only one attorney for all of VAAP's clients.

113.    **Every harm to their clients is a severe harm to Plaintiffs' mission to help their clients.**  Plaintiffs' clients are significantly harmed by the uncertainty they now face, as Plaintiffs may be forced to withdraw from ongoing representations.  The cases Plaintiffs took on in reliance on funding from Defendants are complex and often take years to resolve, and clients will be harmed if they are no longer represented by Plaintiffs.

32

attorneys remaining on staff to represent him at his interview when it is scheduled, and ImmDef is helpless to provide him any assurances.

115.    In representations formerly funded by Defendants, SJC represents—for example—three individuals not in active removal proceedings, with strong cases for affirmative immigration relief that would allow them to stay in the country.  None of these clients could afford to hire a lawyer, but with free representation from SJC each has a clear path to relief.  If SJC cannot continue to represent them, they will be unlikely to secure the relief they qualify for.

116.    The Amica Center represents a four-year-old boy from Haiti in a case formerly funded by Defendants.  The four-year-old has a hearing in the process of obtaining SIJS relief on April 2, 2025.  He also has an immigration court hearing in early June.  Without an attorney, the four-year-old could not engage in these proceedings or obtain any of the immigration relief for which he is eligible.  The Amica Center is continuing to represent him and its other unaccompanied child clients, though continuing its now-unfunded representations is very costly to the organization.

117.    The Florence Project currently represents a set of three siblings who fled their home country after their mother died and their sister was murdered.  All three siblings have pending asylum applications and are in the process of obtaining SIJS relief.  Both the asylum and SIJS processes require complex legal work, and the siblings would have little hope of obtaining relief without an attorney.  Were the three to lose their Florence Project lawyer—previously funded by Defendants—they would be severely harmed, a result antithetical to the Florence Project's mission.

118.    **Defendants' illegal actions prevent Plaintiffs pursuing their missions.**  Because Plaintiffs' missions are founded on the belief that no child should face a trained government prosecutor alone, Plaintiffs also suffer significant harms to their missions because without funding from Defendants, they cannot take on new clients.  Every unaccompanied child in ORR custody who needs but does not receive representation because Defendants have ceased funding legal representation under

33

the TVPRA is a harm to Plaintiffs, as organizations that exist to serve these children and to ensure as few as possible go without a lawyer.  Unrepresented children will be unable to apply for voluntary departure to return home, children who have been trafficked will be unable to access the protections afforded to them by U.S. law, and children with strong cases for asylum who fled persecution in their home countries will be unable to apply for asylum.  These impacts are unacceptable for Plaintiffs.

119.    If Plaintiffs are forced to shut down or stop providing services to unaccompanied children entirely, these mission harms will be even more acute because entire populations will be left unserved.  For example, SJC serves remote areas of California's central valley where there are few other resources for unaccompanied children, VAAP is the only legal service provider for unaccompanied children in Vermont, RMIAN is the primary free legal service provider for unaccompanied children in Colorado, and for the majority of unaccompanied children in ORR custody in Arizona, the Florence Project represents their only access to counsel and only opportunity to receive free legal representation.

**120.    Defendants' illegal actions are also causing collateral harm to other parts of Plaintiffs' missions.**  While work serving unaccompanied children is a large portion of what most Plaintiffs do, many Plaintiffs also serve other immigrant populations—but Defendants' illegal refusal to fund legal representation has knock-on effects that harm all of Plaintiffs' efforts and other missions.

121.    The Florence Project has had to institute a hiring freeze and cannot fill twenty open positions that would be dedicated to serving unaccompanied children.  Because the Florence Project is having to use general funding to maintain its representations of unaccompanied children, it has also had to freeze hirings in all non-unaccompanied-children service areas across the organization, limiting its ability to carry out other elements of its mission to provide legal services to immigrants.

34

122.     As GHIRP draws down its savings to continue serving its unaccompanied child clients, the financial strain threatens its other programming, which also relies on GHIRP maintaining funds to cover gaps in funding for those other programs.

123.     For ImmDef, transferring funds from other efforts to try to sustain legal representations of unaccompanied children for as long as possible will mean cutting back on other services it planned to provide for immigrants, including pro se clinics.  ImmDef has also had to stop providing any non-essential support for its clients (like paying for medical exams required for certain adjustment of status applications), though its mission is to support its clients as much as possible.  And ImmDef has had to freeze all hiring across its organization, hampering its ability to fulfill its overall mission of providing legal services to immigrants.

124.     NWIRP is being forced to draw from its reserves, at the expense of using that money for the other services it provides immigrants in Washington state.

125.     RMIAN will be forced to dedicate its already-limited staff time to fundraise to try to cover the gap left by the cancelled funding.  RMIAN is concerned that its staff might take other jobs with organizations that are more securely funded.

126.     Because VAAP is a small organization, its remaining staff of three has struggled to keep up its legal work and field client questions, and has been unable to engage in basic administrative work to keep the organization running.

<div align="center">

**FIRST CLAIM FOR RELIEF**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Not in Accordance with Law**

</div>

127.     Plaintiffs incorporate herein by reference paragraphs 1 through 126 as if fully rewritten herein.

128.     The Administrative Procedure Act ("APA") authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5

<div align="center">35</div>

U.S.C. § 706(2)(A). Defendants' cancellation of funding for counsel to represent unaccompanied children violates the TVPRA.

129. The TVPRA requires Defendants HHS and ORR to "ensure, to the greatest extent practicable . . . that all unaccompanied . . . children who are or have been in the custody of [Defendants HHS and ORR] . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5). This language in the TVPRA is and has been understood to require Defendants HHS and ORR to fund attorneys to represent unaccompanied children.

130. Congress has consistently and specifically appropriated funds to Defendants HHS and ORR to provide services required by the TVPRA, including funding legal representation. These congressionally appropriated funds remain available to Defendants to pay for legal representation through September 30, 2027.

131. On March 21, 2025, Defendants terminated the contract line items that funded legal representation under the TVPRA. On information and belief, Defendants are not funding the required legal representations for unaccompanied children in any other way. Instead, the Cancellation Order ends government-funded legal representation for unaccompanied children despite the availability of appropriated funding for such representations through at least September 30, 2027—two-and-a-half years from now.

132. By ending funding for legal representation of unaccompanied children despite the availability of appropriated funds for this purpose, Defendants violate the TVPRA's mandate to provide counsel for unaccompanied children "to the greatest extent practicable." Funds remain available for this purpose, and Defendants are subverting congressional appropriations and the TVPRA by failing to fund legal representation for unaccompanied children.

36

133.    Because Defendants' termination of funding for counsel for unaccompanied children is not in accordance with the TVPRA, it is "not in accordance with law" within the meaning of the APA and should be set aside.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
***Accardi* Doctrine**

</div>

134.    Plaintiffs incorporate herein by reference paragraphs 1 through 126 as if fully rewritten herein.

135.    The APA authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Defendants' cancellation of funding for counsel to represent unaccompanied children violates the APA under the *Accardi* Doctrine because it violates ORR's own policies and regulations.

136.    Longstanding Supreme Court caselaw mandates that agencies must adhere to their own policies and regulations, and that failure to do so violates the APA. *See U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954), *superseded by statute on other grounds*; *see also Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004) ("The legal proposition that agencies may be required to abide by certain internal policies is well-established.").

137.    The 2024 Unaccompanied Children Program Foundational Rule requires the government to "fund legal service providers to provide direct immigration legal representation" to unaccompanied children if there are "available appropriations" and to ensure children receive a legal orientation, consultation with a lawyer, and ongoing access to lawyers. 89 CFR 34604.

138.    The ORR Unaccompanied Alien Children Bureau Policy Guide expressly states that "ORR funds legal service providers (LSPs) to provide direct immigration legal representation or representation in non-immigration related matters to the extent of available appropriations, and insofar as it is not practicable for ORR to secure pro bono counsel." *See* "ORR Unaccompanied Alien Children

<div align="center">37</div>

Bureau Policy Guide: Section 3.7.2 Direct Legal Representation," OFFICE OF REFUGEE RESETTLEMENT (revised Aug. 1, 2024), https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-3#3.7.2.

139.    By ending funding for legal representation of unaccompanied children despite the availability of appropriated funds for this purpose through at least September 30, 2027, Defendants violate the Foundational Rule's mandate to provide counsel for unaccompanied children to the extent there are appropriated funds available to do so and violate ORR's policy of funding legal service providers "to the extent of available appropriations."  Defendants' violations of ORR's own rule and policy violate the APA.

140.    Because Defendants' termination of funding for counsel for unaccompanied children violates the Foundational Rule and ORR's own Policy Guide, it violates the APA and should be set aside under the *Accardi* Doctrine as "arbitrary, capricious, an abuse of discretion [and] otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

141.    Plaintiffs incorporate herein by reference paragraphs 1 through 126 as if fully rewritten herein.

142.    The APA authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

143.    Defendants have given no reasoned justification for their abrupt cancellation of mandated and appropriated funding for legal representations for unaccompanied children.  The Cancellation Order gives no reasoning at all.  And the February stop work order expressly disclaimed that it was issued for any "poor performance" of the legal representations.

PI Appeal and Stay Addendum 719

144.    There is significant evidence that providing legal representation improves efficiency in immigration court and conserves immigration court time and resources.  Cancelling funding for legal representation will only make immigration courts operate less efficiently.

145.    In addition, Defendants' unlawful cancellation of funding for legal representations directly undermines Plaintiff organizations' missions to provide representation for as many unaccompanied children as possible.  Defendants have "entirely failed to consider an important aspect of the problem" by failing to consider the impact to Plaintiffs and their clients.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

146.    Because Defendants' termination of the Programs is arbitrary and capricious, Plaintiffs ask that the Court set aside Defendants' actions as violative of the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.    Declare that Defendants' actions violate the APA because they are "arbitrary, capricious, an abuse of discretion, or otherwise in violation of the law."

2.    Declare that Defendants are required to continue funding legal representation to unaccompanied children, consistent with the TVPRA and ORR's Foundational Rule.

3.    Set aside Defendants' actions that violate the APA.

4.    Enjoin Defendants nationwide from ceasing to fund counsel to represent unaccompanied children in violation of the TVPRA and the Foundational Rule.

5.    Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

6.    Award such other relief as this Court may deem just and proper.

Respectfully submitted,

March 26, 2025

s/ *Alvaro M. Huerta*
IMMIGRANT DEFENDERS LAW CENTER

Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org

s/ *Samantha Hsieh*
AMICA CENTER FOR IMMIGRANT
RIGHTS

Adina Appelbaum (D.C. Bar No. 1026331)*
Samantha Hsieh (V.A. Bar No. 90800)*
Peter Alfredson (D.C. Bar No. 1780258)*
Evan Benz (N.C. Bar No. 49077)*
Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*pro hac vice* forthcoming

s/ *Karen C. Tumlin*
JUSTICE ACTION CENTER

Esther H. Sung
Karen C. Tumlin
Laura Flores-Perilla
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

40

JS-CAND 44 (Rev. 12/2024)

# CIVIL COVER SHEET

This civil cover sheet does not replace or supplement the filing and service of pleadings or other papers. The information on this form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket. Instructions are on the reverse of this form.

## I. PLAINTIFF(S)
Community Legal Services in East Palo Alto; (see attachment)

## DEFENDANT(S)
United States Department of Health and Human Services; (see attachment)

County of Residence of First Listed Plaintiff: San Mateo County
*Leave blank in cases where United States is plaintiff.*

County of Residence of First Listed Defendant:
*Use ONLY in cases where United States is plaintiff.*

Attorney or Pro Se Litigant Information *(Firm Name, Address, and Telephone Number)*
Alvaro M. Huerta (see attachment)

Defendant's Attorney's Name and Contact Information *(if known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*
- [ ] U.S. Government Plaintiff
- [x] U.S. Government Defendant
- [ ] Federal Question *(U.S. Government Not a Party)*
- [ ] Diversity

## III. CAUSE OF ACTION
Cite the U.S. Statute under which you are filing: *(Use jurisdictional statutes only for diversity)*
5 U.S.C. 702
Brief description of case: Violation of Administrative Procedure Act

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | **LABOR** | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment & Enforcement of Judgment | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 710 Fair Labor Standards Act | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 720 Labor/Management Relations | 835 Patent–Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 740 Railway Labor Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | 751 Family and Medical Leave Act | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 790 Other Labor Litigation | **SOCIAL SECURITY** | 480 Consumer Credit |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 485 Telephone Consumer Protection Act |
| 190 Other Contract | 362 Personal Injury –Medical | | | 862 Black Lung (923) | 490 Cable/Sat TV |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **IMMIGRATION** | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | 462 Naturalization Application | 864 SSID Title XVI | 890 Other Statutory Actions |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | 465 Other Immigration Actions | 865 RSI (405(g)) | 891 Agricultural Acts |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | 871 IRS–Third Party 26 U.S.C. § 7609 | 896 Arbitration |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | [x] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
- [x] Original Proceeding
- [ ] Removed from State Court
- [ ] Remanded from Appellate Court
- [ ] Reinstated or Reopened
- [ ] Transferred from Another District
- [ ] Multidistrict Litigation–Transfer
- [ ] Multidistrict Litigation–Direct File

## VI. FOR DIVERSITY CASES ONLY: CITIZENSHIP OF PRINCIPAL PARTIES
*(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

| Plaintiff | Defendant | |
|---|---|---|
| [ ] | [ ] | Citizen of California |
| [ ] | [ ] | Citizen of Another State |
| [ ] | [ ] | Citizen or Subject of a Foreign Country |
| [ ] | [ ] | Incorporated or Principal Place of Business in California |
| [ ] | [ ] | Incorporated and Principal Place of Business In Another State |
| [ ] | [ ] | Foreign Nation |

## VII. REQUESTED IN COMPLAINT
- [ ] Check if the complaint contains a **jury demand.**
- [ ] Check if the complaint contains a **monetary demand.** Amount:
- [ ] Check if the complaint seeks **class action** status under Fed. R. Civ. P. 23.
- [x] Check if the complaint seeks a **nationwide injunction** or Administrative Procedure Act vacatur.

## VIII. RELATED CASE(S) OR MDL CASE
*Provide case name(s), number(s), and presiding judge(s).*

## IX. DIVISIONAL ASSIGNMENT pursuant to Civil Local Rule 3-2
*(Place an "X" in One Box Only)*
- [x] SAN FRANCISCO/OAKLAND
- [ ] SAN JOSE
- [ ] EUREKA-MCKINLEYVILLE

DATE  03/26/2025      SIGNATURE OF ATTORNEY OR PRO SE LITIGANT      /s/ Alvaro M. Huerta *(see addendum)*

# COMPLETING THE CIVIL COVER SHEET

Complete the form as follows:

**I.     Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.

**Attorney/Pro Se Litigant Information**. Enter the firm name, address, telephone number, and email for attorney of record or pro se litigant. If there are several individuals, list them on an attachment.

**II.    Jurisdiction.** Under Federal Rule of Civil Procedure 8(a), pleadings must establish the basis of jurisdiction. If multiple bases for jurisdiction apply, prioritize them in the order listed:

(1)   *United States plaintiff.* Jurisdiction based on 28 U.S.C. §§ 1345 and 1348 for suits filed by the United States, its agencies or officers.

(2)   *United States defendant.* Applies when the United States, its agencies, or officers are defendants.

(3)   *Federal question.* Select this option when jurisdiction is based on 28 U.S.C. § 1331 for cases involving the U.S. Constitution, its amendments, federal laws, or treaties (but use choices 1 or 2 if the United States is a party).

(4)   *Diversity of citizenship.* Select this option when jurisdiction is based on 28 U.S.C. § 1332 for cases between citizens of different states and complete Section VI to specify the parties' citizenship. Note: Federal question jurisdiction takes precedence over diversity jurisdiction.

**III.   Cause of Action.** Enter the statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless jurisdiction is based on diversity. Example: U.S. Civil Statute: 47 U.S.C. § 553. Brief Description: Unauthorized reception of cable service.

**IV.   Nature of Suit.** Check one of the boxes. If the case fits more than one nature of suit, select the most definitive or predominant.

**V.    Origin.** Check one of the boxes:

(1)   *Original Proceedings.* Cases originating in the United States district courts.

(2)   *Removed from State Court.* Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C. § 1441. When the petition for removal is granted, check this box.

(3)   *Remanded from Appellate Court.* Check this box for cases remanded to the district court for further action, using the date of remand as the filing date.

(4)   *Reinstated or Reopened.* Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

(5)   *Transferred from Another District.* Check this box for cases transferred under Title 28 U.S.C. § 1404(a). Do not use this for within-district transfers or multidistrict litigation (MDL) transfers.

(6)   *Multidistrict Litigation Transfer.* Check this box when a multidistrict (MDL) case is transferred into the district under authority of Title 28 U.S.C. § 1407.

(7)   *Multidistrict Litigation Direct File.* Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

**VI.   Residence (citizenship) of Principal Parties.** Mark for each principal party *only* if jurisdiction is based on diversity of citizenship.

**VII.  Requested in Complaint.**

(1)   *Jury demand.* Check this box if plaintiff's complaint demanded a jury trial.

(2)   *Monetary demand.* For cases demanding monetary relief, check this box and enter the actual dollar amount being demanded.

(3)   *Class action.* Check this box if plaintiff is filing a class action under Federal Rule of Civil Procedure 23.

(4)   *Nationwide injunction.* Check this box if plaintiff is seeking a nationwide injunction or nationwide vacatur pursuant to the Administrative Procedures Act.

**VIII.   Related Cases.** If there are related pending case(s), provide the case name(s) and number(s) and the name(s) of the presiding judge(s). If a short-form MDL complaint is being filed, furnish the MDL case name and number.

**IX.   Divisional Assignment.** Identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated." Note that case assignment is made without regard for division in the following case types: Property Rights (Patent, Trademark and Copyright), Prisoner Petitions, Securities Class Actions, Anti-Trust, Bankruptcy, Social Security, and Tax.

**Additional Plaintiffs:**

Amica Center For Immigrant Rights; Estrella Del Paso; Florence Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project; Immigrant Defenders Law Center; National Immigrant Justice Center; Northwest Immigrant Rights Project; Rocky Mountain Immigrant Advocacy Network; Social Justice Collaborative; Vermont Asylum Assistance Project.


**Additional Attorney or Pro Se Litigant Information:**

IMMIGRANT DEFENDERS LAW CENTER

Alvaro M. Huerta (CA Bar No. 274787)

Carson A. Scott (CA Bar No. 337102)

Lya Ferreyra (CA Bar No. 340148)

Immigrant Defenders Law Center

634 S. Spring St.,

10th Floor Los Angeles, CA

Telephone: (213) 634-0999


JUSTICE ACTION NETWORK

Esther H. Sung (CA Bar No. 255962)

Karen C. Tumlin (CA Bar No. 234691)

Laura Flores-Perilla (CA Bar No. 355645)*

JUSTICE ACTION CENTER

P.O. Box 27280

Los Angeles, CA 90027

Telephone: (323) 450-7272


AMICA CENTER FOR IMMIGRANT RIGHTS

Adina Appelbaum (D.C. Bar No. 1026331)*

Samantha Hsieh (V.A. Bar No. 90800)*

Peter Alfredson (D.C. Bar No. 1780258)*

Evan Benz (N.C. Bar No. 49077)*

Amica Center for Immigrant Rights

1025 Connecticut Avenue NW, Suite 701

Washington, DC 20036

Telephone: (202) 331-3320


**Additional Defendants:**

Office of Refugee Resettlement; Department of Interior

1   YAAKOV M. ROTH
    Acting Assistant Attorney General
2   WILLIAM C. SILVIS (DCBN 485572)
    Assistant Director
3   MICHAEL A. CELONE (MDBN 1312170145)
4   CHRISTINA PARASCANDOLA (DCBN 468479)
    KATELYN MASETTA ALVAREZ (OHBN 97857)
5   JONATHAN K. ROSS (NCBN 50203)
    Senior Litigation Counsels
6   ZACHARY A. CARDIN (MDBN 1812110052)
7   Trial Attorney

8       U.S. Department of Justice, Civil Division
        Office of Immigration Litigation
9       General Litigation and Appeals Section
        P.O. Box 878, Ben Franklin Station
10      Washington, DC 20044
        (202) 305-2040
11      Michael.A.Celone@usdoj.gov

12

13  Attorneys for Defendants

14              UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16                SAN FRANCISCO DIVISION

17
    COMMUNITY LEGAL SERVICES IN EAST   )  Case No. 3:25-cv-02847-AMO
18  PALO ALTO, *ET AL.*,               )
                                       )  **DEFENDANTS' OPPOSITION TO MOTION**
19          Plaintiffs,                )  **FOR TEMPORARY RESTRAINING ORDER**
                                       )  **AND PRELIMINARY INJUNCTION**
20      v.                             )
                                       )  Date:  April 1, 2025
21  UNITED STATES DEPARTMENT OF        )  Time: 10:00 a.m.
                                       )  Location:  Courtroom 10
22                                     )
                                       )  Hon. Araceli Martínez-Olguín
23          Defendants.                )  United States District Judge
                                       )
24                                     )
                                       )
25  _____)

26

27

28

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................. 2

A.    Legal Framework ............................................................................................. 2

    1.    The Homeland Security Act ("HSA") .................................................. 2

    2.    The Trafficking Victims Protection Reauthorization Act ("TVPRA") .......................... 3

    3.    The Foundational Rule .......................................................................... 3

    4.    Appropriations Acts and Congressional Intent ................................... 4

    5.    The Current Contract and Termination Decision ................................. 5

III.    STANDARDS OF REVIEW ................................................................................ 6

IV.    ARGUMENT ................................................................................................... 6

A.    Plaintiffs cannot demonstrate that they are likely to succeed on the merits. .......... 6

    1.    Plaintiffs lack standing because they are not within the zone of interests that 8 U.S.C. § 1232 is intended to protect. .................... 6

    2.    The APA does not waive sovereign immunity for the monetary relief Plaintiffs seek. ........................................................ 8

    3.    This Court lacks jurisdiction over Plaintiffs' claims because the rights they seek to enforce must be brought in the Federal Court of Claims. .................. 11

    4.    Plaintiffs cannot show that a favorable decision in this case would likely redress their alleged injuries. .............................. 13

    5.    The Termination Contract Termination at Issue Does Not Violate the APA ........ 14

    6.    The Foundational Rule Does Not Require Funding for Taxpayer-funded Direct Immigration Legal Representation Consistent with Available Appropriations. ............................ 15

B.    Plaintiffs Will Not Face Irreparable Harm Without a TRO ................................ 17

C.    The Balance of the Equities and Public Interest Weigh Against Entry of a Temporary Restraining Order. ............................................................. 19

D.    If the Court issues a TRO, it should require Plaintiffs to Post Security. .............. 21

V.    CONCLUSION ................................................................................................. 21

CERTIFICATE OF COMPLIANCE

1

# **TABLE OF AUTHORITIES**

2

## **CASES**

3

*Al Otro Lado, Inc. v. Mayorkas*,

4
  2024 WL 4370577 (S.D. Cal. Sept. 30, 2024) .................................................................... 15

5

*Arcamuzi v. Continental Air Lines*, Inc.,

6
  819 F.2d 935 (9th Cir. 1987) ............................................................................................... 18

7

*Ariz. Dream Act Coal. v. Brewer*,

  757 F.3d 1053 (9th Cir. 2014) ............................................................................................ 18

8

*Arpaio v. Obama*,

9
  797 F.3d 11 (D.C. Cir. 2015) .............................................................................................. 19

10

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*,

11
  501 U.S. 1301 (1991) .......................................................................................................... 19

12

*BFP v. Resolution Trust Corp.*,

  511 U.S. 531 (1994) .............................................................................................................. 8

13

*Caribbean Marine Servs. Co. v. Baldrige*,

14
  844 F.2d 668 (9th Cir. 1988) ......................................................................................... 17, 18

15

*Clapper v. Amnesty Int'l USA*,

16
  568 U.S. 398 (2013) ............................................................................................................ 19

17

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,

18
  601 U.S. 416 (2024) ............................................................................................................ 14

19

*Drakes Bay Oyster Co. v. Jewell*,

  747 F.3d 1073 (9th Cir. 2014) ............................................................................................ 19

20

*Earth Island Inst. v. Carlton*,

21
  626 F.3d 462 (9th Cir. 2010) ................................................................................................ 6

22

*Garcia v. Google, Inc*.,

23
  786 F.3d 733 (9th Cir. 2015) ........................................................................................... 6, 17

24

*Goldie's Bookstore, Inc. v. Superior Court*,

  739 F.2d 466 (9th Cir. 1984) .............................................................................................. 18

25

*Great-W. Life & Annuity Ins. Co. v. Knudson*,

26
  534 U.S. 204 (2002) .............................................................................................................. 9

27

*I.N.S. v. Legalization Assistance Project of Los Angeles Cnty. Fed'n of Lab.*,

28
  510 U.S. 1301 (1993) ........................................................................................................ 6, 7

*Int'l Union, UAW v. Donovan*,
   746 F.2d 855 (D.C. Cir. 1984) ................................................................. 15

*Koller v. Brown*,
   224 F. Supp. 3d 871 (N.D. Cal. 2016) ...................................................... 17

*Lane v. Pena*,
   518 U.S. 187 (1996) ..................................................................................... 9

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ................................................................................... 11

*Lopez v. Brewer*,
   680 F.3d 1068 (9th Cir. 2012) ..................................................................... 6

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
   634 F.2d 1197 (9th Cir. 1980) ................................................................... 18

*Lucas R. v. Becerra*, No.,
   CV 18-5741, 2022 WL 2177454 (C.D. Cal. Mar. 11, 2022) ...................... 5

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................................. 13, 14

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ................................................................................. 6, 7

*Maryland v. King*,
   567 U.S. 1301 (2012) ................................................................................. 20

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ..................................................................................... 7

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ................................................................... 12

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................... 19

*North Side Lumber v. Block*,
   753 F.2d 1482 (9th Cir. 1985) ................................................................... 12

*Novak v. United States*,
   795 F.3d 1012 (9th Cir. 2015) ................................................................... 13

*Pit River Tribe v. BLM*,
   793 F.3d 1147 (9th Cir. 2015) ..................................................................... 7

*Renee v. Duncan*,
   686 F.3d 1002 (9th Cir. 2012) ............................................................................ 13

*Salazar v. Ramah Navajo Chapter*,
   567 U.S. 182 (2012) ........................................................................................... 15

*Sampson v. Murray*,
   415 U.S. 61 (1974) .............................................................................................. 18

*Sharp v. Weinberger*,
   798 F.2d 1521 (D.C. Cir. 1986) ......................................................................... 12

*Star Alaska v. United States*,
   14 F.3d 36 (9th Cir. 1994) ................................................................................... 9

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) ............................................................................... 6

*the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ............................................................................. 6

*United Aeronautical Corp. v. United States Air Force*,
   80 F.4th 1017 (9th Cir. 2023) ...................................................................... 12, 13

*United States Conf. of Cath. Bishops v. U.S. Dep't of State*,
   No. 1:25-CV-00465, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ....................... 12

*United States ex rel. Accardi v. Shaughnessy*,
   347 U.S. 260 (1954) ........................................................................................... 15

*United States v. Mitchell*,
   463 U.S. 206 (1983) ............................................................................................. 9

*United States v. White Mountain Apache Tribe*,
   537 U.S. 465 (2003) ............................................................................................. 9

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................................... 6, 17

————

**Immigration and Nationality Act of 1952, as amended:**

5 U.S.C. § 701 ............................................................................................................ 2

5 U.S.C. § 701(a)(2) ................................................................................................. 10

5 U.S.C. § 702 ............................................................................................................ 9

6 U.S.C. § 279 ............................................................................................................ 2

6 U.S.C. § 279(a) .................................................................................................. 2

6 U.S.C. § 279(b)(1) ........................................................................................ 3, 10

6 U.S.C. § 279(b)(1)(A) ..................................................................................... 2, 3

6 U.S.C. § 279(b)(1)(I) ........................................................................................ 15

6 U.S.C. § 279(g)(2) .......................................................................................... 2, 3

8 U.S.C. § 1232(i) ............................................................................................... 10

8 U.S.C. § 1232 ......................................................................................... 1, 6, 19

8 U.S.C. § 1232(b)(1) ............................................................................................ 3

8 U.S.C. § 1232(c)(1) ............................................................................................ 7

8 U.S.C. § 1232(c)(2) ............................................................................................ 7

8 U.S.C. § 1232(c)(3) ............................................................................................ 7

8 U.S.C. § 1232(c)(4) ............................................................................................ 7

8 U.S.C. § 1232(c)(5) ................................................................................ 3, *passim*

8 U.S.C. § 1232(c)(6) ............................................................................................ 7

8 U.S.C. § 1362 ................................................................................... 3, 7, 10, 16

28 U.S.C. § 1491(a)(1) ......................................................................................... 11

31 U.S.C. § 6305 ................................................................................................... 3

**The Homeland Security Act:**

Pub. L. No. 107-296 ............................................................................................... 2

**William Wilberforce Trafficking Victims Protection Act of 2008 ("TVPRA"):**

Pub. L. No. 110-457 ............................................................................................... 1

**Further Consolidated Appropriations Act:**

Pub. L. No. 118-47 .............................................................................................. 4, 10

**Full-Year Continuing Appropriations and Extensions Act, 2025:**

Pub. L. No. 119-4 ............................................................................................... 4, 10

**FEDERAL RULES OF APPELLATE PROCEDURE**

Fed. R. Civ. P. 65(c) ............................................................................................ 21

**REGULATIONS**

45 C.F.R. Part 410.................................................................................................. 3

45 C.F.R. § 410 .................................................................................................... 19

45 C.F.R. § 410.1309(a)(2)(i)-(v) ......................................................................... 4


**OTHER AUTHORITIES**

H.R. Rep. No. 1656, 94th Cong., 2d Sess. 13...................................................... 12

Standing Order, section 6 and L.R. 11-6.1 .......................................................... 24

*Unaccompanied Children Program Foundational Rule*,
    89 Fed. Reg. 34384, 34,529 (Apr. 30, 2024) ................................................. 15

89 Fed. Reg. at 34,529 ................................................................................... 16, 17

# I.   **INTRODUCTION**

The Court should deny Plaintiffs' extraordinary request for a temporary restraining order and preliminary injunction, ECF No. 7 ("motion"). Plaintiffs' motion is legally unfounded, factually overstated, and disregards both the statutory and regulatory discretion Congress expressly conferred upon the federal government.  The relief they seek would not preserve the status quo, but instead disrupt the government's longstanding management of legal services for unaccompanied alien children ("UAC")— services that remain subject to available appropriations and the agency's judgment.

Plaintiffs are legal service providers seeking to compel the United States Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR"), to indefinitely fund direct legal representation for UAC through specific contracting arrangements.  But the governing statute—the William Wilberforce Trafficking Victims Protection Act of 2008 ("TVPRA"), Pub. L. No. 110-457 (codified in principal part at 8 U.S.C. § 1232)—expressly conditions any such representation on practicability and the availability of pro bono counsel.  It does not create an enforceable right to government-funded representation, let alone compel the agency to maintain any particular scope of services or contractual relationship.  Similarly, the regulatory language Plaintiffs cite, the Foundational Rule, codified at 45 C.F.R. § 410.1309(a)(4), confirms that ORR's obligation to fund direct representation is contingent on both available appropriations and ORR's discretionary determinations.  Congress never mandated indefinite funding for these services, and nothing in the TVPRA or ORR's Foundational Rule suggests otherwise.

As a threshold matter, Plaintiffs seek to convert a discretionary, resource-dependent program into a judicially enforceable entitlement.  That effort fails as a matter of law.  Plaintiffs lack organizational standing, cannot show that the termination decision constitutes final agency action reviewable under the APA and can identify no statutory or regulatory provision that imposes a binding duty on the government to maintain uninterrupted direct representation contracts.  At most, Plaintiffs disagree with the government's policy judgment to conserve resources and reallocate funding within the broad framework of the TVPRA—a judgment that courts have repeatedly held is committed to agency discretion.

Regardless, this Court lacks jurisdiction over what is, at bottom, a dispute over the partial termination of a federal contract. Under the Tucker Act and the Contract Disputes Act, challenges to

government contract terminations must be brought in the U.S. Court of Federal Claims.  Plaintiffs' attempt to recast a contract termination as a violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*., cannot circumvent that exclusive remedial scheme.  Moreover, decisions regarding whether and how to terminate government contracts—particularly for the government's convenience—are classic examples of actions committed to agency discretion and are not subject to judicial review under the APA.

Nor can Plaintiffs establish any of the equitable factors required for injunctive relief.  Their claims of irreparable harm rest on speculative predictions about staffing decisions and funding shortfalls that are neither immediate nor irreversible.  Nothing in the record suggests that Plaintiffs are barred from continuing their work, pursuing other funding sources, or seeking relief through the dispute resolution provisions of the contract, setting aside the fact that none of the plaintiffs are actually a party to that agreement. A TRO's extraordinary relief is not an appropriate mechanism for restructuring federal contract policy to align with a particular group of stakeholders' policy preferences, particularly where the asserted harms are financial and the underlying legal theory is without merit. The Court should therefore deny Plaintiffs' motion.

## II.    BACKGROUND

### A.    Legal Framework

The statutory and regulatory framework governing legal representation for UAC in federal care and custody reflects a coordinated scheme established by Congress to balance the protection of vulnerable children with the Executive's discretion over immigration and programmatic resource allocation.  This framework primarily originates in two statutes: the Homeland Security Act of 2002 ("HSA") and the TVPRA.

In 2002, Congress enacted the HSA, Pub. L. No. 107-296, 116 Stat. 2135 (codified in relevant part at 6 U.S.C. § 279), abolishing the Immigration and Naturalization Service ("INS") and transferring the responsibility for the care and placement of UAC from INS to ORR.  6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2).

The HSA defines a UAC as "a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom— (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide

care and physical custody." 6 U.S.C. § 279(g)(2). Further, it assigns ORR broad authority over the care and custody of UAC while they are in federal custody due to their immigration status, including coordinating their care and placement, ensuring their best interests in custodial decisions, and developing plans to "ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such child." 6 U.S.C. § 279(b)(1)(A). These responsibilities are carried out through cooperative agreements and contracts with care providers under ORR policies and oversight. *See* 6 U.S.C. § 279(b)(1); 31 U.S.C. § 6305.

### 2.    The Trafficking Victims Protection Reauthorization Act ("TVPRA")

Congress enacted the TVPRA in 2008 to strengthen protections for UAC and support their safe repatriation or appropriate placement. The statute, consistent with the HSA, makes the Secretary of HHS responsible for the care and custody of UAC. 8 U.S.C. § 1232(b)(1). The TVPRA explicitly directs HHS to prioritize the utilization of pro bono counsel and does not mandate direct government-funded legal representation: Section 235 of the TVPRA encourages HHS to ensure UAC have counsel "to the greatest extent practicable" and "make every effort to utilize the services of pro bono counsel who agree to provide representation without charge." 8 U.S.C. § 1232(c)(5).

Further, Section 235 encourages HHS to ensure that counsel is available to represent UAC in "legal proceedings or matters," expressly linking representation duties with protecting children from "mistreatment, exploitation, and trafficking." Additionally, it cross-references Section 292 of the Immigration and Nationality Act ("INA"), which specifies representation "at no expense to the Government." 8 U.S.C. § 1362. Therefore, it is clear that HHS is not required to fund access to legal counsel for UAC. The TVPRA's language and structure demonstrate Congress's intent to establish public-private partnerships and encourage pro bono counsel as the primary source of legal assistance for UC, and conferring on ORR exclusive discretion to determine when direct government-funded representation might be utilized (e.g., where pro bono resources are impractical or unavailable).

### 3.    The Foundational Rule

In April 2024, ORR promulgated the Unaccompanied Children Program Foundational Rule, codified at 45 C.F.R. Part 410, to establish comprehensive regulations governing its UAC program. The

Rule, which became effective July 1, 2024, formalized previously informal procedures and explicitly articulated ORR's discretion regarding legal representation funding. Specifically, the Rule provides that ORR "shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children" only "to the extent ORR determines that appropriations are available," and only if securing pro bono counsel is impractical. 45 C.F.R. § 410.1309(a)(4).

In contrast, other subsections impose mandatory obligations. For instance, the Rule explicitly requires ORR to ensure UAC receive mandatory services such as a "presentation concerning the rights and responsibilities of undocumented children," "information regarding the availability of free legal assistance," and a "confidential legal consultation." 45 C.F.R. § 410.1309(a)(2)(i)-(v). This intentional distinction clarifies that direct funding for legal representation remains discretionary, conditional upon the availability of appropriations, and subject to agency determination. The Rule also reinforces congressional policy choices articulated in the TVPRA, highlighting the preferred reliance on pro bono counsel and emphasizing that direct representation services funded by ORR are not guaranteed and remain subject to the agency's discretionary resource management.

### 4. Appropriations Acts and Congressional Intent

Congress periodically appropriates funds to support ORR's UAC program, including legal services. Appropriations language, however, consistently remains broad and nonspecific regarding precise funding allocations. Ex. A, Declaration of Toby Biswas ("Biswas Decl."), ¶ 16. For example, the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, provides general appropriations to execute activities under Section 235 of the TVPRA without earmarking explicit amounts for direct legal representation. This general appropriation approach allows ORR flexibility in determining the allocation of resources based on agency priorities, the availability of pro bono counsel, and shifting immigration policy needs. Biswas Decl., ¶ 16.

Subsequent acts, including the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, similarly maintain funding levels and provide broad discretion without altering statutory obligations or imposing specific mandates for funding legal representation. *Id.* This ongoing legislative practice underscores Congress's intent to maintain flexibility for ORR, allowing the agency to prioritize resources efficiently and adaptively. *Id.* Such discretionary funding practices reflect a

longstanding Congressional policy to balance support for legal services with practical constraints, prioritizing public-private partnerships and pro bono resources where feasible, rather than imposing fixed or rigid funding mandates. *Id.*

Indeed, at least one other court has considered this issue and determined that Congress did not specify what types of legal services ORR must fund with the appropriations intended for carrying out Section 235 of the TVPRA. *Lucas R. v. Becerra*, No. CV 18-5741, 2022 WL 2177454, at *31 (C.D. Cal. Mar. 11, 2022). Rather, ORR is "entitled to prioritize what type of legal representation ORR supports with appropriated funds, in furtherance of the TVPRA." *Id.* The same analysis applies here: without a mandate from Congress in the most recent appropriations legislation, ORR has discretion to prioritize what types of services it funds to further the purpose of the TVPRA.

### 5.    The Current Contract and Termination Decision

The present dispute arises from ORR's partial termination and descoping of a federal contract administered by the Department of the Interior ("DOI"), which serves as the contracting agent through its Interior Business Center. *Id.* ¶ 13. ORR directed DOI to partially terminate a contract previously funding direct legal representation services. *Id.* ¶¶ 12–13. This termination was executed through a formal decision memorandum signed by the Acting Assistant Secretary of the Administration for Children and Families ("ACF"). *Id.* ¶¶ 13–14.

ORR's decision reflects a deliberate exercise of statutory discretion to prioritize available appropriations and pro bono legal services.  While general direct representation contract funding was terminated, ORR maintains other legally required activities, including "know your rights" presentations and confidential legal screening consultations. *Id.* ¶ 5, 11.

This contract termination aligns with ORR's statutory and regulatory discretion under the TVPRA, the Foundational Rule, and relevant appropriations acts, none of which mandate continuous, direct legal representation funding when viable alternatives, such as pro bono representation, exist. *Id.* ¶ 14. Additionally, the termination decision reflects ORR's commitment to fiscal responsibility, ensuring that limited resources are allocated effectively, prudently managing public funds, and preserving governmental flexibility to respond to evolving priorities and urgent programmatic needs. *Id.* ¶ 11, 16.

### III.    STANDARDS OF REVIEW

Preliminary injunctive relief "is an extraordinary and drastic remedy," *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (internal quotation marks and citation omitted), that is "never awarded as of right," *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (internal quotation marks and citation omitted); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that the standard for issuing a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction).  Thus, this relief "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez*, 680 F.3d at 1072 (internal quotation marks and citation omitted; emphasis in original).  This is a "difficult task." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).  To prove their entitlement to such relief, Plaintiffs must establish that:  (1) they are likely to succeed on the merits, (2) are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Under the Ninth Circuit's sliding scale test for preliminary injunctive relief, "serious questions going to the merits" and "a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

### IV.    ARGUMENT

**A.    Plaintiffs cannot demonstrate that they are likely to succeed on the merits.**

**1.    Plaintiffs lack standing because they are not within the zone of interests that 8 U.S.C. § 1232 is intended to protect.**

Plaintiffs lack standing because the statutory provision that, according to Plaintiffs, ensures that UAC have access to legal counsel, 8 U.S.C. § 1232(c)(5), was not intended to protect Plaintiffs. When an organization challenges an agency action under the APA, the organization must show that it is within the "zone of interests" that the statute was meant to protect. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *I.N.S. v. Legalization Assistance Project of Los Angeles Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1305 (1993). To fall within the "zone of interests" of a statutory provision, "the plaintiff must establish that the *injury* he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of

interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 883 (1990); *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). When a plaintiff brings an APA claim against a federal agency, courts look to "the statute that [the plaintiff] says was violated," rather than the APA itself to determine whether the party's injury is within the zone of interests. *Match-E-Be-Nash-She-Wish*, 567 U.S. at 224 (quotation marks omitted). While an "explicit mention" of Congress's intent is not required, something in the "particular provision of law upon which the plaintiff relies" must indicate that Congress intended to protect the organization. *Pit River Tribe v. BLM*, 793 F.3d 1147, 1157 (9th Cir. 2015) (citation omitted). That an agency rule or policy may affect the way an organization allocates its resources does not give standing to an entity which is not within the zone of interests the statute meant to protect. *Legalization Assistance Project*, 510 U.S. at 1305.

Nothing in the text of 8 U.S.C. § 1232(c)(5), nor in the legislative history, indicates that Congress enacted the legal-services provision to address the financial interests of organizations such as Plaintiffs in this case. Rather, the plain text focuses on the interests of the UAC: it requires HHS, to the greatest extent practicable and "consistent with 8 U.S.C. § 1362," to ensure that certain UAC "have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." *Id.* § 1232(c)(5). This provision protects UAC from mistreatment, not to line Plaintiffs' pocketbooks with taxpayer funding. Indeed, when reviewing the statute as a whole, the only intended beneficiary of subsection (c), entitled "Providing safe and secure placements for children," are UAC.[1]

Moreover, Congress's caveat that such legal services must be "consistent with 8 U.S.C. 1362" demonstrates that Congress did not intend for the government to front the bill for legal services or to pay organizations, such as Plaintiffs. 8 U.S.C. § 1362 provides that aliens have the right to representation in immigration proceedings, as long as the representation is "at no expense to the Government." Congress's

---

[1] Each sub-subsection provides safeguards for ensuring the safety of UAC who are in HHS's custody. *See id.* § 1232(c)(1) (requiring agencies to implement policies to protect UAC from trafficking, victimization, and exploitation); *id.* § 1232(c)(2) (requiring UAC to be placed in the least restrictive setting that is in their best interest); *id.* § 1232(c)(3) (requiring that UAC be placed with custodians who will provide for their well-being); *id.* § 1232(c)(4) (ensuring that custodians receive legal orientation explaining the custodian's responsibility to ensure that the UAC appear at immigration proceedings and are protected from harm); *id.* § 1232(c)(5) (*see supra*); *id.* § 1232(c)(6) (authorizing HHS to appoint child advocates for UAC who are particularly vulnerable).

reference to this statutory provision allows no room for doubt: Congress directed HHS to refrain from using taxpayer funding to pay for UAC legal services in immigration proceedings. Further, the second part of § 1232(c)(5) confirms that Congress did not intend to financially benefit legal-services organizations. Congress required that HHS "shall make every effort to utilize the services of *pro bono* counsel" who will represent UAC "without charge." *Id.* § 1232(c)(5). Congress intended that HHS would not spend money on legal services for UAC and, instead, would seek counsel who would represent UAC without using taxpayer funding. *Id.*

Further, Congress's provision for funding child advocates in subsection (c) implies that Congress's silence—or, indeed, prohibition—regarding funding for legal services confirms that Congress never intended for legal-service providers to receive taxpayer funding. "[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) (internal quotation marks omitted). Congress explicitly provides federal funding for child advocates, and thereby intends to benefit child advocates, in subsection (c)(6). By comparison, in subsection (c)(5), Congress discourages federal funding for legal-service providers, mandating that HHS secure "pro bono" counsel and prohibiting federal funding for counsel in immigration proceedings. The juxtaposition of these two subsections leaves no doubt as to Congress's intent: federal funding should not be used to fund legal-service organizations like Plaintiffs.

That Plaintiffs have lost funding and need to reallocate resources does not place them within the zone of interests that Congress meant to protect. Accordingly, Plaintiffs likely cannot show that they have standing to challenge HHS's funding decisions under the APA.

Plaintiffs are also unlikely to succeed on the merits of their claim because they seek monetary relief, and the APA does not waive sovereign immunity over such claims. Although styled as a request for declaratory and injunctive relief, the relief that they seek is simple: they want to compel the United States to continue making payments—relief precluded under the APA.

1    "It is axiomatic that the United States may not be sued without its consent and that the existence

2    of consent is a prerequisite for jurisdiction." *United States v. Mitchell,* 463 U.S. 206, 212 (1983).

3    Accordingly, before a court may exercise jurisdiction over any suit against the United States, the plaintiff

4    must unequivocally show that the United States has waived sovereign immunity, and that their claims fall

5    squarely within the terms of that waiver. *United States v. White Mountain Apache Tribe,* 537 U.S. 465,

6    472 (2003) (citations omitted); *see also Lane v. Pena,* 518 U.S. 187, 192 (1996) (stating that the waiver

7    of sovereign immunity cannot be implied, but "must be unequivocally expressed in statutory text.").

8    Relevant here, the APA only waives sovereign immunity over actions seeking relief "other than

9    monetary damages." 5 U.S.C. § 702. The APA "does not waive sovereign immunity for contract claims

10   seeking equitable relief." *N. Star Alaska v. United States*, 14 F.3d 36, 38 (9th Cir. 1994) (cleaned up). As

11   a result, a court must carefully discern whether a request dressed up as a claim for injunctive or declaratory

12   relief is actually seeking monetary relief, as "any claim for legal relief can, with lawyerly inventiveness,

13   be phrased in terms of an injunction." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 211

14   n.1 (2002).

15   The APA does not provide a waiver of sovereign immunity here because the relief Plaintiffs seek

16   is payment. Specifically, Plaintiffs ask this Court to: (1) declare that "Defendants are required to *continue*

17   *funding* legal representation to unaccompanied alien children, consistent with the TVPRA and ORR's

18   Foundational Rule; (2) enjoin Defendants nationwide from *ceasing to fund counsel* to represent

19   unaccompanied alien children in violation of the TVPRA and the Foundational Rule; (3) to declare that

20   Defendants' actions violate the APA; and (4) to set aside Defendants' actions. ECF No. 1 at 39 (emphases

21   added).[2]  Regardless of how Plaintiffs label their request for relief, the result of granting any of their

22   requests is the same: HHS must continue paying Acacia, and consequently, continue paying Plaintiffs.

23   The APA does not waive sovereign immunity for such a claim, and thus, this Court lacks jurisdiction to

24   order Defendants to provide Plaintiffs with the monetary relief they seek. *N. Star Alaska*, 14 F.3d at 38.

25

26

27   _____

[2] Page number references, when to filings on the Court's docket in this case, are to the page number in

28   the header supplied by the Court's ECF system.

The APA also does not provide a waiver of sovereign immunity here because HHS's funding decision under the TVPRA and the Foundational Rule are discretionary. The APA does not permit judicial review of "agency action" that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The TVPRA provides HHS broad discretion in determining how to provide legal services to UAC. While Section 235 mandates that HHS ensure that counsel is available to represent UAC "to the greatest extent practicable" in "legal proceedings or matters," it also cross-references the provision of the INA—8 U.S.C. § 1362—which specifies that "the privilege" of being represented in removal proceedings is "at no expense to the Government." The TVPRA also directs HHS to "make every effort to utilize the services of pro bono counsel who agree to provide representation without charge." 8 U.S.C. § 1232(c)(5). Likewise, the Foundational Rule explicitly articulates ORR's discretion regarding legal representation funding. It provides that ORR "shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children" only "to the extent ORR determines that appropriations are available," and only if securing pro bono counsel is impractical. 45 C.F.R. § 410.1309(a)(4). The decision to fund direct legal services is "subject to ORR's discretion and available appropriations." *Id.*

Moreover, Congress's funding of ORR's UAC program, including legal services, demonstrates that HHS has been allowed discretion in how it allocates resources. For example, the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, provides general appropriations to execute activities under Section 235 of the TVPRA without earmarking explicit amounts for direct legal representation. And subsequent acts, including the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, similarly maintain funding levels and provide broad discretion without altering statutory obligations or imposing specific mandates for funding legal representation. *Id.* ¶ 16. This ongoing legislative practice underscores Congress's intent to maintain flexibility for ORR, allowing the agency to prioritize resources efficiently and adaptively. *Id.*; *see also* 6 U.S.C. 279(b)(1) (making the Director of ORR responsible for activities including coordinating and implementing the care of UAC and implementing policies with respect to the care and placement of unaccompanied alien children); 8 U.S.C. § 1232(i) (authorizing the Secretary of HHS to "award grants to, and enter into contracts with, voluntary agencies to carry out this section and section 279 of title 6.").

The Court therefore lacks jurisdiction because decisions about the substance of HHS's decision to reallocate resources from direct representation into other aspects of the UAC program is firmly committed to the agency's discretion.  In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decision making standards.  *See id.* at 185–88.  The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Id.* at 192.

Indeed, an agency's allocation of funds from a lump-sum appropriation requires "a complicated balancing of a number of factors which are peculiarly within its expertise": whether its "resources are best spent" on one program or another; whether it "is likely to succeed" in fulfilling its statutory mandate; whether a particular program "best fits the agency's overall policies"; and, "indeed, whether the agency has enough resources to fund a program at all."  *Id.* at 193 (internal citations omitted).  "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes."  *Id.*  But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude."  *Id.*  Because the TVPRA confers HHS discretion to determine how best to allocate and administer the funding for the UAC program, HHS's decisions are not subject to review under the APA.

### 3. This Court lacks jurisdiction over Plaintiffs' claims because the rights they seek to enforce must be brought in the Federal Court of Claims.

Although Plaintiffs cite to the APA as the basis for their claims, the rights that they seek to enforce, and the relief that they seek, are only available to them through contract, and thus their claims are precluded by the Tucker Act.[3]

---

[3] The Tucker Act provides: "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, *or upon any express or implied contract with the United States.*" 28 U.S.C. § 1491(a)(1) (emphasis added).

claim is based upon a contract with the United States and subject to the jurisdictional restrictions in the Tucker Act. *North Side Lumber v. Block,* 753 F.2d 1482, 1486 (9th Cir. 1985), *cert. denied,* 474 U.S. 931 (1985) (citing *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 967–68 (D.C. Cir. 1982)). The Tucker Act "impliedly forbids" APA claims involving government contracts. *Id.* at 1485 (citing H.R. Rep. No. 1656, 94th Cong., 2d Sess. 13). To determine whether the Tucker Act precludes a contract claim "disguised" as an APA claim, the Ninth Circuit employs the D.C. Circuit's *Megapulse* test. *United Aeronautical Corp. v. United States Air Force*, 80 F.4th 1017, 1025–26 (9th Cir. 2023) (citing *Megapulse,* 672 F.2d at 967– 68). Under *Megapulse*, a court must decide whether "the source of the rights upon which the plaintiff bases its claims" arises under a contract and whether "the type of relief sought" is normally available as a contract remedy. *Id.* "If rights and remedies are *statutorily* or *constitutionally* based, then districts courts have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims does, even if the plaintiff formally seeks injunctive relief." *Id.* (emphases in original).

Two weeks ago, a district court in the District of Columbia decided a case very similar to this one and determined that the plaintiff organization's claims resounded in contact and, thus, had to be brought in the Court of Federal Claims. *United States Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 1:25-CV-00465, 2025 WL 763738, at *2 (D.D.C. Mar. 11, 2025). Like here, the relief sought in *Conf. of Cath. Bishops* was styled as a request for an injunction, yet the court correctly reasoned that, in actuality, the relief sought was for "the Government to keep paying up." *Id.* at *5. The district court therefore held that the claim was "founded upon a contract" and "must be heard in Claims Court." *Id.* at *7 (citing *Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) (Scalia, J.) ("We know of no case in which a court has asserted jurisdiction . . . to issue an injunction compelling the United States to fulfill its contractual obligations.")). So too here.

As explained, Section IV.A.2, *supra*, the relief Plaintiffs seek is for "the Government to keep paying up," *Conf. of Cath. Bishops*, 2025 WL 763738, at *2. Because they seek monetary relief, which is unavailable under the APA but normally available in a contract dispute, their claim is precluded by the Tucker Act. *Id.* at *7; *United Aeronautical Corp.*, 80 F.4th at 1025–26.

Not only does Plaintiffs' requested relief resound in contract, but the "source of rights" upon which they base their claims arises from a contract. *Megapulse,* 672 F.2d at 967–68. Plaintiffs cannot separate

their causes of action from their contractual relationship with Acacia. Plaintiffs lack standing to assert claims against the United States absent the contract that HHS has with Acacia because without it they would have no injury. In other words, had Acacia never entered into a contract with HHS to provide direct legal services to UAC, Plaintiffs would have never received funding to provide such legal services and would have no injury to complain of. No statute or regulation requires HHS to compensate *Plaintiffs* for their legal services. Absent a statutory or constitutional entitlement to the appropriated funds that they seek, their injury arises from termination of a contract. Because Plaintiffs' "source of rights" for funding from appropriations stems solely from their contract with Acacia, this Court lacks jurisdiction over their claims. *Id.* at 967–68; *United Aeronautical Corp.*, 80 F.4th at 1025–26.

### 4. Plaintiffs cannot show that a favorable decision in this case would likely redress their alleged injuries.

To the extent Plaintiffs argue that they are not challenging the government's decision to end the contract with Acacia but, rather, the decision to discontinue providing appropriated funds to any legal-services organization, they likewise lack standing to assert such a claim. The "irreducible constitutional minimum" of Article III standing consists of (1) "injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks omitted). The third element of Article III standing, redressability, requires that it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan,* 504 U.S. at 561 (citation and internal quotation marks omitted). To show a likelihood of redressability, Plaintiffs must "show that there would be a 'change in a legal status' as a consequence of a favorable decision" and that this change would significantly increase the likelihood that they would obtain the relief sought. *Novak v. United States*, 795 F.3d 1012, 1019–20 (9th Cir. 2015) (quoting *Renee v. Duncan,* 686 F.3d 1002, 1013 (9th Cir. 2012)).

The relief that Plaintiffs seek—if untethered to their contract claim—would not likely provide them with the monetary relief they seek. Enforcing the statutory authority Plaintiffs rely on in arguing that Congress intended to fund direct-legal services, 8 U.S.C. § 1232(c)(5), would have the opposite effect of the relief Plaintiffs seek. As explained above, Congress did not intend to financially benefit Plaintiffs in ensuring that UAC would have access to legal services; instead, Congress envisioned that such legal

services would generally be provided *pro bono* at no expense to the government. 8 U.S.C. § 1232(c)(5). If the Court were to enforce the plain language and purpose of Section 235 of the TVPRA, it would order the government to seek out *pro bono* counsel for direct legal services and, to the extent possible, avoid funding legal services at the government's expense. Of course, this result would not redress Plaintiffs' injuries, as they seek to be paid for their services and not acting in a *pro bono* capacity.

Likewise, because the Foundational Rule provides HHS with discretion as to whether and how to disburse appropriations for direct legal services, Plaintiffs cannot show that ordering HHS to comply with its regulation would redress their injury. Under the plain language of the regulation, HHS would maintain the discretion to determine whether to fund direct-legal services for UAC, and, using that discretion, it would likely continue to decline to continue funding. Biswas Decl., ¶ 17. And even if HHS changed course and decided to exercise favorable discretion by funding direct legal services, it could contract with organizations other than Acacia and Plaintiffs. *Id.* ¶ 19. There is nothing that Plaintiffs can cite to that would require or encourage HHS to continue funding the Plaintiffs *in this case*. *Id.* ¶¶ 17-19. In other words, even if the agency continued funding direct legal services, Plaintiffs cannot show that it is likely that HHS will continue to contract with Acacia or with any of the Plaintiffs in this case. *Id.* Thus, Plaintiffs' redressability—that HHS would continue funding Acacia or any of the Plaintiffs—is speculative at best and insufficient to establish standing. *Lujan,* 504 U.S. at 561. Accordingly, Plaintiffs fail to show that they likely have Article III standing because enforcing the relevant policies and statutes would not redress their alleged injury.

## 5.    The Termination Contract Termination at Issue Does Not Violate the APA

Plaintiffs erroneously argue that termination of direct legal services violate the APA. Although, the money was authorized by Congress, Congress never mandated its spending. When Congress does not require the agency to spend a certain amount of the appropriated fund, the agency has discretion over how much to spend up to the cap provided by Congress. *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 432 (2024) ("The appropriation of "sums not exceeding" a specified amount did not by itself mandate that the Executive spend that amount; as was the case in England, such appropriations instead provided the Executive discretion over how much to spend up to a cap."). When

1    courts determine whether money is mandatory or discretionary, they must look to the language of the

2    appropriations bill to determine whether Congress required the funds appropriated to be used in a

3    particular way. *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182 (2012) ("An agency's discretion to spend

4    appropriated funds is cabined only by the 'text of the appropriation,' not by Congress' expectations of

5    how the funds will be spent, as might be reflected by legislative history.") (quoting *Int'l Union, UAW v.*

6    *Donovan*, 746 F.2d 855, 860-61 (D.C. Cir. 1984) (Scalia, J.))

7            **6.    The Foundational Rule Does Not Require Funding for Taxpayer-funded**
                    **Direct Immigration Legal Representation Consistent with Available**
8                    **Appropriations.**

9            Plaintiffs contend that Defendants have "ended" funding for legal representation of

10   unaccompanied alien children despite the availability of appropriated funds for this purpose through at

11   least September 30, 2027, and that, by the supposed ending, Defendants violate what they believe is a

12   mandate in the Foundational Rule to provide counsel for UAC to the extent there are appropriated funds

13   available to do so.  ECF No. 1 ¶ 139.  As Plaintiffs note, to establish a claim under *United States ex rel.*

14   *Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954), such a claim must show: (1) that the government

15   has violated its own regulations; and (2) that Plaintiffs are substantially prejudiced by that violation.

16   ECF No. 7 at 14 (citing  *Al Otro Lado, Inc. v. Mayorkas*, 2024 WL 4370577, at *8–9 (S.D. Cal. Sept.

17   30, 2024)). To start, Plaintiffs have not shown that Defendants have violated their own regulations.

18   Indeed, Plaintiffs overlook the fact that the funding at issue here is required only "insofar that it is not

19   practicable for ORR to secure pro bono counsel."  45 C.F.R. § 410.1309(a)(4).  As HHS noted in the

20   preamble to its Foundational Rule, ORR, consistent with the TVPRA, makes every effort to use pro

21   bono legal services "to the greatest extent practicable" to secure counsel for UAC in these contexts.

22   Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384, 34,529 (Apr. 30, 2024).

23   HHS notes that ORR-funded legal services providers may help coordinate referral to pro bono legal

24   services and that ORR provides each UAC with a list of pro bono service providers.[4]  *Id*.  Historically,

25   HHS has acknowledged that, in some cases, it is impracticable for ORR to secure pro bono legal

26   services, such as in markets where demand exceeds supply, or during times of influx.  *Id*.  But where

27

28   _____
     [4] The list of pro bono service providers is statutorily required under the TVPRA. 6 U.S.C. § 279(b)(1)(I).

1   and when it is "impracticable" for ORR to secure pro bono legal services is a determination to be made

2   by ORR. *Id.* (noting that the decision is subject to ORR's "discretion."). Further, since ORR must be

3   selective in the kinds of legal services it funds, it therefore proposed to establish its discretion to fund

4   legal services for specific purposes "based on its judgment and priorities." 89 Fed. Reg. at 34,529.  The

5   clause "based on its judgment and priorities" reflects that ORR has considerable discretion to determine

6   how the provision of legal services to UAC is funded.  The determination of when such provision is

7   "impracticable" is a decision to be made exclusively by ORR, applying its expertise, and not by

8   Plaintiffs or the Court.

9        Plaintiffs next overlook the fact that ORR shall fund legal service providers *subject to ORR's*

10  *discretion,*[5]

11

12

13

14

15      Plaintiffs note that HHS has an obligation "to the greatest extent practicable" and consistent with

16  8 U.S.C. § 1362, to ensure that UAC have counsel in their immigration proceedings.  HHS interpreted

17  "to the greatest extent practicable" to open the door to a grant of authority to pay for legal services

18  beyond that available from pro bono legal service providers.  89 Fed. Reg. at 24,529.  "To the greatest

19  extent practicable," however, cannot reasonably be read as a mandate for HHS to pay for direct

20  immigration legal representation for all UAC, unconditionally.  In the preamble to the Foundational

21  Rule, HHS stated that it "understands that some commenters would like ORR "to fully fund legal

22  services to all [UAC]." *Id.*  HHS also observed that it received comments questioning ORR's legal

23  authority to pay for legal services for UAC and suggesting that ORR not use taxpayer funding for legal

24  representation for UAC. *Id.*  HHS concluded that its approach to providing legal services to UAC, by

25  enabling them to access ORR has determined that "its approach to providing legal services to

26  unaccompanied children by enabling them to access pro bono counsel 'to the greatest extent

27

28  _____
[5] Defendants do not contest that the conditions "to the extent ORR determines that appropriations are available" and "subject to . . .available appropriations," in 45 C.F.R. § 410.1309(a)(4), are met here.

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
3:25-CV-02847- AMO                    16                    PI Appeal and Stay Addendum 748

practicable' and funding legal services for additional unaccompanied children, as resources allow, is consistent with ORR's statutory obligations." *Id*. HHS's interpretation of the INA and TVPRA – as Congress's grant of discretion to ORR to provide funding for immigration services to UAC – is far from a mandate to do provide such funding.

Similarly, and as Plaintiffs point out, HHS did acknowledge that most UAC need legal services to resolve their immigration status, and such representation appears to have a significant impact on court appearance. ECF No. 7 at 13 (citing 89 Fed. Reg. at 34,529). Further, as Plaintiffs note, HHS affirmed that "legal services providers who represent unaccompanied children undertake an important function" and explains ORR's goal of "100 percent legal representation of unaccompanied children." *Id*. (citing 89 Fed. Reg. at 34,526). But Plaintiffs fail to explain why they believe that such services must be funded by the taxpayer. HHS's shift to increased emphasis and reliance upon pro bono service providers might not be Plaintiffs' preference, but it is consistent with the plain language of section 1309(a)(4) and HHS's explanations for why it sculpted the language in 1309(a)(4) as it did. In their motion for a TRO, however, Plaintiffs are silent regarding the importance of pro bono counsel in providing advice and legal representation for UAC, an importance reflected in both section 1309(a)(4) and the preamble. ECF No. 7.

### B.   Plaintiffs Will Not Face Irreparable Harm Without a TRO

The "most important" *Winter* factor is whether Plaintiffs demonstrate irreparable harm. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Koller v. Brown*, 224 F. Supp. 3d 871, 879 (N.D. Cal. 2016) (noting it is the "single most important prerequisite" for a TRO). The "possibility" of harm is insufficient to secure a TRO; Plaintiffs must show that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). "Speculative injury" does not suffice; Plaintiffs must show both immediacy and likelihood that they will be harmed absent a TRO. *See Caribbean Marine Servs. Co*., 844 F.2d at 674. Where "[m]ultiple contingencies must occur" before Plaintiffs' claimed injuries, the injuries are "too speculative" to justify a TRO. *Id.* at 675.

Plaintiffs have failed to make the requisite threshold "clear showing of irreparable harm." *See Garcia*, 786 F.3d at 746 (reiterating that "[h]arm must be proved, not presumed"). Plaintiffs have failed to demonstrate irreparable harm sufficient to warrant extraordinary injunctive relief. Although

Plaintiffs characterize their harm as damaging their ability to provide services, their harm is merely monetary. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("Monetary injury is not normally considered irreparable."). Economic damages are not traditionally considered irreparable because the injury can later be remedied by a damage award. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury . . . ." (internal quotation omitted)); *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 676 (9th Cir. 1988) ("Subjective apprehensions and unsupported predictions of revenue loss are not sufficient to satisfy a plaintiff's burden of demonstrating an immediate threat of irreparable harm."); *Arcamuzi v. Continental Air Lines*, Inc., 819 F.2d 935, 938 (9th Cir. 1987) ("[Temporary economic loss alone generally is not a basis for injunctive relief."); *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 471 (9th Cir. 1984) ("Mere financial injury . . . will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation.").

While Plaintiffs characterize their harm as "frustrating their mission," the actual harm that Plaintiffs allege is "lack of funding," which is plainly monetary harm. *See* ECF No. 7 at 16 ("There is no question that *ceasing funding* for legal representation services for UAC and terminating the existing services will cause imminent harm that cannot be later remediated.") (emphasis added); *id.* at 17 ("Plaintiffs have relied on Congress's and Defendants' assurances that *funding* for these critical resources will continue to be available.") (emphasis added); *id.* ("Sustaining these services without this *funding* will cost the Northwest Immigrant Rights Project *$200,000 a month*.") (emphasis added). Plaintiffs cannot avoid the well-established case law holding that monetary loss (even if significant), is not irreparable harm.

Plaintiffs next allege that "ceasing funding for legal representation services for UAC and terminating existing contracts will cause imminent harm" because it will cause them to cease providing certain legal services. ECF No. 7 at 16. But that too is without merit as the Cancellation Order does not prevent Plaintiffs from continuing to provide legal services – it merely prevents them from receipt of

1    federally funded payment for those services. Indeed, Plaintiffs may freely provide these services *pro*

2    *bono*, which is in line with the plain language and purpose of 8 U.S.C. § 1232(c)(5), and would be

3    welcomed by Defendants.

4         Plaintiffs' further assertion that "impacted attorneys and staff have years of individualized

5    experience and wisdom with clients making rehiring layoffs impracticable" is speculative and attenuated.

6    ECF No. 7 at 18. "Certain impending" injury cannot be shown when the asserted injury is based on a

7    "speculative chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), or on

8    "speculation about the decisions of independent actors," *id*. at 414. As the D.C. Circuit has cautioned:

9    "Because of the generally contingent nature of predictions of future third-party action," a court should

10   be "sparing in crediting claims of anticipated injury by market actors and other parties alike." *Arpaio v.*

11   *Obama*, 797 F.3d 11, 23 (D.C. Cir. 2015). The Court should likewise decline to entertain Plaintiffs'

12   speculative assertion about what third parties—individuals who *might* be laid off—would do if called

13   back to work.

14   **C.**    **The Balance of the Equities and Public Interest Weigh Against Entry of a Temporary**
            **Restraining Order.**

15       Where the government is a party, the balance of equities and public interest factors merge. *Drakes*

16   *Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435

17   (2009)). Courts "explore the relative harms to applicant and respondent, as well as the interests of the

18   public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991)

19   (internal quotation marks and citation omitted). In weighing these factors, Plaintiffs rely on their previous

20   arguments pointing to their allegation that harm arises from Defendants' "shirking [of] their voluntarily

21   undertaken obligations." Motion at 19. But as described above, neither the purported merit of their claims

22   nor their alleged injury support entry of a TRO. This is particularly true because Plaintiffs make no

23   attempt to explain how the broad relief requested in their proposed order (Dkt. 7-3) is tethered to the harms

24   they claim. On the other hand, Defendants are legally entitled to make decisions about the disbursement

25   of their federal grants. *See, e.g.*, 8 U.S.C. § 1232; 45 C.F.R. § 410.

26       Here, the balance of the equities and public interest tip decisively in Defendants' favor. If the

27   status quo is preserved during the pendency of the case, Plaintiffs can still obtain any funding they may

28

be entitled to as a result of the case's ultimate resolution.  But the opposite is not true—if Plaintiffs are given access now, and draw down the funds throughout the litigation, Defendants will be left with no meaningful recourse even if they prevail.  Defendants will bear all the risk if the Court enters a preliminary injunction, whereas Plaintiffs will bear none if it denies one. Such a proposition turns Plaintiffs' burden of establishing irreparable harm on its head. In short, the equities clearly favor Defendants.

Plaintiffs' motion fails to acknowledge the governmental harm that will be imposed through injunctive relief here, suggesting that the TRO is merely to spend appropriated funds. This ignores the substantial harm an injunction imposes by usurping executive branch authority to manage complex programs and allocate billions in taxpayer funds. Forcing continuation of one specific contract hinders ORR's ability to adapt to potentially changing migration flows, shelter needs, health concerns, or to implement potentially more cost-effective or impactful service models across the entire UAC program spectrum.

What's more, the public interests at stake here include effective governance. While Plaintiffs legitimately describe the public interest in protecting vulnerable children and upholding the TVPRA, the public interest also encompasses the efficient, flexible, and responsible administration of federal programs, interests which are opposed to forcing the government to continue to fund paid attorneys. It includes ensuring ORR can make difficult choices to best serve the overall needs of all unaccompanied alien children within its care, using its expertise and the discretion Congress provided. Judicial micromanagement of appropriations allocation via Plaintiffs' requested TRO arguably undermines, rather than serves, the broader public interest in competent government.

Indeed, an injunction here would effectively disable the administration from effectuating its executive authority consistent with their constitutional and statutory authorities. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up) ("[a]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). Where the Government is legally entitled to make decisions about the disbursement or allocation of federal funds, but is nonetheless ordered to release the funds, such funds may not be retrievable afterwards. While Plaintiffs emphasize the mandate in 8 U.S.C. § 1232(c)(5) that HHS "shall

ensure . . . that all unaccompanied alien children . . . have counsel," this mandate is explicitly qualified by "to the greatest extent practicable". This is not mere suggestion; it is the legal standard set by Congress, inherently requiring agency judgment. Here, "practicable" arguably necessitates balancing the goal of providing counsel against competing demands, resource limitations across the entire UAC program, administrative feasibility, and the effectiveness of different service delivery models. It does not mandate funding one specific contract indefinitely, irrespective of other considerations.

In sum, the decision to terminate funding under the contract represents a permissible exercise of the discretion afforded to ORR by Congress under 8 U.S.C. § 1232(c)(5), and codified in its own regulations, *see* 45 C.F.R. § 410.1309(a)(4). It is not contrary to law or arbitrary and capricious. An injunction would improperly substitute judicial preference for agency judgment, unduly restricting the executive's ability to allocate resources and adapt to evolving needs. As a result, the balance of equities and the public interest, properly considered, weigh against granting the extraordinary relief of a TRO.

### D.    If the Court issues a TRO, it should require Plaintiffs to Post Security.

Finally, if the Court deems a TRO warranted (which it should not), Plaintiffs should be required to post bond.  Rule 65(c) provides that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  The circumstances here warrant requiring Plaintiffs to provide security in an amount that could compensate Defendants for the losses caused by a preliminary injunction (in the event that Defendants are found to have been wrongfully enjoined).  To the extent that the Court grants relief to Plaintiff, Defendants respectfully request that the Court require Plaintiffs to post security for any taxpayer funds distributed during the pendency of the Court's Order. Since this case is ultimately about financial allocation, it thus follows that Rule 65(c)'s explicit requirements necessitate Plaintiffs' posting of security.

### V.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a temporary restraining order.

1    DATED: March 31, 2025                    Respectfully submitted,

2

3                                             YAAKOV M. ROTH
                                              Acting Assistant Attorney General

4
                                              WILLIAM C. SILVIS
5                                             Assistant Director

6                                             CHRISTINA PARASCANDOLA
                                              KATE MASETTA ALVAREZ
7                                             JONATHAN K. ROSS
                                              Senior Litigation Counsels
8

9                                             ZACHARY A. CARDIN
                                              Trial Attorney
10

11                                            /s/ Michael A. Celone
                                              MICHAEL A. CELONE
12                                            Senior Litigation Counsel
                                              U.S. Department of Justice, Civil Division
13                                            Office of Immigration Litigation
                                              General Litigation and Appeals Section
14                                            P.O. Box 878, Ben Franklin Station
                                              Washington, DC 20044
15                                            (202) 305-2040
                                              Michael.A.Celone@usdoj.gov
16

17                                            Attorneys for Defendants

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants certifies that this brief contains 22 pages, which complies with the word limit of this Court's Standing Order, section 6 and L.R. 11-6.1.

<div align="right">

Respectfully submitted,

*/s/ Michael A. Celone*
MICHAEL A. CELONE

Office of Immigration Litigation
Civil Division

</div>

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.,*

        Plaintiffs,


UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.,*

        Defendants.

Case No: 3:25-cv-2847 (AMO)

## **DECLARATION OF TOBY BISWAS**

I, Toby Biswas, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Director of the Division of Unaccompanied Alien Children (UAC) Policy for the UAC Bureau of the Office of Refugee Resettlement (ORR), within the Administration for Children and Families (ACF), a component of the U.S. Department of Health and Human Services (HHS).

2.      I have held various roles within ORR since I first started working at the agency in November 2009, and I have held my current role since April 2023. My job duties include, among other things, responsibility for all aspects of the development and implementation of ORR's policies and procedures concerning the care and custody UAC, including those related to the provision of legal services to UAC. In this capacity, I am responsible for ensuring ORR's implementation of and compliance with programmatic policy prerogatives and statutory responsibilities, such as those arising under the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), 8 U.S.C. § 1232, and ORR's Foundational Rule, 45 CFR part 410, which include provisions related to the provision of UAC legal services.[1]

3.      This declaration is based upon my personal knowledge, information acquired by me in the course of performing my official duties, information contained in the records of ACF and ORR, and information conveyed to me by current agency employees and contractors. Further, I have reviewed the pleadings in this matter, and am generally familiar with the facts and circumstances underlying plaintiffs'

---

[1] ORR policies with respect to UAC are also embodied in the ORR UAC Bureau Policy Guide ("UAC Policy Guide"), which is publicly available on ORR's website, and has recently been made available to the public in a Freedom of Information Act reading room: https://acf.gov/e-reading-room

1

allegations concerning the termination of a portion of the Acacia contract for the provision of UAC legal services in March. I also have personal knowledge of the facts and circumstances leading to the termination decision at issue here.

4.      Acacia Center for Justice ("Acacia")[2] is an ORR contractor who provides legal services and other assistance to UAC in and released from ORR care in the sectors defined by ORR, as explained below. Acacia may further sub-award ORR funds to other organizations to provide these services. In this posture, ORR has no direct relationship with these sub-awardees. Rather, as the federal contractor, Acacia is responsible under HHS regulations for, among other things, clearly identifying every sub-award as such, evaluating each subrecipient's risk of noncompliance with Federal requirements, and monitoring subrecipient activities to ensure the subaward is used for authorized purposes, identifying sub-awardees as either subrecipients or sub-contractors. *See* 45 CFR 75.352; *see also* 45 CFR 75.101(b)(1) (making 75.352 applicable to HHS contracts).

6.      Acacia has provided these services pursuant to Contract 140D0422C0009.

7.      Collectively, these services cost ACF/ORR—and by extension U.S. taxpayers—a grand total of $796,720,624.01.

8.      On February 3, 2025, Acting HHS Secretary Dorothy Fink issued the "Secretarial Directive on Program Payment Integrity" ("Secretarial Directive"), which directed all HHS personnel to briefly pause all payments to contractors, vendors, and grantees related to immigration and refugee resettlement for internal review. A true and correct copy of the Secretarial Directive is attached hereto as "Exhibit 1."

9.      Specifically, the Secretarial Directive directed that "Agency personnel shall briefly pause all payments made by the Administration for Children and Families to contractors, vendors, and grantees related to immigration and refugee resettlement for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts

---

[2] Acacia was previously known as the Vera Institute of Justice, or "Vera."

and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy."  Exhibit 1.

10.     In late February, all ORR contracts, including the contract for legal services, were evaluated for termination and modification to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of the President's Administration. The evaluation consisted of making a determination of whether the contracted services were legally required, whether the services provided by the vendor aligned with the administration's priorities, and whether the services could be provided through other means more cost effectively. During that time period, ORR leadership determined that the contract for legal services was only partially required in order to meet statutory requirements and decided to reduce the scope of the contract in order to reduce spending and achieve more cost efficiency.

11.     As a result of the program integrity review conducted pursuant to the Secretarial Directive, ACF and ORR leadership decided, on or about March 20, 2025, to partially terminate the Acacia contract—which was already set to expire on March 29, 2025—with respect to the funding of direct representation of UAC; however, ACF/ORR decided to renew the Acacia contract with respect to the provision of KYR trainings and legal screenings, based on its understanding of its non-discretionary obligations, and in keeping with the Administration's general policy of protecting the public fisc by ensuring taxpayer dollars are only spent on statutorily-required government-funded services.

12.     Accordingly, on March 21, 2025, Acacia was notified of the partial termination decision by the Acquisition Services Directorate of the Interior Business Center within the Department of the Interior ("DOI").  A true and correct copy of the Acacia partial termination notice is attached hereto as "Exhibit 2."

13.     DOI provides assisted acquisition services to HHS and its component agencies, including ACF/ORR, under the Interior Franchise Fund.[3]  Simply put, DOI serves as the technical administrator of the Acacia contract, due to its greater capacity for contract management and administration, but ACF/ORR remains the decisionmaker with respect to all aspects of the Acacia contract, and, for that matter, the development and implementation of all UAC policies, as expressly directed by Congress.  *See* 6 U.S.C. §279(a), 8 U.S.C. § 1232.  DOI merely communicates those decisions to the contractor on ACF/ORR's behalf.  Hence, the partial termination letter Acacia received was from DOI, not ACF/ORR.

14.     As stated in the partial termination letter, ORR has determined to terminate aspects of the Acacia contract related to direct representation of UAC because the TVPRA does not require HHS/ORR to fund direct legal representation. Under the TVPRA, at 8 U.S.C. 1232(c)(5), the Secretary of HHS must "ensure, to the greatest extent practicable and consistent with section 292 of the INA (8 U.S.C. 1362)," that all unaccompanied alien children who are or have been in its custody or in the custody of DHS, with certain exceptions, have counsel "to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." The Secretary of Health and Human Services "shall make every effort to utilize the services of pro bono counsel who agree to provide representation to such children without charge." 8 U.S.C. 1362 provides, "In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (*at no expense to the Government*) by such counsel, authorized to practice in such proceedings, as he shall choose." (emphasis added). ORR has for several years funded at great public expense direct legal representation services for unaccompanied alien children. The TVPRA which authorizes such funding, does not require it, and such services are entirely at the agency's discretion.

15.     ORR's regulations were written based on the understanding that it is responsible for providing access to counsel, but at no expense to the government. *See* 89 Fed. Reg. 34384, 34526-27 (prefacing discussion of 45 CFR 410.1309 with an explanation of requirements under the TVPRA). Thus, even where ORR regulations describe funding direct representation of UAC (e.g., 45 CFR 410.1309(a)(4)), the regulations state that such funding is provided "[t]o the extent ORR determines that appropriations are available, and insofar as it is not practicable for ORR to secure pro bono counsel." As a result, although historically ORR has funded direct representation, it has done so as a matter of its exclusive discretion.  Like many discretionary policies, this one has changed with the change in Administration, and ORR has now determined that it will no longer fund direct representation for UAC.

16.     Congress periodically appropriates funds to support ORR's UAC program, including legal services.  Appropriations language, however, consistently remains broad and nonspecific regarding precise funding allocations.  For example, the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, provides general appropriations to execute activities under Section 235 of the TVPRA without earmarking explicit amounts for direct legal representation.  This general appropriation approach allows ORR flexibility in determining the allocation of resources based on agency priorities, the availability of pro bono counsel, and shifting immigration policy needs.  Subsequent acts, including the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, similarly maintain funding

levels and provide broad discretion without altering statutory obligations or imposing specific mandates for funding legal representation.

17.     Had Acacia never entered into a contract with the United States to provide direct legal services to UAC, Plaintiffs would have never received funding to provide such legal services. Under the Foundation Rule, HHS would maintain the discretion to determine whether to fund direct-legal services for UAC, and, using that discretion, it would likely continue to decline to continue funding. Moreover, while it has cancelled aspects of the Acacia contract pertaining to direct representation of UAC, ORR has not canceled those aspects pertaining to the provision of the KYR trainings and legal screenings because ORR's regulations require the provision of both the KYR presentation and the legal screening.  *See* 45 CFR 410.1309(a)(2)(i) and (v).

18.     The termination of the Acacia contract is in the public's best interest as almost $800 million has been spent on legal services, much of which is not legally mandated, and to continue funding such services that are not legally required does not fulfill this Administration's policy goals of reducing unnecessary public expenditures. The law gives HHS discretion on how to use ORR's funding and given the priorities to reduce public expenditures, ORR has directed such funding be curtailed.

19.     ORR has not made any commitment or representation to Plaintiffs, including Acacia or any other entity involved in this case, that it would continue funding direct legal services through their contracts. The decision to fund such services, if continued, remains subject to the agency's discretion, appropriations, and programmatic priorities. There is no obligation under the applicable statutes or regulations that mandates HHS to maintain contractual relationships with specific service providers, including the Plaintiffs in this matter.

20.     Despite the recent change in the scope of the Acacia contract, ORR will continue to ensure UAC in the agency's custody are provided KYR presentations and legal screenings through the use of legal service providers whether through awards or subawards.

21.     Under the renewed contract, ACF/ORR will still pay $27,318.224.88 remaining costs to Acacia to provide KYR Trainings and legal screenings on a go-forward basis.

22.     UAC have, and remain, free to retain any attorney they wish to represent them in any matter they wish to contest at no cost to the Government, and Plaintiffs and any other legal service providers remains free to provide direct legal services on a truly pro bono basis. Legal service providers who wish to provide pro bono services may contact the agency to have their contact information updated and included in ORR's *Legal Resource Guide – Legal Service Provider List* which provides a state by state breakdown on legal service providers. Lists of local attorneys are provided to UAC when they enter care and when they leave it. The *Legal Service Guide* also provides weblinks to other pro bono resources

from the Immigration Advocates Network and the U.S. Department of Justice's List of Pro Bono Legal Service Providers. The *Legal Resource Guide* is provided to children within 24 hours of their admission into an ORR care provider.

23.     ACF/ORR complies with all federal laws and regulations. Requiring the agency to provide direct representation for UAC prohibits the discretion Congress intentionally conferred upon HHS.

24.     Further, ACF/ORR is concerned that large multimillion dollar contracts create a market for paid legal service providers to take on cases, which disincentivizes the recruitment of and the volunteering of pro bono counsel. Notably, many jurisdictions require or encourage attorneys to take on cases for indignant clients or cases in the public interest pro bono and have annual reporting requirements for attorneys to report those hours. A large influx of public funding for direct representation therefore may have the perverse effect of discouraging the utilization of pro bono counsel in the first instance.

Executed on March 31, 2025.

_____

Toby Biswas

# Exhibit 1.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary
Washington, D.C. 20201

## SECRETARIAL DIRECTIVE ON PROGRAM AND PAYMENT INTEGRITY

February 3, 2025

In June 2022, at the request of Florida Governor Ron DeSantis, the Supreme Court of Florida impaneled a statewide grand jury to investigate the impact of illegal immigration on Florida. One of that grand jury's reports, published in March 2023, outlined over 100 allegations concerning deficiencies in the Office of Refugee Resettlement's (ORR) administration of the Unaccompanied Alien Children (UAC) Program. Allegations included sponsor vetting failures, identity verification lapses, instances of child trafficking, and fraud in the sponsorship process.

These are serious programmatic failures and yet it is currently impossible to access sufficient information from a centralized source within the Department of Health and Human Services to assess them. Specifically, there is no one method to determine whether payments the agency is making to contractors, vendors, and grantees for functions related to immigration and refugee settlement are contributing to the serious problems and acute harms the State of Florida identified in its investigation. It is also currently impossible to assess whether payments the Department is making are free from fraud, abuse, and duplication, as well as to assess whether current contractual arrangements, vendor agreements, and grant awards related to these functions are in the best interests of the United States. *See* FAR 12.403(b), 49.101; 45 C.F.R. § 75.371–372. Finally, it is also impossible to determine with current systems whether current contracts and grant awards are tailored to ameliorate these specific problems and the broader problem of illegal immigration—rather than exacerbate them. The Department has an obligation to ensure that no taxpayer dollars are lost to abuse or expended on anything other than advancing the best interests of the nation.

For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. § 75.371–372, the Secretary of Health and Human Services hereby DIRECTS as follows:

> **Agency personnel shall briefly pause all payments made by the Administration for Children and Families to contractors, vendors, and grantees related to immigration and refugee settlement for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities.**

This Directive shall be implemented through the Department's payment management system by personnel with responsibility for that system who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument. Whenever a payment is paused for review, Department personnel shall immediately send such payment to Principal Deputy Assistant Secretary Andrew Gradison at the Administration for Children and Families for prompt review to determine whether or not the payment is appropriate and should be made. Paused payments shall remain paused pending completion of that review to the maximum extent permitted by law and all applicable notice and procedural requirements in the affected award, agreement, or other instrument.

I thank you for your attention to this matter, as well as your efforts to ensure that no taxpayer dollars are misspent.

Dorothy A. Fink, M.D., Acting Secretary



# United States Department of the Interior

## INTERIOR BUSINESS CENTER
Washington, DC 20240

March 21, 2025

To:    Leah Prestamo
Acacia Center for Justice
1025 Connecticut Avenue NW
Suite 1000A
Washington, DC 20036

Subject:    Notice of Partial Termination for the Government's Convenience

Contract 140D0422C0009, awarded on March 29, 2022, by the United States Department of the Interior (DOI), Interior Business Center (IBC), Acquisition Services Directorate (AQD) on behalf of the Department of Health and Human Services (HHS), Administration for Children and Families (ACF), Office Refugee Resettlement (ORR) as a part of our Interagency Agreement for acquisition services, *is hereby **partially terminated** for the Government's convenience*. Contract Line Items (CLINs) 2 – Direct Representation, 3 – Recruitment, and 4 – Direct Representation Expansion are terminated for the Government's convenience.

In accordance with FAR 52.212-4 Contract Terms and Conditions – Commercial Items (Alternate I) (Nov 2021) – (l) *Termination for the Government's convenience*

"(l) Termination for the Government's convenience. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. **Subject to the terms of this contract, the Contractor shall be paid an amount for direct labor hours (as defined in the Schedule of the contract) determined by multiplying the number of direct labor hours expended before the effective date of termination by the hourly rate(s) in the contract, less any hourly rate payments already made to the Contractor plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system that have resulted from the termination**. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred that reasonably could have been avoided." Emphasis added.

*Recovery for any unpaid Firm-Fixed-Price work would be subject to the non-Alternate I version of FAR 52.212-4(l).

You are hereby notified to immediately stop work on CLINs 2, 3, and 4 and that effective close of business March 21, 2025, the Contracting Officer is terminating CLINs 2, 3, and 4 on Contract 140D022C0009 for the Government's convenience in accordance with FAR 52.212-4 (l) (Alternate I) for T&M work and paragraph (l) of the non-Alternate I version of FAR 52.212-4(l) for any Firm-Fixed-Price effort or products. CLIN 1 – Know Your Rights and Legal Screenings shall remain in full force and effect.

As defined in 44 U.S.C. § 3301, any Federal records created, received, or maintained by Acacia Center for Justice, or its subcontractors, pursuant to this ACF contract, are due back to the ORR No Later Than (NLT) 30 days from this notice. ACF owns the rights to all data and records produced as part of this order. Acacia Center for Justice is notified that any deliverables under the contract not specifically called out in this memo, are the property of the U.S. Government and are expected to be included in the records turnover NLT 30 days from this notice.

Any deliverables under CLINs 2, 3, and 4 that are scheduled for delivery after March 21, 2025, are hereby terminated for the Government's convenience in their entirety. Timely response to this request will be reflected in the CPARS evaluation. Additionally, the Government will ensure to include a narrative to explain the termination was not due to fault of the contractor.

Should you wish to submit a termination settlement proposal, the *final* <u>shall</u> be submitted to the Contracting Officer as promptly as possible, but no later than forty-five (45) calendar days from receipt of this notice.  However, if after considering the costs incurred and the costs previously paid by the Government, Acacia Center for Justice determines a no-cost settlement is in the company's best interest, please contact the undersigned Contracting Officer.

Please acknowledge receipt of this notice, as provided below.


_____          _____
Shelita Saint-Louis, Contracting Officer          Date
U.S. Department of the Interior
Interior Business Center / Acquisition Services Directorate
381 Elden St, Suite 2000A
Herndon, VA 20170




                                        Shelita_Saint-Louis@ibc.doi.gov.



_____          _____
Acacia Center for Justice                         Date
1025 Connecticut Avenue NW
Suite 1000A
Washington, DC 20036

PI Appeal and Stay Addendum 765

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN
EAST PALO ALTO, ET AL.,

            Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
ET AL.,

            Defendants.

No. 3:25-cv-02847-AMO

**[PROPOSED] ORDER REQUIRING
SECURITY UNDER FED. R. CIV.
P. 65(C)**

Honorable Araceli Martínez-Olguín
United States District Judge

The Court, having reviewed Defendants' request to issue preliminary injunction
bond pursuant to Federal Rule Civil Procedure 65(c), hereby enters the following order:

IT IS HEREBY ORDERED that the request is GRANTED. The Court orders
Plaintiffs to post security as required under Federal Rule Civil Procedure 65(c).

DATED: _____            /s/_____
                          Honorable Araceli Martínez-Olguín
                          United States District Judge

<div align="right">1</div>

1
2
3
4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    COMMUNITY LEGAL SERVICES IN              Case No.  25-cv-02847-AMO
     EAST PALO ALTO, et al.,
8
             Plaintiffs,                       **ORDER GRANTING PLAINTIFFS'**
9                                              **MOTION FOR TEMPORARY**
                                               **RESTRAINING ORDER**
10
     UNITED STATES DEPARTMENT OF               Re: Dkt. No. 7
11   HEALTH AND HUMAN SERVICES, et
     al.,
12
             Defendants.
13

14          This matter comes before the Court on a Motion for a Temporary Restraining Order filed

15   by Plaintiff nonprofit organizations that received funding from Defendants to provide legal

16   representation and other legal services to unaccompanied children in immigration courts across the

17   country.[1]  Plaintiffs challenge the actions of Defendants the United States Department of Health

18   and Human Services ("HHS"), HHS's Office of Refugee Resettlement ("ORR"), and the United

19   States Department of the Interior (collectively, "Government" or "Defendants") in the recent

20   termination of funding for counsel representing unaccompanied children in immigration

21   proceedings.  Having considered Plaintiffs' motion, Defendants' response, and the arguments of

22   the Parties at the April 1, 2025 hearing, the Court hereby **GRANTS** Plaintiffs' emergency Motion

23   for a Temporary Restraining Order, effective 8:00 a.m. on April 2, 2025.  The Court VACATES

24   the previous briefing schedule set at the conclusion of the hearing on April 1, 2025, and it SETS a

25   _____

26   [1] Plaintiffs include the following organizations: Community Legal Services in East Palo Alto,
     Social Justice Collaborative, Amica Center for Immigrant Rights, Estrella del Paso, Florence
27   Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project,
     Immigrant Defenders Law Center, National Immigrant Justice Center, Northwest Immigrant
28   Rights Project, Rocky Mountain Immigrant Advocacy Network, and Vermont Asylum Assistance
     Project (collectively, "Plaintiffs").

<div style="writing-mode: vertical">United States District Court
Northern District of California</div>

United States District Court
Northern District of California

1    preliminary injunction briefing schedule at the conclusion of this Order.  The Court enters the

2    following findings of fact and conclusions of law supporting the maintenance of status quo ante

3    pending further briefing from the parties.

4    **I.      BACKGROUND**

5           Plaintiffs previously received funding for their work from ORR disbursed through Acacia

6    Center for Justice.  Compl. ¶¶ 64-65; 88.  Defendants issued a letter to Acacia Center for Justice

7    on March 21, 2025, terminating the contract line items through which HHS and ORR provided

8    funding for counsel for unaccompanied children in immigration court.  Compl. ¶ 11; Biswas Decl.,

9    Ex. 2 (ECF 24-3, the "Cancellation Order").  The letter ordered Plaintiffs to "immediately stop all

10   work" on their ongoing funded representations.  *Id.*  Plaintiffs share the mission of ensuring legal

11   representation for the thousands of unaccompanied children in immigration proceedings

12   throughout the country.  Compl. ¶ 102.  Congress has consistently appropriated funds for this

13   purpose, including the most recent appropriation for over $5 billion to ensure "all children . . .

14   have access to counsel in their immigration proceedings."  Compl. ¶¶ 77-87.

15          Plaintiffs contend that the Government's Cancellation Order violates its obligations under

16   the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"),

17   which requires that the Government "shall ensure, to the greatest extent practicable," that all

18   unaccompanied children receive legal counsel to represent them in "legal proceedings" and to

19   "protect them from mistreatment, exploitation, and trafficking."  Pub. L. No. 110-457, § 235(c)(5),

20   122 Stat. 5044, 5079.  Plaintiffs argue that the Cancellation Order additionally violates the

21   Government's obligations under ORR's own "Foundational Rule," which requires the

22   Government to "fund legal service providers to provide direct immigration legal representation" to

23   unaccompanied children if there are "available appropriations" and to ensure children receive a

24   legal orientation, consultation with a lawyer, and ongoing access to lawyers. 45 C.F.R.

25   § 410.1309(a) (2024).  Plaintiffs allege that Defendants' Cancellation Order conflicts with these

26   legal requirements and thus violates the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

27   Compl. ¶¶ 127-46.

28

In response to the Cancellation Order, Plaintiffs state that they are forced to choose between few harsh alternatives, including continuing to provide unfunded legal representation in the face of limited resources; cutting other vital organizational programs; laying off, furloughing, or terminating staff; or seeking to withdraw from their ongoing representation duties. *See, e.g.*, VAAP Decl. ¶ 21.

## II.    DISCUSSION

The Court has jurisdiction over Defendants and the subject matter of this action. *See* Administrative Procedure Act, 5 U.S.C. § 702.  Contrary to the Government's assertions, this is not a contract dispute in which Plaintiffs seek money damages such that their suit belongs before the Federal Court of Claims. *Pacito v. Trump*, No. 2:25-CV-255-JNW, 2025 WL 893530, at *4-7 (W.D. Wash. Mar. 24, 2025).  A temporary restraining order against Defendants, as provided below, is necessary until the Court can consider Plaintiff States' forthcoming motion for a preliminary injunction.

### A.    Standing

PI Appeal and Stay Addendum 769

'arguably within' the scope of the statute." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)).  In sum, Plaintiffs have standing to bring this suit.

### B.  Entitlement to Temporary Relief

Federal Rule of Civil Procedure 65 authorizes a trial court to grant a temporary restraining order "to preserve the status quo and the rights of the parties until a final judgment issues in the cause."  *See Ramos v. Wolf*, 975 F.3d 872, 887 (9th Cir. 2020) (quoting *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010)).  The status quo in this context "refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy[.]' "  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)).  "The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction."  *Lockheed Missile & Space Co. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995).

To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief, (3) the balance of equities tips in the favor of the moving party, and (4) an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Where the government is a party, courts merge the analysis of the final two *Winters* factors, the balance of equities and the public interest.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large."  *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (internal quotation marks and citation omitted).  The *Winters* factors may be evaluated on a sliding scale, such that preliminary relief may be issued when the moving party demonstrates "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (citation omitted).

United States District Court
Northern District of California

1    Here, the Court finds that Plaintiffs raise serious questions going to the merits.  In

2    particular, the TVPRA requires that the government "shall ensure, to the greatest extent

3    practicable," that all unaccompanied children receive legal "counsel to represent them in legal

4    proceedings" and to "protect them from mistreatment, exploitation, and trafficking."  8 U.S.C.

5    § 1232(c)(5).  The Government argues that HHS's funding decisions under the TVPRA and the

6    Foundational Rule remain discretionary and do not mandate funding of direct legal representation

7    such as that provided by Plaintiffs.  But this raises a "serious question" going to the merits –

8    whether the TVPRA requires the Government to ensure the provision of counsel for unrepresented

9    children in immigration proceedings prior to the cancellation of funding for direct legal

10   representation by organizations such as Plaintiffs.  This serious question weighs in favor of

11   reinstating the status quo ante while the record and the parties' arguments are developed further.

12   Plaintiffs have also shown that they are likely to suffer irreparable harm in the absence of

13   preliminary relief.  Defendants' termination of funding has impacted Plaintiffs, forcing them to

14   issue layoff notices and threatening to require them to dismiss their highly-specialized and

15   seasoned attorneys.  *See* ImmDef Decl. ¶¶ 20-23.  Relevant to the issue of standing raised above,

16   Defendants' termination of funding for direct legal representation directly interferes with

17   Plaintiffs' missions, impeding their ability to provide the direct legal representation of

18   unaccompanied children in immigration proceedings that is fundamental to Plaintiffs' core

19   activities.  RMIAN Decl. ¶ 22; VAAP Decl. ¶¶ 21-22; NWIRP ¶¶ 13-15.  The irreparable harm

20   resulting from Defendants' actions weighs in favor of temporary injunctive relief.

21   The Government argues that it would suffer harm in the form of being compelled to spend

22   down congressionally appropriated funds for the unaccompanied children in immigration

23   proceedings during the pendency of the preliminary injunctive relief.  Not so.  Terminating

24   funding for direct legal representation for unaccompanied children, without any plan to ensure

25   continuity in representation, potentially violates Congress's express directive in the TVRPA and

26   ORR's own commitments in the Foundational Rule.  Moreover, courts regularly find that "[t]here

27   is generally no public interest in the perpetuation of unlawful agency action."  *League of Women*

28   *Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citations omitted).  "To the

5

contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.' " *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).  The Government fails to convince that it would suffer harm at this stage.

On the other hand, the maintenance of funding for direct legal representation services furthers the critical public interests of ensuring children have access to legal representation and protection from human trafficking.  Indeed, ORR itself recognizes "that most unaccompanied children need legal services to resolve their immigration status and that representation appears to have a significant impact on both the court appearance rate and the outcome of cases for unaccompanied children."  Foundational Rule, 89 Fed. Reg. 34384, 34529; *see also id.* at 34526 (stating ORR's goal of "100 percent legal representation of unaccompanied children.").  The Court additionally finds that the continued funding of legal representation for unaccompanied children promotes efficiency and fairness within the immigration system.  *See generally* Br. for Amicus Curiae Former Immigration Judges & Former Members of the Board of Immigration Appeals (ECF 28).  A temporary restraining order enjoining the Cancellation Order serves the public interest.

In sum, the balance of equities tips sharply toward the Plaintiffs and the public interest strongly weighs in favor of entering temporary relief.

//
//
//
//
//
//
//
//
//
//

6

## III.  TEMPORARY RESTRAINING ORDER

For the foregoing reasons, the Court hereby **GRANTS** Plaintiffs' motion for Temporary Restraining Order.  The Court hereby **ORDERS** that:

> Defendants are **ENJOINED** from withdrawing the services or funds provided by the Office of Refugee Resettlement ("ORR") as of March 20, 2025, under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and ORR's Foundational Rule, 45 C.F.R. § 410.1309(a)(4), particularly ORR's provision of funds for direct legal representation services to unaccompanied children.  This injunction precludes cutting off access to congressionally appropriated funding for its duration.

The Court deems no security bond is required under Rule 65(c).  This injunction shall remain in effect until Wednesday, April 16, 2025, at 7:59 a.m. PST.

The Court **SETS** the following briefing schedule for Plaintiffs' Motion for Preliminary Injunction:

- Plaintiffs' opening brief shall be filed by no later than 4:00 p.m. on Friday, April 4, 2025.  Defendants' opposition brief shall be filed by no later than 4:00 p.m. on Friday, April 11, 2025.

- Plaintiffs' reply brief shall be filed by no later than noon on Monday, April 14, 2025.

The Court will set a remote hearing on Plaintiffs' Motion for Preliminary Injunction if it deems one necessary.

**IT IS SO ORDERED.**

Dated: April 1, 2025

_____

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**

United States District Court
Northern District of California

1  YAAKOV M. ROTH
   Acting Assistant Attorney General
2  WILLIAM C. SILVIS
   Assistant Director
3  MICHAEL A. CELONE
4  CHRISTINA PARASCANDOLA
   KATE MASETTA ALVAREZ
5  JONATHAN K. ROSS
   Senior Litigation Counsels
6  ZACHARY A. CARDIN
7  Trial Attorney

8          U.S. Department of Justice, Civil Division
           Office of Immigration Litigation
9          General Litigation and Appeals Section
           P.O. Box 878, Ben Franklin Station
10         Washington, DC 20044
           (202) 305-2040
11         Michael.A.Celone@usdoj.gov

12

13  Attorneys for Defendants

14              UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16                SAN FRANCISCO DIVISION

17

18  PALO ALTO,                              ) Case No. 3:25-cv-02847-AMO
                                            )
19          Plaintiffs,                     ) **DEFENDANTS' MOTION TO DISSOLVE**
                                            ) **TEMPORARY RESTRAINING ORDER**
20      v.                                  )
                                            ) Date: May 15. 2025
21  UNITED STATES DEPARTMENT OF             ) Time: 2:00 p.m.
    HEALTH AND HUMAN SERVICES, *ET AL.*,    ) Location:  Courtroom 10
22                                          )
                                            )
23          Defendants.                     )
                                            )
24  _____ )

25

26

27

28

DEFENDANTS' MOTION TO DISSOLVE TRO
3:25-CV-02847-AMO                                   PI Appeal and Stay Addendum 774

**DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISSOLVE TEMPORARY RESTRAINING ORDER**

PLEASE TAKE NOTICE that on May 15, 2025, at 2:00 p.m., or as soon thereafter as counsel may be heard, in the United States District Court for the Northern District of California, Courtroom 10, 19th Floor, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants United States Department of Health and Human Services, Office of Refugee Resettlement, and Department of the Interior will and hereby do move this Court to dissolve the Temporary Restraining Order (TRO) entered on April 1, 2025.

This motion is based upon this Notice of Motion, the accompanying memorandum of points and authorities, the pleadings and papers on file in this action, oral argument of counsel, and any other matters properly before the Court.

DATED: April 4, 2025                    Respectfully submitted,


                                        YAAKOV M. ROTH
                                        Acting Assistant Attorney General

                                        WILLIAM C. SILVIS
                                        Assistant Director

                                        CHRISTINA PARASCANDOLA

                                        MICHAEL A. CELONE
                                        Senior Litigation Counsels

                                        ZACHARY A. CARDIN
                                        Trial Attorney

                                        */s/ Jonathan K. Ross*
                                        JONATHAN K. ROSS
                                        Senior Litigation Counsel
                                        U.S. Department of Justice, Civil Division
                                        Office of Immigration Litigation
                                        General Litigation and Appeals Section
                                        P.O. Box 878, Ben Franklin Station
                                        Washington, DC 20044
                                        (202) 305-7662
                                        Jonathan.K.Ross@usdoj.gov

                                        Attorneys for Defendants

**INTRODUCTION**

On April 1, 2025, this Court entered a Temporary Restraining Order ("TRO"), ECF No. 33, enjoining Defendants from "withdrawing the services or funds provided by the Office of Refugee Resettlement ("ORR") as of March 20, 2025, under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and the United States Department of Health and Human Services ("HHS") Office of Refugee Resettlement's ("ORR") Unaccompanied Children Program Foundational Rule (codified at 45 C.F.R. § 410.1309(a)(4)) ("Foundational Rule") particularly ORR's provision of funds for direct legal representation services to unaccompanied children." TRO, 7. The Order also enjoins Defendants from "cutting off access to congressionally appropriated funding for its duration." *Id.*

In Defendants' opposition to Plaintiffs' motion requesting the TRO, Defendants argued that the Administrative Procedure Act ("APA") only waives sovereign immunity over actions seeking relief "other than monetary damages." 5 U.S.C. § 702; *see also N. Star Alaska v. United States*, 14 F.3d 36, 38 (9th Cir. 1994) (The APA "does not waive sovereign immunity for contract claims seeking equitable relief." ) (cleaned up); *see also RAJMP, Inc. v. United States*, No. 19-CV-876 AJB (WVG), 2020 WL 905592, at *4 (S.D. Cal. Feb. 25, 2020) ("The Ninth Circuit has held several times that the APA does not waive sovereign immunity over non-monetary, contract-based claims because the Tucker Act impliedly forbids equitable relief."). TRO Opp., 16 (ECF No. 24). Specifically, Defendants argued that the APA does not provide a waiver of sovereign immunity in this case because the relief Plaintiffs seek is payment. TRO Opp., 16. Additionally, Defendants argued that Plaintiffs' claims were barred by the Tucker Act because the rights that they seek to enforce and the relief that they seek is only available to them through contract. TRO Opp., 18-20 (citing *United States Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 1:25-CV-00465, 2025 WL 763738, at *2, 7 (D.D.C. Mar. 11, 2025) (holding that claim requiring the government to keep paying, though styled as an injunction, was "founded upon a contract" and "must be heard in Claims Court.")). Despite the fact that a TRO would require Defendants to pay funds to Plaintiffs, and that their only entitlement to the funds was based on a contract, the Court ruled that "this is not a contract dispute

in which Plaintiffs seek money damages such that their suit belongs before the Federal Court of Claims," and granted the TRO. TRO, 3.

Only days after the Court issued the TRO, the Supreme Court issued a decision today that at least severely undermines this Court's assertion of jurisdiction over this case—if it is not outright controlling here. Specifically, the Supreme Court vacated a temporary restraining order enjoining the government from terminating various education-related grants. *Dep't of Education v. California*, No. 24A910, 2025 WL 1008354, at *1 (U.S. Apr. 4, 2025) (Attached as "Ex. A"). Like this case, the plaintiffs there filed their claims under the APA, even though they ultimately sought monetary relief under governmental contracts. *Id.* The Court held that the government is "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* The Court reasoned that APA does not waive sovereign immunity over cases where a statute either grants consent to suit expressly or impliedly forbids the relief which is sought, such as the Tucker Act's implied preclusion of review over contract claims in courts other than the Court of Federal Claims. *Id.* (citing 5 U. S. C. § 702). It further explained that the APA does not waive sovereign immunity for suits involving monetary relief. *Id.* "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "'any express or implied contract with the United States.'" *Id.* (citing 28 U. S. C. § 1491(a)(1)).

The Supreme Court's decision confirms that Plaintiffs cannot show that they are likely to prevail on the merits of their claims, and that this Court very likely lacked jurisdiction to issue a temporary restraining order requiring the government to pay funds, where Plaintiffs' only entitlement to the funds was through a contract. Rather, as the Court noted, Plaintiffs here must bring their claims in the Court of Federal Claims. *Id.* The Supreme Court's decision is thus an intervening change in the controlling law that warrants vacatur of this Court's TRO.

## ARGUMENT

### A. Legal Standard for Dissolving a Temporary Restraining Order.

A party may seek dissolution of a TRO or preliminary injunction based on a material change in facts or law that warrants revision or dissolution. *See Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (per curiam) (citing *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000)). The test for dissolving or modifying an injunction has two parts. The moving party must show: (1) a significant change in fact

or law; and (2) that in light of the significant change, the injunction should be dissolved or modified under the legal standard that governed the issuance of the injunction in the first place. S*ee Karnoski*, 926 F.3d at 1198 & n.14; *Sharp*, 233 F.3d at 1170. A subsequent challenge to a preliminary injunction "must rest on grounds that could not have been raised before." *Alto v. Black*, 738 F.3d 1111, 1120 (9th Cir. 2013) (citation omitted). Here, *Department of Education v. California* is a significant change warranting dissolution, and it could not have been raised before because it was issued earlier today.

**B.** *Dep't of Education v. California* **is a Significant Change in Law.**

"[E]vents have largely overtaken this litigation." *See Martinez v. Wilson*, 32 F.3d 1415, 1419 (9th Cir. 1994). The Supreme Court's decision in *Department of Education v. California* significantly shifted the legal landscape governing the federal government's authority to terminate funding, affirming the discretion of federal agencies to make funding determinations without judicial interference. This decision directly impacts the Court's prior issuance of the TRO in this case, as the TRO was based on a premise that the government lacked discretion to terminate funding for legal representation under the TVPRA and Foundational Rule.

The TRO enjoined Defendants from withdrawing ORR-funded legal representation services, based in part on the Court's interpretation that the TVPRA mandates ongoing funding for legal services for unaccompanied children. However, the Supreme Court's decision clarified that federal agencies retain the discretion to terminate or alter funding arrangements when they deem it necessary, particularly when appropriations are limited or policy priorities evolve. *Dep't of Education v. California*, 2025 WL 1008354, at *2 ("[T]he APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money[.]'") (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U. S. 204, 212 (2002)); *see id.* **1-2.

Additionally, the Supreme Court's ruling highlights that the Judiciary should not interfere with agency funding decisions absent clear statutory mandates. *Id.* at **1-2. The decision emphasized that

maintaining funding contrary to agency determinations improperly encroaches on executive discretion. *Id.* Therefore, the significant change in controlling law established by *Dep't of Education v. California* warrants dissolving the TRO, as the legal basis for the Court's prior order has been substantially undermined.

**C.    *Dep't of Education v. California* Warrants Dissolution of the TRO.**

When courts assess whether a change "warrants . . . dissolution of the injunction," the "inquiry should be guided by the same criteria that govern the issuance of a preliminary injunction."[1] *Karnoski*, 926 F.3d at 1198 (quoting *Sharp*, 233 F.3d at 1170).  District courts have applied these instructions from *Karnoski* in several ways.  *See Lo v. Cnty. of Siskiyou*, 2022 WL 1505909, at *7 (E.D. Cal. May 12, 2022) (listing cases).  The *Lo* Court observed that one district court required the movant to show an injunction is unwarranted under each of the four criteria, whereas another district court concluded that the defendant may prevail by disproving any one or more of the four criteria.  *Id.* (citing *CW Baice Ltd. v. Wisdomobile Grp. Ltd.*, No. 20-03526, 2021 WL 3053147, at *4 (N.D. Cal. July 20, 2021); *Index Newspapers LLC v. City of Portland*, No. 20-1035, 2022 WL 72124, at *9 (D. Or. Jan. 7, 2022)).  Ultimately, the *Lo* Court "borrowed the terms of *Karnoski*," to conclude that a district court may be "guided by" the "traditional" standard for injunctive relief and "address" each part of that standard without applying the standard mechanically or as a checklist.  *Id.* (citing *Karnoski*, 926 F.3d at 1199, 1202) (cleaned up).  "This more flexible interpretation recognizes district courts' wide discretion to ensure their injunctions are just and to fit those injunctions to the evolving circumstances of each case."  *Id.* (quotations and internal modifications omitted); *see also id.*, at *8 ("Viewing the question in this way demonstrates why a

---

[1] Under those criteria, plaintiffs seeking preliminary injunctions must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  But "[w]here, as here, the government opposes a preliminary injunction, the third and fourth factors merge into one inquiry." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021).

1   defendant who seeks to modify or dissolve an injunction should not be required to prove that each element

2   of the four-part test weighs in its favor.").

3       As applied here, *Dep't of Education v. California* warrants dissolution of the TRO.  *First*, Plaintiffs

4   cannot demonstrate a likelihood of success on the merits.  The Court's TRO was premised on the

5   conclusion that Plaintiffs were likely to succeed on the merits of their claims under the APA.  TRO, 3.

6   The Court's TRO rested on the presumption that Plaintiffs could enforce ORR's funding obligations

7   through the APA.  However, under the Supreme Court's recent decision in *Department of Education v.*

8   *California*, such relief is explicitly unavailable, as the APA's waiver of sovereign immunity does not

9   extend to enforcing contractual obligations or compelling the government to pay money. See 2025 WL

10  1008354, at 2. Given that the APA provided the sole jurisdictional basis for the TRO, the Supreme Court's

11  ruling eliminates Plaintiffs' likelihood of success on the merits.

12      *Second*, Plaintiffs cannot demonstrate irreparable injury because any funding-related harm can be

13  remedied through monetary relief in the appropriate forum.  As the Supreme Court emphasized in

14  *Department of Education*, where plaintiffs retain the ability to seek reimbursement of withheld funds

15  through an appropriate suit, the harm alleged is monetary and does not rise to the level of irreparable injury

16  warranting injunctive relief.  2025 WL 1008354, at 2.  Here, Plaintiffs' asserted injuries stem solely from

17  the termination of funding—an injury explicitly remediable through monetary damages in the proper

18  venue, such as a claim under the Tucker Act.  Therefore, Plaintiffs fail to meet the irreparable harm

19  threshold necessary to sustain the TRO.

20      Moreover, as the Supreme Court also observed, it is the government—not the Plaintiffs—that faces

21  irreparable injury from the disbursement of funds unlikely ever to be recovered once they are disbursed.

22  *Dep't of Education v. California,* 2025 WL 1008354, at 2.  Like the plaintiffs in *Dep't of Education v.*

23  *California*, none of the Plaintiffs here "promised to return withdrawn funds should its grant termination

be reinstated," and this Court declined to impose bond under Rule 65(c). *Id.*; TRO, 7. Thus, Plaintiffs fail to satisfy the irreparable harm threshold necessary to sustain the TRO.

*Third*, the Supreme Court's decision underscores the government's significant interest in maintaining discretion over funding decisions to ensure that appropriations reflect evolving policy priorities and fiscal considerations. *Dep't of Education v. California*, 2025 WL 1008354, at 2. Judicial interference with this discretion not only disrupts agency management of limited resources but also undermines the public interest by constraining the government's ability to effectively allocate taxpayer funds. Given the clarity of the Supreme Court's instruction, neither the balance of equities nor the public interest favors continuation of the TRO. On the contrary, these factors strongly support dissolving the TRO to align with current controlling authority.

Alternatively, the Court should stay the TRO to prevent the government from losing funds that this Court likely lacked jurisdiction to disburse. *See Dep't of Education v. California*, 2025 WL 1008354, at 2. For all of the same reasons explained above, in prior briefing, and now in *Department of Education v. California*, a stay pending potential appeal is warranted here.

## CONCLUSION

The legal basis on which the TRO rested has, as the case law puts it, evaporated. Accordingly, the Court should dissolve the TRO. Alternatively, this Court should stay the TRO pending an appeal by the government.

1  DATED: April 4, 2025                    Respectfully submitted,

2

3                                          YAAKOV M. ROTH
                                           Acting Assistant Attorney General

4
                                           WILLIAM C. SILVIS
5                                          Assistant Director

6                                          CHRISTINA PARASCANDOLA
                                           KATE MASETTA ALVAREZ
7                                          MICHAEL A. CELONE
                                           Senior Litigation Counsels
8

9                                          ZACHARY A. CARDIN
                                           Trial Attorney
10

11                                         */s/ Jonathan K. Ross*
                                           JONATHAN K. ROSS
12                                         Senior Litigation Counsel
                                           U.S. Department of Justice, Civil Division
13                                         Office of Immigration Litigation
                                           General Litigation and Appeals Section
14                                         P.O. Box 878, Ben Franklin Station
                                           Washington, DC 20044
15                                         (202) 305-7662
                                           Jonathan.K.Ross@usdoj.gov
16

17                                         Attorneys for Defendants

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, | Case No. 3:25-cv-02847-AMO |
| Plaintiffs, | **[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER** |
| v. | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *ET AL.*, | |
| Defendants. | |

Having read and considered Defendants' Motion to Dissolve the Temporary Restraining Order and finding good cause therefor:

IT IS HEREBY ORDERED that Defendants' motion is GRANTED.  The Temporary Restraining Order, ECF No. 33, is hereby DISSOLVED.

[Alternatively, should dissolution not be granted, the Court hereby ORDERS that the Temporary Restraining Order be STAYED pending an appeal by the government.]

Dated:

_____
Hon. Araceli Martínez-Olguín
UNITED STATES DISTRICT JUDGE

1

PI Appeal and Stay Addendum 784

1

2                    UNITED STATES DISTRICT COURT

3                    NORTHERN DISTRICT OF CALIFORNIA

4                      SAN FRANCISCO DIVISION

5

6    COMMUNITY LEGAL SERVICES IN EAST   )   Case No. 3:25-cv-02847-AMO
     PALO ALTO,                         )
7                                       )   **DEFENDANTS' EXHIBIT A**
                 Plaintiffs,            )
8                                       )   *Dep't of Education v. California*, No. 24A910, 2025
          v.                            )   WL 1008354, at *1 (U.S. Apr. 4, 2025)
9                                       )
     UNITED STATES DEPARTMENT OF        )
10   HEALTH AND HUMAN SERVICES, *ET AL.*, )
                                        )
11               Defendants.            )
                                        )
12   _____ )

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Cite as: 604 U. S. ____ (2025)  1

Per Curiam

# SUPREME COURT OF THE UNITED STATES

———————

No. 24A910

———————

## DEPARTMENT OF EDUCATION, ET AL. *v.* CALIFORNIA, ET AL.

ON APPLICATION TO VACATE THE ORDER ISSUED BY THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

[April 4, 2025]

PER CURIAM.

On March 10, 2025, the United States District Court for the District of Massachusetts issued what it styled as a temporary restraining order (TRO) enjoining the Government from terminating various education-related grants. The order also requires the Government to pay out past-due grant obligations and to continue paying obligations as they accrue. The District Court's conclusion rested on a finding that respondents are likely to succeed on the merits of their claims under the Administrative Procedure Act (APA), 60 Stat. 237. On March 26, the Government filed this applica-

tended on March 24) and requested an immediate administrative stay. The application was presented to JUSTICE JACKSON and by her referred to the Court.

Although the Courts of Appeals generally lack appellate jurisdiction over appeals from TROs, several factors counsel in favor of construing the District Court's order as an appealable preliminary injunction. Among other considerations, the District Court's order carries many of the hallmarks of a preliminary injunction. See *Sampson* v. *Murray*, 415 U. S. 61, 87 (1974); *Abbott* v. *Perez*, 585 U. S. 579, 594 (2018). Moreover, the District Court's "basis for issuing the order [is] strongly challenged," as the Government is likely

2          DEPARTMENT OF EDUCATION *v.* CALIFORNIA

Per Curiam

to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA. *Sampson*, 415 U. S., at 87. The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U. S. C. §702. Nor does the waiver apply to claims seeking "money damages." *Ibid.* True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen* v. *Massachusetts*, 487 U. S. 879, 910 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 212 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U. S. C. §1491(a)(1).

As for the remaining stay factors, respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed. No grantee "promised to return withdrawn funds should its grant termination be reinstated," and the District Court declined to impose bond. App. to Application To Vacate Order 15a, 17a. By contrast, the Government compellingly argues that respondents would not suffer irreparable harm while the TRO is stayed. Respondents have represented in this litigation that they have the financial wherewithal to keep their programs running. So, if respondents ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate forum. And if respondents instead decline to keep the programs operating, then any ensuing irreparable harm would be of their own making. "Such self-imposed costs are not properly the subject of inquiry on a motion for stay." *Cuomo* v. *NRC*, 772 F. 2d 972, 977 (CADC 1985) (*per curiam*).

Cite as: 604 U. S. ____ (2025)    3

Per Curiam

We construe the application as seeking a stay pending appeal and grant the application. The March 10, 2025 order and March 24, 2025 extension of the United States District Court for the District of Massachusetts, case No. 1:25–cv–10548, is stayed pending the disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

*It is so ordered.*

1

KAGAN, J., dissenting

# SUPREME COURT OF THE UNITED STATES

——————

No. 24A910

——————

## DEPARTMENT OF EDUCATION, ET AL. *v.* CALIFORNIA, ET AL.

ON APPLICATION TO VACATE THE ORDER ISSUED BY THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

[April 4, 2025]

JUSTICE KAGAN, dissenting.

It is a mistake for the Court to grant this emergency application. Nowhere in its papers does the Government defend the legality of canceling the education grants at issue here. And contra the *per curiam*, the respondent States have consistently represented that the loss of these grants will force them—indeed, has already forced them—to curtail teacher training programs. See, *e.g.,* Brief in Opposition to Application 39–40; App. to Application To Vacate Order 7a–8a, 34a–35a. The remaining issue is whether this suit, brought under the Administrative Procedure Act (APA), belongs in an ordinary district court or the Court of Federal Claims. As the Court acknowledges, the general rule is that APA actions go to district courts, even when a remedial order "may result in the disbursement of funds." *Ante,* at 2 (citing *Bowen* v. *Massachusetts*, 487 U. S. 879, 910 (1988)). To support a different result here, the Court relies exclusively on *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204 (2002). But *Great-West* was *not* brought under the APA, as the Court took care to note. See *id.,* at 212 (distinguishing *Bowen* for that reason). So the Court's reasoning is at the least under-developed, and very possibly wrong.

The risk of error increases when this Court decides

2        DEPARTMENT OF EDUCATION *v.* CALIFORNIA

KAGAN, J., dissenting

cases—as here—with barebones briefing, no argument, and
scarce time for reflection.  Sometimes, the Court must act
in that way despite the risk.  And there will of course be
good-faith disagreements about when that is called for.  But
in my view, nothing about this case demanded our immedi-
ate intervention.  Rather than make new law on our emer-
gency docket, we should have allowed the dispute to pro-
ceed in the ordinary way.  I respectfully dissent.

Cite as: 604 U. S. ____ (2025)          1

JACKSON, J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

No. 24A910

———————

## DEPARTMENT OF EDUCATION, ET AL. *v.* CALIFORNIA, ET AL.

ON APPLICATION TO VACATE THE ORDER ISSUED BY THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

[April 4, 2025]

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins,
dissenting.

This application concerns the Department of Education's
decision to cancel, with no meaningful explanation, more
than 100 grants the Federal Government had previously
awarded to public schools and universities across the coun-
try. The District Court issued a temporary restraining or-
der (TRO) finding that the Department's decision was likely
unlawful and pausing the grant cancellations while the
court considers a pending motion for a preliminary injunc-
tion. The TRO expires in three days, and it will become
moot even earlier if the District Court rules on the prelimi-
nary-injunction motion this week.

With the TRO on its last legs, a majority of this Court has
chosen to dive into this dispute today, allowing the Depart-
ment to implement immediately its new summary grant-
termination policy. It does so even though the TRO preserves
the pretermination status quo and causes zero concrete
harm to the Government. By contrast, reinstating the chal-
lenged grant-termination policy will inflict significant harm
on grantees—a fact that the Government barely contests.
Worse still, the Government does not even deign to defend
the lawfulness of its actions. Instead, it asks us to superin-
tend the lower courts' real-time decisions about ancillary

JACKSON, J., dissenting

threshold and remedial questions, which we could easily
wait to address in the ordinary course.

It is beyond puzzling that a majority of Justices conceive
of the Government's application as an emergency. It is like-
wise baffling that anyone is persuaded that the equities fa-
vor the Government when the Government does not even
argue that the lower courts erred in concluding that it likely
behaved unlawfully. This application should have been de-
nied for numerous obvious and independent reasons, and
the Court does itself—and the legal process—no favors in
deciding to grant it.

## I
## A

To address a nationwide shortage of qualified teachers,
Congress has enacted several competitive grant programs
that facilitate the recruitment, training, and support of ed-
ucators. This application concerns the Department's recent
efforts to terminate grants that were awarded under two
such programs: the Teacher Quality Partnership (TQP) pro-
gram and the Supporting Effective Educator Development
(SEED) program.

Congress established the TQP program in 2008, author-
izing the Department to award grants to high-need educa-
tional agencies and schools for the purpose of training
teachers. 20 U. S. C. §§1021(6), 1022a(a), 1022a(c)(1),
1022h. In the statute that creates this program, Congress
made plain its intent to (1) "improve student achievement,"
 "improve the quality of . . . teachers," (3) "hold teacher
preparation programs at institutions of higher education
accountable," and (4) "recruit highly qualified individuals,
including minorities and individuals from other occupa-
tions, into the teaching force." §1022.

By statute, the Department awards each TQP grant
based on a peer-review process "for a period of five years."
§§1022b(a), (b)(3). Similarly, under the SEED program,

Cite as: 604 U. S. ____ (2025)          3

JACKSON, J., dissenting

Congress has mandated that the Department "shall award grants" to institutions of higher education and nonprofit entities that provide certain education-related services, including "evidence-based professional development activities" for teachers. §§6672(a)(2), (f). Congress dictated that SEED grants "shall be" awarded for up to a 3-year period, subject to a possible 2-year extension. §§6672(b)(1)–(2).

On February 5, 2025, the Acting Secretary of Education issued an internal directive requiring Department personnel to review "'issued grants'" to "'ensur[e] that Department grants do not fund discriminatory practices'" that are "'contrary to law or to the Department's policy objectives'" and that "'all grants are free from fraud, abuse, and duplication.'" App. to Application To Vacate Order 12a (App.). The directive expressly extends to "'practices . . . in the form of [diversity, equity, and inclusion ("DEI")].'" *Ibid.* (alteration in original).

Two days later, TQP and SEED grant recipients began to receive letters from the Department announcing the termination of their grant awards. The letters were identical, save for differences in the addressees, grant-award numbers, and termination dates. Each letter included a single paragraph regarding the Department's justification for the grant termination, which stated, in full, as follows:

> "'The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The

JACKSON, J., dissenting

grant is therefore inconsistent with, and no longer ef-
fectuates, Department priorities. See 2 C.F.R.
§200.340(a)(4); see also 34 C.F.R. §75.253. Therefore,
pursuant to, among other authorities, 2 C.F.R.
§200.339–43, 34 C.F.R. §75.253, and the termination
provisions in your grant award, the Department hereby
terminates grant No. [grant award number] in its en-
tirety effective [date of letter].'"  Complaint in No. 25–
cv–10548 (D Mass.), ECF Doc. 1, p. 35 (alterations in
original).

Most grantees also received revised grant-award notifica-
tion letters stating solely that their grants had been
"deemed to be inconsistent with, and no longer effectuat[e],
Department priorities. See 2 C.F.R. 200.340(a)(4); see also
34 C.F.R. 75.253." *Id.*, at 36–37.

                            B

   On March 6, 2025, eight States sued the Department in
the District of Massachusetts, claiming that this mass,
summary termination of TQP and SEED grants was arbi-
trary and capricious, and not in accordance with law, in vi-
olation of the Administrative Procedure Act (APA).
5 U. S. C. §706(2)(A).  The Plaintiff States alleged that, as
a result of the grant terminations, their public universities,
schools, and other institutions "now face abrupt shortfalls
to their current year budgets collectively exceeding ten mil-
lion dollars."  ECF Doc. 1, at 41.  As relevant, the Plaintiff
States sought declaratory and injunctive relief to set aside
the termination of the previously awarded grants.  They
also sought a TRO to immediately block termination of the
grants.
   After holding a 2-hour hearing, the District Court issued
a TRO on March 10.  The order "restore[d] Plaintiff States
to the pre-existing status quo prior to the termination un-
der all previously awarded TQP or SEED grants for recipi-

Cite as: 604 U. S. ____ (2025)          5

JACKSON, J., dissenting

ents in Plaintiff States," and "temporarily enjoined" the Department from terminating any previously awarded or individual TQP or SEED grants for recipients in Plaintiff States. ___ F. Supp. 3d ___, ___–___ (Mass. 2025), App. 9a–10a. The order also contained an exception permitting the Department to make individual grant terminations consistent with applicable law and regulations.

By its terms, the TRO was "effective immediately" and would "remain in effect for 14 days," until March 24. *Id.*, at 10a. The District Court then separately construed the Plaintiff States' TRO motion as a motion for a preliminary injunction and set that motion for a hearing on March 28. The District Court subsequently extended the TRO for an additional 14 days, until April 7, while also expressing its "intent that the TRO be temporary and short." ECF Doc. 79.

Seeking to enforce its termination decisions during the period in which the TRO remained in effect, the Government requested a stay pending appeal. The District Court denied the request, as did a unanimous panel of the First Circuit. The First Circuit panel assumed without deciding that it had jurisdiction to review the TRO and made several determinations, including: that the States were likely to succeed on the merits of their claim that the Department's termination of the grants was arbitrary and capricious; that the Government's assertions of irreparable harm consisted of "speculation and hyperbole"; and that the equitable stay factors cut against the Government. ___ F. 4th ___, ___–___ (2025), App. 24a–35a. The Government then turned to us for an emergency stay.

                              II

First and foremost, the Government's application should have been swiftly denied because this Court lacks jurisdiction over this interlocutory order. It is clear beyond cavil that, ordinarily, "orders granting . . . temporary restraining

JACKSON, J., dissenting

orders are not appealable." 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §3922.1 (3d ed. 2012). This Court has recognized an exception for TROs and other interlocutory orders that are "potentially unlimited" in duration, *Sampson* v. *Murray*, 415 U. S. 61, 87 (1974), and risk imposing a "'serious, perhaps irreparable, consequence,'" *Carson* v. *American Brands, Inc.*, 450 U. S. 79, 84 (1981). But this time-limited TRO presents no such threat.

To start, the District Court has merely ordered restoration of the "pre-existing status quo prior to the termination" of the grants in the Plaintiff States. App. 9a. Its order comes in the form of an injunction only insofar as it has prohibited the Government from implementing the abruptly announced terminations—the District Court has *not* ordered that the Government do anything other than what was required by law before the termination letters issued.

Notably, the TRO also includes an exception that permits the Government to make individual grant terminations while the order is in effect "to the extent the final agency action is consistent with Congressional authorization and appropriations, relevant federal statute[s], including the requirements of the APA, the requirements of the relevant implementing regulations, [and] the grant terms and conditions." *Id.*, at 10a. Thus, the Government is only precluded from implementing what the Plaintiff States challenge as a "mass termination" of previously issued grants; the Government can still proceed with reasoned, individualized grant terminations under its usual review process.[1]

_____

[1] The Department now rejects the "mass termination" characterization on the grounds that it allowed 5 TQP and SEED grants (out of 109) to remain in place. App. 14a. But Department employees previously informed grantees that "*[a]ll* the grants have been terminated." ECF Doc. 8–13, pp. 6, 60 (emphasis added). These inconsistent statements underscore the need for additional factual development below before this Court gets involved.

JACKSON, J., dissenting

This TRO is also expressly time limited and is set to expire just three days from now.  All agree that the order falls squarely within the time limitations prescribed by the Federal Rule of Civil Procedure governing TROs.  See Fed. Rule Civ. Proc. 65(b)(2) (providing that a TRO is "not to exceed 14 days" unless "the court, for good cause, extends it for a like period").  That is true even though the District Court has granted a one-time extension of the TRO while it considers and rules upon the Plaintiff States' motion for a preliminary injunction.  See *ibid*.  The Government provides no reason to believe that the District Court intends to extend the order again.  Quite to the contrary, the fact that the District Court construed the Plaintiff States' TRO motion as a motion for a preliminary injunction, and has already held a hearing, indicates that the court is moving with dispatch and is in no way attempting to shield its interim order from appellate review.

This TRO thus falls squarely within the "general congres-

### III

Even assuming that the TRO is reviewable on appeal, the Government's application does not demonstrate the sort of exigency that warrants emergency relief—what I have elsewhere called a "line-jumping justification," *Labrador* v. *Poe*, 601 U. S. ___, ___ (2024) (opinion dissenting from grant of stay) (slip op., at 1).  As explained above, TQP and SEED are statutorily authorized grant programs that have been implemented by the Department for more than a decade— since 2008 and 2015, respectively.  What is new here is the Department's insistence that it need not go through the notice and review procedures the agency has traditionally used to terminate grants it has awarded.  Instead, the Department now seeks to terminate the pending grants en masse, through the use of boilerplate language that is not

JACKSON, J., dissenting

particularized to any grant recipient.

   The Government has not provided any persuasive reason for why it urgently needs to be relieved of the lower court's requirement that it wait 14 days (and now 28) to execute its preferred grant-termination policy. Even if the Government is right about the merits of the arguments it raises in this application (which is doubtful), there is no reason why the Government cannot proceed through the usual litigation and appeals process to receive its vindication, as other litigants must. To reiterate, the TRO expires in three days, and the District Court held a hearing on the Plaintiff States' preliminary-injunction motion a week ago. The only hint of urgency that the Government offers to justify its unusual request for our intervention is that, during the waning days of the TRO period, some grant recipients might seek to draw down grant funds that the Government wants to terminate.

   If true, that would be unfortunate, but worse things have happened. And that possibility does not come anywhere close to explaining why *this* Court must take the "'extraordinary'" step of intervening *now*. *Williams* v. *Zbaraz*, 442 U. S. 1309, 1311 (1979) (Stevens, J., in chambers); cf. *Nken* v. *Holder*, 556 U. S. 418, 433 (2009) ("'A stay is not a matter of right, even if irreparable injury might otherwise result'"). In my view, the patent lack of exigency alone warrants denying the Government's bid for emergency relief. See *Labrador*, 601 U. S., at ___ (JACKSON, J., dissenting from grant of stay) (slip op., at 1). But, wait, there's more.

   The Government's assertions of harm are speculative, at best, and appear to be far from irreparable. Importantly, there is no evidence that grantees have rushed to draw down the remaining $65 million in grant funds since the District Court entered the TRO 25 days ago. If the past is the best predictor of the future, then there is no factual basis for concluding that any terminated-recipient grant runs are likely to occur in the three days remaining in the TRO.

The Government's speculation is also contrary to the way that the TQP and SEED programs operate. As the Plaintiff States explain, TQP and SEED grantees typically "receive funds spread over the multi-year period of their grants" and "generally submit periodic draw-down requests for expenses they have already incurred." Brief in Opposition to Application 7. Grant recipients are also closely supervised with respect to such withdrawals: "The Department is authorized to monitor draw-down activity for all grants," and certain recipients are even "subject to an annual audit." *Id.*, at 8–9.

Finally, even if the feared flood of recipient withdrawals occurs, the Government has various legal mechanisms to recoup these kinds of funds. See, *e.g.*, 20 U. S. C. §§1234a, 1234b; 2 CFR §200.346 (2024); see also J. Shaffer & D. Ramish, Federal Grant Practice §36:29 (2024 ed.) ("In the end, the Government usually gets its money"). It is likely that, given the Department's new policy position with respect to terminations, it will be extra vigilant about recording any withdrawals made while the TRO is in effect, so that the money can be clawed back if appropriate. Thus, the alleged funding drain at which the Government gestures does not even appear to be irreparable. The Government has certainly not met its burden to show otherwise. See *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*) (stay applicants bear the burden to show, among other things, "a likelihood [of] irreparable harm").

The Court nonetheless swoops in to stay a TRO that will be mooted imminently by either the District Court's ruling on the preliminary-injunction motion or the natural expiration of the TRO period. Instead of playing remedy police in this nascent case, I would permit the litigation to proceed in the lower courts as usual, as we would expect in any other case in which the Government was not the applicant.

Jackson, J., dissenting

## IV

To review, the Court has now granted the Government's request for "emergency" relief, staying a TRO that will expire in just three days in a case where appellate jurisdiction is wanting and the Government's assertions of harm are illusory. One might reasonably assume that, for the Supreme Court of the United States to step in and grant relief in this posture, the applicant would have at least presented a rock-solid argument in support of its underlying merits position. Thus, here, one would expect the Government to vigorously maintain that the Department was legally entitled to all but eliminate two grant programs that Congress established a decade ago. But in this Court, the Government offers *no defense* against the Plaintiff States' claim that the Department's erasure of the grants at issue was arbitrary and capricious. Instead, the Government raises several threshold and remedial questions about the scope of the District Court's power to review the Government's allegedly unlawful conduct.[2]

The Government's request for emergency relief from this Court—without presenting any defense as to the merits of the Plaintiff States' arbitrary-and-capricious challenge—is striking. And the Court now blesses this strategic decision to sidestep the underlying merits by reinstating grant terminations that both lower courts have said are likely unlawful. This seems like a development in our practices related to emergency applications that, at a minimum, requires further exploration. If the emergency docket has now become a vehicle for certain defendants to obtain this

─────────

[2] To be specific, the Government argues that the lawfulness of the terminations is irrelevant for present purposes because (1) the Court of Federal Claims, not the District Court, has original jurisdiction over this dispute; (2) the Department's grant-termination decisions are "committed to agency discretion by law" and thus not reviewable under the APA, 5 U. S. C. §701(a)(2); and (3) the TRO at issue is too broad.

JACKSON, J., dissenting

Court's real-time opinion about lower court rulings on various auxiliary matters, we should announce that new policy and be prepared to shift how we think about, and address, these kinds of applications.

I, for one, think it would be a grave mistake to permit parties seeking equitable emergency relief not only to make an inadequate showing of interim harm but also to seek relief on the basis of their concerns about issues that can be addressed later, in the ordinary course. In an appeals system that is supposed to provide prompt resolution of all legal challenges, this new avenue for piecemeal interlocutory review enables strategic delay and facilitates obfuscation of the weaknesses of the defendant's merits positions.

## A

Take this case, for example. In my preliminary evaluation, the lower courts' early assessment that the Department's mass grant terminations were probably unlawful is not unreasonable, for the reasons I explain in this section. If the lower courts were left alone, they would be able to provide prompt rulings on the core legal question that we could then review, together with the Department's other arguments, in the ordinary course.

The APA requires, among other things, that an agency must not act arbitrarily or capriciously, and that it must explain its actions. See, *e.g.*, *FCC* v. *Prometheus Radio Project*, 592 U. S. 414, 423 (2021) ("The APA's arbitrary-and-capricious standard requires that agency action be reason-

JACKSON, J., dissenting

ment's decisionmaking with respect to any individual ter-
mination decision.  It also appears that the grant recipients
did not receive any pretermination notice or any oppor-
tunity to be heard, much less a chance to cure, which the
regulations seem to require.  See, *e.g.*, 2 CFR §§200.339,
200.208(c) (permitting grant termination only after an
agency "determines that noncompliance cannot be reme-
died by imposing additional conditions," such as by
"[r]equiring additional project monitoring," by requiring
that the recipient obtain technical or management assis-
tance, or by "[e]stablishing additional prior approvals").

The Department's robotic rollout of its new mass grant-
termination policy means that grant recipients and review-
ing courts are "compelled to guess at the theory underlying
the agency's action."  *SEC* v. *Chenery Corp.*, 332 U. S. 194,
196–197 (1947).  Moreover, the agency's abruptness leaves
one wondering whether any reasoned decisionmaking has
occurred with respect to these terminations at all.[3]  These
are precisely the kinds of concerns that the APA's bar on
arbitrary-and-capricious agency decisionmaking was
meant to address.  See *Prometheus Radio Project*, 592 U. S.,
at 423 (explaining that the APA requires a reviewing court
to ensure that "the agency . . . has reasonably considered
the relevant issues and reasonably explained the decision").

It also seems clear that at least one of the items included
on the Department's undifferentiated laundry list of possi-
ble reasons for terminating these grants—that the entity
may have participated in unspecified DEI practices—would

---

[3]The Government suggested before the First Circuit that its retention
of 5 of the 109 previously awarded grants proves that it engaged in rea-
soned decisionmaking.  But the Government has not yet supplied an ad-
ministrative record to facilitate judicial review.  App. 30a; accord, ECF
Doc. 69, p. 13.  Without documentation of the Department's reasoning,
its failure to terminate every single grant could just as easily reflect ne
glect or even additional arbitrariness.  Cf. ECF Doc. 76, p. 7, n. 1 (noting
that one remaining grant "proposed to 'focus on culturally responsive
practices'").

JACKSON, J., dissenting

not suffice as a basis for termination under the law as it currently exists. That is because termination is only permissible for recipient conduct that is inconsistent with the terms of the grants and the statutes that authorize them. But the TQP and SEED statutes *expressly contemplate* that grant recipients will train educators on teaching "diverse populations" in "traditionally underserved" schools, and on improving students' "social, emotional, and physical development." 20 U. S. C. §§1022e(b)(4), 6672(a)(1), 1022a(d)(1)(ii).[4] It would be manifestly arbitrary and capricious for the Department to terminate grants for funding diversity-related programs that the law expressly requires. Cf. *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983) (explaining that an agency acts arbitrarily and capriciously if it relies "on factors which Congress has not intended it to consider").

### B

It is thus small wonder that the Government has chosen not to press its merits arguments in this emergency application. See n. 2, *supra*. What better way to avoid prompt consideration of the Plaintiff States' serious claims about the unlawful arbitrariness of the Government's conduct than to demand that jurists turn away from those core questions and entertain a host of side issues about the power of the District Court on an "emergency" basis?

––––––––

[4]See also, *e.g.*, §1022a(d)(5) (encouraging TQP grantees to "recrui[t] into the teaching profession . . . individuals from under[-]represented populations," "former military personnel," and "individuals to teach in rural communities"); §1022a(e)(2)(A)(vi) (permitting TQP teacher-residency programs to consider choosing "applicants who reflect the communities in which they will teach as well as consideration of individuals from underrepresented populations"); §6672(b)(3) (requiring the Department to ensure that SEED grants are, to the extent practicable, "distributed among eligible entities that will serve geographically diverse areas, including urban, suburban, and rural areas").

JACKSON, J., dissenting

Courts that are properly mulling interim injunctive relief (to prevent imminent harms and thereby facilitate fair adjudication of potentially meritorious claims) should be wary of allowing defendants with weak underlying arguments to divert all attention to ancillary threshold and remedial questions.  Children, pets, and magicians might find pleasure in the clever use of such shiny-object tactics.  But a court of law should not be so easily distracted.

Yet, here we are.  Instead of leaving the lower court judges alone to do the important work of efficiently adjudicating all of the parties' legal claims, the Supreme Court has decided to enter the fray.  We have intervened to stay an almost-expired TRO that is plainly preventing the Plaintiff States from suffering imminent harm—*not* because the harms will not occur (no one seriously disputes this), and *not* because the Government has shown that any harm will actually befall it if the TRO remains in place for another three days, but because the Government has technical questions about which court is the proper forum to hear this case and what relief that court can order.  Albeit interesting, and perhaps even ultimately dispositive, surely those nonurgent issues can get sorted out in the ordinary course as part of the lower court's expedited consideration of the legal claims both sides have made.  There is no reason they have to be addressed by *this* Court at *this* moment.  And it is truly bizarre that a Court that purports to be "a court of review, not of first view," *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005), has seen fit to rouse itself to respond to the Government's queries by addressing these tangential legal issues and disturbing a well-justified, harm-based TRO in the process.[5]

─────────

    [5] Indeed, other than paving the way for the Plaintiff States' immediate suffering, it appears that the primary effect of today's emergency stay is to hand the Government an early "win"—a notch in its belt at the start of a legal battle in which the long-term prospects for its eventual success

JACKSON, J., dissenting

## V

Finally, even if this were a "close cas[e]," *Hollingsworth*, 558 U. S., at 190, the balance of the equities clearly counsel against staying the TRO and reinstating the grant terminations. On one side of the balance, the Government's assertions of harm if the TRO remains in place amount to "speculation and hyperbole," as the First Circuit put it. App. 33a. On the other, there is ample evidence that the loss of grants during the remaining days of the TRO period will inflict significant harm on the Plaintiff States and their instrumentalities.[6]

Those harms are concrete. In Massachusetts, Boston Public Schools has already had to fire multiple full-time employees due to this loss of grant funding. ECF Doc. 8–2, pp. 11–12. In New Jersey, the College of New Jersey has canceled the remainder of its teacher-residency program for the same reason. ECF Doc. 8–9, pp. 8–9. In Illinois, Chi-

---

seem doubtful. And I don't blame the Government for trying. If you're likely to lose on the merits, why not use the Court's procedures to fight on new and creative fronts? The Government has now gotten this Court to nullify clearly warranted interim injunctive relief, deflecting attention away from the Government's own highly questionable behavior, all without any showing of urgency or need. I worry that permitting the emergency docket to be hijacked in this way, by parties with tangential legal questions unrelated to imminent harm, damages our institutional credibility.

[6]The majority asserts that the Plaintiff States' harms may not be irreparable because they "have represented in this litigation that they have the financial wherewithal to keep their programs running." *Ante*, at 2. At most, the Plaintiff States represented below that the Department's decision to terminate grants would require their institutions to either "expend public funds . . . or suffer the obvious public harms resulting from a scarcity of qualified teachers." Appellees' Opposition to Appellants' Motion for Stay in No. 25-1244 (CA1), p. 22. In any event, the majority ignores the District Court's finding that the abrupt grant terminations have caused the Plaintiff States numerous harms that money cannot remedy. App. 8a.

JACKSON, J., dissenting

cago Public Schools—which already faces a multimillion-dollar budget deficit—may have to shut down its successful teacher-pipeline program. ECF Doc. 8–13, p. 7. In California, California State University has ended support for 26 students currently enrolled in its teacher-residency program and has eliminated financial assistance for about 50 incoming students. ECF Doc. 8–3, p. 7.

On the current record, I perceive no clear error in the Dis-

ens of programs upon which public schools, public universities, students, teachers, and faculty rely will be gutted." App. 9a. The harms that will result from permitting the Department to reinstate these terminations are directly contrary to Congress's goals in enacting the TQP and SEED programs and in entrusting the Department with their implementation. It boggles the mind to equate the devastation wrought from such abrupt funding withdrawals with the mere risk that some grantees might seek to draw down previously promised funds that the Department wants to yank away from them.

*     *     *

This Court's eagerness to insert itself into this early stage of ongoing litigation over the lawfulness of the Department's actions—even when doing so facilitates the infliction of significant harms on the Plaintiff States, and even though the Government has not bothered to press any argument that the Department's harm-causing conduct is lawful—is equal parts unprincipled and unfortunate. It is also entirely unwarranted. We do not ordinarily exercise jurisdiction over TROs, and this one is no different. The Government has not articulated any concrete harm it will suffer if the grant terminations are not implemented in the next three days. And this Court will have every opportunity to address all of the legal issues the Government has hastily

JACKSON, J., dissenting

shoved up the chain of review, and more, in due course. Because we could have and should have easily denied this application, I respectfully dissent.[7]

---

[7]Apparently not content to insert itself into this action for no reason, the majority goes further, seizing on this opportunity. Without oral argument and with less than one week's worth of deliberation, the Court now has determined that, at least in this context, restoring the grants at issue might qualify as an order to "'enforce a contractual obligation to pay money'" such that it is the Court of Federal Claims, rather than the District Court, that has jurisdiction over the Plaintiff States' challenge. *Ante*, at 2 (quoting *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 212 (2002)). Even assuming that *Great-West* has any bearing on this issue, the majority's characterization of the relief granted by the District Court is dubious given what the Plaintiff States actually say in their complaint about the legal problem and the relief they are requesting. *See* ECF Doc. 1, pp. 46–47, 51–52; see also *Bowen* v. *Massachusetts*, 487 U. S. 879, 893 (1988) ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages'"). And the majority does not dispute the "basic reality" that some APA challenges to grant-related administrative action may proceed in district court, even if they have as their "natural consequence . . . the release of funds to the plaintiff down the road." *Department of State* v. *AIDS Vaccine Advocacy Coalition*, 604 U. S. ___, ___ (2025) (ALITO, J., dissenting from denial of application) (slip op., at 6).

In any event, the District Court in this case is now hard at work evaluating this and other arguments in the context of the pending preliminary-injunction motion. The majority's attempt to inject itself into the ongoing litigation by suggesting new, substantive principles for the District Court to consider in this case is unorthodox and, in my view, inappropriate.

YAAKOV M. ROTH
Acting Assistant Attorney General
WILLIAM C. SILVIS
Assistant Director
MICHAEL A. CELONE
CHRISTINA PARASCANDOLA
KATELYN MASETTA-ALVAREZ
JONATHAN K. ROSS
Senior Litigation Counsels
ZACHARY A. CARDIN
Trial Attorney

     U.S. Department of Justice, Civil Division
     Office of Immigration Litigation
     General Litigation and Appeals Section
     P.O. Box 878, Ben Franklin Station
     Washington, DC 20044
     (202) 514-0120
     Katelyn.Masetta.Alvarez@usdoj.gov

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO | Case No. 3:25-cv-02847-AMO |
| Plaintiffs, | **DEFENDANTS' MOTION FOR RECUSAL OF A DISTRICT JUDGE  PURSUANT TO 28 U.S.C. § 455 AND REASSIGNMENT** |
| v. | Hearing Date: May 15. 2025 |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *ET AL.*, | Time: 2:00 p.m. Location:  Courtroom 10 |
| Defendants. | |

**DEFENDANTS' NOTICE OF MOTION AND MOTION**

**FOR RECUSAL OF A DISTRICT COURT JUDGE PURSUANT TO 28 U.S.C. § 455 AND**

**REASSIGNMENT**

PLEASE TAKE NOTICE that on May 15, 2025, at 2:00 p.m., or as soon thereafter as counsel may be heard, in the United States District Court for the Northern District of California, Courtroom 10, 19th Floor, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants United States Department of Health and Human Services, Office of Refugee Resettlement, and Department of the Interior will and hereby do move for the recusal of Honorable Araceli Martínez-Olguín and for reassignment.

This motion is based upon this Notice of Motion, the accompanying memorandum of points and authorities, the pleadings and papers on file in this action, oral argument of counsel, and any other matters properly before the Court.

The basis for this motion is that there is an appearance of bias toward Plaintiffs in this case because Judge Martínez-Olguín previously worked as a managing attorney at Community Legal Services in East Palo Alto (CLSEPA)—the lead Plaintiff in this case. As explained more fully in the accompanying memorandum, a reasonable person would likely question Judge Martínez-Olguín's impartiality, and accordingly, recusal is required under 28 U.S.C. § 455(a). In addition, due to Judge Martínez-Olguín's experience as a managing attorney at CLSEPA, she likely has personal knowledge of the irreparable harm that CLSEPA is alleging, which is a disputed fact in this proceeding. Thus, recusal is also required under 28 U.S.C. § 455(b)(1).

1    DATED: April 9, 2025                    Respectfully submitted,

2

3                                            YAAKOV M. ROTH
                                             Acting Assistant Attorney General

4
                                             WILLIAM C. SILVIS
5                                            Assistant Director

6                                            CHRISTINA PARASCANDOLA
                                             JONATHAN K. ROSS
7                                            MICHAEL A. CELONE
                                             Senior Litigation Counsel
8
                                             ZACHARY A. CARDIN
9                                            Trial Attorney

10
                                             /s/ Katelyn Masetta-Alvarez
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR RECUSAL AND REASSIGNMENT
3:25-CV-02847- AMO                    2

# INTRODUCTION

Fair proceedings free from impartiality are critical to the integrity and legitimacy of the judiciary and to halt the inappropriate infringements into President Trump's exercises of Executive Power. In this involving President Trump's determinations on the appropriate expenditure of resources related to various immigration-related priorities.

Although recusal under 28 U.S.C. § 455 is normally undertaken by a judge sua sponte, counsel may bring the issue to a Judge's attention by formal motion or raise it informally.[1] Local Civil Rule 3 – 14 Commentary. Recusal is required in this case for at least three reasons. First, Judge Martínez-Olguín was previously employed as a managing attorney by the lead Plaintiff in this case, Community Legal Services in East Palo Alto (CLSEPA), so a reasonable person would likely question her impartiality. 28 U.S.C. § 455(a). Second, Judge Martínez-Olguín has made various statements critical of President Trump's immigration agenda, further underscoring the appearance of partiality in this case. And third, given Judge Martínez-Olguín's likely knowledge about CLSEPA's budget and organization, she presumably has personal knowledge regarding the irreparable harm that CLSEPA alleges it will suffer absent federal funding, an issue that is contested in this case. Because she likely has personal knowledge about a disputed fact, 28 U.S.C. § 455(b)(1) mandates recusal.

Defendants therefore respectfully request that Judge Martínez-Olguín recuse herself from presiding over this case, vacate the injunctive relief entered, and reassign the case to a different judge whose impartiality would not be questioned.

# STATEMENT OF RELEVANT FACTS

From 2017 to 2018, Judge Martínez-Olguín was an attorney at CLSEPA. *See* Araceli Martínez-Olguín, Questionnaire for Judicial Nominees, at 2,

---

[1] Additionally, under California Rule of Professional Conduct 8.4(f), a lawyer engages in "professional misconduct" if she "knowingly assist[s], solicit[s], or induce[s] a judge or judicial officer in conduct that is a violation of an applicable code of judicial ethics or code of judicial conduct, or other law." Cal. Rules of Prof'l Conduct R. 8.4(f). Because no disclosures about possible conflicts of interest were made at the start of litigation, counsel for Defendants bring these issues to the Court's attention now.

https://www.judiciary.senate.gov/imo/media/doc/Martínez-Olguín%20SJQ%20Public%20Final.pdf (last accessed Apr. 8, 2025). Specifically, in 2017, she was employed as a Senior Immigrants' Rights Attorney and, in 2018, she was the "Managing Attorney" of CLSEPA's Immigrant Rights' Project. *Id.* In 2018, Judge Martínez-Olguín began her career at the National Immigration Law Center, where she was a staff attorney from 2018 to 2020 and then a Supervising Attorney from 2020 until her nomination to the federal judiciary. *Id.* Notably, during her time at National Immigration Law Center, Judge Martínez-Olguín represented a class of individuals who were eligible for Deferred Action for Childhood Arrivals (DACA). *Id.* at 31. One of her co-counsel for that case was Karen C. Tumlin. *Id.* In February 2023, Judge Martínez-Olguín was confirmed as Judge for the Northern District of California.

On March 26, 2025, Plaintiff CLSEPA and other similar organizations filed this lawsuit challenging the government's decision to withhold funding for direct legal services for unaccompanied alien children. *See* ECF No. 1. Plaintiffs are represented by Judge Martinez-Olguin's former employer, National Immigration Law Center, and Karen Tumlin, among others. The following day, Plaintiffs moved for a Temporary Restraining Order (TRO). ECF No. 7. The Court ordered the government to file a response to the TRO motion by noon on March 31, 2025. ECF No. 17. The government filed its opposition accordingly. ECF No. 24. The next day, hours after a hearing on the TRO motion, the Court granted Plaintiffs' TRO Motion. ECF No. 33.

**LEGAL STANDARD**

Recusal is mandatory where a judge's "impartiality might reasonably be questioned." 28 U.S.C. § 455(a) (explaining that a federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned"). Recusal under this subsection is appropriate where a "reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be in question." *Yagman v. Republic Ins.*, 987 F.2d 622, 626 (9th Cir. 1993). That standard is an objective one; the "reasonable person" for this inquiry is not "someone who is 'hypersensitive or unduly suspicious,' but rather is a 'well-informed, thoughtful observer.'" *United States v. Holland,* 519 F.3d 909, 913 (9th Cir. 2008) (citations omitted). Whether a reasonable person would question a judge's impartiality is not based on one single factor, but on the "totality of the circumstances." *See Yagman*, 987 F.2d at 626 (impartiality might be reasonably questioned considering "all the facts."); *see also Doe*

1   *v. Cabrera*, 134 F. Supp. 3d 439, 450 (D.D.C. 2015) (looking to the "totality of the circumstances" to

2   determine whether a reasonable person would question the judge's impartiality).

3          The touchstone for recusal under Section 455(a) is "not the reality of bias or prejudice but its

4   appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994). "The very purpose of § 455(a) is to

5   promote confidence in the judiciary by avoiding even the appearance of impropriety whenever

6   possible." *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003) (quoting *Liljeberg v. Health*

7   *Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988)). Thus, "any doubts must be resolved in favor of

8   recusal." *Id.*; *see also Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988) ("It has been

9   stated on numerous occasions that when a judge harbors any doubts concerning whether his

10  disqualification is required he should resolve the doubt in favor of disqualification.").

11         A judge also "shall" recuse where she has "personal knowledge of disputed evidentiary facts

12  concerning the proceeding" or "has a personal bias or prejudice concerning a party." 28 U.S.C.

13  § 455(b)(1). Unlike 455(a), if one of the provisions of section 455(b) applies, then disqualification is

14  mandatory regardless of whether a reasonable person would question the judge's impartiality. *Liljeberg*,

15  486 U.S. at 859 n. 8. Section 455(b) applies a subjective standard for the judge to determine whether he

16  or she can be truly impartial when trying the case. If the judge believes there is a risk of prejudice, it is

17  "incumbent on him to recuse himself from the case as failure to do so would amount to an abdication of

18  duty" and would be "in clear derogation of the solemn promise he made when he took his oath of

19  office." *United States v. Holland*, 519 F.3d 909, 915 (9th Cir. 2008).

20                                          **DISCUSSION**

21         There is little doubt that a reasonable person would question Judge Martínez-Olguín's

22  impartiality in this case. CLSEPA is the lead Plaintiff in the case, yet Judge Martínez-Olguín served as

23  CLSEPA's managing attorney within Plaintiff's organizations from 2017-2018. In this role, Judge

24  Martínez-Olguín established and ran the Immigration Rights project where she "identified issues for

25  local or state policy advocacy and impact litigation, engaged in community education, and provided

26  advice and counsel to community groups." Araceli Martínez-Olguín, <u>Questionnaire for Judicial</u>

27  <u>Nominees</u>, at 24, https://www.judiciary.senate.gov/imo/media/doc/Martínez-

28

---

DEFENDANTS' MOTION FOR RECUSAL AND REASSIGNMENT
3:25-CV-02847- AMO                           3

1  Olguín was part of CLSEPA's management team, where she set and implemented policies and practices.

2  *Id.* at 48.

3       The conflicts created by Judge Martínez-Olguín's affiliation with the lead Plaintiff is

4  unavoidable. Judge Martínez-Olguín held senior roles for at least one of the litigating parties; her

5  connection to the Plaintiffs is too substantial for a reasonable person to ignore or minimize the risk of

6  impropriety. Further underscoring the close entwinement between CLSEPA and Judge Martínez-Olguín,

7  upon her elevation to the bench in 2023, CLSEPA posted a public Facebook post celebrating that

8  "former CLSEPA attorney Araceli Martínez-Olguín ha[d] been confirmed as a U.S. district judge."

9  Community Legal Services in East Palo Alto, Facebook (Mar. 6, 2023), https://tinyurl.com/58nhrsna.

10  Indeed, at least one media outlet has noted the previous employment relationship between Judge

11  Martínez-Olguín and CLSEPA and has suggested that her recusal may be necessary. *See* Chuck Ross,

12  Federal Judge Orders Trump Admin To Resume Funding Left-Wing Immigration Groups—Including

13  _____                                        _____

14  administration/federal-judge-orders-trump-admin-to-resume-funding-left-wing-immigration-groups-

15  including-her-former-employer ("Martínez-Olguín's work for one of the plaintiffs in the litigation could

16  lead to calls for her recusal from the case."). Recusal is thus warranted because the public would

17  reasonably question her ability to be impartial. The responsibility of the Court is not only to be fair and

18  impartial but to appear fair and impartial to the public.

19       Beyond her affiliation with CLSEPA, Judge Martínez-Olguín has not kept her disdain for

20  President Trump quiet. Instead, she has voiced her political views both inside and outside the courtroom.

21  In various past statements made in her capacity as an immigrant-rights advocate, Judge Martínez-Olguín

22  described President Trump's immigration policies implicating minor aliens as "unlawful and cruel,"

23  National Immigration Law Center, Facebook (Nov. 12, 2019), https://tinyurl.com/5c8jjmr3, and she

24  further rebuked President Trump for his views on various immigration issues, *e.g.*, *Trump admin*

25  *proposal would hike fees for immigration applications, impose asylum charge*, CBS News (Nov. 17,

26  2019), https://tinyurl.com/cnp7urvt. In other public fora, Judge Martínez-Olguín criticized Trump

27  "administration efforts to chip away at DACA" and disclaimed the INA's various jurisdictional

28

1  boundaries to judicial review of President Trump's immigration efforts. ACS Los Angeles 2019-2020

2  Supreme Court Review (Aug. 11, 2020), https://tinyurl.com/2kxe8jcc.

3        Those statements are directly germane to the issues Judge Martínez-Olguín is presiding over and

4  therefore would give a reasonable person pause as to whether she can be impartial. The instant case

5  involves the government's decision to discontinue providing direct legal services to unaccompanied

6  alien children. Plaintiffs filed a Motion for a TRO citing irreparable harm to their organization if the

7  funding stops. *See* Decl. of Marth Ruch, Lead Immigration Managing Attorney, CLSEPA, ECF No. 7-

8  16 ¶ 5 (attesting that "[w]ith [HHS] funding, CLSEPA employs six staff members dedicated to

9  providing legal services to unaccompanied immigrant children," and that representation of

10  unaccompanied children makes up a significant portion of the six staff members' case work). And

11  Defendants raised jurisdictional defects with Plaintiffs' claims that the court rejected outright. *See* Def's

12  Opp, ECF 24, at 1, 10–12. (Mar. 31, 2025).

13        In addition to her prior role as managing attorney for a party in this case and her professional

14  background, Judge Martínez-Olguín also has a relationship with the attorneys representing Plaintiffs in

15  this case. One of the organizations representing Plaintiffs is the National Immigration Law Center,

16  where Judge Martínez-Olguín worked as an attorney up until her confirmation as a district-court judge.

17  In her Senate Questionnaire for Judicial Nominees, she noted that "potential conflicts of interest could

18  be presented in matters being litigated before me by the lawyers from the National Immigration Law

19  Center. If a conflict were to arise, I would immediately recuse myself from the matter." Araceli

20  Martínez-Olguín, Questionnaire for Judicial Nominees, at 50,

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR RECUSAL AND REASSIGNMENT
3:25-CV-02847- AMO                    5

1   Tumlin represented a class of individuals who qualified for DACA, challenging the first Trump

2   Administration's decision to restrict the DACA program. *See Batalla Vidal v. Wolf*, No.

3   16CV4756NGGVMS, 2020 WL 7121849, at *1 (E.D.N.Y. Dec. 4, 2020) (explaining the background of

4   the case). Similarly, Judge Martínez-Olguín represented DACA recipients alongside Ms. Tumlin in

5   *Arizona Dream Act Coalition v. Brewer*, 12-cv-2546 (D. Ariz.). While her representation alongside

6   Plaintiff's counsel in other cases involving foreign-national children may not be sufficient to create an

7   appearance of bias by itself, considering the totality of the circumstances—including her previous

8   employment with Plaintiff CLSEPA and relationship with National Immigration Law Center—a

9   reasonable person would question Judge Martínez-Olguín's impartiality here. *See Yagman*, 987 F.2d at

10  626; *see also Doe*, 134 F. Supp. 3d at 450 (looking to the "totality of the circumstances" to determine

11  whether a reasonable person would question the judge's impartiality).

12      Overall, a reasonable person would question whether a former managing attorney could be

13  impartial when deciding whether her previous employer and employees, represented by her former co-

14  counsel, will be irreparably harmed by a President's policies that the Judge has criticized in the public

15  square as an advocate. That appearance of impropriety mandates recusal.

16      Beyond positional conflicts, Judge Martínez-Olguín should recuse because she, as a former

17  managing attorney at Plaintiff CLSEPA, very likely has personal knowledge of the organization's

18  budget and operations and therefore has personal knowledge about CLSEPA's allegations regarding

19  irreparable harm—a disputed fact in this case. Judge Martínez-Olguín presumably has personal

20  knowledge about how CLSEPA obtains funding, its budget considerations, and its financial dependency

21  upon funding from the federal government. ECF 7-16 at 6. If Judge Martínez-Olguín does, in fact,

22  possess such knowledge based on her previous experience, her recusal is required by law. 28 U.S.C.

23  § 455(b)(1).

24                                  **CONCLUSION**

25      Defendants deserve a court proceeding free from concerns about impartiality. To remove the

26  possibility of any impartiality to these proceedings and to maintain the public's confidence in the judicial

27  system, Defendants respectfully request that this Court recuse itself and return this matter to assignment

28

1    before a judge who does not have a personal connection to a party or counsel in this case. Moreover, given

2    the partiality identified in this filing, Defendants request immediate dissolution of the Court's temporary

3    restraining order, based on concerning conflicts of interest that have created a serious appearance of

4    impropriety. *See Liljeberg*, 486 U.S. at 870 (holding the vacatur was proper remedy for violation of 28

5    U.S.C. § 455).

DATED: April 9, 2025                    Respectfully submitted,


                                        YAAKOV M. ROTH
                                        Acting Assistant Attorney General

                                        WILLIAM C. SILVIS
                                        Assistant Director

                                        CHRISTINA PARASCANDOLA
                                        JONATHAN K. ROSS
                                        MICHAEL A. CELONE
                                        Senior Litigation Counsel

                                        ZACHARY A. CARDIN
                                        Trial Attorney

                                        /s/ Katelyn Masetta-Alvarez
                                        KATELYN MASETTA-ALVAREZ
                                        Senior Litigation Counsel
                                        U.S. Department of Justice, Civil Division
                                        Office of Immigration Litigation
                                        General Litigation and Appeals Section
                                        P.O. Box 878, Ben Franklin Station
                                        Washington, DC 20044
                                        (202) 514-0120
                                        Katelyn.Masetta.Alvarez@usdoj.gov

                                        Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on April 9, 2025, I electronically filed the foregoing Notice of Motion for Recusal and Reassignment and accompanying points and authorities with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.


*s/ Katelyn Masetta-Alvarez*
KATELYN MASETTA-ALVAREZ
Senior Litigation Counsel

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO,

        Plaintiffs,

  v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *ET AL.*,

        Defendants.

Case No. 3:25-cv-02847-AMO

**[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION FOR RECUSAL PURSUANT TO 28 U.S.C. 455 AND FOR REASSIGNMENT**

Having read and considered Defendants' Motion for Recusal Pursuant to 28 U.S.C. 455 and for Reassignment, and finding good cause therefore:

IT IS HEREBY ORDERED that Defendants' motion is GRANTED. Judge Araceli Martinez-Olguin is recused from presiding over this case, and the case will be reassigned to a judge within this district who does not have the appearance of impartiality.

In addition, the Court hereby VACATES the Temporary Restraining Order entered in Plaintiffs' favor, ECF No. 33.

Dated:

_____
Hon. Araceli Martínez-Olguín
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COMMUNITY LEGAL SERVICES IN
EAST PALO ALTO, et al.,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, et
al.,

        Defendants.

Case No.  25-cv-02847-AMO

**ORDER EXTENDING TEMPORARY
RESTRAINING ORDER, ORDERING
FURTHER BRIEFING, AND
RESETTING HEARINGS**

Re: Dkt. No. 47

Before the Court is Defendants' motion for recusal and reassignment.  The Court must address this pending motion before further consideration of the case.  Thus, the Court finds that consideration of the motion for recusal constitutes good cause requiring extension of the Temporary Restraining Order dated April 1, 2025 ("TRO").  *See* ECF 33; Fed. R. Civ. Pro. 65(b)(2).  Accordingly, the Court hereby **EXTENDS** the TRO, and it shall remain in effect until Wednesday, April 30, 2025, at 7:59 a.m. PST.

Plaintiffs' response to the motion for recusal shall be filed by no later than Monday, April 14, 2025, at 5:00 p.m. PST.  The Government's reply in support of the motion for recusal shall be filed by no later than Thursday, April 17, 2025, at 9:00 a.m. PST.

The briefing schedule on Plaintiffs' motion for preliminary injunction remains in effect. *See* ECF 33.  The briefing schedule on Defendants' motion to dissolve the TRO remains in effect. *See* ECF 42.

Both Plaintiffs' motion for preliminary injunction and Defendants' motion to dissolve the TRO shall be heard on Wednesday, April 23, 2025, at 2:00 p.m. PST via Zoom if the case remains with the undersigned following resolution of the motion for recusal.  The Court **ORDERS**

1    declarants Toby Biswas and Sharon Roberts to appear on Zoom for the preliminary injunction

2    hearing.

3

4         **IT IS SO ORDERED.**

5    Dated: April 10, 2025

6

7    _____

8    **ARACELI MARTÍNEZ-OLGUÍN**
     **United States District Judge**

1    YAAKOV M. ROTH
     Acting Assistant Attorney General
2    WILLIAM C. SILVIS (DCBN 485572)
     Assistant Director
3    MICHAEL A. CELONE (MDBN 1312170145)
4    CHRISTINA PARASCANDOLA (DCBN 468479)
     KATELYN MASETTA ALVAREZ (OHBN 97857)
5    JONATHAN K. ROSS (NCBN 50203)
     Senior Litigation Counsel
6    ZACHARY A. CARDIN (MDBN 1812110052)
7    Trial Attorney

8          U.S. Department of Justice, Civil Division
           Office of Immigration Litigation
9          General Litigation and Appeals Section
           P.O. Box 878, Ben Franklin Station
10         Washington, DC 20044
           (202) 305-7662
11         Jonathan.K.Ross@usdoj.gov

12   Attorneys for Defendants

13                        UNITED STATES DISTRICT COURT

14                     NORTHERN DISTRICT OF CALIFORNIA

15                         SAN FRANCISCO DIVISION

16

17   COMMUNITY LEGAL SERVICES IN EAST  )   Case No. 3:25-cv-02847-AMO
     PALO ALTO, *ET AL.*,              )
18                                     )   **DEFENDANTS' REPLY IN SUPPORT OF**
                  Plaintiffs,          )   **MOTION TO DISSOLVE (OR**
19                                     )   **ALTERNATIVELY STAY) THE TEMPORARY**
           v.                          )   **RESTRAINING ORDER**
20                                     )
     UNITED STATES DEPARTMENT OF       )   Hearing Date: April 23, 2025
21   HEALTH AND HUMAN SERVICES, *ET AL.*, )  Time: 2:00 p.m.
                                       )   Location: Courtroom 10
22                Defendants.          )
                                       )   Hon. Araceli Martínez-Olguín
23                                     )   United States District Judge
                                       )
24   _____ )

25

26

27

28

DEFENDANTS' REPLY ISO MOT. TO DISSOLVE TRO
3:25-CV-02847-AMO                                    PI Appeal and Stay Addendum 823

## I.   **INTRODUCTION**

Plaintiffs' opposition fails to rebut the core premise of Defendants' motion to dissolve: the Supreme Court's decision in *Department of Education v. California*, 604 U.S. ----, 2025 WL 1008354 (U.S. Apr. 4, 2025) ("*Dep't of Education*"), is binding, intervening authority that fundamentally reshapes, directly contradicts, and squarely forecloses the legal basis for this Court's temporary restraining order, as extended (ECF Nos. 33, 48) ("TRO").  *See* Mot., ECF No. 38.  While Plaintiffs attempt to confine *Dep't of Education* to its facts or procedural posture, the opinion addresses the precise legal defect at issue here: the Administrative Procedure Act's ("APA") limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money.

Because Plaintiffs' claims arise from contractual expectations and seek monetary relief, they fall outside the APA's limited waiver of sovereign immunity and lie within the exclusive jurisdiction of the United States Court of Federal Claims.  *Dep't of Education* makes clear that such claims cannot be repackaged as statutory to proceed in district court.

Pursuant to this Court's April 7, 2025 Order, ECF No. 42, Defendants respectfully submit this reply in support of their motion to dissolve the TRO, ECF No. 38.  However, on April 12, 2025, the Court of Appeals for the Ninth Circuit docketed Defendants' appeal from the TRO, *see* Docket No. 25-2358 (9th Cir.), thereby divesting this Court of jurisdiction to decide the instant motion under Fed. R. Civ. P. 60(b) to dissolve the TRO absent a remand from the Ninth Circuit.  The Court may nonetheless issue an indicative ruling pursuant to Fed. R. Civ. P. 62.1, granting Defendants' dissolution motion.[1]

## II.   **ARGUMENT**

### A.   *Dep't of Education* **is a Material Change in Law.**

As Defendants argued in their motion to dissolve (Mot. at 4–6), *Dep't of Education* is a material change in law that confirms the Court lacks jurisdiction to compel payment under government contracts through APA litigation.  Plaintiffs do not meaningfully dispute that the relief they seek—continuation of previously funded services through terminated contractual terms—amounts to compelled monetary

---

[1] *See* Fed. R. Civ. P. 62.1(c); *Yurok Tribe v. Bureau of Reclamation*, 319 F. Supp. 3d 1168, 1174 (N.D. Cal. 2018) (Orrick, J.) (observing that district court lacked jurisdiction to rule on party's request for relief from preliminary injunction, following party's timely notice of appeal from said injunction, and that under Fed. R. Civ. P. 62.1, court would issue indicative ruling); *Index Newspapers LLC v. City of Portland*, No. 3:20-CV-1035-SI, 2022 WL 72124, at *1 (D. Or. Jan. 7, 2022) (construing federal defendants' request for an indicative ruling under Rule 62.1 as a motion to dissolve the preliminary injunction for which the district court did not have jurisdiction because of pending appeal, and stating that under Rule 62.1(a)(3) district court would grant the motion to dissolve if the Ninth Circuit remands for that purpose).

disbursement. Nor do they deny that their asserted entitlement flows from agreements governed by federal appropriation mechanisms. As in *Dep't of Education*, the question is not how Plaintiffs style their claims, but what they seek in substance. The Supreme Court was clear: "The APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money.'" 2025 WL 1008354, at *1 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

Contrary to Plaintiffs' suggestion that *Dep't of Education* "does not impact the jurisdiction or Order of this Court" (Opp'n, ECF 54 at 2), the Supreme Court's opinion did not merely parse procedural nuances. Rather, the Supreme Court addressed the jurisdictional scope of the APA and held that sovereign immunity bars injunctive relief compelling contract-based payments. *Id.* Plaintiffs' reliance on *Bowen v. Massachusetts* is likewise misplaced; *Dep't of Education* acknowledged *Bowen* but reaffirmed its limits. 2025 WL 1008354, at *1. Like the plaintiffs in *Dep't of Education*, Plaintiffs here seek "relief along the lines of what the District Court ordered" in that case—restoration of terminated grants or funding. *Id.* (cleaned up).

Plaintiffs' reliance on *United Aeronautical Corp. v. USAF*, 80 F.4th 1017 (9th Cir. 2023), is misplaced, as that decision involved proprietary interests in surplus military property rather than the compelled disbursement of appropriated funds under multi-agency financial contracts at issue here. *See* Opp'n at 5–6. Unlike *United Aeronautical*, Plaintiffs here seek reinstatement of expired contracts and continued federal payments—precisely the relief barred under the APA as clarified by the Supreme Court in *Dep't of Education*.

### B. Plaintiffs Cannot Establish Irreparable Harm or Equitable Basis to Maintain the TRO.

As Defendants raised in their principal motion (Mot. at 4–6), Plaintiffs still have not met their burden to show irreparable harm or a compelling equitable basis to justify continued injunctive relief. *Dep't of Education* makes clear that the cessation of federal grant funding does not constitute irreparable harm where other forums exist for monetary relief. *See* 2025 WL 1008354, at *2. As the Supreme Court explained, where a plaintiff "can recover any wrongfully withheld funds through suit in an appropriate forum," a TRO compelling payment is improper. *Id.*

Plaintiffs' assertion that the funding termination has already caused layoffs, strained their limited reserves, and jeopardized their ability to carry out their mission (Opp'n at 5) fails to overcome this principle. These are economic harms—allegedly arising from a terminated contract—and any claim for

redress belongs in the Court of Federal Claims under the Tucker Act. Plaintiffs may disagree with the administrative decision, but they cannot transform it into equitable relief via the APA.

Meanwhile, the government's harm is unrebutted and irreparable: "no grantee promised to return withdrawn funds should its grant termination be reinstated," and this Court declined to impose a bond (TRO at 7). *Dep't of Education*, 2025 WL 1008354, at *2. The Supreme Court found that such asymmetry, combined with speculative claims of harm, tilts the equitable analysis decisively in the government's favor. *Id.* at **1–2.

*Dep't of Education* also rejected claims of irreparable harm similar to those raised here, including by state governments alleging abrupt funding cuts to public programs. *Id*. Plaintiffs' policy arguments cannot override statutory limits on judicial review. As *Dep't of Education* reaffirmed, "self-imposed costs" do not warrant equitable relief. *Id*. (quoting *Cuomo v. NRC*, 772 F.2d 972, 977 (D.C. Cir. 1985)).

## C. The TRO Bears All the Hallmarks of a Preliminary Injunction—and is Subject to the Same Limits.

Like the TRO at issue in *Dep't of Education*, the TRO here carries "many of the hallmarks of a preliminary injunction." 2025 WL 1008354, at *1 (citing *Sampson v. Murray*, 415 U.S. 61, 87 (1974)). This Court's TRO directs the continued disbursement of appropriated funds, imposes specific obligations on the Executive Branch, and now stretches nearly four weeks—well beyond the presumptive 14-day limit in Federal Rule of Civil Procedure 65(b)(2). These features render the TRO functionally indistinguishable from the one invalidated in DOE and make clear that it cannot stand in light of that decision.

Plaintiffs also claim the TRO's "brief extension" was Defendants' doing, citing the recusal motion. Opp'n at 3. But that premise is both inaccurate and unsupported. The Court sua sponte extended the TRO by an additional 14 days—doubling its lifespan—without new findings of irreparable harm and without any request from Plaintiffs. *See* ECF No. 48. The recusal motion raised distinct concerns unrelated to the legal propriety of the TRO. Respectfully, the notion that a procedural motion justifies ongoing emergency relief compelling expenditure of federal funds reflects a misunderstanding of Rule 65's limits and *Dep't of Education*'s holding.

## D. The Public Interest and Balance of Equities Favor Dissolution

As Defendants explained in their motion to terminate (ECF NO. 38 at 5–6), compelling ongoing payments under terminated contracts not only contravenes the APA's jurisdictional limits, but also

1   disrupts federal program administration and imposes unrecoverable fiscal harm. Plaintiffs offer no

2   meaningful rejoinder to *Dep't of Education*'s holding that the government faces irreparable harm when

3   compelled to disburse funds without clear statutory authority. Continuing to enforce the TRO now—after

4   the Supreme Court has clarified that such relief is beyond the APA's reach—threatens not just the public

5   fisc but also constitutional principles governing the separation of powers.

6       Dissolving the TRO not only prevents the unlawful expenditure of appropriated funds, it reaffirms

7   the proper roles of Congress in appropriating funds, and the Executive Branch in administering such funds

8   through federal programs. Plaintiffs' disagreement with the government's policy decision does not

9   authorize judicial intervention on an emergency basis.

10              **III.    CONCLUSION**

11      Plaintiffs offer no persuasive distinction from *Dep't of Education*, and no valid justification for

12  continued injunctive relief that no longer rests on a tenable legal foundation. The Supreme Court has

13  clarified that claims of this nature must be pursued, if at all, in the Court of Federal Claims, and that the

14  APA cannot be used to compel payment of federal funds under terminated contracts. Because Plaintiffs

15  cannot establish likelihood of success, irreparable harm, or an equitable basis for continued relief, the

16  TRO should be dissolved. In the alternative, it should be stayed pending appeal.[2]

17

18

19

20

21

22

23

24

25

26

---

27  [2] Plaintiffs assert that Defendants "misrepresent" the Supreme Court's order in *Dep't of Education* and
    the nature of the injury at issue (Opp'n at 1, 6), but they cite no specific language from the opinion that
28  contradicts Defendants' position. A disagreement over interpretation does not amount to
    misrepresentation and should not distract from the legal issues properly before the Court.

DEFENDANTS' REPLY ISO MOT. TO DISSOLVE TRO
3:25-CV-02847- AMO                    4

DATED: April 14, 2025                    Respectfully submitted,

                                         YAAKOV M. ROTH
                                         Acting Assistant Attorney General

                                         WILLIAM C. SILVIS
                                         Assistant Director

                                         CHRISTINA PARASCANDOLA
                                         KATELYN MASETTA ALVAREZ
                                         MICHAEL A. CELONE
                                         Senior Litigation Counsel

                                         ZACHARY A. CARDIN
                                         Trial Attorney

                                         */s/ Jonathan K. Ross*
                                         JONATHAN K. ROSS
                                         Senior Litigation Counsel
                                         U.S. Department of Justice, Civil Division
                                         Office of Immigration Litigation
                                         General Litigation and Appeals Section
                                         P.O. Box 878, Ben Franklin Station
                                         Washington, DC 20044
                                         (202) 305-7662
                                         Jonathan.K.Ross@usdoj.gov

                                         Attorneys for Defendants

1

2

### <u>CERTIFICATE OF COMPLIANCE</u>

3       The undersigned, counsel of record for Defendants certifies that this brief contains 4 pages,

4  which complies with the Court's April 7, 2025 Order (ECF No. 42) and Local Rule 7-3(a).

5

6                                                   Respectfully submitted,

7                                                   */s/ Jonathan K. Ross*
                                                    JONATHAN K. ROSS
8                                                   Senior Litigation Counsel
                                                    Office of Immigration Litigation
9                                                   Civil Division

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COMMUNITY LEGAL SERVICES IN
EAST PALO ALTO, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, et al.,

Defendants.

Case No. 25-cv-02847-AMO

**ORDER DENYING MOTION TO STAY
AND MOTION TO DISSOLVE
TEMPORARY RESTRAINING ORDER**

Re: Dkt. Nos. 38, 57

In this Administrative Procedure Act ("APA") case, the Court earlier granted a Temporary Restraining Order ("TRO"). Before the Court are two motions from Defendants United States Department of Health and Human Services, Office of Refugee Resettlement, and Department of the Interior (collectively, the "Government") related to the TRO: a motion to dissolve the TRO (ECF 38) and a motion to stay the TRO pending the Government's appeal to the Ninth Circuit Court of Appeals (ECF 57). The matters are fully briefed and suitable for decision without oral argument. Accordingly, the hearings on these motions set for April 23, 2025,[1] and May 22, 2025, are VACATED. *See* Civil L.R. 7-1(b), Fed. R. Civ. Pro. 78(b). Having read the papers filed by the parties and carefully considered their arguments therein, as well as the relevant legal authority, the Court hereby **DENIES** both motions for the following reasons.

I.     **BACKGROUND**

This lawsuit seeking relief under the Administrative Procedure Act related to the Government's termination of funding allocated to legal services for unaccompanied children in immigration proceedings was filed by on March 26, 2025, by 11 non-governmental organizations.

---
[1] The hearing on Plaintiffs' motion for preliminary injunction remains on calendar for 2:00 p.m. PST on April 23, 2025. *See* ECF 48.

See Compl. (ECF 1). The Plaintiffs are Community Legal Services in East Palo Alto, Social Justice Collaborative, Amica Center for Immigrant Rights, Estrella del Paso, Florence Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project, Immigrant Defenders Law Center, National Immigrant Justice Center, Northwest Immigrant Rights Project, Rocky Mountain Immigrant Advocacy Network, and Vermont Asylum Assistance Project (collectively, "Plaintiffs").

On March 27, 2025, Plaintiffs filed a motion for temporary restraining order ("TRO") and preliminary injunction. ECF 7. The Court issued an order setting a hearing, as well as a deadline for the Government's written response to Plaintiffs' TRO motion. ECF 17. On March 31, 2025, in accordance with the schedule set on March 27, the Government filed its opposition to Plaintiffs' motion. See ECF 24. On April 1, 2025, the parties appeared for a hearing on Plaintiffs' motion. ECF 30. After taking the matter under submission, the Court granted Plaintiffs' motion, issued a TRO, and set an expedited briefing schedule on Plaintiffs' request for a preliminary injunction. ECF 33. The TRO provided,

> Defendants are **ENJOINED** from withdrawing the services or funds provided by the Office of Refugee Resettlement ("ORR") as of March 20, 2025, under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and ORR's Foundational Rule, 45 C.F.R. § 410.1309(a)(4), particularly ORR's provision of funds for direct legal representation services to unaccompanied children. This injunction precludes cutting off access to congressionally appropriated funding for its duration.

ECF 33 at 7.

After the grant of the TRO, several motions were filed. Plaintiffs filed their motion for preliminary injunction (ECF 37), as well as two motions to enforce the TRO (ECF 40, ECF 53). The Government moved to dissolve the TRO (ECF 38) and for recusal of a district judge pursuant to Title 28 U.S.C. § 455 (ECF 47). Finding that consideration of the recusal motion constituted good cause, the Court extended the TRO for an additional 14 days in accordance with Federal Rule of Civil Procedure 65(b)(2), set a briefing schedule on the recusal motion, and continued the hearing on Plaintiffs' motion for preliminary injunction. See ECF 48. The Government filed an

United States District Court
Northern District of California

1  appeal of the TRO following its extension.  ECF 56.  The Government additionally moved to stay

2  the TRO pending that appeal.  ECF 57.

3      Following complete briefing, the Court denied the Government's motion for recusal.  ECF

4  69.  A panel of the Ninth Circuit subsequently determined that the TRO was not appealable and

5  dismissed the Government's appeal, *see Cmty. Legal Services in East Palo Alto et al. v. Dept.*

6  *Health & Hum. Servs. et al.*, Case No. 25-2358, Order (9th Cir. Apr. 18, 2025), rendering the

7  Government's motion for a stay pending appeal (ECF 57) moot.

8  **II.    DISCUSSION**

9      Remaining before the Court is the Government's motion to dissolve the TRO.  A party

10  seeking dissolution of a TRO or preliminary injunction must show (1) a significant change in fact

11  or law; and (2) that in light of the significant change, the injunction should be dissolved or

12  modified under the legal standard that governed the issuance of the injunction in the first place.

13  *See Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (citing *Sharp v. Weston*, 233 F.3d

14  1166, 1170 (9th Cir. 2000)).  "Whether an injunction should be dissolved, just like whether it

15  should be granted, is 'guided by' the *Winter* factors."  *Morning Star, LLC v. Canter, Tr. of Ctr.*

16  *Schoen Fam. Tr. U/D/T Mar. 17, 2015*, Case No. 22-56119, 2023 WL 5092764, at *1 (9th Cir.

17  Aug. 9, 2023) (citing *Karnoski*, 926 F.3d at 1198).  The "*Winter* factors" require a party seeking

18  preliminary injunctive relief must show: (1) a likelihood of success on the merits, (2) a likelihood

19  of irreparable harm to the moving party in the absence of preliminary relief, (3) the balance of

20  equities tips in the favor of the moving party, and (4) an injunction is in the public interest.  *Winter*

21  *v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see* Order (ECF 33) at 4.  "The first two

22  factors . . . are the most critical."  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  Importantly, a

23  party's subsequent challenge to preliminary injunctive relief "must rest on grounds that could not

24  have been raised before."  *Alto v. Black*, 738 F.3d 1111, 1120 (9th Cir. 2013) (citation omitted).

25      The Government contends that the Supreme Court's brief order granting a stay of a TRO in

26  *Department of Education v. California*, 604 U.S. ----, 145 S. Ct. 966 (2025), dictates a stay here.

27  In *Department of Education*, the Supreme Court considered whether to grant a stay of a district

28  court's TRO.  *Id.*  The state government plaintiffs challenged the Department of Education's

3

termination of contracts for the payment of certain educational grants to the respective states.  *Id.* at 1.  The district court issued a TRO enjoining the Government from terminating the grants and requiring "the Government to pay out past-due grant obligations and to continue paying obligations as they accrue."  *Id.* at 1.  The Supreme Court granted the Government's request for a stay of the TRO on the basis that the district court "lacked jurisdiction to order the payment of money under the APA."  *Id.* at 2.  The Court further held, based in significant part on the relief pursued by the plaintiffs, that the Government would likely show the district court lacked jurisdiction over the contractual claims calling for payment, as those claims are committed to the Court of Federal Claims pursuant to the Tucker Act.  *Id.* at 2 (citing 28 U.S.C. § 1491(a)(1)).

The Government argues that *Department of Education* applies with equal force to Plaintiffs' APA claims related to the termination of funding for legal services for unaccompanied children in immigration proceedings.  Not so.  Under the standards governing dissolution of preliminary injunctive relief, the Supreme Court's order does not impact the preliminary relief granted by this Court.

First, *Department of Education* does not represent a significant change in law.  *Cf. Karnoski*, 926 F.3d at 1198.  To the contrary, the Government's consistent invocation of the Tucker Act to assert that this Court lacks jurisdiction, *see, e.g.*, Gov't Opp. (ECF 24) at 11-13, demonstrates that the same legal principles regarding the APA's limited waiver of sovereign immunity have not changed.  Indeed, the Government fails to identify anything different about the law following the Supreme Court's order, much less a significant change sufficient to warrant dissolution of earlier-granted injunctive relief.  This shortcoming alone, on the first step under *Karnoski*, requires denial of the Government's motion to dissolve the TRO.

Second, even if *Department of Education* was a significant change in law, it does not apply to the facts of this case.  Here, Plaintiffs' claims do not arise merely due to a breach of contractual obligations.  The TRO considered in *Department of Education* "enjoin[ed] the Government from terminating various education-related grants" and "require[d] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue."  *Dep't of Educ.*, 145 S. Ct. at 968.  The Supreme Court found the APA likely inapplicable in that case because the plaintiffs

1  there sued "to enforce a contractual obligation to pay money" on the grant contracts, implicating

2  jurisdictional concerns under the Tucker Act.  *Id.*, at 968 (citation omitted).  Plaintiffs have no

3  contract with the Government.  *See* Gov't Opp. to TRO (ECF 24) at 5-6; Biswas Decl. (ECF 24-1)

4  ¶ 4 (stating that the Government's contract with Acacia Center for Justice does not establish a

5  direct relationship with the Plaintiff sub-awardees).  Instead, Plaintiffs bring suit to enforce a

6  statute (the TVPRA) and regulation (the Foundational Rule), and they pursue injunctive relief to

7  enforce those provisions rather than for relief sounding in contract.  *See* Mot. Prelim. Inj. (ECF

8  37) at 15-17.  Indeed, the substance of Plaintiffs' suit is to obtain injunctive, forward-looking

9  relief that Defendants meet their obligations under the TVPRA and the Foundational Rule to

10  provide legal representation to "all" unaccompanied children "to the greatest extent practicable."

11  8 U.S.C. § 1232(c)(5); 45 C.F.R. § 410.1309(a)(4).  As recognized by the Supreme Court, "[o]ur

12  cases have long recognized the distinction between an action at law for damages . . . and an

13  equitable action for specific relief . . . .  The fact that a judicial remedy may require one party to

14  pay money to another is not a sufficient reason to characterize the relief as 'money damages.' "

15  *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (citation omitted).  That the Plaintiff

16  organizations and others may receive payment to fund their continued legal representation of

17  unaccompanied children in accordance with the TVPRA and the Foundational Rule as part of the

18  relief pursued here does not transform the injunctive relief sought into a claim for money damages

19  at law.  *See id.*  The relief sought here does not sound in contact merely because the Government

20  characterizes it so.

21         The Court in *Department of Education* also held that the plaintiffs – state grant recipients –

22  had not demonstrated irreparable harm sufficient to preclude a stay because they represented "that

23  they have the financial wherewithal to keep their programs running" without the grants, such that

24  "any ensuing irreparable harm would be of their own making" if they declined to keep the

25  programs running.  *Dep't of Educ.*, 145 S. Ct. at 969.  That runs counter to the findings here – that

26  Plaintiffs will be forced to abandon much of their mission-driven work if the Government fails to

27  comply with the TVPRA and Foundational Rule, and this constitutes irreparable harm in itself.

28  *See, e.g.*, TRO (ECF 33) at 5-6 (explaining the irreparable harms Plaintiffs face and citing

5

1    declarations). These Plaintiffs do not "have the financial wherewithal to keep their programs

2    running" as demonstrated through staff layoffs as well as the diversion of funding from other

3    programming. *Id.* at 5.

4         The Government's sole basis for dissolution of the TRO is the purported applicability of

5    *Department of Education* to this case. The Government fails to identify any facts or law that

6    would alter the Court's initial balancing of the *Winter* factors, but as discussed above, the Court

7    continues to find the first two factors, likelihood of success and irreparable harm, satisfied based

8    on this record. Having found that *Department of Education* (1) is not a significant change of law

9    and (2) that even if it were, *Department of Education* does not require a different outcome in this

10   case given the harm faced by Plaintiffs, the injunctive relief sought, and the inapplicability of the

11   Tucker Act, the Government fails to establish that the TRO should be dissolved.

12   **III.    CONCLUSION**

13        For the foregoing reasons, the Court **DENIES** Defendants' motion to dissolve the TRO.

14   The Court **DENIES** Defendants' motion to stay the TRO pending appeal as moot. The TRO

15   remains in effect, and the Court will hear Plaintiffs' motion to enforce the TRO as scheduled.

16

17        **IT IS SO ORDERED.**

18   Dated: April 21, 2025

19

20        _____

21        **ARACELI MARTÍNEZ-OLGUÍN**
          **United States District Judge**

22

23

24

25

26

27

28

6

Pages 1 - 52

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martinez-Olguin, Judge

```
COMMUNITY LEGAL SERVICES IN    )
EAST PALO ALTO, et al.         )
                               )
           Plaintiffs,         )
                               )
  VS.                          )    NO. C 25-02847 AMO
                               )
UNITED STATES DEPARTMENT OF    )
HEALTH and HUMAN SERVICES, et  )
al.,                           )
                               )
           Defendants.         )
_____)
```

San Francisco, California
Wednesday, April 23, 2025

**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:  (via videoconference)
For Plaintiffs:

                IMMIGRANT DEFENDERS LAW CENTER
                634 South Spring Street - 10th Floor
                Los Angeles, California  90014
         BY:  **CARSON SCOTT, ATTORNEY AT LAW**

                JUSTICE ACTION CENTER
                P.O. Box 27280
                Los Angeles, California  90027
         BY:  **KAREN C. TUMLIN, ATTORNEY AT LAW**

                AMICA CENTER FOR IMMIGRANT RIGHTS
                1025 Connecticut Ave. NW - Suite 701
                Washington, D.C.  20036
         BY:  **SAMANTHA HSIEH, ATTORNEY AT LAW**

        **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
                    U.S. District Court - Official Reporter

```
1    APPEARANCES:  (continued via videoconference)

2    For Defendants:
                          U.S. DEPARTMENT OF JUSTICE
3                         P.O. Box 878
                          Ben Franklin Station
4                         Washington, D.C.  20044
                     BY:  JONATHAN K. ROSS, ATTORNEY AT LAW
5
     Also Present:        TOBY BISWAS
6                         SHARON ROBERTS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    Wednesday - April 23, 2025                    2:03 p.m.

 2                      P R O C E E D I N G S

 3                         ---oOo---

 4         THE CLERK:  This court is now in session.  The

 5    Honorable Araceli Martinez-Olguin presiding.

 6         Calling civil matter 25-2847, Community Legal Services and

 7    East Palo Alto, et al. v. United States Department of Health

 8    and Human Services, et al.

 9         Counsel, please state your appearances for the record

10    starting with the Government.

11             MR. ROSS:  Jonathan Ross for the United States.

12             THE COURT:  Good afternoon.

13             MR. ROSS:  Good afternoon.

14             MS. TUMLIN:  Good afternoon, Your Honor, Karen Tumlin

15    for the Plaintiffs.

16             MS. SCOTT:  Carson Scott for the Plaintiffs.

17             MS. HSIEH:  Good afternoon, Your Honor, Samantha Hsieh

18    for Plaintiffs.

19             THE COURT:  Apologies, I'm just moving you all around

20    on my screen so I have you three on the top.  All right.

21         So, Counsel, I just want to start by noting that we are

22    here today on Plaintiffs' motion for a preliminary injunction.

23    We are not here on the motions to enforce.  I will note for you

24    that those are regularly noticed motions and are presently set

25    to be heard on May 15th and May 22nd, respectively.
```

1    Indeed, the first motion isn't fully briefed yet, and

2    Plaintiffs' reply isn't due until the 28th of April.  Counsel's

3    ECF entry setting a hearing on these motions for today does not

4    change the timeline laid out in the local rules.  So, we are

5    not here for that today.

6    That said, I do take seriously the assertion that the

7    Government has not complied with the Court's orders, and I do

8    want to hear from the witnesses I ordered to appear today.

9    So -- that I can understand the Government's conduct to

10   date, and I will also want to hear from them after I hear

11   argument from you-all about the PI because I want to make sure

12   that I understand what -- what actions can be taken by the

13   Government Defendants and on what timeline.

14   So, I guess before we jump into the PI, I do have -- well,

15   let me ask you, Mr. Ross, just before we start, I had ordered

16   to appear both Toby Biswas as well as Sharon Roberts.  Are they

17   with you?

18        **MR. ROSS:**  Yes, Your Honor.

19        **THE COURT:**  Okay.  You tell -- I'm inclined to hear

20   from them possibly at the end -- I'm of two minds.  I am

21   inclined to have you-all talk with me about the motion for

22   preliminary injunction and take them at the end.  My hesitation

23   with that is that it requires them to stay here for the entire

24   time that the lawyers are talking.  So, maybe just to save --

25   to save some of their time, why don't we go ahead and speak

```
 1   with them first.
 2        Let me ask you, Mr. Ross, I imagine that it is likely
 3   most -- assuming -- are they in the room with you or are they
 4   also on the Zoom?
 5            MR. ROSS:  Your Honor, they are here in person with me
 6   right now.
 7            THE COURT:  Okay.
 8            MR. ROSS:  As well as several other members of the
 9   Department of Justice, Health and Human Services and the
10   Department of the Interior.
11            THE COURT:  All right.  Does it -- my sense then is
12   that it might -- you tell me what your technological
13   capabilities are.  My sense would be to have them possibly come
14   to the lectern where you are standing.  I see you have a
15   remote.  So, if it is possible for you to redirect the camera,
16   why don't we, if we can start, maybe start with Mr. Biswas.
17            MR. ROSS:  Very good.  Mr. Biswas is right here.
18            THE COURT:  Good afternoon, Mr. Biswas.  I have your
19   declaration.  I think my lingering question for you -- let me
20   make that more specific.  I have your declaration dated
21   April 8th.  It's on the docket as 45-1.  I think my question
22   for you is -- will likely be no surprise; right.  That
23   declaration is dated April 8th.  I can see what you have
24   attested -- the conduct you undertook from April 2nd to the
25   8th.
```

```
 1        Mr. Biswas, is there anything that you have done since
 2   this date?
 3        TOBY BISWAS:  No, Your Honor.  We have been in
 4   communication with our contracting officer, folks over at the
 5   Department of Interior to follow up on this contract
 6   modification necessary for the provision of the CLINS 2, 3 and
 7   4 under the contract.
 8        THE COURT:  Mr. Biswas, is there anything that you or
 9   ORR still need to do at this point -- is there anything that
10   you-all still need to do rescind the March 21st partial
11   termination?
12        TOBY BISWAS:  To my knowledge, no.
13        THE COURT:  All right.  Then, Mr. Biswas, I think
14   those -- that may be the extent of my questions for you.
15   Mr. Ross, if I can impose on you to help me -- to redirect me
16   now to Ms. Roberts.
17        MR. ROSS:  Yes, absolutely.  I will bring her into
18   frame now.
19        THE COURT:  Okay, thank you.
20                   (Pause in proceedings.)
21        THE COURT:  Good afternoon, Ms. Roberts.  So --
22   actually, Mr. Ross, this may actually be a note for you while I
23   have it.  Ms. Roberts, I have reviewed -- this is for both of
24   you.  Ms. Roberts, I have reviewed both of your declarations.
25   There was the declaration that was submitted on April 8th and
```

1    it is ECF 45-2, and I also have a declaration submitted in

2    support of the Government's consolidated opposition.  It is

3    ECF 74-1.  I will note, however, that that document is

4    unsigned.

5          So, I imagine, Mr. Ross, that may be something that you

6    want to take -- fix and take care of because I don't have

7    Ms. Roberts' signature on this.  So, it isn't actually attested

8    to.  But, Ms. Roberts, I have looked -- I have read carefully

9    through your declarations, and I think the pieces I'm trying to

10   understand from you is -- this takes me through all the way to

11   the 21st when it was signed.  It's -- that's only a few days

12   ago, but I think I'm at this point curious to understand what

13   is left to be done.

14         SHARON ROBERTS:  Right now we are actually in the very

15   final stages of processing the modification.  Late on the 21st

16   we did receive Acacia's updated reinstatement proposal.  We are

17   finalizing the documentation as we speak for that modification.

18   We plan to send that to Acacia.  It's a bilateral modification.

19   And once they sign that, we will sign it and it will be in

20   place.

21         THE COURT:  And if I followed that, Ms. Roberts, could

22   you -- do you --

23                    (Pause in proceedings.)

24         THE COURT:  Do you have a sense of when -- if I

25   followed that, you were -- it is at the point where -- the

```
1    papers -- the ball is with you, and then it is going back to
2    Acacia and then it's coming back to you and that would be the
3    end of it.  Did I follow that?
4              SHARON ROBERTS:  That is correct.
5              THE COURT:  All right.  So, the ball is with you.
6    When -- do you have a sense of when you are sending it back to
7    Acacia?
8              SHARON ROBERTS:  We anticipate that that is going to
9    be in the next day or two that we are going to be sending to
10   Acacia.
11             THE COURT:  Ms. Roberts, can I -- I just want to check
12   a few more things with you.  Am I correct that the only party
13   to the contract is -- the parties to the contract are DOI and
14   Acacia?
15             SHARON ROBERTS:  We do have a contract with Acacia
16   only.  That is correct.
17             THE COURT:  Does the contract contemplate which
18   entities Acacia will subcontract with?
19             SHARON ROBERTS:  Potentially when the contract was
20   proposed, they may have included subcontractors but they are --
21   they do have the ability to make changes or make those
22   determinations.
23             THE COURT:  And was that -- Ms. Roberts, I understand
24   you to be referring to the most recent iteration.  Was that
25   consistent through the recent iteration of the contract as well
```

1    as the recently expired iteration of the contract?

2              **SHARON ROBERTS:**  That is correct.

3         **THE COURT:**  I think those are the extent of my

4    questions at this point.  So, I want to thank you both

5    Ms. Roberts and Mr. Biswas, for being here.  I realize that on

6    the East Coast, it is after 5:00, so I apologize.  I actually

7    should apologize to everyone on the East Coast.  It is after

8    5:00.  That's the joy of transnational litigation.

9         I'm going to go ahead and excuse you-all and then we will

10   just move from there on to -- on to my questions for Counsel

11   about the motion for the preliminary injunction.  So, thank

12   you-all.

13             **SHARON ROBERTS:**  Thank you.

14        **MR. ROSS:**  Thank you, Your Honor.  May the Government

15   have the indulgence of the Court for just a moment as we

16   realign?

17        **THE COURT:**  Of course.  Thank you for figuring out the

18   technology in the first place to make that all happen,

19   Mr. Ross.

20        **MR. ROSS:**  We have some good folks to help us with

21   that.  It's definitely not my specialty.  Thank you,

22   Your Honor.

23                        (Pause in proceedings.)

24        **MR. ROSS:**  Thank you very much to my colleagues.

25   Thank you to the Court.  The Government is ready to resume.

**THE COURT:**  Thank you, Mr. Ross.  So folks, I
understand that on Plaintiffs' side different counsel will be
addressing different portions.  I do want to note for you, I
would love to tell you that I had drafted my questions
discreetly enough so that I could just engage with one of you
at a time.  They are not that -- they are not that -- they are
linear to my way of thinking.  They are not linear necessarily
in the order that I think that Ms. Araceli [sic] put out in the
papers.

So, here is what I'm going to ask you-all to do:  I'm
going to run you through the questions that I've got -- this
may be akin to what we did at the TRO stage.  I'm going to run
you through the questions that I have got.  I will -- whoever
the question is directed to, I will give -- I will give the
other side an opportunity to respond to that piece.

When we have gone through my questions, I will give
you-all some time if there are additional points you want to
make time to address that I haven't -- that I haven't asked
you-all to, to make sure that you get to put into the record
whatever it is that you would like to have even if it wasn't
something that particularly interested me today.

So, to that end, my first couple of questions are for
Plaintiffs' Counsel, and I will just leave it to you-all to
play jump ball with the question and direct it as you need to
to the right attorney.

1    So, Plaintiffs, I need you to help me understand better

2  the scope of relief that you are requesting.  It looks to me

3  like you are asking for the Government to comply with the TVPRA

4  and the Foundational Rule in a way that ensures representation

5  for unaccompanied children in immigration proceedings.  My

6  question to you really is:  Have I got that right or how would

7  you -- how would you pin that down if it is not the right -- if

8  I have not described it the way you would?

9         MS. SCOTT:  Good afternoon, Your Honor, Carson Scott

10  for Plaintiffs.

11         MS. TUMLIN:  I think that's mine; is that right?

12  Okay, that's good.  We will, in fact, play jump ball.  So,

13  thank you for the question, Your Honor.  You do have that right

14  in terms of the scope of relief that we are requesting, and I

15  want to say a few additional things about it.

16    So, you know, we are not asking the Court to say that the

17  exact contract that was in place before gets put back in place.

18  That's the Government's decision.  It looks like from the

19  testimony of the two declarants that Your Honor just heard

20  from, that is the choice that they have made; but the how to

21  comply with the TVPRA and Foundational Rule requirements,

22  that's up to the Government.  And we are simply asking that

23  they do comply, right, that they comply to the extent that

24  small children, who are unaccompanied minors, are getting legal

25  representation to the greatest extent practicable taking into

1    account the Congressional funds that have been authorized and

2    whether or not there are pro bono resources available.  That is

3    what is necessary.

4         Now, the Government has made the determination that the

5    way for them to comply with that relief that was presented in

6    the Court's TRO from 21 days ago is to extend the contract, but

7    that's the Government's choice and we are not here to quibble

8    with the choice that they make.

9         **THE COURT:**  So, let me ask, can you draw a line for me

10   between the relief you seek and the redressability issue raised

11   by the Government in opposing your standing?  More

12   specifically, I'm asking what relief you seek -- if you can

13   sort of pin down how I can be sure that the relief you seek is

14   redressable equitable relief under the APA.

15        **MS. TUMLIN:**  Absolutely, it is a good question,

16   Your Honor.  So, first of all, I would start from the principle

17   that the test for redressability does not mean that 100 percent

18   of all of Plaintiffs' harms have to be remedied.  And so, I

19   will give you an example -- and, you know, it is a painful

20   example -- one of the harms that Plaintiffs talk about is

21   having to lay off staff because of the unlawful actions of the

22   U.S. Government in cutting the funding that is required -- that

23   has been appropriated by Congress and is mandated to be

24   provided for representation of unaccompanied kids.

25        If the Government decided that they wanted to fund some

1   other phantom set of legal service providers who were experts

2   in representing unaccompanied children to satisfy these

3   requirements and no funding flowed to our clients, well that

4   one harm that we have alleged it may not be addressed but the

5   other harms -- the mission harms of all eleven Plaintiffs who

6   were mission driven with preexisting core activities to

7   represent child clients in court so no child stands alone --

8   that would be redressed and that would be sufficient,

9   Your Honor.

10          **THE COURT:**  So, I think we have addressed this some.

11  I do want to pin this down.  Are you asking me to specifically

12  order the Government to keep paying the bill?  And if so, do I

13  have authority to do that?

14          **MS. TUMLIN:**  I -- I am not -- so, just to get real

15  precise on that question, when you say "keep paying the bill,"

16  do you mean the prior contract, Your Honor?  We are not asking

17  for that.  If you mean "keep paying the bill," which is expend

18  some dollars on unaccompanied children and ensuring they have

19  legal representation, yes.  And that is because of two things.

20  You do have the authority to do it because it is your job, and

21  you have the authority to ensure that statutes and regulations

22  are enforced.

23          The TVPRA says "shall provide representation to all

24  children to the greatest extent practical."  The Foundational

25  Rules tells us more.  It says if funds have been appropriated,

```
 1   they have.  The U.S. Government doesn't contest that.  It
 2   further says it is in their discretion after they look and see
 3   whether pro bono representation is available how to meet this
 4   mandate; but there is no evidence in the record before this
 5   Court that pro bono representation is available.
 6       When we were in person on April the 1st, the Government
 7   posited that there might be some pro bono army that was going
 8   to rise up and take the place of the trained and skilled legal
 9   service providers who have been providing this representation
10   to children, but nothing in the evidence they presented to the
11   Court shows that that's happened.
12       Instead, they opine in their opposition to our preliminary
13   injunction motion that they, quote, trust that pro bono legal
14   providers will take on the, quote, most meritorious cases.
15   Trust isn't enough given the TVPRA requirement and the
16   Foundational Rule, Your Honor.
17       THE COURT:  The Government -- Mr. Ross, this is my
18   last question for them about the relief; and then I will give
19   you a chance to address these and then I will have a question
20   for you.  But, Plaintiffs, the Government seems pretty
21   convinced that the relief you seek sounds in contract.  You see
22   from my recent orders I disagree.  Help me put my mind at ease
23   about why this is a -- why this is a case that is not about
24   contractual payment.
25       MS. TUMLIN:  My colleague, Ms. Hsieh, will address
```

1    that, Your Honor.

2         **MS. HSIEH:**  Yes, I'm happy to answer that, Your Honor.

3    So, the Ninth Circuit and the D.C. Circuit apply the *Megapulse*

4    test, which looks at both the source of rights for the

5    contracts and the relief that is requested.  And so, under both

6    these factors, Plaintiffs have made a strong showing that this

7    is not a contracts case that's subject to the Tucker Act.

8         So, first, on the type of claims we raise, we are raising

9    statutory and regulatory claims under the TVPRA and the

10   Foundational Rule.  We are not raising contractual claims

11   either in form or function in that -- in order for Your Honor

12   to decide our claims, there's no need to look at the terms of

13   the contracts because the Government's obligation comes from

14   outside of the contracts that it has with Acacia and Acacia

15   with Plaintiffs.

16        Now, I will say the Government is trying to argue for a

17   but-for test for the kind of claims that we are raising.  It is

18   saying that if it weren't for these contracts, Plaintiffs

19   wouldn't be in this court today; but that's the kind of test

20   that has been rejected numerous times by both the Ninth Circuit

21   and the D.C. Circuit, which apply the same test.

22        So, for example, in the Ninth Circuit in the *North Side*

23   *Lumber* case said that even where the claims are contract

24   related, as long as the source of rights come from another

25   authority, they can proceed in district court.

1        Similarly, the Ninth Circuit ruled more recently in the

2   *United Aeronautical Corporation* decision that even where

3   Plaintiffs -- even where Defendants raise a contract as a

4   defense, that still doesn't mean that that case is subject to

5   the Tucker Act.

6        And I also want to point this Court to the D.C. Circuit

7   decisions in *Crowley* and in *Megapulse*, where it acknowledged

8   that it is okay for claims to presuppose the existence of a

9   contract.  That's not the correct test.  Instead, you have to

10  again look at the source of the rights.

11       We also meet the second factor under the *Megapulse* test,

12  which is the kind of the relief we are seeking.  As my

13  colleague Ms. Tumlin was discussing, we are arguing -- we are

14  seeking for the Government to comply with its statutory and

15  regulatory obligations to continue funding representation for

16  these unaccompanied kids as a whole.  We are not seeking

17  contract specific relief such as specific performance or

18  backpay.

19       And I want to emphasize that the kind of relief that would

20  be -- that we would be able to get in the Court of Federal

21  Claims is only contract specific.  So, litigating there is not

22  an adequate substitute for us litigating in this court,

23  Your Honor.

24       And, finally, there is another potential hurdle to us

25  litigating in the Court of Federal Claims as well.  Plaintiffs

```
 1    are subcontractors, and it's generally accepted that
 2    subcontractors cannot litigate in the Court of Federal Claims
 3    unless they have permission from the prime contractor; here,
 4    Acacia.
 5         And so, for all these reasons, it is not an adequate
 6    substitute for us to be litigating under the Tucker Act in the
 7    Court of Federal Claims; and this Court has jurisdiction to
 8    hear this case.
 9         THE COURT:  Thank you, Ms. Hsieh.  Mr. Ross, I'm going
10    to ask you to pick up on the points that I have asked them; and
11    then once you have addressed those to your satisfaction, let me
12    know.  I have got a question for you moving -- related to
13    discretion.
14         MR. ROSS:  Thank you, Your Honor.  Plaintiffs are
15    asking for something that the law does not provide, an order
16    from this Court requiring the Government to continue dispersing
17    discretionary funds in a terminated contract.  And reading from
18    their motion, their proposed order reads that Defendants are
19    enjoined from withdrawing the services or funds provided, and
20    it goes on to cite the TVPRA and the Foundational Rule.
21         But to the extent that Plaintiffs say that their relief --
22    that the relief that they want doesn't lie in contract is
23    contravened by the fact that they are asking for this Court to
24    enjoin the Court from withdrawing discretionary funds.
25         It's also critical to note that the two primary sources
```

1   that they cite in an effort to show redressability, the laying

2   off of their staff -- but seemingly maybe even conceding that

3   point -- and turning only to the implication that it has on

4   their mission, they don't have a right -- the TVPRA and the

5   Foundational Rule don't convey on them a right to continue

6   their mission.  They are outside of the zone of interests.

7        And the APA similarly doesn't authorize the type of relief

8   that Plaintiffs seek.  And in essence they are challenging a

9   decision that the law committed specifically to agency

10  discretion and not only agency discretion on funding but also

11  as it goes to personnel and infrastructure and things that the

12  agency -- and, quite frankly, not this Court -- are in the best

13  position to determine.

14       **THE COURT:**  Part of the discussion regarding

15  Plaintiffs' likelihood of success centers on whether

16  implementation of the TVPRA and the Foundational Rule is left

17  to the agency's discretion.  Could you please tell me how much

18  discretion is left to the agencies where Congress appropriates

19  funding for a certain task?  Your paper suggests that the

20  agency can simply elect not to spend the money, but that

21  doesn't seem to comport with Congress' direction.

22       **MR. ROSS:**  Your Honor, the -- as we discussed at

23  length with the temporary retraining order back on April 1st,

24  the language to the greatest extent practicable, practicable

25  inherently, as I said, includes things beyond funding.  It

```
 1    includes infrastructure and personnel and other matters that
 2    are historically left to agency discretion and a considerable
 3    amount of discretion too as the cases that we cite to in our
 4    brief indicate.
 5         Not only in the TVPRA -- excuse me -- not only in the
 6    Foundational Rule does the word "discretion" expressly appear,
 7    but courts have routinely interpreted that to the greatest
 8    extent practicable means that the agency has discretion with
 9    the who, the what, the why, the how and the when.  So, the
10    agency is very much acting consistent with the TVPRA and the
11    Foundational Rule when it provides the things that it must
12    provide; legal screenings as well as know your rights
13    presentations.
14         Anything beyond that is discretionary and is left to not
15    only whether there is funding available but a number of other
16    considerations too that the agency is in the best position to
17    ascertain.
18         THE COURT:  All right.  So, Plaintiffs, I have a
19    couple of questions for you about your Accardi claim.  The
20    Government's opposition states that you have identified -- that
21    you have not identified any internal policy that HHS has
22    disregarded.  I understand your Accardi claim to be based on
23    the Foundational Rule.  Is there some additional internal
24    policy with which you are seeking compliance?
25         MS. TUMLIN:  No.  You are correct, Your Honor.  Our
```

*Accardi* claim are based on the four corners of the Foundational
Rule.

      **THE COURT:**  All right.  My second question relates to
the relationship between your claim premised on *Accardi* and the
one premised on the TVPRA.  I want you to help me understand if
those rise and fall together.

      **MS. TUMLIN:**  Um, Your Honor, I -- I don't think that
the claims rise and fall together.  I think that sometimes the
*Accardi* case law, even within the Ninth Circuit, is a bit
mushy, to be honest.  And the contrary to law claim, the Court
could find that they simply on the text of the TVPRA, that the
Defendant's actions of the cancellation order violate the
TVPRA's requirement, full stop, without ever reaching an
*Accardi* claim based on the text of the Foundational Rule.

      **THE COURT:**  Thank you.  Mr. Ross, do you want to
address either of those questions?

      **MR. ROSS:**  Your Honor, I think that it's -- it's --
yes, we would.  In terms of the claims that Plaintiffs are
putting forward, they are in essence trying to have it both
ways; right.  They are in essence saying that they are not
asking for -- there's tension between what they are asking for
and the mechanisms by which they are giving the Court to give
meaning to -- to those claims.  And in as much as they ask,
they present that they are not asking for a contractual remedy,
the only way to give meaning to the relief that they seek is by

```
1   means of contract.

2                    (Pause in the proceedings.)

3            MS. TUMLIN:  Your Honor, can I add one thing on that

4   point?

5            THE COURT:  Go ahead.  It gives me a chance to take

6   down the rest of my notes with regard to Mr. Ross.

7            MS. TUMLIN:  Great, I'm here for that.  What I wanted

8   to add to redressability -- just because of what Mr. Ross just

9   said -- that I want to make clear that there are very specific

10  things where there is now evidence in the record where an order

11  of this Court, just like what we have in our proposed order for

12  the preliminary injunction, would indeed redress Plaintiffs'

13  harms.

14       So, for example, this is all uncontested evidence before

15  this Court in the last three weeks since the TRO has issued.

16  So, we know that now tender age children have gone

17  unrepresented in their removal proceedings as a result of the

18  Defendant's actions and noncompliance with the TRO.  That's in

19  the FIRRP declaration at docket 53-3, paragraphs 2 and 3, and

20  the Estrella declaration at docket 53-4, at paragraph 5.

21       We know that small children have appeared in court alone.

22  This is in the FIRRP declaration 53-3, paragraphs 4 and 6.  We

23  know at least one child that we are aware of has been deported

24  and that is in the Estrella declaration at 42-2, paragraphs 4

25  through 9.  And we also know that immigration judges and
```

```
 1  shelter staff have asked our client to represent new
 2  unaccompanied kids in reliance on the Court's TRO.  This is at
 3  the ImmDef declaration 53-5, paragraphs 7 and 8.
 4       And, finally, we know that children have been held in
 5  detention in ORR shelters for longer than necessary because
 6  they have no one to explain their rights to them.  This is the
 7  FIRRP declaration 53-3, paragraph 3.
 8       I cite all of that to outline this isn't about the dollars
 9  and cents.  If the Defendants were taking actions to ensure
10  that unaccompanied children could get some of the funds that
11  Congress expended on their behalf and have representation --
12  even if it was not representation by our clients -- they would
13  have redressability; their harms would be addressed; they would
14  be able to fulfill their mission of ensuring that children
15  don't stand alone in immigration court.
16       THE COURT:  I want to shift gears a little bit and
17  speak with you both about the arbitrary and capricious claim
18  asserted by Plaintiffs.  Mr. Ross, your opposition asserts that
19  the administrative record here reflects reasoned decision
20  driven by policy and fiscal considerations.  However, I don't
21  have an administrative record.
22       So, can you -- much less one that the evidence is the
23  reasoned decision making you assert.  So, can you talk to me a
24  little bit please about how I can rule in your favor if I end
25  up reaching the arbitrary and capricious claim.
```

```
1          MR. ROSS:  Yes, Your Honor.  And apologies for any --
2     for, perhaps, not expressing that as artfully as we could have.
3     I think it is more accurate to describe it as record evidence
4     that -- in terms of the evidence that's in the record.
5          And what is in the record before the Court is, for
6     example, the termination notice that -- that the Government
7     sent out on March 21st explaining its rationale for the -- for
8     the termination.
9          And, Your Honor, with the Court's indulgence too, I would
10    like to respond to what my colleague just raised about three
11    different distinct harms that yet again --
12         THE COURT:  I'm going to stop you for one more moment
13    on the record because I just want to make sure -- I will forget
14    to come back to this.  So, if I'm hearing you right, Mr. Ross,
15    that part of your -- that part of your opposition is intended
16    to point to the record evidence and that would be the recision
17    letter from March 21st; is that right?
18         MR. ROSS:  I believe so, Your Honor.
19         THE COURT:  All right.  And --
20         MR. ROSS:  If something comes to light that makes me
21    change the Government's thoughts on that, then surely we will
22    inform the Court, but --
23         THE COURT:  Okay.  And then just so I'm clear, yes, so
24    that's the document you would point me to.  All right.  That's
25    helpful.  All right.  By all means, you can have a moment to
```

1   address Ms. Tumlin's remarks about some of the children -- her

2   assertions about what's been happening.  Go ahead.

3           **MR. ROSS:**  Yes, Your Honor.  And these are -- what

4   Ms. Tumlin is describing are things that are certainly well

5   reported in the news and that are -- the folks with the

6   Government that are there on the ground, we understand that

7   this is happening and we understand the effect that it's

8   having.

9           Really what it comes down to at the end of the day,

10  though, is not whether legal -- the provision of legal services

11  is good.  Really what it comes down to is whether there is a

12  statute or regulation or an interplay of the two that requires

13  that type and scope of representation.  And unfortunately,

14  there is -- fortunately or unfortunately -- perhaps

15  unfortunately for Plaintiffs -- there is not.  There is not a

16  statutory or regulatory requirement.

17          And even Ms. Tumlin, I have a great deal of respect for

18  her, however, the three distinct things that she points to in

19  support of Plaintiffs' claims are really the same single thing.

20  They are all mission focused; that children are appearing

21  unrepresented in court and that they are in some cases being

22  served with notices to appear in removal proceedings or

23  appearing in court by themselves or with one of ORRs provided

24  guardians or case managers.

25          All of those point to the fact that children, who are once

```
1    receiving legal representation are no longer receiving it.
2    However, that -- they are not receiving it anymore, not because
3    the Government decided that it was just going to arbitrarily
4    withdraw these services.  It was predicated on a reasoned and
5    thoughtful evaluation of not only the fiscal component of this
6    but also the -- the other -- not only the fiscal means by which
7    services is provided but whether it was required by the law and
8    how it was best implemented; again, things that are left to the
9    agency's discretion.
10         But really the overarching point that I want to get to is
11   that there is no -- there is no right -- not only is there not
12   a right to direct legal representation at the expense of the
13   Government, the harms that Plaintiffs point to were otherwise
14   redressable, there is no prohibition for pro bono counsel
15   stepping in to serve these children.  In fact, in light of the
16   Court's temporary retraining order, someone who is operating
17   potentially in a pro bono capacity would at worst do pro bono
18   work and not be paid for it and at best be able to potentially
19   seek to get payment after the fact citing the Court's order.
20   So, to a certain extent these harms are created by Plaintiffs
21   not stepping in when there is nothing prohibiting them from
22   doing that.
23         THE COURT:  Mr. Ross, can I make sure I'm following
24   you?  There is a couple of times there when you said "pro bono
25   counsel."  Normally pro bono counsel are attorneys who are
```

1  volunteering without being paid, and that's not the same as

2  folks who are providing direct representation through a

3  contract with the Government.  Am I wrong?

4       I think throughout these proceedings, I think we have

5  talked about pro bono.  I understand you're -- usually when you

6  invoke the phrase pro bono counsel to mean folks who are

7  volunteering, not necessarily the attorneys who work for

8  Plaintiffs; but I think you just conflated them.  I just want

9  to make sure if I'm misunderstanding or if you haven't maybe

10 conflated them in your last point there.

11      **MR. ROSS:**  Thank you for the opportunity to clarify.

12 No.  When I refer to "pro bono," it is consistent with the

13 Court's construction of pro bono; but that was the principal

14 point that the Government was making is that there is no right

15 to Government funded direct legal representation.

16      The core rights that the TVPRA and the Foundational Rule

17 extend are the know your rights presentations and the legal

18 screening, which have continued.  And so, to the extent that

19 Ms. Tumlin says that no one is informing these unaccompanied

20 children of their rights is simply not true.  They are still

21 receiving those services that are required under the law.  But

22 the second point being that there is no prohibition on the

23 provision of pro bono services.

24      So, to the extent that children were in a position where

25 Plaintiffs felt compelled consistent with their mission to

1    participate in the proceedings, nothing was preventing them

2    from being able -- consistent with their mission to step in and

3    to assist these children.

4        **THE COURT:**  Mr. Ross, then, would you -- if I

5    understand your point, you contend that providing service to

6    one of the children that Ms. Tumlin gave examples of, your

7    contention is that providing services to that additional client

8    doesn't take away from the Plaintiff organization's resources;

9    is that right?

10       **MR. ROSS:**  Not exactly, Your Honor.  In terms of

11   taking away from their resources, the point that -- the

12   overarching point is more of a general one.  And that is, that

13   attorneys who are duly licensed to practice law before the

14   immigration courts may still continue to do so, whether in a

15   pro bono capacity or not.  It really comes down to a question

16   of whether the Government is required under law to pay for

17   those services.

18       **THE COURT:**  I understand the point you are making.

19   All right.

20       Let's talk for a moment about the scope of any injunction.

21   So, Mr. Ross, you argue that any injunction should be limited

22   to these Plaintiffs.  I don't think I saw in your papers you

23   take up vacatur under the APA.  So, I'm trying to go -- I want

24   to give you an opportunity to do that here and maybe talk with

25   me about how vacatur could be limited to these Plaintiffs.

```
 1          MR. ROSS:  Your Honor, the -- I don't have an answer
 2    prepared for that question; however, the Government is happy to
 3    provide a supplemental response addressing that.
 4          THE COURT:  Let me ask you one other question.
 5    I guess I'm also trying to understand -- I'm engaging your
 6    suggestion that an injunction be limited to just these
 7    Plaintiffs.  From what I have just learned from -- from
 8    Ms. Roberts, the -- well, I'm not sure that I have -- I'm
 9    trying to formulate another question on the fly and as you can
10    see, it is harder than when I come with them all written out.
11    I will see if I can formulate it better.
12          In essence what I'm trying to get to is what I got from
13    Ms. Roberts is that the contract is ultimately with Acacia.
14    So, presumably any injunction would have to be about the
15    Government continuing to provide these services and I think at
16    that point -- well --
17                      (Pause in proceedings.)
18          MR. ROSS:  Your Honor, if I may.
19          THE COURT:  Yeah, and I realize that it may be me
20    circling back to a question for the Plaintiffs, whether it is
21    Ms. Tumlin or Ms. Hsieh or Ms. Scott.  Go ahead, Mr. Ross.
22          MR. ROSS:  The mechanism by which an injunction would
23    have any meaning, just as it was with the temporary retraining
24    order, it rests in contract.  The Government would have to, as
25    it has and as it work towards despite what is normally 120-day
```

```
 1    timeline, what it has been able to accomplish in the span of
 2    less than three weeks -- it involves the creation of a contract
 3    modification; and it just further supports the proposition that
 4    Plaintiffs are in essence trying to force the Court -- make the
 5    order -- make the Court put an order on the Government to force
 6    it to contract with -- and entity, which in this case happens
 7    to be Acacia, to give substance to the relief that they seek.
 8    It is simply a power that the Court cannot force the Government
 9    to contract.
10         THE COURT:  Folks, I have one additional question for
11    both of you.  Mr. Ross, since you have got the mic, I'm going
12    to go ahead and ask you to answer it first.
13         If I find that Plaintiffs are likely to succeed on any one
14    of their claims, is that sufficient to warrant a preliminary
15    injunction?
16         MR. ROSS:  No, Your Honor, it's not because not only
17    is it a matter of the likelihood of success, but it is also a
18    question of do the harms that they claim are they irreparable
19    harms and that the harms that the Plaintiffs cite impact to
20    laying off staff and impacts to their institutional impact
21    don't warrant the type of extraordinary relief that's
22    contemplated in the preliminary injunction context.
23         And, similarly, going back to my previous point in terms
24    of equities and public interest, The court -- the Court is not
25    in a position to order the Government to enter into a contract
```

1    specifically when it comes to the disbursement of discretionary

2    funds; that the agency is in the best position to determine how

3    best to give meaning to what -- the flexibility that Congress

4    has extended it.

5         **THE COURT:**  Same question to Plaintiffs.  If I find

6    that you-all are likely to succeed on any one of your claims is

7    that enough for a PI?  Maybe I shouldn't yet pass the mic to

8    them, Mr. Ross, because I think what I meant to make inherent

9    in my question is presuming that I find that the equities are

10   in their favor, that there is irreparable harm, I guess I'm

11   asking if ultimately they need to succeed on all three of their

12   claims or is it enough for them for there to be a likelihood of

13   success on any one of their claims.

14        **MR. ROSS:**  Plaintiffs would need to succeed on all of

15   their claims specifically because they are pointing to

16   statutory and regulatory authority to support their APA claim,

17   which is, as the Government has contended, is squarely within

18   the Tucker Act and the Court of Federal Funds.

19        **THE COURT:**  Thank you, Mr. Ross.  Plaintiffs, same

20   question to you.

21        **MS. TUMLIN:**  Thank you, Your Honor.  We do not need to

22   succeed on all three of our merits arguments in order for

23   complete relief to issue.

24        Any single one of those could give rise and should give

25   rise to the relief that we have sought in our proposed order,

1    whether it is the arbitrary and capricious claim, the contrary

2    to law claim or the *Accardi* claim.

3        **THE COURT:**  Let me talk with you-all one more

4    minute -- this will be my last question and then I will give

5    you-all some space to argue about anything else you want to

6    bring to my attention or that you think is worth

7    highlighting -- because this is fresh or may be relevant

8    because Ms. Tumlin just referenced the proposed order.

9        So, let me ask because unsurprisingly my -- part of my

10   consideration when I look at proposed orders is to figure out

11   whether or not it is actually enforceable, right, is this

12   specific enough that should we need to have a conversation

13   thereafter about whether or not it's being complied with, is it

14   specific enough that we are not arguing about, you know, sort

15   of broad terms therein.

16       So, let me ask Plaintiffs -- and then Mr. Ross if you

17   would like to answer this, I will take it to you too -- I guess

18   I'm curious if since the time you submitted your proposed order

19   if there are edits you would make at this point to ensure that

20   it is sufficiently specific and thorough so that it is clear

21   when compliance is achieved.

22       **MS. TUMLIN:**  Yes, Your Honor.  You know, obviously

23   this is something we have been giving a great amount of thought

24   to in the 21 days since the TRO issued and, you know, listening

25   to Your Honor's questioning of the two Government declarants at

1   the top of the hearing.

2        So, I would say that we are clearly at the point where in

3   addition to the proposed order, I think that extremely regular

4   reporting on compliance would be required from the Government.

5   I -- it's really hard to wrap my mind around how it is the case

6   that we have a sworn statement from a Government declarant on

7   April 8th saying that their choice of how to comply with the

8   TRO was at the final approval stage; but here we are, you know,

9   almost 20 days -- whatever, two weeks after that -- and that

10  still hasn't been completed.

11       So, in light of what has been both a pattern of clear

12  noncompliance with the TRO and what can only look like an

13  effort to run down the clock on the TRO with extremely active

14  motion practice both before this Court and the Ninth Circuit,

15  we would need regular reporting from the Government on the

16  steps that have been taken until it becomes clear that some

17  steps have been taken to comply with the TVPRA and Foundational

18  Rule requirements.

19       **THE COURT:**  Thank you, Ms. Tumlin.  Mr. Ross, can I

20  get your thoughts on that?

21       **MR. ROSS:**  Yes, Your Honor.  Respectfully, the

22  Government takes issue with Plaintiffs' contention that we have

23  been anything but diligent.  As our declarant expressed, and as

24  I just said a moment ago, this is an inherently complicated

25  contracting provision where we are giving -- breathing life

1    back into a contract that has been terminated.

2         And although we can debate whether the -- whether it was a

3    lawful termination, as Defendants contend or an unlawful

4    termination as Plaintiffs allege, it really doesn't change the

5    fact that this is a contract that was set to expire any way at

6    the conclusion of March 2025.

7         And that contracting provisions of this size, complexity,

8    magnitude and the volume of funds involved is a 120-day process

9    as detailed by the declarations that the Government has filed

10   in this action.  We have been extremely diligent in making

11   sure, number one, that due diligence is done but also to ensure

12   that it is done correctly and as quickly as possible.

13        There were a number of ways that the Government could, as

14   Plaintiffs -- as Plaintiffs noted at the beginning of the

15   hearing -- that there was -- that they didn't challenge the

16   way -- the Government's choice in how we chose to comply with

17   the temporary restraining order.  We picked the process that

18   would yield the fastest result, and that's really the point

19   that I want to drive home first.

20        And I think that the -- the evidence that's before this

21   Court readily demonstrates that and that -- at no time despite

22   the motions practice that went on in this court, nothing --

23   nothing detracted from the lawyers doing the work of the

24   lawyers and the agency doing the work of the agency.

25             **MS. TUMLIN:**  Your Honor, I just -- I have one more

 1    point on what -- the specificity that might be required should

 2    the Court be inclined to issue a preliminary injunction motion

 3    after reviewing all of the evidence and the argument -- you

 4    know, well, actually two points.

 5         First, to Mr. Ross' last point about choosing the fastest

 6    method, I want to just really be clear that what the Government

 7    is trying to do is hide behind a contract here.  We are not

 8    here on a contract.  We are here on the TVPRA.  We are here on

 9    the Foundational Rule.  And whatever steps the Government

10    usually takes in issuing its contracts or its protocols or the

11    120 days they say that it usually takes, that's really neither

12    here nor there, Your Honor, for what is required when the Court

13    finds that we are likely to succeed on the merits of our claims

14    and that irreparable harm is happening and the public interest

15    tips in our favor.  So, being faster than 120 days is not good

16    enough.  That's kind of point one.

17         And then, secondly, Your Honor, what we are asking for

18    right now is a preliminary injunction as quickly as the Court

19    is able to reach a decision on that.  We are not asking or

20    moving for contempt right now, and the Government would be able

21    to appeal a preliminary injunction, of course, if you choose to

22    issue one.  I want to be very clear, however; that if the

23    Government does not do what any preliminary injunction

24    requires, we would expect then to return to this Court to seek

25    orders of contempt directed against the responsible Government

1    actors including the declarants who appeared on Zoom today.

2         We have a very well documented pattern of noncompliance

3    over the past 20 -- almost 22 days, and it's just not

4    acceptable.

5              **MR. ROSS:**  Your Honor, may the Government be heard?

6              **THE COURT:**  Of course.

7              **MR. ROSS:**  Thank you.  Again, a tremendous amount of

8    respect to Plaintiffs.  However, the way that they are

9    contending that the Government has -- that any grounds for

10   sanctions or that any noncompliance has occurred fails -- falls

11   flat on its face.  It is simply not an issue where the

12   Government is trying to hide behind a contract.  There must be

13   a mechanism by which Acacia receives payment that Plaintiffs

14   are asking for this Court to resume, in fact, the TRO -- the

15   relief contemplated by the TRO expressly related to the

16   provision of services that were provided through contractual

17   means to Acacia.

18        So, it is not a matter of hiding behind a contract -- to

19   use Plaintiffs' terminology -- there needs to be a way to write

20   the check.  And, quite frankly, this was the best most -- the

21   best and fastest way to give meaning to the Court's order.  The

22   Government has been diligent at every single step of this

23   process.

24                    (Pause in proceedings.)

25             **THE COURT:**  I thank you both for taking me through

```
 1    that.  Folks, I am through my questions.  Let me ask you-all,

 2    you can have a few more minutes on both sides if there are

 3    other things you want to highlight or bring to my attention

 4    that I haven't asked you-all about.  It's Plaintiffs' motion,

 5    so you all are welcome to hit -- to do that first.

 6         MS. TUMLIN:  Sure.  Sam, I think you wanted to handle

 7    one point first and then I can do the rest if that works.

 8         MS. HSIEH:  Yeah, of course.  I'm happy to do that.

 9    So, the Government, Your Honor, is arguing that the only way

10    for them to comply with this -- with your Court's TRO and a

11    potential PI is through contracts.  And so, that, therefore,

12    they are somehow absolved from complying.  That is not the

13    case, Your Honor.

14         Here, the Court's TRO and a potential PI would give the

15    Government discretion and allow it to resume funding in almost

16    an unlimited number of ways.  Here, for the TRO, the specific

17    mechanism they chose was the contract with these Plaintiff

18    organizations.  So, once they choose that path, they have to

19    follow through with it.  This -- we are not asking for this

20    Court to tell the Government exactly how to contract, whom to

21    contract with, what terms.  We are asking for the Government to

22    comply with the mandates under the TVPRA and Foundational Rule.

23    Whatever path they chose -- they choose, they have to follow

24    through with it.  I also did want to just briefly touch on the

25    DOE decision.
```

1    This Court has already decided that the DOE decision is
2    not a change in law and is inapplicable to this case.  I just
3    wanted to raise two additional points on top of the reasoning
4    that this Court gave in its recent order denying the
5    Government's motion to dissolve the TRO.

6    And so, in addition to the reasons that this Court gave,
7    DOE is also entitled to less weight because of its specific
8    procedural posture.  There, the Supreme Court was ruling on the
9    Government's emergency motion to stay the lower court's TRO.
10   It was not a decision on the merits.  The Supreme Court did not
11   have the benefit of full briefing or an argument.

12   And this Court cited to the *Pacito* case in its TRO order
13   and I want to note that more recently the *Pacito* court also
14   found this; that DOE is not the same as a full decision on the
15   merits.  And so, it is inapplicable in determining whether to
16   re-visit the -- a prior PI or to grant a PI here.

17   I also want to emphasize that the harms to the Government
18   that the Supreme Court noted in DOE are not present here.
19   Here, we have a specific statutory and regulatory mandate to
20   continue this funding unlike in DOE.  And this funding has been
21   appropriated through 2027.  The Government cannot show
22   irreparable harm by being ordered to comply with the law.

23   And for reasons, Your Honor, that's why DOE -- in addition
24   to the reasons that this Court gave earlier -- is not
25   applicable to this case and does not prevent this Court from

 1   ordering a PI.

 2        **THE COURT:**  Thank you, Ms. Hsieh.  Ms. Tumlin, did I

 3   understand you have something further to add?

 4        **MS. TUMLIN:**  Yes, just a couple of quick things,

 5   Your Honor, on the discussions you had with Mr. Ross.  First,

 6   on the arbitrary and capricious claim, you asked about whether

 7   it mattered that there was no administrative record; and, you

 8   know, Mr. Ross pointed you to the four corners of the

 9   cancellation order itself.

10        And so, what that means, of course, is that the only

11   reason that has been given for the departure of the

12   long-standing practice of providing -- of spending the

13   Congressionally appropriated funds for direct representation of

14   unaccompanied children is convenience.  And that simply fails

15   under all arbitrary and capricious precedent in terms of being

16   a rationale decision of an agency that is defensible.

17        Secondly, Mr. Ross talked a fair amount about how in his

18   mind or in the Government's mind, the obligations of the TVPRA

19   and Foundational Rule are being met by the provision of group

20   know your rights presentations or legal intakes.

21        So, I want to clear that up.  So, I want to clear that up

22   in kind of two specific ways.  That is not what the TVPRA or

23   the Foundational Rule mandates to be provided.  And there is no

24   better place than to always look than the text.

25        The TVPRA itself, the provision that we are saying is

1    contrary to law with the cancellation order is contrary to law,

2    talks about "have counsel to represent them in legal

3    proceedings or matters."

4        So, all unaccompanied children, which the text of the same

5    sentence of the TVPRA having counsel to represent them in legal

6    proceedings is absolutely not a group know your rights

7    presentation at an ORR funded shelter.  They are apples and

8    oranges.  It is not a legal intake that may happen after such a

9    presentation.

10       And then separately, the text of the Foundational Rule

11   that we are talking about for our *Accardi* claim is a specific

12   section.  It is 45 CFR 410.1309(a), number 4.

13       In that section the exact language -- and, again, this is

14   a quote -- is that, quote, "ORR shall fund legal service

15   providers to provide direct immigration legal representation

16   for certain unaccompanied kids -- children" -- sorry.

17       What Mr. Ross is talking about is an entirely separate

18   section of the Foundational Rule that goes on to talk about the

19   requirements for know your rights presentations.  And if I was

20   classier, I would still have that section before me; but I'm

21   going to pull it up if I --

22                    (Pause in proceedings.)

23       **MS. TUMLIN:**  -- if I can.  I will give it to you in a

24   second and I will carry on; but it is, in fact, a separate

25   provision.  Let's see.

1      Okay.  So, I wanted to clear that up.  Also, you asked a

2   question of Mr. Ross regarding the scope of relief.  He didn't

3   have a clear answer despite it being the Government's position

4   that relief should be limited geographically or otherwise in

5   some fashion.

6      And I just want to say that any supplemental briefing that

7   the Court may order should not be a basis to, one, continue to

8   have noncompliance with the Court's TRO or to delay a ruling on

9   the preliminary injunction in light of the uncontested record

10   evidence of the harms that are amassing every day.

11      Okay, thanks to my brilliant co-counsel, the separate

12   section of the Foundational Rule that I wanted is

13   Subsection (a)(2).  So, it is all the same 45 CFR

14   410.1309(a)(2), that's about know your rights.  That's a whole

15   different thing.  We are not here to talk about that.

16      And (a)(4) is what we are here to talk about and why the

17   provision or the continued funding for know your rights doesn't

18   do anything to alleviate the unlawful actions of the Government

19   that are at issue in this case.

20      And then there has been a lot of discussion about, like,

21   oh, well, we really just want the contract to get extended and

22   it takes time and it is complicated.  I just got to really end

23   where we started, which is that is the U.S. Government's

24   decision.  If they choose that the way that they want to comply

25   with this Court's order and the TVPRA and the Foundational Rule

1    is to reinstitute the same contract, that's on them.

2        They have -- they do, in fact, have discretion.  What they
3    don't have discretion is to spend zero dollars.  They do not
4    have discretion to spend zero dollars on the provision -- on
5    legal representation for unaccompanied children who are going
6    to immigration court and who are facing a skilled government
7    attorney on the other side trying to deport them.  That is not
8    a choice that they have.

9        There's a lot of talk about pro bono counsel, and the
10   Government may think that pro bono means free to them.  It does
11   not.  It means free to the client.  Congress has spoken.  They
12   have appropriated the funds.  They have said that they want
13   little kids represented to the greatest extent practicable, and
14   that needs to happen.

15       I think that's it, Your Honor.  I could spend so much time
16   talking to you about what's in our declarations, about the
17   harms that are happening every day; but I really -- I will just
18   give one example and then I'm sure we want to let Mr. Ross also
19   add anything he has.

20       The example that I want to give is there's no place for
21   our clients to go to hand off the children that they are
22   already representing.  Again, there is a lot of talk in this
23   situation that maybe there is some pro bono counsel somewhere.
24   Nobody has shown us where it is.  And so, every day the
25   attorneys at these organizations face their ethical obligation

of "what am I going to do."  And then it is a limited pot of

discretionary funds that these Plaintiffs have to continue

their representation, and there is no hand-off.  There is no

mythical pro bono Army that has materialized to take care of

these kids, and the violations continue every day.

        And so, to close, Your Honor, I want to share the words of

the Director of Legal Services at IMMDEF, Marion

Donavon-Kaloust, from her declaration.  It's at docket 53-5.

You know, she describes in paragraph 7 what the detained

juvenile docket looked like on April 9th.  That's seven days

after the TRO took effect.  The immigration judge expressed

frustration that front of the court services had not been

restored to kids in his courtroom that day because he heard

about the Court's TRO.  And Ms. Donovan-Kaloust notes that

using -- running an organizational deficit, ImmDef chose to

provide front of the court services that day in reliance of the

TRO.  And she said -- and I'm quoting here -- quote, "One of

our attorneys advocated on behalf of a child whose case was and

should be funded under the terminated program who is so

developmentally delayed that he does not understand where he

is.  We will continue to represent him despite the uncertainty

regarding whether funding will be restored because of our

ethical responsibility to do so and because he is simply not

competent to navigate the system alone.  No child is.  But to

know that if funding is not restored, our organization would

1    have to turn away children such as this client who lack even

2    basic competence to understand what a court is, is antithetical

3    to our mission and the concept of due process."

4        That's the end of the quote.  And, Your Honor, that's

5    what's at stake every day.  And that Defendants continue to

6    violate this Court's order, that's why we are here and that's

7    why we urge the Court to order a preliminary injunction

8    promptly.  Thank you so much.

9            **THE COURT:**  Mr. Ross, I want to give you the mic.  I

10   do -- Ms. Tumlin's remarks piqued one more question for me.  I

11   don't -- again, this is actually a jump ball between you-all.

12   I don't know if anyone is prepared for this, and I don't think

13   it is something we discussed.

14       Can we talk for a moment about the use of the words "pro

15   bono" in statute?  Ms. Tumlin is drawing this distinction

16   between lawyers who are free to the client versus those who are

17   free to the Government.  I'm curious if you-all have any

18   inkling of whether the statute actually offers any guidance in

19   that regard.

20           **MS. TUMLIN:**  Sure.  Your Honor, we think the statute

21   does offer guidance with regard to what pro bono is supposed to

22   mean and that is because -- and I will pull this up for you --

23   it is because we didn't get to the Foundational Rule without

24   having a history that came before -- in fact, both the TVPRA

25   text that we are talking about.  There was a long history.

```
 1   There was a three-year study by the very institute -- this is
 2   all outlined in our complaint as well as our papers -- where
 3   first the U.S. Government was, like, Hey, maybe we can do what
 4   we want to do, which is represent little kids in immigration
 5   proceedings if we really do a better job trying to get together
 6   a pro bono bar to serve them.  And the conclusion was, Oh, no,
 7   pro bono services will never be sufficient.  It won't be
 8   enough.  Some direct representation is required.  And that is
 9   what led to the TVPRA provision that we have.
10        And then in addition we have -- I would point the Court to
11   what the former ORR officials say about pro bono services --
12   and they have our understanding as well; that pro bono
13   representation will not be sufficient to meet the requirements
14   of the Foundational Rule.  So -- so, that is what I would point
15   the Court to with that respect.  And if you give me one second,
16   I will, in fact -- so, where we are outlining the three-year
17   pilot program on pro bono, that's in our complaint,
18   paragraphs 50 to 53 for the Court's reference.
19        THE COURT:  Thank you, Ms. Tumlin.  Mr. Ross, you are
20   welcome to pick it up there or start anywhere you would like.
21        MR. ROSS:  Thank you, Your Honor.  And, respectfully,
22   to answer the last question that the Court posed, the -- it is
23   defined what pro bono means, that is defined as at no expense
24   to the Government.  That's at 8 U.S.C. 1362 and elsewhere as
25   well, but critically that's what pro bono counsel means legally
```

1    and that is at no expense to the Government.

2        It is also critical to circle back to a quote that my

3    colleague, Ms. Tumlin, read earlier that -- unfortunately and

4    probably inadvertently -- omitted not one but two references to

5    agency discretion as part of the provision of direct legal

6    services.

7        And so, turning back to Section (a)(4), as she directed

8    the Court, the sentence begins:  To the extent ORR determines

9    that appropriations are available -- now, it may be easy to

10   skip to the chase and just say, by virtue of Congress laying

11   out this money, that it inherently is -- those funds are

12   inherent available.  That is still a determination that the

13   agency is left to make and understand what those funds are

14   spent -- what those funds can be directed towards.

15       But -- so, then not only is there one discretionary

16   determination there.  It goes on after the provision that --

17   where Ms. Tumlin left her quote off, Subject to ORR's

18   discretion and available appropriations, period.  That part

19   matters.  "Subject to ORR's discretion" matters when we are

20   talking about the question of what is practicable.  That means

21   it is a discretionary standard that means -- that does not

22   create an enforceable right to counsel, and it doesn't

23   guarantee that legal services in every case.  It is a clear

24   acknowledgment that full coverage is not achievable.

25       Despite this, there are robust mechanisms in place that

1    are available to children in ORR's care and custody despite

2    Ms. Tumlin's averments that know your rights presentations and

3    legal screenings are insufficient, for whatever reason that she

4    failed to acknowledge other than saying that know your rights

5    presentations are in group settings, that inherently doesn't

6    mean that they are not -- they don't serve a purpose -- an

7    important purpose, and that's why they were included actually

8    in the TV -- excuse me -- in the Foundational Rule specifically

9    to ensure that there was -- that children had access to counsel

10   at no expense to the Government except for those discrete areas

11   in the agency's discretion.

12        Your Honor, the Government has talked at length today

13   about why Plaintiffs have not met their burden to show that a

14   preliminary injunction should issue because they are not able

15   to demonstrate a likelihood of success on the merits.  They are

16   outside of the zone of interests, and they are challenging a

17   decision that the -- they are challenging a legal determination

18   that Congress has expressly given to the agency.

19        But even overlooking that threshold question, they still

20   are not able to point to harms that are actually irreparable in

21   scope.  The lack of -- the financial strain and impact on their

22   institutional mission does not rise to the level of irreparable

23   harm.

24        Similarly, equities of public interest favor the

25   Government where Congress is told the agency that it is best in

1    a position -- not Plaintiffs' complaint -- to lay out what pro

2    bono services can and should look like but for what the agency

3    to determine what those services should look like.

4         *Department of Education* is informative for a reason that

5    the Court has not addressed yet, and that is that the district

6    court's temporary restraining order in *Department of Education*

7    is strikingly similar to the one that this Court entered.  And

8    although the Government acknowledges that that decision is

9    cabined to the extent that there is not a full record before

10   the Court, apples are apples; and the Court can very easily

11   look to the four corners of the TRO in that case to see the

12   striking resemblance between the TRO issued there and the TRO

13   issued here.

14        With respect to the proposed order that Plaintiffs put

15   forward, it must be specific.  It must be enforceable.  And

16   that is outlined not only by ample case law from the Supreme

17   Court on down, but it must give meaning to whatever the Court

18   intends to require if the Court finds that a preliminary

19   injunction is appropriate here.  And for the reasons that I

20   gave, Plaintiffs have not met their burden.

21        Alternatively, if the Court were to issue a preliminary

22   injunction, we still think -- consistent with the *Department of*

23   *Education* -- there needs to be a security interest in here in

24   the form of a bond because the money that is expended from this

25   funding should it go forward, will never -- the Government will

1    never see that funding again if ultimately Plaintiffs do not

2    succeed on the merits of their claims, which they will not.

3        Finally -- and in acknowledging that the Court has already

4    decided this point -- the Court should dissolve the temporary

5    restraining order here and now for the reasons that we have

6    been able to lay out more fully since this matter was

7    originally briefed and in light of the current state of

8    compliance that the Government has shown.

9        **THE COURT:**  Thank you, Mr. Ross.  Absent anyone having

10   anything further to add, I'm going to take your motion under

11   submission.  I'm very cognizant of the TROs, its duration.  And

12   so, my hope and expectation is that you-all should have

13   something one way or the other before then so that the -- if I

14   end up granting a preliminary injunction, there shouldn't be a

15   gap between that.  That is my hope.  It is not a promise.

16       **MS. TUMLIN:**  Okay.  We will be really brief,

17   Your Honor.  One thing from me and then I will pass it to

18   Ms. Carson to just close.  The only thing I want to add is,

19   Mr. Ross just in the last exchange made a reference to a

20   specific INA section, which is Section 1352, actually the

21   8 U.S.C.  And I do want to distinguish that we are not here for

22   that section.  That is the INA section which is drafted -- we

23   address this in our reply brief also -- it is drafted to cover

24   all immigration removal proceedings.  The bulk of immigration

25   removal proceedings are for adults.  Sometimes they are for

```
 1    family units that have an adult head and a child, and then, of
 2    course, unaccompanied children get put in removal proceedings
 3    too.  The vast majority of that deals with adults or with
 4    family units.
 5         So, what Congress said there for each and every flavor of
 6    immigration removal proceedings is, of course, superceded by
 7    the TVPRA, which directs for the small subset of unaccompanied
 8    kids, the type of representation that Congress intended.  That
 9    then, of course, got interpreted again in the Foundational
10    Rule, and I would simply also point the Court to, one, the
11    preamble of the TVPRA that makes this clear and explains what
12    the reference to INA Section 1362 is about; and, secondly, the
13    brief of the form ORR officials that says they understood the
14    law exactly the same way that we are explaining it to you
15    today.
16         MS. SCOTT:  Your Honor, I will quickly address zone of
17    interest and irreparable harm.  Plaintiffs are legal service
18    providers who built their missions around protecting the TVPRA
19    rights of unaccompanied children.  They are here to ensure that
20    no child appear in court on their own and that they are
21    protected from exploitation, mistreatment and trafficking.  And
22    that's exactly what Congress intended with enacting the TVPRA.
23    So, Plaintiffs -- there is no doubt Plaintiffs are squarely
24    within the zone of interest of the TVPRA.
25         And just quickly on irreparable harm, Your Honor, this
```

```
 1    Court should reaffirm its prior finding that Plaintiffs have
 2    suffered irreparable harm.  Since that order, children have
 3    gone to court on their own.  The Young Center amicus brief at
 4    docket 51, page 16 describes how a 14-year-old was in tears
 5    before her hearing frightened at the prospect of representing
 6    herself.  Five-year-old children were sitting before
 7    immigration judges expected to represent themselves.  A child
 8    in Estrella Del Paso service area was deported without the
 9    provision of legal services.  That's at docket 40-2, paragraphs
10    5 through 6.
11        And that's just the harm to the children.  Obviously, this
12    is also harm to Plaintiffs' mission because Plaintiffs' mission
13    is to, again, ensure no unaccompanied child goes to court
14    alone; and they are unable to provide these services as
15    contemplated by the TVPRA and the ORR Foundational Rule because
16    of Defendants' actions.
17        Defendants make a big point about how this is merely
18    financial loss.  This financial loss is the exact kind of loss
19    the Ninth Circuit has repeatedly said establishes irreparable
20    harm.  Defendants have now since the TRO -- since this Court's
21    order -- had to execute layoffs.  ImmDef laid off 24 staff.
22    That's at our supplemental declaration, paragraphs 3 and 4.
23    The Vermont Asylum Assistance Project has terminated
24    25 percent.  FIRRP has laid off 8 staff, docket 53-2,
25    paragraph 3.  And with these staff is the loss of institutional
```

```
 1    knowledge but it also places Plaintiffs in an ethical -- in an

 2    impossible ethical dilemma.  Plaintiffs can either continue to

 3    divert resources -- scarce resources their organizations have

 4    to cover their existing obligations to the children they

 5    currently represent and work themselves into bankruptcy.

 6    ImmDef declared that it estimates --

 7         THE COURT:  I'm going to ask you to try and wrap this

 8    up because we have hit this.  We have talked about some of

 9    these harms already today.  So, please take just another minute

10    or two but we have got this -- I have got this.

11         MS. SCOTT:  Great, thank you, Your Honor.  So, just to

12    conclude, absent relief from this Court, those harms to both

13    Plaintiffs' clients and Plaintiffs will continue; and the

14    consequence is Plaintiffs will essentially cease to exist and

15    will then forego the protection of thousands of unaccompanied

16    children within our borders as was contemplated by the TVPRA.

17         MR. ROSS:  Your Honor, can the Government be heard on

18    one last thing that's not been fully fleshed out that

19    Plaintiffs raised previously?

20         THE COURT:  Go ahead.

21         MR. ROSS:  Thank you.  8 U.S.C. 1232 is expressly

22    incorporated into the TVPRA.  Therefore, it is a definition of

23    pro bono counsel that is free to UACs and also at no expense to

24    the Government is contained in there expressly.  Thank you.

25         THE COURT:  Thank you, Mr. Ross.  All right, Counsel,
```

1    I thank you for your presentations today and for all of your

2    papers.  We have got them.  We have been pouring through them.

3    We will continue to pour through them, and you will get an

4    order as soon as we are able.  Thank you-all.  Have a good

5    evening.

6             **MR. ROSS:**  Thank you, Your Honor.

7             **MS. TUMLIN:**  Thank you, Your Honor.

8             **MS. SCOTT:**  Thank you.

9                  (Proceedings adjourned at 3:20 p.m.)

10                      ---oOo---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                      **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:   April 25, 2025

8

9

10

11   _____

12        Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
         United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

APR 25 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO; SOCIAL JUSTICE COLLABORATIVE; AMICA CENTER FOR IMMIGRANT RIGHTS; ESTRELLA DEL PASO; FLORENCE IMMIGRANT AND REFUGEE RIGHTS PROJECT; GALVESTON-HOUSTON IMMIGRANT REPRESENTATION PROJECT; IMMIGRANT DEFENDERS LAW CENTER; NATIONAL IMMIGRANT JUSTICE CENTER; NORTHWEST IMMIGRANT RIGHTS PROJECT; ROCKY MOUNTAIN IMMIGRANT ADVOCACY NETWORK; VERMONT ASYLUM ASSISTANCE PROJECT,<br><br>      Plaintiffs - Appellees,<br><br> v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF THE INTERIOR; OFFICE OF REFUGEE RESETTLEMENT,<br><br>      Defendants - Appellants. | No. 25-2358<br><br>D.C. No.<br>3:25-cv-02847-AMO<br>Northern District of California,<br>San Francisco<br><br>**ORDER** |

Before: TASHIMA, OWENS, and DESAI, Circuit Judges.
Dissent by Judge Bumatay and Judge VanDyke.

Judges Owens and Desai have voted to deny Appellants' petition for

rehearing en banc, and Judge Tashima has so recommended.

The full court was advised of Appellants' petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 40.

Appellants' petition for rehearing en banc, Docket No. 17, is DENIED.

FILED

*Community Legal Servs. in East Palo Alto, et al. v. DHHS, et al.*, No. 25-2358

BUMATAY and VANDYKE, Circuit Judges, joined by CALLAHAN, IKUTA, BENNETT, R. NELSON, BADE, COLLINS, LEE, and BRESS, Circuit Judges, dissenting from the denial of rehearing en banc:

APR 25 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

We respectfully dissent from the denial of the government's request to rehear this case en banc. The government's appeal in this high-profile case raises serious questions about judicial overreach, separation of powers, and the misuse of injunctive relief. Consideration by the full court was therefore warranted to fix the motions panel's errors that entrenched the district court's ruling. Most concerning, the panel's order is contrary to the Supreme Court's recent ruling in an indistinguishable case that presented the same issues.

The Trafficking Victims Protection Reauthorization Act ("TVPRA"), 8 U.S.C. § 1232, directs the Department of Health and Human Services ("HHS") to ensure, "to the greatest extent practicable," that unaccompanied children in immigration custody receive legal representation. *Id.* § 1232(c)(5). Consistent with the TVPRA's requirement that HHS prioritize pro bono counsel, HHS's Office of Refugee Resettlement ("ORR") issued the "Foundational Rule," codified at 45 C.F.R. § 410.1309(a)(4), formalizing the agency's discretion to either fund direct legal representation or secure pro bono counsel. The government exercised this discretion in March 2025 to terminate funding for direct legal services provided by nonprofit subcontractors under a federal contract with the Acacia Center for Justice.

1

Eleven nonprofit legal organizations sued, alleging that the contract termination violated the Administrative Procedure Act ("APA"), the TVPRA, and ORR's regulations.  Following a hearing, the district court granted a temporary restraining order ("TRO") enjoining the government "from withdrawing the services or funds, … particularly ORR's provision of funds for direct legal representation services to unaccompanied children."  In doing so, the district court also refused the government's request for an injunction bond under Rule 65(c).

The government moved to dissolve the TRO after the intervening Supreme Court decision in a closely analogous case.  *See Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam).  But instead of dissolving the TRO, the district court *extended* it to the maximum time allowed by Federal Rule of Civil Procedure 65.

The government immediately sought relief from the Ninth Circuit, arguing that the TRO functioned as a de facto preliminary injunction and was entered without jurisdiction in light of *Department of Education v. California*.  After receiving additional briefing from the parties, the motions panel summarily dismissed the appeal and denied the government's emergency motion to stay the TRO as moot in a one-paragraph order.  The motion panel's order concluded that the district court's temporary restraining order was not appealable and did not reach the merits.  The government then requested en banc review by the full court.  We should have granted it.

2

The Supreme Court has cautioned that a district court cannot "shield its orders from appellate review merely by designating them as [TROs], rather than as preliminary injunctions." *Sampson v. Murray*, 415 U.S. 61, 87 (1974). Just a few weeks ago the Court reiterated that a TRO is appealable under 28 U.S.C. § 1292(a)(1) when it carries "the hallmarks of a preliminary injunction." *Dep't of Educ.*, 145 S. Ct. at 968. Indeed, this court too has made clear it "treat[s] a TRO as a preliminary injunction 'where an adversary hearing has been held, and the court's basis for issuing the order [is] strongly challenged.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018) (quotation omitted).

The district court's TRO in this case has the "practical effect" of a preliminary injunction and it is thus appealable. *Abbott v. Perez*, 585 U.S. 579, 594 (2018) (citation omitted). The Supreme Court has recognized that such "practical effects" include whether the challenged TRO might have "serious, perhaps irreparable, consequence[s]." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981) (internal quotation marks omitted). Another relevant consideration is whether the challenged TRO can be "'effectually challenged' only by immediate appeal." *Id.* (citation omitted); *see also Sampson*, 415 U.S. at 86 n.58 (noting that "the possibility of drastic consequences which cannot later be corrected" is a relevant factor (quoting *Pan Am. World Airways, Inc. v. Flight Eng'rs' Int'l Ass'n*, 306 F.2d 840, 843 (2d Cir. 1962))); *Dep't of Educ.*, 145 S. Ct. at 968.

3

The TRO here exhibits the "hallmarks" and "practical effect" of a preliminary injunction. *Dep't of Educ.*, 145 S. Ct. at 968; *Abbott*, 585 U.S. at 594. To comply with the TRO, the federal government must disburse taxpayer funds, directly impacting the U.S. Treasury and necessarily interfering with the Executive Branch's discretionary administration of ORR funds as allocated by Congress. This will have "serious, perhaps irreparable, consequence[s]," *Carson*, 450 U.S. at 84, because the disbursed funds will be difficult or impossible to recover.[1] Such a "practical effect" is characteristic of mandatory preliminary injunctive relief, not a temporary restraint. *Abbott*, 585 U.S. at 594. And the effect is practically indistinguishable from the effects of the TRO that the Supreme Court held earlier this month constituted an "appealable preliminary injunction." *Dep't of Educ.*, 145 S. Ct. at 968 (construing as an appealable preliminary injunction an order that "enjoin[ed] the Government from terminating various education-related grants" and "require[d] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue").

---

[1] Underscoring the permanent and irreparable harm to the government from the disbursement of the funds at issue, the district court refused to set a bond under Rule 65(c) of the Federal Rules of Civil Procedure. Fed R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (emphasis added)).

4

In addition to being on all fours with the TRO that the Supreme Court construed as a preliminary injunction in *Department of Education*, the TRO here also satisfies the sufficient condition articulated by this court in *East Bay*. 932 F.3d at 762 ("We treat a TRO as a preliminary injunction where an adversary hearing has been held, and the court's basis for issuing the order [is] strongly challenged." (internal quotation marks and citation omitted)). The parties had an opportunity to be heard, and the district court issued the TRO based on briefing. *See id.* at 763 (citing the appealing party's opportunity to brief and be heard as an important factor supporting appealability). And "the [district] court's basis for issuing the order [is] strongly challenged" because it likely lacked jurisdiction for the same reasons the Supreme Court identified earlier this month in *Department of Education*. *See* 145 S. Ct. at 968.

The trajectory of that case may sound familiar. There, a group of States brought an APA challenge to the cancellation of several federal grants. *See id.* A district court granted a TRO and effectively required the government to pay out past-due grant obligations. *Id.* The government appealed and moved for a stay pending appeal, which was denied, and the government then filed an application with the Supreme Court to vacate the TRO. *Id.* The Supreme Court held that the government was likely to succeed in showing that the district court lacked jurisdiction to order the payment of money under the APA. *Id.* The Court explained that "the APA's

<center>5</center>

limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money'" as the district court had ordered the government to do, and that "the Tucker Act grants the Court of Federal Claims jurisdiction over [such] suits." *Id.* (citation omitted). The Supreme Court thus stayed the district court's TRO.

That analysis should have controlled this case. As in *Department of Education*, Plaintiffs here proceeded under the APA seeking monetary relief, and the district court issued an order "to enforce a contractual obligation to pay money." *Id.* (quotation omitted). But the Supreme Court made crystal clear its skepticism about the federal district court's jurisdiction over claims like this one: claims that seek "to order the payment of money under the APA" or "enforce a contractual obligation to pay money." *Id.* (quotation marks and citation omitted). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)). Thus, "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* (citation omitted).

*Department of Education* cannot be distinguished on the ground that the Plaintiffs here instead seek forward-looking injunctive relief to enforce the provisions of the TVPRA and Foundational Rule rather than monetary relief for

6

past-due contractual breaches.  The district court in *Department of Education* did not *expressly* require the payment of past-due amounts and instead required the restoration of the status quo.  *See California v. Dep't of Educ.*, No. CV 25-10548-MJJ, 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025).  And the Supreme Court understood the district court's order to "enjoin[] the Government from terminating various … grants."  *Department of Education*, 145 S. Ct. at 968.  The district court in this case styled its relief in much the same way, "enjoin[ing]" the defendants "from withdrawing the services or funds provided by the [ORR]."  Because Plaintiffs' lawsuit still fundamentally seeks "to enforce a contractual obligation to pay money," it cannot be brought under the APA—just as in *Department of Education*.

That the TRO expires in just a few days, on April 30, 2025, did not provide a valid basis for denying en banc review.  That timing rationale will always exist in every case involving a preliminary injunction masquerading as a TRO—including the *Department of Education* case where the Supreme Court recently stayed the district court's TRO.  *See id.* at 970 (Jackson, J., dissenting) (reasoning that the Court should have denied review because "[t]he TRO expires in three days").  Ultimately, this case merited en banc review for the same reason the Supreme Court acted in *Department of Education*.  The limited time period of the TRO does not change the reality that the district court here acted without jurisdiction.  And "[a]ny time [the government] is enjoined by a court from effectuating statutes enacted by

7

representatives of its people, it suffers a form of irreparable injury." *Maryland v King*, 567 U. S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). If the limited duration of a TRO was always a reason to avoid en banc review, district courts could routinely interfere with executive actions for up to 28 days notwithstanding their complete lack of jurisdiction. We should have taken this case en banc to reinforce that is not acceptable.

\* \* \*

Our court should have taken this case en banc to fix the motions panel's errors in dismissing this appeal and denying the government's motion for a stay. The ink is barely dry on the Supreme Court's decision in *Department of Education*, yet our court has disregarded it in two respects—ignoring its conclusion controlling our jurisdiction to hear appeals of certain TROs, as well as its conclusion governing a district court's jurisdiction to interfere with government contracts. It is unfortunate that we are leaving this to the Supreme Court to (once again) deal with, instead of appropriately addressing it ourselves en banc.

8

1

2

3

4                           UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7    COMMUNITY LEGAL SERVICES IN              Case No.  25-cv-02847-AMO
     EAST PALO ALTO, et al.,

8                    Plaintiffs,              **ORDER GRANTING PLAINTIFFS'**
                                              **MOTION FOR PRELIMINARY**
9           v.                                **INJUNCTION**

10   UNITED STATES DEPARTMENT OF              Re: Dkt. No. 37
     HEALTH AND HUMAN SERVICES, et

11   al.,

12                   Defendants.

13

14          This matter comes before the Court on a Motion for Preliminary Injunction filed by

15   Plaintiff nonprofit organizations that provide legal representation to unaccompanied children in

16   immigration courts across the country.  Plaintiffs challenge the recent termination of funding for

17   counsel representing unaccompanied children by Defendants the United States Department of

18   Health and Human Services ("HHS"), HHS's Office of Refugee Resettlement ("ORR"), and the

19   United States Department of the Interior ("DOI") (collectively, "Government" or "Defendants").

20   Having considered Plaintiffs' motion, Defendants' response, the arguments of the Parties at the

21   April 23, 2025 hearing, and the relevant case law, the Court hereby **GRANTS** Plaintiffs' Motion

22   for Preliminary Injunction for the following reasons.

23   **I.      BACKGROUND**

24           **A.      Legal Framework**

25          Congress established a coordinated scheme to govern the legal representation of

26   unaccompanied children in immigration proceedings, a scheme primarily reflected in two statutes:

27   the Homeland Security Act of 2002 ("HSA") and the William Wilberforce Trafficking Victims

28

Protection Act of 2008 ("TVPRA").  Giving effect to the TVPRA, ORR promulgated the Unaccompanied Children Program Foundational Rule.

As relevant to this case, the HSA defines an "unaccompanied alien child" (hereafter "unaccompanied children") as "a child who – (A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom – (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody."  6 U.S.C. § 279(g)(2).  Further, the HSA assigns ORR broad authority over the care and custody of unaccompanied children while they are in federal custody.  This authority includes coordinating their care and placement, ensuring their best interests in custodial decisions, and developing plans to "ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such child."  6 U.S.C. § 279(b)(1)(A).  These responsibilities are carried out through cooperative agreements and contracts with care providers under ORR policies and oversight.  *See* 6 U.S.C. § 279(b)(1); 31 U.S.C. § 6305.

Congress enacted the TVPRA to strengthen protections for unaccompanied children. Consistent with the HSA, the TVPRA makes the HHS Secretary responsible for the care and custody of unaccompanied children.  8 U.S.C. § 1232(b)(1).  It requires HHS to "ensure, to the greatest extent practicable . . . , that all unaccompanied alien children . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking."  8 U.S.C. § 1232(c)(5).

In April 2024, ORR promulgated the Unaccompanied Children Program Foundational Rule ("Foundational Rule"), codified at 45 C.F.R. Part 410, to establish comprehensive regulations governing programs for unaccompanied children.  The Foundational Rule, which became effective July 1, 2024, provides that ORR "shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children" only "to the extent ORR determines that appropriations are available," and only if securing pro bono counsel is "not practicable."  45 C.F.R. § 410.1309(a)(4).  Other subsections of the Foundational Rule impose obligations – requiring, for example, ORR to ensure unaccompanied children receive mandatory

2

services such as a "presentation concerning the rights and responsibilities of undocumented children," "information regarding the availability of free legal assistance," and a "confidential legal consultation." 45 C.F.R. § 410.1309(a)(2)(i)-(v).

### B. Congressional Funding and ORR's Termination

Since 2012, Congress has consistently appropriated funds for the direct legal representation of unaccompanied children in immigration proceedings, including the most recent appropriation for over $5 billion to ensure "all children . . . have access to counsel in their immigration proceedings." Compl. ¶¶ 77-87. Congressional appropriations for direct legal representation of unaccompanied children remain available until September 2027, including funds appropriated as recently as March 15, 2025, one week before the Government's challenged actions. *See, e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, Div. A Tit. I Sec. 1101(8) (2025); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 665-666 (2024); S. Rep. 118-84, at 169. Despite funding being available, ORR decided on or about March 20, 2025, to partially terminate the contract funding direct legal representation services. Biswas Decl. (ECF 24-1) ¶¶ 12-13. This termination followed a directive memorandum signed by the Acting Assistant Secretary of the Administration for Children and Families dated February 3, 2025. *Id.* ¶¶ 13-14; *see also* Biswas Decl., Ex. 1 (ECF 24-2, the "Secretarial Directive"). The Secretarial Directive instructed agency personnel to pause all payments to contractors and vendors related to immigration and refugee resettlement "for payment integrity." *Id.* On March 21, 2025, DOI sent a letter to Acacia Center for Justice, the sole contractor for direct representation legal services, terminating the contract line items through which HHS and ORR provided funding for counsel for unaccompanied children in immigration proceedings. Compl. ¶ 11; Biswas Decl. ¶ 12, Ex. 2 (ECF 24-3, the "Cancellation Order"). The Cancellation Order instructed Acacia to "immediately stop all work" on the contract. *Id.* The Cancellation Order terminated funding for direct legal representation services "for the Government's convenience" and made no reference to the Secretarial Directive. *Id.* Acacia notified its direct representation subcontractors, including Plaintiffs, of the Cancellation Order the same day. *See, e.g.*, FIRRP Decl. (ECF 7-4) ¶ 32.

United States District Court
Northern District of California

### C.    Plaintiff Organizations

Plaintiffs include the following organizations: Community Legal Services in East Palo Alto, Social Justice Collaborative, Amica Center for Immigrant Rights, Estrella del Paso, Florence Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project, Immigrant Defenders Law Center, National Immigrant Justice Center, Northwest Immigrant Rights Project, Rocky Mountain Immigrant Advocacy Network, and Vermont Asylum Assistance Project (collectively, "Plaintiffs").  Plaintiffs previously received funding for their work from ORR disbursed through Acacia Center for Justice.  Compl. ¶¶ 64-65; 88.  The organizations share the mission of ensuring persons in immigration proceedings, including the uniquely vulnerable population of unaccompanied children, have legal representation.  *See, e.g.*, FIRRP Supp. Decl. (ECF 37-5) ¶ 5 ("Since the Florence Project began serving children in 2000, a central tenet of our mission has been that no child should have to stand alone in court."); NWIRP Decl. (ECF 7-10) ¶¶ 1-2 (Northwest Immigrant Rights Project "provides legal services to unaccompanied immigrant children and youth" in accordance with its "mission to promote justice by defending and advancing the rights of immigrants through direct legal services, systemic advocacy, and community education."); KIND Decl. (ECF 7-18) ¶ 1 (describing KIND's "mission [to] ensur[e] that no child appears in immigration court without high-quality legal representation."); *see also* Compl. ¶ 102.

In response to the Cancellation Order, and the resulting funding termination, Plaintiffs state that they have been forced to choose between cutting vital organizational programs or dismissing their specialized and seasoned attorneys.  *See, e.g.*, GHIRP Supp. Decl. (ECF 53-2) ¶ 3 (describing the layoff of eight staff members due to the Cancellation Order's termination of funding.  Further, the Cancellation Order prevents Plaintiffs from providing thousands of unaccompanied children direct representation, impeding Plaintiffs from ensuring unaccompanied children are supported by legal counsel.  *See, e.g.*, Estrella del Paso Supp. Decl. (ECF 53-4) ¶¶ 3-4; ImmDef Supp. Decl. (ECF 53-5) ¶ 8.  The unaccompanied children to whom Plaintiffs would normally have provided representation are instead facing immigration court proceedings without counsel.  *See, e.g.*, GHIRP Supp. Decl. (ECF 53-2) ¶¶ 4-7. Consequently, "[t]his means that

1   children who want voluntary departure will have their return home unacceptably delayed, [and]

2   victims of trafficking will not be able to access the protections they deserve[.]"  ImmDef Decl.

3   (ECF 7-8) ¶ 25.

4       **D.**    **Procedural History**

5         Plaintiffs brought this lawsuit against the Government on the bases that the Cancellation

6   Order (1) violates the TVPRA, (2) conflicts with the Foundational Rule, and (3) constitutes an

7   "arbitrary and capricious" agency action, each of which gives rise to a claim for violation of the

8   Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).  Compl. ¶¶ 127-46.

9         On March 27, 2025, Plaintiffs filed a motion for temporary restraining order ("TRO") and

10  preliminary injunction.  ECF 7.  The Court issued an order setting a hearing, as well as a deadline

11  for the Government's written response to Plaintiffs' TRO motion.  ECF 17.  On March 31, 2025,

12  in accordance with the schedule set on March 27, the Government filed its opposition to Plaintiffs'

13  motion.  *See* ECF 24.  On April 1, 2025, the parties appeared for a hearing on Plaintiffs' motion.

14  ECF 30.

15        After taking the matter under submission, the Court granted Plaintiffs' motion, issued a

16  TRO, and set an expedited briefing schedule on Plaintiffs' request for a preliminary injunction.

17  ECF 33.  The TRO provided,

18
19
>   Defendants are **ENJOINED** from withdrawing the services or funds
>   provided by the Office of Refugee Resettlement ("ORR") as of
>   March 20, 2025, under the Trafficking Victims Protection
>   Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5),
>   and ORR's Foundational Rule, 45 C.F.R. § 410.1309(a)(4),
>   particularly ORR's provision of funds for direct legal representation
>   services to unaccompanied children.  This injunction precludes
>   cutting off access to congressionally appropriated funding for its
>   duration.

20
21
22

23  ECF 33 at 7.

24        After the TRO grant, several motions were filed.  Plaintiffs filed their motion for

25  preliminary injunction (ECF 37), as well as two motions to enforce the TRO (ECF 40, ECF 53).

26  The Government moved to dissolve the TRO (ECF 38) and for recusal of a district judge pursuant

27  to Title 28 U.S.C. § 455 (ECF 47).  Finding that consideration of the recusal motion constituted

28  good cause, the Court extended the TRO for an additional 14 days in accordance with Federal

United States District Court
Northern District of California

5

1    Rule of Civil Procedure 65(b)(2), set a briefing schedule on the recusal motion, and continued the

2    hearing on Plaintiffs' motion for preliminary injunction.  *See* ECF 48.  The Government sought to

3    appeal the TRO following its extension.  ECF 56.  The Government additionally moved to stay the

4    TRO pending that appeal.  ECF 57.

5           Following complete briefing, this Court denied the Government's motion for recusal.  ECF

6    69.  A panel of the Ninth Circuit subsequently determined that the TRO was not appealable and

7    dismissed the Government's appeal, *see Cmty. Legal Servs. in East Palo Alto v. Dept. Health &*

8    *Hum. Servs.*, Case No. 25-2358, Order (9th Cir. Apr. 18, 2025), rendering the Government's

9    motion for a stay pending appeal (ECF 57) moot.[1]  The Court denied the Government's motion to

10   dissolve the TRO by written order dated April 21, 2025.  ECF 75.  At the time of writing, the TRO

11   remains in effect.

12   **II.     DISCUSSION**

13          Plaintiffs move for a preliminary injunction on much of the same reasoning underlying the

14   TRO.  The Government opposes on several bases.  The Court first addresses the Government's

15   arguments regarding threshold issues of standing and subject matter jurisdiction before turning to

16   the merits of Plaintiffs' motion.

17          **A.      Plaintiffs' Standing**

18          The Court understands the Government to challenge Plaintiffs' standing under two

19   theories.  First, the Government contends that Plaintiffs lack Article III standing to bring this

20   lawsuit because Plaintiffs' purported harms are not redressable by a favorable ruling from this

21   Court.  Second, the Government contends that Plaintiffs fall outside the "zone of interests"

22   necessary to bring their APA claims.  Though not squarely challenged by Government, the Court

23   first considers whether the Plaintiffs have adequately established organizational injury in fact in

24   support of Article III standing and then takes up each of the Government's standing arguments in

25   turn.

26   _____

27   [1] The Government sought en banc review, which was denied.  *Cmty. Legal Servs. in E. Palo Alto v. United States Dept. of Health and Human Servs.*, No. 25-2358, 2025 WL 1203167, at *1 (9th Cir. Apr. 25, 2025).

28

6

United States District Court
Northern District of California

### 1.      Article III

Article III standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* at 338 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

#### a.      Organizational Injury in Fact

"Organizations can assert standing on behalf of their own members, or in their own right[.]" *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021) ("*EBSC III*") (citations omitted). "[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *Id.* at 663; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (setting forth organizational standing test of "frustration of mission" coupled with "diversion of resources"). Organizational plaintiffs may also "demonstrate organizational standing" by showing that a government policy "will cause them to lose a substantial amount of funding." *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 766-67 (9th Cir. 2018) ("*EBSC I*").

Here, Plaintiffs establish that the Government's conduct "has frustrated [their] mission and caused [them] to divert resources in response to that frustration of purpose." *EBSC III*, 993 F.3d at 663. The organizations share the mission of ensuring persons in immigration proceedings, including the uniquely vulnerable population of unaccompanied children, have legal representation. *See, e.g.*, FIRRP Supp. Decl. (ECF 37-5) ¶ 5 ("Since the Florence Project began serving children in 2000, a central tenet of our mission has been that no child should have to stand alone in court."); NWIRP Decl. (ECF 7-10) ¶¶ 1-2 (Northwest Immigrant Rights Project "provides legal services to unaccompanied immigrant children and youth" in accordance with its "mission to promote justice by defending and advancing the rights of immigrants through direct legal services, systemic advocacy, and community education."); KIND Decl. (ECF 7-18) ¶ 1 (describing KIND's

<div align="center">7</div>

1    "mission [to] ensur[e] that no child appears in immigration court without high-quality legal

2    representation.").  Plaintiffs' missions and ethical duties drive them to continue legal

3    representation of unaccompanied children in immigration proceedings.  By cancelling all funding

4    for direct legal representation of unaccompanied children, the Government "perceptibly impair[s]"

5    Plaintiffs' ability to fulfill their shared organizational mission.  *See EBSC III*, 993 F.3d at 663.

6    Plaintiffs present significant evidence that unaccompanied children were not provided counsel

7    following the Cancellation Order, leaving them unrepresented in immigration proceedings, subject

8    to removal and/or unable to pursue desired relief.  *See, e.g.*, KIND Decl. ¶¶ 13-19; Estrella Supp.

9    Decl. (ECF 40-2) ¶¶ 4-9.  Plaintiffs thus satisfy the "frustration of mission" requirement for

10   organizational standing as set forth by this circuit.

11          In addition to demonstrating a frustration of mission, Plaintiffs must also establish that the

12   Government's actions required them to divert resources that they would have spent in other ways.

13   *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F3d 936, 943 (9th

14   Cir. 2011).  Plaintiffs have needed to draw on funds intended for other organizational purposes to

15   respond to the suddenly diminished funding resulting from the Government's Cancellation Order.

16   *See, e.g.*, FIRRP Supp. Decl. (ECF 37-5) ¶ 3 ("Florence Project has continued to provide services

17   to our clients, drawing on funding from other sources and fundraising to ensure that we are able to

18   provide legal representation, pro bono placement and mentoring, additional legal services, court

19   preparation, and friend of court services to unrepresented children in keeping with our mission for

20   as long as we can responsibly financially manage to do so."); NIJC Supp. Decl. (ECF 37-11) ¶ 3

21   ("Since the ORR funding ceased, NIJC was forced to temporarily shift staff members to work on

22   other NIJC projects.").  Given the ways in which Plaintiffs have had to divert resources to

23   adequately advocate for unaccompanied children, there can be little doubt that the Government's

24   conduct has "impaired [Plaintiffs'] ability to provide [legal] services" to unaccompanied children,

25   and "there can be no question that the organization[s] ha[ve] suffered injury in fact."  *Havens*, 455

26   U.S. at 379; *see also EBSC III*, 993 F.3d at 663 (finding standing where new administrative rule

27

28

United States District Court
Northern District of California

8

barring access to asylum procedures for certain migrants caused diversion of resources for organizations formed to assist asylum seekers).[2]

### b.    Redressability

The Government asserts that Plaintiffs cannot satisfy Article III's requirements because they cannot establish that a favorable ruling would redress their alleged injuries. *See* Opp. at 12-14. Redressability, the third element of Article III standing, demands that it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (citation and internal quotation marks omitted). Plaintiffs' burden to establish redressability is "relatively modest." *Bennett v. Spear*, 520 U.S. 154, 171 (1997); *Tucson v. City of Seattle*, 91 F.4th 1318, 1325 (9th Cir. 2024). "Plaintiffs need not demonstrate that there is a guarantee that their injuries will be redressed by a favorable decision." *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (internal citation and quotation omitted). Rather, Plaintiffs need only show that a favorable decision would result in a "change in a legal status," and that a "practical consequence of that change would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002).

The Government argues that Plaintiffs' purported harms are not redressable because the agencies hold no obligation to continue to fund the Plaintiff organizations. Opp. at 12-13. However, this argument distorts Plaintiffs' claims as sounding in contract, an incorrect characterization for reasons discussed in greater depth below. *See* Section II.B. Plaintiffs pursue injunctive relief requiring the Government to ensure legal representation of unaccompanied children in immigration proceedings. Plaintiffs concede that the Government can accomplish this by means other than by paying for their services and, if the Government takes steps to ensure direct representation through others, the harm Plaintiffs suffer in the form of providing

---

[2] Though standing is not challenged on this basis, Plaintiffs likely also have standing to challenge the Government's Cancellation Order because of the new and ongoing operational costs they allege. *City and Cnty. of San Francisco v. United States Citizenship and Immigration Servs.*, 944 F.3d 773, 787-88 (9th Cir. 2019). Plaintiffs have suffered near-immediate financial impacts, and they have thus made a sufficient showing of concrete and imminent economic injury. *See, e.g.*, Estrella del Paso Decl. ¶ 13 (describing staff furloughs in response to Cancellation Order).

1    representation without payment or diverting resources would be alleviated.  *See* Reply (ECF 63) at

2    14.  The reinstatement of funding for direct representation to unaccompanied children increases

3    the likelihood that Plaintiffs will obtain relief, either through funding to continue their own

4    representations or an alternative plan providing legal representation to unaccompanied children

5    consistent with the TVPRA and the Foundational Rule.  *Id.*  The requested injunctive relief thus is

6    likely to ensure that the unaccompanied children have and maintain counsel, which will redress

7    the injury to Plaintiffs' missions, and this is sufficient to establish standing.

          **2.**      **APA – Zone of Interests**

9          The Government avers that Plaintiffs fall outside the zone of interests to bring their APA

10   claims because the TVPRA was not enacted to protect service providers' finances or operational

11   goals.  *See* Opp at 7-6.  The Government contends that Plaintiffs fall outside the zone of interests

12   because the organizations are not in the class of unaccompanied minors intended for the TVPRA's

13   protections.  *Id.*  These arguments miss the mark.

14         "The breadth of the zone-of-interests test varies, depending on the provisions of law at

15   issue.  Under the APA, the test is not especially demanding.  The zone-of-interests analysis

16   forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the

17   purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that

18   plaintiff to sue."  *EBSC III*, 993 F.3d at 667 (citing *Lexmark Int'l, Inc., v. Static Control*

19   *Components, Inc.*, 572 U.S. 118, 129 (2014)) (internal quotation marks omitted).  "[B]ecause the

20   APA provides a cause of action only to those 'suffering legal wrong because of agency action . . .

21   within the meaning of a relevant statute,' the relevant zone of interest is that of the" TVPRA.  *See*

22   *id.* at 667.

23         Plaintiffs' interests in ensuring TVPRA protections for unaccompanied children, including

24   direct representation legal services, is consistent with the TVPRA's purpose of "[p]reventing the

25   trafficking of unaccompanied [noncitizen] children found in the United States by ensuring that

26   they are not repatriated into the hands of traffickers or abusive families, and are well cared for."

27   H.R. Rep. No. 110-430 at 35 (2007); *see EBSC III*, 993 F.3d at 668 (concluding that courts are

28   "not limited to considering the specific statute under which plaintiffs sued, but may consider any

PI Appeal and Stay Addendum 908

United States District Court
Northern District of California

United States District Court
Northern District of California

1    provision that helps [them] to understand Congress' overall purposes in enacting the statute.")

2    (internal quotation marks omitted); *see also EBSC I*, 932 F.3d at 768 (finding organizational

3    plaintiffs in the Immigration and Nationality Act's zone of interests because their "interest in

4    aiding immigrants seeking asylum is consistent with the INA's purpose to establish the statutory

5    procedure for granting asylum to refugees") (internal quotation marks and alterations omitted).

6    Under the TVPRA, the Government "shall ensure, to the greatest extent practicable[,] . . . that all

7    unaccompanied [noncitizen] children who are or have been in the custody of the Secretary of

8    [HHS] or the Secretary of Homeland Security . . . have counsel to represent them in legal

9    proceedings" and that, "[t]o the greatest extent practicable, the Secretary of [HHS] shall make

10   every effort to utilize the services of pro bono counsel[.]" 8 U.S.C. § 1232(c)(5). Indeed, ORR

11   contracted with Acacia Center, and Acacia in turn subcontracted with Plaintiffs to fill this role

12   contemplated by the TVPRA. Plaintiffs fit within the zone of interests because their interests are

13   congruent with the TVPRA's and Foundational Rule's beneficiaries, namely, unaccompanied

14   children. Indeed, Plaintiffs' missions align with Congress's purpose in enacting the TVPRA,

15   ensuring representation for unaccompanied children to prevent their trafficking and abuse. *EBSC*

16   *I*, 932 F.3d at 768 (finding organizational plaintiffs in zone of interests where "Congress took

17   steps to ensure that pro bono legal services of the type that the Organizations provide are available

18   to" those protected by the relevant statutes). Given the zone of interests test for APA claims is not

19   "especially demanding," *Lexmark*, 572 U.S. at 130, the Court is persuaded that Plaintiffs have

20   more than met their burden to show that their interests are "marginally related to" and "arguably

21   within" the scope of the relevant statutes. *See EBSC III*, 993 F.3d at 668.

22        **B.    Subject Matter Jurisdiction (Tucker Act)**

23        Having resolved the Government's challenges to Plaintiffs' standing, the Court turns to the

24   Government's argument that the Tucker Act requires Plaintiffs' claims be brought in the Federal

25   Court of Claims because they sound in contract, and thus this Court lacks subject matter

26   jurisdiction. *See* Opp. at 8-11. The Government is mistaken.

27        The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over suits

28   based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

However, "the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). "Generally speaking, the Tucker Act does not permit the [Court of Federal Claims] to grant equitable or declaratory relief." *N. Star Alaska v. United States*, 9 F.3d 1430, 1432 (9th Cir. 1993). "Due to this limited remedial authority, a contract-based action falls within the scope of the Tucker Act only if the plaintiff seeks *money damages* for the breach of a government contract." *United Aeronautical Corp. v. United States Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (emphasis in original). Nonetheless, the Supreme Court has long recognized that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages' " within the meaning of the APA's and Tucker Act's jurisdictional limitations. *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (holding that federal district courts, not the Court of Federal Claims, have jurisdiction to review federal agency action such as the denial of reimbursements owed for Medicaid expenditures).

The Ninth Circuit has held that the Tucker Act " 'impliedly forbid[s]' an APA action seeking injunctive and declaratory relief only if that action is a 'disguised' breach-of-contract claim." *United Aeronautical Corp.*, 80 F.4th at 1026 (citing *Megapulse*, 672 F.2d at 968). To assess whether an APA claim is an improperly disguised contract claim, the court adopted the same two-part test from the D.C. Circuit's *Megapulse* decision, requiring assessment of (1) "the source of the rights upon which the plaintiff bases its claims" and (2) "the type of relief sought (or appropriate)." *United Aeronautical Corp.*, 80 F.4th at 1026 (citing *Doe v. Tenet*, 329 F.3d 1135, 1141 (9th Cir. 2003)); *see also Megapulse*, 672 F.2d at 968. To assess the "source of rights" that form the basis of a plaintiff's claim, the Court must consider whether: (a) the plaintiff's asserted rights and the government's purported authority arise from statute or contract; (b) the plaintiff's rights "exist[ ] prior to and apart from rights created under the contract"; and (c) the plaintiff "seek[s] to enforce any duty imposed upon" the government "by the . . . relevant contracts to which" the government "is a party." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (internal quotations and citations omitted).

United States District Court
Northern District of California

1   Here, the source of Plaintiffs' claims is the APA.  They aver that the Government's refusal

2   to fund direct representation for unaccompanied children violates the agencies' obligations under

3   the TVPRA and the Foundational Rule.  They advance that the Government's conduct gives rise

4   to a claim under the APA as contradictory to law, another claim under the APA as contravening

5   the agencies' regulations, and a third claim under the APA for arbitrary and capricious acts.

6   Plaintiffs assert no breach-of-contract claim for money damages.  Indeed, although the

7   Government repeatedly contends that Plaintiffs seek to enforce contractual rights, the contract

8   underlying the Cancellation Order was between DOI and Acacia Center – these legal services

9   providers were not parties to that contract and assert no rights related to that contract.[3]  Moreover,

10  as discussed above, Plaintiffs' asserted harms arise from the frustration of their mission and

11  diversion of resources to ensure unaccompanied children have legal representation.  Plaintiffs'

12  asserted rights do not rely on or arise from any contract, are not contract claims in disguise, and

13  thus do not implicate the Tucker Act under the first prong of the *Megapulse* test.

14  Turning to the second prong, the type of relief sought, Plaintiffs seek "declaratory and

15  injunctive relief" under the APA to prevent the Government from refusing to fund counsel for

16  unaccompanied children.  Their action does not seek money damages to compensate them for

17  losses; instead, they seek an injunction and vacatur of the purportedly unlawful Cancellation

18  Order.  That such relief may result in the payment of money does not transform their claim into

19  one for money damages.  *Cf. Bowen*, 487 U.S. at 893.  Plaintiffs could not obtain the injunctive

20  relief they seek in the Court of Federal Claims, which "has no power to grant equitable relief[.]"

21  *Richardson v. Morris*, 409 U.S. 464, 465 (1973).  Because Plaintiffs seek injunctive relief rather

22  than money damages, the claims do not implicate the Tucker Act under the second prong of the

23  *Megapulse* test.  Finally, Plaintiffs do not seek to enforce any duty imposed on the Government by

24  a contract.  The Government makes clear that the contract by which ORR funded direct

25

26  _____

27  [3] Even if Plaintiffs brought a claim for breach of the contract between DOI and Acacia Center
    under a theory of third-party liability, they likely would not be able to litigate in the Federal Court
    of Claims – given the absence of privity between the Government and subcontractors like

28  Plaintiffs, there is no express or implied contract that would implicate the Tucker Act.  *See United
    States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550-51 (Fed. Cir. 1983).

PI Appeal and Stay Addendum 911

1    representation of unaccompanied children was coming to a close by its own terms, potentially

2    hampering any potential claim to enforce a duty under that contract.  *See* Biswas Decl. (ECF 24-1)

3    ¶ 11 (stating that the Government's contract with Acacia was set to expire March 29, 2025).

4    Plaintiffs' claims for injunctive relief do not seek enforcement of any contractual duty; rather, they

5    pursue enforcement of the TVPRA and the Foundational Rule.  *See* Compl. ¶¶ 127-46. Because all

6    of the *Crowley Government Services* factors indicate that Plaintiffs' claims do not sound in

7    contract, the Court rejects the Government's argument that it lacks jurisdiction over this case.

8         The Government resists this conclusion by attempting to analogize this case to the

9    Supreme Court's recent order staying a different district court's temporary restraining order in

10   *Department of Education v. California*, 604 U.S. ----, 145 S. Ct. 966 (2025).[4]  In *Department of*

11   *Education*, the state government plaintiffs brought an APA challenge to the Department of

12   Education's termination of contracts for the payment of certain educational grants to the respective

13   states. *Id.*, 145 S. Ct. at 968.  The district court issued a TRO enjoining the Government from

14   terminating the grants and requiring "the Government to pay out past-due grant obligations and to

15   continue paying obligations as they accrue." *Id.*  The Supreme Court granted the Government's

16   request for a stay of the TRO on the basis that the district court "lacked jurisdiction to order the

17   payment of money under the APA." *Id.*  The Court further held, based in significant part on the

18   relief pursued by the state governments, that the Government would likely show the district court

19   lacked jurisdiction over the contractual claims calling for payment, as those claims are committed

20   to the Court of Federal Claims pursuant to the Tucker Act. *Id.* (citing 28 U.S.C. § 1491(a)(1)).

21        In the course of this litigation, this Court has already found *Department of Education*

22   insufficient to warrant dissolution of the TRO.  ECF 75.  It adds that *Department of Education* is

23   distinguishable from Plaintiffs' APA claims related to the termination of funding for legal services

24   for unaccompanied children in immigration proceedings.  These Plaintiffs, in contrast to the state

25   governments in *Department of Education*, are subcontractors lacking privity with the Government,

---

[4] The Government earlier moved to dissolve the TRO in reliance on the same order from the
Supreme Court's emergency docket.  *See* ECF 38.  The Court denied the Government's motion to
dissolve the TRO.  ECF 75.  The Court's earlier reasoning regarding the inapplicability of
*Department of Education* remains applicable.

United States District Court
Northern District of California

1    and they have no contractual rights to enforce.  Moreover, though the Government regularly

2    characterizes their claims as nothing more than a money grab, the legal service providers do not

3    seek payout – they seek to ensure representation for unaccompanied children in immigration

4    proceedings, regardless of which lawyers provide it.  *Department of Education* has no bearing here

5    given the lack of (1) contractual relationship or (2) contractual relief sought against the United

6    States by Plaintiffs, the two hallmarks of actions left to the jurisdiction of the Federal Court of

7    Claims.

8           For these reasons, Plaintiffs' claims have no business before the Federal Court of Claims

9    and this Court has jurisdiction to consider Plaintiffs' APA claims.

10          **C.      Preliminary Injunction**

11          Having rejected the Government's jurisdictional arguments, the Court next examines

12   whether Plaintiffs are entitled to the extraordinary relief they seek.  To obtain preliminary

13   injunctive relief, the moving party must show: (1) a likelihood of success on the merits, (2) a

14   likelihood of irreparable harm to the moving party in the absence of preliminary relief, (3) the

15   balance of equities tips in the favor of the moving party, and (4) an injunction is in the public

16   interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Where the government

17   is a party, courts merge the analysis of the final two *Winter* factors, the balance of equities and the

18   public interest.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing

19   *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Courts "explore the relative harms to applicant and

20   respondent, as well as the interests of the public at large."  *Barnes v. E-Sys., Inc. Grp. Hosp. Med.*

21   *& Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (internal quotation marks and citation omitted).

22   The *Winter* factors may be evaluated on a sliding scale, such that preliminary relief may be issued

23   when the moving party demonstrates "that serious questions going to the merits were raised and

24   the balance of hardships tips sharply in the plaintiff's favor."  *All. for the Wild Rockies v. Cottrell*,

25   632 F.3d 1127, 1134-35 (9th Cir. 2011) (citation omitted).

26          **1.      Likelihood of Success on the Merits**

27          The APA establishes a "basic presumption of judicial review [for] one 'suffering legal

28   wrong because of agency action.' "  *Dep't of Homeland Sec. v. Regents of the Univ. of California*,

United States District Court
Northern District of California

15

PI Appeal and Stay Addendum 913

591 U.S. 1, 16 (2020) (citation omitted). "The [APA] was adopted to provide, inter alia, that administrative policies affecting individual rights and obligations be promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished ad hoc determinations." *Morton v. Ruiz*, 415 U.S. 199, 232 (1974). To that end, "[t]he APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). It authorizes judicial review for those "suffering legal wrong" or "adversely affected" by a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. §§ 702, 704.[5]

The Government contends that Plaintiffs are unlikely to succeed on the merits of their APA claims because the provisions at issue leave discretion to the agencies that evades judicial review. The Court takes up this issue first, and after concluding the conduct at issue is not committed to Government discretion, it then considers the substance of Plaintiffs' three APA claims. Though Plaintiffs' need only show a likelihood of success on one claim to demonstrate likelihood of success in support of a preliminary injunction, the Court analyzes each of their claims.

### a.     Bar to Review

The Government argues that Title 5 U.S.C. § 701(a)(2) precludes judicial review of the Cancelation Order. Section 701(a)(2) provides an exception to the waiver of sovereign immunity found in Sections 702 and 706 of the APA. Under Section 701(a)(2), a court may not review an agency action if the "agency action is committed to agency discretion by law." However, the Section 701(a)(2) waiver is a narrow exception.

An agency action "is committed to agency discretion by law" only "where a statute is drawn in such broad terms that in a given case there is no law to apply, and the court would have no meaningful standard against which to judge the agency's exercise of discretion." *Webster v.*

---

[5] The parties do not appear to dispute that the Cancellation Order constitutes a final agency action for purposes of APA review. In the interest of thoroughness, the Court finds that the Cancellation Order is a final agency action as the Government has not indicated, much less evidenced, that it intends to take further steps in its decision-making process and, thus, the termination of funding leads to legal consequences. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

16

United States District Court
Northern District of California

1  *Doe*, 486 U.S. 592, 592 (1988); *see Jajati v. United States Customs & Border Prot.*, 102 F.4th

2  1011, 1014 (9th Cir. 2024) (holding that the Section 701(a)(2) exception applies when "there is

3  truly no law to apply").  The Supreme Court requires courts to "read the exception in § 701(a)(2)

4  quite narrowly" such that it should apply only in "rare circumstances."  *Weyerhaeuser Co. v. U.S.*

5  *Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).

6  Even when Congress intended to create a wide zone within which decisions are committed to an

7  agency's discretion, the agency still must meet "permissible statutory objectives."  *Lincoln*, 508

8  U.S. at 183.

9        In one of the few cases in which the Supreme Court applied the Section 701(a)(2)

10  exception, it held the exception applied in cases involving "agency decisions that courts have

11  traditionally regarded as unreviewable, such as the allocation of funds from a lump-sum

12  appropriation."  *Weyerhaeuser*, 586 U.S. at 23 (citing *Lincoln*, 508 U.S. at 191).  In *Lincoln*, the

13  Court found the Indian Health Service's particular use of funds from a "lump sum" grant was

14  committed to its discretion because "the very point of a lump-sum appropriation is to give an

15  agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in

16  what it sees as the most effective or desirable way."  *Lincoln*, 508 U.S. at 192.  That is, "a lump-

17  sum appropriation reflects a congressional recognition that an agency must be allowed flexibility

18  to shift funds within a particular appropriation account so that the agency can make necessary

19  adjustments for unforeseen developments and changing requirements."  *Id.* at 193 (internal citation

20  omitted).

21        The Government argues that the appropriation for direct legal representation of

22  unaccompanied children at issue here mirrors the lump sum appropriation over which the Indian

23  Health Service maintained discretion to allocate funds in *Lincoln*.  *See* Opp. at 11-12.  But unlike

24  the appropriation in *Lincoln*, the TVPRA mandates direct legal representation, and Congress has

25  expressly appropriated funds for services required under the TVPRA, including direct

26  representation.  *See, e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L.

27  119-4, Div. A Tit. I Sec. 1101(8) (2025); Further Consolidated Appropriations Act, 2024, Pub. L.

28  118-47, Div. D Tit. I, 138 Stat. 460, 664-65 (2024); S. Rep. 118-84, at 169.  The Government's

PI Appeal and Stay Addendum 915

United States District Court
Northern District of California

1   cancellation of all funding for direct representation is not the type of judgment regarding how to

2   spend appropriated funds that is presumptively committed to agency discretion.

3        Beyond the appropriations question, the Court has several meaningful standards against

4   which to judge the agencies' discretion.  *Cf. Weyerhaeuser*, 586 U.S. at 23.  Indeed, the TVPRA

5   and the Foundational Rule provide "meaningful standards under which courts can review whether

6   [the Government] wielded its discretion in a permissible manner."  *Jajati*, 102 F.4th at 1014.  Both

7   the TVPRA and Foundational Rule include language describing the Government's obligations to

8   fund direct representation.  *See* 8 U.S.C. § 1232(c)(5) (HHS "shall ensure, to the greatest extent

9   practicable," that all unaccompanied children receive legal "counsel to represent them in legal

10  proceedings"); 45 C.F.R. § 410.1309(a)(4) (ORR "shall fund legal service providers . . . subject to

11  ORR's discretion and available appropriations").  Such statutory and regulatory language offers a

12  clear standard to assess the Government's actions; therefore, Section 701(a)(2) does not bar review

13  of the Government's actions in this case.

14               b.        **First Claim – Agency Action Not in Accordance with Law**

15       The APA requires reviewing courts to "hold unlawful and set aside agency action . . .

16  found to be . . . not in accordance with law"; "contrary to constitutional right [or] power"; or "in

17  excess of statutory jurisdiction [or] authority."  5 U.S.C. § 706(2)(A)-(C).  Plaintiffs argue that the

18  Government's termination of funding for direct legal representation violates the TVPRA.  *See*

19  Mot. (ECF 37) at 11.  The relevant subsection provides that the Government "shall ensure, to the

20  greatest extent practicable," that all unaccompanied children receive legal "counsel to represent

21  them in legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking."

22  8 U.S.C. § 1232(c)(5).[6]  By cancelling all funding for direct representation of unaccompanied

23

24  [6] The provision reads in full:

25       The Secretary of Health and Human Services shall ensure, to the
         greatest extent practicable and consistent with section 292 of the
26       Immigration and Nationality Act (8 U.S.C. 1362), that all
         unaccompanied alien children who are or have been in the custody
27       of the Secretary or the Secretary of Homeland Security, and who are
         not described in subsection (a)(2)(A), have counsel to represent
28       them in legal proceedings or matters and protect them from
         mistreatment, exploitation, and trafficking. To the greatest extent

                                    18

1    children and failing to ensure that the children receive counsel when funds remain available for

2    that purpose, Plaintiffs contend, the Government violates the express mandate of the TVPRA.

3         The Government asserts that the TVPRA "does not mandate government-funded legal

4    representation," Opp (ECF 55) at 9, arguing Section 235 of the TVPRA merely "encourages"

5    HHS to ensure unaccompanied children have counsel "to the greatest extent practicable," *id.* at 11.

6    The Court disagrees.  Section 235 creates an affirmative obligation on the Government, requiring

7    the agencies "shall ensure" unaccompanied children have legal counsel "to the greatest extent

8    practicable."  8 U.S.C. § 1232(c)(5).  There is no dispute that congressionally appropriated funds

9    for legal representation are available, making the provision of direct legal services "practicable,"

10   particularly in the absence of alternative methods to provide counsel.  *See* Further Consolidated

11   Appropriations Act, 2024, Pub. L.118-47, § 4, 130 Stat. 460, 461.  The Government here

12   terminated all funding for direct legal services through its Cancellation Order, *see* Biswas Decl.,

13   Ex. 2 (ECF 24-3), effectively eliminating direct representation for unaccompanied children.

14   Amica Supp. Decl. ¶ 8; VAAP Decl. (ECF 7-7) ¶¶ 20-21.  While the Government posits that " 'to

15   the greatest extent practicable' cannot reasonably be construed as a mandate for HHS to

16   unconditionally pay for direct immigration legal representation for all" unaccompanied children,

17   that is not what Plaintiffs seek nor what the TVPRA requires.  Opp. at 15.  The TVPRA's proviso

18   that HHS "shall ensure" counsel to represent unaccompanied children "to the greatest extent

19   practicable" requires something more than zero expenditure where appropriated funds are

20   available and the agencies fail to show any effort to ensure representation through alternative

21   means.  The Government violates the TVPRA by withholding funding for direct legal

22   representation entirely, with no supplemental plan to ensure unaccompanied children have legal

23   counsel "to the greatest extent practicable."  *Cf. Pacito v. Trump*, No. 2:25-CV-255-JNW, 2025

24   WL 655075, at *18 (W.D. Wash. Feb. 28, 2025) (finding that withholding congressionally

25

26   _____

27        practicable, the Secretary of Health and Human Services shall make
         every effort to utilize the services of pro bono counsel who agree to
         provide representation to such children without charge.

28   8 U.S.C. § 1232(c)(5).

19

appropriated funding for private service providers likely violated the APA and supported the grant of a preliminary injunction).  On this basis, Plaintiffs show likelihood of success on their first APA claim.

### c.    Second Claim – *Accardi* Violation

Under the *Accardi* doctrine, "an administrative agency is required to adhere to its own internal operating procedures."  *Church of Scientology of Cal. v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)).  In accordance with this principle, agencies must follow a regulation if they promulgate one.  *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003).  To establish an APA claim under the *Accardi* doctrine, Plaintiffs must show both that (1) the Government violated its own regulations, and (2) Plaintiffs suffer substantial prejudice as a result of that violation.  *See Al Otro Lado, Inc. v. Mayorkas*, 2024 WL 4370577, at *8-9 (S.D. Cal. Sept. 30, 2024).

Here, Plaintiffs aver that the Government violated the Foundational Rule, under which "ORR shall fund legal service providers" "[t]o the extent ORR determines that appropriations are available and insofar as it is not practicable for ORR to secure pro bono counsel."  45 C.F.R. § 410.1309(a)(4).[7]  The Government argues that interpreting the Foundational Rule to require

---

[7] The provision reads in full:

> Direct immigration legal representation services for unaccompanied children currently or previously under ORR care. To the extent ORR determines that appropriations are available, and insofar as it is not practicable for ORR to secure pro bono counsel, ORR shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children, subject to ORR's discretion and available appropriations. Examples of direct immigration legal representation include, but are not limited to:

> (i) For unrepresented unaccompanied children who become enrolled in ORR Unaccompanied Refugee Minor (URM) programs, provided they have not yet obtained immigration relief or reached 18 years of age at the time of retention of an attorney;

> (ii) For unaccompanied children in ORR care who are in proceedings before EOIR, including unaccompanied children seeking voluntary departure, and for whom other available assistance does not satisfy the legal needs of the individual child;

> (iii) For unaccompanied children released to a sponsor residing in the defined service area of the same legal service provider who

20

United States District Court
Northern District of California

1   continued funding of direct representation for unaccompanied children conflicts with Title 8

2   U.S.C. § 1362, which provides that the privilege of being represented by counsel in immigration

3   proceedings shall be "at no expense to the Government." *See* Opp. at 15. The Court finds no

4   conflict between these two provisions. Section 1362 simply clarifies that *Gideon v. Wainwright*,

5   372 U.S. 335 (1963), does not extend to immigration proceedings – meaning persons subject to

6   removal proceedings have a right to counsel, but that right does not require the Government to

7   provide such counsel. The Foundational Rule does not conflict with Section 1362 because it does

8   not create a substantive right to counsel at the expense of the Government. Instead, it creates an

9   obligation for ORR to seek out direct representation counsel for unaccompanied children,

10  including by securing pro bono counsel or utilizing appropriated funds when ORR is not able to

11  secure pro bono counsel. It is undisputed that appropriations for direct representation remain

12  available, and the Government has evidenced no effort to ensure pro bono counsel. Thus, the

13  Government cannot invoke this perceived statutory conflict as a basis for failing to comply with its

14  obligations under the Foundational Rule.

15          Changing tack, the Government next acknowledges the Foundational Rule obliges ORR to

16  "fund legal service providers to provide direct immigration legal representation for certain

17  unaccompanied children," but emphasizes the discretion ORR retains, as the obligation to fund

18  exists only "to the extent ORR determines that appropriations are available," and only if securing

19  pro bono counsel is impractical. 45 C.F.R. § 410.1309(a)(4). The Government contrasts this

20  provision to other subsections that leave ORR no discretion. For instance, the Foundational Rule

21  explicitly requires ORR to ensure unaccompanied children receive mandatory services such as a

22  "presentation concerning the rights and responsibilities of undocumented children," "information

23  regarding the availability of free legal assistance," and a "confidential legal consultation." 45

24  C.F.R. § 410.1309(a)(2)(i)-(v). According to the Government, this intentional distinction clarifies

25  _____

26          provided the child legal services in ORR care, to promote continuity
        of legal services; and

27          (iv) For other unaccompanied children, to the extent ORR
        determines that appropriations are available.

28  45 C.F.R. § 410.1309(a)(4).

United States District Court
Northern District of California

1    that direct funding for legal representation remains discretionary, conditional upon the availability

2    of appropriations, and subject to agency determination.

3          Even so, the Government's argument does not address Plaintiffs' claim.  The Government

4    may be right that it retains some modicum of discretion related to how direct representation legal

5    services are provided and to what degree the Government funds them; however, the Cancellation

6    Order contravenes the Foundational Rule.  The termination of all direct representation funding is

7    incompatible with the Foundational Rule's requirement that the agency "shall fund" direct

8    representation so long as funds remain available and pro bono legal services are not secured.  The

9    Government proffers no evidence that it found pro bono counsel or even sought out alternative

10   representation for the unaccompanied children.  Plaintiffs are prejudiced by the Government's

11   failure to comply with the Foundational Rule because they are inhibited in their ability to fulfill

12   their missions of ensuring representation for unaccompanied children.  *See* Section II.A.1.a, above.

13   The Government's Cancellation Order thus violates the Foundational Rule, and Plaintiffs have

14   shown a likelihood of success on their APA claim under the *Accardi* doctrine.

15                    **d.       Third Claim – Arbitrary and Capricious Agency Action**

16         "[T]he touchstone of 'arbitrary and capricious' review under the APA is 'reasoned

17   decisionmaking.' "  *Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1080 (9th Cir. 2019)

18   (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

19   52 (1983)).  "[A]n agency's action can only survive arbitrary or capricious review where it has

20   articulate[d] a satisfactory explanation for its action including a rational connection between the

21   facts found and the choice made."  *Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th

22   Cir. 2023) (citing *Altera Corp. & Subsidiaries*, 926 F.3d at 1080).  "Although we may uphold a

23   decision of less than ideal clarity if the agency's path may reasonably be discerned, we may not

24   infer an agency's reasoning from mere silence."  *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th

25   Cir. 2008) (citations and quotation marks omitted).  As the Supreme Court has elucidated, "[a]n

26   agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that

27   are still on the books.  And of course the agency must show that there are good reasons for the

28   new policy," even though it need not convince the court of the merits of its new policy.  *FCC v.*

United States District Court
Northern District of California

*Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (internal citation omitted).  Also, where an agency action rescinds a prior policy, the agency must show that it gave due consideration to "serious reliance interests."  *Id.* at 515; *see also Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. at 30 ("[W]hen an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].' ").

Here, only two documents are proffered to provide insight into the Government's change in position – the February 3, 2025 Secretarial Directive and the March 21, 2025 Cancellation Order.  *See* Biswas Decl., Ex. 1 (ECF 24-2) & Ex. 2 (ECF 24-3).[8]  Neither of the documents contemplates any alternatives to the existing policy of funding legal services providers for direct representation.  *Cf. Regents*, 591 U.S. at 30.  Neither of the documents finds any facts that would support the decision to terminate all funding, nor do they draw a rational connection between any facts considered and the decision made "for the Government's convenience."  Biswas Decl., Ex. 2 (ECF 24-3).  Rather, the Government identifies, for the first time in its opposition, a handful of rationales for the decision to terminate funding for direct legal services, including "sustainability" and "fiscal constraints."  The Government contends that "ORR's rationale, focusing on legal orientation and screenings to ensure all UAC receive basic legal information, while trusting that pro bono resources (supplemented by post-release services and child advocates in special cases) will provide representation in meritorious cases, is a rational strategy to fulfill its statutory obligations in a sustainable way."  Opp. at 17; *see also* Opp. at 17-18 (alternatively detailing the rationale, without supporting citation, as "aligning with the TVPRA's pro bono preference, addressing fiscal constraints, and rebalancing priorities to ensure core legal orientation and screening services reach all" unaccompanied children).  None of these rationales are evidenced in the record.  Neither of the agency documents in evidence refers to "legal orientation and

---

[8] The Government has so far refused to produce any administrative record to justify the funding termination decision until it files its answer.  Amica Supp. Decl. (ECF 37-15) ¶ 13.  Moreover, though the Government argues that "the administrative record here reflects a reasoned decision," Opp. at 17, when pressed at the preliminary injunction hearing about the administrative record in this case, the Government conceded that its briefs should refer instead to "record evidence" in the absence of an administrative record.  Hr'g Tr. (ECF 83) at 22-23.

23

1  screenings" as a policy course to replace direct legal representation.  Moreover, those legal

2  services are separately required by the Foundational Rule.  *See* 45 C.F.R. § 410.1309(a)(2)

3  (enumerating a panoply of services an "unaccompanied child in ORR's legal custody child shall

4  receive").  The Government's interpretation essentially reads the direct legal representation

5  contemplated in (a)(4) out of the Foundational Rule.  Further, neither of the agency documents in

6  evidence refers to pro bono resources as a replacement for the direct legal representation available

7  by use of congressionally earmarked funds.[9]  "It is a foundational principle of administrative law

8  that judicial review of agency action is limited to the grounds that the agency invoked when it took

9  the action."  *Regents*, 591 U.S. at 20 (internal quotation marks and citation omitted).  The

10  Government's attempt to make up for its failure to provide meaningful explanation for the funding

11  termination amounts to post hoc rationalization via attorney argument.  This is insufficient to

12  overcome the Government's failure to proffer any competent evidence of reasoned decision

13  making.  Though the Government characterizes this litigation as "a disagreement over policy,"

14  Opp. at 19, the agencies have failed to identify any reasoned policy with which Plaintiffs could

15  disagree – there are no materials showing even the "minimal level of analysis" required under the

16  APA.  *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016).  On this record, the

17  Court finds that Plaintiffs show a likelihood of success on their third APA claim for arbitrary and

18  capricious agency action.

### 2.  Irreparable Harm

20  Beyond establishing a likelihood of success of the merits, plaintiffs seeking a preliminary

21  injunction must show that they are likely to suffer irreparable harm without preliminary relief.

22  *Winter*, 555 U.S. at 20.  "Irreparable harm is traditionally defined as harm for which there is no

23  adequate legal remedy, such as an award of damages."  *Arizona Dream Act Coal. v. Brewer*, 757

24  F.3d 1053, 1068 (9th Cir. 2014) (citation omitted).  A "showing of a mere possibility of

[9] Because the exclusive use of pro bono attorneys to replace government-funded direct representation does not find any support in the record, the Court does not reach the parties' further dispute regarding the viability of relying exclusively on pro bono counsel to represent unaccompanied children.  *See* Opp. at 19; Reply at 12; *see also* Amicus Br. Former HHS Officials (ECF 78) at 7-9 (describing impracticability of replacing funded direct representation with pro bono counsel).

irreparable harm is not sufficient under *Winter*." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 468 (9th Cir. 2010).

Here, Plaintiffs have shown that they are likely to suffer, if not already suffering, irreparable harm in the absence of preliminary relief. The Government's termination of funding has impacted Plaintiffs, forcing them to issue layoff notices and threatening to require them to dismiss their specialized and seasoned attorneys. *See* GHIRP Decl. (ECF 53-2) ¶ 3 (describing the layoff of eight staff members due to the Cancellation Order's termination of funding). As the Court noted in its standing analysis, the Cancellation Order prevents Plaintiffs from providing thousands of unaccompanied children with the direct representation required by the TVPRA and the Foundational Rule, frustrating Plaintiffs' missions of ensuring unaccompanied children are supported by legal counsel. *See, e.g.*, Estrella del Paso Supp. Decl. (ECF 53-4) ¶¶ 3-4; ImmDef Supp. Decl. (ECF 53-5) ¶ 8. Given these harms, the Plaintiff organizations "have established a likelihood of irreparable harm" based on their showing of serious "ongoing harms to their organizational missions," including diversion of resources and the non-speculative loss of substantial funding. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). The Government's repetition of its arguments against standing fail to persuade. The irreparable harm resulting from the Government's Cancellation Order weighs in favor of a preliminary injunction.

### 3.     Balance of Equities and Public Interest

In deciding whether to grant an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (quoting *Winter*, 555 U.S. at 24). Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (internal quotation marks and citation omitted). Where the government is a party, the balance of equities and public interest factors merge. *Drakes Bay Oyster Co.*, 747 F.3d at 1092 (citing *Nken*, 556 U.S. at 435).

When the Court issued the TRO, it concluded that these third and fourth *Winter* factors supported enjoining the Cancellation Order. *See* ECF 33 at 5-6. The Court's reasoning remains

25

intact.  The record reveals substantial, immediate, and ongoing harms to the Plaintiff

organizations.  But further, as amici make clear, the risk of substantial harm to unaccompanied

children as a result of not receiving counsel further weighs in favor of injunctive relief.  One group

of amici, including civil rights legal organizations that represent detained immigrant children,

details the important role that direct legal service providers play in recognizing and combatting the

potential mistreatment of unaccompanied children in ORR custody.  *See* Amicus Br. of National

Center for Youth Law et al. (ECF 79).  Another group of amici, former HHS officials, warns that

unaccompanied children lacking counsel face greater risk of exploitation and human trafficking.

Amicus Br. of Former HHS Officials (ECF 78) at 5.  Such harms weigh in favor of injunctive

relief.  The Government avers that it would suffer harm where executive branch authority is

hindered, Opp. at 21-22, but the Government cites no authority that this is a factor properly

considered.  *Id.* at 22.  Indeed, the Government's argument fails to address the equities of granting

an injunction and instead merely reasserts its position that the Cancellation Order violates neither

the TVPRA nor the Foundational Rule.  The public interest is not served by maintaining agency

actions that conflict with federal law and federal agencies' own regulations.  *Valle del Sol*, 732

F.3d at 1029 (no legitimate government interest in violating federal law).  Because the Court has

concluded that the Cancellation Order likely violates the APA, the balance of equities and the

public interest both tip decisively in Plaintiffs' favor.

### 4. Bond

The Government requests that the Court require Plaintiffs to post a bond as security for

damages that may result from a wrongfully-granted injunction.  Opp. at 24.  In granting relief

under Rule 65, "[t]he court has discretion to dispense with the security requirement, or to request

mere nominal security, where requiring security would effectively deny access to judicial

review."  *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d

1319, 1325 (9th Cir. 1985).  As result of the Cancellation Order, the Plaintiff organizations are

unable to pay their staff and are laying some of them off.  *See e.g.*, MIRC Decl. (ECF 37-10) ¶ 4.

Based on this record, the Court finds that requiring a bond would stifle Plaintiffs' enforcement of

their rights under the APA.  Because this litigation is brought by nonprofit organizations to protect

26

1  the public interest and ensure compliance with federal law, the Court declines the Government's

2  request.

3  **5.  Scope of Relief**

4    The Government argues that any injunctive relief granted by the Court must be narrowly

5  tailored to address only the harm suffered by these Plaintiffs and may not extend nationwide.  *See*

6  Opp. at 25.  Under the APA, however, courts are required to "hold unlawful and set aside" agency

7  action found to be invalid such that the challenged agency action no longer applies to anyone, not

8  just the plaintiffs at bar.  5 U.S.C. § 706(2).  Indeed, appropriate relief for successful plaintiffs in

9  APA cases may necessarily reach nationwide.  *See, e.g.*, *Regents*, 591 U.S. at 9 (holding that the

10  rescission of a major federal program "must be vacated"); *see also Lujan*, 497 U.S. at 913

11  (Blackmun, J., dissenting) ("[I]f the plaintiff prevails, the result is that the rule is invalidated, not

12  simply that the court forbids its application to a particular individual.").

13    The Ninth Circuit has consistently recognized "the authority of district courts to enjoin

14  unlawful immigration policies on a universal basis."  *Regents of the Univ. of Cal. v. Dep't of*

15  *Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018) (citation omitted) ("A final principle is also

16  relevant: the need for uniformity in immigration policy."); *Hawaii v. Trump*, 878 F.3d 662, 701

17  (9th Cir. 2017), *rev'd on other grounds*, 585 U.S. 667 (2018) ("Because this case implicates

18  immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of

19  their rights."); *Washington v. Trump*, 847 F.3d 1151, 1166-67 (9th Cir. 2017) ("[A] fragmented

20  immigration policy would run afoul of the constitutional and statutory requirement for uniform

21  immigration law and policy." (citing *Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir.

22  2015)).  "Such relief is commonplace in APA cases, promotes uniformity in immigration

23  enforcement, and is necessary to provide the plaintiffs here with complete redress."  *Regents of the*

24  *Univ. of Cal. v. Dep't of Homeland Sec.*, 908 F.3d at 512.

25    In this case, there is no practical way to limit injunctive relief relating to immigration law

26  and policy by party or by geography.  Indeed, as discussed with the Government's declarants at

27  the preliminary injunction hearing, there exists only one contract for the provision of the subject

28  funding, and it applies to direct legal services nationwide.  *See* Hr'g Tr. at 8-9.  Moreover, the

1   Government fails to identify any way to limit injunctive relief only to these Plaintiffs.  Nor would

2   such fractured relief prove effective at addressing the scope of the Government's likely violation

3   of the APA.  The Government's Cancellation Order had nationwide effect; the relief necessary to

4   remedy the termination is for the Court to set aside that termination and require the Government to

5   comply with its statutory and regulatory obligations.  Therefore, the relief granted by the Court

6   must reach nationwide.

## III.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' motion for preliminary

injunction.  The Court **ORDERS** as follows:

> Defendants are **ENJOINED** from withdrawing the services or funds
> provided by the Office of Refugee Resettlement ("ORR") as of
> March 20, 2025, under the Trafficking Victims Protection
> Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5),
> and ORR's Foundational Rule, 45 C.F.R. § 410.1309(a)(4),
> particularly ORR's provision of funds for direct legal representation
> services to unaccompanied children.  This injunction precludes
> cutting off access to congressionally appropriated funding for its
> duration.

This injunction takes effect **immediately**, replacing the Court's April 1, 2025 temporary

restraining order (ECF 33), and will remain in place until a final judgment on Plaintiffs' claims.

Defendants shall file a status report by no later than 2:00 p.m. PST, Friday, May 2, 2025, to report

on compliance with the injunction.  Additional status reports regarding compliance with the

injunction shall be filed no later than 2:00 p.m. PST, on May 9 and 23, 2025, and every 45 days

thereafter.  This Order shall apply to the maximum extent provided for by Federal Rule of Civil

Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706.  Non-compliance or delayed compliance may

result in a contempt finding and sanctions.

**IT IS SO ORDERED.**

Dated: April 29, 2025

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**

United States District Court
Northern District of California

1   YAAKOV M. ROTH
    Acting Assistant Attorney General
2   WILLIAM C. SILVIS
    Assistant Director
3   MICHAEL A. CELONE
4   CHRISTINA PARASCANDOLA
    KATE MASETTA ALVAREZ
5   JONATHAN K. ROSS
    Senior Litigation Counsel
6   ZACHARY A. CARDIN
7   Trial Attorney

8        U.S. Department of Justice, Civil Division
         Office of Immigration Litigation
9        General Litigation and Appeals Section
         P.O. Box 878, Ben Franklin Station
10       Washington, DC 20044
         (202) 305-7662
11       Jonathan.K.Ross@usdoj.gov

12  Attorneys for Defendants

13                  UNITED STATES DISTRICT COURT

14                 NORTHERN DISTRICT OF CALIFORNIA

15                    SAN FRANCISCO DIVISION

16

17  COMMUNITY LEGAL SERVICES IN EAST  )   Case No. 3:25-cv-02847-AMO
    PALO ALTO,                        )
18                                    )   **DEFENDANTS' NOTICE OF APPEAL**
                  Plaintiffs,         )
19                                    )
         v.                           )
20                                    )
    UNITED STATES DEPARTMENT OF       )
21  HEALTH AND HUMAN SERVICES, *ET AL.*, )
                                      )
22                Defendants.         )
                                      )
23  _____  )

24

25

26

27

28

1

**DEFENDANTS' NOTICE OF APPEAL**

2

Defendants hereby appeal to the United States Court of Appeals for the Ninth Circuit from the

3

Court's Order Granting Plaintiffs' Motion for Preliminary Injunction entered on April 29, 2025 (ECF

4

No. 87). Defendants are exempt by statute from paying the appellate filing fee. *See* 9th Cir. R. 3-1(c).

5

Defendants previously filed a notice of appeal from the Court's temporary restraining order. ECF No.

6

56; *see Community Legal Services of East Palo Alto, et al. v. HHS, et al.*, No. 25-2358 (9th Cir.).

7

8

DATED: April 30, 2025                    Respectfully submitted,

9

10

                                         YAAKOV M. ROTH
                                         Acting Assistant Attorney General

11

12

                                         WILLIAM C. SILVIS
                                         Assistant Director

13

14

                                         CHRISTINA PARASCANDOLA
                                         KATE MASETTA ALVAREZ
                                         MICHAEL A. CELONE
                                         Senior Litigation Counsel

15

16

                                         ZACHARY A. CARDIN
                                         Trial Attorney

17

18

                                         */s/ Jonathan K. Ross*
                                         JONATHAN K. ROSS

19

                                         Senior Litigation Counsel
                                         U.S. Department of Justice, Civil Division

20

                                         Office of Immigration Litigation
                                         General Litigation and Appeals Section

21

                                         P.O. Box 878, Ben Franklin Station

22

                                         Washington, DC 20044
                                         (202) 305-7662

23

                                         Jonathan.K.Ross@usdoj.gov

24

                                         Attorneys for Defendants

25

26

27

28