IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, et al., | Case No. 4:25-CV-02847-AMO |
| Plaintiffs, | **DECLARATION OF MICHAEL LUKENS IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE PRELIMINARY INJUNCTION** |
| v. | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | |
| Defendants. | |

**DECLARATION OF MICHAEL LUKENS**

**EXECUTIVE DIRECTOR, AMICA CENTER FOR IMMIGRANT RIGHTS**

*I, Michael Lukens, make the following statements on behalf of myself and Amica Center for Immigrant Rights. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. §1746.*

1. I am over the age of 18 and make this declaration based upon my personal knowledge and experience.  If called to do so, I could and would competently testify to these matters under oath.

2. I am an attorney and the Executive Director of Amica Center for Immigrant Rights ("Amica Center"), a plaintiff in the above-captioned case.

3. In my capacity as Executive Director of Amica Center, I regularly communicate with the Acacia Center for Justice ("Acacia"), as well as with the dozens of other organizations offering legal services as subcontractors within Acacia's Unaccompanied Children's Program ("UCP") provider network. Acacia frequently shares updates with Amica Center and other organizations that are part of the provider network about issues impacting the network, which is how I have personal knowledge of the information described in this declaration.

4. While I cannot speak formally on behalf of other organizations in the UCP provider network, I understand from my communications with the majority of the organizations in the network that Amica Center and the other organizations face common challenges related to Defendants' refusal to fund legal services for unaccompanied children since December 2025, including pressing organizational financial stress, the impossibility of meeting Defendants' demand for previously unrequired data that cannot be created retroactively, and serious concerns over violating attorney client privilege and ethical duties to unaccompanied child clients.

5. For years prior to December 2025, Amica Center, like other organizations in the UCP provider network, regularly submitted invoices and supporting documentation to Acacia for legal services that we provided under contract line item number ("CLIN") 2, covering

direct representation of unaccompanied immigrant children who are or had been in Office of Refugee Resettlement ("ORR") custody. As part of these invoices, we included a summary of the number of hours of CLIN 2 legal services we performed each month, and calculated a total bill based on negotiated hourly rates for these services.

6. Acacia would then share the invoice and supporting documentation with a Contracting Officer Representative ("COR") at the Department of Health and Human Services ("HHS"), who reviewed the information and followed up with Acacia if there were any questions about the invoices or supporting documentation. If Acacia could not resolve these inquiries on their own, they would ask the provider organizations to clarify or correct the issueand then Acacia would relay theinformation back to the COR.

7. Prior to December 2025, this follow-up typically resulted in a satisfactory outcome, with the COR approving the invoices for payment. Acacia would then submit the invoices for payment in the Treasury Department's payment system, along with abridged supporting documentation (compared to the more detailed documentation that the COR would previously have reviewed), since the Treasury Department system has a more limited capacity for processing larger documents. After the invoices were submitted, HHS would then have 30 days to issue payment to Acacia, who would then transmit these funds to the provider organizations. Often there could be a delay of a few months between when work was performed and when an invoice would actually be paid; HHS would always inevitably pay the invoice.

8. In August 2025, Acacia was working to negotiate a new bridge contract with HHS, partly to comply with the Court's injunction in this litigation. As part of those discussions, we understand that Acacia asked, and a COR at HHS confirmed, that these existing invoicing procedures would continue unchanged under any new bridge contracts.

9. In March 2026, Acacia submitted invoices to the COR for work performed in December 2025. I understand that the COR did not follow up with Acacia at all for six weeks, which was significantly longer than the usual timeline for the COR's responses in previous months. In addition, this time the COR asked Acacia for new, retroactive data which it had

2

never before requested, such as timesheet-style information with specific hours allocated to each individual child client.

10. ORR communicated that it needed this information to substantiate invoices and that unless Acacia and the provider organizations shared this data, it would not issue payment for any work performed for the December 2025 invoice.

11. We had never recorded that data that ORR demanded and had no way to piece it together retroactively. Quite simply, the data that ORR was requesting for these invoices does not exist and is impossible to produce now, after the fact. Relatedly, ORR also demanded client-level data that is confidential and legally privileged, such as detailed information about the work that individual attorneys had performed for individual child clients, which is inherently reflective of the privileged legal strategies that those attorneys are pursuing in those cases. Sharing this privileged information with ORR would betray the attorneys' ethical obligations to their clients.

12. Multiple times, Acacia communicated to ORR (and kept organizations apprised) that the provider organizations would be unable to share this requested information with the COR, because of both the logistical impossibility and ethical violations triggered by sharing this information with ORR. See Ex. A, July 6, 2026, Email from Acacia to UCP Network Providers. On May 6, May 15, and July 6, 2026, Acacia specifically told ORR by email that the provider organizations do not record case-level hour-by-hour billing records, so the requested information was impossible to obtain and share with ORR. *Id*. In addition, on April 15, April 20, May 15, June 10, and July 6, 2026, Acacia explained that sharing the requested information would violate attorney-client privilege and reveal confidential information, violating the attorneys' ethical obligations to their clients. *Id*.

13. On May 29, 2026, ORR confirmed to Acacia that it would in fact pay the December 2025 invoices, as well as the invoices from January, February, and March 2026, in order to comply with the Court's preliminary injunction in this litigation. However, the following month, ORR backtracked and once again insisted that it would not pay these invoices unless Acacia and the provider organizations shared the previously requested unavailable

3

and privileged information. Since that time, ORR has repeatedly told Acacia and the provider organizations that it will not pay the invoices without the requested data.

14. I understand that Acacia has proposed compromises to share some information with ORR that would satisfy some of the agency's apparent concerns about this data. For example, Acacia suggested sharing a list of children represented across the provider network, the total number of cases represented by each provider organization, a breakdown of billing by provider organization and task code, and—if available and with the client's consent—the provider name and whether the attorney has formally entered an appearance.  ORR, however, was not amenable to this offer of data and instead has continued to refuse to issue payment and insist on this same information that either does not exist retroactively or would violate confidentiality and attorney-client privilege.

15. On July 21, 2026, counsel in the above-captioned case had a meeting to confer with Defendants' counsel, whom reiterated their demand for data retroactively and prospectively, this time specifying three categories: which UAC received direct representation during the billable month; the hours billed for each UAC; and the UAC A-number associated with all other direct costs. Despite receiving these repeated explanations as to why this data cannot be shared, ORR has now, for months, doubled down on its refusal to pay absent this impossible-to-collect and privileged data. The consequences for many organizations in the provider network have already been catastrophic and will only get worse with each day that ORR continues to withhold payment to the provider organizations.

16. In an effort to further propose a data sharing compromise, on July 23, 2026, Plaintiffs' counsel submitted a counteroffer to Defendants' counsel agreeing to prospectively share (not retroactively, due to the impossibility of doing so described above) the same three categories of data Defendants' counsel requested on July 21, 2026, with the caveat that plaintiffs will need to obtain child consent for certain items. That same day, Defendants rejected Plaintiffs' effort to reach a compromise by providing data prospectively. I also

understand that the current bridge contract with Acacia is scheduled to end on July 31, 2026, without any clear indication of what will come next.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 23rd of July 2026, in Washington, DC

/s/ Michael Lukens

MICHAEL LUKENS

EXECUTIVE DIRECTOR

AMICA CENTER FOR IMMIGRANT RIGHTS

5