IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br><br>Defendants. | Case No. 4:25-cv-02847-AMO<br><br>**SECOND SUPPLEMENTAL DECLARATION OF WENDY YOUNG, PRESIDENT, KIDS IN NEED OF DEFENSE, IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE** |

**SECOND SUPPLEMENTAL DECLARATION OF WENDY YOUNG,
PRESIDENT, KIDS IN NEED OF DEFENSE**

I, Wendy Young, make the following statements on behalf of myself and KIND, Inc.  Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the following statements are true and correct to the best of my knowledge.

1.  I am the President of KIND, Inc., doing business as Kids in Need of Defense (KIND).  If called upon to testify, I could and would testify competently to the facts herein.

2.  The purpose of this declaration is to describe the harm to KIND, its staff, and the children we serve because KIND has not received over $26.26 million in payments for work KIND has performed since December 1, 2025 pursuant to its subcontract with the Acacia Center for Justice (Acacia), which in turn is funded by a contract between Acacia and the Department of Health and Human Services (HHS), Office of Refugee Resettlement (ORR). This declaration supplements and updates my two declarations dated March 25, 2025 and April 4, 2025, and previously submitted in this matter, describing in more detail KIND's work on behalf of unaccompanied children and the effects of the 2025 partial termination of HHS's contract with Acacia.

**KIND's work on behalf of migrant children.**

3.  KIND is the leading international not-for-profit organization devoted to protecting the rights and well-being of unaccompanied and separated children.  KIND was founded in 2008 to respond to an unmet need for legal representation for unaccompanied children in the United States immigration system. Today, following reductions in KIND's footprint since last year, KIND operates at fourteen locations across the United States, with additional programming in Mexico and Europe.

4.  KIND also provides psychosocial support to children and families; works to address the root causes of child migration; and advocates for laws, policies, and practices to improve the protection of unaccompanied children within the United States and abroad.

5.  Since 2008, through its programs in the United States, KIND has provided legal rights education to more than 78,000 children, and legal representation in immigration matters to more than 17,000 children. KIND provides children with legal representation in part through its staff, and in part through pro bono partnerships with over 900 law firms, corporations, law schools, and bar associations, whose lawyers represent children pro bono with training and support from KIND.

1

**KIND's subcontract with Acacia.**

6. Since 2009, KIND has served children as a subcontractor for Acacia or its predecessor, the Vera Institute for Justice (Vera).

7. The work subcontracted to KIND is funded under a Legal Services for Unaccompanied Children prime contract (the Contract) between Acacia and HHS.

8. All of KIND's locations in the United States deliver legal and social services funded through its relationship with Acacia.  Under the subcontractor relationship, KIND serves children who are in the custody of ORR, and children released from ORR care and living in communities served by KIND's field offices.

9. For children in ORR custody, KIND conducts educational "know your rights" (KYR) presentations that provide unaccompanied children with information about the immigration system, their rights and responsibilities, and what to expect in immigration court.  KIND also conducts legal screenings to assess each child's protection needs and evaluate options for legal relief as well as making appropriate referrals for further legal or social services during or after ORR custody.  As needed, KIND may also support children in requests for release on recognizance or with notifications relating to changes of address and venue. If a child is required to attend immigration court while in ORR custody, KIND will educate the child about immigration court processes, prepare them to attend the hearing, and accompany the child to court in the capacity of "friend of the court."  In limited circumstances, KIND may provide certain children in ORR custody with legal representation – for example, for children who are required to enter pleadings in their immigration removal proceedings during their time in ORR care, or children who are placed in federal long-term foster care.

10. Following release from ORR custody, some children who live in communities served by KIND may receive free legal representation through KIND's network of pro bono attorneys and/or KIND staff.  KIND staff and KIND pro bono attorneys represent children in proceedings before the immigration courts, in administrative proceedings before U.S. Citizenship and Immigration Services (USCIS), in ancillary proceedings in state courts, and occasionally before the Board of Immigration Appeals, federal district courts, or federal courts of appeal.  Many children receiving legal services through KIND following release from ORR custody also receive psychosocial services through KIND, through a combination of direct services and referrals.

