UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.,*

        Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.,*

        Defendants.

Case No:  4:25-cv-2847 (AMO)

## <u>DECLARATION OF RICHARD B. DEBANY</u>

I, Richard B. Debany, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Chief for the Division of Acquisition Requirements of the Office of Refugee Resettlement (ORR), within the Administration for Children and Families (ACF), a component of the U.S. Department of Health and Human Services (HHS).

2. My job duties include, among other things, responsibility for coordinating ORR's acquisition requirements with our contracting support partners to deliver and manage contract solutions that meet ORR's programmatic and mission needs. In this capacity, I am responsible, in collaboration and coordination with HHS' Office of Mission Acquisition Solutions (OMAS), for directing ORR's post award contract management of its contracts, including its legal services contract. Through levels of leadership, I direct ORR's Contracting Officer Representatives (CORs) who are appointed by the Contracting officers (COs) for various contract administrative functions; these include but are not limited to monitoring and assessing contractor performance, verifying the acceptable delivery of services, invoice review, and invoice approval to allow payment to vendors.

3. This declaration is based upon my personal knowledge, information acquired by me in the course of performing my official duties, information contained in the records of ACF and ORR, and information conveyed to me by current agency employees and contractors. Further, I am familiar with the preliminary injunction issued in this matter, Plaintiffs' allegations in their motion to enforce the preliminary injunction, and the general facts and circumstances underlying the present administrative invoicing issue. I submit this declaration in order to explain the reason for the delay in payment of certain invoices due to the agency's inability to conclude, from the documentation submitted with the invoices,

1

that billed services were provided to eligible children during the applicable billing period in accordance with the terms and conditions of the contract. I also submit this declaration to respond to allegations in plaintiffs' motion that the invoice substantiation issue described herein is a pretext for evading the requirements of the Court's preliminary injunction, and to explain the additional steps ORR is taking to ensure it is able to meet its statutory obligations under the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), 8 U.S.C. § 1232, ORR's Foundational Rule, 45 CFR § 410.1309, and this Court's preliminary injunction, consistent with its independent obligations under the relevant acquisition statutes.

4.      OMAS, on behalf of ORR, awarded Contract No. 75P00125C00016 to Acacia Center for Justice ("Acacia") to provide legal support services to unaccompanied alien children (UAC) in, and released from, ORR care, consistent with the TVPRA and ORR's Foundational Rule. A true and correct redacted copy of the awarded contract is attached hereto as "Exhibit 1."

5.      Performance began on August 1, 2025. The contract includes three option periods. On April 30, 2026, ORR exercised Option Period 3 to continue contract performance through July 31, 2026, to ensure continuity of services while ORR pursues a longer-term ongoing competitive procurement.

6.      The work included four principal Contract Line Item Numbers (CLINs): "Know Your Rights" presentations and legal screenings (CLIN 1); Representation, Other Legal Assistance, Data Collection & Analysis, and Services at Emergency Facilities (CLIN 2); Attorney Recruitment Project (CLIN 3); and Spanish Language Support and Technical Assistance Training (CLIN 4). Acacia sub-contracts the contract funds to other organizations to provide these services, with Acacia serving as the prime contractor managing a nationwide network of legal service providers who deliver legal screenings, legal orientation, direct legal representation, and related services directly to UAC.

7.      The contract is a hybrid Firm-Fixed-Price (FFP) and Time-and-Materials (T&M) contract. CLINs 1, 3, and 4 are FFP, while CLIN 2 is T&M. As T&M, invoices submitted under CLIN 2 require more detailed supporting documentation to substantiate the labor hours and costs billed.

8.      The contract requires the submission of periodic reports, invoices, transition-planning materials, and other information required for contract administration, including, but not limited to, court filings, invoices, receipts, and forms with sufficient information to identify qualifying UACs. *See, e.g.*, Exh. 1, pp. 30-31, § C.2, Objectives IV(b), (d), (e); *see also* Federal Acquisition Regulations (FAR) 52.212-4, Alternative I, para. (i)(1)(i)(D) ("When requested by the Contracting Officer or the authorized representative, the Contractor shall substantiate invoices (including any subcontractor hours reimbursed at the hourly rate in the schedule) by evidence of actual payment, individual daily job timecards, records that verify the employees meet the qualifications for the labor categories specified in the contract, or other substantiation specified in the contract.").

