GIBSON, DUNN & CRUTCHER LLP
Katherine Marquart (CA Bar No. 248043)
Ariana Sañudo (CA Bar No. 324361)
Arthur Halliday (CA Bar No. 347620)
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
kmarquart@gibsondunn.com
asanudo@gibsondunn.com
ahalliday@gibsondunn.com

Laura M. Sturges (CO Bar No. 36843) (pro hac vice)
Patricia M. Herold (CO Bar No. 54552) (pro hac vice)
Caelin Moriarity Miltko (CO Bar No. 56721) (pro hac vice)
1900 Lawrence Street, Suite 3000
Denver, CO 80202-2211
(303) 298-5700
lsturges@gibsondunn.com
pherold@gibsondunn.com
cmoriaritymiltko@gibsondunn.com

IMMIGRANT DEFENDERS LAW CENTER
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org

JUSTICE ACTION CENTER
Esther H. Sung (CA Bar No. 255962)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

AMICA CENTER FOR IMMIGRANT RIGHTS
Adina Appelbaum (VA Bar No. 88974) (pro hac vice)
Samantha Hsieh  (VA Bar No. 90800) (pro hac vice)
Peter Alfredson (D.C. Bar No. 1780258) (pro hac vice)
Evan Benz (NC Bar No. 49077) (pro hac vice)
Amica Center for Immigrant Rights
1025 Connecticut Ave., NW, Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, et al.,<br><br>　　　　　　　Plaintiffs,<br>　　　v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,<br>　　　　　　　Defendants. | CASE NO. 4:25-CV-02847-AMO<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION TO ENFORCE THE PRELIMINARY INJUNCTION**<br><br>Date:　　　August 6, 2026<br>Time:　　　2:00 p.m.<br>Judge:　　Hon. Araceli Martínez-Olguín<br>Date Action Filed: March 26, 2025 |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

DEVELOPMENTS SINCE PLAINTIFFS' MOTION ....................................................... 2

ARGUMENT ........................................................................................................................... 4

I.     Defendants concede they are not paying out available funding, which violates both the text and spirit of the preliminary injunction. ...................................................... 4

II.    Defendants cannot use the contract as a shield for their non-compliance. ................... 6

III.   Even if they were relevant, Defendants' specific contractual excuses are meritless. ........................................................................................................................ 8

     A.    Defendants' Purported "Substantiated Concerns" Have No Basis. ................. 8

     B.    Defendants' Arguments That This Data Exists Are Nonsensical. .................. 11

     C.    Defendants Seek Confidential and Privileged Information. ........................... 13

IV.   The Court should not permit Defendants to remain non-compliant pending a possible motion to modify the order. .............................................................................. 14

V.    The Court should not require a bond. ........................................................................... 15

CONCLUSION ...................................................................................................................... 15

# TABLE OF AUTHORITIES

## Cases

*Afghan and Iraqi Allies Under Serious Threat Because of Their Faithful Service to the United States v. Rubio*,
824 F. Supp. 3d 64 (D.D.C. 2026) ...............................................................................................6

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
768 F. Supp. 3d 1 (D.D.C. 2025) .................................................................................................7

*City and County of San Francisco v. Trump*,
782 F. Supp. 3d 830 (N.D. Cal. 2025) .......................................................................................15

*Cmty. Legal Servs. in East Palo Alto v. U.S. Dep't of Health and Human Servs.*,
137 F.4th 932 (9th Cir. 2025) ...............................................................................................5, 14

*Flaherty v. Pritzker*,
17 F. Supp. 3d 52 (D.D.C. 2014) ..............................................................................................15

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc.*,
774 F.3d 935 (9th Cir. 2014).......................................................................................................5

*New York Times Co. v. Dept. of Defense*,
--- F. Supp. 3d ---, 2026 WL 962252 (D.D.C. Apr. 9, 2026).................................................5, 7

*Peacock v. Thomas*,
516 U.S. 349 (1996).....................................................................................................................7

*Shillitani v. U.S.*,
384 U.S. 364 (1966).....................................................................................................................7

*Simon v. City & Cnty. of San Francisco*,
2024 WL 4314207 (N.D. Cal. Sept. 26, 2024) ...........................................................................5

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,
766 F.2d 1319 (9th Cir. 1985).....................................................................................................15

## Statutes

8 U.S.C. § 1232(c)(5)..........................................................................................................................8

## Other Authorities

45 C.F.R.§ 410.1309(a)(4) ..................................................................................................................5

Advisory Opinion No. 544, 103 N.J. 399, 411–12 (1986)..................................................................13

CA Eth. Op. 2016-195, 2016 WL 4268977, at *1 ..............................................................................14

FAR 2.212-4.......................................................................................................................................12

Gibson, Dunn &
Crutcher LLP

**INTRODUCTION**

Instead of "provi[ding] funds for direct legal representation services to unaccompanied children," as required by this Court's order, Defendants are "cutting off access to congressionally appropriated funding." Defendants admit there is funding available. Defendants also admit they have withheld funds for "direct legal representation services to unaccompanied children" as a result of new demands Defendants have made. Defendants are not complying with the preliminary injunction. The Court should enforce its order.

