GIBSON, DUNN & CRUTCHER LLP
Katherine Marquart (CA Bar No. 248043)
Ariana Sañudo (CA Bar No. 324361)
Arthur Halliday (CA Bar No. 347620)
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
kmarquart@gibsondunn.com
asanudo@gibsondunn.com
ahalliday@gibsondunn.com

Laura M. Sturges (CO Bar No. 36843) (pro hac vice)
Patricia M. Herold (CO Bar No. 54552) (pro hac vice)
Caelin Moriarity Miltko (CO Bar No. 56721) (pro hac vice)
1900 Lawrence Street, Suite 3000
Denver, CO 80202-2211
(303) 298-5700
lsturges@gibsondunn.com
pherold@gibsondunn.com
cmoriaritymiltko@gibsondunn.com

IMMIGRANT DEFENDERS LAW CENTER
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org

JUSTICE ACTION CENTER
Esther H. Sung (CA Bar No. 255962)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

AMICA CENTER FOR IMMIGRANT RIGHTS
Adina Appelbaum (VA Bar No. 88974) (pro hac vice)
Samantha Hsieh (VA Bar No. 90800) (pro hac vice)
Peter Alfredson (D.C. Bar No. 1780258) (pro hac vice)
Evan Benz (NC Bar No. 49077) (pro hac vice)
Amica Center for Immigrant Rights
1025 Connecticut Ave., NW, Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, et al.,
Plaintiffs,
v.
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,
Defendants.

CASE NO. 4:25-CV-02847-AMO

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ORDER TO SHOW CAUSE WHY DEFENDANTS ARE NOT IN VIOLATION OF THE PRELIMINARY INJUNCTION AT AN IMMEDIATE EVIDENTIARY HEARING**

Date: September 24, 2026
Time: 2:00 p.m.
Judge: Hon. Araceli Martínez-Olguín
Date Action Filed: March 26, 2025

PLEASE TAKE NOTICE that, on September 24, 2026, at 2:00 p.m., in the United States District Court for the Northern District of California, 1301 Clay St., Oakland, CA 94612, Plaintiffs Community Legal Services in East Palo Alto, Social Justice Collaborative, Amica Center for Immigrant Rights, Estrella del Paso, Florence Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project, Immigrant Defenders Law Center, National Immigrant Justice Center, Northwest Immigrant Rights Project, Rocky Mountain Immigrant Advocacy Network, and Vermont Asylum Assistance Project, will, and hereby do, move this Court for an order directing Defendants United States Department of Health and Human Services, Office of Refugee Resettlement, and Department of the Interior to show cause at an evidentiary hearing—scheduled at the earliest possible date—to demonstrate why they should not be found in violation of this Court's April 29, 2025 preliminary injunction.

On April 29, 2025, this Court issued a preliminary injunction, which enjoined Defendants "from withdrawing the services or funds provided by the Office of Refugee Resettlement ('ORR') as of March 20, 2025, under the Trafficking Victims Protection Reauthorization Act of 2008 ('TVPRA'), 8 U.S.C. § 1232(c)(5), and ORR's Foundational Rule, 45 C.F.R. § 410.1309(a)(4), particularly ORR's provision of funds for direct legal representation services to unaccompanied children," and precluded Defendants from "cutting off access to congressionally appropriated funding for its duration." Dkt. 87 at 28. Since April 29, 2025, Defendants have repeatedly represented to this Court that they are complying with this injunction. Dkts. 91, 98, 104, 127, 137, 142, 146, 148, 150, 151, 153, 156. However, Defendants recently unlawfully withheld funding for children's services provided after December 1, 2025—refusing to pay invoices from December forward for services required by both the law and the preliminary injunction unless child clients' confidential data was shared with the Government.

On August 6, 2026, the Court granted Plaintiffs' motion to enforce the preliminary injunction, finding Defendants were violating "both the plain language as well as the spirit of the preliminary injunction" by refusing to "maintain[] the funding of legal representation for unaccompanied minors in accordance with the TVPRA and the Foundational Rule." Dkt. 172 at 2. The Court ordered Defendants to release the withheld funding. *Id.* at 3. And the Court noted that, because the contract

with Acacia through which Defendants had chosen to provide the required services to unaccompanied children expired on July 31, 2026, "no mechanism presently exists by which Defendants are complying with the preliminary injunction." *Id.* The Court ordered Defendants to file a report to "evidence their compliance" with the TVPRA, the Foundational Rule, and the preliminary injunction. *Id.* at 3-4.

Defendants released the withheld funds, Dkt. 176-1, but they have not come into compliance with the law or the Court's preliminary injunction. Instead of laying out a detailed plan for compliance, Defendants' August 13, 2026 declaration that was required to "evidence their compliance" under the Court's enforcement order raises more questions than it answers. *See* Dkt. 177. It appears to be deliberately vague about certain details that would conclusively prove Defendants are not complying with the preliminary injunction or the law, while being oddly precise about purported facts that are entirely unsupported and demonstrably false. And it does not provide any specific details about Defendants' purported agreements or plans to provide required services to unaccompanied children, while evidence filed with this motion shows that Defendants' actions have already caused significant legal services gaps for unaccompanied children across the country.

Plaintiffs now move for an order requiring Defendants to show cause at an evidentiary hearing as to why they should not be found in violation of the preliminary injunction as a result of their continuing and willful failure to provide the services and funding required by the TVPRA, the Foundational Rule, and the preliminary injunction. Plaintiffs ask the Court to order an evidentiary hearing as soon as possible, and ideally in the next week, to require Defendants to provide a full explanation of their non-compliance. Plaintiffs further ask the Court to order Defendants' repeated declarant, Richard Debany, to appear at the evidentiary hearing to testify under oath.

The motion is based upon this notice of motion; the memorandum of points and authorities in support thereof that follows; the declarations of Ana Devereaux, Marion Donovan-Kaloust, Roxana Avila-Cimpeanu, Lauren Fisher Flores, Cristel Stefany Martinez, Andrea Crane, Elizabeth Sanchez Kennedy, Mary McClenahan McCabe, Melissa Mari Lopez, Laura Nally, Vanessa Gutierrez, Lisa Koop, Ashley T. Harrington, and Sarah Hough filed concurrently herewith; the proposed order filed

concurrently herewith; the pleadings, records, and papers on file in this action; oral argument of counsel; and any other matters properly before the Court.

