IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

Defendants.

Case No. 4:25-CV-02847-AMO

**DECLARATION OF LAURA NALLY (AMICA CENTER) IN SUPPORT OF PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE**

**DECLARATION OF LAURA NALLY**
**PROGRAM DIRECTOR FOR THE CHILDREN'S PROGRAM AT AMICA CENTER FOR IMMIGRANT RIGHTS**

*I, Laura Nally, make the following statements on behalf of myself and Amica Center for Immigrant Rights. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. §1746.*

1. I am over the age of 18 and make this declaration based upon my personal knowledge and experience. If called to do so, I could and would competently testify to these matters under oath.
2. I am the Program Director for the Children's Program at Amica Center for Immigrant Rights, a plaintiff in the above-captioned case. I incorporate my Declaration in Support of Plaintiffs' Motion for a Temporary Restraining Order (Dkt. 7-15), Declaration in Support of Plaintiffs' Motion for a Preliminary Injunction (Dkt. 37-15), and Second Supplemental Declaration in Support of Plaintiffs' Motion for a Preliminary Injunction (Dkt. 86-1) as if fully set forth herein.
3. Amica Center currently works with over 800 children, including 38 children detained in Virginia. Specifically, Amica Center's Children's Program focuses on offering legal services and representation to unaccompanied immigrant children held by the Office of Refugee Resettlement ("ORR") at ORR-subcontracted facilities, including shelter and foster care programs, as well as children in ORR Unaccompanied Refugee Minor ("ORR URM") programs in the greater Washington, D.C. and Baltimore areas. Many have faced abuse, neglect, trauma, and separation from family. Amica Center currently has thirteen full-time and two part-time attorneys, and five DOJ-Accredited Representatives who are currently handling approximately 800 active cases representing unaccompanied children, more than 750 of which are cases open under the UCP contract. In addition, our attorneys mentor pro bono attorneys handling over 90 active pro bono cases representing unaccompanied children.

4. Since the expiration of the UCP contract on July 31, 2026, our attorneys continue to provide unfunded ongoing representation for our hundreds of child clients, consistent with our ethical obligations to our clients and our mission to ensure that children receive high-quality, trauma-informed services. We continue to provide limited services to children detained in local ORR-subcontracted facilities on an as-needed basis to preserve their rights and options in their immigration cases, including providing *pro se* assistance with applications for asylum, and continue to serve as Friend of Court for *pro se* children for whom we have previously provided these services. As children must now appear in immigration court at least every three weeks, there are often follow-up tasks requested (or ordered) by the court which must be completed on a timely basis or risk harm to a child's legal case.

5. Since July 31, 2026, our attorneys have handled 7 asylum interviews and appeared at 36 hearings in immigration court for children as either counsel of record or Friend of Court. As of the time of writing, we have 23 more asylum interviews and 8 individual asylum trials scheduled for children we represent in the next four months. Given the accelerated asylum interviews and merits hearings being scheduled in our region and nationwide, we expect this number to continue to rise. We also have more than 30 upcoming state court hearings related to Special Immigrant Juvenile Status (SIJS) matters for our existing child clients, for whom we are ethically obligated to continue to appear and which require bar licensure in the state in which the case is pending.

6. Without the UCP funding that we have relied on to provide these legal services, and against the backdrop of an increasingly unforgiving immigration system, it is becoming increasingly difficult for us to represent our current child clients. The options to mitigate potential harm to children who would otherwise be left without representation are very limited. The local asylum office no longer considers requests to reschedule interviews, and judges on detained juvenile dockets will not grant more than a three-week continuance, including for merits hearings. Fee waivers are no longer available for most applications for relief, so Amica Center continues to pay the fees out of pocket to ensure that clients meet

all applicable deadlines and do not risk abandoning the ability to apply for relief from removal including asylum and Special Immigrant Juvenile Status (SIJS).

7. Although Amica Center has been able to avoid layoffs and furloughs to date, our ability to maintain current staffing levels without UCP funding is not indefinite. Of more urgent concern, when our clients are transferred within the ORR system either to Long Term Foster Care ("LTFC") or Unaccompanied Refugee Minors ("URM") programs in other parts of the country, we are increasingly unable to refer the case for representation or locate another organization willing to substitute counsel. As EOIR has pushed for a return to in-person hearings, and USCIS has eliminated the option for attorneys to participate either virtually or telephonically at asylum interviews, this puts us in the difficult position of either withdrawing from the child's case or being expected to travel for in-person appearances in other states.

8. Motions to withdraw are also not guaranteed to be granted, as many immigration judges are reluctant to permit such motions if it will leave a child *pro se.* We recently had such an experience, when an immigration judge denied a motion to withdraw for a child who had reunified with a sponsor in New York, requiring that the Amica Center attorney continue to provide remote services to the child.

9. Just as importantly, it can take months and sometimes years to build a trusting relationship with a child who has experienced significant trauma, survived abuse or trafficking, or been neglected or abandoned by the prior adults in their life. In a deeply re-traumatizing immigration experience, the relationship that a child has built with their attorney and other legal support staff can make a critical difference in ensuring that the child can share their experiences and access necessary immigration legal protections. In addition to the risk of missed deadlines, a sudden or unplanned disruption in access to counsel can also have serious impacts on the child's ability to continue preparing for their legal matter.

