IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

Defendants.

Case No. 4:25-CV-02847-AMO

**DECLARATION OF ROXANA AVILA-CIMPEANU (FIRRP) IN SUPPORT OF PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE**

**DECLARATION OF ROXANA AVILA-CIMPEANU**

**DEPUTY DIRECTOR, FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT**

*I, Roxana Avila-Cimpeanu, make the following statements on behalf of myself and the Florence Immigrant & Refugee Rights Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. §1746.*

1. I am over the age of 18 and make this declaration based upon my personal knowledge and experience. If called to do so, I could and would competently testify to these matters under oath.

2. I am the Deputy Director of the Florence Immigrant & Refugee Rights Project ("Florence Project" or "FIRRP"), a plaintiff in the above-captioned case. I incorporate my Declaration in Support of Plaintiff's Motion for Temporary Restraining Order (Dkt. 7-4) and Preliminary Injunction (Dkt. 37-5) as if fully set forth herein.

3. Every year, the Florence Project provides free legal and social services to hundreds or thousands of unaccompanied children in Arizona, depending on the number of children placed in the ORR shelters we serve. The Florence Project Children's Program currently has 52 staff members, including 25 attorneys and 3 fully-accredited DOJ representatives, who are currently representing around 600 unaccompanied children in various stages of their immigration proceedings, including state court processes for children who qualify for Special Immigrant Juvenile Status ("SIJS"), in a district court case demanding that children not be illegally repatriated, and in a group habeas petition asking that children not be illegally transferred from Arizona. This number also includes 20 active pro bono cases representing unaccompanied children in partnership with external pro bono attorney volunteers, as well as 27 children currently living in a non-detained setting in ORR's Unaccompanied Refugee Minor Program ("URM") in Arizona.

4. Since the expiration of the UCP contract on July 31, 2026, the Florence Project has continued to provide legal services to unaccompanied children by drawing on our reserves and other limited private funding. This includes providing know your rights ("KYR") legal orientations and consultations to children detained in ORR custody in Arizona, friend of

court and court preparation services for detained children, as well as direct representation services to detained and non-detained unaccompanied children in immigration court and before U.S. Citizenship and Immigration Services ("USCIS"), and direct representation for children with state court proceedings necessary for obtaining SIJS.

5. Since the lapse in the UCP contract for provision of legal services on July 31, 2026, we are aware of at least one new unaccompanied child who arrived at one of the ORR facilities in Arizona who needed a Know Your Rights presentation ("KYR") as required by the TVPRA, but who stated at the time our staff met with them that they had not met with any attorneys other than those from the Florence Project. For over two decades, the Florence Project has been the sole designated legal service provider for all ORR facilities in Arizona, and since no other organization provided services to this child, we met with this minor within 10 days of arrival and provided a KYR and court preparation services. In addition, we have identified at least 23 children in care in Arizona with lengths of stay over 180 days. Under the TVPRA, these children are required to be provided with a KYR every 180 days. Given the lapse of the UCP contract, however, this is not a service the Florence Project can currently provide, and we have no indication that anyone else is providing the KYRs to the children who require it.

6. Providing legal services for our unaccompanied child clients without any clear funding to support our work is a significant burden on the Florence Project and it is simply unsustainable in the long term. This is particularly true because the contract expiration at the end of July coincides with several new government policies, each of which make representation of unaccompanied children more important and impactful than ever, while at the same time making such representation more challenging and time-consuming.

7. The first critical shift is a sudden influx of cases being set for asylum interviews. Since July 31, the last day of the contract, Florence Project has had approximately 50 cases for both detained and non-detained unaccompanied minors being called up for asylum interviews with USCIS; these include asylum cases that were recently filed as well as cases that have been pending for years. This is a significant departure from the normal flow of

