UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,

Defendants.

Case No: 4:25-cv-2847 (AMO)

**DECLARATION OF RICHARD B. DEBANY**

I, Richard B. Debany, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Chief for the Division of Acquisition Requirements of the Office of Refugee Resettlement ("ORR"), within the Administration for Children and Families ("ACF"), a component of the U.S. Department of Health and Human Services ("HHS").

2. My duties include responsibility for coordinating ORR's acquisition requirements with contracting support partners to develop and manage contract solutions that meet ORR's programmatic and mission needs. In collaboration and coordination with HHS's Office of Mission Acquisition Solutions ("OMAS"), I am responsible for directing ORR's post-award management of contracts, including contracts for legal services for unaccompanied alien children ("UAC").

3. I previously submitted declarations dated July 10, August 6, and August 13, 2026, concerning ORR's administration of legal-services contracts and its efforts to maintain legal services following expiration of ORR's contract with Acacia Center for Justice ("Acacia"). This declaration is based on my personal knowledge, information acquired in the course of performing my official duties, information contained in ACF and ORR records, and information conveyed to me by current agency employees, contractors, and grantees in the course of my official duties. I submit this supplemental declaration to explain more specifically the actions ORR can take to facilitate the provision of legal services, the actions the agency has taken, the operational transition to successor providers, and the respects in which the level and kind of legal services depends upon the participation and professional judgment of independent organizations and attorneys outside of the Government.

**I. The Government's Role in Providing Legal Services Through Independent Providers**

4. ORR does not itself operate the nationwide network of attorneys that provides the direct legal representation and other legal services to UAC. ORR provides federal funding and establishes arrangements through which independent organizations employ, retain, organize, and supervise attorneys and other personnel who perform those services.

5. Under the contract that expired July 31, 2026, Acacia served as the prime contractor managing a nationwide network of legal-service providers ("LSPs"). Acacia, in turn, subcontracted with independent organizations, including the plaintiffs in this matter, that provided legal screenings, legal orientations, direct legal representation, friend-of-court services, and related legal services to UAC.

6. There is an important distinction between actions ORR and other Government officials can take and the actual performance of legal services by independent providers. ORR can identify its programmatic requirements; make funding available when legally authorized; conduct procurements; solicit proposals; negotiate proposed agreements; award contracts and cooperative agreements when applicable legal requirements are satisfied; provide available information necessary to facilitate referrals and case assignments; coordinate transitions between providers; establish service priorities; and administer agreements after they are awarded.

7. ORR cannot, however, compel an independent organization, law firm, contractor, grantee, subcontractor, or individual attorney to enter into an agreement with the Government or another private organization. Nor can ORR compel such an organization to accept particular contractual terms, the manner in which an organization employs or retains its attorneys, require an entity to perform work in excess of obligated funds, or require an entity to continue performing services after the legal instrument authorizing and funding those services has expired.

8. The same distinction exists at the individual-representation level. An award of federal funding does not itself create an attorney-client relationship between a provider and an individual child. Before an LSP enters an appearance as attorney of record, the provider may need to consult with the child, determine the child's wishes, evaluate the posture of the child's case, determine whether direct representation is appropriate, identify potential conflicts, and determine whether another attorney or provider already represents the child or has taken action on the child's behalf.

9. Those professional and ethical determinations are made by the attorneys and LSPs providing the legal services. ORR can fund and facilitate access to those services, provide available case and hearing information, and coordinate referrals. ORR cannot itself make the independent professional determinations required before an attorney enters into an attorney-client relationship or after.

10. An appropriation or the availability of federal funding therefore does not, by itself, cause legal representation to occur. Actual representation requires a willing provider with qualified legal personnel and sufficient operational capacity, followed by the case-specific steps necessary for an attorney appropriately to undertake representation.

11. ORR therefore can create, fund, and facilitate mechanisms through which legal services are provided, but the actual delivery of those services necessarily depends upon the participation and performance of independent providers and attorneys.

**II. ORR Began Pursuing Successor Services Before Expiration of the Acacia Contract**

12. ORR did not begin its efforts to establish successor legal-service capacity in response to Plaintiffs' present enforcement motion or after expiration of the Acacia contract. Rather, ORR began efforts to competitively procure a long-term successor legal-services contract in November 2025, approximately eight months before the Acacia contract expired on July 31, 2026.

