GIBSON, DUNN & CRUTCHER LLP
Katherine Marquart (CA Bar No. 248043)
Ariana Sañudo (CA Bar No. 324361)
Arthur Halliday (CA Bar No. 347620)
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
kmarquart@gibsondunn.com
asanudo@gibsondunn.com
ahalliday@gibsondunn.com

Laura M. Sturges (*pro hac vice*)
Patricia M. Herold (*pro hac vice*)
Caelin Moriarity Miltko (*pro hac vice*)
1900 Lawrence Street, Suite 3000
Denver, CO 80202-2211
(303) 298-5700
lsturges@gibsondunn.com
pherold@gibsondunn.com
cmoriaritymiltko@gibsondunn.com

IMMIGRANT DEFENDERS LAW CENTER
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Riley H. Mailman (CA Bar No. 329015)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org
rmailman@immdef.org

JUSTICE ACTION CENTER
Esther H. Sung (CA Bar No. 255962)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)
Hillary Li (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
Emily Satifka (*pro hac vice*)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
hillary.li@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org
emily.satifka@justiceactioncenter.org

AMICA CENTER FOR IMMIGRANT RIGHTS
Adina Appelbaum (*pro hac vice*)
Samantha Hsieh (*pro hac vice*)
Peter Alfredson (*pro hac vice*)
Evan Benz (*pro hac vice*)
Amica Center for Immigrant Rights
1025 Connecticut Ave., NW, Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, et al.,
Plaintiffs,
v.
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,
Defendants.

CASE NO. 4:25-CV-02847-AMO

**PLAINTIFFS' POST-HEARING BRIEF**

Judge: Hon. Araceli Martínez-Olguín
Date Action Filed: March 26, 2025

## TABLE OF CONTENTS

**INTRODUCTION** .......... 1
**RELEVANT FACTUAL BACKGROUND** .......... 1
I. Funding and Services Provided Before August 1, 2026. .......... 1
II. Defendants Attempt To Replace the Acacia Contract. .......... 3
III. The Acacia Contract Expires On July 31, 2026 With No Replacement. .......... 4
IV. Defendants Acknowledge Gaps In Services. .......... 6
**LEGAL STANDARD** .......... 7
I. Defendants Have Withdrawn Services. .......... 8
II. Defendants Have Withdrawn Funds. .......... 12
III. Defendants Cannot Use the Chaos They Created—Which They Know How to Avoid—as an Excuse For Withdrawing Services and Funds. .......... 12
**CONCLUSION** .......... 15

# TABLE OF AUTHORITIES

## Cases

*A&M Recs., Inc. v. Napster, Inc.*,
284 F.3d 1091 (9th Cir. 2022)....................7

*City and County of San Francisco v. Trump*,
782 F. Supp. 3d 830 (N.D. Cal. 2025)....................7, 13

*Frew ex rel. Frew v. Hawkins*,
540 U.S. 431 (2004)....................7

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc.*,
774 F.3d 935 (9th Cir. 2014)....................7

*New York Times Co. v. Dept. of Defense*,
830 F. Supp. 3d 1 (D.D.C. 2026)....................7

*Simon v. City and County of San Francisco*,
2024 WL 4314207 (N.D. Cal. Sept. 26, 2024)....................7

*Spallone v. United States*,
493 U.S. 265 (1990)....................7

## Regulations

45 C.F.R. § 410.1309(a)(2)(i)(B)....................2, 10

## INTRODUCTION

Until July 31, 2026, Defendants provided approximately $15.7 million per month in funding for hundreds of attorneys who represented more than 20,000 unaccompanied children, as required by the Trafficking Victims Protection Reauthorization Act ("TVPRA"), the Office of Refugee Resettlement's ("ORR's") Foundational Rule, and this Court's preliminary injunction order—in addition to millions more to fund other required services for the children. Today, Defendants are providing only $4 million per month ($20 million over a five-month period between August and December 2026), for representation *and all other required services*, to fund attorneys who have filed appearances on behalf of, at most, *a few dozen* children since July 31, 2026. The Court's preliminary injunction set a clear standard: to ensure Defendants' compliance with the TVPRA and the Foundational Rule, Defendants must continue to provide the funding and services they provided to unaccompanied children as of March 20, 2025. Dkt. 87 at 28.

The September 8, 2026 evidentiary hearing and testimony from Richard Debany, Defendants' witness and declarant, made clear Defendants are providing significantly less funding and significantly fewer services than what they provided as of March 20, 2025. Defendants admitted to spending less than a quarter of what they previously spent, providing a vanishingly small fraction of the funded representations they previously provided, and not providing the same scope of representation for the same scope of relief they previously provided. Defendants also admitted to "a gap in service" which remains ongoing because the contract with Our Rescue is stayed. Sturges Decl. Ex, A ("Tr.") 11:5–7. Instead of funding and providing services, Defendants are depending on Plaintiffs and other legal services organizations they formerly funded to continue providing required services for free, with no transition plan in sight.

