# EXHIBIT A

**Pages 1 - 68**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín, Judge

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, et al.,

Plaintiffs,

VS.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

Defendants.

**NO. C 4:25-cv-02847-AMO**

Oakland, California
Tuesday, September 9, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

IMMIGRANT DEFENDERS LAW CENTER
634 S. Spring Street, 10th Floor
Los Angeles, California 90014
**BY: LYA FERREYRA, ATTORNEY AT LAW**

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
**BY: ARTHUR HALLIDAY, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
Official United States Reporter, CSR No. 12219

**APPEARANCES**: **(CONTINUED)**

GIBSON DUNN & CRUTCHER LLP
1900 Lawrence Street - Suite 3000
Denver, Colorado 80202
**BY: CAELIN MORIARITY MILTKO, ATTORNEY AT LAW**
**LAURA M. STURGES, ATTORNEY AT LAW**

AMICA CENTER FOR IMMIGRANT RIGHTS
1025 Connecticut Ave. NW - Suite 701
Washington, D.C. 20036
**BY: SAMANTHA HSIEH, ATTORNEY AT LAW**
**ALVARO M. HUERTA, ATTORNEY AT LAW**

JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, California 90027
**BY: EMILY SATIFKA, ATTORNEY AT LAW**
**ESTHER H. SUNG, ATTORNEY AT LAW**
**KAREN C. TUMLIN, ATTORNEY AT LAW**

For Defendants:

US DEPARTMENT OF JUSTICE
CIVIL DIVISION
Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
**BY: WILLIAM C. SILVIS, TRIAL ATTORNEY**

US DEPARTMENT OF JUSTICE
Civil Division
405 5th Street NW - Suite 5427
Washington, D.C. 20549
**BY: DANIEL SCHUTRUM-BOWARD, TRIAL ATTORNEY**

**Also Present: Lindsay Toczlowski**

**I N D E X**

Tuesday, September 9, 2026


| PLAINTIFFS' WITNESSES | PAGE | VOL. |
| --- | --- | --- |
| **DEBANY, RICHARD** | | |
| (SWORN) | 7 | |
| Direct Examination by Ms. Ferreyra | 9 | |
| Cross-Examination by Mr. Silvis | 44 | |
| Redirect Examination by Ms. Ferreyra | 63 | |

**Tuesday - September 9, 2026** **1:35 p.m.**

**P R O C E E D I N G S**

---o0o---

**THE COURTROOM DEPUTY:** All rise. This court is now in session. The Honorable Araceli Martínez-Olguín presiding.

**THE COURT:** You may be seated.

**THE COURTROOM DEPUTY:** Calling Civil Matter 25-2847, Community Legal Services in East Palo Alto, et al. v. United States Department of Health and Human Services, et al.

Counsel, please state your appearances for the record, starting with the plaintiff.

**MS. MORIARTY-MILTKO:** Hi. Caelin Moriarty-Miltko for the plaintiffs. And with me are Laura Sturges, Arthur Halliday, Alvaro Huerta, Lya Ferreyra, Sam Hsieh, Karen Tumlin, Esther Sung, and Emily Satifka. We also have brought a plaintiff representative, Lindsay Toczlowski.

**THE COURT:** Thank you. Good afternoon.

**MR. SILVIS:** Good afternoon, Your Honor. William Silvis from the Department of Justice, and I'm here with my colleague Daniel Schutrum-Boward, also from the Department of Justice.

**THE COURT:** Thank you. Good afternoon.

All right, folks. We're here today for an evidentiary hearing regarding plaintiffs' motion for an order to show cause, a motion which I've clarified I'm construing as a second

motion to enforce the preliminary injunction.

I want to make clear why we're here and what I'm hoping to hear today.

As stated in my last order setting this conference, I'm not interested in any particular instance of non-representation. I want you all to focus on defendants' overall compliance with the preliminary injunction.

Further, just so you know what to expect here, I'm not really interested in hearing attorney argument today. I want to hear evidence.

Also, you should anticipate not receiving any rulings from me today. Instead, I will be asking you all to submit post-hearing briefs.

Plaintiffs, you should expect to submit a brief of no more than 15 pages, and it will be due September 18th.

And, defendants, you should expect to submit a response by noon, September 25th.

And I don't think I said this for plaintiffs: Yours is also due by noon.

In your briefs, I urge you to marshal the evidence presented today to argue why the Government is or is not in compliance with the preliminary injunction.

Now, let me talk with you a little bit more about today. We will wrap everything up by 3:30 today, and about halfway through, we're going to take a 10- or 15-minute break to give

our court reporter and the court staff a little break in between.

Plaintiffs, this is your show, so I'm expecting you to elicit evidence regarding compliance with the preliminary injunction. I'll expect Mr. Debany to take the stand and answer some questions.

Mr. Silvis, do you plan or do we need to plan for any other witnesses today?

**MR. SILVIS:** Should I approach, Your Honor? Should I approach or speak from here?

(Reporter interruption for clarity of the record.)

**MR. SILVIS:** Your Honor, we've brought Mr. Biswas today -- Toby Biswas -- in case there are any policy questions that got to policies for grants, grant awardance, and cooperative agreement awardance. So if necessary, he's here to be a witness, but we do not intend on calling him.

**THE COURT:** Thank you.

And let me ask also: I did see -- and I don't know if you all have seen. I did see the stipulated protective order that you all have submitted. The version that was submitted today I think has already been entered on the docket.

I'll ask Mr. Silvis again, do you anticipate any of the testimony being offered needing to be offered under seal or with the courtroom closed?

**MR. SILVIS:** It depends Your Honor. I think we're

comfortable with the testimony that was provided in the declarations. To the extent it gets into the contents of a bid protest and the circumstances of a bid protest, or if there is a contractual arrangement being discussed but it hasn't been finalized, there's specific things within the context of a contract or cooperative agreement that Mr. Debany would not be able to speak today in open court, and we would ask that that be -- we'd either close the courtroom or take that testimony and then -- under the protective order and then it could be reviewed.

But -- so it sort of depends on where the questioning goes. We don't anticipate asking any questions that would require it, but if the Court had questions that went to those areas or plaintiffs did, then we would ask for that procedure.

**THE COURT:** Okay. Thank you.

All right. With that, let's go ahead and get started.

So, Mr. Debany, if you would please go ahead and come up to the witness stand and be sworn.

(Richard Debany steps forward to be sworn.)

**THE COURTROOM DEPUTY:** Please raise your right hand.

**RICHARD DEBANY**,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

**THE WITNESS:** I do.

**THE COURTROOM DEPUTY:** Please be seated and state your

full name, and spell your last name for the record.

**THE WITNESS:** My name is Richard B. Debany, D-E-B-A-N-Y.

**THE COURT:** Good afternoon, Mr. Debany.

My intention is to let plaintiffs' counsel ask some questions, so why don't you go ahead.

**MS. FERREYRA:** Good afternoon, Your Honor. Lya Ferreyra for the plaintiffs.

Just some quick housekeeping before we begin.

First, I believe that there are some issues with the public Zoom link. I don't know who would be the best person to address those.

And secondly, we did provide opposing counsel with a binder that contains all of Mr. Debany's declarations that have been filed in this case, taken directly from the docket, and they have stipulated for the convenience of the parties and the Court that they are the true and correct copies of Mr. Debany's declarations.

And I'm happy to provide a courtesy copy for the Court, and if I may approach Mr. Debany with a binder as well.

**THE COURT:** You may approach. I brought my copies. Just let me know which one. If you could let me know by date which one you'll be referring to at any given point. I don't need yours, but thank you.

**MS. FERREYRA:** Yes, Your Honor.

**DIRECT EXAMINATION**

**BY MS. FERREYRA:**

**Q.** Good afternoon, Mr. Debany.

My name is Lya Ferreyra, and I'll be asking you some questions regarding ORR's compliance with the Court's current preliminary injunction.

To begin, what is your current position at ORR?

**A.** I am ORR's chief of acquisition requirements.

**Q.** And as part of your role, do you coordinate ORR's acquisition requirements with the contracting partners?

**A.** Yes.

**Q.** And do you direct ORR's post-award management of its contracts, including its legal services contracts?

**A.** Yes.

**Q.** And do you also direct the contracting officers' representatives, the people who monitor the contractor performance?

