BRETT A. SHUMATE
Assistant Attorney General
Civil Division
WILLIAM C. SILVIS
Assistant Director
MICHAEL A. CELONE
DANIEL SCHUTRUM-BOWARD
Senior Litigation Counsels
ZACHARY A. CARDIN
Trial Attorney

U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 532 - 4945
Michael.A.Celone@usdoj.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,

Defendants.

Case No. 4:25-cv-02847-AMO

**POST HEARING BRIEFING**

## I. INTRODUCTION

The hearing record forecloses any argument that Defendants have withheld funds. The Office of Refugee Resettlement (ORR) obligated $444 million in fiscal year 2026 for the legal services the preliminary injunction addresses, $33 million more than the $411 million spend plan ORR itself submitted to Congress, and Mr. Debany testified without qualification that ORR has "already spent beyond the expectation of Congress." Tr. 46:5-16. That figure includes $158 million obligated under a contract with Our Rescue. Performance under that contract is presently subject to a Competition in Contracting Act stay triggered by a separate bid protest, and Mr. Debany testified that he was aware of nothing ORR could do to lift that stop-work while the protest remained pending. Tr. 46:23-47:8.[1] An agency that has obligated more than it planned to spend, while a substantial additional funded contract is legally precluded from performance by a statutory protest stay, cannot fairly be characterized as having chosen to withdraw funding.

Plaintiffs contend instead that ORR is not providing direct representation at the same level it did while Acacia held the prime contract, holding out Acacia's alleged prior performance as the yardstick against which to measure USCRI's present performance. As an initial matter, there is no evidence in the record establishing Acacia's actual prior performance under the expired contract against which to compare USCRI's present performance during its ramp-up period. Furthermore, the TVPRA requires Defendants to ensure representation "to the greatest extent practicable," and the Foundational Rule likewise conditions ORR's obligation to fund direct representation on available appropriations and ORR's discretion. 45 C.F.R. § 410.1309(a)(4). The preliminary injunction enforces that standard; it does not convert a practicability requirement into an absolute guarantee of a particular staffing level without regard to

[1]The September 18, 2026 Government Accountability Office (GAO) decision, discussed *infra*, denied Acacia's June 15, 2026 protest challenging the terms of ORR's long-term competitive solicitation. GAO Decision at 1, 13. Acacia's August 17, 2026 protest challenging the award of the contract to Our Rescue is pending resolution.

intervening circumstances. As this Court has recognized, "maintaining the funding of legal representation for unaccompanied minors in accordance with the TVPRA and the Foundational Rule is the preliminary injunction's objective." Dkt. 172 at 2. As set forth below, the present level of direct representation, though still building toward the scope Acacia's network once provided, reflects what is presently feasible given ORR's dependence on third-parties, Acacia's own conduct, and an active bid-protest process, rather than any choice by Defendants to withdraw services.

## II. ORR HAS NOT WITHHELD FUNDS

Plaintiffs compare a historical average of $15.7 million per month under the Acacia contract to $4 million per month under the current cooperative agreement with USCRI. Tr. 36:22-37:25. That comparison omits the $158 million ORR has already obligated under its contract with Our Rescue, funding that remains available and will flow once the automatic stay imposed by Acacia's own bid protest is lifted. Tr. 46:23-47:3. Taken together, ORR obligated $444 million in fiscal year 2026 for these services, $33 million more than the $411 million spend plan it submitted to Congress. Tr. 46:5-16.

Plaintiffs further argue that obligating funds without releasing them for services violates the injunction regardless of the reason, invoking this Court's prior rejection of Defendants' position that funds were merely "available for immediate disbursement." Dkt. 169-1, ¶ 31. The circumstances here are different. The prior dispute involved Defendants voluntarily withholding payment pending invoice verification.[2] The Our Rescue funds are unavailable because a bid protest filed by Acacia has triggered an automatic stay under the Competition in Contracting Act, and Mr. Debany testified that ORR is "aware of nothing that we can do to change that stop work" while that protest remains pending. Tr. 46:23-47:8.

