U.S. GOVERNMENT ACCOUNTABILITY OFFICE

441 G St. N.W.
Washington, DC 20548

Comptroller General
of the United States

DOCUMENT FOR PUBLIC RELEASE

The decision issued on the date below was subject to a GAO Protective Order. This redacted version has been approved for public release.

# Decision

**Matter of:** Acacia Center for Justice

**File:** B-424162.4

**Date:** September 18, 2026

Jonathan J. Frankel, Esq., and Karla J. Letsche, Esq., Frankel PLLC, for the protester.
Terrius D. Greene, Esq., and Tami S. Hagberg, Esq., Department of Health and Human Services, for the agency.
Jungi Hong, Esq., and Peter H. Tran, Esq., Office of the General Counsel, GAO, participated in the preparation of the decision.

## DIGEST

1. Protest challenging invoicing submission terms as unduly restrictive of competition is denied where the solicitation's requirements are reasonably related to the agency's requirements.

2. Protest challenging the scope of representation and hearing requirements as unduly restrictive of competition is denied where the protester's interpretation of the solicitation language is not reasonable when the solicitation is read as a whole and in a manner that gives effect to all of its provisions.

3. Protest challenging supporting documentation requirements for invoicing as unreasonable is denied where the agency has articulated a reasonable basis for imposing the requirement.

## DECISION

Acacia Center for Justice (Acacia), of Washington, D.C., protests the terms of request for proposals (RFP) No. 75P00126R00003, issued by the Department of Health and Human Services (HHS), Office of Refugee Resettlement (ORR) for legal services for unaccompanied alien children (UAC). The protester argues that the solicitation contains requirements that are unduly restrictive of competition or are otherwise unreasonable.

We deny the protest.

BACKGROUND

On November 24, 2025, using the procedures of the Revolutionary Federal Acquisition Regulation (FAR) Overhaul (RFO) parts 12 and 15, the agency issued the current solicitation seeking legal services for unaccompanied migrant children in ORR's care and custody as required by the Trafficking Victims Protection Reauthorization Act (TVPRA) of 2008, 8 U.S.C. § 1232, and ORR's regulations at 45 C.F.R. Part 10.[1] COS at 1; AR, Exh. 7, RFP at 2.[2] The solicitation contemplates the award of "a single hybrid-type contract, with the preponderance of services (direct legal representation) to be performed on a firm-fixed unit price (FFUP) basis," to include fixed-price contract line item numbers (CLINs) "for specified tasks and time-and-materials [] CLINs for the reimbursement of approved travel conducted under" the contract. RFP at 2-5. The RFP anticipates a 5-year period of performance, with a 1-year base period and four 1-year option periods. *Id.* at 8. Award is to be made on a best-value tradeoff basis, considering the following evaluation factors in descending order of importance: (1) scalability and pro bono integration capabilities; (2) technical approach; (3) past performance; and (4) price. *Id.* at 84. The performance work statement (PWS) lists 8 types of services for the contractor to provide, including direct representation legal services for unaccompanied children in immigration court and Department of Homeland Security (DHS) proceedings. AR, Exh. 8, PWS at 2, 12.

Acacia is the incumbent provider of the UAC legal services and recently received a bridge contract to provide these services, working on approximately 24,000 active UAC cases. COS at 1; PWS at 2 (stating the contractor will transition from the incumbent contract of approximately 24,000 active cases). On December 16, 2025, Acacia filed a protest with our Office challenging the terms of the RFP. COS at 2. In response, HHS informed our Office that it would take corrective action by reassessing its requirements and amending the solicitation; we dismissed the protest as academic on December 31. *Acacia Ctr. for Just.*, B-424162, Dec. 31, 2025 (unpublished decision). In April 2026, after subsequent amendments to the RFP, Acacia and another potential offeror filed new challenges to the terms of the solicitation. COS at 2. HHS notified our Office that it, again, would take corrective action by reassessing its requirements and amending the RFP as necessary. As a result, we dismissed the protests as academic on April 21. *ICF Inc., L.L.C.*, B-424162.2, Apr. 21, 2026 (unpublished decision); *Acacia Ctr. for Just.*, B-424162.3, Apr. 21, 2026 (unpublished decision). Subsequently, HHS issued new amendments that modified, among other things, the solicitation's PWS and invoicing

---

[1] The agency explains that HHS issued a class deviation on November 3, 2025, to follow the provisions of the RFO. Agency Report (AR), Exh. 12, Contracting Officer's Statement (COS) at 1; AR, Exh. 1, HHS FAR Class Deviation 2025-09; AR, Exh. 2, HHS FAR Class Deviation 2026-01 amend. 2.