11. My previous declarations described events after Acacia notified KIND on February 18, 2025, that HHS had issued a stop-work order under the Contract; that HHS had rescinded the stop-work order on February 21, 2025; and that HHS noticed partial termination of the Contract on March 21, 2025.  My April 4, 2025, declaration disclosed that as of March 21, 2025, the  funds from KIND's subcontractor relationship with Acacia supported approximately 350 full-time positions, and that KIND laid off

2

approximately 240 staff across the organization, hindering KIND's ability to serve children, following the partial termination of the Contract between Acacia and HHS. That declaration also projected consolidation and closing of several KIND locations. Although most of the anticipated office closings did not ultimately occur, and although KIND was able to hire to fill many of the positions vacated in spring 2025, the organization was not restored to the scope, size, and capacity for serving children that KIND had before the partial termination.

12. In my March 2025 declaration, I provided the following metrics: For the three-year period January 2022 through December 2024 inclusive, KIND's subcontract with Acacia supported know-your-rights presentations and legal screenings to over 16,900 children in ORR custody, immigration legal representation for approximately 6,700 children through KIND and its pro bono attorneys, and psychosocial services for approximately 2,400 children. During the same period, through other contracts and other resources, KIND and its pro bono partners additionally represented approximately 3,700 children, and KIND provided psychosocial services to approximately 1,100 children.

13. For the eighteen-month period from January 2025 through June 2026, pursuant to the subcontract, KIND delivered know-your-rights presentations and legal screenings to approximately 450 children in ORR custody, immigration legal representation through KIND staff or pro bono attorneys to approximately 4,500 children, and psychosocial services for approximately 1,100 children. For the same period, through other contracts and other resources, KIND and its pro bono partners represented approximately 3,300 children, and KIND provided psychosocial services to approximately 800 children. Comparing the earlier three-year period with the past 18 months shows the disruptive effects of the temporary stop work order and partial termination. Due in large part to the instability of the funding, KIND stopped providing services to children in ORR custody in most of the facilities where KIND served previously. With fewer children receiving services through KIND's subcontractor work, KIND was forced to seek other resources and funding to continue to represent children with pending cases.

14. KIND understands that in or about August 2025, HHS entered into a bridge contract with Acacia for a three-month base period plus option periods, for a total possible contract time of twelve months.

15. Late in April 2026, KIND learned that HHS exercised its final option to renew its bridge contract with Acacia for the final three-month period ending July 31, 2026.

16. After over 17 years as an HHS subcontractor, on June 30, 2026, KIND made the difficult decision to notify Acacia that KIND is terminating its subcontract with Acacia, effective July 30, 2026. The decision was driven by the cumulative effects of nonpayment under the prime Contract on KIND's operations and its capacity to deliver services to children, as detailed below. The nonpayment under the subcontract has had and will continue to

3

have a significant negative impact on KIND's ability to retain staff and provide services to children.

**Cessation of payments to KIND under the subcontract.**

17. Under the subcontract, to receive payment for services provided to children in a given month, KIND submits an invoice to Acacia within 15 business days of the end of the month of service.  KIND has in fact timely submitted monthly invoices. KIND understands that it is typical for Acacia, as prime contractor, to receive payments from HHS under the Contract months in arrears.  Typically, KIND receives payment from Acacia for services performed in a given month approximately 90 days after the end of that month.

18. KIND last received payment from Acacia under the subcontract in April 2026, for work performed in November 2025—five months after KIND performed the work.  Despite KIND's submission of monthly invoices to Acacia, Acacia has not paid KIND for any of the services KIND provided to children since December 1, 2025. KIND has continued to perform all contractual obligations during this time. Based on payment history under the subcontract, KIND would have expected payment for work performed during December 2025 before the end of March 2026.