9. Together these reporting and documentation requirements are intended to enable ORR, as a good steward of public funds, to verify that invoiced costs correspond to direct-representation services provided during the relevant billing period and that the claimed costs are properly chargeable under CLIN 2. *See generally* FAR 31.201-2 to 31.201-4 (costs charged to a federal contract must be allowable, allocable, reasonable, adequately supported, and properly chargeable to the contract); Treasury Financial Manual (TFM), Vol. I, Part 4A, Section 2075 ("Effective control over disbursements requires the preaudit and approval of vouchers before they are certified for payment . . . to determine [among other things] whether . . . [t]he goods received or the services performed were in accordance with the agreement, [t]he quantities, prices, and amounts are accurate, . . . [and] [p]roper forms of documentation were used[.]").

10. Beginning in late 2025, ORR became aware of multiple media reports about unrepresented UAC, and undertook efforts to validate information submitted by Acacia regarding direct legal-representation services provided under the contract. This was especially troubling as the contract was still being paid in full and even though the number of UAC in ORR custody had decreased significantly, the cost had remained relatively constant to prior years. Despite fully funding legal representation at an average of approximately $20 million per month, UAC were appearing in immigration court without an attorney. For instance, ORR reviewed attorney appearances for UAC for the week of May 11, 2026, and found 73% of UAC were unrepresented; for the week of May 18, 2026, 69% of UAC were unrepresented. ORR immediately attempted to resolve the issue by sending policy letters to the shelters and requesting shelter employees notify LSPs via email about upcoming hearings for their clients. In June 2026, care providers were instructed to contact a child's attorney directly if the child was absent from their court appearance, ensuring the attorney was aware of the situation. Since then, ORR shelters have notified LSPs each day about immigration hearing dates.  In June and July 2026 ORR conducted a second review of UAC immigration hearing representation, which revealed that in June 2026, 41% of UAC in our custody still appeared unrepresented and 40% appeared unrepresented in July 2026.

11. ORR's invoice validation efforts identified discrepancies between Acacia's reported active-representation data and information available from other federal sources. Among other issues, ORR identified children reported as actively represented for whom no corresponding indication of representation could be located in ORR, U.S. Citizenship and Immigration Services (USCIS), or the Executive Office for Immigration Review (EOIR) records, as well as children appearing in active-representation reports who appeared to have been repatriated and were no longer present in the United States. ORR also received information suggesting that some children were appearing in immigration proceedings without legal representation notwithstanding reports indicating active representation.  This

information raised serious questions concerning the accuracy of the underlying data used to support Acacia's reports and invoices and prompted further review.

12.     By the spring of 2026, ORR's review focused specifically on substantiating costs billed under Acacia's December 2025 CLIN 2 invoice, submitted on May 7, 2026, in the amount of $14,938,000.96.

13.     As part of its review of Acacia's December 2025 invoice, ORR examined the invoice and supporting documentation. Separate from invoices, Acacia also provides a monthly Legal Representation Activity Report, which Acacia had previously represented was a list of its "active clients"—generally defined as representations initiated under CLIN 2 funding that remained open. To verify that the invoiced services corresponded to actual contract performance, ORR compared the A-Numbers listed in Acacia's monthly report against records maintained by ORR, USCIS, and EOIR. That review identified several significant discrepancies and is attached hereto as "Exhibit 2."

14.     Of the 24,157 A-Numbers reported by Acacia for November 2025, ORR found that 3,574 children did not have a Notice of Representation Form filed with either DHS (Form G28) or DOJ (Form E28) reflected in any of the available federal systems—meaning ORR could not verify that those children were actually receiving the direct legal representation in EOIR hearings, or pursuing immigration relief with USCIS, for which payment was sought. ORR also identified 265 children who appeared to have been repatriated before or during the billing period, indicating they were no longer in the United States and therefore raising questions as to whether contract-funded representation was still being provided. In addition, ORR identified individuals whose recorded ages appeared inconsistent with eligibility for services under the contract.