Defendants' actions have put Plaintiffs, other legal service providers, and the more than 20,000 unaccompanied children they serve in an even more precarious position than the one they were in last April, when this Court entered its preliminary injunction. For months, Defendants have withheld funding for services provided eight months ago, threatening Plaintiffs' abilities to provide these services going forward and causing irreparable harm to the availability and ability of legal services providers to represent unaccompanied children. Some providers have already been forced to start declining new representations for unaccompanied children, winding down existing representations and/or furloughing and terminating highly trained staff because Defendants' actions have made it uncertain as to whether providers will ever receive payment. Even if funding is reinstated at some uncertain, future date, many of these organizations could not simply or quickly be rebuilt to provide these services at scale, particularly in remote areas of high need.

Even worse, although Defendants have represented to this Court for months that their only vehicle to comply with the Court's order is the contract with Acacia Center for Justice ("Acacia"), that contract expired on July 31, 2026. As far as Plaintiffs are aware, no bridge contract has taken its place, and there is no evidence Defendants have taken any other actions to comply with the preliminary injunction.

Defendants try to relitigate the merits of the preliminary injunction, arguing that the Court cannot review or enforce their compliance because they have chosen to implement the preliminary injunction through a contract. Defendants' positions fail on the law and the facts. The Court has inherent power to enforce its preliminary injunction, and contracts and regulations do not shield Defendants from scrutiny. Moreover, Defendants' contractual excuses are nonsensical and contain

Gibson, Dunn & Crutcher LLP

1

factual and logical weaknesses that suggest this is merely their latest maneuver to violate the Trafficking Victims Protection Reauthorization Act ("TVPRA") and the Foundational Rule.  Finally, the Court should reject Defendants' requests to impose the same stay and bond the Court has already rejected, which appear to be yet another attempt to stall while they continue to do further damage to eviscerate the financially fragile network of legal service providers that serve unaccompanied children.

Today, more than 20,000 children are not receiving funded representation and as of August 1, 2026, to Plaintiffs' knowledge, there is not even a mechanism to provide it.  Between the filing of this brief and the hearing on this motion, these children will have court dates and filing deadlines, and may face those without a lawyer—entirely because of Defendants' non-compliance with the preliminary injunction.  Plaintiffs urge the Court to act as quickly as possible to enforce its order and uphold the TVPRA and Foundational Rule.

## DEVELOPMENTS SINCE PLAINTIFFS' MOTION

Critical developments since Plaintiffs filed their motion further reveal Defendants' latest attempt to avoid compliance with the law and the preliminary injunction.

The contract through which the Office of Refugee Resettlement ("ORR") paid Acacia (and Plaintiffs as sub-contractors) to provide direct representation and other legal services to unaccompanied children, lapsed on July 31, 2026.  Supplemental Declaration of Michael Lukens ("Lukens Suppl. Decl.") ¶ 18.  Before the contract lapsed, ORR refused to engage with Acacia on any extension or bridge contract that did not require Acacia to provide the same impossible, confidential data that Defendants insist justifies their illegal delay of payment.  *Id.* ¶ 5.

Each of Defendants' status reports in this case cited a contract between ORR and Acacia as Defendants' chosen method of complying with the preliminary injunction.  *See* Dkt. 91, 98, 104, 127, 137, 142, 146, 148, 150, 151, 153, 156, 160.  Now that the Acacia contract has expired, Defendants' counsel has represented that ORR will sign a bridge contract for legal services, with an unknown group of contractors—but Plaintiffs are not aware of *any* confirmed contract ORR has with *any* parties to fund *any* direct representation of unaccompanied children or any other vehicle through which Defendants are providing these services, as required by the TVPRA, the Foundational Rule, and the

Gibson, Dunn & Crutcher LLP

2

preliminary injunction. Lukens Suppl. Decl. ¶¶ 16-17; Dkt. 87 at 19, 22, 28. Thus, as of August 1, 2026, it appears that Defendants no longer have any vehicle in place to comply with the TVPRA, the Foundational Rule, and this Court's order, Lukens Suppl. Decl. ¶ 19, despite the continued availability of congressionally appropriated funding, Dkt. 166 at 17, and this Court's injunction.

ORR waited until the last week of the contract to begin discussions about transitioning cases, even though Acacia previously prepared a transition plan that outlined the timelines and information for a feasible transition to new contractors. Lukens Suppl. Decl. ¶ 6. On July 26, 2026, ORR sent Acacia a Performance Work Statement ("PWS") for "Legal Services Caseload Transfer." *Id.* ¶ 7; *id.* Ex. A. The PWS called for Acacia and its subcontractors to take certain actions to transition some representations of unaccompanied children to an unidentified future contractor following expiration of the Acacia contract on July 31, 2026. *Id.* Under the PWS, certain categories of cases, including cases without an identified form of relief, cases seeking certain types of relief, such as relief under the Convention Against Torture, motions to re-open, or appeals, would not be eligible for transition to a new contractor, forcing the lawyers handling these cases to continue their previously funded representations for free (if they are able to do so) or leaving these children abruptly stripped of counsel. *Id.* The PWS explicitly would not pay for any legal services for unaccompanied children during the transition period up to 120 days, which would mean providers would potentially have to provide months more of free services after months of withheld payments. *Id.* Further, the PWS indicated that Defendants expect that at least some providers would continue to provide services under a new contract, which will be soon impossible if more providers are forced to limit their representation services and proceed with furloughs and layoffs because Defendants have withheld funding. *Id.*