Respectfully submitted,

August 20, 2026

/s/ Laura M. Sturges

GIBSON, DUNN & CRUTCHER LLP
Katherine Marquart (CA Bar No. 248043)
Ariana Sañudo (CA Bar No. 324361)
Arthur Halliday (CA Bar No. 347620)
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
kmarquart@gibsondunn.com
asanudo@gibsondunn.com
ahalliday@gibsondunn.com

Laura M. Sturges (CO Bar No. 36843) (*pro hac vice*)
Patricia M. Herold (CO Bar No. 54552) (*pro hac vice*)
Caelin Moriarity Miltko (CO Bar No. 56721) (*pro hac vice*)
1900 Lawrence Street, Suite 3000
Denver, CO 80202-2211
(303) 298-5700
lsturges@gibsondunn.com
pherold@gibsondunn.com
cmoriaritymiltko@gibsondunn.com

/s/ Alvaro M. Huerta

IMMIGRANT DEFENDERS LAW CENTER
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org

/s/ Karen C. Tumlin

JUSTICE ACTION CENTER
Esther H. Sung (CA Bar No. 255962)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

/s/ Samantha Hsieh

AMICA CENTER FOR IMMIGRANT RIGHTS
Adina Appelbaum (*pro hac vice*)
Samantha Hsieh (*pro hac vice*)
Peter Alfredson (D.C. Bar No. 1780258)
Evan Benz (*pro hac vice*)
Amica Center for Immigrant Rights
1025 Connecticut Ave., NW, Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**INTRODUCTION** .......... 1

**DEVELOPMENTS SINCE DEFENDANTS ALLOWED THE ACACIA CONTRACT TO EXPIRE** .......... 4

**ARGUMENT** .......... 13

I. The Court has inherent powers to issue an order to show cause, enforce compliance, and set an evidentiary hearing. .......... 13

II. The facts and information available show that this Court should issue an order to show cause why Defendants are not complying with the Court's orders. .......... 14

III. The Court should set an evidentiary hearing because Defendants are hiding the extent of their non-compliance. .......... 16

**CONCLUSION** .......... 21

# TABLE OF AUTHORITIES

## Cases

*Cuviello v. City of Oakland*,
No. C-06-5517-MHP(EMC), 2009 WL 734676 (N.D. Cal. Mar. 19, 2009) ....14

*Frew ex rel. Frew v. Hawkins*,
540 U.S. 431 (2004) ....13

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc.*,
774 F.3d 935 (9th Cir. 2014) ....15

*Legal Services Corp. v. Velazquez*,
531 U.S. 533 (2001) ....8

*Nat'l Treas. Empls. Union v. Vought*,
778 F. Supp. 3d 144 (D.D.C. 2025) ....14

*New York Times Co. v. Dept of Defense*,
830 F. Supp. 3d 1 (D.D.C. 2026) ....15

*Spallone v. United States*,
493 U.S. 265 (1990) ....13

## Statutes

8 U.S.C. § 1232(c)(5) ....16

## Rules

ABA Model Rule 1.14 ....9

ABA Model Rule 4.2 ....8

## Regulations

45 C.F.R. § 410.1309(a)(2)(i)(B) ....11

91 Fed. Reg. 50848 (Aug. 6, 2026) ....6

## INTRODUCTION

On the morning of August 6, 2026, in an immigration court in Los Angeles, an unaccompanied child appeared before an immigration judge—facing a Department of Homeland Security attorney and the possibility of removal. *See* Martinez Decl., ¶ 6. The child had no legal representation and appeared on their own. Without legal advice and almost certainly unaware of their rights—to the extent any child could understand the concept of legal rights—the child requested voluntary departure from the United States. *See id*. In some ways, voluntary departure is the nuclear option of immigration court, where an individual relinquishes any relief they may have been qualified to receive and, like in the case of removal, is taken to another country. An attorney from the U.S. Committee for Refugees and Immigrants ("USCRI"), an organization that Defendants' declarant Richard Debany swore is providing "100% coverage for all hearings," was in the courtroom and said nothing as this child asked to waive all rights to seek immigration relief, likely not knowing whether the child qualified for asylum, Special Immigrant Juvenile Status ("SIJS"), or any other relief—and there is no indication the child was even aware of these possibilities and what they could mean for them. *See id.*; Dkt. 177 at 5, ¶ 5.

Luckily, an attorney from a legal service organization that was previously funded by Defendants to provide services to unaccompanied children was also in the courtroom and spoke up as a friend of court, suggesting the judge grant a continuance to allow the child to consult with an attorney—which the judge did. *See* Martinez Decl., ¶ 6. This child nearly waived their due process rights without the opportunity to exercise any of the rights afforded to them by law because Defendants are violating the Court's preliminary injunction and not complying with their obligations under the Trafficking Victims Protection Reauthorization Act ("TVPRA") and Foundational Rule to provide unaccompanied children with independent, funded legal representation. The attorney who stepped in to help protect the child's rights was formerly funded by Defendants to provide legal services required by the law and the preliminary injunction. Defendants were not funding the USCRI lawyer (who observed and did nothing to assist the child or the court) to provide *representation*—a service Defendants are legally obligated to provide to the greatest extent practicable—even though USCRI is core to Defendants' purported plan to provide required services.

Similarly, in Texas, on August 11, 2026, another unaccompanied child appeared in immigration court with no attorney representation. *See* Flores Decl., ¶ 11. At this hearing, no lawyer from any organization (including USCRI) was present to provide friend-of-court or other legal services and the judge granted voluntary departure. *Id.* As a result, that child—and potentially countless others—waived their right to seek any relief from removal without the opportunity to speak to a lawyer or seek representation in their case, violating the purpose of the TVPRA.

Just two days ago, on August 18, 2026, a one-year-old baby appeared unrepresented in an Arizona immigration court. Avila-Cimpeanu Decl., ¶ 31. A USCRI attorney was present virtually, and watched silently as the immigration judge ordered the baby to file an asylum application by their next hearing. *Id.* The USCRI attorney did not speak up—let alone suggest that it is facially absurd to ask an unrepresented baby to do anything—despite knowing the baby would be ordered deported if unable to file the complicated application by the next hearing. *Id.* To the best of Plaintiff Florence Immigrant & Refugee Rights Project's knowledge, Defendants are not funding any lawyer to represent the baby. *Id.*

These children appeared alone at their immigration court hearings despite Defendants' sworn declaration that since August 5, 2026, "USCRI attorneys have provided 100% coverage for all hearings, with all required services being offered during this interim period." Dkt. 177 at 5, ¶ 5. These children are just three of the many victims of Defendants' violation of the law and the Court's order, including countless unknown children nationwide who Defendants have failed to provide with legal services. Defendants have caused immeasurable harm to unaccompanied children in the weeks since they decided to allow the legal services contract with Acacia expire with no viable alternative in place.

Allowing children to routinely appear in court unrepresented is the exact harm the TVPRA, the Foundational Rule, and the preliminary injunction are meant to prevent—as Defendants have created the same harms their initial cancellation of services created. The preliminary injunction prohibits Defendants "withdrawing the services" they provided "as of March 20, 2025," Dkt. 87 at 28, but that is exactly what Defendants have done—by allowing the Acacia contract to expire, Defendants have left unaccompanied children without services Defendants have previously provided. Unrepresented, unaccompanied children making uninformed and life-changing legal decisions alone

are uniquely vulnerable to being trafficked, abused, or otherwise deprived of their rights under U.S. law. By their own admission, Defendants have hundreds of millions of dollars of congressionally appropriated funds to pay for lawyers to provide critical legal services for the thousands of unaccompanied children now left to face their legal proceedings alone. Defendants have spent the weeks since the contract with Acacia Center for Justice lapsed purporting to enter into multiple cooperative agreements to create a façade of compliance with the law and this Court's order, but the result is chaos that has forced countless children to face their immigration court proceedings alone. Whether this is intentional, reckless, or the result of incompetence, Defendants' failure to provide legal services to thousands of unaccompanied children is a violation of the Court's order prohibiting Defendants from "withdrawing the services" they previously provided.