10. Since the UCP contract expired on July 31, 2026, we have received no official outreach from the Office of Refugee Resettlement (ORR), U.S. Committee for Refugees and Immigrants (USCRI), or any potential successor legal services provider other than requests

to confirm representation status for specific dockets within the initial two-week period. Although a USCRI staff member has appeared in local dockets, they have neither entered their appearance for any children nor provided Friend of Court services. There appears to be little to no coordination across geographic areas to ensure continuity of representation.

11. In one local example, an unaccompanied child who had been previously detained at an ORR-subcontracted facility in Virginia was transferred to an LTFC program in Michigan. Their case remained on the detained juvenile docket in Annandale, VA, which a USCRI attorney joined virtually but never unmuted themselves or turned on their camera, ultimately logging off before this *pro se* case was called. An Amica Center attorney, recognizing the child's name, remained on the call to act as Friend of Court. The immigration judge reviewed the NTA with the child *pro se*, found him to be removable, and then screened him for relief, at which point the child expressed a fear of return. The immigration judge indicated that he would mail the child a copy of the form I-589 and instructed the child to complete the form prior to his next hearing in three weeks. After the docket, Amica Center contacted the child's former legal service provider in Michigan, who emailed USCRI (copying Amica Center) on August 10, 2026, to highlight the child's need for legal support. As of August 18, 2026, Amica Center has received no response, and there are no indications that the child will receive the necessary legal services to ensure that their application is filed by the August 28, 2026, deadline set by the court, after which the application will be deemed abandoned.

12. On August 14, Amica Center's Executive Director sent a letter to USCRI to inquire whether they would provide representation to the unaccompanied children currently in need of services in our region and to highlight legal ethical rules that require them not to speak to clients who are represented by counsel. *See* Ex. A, August 14, 2026, Amica Center Letter to USCRI. USCRI Senior Director of Humanitarian Legal Services & Field Offices Julie Beyer responded without any details of a plan to provide representation for unrepresented unaccompanied children in our region, declining to commit to ethical obligations under the Rules of Professional Conduct in Virginia and elsewhere that prohibit

communication with persons represented by counsel. *See* Ex. B, August 16, 2026, USCRI Response to Amica Center (stating "while USCRI will take reasonable steps to identify whether a child is represented before engaging in legal representation activities, we cannot commit to the proposition that all communications by all USCRI personnel with represented children are categorically prohibited.")

13. On August 17, 2026, Amica Center staff learned that an unrepresented child at an ORR-subcontracted facility in Maryland has been quickly scheduled for an initial master calendar hearing on August 19, 2026. Amica Center staff instructed the ORR-subcontracted facility to reach out to USCRI to provide services to the child. USCRI responded by email, stating noncommittally that they "may or may not be able to screen [the child] for intake prior to the hearing." As the time of writing (three hours before the scheduled master calendar hearing), no meeting had taken place with the child.

14. Our commitment to continuing representation, even without funding, for as long as needed to avoid direct harm to children's immigration cases is causing and will continue to cause irreparable harm to Amica Center. UCP funding has represented approximately 30% of Amica Center's overall annual budget and 75% of the budget for the Children's Program. Our current inability to take on any new cases for unrepresented unaccompanied children due to the loss of funding is frustrating for our staff and mission.

15. While we have been able to secure foundation grants to cover some portion of the work done by our Children's Program, it is a small fraction of what was supported by the UCP funding and inadequate to sustainably continue representation for the children for whom we initiated representation under the UCP program.

16. While Amica Center has not yet set a timeline by which decisions would need to be made regarding staff layoffs or the discontinuation of any major aspects of our work, we have been relying on and drawing down emergency reserve funding and other grants. Those funds would otherwise be applied for other high-need areas across the organization serving our mission to confront the impact that the unjust immigration system has on our clients and communities through direct legal representation and client-centered advocacy.

17. If Amica Center's Children's Program were forced to lay off staff due to the termination of funding, the harm to our organization, our mission, our staff, our clients, and the delivery of legal representation and other services to the unaccompanied immigrant children held in ORR custody would be catastrophic and potentially irreversible. Our organizational expertise and the collective experience of our specialized staff would be nearly impossible to recover and would hobble our ability to deliver high-quality services to unaccompanied children in the Capital region, even if funding were restored to similar levels in the future. The level of investment required to hire and train new staff, fellows, volunteers, or interns would divert significant director and manager time and resources from the continued provision of representation to existing clients and have a lasting impact on the morale and retention of supervisors and managers. My own time has been overwhelmingly diverted from direct representation of dozens of child clients and essential case supervision and legal guidance in a rapidly changing area of immigration practice to responding to threats to our funding which disrupt program stability.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 19th of August 2026, in Washington, DC.

Laura Nally

______________________________

Laura Nally
Program Director, Children's Program
Amica Center for Immigrant Rights