USCIS's scheduling of such cases, which usually does not happen for many years after the case is filed, and only rarely has happened for detained children, usually in situations where the minor asks for an expedited hearing. We have not seen such high numbers of cases set for interviews in such a short time frame since 2017, when around 300 cases were called in just a few months' time. Based on my experience both directly representing and supervising attorneys who are representing children in asylum interviews, it typically takes an attorney anywhere from 15 to 35 hours, or sometimes longer if the child is of tender age or extremely traumatized, to prepare a child client for an asylum interview. Preparing so many cases on such a rapid timeframe is putting a serious strain on Florence Project attorneys' time and resources, and their emotional wellbeing. One of our attorneys has 9 interviews scheduled for the next six weeks alone. And if the asylum office determines that any of these minors are not eligible for asylum, the TVPRA requires such cases to be referred to immigration court where immigration judges will either seek to pretermit the case based on recent BIA precedent or will move the case quickly towards an individual hearing. In both scenarios, our staff will have to work quickly again to file motions to fight the pretermission or to prepare the minor and the case for an asylum hearing, but this time in an adversarial court setting that is neither child-centered nor trauma-informed. In addition to the legal preparation, our Social Services team must also dedicate substantial time and resources to provide additional supportive trainings to staff on child-centered interview methods, and on self-care techniques for clients and staff alike. They also work with particularly vulnerable clients to prepare them for the re-traumatization, and prepare asylum bags that our staff take to every interview, which contain toys, stress balls, tissues, water, snacks, coloring books, and other items that can be helpful for the child as they endure the process.

8. The second critical shift is the current children's "rocket docket" that has been operating in Arizona. Since the Spring of 2025, immigration courts in Arizona with detained children's dockets have been functioning on an atypically accelerated schedule. Children are being issued notices to appear requiring them to go to court very quickly upon coming

into ORR custody and, once on the court's docket, immigration judges are moving children rapidly through the removal process, forcing them to enter pleadings quickly in their cases, and/or finding them removable based on documents filed by DHS, which in my experience, regularly contain inaccurate information or fail to comply with rules designed to protect children's rights, such as proper service or explanation of rights. Often, the child does not have the opportunity to review the documents being used against them, which are written in English, nor are they able to review them with independent legal counsel and therefore, do not have a meaningful opportunity to contest the accuracy of evidence being used against them or to assert their rights. Immigration judges are also outright denying continuances in some cases, even where there is good cause for a continuance, or granting only very brief continuances of around 14-21 days. This fast-tracking of children's cases has meant that we have had to reassess our cases for asylum relief and move quickly to file asylum applications where applicable. As a result, we have had to triage and prioritize urgent work for these cases by temporarily cutting back on other services, and staff are working under high-pressure and emotionally devastating conditions to represent children whose cases we started under UCP funding.

9. The speed of the current children's docket creates additional work for Florence Project attorneys who are covering court, as the dockets themselves are both more frequent and often significantly longer than they used to be, with attorneys sometimes having to go back to court twice on the same day. Even in situations where docket is virtual, our attorneys and legal assistants are now prepared to spend the entire day in court on days when they are assigned to docket, rather than doing other critical work on their cases. Additionally, for every hearing date a child we serve is scheduled for, we meet with that child in person in order to orient them to the court process, prepare them for their hearing, answer their questions and assuage their fears, prepare them emotionally and educate them about their options where a removal order is possible. As such, the increased pace and frequency of the children's docket creates substantial additional work for Florence Project staff to ensure that our clients are prepared and that their rights are respected in this accelerated process.

The speed of removal proceedings also puts increased pressure for children and their attorneys to move their cases forward quickly regardless of child-centered and trauma-informed best practices that historically have allowed children time to reunite with family, who can often provide the legal team with additional critical information and context about the harm a child may face that the child may not be able to articulate or understand themself.

10. We are also seeing children with valid applications for relief being ordered removed. In the past 4 weeks, we have seen 2 children ordered removed who have pending or approved I-360 petitions for SIJS, and the immigration judges have informed staff that the court can no longer continue cases with SIJS only, even where USCIS has already approved the SIJS application and the only delay is caused by visa backlogs that necessarily delay final adjustment. As a result, we have had to move quickly to assess asylum claims for all our cases and are working to file asylum applications for all such children who qualify, even if SIJS is a more efficient or less traumatizing way to resolve the child's case, so children do not get unjustly removed. In one case, after the ending of the contract, an unrepresented child was told that he would have one more opportunity (10 days) to file for relief or he would be removed. Since no one had stepped in to represent the minor, Florence Project staff stepped in and helped the minor, who expressed a fear of return to his home country, to file an asylum application in just 4 days, ensuring the child was not wrongfully removed to dangerous conditions.