13. Since November 2025, OMAS and ORR have attempted three times to proceed with the competitive solicitation. The terms of the competitive solicitation have been challenged through the bid-protest process. Bid protests were filed on December 15, 2025, April 2 and April 3, 2026 (two of which were filed by Acacia), and most recently by Acacia on June 15, 2026.

14. In response to the protests, the agency undertook voluntary corrective action, including reassessing its requirements, revising the solicitation as necessary, and accepting new or revised proposals.

15. Each protest, including the most recent June 15, 2026, protest, prevented ORR from proceeding with award and performance under the competitive solicitation while that protest remained pending, as required by the Competition in Contracting Act, 31 U.S.C. §§ 3553(c)(1), (d)(3)(A)(i). ORR therefore could not proceed to award or allow performance of the contemplated long-term successor contract while the protest was pending.

16. Separately, on April 30, 2026, ORR exercised the final option period under the then-existing Acacia contract, extending performance through July 31, 2026. ORR exercised that option to maintain continuity of services while pursuing the longer-term competitive procurement. Federal Acquisition Regulation (FAR) 6.302-2 allows the agency to temporarily bypass normal competition to address an emergency, but the agency is expected to move toward a competitive follow-on contract and cannot keep the emergency contract in place longer than necessary to enter into another contract through the use of competitive procedures. Accordingly, ORR/OMAS awarded the contract for the minimum amount of time thought necessary to recompete the requirement — 12-months total comprised of a 3-month base period and three, 3-month option periods. The relatively short option periods were constructed

to allow natural break points to transition, aligned with the FAR, to the competitive follow-on contract once awarded.

17. In the weeks following the June 15 protest, ORR and OMAS attempted to establish an additional short-term bridge arrangement with Acacia, as the incumbent, to continue services after July 31. ORR and OMAS remained in active discussions with Acacia concerning such an arrangement from July 2, 2026 until approximately July 9, 2026[1], when it became apparent that the parties were unlikely to reach agreement on bridge terms before expiration of the existing contract.

18. The proposed bridge included requirements intended to enable ORR to determine what services were being billed and to whom those services were provided. The agency determined that such requirements were necessary for the proposed new bridge contract to address the issues ORR had identified during administration of the prior contract with Acacia concerning its inability to provide sufficient documentation to verify billed direct-representation services and was intended to resolve that issue moving forward.

19. During administration of the Acacia contract, ORR had requested information sufficient to determine which children received direct representation, identify the attorneys providing services, determine when services were performed, confirm attorney appearances where applicable, verify billable hours, and connect supporting documentation to eligible children. ORR and Acacia did not reach agreement concerning the information ORR determined is necessary for ORR to validate invoices submitted for payment.

20. Acacia did not accept the proposed bridge arrangement on the terms proposed by ORR. ORR can propose an agreement, negotiate its terms, make funding available, and evaluate Acacia's proposal, but ORR does not have authority to compel Acacia, or any other entity, to accept proposed terms or enter into a contract.

21. ORR likewise could not simply convert Acacia's former subcontractors into direct Government contractors or recipients of federal awards after Acacia's prime contract expired. Establishing a new federally funded relationship with an independent organization requires an appropriate legal mechanism and the participation of the organization receiving the funds.

22. The contract with Acacia that ended July 31 had language requiring Acacia to develop a transition plan. Acacia submitted it to ORR on September 30, 2025, and updated it at ORR's request on April 10, 2026. The plan, however, was designed to transition cases to attorneys under a new contractor no later than 60 days prior to the end of the contract. The multiple protests of ORR's competitive

[1] My August 13 declaration incorrectly stated the date as June 10, 2026. The correct date is reflected above.

solicitation, in particular the last one on June 15, 2026 compounded by Acacia's unwillingness to meet the Government's terms and conditions for the follow-on bridge, prevented ORR from furnishing a new legal service provider to which Acacia could transfer cases before the contract ended on July 31, 2026. After July 31, no contract vehicle existed under which Acacia would perform the transition.