The Court should find Defendants are violating the preliminary injunction and should issue relief appropriate to ensure Defendants' compliance going forward.

## RELEVANT FACTUAL BACKGROUND

### I. Funding and Services Provided Before August 1, 2026.

The Court's April 29, 2025 preliminary injunction prohibits Defendants "withdrawing the services or funds provided by the Office of Refugee Resettlement ('ORR') as of March 20, 2025," to

ensure Defendants' compliance with the TVPRA and the Foundational Rule. Dkt. 87 at 28. As of March 20, 2025 (and from April 29, 2025 to July 31, 2026), Defendants provided the services and funding for unaccompanied children required by law, regulation, and the preliminary injunction through a contract with the Acacia Center for Justice. *See* Dkt. 87 at 4; *see also* Dkts. 91, 98, 104, 127, 137, 142, 146, 148, 150, 151, 153, and 156.

Under the Acacia contract, Defendants provided/funded legal services for "the maximum number of children possible given available funding," "ensuring each child receive[d] professional and robust representational services to the maximum extent possible." Dkt. 169-2 at 22 (Acacia contract). This included requirements to leave no ORR shelter without services, as Acacia and its provider network were required to serve new facilities within 30 days of receiving notice that a new facility was opening. *Id.* Through the Acacia contract, Defendants funded legal service providers across the country, near every county where ORR released children from shelters. *Id.* at 23.

Defendants also funded Know-Your-Rights presentations for children in ORR custody on precise timelines, tracking regulatory requirements. *See* Dkt. 169-2 at 21; 45 C.F.R. § 410.1309(a)(2)(i)(B). Defendants provided, through the Acacia contract, Know-Your-Rights presentations to children within ten business days of admission to an ORR shelter, within ten business days of transfer to any new ORR shelter, and every six months if they remained in shelters. Dkt. 169-2 at 24. In October 2025, Defendants spent $4,665,260.95 to fund Know-Your-Rights presentations and screenings, $17,475,889.58 to fund direct representation and related services, $1,797.439.58 to fund attorney and pro-bono-partner recruitment, and $670,815.46 on language services—for a total of $24,609,405.58 in funding for services required by the TVPRA, the Foundational Rule, and the preliminary injunction. Dkt. 169-6.

Defendants funded legal screenings for every child in ORR custody on the same timelines, with providers spending up to ten hours with each child to build rapport and identify relief the child could seek. *See* Dkt. 169-2 at 25. In these screenings, providers screened for potential trafficking and sought consent from the child to refer them for representation. *Id.* at 25-26.

Defendants also funded representation for children in most immigration-related legal proceedings, including representation to seek Special Immigrant Juvenile Status ("SIJS"), Special

Immigrant Visas, T visas (for victims of human trafficking), U visas (for victims of certain crimes), relief under the Violence Against Women Act, deferred action, relief based on acting as a material witness in criminal matters, forms of asylum and related relief, family-based petitions, and work permits—as well as appeals of immigration decisions. *See* Dkt. 169-2 at 21. Defendants' contract with Acacia required that services be available in the many languages frequently encountered in the diverse population of unaccompanied children. *Id.* While Defendants only funded representations that began before the child's 18th birthday, representations started before a child turned 18 could continue to be funded after the child's birthday—as many cases often extend for years. *Id.* at 27.

Defendants also funded services where full-scope representation was not practicable due to funding limitations or other circumstances. Under the Acacia contract, Defendants funded service providers to attend hearings for unrepresented children in custody and appear in a limited-scope representation with the child as a client for only that hearing, or in a non-representative "friend-of-court" capacity. Dkt. 169-2 at 26.

The services Defendants provided as of March 20, 2025 also included requirements to ensure continuity of representations. For example, Defendants required referrals to alternative counsel for children who moved out of the service area of existing counsel, and required similar efforts when children were released from ORR custody. Dkt. 169-2 at 29-30. Those transitions occurred counsel-to-counsel, and did not require communicating with a middleman employed by Defendants.

## II. Defendants Attempt To Replace the Acacia Contract.

In August 2025, with the Court's preliminary injunction in effect, Defendants executed a bridge contract with Acacia, which was scheduled to expire on July 31, 2026. Dkt. 169-1, ¶¶ 4–5. This contract required Acacia to submit a plan to transition cases to a new contractor to maintain continuity of ongoing representations. Dkt. 169-2 at 24. Acacia timely submitted this plan on September 30, 2025. Tr. 40:15–17. According to Mr. Debany, ORR began "efforts to competitively procure a long-term successor contract in November 2025." Dkt. 186-1, ¶ 12. As part of these efforts, Defendants requested a revised transition plan, which Acacia submitted on April 10, 2026. Tr. 40:18–20. That transition plan informed Defendants that Acacia required at least a 60-day period to transition the representation services Plaintiffs and other providers were then performing. Tr. 40:21–24.