**A.** Yes.

**Q.** So to summarize, you award, coordinate, and monitor ORR's legal service contracts?

**A.** Yes.

**Q.** And does this include verifying the acceptable delivery of services?

**A.** Yes.

**Q.** Now, on August 4th, ORR granted the U.S. Committee for

Refugee an Immigrant Services, also known as USCRI, a grant to provide legal services to unaccompanied children; correct?

**A.** Yes.

**Q.** And this was because the previous bridge contract with Acacia had expired on July 31, 2026?

**A.** To clarify, you're referring to USCRI in the same category as a contract, but it is a cooperative agreement, not a contract.

**Q.** So to clarify, the cooperative agreement given to USCRI was done so only after the previous bridge contract with Acacia had expired on July 31st, 2026; correct?

**MR. SILVIS:** Objection.

**THE COURT:** What's the basis?

**MR. SILVIS:** It's a compound question.

**THE COURT:** All right. Split it up.

**BY MS. FERREYRA:**

**Q.** So USCRI was given a contract -- or excuse me -- a cooperative agreement on August 4th, correct, of 2026?

**A.** Yes.

**Q.** And this was because the previous contract with Acacia had expired on July 31st, 2026?

**A.** Yes.

**Q.** And on August 26, 2026, the agreement with USCRI was amended to expand the scope of work from approximately 2,000 children to 22,000 children; correct?

**A.** Yes.

**Q.** So between July 31st and August 27th, when the USCRI grant was expanded, who was funded to provide services for those 20,000 children?

**A.** There was a gap in service whereas the contract that ORR had funded with Our Rescue was awarded on the 7th, but it was subsequently protested.

**Q.** So in terms of the current contract that is in place with USCRI, do those -- does that contract currently include Know Your Rights presentations for legal screenings, historically known as CLIN1?

**A.** Just to clarify, that is not a contract; that's a cooperative agreement. But yes.

**Q.** And you currently stated that as part of the cooperative agreement that USCRI is providing legal orientations for all children within 10 days of a child's admission to ORR; correct?

**A.** For clarification, is this a confirmation of my statement in the declaration where I stated that they were providing 100 percent of services?

**Q.** Yes. And this can be found on Tab 7 -- which would be Docket 186-1 for the Court -- page 13, paragraph 88.

**A.** Yes. In that section, Section 5, I did discuss 100 percent coverage, but that was more in the context of the entire paragraph where it was talking about how they were building capability, and as they were building that capability,

they were providing 100 percent of their -- of the services within that -- that -- that buildup process.

**Q.** Thank you. And we will be discussing that shortly.

But in terms of the legal orientation, specifically as part of the services being provided, do you know if USCRI is currently providing legal orientations within 10 business days of a child's transfer to a new ORR facility?

**A.** Their cooperative agreement covers the orientations, but we have not received the data yet in the first reporting period of data to know exactly whether -- how many they've provided.

**Q.** So can you tell the Court today whether USCRI is currently providing legal orientations for unrepresented children who have been in ORR custody for six months or more as practicable?

**A.** My understanding is that they are providing orientations.

**Q.** In terms of direct legal representation, can you tell the court today whether USCRI is providing direct representation for children to apply for asylum before U.S. Citizenship and Immigration Services, also known as USCIS?

**A.** I cannot answer that question with accuracy.

And just a reminder, that is a cooperative agreement, not a contract, which I'm not directly responsible for overseeing.

**Q.** So you can you confirm for the Court today whether USCRI is representing children in asylum interviews before USCIS?

**A.** I cannot answer that question. I do not have the knowledge.

**Q.** Do you have any knowledge of whether USCRI is providing representations for filings with USCIS for I-360s for Special Immigrant Juvenile Status?
**A.** I do not specifically have that information.
**Q.** Do you have any information on whether USCRI is filing T visas for children who are victims of trafficking with USCIS?
**A.** I can't answer that question specifically.
**Q.** Do you have any numbers or any information about representation for U visas for children who are victims of crime before USCIS?
**A.** Specifically for U visas, I do not.
**Q.** What about family petitions, which are known as I-130s?
**A.** The same with that category.
**Q.** Is USCRI representing children before state court for special immigrant juvenile findings?
**A.** I can't answer that for the same reason.
**Q.** Is ORR paying USCRI for state court appeals in special immigrant juvenile cases?

**MR. SILVIS:** Your Honor, I would object at this point. I don't know if this is being done as a cross-examination based on declarations that Mr. Debany has provided or whether this is meant to be more as a direct examination.

Mr. Debany has provided several declarations, but I think some of these -- some of the statements in here and questions are going beyond his testimony.

**THE COURT:** The purpose is to go beyond the scope of the declarations, because the reason we're doing this is that I found his declarations not entirely helpful. So if that's an objection -- which I'm not sure what the basis of that was -- I will overrule it, and I'm going to let her continue asking him some questions.

Do you think it's beyond the scope of this hearing in some way?

**MR. SILVIS:** No, Your Honor. I guess I was seeking guidance as to whether I should be objecting to leading questions.

**THE COURT:** There's no jury here. I think I can tell when she's leading. So that's -- you can have a standing objection right now, Counsel, and -- but we're not going to -- you're not going to keep popping up for that.

So I'm going to let her ask her questions, and then you will get a chance to also have him answer some questions.

I'm the only one here. As my law clerks like to remind me, they're not really here; I'm the only one here.

So we're not going to do that.

Go ahead.

**BY MS. FERREYRA:**

**Q.** Do you know whether USCRI is currently doing state court appeals in Special Immigrant Juvenile cases?

**A.** I do not know whether they have actually provided that

service yet, but it is covered under the cooperative agreement.

**Q.** Do you know whether USCRI is providing direct representation to children to help them file applications for asylum, withholding of removal, and the convention against torture before the immigration court?

**A.** The cooperative agreement covers that service.

**Q.** Can you confirm today whether USCRI is currently providing representation to help children request voluntary departure before the immigration court?

**A.** That service is covered under the cooperative agreement, but I do not know if they actually have provided that service as of yet.

**Q.** And is USCRI currently providing representation for constitutional challenges in immigration court, such as lack of due process?

**A.** I do not have specific information on that.

**Q.** Is USCRI representing children before the Board of Immigration Appeals of immigration court decisions?

**A.** I do not have the specific information on that.

**Q.** Does USCRI represent unaccompanied children after their 18th birthday?

**A.** It is covered under the cooperative agreement within the limitations of -- of -- that are covered.

**Q.** And do you know whether today USCRI is able to receive and respond -- and respond to reports of abuse and other incidents

that are subject to mandatory reporting in ORR shelters?
**A.** Could you repeat the question, please.
**Q.** Yes. Whether USCRI is able to receive and respond to reports of abuse and other incidents that are subject to mandatory reporting in ORR shelters.
**A.** My understanding is yes.
**Q.** Is USCRI providing services at emergency facilities?
**A.** No, because we do not have any emergency facilities right now. But it is covered under the cooperative agreement.
**Q.** Now, all of the legal services that we just reviewed were covered and executed by the previous prime contractor as of March 20, 2025; correct?
**A.** That's my understanding, yes.
**Q.** And you said that one of the reasons that you cannot tell the Court today exact numbers or representations of what is happening is because USCRI's reporting period is not up?
**A.** That is my understanding, yes.
**Q.** Can you please let us know when you believe that they will be reporting this data to ORR?
**A.** I believe it's mid-September, but I do not have an exact date.
**Q.** And do you know when that information would be available for the Court if required?
**A.** I cannot -- I do not know.
**Q.** And, Mr. Debany --

**MS. FERREYRA:** I would ask the Court if I can approach him with the order granting the motion to set this evidentiary hearing, Your Honor. This is document 183. I also have copies for opposing counsel.

**THE COURT:** That's fine. You may approach.

(Counsel approaches witness.)

**BY MS. FERREYRA:**

**Q.** So, Mr. Debany, this is the order granting the motion to shorten time and setting evidentiary hearing, which set today's date.

If I could point you to page 2, lines 1 through 5 [as read]:

> "The hearing will focus on defendants' ongoing compliance a with the preliminary injunction following July 31st, 2026, including historical and contemporary contracts negotiated, funds distributed, and the numbers and types of representations of unaccompanied minors that have taken place and which defendants project will take place."

So just to clarify, as of today, you are letting me know that you cannot confirm any of the services that we just reviewed as to whether children are receiving them today?

**MR. SILVIS:** Objection. Misstates the testimony.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Could you state the question again.