[2] Defendants note that all claims in Plaintiffs' complaint pertain to the withholding of payment for invoices submitted under the prior contract—an issue that has been indisputably resolved. Presently, there is no operative complaint in this matter that articulates a live case or controversy. Unless plaintiffs amend their pleading to articulate a live case or controversy promptly, Defendants intend to file an appropriate motion in the near future seeking dismissal of this matter.

A statutory stay imposed by operation of law in response to a third party's protest is not a voluntary withholding of funds within Defendants' control.

The lower current obligation under the USCRI cooperative agreement does not indicate a diminution in the government's commitment to comply with the preliminary injunction. It represents only the first obligation to initially establish services under the cooperative agreement. Increased funding is fully anticipated as it ramps-up services and develops its network.

The prior Acacia contract's time-and-materials billing for direct representation, compounded by Acacia's refusal to adequately substantiate that billing when requested, left ORR unable to confirm what services its payments actually purchased. Tr. 53:25-54:6. The solicited competitive 5-year procurement, as with the protested bridge contract with Our Rescue, uses a firm-fixed-unit-price model with invoice-substantiation requirements designed to tie payment to confirmed delivery of service. Tr. 52:20-53:19, 56:8-15. GAO has now independently upheld that approach, finding that ORR identified "real problems" with prior payment models, including improper incentives and wasteful overpayments, and reasonably adopted unit pricing to tie government payments more closely to actual service delivery. GAO Decision at 5-6. GAO likewise found reasonable ORR's requirement for supporting documentation sufficient to verify that invoiced charges correspond to services actually provided to eligible children. *Id.* at 11-13. Those findings reinforce that ORR's verification requirements reflect legitimate program-integrity concerns, not an effort to avoid providing legal services. Meanwhile, ORR and Acacia continue to negotiate a case-transfer arrangement under which Acacia's legal service providers could continue representing, and continue to be paid for, existing clients while eligible cases transition to successor providers. Tr. 39:22-25, 48:1-15, 58:25-59:22.

**III. THE QUESTION IS WHETHER DIRECT REPRESENTATION AT PRIOR LEVELS IS PRESENTLY FEASIBLE**

The TVPRA does not require universal representation without regard to circumstance; it requires Defendants to ensure representation "to the greatest extent practicable." The Foundational Rule likewise requires ORR to fund direct representation only "to the extent ORR determines that appropriations are available," and expressly makes that obligation "subject to ORR's discretion and available appropriations." 45 C.F.R. § 410.1309(a)(4). The preliminary injunction enforces that statutory and regulatory standard by requiring Defendants to maintain the services and funding provided as of March 20, 2025, a level of service that was feasible at that time because a specific contract vehicle, Acacia's, existed to deliver it and specific appropriated funds existed to pay for it. It does not follow that the same precise level of service remains feasible in perpetuity regardless of what becomes of the contract vehicle that delivered it. ORR does not itself employ the attorneys who provide direct representation to unaccompanied children; it funds and contracts with independent organizations that do. Tr. 60:25-61:2. When the vehicle that previously delivered a given level of service expires and cannot immediately be replaced, for reasons outside ORR's control, the question the injunction poses is whether ORR has done what is practicable to restore that level of service, not whether it has instantaneously replicated Acacia's decades-old legacy legal service provider network. The record set forth below establishes that it has.

**IV. DIRECT REPRESENTATION AT PRIOR LEVELS IS NOT PRESENTLY FEASIBLE BECAUSE ORR CAN ACT ONLY THROUGH THIRD-PARTY CONTRACTORS, AND ACACIA'S CONDUCT HAS OBSTRUCTED THE TRANSITION**