[2] Citations to the record refer to the documents' internal Adobe PDF pagination. The RFP was amended seventeen times; reference to the RFP is to the conformed version at exhibit 7 of the agency report. COS at 2.

procedures, and extended the proposal submission deadline to June 15, 2026. COS at 2; Decl. of Chief for Division of Acquisition Requirements at 3.

Multiple offerors, including Acacia, submitted proposals by the June 15 closing date. RFP at 76; COS at 2. Prior to the closing time for proposal submissions, Acacia filed this protest.

DISCUSSION

The protester argues that the terms of the solicitation are either unduly restrictive of competition or unreasonable in several respects. First, Acacia challenges the requirement to submit invoices after completing direct representation services, which it contends is unduly restrictive because the contractor must wait an unreasonable time to receive final documentation. Protest at 13-20; Comments at 15-19. Second, Acacia argues that the solicitation is unduly restrictive because it requires the contractor to represent all unaccompanied children, without HHS providing the information and funding for the contractor to adequately comply. Protest at 20-25; Comments at 19-22. Third, the protester alleges the supporting documentation for invoicing is unreasonable because it obligates the contractor to violate its ethical obligations by submitting potentially identifiable information and confidential information without the client's informed consent to invoice and receive payments. Protest at 25-31; Comments at 22-27. While we do not specifically address every argument, we have considered them all and conclude that none provide a basis to sustain the protest.

Interested Party

As an initial matter, HHS contends the protester is not an interested party to pursue the protest because Acacia submitted a proposal that did not take exception to the disputed solicitation terms. Memorandum of Law (MOL) at 5-7, 9. Acacia contends there is "no rule holding that a party that submits a proposal under a restrictive solicitation automatically forfeits its standing as an interested party to challenge those restrictions." Comments at 4. The protester asserts that despite submitting a timely proposal, it has suffered competitive harm as a result of the restrictive solicitation requirements. *Id.* at 6-7.

Under the bid protest provisions of the Competition in Contracting Act of 1984, 31 U.S.C. §§ 3551-3557, only an "interested party" may protest a federal procurement. That is, a protester must be an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of a contract or the failure to award a contract. 4 C.F.R. § 21.0(a)(1). Determining whether a party is interested involves consideration of a variety of factors, including the nature of issues raised, the benefit or relief sought by the protester, and the party's status in relation to the procurement. *RELM Wireless Corp.*, B-405358, Oct. 7, 2011, at 2. Where a protester challenges the terms of a solicitation and the remedy sought is the opportunity to compete under a revised solicitation, it is an interested party to pursue the protest regardless of whether or not it submitted--or could have submitted--a bid or offer under the challenged

solicitation, so long as the challenged requirement has compromised its competitive position. *MLS-Multinational Logistic Servs., Ltd.*, B-415782, B-415782.2, Mar. 7, 2018, at 3; *Johnson Controls, Inc.*, B-243605, Aug. 1, 1991, at 4.

In our view, Acacia is an interested party because the protester argues the solicitation must be canceled or amended in a way that reasonably could materially affect the resulting competition. In this respect, the protester contends that the unduly restrictive portions of the solicitation prevent the firm from offering more competitive pricing, and that Acacia also risks submitting a non-responsive proposal if the firm does not agree to turn over, for invoicing, materials Acacia deems confidential or privileged. Comments at 7-13. Given the economic harm articulated by the protester and the relief sought, we find Acacia to be an interested party to pursue its protest regardless of whether it submitted an offer under the challenged solicitation. *Johnson Controls*, *supra*.