19. On or about May 7, 2026, Acacia told KIND that Acacia was not receiving expected payments under the prime Contract on the customary timeframe. Moreover, Acacia told KIND that as a prerequisite to issuing payment, the government had called for additional and unprecedented information, including identifying information about clients served under the Contract.  Acacia stated their view, a view shared by KIND, that submitting such information could violate attorney professional conduct rules.  KIND promptly began to inform its staff and partners of the nonpayment.

20. The following week, after consultation with KIND and others in the legal services network, Acacia told KIND that despite their belief that further information was not required under the Contract, they proposed providing the government with aggregated, network-wide data to satisfy the government's request for additional data without compromising the confidential information of child clients.  KIND offered its support to Acacia's efforts to break the impasse.   On June 15, Acacia asked KIND for additional information relating to the January and February invoices, in response to a request from ORR to provide additional information on case activities during those months. KIND promptly provided that data to Acacia.

**Impacts on KIND of payments not made under the subcontract.**

21. By mid-May, the effect of the unpaid balance under the subcontract was significantly depleting KIND's cash balances, requiring KIND to access a line of credit secured by its reserves to fund operations, pay staff payroll, and maintain its programs for children. KIND acted quickly to control costs, not only for the programs supported by the

4

subcontract, but across the organization.  KIND promptly implemented cost-saving measures including pausing active hiring processes for multiple positions, limiting work travel by staff, and making other spending cuts with the aim of conserving resources needed to provide services.

22. In parallel with cost-cutting measures, KIND began advocating with Congress and the administration to release the funds due under the Contract. KIND also sought financial assistance from its supporters, as well as an increase in its line of credit, secured by the outstanding payments owed, in an effort to resource and support our programs and services for children.

23. In the third week in May, KIND told its staff that temporary staff furloughs as soon as mid-June would be necessary to manage costs.  KIND also told its staff that extended furloughs or a permanent workforce reduction could become necessary absent a significant and timely improvement in finances.  Across KIND, these announcements raised profound concerns over the inevitable impact of such measures on staff's efforts to serve clients and support pro bono partners.

24. On May 29, 2026, KIND heard from Acacia that the government was processing payment for Acacia's invoice for December 2025, with payment anticipated in a matter of weeks. On the strength of this news, KIND decided to defer implementing its planned furloughs for about two weeks, in anticipation that a forthcoming payment would improve its financials and provide some of the resources needed to support ongoing services for children.  However, the reprieve was temporary because Acacia did not in fact receive payment for December 2025 as anticipated.

25. On June 12, 2026, KIND informed staff that it would proceed to place some staff on temporary furlough for the period July 1 to July 31, 2026.  Early in the week of June 15, KIND notified approximately 119 of its 338 United States staff members – approximately 35% of KIND's U.S. staff – that they would be furloughed.  During the month of July, furloughed staff will receive no salary (although KIND continues to support their health benefits).  While necessary to conserve resources, this also means that furloughed staff will perform no work during July, sharply curtailing the staffing for KIND's programs and services for children.

26. For KIND staff who were not placed on furlough, staff paid hourly saw their work weeks reduced from 40 to 32 hours.  Salaried staff who were not furloughed saw reductions in their base pay of at least 20%, with cuts of 25% to 40% for more senior positions, effective July 1, 2026.

27. KIND intends to conduct a review by the end of July to determine whether to extend the temporary furlough and pay reductions, or whether the financial situation will necessitate a reduction in force across the organization, which would in turn further curtail KIND's capacity to provide services to children.

5

28. The furloughs and salary reductions were essential to conserve the resources KIND needs for meeting its responsibilities to its clients and pro bono partners as well as its contractual obligations. However necessary, implementing these measures was resource-intensive and disruptive. The consequences began well before the furloughs took effect on July 1. Possibly the single gravest pre-furlough consequence was that, due to the short lead time before furloughs began, KIND legal services staff had limited time to transition cases from furloughed staff to those remaining, including planning for ongoing services, meeting imminent deadlines, addressing sensitive case-specific issues, and notifying clients and partners of what to expect during the furlough period. These shifts also disturbed established connections between children and the legal and psychosocial services staff who support them, relationships where consistency is invaluable. The KIND team worked many extended hours to take all possible steps to reduce impacts on their clients and fellow staff members, while continuing to meet contractual and professional responsibilities.