15.     ORR also attempted to review documentation submitted in support of labor and other direct costs reflected in the invoice. Much of the supporting documentation was partially or extensively redacted, did not identify the unaccompanied child for whom services allegedly were performed, and lacked sufficient information to determine whether the services were provided to qualified children during the applicable billing period. As a result, ORR was unable to validate or reconcile the claimed costs or trace those costs to identifiable contract performance.

16.     For instance, Acacia reported in its April 30, 2026, Semi-Annual Direct Representation Spending Update that it has billed $1,879 per case from the beginning of the contract through February 28, 2026. That report is attached hereto as "Exhibit 3." Acacia calculates this cumulative spending per case metric by dividing the cumulative amount billed to the contract by the total number of cases represented under the contract to date, across all LSPs and representation case categories. Acacia defines "active representation" as representation that has been initiated under CLIN 2 funding and has not yet closed,

which on May 31, 2026, Acacia reported to be 22,701. In addition to active representation as defined by Acacia, the metric also includes completed cases that have not been closed by the appropriate LSP. By utilizing an "active case" case list that is defined to include completed cases, Acacia likely understates the cumulative spending per case. Compounded by the aforementioned insufficient invoice substantiating documentation, ORR cannot validate whether Acacia's spending per case complies with the contract's cap. *See* Exh. 1, p.28, Section C.2, Objective III(c) ("Contractor shall collaborate with COR per Objective IV(e) [pertaining to reporting on labor and costs] to ensure monitoring of average cost per case initiated under this contract is in line with the Government's case cost mark of $8,500 per case").

17.     To assist with its invoice validation efforts, in early May 2026, ORR requested the support of forensic auditors from the Department of War's Defense Contract Audit Agency (DCAA), which specializes in contract audits and fiscal advisory services for federal agencies. DCAA provided 6 auditors for 180 days to perform a thorough analysis of Acacia's monthly Invoices. DCAA recently completed its review of the December 2025 invoice, a redacted copy of which is attached hereto as "Exhibit 4."

18.     DCAA was able to perform a forensic invoice review only on Other Direct Costs (ODCs), which represented 3.46% of the December 2025 invoice. The remaining 96.54% of the invoice consisted of labor costs, which DCAA was unable to validate because the contractor failed to provide adequate supporting documentation. Despite this limitation, DCAA's review identified several concerns regarding the allowability, reasonableness, allocability, and adequacy of the claimed ODCs.

19.     Specifically, DCAA identified apparent duplicate supporting documents, unsupported adjustments to claimed amounts, missing receipts and invoices, insufficient explanations supporting billed charges, inconsistencies between claimed amounts and the underlying documentation, and recruitment and language translation costs charged to CLIN 2 rather than CLINs 3 and 4. DCAA also found that the supporting documentation lacked sufficient identifying information to verify that the services were provided to eligible UACs. In many instances, the documentation did not identify the date or location of the services performed, did not establish that the services were provided to active UACs under the contract, and did not describe the purpose or nature of the work performed by subcontractors. As a result, DCAA could not determine whether the billed hours and costs were properly incurred and allocable to the contract. These deficiencies are inconsistent with FAR 31.205-46, Travel Costs, which requires contractors to maintain adequate documentation supporting claimed costs, including receipts for expenditures of $75 or more, and documentation identifying the (i) date and place of the expense, (ii) purpose of the trip, and (iii) name of the traveler and that person's title or relationship to the contractor. *See* FAR 31.205-46(a)(3)(iv) and (a)(7).

20.     Some invoices appeared to include interpretation, translation, or language-support services that potentially related to contract line items other than CLIN 2. Other invoices lacked sufficient information to determine whether services occurred during the applicable billing period, whether costs related to the correct option period, or whether the claimed expenses were associated with contract performance at all. DCAA further identified instances involving unsupported manual calculations, unexplained invoice adjustments, duplicate entries, and costs that could not be reconciled to the underlying documentation provided.