On July 29, 2026, at 7:33 p.m. Eastern Time, the Department of Health and Human Services ("HHS") sent Acacia an RFP ("Request for Proposal") to perform the transition work in the PWS. Lukens Suppl. Decl. ¶ 9. HHS set a deadline of 8:00 a.m. Eastern *the next day*, July 30, 2026, for any questions about the RFP—giving Acacia 12 total hours and zero business hours to send any questions about the unworkable RFP. *Id.* And HHS set a proposal deadline of 12:00 p.m. Eastern on *the same day*, July 30, 2026, just 17 hours (mostly overnight) after it sent the RFP and only four hours after any questions were due. *Id.* RFP responses take significant time and effort to put together, with a typical

Gibson, Dunn & Crutcher LLP

3

timeline for RFP responses of at least a week for sole-source solicitations and at least thirty days for a public competition.  *Id.* ¶ 12.  A overnight timeline is both unheard-of and impossible to meet.  *Id.* ¶ 9.  Acacia responded to HHS the night of July 29, 2026, explaining that Acacia would need at least five business days to prepare a proposal after the new contractor is identified.  *Id.* ¶ 10.  HHS subsequently moved the deadline for questions to July 31, 2026—the last day of the now-expired contract—and the deadline for proposals to 9:00 a.m. Eastern on August 5, 2026, but has yet to identify any new contractor.  *Id.* ¶ 11.

Although the Court can grant Plaintiffs' motion based only on the factual record of Defendants' withholding of funding, the Court can and should consider that Defendants' actions since the motion was filed necessarily compound the irreparable harms to both Plaintiffs and unaccompanied children—leaving no doubt that Defendants' actions eviscerate this Court's preliminary injunction.  As of today, ORR has not contacted Acacia or Plaintiffs to transition any cases, and is not paying for any representations.  Lukens Suppl. Decl. ¶ 18.  No lawyer is providing funded representation to a single unaccompanied child.  *Id.*

## ARGUMENT

### I. Defendants concede they are not paying out available funding, which violates both the text and spirit of the preliminary injunction.

The language of this Court's preliminary injunction order is clear:  Defendants are prohibited from "withdrawing the services or funds provided by [ORR] as of March 20, 2025" and "preclude[d from] cutting off access to congressionally appropriated funding for its duration."  Dkt. 87 at 28. Defendants do not contest that they have cut off access to congressionally appropriated funds, Dkt. 169, arguing instead that their actions are justified by newly identified "substantiation concerns" and previously rejected merits arguments.  *Id.*  Defendants further admit the only way to "unlock payment" of the funds is to retroactively provide newly requested (and impossible to provide) information, including confidential information, *id.* at 6–7, but the order does not permit "locking" funds in the first place.  *See* Dkt. 87 at 28.  This is a violation of the order.

This Court found that Plaintiffs are likely to succeed on each of their claims, including because the TVPRA "creates an affirmative obligation on the Government" to fund counsel to represent

unaccompanied children if congressionally appropriated funds remain available, Dkt. 87 at 19–20, and ORR's Foundational Rule states that Defendants "'shall fund' direct representation so long as funds remain available . . . ," Dkt. 87 at 22 (45 C.F.R.§ 410.1309(a)(4)). The Ninth Circuit has already firmly rejected Defendants' request to stay the Court's order pending appeal, holding that "plaintiffs seek to enforce compliance with statutes and regulations" through the order. *Cmty. Legal Servs. in East Palo Altov. U.S. Dep't of Health and Human Servs.*, 137 F.4th 932, 938 (9th Cir. 2025).

Defendants' bid to ground their violation in "significant invoice substantiation concerns" is an attempted end-run around the order (and the TVPRA and Foundational Rule), frustrating its principal objective:  to ensure the continued funding of services for unaccompanied minors and enforce compliance with the law. *See, e.g., New York Times Co. v. Dept. of Defense*, --- F. Supp. 3d ---, 2026 WL 962252, at *9 (D.D.C. Apr. 9, 2026) (granting motion to enforce injunction after the Government "flout[ed]" the "principles at the heart" of the order); *see also Simon v. City & Cnty. of San Francisco*, 2024 WL 4314207, at *3 (N.D. Cal. Sept. 26, 2024). Having failed in their initial attempt to cut off funding wholesale, Defendants pivoted, now conditioning funding on impossible-to-fulfill information demands despite previous assurances that the billing process would remain the same. Dkt. 166-1 ¶ 8. The tactic has changed, but the result remains the same:  Defendants are "cutting off access to congressionally appropriated fund[s]." Dkt. 87 at 28. The Court should countenance no such effort. *See New York Times Co.*, 2026 WL 962252, at *4 (the Government cannot "take steps to circumvent the Court's injunction and expect the Court to turn a blind eye"); *Simon*, 2024 WL 4314207, at *3 ("Defendants' behavior . . . is the same conduct that formed the basis for the Court's injunction, and there can be no question that the conduct violates the spirit of the injunction").