Instead of describing their plan to ensure these vital legal services are provided without interruption, Defendants' filings give only vague, inaccurate statements that suggest compliance while relying on an informational asymmetry that allows Defendants to indefinitely claim a plan is forthcoming. Indeed, Defendants have averred that because of the Procurement Integrity Act, they simply cannot provide this Court or Plaintiffs with further information regarding how they intend to comply with this Court's order and the law. Dkt. 177 at 6, ¶ 8. Meanwhile, hundreds and likely thousands of unaccompanied children, who would otherwise be informed and advised by counsel when making serious legal decisions, are being scheduled for asylum interviews in the forthcoming days and weeks without the ability to reschedule and are being removed from the country without receiving any legal advice.

Because of this lapse in services and because Defendants' Court-ordered statement creates more questions than answers, Plaintiffs now move for an order requiring Defendants to show cause that they are in compliance with the preliminary injunction at an evidentiary hearing. An evidentiary hearing will provide an opportunity to test the veracity of Defendants' contradictory or factually impossible statements, get to the bottom of key questions and details Defendants have left vague or unaddressed, and cut to the chase of the pressing question of whether Defendants are illegally leaving thousands of unaccompanied children without legal services. The Court should order Defendants to immediately produce any documents Defendants may rely on to argue they are in compliance. And

the Court should order Mr. Debany to appear at the hearing to testify under oath, and to be questioned by the Parties and the Court. Defendants' failure to ensure a continuity of services after the Acacia contract lapsed has already caused irreparable harm to Plaintiffs and the unaccompanied children they served. This Court can and should step in to prevent further harm.

## DEVELOPMENTS SINCE DEFENDANTS ALLOWED THE ACACIA CONTRACT TO EXPIRE

For years, Defendants have funded Plaintiffs and other legal service providers to provide direct representation and other legal services to thousands of unaccompanied children at any given time. On July 31, 2026, Defendants allowed the contract that enabled and funded these services to expire, using as an excuse providers' failure to accede to informational demands that this Court has already rejected as an excuse for failing to provide funding and legal services for unaccompanied children. *See* Dkt. 171 at 3, ¶¶ 14-15. Defendants admit they did this even though "Acacia was best positioned to maintain continuity" of the services. Dkt. 177 at 6, ¶ 10. Defendants offer no real explanation for why they failed to find a sufficient replacement for the Acacia contract, despite acknowledging that Defendants made the decision not to enter into another bridge contract with Acacia as early as June 10, 2026—fifty-one days before the Acacia contract lapsed. *Id.* The weeks since have been chaos, as providers, including Plaintiffs, have been forced to limit their representations going forward, lay off employees, and close entire programs. The result has been thousands of children who have not received the legal services they should have received under the TVPRA and Foundational Rule, while Plaintiffs and other providers have lacked the resources to fill the gap.

On August 1, 2026, the legal services and representations formerly funded by Defendants under the now-expired contract did not (and could not) immediately transfer to new, funded attorneys. To the best of their abilities, Plaintiffs and other legal services providers continued, without funding, to represent unaccompanied children, pursuant to all of the ethical obligations that come with that representation and that limit an attorney's ability to simply withdraw from a representation or violate their duty of confidentiality to facilitate a case transition. *See, e.g.,* Hough Decl., ¶ 4; Flores Decl., ¶ 5; Lopez Decl., ¶ 4; Crane Decl., ¶ 4; Donovan-Kaloust Decl., ¶ 8; Harrington Decl., ¶ 4; Martinez Decl., ¶ 4; Avila-Cimpeanu Decl., ¶ 4; Devereaux Decl., ¶ 4; Nally Decl., ¶ 4; Kennedy Decl., ¶ 4;

Koop Decl., ¶ 4; McCabe Decl., ¶ 4; Gutierrez Decl., ¶ 4. Some Plaintiffs and legal services providers have been forced to begin the process of winding down their representations without the ability to transition these cases to new attorneys because Defendants have not provided a viable transition plan. *See, e.g.*, Lopez Decl., ¶ 9; Crane Decl., ¶ 6; Donovan-Kaloust Decl., ¶ 7; Harrington Decl., ¶ 6; Martinez Decl., ¶ 9; Avila-Cimpeanu Decl., ¶ 6; Devereaux Decl., ¶ 4; Nally Decl., ¶¶ 16-17; Kennedy Decl., ¶ 11; Koop Decl., ¶ 9; McCabe Decl., ¶ 11; Gutierrez Decl., ¶ 7. As a result, Plaintiffs are suffering the exact irreparable harm this Court held was sufficient to grant a preliminary injunction more than year ago: Defendants have forced Plaintiffs to choose between (1) continuing representations unfunded, even though they are legal service providers that cannot do so without spending themselves into the ground, or (2) abandoning their clients and allowing children to appear in court unrepresented, which goes against Plaintiffs' missions and their ethical obligations to their clients. *See* Dkt. 37 at 22 ("Plaintiffs will have to choose between bankruptcy and abandoning their missions."); Dkt. 87 at 7-10. As of this filing, Defendants have not provided any plan to relieve these harms to Plaintiffs by funding other legal service providers who can ethically take on Plaintiffs' existing cases or who have communicated with Plaintiffs about any viable plan for executing on such a transition. *See, e.g.*, Avila-Cimpeanu Decl., ¶ 18; Crane Decl., ¶ 5; Kennedy Decl., ¶ 5.

At best, Defendants have represented that they intend to provide only a fraction of the kinds of services Plaintiffs and other legal services providers previously performed for unaccompanied children, for only a fraction of the unaccompanied children previously served. But this Court's preliminary injunction does not permit Defendants to limit services in these ways. *See* Dkt. 87 at 28 ("Defendants are ENJOINED from withdrawing the services or funds provided by [ORR] as of March 20, 2025"). And Defendants' plan for providing even those limited services remains bafflingly unclear. For example, on the morning of August 6, 2026—just hours before the Court's hearing on Plaintiffs' motion to enforce—Defendants' declarant Richard Debany filed a declaration that purported to assure the Court, Plaintiffs, and the public that Defendants had a plan to comply with the Court's order and the law. *See* Dkt. 171. Mr. Debany swore that the Office of Refugee Resettlement ("ORR") was "processing the grant application" for a $150 million cooperative agreement for services from the Burke Law Group—a Texas law firm with limited, if any, immigration experience—for

approximately 1,800 unaccompanied children currently in ORR shelters. *Id.* at 2, ¶ 9; *see also* Announcement of the Intent to Award a Single-Source Cooperative Agreement to Burke Law Group, PLLC in Houston, Texas, 91 Fed. Reg. 50848 (Aug. 6, 2026). But, for whatever reason, the Burke Law Group backed out days later, claiming it had never even applied for a grant to provide services to unaccompanied children. *See* BLG Tweets (@BurkeLawTweets), X (Aug. 11, 2026, 1:28 PM), https://x.com/BurkeLawTweets/status/2087274988235637197.