11. Additionally, hearings for detained children in Arizona historically have been largely in person, except for a relatively brief period during the COVID-19 pandemic. However, on the August 13, 2026 morning docket in Tucson, the Immigration Judge who is currently hearing detained children's cases in Arizona stated in the middle of a hearing that she received a notification from the Chief Immigration Judge that all detained children's cases are to be held virtually from that day forward. No justification for the shift in policy was offered beyond the fact that these were the instructions she had received. At the afternoon docket that day, Florence Project staff asked the court if any legal authority was given as

to why the hearings are suddenly virtual, and the judge stated that the Chief Immigration Judge had ordered that all juvenile hearings should be remote, that the Chief Judge did not cite any authority, but that the IJ works for the Chief Judge and has to follow her directions. It is notable, and perhaps not coincidental, however, that neither USCRI nor Our Rescue (who appears to have no legal staff other than their general counsel) have any attorneys or legal staff who are based in Arizona to the best of my knowledge. And, thus far, to the extent USCRI has sought to participate as friend of court in children's dockets in Arizona, they have done so exclusively through Webex appearances, even for hearings that were in person.

12. The use of video teleconferencing ("VTC") hearings for children undermines the fairness of proceedings for children and is neither child-centered nor trauma informed. Forcing children to appear by themselves from the place of their detention while their attorney or legal support is in another location is not a child-centered way to manage children's removal cases. To begin with, virtual hearings make each proceeding take exponentially longer because simultaneous interpretation is not available online, leading to exhaustion among our clients and staff. Additionally, VTC prioritizes convenience of the court and government over the rights of our child client, including due process and fundamental fairness. This is especially true in immigration proceedings, where discretion and credibility are paramount for winning relief from removal. The risk of a wrongful removal in VTC hearings is heightened when working with children who are of tender age or who have been traumatized. In such cases, nonverbal cues can be missed by the judge, or the child may find it harder to fully participate in remote settings. Finally, VTC leaves the child alone with ORR detention staff during the process, and it does not allow our staff to orient the child to the room and court setting in real time or to be physically next to them for such a traumatizing proceeding. We cannot ask our clients if they are okay in the moment as the judge warns them that they will be sent back to danger, or hand them a toy or comforting object during particularly difficult moments.

13. On August 17th, I observed a virtual children's docket that started 30 minutes late due to technology issues, meaning children were left nervously waiting while the Court fixed its connectivity problems. The technological delays and confusion caused by the video hearing process added stress to an already stressful situation. Now that USCRI and Our Rescue have allegedly taken over legally mandated UCP services, it is more likely that children will be moving forward with VTC hearings and will have no advocate physically by their side to counsel and comfort them, given that neither organization seem to have staff in Arizona. And the work that the Florence Project has put in for many years to advocate for better, in-person conditions for hearings for children has been put aside for the convenience of the adults involved in this process.

14. A third critical shift in policy that has made representation for unaccompanied children more challenging and time-consuming at the precise moment when funding for these services expired is the new Asylum Referral Interim Final Rule ("Asylum IFR"). On July 28, 2026, two days before the contract for UC legal services with Acacia expired with no clear successor plan in place, USCIS issued a new IFR titled Affirmative Asylum Referrals Without Interview, 91 Fed. Reg. 47,101 (July 28, 2026). This Asylum IFR went into effect as of the date of publication and fundamentally changed how USCIS processes asylum claims. Chiefly, the Asylum IFR allows asylum offices to deny a claim for asylum and refer a pending asylum application, including applications of unaccompanied children, to an immigration judge without ever conducting an asylum interview. This means that the first time a child may have the opportunity to testify or answer questions about their asylum claim will be in an adversarial court setting, instead of with an asylum officer specifically trained in trauma-informed interviewing, as required by the TVPRA. A denial referral can happen without any written notice or opportunity to respond. Given this significant shift in how affirmative asylum claims before USCIS are processed, Florence Project staff must also respond to this rule change by quickly supplementing the paper record for the majority of our nearly 300 open cases pending before USCIS where an unaccompanied child client has applied for asylum.