23. ORR nevertheless continued attempting to reach an agreement with Acacia. ORR offered Acacia a four-month bridge arrangement intended to transition active cases. OMAS provided Acacia a solicitation on July 29 and Acacia offered a proposal on August 4, 2026. OMAS updated Acacia on at least August 11, 2026 and August 26, 2026 of the status of the proposal review. On August 24, to ensure required legal services remain available to eligible UAC and to avoid further confusion for UAC who were being represented by Acacia's subcontractors, ORR and OMAS requested information on active cases as of July 31, 2026. Acacia responded the same day, declining to provide the information on the basis that there was not a contractual vehicle in place after July 31, 2026 to collect information from its LSPs and to provide the requested information to the Government. Revising the requirement to include the requested information as a deliverable and all representation necessary to maintain continuity of representation from the date of award through each case's transfer, ORR and OMAS resolicited to Acacia the four-month contract on August 27, 2026, requesting a revised proposal on September 3, 2026.

**III. ORR Pursued Multiple Alternative Means of Maintaining Services**

24. When it became apparent that ORR might not obtain additional services from Acacia after July 31, 2026, on or about July 9, 2026, ORR did not wait for resolution of the competitive procurement protested by Acacia on June 15, 2026. ORR shifted its transition strategy and pursued multiple alternative workstreams simultaneously.

25. Those efforts included pursuing successor contracts with other providers, interim cooperative-agreement funding, continued transition discussions with Acacia in attempt to reach agreement on additional services, coordination with existing LSPs, and operational planning to integrate new providers as rapidly as practicable.

26. ORR acquisition personnel, program officials, and OMAS contracting personnel worked intensively on these efforts, including meeting multiple times per day to evaluate proposals, respond to potential providers, prepare acquisition and funding documentation, and coordinate implementation.

27. In determining which mechanisms to pursue, ORR considered the need to establish legal-service capacity as quickly as practicable while also complying with applicable acquisition, fiscal, program-integrity, and contract-administration requirements. The availability of appropriated funding did

not eliminate those requirements or give ORR authority to compel an independent provider to accept an award.

**A. USCRI**

28. On August 4, 2026, ORR awarded a supplemental cooperative agreement of up to $20 million to the U.S. Committee for Refugees and Immigrants ("USCRI") to provide legal services for UAC in ORR care.

29. USCRI began providing services on August 5, 2026.

30. ORR operationalized the USCRI award as legal-services model for the approximately 2,000 UAC then in ORR's care and custody.

31. ORR provided USCRI information identifying children with upcoming immigration-court hearings, including information concerning next-day hearings, so that USCRI could verify hearing information, identify children requiring legal coverage, and coordinate attorney assignments.

32. ORR designated a full-time coordinator to oversee assignments, track hearing coverage and representation status, identify discrepancies or gaps, and coordinate the eventual phased transition of cases to successor providers without unnecessarily disrupting existing representations.

33. ORR directed USCRI initially to prioritize children with immigration-court hearings during the immediate period following the award while also providing legal orientations and consultations to newly referred children entering ORR care.

34. On August 26, 2026, ORR and USCRI amended the grant agreement to include services for both children in ORR care and post-release UAC. This change expanded the grant's scope of work from approximately 2,000 children in care to approximately 22,000 UAC, including children both in and out of ORR care.

35. As of my August 13 declaration, USCRI had planned to assign at least 57 legal personnel as an initial staffing level for this work. Since then, due to the expanded scope of work, USCRI has committed to increasing capacity through a combination of staff full-time equivalents ("FTEs") and subgrants, with the goal of reaching at least 115 FTEs and subaward staff in addition to the initial 57 legal personnel. This expanded staffing and subgrant structure includes leadership, management, supervisory, attorney, paralegal, program support, business coordination, and program officer positions, and is intended to ensure coverage for children scheduled for immigration hearings before EOIR, adjudications before USCIS, and any other covered hearings under the prior contract.

36. During the initial implementation period, USCRI attorneys provided hearing coverage at the locations where the most immediate upcoming hearings were scheduled. USCRI used both direct representation and friend-of-court appearances depending upon the circumstances of individual cases.