By at least June 15, 2026, Defendants knew a new bridge contract would be required to provide services after July 31, 2026, as no long-term successor contract was in place. Tr. 52:2–5. But Defendants waited nearly three weeks to reach out to Acacia regarding any bridge contract, beginning negotiations on July 2. *Id.* 52:14–15. They negotiated for only seven calendar days, with three days falling over the July 4 holiday weekend. *Id.* On July 9, Defendants unilaterally concluded no bridge contract with Acacia was possible because Acacia would not agree to provide information Acacia viewed as confidential. *Id.* 33:25–34:4. This was the same confidential information over which Defendants recently withheld payments for services; this Court ordered Defendants to release those payments on August 6, 2026. *Id.* 34:5–21; *see also* Dkt. 172 (rejecting data demands as excuse for non-compliance). Defendants acknowledge that Acacia remained "interested in [] providing a bridge contract." Tr. 35:5–8. But Defendants "moved on to other strategies," *id.*. 35:10–12, despite recognizing "Acacia was best positioned to maintain continuity" of required services, Dkt. 177 ¶ 10.

Defendants delayed more than two weeks before reaching out to Acacia regarding a plan to transfer ongoing representations to an unidentified contractor who would take over after July 31, 2026. Defendants contacted Acacia on Sunday July 26, 2026, five days before the existing contract expired, with a proposed solicitation for "Legal Services Caseload Transfer." Dkt. 170-1 ¶ 7. No contract was in place to provide for these ongoing representations as of August 1, 2026, meaning Defendants did not give Acacia, Plaintiffs, or other providers any way to transition their ongoing cases. Tr. 43:8–9.

### III. The Acacia Contract Expires On July 31, 2026 With No Replacement.

The Acacia contract expired on July 31, 2026. As of August 1, 2026, Defendants had no vehicle in place to provide services or representations to unaccompanied children, admitting "[t]here was a gap in services" beginning July 31, 2026. Tr. 11:5–6. To the best of their abilities in light of their limited resources, Plaintiffs and other legal services providers have continued, *without funding*, to represent unaccompanied children. *See* Dkt. 182-1 at 10-11 (citing declarations).

On August 4, 2026, Defendants announced a supplemental cooperative agreement with the U.S. Committee for Refugees and Immigrants ("USCRI") to start providing limited legal services from August 5, 2026 to December 31, 2026. Dkt. 171 ¶ 6. Initially, the cooperative agreement covered only the approximately 2,000 children in ORR shelters, paying USCRI $20 million between

August 5, 2026 to December 31, 2026, with a limited geographic scope of just nineteen immigration courts. *See Id.*; Tr. 10:23-11:1, 24:24-25:6, 37:23-25.

On August 13, 2026, Defendants declared to this Court that USCRI was "providing 100% coverage for all hearings, with all required services being offered during this interim period" and that "appearances have proceeded without complications." Dkt. 177 ¶ 5. Defendants later walked back that statement, clarifying that they merely meant that USCRI was "providing 100 percent of their – of the services within that – that – that buildup process." Tr. 11:22-12:2. In other words, Defendants meant only that USCRI provided 100% coverage for any hearing that USCRI actually attended. *See also id.* 24:21–23 ("[I]t's talking about the 100 percent of coverage within that amount of – of that ramp-up, not of all UACs."). Defendants further admitted that by "appearances," they referred to friend-of-court appearances, not appearances as attorney of record. *Id.* 18:23–19:2.

On August 27, 2026, Defendants expanded the cooperative agreement with USCRI to include the more than 20,000 children previously served by the Acacia network—without increasing the funding available to provide these services. Tr. 10:23-11:1, 37:23-25; Dkt. 186-1 ¶ 34.

Meanwhile, on August 13, 2026, Defendants announced a contract with Our Rescue, an organization that has never provided any legal services to unaccompanied children and that does not employ any immigration defense attorneys. *See* Dkt. 177 at 5, ¶ 6; Sens. Blumenthal, Hirono, et al., *Letter to Mr. Benner and Chair Vassilaros* (Aug. 18, 2026), accessible at https://www.blumenthal.senate.gov/imo/media/doc/20260818_letter_to_our_rescue_regarding_contract_award_from_hhspdf.pdf. This contract with Our Rescue was stayed on August 17, 2026, when Acacia filed a bid protest. Dkt. 186-1 ¶ 44. As a result of the stay, Our Rescue is not currently providing any services for unaccompanied children. Tr. 21:5-13.

To date, the only funded vehicle in place to actually provide services is the USCRI cooperative agreement, which funds a single organization with at most 115 dedicated employees to perform the required services for *more than 20,000* unaccompanied children with only $20 million available until December 31, 2026. Tr. 21:11-13. In fact, the data show that there are less than 20 USCRI attorneys actually providing services. Sturges Decl. Exs. C-F. Defendants are not in *any* negotiations to provide any additional services. *Id.* 39:18-19.