**BY MS. FERREYRA:**
**Q.** As of today, you are unable to confirm whether USCRI is actually providing any of the services which we just covered a few moments ago today in court?
**A.** To the specific services? That is correct.
**Q.** Okay.
Now, your declaration reports that USCRI appeared in over 300 hearings each week of August; correct?
**A.** I don't remember exactly, but if that's what it states, then yes.
**Q.** Yes. And that would be Tab 7 of your folder, sir.
**MS. FERREYRA:** Docket 186-1 for the Court, page 13.
Also, Your Honor, I'm being told that on the public Zoom link, they're having issues with audio.
**THE COURT:** We'll look into it. That's the last time I want to hear about a problem with the public Zoom.
**MS. FERREYRA:** Understood.
**THE COURT:** Thank you.
**BY MS. FERREYRA:**
**Q.** And in your declaration, you also clarified that USCRI was present at about 19 to 25 different hearing locations; correct?
**A.** That sounds like -- familiar. That's what I wrote.
**Q.** And you said that they appeared in these hearing locations, and by "appeared in," you meant friend-of-court appearances; correct?

**A.** That is correct. They witnessed and then appeared, as appropriate, as friend-of-court.
**Q.** And in how many of these appearances did USCRI appear as attorney of record?
**A.** I cannot answer that question.
**Q.** Do you know how many E-28s, which is notice of attorney of record, USCRI has filed before EOIR?
**A.** I believe the number is 12 as of September 3rd.
**Q.** Do you know how many G-28s USCRI has filed before USCIS?
**A.** I do not know.
**Q.** As of today, how many of the 22,000 children covered by the ORR grant does USCRI represent as attorney of record?
**A.** I cannot answer that question.
**Q.** Can you not answer that question because you don't know the number?
**A.** I do not know the number.
**Q.** And how many of the 22,000 children covered by the grant are currently represented by attorneys other than USCRI?
**A.** Can you state the question again?
**Q.** Yes.
How many of the 22,000 children covered by the supplemental cooperative agreement are currently represented by attorneys other than USCRI?
**A.** I can't answer the question, but there's a lot of challenges about why we can't -- why I don't know that

information.

**Q.** In terms of the number of E-28s before EOIR and G-28s before USCIS, I would like to turn to you to Tab 1, which is Docket 161-1, page 3, paragraph 11, lines 9 to 23.

In this section, you say that ORR was able to cross-reference whether Acacia was attorney of record both at EOIR and USCIS; is that correct?

**A.** Give me a moment to read it, please.

(Pause in proceedings.)

**THE WITNESS:** Okay. I'm sorry. What was the -- could you repeat the question.

**BY MS. FERREYRA:**

**Q.** Is an accurate representation of that paragraph that in the past, ORR was able to cross-reference whether Acacia had put in appearances as attorneys of record at EOIR and USCIS?

**MR. SILVIS:** Objection. Form of the question.

**THE COURT:** Overruled.

Do you understand her question?

**THE WITNESS:** Not entirely. I think she's asking whether we had the data available to know whether Acacia and its providers had E-28s filed, I think.

Is that what you're asking?

**BY MS. FERREYRA:**

**Q.** Correct, before EOIR, and G-28s before USCIS.

**A.** Yes. We could use data to see how many had E-28s filed,

to my understanding, and G-28s.

**Q.** And those same mechanisms exist in order to confirm USCRI's representation?

**A.** Yes, we would be able to see theirs as well.

**Q.** Okay. Now, as of today, the only ORR-funded provider to unaccompanied children is USCRI; correct?

**A.** That is incorrect.

**Q.** Who's --

**A.** Our Rescue is funded. They are under a stop work due to the protest.

**Q.** So the only ORR-funded provider actually able to provide services to unaccompanied children today is USCRI?

**A.** That is correct.

**Q.** And this has been true since August 4th; correct?

**A.** Their performance started August 5th, but yes.

**Q.** As of August 13th, how many attorneys did USCRI have on staff?

**A.** As of that date, I do not know.

**Q.** So in your -- can you please turn to Tab 6, Mr. Debany, which is Docket 177, page 2.

**A.** I'm sorry. What page?

**Q.** Page 2.

**A.** 2.

**Q.** And it will be paragraph 5, line 9.

And there -- which is your August 13th declaration -- you

state that USCRI had a total of 57 legal personnel; correct?
**A.** That is correct, yes.
**Q.** And of those 57, 30 were staff attorneys; is that right?
**A.** That's correct.
**Q.** Do you know what states these 30 staff attorneys are bar'd in?
**A.** At this very moment, I do not.
**Q.** Now, your August 28th declaration -- which can be found on Tab 7 if needed -- describes a goal of adding 115 follow-through employees and subaward staff; is that correct?
**A.** Yes, that is correct that the total number would be 115.
**Q.** How many of those 115 have been hired today?
**A.** I do not know the exact status as of today.
**Q.** And who set this goal of 115 follow-on employees?
**A.** I do not know the answer to that.
**Q.** Do you know what this goal is based on?
**A.** That is based on an evaluation of the workload and the number of cases that were planned by the end of February.
**Q.** And do you know who conducted this evaluation?
**A.** I do not know.
**Q.** So can you explain to the Court today how you landed on the number 115?
**A.** I did not land on the number of 115.
**Q.** Can you explain to the Court how ORR, in its evaluation, landed on 115?

**A.** My understanding of the number would be speculative on my part.
**Q.** Now, 30-some attorneys for 22,000 children is more than 600 children per attorney, isn't it?
**A.** I trust your math.
**Q.** And as of March 20th, 2025, do you know what the ratio was of children-to-attorneys providing services?
**A.** I do not know that exact ratio.
**Q.** Do you know of someone at ORR who would know that exact ratio?
**A.** Of the number of attorneys?
**Q.** Providing services to children, yeah.
**A.** I don't know if ORR would have that information based on number of subcontractors under Acacia, which was approximately 100 subcontractors. I do not know how many attorneys that would have been.
**Q.** Was it more than 30 attorneys?
**A.** Yes.
**Q.** Looking on to your August 13th declaration -- so, again, back to Tab 6, Docket 177, for the Court -- page 2. And that will be paragraph 5.
If you can just let me know when you've found it, Mr. Debany.
**A.** Page 2, paragraph 5.
**Q.** In this paragraph, you say [as read]:

"Since implementation, USCRI attorneys have provided 100 percent coverage for all hearings with all required services being offered during the interim period."

Is that correct?

**A.** That is what it says.

**Q.** And further on, it says [as read]:

"Attorneys have been available to appear at all locations where upcoming hearings are scheduled, and appearances have proceeded without complications."

Is that correct?

**A.** That is what it says.

**Q.** When you said "all hearings," was that all hearings in all immigration courts across the country for all unaccompanied children?

**A.** No.

**Q.** What did you mean by that?

**A.** First, it's children that are in care, and also it's in the context of all of paragraph 5, which talks about the lead-up of how many -- of how much coverage they're going to include as they initially ramp up, and it's talking about the 100 percent of coverage within that amount of -- of that ramp-up, not of all UACs.

**Q.** So at that point on August 13th, how many courts was USCRI appearing in?

**A.** I do not know the -- that exact number.
**Q.** And in your August 6th declaration, you said that that would be about 19 immigration courts?
**A.** The initial ramp-up was a focus on 19 states.
**Q.** Has that expanded?
**A.** I do not know if it's expanded past that yet.
**Q.** So can you tell the Court today how many immigration courts are being covered by USCRI at this moment?
**A.** I do not know how many courts are being covered by USCRI at this very moment.
**Q.** At the time you wrote this in your declaration, how did you come to learn that 100 percent coverage was provided for all hearings?
**A.** The -- well, to clarify what I meant by that is slightly different the way it's said in there. If -- in hindsight, I probably would have worded it differently to mean more in the context of the paragraph.
Could you say the question again, please.
**Q.** Who gave you the information that 100 percent coverage was being provided for all hearings?
**A.** It was a conglomerate of information obtained by people in ORR that focused on the grants management side of -- and the -- and the delivery of legal services.
**Q.** Was some of that information provided by USCRI itself?
**A.** I'm sure USCRI in meetings with US -- with ORR provided

some information.

**Q.** And you said all required services were being offered; correct?

**A.** All services are covered by August 7th in the supplement that all services were covered under the cooperative agreement in the first expansion.

**Q.** How do you define "all required services" in this context?

**A.** In its plainest way; it would be orientations, consultations, and direct representation.

**Q.** And what exactly did you do to confirm that all these required services were being provided?

**A.** Like I said, right now -- well, at the time those services were added to the grant or to the cooperative agreement on August 7th, and there, we -- I articulated a ramp-up time period or ramp-up process, and so it would be normal for any new provider to take time to provide the full -- full services that are in their agreement.