***A. The Transition Timeline Reflects Acacia's Conduct, Not Lack of Planning or Delay by ORR***

Plaintiffs characterize the three weeks between the June 15, 2026 protest and the start of bridge negotiations on July 2 (and the seven days of negotiation that followed) as unexplained delay. The record shows that those seven days ended because Acacia told ORR it could not meet the government's proposed terms—terms the GAO has since upheld as reasonable—not because Defendants simply abandoned

negotiations. Tr. 32:24-33:2, 35:9-12. Plaintiffs also treat the information at issue in those negotiations as identical to the CLIN 2 invoice documentation this Court previously addressed. Mr. Debany testified otherwise: the proposed bridge was a fixed-price vehicle and sought supporting documentation that was "similar," but "not entirely the same," as the time-and-materials documentation at issue in CLIN 2. Tr. 34:1-24. He testified that ORR sought documentation necessary to establish proper payment and allowability of costs, not attorney-client privileged information. Tr. 33:18-34:24. GAO's September 18, 2026 decision independently confirms that these were reasonable agency concerns. GAO found that ORR had experienced problems validating invoices under the prior UAC legal-services contract and reasonably revised its requirements to permit verification of the services actually provided. GAO Decision at 11-13. GAO also rejected Acacia's challenge to the related documentation requirements, while recognizing the solicitation's express position that the Government was not requiring disclosure of privileged or confidential information. *Id.* at 10-13. That Acacia was best positioned operationally to maintain continuity did not require ORR to abandon reasonable accountability requirements for a new federal contract. *See* Dkt. 177 at 6, ¶ 10; Tr. 53:25-54:6. As to case transition, Mr. Debany testified that no successor contract had been awarded before the Acacia contract expired and that ORR nonetheless continued pursuing a case-transfer arrangement with Acacia after expiration, including a revised proposal requested on August 27, 2026. Tr. 42:5-43:24, 44:1-11.

### *B. The Current Scope of Services Reflects a Reporting Lag and an Active Ramp-Up, Not a Withdrawal*

Plaintiffs' table of specific services Mr. Debany could not confirm as of September 8 conflates ORR's inability to state exact figures with an absence of service. Mr. Debany testified repeatedly that many of the categories Plaintiffs identify are covered under the USCRI cooperative agreement, while he lacked then-current utilization data because USCRI's first reporting period had not yet closed. Tr. 12:15-16:9, 16:18-21. Coverage under an agreement and confirmed utilization of that coverage are different

questions, and the record establishes the former even where Mr. Debany could not yet speak to all aspects of the latter. Plaintiffs also emphasize that only twelve E-28 notices of appearance had been filed as of September 3, 2026, out of a cooperative agreement expanded to approximately 22,000 children. That comparison should be read against the timeline: the expansion to the broader population occurred on August 26, 2026, approximately one week before that data point. Tr. 10:23-11:1, 19:6-8. And the 21,902 figure Plaintiffs use as the historical comparator was Acacia's reported "active client list," not a verified count of contemporaneously active, full-scope representations. Mr. Debany testified that ORR's data did not support treating every listed case as still active: ORR could not identify an E-28 for approximately 3,000 listed cases, and some listed children were no longer in the country. Tr. 62:19-63:12. The historical figure is therefore an unvalidated client-list count, not a like-for-like measure against USCRI's first weeks of newly entered appearances. Tr. 37:1-16.

And when asked directly whether Acacia had "100 percent coverage of all legal services at all times," Mr. Debany answered: "There was not." Tr. 58:3-8. He further testified that there were numerous instances in which children lacked direct representation under the prior arrangement. Tr. 61:14-62:8. Thus, the historical contract's statement of work may identify the services ORR purchased, but it does not by itself prove perfect historical performance or establish the actual volume of each service delivered on March 20, 2025. ORR's post-hearing review further explains that Acacia's monthly reports provided aggregate service counts that ORR could not independently validate, while Acacia's active-representation report consisted of A-numbers without information identifying the extent, type, or scope of the representation. ORR Overview at 4-5. By contrast, USCRI is subject to weekly, service-specific reporting and validation against independent data sources. *Id.* at 2, 4-5. Plaintiffs therefore compare current validated measures of particular services against historical self-reported aggregate and client-list data that did not permit the same verification.