Unduly Restrictive Requirements

Next, we address the protester's challenges to the terms of the solicitation as being unduly restrictive of competition.

Waiting Period Before Invoice Submission

Acacia objects to the solicitation's requirement, which, according to the protester, requires the contractor to complete services and a federal or state adjudicator to issue "its final decision" before the contractor can submit invoices for payment. Protest at 13-20; Comments at 15-19. The protester contends waiting to invoice an entire service (or a post-filing phase of a service) until after it has a decision from immigration proceedings is unreasonable and unduly restrictive due to the excessive wait times for such adjudications. Protest at 13. For example, Acacia cites DHS's statistics on final adjudications, which state a "T visa" takes on average over 21 months, and a "U visa" takes on average 72 months.[3] *Id.* at 15. Acacia argues this structure is unnecessary and unduly restricts competition to offerors who can bear such cash burdens when waiting to invoice. *Id.* at 13. The agency responds that the new invoice requirements are reasonable because ORR has documented issues with its previous payment model that justifies the agency's current approach. MOL at 6.

In preparing a solicitation, a contracting agency must solicit offers in a manner designed to achieve full and open competition, and "include restrictive provisions or conditions only to the extent necessary to satisfy the needs" of the agency. 41 U.S.C.

---

[3] According to the PWS, a "T nonimmigrant status visa," or T visa, is a "temporary federal visa for victims of severe form of human trafficking, which includes sex trafficking and labor trafficking involving force, fraud, or coercion." PWS at 12. Similarly, a "U nonimmigrant status visa," or U visa, is a "temporary federal visa for victims of substantial mental or physical abuse resulting from certain crimes, such as domestic violence, sexual assault, or trafficking." *Id.* at 13.

§ 3306(a)(2)(B). The determination of the agency's needs and the best method of accommodating them is primarily the responsibility of the procuring agency. *Columbia Imaging, Inc.*, B-286772.2, B-287363, Apr. 13, 2001, at 2. To the extent a protester challenges a specification as unduly restrictive, that is, challenges both the restrictive nature of the requirement as well as the agency's need for the restriction, the procuring agency has the responsibility of establishing that the specification is reasonably necessary to meet its needs. *Smith & Nephew, Inc.*, B-410453, Jan. 2, 2015, at 5. The adequacy of the agency's justification is ascertained through examining whether the agency's explanation is reasonable, in other words, whether it can withstand logical scrutiny. *Id.* Our Office will not sustain a protest challenging an agency's determination of its needs unless the protester presents clear and convincing evidence that the specifications are in fact impossible to meet or unduly restrict competition. *Instrument Control Serv., Inc.; Science & Mgmt. Res., Inc.*, B-289660, B-289660.2, Apr. 15, 2002, at 6.

As relevant to this protest, the solicitation contains firm-fixed unit price line items for direct legal representation services. RFP at 2-3; PWS at 12. Under these CLINs, the contractor will be responsible for performing a variety of legal services for unaccompanied children in or released from ORR custody. PWS at 1. The solicitation bases payment on a "fee for service" model where the offeror provides a firm-fixed unit price for each legal service that it performs on an as-required basis. RFP at 2-3. Depending on the type of legal service, the PWS either considers the service to be an entire unit to be invoiced with documentation, or requires the contractor to invoice at the conclusion of each "phase" of the service, providing sufficient evidence for each phase. PWS at 12. For example, the contractor completes temporary protected status services as a single unit, submitting invoices only after service completion.[4] *Id.* at 15. In comparison, the PWS bifurcates T Visa services into two invoicing phases. The first phase occurs when the contractor submits its notice of entry of appearance and confirmation of filing the appropriate application/petition with the United States Citizenship and Immigration Services (USCIS). *Id.* at 12-13. For the second phase, the contractor provides post-filing services and submits the USCIS decision and any applicable Executive Office for Immigration Review (EOIR) filing receipts and orders to support the invoice. *Id.* at 13.