29. Meanwhile, among other consequences, KIND's technology, program management, finance, human resources, security, and operations teams engaged rapidly in intensive planning for the many contingencies that arose from the furlough and pay reduction measures, while trying to maintain support for the children we serve. And staff across the organization were forced to make personal adjustments to accommodate their loss or reduction of income and make other arrangements for the furlough period. Throughout, the organization's highest priority was the needs of the children KIND serves. I personally observed the negative impact at all levels of the organization as staff grappled with how to prevent or ameliorate the repercussions for clients, who are vulnerable children, in a nearly impossible situation. For some staff, absorbing the uncertainty created by the nonpayment was not tenable, personally and/or professionally, and they chose to leave KIND to find other opportunities, which has further depleted KIND's capacity to serve children.

30. As of July 1, 2026, the temporary furloughs required KIND staff remaining at work to assume responsibilities for additional cases to provide temporary coverage during the furlough period. This means that in addition to pre-existing caseloads, KIND staff are required to rapidly assess the facts of multiple unfamiliar matters, some of them complex and long-pending, and integrate the needs of those cases into existing priorities. Stewardship of these additional cases limits the time available for each individual matter. And with a smaller number of staff remaining in place, adequately supporting the children KIND serves has become more challenging.

31. For the children KIND serves, shifts in staffing disrupt continuity in representation. Because the pursuit of relief in children's cases commonly takes several years, as more fully described in my March 25, 2025 declaration at paragraph 10, for many clients this means interrupting a long-standing relationship in which clients had built hard-won trust to discuss sensitive or traumatic information, only to be required to begin anew with an unfamiliar practitioner.

6

32. Moreover, these disruptions in staffing and services occur at a time of rapid changes in policies and practices affecting children's immigration cases.  For example, in comparison with past practices, immigration court calendars have accelerated, requiring appearances earlier and more often in the life of a case, often while stringently limiting postponements for pursuing relief before USCIS and advancing final completion dates for removal proceedings.  These practices create duplicative work for the children and their counsel, spurring many children to pursue relief before the immigration judge that would have been unnecessary under more flexible court calendars.  Other children will need to take appeals from removal orders. The additional demands this places on practitioners' time and attention is in great tension with the resource cuts caused by the nonpayment.

33. The unpaid balance owed KIND for work performed under the subcontract between December 1, 2025 and June 30, 2026 totals $26,263,477.  The duration and magnitude of this shortfall not only impairs current operations and service delivery for children, but is a major setback for organizational stability and growth. These harms have intensified as the delays in payment lengthen.  This means that even after full payment is made, the consequences for KIND, its staff, and especially its current and future clients will persist due to the upheaval and staffing changes that have already occurred and will likely continue in the immediate future.

**The cessation of payments to KIND frustrates KIND's mission.**

34. At the core of KIND's mission in the United States is ensuring that no child appears in immigration court without high-quality legal representation.  Among the ways that KIND approaches this aspect of our mission are our synergistic partnerships with pro bono attorneys who receive mentorship from KIND to expand the range of free legal services available to children; building and reinforcing expertise through guidance and legal technical assistance; and our commitment to child-centered and trauma-informed practices.  Nonpayment under the subcontract impedes and frustrates KIND's mission in each of these respects.