21.     Travel costs presented similar verification issues. DCAA found that numerous travel claims lacked information necessary to evaluate the claimed expenses, including the identity of the traveler, the traveler's relationship to the contractor, the business purpose of the travel, and documentation showing how claimed mileage or travel expenses were calculated. In many cases, mileage claims consisted primarily of route printouts and reimbursement calculations without sufficient information to determine who traveled, why the travel occurred, or how the claimed costs related to performance under the contract. DCAA advised that, without such information, it could not determine whether the travel costs satisfied applicable federal cost principles.

22.     Taken together, these discrepancies and deficiencies have prevented ORR from determining whether the costs claimed were allowable, allocable, reasonable, adequately supported, and properly chargeable under CLIN 2. As a result, ORR could not conclude that the submitted invoice constituted a proper invoice for payment under the contract and could not authorize payment consistent with its contractual obligations and fiscal oversight responsibilities under FAR 52.212-4(a).

23.     On September 25, 2025, the COR requested A-Number level information to verify legal representation data; Acacia refused on October 1, 2025, citing "confidentially constraints." Between April 10-15, 2026, the COR sought adequate supporting documentation, to include unredacted invoice documents and A-Number level details; Acacia refused, citing "relevant attorney-ethics rules." Starting in late April 2026, ORR began requesting additional non-privileged information sufficient to verify which children received direct representation during the billing period, identify the attorneys providing those services, determine when the services were performed, confirm the filing of attorney appearance forms where applicable, verify billable hours, and explain discrepancies involving children who appeared to lack attorneys of record or who appeared to have been repatriated.

24.     In June 2026, Acacia agreed to provide some additional information in response to ORR's requests. For January and subsequent invoices, Acacia agreed to provide an aggregate list of A-Numbers corresponding to represented children's cases for which LSPs reported performing work during the invoiced month. However, in May and June 2026, Acacia objected on various grounds to limiting

supporting document redactions and sharing other categories of information—such as timesheets by attorney/non attorney and A-Number, type of case on timesheets, case stipend supporting documentation that links specific children via their A-Numbers to case stipend materials. ORR and Acacia corresponded specifically about these issues from April to June 2026 but recently reached an impasse with respect to the documentation necessary to verify the CLIN 2 invoices. Providing an aggregate list of UAC that were supported during the month without aligning that service to specific supporting documentation does not allow ORR the ability to determine reasonableness, allowability or allocability of an invoice charge. ORR would still have no linkage between a supporting document and an eligible UAC to validate the charges.

25.     To date, ORR has paid $134,271,448, for all invoices received: CLINs 1, 3, and, 4 paid through June 2026 and CLIN 2 paid through November 2025.  The outstanding invoices are for the CLIN 2 invoices from Dec. 2025 to March 2026, received between May 7 to June 22, 2026, which remain pending due to the ongoing invoice substantiation issue outlined above. A summary of the payment history and current invoice status is attached hereto as "Exhibit 5."

26.     On June 15, 2026, Acacia issued a demand for payment of its December 2025 CLIN 2 invoice, submitted on May 7, 2026. *See* June 15, 2026, Acacia's Demand Letter, attached hereto as "Exhibit 6."

27.     On June 29, 2026, the OMAS CO responded on behalf of ORR, reiterating the discrepancies previously identified, providing Acacia with copies of ORR's and DCAA's analyses, and renewing ORR's request for documentation sufficient to verify the CLIN 2 invoices. Specifically, ORR requested, for each UAC for whom representation was billed during the applicable period, the child's A-Number, the name of the attorney and law firm providing representation, the date(s) of representation or court hearing, the date the EOIR-28 or G-28 notice of appearance was filed, and the billable hours associated with the representation. *See* June 29, 2026, Demand Letter Response, attached hereto as "Exhibit 7."

28.     The response letter also requested that Acacia provide additional clarification regarding its provision of direct representation services. Specifically, Acacia was asked to explain how direct representation was provided to children who did not have an attorney of record on file and/or who had been repatriated to their country of origin, as well as why those UAC were included on Acacia's list of clients receiving direct representation. In addition, the response requested an explanation for the identified discrepancies, including how Acacia determined that these children were receiving active representation as part of the December invoice despite the absence of an attorney of record, records indicating that the UAC had been repatriated, or cases involving individuals whose eligibility for services could not be verified based on their ages.

29. Consistent with its prior communications, ORR advised Acacia that payment would be evaluated upon receipt of sufficient substantiating documentation.