Whether Defendants intended to violate the order in this way is irrelevant to the question of whether the violation occurred, *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc.,* 774 F.3d 935, 950 (9th Cir. 2014); regardless, myriad indicators suggest Defendants did so intend. As explained in full in Plaintiffs' motion, Dkt. 166 at 19, Defendants: (1) requested new, impossible-to-produce retroactive data after years of processing bills without it; (2) never raised these concerns during status reports and waited until after invoices were already behind schedule to raise the new data requirements; (3) shifted course on whether they would pay without the new requirements; (4) rejected

Gibson, Dunn &
Crutcher LLP

5

alternative offers to provide existing information that does not violate ethical considerations; and (5) rejected offers to provide the information prospectively and with client consent where required. Defendants acted with full knowledge and awareness of the immediate and extreme harm that would result to Plaintiffs and unaccompanied children in the interim. Their purported justifications—265 children who were allegedly removed from the United States (who could have been fully represented prior to or during that deportation process) and their supposed inability to verify the representation of approximately 3,500 children (who may or may not yet have an E-28 or G-28 on file for a myriad of valid reasons)—cannot justify cutting off funding of direct legal representation for more than *twenty thousand* unaccompanied minors for months on end.

Defendants have manufactured a situation with only one possible result: "cutting off access to congressionally appropriated funding" in violation of the preliminary injunction, the TVPRA, and the Foundational Rule. The Court should intervene and compel compliance.

**II.     Defendants cannot use the contract as a shield for their non-compliance.**

Defendants say purported contractual and regulatory rights justify their refusal to spend available funds—and, thus, justify their non-compliance with the preliminary injunction. But whatever contractual or regulatory rights Defendants may have, those rights must be exercised in compliance with this Court's lawful order and do not excuse Defendants' non-compliance. *See Afghan and Iraqi Allies Under Serious Threat Because of Their Faithful Service to the United States v. Rubio*, 824 F. Supp. 3d 64, 77-8 (D.D.C. 2026) (granting motion to enforce, explaining that a presidential proclamation and various statutory provisions that might permit the Government's actions were irrelevant to the Government's non-compliance with the court's order). Defendants have repeatedly tried to make this case a contract dispute to avoid this Court's jurisdiction and to justify violating the TVPRA and the Foundational Rule (and now the preliminary injunction), but both this Court and the Ninth Circuit have rejected this argument each time Defendants have made it. *See* Dkt. 166 at 21 (citing these decisions). Defendants now claim their non-compliance with the preliminary injunction is really just a "contract-administration dispute" between ORR and Acacia, such that this Court cannot issue an order to enforce the preliminary injunction. *See* Dkt. 169 at 2–3. The Court should reject the latest version of this stale argument.

Gibson, Dunn &
Crutcher LLP

REPLY ISO PLAINTIFFS' MOTION TO ENFORCE THE PRELIM. INJUNCTION
CASE NO. 4:25-CV-02847-AMO

The Court has the inherent power to enforce compliance with its own order. *See, e.g., Shillitani v. U.S.*, 384 U.S. 364, 370 (1966) ("There can be no question that courts have inherent power to enforce compliance with their lawful orders . . . ."); *Peacock v. Thomas*, 516 U.S. 349, 356 (1996) (noting a court has "jurisdiction" and "inherent power to enforce its judgments"). Defendants cannot divest the Court of jurisdiction to enforce an order that requires no contracting by voluntarily choosing to comply with the order through contracting.

The logical outcome of Defendants' argument would create a sort of absolute government contracting immunity, whereby the government could choose to use a contract as a vehicle for its purported compliance with a court's order (as it did here), use that contract to engineer the same result the order prohibited (by claiming contractual rights to withhold funds), and then use that contract to prevent the court from enforcing its order. That outcome would be absurd and illegal. *See, e.g., New York Times Co.*, 2026 WL 962252, at *4 (the government cannot "take steps to circumvent the Court's injunction and expect the Court to turn a blind eye").

Defendants next say the Court cannot adjudicate any question arguably touching on ORR's now-expired contract with Acacia, because Acacia is not a party to this case. Dkt. 169 at 8-9. But Plaintiffs are not asking the Court to resolve any contractual question because Plaintiffs do not ask this Court to determine whether Defendants may seek this information as a general matter; only that their belated "cutting off funding" on the basis of these new demands violates this Court's order.

Finally, Defendants advance their own interpretation of the Court's injunction, claiming "it has been Defendants' understanding" that the terms of the contract and federal contracting regulations operate "alongside" the preliminary injunction—and thus that Defendants can invoke these terms without any limitations. Dkt. 169 at 9-10. Defendants' "understanding" of the order is irrelevant; the order is unambiguous. Further, the proper remedy for Defendants to determine the scope of the Court's order was to file a motion seeking clarification, not to violate it for months on end. Defendants cannot seriously argue that executive actions may override court orders. *See AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 768 F. Supp. 3d 1, 4 (D.D.C. 2025) (rejecting the Government's invitation to "confirm their understanding that the TRO does not enjoin Defendants from taking actions . . . based on 'exercise of authorities under statutes, regulations, and other legal authorities'"). Nor can

Gibson, Dunn & Crutcher LLP

7

Defendants place their compliance with the order beyond the reach of this Court by electing to comply with that order via contract.