Mr. Debany's August 6, 2026 declaration also revealed for the first time that Defendants were contracting with USCRI to provide some services required by this Court's order. *See* Dkt. 171 at 2, ¶ 6. Mr. Debany represented that "USCRI attorneys will be available at approximately nineteen immigration court locations nationwide." *Id.* at 2 ¶ 8. Just a week later, Mr. Debany reported that, despite this limited-scope implementation on August 6, USCRI has actually "provided 100% coverage for all hearings, with all required services being offered during this interim period" by only 57 assigned legal personnel. Dkt. 177 at 5, ¶ 5. Mr. Debany has not clarified whether USCRI has only provided coverage for hearings in the nineteen immigration court locations where USCRI was available or what services Mr. Debany considers "required."

USCRI previously provided sponsor vetting and related case management services for ORR's unaccompanied children program, but Plaintiffs are not aware of it having ever provided defensive immigration legal representation or the other legal services required by the TVPRA, the Foundational Rule, and the preliminary injunction. Mr. Debany has repeatedly characterized the services USCRI is to provide as "representation," *see* Dkt. 171 at 2, ¶ 8; Dkt. 177 at 5, ¶ 5, but Plaintiffs are not aware of any instance of USCRI attorneys actually entering an appearance on behalf of any unaccompanied child. *See, e.g.,* Nally Decl. Decl., ¶ 10; Avila-Cimpeanu Decl., ¶¶ 23-31; Kennedy Decl., ¶ 9. Instead, USCRI attorneys have appeared in court solely as friends of the court—though some USCRI attorneys themselves appear to be confused about the meaning and limitations of that role. A friend of the court is a lawyer in the courtroom—not representing a client—who may make suggestions on behalf of *pro se* respondents that the court may take into account. Unlike an attorney who appears on behalf of a client, a friend of the court has no ethical duties and cannot make motions or file papers—and some immigration judges forbid friend-of-court appearances entirely. *See, e.g.,* Avila-Cimpeanu

Decl., ¶ 24. For example, the child previously discussed in Los Angeles was granted a continuance because a friend-of-court attorney from an organization previously funded by Defendants spoke up to suggest *the court* do so in its own discretion—but the attorney could not herself make such a motion. The child in Texas was not so lucky. *See* Flores Decl., ¶ 11. Moreover, like the "here one day, gone the next" Burke Law Group contract, the contract with USCRI only appears to cover the approximately 1,800 unaccompanied children in ORR shelters, and only through December 2026. *See* Dkt. 177 at 4-5, ¶¶ 4, 5. Thus, even assuming USCRI is providing maximum services under its contract (Plaintiffs understand that USCRI is not), these services would cover *less than ten percent* of unaccompanied children who previously received services under the Acacia contract and these services will only be provided for a few months.

In their latest declaration, Defendants report a new contract with Our Rescue. *See* Dkt. 177 at 5, ¶ 6. Our Rescue is an anti-sex-trafficking organization whose founder faces multiple allegations of sexual abuse. *See* "Law firm with ties to Trump administration declines offer to represent migrant children," NBC NEWS (Aug. 13, 2026), available at https://www.nbcnews.com/news/us-news/law-firm-ties-trump-administration-declines-offer-represent-migrant-ch-rcna592306. Its current CEO is a former Immigration and Customs Enforcement ("ICE") official. *Id.* To Plaintiffs' knowledge, Our Rescue has never provided any legal services to unaccompanied children. While Mr. Debany's August 13, 2026 declaration describes at length the resources that USCRI can dedicate to representing a fraction of unaccompanied children, he is notably silent on Our Rescue's resources or the scope of its legal services. *Compare* Dkt. 177 at 5, ¶ 5 to *id.* at 5, ¶ 6. Our Rescue appears to employ no immigration defense attorneys—let alone practitioners experienced in representing unaccompanied children and providing trauma-informed client services. *See* Sens. Blumenthal, Hirono, et al., *Letter to Mr. Benner and Chair Vassilaros* (Aug. 18, 2026), accessible at https://www.blumenthal.senate.gov/imo/media/doc/20260818_letter_to_our_rescue_regarding_contract_award_from_hhspdf.pdf. In any event, Plaintiffs, who operate in immigration courts and ORR shelters across the country, are not aware of any legal services that Our Rescue is currently providing to unaccompanied children.

Even if USCRI and Our Rescue *were* capable of competently representing all unaccompanied

children previously represented under the Acacia contract (they are not), Plaintiffs' understanding is that their contracts with Defendants do not permit many of the services Defendants previously funded. Consistent with their ethical obligations, funded attorneys have been entitled to consult with their clients to determine the best potential avenues for relief. Now, however, Plaintiffs understand that Defendants seek to control that decision and will refuse to provide funding for certain types of relief. For example, because these types of representations were not included in ORR's proposed transition plan, Plaintiffs understand that these new contracts and cooperative agreements will not fund representation if an attorney is seeking relief under the Convention Against Torture, seeking cancellation of removal, or helping children apply for S-Visas, a type of visa for individuals who assist law enforcement as informants or witnesses. *See* Dkt. 170-1 at 3-4, ¶ 7 and Ex. A. And, to make matters worse, Plaintiffs understand that Defendants will no longer fund certain procedural motions that help vindicate children's rights, nor will Defendants fund motions to re-open or appeals. *Id.*. Refusing to fund appeals is particularly egregious, as it effectively amounts to taking away unaccompanied children's right to appeal, which is protected by law and due process. Moreover, representations for these forms of relief and motions were services Defendants provided as of March 20, 2025, and their withdrawal of these services violates the preliminary injunction.