15. While Florence Project remains committed to continuing to represent our current child clients, there are currently approximately 60 children in ORR custody to whom Florence Project would strongly consider offering more robust representation if the prior UCP contract were in place. But our attorneys right now are at capacity due to the policies noted above, and without any mechanism to fund such representation, we do not have the ability to staff up to the level necessary to ethically take on that many new cases at this time, and in the timeframe needed to competently represent each of those children in their removal proceedings and file applications for relief. This remains true even though the children need help now more than ever, given the rocket dockets leading to immigration judges ordering children removed before they can obtain relief for which they are eligible, and in some cases even after the same Government has declared them to be Special Immigrant Juveniles who require our protection.

16. Since the UCP contract expired on July 31, 2026, Florence Project has also continued to receive Child Level Event notices from shelter facilities in Arizona. These notices are issued when a child has experienced some kind of significant incident in custody – for example, allegations of serious misconduct, instances of harm, severe medical issues, or reports of abuse while in custody, or situations that might impact their immigration case where they need the advice of a legal representative. Under the terms of the UCP contract, Florence Project, as the assigned legal service provider in Arizona, was the designated independent legal service provider who would receive notifications of such events, in accordance with the TVPRA, Prison Rape Elimination Act ("PREA"), and ORR's own policies. Since July 30, 2026, Florence Project has received two distinct notices regarding children who reported sexual abuse or harassment by a caretaker while in ORR custody, and one notice of a separate law enforcement event involving a child. We also received a notification regarding a report of sexual abuse or harassment of a third child in ORR custody, and we are working to build rapport, so the child feels comfortable enough to disclose details to our team. In each of these cases, Florence Project attorneys have

continued to work with our child clients to ensure that their rights are being protected while they are in ORR custody and advocate that ORR take action for safer conditions.

17. These situations are extremely concerning to us, including because, after decades of doing this work, we know that in many cases, attorneys on the ground who have met with children and built trust over many meetings, are often the first person the minor discloses incidents to. This was made extremely apparent in 2018, when several children in ORR care in Arizona bravely disclosed to FIRRP staff that they were being sexually abused by an ORR staff member. These disclosures to trusted legal counsel led to the discovery and conviction of a youth care worker who sexually abused at least seven young boys, some on more than one occasion (*United States v. Pacheco,* No. 2:17-cr-01152-SPL (D. Ariz.)). And this, in turn, led to the investigation of an ORR provider, Southwest Key Programs, and a 2024 DOJ civil rights lawsuit against them (Complaint, *United States v. Southwest Key Programs*, Inc., No. 1:24-cv-00798 (W.D. Tex. July 17, 2024)) wherein DOJ alleged that from 2015-2023, multiple Southwest Key employees subjected unaccompanied minors in their care to severe and pervasive sexual harassment and abuse. Though the DOJ case was swiftly dismissed by the Trump Administration just months into his presidency, staff at the Florence Project remember this incident and many others and understand clearly from those past experiences the critical role that on-the-ground legal service providers play in ensuring that children are not subject to institutional abuse. The recent lapse of the UCP contract and failure to set in place an adequate successor plan puts children in ORR custody in danger. In *Southwest Key Programs*, the DOJ stated that ORR staff threatened children and "exploited the children's vulnerabilities, language barriers, and distance from family and loved ones." Now, ORR is cobbling together plans that keep children from trusted attorneys who can fight for child survivors of institutional abuse. Luckily, the Florence Project continued to receive notifications about the described incidents of sexual abuse and harassment after the lapse of the contract in these cases, and we were able to meet with these children quickly and in person. And we are extremely afraid of what will happen to children if we are no longer able to help children on the ground and if ORR has not

contracted with attorneys who can act quickly to meet with children in person and advocate for them.