37. A friend-of-court appearance during this transition period is a form of legal services. Among other functions, such an appearance can permit an attorney to determine a child's existing representation status, facilitate or provide a legal consultation, request additional time where appropriate, and determine whether direct representation can appropriately be undertaken. As discussed below, there are instances where Acacia-funded LSPs appear as friends of the court on behalf of UAC for whom they are also listed as counsel of record on certain forms.

38. Friend-of-court appearances were necessary during the transition because USCRI inherited an active population of children whose cases had previously been serviced through the Acacia network. Before entering a new appearance, USCRI needed, in appropriate cases, to first determine whether a child already had an attorney, whether another LSP had taken action in the case, whether a conflict existed, what the child wanted to do, and whether direct representation was appropriate.

39. ORR could provide USCRI available information, facilitate access to children, identify hearings, establish priorities, and fund USCRI's work. The legal consultations, conflicts analysis, attorney-client decisions, staffing decisions, and actual provision of professional legal services are performed by USCRI and its attorneys.

**B. Additional Successor Contract**

40. ORR and OMAS also simultaneously undertook efforts to contract with other providers rather than relying exclusively on USCRI.

41. On August 7, 2026, OMAS executed a contract with Our Rescue to provide legal orientations, consultations, and direct legal representation.

42. The contract provides for a six-month base period, multiple option periods that may extend performance, and a total potential contract value of approximately $244 million if the available options are exercised.

43. Performance and transition activities began following award.

44. However, on August 17, 2026, Acacia filed a bid protest with the GAO which resulted in the Our Rescue award being automatically stayed pursuant to the Competition in Contracting Act, meaning that Our Rescue cannot perform until the GAO bid protest is resolved.

**C. Burke Law Group**

45. ORR also pursued a cooperative agreement with Burke Law Group, PLLC, a private law firm with a substantial geographic presence in Texas.

46. On August 4, 2026, ORR published a Federal Register notice announcing its intent to enter into that cooperative agreement and began processing the associated administrative requirements so that services could begin as expeditiously as practicable if an award was completed.

47. On August 11, 2026, Burke Law Group informed ORR that it was withdrawing from consideration. During this time period there was negative publicity.

48. Once Burke withdrew, ORR could not require the firm to accept federal funding or participate in the program. ORR had taken the actions available to it to pursue additional provider capacity through Burke, but the ultimate availability of that capacity depended upon Burke's voluntary participation.

49. ORR continued pursuing other sources of successor capacity notwithstanding Burke's withdrawal.

**IV. Transition From the Acacia-Funded Provider Network**

50. Expiration of the Acacia prime contract also presented operational issues concerning the network of independent legal-service organizations that previously received funding through Acacia.

51. Those organizations were not ORR employees. Their attorneys were not federal employees, and ORR did not have authority simply to convert Acacia's subcontractors into Government contractors or grantees when the Acacia contract expired.

52. ORR, therefore, undertook transition planning and communicated with existing LSPs to identify children who continued to be represented, reduce the risk of duplicate or conflicting representation, identify potential coverage gaps, and facilitate continuity as successor arrangements became operational.

53. That transition has been complicated by incomplete or inconsistent information concerning the representation status of some children. ORR has not received from Acacia a comprehensive list identifying all children being represented or served through the former Acacia network.

54. Transition activities have been further complicated by plaintiffs' positions that they cannot disclose their clients' identities to ORR; they cannot discuss transition with their clients or ORR until an acceptable successor contract is in place; ORR and USCRI cannot communicate with represented children, generally; and ORR and USCRI cannot communicate with children given plaintiffs' stated inability to identify who their clients are.

55. As a result, there have been circumstances in which the information available to ORR and USCRI did not identify a child's upcoming hearing or did not clearly establish the child's current representation status.

56. These information gaps have operational consequences. To assign new counsel appropriately, a successor LSP needs to know whether another attorney already represents the child, whether another provider has undertaken work on the case, what proceedings or deadlines are pending, and whether a new representation would create duplication or conflict.