There is still no plan to transition cases from formerly funded providers to a new provider.

## IV. Defendants Acknowledge Gaps In Services.

On September 8, 2026, Mr. Debany testified on behalf of Defendants on the status of Defendants' compliance with the preliminary injunction, including "the numbers and types of representations of unaccompanied children" currently provided by Defendants. Dkt. 183 at 2. Mr. Debany was unable to confirm key details, including the types of representations and services Defendants are currently funding and providing to unaccompanied children. *See, e.g.* Tr. 12:4-15:19. His inability to confirm whether Defendants are providing specific required services is patently insufficient. Mr. Debany testified Defendants expected to receive additional data regarding USCRI's services sometime in "mid-September." *Id.* 16:18-21 Despite repeated requests for the information, Plaintiffs received that data—dated September 4 and September 11—only hours before this filing on September 18. Sturges Decl, ¶ 4. This (belated and incomplete) data confirms Mr. Debany's testimony: USCRI has provided only a handful of Know-Your-Rights presentations and has entered representation of *at most a few dozen* unaccompanied children *since August 5*. *Id.*, Exs. C-F.[1][2]

Mr. Debany's testimony confirmed Defendants have cut off access to more than three-quarters of the funding they previously provided—and, as a result, are funding only a fraction of the services they previously provided and providing services to an even smaller fraction of the population they previously served. *See, infra*, at 8-12. At the same time, unaccompanied children are in dire need of the services Defendants are legally required to provide. As Plaintiffs have previously explained, the Government has scheduled an unprecedented number of asylum interviews, court dates, and other deadlines, sometimes set with minimal notice (including asylum interviews scheduled with less than 24 hours' notice), while simultaneously making it more difficult for unaccompanied children to meet the standard to reschedule their asylum interviews. *See* Dkt. 182-1 at 18-19 (citing declarations).

---

[1] Defendants sent Plaintiffs additional data at 11:15 a.m. PT on September 18, 2026. Although provided without sufficient time for Plaintiffs to address here, Plaintiffs note that data appears to show more of the same—deficient non-compliance and virtually no representation provided. Plaintiffs object to Defendants' delay in providing this information and reserve the right to respond to it in a later filing, if necessary.

[2] Defendants noted the data was unvalidated because ORR was still reviewing, and that Defendants reserve the right to "supplement, correct, amend, and contextualize any data" in their upcoming brief. Plaintiffs object to any such correction of data, and reserve their rights to object to any new evidence.

## LEGAL STANDARD

The preliminary injunction sets a clear rule: Defendants may not "withdraw[] the services or funds provided by the Office of Refugee Resettlement ("ORR") as of March 20, 2025," which ensures Defendants comply with the TVPRA and the Foundational Rule. Dkt. 87 at 28. The Court has jurisdiction to "supervis[e] compliance" with and enforce the preliminary injunction, and cannot dissolve or significantly modify it pending resolution of Defendants' Ninth Circuit appeal. *See A&M Recs., Inc. v. Napster, Inc.*, 284 F.3d 1091, 1099 (9th Cir. 2022).

As the Court has recognized, "[f]ederal courts are not reduced to issuing injunctions . . . and hoping for compliance." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004) (citation omitted). Courts "have inherent powers to enforce compliance with their lawful orders," *Spallone v. United States*, 493 U.S. 265, 276 (1990) (citation omitted), including by preventing post-order actions that "can be used as an end run around the Preliminary Injunction," *City and County of San Francisco v. Trump*, 782 F. Supp. 3d 830, 836 (N.D. Cal. 2025). The Court should look both to the plain language of the preliminary injunction and to its purpose in determining whether Defendants are complying. *See Inst. of Cetacean Research v. Sea Shepherd Conservation Soc*., 774 F.3d 935, 949 (9th Cir. 2014); *see also New York Times Co. v. Dept. of Defense*, 830 F. Supp. 3d 1, 8-9 (D.D.C. 2026) (granting motion to enforce where the government violated both preliminary injunction's text and principles).

## ARGUMENT

The Court has already held the preliminary injunction does not allow Defendants to "utilize a contractual dispute as a shield for their failure to abide by the terms of the preliminary injunction." *See* Dkt. 172 at 2 (granting motion to enforce where Defendants cited contracting excuses). And Defendants may not induce the same outcomes the preliminary injunction sought to avoid by making choices that "inevitably result[]" in a withdrawal of required funds or services. *Id.*; *see Simon v. City and County of San Francisco*, 2024 WL 4314207, at *3 (N.D. Cal. Sept. 26, 2024) ("Defendants' behavior . . . is the same conduct that formed the basis for the Court's injunction, and there can be no question that the conduct violates the spirit of the injunction"). Defendants' admissions at the September 8 hearing show they have both (1) withdrawn services they provided as of March 20, 2025, and (2) withdrawn funds they provided as of March 20, 2025. Defendants know how to comply with

the order and the law while navigating the federal contracting process. They have chosen not to.