**Q.** Now, you also said that appearances have proceeded without complications; correct?

**A.** Yes.

**Q.** Now, what did you mean by "complications"?

**A.** Meaning any great barriers for them to begin providing the services in accordance with the -- the cooperative agreement, which is not to mean that there aren't challenges with knowledge from the incumbent provider, Acacia, and

understanding the caseloads that they provide.

**Q.** You also described operational issues in your August 28th declaration that suggested ORR's ability to comply; correct?

**A.** Correct.

**Q.** And you say that some of those operational issues explain some of the issues that plaintiffs have brought -- had brought up; is that right?

**A.** If you're quoting my declaration, I would agree with you, but I'm not sure if that's from my declaration or not specifically.

**Q.** Well, specifically, my question, really, Mr. Debany, is: Would you consider those operational issues complications?

**A.** I would call them operational issues.

**Q.** Let's take a closer look at some of the operational issues that you've identified.

On August 6th, 2026, you reported that USCRI attorneys were not able to appear at -- as friends-of-court at a hearing because the hearing began before the scheduled time; correct?

**MR. SILVIS:** Objection, Your Honor. I believe at this point we decided that we're not going to talk about individual issues. I just want to understand the scope of the testimony expected of Mr. Debany.

**MS. FERREYRA:** Your Honor, may I respond?

**THE COURT:** No. Give me a moment. I'm reading the question, and I don't see anything asking for anything about an

individual case.

So, Ms. Ferreyra, why don't you ask your question again.

**MS. FERREYRA:** Yes.

**BY MS. FERREYRA:**

**Q.** On August 6th, '26, you reported that an USCRI attorney was not able to appear as friend-of-court at a hearing because the hearing began before the scheduled time; correct?

**A.** If that's from that particular declaration, then yes.

**Q.** And on August 11th, you reported that USCRI did not attend a Texas hearing because of an ORR data discrepancy?

**A.** Sorry. Just to clarify, are these from my August 28th declaration or are these from a different declaration?

**Q.** So this will be Tab 7 of the declarations that you put in with the Court. So it will be Docket 186-1, which I believe --

**A.** I --

**Q.** -- is the August 28th declaration.

**A.** -- understand. So these are on the specific case that were brought up.

**Q.** I'm not asking about a specific child or about a specific case --

**THE COURT:** Can I interrupt you for a moment?

If it's in his declaration, it's -- my point in putting into the order that you didn't need to prepare him on individual cases was so that you didn't have to do additional work beyond what's in his declaration. He should be able to

explain anything in his declaration.

If you need more time afterwards, we can figure that out, but at this point, this was all signed. He signed documents submitted to this Court saying he had this -- he knew this information. So he should have this.

**MR. SILVIS:** I understand, Your Honor. We're just trying to have fair witness -- they're appearing --

**THE COURT:** Yes. I'm sorry. I put it in trying to tell you that you didn't need to continue to prepare him on anything -- there are a number of additional allegations or assertions made by plaintiffs' counsel that are not in these declarations, and that's what I didn't need -- didn't want you to think you had to prepare him for.

**MR. SILVIS:** Our goal was to provide, per the Court's order, a prepared witness. So to the extent that the Court finds this unsatisfactory on these grounds, we were following the Court's order.

**THE COURT:** You can continue, Ms. Ferreyra.

**MS. FERREYRA:** Thank you.

**BY MS. FERREYRA:**

**Q.** I'll repeat the question for you, Mr. Debany.

On August 11th, you report that USCRI did not attend a Texas hearing because of an ORR data discrepancy; correct?

**A.** Correct. And that was in response to the August 20th motion -- document from the plaintiff that did not provide the

full context of that event.

**Q.** Can you describe this data discrepancy for the Court that occurred that day?

**A.** My understanding is that the information from -- if it's the one that I'm thinking of -- was not transferred from the former Acacia subcontractor to -- to ORR, which led to ORR and, subsequently, USCRI's specific information on that case.

**Q.** Thank you.

Now, Mr. Debany, I'd like for us to turn to the contractual history that ORR has in this case.

So prior to USCRI, Acacia was the prime contractor providing children with legal services; correct?

**A.** Correct.

**Q.** And they did this by managing a nationwide network of legal services providers, including plaintiffs?

**A.** Yes.

**Q.** And as the prime contractor, Acacia reported to ORR the number of children covered by their services; correct?

**A.** Yes.

**Q.** And as of November 2025, Acacia reported that they were providing services to approximately 24,000 children; isn't that right?

**A.** That's correct.

**Q.** Now, the most recent contract with Acacia was set to expire on July 31st, 2026; is that right?

**A.** Yes.
**Q.** And before the latest contract with Acacia expired on July 31st, ORR was engaged in discussions with Acacia about a bridge contract; correct?
**A.** Correct.
**Q.** And that bridge contract would have been for Acacia to continue providing legal services to unaccompanied children beyond July 31st?
**A.** Yes. And by the way, just to clarify the previous answer, you said ORR was in discussions. It was technically the -- our contracting partner with ORR, but it was always through the contracting officer, which is a separate organization from ORR.
**Q.** But ORR was involved in those --
**A.** We were involved, yes.
**Q.** Okay.
Now, separately from this, there was also a discussion with Acacia about a transition plan; correct?
**A.** Correct.
**Q.** And this transition plan was mainly aimed at transferring cases for unaccompanied children to a new contractor which would be identified by the Government?
**A.** Correct.
**Q.** So to clarify in this timeline, there are two negotiations happening: one for a bridge contract for services and one for a transition of cases?

**A.** Incorrect.

**Q.** So you would say there weren't two separate negotiations occurring for a bridge contract or a transition of services?

**A.** Not simultaneously, no.

**Q.** Not simultaneously. But they both did occur prior to today's hearing?

**A.** Yes, but I wouldn't characterize the transition. That was a deliverable under the contract. They provided us a transition plan on -- on -- in September. And then in April, we provided feedback that I would not characterize it as negotiations.

**Q.** But a transition -- conversations around a transition plan did exist?

**A.** Yes.

**Q.** Okay. And we'll talk about that in detail in a second as well, Mr. Debany. But let's begin with the possible bridge contract.

So in June and July, ORR was in talks with Acacia on a possible bridge contract; correct?

**A.** Incorrect.

**Q.** You were not having discussions about the bridge contract at all in June or July?

**A.** It's only partially correct. In my -- in my -- one of my statements, I had said that it was -- that it occurred between -- in June, and we corrected that with a subsequent

declaration, and the conversations occurred between the 2nd and the 9th of July.

**Q.** I see. Thank you for the clarification, Mr. Debany.

And in that declaration, you said that by July 9th, the Government knew that it would not be moving forward with Acacia on a bridge contract?

**A.** Correct, based on Acacia's statement that they could not meet the terms and conditions.

**Q.** And that was three weeks before the expiration of their contract; correct?

**A.** Approximately, yes.

**Q.** And you stated in your declaration that ORR and Acacia could not reach an agreement concerning the information that ORR had determined necessary to validate payment; is that correct?

**A.** Correct.

**Q.** And that information at a broad level was client-specific information that Acacia informed ORR was confidential; correct?

**A.** Incorrect.

**Q.** How would you describe the information that was being requested?

**A.** As supporting documentation that was necessary to document the proper payment and the allowability of costs, and it was not attorney/client-protected information.

**Q.** But Acacia's position in those negotiations was that it

was confidential; correct?

**A.** During those negotiations, I do not remember if that was exactly one of their points, but that is a general characteristic of their position.

**Q.** And this is the same information that ORR had previously insisted was necessary in order to pay the invoices for services performed between December 2025 and July 2026?

**A.** No, it's not the same information. Similar information, but not entirely the same.

**Q.** How would you distinguish it?

**A.** Under the previous contract, the payment substantiation revolved around time and material aspects of -- of invoicing, which is paying the attorney on the hourly basis with substantiating documents.

That is a slightly different -- part of it is the same with approving the A number and that the -- any particular child receive services, so that portion is the same.

The dispute over how to document for time and material is -- there's a lot of differences between that and the requirements for the proposed bridge contract that we offered Acacia, which was a fixed-price-type contract.

**Q.** But Acacia still was not willing to negotiate based on the specific client information; correct?

**A.** I cannot tell you exactly what their reasons were, but they told us that they could not meet the terms and conditions

of the contract.