Plaintiffs' characterization of the August 13, 2026 declaration's "100 percent coverage" statement is addressed directly in the same testimony Plaintiffs cite. Mr. Debany testified that, read in context, the statement described 100 percent coverage of the hearings USCRI was covering during its initial ramp-up period, not universal coverage of all unaccompanied children, and that in hindsight he would have worded the statement differently. Tr. 25:12-26:6. Defendants do not dispute that the statement was imprecise. But the record does not support treating an imprecisely worded declaration, corrected under oath at the first opportunity, as evidence of a substantive withdrawal of services. On friend-of-court appearances, Mr. Debany agreed that such appearances are not representation, and that under the Acacia contract they supplemented, rather than replaced, direct representation for the broader population Acacia served. Tr. 57:21-58:2. He also testified that friend-of-court appearances during the current transition serve the same purpose they served under Acacia: determining whether a child already has counsel, preserving time for consultation, and avoiding conflicting representation, before a new provider takes on a case as attorney of record. Tr. 57:24-58:2. The present reliance on that mechanism is a function of the same transition constraints described above, not a policy choice to substitute friend-of-court appearances for representation on a permanent basis. The subsequent data also show substantial courtroom activity during that transition: between August 5 and September 14, USCRI attended 1,852 of 1,975 hearings for children in care, or 93.8 percent, primarily in a Friend-of-Court capacity while direct representation ramps up. ORR Overview at 3. ORR reports that the remaining nonappearances included matters affected by initial restrictions on virtual appearances and hearings that were rescheduled, reset, moved to a different venue, not called, or otherwise procedurally altered. Id.

The ramp-up itself is not evidence that ORR elected to withdraw services. Mr. Debany testified that it would be "normal for any new provider to take time" to provide the full services covered by its agreement. Tr. 26:8-18. He later explained that, after contracting mechanisms impeded ORR's planned awards, ORR used the USCRI cooperative agreement as another means of delivering services and that "it

takes time to ramp up to provide the same level of service" across the locations and courts previously served through Acacia. Tr. 57:3-20. Nor was USCRI ever intended to reproduce the entire Acacia network alone. Mr. Debany testified that ORR's strategy since July 10 had been a multiple-award approach using both contract vehicles and the cooperative agreement. Tr. 49:1-10. Plaintiffs' comparison of the mature Acacia network to USCRI standing alone during the first weeks of expansion therefore does not measure ORR's overall compliance strategy. ORR's analysis supplies additional context for that ramp-up: under normal circumstances ORR would anticipate approximately 120 days for a provider newly onboarding immigration services, whereas the data before the Court reflect roughly the first 45 days of USCRI's expanded performance. ORR Overview at 6. By September 18, 1,419 of the 1,844 children then in ORR care had received legal orientations and 1,328 had received legal consultations, and ORR projected that the remaining children then in care would receive both by October 1. *Id*. USCRI also had 28 cleared attorneys assigned to the work, with four additional attorneys scheduled to begin shortly, while subaward staffing in progress included another 21 attorneys and more than 20 DOJ-accredited representatives. *Id*. at 6-7. These are concrete indicators of *expanding* capacity, not a static service model.

### *C. The Brief Gaps in Population Coverage Reflect the Same Transition Timeline, Not a Separate Failure*

Plaintiffs identify four specific gaps in population coverage: that no funded vehicle was providing services between the Acacia contract's expiration and USCRI's award on August 4, 2026, Tr. 21:5-15; that USCRI's initial scope did not extend to the more than 20,000 children already released from ORR custody until the agreement was expanded on August 26, 2026, Tr. 10:23-11:7; that Mr. Debany could not confirm the current geographic scope of USCRI's coverage, Tr. 25:2-6; and that Mr. Debany could not confirm whether every ORR shelter and immigration court presently has coverage, Tr. 39:2-8, even though he was not aware of any such location gap under the Acacia contract, Tr. 39:9-13. Each of these

traces to the same timeline and the same reporting lag already addressed above, rather than to any distinct or independent failure.