In adopting a firm-fixed unit price invoicing model, ORR maintains that it is reasonably "taking lessons learned from its prior contracts to inform its current requirements." MOL at 7. The agency explains that the current pricing model resulted from multiple rounds of market research conducted by HHS. The initial market research in October 2025 "surveyed the availability of sources to meet the UAC legal services requirement." *Id.* at 6. The agency performed supplemental market research in May 2026 to look

[4] A "temporary protected status" is "a temporary, renewable immigration designation granted by the DHS Secretary to foreign nationals in the U.S. who cannot safely return to their home country due to armed conflict, environmental disasters, or extraordinary, temporary conditions." PWS at 15.

specifically at the "[firm-fixed unit price] services model for legal representation services." *Id.* According to HHS, the agency's prior contracts for UAC legal services utilized time-and-materials and firm-fixed price models for direct legal representation services. AR, Exh. 6, Market Research Report Addendum at 1. Under the time-and-material model, the agency paid the contractor "for allowable hours and materials associated with the provision of legal services, but the contractor was not incentivized to perform efficiently or minimize costs for services rendered to each UAC." *Id.* The agency also found firm-fixed price payments for direct representation services wasteful because it "paid a multi-million-dollar fixed price regardless of the number of UAC that received services." *Id.* HHS selected the firm-fixed unit price model "to implement a balanced approach to more closely tie the price the Government pays to each instance of service delivery." *Id.* The agency determined that using a firm-fixed unit price allows HHS to "know how much it will be paying for each service, which enables ORR to more effectively manage the funds appropriated to the UAC program," and that adopting the firm-fixed unit pricing model would "best accommodate program accountability and efficiency requirements."[5] *Id.* at 2.

Acacia generally disagrees with the agency's rationale for the invoicing terms, maintaining "HHS never explains why these drastic changes are necessary to meet its needs, or even what those needs are." Comments at 15. The protester, however, has not presented clear and convincing evidence that the specifications are in fact impossible to meet or unduly restrict competition. *Instrument Control Serv.*, *supra*. In this regard, Acacia has not alleged that the invoicing procedures violate any law or regulation, nor are we aware of such. Moreover, the record shows that HHS has adequately documented its rationale for establishing the solicitation's firm-fixed unit pricing model. Specifically, the agency identified real problems with alternative payment models, which included improper incentives, and wasteful over payments. The current model is an attempt to address those specific concerns, and the protester fails to address how the agency's selected approach does not in fact address those concerns. While the selected reimbursement structure may be burdensome or increase the contractor's risk, as our Office has noted, an agency may provide for a competition that imposes maximum risks on the contractor and minimum burdens on the agency, provided the solicitation contains sufficient information for offerors to compete intelligently and on equal terms. *Phoenix Env't. Design, Inc.*, B-411746, Oct. 14, 2015, at 3. On this record, we find unobjectionable the solicitation's use of the firm-fixed unit pricing model, as well as the requirement that the contractor submit invoices after completion of service (or identified phase of service). Accordingly, we deny the

---

[5] As part of its market research, HHS examined available information from marketplace surveys, law firms, non-profit organizations, and "academic/Non-Government Organizations to determine whether flat and fixed rate pricing specific to immigration relief services is a standard commercial practice." AR, Exh. 6, Market Research Report Addendum at 2. The report noted that "[f]lat or fixed rate prices were generally available and served to support the viability of an FFUP model consistent with the programmatic intent" of the agency. *Id.*

protester's allegation that these solicitation terms are unduly restrictive of competition. *Second St. Holdings LLC*, B-417006, Jan. 17, 2019, at 7 (finding provision which merely affects desirability of competing, but did not prevent firms from competing, does not actually present a question of unduly restrictive terms).

Representation of all UACs and Hearing Requirements

Next, the protester alleges the RFP unduly restricts competition because it creates a duty for the contractor to appear at every hearing for every child, estimated to be 126,000, even though HHS refuses to provide a case docketing system or reasonable alternative for the contractor to comply with the requirement to enter appearances in all proceedings. Protest at 20-25. HHS responds that "Acacia's protest rests on an unreasonable interpretation of the solicitation that ignores the plain language of the PWS and the Q&As." MOL at 8.