35. First, in furtherance of its mission, KIND involves the private sector in creating an additional pool of representation that would not be available without KIND's extensive support.  Since KIND's founding, its pro bono partners—now numbering over 900— have exponentially increased KIND's capacity to deliver legal services to children who might otherwise remain unrepresented.  This is because a single mentoring attorney can support multiple pro bono teams simultaneously.  For calendar year 2025, KIND's pro bono partners reported expending over 132,800 hours across KIND's legal programs in the United States, at an estimated value of over $123,900,000 – an increase over the hours contributed in 2024, and contributing to a total of over 1.8 million pro bono hours valued at over $1.18 billion dollars worldwide over KIND's history.  A myth persists that if nonprofit providers are subtracted from the equation, private law firms will donate their time and services pro bono to fill the gap.  But pro bono attorneys typically have little if

7

any experience in relevant practice areas or in serving children. KIND's partners have expressly told us that their commitment to pro bono services depends on KIND's roles: legal screening to identify a client who can benefit from pro bono services, specialized training and guidance on substantive law and skills needed for representing children, consulting on case-specific questions and strategy, offering access to psychosocial services and other resources, and other support at all phases of a child's immigration case. The nonpayment gives rise to apprehension among our pro bono partners as to KIND's availability to offer the full scope of support on which they rely to deliver their services. If KIND is compelled to pull back from these partnerships due to the government's nonpayment, this pro bono momentum will be lost and perhaps become irretrievable, further undermining KIND's mission of ensuring that all children have high-quality immigration representation.

36. Second, the nonpayment increases the challenges of providing high-quality legal representation to children. Due to the staffing shortages and increased workload demands occasioned by the nonpayment, professionals serving unaccompanied children will have less time available to devote to professional development and acquisition of new skills. In turn, this impacts job satisfaction and is contributing to attrition, reducing the availability of legal representation for children. Moreover, the subcontract supported a team providing training, written guidance, and group and one-on-one legal technical assistance to KIND's legal services staff. At its peak, the team comprised thirteen staff with a range of experience in providing legal and psychosocial services to immigrant youth. The furloughs reduced the size of the team, but not the complexity of the legal problems they are tasked with addressing. As occurred in the period following the partial contract termination, staff and pro bono attorneys will see reduced access to policy analysis and troubleshooting, impeding their mission of delivering high-quality services tailored to the needs of children and youth.

37. Third, the disruption of attorney-client relationships due to the missed contract payments is inconsistent with child-centered, trauma-informed services in several ways. For example, children will face unnecessary repetition and review of sensitive and painful case facts following a change in counsel forced by furloughs. Nonpayment that sidelines a trusted service provider tacitly tells a child that the support for their right to counsel was expendable. And as staff capacity constricts, not only at KIND but at other impacted providers, practitioners will inevitably be forced to opt for efficiency over pacing that better responds to a child's particular capacities or history of trauma.

**The cessation of payments to KIND frustrates the TVPRA mandate on legal services.**

38. Finally, nonpayment under the Contract has led to furloughs that directly reduce the availability of legal services to unaccompanied children, frustrating the TVPRA's mandate. That statute mandates that HHS ensure, to the greatest extent practicable and consistent with the INA, that all unaccompanied children are represented in legal proceedings to

8

protect them from mistreatment, exploitation, and trafficking. In furthering the TVPRA's mandate, KIND's work also promotes the fair administration of justice in the immigration system. Children served by KIND and its partners are overwhelmingly likely to appear in court for their hearings, consistent with overall trends that immigrants who apply for relief and immigrants who have representation also have especially high rates of attendance at immigration court hearings.  Before both EOIR and USCIS, participation by well-prepared counsel aids adjudicators by bringing to their attention pivotal facts and legal authorities. Government agencies have repeatedly expressed that KIND's work contributes to their efficiency and effectiveness, as in the examples described in my March 25, 2025 declaration, paragraphs 11-12.

39. The TVPRA further charges HHS with "mak[ing] every effort to utilize the services of pro bono counsel who agree to provide representation to such children without charge." 8 U.S.C. § 1232(c)(5).   KIND and its pro bono partners have provided free legal representation to over 17,000 children during 17 years, but the nonpayment under the Contract imperils those services, contravening the statutory mandate.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on the 23rd of July 2026, in Falls Church, Virginia.


        /s/ Wendy Young
Wendy Young
President
Kids in Need of Defense