30. To date, ORR has not received sufficient responsive documentation from Acacia. However, on July 6, 2026, Acacia requested a call to discuss the matters ORR raised in its June 29, 2026, letter, and the parties spoke on July 10, 2026.

31. The funding to pay CLIN 2 invoices remains available for immediate disbursement once Acacia provides the information necessary for ORR to perform its ordinary contract-administration, inspection, acceptance, and fiscal-oversight responsibilities that allows both an allowability and allocability determination. Furthermore, that funding will remain available to pay the CLIN 2 invoices for services provided during the period of performance after the contract expires on July 31, 2026.

32. Since entry of the Court's preliminary injunction, ORR has devoted substantial effort to maintaining uninterrupted legal services for UAC while simultaneously complying with applicable federal procurement requirements. To that end, ORR has pursued a competitive acquisition for follow-on legal services while also developing bridge services strategies designed to avoid any interruption in services during the transition to successor provider(s). These efforts have required extensive coordination among ORR program personnel, acquisition officials, contracting officers, and Department leadership. These efforts to provide follow-on legal services contracts and maintain continuity of services were already underway before Plaintiffs filed their motion to enforce the preliminary injunction. Specifically, on November 24, 2025, ORR issued solicitation 75P00126R00003, well before Plaintiffs filed their motion. ORR received a solicitation protest at the Government Accountability Office (GAO) on December 15, 2025, took voluntary corrective action, and reopened the solicitation for proposals on February 2, 2026. ORR received another two GAO protests on April 1 and 3, 2026, took voluntary corrective action, and reopened the solicitation for proposals on May 15, 2026. The solicitation was again protested at the GAO on June 15, 2026, and a decision is pending.

33. Throughout this period, ORR has continued administering the existing Acacia contract while simultaneously performing a competitive procurement under solicitation 75P00126R00003 to award a follow-on UAC legal services contract. The existing Acacia contract remains the contractual vehicle through which ORR administers nationwide legal services for UAC through the end of the period of performance on July 31, 2026. As part of its ordinary contract-administration responsibilities, ORR has continued reviewing invoices, evaluating supporting documentation, paying invoices to include all invoices for fixed-price contract line items, administering contractor performance, coordinating with acquisition officials, and planning for transition to a new vehicle for continuity of UAC legal services. In my experience, ORR's continued administration of the existing contract while simultaneously planning for

transition of UAC legal services after July 31, 2026 is inconsistent with any suggestion that ORR has attempted to evade its legal obligations under the TVPRA, ORR Foundational Rule, and this Court's preliminary injunction. Rather, ORR has continued administering the existing contract while working through the procurement and other actions necessary to maintain continuity of legal services consistent with applicable law.

34.     In the normal course, when questions arise regarding whether an invoice is adequately supported or whether particular charges are allowable under the contract, the issue is first addressed through the ordinary contract-administration process overseen by the CO, a process which remains ongoing, as described below.

35.     If an issue cannot be resolved through this process, a contractor may bring a formal claim under the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101-7109, which establishes a comprehensive statutory framework for resolving disagreements between the Government and its contractors concerning payment, contract interpretation, contract performance, and other matters of contract administration. To initiate a claim under the CDA, a contractor must first submit the dispute as a formal, certified claim to the CO for a final decision, which must be rendered within 60 days. If the claim cannot be resolved with the CO in the 60-day timeframe, the CDA provides established procedures through which the contractor may pursue an appeal before the Civilian Board of Contract Appeals or file suit in the United States Court of Federal Claims.

36.     As noted above, ORR and Acacia participated in teleconference on July 10, 2026 to discuss the invoice substantiation issue. ORR's last substantive written communication to Acacia following Acacia's June 15, 2026 demand letter occurred on July 20, 2026, when ORR, through the CO, requested that Acacia provide a sample of the new aggregated data reporting Acacia offered in a July 14, 2026 follow-up communication as a possible way to resolve the invoice substantiation issue; in its July 20, 2026 communication, the CO also provided a template excel spreadsheet of the information that could allow ORR to substantiate the invoices as an alternative to Acacia's proposal and to facilitate information sharing among the parties.  Despite some clarification messages between Acacia and the CO on July 20, 2026 and July 24, 2026, ORR and the CO have not received a full response from Acacia regarding the CO's July 20, 2026 communication. Further, on July 21, 2026, Acacia's CEO stated in a press conference recorded on Youtube that, "We are still in negotiations with the government over the delayed payments and very much trying to understand what their position is." *See* Acacia, Press Call: Crisis Point for 20,000 Unaccompanied Immigrant Kids, Risk Losing Legal Representation, available at https://www.youtube.com/watch?v=cO21UetHsas (Statement of Acacia CEO Shaina Aber at 31:07).