The Court's task in ruling on Plaintiffs' motion is simpler than Defendants suggest:  the only question is whether Defendants' actions violate the language or intent of the preliminary injunction (a legal standard Defendants neither contest nor meaningfully engage with), not whether those actions might be permissible absent the Court's order.  The preliminary injunction commands Defendants to follow the TVPRA and the Foundational Rule by spending funding available to provide legal representation services for unaccompanied children.  Defendants are withholding available funding and are thus not complying with the injunction.

**III.    Even if they were relevant, Defendants' specific contractual excuses are meritless.**

Defendants attempt to manufacture a contractual dispute—based on data that was never before a condition of payment in over a decade of providing these services—to excuse their failure to pay more than $65 million due to legal services providers for congressionally mandated services.  These contractual excuses lack a sufficient factual or legal basis.

**A.    Defendants' Purported "Substantiated Concerns" Have No Basis.**

Defendants insist they have "[s]ignificant [i]nvoice [s]ubstantiation [c]oncerns" that justify delayed payment.  Dkt. 169 at 3.  They suggest these concerns arose because Defendants purport to identify (1) "significant percentages of children appearing unrepresented"; (2) 3,574 children who Acacia reports as receiving representation services where no notice of representation has been filed with ORR, USCIS, or EOIR; and (3) 265 children who were "repatriated before or during the billing period."  *Id.* at 4.  These concerns are a smokescreen.

First, although Plaintiffs' missions are to ensure as many children are represented as possible, and as much as they desire for every child to have legal counsel, nothing requires representation for every unaccompanied child, particularly when Defendants have not provided sufficient resources to support such an effort.  The TVPRA requires Defendants to "ensure, *to the greatest practicable . . .* that all unaccompanied alien children who are or have been in the custody of" Defendants "have counsel to represent them in legal proceedings."  8 U.S.C. § 1232(c)(5) (emphasis added).  As Defendants have attested in this case, this does not require providing representation to all

Gibson, Dunn & Crutcher LLP

REPLY ISO PLAINTIFFS' MOTION TO ENFORCE THE PRELIM. INJUNCTION
CASE NO. 4:25-CV-02847-AMO

unaccompanied children if there are insufficient resources to do so. *See* Dkt. 24 at 23. And the contract requires Acacia and providers to "serve the maximum number of children possible given available funding and in accordance with ORR directives." Dkt. 169-2 at 22.

In any event, this is an obstacle of Defendants' own making, having cut off access to the resources necessary to provide these critical, congressionally mandated services. Plaintiffs strive to represent as many children as possible, but they are constrained by the resources available—including the funding that Defendants have now withheld for months. The longer this funding is withheld, the more difficult it is for Plaintiffs and other providers to provide these services. Despite claiming that concerns about the number of represented children arose in "late 2025," Defendants apparently made no effort to investigate these concerns until May 2026. Dkt. 169-1 ¶ 10. And Defendants purport to have "reviewed attorney appearances for UAC for the week of May 11, 2026," *after* Defendants already began withholding the funding to provide these services. *Id.* Defendants' failure to comply with this Court's order is already forcing providers to decline taking on new cases and wind down existing representations, demonstrating that the increasing number of unrepresented children is a direct result of Defendants' violation of this Court's orders. *See, e.g.*, Dkt. 166-5 ¶ 11 (GHIRP limiting new cases and narrowing scope of existing cases); Dkt. 166-6 ¶ 9 (AI Justice limiting new representations); Dkt. 166-8 ¶ 6 (MIA winding down operations entirely); Dkt. 166-9 ¶ 12 (NWIRP only taking "emergency cases"); Dkt. 166-10 ¶ 9 (ABA ProBAR restricting representation of new clients for "the past several months"); Dkt. 166-13 ¶ 8 (Estrella del Paso no longer taking new cases).

Second, Defendants attempt to manufacture a substantiation issue based on a small number of alleged data discrepancies. At most, Defendants claim they cannot verify services for 3,839 children, less than 16% of the 24,157 children identified by Acacia as receiving services as of November 30, 2025. Dkt. 169-3 at 1. The solution to such concerns (if valid) should be targeted requests to substantiate those specific services, not withholding all funds. But these numbers are based on a misreading of the relevant data. Defendants purport to identify these children based on Acacia's December Legal Representation Activity Report, which lists 24,157 A-Numbers for children who received services. Dkt. 166-2 at 7. Although the report is referred to as Acacia's "December" report, there is no dispute that this report only provides information regarding services provided as of

Gibson, Dunn &
Crutcher LLP

November 30, 2025. Defendants misuse this list to raise concerns about services provided the *following* month—in December 2025—asserting to Acacia and this Court that "265 UAC are documented as no longer being in the United States during December 2025 because they were previously repatriated." Dkt. 169-8 at 2; *see also* Dkt. 169 at 4 (indicating these children were "repatriated before or during the billing period"). Despite now acknowledging that Acacia's list provides information regarding services as of November 30, 2025, *see* Dkt. 169-3 at 2, Defendants have not updated this number to reflect the correct month, November 2025, and continue to rely on these mismatched figures in their pleadings to legitimize their new data requests.