In addition to curtailing the forms of relief for which funded attorneys may now apply on behalf of their clients and curtailing the ability of funded attorneys to re-open or appeal decisions (a serious ethical problem for these lawyers and a potential violation of the First Amendment under *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001)), Defendants' actions show a complete disregard for the agency and wishes of unaccompanied children, which directly contravenes the purpose of the TVPRA and the Foundational Rule. For example, Defendants have shared details about unaccompanied children represented by Plaintiffs in now-unfunded cases, including their legal needs and their hearing schedules, with USCRI and Our Rescue without the consent of these children. *See, e.g.,* Martinez Decl., ¶ 5. USCRI has used this information to communicate directly with represented children, despite ethical rules that prohibit outside lawyers speaking with represented parties about the matter in which they are represented. *See, e.g.*, ABA Model Rule 4.2 ("[A] lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be

represented by another lawyer in the matter"); Nally Decl., Ex. B at 2 ("[W]hile USCRI will take reasonable steps to identify whether a child is represented before engaging in legal representation activities, we cannot commit to the proposition that all communications by all USCRI personnel with represented children are categorically prohibited."). USCRI has also repeatedly and unethically made friend-of-court appearances for children who already have representation, prompting at least one legal service provider to send a cease-and-desist letter to protect their client's rights and remind USCRI attorneys of their ethical duties. Martinez Decl., ¶ 7. When this legal service provider brought this serious ethical breach to the attention of the Deputy UAC Ombudsman at ORR, the deputy confirmed that she has received similar complaints about USCRI's ethical breaches and that her office is investigating the matter. *Id.*

Defendants' entire purported "transition" plan is premised on the idea that Plaintiffs can simply hand off their clients to newly funded organizations immediately. Defendants appear to have assumed that, because they are funding the representation, they can simply take over the individual cases and transition them to new attorneys without consideration for the children's rights or the attorney's ethical duties. But each unaccompanied child client must *consent* to be represented by a new attorney, and attorneys must file motions to withdraw in court and have such motions adjudicated by an immigration judge. *See, e.g.,* Nally Decl., ¶ 8. And any transition of cases must take place through communication between the child and the attorneys—Defendants cannot act as a middleman for privileged and confidential information regarding a child's legal representation. Defendants' assumption that USCRI attorneys can swoop in and represent (or provide limited friend-of-court services for) already-represented children takes all agency and self-determination away from unaccompanied children. Attorney ethics rules place a *heightened* burden on a lawyer's duties to and interactions with children—they do not allow lawyers to ignore a child client's agency. *See* ABA Model Rule 1.14 ("Client with Decision-Making Limitations"). These blatantly unethical actions cannot be the basis of a legitimate legal services plan.

And, now, even since Mr. Debany's August 13 declaration, Plaintiffs understand there are further disturbing developments that demonstrate Defendants' lack of any real plan to provide required legal services to unaccompanied children. First, it is being reported that Defendant

Department of Health and Human Services has tried recruiting current and former Pentagon attorneys to directly provide services to unaccompanied children, which Plaintiffs understand to be a violation of the Foundational Rule's requirement that unaccompanied children receive *independent* legal advice—not services from lawyers employed by the same Executive Branch that is the prosecutor in immigration cases. *See* Madeleine Ngo, "Trump Officials Scrap Effort to Recruit Pentagon Lawyers to Represent Migrant Children," NEW YORK TIMES (Aug. 19, 2026), available at https://www.nytimes.com/2026/08/19/us/politics/migrant-children-pentagon-lawyers.html. Second, it is also being reported that—during this period of chaos and clear gaps in required legal service—Defendants are planning to build a massive new ORR shelter facility capable of housing up to 3,000 unaccompanied children, even as Defendants refuse to provide these children required legal services. *See* Alex Woodward, "Exclusive: Trump admin reveals plan to lock 3,000 migrant children in massive new detention facility," THE INDEPENDENT (Aug. 18, 2026), available at https://www.the-independent.com/news/world/americas/us-politics/trump-migrant-children-detention-plans-b3035247.html.

The contractual chaos and disregard of basic attorney ethics are real problems causing real harm to children (and to Plaintiffs, who experience both financial and mission harms), which could have been avoided had Defendants taken real steps to comply with this Court's order and the law. The ongoing harms to unaccompanied children include:

- As described above, Plaintiffs are aware of instances (including the child in Los Angeles, the 7-year-old in Texas, and the baby in Arizona) where unaccompanied children appeared in court without representation and made (or almost made) irrevocable and grave legal decisions, without the benefit of services provided under the TVPRA. *See also* Kennedy Decl., ¶ 6.
- Even with USCRI making sporadic and often-remote friend-of-court appearances, Plaintiffs have frequently observed USCRI attorneys not showing up at hearings in any capacity, arriving late or leaving early, and remaining silent at moments when friend-of-court services would have been valuable. *See, e.g.*, Nally Decl., ¶ 11; Devereaux Decl., ¶ 8; Avila-Cimpeanu Decl., ¶ 22.

- Since August 3, 2026, 40 children have called ProBAR's emergency hotline to receive legal advice, because they are not currently receiving legal advice and orientation services previously provided by Defendants. Flores Decl., ¶ 7.
- ORR shelter employees have regularly reached out to Plaintiffs and other service providers that formerly sub-contracted with Acacia, because no one funded by Defendants is providing services at their shelters. *See, e.g.*, Flores Decl., ¶ 6; Hough Decl., ¶¶ 13-15; Crane Decl, ¶ 5; Donovan-Kaloust Decl., ¶ 7; Avila-Cimpeanu Decl., ¶ 5.
- Because Defendants are not providing Know Your Rights presentations, unaccompanied children around the country are not being given these presentations with the speed and frequency required under the TVPRA. *See* Avila-Cimpeanu Decl., ¶ 5; *see also* 45 C.F.R. § 410.1309(a)(2)(i)(B) (Foundational Rule requiring presentations within 10 days of arrival at a shelter and then every 6 months after that).
- Legal providers formerly funded by Defendants filled—among many important roles—the role of receiving "child level event" notifications from ORR shelters as the shelters' assigned legal services providers. *See* Avila-Cimpeanu Decl., ¶ 16. "Child level events" are an extraordinarily serious matter; they are issued when a child experiences a significant incident in custody, such as serious misconduct by shelter staff, instances of physical harm, severe medical issues, or reports of abuse. *Id.* Legal service providers must receive child level event notifications under the TVPRA, Prison Rape Elimination Act, and ORR's own policies. *Id.* Defendants have not funded new service providers to step into this mandated role. For example, since the Acacia contract expired, Plaintiff Florence Immigrant & Refugee Rights Project has received two notices of children reporting experiencing or witnessing sexual abuse in ORR custody, and a third notice of a child experiencing sexual harassment in custody. *Id.* Defendants have withdrawn funding for service providers to respond to these reports. Defendants' actions leave children individually and systemically vulnerable, undoing the arduous progress that has been made to crack down on once-rampant abuse in ORR

shelters. *Id.*, ¶ 17.