18. Since the end of the UCP contract, there has been significant confusion and lack of clarity surrounding the government's plan to transition legally required work to a new provider. To date, no one at FIRRP has been approached to transition cases, nor have we been asked to join any new network, nor have we been provided with any terms of a contract or information about what services will be provided and by whom under a new system. Without this information, we are not in a position to counsel our child clients about transitioning their case to a new provider, nor are we able to assess whether we would morally or ethically be able to join any new network. For now, we cannot abandon our clients just as their cases are getting to critical points. But our staff are feeling the mental and emotional strain of the relentless attacks on children, which is exacerbated by the confusion and uncertainty surrounding the UCP contract. Indeed, rather than setting up a smooth, child-centered and trauma-informed transition that meets the needs and acknowledges the special vulnerabilities of minors in ORR care, the government's purported plan has sown confusion and, in some cases, led to interference with existing attorney-client relationships.

19. Since the end of the UCP contract, ORR and USCRI have continued to ask for information that, should FIRRP attorneys provide answers, would constitute a breach of our professional responsibility. Arizona Rule of Professional Responsibility Rule 1.6 states, "[a] lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent" and "[a] lawyer shall make reasonable efforts to prevent the inadvertent or unauthorized disclosure of, or unauthorized access to, information relating to the representation of a client." Confidential information is defined broadly as "all information relating to the representation, whatever its source," Arizona R. Sup. Ct. 42, ER 1.6 cmt. [3]," and can encompass "disclosures by a lawyer that do not in themselves reveal protected information but could reasonably lead to the discovery of such information by a third person. " ER 1.6 cmt. [4]. It is well established that even the identity of the client may

be "confidential information" subject to ER 1.6. Informed consent is also defined to require "agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Ariz. R. Sup. Ct. 42, ER 1.0(e). Taken together, and especially in the context of the current dearth of information regarding agreements for a new service provider or the terms of such agreements with respect to scope and confidentiality, Florence Project is not in a position to share information with ORR, USCRI, or any other third party.

20. For example, on August 4, 2026, in the early afternoon, Florence Project litigators began receiving emails from UACPolicy@acf.hhs.gov, with no name in the signature line, asking us to submit the following information to a Microsoft Form about Florence Project child clients with upcoming hearings: Name of Attorney; Email address of the attorney; Phone Number of the Attorney; Name of the Law Firm; A-number of the UC; and whether we will be entering an appearance on behalf of the child. The email gave a deadline of just a few hours (by 9 PM PST) to submit the form. Due to the lack of name of sender, the urgent nature of the wording, and the unusual use of a Microsoft form, our staff flagged this as phishing attempts. In any case, our office would not submit confidential information to an anonymous person through a Microsoft Form that we cannot confirm is secure and follows ORR protocol on protecting personally identifiable information ("PII") of minor clients.

21. Additionally, on August 5, 2026, Florence Project staff received an email from Mr. Robert Shikiar, Supervisory Attorney at USCRI, with ORR staff copied. This email, which contained the minor's full name and A-number in the subject line in violation of requirements to protect PII, asked us to confirm whether we are representing a minor at Immigration Court that day. We informed Mr. Shikiar that we would not be divulging confidential information to third parties, including whether we are representing specific vulnerable children, the scope of representation, or details about their cases and hearings. We also asked if he could clarify USCRI's role moving forward. We did not receive a response to this email.

22. Since July 31, 2026, Florence Project has appeared at around 6 dockets set at the Tucson Immigration Court and 4 detained children's dockets set at the Phoenix Immigration Court. Despite the government's assertions that USCRI is providing "100% coverage" of cases during the gap in services, this does not match the realities of what we are seeing on the ground.

23. On August 5, 2026, at the Phoenix Immigration Court's in-person detained children's docket, a USCRI attorney, who upon information and belief was Mr. Robert Shikiar, appeared via Webex. The attorney showed up late and stated that he was there to represent a minor who FIRRP is representing and whose case had already been heard that day. The judge informed that attorney that he did not think he was there to represent that minor and asked who he was, to which the attorney responded that he was from USCRI, there to represent all the children. One of Florence Project's attorneys asked the court for clarification on whether the USCRI attorney was there to represent or to assist as Friend of Court ("FOC"). The attorney clarified that he was there as FOC, but the judge informed him that FIRRP was already there doing that job, and FIRRP provided FOC services for children who needed them that day, in addition to appearing as counsel of record for other children we represent.