57. ORR can request information from prior providers, compare available ORR and EOIR information, provide the information available to successor providers, and coordinate transition efforts. ORR cannot unilaterally obtain information maintained by an independent provider that has determined that the information cannot be supplied to the Government.

58. For these reasons, the transition from the former Acacia network requires more than the availability of federal funding. It also requires the cooperation of the prior incumbent contractor (Acacia) and LSPs (plaintiffs) to identify existing attorney-client relationships, decide whether they will continue to represent their clients pro bono or withdraw from representation in a timely manner, and if they opt to withdraw, share case information necessary to transition cases to successor LSPs.

**V. Examples Illustrating the Transition Process**

59. I understand that Plaintiffs have identified several individual cases as examples of children allegedly lacking legal services during the transition. As an initial matter, ORR, via DOJ, requested that plaintiffs identify these children by A number to enable ORR to investigate their specific circumstances, but plaintiffs have not provided this information as of the date of this declaration. Nevertheless, ORR reviewed available agency and EOIR information in an attempt to identify those UAC to the best of its ability. A review of those examples illustrates several of the operational issues described above, and shows that the individual cases are considerably more nuanced than plaintiffs' declarations suggest.

**A. Los Angeles**

60. One example concerns a child who appeared in immigration court in Los Angeles on August 6, 2026. The child was in ORR care at the time of the hearing. Available information indicates that the hearing began before the time reflected on EOIR's Automated Case Information system. That timing impeded USCRI's ability to have its attorney present at the outset of the proceeding.

61. ORR records indicate that the child had been in ORR custody since June 2, 2026, nearly two months before the Acacia contract expired. The child had appeared at two hearings before August 6. Available records reflect that the Acacia LSP had appeared as a friend of the court rather than entering an appearance as attorney of record.

62. The immigration judge did not grant voluntary departure at the August 6 hearing. The judge provided an additional ten days for the child to consult with an attorney regarding his wishes.

63. Available information further indicates that the child stated that he had discussed his decision with his parents, was not afraid to return home, and had not been threatened to return.

64. At the subsequent August 18 hearing, the current LSP attorney, together with USCRI, advocated concerning the child's expressed wishes and requested protections concerning the costs associated with departure.

65. Thus, the alleged absence of an attorney-of-record appearance at the outset of the August 6 proceeding does not provide a complete picture of the legal services provided to the child during the transition.

**B. Texas**

66. A second example concerns an August 11, 2026, hearing in Harlingen, Texas. The child was in ORR care at the time of the hearing. ORR's review indicates that the child's case was not included in the information available to USCRI because of an ORR data discrepancy. That discrepancy illustrates that the prior LSP had not shared sufficient data with ORR to ensure that ORR had the information needed to provide complete and accurate data to USCRI. As a result, USCRI did not receive advance notice of the hearing.

67. ORR examined the child's case and determined that, although Plaintiffs' description contains misrepresentations, the relevant facts are as follows: ORR's information indicates that the child's objective was reunification with her adult sister, with whom she had entered the United States, and that the voluntary-departure order was entered in furtherance of the child's stated objective. In fact, the child's parents had requested the expedited return of the child to her home country.

68. This example illustrates the operational significance of complete transition data. A successor provider cannot assign an attorney in advance to a hearing of which the provider does not have advance notice. ORR has worked to identify and correct such discrepancies as the transition has proceeded.

**C. Arizona**

69. A third example concerns a one-year-old child who appeared in Phoenix immigration court on August 17, 2026.

70. ORR records reflect that the child was accompanied by his 17-year-old mother, who spoke on his behalf during the proceeding.

71. ORR's records also contain an L-3 form submitted by the Florence Immigrant & Refugee Rights Project indicating representation for the child within an identified scope of services. The child had entered ORR custody on June 26, 2026, while the Acacia contract was in effect.

72. A USCRI supervisory attorney appeared virtually as friend of the court in Phoenix on August 17. The attorney had identified the cases in which he would appear and explained that his purpose was to determine whether the children had existing representation and, where necessary, seek additional time so that legal consultation could occur and direct representation could be assessed.

73. In this child's case, the immigration judge granted a continuance until October 23, 2026. The continuance provided USCRI additional time to determine the child's representation status, conduct any necessary consultation and assessment, and coordinate with any prior LSP activity.