**I. Defendants Have Withdrawn Services.**

Under the Acacia contract, Defendants provided a defined set of services, both in terms of who received services and what services these children received. The "who" and "what" of these services provide a yardstick to measure Defendants' compliance with the preliminary injunction: because Defendants are providing significantly fewer services to many fewer children, they are violating the preliminary injunction.

**Defendants are not providing services to the same scope of children as on March 20, 2025.** Defendants are violating the preliminary injunction by providing services (and most notably direct representation) to only a tiny fraction of the children served as of March 2025, and leaving entire populations of children without funded services. Defendants created these service gaps by funding only a fraction of the attorneys they formerly funded to provide services.

Under the Acacia contract, the number of children to whom Defendants provided representation through approximately 100 legal service subcontractors, Tr. 23:13-15, was consistently in the low- to mid-20,000s, Dkt. 169-3. In November 2025, Defendants provided representation to more than 24,000 children through Acacia. *See* Dkt. 161-1, ¶ 14. When Defendants allowed the Acacia contract to expire on July 31, that number was more than 21,000. Tr. 37:12-15. As of September 8, according to Mr. Debany, the current provider has entered record appearances on behalf of only *twelve* children. Tr. 19:6-8. It appears that the majority of the $4 million Defendants are spending per month is being spent either on orientations or on friend-of-court appearances, while direct representations remain largely unfunded. Sturges Decl. Exs. C-F. Defendants admit these orientations and friend-of-court appearances are not "direct representation," which is a service the preliminary injunction requires. *See* Tr. 59:9–19. Although the preliminary injunction does not demand an exact number of representations or universal representation, it is incompatible with the preliminary injunction for Defendants to provide less than 1% of the representations that were previously provided to unaccompanied children. *See* Dkt. 172 at 2 ("[M]aintaining the funding of legal representation for unaccompanied minors in accordance with the TVPRA and the Foundational Rule is the preliminary injunction's objective."). More than just a "spirit of the order" violation, this

is a facial violation, as this Court instructed Defendants to provide services and funds *as provided March 20, 2025*. Dkt. 87 at 28.

The testimony Defendants offered to prove their compliance instead proves that Defendants are additionally violating the preliminary injunction by leaving entire populations of children unserved, though they received services funded by Defendants as of March 20, 2025:

- From August 1 to August 4, Defendants did not fund any services for any children. Tr. 21:11-15.
- From August 1 to August 27, Defendants did not provide a single service to the more than 20,000 children not in ORR custody. Tr. 11:2-7.
- Defendants do not know the geographic scope of the services they are providing and could not confirm that USCRI had expanded to cover services nationwide, Tr. 25:2-6, compared to nationwide services under the Acacia contract, *id.* 30:11-16.
- Defendants cannot confirm that services are available for children in all ORR shelters and all immigration courts, Tr. 39:2-8, though there were no such location gaps under the Acacia contract, *id*. 39:9-13.

These limitations in populations served are a withdrawal of services provided on March 20, 2025, in violation of this Court's order.

Defendants' withdrawal of services from a vast majority of the children they formerly served is the inevitable outcome of Defendants only funding somewhere between 30 and 115 employees (only a fraction of them attorneys), through USCRI only, to provide the required services. Tr. 21:25-22:13. To represent the 21,000+ children who previously received funded representation, each USCRI attorney would have to represent hundreds of children. *Id*. 23:3-5. And because USCRI is the only entity with whom Defendants have an active contract to provide services, USCRI alone must also provide all Know-Your-Rights presentations, legal screenings, and other required non-representation services Defendants previously provided. *Id*. 21:11-13. Previously, Defendants funded more than 100 Acacia subcontractor *organizations* to provide these services (not just, at most, 115 employees). *Id*. 23:12-16. Defendants are not funding enough personnel to provide the required services.

**Defendants are not providing the same breadth of services as on March 20, 2025.**

Defendants are additionally violating the preliminary injunction by not funding the same broad range of services they funded for unaccompanied children as of March 20, 2025. Defendants concede they previously funded services that allowed children to seek many different forms of legal relief connected with immigration proceedings. Tr. 16:10-13. But Defendants could not confirm they are now funding the same breadth of services for those few children for whom Defendants are providing services at all:

| Service provided under Acacia contract | Confirmation Defendants are providing? |
|---|---|
| Know-Your-Rights presentations at the frequency mandated by the Foundational Rule: within 10 days of a child's arrival at an ORR shelter and then every 6 months. Dkt. 169-2 at 24; 45 C.F.R. § 410.1309(a)(2)(i)(B). | **EFFECTIVELY NO.** KYRs are provided under the cooperative agreement, but Mr. Debany could not confirm the timing or frequency of the orientations. Tr. 12:4-10.<br><br>According to Defendants' data, only a handful of orientations have occurred, most of them virtual. USCRI has performed KYRs for 28 children on five dates in five locations. Sturges Decl. Exs. C, D. |
| Representation for asylum applications and interviews with USCIS. Dkt. 169-2 at 21. | **NO.** Tr. 12:15-25.<br><br>The data does not show any representation for asylum interviews. Sturges Decl. Exs. E, F. |
| Representation for Special Immigrant Juvenile Status ("SIJS") applications with USCIS. Dkt. 169-2 at 21. | **NO.** Tr. 13:1-4. |
| Representation for SIJS state court predicate proceedings. Dkt. 169-2 at 21. | **NO.** Tr. 13:14-16. |
| Representation for SIJS state court appeals. | **EFFECTIVELY NO.** Mr. Debany stated they were covered by the cooperative agreement, but could not confirm whether the service had been provided. Tr. 14:23-15:1. |
| Representation for trafficking victims to apply for T visas. Dkt. 169-2 at 21. | **NO.** Tr. 13:5-7. |
| Representation for victims of crimes to apply for U visas. Dkt. 169-2 at 21. | **NO.** Tr. 13:8-11. |
| Representation on family-based petitions, known as I-130s. Dkt. 169-2 at 21. | **NO.** Tr. 13:12-13. |
| Direct representation to help children file applications in immigration court for asylum, withholding of removal, and withholding under the Convention Against Torture. Dkt. 169-2 at 21. | **EFFECTIVELY NO.** Mr. Debany stated that the cooperative agreement covered this service, but could not confirm whether this service was provided. Tr. 15:2-6. He further testified that USCRI had only entered notices of appearance on behalf of 12 children. Tr. 19:6-8.<br><br>At most, a few dozen children have USCRI |

| | |
|---|---|
| | representation. Sturges Decl. Exs. E, F. Most appearances appear to be approximately 15 minutes. *Id.* |
| Direct representation to help children request voluntary departure in immigration court. Dkt. 169-2 at 21. | **EFFECTIVELY NO.** Mr. Debany stated that the cooperative agreement covered this service, but could not confirm whether this service was provided. Tr. 15:2-6. He further testified that USCRI had only entered notices of appearance on behalf of 12 children. Tr. 19:6-8. |
| Representation to make constitutional challenges to conditions in detention, immigration proceedings, or any other unconstitutional actions. Dkt. 169-2 at 21. | **NO.** Tr. 15:13-16. |
| Representation to appeal immigration court decisions to the Board of Immigration Appeals. Dkt. 169-2 at 21. | **NO.** 15:17-19. |
| Representation of children after their 18th birthday. Dkt. 169-2 at 21. | **EFFECTIVELY NO.** Mr. Debany stated that the cooperative agreement covered this service, but could not confirm whether this service was provided. Tr. 15:2-6. |
| Receiving and responding to reports of abuse and other incidents that are subject to mandatory reporting in ORR shelters. Dkt. 169-2 at 21. | **YES.** Tr. 16:3–6. |
| Services at emergency facilities. Dkt. 169-2 at 21. | **NO.** Mr. Debany testified this was covered by the cooperative agreement, but that no services were provided because there are no emergency facilities. Tr. 16:7-9. |

In fact, as discussed above, Defendants are barely funding representations—they are instead, selectively and impermissibly, choosing to fund non-representative friend-of-court appearances in lieu of the broad representation they provided as of March 20, 2025. Defendants concede that past statements that they were funding USCRI attorneys to "appear" at hearings did not reference representative appearances, but rather described attorneys attending and/or acting as "friend of court" at some limited number of hearings. Tr. 18:23-19:2. As Defendants admit, friend of court is not representation. *Id.* 57:21-23. While the Acacia contract provided friend-of-court services as a "lever" to help as many children as possible, they were provided *alongside and in addition to representations of more than 20,000 children*—not as a substitute for providing direct representation. *Id.* 57:21-25.

Because Defendants are providing significantly fewer services to significantly fewer unaccompanied children than they did as of March 20, 2025, they have withdrawn services in violation

of the preliminary injunction.

## II. Defendants Have Withdrawn Funds.

Defendants are additionally violating the preliminary injunction by withdrawing funding—spending less than a quarter of what they spent on services as of March 20, 2025. As the Court held in finding Defendants in violation of the preliminary injunction for refusing to pay for services, "[t]his violates both the plain language and the spirit of the preliminary injunction, as maintaining the funding of legal representation for unaccompanied children in accordance with the TVPRA and the Foundational Rule is the preliminary injunction's objective." Dkt. 172 at 2.