**Q.** But Acacia did tell ORR that it was still open to entering a bridge contract to continue providing this work, correct, aside from this data?

**A.** They did indicate that they were interested in -- in providing a bridge contract. I can't tell you exactly all of the -- all of the aspects that they -- they objected to at this very moment.

**Q.** Did ORR respond to this counter-proposal by Acacia?

**A.** We were in discussions between the 2nd and the 9th, and then on the 9th, when they said that they could not meet the terms and conditions, we moved on to other strategies.

**Q.** Now, at this point in time, so around July 9th, ORR had extended bridge contracts to Acacia on three separate occasions; correct?

**A.** Could you explain that a little more? Because that does not sound correct.

**Q.** So there was a date on October 13th, 2025, January 30th, 2026, and April 30th, 2026. And this is mentioned in your declaration on Tab 7, which is Docket 186-1 for the Court, page 3.

**A.** Did you say did we extended the terms of it?

Could you just repeat the question? I think I misunderstood the question.

**Q.** Yes. That you extended the bridge contracts, the period.

**A.** Yes, we did extend the bridge contracts.

**THE COURT:** Ms. Ferreyra, I'm going to pause you.

It's 2:20. I told you all we were going to take a break about halfway through, so we are.

But here's -- Mr. Debany, I want to ask you a handful of questions when we come back.

Ms. Ferreyra, I don't have a good sense of how long Mr. Silvis will need, but to the extent I told you all you were going to have a total of about two hours, I want to give you a chance to ask -- I want to give the Government a chance to ask Mr. Debany any questions it has.

So here's what we're going to do: Mr. Debany, I have some questions for you that I think you've started to answer in response to Ms. Ferreyra, but I want to ask a handful more.

When we come back, Ms. Ferreyra, you can have maybe another 10 minutes, and then I want to give Mr. Silvis a chance to ask some questions. If there's time remaining after he's done, you can have it.

All right. So, Mr. Debany, I think you've started to answer lots of these, but I just need to ask them more directly because I'm not sure I heard answers to all of these yet.

I know that we've been talking about a number of different services. For a moment I want to ask you specifically about contract line Number 2, which is -- I understand to be for direct representation.

Historically, how much was spent on CLIN2?

**THE WITNESS:** So CLIN 2, historically, under the bridge contract that just ended with Acacia, the average is approximately $15.7 million per month.

**THE COURT:** And historically, how many representations did those funds cover?

**THE WITNESS:** I cannot answer exactly how many children -- I mean, I know how many are on their active client list, but without this -- the data and invoicing, it was very difficult for ORR to have clarity on exactly the cases that were being covered for those $15.7 million every month.

**THE COURT:** And how many are on the client list?

**THE WITNESS:** The last client list that we received from Acacia before the end of the contract was dated June 30th, and it had 21,902.

**THE COURT:** Under the contracts currently in place, how much money is being spent?

**THE WITNESS:** I assume you mean the USCRI --

**THE COURT:** Everything --

**THE WITNESS:** -- cooperative agreement and the currently stop-worked Our Rescue contract; correct?

**THE COURT:** Yes.

**THE WITNESS:** So for the -- the cooperative agreement, the amount through the end of July -- I'm sorry -- of December of this year is approximately $20 million.

And for -- it's a completely different pricing model for -- for Our Rescue's award than it was under the previous Acacia contract. The total obligation for the first six months was $158 million, so I can't tell you without doing -- taking out my calculator exactly what that would be per month.

**THE COURT:** Thank you. None of us want to do math. I'm with you there.

So let me -- let me ask you: Under the contracts currently in place, how many representations are taking place?

**THE WITNESS:** So the initial -- I can't answer specifically, but the -- USCRI has been focusing first on participating as a friend-of-court, and they attended approximately 1,600 hearings to ensure that there was coverage and to provide friend-of-court as necessary during that.

With the expansion of the cooperative agreement on the 7th of August, and then again later in August on the 26th, I believe, which expanded the service, I do not have the data yet.

**THE COURT:** That will come in November.

**THE WITNESS:** It should come in middle of September of the first round of data. Any numbers of -- of representation would be completely speculative on my part.

**THE COURT:** Okay.

And under the contracts currently in place, do you know how many minors are going unrepresented?

**THE WITNESS:** I do not have a specific number.

**THE COURT:** Are there any facilities or immigration courts where unaccompanied minors are going completely unrepresented now?

**THE WITNESS:** I do not know if there's any specific locations that are completely not covered, but the cooperative agreement does include nationwide, and that is the -- the objective of USCRI to cover every court.

**THE COURT:** Historically, were there any facilities or immigration courts where unaccompanied children went completely unrepresented?

**THE WITNESS:** I am not aware of any -- any location gaps under the previous contract.

**THE COURT:** All right.

I have one final question, but I worry that this may be -- well, this -- the first one is a yes/no, so that won't require us sealing anything.

Are there other contracts currently under negotiation?

**THE WITNESS:** At the present time, no.

**THE COURT:** All right.

So those were my questions. Let's go ahead and take a 10- -- go ahead, sir.

**THE WITNESS:** Not to include the Acacia transition contract that we are working -- that is, yes, we are working with Acacia on a transition contract.

**THE COURT:** Thank you.

All right. Let's go ahead and take a 10-minute break, and we'll pick it back up. Thank you.

We're in recess for 10 minutes.

(Recess taken at 2:27 p.m.)

(Proceedings resumed at 2:39 p.m.)

**THE COURTROOM DEPUTY:** All rise. This court is back in session.

**THE COURT:** You may be seated.

You can continue, Ms. Ferreyra.

**BY MS. FERREYRA:**

**Q.** Now, Mr. Debany, I would like for us to talk a little bit about the transition plan that ORR discussed with Acacia prior to the contract expiration.

Acacia originally submitted a transition plan on September 30th, 2025; correct?

**A.** Yes.

**Q.** And they submitted an updated transition plan at ORR's request on April 10th, 2026; correct?

**A.** Yes.

**Q.** And this transition plan called for a 60-day period to finish the transition of approximately 24,000 children before July 31st?

**A.** Yes.

**Q.** And that would have put the date for transfer around

June 1st?
**A.** Yes.
**Q.** When did ORR send Acacia a performance work statement for a transition plan?
**A.** Are you referring to which -- we've been in negotiate -- discussions with Acacia under different contracts, so which one are you referring to?
**Q.** Specifically the performance work statement for a transition plan based on what they had sent on April 10th.
**A.** As you're -- there's not a specific performance work statement on the transition plan as you are -- the transition plan that they provided was under their existing performance work statement.
**Q.** Okay. So -- but to confirm, they did ask for 60 days in order to transition cases; correct?
**A.** Yes.
**Q.** And ORR knew that Acacia needed at least 60 days to transfer these new services; is that right?
**A.** That is correct, according to that transition plan, yes.
**Q.** So by the time the contract expires on July 31st, 2026, there's no contract vehicle under which Acacia could perform the transition; is that right?
**A.** That is correct.
**Q.** And that was because there was no way for transition to occur because ORR gave Acacia less than a week to transition

services?

**MR. SILVIS:** Objection. Argumentative.

**THE COURT:** Over -- can I --

Can you answer her question? Are you able to answer her question?

**THE WITNESS:** She has filtered it down to such a simplistic level that it's impossible to accurately answer it.

I can give --

**THE COURT:** No, no, it's okay.

So, Mr. Silvis, I'm the only one -- I know you've got a gallery, but I'm it. So evidentiary objections as a general matter, I'm going to tell you, you're done with them. He's going to answer her questions. He's going to do his best. If you don't understand her question, you go ahead and let her know. I'm tired of -- I'm done fielding objections from you that are evidentiary in nature in that way.

It's argumentative. I can hear it's argumentative. If he has trouble with it --

I'm empowering you right now, Mr. Debany, to go ahead and tell her. You've been doing a very good job of giving her the answer as I hear you crafting it, so we're going to -- we're going to just keep going through and let her have her last eight minutes or so here.

Go ahead.

**THE WITNESS:** Could you ask the question again,

please.

**BY MS. FERREYRA:**

**Q.** Yes. ORR gave Acacia less than a week to transition services, despite knowing that Acacia needed at least 60 days?

**A.** That's inaccurate as the question is asked.

**Q.** How much time did ORR give Acacia to transition services, knowing that they needed at least 60 days?

**A.** We did not give them any time to transition because the contract was not awarded prior to the end of their contract.