The period between the Acacia contract's expiration on July 31, 2026 and USCRI's award on August 4, 2026 is the same period during which ORR was finalizing the cooperative agreement that began performance the following day. USCRI's initial scope covered the approximately 2,000 children then in ORR's physical custody before expanding, three weeks later, to the approximately 22,000 children both in and out of care. Tr. 22:23-23:1. That sequencing prioritized children in direct government custody first, and reflects the pace of a phased expansion rather than any intent to leave released children unserved. As to geographic coverage, Mr. Debany's inability to state the current number of courts USCRI covers is the same data-reporting limitation described above. He testified that the cooperative agreement's stated objective is nationwide coverage of every court, and that USCRI's coverage has grown from an initial focus on nineteen states. Tr. 25:2-6, 39:9-14. The absence of confirmed, validated data on current geographic scope is not itself evidence that a gap exists, particularly where Mr. Debany testified he was not aware of any location that is completely uncovered. Tr. 39:9-11.

## **V. THE COURT SHOULD NOT ENFORCE THE INJUNCTION TO REQUIRE WHAT IS NOT PRESENTLY POSSIBLE**

"Where compliance is impossible, neither the moving party nor the court has any reason to proceed with [a] civil contempt action." *United States v. Rylander,* 460 U.S. 752, 757 (1983); *see also Maggio v. Zeitz,* 333 U.S. 56, 69 (1948). That principle applies with equal force to a request to enforce an injunction premised on a statutory practicability standard. The TVPRA and Foundational Rule never required ORR to guarantee a fixed level of direct representation without regard to whether the mechanism for delivering it remains available; they require ORR to act to the greatest extent practicable and subject to ORR's discretion and available appropriations. 45 C.F.R. § 410.1309(a)(4). ORR cannot be held in violation of

an order enforcing that standard for failing to achieve a result that presently depends on the cooperation of a third party it cannot compel.

The present gap in direct-representation capacity does not reflect a choice by ORR to withhold services. Acacia's protests have constrained ORR's contracting options, including through the stay of the Our Rescue award; Acacia did not accept the bridge terms ORR proposed in July; and ORR still had not received the case-level information it considered adequate to accomplish an orderly transfer of existing representations. Tr. 35:5-12, 46:23-48:7. Mr. Debany testified that ORR had "explored every opportunity legally available to it" to preserve continuity of legal services and, to the best of his knowledge, knew of nothing more ORR could then be doing. Tr. 46:17-47:2. He also explained the basic third-party constraint: ORR "can't compel any organization" to provide services without an existing instrument. Tr. 60:25-61:2. Nor was ORR required to abandon reasonable verification requirements merely because Acacia objected to them. GAO has now held that ORR reasonably sought documentation enabling it to verify performance and properly chargeable services, and denied Acacia's challenge to those solicitation terms. GAO Decision at 11-13. That decision concerned the long-term competitive solicitation and did not resolve or lift the separate protest stay affecting the Our Rescue award.

Plaintiffs point to the August 2025 bridge contract, executed "without any interruption of services," as proof that Defendants know how to navigate obstacles when they choose to. Dkt. 137 at 2. That contract was not a response to any bid protest. Mr. Debany testified it was a sole-source contract awarded before any competitive solicitation existed, entered into on an expedited basis precisely because there had not yet been time to design and compete a long-term replacement. Tr. 50:19-51:5. It is accordingly not evidence that Defendants know how to defeat a pending, statutorily automatic stay triggered by a third party's protest; no such stay existed in that instance. Bid protests of the kind Acacia has filed here are not unusual. Mr. Debany testified, based on twenty-six years of experience in federal contracting, that using a bid protest to slow a contracting decision is "very common." Tr. 63:11-18. That

a common and lawful process has repeatedly slowed ORR's efforts does not transform ORR's diligent, overlapping pursuit of USCRI, Our Rescue, and Burke Law Group into a manufactured excuse, nor does it render achievable, through an order of this Court, what remains presently infeasible.