When a dispute exists as to a solicitation's requirements, we will first examine the plain language of the solicitation and will resolve the dispute by reading the solicitation as a whole and in a manner that gives effect to all of its provisions. *CMSoft, Inc.*, B-419370, Jan. 26, 2021, at 4. To be reasonable, and therefore valid, an interpretation must be consistent with the solicitation when read as a whole and in a reasonable manner. *Id.*; *Crew Training Int'l, Inc.*, B-414126, Feb. 7, 2017, at 4. If the solicitation is unambiguous our inquiry ceases; an ambiguity exists, however, where two or more reasonable interpretations of the terms of the solicitation are possible. *CMSoft*, *supra* at 4; *Perimeter Sec. Partners, LLC*, B-422666.4, Mar. 11, 2025, at 5.

Acacia alleges that the PWS obligates the legal services contractor to "appear at *every* court or DHS hearing on behalf of *virtually all* 126,000+ of these children." Comments at 19. In support of this contention, the protester cites to specific provisions of the PWS. The first provision, found in PWS section C.4.2.4.1.6, states: "The Contractor shall ensure that a qualified legal representative is present and has entered an appearance at all scheduled immigration court proceedings and any other DHS-related proceedings for each UAC. This requirement applies to all UAC identified in C.4.2.4.1.1." PWS at 12. Section C.4.2.4.1.1 of the PWS, in turn, states: "The Contractor shall provide direct legal representation to UAC who are currently in, or have been released from, ORR custody and who have not left the United States so long as representation was initiated prior to the UAC's 18th birthday and prior to immigration relief being granted." *Id*. at 11. In Acacia's view, these provisions, taken together, requires the contractor to "ensure counsel appear at ***every*** court or DHS hearing on behalf of ***every*** child who is in or has been released [from ORR] custody." Protest at 21. According to the protester, because the solicitation considers a single occurrence of children appearing without representation a "material contractual non-conformance," Acacia contends the requirement "is utterly unworkable, let alone reasonable or practicable." *Id.* at 22.

Relevant here, the PWS identifies eight specific tasks to be performed by the contractor.[6] PWS at 2. Acacia's allegation is specific to PWS task four: Direct Legal Representation. The protester reads the task's general requirements at section C.4.2.4.1.1--stating the contractor must ensure a qualified legal representative is present at proceedings for "each UAC"--without placing it within the context of the task's specific requirements. In this regard, HHS explains that task four only requires that the contractor "offer access to direct representation to UAC," and that the task does not state the contractor must provide in-court representation services for 100% of UAC in ORR's care and custody. MOL at 8 (quoting PWS section C.4.2.4); COS at 3. As such, the agency contends the scope of direct representation services is limited to the children that accept the offered representation services. MOL at 8. According to ORR, had the agency "intended for the contractor to provide direct legal representation services to every UAC in or released from ORR custody, the Agency could have used explicit language to require it, just as it did in Sections C.4.2.2 and C.4.2.3 to require the contractor to provide legal orientations [task two] and legal consultations [task three]" services to "100% of UAC in ORR custody." *Id.* (quoting PWS section C.4.2.2 and C.4.2.3).

Moreover, the agency explains this requirement was further clarified in the solicitation's Q&A. COS at 3. Specifically, a prospective offeror asked: "Can the government confirm this requirement [C.4.2.4.1.6] does not apply to 1) children who have private counsel and 2) children who decline representation by a qualified legal representative?" AR, Exh. 10, RFP attach. L Q&As (Question 10) at 5. The agency provided the following response:

> Per C.4.2.4.1.6, "the Contractor shall ensure that a qualified legal representative is present and has entered an appearance at all scheduled immigration court proceedings and any other DHS-related proceedings for each UAC." If either of the two circumstances in the question preclude the Contractor from providing representation, the Contractor shall document the circumstances and notify the COR [contracting officer's representative]. This would not be considered contractual non-conformance.