37. ORR does not understand Acacia's June 15, 2026 demand letter to be a formal certified claim under the CDA because Acacia never characterized it as such, and because the June 15th demand letter does not meet the statutory requirements to be one. Based on the CO's communications with Acacia outlined above and Acacia's July 21st public statement, ORR understands the parties to still be attempting to resolve the invoice substantiation issue through the ordinary contract-administration process established by the FAR.

38. In my experience, the Government's review of invoice support and requests for additional documentation are ordinary aspects of federal contract administration designed to ensure that appropriated funds are expended only for allowable and properly substantiated costs. Disagreements with contractors regarding the content of those substantiation requests are not uncommon. The existence of a disagreement regarding invoice documentation or payment does not eliminate the parties' contractual rights or the dispute-resolution procedures established by the contract, regulation, and statute. Rather, those procedures are specifically designed to resolve disagreements over payment, including disputes concerning whether invoices are adequately supported or comply with applicable legal requirements, for the purpose of facilitating payment consistent with those laws.

39. Because Acacia serves as the incumbent contractor providing a nationwide legal-services network pursuant to a contract that expires on July 31, 2026, ORR determined that an orderly transition process is necessary. According to Acacia, the existing network is responsible for approximately 24,000 active matters involving unaccompanied children. Transitioning these matters requires the orderly transfer of case files, attorney-client privileged information, and other information necessary to permit successor providers to assume representation consistent with applicable ethical obligations. For that reason, ORR sought to negotiate a short-term transition arrangement with Acacia while also performing market research to identify other entities capable of assuming performance after July 31, 2026 with minimal interruption. These activities have occurred contemporaneously with ORR's ongoing administration of the existing contract. However, Acacia rejected a new bridge contract that would have clarified ORR's requirements and Acacia's obligations with respect to, among other things, invoice substantiation. ORR nevertheless continues good-faith efforts to negotiate an orderly transition while simultaneously pursuing additional actions to maintain continuity of services.

40. My involvement with administration of the Acacia contract has occurred against the backdrop of these broader procurement efforts. The same agency officials responsible for maintaining continuity of legal services, transitioning the services after July 31, and ensuring compliance with applicable requirements have also continued administering the existing contract, including review of contractor submissions and invoices. In my experience, those activities are all components of ordinary

federal contract administration. At no point have I understood ORR's administration of the existing contract—including its review of invoice supporting documentation—to reflect an intent to discontinue legal services or evade the Court's preliminary injunction. Rather, ORR has continued administering the existing contract while simultaneously pursuing transition planning actions intended to ensure the continued availability of legal services for UAC after July 31, 2026—efforts which are being actively obstructed by Acacia through bid protests.

41.     The ordinary administrative process for resolving procurement challenges contemplates preservation of the status quo while a timely bid protest is adjudicated. Under the Competition in Contracting Act ("CICA"), a disappointed offeror such as Acacia may file a bid protest with the GAO challenging a solicitation or contract award. If a protest is timely filed, CICA generally prohibits the procuring agency from awarding the contract while the protest is pending—or, if the contract has already been awarded, requires suspension of contract performance, unless the agency invokes the statute's limited override authority. 31 U.S.C. § 3553(c), (d).

42.     ORR understands the Court's preliminary injunction to have contemplated the contractual nature of ORR's chosen implementation mechanism, the normal operation of contractual processes, and the parallel operation of applicable statutes and regulations, including the FAR, CDA, and CICA, which ORR must abide by in administering the current contract and in soliciting new contracts.

Executed on July 31, 2026.


_____

Richard B. Debany