Third, Defendants' purported concern that they cannot identify formal notices of representation for all children Acacia lists as receiving services under the contract misunderstands how services are provided.[1] As Acacia already explained, Acacia and providers "provide[] other CLIN 2 services to children who are not represented" and "monthly invoice submissions for CLIN 2 labor and expenses include services provided to both represented and non-represented children." Dkt. 166-2 at 5. As a result, not every child served under the contract will have a formal notice of representation form filed on their behalf. Further, representation may begin before a formal notice of representation form is filed with a government entity, because representation begins when the child accepts an offer of representation. *Id.* at 8. Expecting to identify a notice of representation for every child receiving these services runs counter to how these services are provided in practice.

Fourth, Defendants' purported concern about repatriated children is similarly misplaced. Children may receive services that continue after they leave the United States—for example, a child may continue to pursue a pending U-Visa claim. *Id.* at 9. And a case may remain open after a child leaves the country, as the provider finishes required closeout activities such as disengagement letters. *Id.* Provision of services to children who may have left the country is not evidence of any "substantiation concern."

_____

[1] Notably, Defendants' brief states that ORR could not identify a notice of representation form "in any available federal system" for "at least 3,574 children." Dkt. 169 at 4. This misrepresents Defendants' own record. According to ORR's records, for the December 2025 dataset (providing numbers for November 2025), ORR identified 3,574 A-Numbers without G-28 or E-28 forms. However, this number decreases to 2,928 when ORR considers children for whom a Form L-3, another type of Notice of Representation that is filed with ORR, has been filed. Dkt. 169-3 at 1.

Gibson, Dunn & Crutcher LLP

10

REPLY ISO PLAINTIFFS' MOTION TO ENFORCE THE PRELIM. INJUNCTION
CASE NO. 4:25-CV-02847-AMO

Finally, Defendants rely upon a post-hoc audit—dated June 15, 2026, signed July 1, 2026, long after Defendants began withholding funds—conducted by the Defense Contract Audit Agency ("DCAA") that they insist substantiates their concerns. Dkt. 169 at 4–5. However, like Defendants, the audit refuses to consider how labor costs can be substantiated with available information, instead taking the position that all supporting documentation must retroactively identify the unaccompanied child for whom work was performed. *See, e.g.*, Dkt. 169-5 at 33. The DCAA does not explain why this information is necessary or why the information Acacia has offered is insufficient. The audit merely confirms the fundamental problem: the DCAA, like Defendants, is insisting on a new standard to substantiate the work performed. But this new standard (by child instead of task category) is unsupported by the long history of this contract or any other reasoning.

Defendants' purported "concerns" fall flat and cannot justify Defendants' failure to pay any funding due for direct legal representation services performed since December 2025.

**B.      Defendants' Arguments That This Data Exists Are Nonsensical.**

Defendants say it is "Not True" that "it is impossible for Acacia to produce the requested information." Dkt. 169 at 6. Defendants do not contest that they have never required this information under any contract or as a prerequisite to payment. Defendants also do not contest that they reversed course here after making assurances in August 2025 that the invoicing procedures would remain the same and then again after initially agreeing to pay the outstanding invoices without this information on May 29, 2026. Dkt. 166-1 ¶¶ 8, 13. Instead, they suggest this data must exist because they now view it as required under the contract.

First, Defendants' assertion that they only seek "A-numbers, attorney and firm names, dates of representation, and EOIR-28/G-28 filing dates," Dkt. 169 at 6, is misleading. The information demanded includes information describing the scope of the legal representation and what types of relief may be sought, Dkt. 166-1 ¶ 11, and Defendants later acknowledge that they have demanded billable hours for each child, Dkt. 169 at 7. It is this particular demand for retroactively-generated,

case-by-case billable hour reports that is impossible to recreate retroactively.[2]  Dkt. 166-1 ¶¶ 9–12.

Second, Defendants attempt to suggest these records must exist by *ipse dixit* claiming the contract requires them, relying solely on their declarant's summary of the contract, without quoting the actual contract.  Dkt. 169 at 6 (quoting Dkt. 169-1 ¶ 8).  The declaration points to Objective IV(d) in Section C.2, but that section requires Acacia to "collect quantitative and qualitative data on program services performed by LSPs," and providers to report to Acacia "individualized data on date, location, and other service delivery details on KYRs, legal screenings, representation, referrals, and other legal services."  Dkt. 169-2 at 30-31.  It *does not* require either hourly collection of time spent per child (as opposed to by labor category) or for Acacia to share that information with ORR.  In contrast to this "objective," the invoice requirements merely require "supporting documentation to (1) substantiate the number of labor hours invoiced for each labor category, and (2) substantiate material costs incurred (when applicable)."[3]  *Id.* at 53.  This is, of course, precisely what Acacia and providers have already provided to Defendants.  Dkt. 166-2 at 5 ("Acacia validates the invoices we receive from LSPs against deliverables-based reporting and time and effort documentation, both of which we provide to the Government.  Acacia further requires time and effort reporting *at the task-level with LSPs*." (emphasis added)).  And, if further information is needed, Acacia has offered to provide "a billing breakdown by provider and task code" to further substantiate these invoices.  Dkt. 166 at 11.