Defendants and immigration enforcement officials are also making decisions that amplify each of these harms—as they are orchestrating a surge of asylum interviews, court dates, and other deadlines for unaccompanied children at the same time that Defendants are stripping away the legal services that would enable children to meet these demands. For example, since the expiration of the Acacia contract just weeks ago, Plaintiff Florence Immigrant & Refugee Rights Project has had approximately 50 clients set for asylum interviews—an unprecedented influx of interviews. *See* Avila-Cimpeanu Decl. ¶ 7. Plaintiff Galveston-Houston Immigrant Representation Project has more than 70 clients set for asylum interviews in the next six weeks, in addition to 10 immigration court merits hearings in the next three months—an unprecedented clustering of interviews and hearings. *See* Kennedy Decl., ¶ 4. Plaintiff Immigrant Defenders Law Center has 43 clients scheduled for asylum interviews in August 2026, and more than 150 clients scheduled for asylum interviews in September, 2026 (including more than *30* interviews on September 18, 2026, and another more than 30 on September 24, 2026)—an unprecedented surge with most notices coming at or shortly after the time the Acacia contract expired. *See* Donovan-Kaloust Decl., ¶ 18. Each interview, if the child is fortunate enough to have representation during this period where Defendants are not providing it, takes 15 to 35 hours to prepare for (depending on the complexity of the case and the ability of the child to participate in sustained preparation) and can be the final word on whether the child is able to remain in the country as an asylee. *See* Avila-Cimpeanu Decl. ¶ 7. And new USCIS policy requires applicants to submit evidence two weeks before hearings, even as USCIS is setting hearings with only 3-6 weeks of notice, creating untenably short timelines to gather evidence and prepare, all during a time when Defendants are denying and refusing to fund the services that could help children meet these urgent demands. *See* Donovan-Kaloust Decl., ¶ 19. Because USCIS has *also* announced a new policy of refusing to reschedule asylum interviews absent "exceptional circumstances," there is little relief for children caught in this surge but unaided by the services Defendants are required to provide. *Id.*

Immigration court practices have also shifted, with judges no longer granting continuances for unaccompanied children who have SIJS status (and are thus in line for a green card) and denying

continuances in most other situations—forcing children to appear in court every two to three weeks. *See* Flores Decl., ¶ 5; Nally Decl., ¶ 4. And, while existing cases are busier with more court dates and USCIS interviews, newly arrived children are seeing their cases expedited, being forced to appear and to respond to charges at a rapid pace that makes it much more difficult—even in ideal circumstances and with Defendants providing required services—for children to obtain services and representation before their first hearings. *See* Kennedy Decl., ¶ 9. There could hardly be a worse time for Defendants to deny unaccompanied children the services they are guaranteed under the TVPRA, the Foundational Rule, and the preliminary injunction.

## ARGUMENT

### I. The Court has inherent powers to issue an order to show cause, enforce compliance, and set an evidentiary hearing.

Defendants have made it impossible for Plaintiffs or this Court to understand the extent of their non-compliance. Plaintiffs are aware of the gaps in services identified above only because of their ongoing work in shelters and courtrooms—not because Defendants have given Plaintiffs enough information to meaningfully evaluate whether they are complying with the preliminary injunction. As described above, Defendants' declarant, Richard Debany, uses vague and often contradictory language to describe the services provided under new agreements with USCRI and Our Rescue, without attaching the actual contracts with either organization. Mr. Debany further insists that he cannot provide details regarding Defendants' purported plan to comply going forward because of the Procurement Integrity Act, even though such information could potentially be provided under seal. Defendants *know* what services they are currently providing (or not providing), but rather than describe those services in detail to allow this Court and Plaintiffs to assess their compliance, Defendants vaguely assert they are providing "all required services." Dkt. 177 2, ¶ 5. As described in detail above, Plaintiffs know this is untrue.

The Court can and should order Defendants to provide this information; it is "not reduced to issuing injunctions . . . and hoping for compliance." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004) (citation omitted). The Court has "inherent powers" to craft procedure and relief "to enforce compliance with [its] lawful orders." *Spallone v. United States*, 493 U.S. 265, 276 (1990) (citation

omitted). If the Court is satisfied that it has sufficient evidence to find and address Defendants' non-compliance, it has the power to order *sua sponte* enforcement of the preliminary injunction or to issue any other relief to enforce the TVPRA, the Foundational Rule, and the preliminary injunction—and to secure for vulnerable children the benefits of those laws. *See id*.

But, to the extent further evidence is needed to understand precisely what Defendants are doing (or not doing), the Court should issue an order to show cause for Defendants to produce all documents and information they claim shows they are not withdrawing services required by the preliminary injunction and to appear for an evidentiary hearing where Mr. Debany will be questioned under oath by the Court and the Parties. *See*, *e.g.*, *Cuviello v. City of Oakland*, No. C-06-5517-MHP(EMC), 2009 WL 734676, at *4 (N.D. Cal. Mar. 19, 2009) (setting evidentiary hearing on order to show cause for violating preliminary injunction); *see also Nat'l Treas. Empls. Union v. Vought*, 778 F. Supp. 3d 144, 148-149 (D.D.C. 2025) (court held evidentiary hearing on motion to show cause for violation of preliminary injunction where government evidentiary submissions created significant uncertainty about compliance). Defendants have shown—through their insufficient and contradictory August 13, 2026 declaration, their last-minute August 6, 2026 declaration, and their many status reports insisting they were complying with the preliminary injunction (while they were illegally withholding funding)—that a status report requirement alone is no longer sufficient to enforce or validate their compliance. Accordingly, an evidentiary hearing will close the informational gap behind which Defendants are seeking to disguise their non-compliance, and will allow both Plaintiffs and this Court to answer the questions created by Defendants' recent declarations.

## II. The facts and information available show that this Court should issue an order to show cause why Defendants are not complying with the Court's orders.

As described above, there are, at minimum, significant gaps in the services Defendants are required to provide unaccompanied children. The preliminary injunction enjoins Defendants "from withdrawing the services or funds provided by the Office of Refugee Resettlement ("ORR") as of March 20, 2025" under the TVPRA and Foundational Rule. Dkt. 87 at 28. Before ORR's contract with Acacia expired, Defendants violated the preliminary injunction by "withdrawing . . . funds." *See* Dkt. 172 (granting motion to enforce). Now, based on the evidence Plaintiffs have been able to gather,

Defendants are "withdrawing the services" they provided "as of March 20, 2025" and for years before, violating the other half of this Court's preliminary injunction. Defendants' withdrawal of required services, through cutting representation and services for children and failing to implement a workable transition plan, violates both the plain language and the spirit of the preliminary injunction. *See Inst. of Cetacean Research v. Sea Shepherd Conservation Soc.*, 774 F.3d 935, 949 (9th Cir. 2014) (courts should consider both the text and the spirit of a preliminary injunction when evaluating compliance); *New York Times Co. v. Dept of Defense*, 830 F. Supp. 3d 1, 8-9 (D.D.C. 2026) (same).

**The plain language of the preliminary injunction requires Defendants to provide all services they provided to unaccompanied children as of March 20, 2025.** Even with limited information, a comparison between the current situation and what Defendants provided through their contract with Acacia as of March 20, 2025—services that were provided for years before March 2025 and that Plaintiffs provided through July 31, 2026—illustrates significant gaps in services that violate the command of the preliminary injunction by "withdrawing the services" it requires.