24. On August 6, 2026, Florence Project staff received at least two emails from Julie Beyer, Senior Director of Humanitarian Legal Services and Field Offices at USCRI. In these emails, Ms. Beyer asked us to confirm representation for three minors, and stated that ORR asked USCRI to "appear" as FOC to "request" continuances until counsel could be obtained. There was no indication that USCRI was looking to represent children directly or asking us to transfer cases. The emails also showed a lack of understanding of the FOC role, as per EOIR guidance, FOC cannot appear on behalf of children and cannot make motions for children. Again, we responded to let Ms. Beyer know that we take our ethical obligations seriously and would not be divulging confidential information to third parties.

25. At the August 6, 2026 Tucson detained children's docket, there was no USCRI or Our Rescue attorney present, despite several unrepresented children set for hearings. The

Florence Project represented our clients and provided FOC services for unrepresented children.

26. On August 7, 2026, Florence Project staff again observed a USCRI attorney attempt to appear on behalf of or provide FOC services to a minor with private representation.

27. On August 10, 2026, USCRI Attorney Derek Tripp, Senior Attorney with USCRI, emailed Florence Project teams and stated that USCRI has been asked to request continuances as a "friend of the court" for all unrepresented minors until federal contracts for their representation are restarted. Mr. Tripp's message did not indicate that USCRI would be providing representation of children, and showed the same lack of understanding regarding FOC, who cannot ask for continuances or make motions on behalf of children. We let Mr. Tripp know that we take our ethical obligations seriously and that we would not be divulging confidential information to third parties.

28. On August 13, 2026, USCRI Attorney Carol Morales Roca was online for two children's detained docket for Tucson Immigration Court. She did not enter representation for any of the children on docket that day.

29. On August 17, 2026, I observed that Mr. Shikiar connected to a Tucson detained children's docket and listed "ORR-contracted Friend of the Court" next to his name on the Webex connection. Despite this, Mr. Shikiar did not speak on the record and did not attempt to provide FOC services, or enter representation, for any minors.

30. On August 19, 2026, at the virtual Phoenix detained children's docket, USCRI attorney Zeyna Noor connected to the court for the docket, but Florence Project was already providing representation and Friend of Court services to the minors who were scheduled. In the middle of the docket, Ms. Noor sent a chat to the Florence Project attorney assigned to docket, stating "Hello mrs. Richardson, Thank you for appearing as FOC for these cases. I was in the waiting room and not sure if any others were called. Would you mind confirming whether you appeared as FOC for tthese other cases just so i can note in my records? ,670 ,345 ,083 ,165 ,957 ,757 ,010 ,238 ,055 ,719 ,673 ,303 ,427, 818, 928 9 (*sic)*". For just one case, Ms. Noor stated on the record that ORR has asked USCRI to meet and

assess for relief due to the lapse in the contract, that they want to meet with the child, and intend to file an E28 if the minor consents to representation. However, that was the only case Ms. Noor spoke up for, and six other children went unrepresented with only FOC services from the Florence Project provided. Of the six unrepresented children in whose cases Ms. Noor did not engage, the judge told one to return with an asylum application at the next hearing, and another received SIJS advisals.

31. Additionally, I am aware of at least one child who was transferred to an Arizona facility after the contract's end, who arrived with a pending asylum interview, which has been initially set for an interview in another state. Since the minor was transferred, their prior attorney can no longer represent them, and the minor's Young Center Child Advocate has reached out to the Florence Project on August 5 and August 18th to see if we have capacity to take on the case. And on August 18, 2026, at a docket USCRI was present virtually, we saw an immigration judge order an unrepresented one-year-old baby to file an asylum application by their next hearing, or they will be deported. To my knowledge, these children remain unrepresented.