74. These examples illustrate that direct attorney-of-record representation cannot always appropriately be entered immediately. During the initial transition, friend-of-court appearances served, among other purposes, to identify representation status, preserve time where necessary, permit consultations to occur, and avoid duplicate or conflicting representation while the successor provider evaluated whether and how direct representation should proceed.

**VI. Actions Within ORR's Control and Actions Requiring Cooperation of Independent Providers**

75. Again, it is critical to understand the distinction between actions necessary to facilitate legal representation that ORR can perform itself and actions that require the cooperation of an independent provider or attorney.

76. ORR can make available legally authorized funding; establish acquisition requirements; solicit and evaluate proposals; negotiate agreements; make awards when legally authorized; provide available information concerning children and hearings; establish service priorities; coordinate referrals; monitor provider implementation; communicate with existing providers; identify apparent coverage gaps; and take other administrative and operational steps within the agency's authority.

77. ORR has taken those types of actions during the course of this litigation, as described in this and my prior declarations.

78. Other actions necessary to establish direct representation cannot be performed by ORR officials. Among other things, an independent provider must agree to participate in the program and establish sufficient staffing and operational capacity. An attorney must then undertake the professional steps appropriate to an individual case, which may include consulting with the child, determining the child's wishes, reviewing the case posture, determining whether another attorney already represents the child, identifying potential conflicts, and determining whether and within what scope an attorney-client relationship can appropriately be established.

79. Those steps cannot be compelled by an ORR directive or by the mere availability of appropriated funds. ORR cannot direct the formation of an attorney-client relationship between a child and

an independent attorney, make professional judgments for that attorney, or require a private attorney to enter an appearance in a particular immigration proceeding.

80. ORR likewise cannot require an independent organization to enter into an agreement with the Government, compel the manner in which an existing provider employs or retains its staffing capacity, or compel a provider to continue performance after expiration of its agreement.

**VII. The Difference Between Funding and Operational Legal-Service Capacity**

81. In my experience administering these acquisition requirements, the existence of appropriated funds is different from the existence of operational legal-service capacity.

82. Government officials can make funds available through legally authorized mechanisms and can work to establish those mechanisms as quickly as reasonably practicable, which ORR has. Federal funding, however, does not, itself, supply an attorney, create an attorney-client relationship, resolve an asserted conflict of interest, identify a child's wishes, transfer information held by a former provider, or cause an independent attorney to enter an appearance in a particular case.

83. In addition, a successor provider may need to hire or assign attorneys and other personnel, establish operational procedures, obtain and review case information, determine existing representation status, identify upcoming hearings and deadlines, conduct consultations, check for conflicts, establish referral and case-management processes, and transition active matters without unnecessarily disrupting existing attorney-client relationships.

84. As described above, some of activities are matters within ORR's control. Others necessarily require the actions and professional judgment of independent legal-service organizations and attorneys, such as Acacia and plaintiffs.

85. Transition, therefore, depends upon provider capacity, the availability and accuracy of transition data, cooperation between prior and successor providers, and the professional obligations governing individual attorneys. ORR can facilitate and oversee the process within its authority, but it cannot itself perform every step necessary to create private legal-service capacity.

**VIII. ORR's Efforts Have Produced Actual Legal-Service Capacity**

86. ORR's transition efforts have resulted in actual legal-service capacity.

87. ORR's current provider, USCRI, began providing services on August 5. During the initial implementation period addressed in my August 13 declaration, USCRI attorneys provided legal services for the hearings identified through this process. The services provided during the transition included legal orientations, consultations, direct representation where accepted, and initial friend-of-court appearances in order to identify representation status and preserve children's ability to obtain appropriate legal services.