Historically, Defendants spent an average of $15.7 million per month to fund lawyers to represent more than 20,000 unaccompanied children across the many kinds of representation and forms of relief Defendants funded under the Acacia contract. Tr. 36:22-37:4. Today, though Defendants have available congressionally appropriated funding sufficient to spend at the same level they historically have, Defendants are only paying one legal service provider—USCRI—a *total* of $20 million to provide services to unaccompanied children from August 5, 2026, to December 31, 2026. *Id.* 37:16-25. That is an average of $4 million per month, split across *all services* (friend-of-court, know-your-rights, screenings, etc.), not just for representation. By contrast, in October 2025, Defendants spent $24.6 million on *all* legal services they provided under the Acacia contract, including more than $4 million on Know-Your-Rights orientations alone. *See* Dkt. 169-6. All evidence points to the conclusion that even where Defendants are providing *some* services, they are providing those services at a much lower volume and with significantly less funding than they previously did. By spending a *total* of $4 million per month on *all services*, Defendants have withdrawn funding in violation of the preliminary injunction.

## III. Defendants Cannot Use the Chaos They Created—Which They Know How to Avoid—as an Excuse For Withdrawing Services and Funds.

The Court has repeatedly cautioned Defendants that they cannot "utilize a contractual dispute as a shield for their failure to abide by the terms of the preliminary injunction," Dkt. 172 at 2—but that is exactly what Defendants are doing. At the September 8, 2026 hearing, Defendants offered a set of contract-based excuses for withdrawing services and funding, despite the Court recognizing that

contractual rights and contractual disputes do not allow Defendants to withdraw funding or services, as that "would be an end run around the injunction that the Court must reject." *Id.* at 3 (citing *City and County of San Francisco*, 782 F. Supp. 3d at 836).

Defendants know how to navigate around each purported obstacle to provide the full required funding and services for unaccompanied children—because they have done so in the past, extending bridge contracts when faced with bid protests, avoiding the need to transition cases, and utilizing capable providers who don't require a "ramp-up" period. Whether because Defendants have chosen not to implement these work-arounds now or because they have made choices that now preclude these work-arounds, the withdrawal of funding and services is the result of Defendants' actions. None of these excuses give Defendants permission to violate the Court's order and the law.

**The failure to negotiate a bridge contract with Acacia is not an excuse for Defendants' violation of the preliminary injunction.** Forced to acknowledge that there has been a "gap in service" because there is no contract in place to provide all required services, Tr. 11:5–7, Defendants attempt to blame this gap on Acacia. But Defendants made the choices that created the avoidable gap and lack of a transition of cases to a funded provider.

Defendants delayed negotiating a bridge contract with Acacia for more than three weeks; Defendants decided Acacia could not meet the "terms and conditions" of their data demands after only four business days of discussions; and Defendants decided to delay planning a transition for another two weeks, failing to give Acacia "any time" to transition cases. *See supra* at 3-4.

Defendants insinuate Acacia and its former subcontractors are to blame for Defendants' failure to transition cases, because while Acacia agreed to provide information to transition cases to *the legal service provider receiving the case*, it has not agreed to provide that information to ORR. Tr. 64:10-15. This cannot justify Defendants' ongoing failure to put into place a transition plan to comply with the preliminary injunction, for three reasons. First, Defendants do not need information to transition cases—they simply need to connect the formerly funded legal service providers with presently funded providers that can take on cases. The legal service providers themselves can share information with client consent—as Acacia proposed in its transition plan. *See Id*. Second, the details of data-sharing are part of the transition plan discussions, which Defendants have repeatedly delayed. *See, supra*, at

3-4. And third, the Court already rejected Defendants' attempts to strong-arm legal service providers into divulging privileged and/or confidential information without client consent. *See* Dkt. 172.

**USCRI's "ramp-up" period is not an excuse for Defendants' violation of the preliminary injunction.** At the hearing, Defendants' witness explained that USCRI—as the only contractor funded and providing services for unaccompanied children—was not covering all required services, because USCRI has to "ramp up" its capacity to provide services. Tr. 24:17-23. But this ramp-up period is only necessary because Defendants failed to put in place a case transfer plan *before* July 31, 2026. And it only emphasizes why the USCRI contract is an insufficient solo vehicle for compliance through the next several months, because USCRI simply does not have the capacity to provide all required services in every court and every state. *Id*. 24:13-25:10. Defendants do not know if USCRI has, in fact, ramped up its organizational capabilities at all. *Id*. 25:5-6. This is a situation of Defendants' own creation—cutting off services for thousands of unaccompanied children because Defendants chose to contract with an organization that was unprepared to take on the work.