**Q.** Okay. And do I have it right, Mr. Debany, that ORR didn't request a revised transition proposal from Acacia until August 27th, 2026?

**A.** I would not say that is accurate.

**Q.** Can I point you to Tab 7 of your declaration -- which is Docket 186-1 for the Court -- page 5.

If you can let me know when you have the page, Mr. Debany.

**A.** I'm on page 5.

**Q.** Okay. It's going to be paragraph 23, lines 13 through 14.

Okay. Sorry. Paragraph 23 -- yes, lines 13 through 14.

And here you say that Acacia did -- excuse me -- that ORR did request a revised transition proposal from Acacia on August 27, 2026; correct?

**A.** That is part of a separate contract. Has nothing to do with the transition plan that they provided under the last contract.

**Q.** It was a revived transition proposal?

**A.** It's a case transfer. We requested a proposal for case transfer, but this was the second one. They had already submitted a -- a previous proposal under that.

**Q.** And this separate transition or case management proposal was not requested until almost a full month after the July 31st contract expired; correct?

**A.** I don't remember the exact date. I'd have to look in the documents of when we first asked for the case transfer proposal.

**Q.** But you did ask for one on August 27th; correct?

**A.** A revised one, yes.

**Q.** A revised one.

And that was a full month after the -- almost a full month after the contract expired?

**A.** That is correct.

**MS. FERREYRA:** And at this time, Your Honor, we would like to reserve our time for after any additional questioning opposing counsel may make.

**THE COURT:** That's fine. Thank you, Ms. Ferreyra.

**MS. FERREYRA:** Thank you, Mr. Debany.

**THE COURT:** Mr. Silvis, your witness.

**CROSS-EXAMINATION**

**BY MR. SILVIS:**

**Q.** Good afternoon, Mr. Debany.

Could you tell us how much has been obligated by ORR to provide the legal services required by the preliminary injunction?

**A.** In fiscal year '26, it's $444 million.

**Q.** And how much of that is -- did Congress provide? Is that the full amount that Congress has provided for these services?

**A.** So the way the obligation works with Congress, the appropriations are based on ORR's spend plan, which was submitted in December of '25, and the amount in ORR's spend plan for legal services in FY 26 was $411 million.

**Q.** So is there any money left behind -- beyond what Congress has appropriated for those services that ORR has not committed for legal services?

**A.** No. We've already spent beyond the expectation of Congress, from my understanding.

**Q.** And how much money was obligated to USCRI?

**A.** $20 million, approximately.

**Q.** Approximately $20 million. Is that for which -- for which cooperative agreement?

**A.** This is specifically for the cooperative -- the supplement to their existing cooperative agreement. There was an additional $20 million for legal services.

**Q.** And then how much money was obligated for Our Rescue?

**A.** $158 million.

**Q.** And how come that money can't be used?

**A.** That performance under that contract is under a CICA -- or a Competition in Contracting Act -- stay, more commonly known as a stop work, due to a protest filed by Acacia.

**Q.** All right. So is there anything ORR can do while that is in place, that stop work?

**A.** No. I'm aware of nothing that we can do to change that stop work except for, at this point -- and I'm not -- I caveat this with I'm not an attorney on all the legal remedies, but my understanding is we are, at this point, waiting for the -- the GAO to rule on that case.

**Q.** You've been asked a lot of questions today about ORR's efforts to provide the legal services required by the preliminary injunction.

Are you aware of any avenues that ORR has not taken to provide the funding required by the preliminary injunction?

**A.** To the best of my knowledge, ORR has explored every opportunity legally available to it to provide legal -- to continuity of services for legal services.

**Q.** So there's nothing, to your knowledge, that ORR could be doing more to provide these legal services?

**A.** Correct.

**Q.** You were -- also answered some questions that you were not able to answer today about specific numbers and types of legal representation.

Given the opportunity, would you be able to ask other

individuals at ORR for that data?
**A.** I can certainly ask for the information.
**Q.** And do you believe --
**A.** Yes.
**Q.** -- that they would be able to answer the questions?
**A.** I cannot answer that question. I do not believe that information has been received yet from USCRI.
**Q.** Okay. Is that because you're waiting for November for the report to come?
**A.** Mid-September, from what I understand, not November.
**Q.** Okay. Thank you very much.
I'd like to talk a little bit about the transition from Acacia.
What -- were you given -- was ORR given the information about direct representation from Acacia during the transition?
**A.** We were not provided adequate information to transition by the time their contract ended or to date yet.
**Q.** And what impact did that have on your ability to provide services when that contract ended?
**A.** Without the granularity of the cases, it's been -- very difficult to impossible to provide the information to USCRI, or while the contract was going, to Our Rescue to transition those cases.
**Q.** And what impact has it had on the ability to provide full legal representation for children?

**A.** It's forced ORR -- this is specifically on the USCRI grant and putting aside the Our Rescue while it's under a stop work. It's forced USCRI to attend hearings as we know about them, so we -- we do our data-crunching, understand when hearings will be held.

Our -- the -- the -- USCRI then attends those hearings. And they've attended, as of approximately September 3rd, approximately 1,600 hearings and -- to be there to provide friend-of-court as they ramp up their ability to provide direct representation.

**Q.** And what is the plan going forward when this information is -- there are efforts to get this direct representation information from Acacia; is that correct?

**A.** Yes, the -- from Acacia, the effort is to award a bridge contract that will provide both continuity of services as they transfer each case over to ORR's provider during a 120-day period.

**Q.** And when that information is provided, that will then enable our res- -- USCRI to provide additional legal services?

**A.** Correct. The information that we've established in the performance work statement would provide us the information that we would also supplement with the data that we're able to acquire ourselves to fully inform USCRI to provide the full-scope services for all cases.

**Q.** Was it ever ORR's plan for USCRI to provide 100 percent of

the legal services that were provided under the previous contract?

**A.** No. The plan has always been a -- well, since on -- starting on July 10th, the plan has been a multiple-award strategy leveraging both contracts -- well, to put -- multiple awards to who we could award to; and that has evolved from a completely contracting approach to once we receive the offer from USCRI, expanding it to both an award of contracts and a cooperative agreement.

**Q.** The contract that -- that ORR had in place with Acacia as of August 25th, 2025, what type of contract was that?

**A.** That was a time-and-material contract, sole-source time-and-material contract.

**Q.** Would you characterize that as a bridge contract?

**A.** Yes. It is a bridge contract to get to our desired competitive contract.

**Q.** And what was the agency's goal after that bridge contract to provide the legal services required?

**A.** Sure. Our strategy, as soon as the -- the preliminary injunction was put in place, was to have a follow-on contract with Acacia competitively awarded, which is always the Government's desire, to replace the Acacia contract when that contract ended its natural life, which was planned for originally -- well, at that point in September of 2025.

**Q.** And was that contract that was then offered later, was

that the same contract that Acacia had in place on -- as of the end of, I guess, August 2025?

**A.** So -- the -- being that we had very little time to put a bridge contract in place so that there wouldn't be a disruption of services, we essentially mirrored Acacia's previous contract by -- that was awarded by the Department of the Interior, and we had the Health and Human Services award essentially a mirrored contract to that that was effective on August 1st, 2025.

**Q.** And then what was the next solicitation for the legal services contract?

**A.** So we spent the next several months planning and writing the requirement and having it approved through the multitude of approval processes, and we were able to solicit the competitive contract on December 24th, 2025.

**Q.** And when did the planning start for that -- that solicitation that you offered in December 2025?

**A.** Immediately upon the preliminary injunction.

**Q.** So approximately August 2025?

**A.** As soon as the award -- the preliminary injunction was put in place, our planning focused on a competitive replacement, but to get to that competitive replacement, we had to first focus on the sole-source bridge award to Acacia so to -- to ensure that services were not interrupted.

**Q.** Yeah. And then what happened with the solicitation from

December 2025?

**A.** Once it was awarded in December 2025 -- sorry -- solicited on December 24th, 2025, it was subsequently protested on December 15th. And then we took corrective action, resolicited on February 23rd, and then it was protested again and was resolicited again. And then it was protested again finally, which is the existing protest, which occurred on June 15th. So we resolicited it twice after the first solicitation.