## **VI. THE BROAD RELIEF PLAINTIFFS SEEK WOULD EXPAND THE INJUNCTION BY DIRECTING WORK TO ACACIA AND PLAINTIFFS IN WAYS NOT CONTEMPLATED BY THE INJUNCTION OR APPLICABLE LAW**

### ***A. Enforcement Should Be Limited to the Obligation the Injunction Actually Imposes***

The injunction prohibits Defendants from withdrawing the services or funds ORR provided as of March 20, 2025. It does not identify Acacia or Plaintiffs as the required provider, require preservation of any particular prime contractor or subcontractor LSP network, prescribe a contract type, or direct ORR to accept particular pricing, data, or invoicing terms. Nor does it require Defendants to coordinate transition planning with Plaintiffs directly or to file additional recurring reports. The Acacia contract expired on July 31, 2026; there is no existing Acacia contract for the Court simply to "restore." What Plaintiffs seek would therefore require some new instrument--a new contract, bridge arrangement, modification, or cooperative agreement--involving contractor selection, pricing, scope, data requirements, and other procurement judgments committed to the agency in the first instance. The Court may enforce the injunction's prohibition against withdrawal of services or funds without prescribing which private entity must provide those services or the federal vehicle and terms through which ORR must obtain them.

### ***B. The Transition and Reporting Relief Plaintiffs Seek Would Place Ongoing Procurement Administration Under Judicial Supervision***

Plaintiffs ask the Court to order Defendants to coordinate a transition plan with Plaintiffs and other former subcontractors directly. But the hearing established that ORR was already negotiating a paid Acacia transition bridge contract directed to that same practical objective. Mr. Debany testified that the contemplated arrangement would transition eligible cases over approximately 120 days and, during that

period, "Acacia and its legal service providers would continue to provide [paid] representation for those cases" while they transition to successor providers. Tr. 58:25-59:22; *see also* Tr. 48:1-15. Thus, to the extent Plaintiffs seek continued participation by the former legal service provider network during transition, ORR is already pursuing an instrument designed to fund precisely that continuity. A judicial directive prescribing additional coordination while the parties are negotiating the terms of that arrangement risks complicating rather than facilitating the transition. Plaintiffs also ask for weekly reporting (stepping down to monthly reporting only once the Court is satisfied) covering transition discussions, funding vehicles, future negotiations, and facility-level service and representation data. Ordering that degree of recurring disclosure regarding ongoing procurement negotiations and contractor selection would convert enforcement of a discrete prohibition into continuing administration of ORR's contracting process, and would force the same agency personnel working on these efforts to divert their attention to preparing reporting on their efforts.

To the extent the Court concludes that some additional reporting is warranted, it should be limited to objective, readily verifiable metrics and the status of relevant service vehicles, rather than the substance of ongoing negotiations, vendor selection, or terms still under discussion. Such reporting should also occur at reasonable intervals informed by the cadence at which reportable information is generated or received by the agency. Weekly reporting is likely to overtake the rate at which relevant information is available to the agency, and will create a situation in which the agency personnel working on these issues will have to divert significant time to generate reports about the agency's compliance efforts, thereby—ironically—hampering those same efforts. ORR's current analysis also explains why those representations cannot simply be reassigned en masse: transfer of individual cases may require informed client consent, court approval, and notice to USCIS or other adjudicatory bodies. ORR Overview at 7. Given the number of reported active matters and those individualized requirements, ORR anticipates approximately 120 days

to complete the transfer process. *Id*. That practical and ethical reality further counsels against a judicial directive that would prescribe the mechanics or timetable of the ongoing transition negotiations.

## VII. CONCLUSION

For the foregoing reasons, the record does not establish that ORR has chosen to withdraw funds or services. It instead shows substantial funding commitments, an active statutory protest stay, a ramp-up by a new provider, dependence on third parties ORR cannot compel, and continuing efforts—including the proposed Acacia transition bridge—to preserve and restore legal representation. Plaintiffs' comparison to the former Acacia arrangement also rests on contract requirements and an unvalidated client-list count rather than proof that the incumbent historically delivered every required service to every listed child. The Court should deny Plaintiffs' motion for further enforcement relief.

Dated: September 25, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

WILLIAM C. SILVIS
Assistant Director

MICHAEL A. CELONE
DANIEL SCHUTRUM-BOWARD
Senior Litigation Counsel

ZACHARY A. CARDIN
Trial Attorney

*/s/ Michael A. Celone*
MICHAEL A. CELONE
Senior Litigation Counsel
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
202-532-4945
Michael.A.Celone@usdoj.gov

*Attorneys for Defendants*