*Id.* In the agency's view, because the "PWS states that ORR is required by statute to provide UAC access to legal counsel to the greatest extent practicable, and the purpose of the contract is to acquire legal services for UAC . . . the hearing attendance requirements are reasonable."[7] COS at 3. We agree with the agency.

---

[6] The tasks are: (1) Transition-In; (2) Legal Orientations; (3) Legal Consultations; (4) Direct Legal Representation; (5) Legal Service Provider (LSP) Network Management; (6) Data Collection, Analysis, and Reporting; (7) Pro Bono Maximation; and (8) Transition-Out. PWS at 2.

[7] Section C.4.2.4, which provides the preamble to task four of the PWS, states:

(continued...)

Contrary to the protester's allegation, the solicitation does not require the contractor to "ensure counsel appear at ***every*** court or DHS hearing on behalf of ***every*** child who is in or has been released [from ORR] custody," and that "***[a]ny*** instance of a missed court or DHS appearance is deemed to be a ***material contractual non-conformance***." Protest at 21, 22. As discussed above, section C.4.2.4 of the PWS requires that "the Contractor . . . offer access to direct legal representation to UAC." PWS at 10. The scope of direct representation services, therefore, are limited to the children that accept those services, and the solicitation's Q&As confirm that it would not find a contractual non-conformance where an unaccompanied child proceeds without representation under those circumstances.[8] MOL at 8; AR, Exh. 10, RFP attach. L Q&As (Question 10) at 5. As such, we find the protester's interpretation of the solicitation to be unreasonable, when read as a whole and in a manner that gives effect to all of its provisions. *Global-PPE, Inc.*, B-419536, Mar. 10, 2021, at 3.

Where, as here, the agency has established that the challenged specification is reasonably necessary to meet its needs--and the protester's claim is premised on an unreasonable reading of the solicitation--Acacia has failed to meet its burden to present clear and convincing evidence that the specifications are in fact impossible to meet or unduly restrict competition.[9] *See Louis Berger Servs., Inc.*, B-410024, Oct. 10, 2014, at 4-5.

---

(...continued)

> Pursuant to the TVPRA at 8 USC 1232(c)(5), HHS is generally required to "ensure, to the greatest extent practicable" and consistent with 8 USC 1362 (i.e., "at no expense to the Government") that UAC have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking—making every effort to utilize the services of pro bono counsel who agree to provide services to such children without charge.

PWS at 10.

[8] In its comments, Acacia concedes that some children will have private counsel or proceed without representation, but argues this number is "trivial." Comments at 19 n.7. According to the protester, its legal service providers "performed 216,927 initial legal screenings," and of that number, "only 52 children had private counsel, and 964 children declined legal representation." *Id.*

[9] In any event, we find nothing inherently unreasonable with the solicitation's requirement to provide legal representation to any client that requests it when appearing before administrative hearings or court proceedings. To the extent that the protester's true concern is that the requirement is unduly burdensome due to the high number of potential clients, as discussed above, an agency may provide for a competition that imposes maximum risks on the contractor and minimum burdens on the agency,

(continued...)

In the second part to this claim, the protester contends that it is unable to compete intelligently because HHS refuses to offer information on hearings and appearances, and rejects any alternatives like providing a docketing system. Protest at 22-24. This argument is similarly flawed because it is predicated on Acacia's unreasonable interpretation of the scope of the requirement to represent unaccompanied children. *See Magellan Fed., Inc.*, B-422890.2, Dec. 17, 2024, at 8 (declining to address collateral argument found to be derivative of allegation found to be without merit); *ERP Servs., Inc.*, B-419315, Feb. 24, 2021, at 3 n.4 (same). In any event, there is nothing to suggest that the agency is withholding key information within its possession. The hearings and appearances at issue are future events. Rather, the crux of the protester's concerns are with the fundamental challenges that the contractor will face during performance of the contract. Comments at 20-22. While Acacia would prefer that the agency take actions, to include providing the contractor some sort of docketing or case tracking system (a system the agency does not currently have) to help manage the contractor's caseload and assist the contractor with tracking required hearings and appearances, the agency is under no obligation to ease the burdens of its requirements for the contractor. Protest at 23. Again, the agency can place the maximum burdens and risks of its requirements on the contractor. *Phoenix Env't. Design*, *supra* at 3. Accordingly, the protester's arguments in this regard are without merit and denied.