Defendants suggest that providers should have begun collecting this information in September 2025 when ORR allegedly made a similar request at that time to Acacia, Dkt. 169-1 ¶ 23, that it then withdrew.  Notably, Defendants do not attach that communication to their filing, making it impossible to know precisely what information was requested in September 2025 and whether it included the billable hour information Defendants now insist is necessary.  Plaintiffs understand that the September 2025 data request did *not*, in fact, seek billable hours by child.  Lukens Suppl. Decl. ¶ 4.  Moreover, Plaintiffs understand it was one of many routine data requests that Acacia handles under the contract.

---

[2] Other information would be burdensome to collect and report retroactively.  For example, while it may be technically possible to identify retroactively all hearings that occurred by reviewing individual case records, this would require a significant amount of time and effort to compile.

[3] FAR likewise does not impose a requirement to create these records.  Instead, it incorporates the contract's specific requirements.  *See* FAR 2.212-4, Alt. 1 (requiring, among other items, "other substantiation specified in the contract").

12

Gibson, Dunn &
Crutcher LLP

*Id.* In any event, providers had no ability to foresee that, months later, Defendants would withhold funding for months in pursuit of information Acacia had already informed them was likely confidential and could not be provided. *See* Dkt. 169-1 ¶ 23.

Third, it is absurd for Defendants to argue Acacia's and Plaintiffs' previous negotiations prove that retroactive case-by-case billable hour information is available for services rendered months ago. As Defendants admit, both Acacia and Plaintiffs have offered to provide billable hour information for each represented child on a *prospective* basis only and where providers obtain client consent to share confidential information. This merely reflects that providers can create billable hour records by child going forward (something no one disputes). It has no bearing on whether providers can accurately recreate billable hour entries by child for services performed more than eight months ago given the time that has passed and the extensive personnel burden required to retroactively create even an approximation of such record retroactively. Defendants make no effort to explain how this information should be recreated.

Defendants cannot show that the information they have actually demanded can be accurately recreated for services provided in December 2025. Nor can they indefinitely withhold payments required under this Court's order because providers cannot perform the impossible.

### C.    Defendants Seek Confidential and Privileged Information.

Defendants make a conclusory argument that the information they demand—including "billable hours"—is not privileged because they characterize it as "ordinary substantiation" that does "not require disclosure of privileged communications, litigation strategy, or the substantive content of representation." Dkt. 169 at 7. But the information demanded is much broader, and seeks information that would reveal litigation strategy or "substantive content" of the representation, including information about the scope of the representation and the types of relief sought. Dkt. 166-1 ¶ 11.

Also, an attorney's duty of confidentiality is broader than privilege. The duty of confidentiality extends "to all information relating to the representation, whatever its source." Comment [3] to Am. Bar Ass'n R. 1.6(a). In some circumstances, this may include client-identifying data, the fact of representation, and even certain publicly available facts. *See* Advisory Opinion No. 544, 103 N.J. 399, 411–12 (1986) (finding that "client-identifying data with respect to persons

receiving legal assistance" through a non-profit constituted "information relating to representation" such that "it would be improper to reveal such information to either public or private funding sources in the absence of valid consent or reasonable rules clearly requiring disclosure for legitimate purposes"); CA Eth. Op. 2016-195, 2016 WL 4268977, at *1 (Cal. St. Bar. Standing Comm. Prof. Resp. Jan. 1, 2016) (confidential information includes "publicly available information that the lawyer obtained during the professional relationship which the client has requested to be kept secret or the disclosure of which is likely to be embarrassing or detrimental to the client"). Thus, Defendants cannot demand that Acacia or providers identify their clients as a condition of payment.

Defendants ignore that providers (through Acacia) have offered to provide much of the requested information in a manner that does respect attorneys' duties of confidentiality and privilege by identifying all children represented by the network, the total number of cases for each provider, and "if available and with consent, the provider and whether the attorney has formally appeared." Dkt. 166 at 5. Defendants have rejected this offer that would provide the A-Number of all represented children, information regarding the amount of work performed by each provider, and, consistent with ethical obligations, specific representation information where a child has consented to sharing. Defendants already have other information, including the EOIR-28 and G-28 forms they insist are necessary, as well as L-3 forms that contain similar information. *See* Dkt. 169-3.

Defendants' opposition does not address a single governing privilege or confidentiality standard, and instead merely attempts to wave away these concerns. This Court should not allow them to do so as justification for their continued violation of the Court's orders.