As of March 20, 2025, Plaintiffs and other legal service providers provided the following services to unaccompanied children in ORR shelters: child-friendly Know Your Rights presentations, legal screenings, court preparation for unrepresented children, referrals for legal services for unrepresented children leaving our service area, screening for trafficking and submission of Office of Trafficking in Persons ("OTIP") eligibility letters as appropriate, referrals to child advocates, and full-scale direct representation for immigration court proceedings. For children released from ORR, legal service providers provided direct, full-scope representation on all matters before EOIR, USCIS, and state courts in connection with petitions for SIJS predicate findings. And, as described above, legal service providers funded by Defendants were legally mandated recipients of child level event notifications, protecting kids reporting abuse and other serious needs. Before it lapsed, the Acacia contract required legal services providers to:

> provide children with legal services related to the child's immigration case, including . . . adjustment of status based in United States law such as obtaining Special Immigrant Juvenile Status (SIJS), Special Immigrant Visas (SIV), T visa, U visa, Violence Against Women Act (VAWA), deferred action, relief based on activities related to acting as a material witness, and other immigration-related forms of asylum and family-based petitions for which children may be eligible, as well as appeals of immigration decisions.

Dkt. 169-2 at 21.

But now, even with the limited information available to Plaintiffs, it is clear that Defendants are not providing at least the services identified above, *supra* 4-11, including new direct representations, Know Your Rights presentations, appeals, SIJS state court filings, and assistance filing for various other forms of relief.

The end result is that, while more than 20,000 unaccompanied children were being provided funded legal services under the TVPRA, Foundational Rule, and preliminary injunction on July 31, 2026 (the last day of the Acacia contract), today only a fraction of those children are receiving services from Defendants—and those who are receiving services are receiving only a fraction of the services formerly provided.

**The chaos and gaps in services violate the spirit of the preliminary injunction.** In its August 6, 2026 enforcement order, the Court emphasized that "maintaining the funding of legal representation for unaccompanied minors in accordance with the TVPRA and the Foundational Rule is the preliminary injunction's objective." Dkt. 172 at 2. The TVPRA, in turn, requires Defendants to provide attorneys to represent unaccompanied children for the purpose of "protect[ing] them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5). As illustrated by the anecdotes above, *supra* 10-11, Defendants' actions in withdrawing services have done considerable harm to unaccompanied children, abandoning them to make life-changing and permanent decisions about their cases while uninformed of the legal consequences, which, aside from being a violation of the children's due process rights, also makes these children exponentially more vulnerable to mistreatment, exploitation, and trafficking. Defendants' actions that put unaccompanied children at risk and take away their basic rights to a confidential attorney-client relationship with the counsel of their choosing are contrary to the preliminary injunction, the TVPRA, the Foundational Rule, foundational legal ethics rules, and basic human decency.

## III. The Court should set an evidentiary hearing because Defendants are hiding the extent of their non-compliance.

The Court's August 6, 2026 enforcement order recognized that the Debany declaration filed the morning of the hearing "raise[d] more questions than it provides answers" and did "not sufficiently

detail Defendants' efforts to comply with the preliminary injunction in the coming weeks and months." Dkt. 172 at 3. The Court ordered Defendants to "file a report detailing their current and ongoing compliance with the preliminary injunction following the expiration of the contract with Acacia." *Id.* Defendants' "report" came in the form of another declaration by Mr. Debany. Dkt. 177. As shown above, the latest declaration again prompts more questions than it provides answers. For example, it does not include or meaningfully describe any contract to provide the required services, making it impossible for the Court or Plaintiffs to understand precisely what Defendants are doing or whether it complies with the Court's order or the law. *See id.*

What Defendants' statements do clearly show is their chaos and disorganization, with the effect of harming vulnerable children—and no apparent plan to provide the full required services.

It is not clear, even, that Plaintiffs or the Court can trust the veracity of Mr. Debany's written statements under oath. For example, on August 6, Mr. Debany wrote in an apparent attempt to reassure the Court that Defendants were "processing the grant application" from Burke Law Group to allow some unspecified amount of services to restart after Defendants allowed the Acacia contract to expire. Dkt. 171 at 2, ¶ 9. But Burke Law Group has since claimed that it did not file any grant application at all, let alone one that ORR had begun to process. *See* BLG Tweets (@BurkeLawTweets), X (Aug. 11, 2026, 1:28 PM), https://x.com/BurkeLawTweets/status/2087274988235637197. Inconsistent with his earlier statement, Mr. Debany's subsequent August 13 declaration stated that Burke Law Group "withdr[ew] from consideration." Dkt. 177 at 5-6, ¶ 7. The inconsistencies and inaccuracies in Mr. Debany's two declarations make it difficult to understand the extent of Defendants' non-compliance.

Mr. Debany's August 13th declaration contains additional statements that are demonstrably false and/or entirely unsupported and vague—and thus unverifiable. For example:

- Mr. Debany repeatedly describes USCRI as providing, vaguely, "legal services" to unaccompanied children, *see, e.g.,* Dkt. 177 at 5, ¶ 5, but to the best of Plaintiffs' knowledge, USCRI is providing only "friend-of-court services"—which is, by definition, not providing direct representation under the TVPRA or the Foundational Rule. Friend-of-court services are certainly not the full scope of services the

preliminary injunction requires, which specifically prohibits withdrawing "funds for direct legal representation services to unaccompanied children." Dkt. 87 at 28.

- Mr. Debany states that, since Defendants started relying on USCRI, "USCRI attorneys have provided 100% coverage for all hearings, with all required services being offered." Dkt. 177 at 5, ¶ 5. Plaintiffs are aware of many examples that show this is not true, including as described above. *See, e.g.*, Avila-Cimpeanu Decl., ¶ 22. Since Defendants allowed the Acacia contract to expire, and under USCRI's supposed watch, many children have gone without legal services and many children have appeared at hearings alone. For example, Plaintiffs recounted the heartbreaking story of the 7-year-old child appearing without assistance from USCRI. Flores Decl., ¶ 11. Even when a USCRI attorney has showed up, they have often been late or left early, leaving children without even a silent friend of court. *See, e.g.*, Nally Decl., ¶ 11; Devereaux Decl., ¶ 8; Lopez Decl., ¶ 7. And some immigration court judges do not allow WebEx appearances, which has prevented USCRI (with its limited geographic scope) from appearing at all in certain courts. *See, e.g.,* Lopez Decl., ¶ 8. Other judges do not permit friend of court appearances, preventing USCRI from appearing at all. *See, e.g.*, Devereaux Decl, ¶ 10. Even Mr. Debany's own August 6, 2026, declaration states that USCRI was only providing services at 19 immigration courts—which could not mean they were covering "100%" of hearings nationwide. *See* Dkt. 171 at 2, ¶ 8. Whatever the real percentage is, Mr. Debany's declaration is clearly incorrect.
- Even if Mr. Debany's statement of "100% coverage" could be true, it appears Mr. Debany may have intended that statement to apply only to coverage of services to the roughly 1,800 children currently in ORR shelters. *See* Dkt. 177 at 5, ¶ 5 (declaring that USCRI was meant to "maintain continuity of services for the approximately 1,800 UACs presently in ORR's care and custody"). But Mr. Debany's statement is so vague that it could easily be read (and may actually be intended) to apply to all 20,000+ unaccompanied children who had previously received services funded through the Acacia contract.