32. The Florence Project also currently represents 27 children in ORR's Unaccompanied Refugee Minor ("URM") Program. Children in URM are children in special categories, such as asylees, special immigrant juveniles, or survivors of trafficking, who have no one to care for them. If accepted into the URM program, which must happen when they are under 18, the children are placed in non-detained long-term foster care programs, where they can receive services and stay in care until the age of 21. When new children are accepted and transferred to this non-detained long-term foster care program FIRRP has entered representation for most of these cases under the now defunct UCP contract, and we continue to represent these children. It is critical to note that for URM representation, Arizona state licensure is a requirement, since children placed in URM enter the program before age 18, and a juvenile court petition has to be filed for the minor within 30 days of their placement in the program in order to meet state licensing and URM Program placement requirements. When the Florence Project accepts representation, we assess the

child's individual case facts and potential immigration relief, including steps that need to be taken to preserve petitions that have already been filed or approved. We also file the necessary juvenile court documents to obtain custody orders and protective orders for the minors. Our representation in state juvenile court includes appearing at any report and review hearings, monitoring the child's placement and services, and advocating for the child's legal interests to ensure that the URM program can provide the care and services to which the child is entitled and which are required by the juvenile court. If Florence Project is at capacity when the children arrive and ORR does not provide the children with independent, Arizona-barred, and experienced counsel, these children are at risk of losing their place in the foster care program, could lose eligibility for their immigration relief petition, and could be ordered removed.

33. On August 18, 2026, Florence Project's Children's Legal Program Manager met with Arizona's Department of Economic Security ("DES"), which manages the URM Program in Arizona. In our conversation on August 18, 2026, Florence Project was informed that neither DES nor the URM program are aware of the transition of representation to USCRI attorneys or any other attorneys. DES representatives mentioned that the URM program is expected to open 2-4 beds in the next few months, which means that more children in the program will need representation.

34. On top of these many ongoing challenges, the gap in the UCP since the contract's lapse has led to blackholes of information related to clients. For example, Florence Project had one client who was transferred to a secure facility in Texas. ORR has not inform us about where our client is, nor have they given us information regarding how to contact him. Because we are no longer funded by ORR, we have lost access to critical oversight tools, such as the ORR UC Portal, which is where we would previously have been able to see where our clients are transferred or released to, and how to contact them. Without access to these systems, staff must use precious time and resources trying to locate and contact our client to try to understand what happened and make sure he is ok and that his rights are being respected. It was not until August 18, 2026, that we learned the potential fate of our

client, and it was only through a declaration from ORR's Policy Director Toby Biswas that was filed as part of a pending habeas litigation that we discovered that our minor client was detained by ICE in Arizona on August 2, transferred to Texas on August 4, and transferred to an unknown law enforcement entity in Texas on August 9. We are still working to find out where this child is and to contact him, and because we have not received notification from ORR as required to us as the attorneys of record, and because we have lost access to information systems, this child could be in danger. Under ORR policy, the minor's Florence Project attorney should have been notified within 24 hours of the transfer and provided with a Notice of Placement. Despite this, Florence Project staff did hear anything from ORR about the transfer until over two weeks after the minor was transferred, and only through other pending litigation. In those two weeks, many events occurred during which minor should have been allowed to have his counsel present and to assist him, including to ensure the transfer was proper and to advise him and represent him during law enforcement and ICE interactions.

35. While Florence Project plans to continue to serve our clients and other unaccompanied children in Arizona for as long as we can sustainably do so, the uncertainty and the lapsing of the UCP contract have already had negative impacts on children. Children in detention across the country are not receiving the services they normally would have due to organizations across the county being forced to close their unaccompanied children program or reduce staffing. This gap extends to when children reunify with family in other states or are transferred or accepted into less restrictive placements such as ORR long-term foster care or the URM program. Where we would typically refer them to other organizations in the network for legal counsel in their new home, there are now fewer and fewer options for children to find attorneys to take them through to the conclusion their cases, and clients for whom we have fought are at higher risk of removal due to the gaps in services.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 20th of August 2026, in Phoenix, AZ

Roxana Avila-Cimpeanu

________________________________

Roxana Avila-Cimpeanu

Deputy Director

Florence Immigrant and Refugee Rights Project