88. .ORR continues to collect and review information concerning children served, consultations performed, direct representations undertaken, hearings covered, friend-of-court appearances, geographic coverage, provider staffing, and other measures of operational capacity. The week of August 3, 2026, USCRI appeared in 329 hearings in at least 19 different hearing locations. The week of August 10, 2026, USCRI appeared in 313 hearings in at least 23 different locations. The week of August 17, 2026, USCRI appeared in 418 hearings in at least 25 different locations. The week of August 24, 2026, USCRI appeared in 377 hearings in at least 23 different hearing locations. During these hearings, USCRI stepped in on behalf of any children who appeared without legal representation. In some matters, USCRI did not step in because another legal service provider was present, the hearing had been rescheduled before it was called, the hearing was reset, venue had changed, the case was not called, or another procedural outcome occurred. In those instances, USCRI was present to confirm and record the outcome of all cases. Furthermore, USCRI is providing legal orientations within 10 days of entry into ORR care for UAC, including UAC who entered care before the grant award and did not already receive an orientation from an Acacia-funded legal service provider.

89. To be sure, the ongoing transition efforts have not produced instantaneous duplication of every feature of the former Acacia-funded network. A nationwide network developed over time cannot be recreated immediately merely by obligating funds. New providers must establish operational capacity, obtain and reconcile case information, assign qualified personnel, conduct appropriate case-specific reviews, and undertake representations consistent with attorneys' professional obligations.

**IX. Present Ability to Address Remaining Service Gaps**

90. ORR continues to identify and address remaining service gaps through the mechanisms described above. Where ORR identifies a matter requiring additional capacity, ORR can take actions within its authority, including communicating the need to a provider, supplying available case information, adjusting priorities where appropriate, pursuing additional contractual or cooperative-agreement capacity, and coordinating among providers.

91. There are, however, aspects of the ultimate result that are outside of ORR's control. ORR cannot require an independent organization to enter into an agreement with the Government; compel the manner in which an existing provider employs or retains its available staffing capacity; require a private attorney to undertake representation of a particular child; eliminate the professional and ethical steps necessary before representation begins; or compel a former provider to supply information that it has determined cannot or will not provide to ORR.

92. As of the date of this declaration, I am not aware of a unilateral action presently available to immediately recreate the former Acacia- nationwide provider network. I am also not aware of a unilateral action to immediately assign every child an attorney of record.

93. That does not mean ORR lacks means of continuing to improve and expand legal-service capacity. ORR continues to exercise the authorities available to it and to work with current and potential providers to increase capacity and facilitate representation. The distinction is that those Government actions cannot by themselves guarantee the timing or outcome of actions that must be undertaken by independent organizations and attorneys.

94. ORR has pursued multiple mechanisms rather than relying on any single approach. Those efforts have included the long-term competitive procurement initiated in November 2025; voluntary corrective action following bid protests of the competitive solicitation; extension of the Acacia contract through July 31; negotiations for another Acacia bridge; the USCRI cooperative agreement; the successor contract awarded to Our Rescue on August 7; the attempted Burke cooperative agreement; negotiations with additional potential successor providers; communications with existing LSPs; and operational transition planning.

95. Some of the efforts succeeded and resulted in services. Others were statutorily delayed by bid protests or did not result in agreements because an independent provider did not accept the proposed arrangement or withdrew from consideration.

96. Based on my involvement in these efforts and my responsibilities for ORR's acquisition requirements, I am not aware of a Government-controlled mechanism that ORR can unilaterally exercise to immediately restore the provider structure and level of direct representation that existed under the former Acacia arrangement.

97. To the extent service gaps are identified during the transition, ORR continues to evaluate whether additional actions within its authority can reasonably address them. Where such actions are identified and legally available, ORR has sought and will continue to seek to implement them.

98. ORR will continue to solicit, negotiate, fund, contract, coordinate, provide available information, identify service priorities, monitor implementation, and pursue other actions within its lawful authority to facilitate legal services for UAC.

99. Based on my responsibilities for ORR's acquisition requirements and my involvement in the transition described above, ORR has pursued all available mechanisms to maintain and replace legal-service capacity following expiration of the Acacia contract and continues to do so. The Government can fund, facilitate, coordinate, and oversee those mechanisms, but the ultimate provision of direct legal

representation necessarily requires the good faith participation and professional action by independent organizations and attorneys whom ORR does not control.

Executed on August 28, 2026.

RICHARD B. DEBANY -S
Digitally signed by RICHARD B. DEBANY -S
Date: 2026.08.28 13:50:10 -04'00'

Richard B. Debany