**The stay on the Our Rescue contract is not an excuse for Defendants' violation of the preliminary injunction.** At the hearing, Defendants suggested they could be in compliance had their contract with Our Rescue not been automatically stayed when Acacia exercised its right to file a bid protest. Tr. 45:23-46:10. But, as with the "ramp-up" excuse, Defendants know how to navigate a bid protest without violating the preliminary injunction—they simply chose not to take those steps. The possibility of a bid protest is a simple reality of federal contracting. *Id*. 63:15-17. Whether there is a protest or not, the responsibility to comply with the preliminary injunction and the law falls on Defendants, not any third party or contractor.

Defendants previously found ways to comply with the preliminary injunction when faced with bid protests. On three separate occasions, Defendants solicited competitive bids for a contract to provide services for unaccompanied children and were met with bid protests. Dkt. 186-1, ¶ 13. Defendants nevertheless found "mitigation" strategies to provide services each time. Tr. 60:2-19. For example, when Defendants' first post-injunction contract with Acacia expired on July 31, 2025, ORR entered into a new contract with Acacia on August 1, 2025—"without any interruption of services." Dkt. 137 at 2 (Defendants' status report). Defendants' failure to mitigate the impact of this latest bid

protest, instead allowing a gap in services, is evidence of their non-compliance, not an excuse for it.

Defendants also claim the stayed Our Rescue contract excuses their failure to spend appropriated funds on legal services, because they have "obligated" funds for the dormant contract. Tr. 45:1-15. But the injunction does not require Defendants to "obligate" funding—it prohibits them withdrawing or cutting off funding and services. *See* Dkt. 87 at 28. Obligating funding without releasing it to provide covered services violates the injunction. Defendants previously argued that having funding "available for immediate disbursement" pending some obstacle—in that case, a data request with which Acacia could not comply—excused them not providing required funding. Dkt. 169-1, ¶ 31. The Court rejected that argument. *See* Dkt. 172. It should reject the latest version.

Each purported "excuse" for Defendants' violation of the preliminary injunction is the inevitable result of Defendants' choices. Defendants know how to comply with the preliminary injunction within the world of government contracting; their contracting excuses are as unavailing now as they have always been. *See, e.g*, Dkt. 172 at 2 (refusing Defendants' "attempt to utilize a contractual dispute as a shield for their failure to abide by the terms of the preliminary injunction").

## CONCLUSION

For the reasons explained above, the Court should find Defendants in violation of the preliminary injunction. Plaintiffs request that this Court enforce its injunction by ordering Defendants to: (a) comply with the injunction by restoring funding for the full scope of services available as of March 20, 2025; (b) coordinate with existing provider entities, including Plaintiffs, regarding a transition plan for continuing previously funded representations; and (c) Defendants to provide weekly status reports until the Court is satisfied that Defendants are complying with its order and then every 30 days thereafter. At minimum, status reports should include (i) details regarding existing compliance mechanisms, including status of transition discussions and activities, funds disbursed through each vehicle, and status of any negotiations related to future vehicles; (ii) number of Know-Your-Rights orientations and screenings completed each week in each facility; (iii) number of new representations entered into by new providers; and (iv) number of friend-of-court appearances.

Respectfully submitted,

September 18, 2026

*/s/ Laura M. Sturges*

GIBSON, DUNN & CRUTCHER LLP
Katherine Marquart (CA Bar No. 248043)
Ariana Sañudo (CA Bar No. 324361)
Arthur Halliday (CA Bar No. 347620)
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
kmarquart@gibsondunn.com
asanudo@gibsondunn.com
ahalliday@gibsondunn.com

Laura M. Sturges (*pro hac vice*)
Patricia M. Herold (*pro hac vice*)
Caelin Moriarity Miltko (*pro hac vice*)
1900 Lawrence Street, Suite 3000
Denver, CO 80202-2211
(303) 298-5700
lsturges@gibsondunn.com
pherold@gibsondunn.com
cmoriaritymiltko@gibsondunn.com

*/s/ Alvaro M. Huerta*

IMMIGRANT DEFENDERS LAW CENTER
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Riley H. Mailman (CA Bar No. 329015)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org
rmailman@immdef.org

*/s/ Karen C. Tumlin*

JUSTICE ACTION CENTER
Esther H. Sung (CA Bar No. 255962)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)
Hillary Li (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
Emily Satifka (*pro hac vice*)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
hillary.li@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org
emily.satifka@justiceactioncenter.org

*/s/ Samantha Hsieh*

AMICA CENTER FOR IMMIGRANT RIGHTS
Adina Appelbaum (*pro hac vice*)
Samantha Hsieh (*pro hac vice*)
Peter Alfredson (*pro hac vice*)
Evan Benz (*pro hac vice*)
Amica Center for Immigrant Rights
1025 Connecticut Ave., NW, Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org
*Attorneys for Plaintiffs*

**ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3) of the Northern District of California, I attest that concurrence in the filing of this document has been obtained from each of the other signatories to this document.

DATED: September 18, 2026

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Laura M. Sturges*

Laura M. Sturges

*Attorneys for Plaintiffs*