**Q.** Was it -- did Acacia -- is Acacia one of ones to enter a bid -- protest the solicitation?

**A.** Acacia is one of the protesters and is the protester for the final protest.

**Q.** How many times did Acacia protest it?

**A.** I'm --

**Q.** I'm talking about the December solicitation.

**A.** So the December one was protested, I -- I believe by Acacia on December 15th, but I'm not 100 percent sure.

**Q.** Did Acacia have the opportunity to apply for the solicitation, the December solicitation?

**A.** I believe all of the information on who provided pro- -- provided proposals is because that -- that is an ongoing procurement -- would be source-selection sensitive.

**Q.** Okay. Thank you.

Then following the -- that solicitation, why was it -- why were you not able -- ORR not able to get a contract in place by

the end of July 31st, 2026?

**A.** When they -- when the current protest was submitted on June 15th, that gave us very little time, and it was impossible at that point to come to a separate -- a competitive award given the timeline for the GAO.

Their response, I believe, is scheduled for December -- I'm sorry -- for September 23rd, if I remember correctly. So we had no time to do competitive. So we had to immediately shift at that point to a -- to a bridge concept -- bridge contract, a second bridge contract.

And we, of course, turned to the incumbent again, Acacia, to provide that -- that bridge contract.

**Q.** Did Acacia accept that?

**A.** They did not. We had discussions from July 2nd to July 9th.

**Q.** And turning back to the -- the Acacia contract that was in place as of August 2025, in comparing that to the solicitation that went out in December of 2025, how were those two contracts different?

**A.** There's some fundamental differences. We -- we discovered that there was fundamental challenges with the design of the Acacia contract that was written for a different company called Vera in -- it was awarded in March of 2022. That was a -- primarily -- it was a hybrid contract of time and material for the direct representation, or CLIN 2, which is the majority of

the contract. And the rest of the contract's portions were a fixed-price-type contract. And the -- the redesigned contract, which is based on that -- the previous contract was not written by me or by any -- by the current people that are managing ORR's contracts.

That contract was very deficient in its design, and we designed a superior contract based on a firm fixed unit price model, which is the -- always the desire of the Government is to have fixed price aspects of it where possible. And so we designed a firm fixed unit price for the delivery of legal representation.

And it also improved data delivery so that identifying the challenges of substantiating the invoices from the previous contract, we designed data delivery requirements and invoice substantiation that would meet normal contract expectations in accordance with the FAR to ensure that the Government had confidence that the services billed were the services that were actually delivered.

**Q.** In layman's terms, what was the problem, I guess, with the data deficiencies based on the prior contract with Acacia?

**A.** It allowed no accountability -- very little accountability for the services that were provided and oversight from the Government.

**Q.** Under that contract, could ORR determine what services -- legal services it was paying for?

**A.** It -- we could not.

**Q.** So if I understand your testimony, the goal with the new contract was to address these deficiencies?

**A.** Correct.

**Q.** Okay. And how did -- the new contract does that how so?

**A.** It -- for -- first of all, those -- we abandoned the time and material aspects of it, so it's not an hourly billing; it's a pay-for-the-service in line with industry practices so that the deliverables for the service would be the documentation that the contractor invoiced the Government for as proof that the services were delivered.

And that -- that would allow us to actually see what the documentation that we specified, what's -- that each child received the services that were claimed in the invoice.

**Q.** Now, going forward, you, ORR, was eventually able to get a -- a cooperative agreement with USCRI to provide the legal services required under the preliminary injunction; is that correct?

**A.** That is correct.

**Q.** Okay. Does that cooperative agreement require USCRI to provide this type of invoice documentation?

**A.** So a cooperative agreement is a -- it's very difficult to compare that to a contract. And I am not an expert on cooperative agreements, so I cannot answer that question with enough precision.

**Q.** But are you -- is ORR able to tell based on the amount that's being spent for legal services with that cooperative agreement?

**A.** Yes, we can. And we certainly would be under the Our Rescue, which is designed, again, on the exact same firm fixed unit price with the same invoice substantiation requirements that were required.

**Q.** I was going to ask that question next.

So you did have a contract that was executed with Our Rescue; is that correct?

**A.** That's correct.

**Q.** And Our Rescue -- does that contract include invoice substantiation?

**A.** It does. It's designed around a very similar model to the competitive contract that is based on firm fixed unit price with very explicit invoice substantiation requirements.

**Q.** And Acacia had the opportunity to bid on that contract as well?

**A.** They did, yes.

Just to correct, it wasn't a bid. We offered them that same PWS as the bridge, and they turned it down.

**Q.** But as part of the initial solicitation in December 2025, that was -- that was bid out to any contractor; correct?

**A.** Anybody could put a bid on that as long as they met the qualifications.

**Q.** So Acacia could have bid on that contract in that solicitation; is that correct?
**A.** That is correct.
**Q.** When you're talking the bridge contract you were just referring to, which bridge -- you weren't talking about the initial bridge contract from August 2025, were you?
**A.** No. I'm talking about the bridge contract to Our Rescue.
**Q.** Okay. Now, there's a bridge -- are there discussions about a bridge contract with Acacia currently?
**A.** Yes, there is.
**Q.** Okay. And what's the purpose of that bridge contract?
**A.** That bridge contract is to -- for the purpose of case transition, to take those 21,902 cases that they reported in June and transition those to ORR's awardees, whether that be a cooperative agreement or a contractor.
**Q.** Okay. So once that information is forthcoming to ORR, what will happen?
**A.** That information was -- part of their case transition contract is to deliver information that we need to inform -- at this point, I'll just refer to it as USCRI, since the Our Rescue contract is currently protested.
But that data that they would provide as a deliverable under that contract would allow ORR to -- to determine which cases would be transferable to the new contract.
**Q.** You've had several questions today about ORR's efforts.

Is there anything else you would like to add about the efforts that ORR is making to provide the required legal services?

**A.** Yes. So it's -- I think it's important for the Court to understand that we took the and take, the preliminary injunction, extraordinary seriously. And we've made every effort to establish a contract to -- a competitive contract and then bridge contracts to provide continuity of those services that are required under the preliminary injunction.

We have been stopped through contractual mechanisms that are allowable under the Federal Acquisition Regulation to not be able to proceed with those plans. We have done everything to try to deliver a contract with no interruption at the end of the bridge contract. We have been unable to do that.

We've attempted to establish a bridge contract and have been stopped from doing that through allowable Federal Acquisition Regulation means.

So we've gone to using a cooperative agreement to deliver those services, and it takes time to ramp up to provide the same level of service to all of the places and all of the courts that were under the Acacia contract.

And it's important to note that the friends-of-court, which is naturally the way to provide an attorney in the courtroom coverage, while not equaling full representation, was a lever utilized extensively and allowably under the Acacia contract. And this is -- and so what you see as a

friend-of-court is very similar to what Acacia was providing under the last contract.

**Q.** To your knowledge, under the Acacia contract, was there 100 percent coverage of all legal services at all times?

**A.** There was not.

**Q.** I want to ask a couple more questions just about the current bridge contract negotiations with Acacia.

If that agreement is reached, what will happen to those cases that are currently being serviced by legal service providers?

**A.** Can you state the question again.

**Q.** Yes. Apologies.

There's a bridge contract currently under discussion. What's the purpose of that bridge contract?

**A.** This would be the bridge contract with Acacia, and this is to provide the transfer of all cases, all eligible cases, to ORR's new providers, and that would be accomplished within 120 days of award. And during that 120 days, Acacia and its legal service providers would continue to provide representation for those cases while they transition over to the new provider.

**Q.** Okay. So sort of -- legal services would continue under this contract until either the expiration of the contract date or a new legal service provider was available?

**A.** The -- that -- just to clarify, we have not come to an

agreement exactly with Acacia under the technical aspects of the contract, but, yes, that is our intent.

**Q.** Okay.

**MR. SILVIS:** Your Honor, may I confer briefly with counsel?

**THE COURT:** Yes, go ahead, with the one note that I have some questions about the last bit of narrative that you had.

Mr. Debany, I heard you try to sort of say -- explain more about friends-of-court. So as you can imagine, in my world, I'm used to that being amici, and those are folks who don't represent a party.

Is that true also for -- is that also true for the friends-of-court that you're describing? They don't represent anybody?

**THE WITNESS:** So I just want to clarify, ma'am, that my specialty is acquisition, not on legal services. But from what I've been informed, yes, that is an accurate description of friends-of-court in my usage.

**THE COURT:** And you mentioned earlier -- right -- well, I won't get this right, but right -- there's -- there was a contract with -- you'll please correct me.

There was a contract with Our Rescue, but there's a stop work on that; is that right?