Unreasonable Documentation Requirement

Lastly, Acacia objects to the requirement to supply supporting documentation for invoices. The protester claims the provision is unreasonable because the required supporting information for payment includes personally identifying information (PII) and confidential information about a direct representation service. Protest at 25-26. In this connection, Acacia contends that linking a client's "A number" to USCIS decisions, EOIR orders, travel plan descriptions, and more, constitute PII and confidential materials that legal providers are ethically barred from turning over without their clients' informed consent.[10] *Id.* at 26-30. Acacia contends the supporting documentation requirement is unreasonable because the attorney service provider might not be able to recommend that disclosure of such information to clients is in the client's best interests, and the solicitation does not provide alternative means for payment if the client declines to disclose the information. *Id.* at 30. In response, the agency maintains the solicitation provides a mechanism for ethical conflicts and the specific supporting documentation to

---

(...continued)
provided the solicitation contains sufficient information for offerors to compete intelligently and on equal terms. *Phoenix Env't. Design*, *supra* at 3.

[10] An "A number," assigned to all unaccompanied children when initially taken into federal custody, "is a unique alphanumeric identifier created by DHS" which "serve[s] as the principal means of identifying individual unaccompanied children and facilitating and tracking their interactions with federal, state, and local government entities." Decl. of Chief for Division of Acquisition Requirements at 2.

the invoices is reasonably related to its current minimum needs. Resp. to GAO Req. at 2-3.

The solicitation's general invoicing requirements state invoices "shall not include any personally identifiable information or other potentially sensitive UAC-related information." RFP at 12. The RFP, however, also requires invoices to have supporting documentation, which includes the "direct representation case inventory report." *Id.* The case inventory report is "a master spreadsheet in Microsoft Excel" that lists, among other things, the supporting documentation to invoice for payment, by identified PWS service. AR, Exh. 9, Attachment K Direct Representation Case Inventory Report. For example, the contractor must provide copies of the USCIS decision and the EOIR order to invoice for T visa application services. *Id.* at 2. The supporting documentation must link to the unaccompanied child's A number in all submissions. RFP at 12. Additionally, for travel greater than 50 miles, the PWS requires the contractor to submit travel plans that "shall include the purpose to include services to be performed" and "must be 100% accurately linked to A Number(s)." PWS at 35. The RFP states that in the event of an ethical conflict, the provider "shall promptly notify the COR [contracting officer's representative] in writing within 24 hours, identify the conflict, and seek ORR guidance to resolve the conflict in a manner consistent with ORR's statutory mandates." RFP at 17-18.

As discussed above, the determination of a contracting agency's needs and the best method of accommodating them are matters primarily with the procuring agency's discretion. *See Trigent Sols., Inc.*, B-419801, August 6, 2021, at 4. We will not disturb an agency's choice of procurement approach absent clear evidence that such an approach is arbitrary or unreasonable or in violation of statute or regulation. *Supreme Foodservice GmbH*, B-405400, B-405400.2, Oct. 31, 2011, at 10. Here, we find HHS has established a reasonable basis for the solicitation's supporting documentation requirement for invoicing. The agency avers that, in preparing to re-compete the current legal services contracts, the agency and the protester were involved in an invoicing dispute under the prior contract. Resp. to GAO Req. at 2; *see also* Protest at 30 n. 20. According to HHS, the agency had recently experienced "issues . . . validating invoices under the current UAC legal services contract," and were concerned that its invoicing procedures were not adequately verifying legal services for unaccompanied children.[11] COS at 3; Resp. to GAO Req. at 2. In the agency's view, "it was prudent to reconsider its invoicing and payment requirements and to revise [the current RFP] to ensure the new legal services contract clearly specifies the documentation and information that enables ORR to verify the services being provided"