**IV.    The Court should not permit Defendants to remain non-compliant pending a possible motion to modify the order.**

After failing to comply with the Court's injunction causing irreparable harm to Plaintiffs and the unaccompanied children they serve, Defendants now ask the Court to delay any enforcement order to allow them to file a motion to amend the preliminary injunction. Dkt. 169 at 9. In effect, Defendants are asking (again) to stay the order to allow them to challenge it, though this Court and the Ninth Circuit denied their earlier requests to do so. *Id.*; Dkt. 107; *Cmty. Legal Servs. in East Palo Alto v. U.S. Dep't of Health and Human Servs.*, 137 F.4th 932, 942–43 (9th Cir. 2025). Defendants

Gibson, Dunn & Crutcher LLP

14

have made no showing of a change in circumstances warranting modifying the preliminary injunction; nor can they excuse their failure to comply with the Court's injunctive relief. *Supra* Sections I–III. Delaying issuing an enforcement order pending a motion to modify only rewards Defendants for their ongoing noncompliance. *See City and County of San Francisco v. Trump*, 782 F. Supp. 3d 830, 836 (N.D. Cal. 2025) (courts should rejects attempts to "end run around the Preliminary Injunction"). Moreover, this Court specifically tasked Defendants with coming to it with a properly briefed motion to modify at the July 16, 2026, hearing if one were required. Defendants chose not to, instead opting to merely request leave to file such a motion in attempt to further delay resolution of the issues Plaintiffs have properly raised. Because Plaintiffs have "demonstrate[d] that . . . [D]efendant[s] ha[ve] not complied with a[n order] entered against [them]," this Court should grant Plaintiffs' motion to enforce. *Flaherty v. Pritzker*, 17 F. Supp. 3d 52, 55 (D.D.C. 2014) (quotation marks omitted).

## V.    The Court should not require a bond.

The Court already rejected Defendants' request to bond this injunction. Dkt. 87 at 26–27. Nothing has changed to justify a bond now. *See Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985).

## CONCLUSION

The Court should grant Plaintiffs' motion to enforce and issue any order necessary to ensure Defendants' compliance with the preliminary injunction, the TVPRA, and the Foundational Rule.

Respectfully submitted,

August 3, 2026

/s/ Laura M. Sturges                          /s/ Karen C. Tumlin

GIBSON, DUNN & CRUTCHER LLP        JUSTICE ACTION CENTER
Katherine Marquart (CA Bar No. 248043)   Esther H. Sung (CA Bar No. 255962)
Ariana Sañudo (CA Bar No. 324361)        Karen C. Tumlin (CA Bar No. 234691)
Arthur Halliday (CA Bar No. 347620)      Laura Flores-Perilla (CA Bar No. 355645)
333 South Grand Avenue                   JUSTICE ACTION CENTER
Los Angeles, CA 90071-3197               P.O. Box 27280
(213) 229-7000                           Los Angeles, CA 90027
kmarquart@gibsondunn.com                 (323) 450-7272
asanudo@gibsondunn.com                   esther.sung@justiceactioncenter.org
ahalliday@gibsondunn.com                 karen.tumlin@justiceactioncenter.org
                                         laura.flores-
Laura M. Sturges (CO Bar No. 36843) (*pro hac vice*)   perilla@justiceactioncenter.org
Patricia M. Herold (CO Bar No. 54552) (*pro hac vice*)
Caelin Moriarity Miltko (CO Bar No. 56721) (*pro hac vice*)   /s/ Samantha Hsieh
1900 Lawrence Street, Suite 3000
Denver, CO 80202-2211                    AMICA CENTER FOR IMMIGRANT
(303) 298-5700                           RIGHTS
lsturges@gibsondunn.com                  Adina Appelbaum (*pro hac vice*)
pherold@gibsondunn.com                   Samantha Hsieh (*pro hac vice*)
cmoriaritymiltko@gibsondunn.com          Peter Alfredson (D.C. Bar No. 1780258)
                                         Evan Benz (*pro hac vice*)
                                         Amica Center for Immigrant Rights
/s/ Alvaro M. Huerta                     1025 Connecticut Ave., NW, Suite 701
                                         Washington, D.C. 20036
IMMIGRANT DEFENDERS LAW CENTER    (202) 331-3320
Alvaro M. Huerta (CA Bar No. 274787)     adina@amicacenter.org
Carson A. Scott (CA Bar No. 337102)      sam@amicacenter.org
Lya Ferreyra (CA Bar No. 340148)         peter@amicacenter.org
Immigrant Defenders Law Center           evan@amicacenter.org
634 S. Spring St., 10th Floor
Los Angeles, CA                          *Attorneys for Plaintiffs*
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org

Gibson, Dunn &
Crutcher LLP

16

REPLY ISO PLAINTIFFS' MOTION TO ENFORCE THE PRELIM. INJUNCTION
CASE NO. 4:25-CV-02847-AMO

**ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3) of the Northern District of California, I attest that concurrence in the filing of this document has been obtained from each of the other signatories to this document.

DATED:  August 3, 2026                                  GIBSON, DUNN & CRUTCHER LLP

                                                        By: */s/ Laura M. Sturges*

                                                        Laura M. Sturges

                                                        *Attorneys for Plaintiffs*

Gibson, Dunn &
Crutcher LLP

REPLY ISO PLAINTIFFS' MOTION TO ENFORCE THE PRELIM. INJUNCTION
CASE NO. 4:25-CV-02847-AMO