- Mr. Debany states that USCRI is providing "legal orientations" to unaccompanied children in ORR shelters, Dkt. 177 at 5, ¶ 5, but Plaintiffs have observed children across the country going without required "know your rights" orientations, *see, e.g.*, Donovan-Kaloust Decl., ¶ 7; Avila-Cimpeanu Decl., ¶ 5; Lopez Decl., ¶ 6 ("To the best of our knowledge and belief, there have been no Know Your Rights presentations or legal screenings provided to any children in El Paso since July 31, 2026."); Koop Decl., ¶ 8 ("To my knowledge, no legal service provider is providing legal orientations or legal screenings to children detained in NIJC's service area.").
- Mr. Debany's brief description of Our Rescue omits even basic information regarding what sorts of services Our Rescue is supposed to provide. While he describes at length the number of employees USCRI could devote to providing services to, likely, no more than 1,800 unaccompanied children, Mr. Debany says nothing about what legal resources Our Rescue could bring to bear, nor does he say anything about how many unaccompanied children or what population Our Rescue is contracted to serve. *See* Dkt. 177 at 5, ¶ 6 (omitting *any* details about Our Rescue). Mr. Debany should provide this information at an evidentiary hearing, to enable the Court and Plaintiffs to evaluate whether Defendants are complying with the preliminary injunction.
- Mr. Debany declares that ORR is participating in "operational transition planning, including coordinating with existing legal providers." Dkt. 177 at 6, ¶ 9. But Plaintiffs have received just one perfunctory email requesting information about children scheduled for hearings the following morning. Avila-Cimpeanu Decl., ¶ 20; Donovan-Kaloust Decl., ¶ 6. This email was unsecured and directed Plaintiffs to submit sensitive and confidential information in an unsecured form. Avila-Cimpeanu Decl., ¶ 20. Defendants have not reached out to Plaintiffs about any additional dockets, any upcoming state court dates, or any USCIS interviews—nor have they provided any information that would allow Plaintiffs to communicate with qualified attorneys who could potentially take over existing representations. *See, e.g.*, *id.*, ¶ 18; Crane Decl., ¶ 5; Kennedy Decl., ¶ 5. Mr. Debany cannot seriously contend that a single email is

"coordinating."

- Mr. Debany states that ORR decided on June 10, 2026—*nearly two months before the Acacia contract expired*—that it would not be contracting with Acacia after July 31, 2026. Dkt. 177 at 6, ¶ 10. But ORR apparently sat on its hands before belatedly sending an unworkable transition plan to Acacia and engaging in the harmful chaos described in this motion, instead of arranging for actual continuity of services.

Mr. Debany also asserts a right to actively hide missing information; in addition to obfuscating and providing information that is at odds with reality, Mr. Debany employs a familiar tactic Defendants have used repeatedly in this case: hiding non-compliance behind contracting excuses. Mr. Debany represents that there are plans "in the final stages of negotiations" for one or more additional contracts to provide services—but says he cannot "publicly disclose" those plans. Dkt. 177 at 6, ¶ 8. As an initial matter, having plans "in the final stages" but not yet implemented—two weeks after the contract expired and two months after Defendants apparently decided to move on from the Acacia contract—is not compliance with the preliminary injunction. And, while there are laws that govern what Mr. Debany may *publicly* disclose about certain procurement-related details, Mr. Debany's refusal to disclose anything or to make non-public disclosures effectively gives Defendants a get-out-of-jail-free card, where in response to any attempt to enforce the preliminary injunction or conclude that Defendants are not in compliance, Defendants can gesture to secret and undisclosable plans—plans that may or may not pan out, as the Burke Law Group fiasco shows.

Ultimately, whether Mr. Debany can *publicly* disclose these details that are plainly necessary to evaluate and enforce Defendants' compliance is irrelevant. Mr. Debany can explain these plans in a sealed filing that avoids any public disclosure. Alternatively, the Court can enter the District's model protective order and Mr. Debany can share details of these purported plans under an "Attorneys' Eyes Only" designation. The Court should reject Defendants' attempt to hide behind contractual excuses just as it has rejected every previous attempt to cloak non-compliance in contracting bureaucracy.

Defendants have shown that they cannot be trusted to provide full information to evaluate their compliance (or the extent of their non-compliance) with the law and the preliminary injunction. The

Court should set an evidentiary hearing to resolve the many open questions Defendants' evidentiary submissions have left and to allow the Court and Plaintiffs to meaningfully probe whether Defendants are complying with the preliminary injunction—and, if not, the extent of and solution to their non-compliance.

**CONCLUSION**

This Court should take further action to enforce the law as set out in the TVPRA, Foundational Rule, and its own preliminary injunction. The Court should issue an order to show cause why Defendants are not in violation of the preliminary injunction and should set an evidentiary hearing on this motion on the shortest possible timeline.

Respectfully submitted,

August 20, 2026

/s/ Laura M. Sturges

GIBSON, DUNN & CRUTCHER LLP
Katherine Marquart (CA Bar No. 248043)
Ariana Sañudo (CA Bar No. 324361)
Arthur Halliday (CA Bar No. 347620)
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
kmarquart@gibsondunn.com
asanudo@gibsondunn.com
ahalliday@gibsondunn.com

Laura M. Sturges (CO Bar No. 36843) (*pro hac vice*)
Patricia M. Herold (CO Bar No. 54552) (*pro hac vice*)
Caelin Moriarity Miltko (CO Bar No. 56721) (*pro hac vice*)
1900 Lawrence Street, Suite 3000
Denver, CO 80202-2211
(303) 298-5700
lsturges@gibsondunn.com
pherold@gibsondunn.com
cmoriaritymiltko@gibsondunn.com

/s/ Alvaro M. Huerta

IMMIGRANT DEFENDERS LAW CENTER
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org

/s/ Karen C. Tumlin

JUSTICE ACTION CENTER
Esther H. Sung (CA Bar No. 255962)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

/s/ Samantha Hsieh

AMICA CENTER FOR IMMIGRANT RIGHTS
Adina Appelbaum (*pro hac vice*)
Samantha Hsieh (*pro hac vice*)
Peter Alfredson (D.C. Bar No. 1780258)
Evan Benz (*pro hac vice*)
Amica Center for Immigrant Rights
1025 Connecticut Ave., NW, Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*Attorneys for Plaintiffs*

## ATTESTATION

Pursuant to Civil Local Rule 5-1(i)(3) of the Northern District of California, I attest that concurrence in the filing of this document has been obtained from each of the other signatories to this document.

DATED: August 20, 2026

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Laura M. Sturges*

Laura M. Sturges

*Attorneys for Plaintiffs*