**THE WITNESS:** That is correct. The contract still

exists, but it's just in stop work.

**THE COURT:** Okay. So let me ask: When there is a stop work on a contract, is it typical for the Government not to try to find another way to get the services contracted for?

**THE WITNESS:** That's -- it's complex for this one. All situations are different. This is a -- a -- the purpose of that one was to provide those services due to a stop work -- well, due to a protest, because this started because of -- the competitive contract was protested, so our -- our mitigation for that, one of our mitigations, was to create this bridge contract.

**THE COURT:** With Our Recuse --

**THE WITNESS:** That too was protested, and so that was our first defense against mitigation to ensure services was to award this -- this contract.

Now, we were under negotiations with a second contractor, because we had a multiple award strategy. That has since stopped, and -- so we're no longer able to continue with those negotiations. They've withdrawn from consideration.

But the -- the approach part of that is -- looking at it in its whole context is it wasn't just the Our Rescue and that other contract that we were working on, but awarding the cooperative agreement with USCRI is part of that as well.

But we -- we can't -- to fully answer your question, ma'am, we can't -- we can't compel any organization from

providing services to us without an existing instrument to provide those services.

**THE COURT:** Mr. Silvis.

**MR. SILVIS:** Thank you, Your Honor. Just a few more.

**BY MR. SILVIS:**

**Q.** Earlier I asked you about whether Acacia had 100 percent coverage of the legal services.

Do you remember that question?

**A.** Yes, I do.

**Q.** Are you able to estimate like what percentage you would think they have? Was it --

**A.** Well, first of all, let's -- there's -- to the judge's point that -- that friends-of-court is not considered representation, so taking that out of the equation -- and even with that, there was numerous cases of children not having representation.

I'm going to go out on a limb here and talk about some data that I have that I don't have right in front of me, so I -- please take this with a grain of salt as far as this.

But when we attended -- well, I'm sorry -- USCRI attended 1,600 hearings recently. Of that, approximately 366, I want to say, cases had E-28s that were filed; and with those 366 cases or so, only approximately 70 of which had representation had an attorney from a previous Acacia legal service provider provided only friends-of-court, which left from those cases

approximately 1,100 didn't have any representation.

**Q.** So what conclusion did you draw from that?

**A.** The conclusion is that under the previous contract, Acacia left quite a bit of cases that did not have direct representation, based on those numbers, and they also left at least 30 percent, approximately, of the obligated dollars for CLIN 2, which provides representation, unspent.

**Q.** You were asked questions earlier today about a number of open cases or a case list of approximately 2,500 [sic] unaccompanied children cases.

Do you recall that?

**A.** Say that again.

**Q.** You were asked questions about a caseload of approximately 25,000 cases.

Do you recall that earlier?

**A.** I don't think I used 25,000, but, yes, that's -- 24,000 was the number in November. Now it's 21,902.

**Q.** What does that number represent?

**A.** That is Acacia's active client list, and that is -- I may not get the words exactly right, but Acacia has defined that for us as -- as UAC that have entered into representation agreement with an Acacia contractor, a legal service provider, and until the case has been resolved.

**Q.** Okay. So of that 24,000 cases, are those all open cases?

**A.** According to Acacia, those are all open cases.

**Q.** Is your understanding -- do you have a different understanding of what that number is?
**A.** Our data does not support that all of those are -- are valid still, that several of them -- like approximately -- if you look at the data, maybe 3,000 cases of those we could not identify an E-28 or a -- an E-28 form. And some of those cases were for children that were no longer in the country.
**Q.** Okay. So you have reason to believe that that 24,000 number is significantly lower?
**A.** I believe that the actual active case is significantly lower, yes.
**Q.** And you've been around federal contracting for -- for quite some time; is that correct?
**A.** Yes, approximately 26 years.
**Q.** Is it a common practice to use a bid protest to slow down contracting decisions?
**A.** It's very common.
**Q.** Okay.
**THE COURT:** All done?
All right. Thank you.

**REDIRECT EXAMINATION**

**BY MS. FERREYRA:**
**Q.** Mr. Debany, you stated that Acacia did not provide adequate information to transition cases; correct?
**A.** That's correct.

**Q.** Would you have gotten the information to transition the cases if you had followed Acacia's April 10th proposal?
**A.** They did not provide us a proposal in April.
**Q.** They didn't provide you with a transition plan on April --
**A.** They did, but I wouldn't characterize that as a proposal, which is a different vehicle in contracting.
**Q.** But there was a transition plan included --
**A.** They provided a plan based on the terms and conditions of the contract, yes.
**Q.** And based on that plan, if it had been followed, would they have provided you with the information to transition the cases?
**A.** They would have provided information to the incoming contractor. Nowhere in their plan did they provide the data that ORR has been requesting for the many months prior to that.
**Q.** And just to confirm, Mr. Debany, the numbers that you just gave Mr. Silvis, you were talking about August cases right now specifically?
**A.** Could you be more explicit? I gave him a lot of different information. Which ones, please?
**Q.** The ones specifically where you were talking about the number of children represented versus unrepresented.
**A.** That data was from August 5th through September 3rd, I believe.
**Q.** So that was after the Acacia contract had expired?

**A.** It is, but in most cases, those children were in -- under Acacia well before the contract ended.
**Q.** Now, did Acacia's July 31st reporting share with you how many kids in ORR custody didn't have representation?
**A.** I do not recall. I do not specifically know the answer to that.
**Q.** Now, you mentioned that there's currently a stop-work order for Our Rescue for a contract with Our Rescue; correct?
**A.** Correct.
**Q.** Can you tell this Court when the GAO contract protest will be resolved?
**A.** If I remember correctly, it is November 24th. Thereabouts.
**Q.** November 24th of 20- --
**A.** 2026.
**Q.** 2026 is when it's anticipated?
**A.** Thereabouts. I believe that's the date, but it could be somewhere around that date.
**Q.** Okay. So there's no definitive date as of today that you can give the Court when a successor contract will be in place?
**A.** You're talking about the -- oh, I'm sorry. That's a different protest.
You're talking about the protest of the competitive contract?
**Q.** Correct, for Our Rescue.

**A.** That's a -- I'm sorry. It seems like you're discussing two different protests.
**Q.** So specifically right now there's a stop work order as to Our Rescue because there's a protest on that competitive contract; correct?
**A.** Correct.
**Q.** Do you have a timeline of when that protest will be resolved?
**A.** For the competitive?
**Q.** Correct.
**A.** That's September 23rd.
**Q.** Okay.
Now, if the Our Rescue protest is resolved, does this contract provide for a network of attorneys?
**A.** Our Rescue's performance work statement does require a nationwide network of attorneys.
**Q.** Do you know how many attorneys would be included?
**A.** We do not specify the number of attorneys. It's for the prime contractor to decide that.
**Q.** Now, as to services currently being provided, you mentioned that USCRI still has not reported to ORR exact numbers on representation; correct?
**A.** That is my understanding.
**Q.** Do you have a date in September of when they will be providing that information?

**A.** I do not know the exact date.

**Q.** Okay.

**MS. FERREYRA:** Your Honor, just a point for us. Because our briefing is due on September 18th and we don't know when that information will be available, we would ask to see if opposing counsel would make that information available to us for our briefing.

**THE COURT:** So this time is for you to ask Mr. Debany any questions. Are you done with Mr. Debany?

**MS. FERREYRA:** Your Honor, I don't have any additional questions for Mr. Debany at this time.

**THE COURT:** Okay. So let's let Mr. Debany leave the witness stand.

Thank you for time this afternoon, sir.

**MS. FERREYRA:** Thank you.

(Witness excused.)

**THE COURT:** So you're going to raise these questions with opposing counsel rather than asking the Court for assistance before talking to them. Talk to them. See if you want to stipulate to a different briefing schedule or try to see what data is available, have that conversation, and then I'll take either any stipulation or motion that you may have if you don't get agreement from opposing counsel.

But I apologize that you all have been in front of me enough that I think you know that I don't love being asked for

things before you've asked opposing counsel.

So ask them first and then come back to me.

Do you need anything else today, Ms. Ferreyra?

**MS. FERREYRA:** Can I confer with cocounsel very quickly?

**THE COURT:** Yes.

(Plaintiffs' counsel conferring.)

**MS. FERREYRA:** That would be all. Thank you, Your Honor.

**THE COURT:** Have a good afternoon.

(Proceedings adjourned at 3:22 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, September 8, 2026

Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court