---

[11] While, the protester challenges the nature and account of the invoicing dispute, Acacia acknowledges that in April 2026, ORR requested "additional supporting data to 'validate' Acacia's invoices for services performed in December 2025" and that, over the next several months, "Acacia *repeatedly* answered ORR's asserted concerns with alleged discrepancies in the December 2025 invoice." Acacia Reply to Further Resp. at 6.

and, therefore, validate the contractor's invoices for payment. Decl. of Chief for Division of Acquisition Requirements at 3. With the RFP's supporting documentation requirement, the agency represents that it seeks to primarily "verify that invoiced charges correspond to direct representation services provided to an eligible unaccompanied child during the relevant billing period and that the claimed charges are properly chargeable under the contract." *Id.* at 5. For example, HHS explains that having final USCIS decisions and EOIR orders allows the agency "to verify the appropriateness of continued billing and prevent payment for services on closed cases." *Id.* at 4.

The protester generally disagrees with the agency's rationale for its supporting documentation terms, responding that HHS fails to show such requirements are reasonably necessary, and arguing that the agency had not directly addressed the firm's contention that attorneys are ethically barred from turning over confidential information in the supporting documentation for invoicing. Acacia Reply to Further Resp. at 2-5, 8-12.

Our review of the record finds that HHS has adequately articulated a basis to demonstrate that the RFP's documentation requirement for invoicing is reasonably necessary to meet the agency's needs. For example, with respect to Acacia's argument that providers cannot link A numbers with invoicing documentation because the A numbers contain PII or confidential information, the protester does acknowledge that, in the prior contract, providing A numbers was necessary to verify services rendered. Protest at 31. In this regard, Acacia previously provided HHS "with an aggregated list of A numbers showing all of the children it has represented during the invoice period, but not identifying the specific legal work performed for each client." *Id.* While the protester takes issue with linking A numbers to individual supporting documentation--rather than in an aggregate list--we do not find objectionable the agency's explanation that the "invoicing requirements are intended to enable ORR . . . to verify that invoiced charges correspond to direct representation services provided to an eligible unaccompanied child during the relevant billing period and that the claimed charges are properly chargeable under the contract." Decl. of Chief for Division of Acquisition Requirements at 5.

Acacia also contends that linking the A numbers to supporting documentation supplies "improper visibility" into the attorney-client relationship and future litigation strategies. Protest at 28. For example, the protester claims linking A numbers to the description of attorney's travel plans of more than 50 miles is improper, arguing the requirement for travel plans to share "the purpose to include services to be performed" will contain confidential and strategic information. *Id.* (citing to PWS at 35). The agency responds that the requested travel plan only seeks "general" information on the purpose of travel and type of work to be performed but does not require the disclosure of confidential information. Decl. of Chief for Division of Acquisition Requirements at 4-5. While we recognize the protester's concerns regarding the disclosure of attorney travel plans in the representation of UACs, we find such required invoicing information to be limited and are reasonably necessary to meet the agency's needs for verification. Here, for

travel of more than 50 miles, the RFP simply requires the contractor to submit travel plans that "include the purpose to include services to be performed." PWS at 35. Contrary to the protester's assertions, the provision does not require the contractor to provide "visibility into the attorneys' relationships with their clients" or "advance notice of their contemplated next steps." Protest at 28. Furthermore, the agency maintains--and the solicitation reiterates--that the "Government is not requiring disclosure of any confidential or privileged information," with regards to the documentation requirements. AR, Exh. 10, RFP attach. L Q&As at 13-14 (Questions 19 and 20); Decl. of Chief for Division of Acquisition Requirements at 5.

In sum, we find the solicitation's requirement for the contractor to provide supporting documentation for invoicing is reasonably necessary to meet ORR's needs to verify performance. Although the protester contends that the requirements have "added performance risk to its Pro Bono Services plan and increased the proposal's cost," the fact that a requirement may be burdensome or even impossible for a particular firm to meet does not make it objectionable if the requirement properly reflects the agency's needs. Protest at 31; *Supreme Foodservice*, *supra* at 10. On the record here, we find no basis to sustain the allegation.

This protest is denied.

Edda Emmanuelli Perez
General Counsel